UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -- -X

Entesar Osman Kashef; Sara Noureldirz Abdalla;
Alfadel Mosabal; Abubakar Abakar; Siama
Abdelnabi Hamad; Abbo Ahmed Abakar; Hawa
Mohamed Omar; Jane Doe; Shafika G. Hassan;
Nyanriak Tingloth; Reverend Anderia Lual; Jane
Roe; Nicolas Hakim Lukudu; Turjuman Ramadan
Adam; Judy Doe; Johnmark Majuc; Joseph Jok,
Ambrose Martin Ulau; Sandi (Sunday) Georgari
Marjan; Halima Samuel Khalifa; and Amir
Ahmed

                **Case 1:16-cv-03228-AJN**

            Plaintiffs,

– against –                  **JURY TRIAL DEMANDED**

BNP Paribas, S.A., a French corporation; BNP
Paribas, S.A. New York Branch, a foreign branch;
BNP Paribas North America, Inc., a Delaware
corporation; and DOES 2-10;

            Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -- -X

## <u>SECOND AMENDED COMPLAINT</u>

# TABLE OF CONTENTS

**PAGE(S)**

I.      INTRODUCTION ................................................................................... 1

II.     THE PARTIES ...................................................................................... 11

     A.    The Plaintiffs ................................................................................ 11

     B.    Representative Plaintiffs ............................................................. 13

     C.    Defendants .................................................................................... 31

III.    JURISDICTION AND VENUE ........................................................ 32

IV.    FACTUAL BACKGROUND ............................................................. 36

     A.    The Repressive Secession of the South Sudan Government of
         Sudan Sought to Exploit Its Oil Resources .............................. 36

         1.    The al-Bashir Regime .................................................... 36

         2.    Sudan's 1997 Entry Into International Oil Markets ..... 38

         3.    To Capitalize on Oil Exports, the GOS Needed Access to
              "Petrodollars," Which BNPP Agreed to Provide ......... 39

     B.    U.S. Sanctions Implemented U.S. Policy Opposing the
         Government of Sudan's Persecution of Disfavored Sudanese
         Civilians and the Use of Oil Income to Finance Such Persecution ...... 41

     C.    BNPP Agreed and Conspired with the GOS to Provide Illegal
         Access to U.S. Financial Markets with the Understanding That
         This Would Sustain and Expand the GOS's Campaign of Violence
         and Internal Repression ............................................................. 48

     D.    With Access to Petrodollars Provided by BNPP, Sudan's Exports
         of Oil and Revenues Rose Dramatically ................................... 53

     E.    As a Result of Increased Oil Revenues, Military Spending Grew,
         Both in Total Dollars and as a Percentage of Government Spending ... 55

     F.    Sudan Used its Oil Revenue to Buy and Manufacture Weapons and
         Weapons Delivery Systems ......................................................... 57

i

G.      Well-Funded by Oil Revenues and Equipped with Newly-Purchased Weapons, Sudan Increased its Violence Against the Class and Other Civilians .......................................................60

H.      Plaintiffs' Injuries Were Foreseeable:  BNPP Knew the Atrocities in Sudan Were Funded By and an Intrinsic Part of the Government of Sudan's Exploitation of Its Oil Resources, Which BNPP Made Possible .............................................................66

        1.      Contemporaneous Reporting of the Atrocities in Sudan and the Connection to Oil ...................................................67

        2.      Three Companies, Talisman, Lundin, and OMV, Were Forced to Withdraw from Sudan by Public Pressure .................71

I.      As a Result of an Array of Federal and State Investigations, BNPP Agreed to Two Criminal Guilty Pleas, Two Cease And Desist Orders, a Settlement Agreement, and a Consent Order .........................................77

        1.      BNPP Pled Guilty to Violating U.S. Sanctions ..........................78

        2.      BNPP Pled Guilty to Violating New York Law .........................80

        3.      BNPP Entered into Agreements with Federal and State Regulators Admitting Substantial Wrongdoing and Agreeing to Substantial Penalties .......................................82

V.      CLASS ALLEGATIONS ........................................................89

        A.      Class Definition .......................................................90

        A.      Numerosity .............................................................91

        B.      Typicality ..............................................................92

        C.      Adequacy ..............................................................92

        D.      Commonality and Predominance of Common Issues .............................92

        E.      Superiority .............................................................98

VI.     THE CAUSES OF ACTION ALLEGED HEREIN ACTION ARE TIMELY ........100

VII.    CAUSES OF ACTION ...............................................102

        FIRST CAUSE OF ACTION
        FOR NEGLIGENCE PER SE ...............................................102

SECOND CAUSE OF ACTION
    FOR NEGLIGENCE PER SE ............................................................................107

THIRD CAUSE OF ACTION
    FOR CONSPIRACY TO COMMIT BATTERY ................................................112

FOURTH CAUSE OF ACTION
    FOR AIDING AND ABETTING BATTERY ....................................................114

FIFTH CAUSE OF ACTION
    FOR CONSPIRACY TO COMMIT BATTERY
    IN PERFORMANCE OF
    PUBLIC DUTY OR AUTHORITY ...................................................................117

SIXTH CAUSE OF ACTION
    FOR AIDING AND ABETTING BATTERY
    COMMITTED IN PERFORMANCE OF
    PUBLIC DUTY OR AUTHORITY ...................................................................119

SEVENTH CAUSE OF ACTION
    FOR CONSPIRACY TO COMMIT ASSAULT.................................................122

EIGHTH CAUSE OF ACTION
    FOR AIDING AND ABETTING ASSAULT.....................................................125

NINTH CAUSE OF ACTION
    FOR CONSPIRACY TO COMMIT FALSE ARREST
    AND FALSE IMPRISONMENT ......................................................................128

TENTH CAUSE OF ACTION
    AIDING AND ABETTING FALSE ARREST
    AND FALSE IMPRISONMENT ......................................................................130

ELEVENTH CAUSE OF ACTION
    FOR CONSPIRACY TO COMMIT CONVERSION
    –WRONGFUL TAKING....................................................................................132

TWELFTH CAUSE OF ACTION
    FOR AIDING AND ABETTING CONVERSION
    –WRONGFUL TAKING....................................................................................135

THIRTEENTH CAUSE OF ACTION
    FOR CONSPIRACY TO COMMIT CONVERSION
    – WRONGFUL DETENTION, USE OR DISPOSAL
    WHERE POSSESSION WAS LAWFULLY OBTAINED ................................138

FOURTEENTH CAUSE OF ACTION
    FOR AIDING AND ABETTING CONVERSION

– WRONGFUL DETENTION, USE OR DISPOSAL
WHERE POSSESSION WAS LAWFULLY OBTAINED ................................141

FIFTEENTH CAUSE OF ACTION
OUTRAGEOUS CONDUCT CAUSING EMOTIONAL
DISTRESS ...........................................................................................................145

SIXTEENTH CAUSE OF ACTION
FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
– BYSTANDER/ZONE OF DANGER THEORY ...............................................147

SEVENTEENTH CAUSE OF ACTION
FOR COMMERCIAL BAD FAITH ...................................................................149

EIGHTEENTH CAUSE OF ACTION
FOR UNJUST ENRICHMENT...........................................................................150

NINETEENTH CAUSE OF ACTION
FOR CONSPIRACY TO COMMIT WRONGFUL DEATH ............................152

TWENTIETH CAUSE OF ACTION
FOR AIDING AND ABETTING WRONGFUL DEATH
CAUSED BY INTENTIONAL MURDER .........................................................154

**VIII.   PRAYER FOR RELIEF.................................................................................................157**

# **TABLE OF EXHIBITS**

| **Document Name** | **Exhibit** |
|---|:---:|
| Information, *United States v. BNP Paribas* (S.D.N.Y., filed July 9, 2014) (Docket 14-CR-460-LGS No. 002) | A |
| Letter from Preet Bharara, United States Attorney for the Southern District of New York, Leslie Caldwell, Assistant Attorney General, Criminal Division, Department of Justice, and Jaikumar Ramaswamy, Chief, Asset Forfeiture and Money Laundering Section, Department of Justice, to Karen Patton Seymour, Esq., Sullivan & Cromwell LLP, *United States v. BNP Paribas, S.A.*, June 27, 2014. | B |
| Statement of Facts dated June 30, 2014, Ex. 2 to Plea Agreement, Dkt. No. 14-CR-00460-LGS Doc. No. 13 | C |
| Plea Agreement Between BNP Paribas SA and the District Attorney of the County of New York, June 30, 2014 | D |
| Exhibit A to Plea Agreement Between BNP Paribas SA and the District Attorney of the County of New York, June 30, 2014 | E |
| Cease and Desist Order Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended; Supervisory Cooperation Decision Applying the Joint Statement of French and US Banking Supervisors of May, 24th 2004, Dkt. No. 14-022-B-FB | F |
| Order to Cease and Desist and Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended, Dkt. Nos. 14-022-B-FB, 14-022-CMP-FB | G |
| Settlement Agreement between the U.S. Department of Treasury's Office of Foreign Asset Control ("OFAC") and BNP Paribas SA ("BNPP"), COMPL-2013-193659 | H |
| *In re BNP Paribas, S.A. New York Branch*, *Consent Order Under New York Banking Law § 44*, New York State Department of Financial Services ("DFS") | I |
| DFS Press Release, Cuomo Administration Announces BNP Paribas to Pay $8.9 Billion, Including $2.24 Billion to NYDFS, Terminate Senior Executives, Restrict U.S. Dollar Clearing | J |

| **Document Name** | **Exhibit** |
|---|---|
| Operations for Violations of Law (June 30, 2014) | |
| *BNP Paribas Sentenced for Conspiring to Violate the International Emergency Economic Power Act and the Trading with the Enemy Act, Justice News*, May 1, 2015 | K |
| Maps of Sudan | L-O |

Plaintiffs Entesar Osman Kashef, Sara Noureldirz Abdalla, Alfadel Mosabal, Abubakar Abakar, Siama Abdelnabi Hamad, Abbo Ahmed Abakar, Hawa Mohamed Omar, Jane Doe, Shafika G. Hassan, Nyanriak Tingloth, Reverend Anderia Lual, Jane Roe, Nicolas Hakim Lukudu, Turjuman Ramadan Adam, Judy Doe, Johnmark Majuc, Joseph Jok, Ambrose Martin Ulau, Sandi (Sunday) Georgari Marjan, Halima Samuel Khalifa, and Amir Ahmed  (collectively, "Plaintiffs"), on behalf of themselves and all those similarly situated, through their undersigned attorneys, hereby bring this action and allege as follows:

## I.      INTRODUCTION

1.      This action seeks justice on behalf of Plaintiffs, and those similarly situated, who are victims of one of the greatest bank crimes of all time.  From 1997 to 2007, in criminal violation of U.S. sanctions that were intended to stop Sudan's terrorist activities and human rights abuses and of New York law, Defendant BNP Paribas, S.A., along with its affiliates Defendants BNP Paribas, S.A. New York Branch and BNP North America, Inc., (collectively "BNPP") secretly conspired with the rogue government of Sudan and gave it forbidden access to the U.S. financial markets and U.S. dollar clearing services in New York. By 2007, BNPP facilitated an astonishing quarter of Sudan's exports and a fifth of its imports.  BNPP's financial transactions for the government of Sudan, along with some other illicit transactions with Iran and Cuba, totaled as much as $190 billion dollars.  With BNPP's assistance, rather than being crippled by the U.S. sanctions, the government of Sudan exploited its oil resources by harming, killing, and displacing civilians living in oil rich regions and saw its revenues from oil dramatically increase, revenues it used to buy planes, helicopters and weapons, to fund its military and militias, and to escalate its campaign of unspeakable atrocities against its own people.

2.      Defendants' criminal conduct, which began in 1997, was a substantial factor in causing Plaintiffs' injuries that have persisted to the present.  Plaintiffs were the intended beneficiaries of the very sanctions that Defendants have been convicted, in New York, of violating.  And Plaintiffs have suffered grave injury as a result of BNPP providing Sudan with the means to wage genocidal and unlawful attacks on civilians.  Without BNPP's willingness to break U.S. and New York law to provide Sudan with much needed dollars used to trade oil and buy arms, Sudan could not have engaged in the well-documented mass scale ethnic cleansing and violence against its disfavored population, including crude, indiscriminate bombings of their homes and villages, mass rape, torture, infection with HIV, loss of property and income, and displacement of hundreds of thousands from their homes and property through the use of large scale weapons purchased after BNPP became the government of Sudan's bank providing it access to U.S. dollars.  BNPP's clandestine, criminal conduct in conspiracy with the government of Sudan went far beyond ordinary commercial banking activity, as in the case of other multinationals sued for their business ventures with rogue governments.

3.      Defendant BNP Paribas, S.A. ultimately was caught by U.S. authorities, pled guilty to violating U.S. sanctions against doing business with Sudan and to committing a New York felony for falsifying business records, and was ordered to pay a criminal forfeiture of approximately $8.9 billion.  But BNPP's ultimate victims, including Plaintiffs and those similarly situated, the Class, have not been compensated for their injuries caused by BNPP's conduct.  Plaintiffs and the Class, all of whom now lawfully live in the United States, now seek damages from BNPP.

*****

4.      In 1989, military officers under then-Colonel Omar al-Bashir seized power in Sudan.  The military coup had the support of the National Islamic Front, an offshoot of the Muslim Brotherhood.[1]  As head of the military junta, al-Bashir became Sudan's president, chief of state, prime minister, and chief of the armed forces.  The coup began what is now a decades-long pattern of serious human rights abuses, including genocide, in violation of international law and support for terrorism.[2]  By the mid-1990s, the human rights abuses in Sudan were well known, including by BNPP, and attracted considerable international attention.

5.      At the same time, the Khartoum regime sought to exploit Sudan's rich oil reserves, knowing that money was crucial to keep it in power.  Though Sudan's oil reserves had been known for many years, even by 1997, Sudan had not been able to produce sufficient oil for export, let alone enough oil to generate substantial revenue.  The exploitation of oil required access to the capital and the know-how needed to drill for oil, as well as access to international financial markets to export it at the highest price.

6.      Due to longstanding and economically compelling market forces, international oil transactions are priced in U.S. dollars ("petrodollars"), and overwhelmingly cleared through financial intermediaries in New York City that have large dollar deposits.  Sudan therefore needed access to the U.S. financial system to maximize its future oil revenue.  Conversely, if a country like Sudan desired to sell oil without access to U.S. dollars and the ability to clear transactions in New York or elsewhere in the United States, it would suffer a

---

[1] The National Islamic Front changed its name to the National Congress Party in 1998.

[2] Along with Syria and Iran, Sudan is one of only three countries designated by the U.S. State Department as a state sponsor of terrorism.

substantial discount, either having to barter its oil in exchange for other commodities or goods or sell it in other currencies.

7.      Sudan's development of its oil resources was linked to its human rights abuses not just through the government's desire to use oil revenue to stay in power.  Many of Sudan's oil rich regions were occupied by civilians opposed to the government of Sudan on the basis of ethnicity, religion, and longstanding political disagreements with successive Khartoum governments, particularly the military-Islamist regime that grabbed power in 1989. To exploit its oil resources, the government of Sudan had used and would use its military and allied militias to harm, kill or displace hundreds of thousands of civilians from oil rich regions.

8.      In 1997, cognizant of Sudan's desire to exploit its oil resources and the link between that oil exploitation and human rights abuses, the United States enacted sweeping sanctions specifically to curtail and to stop the government of Sudan's human rights abuses and its support for global terrorism.  Pursuant to the International Emergency Economic Powers Act ("IEEPA")[3] and the Trading with the Enemy Act ("TWEA"),[4] President Bill Clinton imposed comprehensive criminal sanctions that, among other things, barred banks operating in the United States from extending credit to or facilitating or brokering U.S. dollar transactions for the government of Sudan and its agencies, instrumentalities, and controlled entities (collectively, the "GOS").  In 2006, President George W. Bush enacted further sanctions. (collectively and together with their implementing regulations, the "U.S. Sanctions," or the "Sanctions").  The U.S. Congress and the Executive Branch thus recognized the causal link—***the precise causal link at issue in this case***—between the

---

[3] International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq.*

[4] Trading with the Enemy Act, 50 U.S.C. §§ 4303 *et seq.*

GOS's access to the U.S. financial system and the GOS's atrocities against its civilians, including those from its oil exploitation.

9. Given its nascent oil development, Sudan's meagre, pre-oil economy was particularly vulnerable to U.S. Sanctions. The U.S. Sanctions, if observed, would have cut the GOS off from funding to exploit its oil resources and to export its oil at market prices, thereby negatively impacting the GOS's revenues from its oil and limiting the GOS's ability to commit atrocities. Similarly, the U.S. Sanctions, if observed, would have cut the GOS off from importing goods using dollar-denominated lines of credit, thereby negatively impacting its buying power and its ability to acquire goods, such as planes, helicopters and weapons. Thus, U.S. Sanctions were designed and intended to have an adverse impact on the GOS's economy, thereby limiting the al-Bashir regime's solidification of its hold on power and its ability to wage its campaign of atrocities against its civilian population.

10. But the U.S. Sanctions did not have their intended or expected impact because BNPP flagrantly and knowingly chose to violate them. In 1997, just as the first U.S. Sanctions were going into effect, knowing that the GOS was a terrorist state and that it was committing atrocities against civilians, BNPP agreed and conspired with the GOS to circumvent U.S. Sanctions and prevent the Sanctions from having their intended and expected impact on the GOS and Sudan's economy and the protection of Sudan's victims. BNPP became the GOS's sole correspondent bank in Europe and provided the GOS with the means to evade U.S. Sanctions via concealed access to U.S. financial markets and clearing facilities in New York City.

11. Specifically, BNPP assisted the GOS with its oil exploitation efforts, which were well-known to include harming, killing and displacing people in oil rich regions. In

turn, assisting the GOS in its export of oil, BNPP gave the GOS resources to exploit additional oil resources.  Thus, BNPP's U.S. Sanctions violations created a macabre feedback loop.  The resources that oil development generated allowed the GOS to purchase planes, helicopters and weapons, to manufacture weapons, and to fund militia.  In turn, the GOS violently harmed, killed and displaced more Sudanese civilians, including those it perceived as ethnically and politically "non-Arab" and those who were in the way of oil development.  Oil revenue was both the object and the *sine qua non* of its ability to carry out the mass destruction and extermination that it let loose on its own civilian population, including Plaintiffs and the Class.

12.     As recognized in the promulgation of the U.S. Sanctions themselves by Congress and the Executive Branch, in the experience of other countries subjected to U.S. sanctions like Iraq and Iran, and in the opinions of observers and experts, when complied with, U.S. sanctions are effective because the lion's share of international trade, particularly for commodities like oil that are priced in dollars, relies on access to the U.S. financial system.  Absent that access, countries need to export commodities and import goods through barter or through use of secondary currencies, both of which are significantly less efficient and result in less revenue from exports and more costly imports.  As a result, when U.S. sanction are observed, a country's economy suffers, and it will inevitably have less economic resources with which to acquire weapons and oppress its people.

13.     By conspiring with the government of Sudan and giving it access to the U.S. financial system in the pursuit of illicit profits, BNPP enriched itself, undermined U.S. Sanctions and prevented their intended and expected effect, and assisted the terrorist, genocidal government of Sudan.  Thus, BNPP's Sanctions violations were a natural result of

its conspiring with the government of Sudan and were a substantial factor in causing the atrocities suffered by Plaintiffs and the Class.

14.     The injuries to Plaintiffs and the Class were also reasonably foreseeable by BNPP.  As documented in its own internal files, BNPP knew that its violations of Sanctions were linked to human rights abuses.  BNPP knew that the Sanctions were intended and expected, if observed, to protect the civilians of Sudan, including Plaintiffs and the Class. BNPP knew that the GOS wanted BNPP's assistance to increase its ability to exploit its oil resources which directly involved human rights abuses.  BNPP knew that the GOS wanted BNPP's assistance to increase the GOS's economic resources both for its exports and imports.  And BNPP knew, as documented in contemporaneous reports by the United States, Canada, international NGOs, and the media, that the GOS used those increased economic resources to increase its military expenditures and to escalate its human rights abuses. Among other things, BNPP knew about the GOS's acquisition of advanced military hardware and funding of militias with those additional resources, about the GOS's manufacture of weapons, and about the GOS's committing human rights atrocities using that military hardware and those militias.  Thus, by violating the Sanctions, BNPP knew that Sudan's human rights abuses would escalate, not be curtailed.

15.     BNPP's deliberate violation of U.S. Sanctions aimed at preventing the GOS's human rights abuses against the Sudanese people is incontestable.  To no avail, responsible BNPP officials raised internal alarms, including by executives, that if BNPP's illegal support for the GOS became known externally, it would demonstrate BNPP's complicity in the GOS actions.  BNPP also did everything it could to keep its complicity secret, including falsifying business records.

16.     Ultimately, the United States and the State of New York discovered BNPP's crimes, through years-long investigations and the exercise of prosecutorial discretion by the United States and New York.  Five federal and state agencies, primarily in New York, extensively investigated Defendants' illicit financial dealings with Sudan as well as with Iran and Cuba:

a.     The U.S. Department of Justice ("DOJ") through the U.S. Attorney for the Southern District of New York;

b.     The New York County District Attorneys' Office ("DANY");

c.     The Federal Reserve Board of New York ("FRB-NY");

d.     The U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"); and

e.     The New York Department of Financial Services ("DFS").

17.     These investigations culminated in two criminal guilty pleas in this judicial district in 2015—to a federal felony, a New York felony, and a New York misdemeanor, two cease and desist orders, a settlement agreement, and a consent order.  In 2014, BNPP pled guilty to conspiracy to violate the IEEPA and the TWEA by processing billions of dollars of transactions through the U.S. financial system on behalf of Sudanese, Iranian, and Cuban entities subject to U.S. economic sanctions, and BNPP pled guilty to violation of the New York State Penal Law[5] by falsifying business records with the intent to commit, aid, or conceal another crime.  OFAC's investigation resulted in a settlement agreement with BNPP, pursuant to which OFAC fined BNPP over $960 million and BNPP agreed to terminate its Sanctions violating conduct.  Similarly, DFS's investigation resulted in a consent decree, pursuant to which DFS fined BNPP over $2 billion and BNPP agreed to make reparations and restitution in the amount of $1.05 billion.  Further, BNPPNY was suspended for clearing

---

[5] New York State Penal Law Section 175.10.

U.S. dollar transactions for other BNPP branches for a year, and BNPP could not act as a U.S. dollar clearing bank for unaffiliated third party banks for two years.

18.     The array of enforcement actions, regulating BNPP's past and future conduct, taken by both the United States and New York demonstrates their critical interest in preserving New York as a global financial center and in ensuring that New York is not used to aid in committing human rights abuses.  Indeed, New York was central to BNPP's illegal activities.  BNPP aided and abetted and conspired with the GOS to evade Sanctions through various means and methods in New York.  These included, among other things: accepting and following the direction of sanctioned entities to structure financial transactions on behalf of blocked entities in New York to evade the Sanctions; actually processing prohibited transactions in New York through the facilities of BNPPNY and other New York based banks; and in a felony violation of New York law, using false and fraudulent transaction descriptions and transmittal messaging at BNPPNY and the other New York banks to conceal that the transactions were being processed on behalf of blocked entities.  These actions, without which BNPP would not have been able to aid the Sudanese government, undermined not only the Sanctions regime but also the integrity of the New York financial system.

19.     In 2015, BNPP was sentenced to forfeit approximately $8.9 billion as part of its agreement to plead guilty.[6]  OFAC also levied a fine of $963 million in a parallel civil settlement.  Approximately 70% of BNPP's criminal asset forfeiture addressed BNPP's activities with the GOS.  BNPP's criminal activity starkly contrasts with ordinary commercial or banking activity.

---

[6] Note, although there were separate fines and penalties, these fines and penalties were deemed satisfied by virtue of BNPP's payment of the approximately $8.9 billion forfeiture.

20.    The forfeiture and fine, none of which went to the victims of BNPP, are among the largest penalties ever levied.   Nevertheless, as reported by the Wall Street Journal's Editorial Board, BNPP "got off easy in its plea deal with U.S. authorities."[7]

21.    Plaintiffs, who lawfully immigrated to the United States, primarily from southern Sudan, the Darfur region and Khartoum under extreme circumstances, on behalf of themselves and the Class they represent, allege the claims herein, including claims for negligence per se given BNPP's admitted crimes, and seek damages from Defendants to compensate for the atrocities they have suffered, atrocities for which they have never received any compensation, as well as disgorgement of BNPP's profits obtained through its complicity in those crimes.

*****

22.    This action is limited in scope.   It involves the legality of the actions of BNPP and the Doe Defendants, all of which are private actors that went far beyond ordinary commercial or banking activity to engage in clandestine criminal conduct.   The immediate GOS perpetrators of atrocities against Plaintiffs and the Class, some indicted by the International Criminal Court ("ICC"), are not parties here and, unlike the criminally-convicted BNPP, are beyond the remedial reach of U.S. courts.   Plaintiffs' claims do not seek relief that would require the Court to intervene against or declare invalid any official, governmental act of the GOS.   To the contrary, the claims here arise out of the horrific, settled finality of the GOS's transnational crimes.   Plaintiffs, on behalf of themselves and those similarly situated, seek only to obtain damages from the private parties whose deliberate, criminal conduct were a substantial factor in these acts and the resultant harm.

---

[7] Editorial Board, *BNP Got Off Easy*, Wall St. J. Asia, July 3, 2014, at 9.   The Board also noted that the bank was "lucky not to lose its U.S. banking license." *Id.*

## II. THE PARTIES

### A. The Plaintiffs

23.     Each Plaintiff is a refugee from Sudan, including the portion of Sudan that, in 2011, became the Republic of South Sudan ("South Sudan"). Each Plaintiff entered and resides lawfully in the United States or is a U.S. citizen. Some participated in U.S. refugee resettlement programs administered in conjunction with the United Nations High Commissioner for Refugees or authorized non-governmental organizations ("NGOs"). Some claimed asylum at a U.S. border, embassy, or other intake center. All have undergone background investigations and met the rigorous security standards established by the United States. Most have become U.S. citizens; the rest are permanent residents or waiting to become eligible for permanent resident status.

24.     Each Plaintiff claims significant injuries that began in Sudan, including the part that is now South Sudan, from 1997 through at least 2009. This time frame includes 1997-2007, the period when BNPP provided criminal assistance to the GOS, and at least an additional two years, 2008-2009, depending on discovery, during which the effects of the conspiracy continued.[8] As set out in detail below, Plaintiffs and the Class suffered extraordinary and unspeakable harm at the hands of the GOS as a result of BNPP's assistance, including but not limited to beatings, maiming, sexual assault, rape, infection with HIV, loss of property, displacement from their homes, and watching family members be killed. These actions violate all human decency and norms of conduct.

25.     Some members of the Class were under the age of 18 when they suffered the injuries described herein, and some are still minors today.

---

[8] In fact, the conspiracy's effects likely continued for far long.

26.     Before fleeing to the United States, Plaintiffs and the Class resided in three main geographic areas: (1) southern Sudan, including the states of Upper Nile, Jonglei, the Equatorias, Western Bahr el Ghazal, Northern Bahr el Ghazal, and Unity; (2) the contested border region of Abyei; and (3) in the north, the Nuba Mountains region of Southern Kordofan, the Darfur region, and Khartoum, Sudan's capital where many groups fled to escape the violence in their homelands.  Plaintiffs are culturally diverse and practice various religions.  Those Plaintiffs and the Class from southern Sudan, now the separate country of South Sudan, generally practice traditional African religions or Christianity, while those who reside in the west (Darfur) are primarily Muslim.  These regions are reflected on the maps attached hereto as **Exhibits L-O**.

27.     Unlike Sudan's ruling elite, which come predominantly from the Nile Valley in and around Khartoum, and which have "riverine" identity, Plaintiffs are black Africans from peripheral regions of the country.  Many of their Arab countrymen, and the Khartoum-based riverine elite in particular, often refer to them as "zurga," a racial slur frequently used in Darfur, or "abid," a term which is predominately used in Central and Southern Sudan and means slave.   Successive governments in Khartoum stretching back decades have marginalized the peoples living away from the Nile, who are Arabs as well as Africans.  This marginalization has always been stratified and layered such that some groups (who often self-define as "African") have faced greater degrees of exclusion and violent repression than others.  The Sudanese state has long sought to assimilate the different people in the country to the riverine identity, including through the promotion of one language (Arabic) and one faith (Islam) at the expense of others.  Those people who have sought to resist that effort (like the people in the South, Darfur, and the Nuba Mountains in Central Sudan) have faced the

brunt of state-organized violence.   This marginalization and persecution escalated significantly in 1997.

28.    After fleeing the GOS's violence, many of the Plaintiffs experienced serial displacement, starvation, disease, and prolonged stays in overcrowded refugee camps.   They were living in abject poverty and suffering from physical injuries, loss of all their possessions, and emotional scars inflicted by the GOS and its proxies.

29.    Plaintiffs arrived in the United States with nothing.   Most of the Muslim female Plaintiffs from western Sudan (Darfur) entered the United States with little or no education that would permit them to adapt to the U.S. economy and way of life.   And many of the Plaintiffs continue to suffer from physical and emotional injuries or from diseases such as HIV.

### B.    Representative Plaintiffs

30.    Plaintiff Entesar Osman Kashef ("Kashef") was born on August 29, 1986 in Kadugli, in South Kordofan state, Sudan.[9]   Her family owned cows, goats, and sheep, and earned money from selling milk and animals.   In 1992, her family moved to Kutum, a city in North Darfur.   Around the spring of 2008, when Kashef was approximately seventeen years old, the Janjaweed (an Arabic colloquialism often translated as "devils on horseback," a paramilitary force allied with and supported by the GOS) with weapons, military-style clothing, and covered faces attacked Kutum.   They shot and killed Plaintiff Kashef's entire family, including her mother Halima Shantu, father Osman Kashef, sister Daula Kashef (who was only ten years old at the time), and grandmother Zaneb Ibrahim.   The Janjaweed also burned down her house, and stole all her property, including cows, goats, and sheep.   Kashef

---

[9] When Kashef entered the United States, immigration officials incorrectly recorded her birthdate as January 1, 1984.

fled to Khartoum on foot, where a GOS-backed militia arrested her without charge, and beat and sexually assaulted her over the course of three months.  Kashef entered the United States as a refugee around August 2015, and resides in San Diego, California.  As a result of BNPP's criminal actions, the GOS had substantial financial resources that it would otherwise not have had and used those resources to acquire military hardware and fund militia that it then used to harm Plaintiff Kashef and caused Plaintiff Kashef to suffer grave injury, including mental trauma that continues through today and physical injury as well as loss of property.

31.    Plaintiff Sara Noureldirz Abdalla ("Abdalla") was born on April 20, 1998 in Nyala in Darfur Sudan.  Her family owned and rented dozens of homes in Darfur, when in or about November 2003, the Janjaweed attacked the town of Nyala and burned the home where she lived with her family.  The Janjaweed soldiers entered her home, arrested and took her father, and beat her and her mother with guns and night stick-like weapons.  Plaintiff Abdalla's arm was broken in the struggle.  Because it was not treated, she still suffers pain in her arm.  As a child, Abdalla witnessed the atrocities committed on her family, including the Janjaweed shooting her grandfather and assaulting her grandmother.  The Janjaweed took her family's home, land, and animals.  She fled Nyala with her mother, dragging her grandmother with two broken legs outside of town.  One week later, they arrived outside of Khartoum where they resettled in squalid camps with other victims fleeing violence.  In 2004 and then again in 2005, Abdalla experienced the traumatic false arrest of her mother by GOS-backed militiamen.  The first arrest lasted three days and the second lasted two weeks.  In 2006, Abdalla and Jane Doe made their way to Egypt where Abdalla suffered numerous atrocities, including being detained separately from her mother.  Abdalla was detained

without food or water and was subjected to torture, chemical weapons, and repeated assaults. Plaintiff Abdalla is a U.S. citizen and resides with her remaining family members in San Diego, California, where she is attending college.  As a result of BNPP's criminal actions, the GOS had substantial financial resources that it would otherwise not have had and used those resources to acquire military hardware and fund militia that it then used to harm Plaintiff Abdalla and caused Plaintiff Abdalla to suffer grave mental trauma that continues through today.

32.     Plaintiff Alfadel Mosabal ("Mosabal") is from Manawashi, South Darfur, Sudan.  Early one morning in 2004, the Janjaweed attacked his home village.  The Janjaweed killed Mosabal's uncle, and the rest of his family fled to a camp for internally displaced people ("IDPs"), leaving behind substantial property and wealth including cows, goats, and sizable orchards and vegetable fields.  In 2010, Mosabal was working for a Western-based NGO when most of his colleagues were rounded up and arrested by GOS forces for helping IDPs.  Mosabal fled to Libya and eventually Egypt.  Around September 2, 2015, Mosabal resettled in the United States as a refugee.  Plaintiff Mosabal currently resides in Lexington, Nebraska.  As a result of BNPP's criminal actions, the GOS had substantial financial resources that it would otherwise not have had and used those resources to acquire military hardware and fund militia that it then used to harm Plaintiff Mosabal and caused Plaintiff Mosabal grave injury, including mental trauma that continues through today as well as loss of property and sources of income.

33.     Plaintiff Abubakar Abakar ("Abakar") was originally from Geraida, Darfur, Sudan.  A member of the Massalit ethnic group, Abakar was a middle school teacher in Nyala, South Darfur, and his family owned a farm in Geraida.  In 1999, Abakar fled to the

town of Beda, Darfur to avoid being forcibly recruited by the GOS to fight in southern Sudan and again began teaching school.  Abakar also built and operated a gas-powered millstone to grind flour, which he rented to others for a fee.  He built a hut to house the millstone on land he purchased from the GOS and also paid for a permit to operate the millstone.  One day in or about July or August 2003, in the fields surrounding Beda, Abakar saw fires set by GOS-backed militias wearing uniforms with a GOS insignia and carrying weapons, which he had seen them obtain from the police station and army barracks.  The local head of the militia force was also the school principal, so Abakar knew him very well.  Abakar saw the bodies of people the militia killed.  His hut and millstone burned in the fires.  He fled to a refugee camp in Chad, where his wife and children were able to join him.  He and his family resettled in the United States in 2010 and reside in San Diego, California.  They became U.S. citizens in April 2016.  As a result of Defendants' criminal actions, the GOS had substantial financial resources that it would otherwise not have had and used those resources to acquire military hardware and fund militia that it then used to harm Plaintiff Abakar and caused Plaintiff Abakar damages, including mental trauma that continues through today as well as loss of property and sources of income.

34.     Plaintiff Siama Abdelnabi Hamad ("Hamad") is from the region of Gundo in South Darfur, Sudan.  Her family had three houses and a large plot of inherited land, where they kept cows, sheep, goats, donkeys, camels, and chickens, and grew many crops.  The family sold many farm products at the weekly market.  Plaintiff Hamad's husband also operated a prosperous coffee and tea shop in the market.  In or about 2001, Arab militias with covered faces, uniforms, and weapons attacked Hamad's village.  Hamad's family saw a GOS backed militia patrolling the town, heard gunfire, and fled into the bush.  One of

Hamad's sons fled with the cows, which the militia stole. She witnessed the militia shoot and kill her husband. After two years of living in the bush, Hamad arrived in a refugee camp in Chad in early 2004 with her children. Around 2007, Hamad and her family resettled in the United States. Hamad resides in Utica, New York, as a lawfully admitted refugee from Sudan. As a result of Defendants' criminal actions, the GOS had substantial financial resources that it would otherwise not have had and used those resources to acquire military hardware and fund militia that it then used to harm Plaintiff Hamad and caused Plaintiff Hamad damages, including mental trauma that continues through today as well as loss of property.

35.    Plaintiff Abbo Ahmed Abakar ("Abbo Abakar") is from Bauoda, West Darfur, Sudan. A member of the Massalit ethnic group, Abbo Abakar worked as a men's tailor in Sudan. His business was prosperous, and he also owned cows and a farm. He built the family home himself. The violence in Bauoda started to worsen in 2002. He often saw Arab militias wearing military uniforms and ammama, a type of head covering, together with Sudanese government officials, who protected them. He would see dead bodies in the streets after the militias rampaged. One night around July 2003, the Janjaweed came and set fire to Abbo Abakar's house. Abbo Abakar and his family fled with only their cows to Kassaross, another village that was attacked by the Janjaweed in 2005. Abbo Abakar lost his two boys in 2005. By the time he was able to return to the house, his entire family had fled with the exception of his father's brother, who was killed. The Janjaweed took all of the animals and belongings. Abbo Abakar fled to a refugee camp in Ghana. In 2009, he resettled in the United States. He was never able to locate his wife and children, whom he presumes are dead. Abbo Abakar now resides in San Diego, California, having been lawfully admitted to

the United States as a Sudanese refugee in 2009. He has been a U.S. citizen since May 2014. As a result of Defendants' criminal actions, the GOS had substantial financial resources that it would otherwise not have had and used those resources to acquire military hardware and fund militia that it then used to harm Plaintiff Abbo Abakar and caused Plaintiff Abbo Abakar damages, including mental trauma that continues through today as well as loss of property and sources of income.

36.     Plaintiff Hawa Mohamed Omar ("Omar") was born in Sulu, West Darfur, Sudan. A member of the Fur ethnic group, Omar sold fruit from the family's farm at the market, as well as essential oils and flowers. Her husband was a high school teacher, and they owned cows, goats, and sheep. Around December 2003, Omar was at home when she saw fires in a nearby town. The Janjaweed, wearing army uniforms and carrying large guns, then came to her town where they killed her younger brother, set fire to her house, and took all of her family's animals. Omar fled to Mornei, a nearby large city. She remained there for approximately three years before fleeing again in 2005 with her four-year old daughter to a refugee camp in Chad. In 2009, Omar resettled in the United States. She resides in San Diego, California and became a U.S. citizen in 2014. As a result of BNPP's criminal actions, the GOS had substantial financial resources that it would otherwise not have had and used those resources to acquire military hardware and fund militia that it then used to harm Plaintiff Omar and caused Plaintiff Omar grave injuries, including mental trauma that continues through today as well as loss of property and sources of income.

37.     Plaintiff Jane Doe ("Jane Doe"), named here anonymously, was born in Nyala, South Darfur. Jane Doe's family was very prosperous, with a large farm and a successful import/export trading business throughout the central African region. Jane Doe's

family also grew gum, a major export of Sudan.  The family owned and rented dozens of

homes in Darfur and were planning to build a hotel, when in or about November 2003, the

Janjaweed attacked Jane Doe's town of Nyala in the early morning hours while Jane Doe and

her family were sleeping.  The Janjaweed militia, on horseback and in Land Cruisers, armed,

burned her home as well as the entire town.  The soldiers entered her home, arrested her

husband and took him; and beat her and her children with guns and night stick-like weapons.

Her four-year old daughter's arm was broken in the struggle, and her teenage son was hit in

the head.  The Janjaweed shot Jane Doe's father in front of her and her children, and broke

both the legs of her mother.  The Janjaweed took her home, land, and animals and burned her

donkeys.  All of Jane Doe's family's belongings were stolen.  She fled Nyala with her

children, dragging her mother with two broken legs outside of town.  One week later, they

arrived outside of Khartoom where they resettled in squalid camps with other victims fleeing

violence.  Until 2006, Jane Doe lived in Khartoum. Twice (in 2004 for three days and in

2005 for two weeks) she was falsely arrested and detained by GOS-backed militia and

security for days in inhumane conditions in detention, where they continuously beat, raped,

and tortured her.  Upon release, Jane Doe fled Sudan and made her way to a refugee camp in

Egypt in 2006.   In the Egyptian camp, Jane Doe and her children suffered numerous

atrocities, including being detained separately, in conditions without food and water,

subjected to torture, chemical weapons, repeated beatings and rape.  Jane Doe lost two of her

children, and was forced to search for them among the dead being held in refrigerators at the

camp.  Her teenage son was locked alive in one of the freezers for three days.  Jane Doe now

resides in San Diego, California, having been lawfully admitted to the United States as a

Sudanese refugee in 2007.  She became a U.S. citizen around January 2013.  As a result of

BNPP's criminal actions, the GOS had substantial financial resources that it would otherwise not have had and used those resources to acquire military hardware and fund militia that it then used to harm Plaintiff Jane Doe and caused Plaintiff Jane Doe grave injury, including mental trauma that continues through today as well as loss of property and income.

38.     Plaintiff Shafika G. Hassan ("Hassan") was born in Zalingei, West Darfur, Sudan.  A member of the Furawi ethnic group, Hassan eventually moved her family to Khartoum, Sudan.  Her husband was a car mechanic and often did business between Khartoum and Darfur.  Late one night around April 2004, plain-clothed GOS security forces carrying small guns came to the house and forcibly arrested her husband.  The security officers took him to a detention center, where they held him in a dark basement, and severely beat and tortured him, falsely demanding to know why he was helping political opponents of the regime.  Later, several militia members with covered faces came to the house and beat Hassan in front of her four young children, pulling her down on the ground and sexually assaulting her.  The militiamen also kicked and slapped the children.  Plaintiff Hassan fled with the children to Egypt, leaving all their belongings behind.  She, her husband, and her children resettled in the United States in 2010 and now reside in San Diego, California. Plaintiff Hassan's husband is a U.S. citizen, and she is a lawful permanent resident.  As a result of BNPP's criminal actions, the GOS had substantial financial resources that it would otherwise not have had and used those resources to acquire military hardware and fund militia that it then used to harm Plaintiff Hassan and caused Plaintiff Hassan grave injury, including mental trauma that continues through today as well as loss of property and income.

39.     Plaintiff Nyanriak Tingloth ("Tingloth") was born to a Christian family in Abyei, a contested border enclave between Sudan and what became South Sudan.  She is a

member of the Dinka ethnic group, and her family were cattle farmers and fishermen. Extended family members lived together on the land in separate homes, and the family held the entire parcel of land in common. In 1987, Tingloth's father, Kuol Kon Tingloth was killed. Shortly thereafter, in 1988, Tingloth moved to Khartoum, Sudan. In 2002, Tingloth's husband, Kuol, was arrested and held in prison for five days, where he was beaten. After his release, Kuol fled to Egypt. When GOS security forces came to Tingloth's house looking for Kuol, she fled with their children to the bush, leaving everything behind—including furniture, clothes, and appliances. GOS security forces remained in the house and converted it into an Islamic school. In 2003, Plaintiff Tingloth traveled to Abyei. Over the course of the next month, both her brothers were killed by GOS militiamen. The first brother, Kon Kuol Kon Tingloth, was killed on April 13, 2003. The second, Ring Kuol Kon Tingloth, was killed on April 30, 2003, the same day as her grandmother. After the murders, Tingloth fled to the bush again, leaving the house in Abyei and all their belongings, as well as all their cows. The house was razed and all the land taken. Tingloth and the children fled to Egypt. Several other members of Tingloth's family were killed in Sudan, or were kidnapped and sold into slavery. In June 2004, Tingloth's father-in-law, Akuei Kuol Shbur was killed. Around 2004, Tingloth was accepted for refugee resettlement to the United States and became a U.S. citizen in 2013. She lives in Phoenix, Arizona. As a result of BNPP's criminal actions, the GOS had substantial financial resources that it would otherwise not have had and used those resources to acquire military hardware and fund militia that it then used to harm Plaintiff Tingloth and caused Plaintiff Tingloth grave injury, including mental trauma that continues through today as well as loss of property and sources of income.

40.     Plaintiff Reverend Anderia Lual ("Lual") is an Episcopal pastor from Bor in southern Sudan.   He moved to Khartoum in 1969.   Self-identified GOS security forces arrested him on three separate occasions in 1997, 1998, and 2001.   They threw him in jail for holding Bible study in violation of Sudan's Penal Code, which prioritizes an illiberal interpretation of Sharia (Islamic law), but never actually charged him with any crime. During his first prison detention, GOS security forces took Reverend Lual to a detention camp and threatened him, telling him that if he continues his activities, he will never see the sun again.   The second time, the security forces took Reverend Lual to a jail, where he was told that he was singled out for his support of the rebels.   Lual's torture—which included being kicked, beaten with a nightstick—was so severe that on his final day in jail, he was beaten to the brink of unconsciousness.   The final time Reverend Lual was arrested, he was threatened and taken to court on fabricated charges.   He managed to clear his name and get released with the help of the Episcopal Archdiocese.   The conditions of all three detention facilities were horrific; there was virtually no food or water and it was highly unsanitary. Reverend Lual knew people who came out of these facilities blind.   In addition, four of Reverend Lual's brothers in Bor were killed in 2001 by GOS-backed militias.   Reverend Lual knows that militiamen killed his brothers because of reports he received from people who escaped the mayhem.   Another of Lual's brothers died of starvation with his family members in the bush because all their crops had been destroyed.   The militia also looted Lual's family home in Bor, stealing their possessions, crops, and livestock.   Once they finished the robbery, the militia burned the home to the ground.   In or about December 3, 2002, at the invitation of the Episcopal Diocese of Colorado, in collaboration with the Archbishop of Canterbury (England), Reverend Lual resettled in the United States as a

refugee.  He now lives in Phoenix, Arizona.  As a result of BNPP's criminal actions, the GOS had substantial financial resources that it would otherwise not have had and used those resources to acquire military hardware and fund militia that it then used to harm Plaintiff Lual and caused Plaintiff Lual grave injury, including mental trauma that continues through today as well as loss of property.

41.    Plaintiff Jane Roe ("Jane Roe"), named here anonymously, was born in Juba, southern Sudan.  Her ethnicity is Kuku.  Her husband's trading business took him regularly to other towns throughout southern Sudan.  In 2001, Sudanese plainclothes security forces with identification badges began following his movements, so they fled to Khartoum seeking anonymity.  Their house in Juba was raided and all their belongings stolen.  Around January 2003, GOS security forces wearing khaki fatigues and carrying weapons arrested Roe in her home in Khartoum, blindfolded her, and kept her in a locked room without food, light, or water.  Security forces repeatedly raped and tortured her for days, causing her to miscarry her existing pregnancy, and infected her with HIV.  When they returned her home, they threatened her.  They arrested, tortured, and killed her husband.  Upon being released, Roe fled Sudan with her daughter.  In the violence caused by the GOS, the security forces stole Roe's property, including her house and all its belongings.  She resettled in the United States as a refugee in 2006, and is a U.S. citizen.  As a result of BNPP's criminal actions, the GOS had substantial financial resources that it would otherwise not have had and used those resources to acquire military hardware and fund militia that it then used to harm Plaintiff Roe and caused Plaintiff Roe grave injury, including mental and physical injury and loss of property and income.

42.     Plaintiff Nicolas Hakim Lukudu ("Lukudu") is originally from Juba, southern Sudan.  Lukudu moved with his family to Khartoum in 1985 where he owned a very successful mercantile import-export shipping business, including exporting coffee overseas. Around February 2004, Lukudu was arrested by GOS-backed militia forces on false charges and imprisoned unlawfully for three days, during which time he was beaten and tortured. The security forces carried weapons, drove a marked car with government plates, and wore uniforms.  At that time, the Sudanese government confiscated all his business's assets and his large home.  Lukudu fled to Egypt and was later lawfully admitted to the United States in 2004.  He resides in San Diego, California and has been a U.S. citizen since 2009.  As a result of BNPP's criminal actions, the GOS had substantial financial resources that it would otherwise not have had and used those resources to acquire military hardware and fund militia that it then used to harm Plaintiff Lukudu and caused Plaintiff Lukudu grave injury, including mental and physical injury and loss of property and income.

43.     Plaintiff Turjuman Ramadan Adam ("Adam"), a member of the Keraish ethnic group, lived in Wau, Western Bahr el Ghazal state, Sudan, where he worked as a judge and lawyer.  When Adam won legal cases against the GOS or complained about Khartoum's treatment of people in southern Sudan, he would be detained for two to three days at a time. In or around 2000, uniformed member of the national intelligence service detained Adam in a military barracks for three days.  While there, intelligence officials admitted to Adam that they were killing rebels.  The violence became worse in 2002.  In or about late 2002 to early 2003, Adam was providing legal advice to a man who was detained by the GOS just to get him to relinquish ownership of his business.  In retribution for providing legal services, uniformed GOS security forces came to Adam's house, arrested him, and detained him for

24

eleven days.  While in detention, he was brutally beaten and forced to witness violence and brutality, including the rape of his wife by Sudanese government security soldiers.  Adam fled Sudan for Egypt with his five young children, leaving their home and all their belongings behind.  Plaintiff Adam returned to Wau (now part of independent South Sudan) to reclaim his house, but all the belongings were gone.  He and his family were granted refugee status, resettled in the United States in 2005, and now reside in San Diego, California.  As a result of BNPP's criminal actions, the GOS had substantial financial resources that it would otherwise not have had and used those resources to acquire military hardware and fund militia that it then used to harm Plaintiff Adam and caused Plaintiff Adam grave injury, including mental and physical injury and loss of property.

44.     Plaintiff Judy Doe ("Judy Doe"), named here anonymously, is from Wau, Western Bahr el Ghazal, Sudan.  Judy Doe is a Christian.  In Sudan, she worked for a French women's organization.  On multiple occasions around 2002, GOS security forces in marked cars, wearing uniforms, and carrying weapons came to the house looking for her husband.  While there, the security forces also beat and threatened Judy Doe.  In late 2002-early 2003, GOS security soldiers brutally beat and repeatedly raped Judy Doe over the course of several days, infecting her with HIV.  Judy Doe and her husband fled Sudan for Egypt with their five children, leaving their home and all their belongings behind.  While in Egypt, their daughter became very sick and died.  She and her family were granted refugee status, resettled in the United States in 2005, and now reside in San Diego, California.  Judy Doe became a U.S. citizen in 2013.  As a result of Defendants' criminal actions, the GOS had substantial financial resources that it would otherwise not have had and used those resources to acquire

military hardware and fund militia that it then used to harm Judy Doe and cause her damages, including mental and physical injury and loss of property.

45.     Plaintiff Johnmark Majuc ("Majuc") is from Bahr el Ghazal state in southern Sudan.  In April-May 1998, GOS army soldiers came to Majuc's village looking for boys to recruit, including Majuc, to fight in irregular militias that fought side by side with regular government troops.  Majuc fled into the bush with just the clothes on his back to avoid the soldiers, who were shooting at him.  His mother was tortured and beaten for hiding him, and their homes and crops set on fire.   The family lost several cattle from having to run constantly from GOS forces.  Eventually, Plaintiff Majuc arrived in the village of Chukudum. GOS-backed forces bombed Chukudum every day at regular intervals, using crudely modified Antonov cargo plans to drop barrel bombs.  Plaintiff Majuc fled again in early January 2000 to the Kakuma refugee camp just across the border in northern Kenya.  He was approved for resettlement and arrived in the United States in or about early 2011.  He resides in Utica, New York.  As a result of BNPP's criminal actions, the GOS had substantial financial resources that it would otherwise not have had and used those resources to acquire military hardware and fund militia that it then used to harm Plaintiff Majuc and caused Plaintiff Majuc grave injury, including mental and physical injury and loss of property and income.

46.     Plaintiff Joseph Jok ("Jok"), a member of the Dinka ethnic group, was born in Bor, southern Sudan, and was lawfully admitted to the United States as a refugee.  He is now a U.S. citizen, residing in San Diego, California.   In or about 2003, Jok provided seed funding for his nephew's mobile phone distribution business in Malakal, southern Sudan.  By 2009, the business prospered and the family built two homes there.  In or about March 2009,

two weeks after Jok returned to the U.S. from a visit to Malakal, GOS proxy militia led by Gabriel Tanginye looted and destroyed the family's business and homes. As a result of BNPP's criminal actions, the GOS had substantial financial resources that it would otherwise not have had and used those resources to acquire military hardware and fund militia that it then used to harm Plaintiff Jok and caused Plaintiff Jok grave injury, including mental trauma and loss of property.

47. Plaintiff Ambrose Martin Ulau ("Ulau"), a member of the Balanda ethnic group, was born in Wau, Western Bahr el Ghazal, and was lawfully admitted to the United States as a refugee. He is a U.S. citizen residing in San Diego, California with his wife and five children. In or about December 1999, Plaintiff Ulau resided in the Bahri area of Khartoum, Sudan in his family home, a four-bedroom residence. He was employed in a cooking oil and soap factory. He was active in the Catholic Church's lay leadership and was also a Christian preacher. At that time, three plain-clothes GOS security officers openly carrying small and large guns came into Plaintiff Ulau's house, accusing Ulau of attempting to convert Muslims to the Christian faith. The security forces detained Ulau, took him by military transport to a warehouse detention center where they blind-folded him, tied him up and hung him by his feet. Security forces repeatedly beat and tortured Ulau with weapons, deprived him of food and water, and subjected him to filthy and inhumane conditions in a locked, isolated cell. Plaintiff Ulau suffered physical injury, including bruises to his body and head, and severe mental trauma from, *inter alia*, threats to the security and life of his family, including his wife and child. After being dropped on the street from a military vehicle, he fled in June 2000 to Egypt with his pregnant wife. He resettled in the United States in September 2004. As a result of BNPP's criminal actions, the GOS had substantial

financial resources that it would otherwise not have had and used those resources to acquire military hardware and fund militia that it then used to harm Plaintiff Ulau and caused Plaintiff Ulau grave injury, including physical and mental trauma and loss of property, including his house and belongings, which were confiscated by the GOS, as well as his livelihood and income.

48.     Plaintiff Sandi (Sunday) Georgari Marjan ("Marjan"), a member of the Bango ethnic group, was born in Wau, Western Bahr el Ghazal, and was lawfully admitted to the United States as a refugee in May 30, 2002.  He is a U.S. permanent resident residing in San Diego, California, with his U.S. citizen wife and four children.  In or about May 1997, Plaintiff Marjan was 17 years old and resided in his family home in Wau with his parents, brothers, and sisters.  His family owned and earned their livelihood from their agricultural property in Wau, where they employed approximately 50 workers, owned approximately 26 heads of cattle, three cars, and grew peanuts, beans, and other crops.  Uniformed GOS security forces carrying weapons arrested Marjan as he was walking to his home and transported him to a military base, where he was tied upside down in a tree by one leg and severely and continually beaten for approximately 24 hours.  The soldiers cut his back with a large knife causing deep wounds.  When released by the GOS security forces, Plaintiff Marjan walked 25 miles away from his home due to the fear that the security forces would come back for him and his family, including his son Simon, which they did.  He was nursed back to health by a tribal leader's wife, and helped to flee to Khartoum.  While in Khartoum, Marjan and his wife had a second boy, Martin.  GOS security forces killed his father and uncle, burned his home in Wau, and confiscated his property, cattle, and crops.  Security forces arrested Marjan again in 1999, this time detaining him in inhumane conditions in a

warehouse where he was severely beaten.  Upon being released, Plaintiff Marjan escaped to Egypt with his three month old son, where he remained until he resettled in the United States in May 2002.  Plaintiff Marjan suffered physical injury, including bruises and bloody wounds to his body and head, and severe mental trauma from, *inter alia*, threats to the security and life of his family, including his wife and child.  As a result of BNPP's criminal actions, the GOS had substantial financial resources that it would otherwise not have had and used those resources to acquire military hardware and fund militia that it then used to harm Plaintiff Marjan and caused Plaintiff Marjan grave injury, including physical and mental trauma and loss of property, including losing his property.

49.    Plaintiff Halima Samuel Khalifa ("Khalifa"), a member of the Baka ethnic group, was born in Maridi, Western Equatoria, southern Sudan, and was lawfully admitted to the United States as a refugee in 2005.  She is a U.S. citizen since 2009, residing in San Diego, California with her children.  In or about October 1999, Plaintiff Khalifa resided in a house in Khartoum with her husband and children, having left Maridi due to lack of resources.  Her husband worked in agriculture outside of the city.  Upon inquiring at her husband's place of employment after he had failed to return home, she was told the military took him.  There, she was forcibly detained by armed and uniformed GOS soldiers and taken by them to a warehouse detention facility where she was brutally beaten and repeatedly raped by the soldiers for approximately four days.  She was tortured with pepper dust over her head, repeatedly raped, put in toe clamps, and cut with spears, causing deep wounds to her leg, which left her unable to walk for months.  She was kept in an unsanitary, filthy, dark, and isolated cell without sufficient medical care, food or water.  Khalifa's husband never returned home.  After returning to Khartoum, GOS-backed militia forces again went to her

home where they beat and raped her while her children were present.  In 2000, Plaintiff Khalifa escaped Sudan with her children, including Plaintiff Amir Ahmed, to Egypt.  She resettled in the United States in September 2005 with three of her then-four children.  As a result of BNPP's criminal actions, the GOS had substantial financial resources that it would otherwise not have had and used those resources to acquire military hardware and fund militia that it then used to harm Plaintiff Khalifa and caused Plaintiff Khalifa grave injury, including physical and mental trauma and loss of property, including losing her property, her family home and belongings, all which were confiscated by the GOS.

50.     Plaintiff Amir Ahmed ("Ahmed"), a member of the Baka ethnic group, was born on March 26, 1998, in Maridi, Western Equatoria, southern Sudan.  In or about October 1999, Plaintiff Ahmed and his family moved from Maridi for Khartoum.  His father worked in agriculture outside of the city.  When his father failed to return from work one day, Ahmed's mother went to his place of employment, only to be forcibly detained by armed and uniformed GOS soldiers.  His mother was taken to a warehouse detention facility where she was brutally beaten and raped repeatedly by the soldiers for approximately four days. Plaintiff Ahmed never saw his father again.  After his mother was released, Plaintiff Khalifa returned home to Khartoum, where Plaintiff Ahmed was living with his siblings.  GOS-backed militia forces went to their home, where they beat and raped Khalifa in front of her children, including Plaintiff Ahmed.  In 2000, Plaintiff Ahmed escaped Sudan to a refugee camp with his three siblings and Plaintiff Khalifa.  He resettled in the United States in September 2005 with Plaintiff Khalifa and two of his three siblings.  As a result of BNPP's criminal actions, the GOS had substantial financial resources that it would otherwise not have

had and used those resources to acquire military hardware and fund militia that it then used to harm Plaintiff Ahmed and caused Plaintiff Ahmed grave mental trauma.

51.     BNPP's actions were a substantial factor in causing the foreseeable harm described above to each of the Plaintiffs.

52.     Plaintiffs, and each of them, seek to represent themselves, the estates of their immediate family members killed, and all others similarly situated who were the subject of the GOS's unlawful, violent, and in some cases genocidal, campaign against the country's civilian population and who are now living lawfully in the United States or who are U.S. citizens

### C.     Defendants

53.     Defendant BNP Paribas, S.A. is a global financial institution headquartered in Paris, France.  BNP Paribas, S.A. came into existence in May 2000 as the result of a merger of Banque Nationale de Paris S.A. and Banque de Paris et des Pays-Bas S.A.[10]  BNPPSA is the ultimate parent of its U.S. branch office and has its U.S. headquarters located at The Equitable Tower, 787 Seventh Avenue, New York, New York 10019.  BNPPSA is also the parent of its subsidiary, BNPP Geneva (BNP Paribas (Suisse) S.A.), located in Geneva, Switzerland ("BNPP Geneva").  BNPPSA pled guilty for U.S. Sanctions violations and criminal conduct committed by its subsidiaries, including BNPP Geneva and BNPPNY.

54.     Defendant BNP Paribas, S.A. New York Branch a/k/a BNP Paribas, named in the First Amended Complaint as Doe 1, is one of BNPPSA's U.S. subsidiaries.  It is

---

[10] Each of the two parent banks descended from four founding banks:  BNP resulted from the 1966 merger of two French banks, Banque Nationale Pour le Commerce et l'Industrie ("BNCI"), and Comptoir National d'Escompte de Paris ("CNEP"); Paribas was formed in 1872 from two investment banks based in Paris and Amsterdam.

registered with the New York State Department of Financial Services as a "foreign bank branch." Its offices are located at 787 Seventh Avenue, New York, New York, 10019.

55.     Defendant BNP Paribas North America, Inc. ("BNPPNA") is a U.S. subsidiary of BNPPSA. It is incorporated in Delaware and registered to do business in New York as a foreign business corporation. Its offices are located at 787 Seventh Avenue, New York, New York, 10019.

56.     The true names and capacities, whether individual, official, corporate, associate, or otherwise, or precise participation of Defendants, Does 2 through 10, inclusive, are not known to Plaintiffs at the time of the filing of this Second Amended Complaint and, therefore, these Defendants are being sued by such fictitious names. Plaintiffs will seek leave to amend this Second Amended Complaint to show their true names and/or capacities and precise participation when the same have been ascertained. Each Defendant designated as a Doe Defendant is a private actor and was responsible intentionally, negligently, or in some other actionable manner, for the events and happenings referred to herein which caused damages and injury to Plaintiffs within this Second Amended Complaint.

57.     Plaintiffs are informed and believe and thereon allege that at all times herein mentioned each Defendant sued herein was the agent, alter ego, subsidiary, and/or employee of each of the remaining Defendants and at all times was acting within the purpose and scope of such agency, alter ego, subsidiary relationship, or employment, with the permission and consent of their Co-Defendants and with the knowledge, authorization, permission, and consent and/or subsequent ratification and approval of each Co-Defendant.

### III.     JURISDICTION AND VENUE

58.     This Court has original jurisdiction over this case pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because there are more than one hundred class members,

at least one class member is diverse from Defendants, class members reside throughout the United States, and more than $5 million in aggregate, exclusive of interest and costs, is in controversy.

59.     This Court has personal jurisdiction over BNPPSA because BNPPSA, *inter alia*, purposefully availed itself of the New York forum and transacted business in New York under CPLR § 302(a)(1) by deliberately processing thousands of financial transactions in U.S. dollars, from and through the New York financial system, beginning in 1997 through 2007, which it knew were in violation of U.S. Sanctions and New York law.  BNPPSA also knew that its actions would cause foreseeable harm to the Class.  Personal jurisdiction is also proper under CPLR § 302(a)(2) because BNPPSA committed these tortious acts within the state as alleged herein.  These acts were confirmed by BNPPSA's admitted crimes in this district in the criminal prosecutions by the United States and the DANY.  Indeed, both this Court and the New York State Supreme Court exercised jurisdiction over BNPPSA when BNPPSA pled guilty.

60.     This Court has personal jurisdiction over BNPPNY because, *inter alia*, New York is its principal place of business.  Its address is 787 Seventh Avenue, New York, New York 10019.  BNPPNY transacts business in New York as defined by CPLR § 302(a). BNPPNY is the U.S. subsidiary branch of BNPPSA and it is headquartered in New York. BNPPSA used BNPPNY as a conduit for thousands of financial transactions in, from, and through New York beginning in 1997 through 2007.  Personal jurisdiction is also appropriate under CPLR § 302(a)(2) because BNPPNY committed tortious acts within the state as alleged herein and confirmed by its admitted crimes in this district in the criminal

prosecutions by the United States and the DANY and the consent order BNPPNY entered into with the DFS.

61.     This Court has personal jurisdiction over BNPPNA, *inter alia*, because its principle place of business is located in this state at 787 Seventh Avenue, New York, New York, 10019.  BNPPNA transacts business in New York as defined by CPLR § 302(a) in that its New York office was used as part of BNPP's scheme to conduct thousands of financial transactions in, from, and through New York beginning in 1997 through 2007.  Personal jurisdiction is also proper under CPLR § 302(a)(2) because BNPPNA committed tortious acts within the state as alleged herein.

62.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(a) and (b)(1), (2), and (3). First,     venue is proper under (b)(1) because BNPPNY's principal place of business is New York.  Further, BNPPSA is a resident under (c)(2) because it is subject to the Court's personal jurisdiction with respect to the civil action in question.

63.     Second, venue is proper under (b)(2) because "a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated" occurred in this judicial district.  Here, a substantial part of the events or omissions that gave rise to the claims occurred within New York and this district, including the criminal investigations, charges, and convictions.  As the United States' global financial center, New York was inextricably linked to BNPP's criminal conduct, which in turn, essential for the GOS to have the resources to perpetrate its campaign of violence against Plaintiffs.  Although dollar-denominated transactions can clear elsewhere in the United States, the New York City-based Clearing House Interbank Payments System ("CHIPS") handles approximately 95% of all cross-border U.S. dollar payments.  Thus,

without New York, the global locus for financial clearinghouse services for petrodollars, BNPP would not have been able to provide access to U.S. dollars and the U.S. financial system that the GOS needed to circumvent the U.S. Sanctions.  Further, BNPP cleared transactions in New York, thereby placing the funds at issue here in New York, yielding another basis for venue.

64.     The fact that the DANY investigated, charged, and convicted BNPP for falsifying business records demonstrates that BNPP committed illegal actions in New York and under New York state law, *e.g.*, "cooking" its records to cover up its violations of the U.S. Sanctions and/or formulating its intent to do the same, in New York.  Importantly, this criminal charge was not limited to the period in which BNPP used its New York Branch to process the illicit transactions.  The charges included the time period after 2004 in which BNPP used a third-party correspondent bank to process transactions in New York on Sudan's behalf.

65.     The fact that venue is proper here is confirmed by the fact that New York State law regulated BNPP's conduct, and New York state-based prosecutors and agencies, including the DANY, the DFS, the U.S. Attorney for the Southern District of New York, and the FRB-NY, exercised investigatory and regulatory authority over BNPP.

66.     The Southern District of New York is the proper forum because it has a strong interest in applying both its laws and the laws of the United States to entities that commit crimes and enter into pleas for those crimes within its borders, and New York has a strong interest in obtaining justice for the victims of the crimes that happen here and in overseeing the adjudication of civil liability for those crimes.  The array of federal and state laws, involved in this case—including the TWEA and the IEEPA, the U.S. Sanctions, and the

regulations supporting those Sanctions—and the enforcement thereof reflect the assessment by the U.S. and New York State governments, including the Judicial Branches of each, that BNPP's conduct can and should be regulated and punished here.

67.     Further, the Southern District is the proper forum because much of the evidence relevant to proving Plaintiffs' causes of action is already in New York.  During the investigations by multiple government agencies in New York, the agencies collected extensive information from BNPP, much of which demonstrates BNPP's liability.  Further, BNPPNY and the third party correspondent bank that BNPP also used to process financial transactions in New York, key components of the criminal conduct that is the subject of this suit and the above-mentioned investigations, are located in New York.

## IV.     FACTUAL BACKGROUND

### A.     The Repressive Secession of the South Sudan Government of Sudan Sought to Exploit Its Oil Resources

#### 1.     The al-Bashir Regime

68.     Sudan was, until the July 2011 secession of South Sudan, Africa's largest country, but despite being endowed with a wide variety of natural resources, it remains one of the poorest countries in the world.  It has been torn by civil strife since achieving independence in 1956, with a multitude of violent, interlocking conflicts in Western, Central, Eastern, and Southern Sudan.  The root cause of the decades of catastrophic violence is the continued dominance of certain groups from Khartoum and the surrounding Nile Valley.  To maintain its position of wealth and power, these riverine elite followed a strategy of divide and rule.  In the process, the elite have used religion, ethnicity, and language to divide and oppress disfavored groups, and have left the vast majority of the Sudanese in dismal poverty.

69.     This long history of oppression and division entered one of its darkest chapters in June 1989, when a cabal of Islamist politicians and military officers took power in a coup against a democratically elected government.  The coup installed Omar Hassan al-Bashir as head of the Revolutionary Command Council for National Salvation, the authority by which the junta exercised control.  Under the reign of al-Bashir and his allies, the GOS conducted a bloody and ever-intensifying campaign of violence against those in the south, east, and west of the country who might stand in the way of its efforts to consolidate power and expand oil exploration and revenue, including those disfavored civilians living in oil rich regions.

70.     Notably, even in the early 1990s, the human rights violations by the al-Bashir regime were internationally reported.  For example, in 1990, Africa Watch, a prominent African NGO, released one of the first major independent accounts of the crisis in the country, "Sudan, a Human Rights Disaster," which garnered substantial international media attention.[11]  In 1993, the U.S. designated Sudan as a state sponsor of terrorism, a designation that it still has.  And, in 1996, Human Rights Watch published a book-length report, "Behind the Red Line: Political Repression in Sudan," describing the violently coercive control the GOS imposed to discipline and punish its own citizens.  That report generated considerable international attention.[12]

---

[11] *See, e.g.*, Neil Henry, Life in Impoverished Sudan Grows Harder after Failed Coup, Wash. Post, May 24, 1990, at A45; Famine 'Used as Weapon', Guardian, Mar. 19, 1990; Michael A. Hiltzik, Sudan Accused of 'Brutal Repression' of Opposition: Human Rights: Hundreds were Jailed, Tortured or Hanged, the Africa Watch Group Reports, L.A. Times, Mar. 15, 1990.

[12] Human Rights Watch, Sudan: Rights Group Calls on Sudan to Open Secret Trials, Africa News, Sept. 13, 1996; Sudan: Slavery and War Abuses Continue, Rights Group Says, Inter Press Service, May 29, 1996; Abed Jaber, Rights Groups Accuses Sudan of Abuses, United Press Int'l, May 28, 1996.

### 2.    Sudan's 1997 Entry Into International Oil Markets

71.    The GOS, as part of its efforts to consolidate power and enrich itself, sought to develop Sudan's oil resources.  Although major oil deposits were discovered in southern Sudan beginning in 1979, efforts to exploit them, through concessions to foreign operators, had been frustrated by the on-going civil war, especially in the period following 1983, known as the Second Civil War.

72.    Beginning in 1995, the GOS looked to jump-start its oil production to obtain much needed revenue.  Given the lack of domestic know-how, the GOS needed to attract foreign partners with the technical ability to drill and export the oil.  To this end, al-Bashir visited China in 1995.  There, he signed an agreement with the China National Petroleum Corporation ("CNPC") to develop an oil rich region called Block Six, which is in the Muglad Basin in the Kordofan and Abyei regions.[13]  Two years later, CNPC and its partners, including Arakis Energy Corporation, a Canadian company that was taken over by Talisman Energy, Inc. ("Talisman") in 1998, formed a joint operating company, known as the Greater Nile Petroleum Operating Company ("GNPOC") to develop Blocks One, Two, and Four.

73.    By 1997, Sudan's effort to develop its oil reserves were well underway and it began planning to begin exporting oil.  This represented an auspicious opportunity for the regime to tap into new sources of funding for the military, but also to reward its key constituencies who had supported the military-Islamist government.  Thus, from the onset, the regime saw politics and the economy as mutually constitutive:  Political power was to be buttressed and expanded through the military and through wealth accumulation for new elites

---

[13] Sudan's oil fields are divided into a series of "blocks," each of which has been allocated to a different concessionaire.  Sudan awarded many of these blocks to foreign concessionaries to develop.

fiercely loyal to the new order, and, conversely, political networks were put at the service of enriching those deemed to deserve it for their support of the regime.

### 3. To Capitalize on Oil Exports, the GOS Needed Access to "Petrodollars," Which BNPP Agreed to Provide

74. The GOS, like other oil exporters, sought to market and sell its oil globally. In 1997, as now, that meant selling its oil for U.S. dollars, a/k/a "petrodollars," because that would maximize the revenues from its oil and give it U.S. dollars with which to import goods.

75. Oil transactions on the global market are priced and settled in U.S. dollars. This is so for many reasons: As the global reserve currency, the dollar is considered uniquely stable and easily convertible, unlike the currencies of many other countries with a large presence in the oil trade; the bulk of international trade is priced and transacted in U.S. dollars; over half of the world's central banks' foreign currency reserves are held in dollars; the United States has historically been a major buyer and seller in the global oil market; and the OPEC countries, which account for the bulk of global oil exports, price their oil in U.S. dollars.

76. For the GOS, like other oil exporters, to sell oil in dollars meant that it needed access to the U.S. financial system. Because of the structure and organization of global financial markets, transactions settled in dollars must be processed through the U.S. financial system in the United States. As mentioned above, the New York City-based CHIPS handles approximately 95% of all cross-border U.S. dollar payments. Payments flow through CHIPS even if both the payer and recipient are based outside of the United States.[14] Foreign banks

---

[14] *See* Barry E. Carter & Ryan Farha, *Overview and Operation of U.S. Financial Sanctions, Including the Example of Iran*, 44 Geo. J. Int'l L. 903-913 (2013).

settle U.S. dollar transactions either through a United States-based subsidiary or a correspondent bank based in the United States.[15]

77.     The GOS's alternatives to selling oil in U.S. dollars were significantly less advantageous, a fact confirmed by the experience of other oil producers like Iraq and Iran that suffered under U.S. Sanctions.  Without access to dollars via the U.S. financial system, the GOS would either have had to (*i*) barter its oil in exchange for other goods or services, or (*ii*) accept other currencies, both of which have significant drawbacks.

78.     Bartering limits potential counterparties to those that have something the oil producer wants and who, in turn, want oil.  Russia and China, two of the GOS's main weapons suppliers, are the second and fifth largest global oil producers and therefore are unlikely barter partners for Sudan's oil.  Bartering also requires shipping oil to the counterparty, which can be an expensive or difficult proposition.  Similarly, using an alternative currency is generally financially disadvantageous.  Currencies other than the U.S. dollar are less stable and less convertible, and therefore they increase transaction costs due to risk discounts and currency arbitrage.

79.     Access to letters of credit from reputable, internationally known banks such as BNPP, including letters of credit denominated in U.S. dollars, was also crucial to the GOS's ability to monetize its oil from and after the late 1990s, both for its exports and imports.

80.     Letters of credit are an essential part of trade finance, where payment for imported goods is not made at the time of delivery (typically, it is made thirty days after).  In international trade, assessing the creditworthiness of counterparties in different countries is difficult, and seeking and obtaining compensation for contractual nonperformance is

---

[15] A correspondent bank is a financial institution that provides services on behalf of another financial institution, including wire transfers, business transactions, and accepting deposits.

expensive, time-consuming, and problematic.  Letters of credit are designed to address these issues.  A letter of credit is a commitment to pay by the issuing bank, enabling a seller to substitute the bank's creditworthiness for that of the buyer, and it is used when the transaction value is sizeable.  For example, a single cargo of crude oil could be worth $20 million to $75 million, depending on the price of oil.  A letter of credit guaranteed payment in the case of buyer non-performance.

81.    In addition, when buyers incur costs in purchasing goods (*e.g.*, in chartering a tanker to pick up a cargo of crude oil), or are concerned that sellers may not make delivery on previously agreed pricing terms (*e.g.*, when markets are volatile), sellers may need to post a performance bond, which are often in the form of a letter of credit.

82.    Thus, by 1997, the GOS needed and sought out a banking partner such as BNPP that would be able to settle oil transactions in the U.S. and to provide it with U.S. dollar denominated letters of credit to maximize its exploitation of its oil resources.  The GOS also needed a banking partner willing to violate U.S. Sanctions against prohibiting those very services due to the likely impact on civilian populations.

**B.    U.S. Sanctions Implemented U.S. Policy Opposing the Government of Sudan's Persecution of Disfavored Sudanese Civilians and the Use of Oil Income to Finance Such Persecution**

83.    Just as the GOS was entering the global market for oil and in need of access to the U.S. financial system, the United States implemented and increased its Sanctions on Sudan.  The United States did so, in part, because of the atrocities being committed by the GOS and the fact that oil revenues would undoubtedly boost the GOS's ability to continue them.  The critical role of the U.S financial system in international trade, including the oil industry, were well known in the 1990s, and, when it exercised its sanctions power, the

United States did so knowing that a country cut off from access to it would suffer economically. They were not paper tigers. The sanctions were intended and expected to have a material impact on the GOS.

*****

84.     Congress and the Executive Branch recognized the Sudanese people's suffering at the hands of the GOS, their own government, and took action to try to end these atrocities by imposing economic sanctions on Sudan and those that would do business with the GOS.

85.     A 1992 concurrent resolution in the House of Representations and the Senate "condemn[ed] the egregious human rights abuses by the [GOS] and call[ed] upon [it] to cease its abuses of internationally recognized human rights."[16] Congress admonished the GOS for its "imprisonment, torture, and execution of suspected dissidents across the country," "cruel campaign to relocate some 500,000 internally displaced southerners and westerners from the outskirts of Khartoum to inhospitable camps far from the city," and "campaign of forced displacement of tens of thousands of Nuba from their ancestral homes in southern Kordofan Province, the destruction of Nuba villages, and the killing of hundreds of civilians."[17]

86.     In 1993, the U.S designated Sudan as a state sponsor of terrorism, a designation that it still has today.

---

[16] S. Con. Res. 140, 102 Cong., 106 Stat. 5207 (Oct. 6, 1992).

[17] *Id.*

87.     In 1995, a U.S. State Department report to Congress principally attributed Sudan's on-going internal havoc to the GOS's campaign of massive human rights abuses.[18]

88.     As the violence persisted and as Sudan was working to exploit its oil resources and begin exporting oil, President Bill Clinton issued Executive Order 13067 on November 3, 1997 ("E.O. 13067"), pursuant to authority granted by, *inter alia*, the IEEPA.[19]

89.     E.O. 13067 was designed to cut off the GOS from the U.S. financial system to deprive the GOS of access to the dollars that it needed to fund its human rights violations. E.O. 13067 imposed broad economic sanctions that froze GOS assets in the United States and prohibited broad categories of transactions by any individual or entity in the United States with the GOS, its agencies, instrumentalities, and controlled entities, including the Central Bank of Sudan.   The 1997 sanctions covered the import and export of goods, technology, and services, including brokerage, lending, and financing services.[20]   The sanctions did so because "the policies and actions of the [GOS], including continued support for international terrorism; ongoing efforts to destabilize neighboring governments; ***and the prevalence of human rights violations, including slavery and the denial of religious freedom***, constitute an unusual and extraordinary threat to the national security and foreign policy of the United States." (emphasis added)[21]

90.     The 2002 Sudan Peace Act recognized the continuing grave situation on the ground:  "The acts of the [GOS] . . . constitute genocide as defined by the Convention on the

---

[18] U.S. Department of State Dispatch, U.S. Policy Toward Sudan, Statement by Edward Brynn, Acting Assistant Secretary for African Affairs, before the Subcommittee on Africa, House, International Relations Committee (Mar. 22, 1995).

[19] Codified at 50 U.S.C. 1701 *et seq*.

[20] Exec. Order No. 13067, 62 Fed. Reg. 59989 (Nov. 3, 1997), reprinted in 31 C.F.R. 538 (62 Fed. Reg. 59989, November 5, 1997).

[21] *Id.*

Prevention and Punishment of the Crime of Genocide."[22]   Congress found that the GOS: (*i*) "intensified its prosecution of the war against areas outside of its control, which has already cost more than 2,000,000 lives and has displaced more than 4,000,000 people;" (*ii*) "used divide-and-conquer techniques effectively to subjugate its population;" and (*iii*) "utilize[d] and organize[d] militias, Popular Defense Forces, and other irregular units for raiding and enslaving parties in areas outside of [its] control . . . in an effort to disrupt severely the ability of the populations in those areas to sustain themselves."[23]   The Act singled out the GOS's "use of raiding and slaving parties [as] a tool for creating food shortages and [ ] as a systematic means to destroy the societies, culture, and economies of the Dinka, Nuer, and Nuba peoples. . . ."[24]

91.    The Peace Act required the President, after consultations with Congress, to implement further sanctions if the President concluded that the GOS was not making a good faith effort to end the on-going civil war and its human rights abuses.[25]   The Act focused specifically on the direct relationship between GOS's abuses and its access to oil revenues, finding that the GOS "***has repeatedly stated that it intends to use the expected proceeds from future oil sales to increase the tempo and lethality of the war against the areas outside of its control.***"[26] (emphasis added).   To that end, the Act instructed the President to "take all necessary and appropriate steps . . . to deny the [GOS] access to oil revenues to

---

[22] The Sudan Peace Act, Pub. L. 107-245 at § 2(10), 116 Stat. 1504 (2002) (codified at 50 U.S.C. § 1701 note).

[23] Pub. L. 107-245 § 2(1)-(7).

[24] *Id*. at § 4(2).

[25] *Id*. at § 6(b).

[26] *Id*. at § 2(8).

ensure that the [GOS] neither directly nor indirectly utilizes any oil revenues to purchase or acquire military equipment or to finance any military activities."[27]

92. Forerunning the explicit terms of the Peace Act itself, the Congressional debate on the Peace Act focused repeatedly on the link, recognized at that time, between the GOS's human rights abuses and its oil sales, further evidencing Congress's desire to protect the victimized Sudanese people when it enacted the Sudan Peace Act:

- "The Sudanese Government *has increased oil mining in areas inhabited by the southern Sudanese, thereby forcibly displacing the people to finance a more lethal and offensive war.* I would point out to my colleagues that *oil has been facilitating this war, and we have got to be very clear that any way that we help or enable the production of oil in the Sudan means that more innocent people will lose their lives.*"[28]

- "*And for the first time, there will be a link made officially between the genocide and the slaughter in Sudan and oil money.*"[29]

- "[T]he bill before us today makes *the express link between oil and the Government of Sudan's intention to use future revenues to expand the war into areas beyond its control.*"[30]

93. The 2004 Comprehensive Peace in Sudan Act[31] broadened the concerns of the 2002 Act to include the Darfur region,[32] because "both the executive branch and Congress [ ] concluded that genocide has been committed and may still be occurring in the Darfur region, and that the [GOS] and militias supported by the [GOS], known as the Janjaweed, bear

---

[27] *Id*. at § 6(b)(2)(C).

[28] Statement of Representative Chris Smith, 107 Cong. Rec. H7105 (Daily ed. Oct. 7, 2002) (emphasis added).

[29] Statement of Representative Bachus, *Id*. at H7108 (emphasis added).

[30] Statement of Representative Eddie Bernice Johnson , *Id*. at H7109 (emphasis added).

[31] Comprehensive Peace in Sudan Act of 2004, Pub. L. 108-497, 118 Stat. 4012 (2004).

[32] Pub. L. 108-497 § 4(a).

responsibility for the genocide."[33]  Congress again recognized the role of oil in fueling the conflict and required the Secretary of State to submit to it a report describing the "***current status of Sudan's financing and construction of infrastructure and pipelines for oil exploitation, the effects of such financing and construction on the inhabitants of the regions in which the oil fields are located and the ability of the [GOS] to finance the war in Sudan with the proceeds of the oil exploitation.***"[34]

94.    President George W. Bush issued E.O. 13400 on April 26, 2006 ("E.O. 13400"),[35] which expanded the scope of E.O. 13067 to block property and property interests of certain persons connected to the conflict in Darfur.  E.O. 13400 was in response to "the persistence of violence in Sudan's Darfur region, particularly against civilians and including sexual violence against women and girls, and by the deterioration of the security situation and its negative impact on humanitarian assistance efforts. . . ."

95.    On October 13, 2006, President Bush signed the Darfur Peace and Accountability Act.[36]  Congress found that "the genocide unfolding in the Darfur region of Sudan is characterized by acts of terrorism and atrocities directed against civilians, including mass murder, rape, and sexual violence committed by the Janjaweed and associated militias with the complicity and support of the National Congress Party-led faction of the Government of Sudan."[37]  The Act required that the 1997 sanctions "remain[ed] in effect, and shall not be lifted . . . until the President certifies to the appropriate congressional

---

[33] Pub. L. 108-497 § 3(6).

[34] *Id*. at §8(a)(1) (emphasis added).

[35] Exec. Order No. 13400, 71 Fed. Reg. 25483 (Apr. 26, 2006).

[36] Darfur Peace and Accountability Act of 2006, Pub. L. 109-344, 50 U.S.C. § 1701 (2016).

[37] *Id.* at § 4(1).

committees that the [GOS] is acting in good faith to," among other things, "implement the Darfur Peace Agreement," "disarm, demobilize, and demilitarize the Janjaweed and all militias allied with the Government of Sudan," "fully implement the Comprehensive Peace Agreement for Sudan without manipulation or delay," and "withdraw[ ] government forces from Southern Sudan consistent with the terms of the Comprehensive Peace Agreement for Sudan."[38]

96.    Days later, President Bush issued Executive Order 13412 ("E.O. 13412"), imposing additional sanctions aimed specifically at the GOS's ability to fuel genocide with oil.  It prohibited "***all transactions by United States persons relating to the petroleum or petrochemical industries in Sudan***, including, but not limited to, oilfield services and oil or gas pipelines. . . ."[39]

97.    As summarized in a 2007 State Department statement of "overall policy": the "United States has imposed economic sanctions on Sudanese individuals and companies owned or controlled by the Government of Sudan to increase pressure on Khartoum to end the violence in Darfur."[40]

98.    Throughout the awful history of the GOS since 1989,

U.S. policy in Sudan [has been] focused on achieving a definitive end to gross human rights abuses and conflicts, including in Darfur, Blue Nile and

---

[38] Pub. L. 109-344 § 7(a).

[39] Exec. Order No. 13412, 71 Fed. Reg. 61369 (Oct. 17, 2006) (emphasis added).  The Office of Foreign Assets Control ("OFAC") promulgated the Sudanese Sanctions Regulations on July 1, 1998 to implement E.O. 13067.  *See* 31 C.F.R. part 538.  OFAC amended the regulations on October 31, 2007 to implement E.O. 13412.  It issued the Darfur Sanctions Regulations, 31 C.F.R. part 546 on May 28, 2009 to implement E.O. 13400.

[40] U.S. State Dept., U.S. Support for the People of Sudan, Nov. 20, 2007 (emphasis added), https://2001-2009.state.gov/documents/organization/95916.pdf.

Southern Kordofan.…  Sanctions underscore the U.S. commitment to ending the suffering of millions of Sudanese affected by the crisis in Darfur.[41]

99.     Thus, the U.S. Congress and the Executive Branch recognized the causal link between the GOS's access to the U.S. financial system and resulting increase in the GOS's oil revenue and the GOS's atrocities, including those committed in connection with the GOS's exploitation of its oil resources.

100.     Accordingly, the U.S. Sanctions, as established by laws of these United States and implemented by the Executive Branch were intended and expected to harm Sudan's economy and its exploitation of its oil resources and therefore to benefit disfavored civilians in Sudan and protect them from unspeakable violence at the hands of the GOS and its proxies.  Those civilians included Plaintiffs and the Class they represent.  Plaintiffs and the Class were therefore the legislatively-intended beneficiaries of the U.S. Sanctions.

## C.     BNPP Agreed and Conspired with the GOS to Provide Illegal Access to U.S. Financial Markets with the Understanding That This Would Sustain and Expand the GOS's Campaign of Violence and Internal Repression

101.     Faced with a compelling need for access to the U.S. financial system to develop its oil resources and maximize its profits, a need for dollar-denominated letters of credit, and a need for dollars to acquire goods, the GOS sought to evade the U.S. sanctions, and BNPP agreed and conspired with the GOS to allow it to evade the impact of the sanctions and to enrich GOS.  BNPP's agreement and conspiracy with the GOS were intended to provide the means to the GOS to continue and to increase its exploitation of its oil resources that was, and was understood to be, part and parcel of the GOS's atrocities and campaign of human rights abuses.  BNPP did so to make money, out of greed and desire for

---

[41]  U.S. State Dept., U.S. Relations with Sudan Fact Sheet (Nov. 3, 2015),

http://www.state.gov/r/pa/ei/bgn/5424.htm.

profits, even as it knew that its services were in support of a terrorist, human-rights abusing regime.[42]

102.    In 1997, on the heels of the initial U.S. Sanctions, BNPP became become the GOS's sole correspondent bank in Europe, responsible for transactions that comprised a huge portion of Sudan's exports and imports, and undertook a decade-long, secret program of violating U.S. and New York law aimed at preventing GOS access to U.S. financial markets. BNPP's participation was essential to the GOS's war against its own people.

103.    BNPP's actions were made in concert with the GOS.  By 1997, the GOS had taken total control of foreign exchange, and the GOS demanded complicity and alignment from its commercial partners in its objectives, which at that time including committing atrocities such as removing disfavored civilian populations from oil rich regions.  BNPP provided the explicit, or at least implicit, acquiescence required by the GOS of its commercial partners, including avoiding any conflict with the GOS objectives, in particular, its attacks on civilian populations that occurred with greater frequency and velocity after BNNP agreed to partner with the GOS.

104.    The GOS quickly directed all major Sudanese commercial banks to use BNPP as their primary correspondent bank in Europe.  As a result, nearly all major Sudanese commercial banks had U.S. dollar accounts with BNPP.  For example, in that role, BNPP held U.S. dollar accounts for the GOS and for sanctioned Sudanese entities ("Specially

---

[42] *See* Press Release, NYDFS, Cuomo Administration Announces BNP Paribas to Pay 8.9 Billion, Including $2.24 Billion to NYDFS, Terminate Senior Executives, Restrict U.S. Dollar Clearing Operations for Violations of Law (June 30, 2014) (stating that "the commercial stakes are significant"), attached as Ex. J, and is incorporated herein as if set forth in its entirety.

Designated Nationals" or "SDNs") in order to process U.S. dollar transactions and develop credit for Sudanese banks.

105.    As recounted in a diplomatic cable from the U.S. Embassy to the U.S. Secretary of State, the Director of the Petroleum Unit in the Sudanese Ministry of Finance and Economic Planning Yousif Ramadan Mohammed El Hassan, confirmed BNPP's crucial role in the GOS's oil sales and revenues:

> El Hassan said that money from the sales of oil are first deposited at the Central Bank of Sudan account at [BNPP Geneva].  From there, the money is transferred to the Bank headquarters in Khartoum, the amount due to the [GOS] is transferred to the Bank of Southern Sudan (BOSS).  BOSS is simply the southern branch of the Central Bank.  The BOSS maintains accounts in commercial banks in Khartoum (e.g., Bank of Khartoum, Omdurman National Bank and Dubai Bank of Khartoum) as well as in Nairobi (at Stanbic Bank).[43]

Thus, revenue from the sales of oil transactions, performed and enabled by BNPP, provided revenue to the GOS.

106.    From 1997 to 2007, Sudan's primary export and source of government revenue was—by a significant amount—oil.[44]  During that time, as admitted by BNPP in the Statement of Facts supporting its guilty plea, it "developed a business in letters of credit for the Sudanese banks.  Due to its role in financing Sudan's export of oil, BNPP Geneva also took on a central role in Sudan's foreign commerce market."[45]  BNPP provided letters of credit not only on behalf of the GOS's counterparties but also on behalf of the GOS itself.

---

[43]  Diplomatic Cable from U.S. Embassy, Sudan to Intergovernmental Authority on Development and U.S. Secretary of State, *Oil Revenue: 2007 GNU Budget Based on Questionable Assumptions*, (Feb. 9, 2007), at 5, https://www.wikileaks.org/plusd/cables/07KHARTOUM194_a.html ("Feb. 9 Cable").

[44]  Foreign Trade Statistical Digest, Central Bank of Sudan, table of Trade Balances 2005-2014, at 5.  http://www.cbos.gov.sd/sites/default/files/digest_q4_14.pdf

[45]  Statement of Facts dated June 30, 2014, Ex. 2 to Plea Agreement, Dkt. No. 14-CR-00460-LGS Doc. No. 13, attached as Ex. C, ¶19 (the "SOF") and is incorporated herein as if set forth in its entirety.

***By 2006, BNPP's letters of credit came to represent a quarter of all Sudan's exports and a fifth of its imports***.  Over 90% of these letters of credit were denominated in U.S. dollars.[46]  One state-owned Sudanese bank's deposits at BNPP "represented about 50% of Sudan's foreign currency assets during this time period."[47]  At the time of BNPP's guilty plea, the U.S. Deputy Attorney General described BNPP as acting "as a de facto central bank for the Government of Sudan."[48]

107.   In addition to processing U.S. dollar transactions, in 2000, BNPP also developed a business in providing letters of credit for Sudanese banks that in turn facilitated the GOS's ability to buy imports, particularly those where the sellers priced their goods in dollars, thereby increasing the GOS's available resources to acquire goods.

108.   On information and belief, BNPP's letters of credit covered a significant part of Sudanese imports and therefore enabled the GOS to import weapons and other goods sold in dollars.  Similarly, on information and belief, BNPP's letters of credit covered a significant part of Sudanese exports and therefore facilitated and increased revenues from Sudan's crude oil sales, which accounted for nearly all of the country's exports.

109.   Thus, by having access to dollars and dollar-denominated letters of credit to purchase goods to import, the GOS was able to purchase materially more imports than it otherwise would because dollars, as the leading global currency, are more desirable than other currencies, are preferred to bartering, and are more widely accepted.  In other words,

---

[46] *Id.* (emphasis added).

[47] *Id*.

[48] Remarks by Deputy Attorney General Cole at Press Conference Announcing Significant Law Enforcement Action, Justice News, June 30, 2014, https://www.justice.gov/opa/speech/remarks-deputy-attorney-general-cole-press-conference-announcing-significant-law.

BNPP's assistance gave the GOS more buying power than it otherwise would have had.  As described above, U.S. Sanctions were intended to prevent this precise outcome.

110.    BNPP continued its key role clearing transactions through or into the United States until 2007 when the U.S. authorities alerted BNPP to their investigation, holding U.S. dollar accounts for the GOS and sanctioned Sudanese entities ("Specially Designated Nationals" or "SDNs") in order to process illegally U.S. dollar transactions in New York and develop credit for Sudanese banks.

111.    To enable it to continue its conspiracy with the GOS, for as long as it did, BNPP agreed with the GOS to use deceptive procedures and transaction structures to avoid U.S. screening procedures that identify and block transactions involving sanctioned entities.  For example, BNPP concealed its illicit conduct by modifying or omitting references to SDNs in U.S. dollar transactions, including letters of credit, processed through the United States.

112.    BNPP also agreed with the GOS to evade sanctions by using banks unaffiliated with BNPP or Sudan to process illicit transactions.  BNPP called them "satellite banks."  In these transactions, Sudanese banks seeking to settle U.S. dollar transactions through New York first transferred funds within BNPP to a satellite bank's BNPP account.  The satellite bank transferred the funds to a U.S. bank and then on to the Sudanese bank's intended beneficiary.  This was all done without reference to Sudan or the Sudanese bank, which was not the usual and customary method.  To help to obscure the ultimate reason for the transactions, BNPP often instructed the satellite bank to wait a day or more to clear the funds through New York.  The process was reversed to get U.S. dollars into Sudan from third parties not located within the country.

113.   This satellite bank structure had no purpose other than to evade U.S. Sanctions, and the deceptive transaction-clearing procedures used by BNPP, enabled the SDNs to process thousands of illicit U.S. dollar transactions worth billions of dollars.[49]

114.   Even after having some "deficiencies" caught by U.S. regulators, BNPP continued its conspiracy with the GOS.   In 2004, the FRB-NY and the DFS first identified "deficiencies in [BNPPNY's] monitoring of transactions with overseas clients, including the processing of U.S. dollar transactions for overseas clients."[50]   In September 2004, BNPP entered into a Memorandum of Understanding ("MOU") with the FRB-NY and the DFS that required, *inter alia*, that BNPPNY improve its systems for compliance with U.S. Sanctions. Instead, BNPP simply shifted the processing of U.S. dollar transactions—doctored to conceal any Sudan connection—from BNPP's New York branch to flow through an unaffiliated bank which, on information and belief, was also New York-based.   Thus, though the bank may have changed, BNPP continued to structure and accomplish settlement in New York of U.S. dollar transactions for the SDNs.

**D.    With Access to Petrodollars Provided by BNPP, Sudan's Exports of Oil and Revenues Rose Dramatically**

115.   Between 1998 and 2007, Sudan's oil production rose dramatically, and in turn, total GOS revenue grew substantially.

116.   Through BNPP financing, letters of credit in U.S. dollars, and *de facto* money laundering, the GOS transformed Sudan's rudimentary oil industry quickly and dramatically. World Bank data shows the 1997-2006 growth in Sudan's oil production, measured in 1,000s

---

[49] SOF, Ex. C, ¶24.

[50] *Id*. at ¶28.

of barrels of oil per day.[51]  In 1997, Sudan produced 9,000 barrels of oil per day.  Just two

years later, it produced 63,000 barrels per day and by 2006, Sudan's oil production had

exploded to 331,000 barrels per day.

117.   On information and belief, GOS revenues from Sudan's export of oil also

grew significantly rising from less than $2 billion in 2002 to nearly $10 billion in 2007.[52]

Sudan's increased oil production, exports and revenues were made possible only by its illegal

financial transactions with BNPP.

118.   The fact that BNPP's partnership with the GOS to violate Sanctions was a

substantial, causal factor in Sudan's increased oil production, exports and revenues is further

demonstrated by the experience of other countries subject to U.S. sanctions.  Economic

sanctions imposed against Iran in 2005 by the United States and the European Union are a

case in point.  Iran had to price its oil in the currencies of its main customers, China and

India.[53]  Because their currencies are not readily convertible, Iran sold its oil for a significant

discount, which may have been as much as ten percent.[54]  If Sudan—a poorer, less

---

[51] Data from the World Bank, http://data.worldbank.org/country/sudan.

[52] European Coalition on Oil in Sudan, Sudan: Whose Oil?, at 25 (April 2008).  This comports with U.S. State Department data, which estimated that in 2002, Sudan's oil production yielded overall revenues as high as $1.2 billion.  *See* Press Release accompanying 2003 U.S. Department of State Sudan Peace Act Report to Congress. Press Release, State Dept., Sudan Peace Act: Presidential Finding and Reports to Congress (April 22, 2003), http://reliefweb.int/report/sudan/ sudan-peace-act-presidential-finding-and-reports-congress.

[53] Kennth Katzman, Cong. Research Serv., RS20871, *Iran Sanctions*, at 51-52 (Oct. 11, 2013).

[54] See Wayne Ma and Tennille Tracy, Sanctions Gap Allows China to Import Iranian Oil; Beijing Bypasses U.S. Law by Importing More Fuel Oil Not Covered by Sanctions, Wall St. J. Online, Aug. 21, 2013,; *see also* Asia, Black Market Only Options for Iran's Crude, Petroleum Intelligence Weekly, Apr. 23, 2012.  This discount was not the only significant financial harm that Iran suffered as a result of the sanctions on its oil production.  Royal Dutch Shell, a Anglo-Dutch oil company and one of Iran's customers, was unable to remit to Iran $2 billion for oil it purchased prior to the sanctions going into effect.  See Benoit

economically powerful, and less geopolitically important country than Iran, and, therefore, less able to barter or support its oil pricing—were to have suffered the same ten percent discount in 2006, when the country produced 331,000 barrels per day, it would have represented a potential loss of about $730 million or $2 million a day, an amount equal to about 30% of the GOS's 2006 military spending.

119.    When not undermined as they were in Sudan, U.S. financial sanctions are a potent economic tool in curbing the violent and repressive conduct of governments such as the al-Bashir regime.

### E.    As a Result of Increased Oil Revenues, Military Spending Grew, Both in Total Dollars and as a Percentage of Government Spending

120.    Plaintiffs are informed and believe that the proceeds to the GOS from BNPP's Sanctions violations during all or most of the period of Plaintiffs' injuries exceeded the GOS's total military expenditures.  They were such a substantial source of revenue that the GOS could otherwise not have funded the military at the nearly same level without BNPP's Sanctions violations during the period when GOS's military and proxy militia forces operated and funded by the GOS inflicted Plaintiffs' injuries.  Enabled by petrodollars, GOS troops and their surrogate paramilitaries caused the violent death and injury of thousands of Darfuris and citizens of central and south Sudan.

---

Faucon, Shell CEO Discusses $2 Billion Debt Payment With Iran Oil Minister, Wall St. J. Online, June 3, 2015, http://www.wsj.com/articles/shell-ceo-discusses-2-billion-debt-payment-with-iran-oil-minister-1433359074; see also Emmanuel Hache and Olivier Massol, Sanctions against Iran: An Assessment of their Global Impact Through the Lens of International Methanol Prices, at 7 (IFP Énergies Nouvelles, Working Paper 106, Apr. 2016), https://www.researchgate.net/profile/Emmanuel_Hache/publication/301222462_Sanctions_against_Iran_An_assessment_of_their_global_impact_through_the_lens_of_international_methanol_prices/links/570d602008ae3199889bbf62.pdf.

121.    At the start of BNPP's involvement, the GOS's oil revenue was insignificant; by 2006, according to World Bank data, oil revenue accounted for more than 10% of GDP.[55] The GOS spent a disproportionate, increasing amount of its growing revenues on the military, the National Intelligence and Security Services (NISS), the Popular Defense Forces (PDF), and the other formal and informal branches of the GOS's coercive apparatus.   On information and belief, during most years when BNPP was processing oil exports for the GOS, military spending alone (*i.e.*, the officially allocated budget for the Sudanese Armed Forces) as a percentage of total GOS spending was more than double, or even triple, what it had been pre-BNPP.  ***Between 1997 and 2006, GOS military spending grew nearly ten-fold: from $282 million in 1997 to $2.7 billion in 2006, and, as a share of GDP, went from less than 1% to nearly 3.4%.***[56]   To spend this percentage of GDP on the military is quite remarkable, particularly for a poor country.

122.    Because true military spending is not public information, these figures are approximate.  Moreover, the figures almost certainly underestimate the GOS's actual military spending because they most likely do not include the money the GOS spent on the NISS, its most important secret service, and the various militias the GOS supported.

123.    The U.S. Embassy in Khartoum recognized the extent of Sudan's military spending:  In 2007, Sudan's "budget allocate[d] substantial revenue to military and security expenditures, leaving relatively small amounts available for development, health and education."[57]

---

[55] World Bank, Sudan Public Expenditure Review: Synthesis Report, at 9 (Report No. 41840-SD, Dec. 2007).

[56] *See* Stockholm International Peace Research Institute, SIPRI Military Expenditure Database, https://www.sipri.org/databases/milex.

[57] Feb. 9 Cable at ¶ 1.

124.    In its country status report, the World Bank observed the connection between the GOS's oil revenues and the continuing conflict: "Petroleum has emerged as a major source of economic growth and revenue for the government.  It has also emerged as one of the major factors that keeps the war going."[58]

125.    The GOS's vast increase in oil revenue, made possible only because of BNPP enabled the GOS to grow its military spending and to keep the war going.[59]

### F.    Sudan Used its Oil Revenue to Buy and Manufacture Weapons and Weapons Delivery Systems

126.    The GOS used the oil wealth that it acquired thanks to BNPP's criminal actions to embark on a major weapons acquisition spree.  The GOS did not just purchase standard guns and ammunition.  It purchased modern, highly sophisticated, and extremely expensive armaments capable of inflicting massive amounts of harm and damage in a ruthlessly efficient manner.  Sudan's major weapons suppliers included China, Russia, Ukraine, Iran, and Belarus.[60]

127.    The GOS's access to U.S. dollars that BNPP provided, on information and belief, enhanced the GOS's ability to import weapons, especially from suppliers in countries

---

[58] World Bank, Sudan, Country Economic Memorandum: Stabilization and Reconstruction, Report No. 24620-SU, at 18 (June 2003), http://documents.worldbank.org/curated/en/440091468777571140/main-text.

[59] When BNPP began its involvement in Sudan, Sudan was in arrears on the repayment of its foreign debt and could not have borrowed more money from the international debt market without the additional oil revenue.  By the end of 2001, Sudan's foreign debt was $20.9 billion, almost twice the country's GDP.  *See* Republic of Sudan and European Community, Country Strategy Paper and National Indicative Programme for the Period 2002-2007, DEV/0116/EN, at 11-13 (Oct. 2002).

[60] Like its oil revenues, the GOS's arms purchases are likely underreported.  Therefore, the extensive weapons acquisitions detailed herein likely understate the full extent of what the GOS bought.

with nonconvertible currencies, such as those above.  Arms suppliers prefer payment in U.S. dollars for the same reasons as oil exporters—convertibility, liquidity, and stability.

128.   One branch of its military that the GOS focused on expanding was its air force.  Prior to 1997, Sudan had only a rudimentary air force, composed of a small number of aging aircraft.  This changed once the GOS started receiving its oil revenues.  During the relevant period, the GOS purchased tactical attack jets (such as the MiG-29 and Su-25), combat helicopters (such as the Mi-17), helicopter gunships (such as the Mi-24),[61] and goods and troop transports (such as Antonovs).[62]  The GOS retrofitted many of the cargo planes into crude bombers from which barrel bombs were simply rolled out of the cargo bay and onto unsuspecting victims.[63]  Indeed, in just one year, 2001, the GOS *tripled* its fleet of attack helicopters by purchasing twelve Russian made aircraft.[64]  The MiG-29s were particularly expensive.  On information and belief, each plane cost $11 million, before the additional, substantial expenses of service and training contracts.[65]

129.   The GOS also spent its oil revenue building up its small arms and military hardware reserves.  For example, the GOS purchased Russian armored combat vehicles, large-caliber artillery systems from Belarus, Chinese made WeiShi-2/3 missiles (which have

---

[61] *See* Small Arms Survey – Supply and Demand, Arms Flow and Holdings in Sudan, HSBA (Dec. 2009), http://www.smallarmssurveysudan.org/fileadmin/docs/issue-briefs/HSBA-IB-15-arms-flows-and-holdings-in-Sudan.pdf.

[62] *See* Amnesty International, Sudan: Arming the Perpetrators of Grave Abuses in Darfur, at 19, 35-36 (Nov. 16, 2004), https://www.amnesty.org/en/documents/afr54/139/2004/en/

[63] *See* Amnesty International, Blood at the Crossroads: Making the Case for a Global Arms Trade Treaty, at 86-87, 94 (Sept. 17, 2008), https://www.amnesty.org/en/documents/ACT30/011/2008/en/.

[64] *See* Human Rights Watch, Sudan, Oil, and Human Rights, at 37 (2003).

[65] *See* How Much Does a MiG-29 Cost?, Angel Fire, http://www.angelfire.com/falcon/fighterplanes/texts/articles/MiG-29.html.

a range of 200 kilometers), tanks, armored personnel carriers, infantry fighting vehicles, multiple rocket launchers, portable surface to air missiles, recoilless rifles, mortars of various sizes, and heavy machine guns (such as Russian-built "Doshka" machine guns).[66]

130.    Further, the GOS used its oil revenue to establish a domestic weapons industry.  Beginning in the late 1990s, Sudanese officials boasted of using its oil revenues to develop the ability to manufacture ammunitions, mortars, tanks, and armored personnel carriers.[67]   On January 7, 2002, the GOS paraded its domestically produced hardware in central Khartoum.

131.    The GOS used its new resources to manufacture its own armaments:  "[Sudan] will this year reach self-sufficiency in light, medium and heavy weapons from local production," thanks to its "*unprecedented economic boom particularly in the field of oil exploration and exportation*."   (emphasis added).   Sudan also produced rocket-propelled grenades, machine guns, and mortars.[68]

132.    The GOS shared many of its weapons, particularly the small arms, with the various proxy militias that fought under the government's direction to achieve its awful aims. For example, the GOS provided militias with Russian-made arms.

133.    The effects of Sudan's enhanced military procurements during this period continue to be felt through today due to the long shelf lives of many of the military hardware and weapons the GOS purchased.  Thus, planes helicopters and weapons bought by the GOS

---

[66] *See* Eric Reeves, Kleptocracy in Khartoum: Self-Enrichment by the National Islamic Front/National Congress Party, Enough Project, Dec. 2015, http://www.enoughproject.org/files/EnoughForum_KleptocracyInKhartoum_Reeves_Dec2015.pdf

[67] *See* Human Rights Watch, Sudan, Oil, and Human Rights, at 353 (2003), https://www.hrw.org/reports/2003/sudan1103/sudanprint.pdf.

[68] Sudan to Achieve Self-Sufficiency in Weapons: Spokesman, Agence France Presse – English, July 1, 2000.

between 1997 and 2007 continue to kill and harm civilians, and have been instrumental in displacing millions of people.  Further, Sudan's own ability to manufacture weapons, an ability it gained between 1997 and 2007 continues through today.

134.    In sum, BNPP's actions in facilitating the GOS's development of its oil industry and its economy overall were a substantial factor in facilitating the growth of the GOS's budget, its military spending, its acquisition of weapons, and the creation of a domestic arms industry.

### G.    Well-Funded by Oil Revenues and Equipped with Newly-Purchased Weapons, Sudan Increased its Violence Against the Class and Other Civilians

135.    With its new oil wealth and modernized army, that it had as a result of its conspiracy with BNPP the GOS went from a regime besieged on all sides—with rebels advancing in the south and east of the country, threatening to break the back of the Sudanese Armed Forces—to a government that was aggressively asserting its authority throughout the country, smashing any rebel hopes of advancing on Khartoum or capturing other major cities.

136.    In the process of securing its hold on power, the GOS engaged in systematic, widespread human rights abuses on a scale unseen before.  These atrocities included ethnic cleansing, violent forced displacement, and terror tactics such as arbitrary detention, theft, torture, rape, and murder as well as genocide, all in contravention of international law.  These inhuman depredations were experienced in various forms by all Plaintiffs and their communities, which were often defined ethnically—as "non-Arab" by the GOS and its proxies—and geographically—southern Sudan and Darfur.

137.    The female Plaintiffs were often victims of brutal sexual violence.  The GOS used this violence as a means of terror, torture, and ethnic cleansing.

138.   The GOS used its new air force to project its power on a scale it could not have contemplated before 1997.  For example, the GOS used its helicopter gunships in the Western Upper Nile and Unity State, much of which is now part of South Sudan.

139.   Similarly, the GOS used its retrofitted Antonov cargo planes to attack civilians in southern Sudan, the Nuba Mountains of South Kordofan, southern Blue Nile State, the Jebel Marra region in central Darfur, as well as numerous other regions in Darfur. These attacks were particularly cruel because the purposefully crude nature of the retrofit made the Antonovs highly inaccurate, leading to massive amounts of terror in those regions.

140.   The GOS also used its oil money to finance third party militias who also committed significant acts of violence.  These militias acted as proxies for the GOS, killing, raping, and displacing large numbers of civilians, many of whom belonged to ethnic groups associated with the rebels, such as Dinka (who were primarily in Abyei and South Sudan), Ingessana (Blue Nile), Fur (Darfur), and Zaghawa (Darfur).  The most infamous militia was the Janjaweed, also known as the Jingaweid, which was under the GOS's control.  It wreaked havoc in Darfur from 2002 onwards.[69]  This region is home to various non-Arab groups, including the Fur, Zaghawa, and Massalit.  Often, the GOS's military and the Janjaweed worked in tandem to brutal ends.  After the GOS's air force bombarded a village, the Janjaweed would attack on horseback, brandishing GOS-provided weapons.  The militiamen swept into villages, killing and mutilating the men, raping the women, and killing or

---

[69] *See* U.S. State Dept. Fact Sheet, Sudan: Ethnic Cleansing in Darfur (Apr. 27, 2004), https://2001-2009.state.gov/g/drl/rls/31822.htm:

"The Government [GOS] operates jointly with these militias, known as 'Jingaweid,' in attacks on civilians from the Fur, Masaalit, and Zaghawa ethnic groups. …The Jingaweid have perpetrated widespread atrocities against theses civilians." …In February 2004, an eyewitness account of a raid on the village of Tawila noted that a well-organized attack by horseman and members of the military dressed in fatigues in which 67 people were killed, 16 girls abducted and over 93 females were raped.  The attack displaced over 5,000 people."

kidnapping the children.  The raiders also destroyed the foundations of the village, burning fields and homes, poisoning wells, and seizing anything of value.

141.    The GOS's actions in Darfur are frequently labeled as crimes against humanity and genocide by the international community.  As set out above, those actions were recognized as genocide by the U.S. Congress, as well as Secretary of State Colin Powell and President Bush in 2004, a time when BNPP continued to violate U.S. Sanctions.[70]  The U.N. Security Council referred the situation in Darfur to the ICC in March 2005.  In 2007, the ICC issued its first arrest warrants for Sudanese government officials.[71]  The genocide began in 2003 and continued through the signing of a ceasefire in 2004, a peace agreement in 2006, to today.  It was made possible in substantial part by BNPP's financial support of the GOS.

142.    Plaintiffs from Darfur, including but not limited to Kashef, Abakar, Hammad, Mosabal, and Omar were victims of brutal attacks by the GOS-funded Janjaweed.  Kashef's entire family was killed by the militia.  Jane Doe and her children witnessed the Janjaweed rape her mother, their grandmother, and break both her legs during the attack on her home. Abakar witnessed the Janjaweed set flame to his business.  Hamad looked on in horror as the Janjaweed shot and killed her husband.

143.    Much of the focus of the GOS's attacks was on civilians living in the path of oil development.  The GOS's ability to exploit its oil after 1997 thus intensified pre-existing conflicts as the GOS sought to monopolize the gains from oil and, in the process, cleansed,

---

[70] Glen Kessler and Colum Lynch, *U.S. Calls Killings in Sudan Genocide, Khartoum and Arab Militias Are Responsible, Powell Says*, Wash. Post, Sept. 10, 2004, www.washingtonpost.com/wp-dyn/articles/A8364-2004Sep9.html; George W. Bush Address to United Nations (Sept. 21, 2004), http://www.presidentialrhetoric.com/speeches/09.21.04.html.

[71] International Criminal Court - Situation in Darfur, Sudan, ICC-02/05, (Dec. 22, 2016), https://www.icc-cpi.int/darfur.

by brute force, the oil rich regions of their native inhabitants.  Essentially, the GOS used its military and paramilitary forces to remove entire villages living on or near oil fields.  A Chinese geologist on the ground in Sudan described this forced displacement in 2000 from Heglig in the disputed Abyei region:

> I was based at a Chinese camp in Heglig, which was located close to the main camp of Talisman.  We (workers of the Chinese company) were guarded by Sudanese soldiers all the time.  Every time we went to the field to conduct exploration activities, the soldiers went ahead and shot into the bush with big guns to cause the natives to flee.  Then the soldiers informed the Chinese that it was safe.  We moved into the area and did the required work.  In some places, we found deserted villages and burnt houses.  Also, we found human bodies in the exploration area and dead elephants.[72]

144.    In its 2003 report to Congress, the U.S. State Department recognized this horrifying connection between oil exploitation and the GOS's atrocities.  Specifically, the State Department found that the increase in oil production "translated into at least proportionally increased military expenditures by the [GOS]."[73]   The report noted that between 2002 and 2003

> most reported incidents of attacks on civilians and forced displacement have occurred in Western Upper Nile, most as a result of actions by the government and its allied militias.  Various types of violent actions against civilians have been used to compel their displacement from their usual areas of habitation, including killing, rape, abduction, burning of shelters, and looting of property (including cattle and crops) necessary for livelihood.[74]

---

[72] *See* Leben Moro, *Oil Development Induced Displacement in the Sudan* (University of Durham, Institute for Middle Eastern and Islamic Studies, Working Paper 10, 2009), at 14. http://dro.dur.ac.uk/6232/1/6232.pdf.

[73] State Dept., Sudan Peace Act: Presidential Finding and Reports to Congress (Apr. 22, 2003).

[74] *Id.*

145.    The State Department also found that these types of attacks "have been regularly reported throughout the history of the civil war."[75]

146.    Many of the Plaintiffs were victims of the GOS's crimes simply because they had the misfortune of being on or near an oil field.  For example, Plaintiff Majuc was subjected to daily aerial bombings—carried out by planes that the GOS would not have had but for BNPP's actions—in a south Sudan village.  Tingloth, a native of Abyei, was driven from her village following the killing of her father and grandmother.  When Tingloth returned to Abyei, the GOS killed her brothers and seized her families' land and crops.

147.    Those people who were fortunate enough to survive the GOS's onslaught became refugees, forced to leave their homes with nothing more than a mat or some cattle.  Nearly all of the representative Plaintiffs were IDPs.  The lucky Plaintiffs found tenuous sanctuary in other villages.  The unlucky ones had to take refuge in the bush.  According to the NGO, the Internal Displacement Monitoring Centre, as of August 2006, there were approximately 5 million IDPs in Sudan; 1.8 million were from Darfur.[76]  Plaintiffs, including but not limited to Kashef, Mosabal, Abakar, Hamad, Abbo Abakar, Omar, and Jane Doe, were among the 1.8 million Darfurians displaced at that time.

148.    Many of the IDPs, including certain Plaintiffs, fled to Khartoum, believing they would be safe.  However, once there, they were subjected to yet more horrors.  For example, many people who were part of disfavored groups were put into "ghost houses," secret detention facilities where many of the inmates were tortured used "unspeakably

---

[75] *Id.*

[76] iDMC, Slow IDP Return to South While Darfur Crisis Continues Unabated, at 1 (Aug. 17, 2006),  http://www.internal-displacement.org/sub-saharan-africa/sudan/2006/slow-idp-return-to-south-while-darfur-crisis-continues-unabated.

sadistic methods."[77]   The GOS's use of ghost houses started before BNPP's involvement and continued throughout the relevant period.[78]   Plaintiff Lual is among the people subjected to the ghost house detention centers.  While there, Lual was tortured, beaten, assaulted, and left in sordid, unsanitary, and inhuman solitary confinement for days on end.

149.    Though the Fur, Zaghawa, Massalit, and other non-Arab ethnic groups in Darfur may have been the most reported on ethnic groups that were harmed by the GOS, they were hardly the only ones.  Other communities that the GOS harmed include the Dinka Ngok in Abyei, the Nuba in South Kordofan, and the various ethnic groups in the Blue Nile (particularly the Ingessana), as well as civilians from various ethnic groups along the North/South border, from Upper Nile State to Western Bahr el Ghazal.  The GOS particularly victimized the Nuer communities of Unity State (formerly Western Upper Nile) during 2002,

---

[77] Claude Adams, *On the Run from Sudan's Enforcers*, Globe and Mail (Canada), Oct. 21, 1995.

[78] *See, e.g.*, Caroline Cox, John Eibner, *The Government of Sudan Enslaves its Own*, Asian Wall St. J., July 30, 1996, at 6; Caroline Cox, John Eibner, *Sudan Government Enslaves its Own*, Wall St. J. Europe, May 21, 1996, at 10; Claude Adams, *On the Run from Sudan's Enforcers*, Globe and Mail (Canada), Oct. 21, 1995; Con Coughlin, *Sudan Training Next Terrorist Generation*, Globe and Mail (Canada), May 16, 1994; Eileen Alt Powell, *Suffering Rises in Sudan, U.S. Suspects it of Backing Terrorism, Cuts Aid*, Miami Herald, Jan. 9, 1994, at B4; William Johnson, *The Stakes are High for Muslims*, Globe and Mail (Canada), Nov. 1, 2001, at A25; *Sudan vs. Civilization*, Wall St. J. Europe, Oct. 10, 2000, at 12; Peter Dalglish, *Witness to War*, Globe and Mail (Canada), Feb. 18, 2000, at A13.

The U.S. government also took note of the ghost houses:  "The [GOS] human rights record remained extremely poor, and it continued to commit numerous, serious abuses. Citizens do not have the ability to change their government peacefully.  Government forces were responsible for extrajudicial killings and disappearances.  Government security forces regularly tortured, beat, harassed, arbitrarily arrested and detained, and detained incommunicado opponents or suspected opponents of the [GOS] with impunity.  Security forces beat refugees, raped women, and reportedly harassed and detained persons on the basis of their religion.  Prison conditions are harsh, prolonged detention is a problem, and the judiciary is largely subservient to the Government."  State Dept., Sudan - Country Report on Human Rights Practices, 1999, at 2 (Feb. 23, 2000), http://www.state.gov/j/drl/rls/hrrpt/1999/273.htm

the last year of major fighting in the Second Sudanese Civil War.  In addition, the eastern

Sudan states of Red Sea, Kassala, and Gedaref (particularly the Beja people) suffered terribly

from economic and political marginalization and domination by the GOS.  The Nubian

people of far northern Sudan were similarly marginalized and harmed by environmentally

and economically irresponsible dam projects along the Nile.  Many thousands of farmers

from this community were displaced from their lands without compensation.

150.    Children—including Plaintiffs Abdalla and Ahmed—were also subjected to

atrocities at the hands of the GOS, including physical violence and mental harm as a result of

the GOS's persistent terror against themselves and their families.

151.    BNPP's violations of U.S. Sanctions, assistance to, and conspiracy with the

GOS, enabled the GOS to have increased resources to terrorize and exterminate politically

disfavored civilian.  Thus, BNPP's actions were a substantial factor in causing injuries to

Plaintiffs and the Class.

**H.    Plaintiffs' Injuries Were Foreseeable:  BNPP Knew the Atrocities in Sudan Were Funded By and an Intrinsic Part of the Government of Sudan's Exploitation of Its Oil Resources, Which BNPP Made Possible**

152.    Throughout its long partnership with the GOS, BNPP knew and accepted that:

(*i*) the GOS was engaged in a persistent campaign of terrible atrocities against Sudanese

civilian groups, including genocide; and (*ii*) the GOS's monetization of its oil—made

possible through BNPP's criminal sanctions violations and falsification of business records

in New York—was both a principal object of and the prerequisite for the GOS's atrocities.

Extensive reporting—by the United Nations, the governments of the United States and

Canada, the ICC, international NGOs, and the international press—documented both the

66

GOS's crimes and the causal link between those actions and its oil revenues.  Yet BNPP kept up its depraved, illegal conspiracy with the GOS.

> 1. **Contemporaneous Reporting of the Atrocities in Sudan and the Connection to Oil**

153.    Even before 1997, the international community had recognized and condemned GOS atrocities against Sudanese civilians.  For example, in his 1995 *Interim Report on the Situation of Human Rights in the Sudan*, the U.N. Special Rapporteur on Human Rights in the Sudan reported "grave and widespread violations of human rights by government agents," including "[i]ndiscriminate and deliberate aerial bombardments by government forces on civilian targets."[79]

154.    In 1997, the international media widely reported on the imposition of U.S. Sanctions.[80]

155.    In 1999, the U.S. State Department's "Country Reports on Human Rights Practices" reported on Sudan's dismal human rights record, setting out serious abuses including extrajudicial killings, beatings rape, arbitrary, and forced conscription.[81]

156.    In 2000, Doctors Without Borders/Médecins Sans Frontières, recipient of the 1999 Nobel Peace Prize, reported on the GOS's use of indiscriminate bombings and chemical weapons against civilians.[82]

---

[79] Gaspar Biro (Special Rapporteur of the Commission on Human Rights), *Interim Report on the Situation of Human Rights in the Sudan,* at ¶¶ 10, 72, U.N. Doc. A/50/569 (Oct. 16, 1995).  Concerning Resolution 1955/77 (Mar. 8, 1995).  http://www.un.org/documents/ga/docs/50/plenary/a50-569.htm.

[80] *See, e.g.*, Norman Kempster, *U.S. Imposes Tougher Sanctions on Sudan*, L.A. Times, Nov. 5, 1997; AFP, *U.S. Sanctions Punish Sudan*, The Australian, Nov. 6, 1997.

[81] *See* State Dept., Sudan - Country Report on Human Rights Practices - 1999 (Feb. 23, 2000) http://www.state.gov/j/drl/rls/hrrpt/1999/273.htm.

157.    In 2001 and 2002, the international media covered GOS attacks on civilians, including its use of attack helicopters, to clear civilians from oil blocks, especially Blocks One and 5A.[83]

158.    A 2002 report by the U.N. Special Rapporteur on Human Rights in Sudan concluded that, "the overall human rights situation has not improved" since 2001 and that "oil exploitation is closely linked to the conflict which . . . is mainly a war for the control of resources and, thus, power."[84]  The Rapporteur "noted that oil exploitation continued to cause widespread displacement" and, as a result, has "seriously exacerbated the conflict while deteriorating the overall situation of human rights."[85]

159.    In 2003, Human Rights Watch published its landmark report, "Sudan, Oil, and Human Rights," detailing the link between oil and human rights violations.[86]  It focused on the plight of southern Sudanese from the oil-producing areas, especially the Nuer and Dinka, who were displaced to facilitate oil operations through ethnic manipulation, direct military attack, and aerial bombing.  The report noted that, in addition to funding large purchase of

---

[82] *See* Doctors Without Borders/Médecins Sans Frontières (MSF), Living under Aerial Bombardments: Report of an Investigation in the Province of Equatoria, Southern Sudan (Feb. 20, 2000), http://reliefweb.int/report/sudan/living-under-aerial-bombardments-report-investigation-province-equatoria-southern-sudan.

[83] Norimitsu Onishi, *Sudan Government Tops List of Those Causing Agony for Oil*, N.Y. Times, Oct. 13, 2001; W.F. Deedes, *Innocent Victims of Sudan's Forgotten War*, Daily Telegraph (London), Apr. 27, 2002.

[84] Gerhart Baum (Special Rapporteur on the Commission of Human Rights), *Situation of Human Rights in the Sudan*, at 3-4, U.N. Doc. E/CN.4/2002/46 (Jan. 23, 2002).

[85] *Id*. at 3, 12.

[86] *See* Human Rights Watch, Sudan, Oil, and Human Rights (2003), https://www.hrw.org/reports/2003/sudan1103/sudanprint.pdf.

weapons made elsewhere, "[t]he new oil revenue also facilitated a brand-new domestic arms industry."[87]

160.    In February 2004, the U.S. Department of State released its 2003 Human Rights report on Sudan.  The report stated:

> Security forces and associated militias were responsible for extrajudicial killings and disappearances.  Security forces regularly beat, harassed, arbitrarily arrested, and detained incommunicado opponents or suspected opponents of the Government, and there were reports of torture.  Security forces and associated militias beat refugees, raped women abducted during raids, and harassed and detained persons.  Government security forces and pro-government militias acted with impunity. . . .  Government forces pursued a scorched earth policy aimed at removing populations from around the oil pipeline and other oil production facilities, which resulted in deaths and serious injuries.[88]

161.    In March 2004, the U.N. humanitarian coordinator for Sudan, Mukesh Kapila, told the press that an "ethnic cleansing" campaign was taking place in Darfur that was "comparable in character, if not in scale," to the Rwandan genocide.[89]

162.    In April 2004, Human Rights Watch's report, "Darfur in Flames: Atrocities in Western Sudan,"[90] described an oil-fueled government strategy of forced displacement targeting civilians.[91]

---

[87] *Id.* at 353.

[88] U.S. Department of State, Bureau of Democracy, Human Rights, and Labor, Sudan, at 2, 12 (Feb. 25, 2004), https://www.state.gov/j/drl/rls/hrrpt/2003/27753.htm.

[89] *Mass Rape Atrocity in West Sudan*, BBC News, Mar. 19, 2004, http://news.bbc.co.uk/2/hi/africa/3549325.stm.

[90] Human Rights Watch Report, Darfur in Flames: Atrocities in Western Sudan (Vol. 16, No. 5 (A) Apr. 2004), https://www.hrw.org/reports/2004/sudan0404/sudan0404.pdf.

[91] *See id.* at 15-17.

163.    In July 2004, the House and the Senate passed House Concurrent Resolution 467, declaring that the GOS's atrocities in Darfur violated the Convention on the Prevention and Punishment of the Crime of Genocide.[92]

164.    In early September 2004, U.S. Secretary of State Colin Powell publicly stated that a "genocide has been committed" in the Sudanese region of Darfur.[93]

165.    In mid-September, 2004, the Security Council adopted Resolution 1564 requesting, *inter alia*, that the Secretary General,

> rapidly establish an international commission of inquiry in order immediately to investigate reports of violations of international humanitarian law and human rights law in Darfur by all parties, to determine also whether or not acts of genocide have occurred, and to identify the perpetrators of such violations with a view to ensuring that those responsible are held accountable.[94]

166.    In November 2004, Human Rights Watch published its report "If We Return, We Will be Killed: Consolidation of Ethnic Cleansing in Darfur, Sudan," focusing on the horrors faced by the approximately two million people driven from their homes.

167.    In January 2005, the Report of the International Commission of Inquiry on Darfur to the United Nations Secretary General, which the Security Council requested in Resolution 1564, was published.  The Report took "as the starting point for its work" the "irrefutable facts" that "there are 1.65 million internally displaced persons in Darfur, and more than 200,000 refugees from Darfur in neighboring Chad," and that "there has been

---

[92]    *See* H.R. Con. Res. 467, 108th Cong. (2004) (enacted). https://www.congress.gov/bill/108th-congress/house-concurrent-resolution/467.

[93]    *Powell Calls Sudan Killings Genocide*, CNN.com, Sept. 9, 2004, at 1, http://www.cnn.com/2004/WORLD/africa/09/09/sudan.powell/.

[94]    S.C. Res. 1564, ¶ 12 (Sept. 19, 2004), http://www.un.org/en/ga/search/view_doc.asp?symbol=S/RES/1564(2004).

large-scale destruction of villages throughout the three states of Darfur."[95]  After a "thorough analysis of the information gathered in the course of its investigations," the Report found "that the [GOS] and the Janjaweed are responsible for serious violations of international human rights and humanitarian law amounting to crimes under international law."[96]

168.    In June 2005, the ICC opened its investigation into the crisis in Darfur,[97] which ultimately led to the issuance of arrest warrants for President al-Bashir, other GOS officials, and a Janjaweed commander.

169.    On December 8, 2005, Human Rights Watch published a further report on the crisis in Darfur, "Entrenching Impunity: Government Responsibility for International Crimes in Darfur."  It documented the role of civilian and military officials in the use of Janjaweed militias and the Sudanese armed forces to commit war crimes and crimes against humanity since mid-2003.

### 2. Three Companies, Talisman, Lundin, and OMV, Were Forced to Withdraw from Sudan by Public Pressure

170.    In addition to the reports above, the news media extensively covered the three Western companies, Talisman, Lundin, and OMV, which were publicly known to be doing business with the GOS.  Notable, none of these companies provided, or were capable of providing, access to the U.S. financial system, essential for exporting oil in petrodollars at market prices.

---

[95] Rep. of the Int'l Comm'n of Inquiry on Darfur to the U.N. Secretary-General, at 3 (Jan. 25, 2005).

[96] *Id.*

[97] Situation in Darfur, Sudan, ICC Investigations Opened: June 2005, ICC-02/05, https//www.icc-cpi.int/darfur.

171.    Talisman, a Canadian company, was the operator of GNPOC's concession for three blocks in Sudan, including Block One.  Throughout 1999, the GOS launched a bloody campaign to kill or displace civilians living in Block One, primarily the Dinka, a black African ethnic group that the GOS considered hostile because the bulk of the rebels in the region were drawn from Dinka ranks.   The GOS used government troops, aerial bombardment, and militias to displace and kill those civilians unfortunate enough to live near Block One.  As the ground troops and militias swept through the Dinka communities, many of them looted freely and burned whatever was left.[98]

172.    In May of 1999, in a major offensive on Block One, the GOS made an all-out effort to clear civilians from the Block, using its Antonov bombers, helicopter gunships, tanks, armored personnel carriers, and proxy militiamen.  The GOS indiscriminately attacked civilians and destroyed items necessary for survival including food, huts, and seeds.  This drive succeeded in scattering residents away from Block One towards the north and south. Though most of the displaced were Dinka, some Nuer, who sought shelter in the region after they were previously kicked out of their homes, were also displaced.[99]

173.    Talisman's annual shareholder meeting in May 1999 was marked by a shareholder proposal—blocked by management—criticizing the company's business in Sudan and by demonstrators protesting the company's profiting from the GOS's atrocities.[100]

174.    The U.S. government also criticized Talisman's business in Sudan.  In late 1999, Secretary of State Madeleine Albright personally expressed her displeasure to

---

[98] Human Rights Watch, Sudan, Oil, and Human Rights, at 186-95 (2003).

[99] *See id.* at 187-93.

[100] *See id.* at 394-96; *see also* Ian Fisher, *Oil Flowing in Sudan, Raising the Stakes in Its Civil War*, N.Y. Times, Oct. 17, 1999, http://www.nytimes.com/1999/10/17/world/oil-flowing-in-sudan-raising-the-stakes-in-its-civil-war.html.

Canada's Foreign Minister Lloyd Axworthy, leading him to take "the unusual step of publicly expressing grave reservations about Talisman's involvement in Sudan."[101] Axworthy also directed John Harker, a former director of affairs for the Canadian Labor Congress, to investigate Talisman's Sudanese business.[102]

175.   In January 2000, the Canadian Foreign Ministry issued its report on Talisman's business.[103]   The Harker Report concluded that oil became a key factor in "exacerbating the conflict in Sudan."[104]   As a result, it was "***difficult to imagine a cease-fire while oil extraction continues, and almost impossible to do so if revenues keep flowing to GNPOC partners and the GOS as currently arranged.***"[105]   The Report also criticized Talisman's oil extraction operations in Sudan for "contributing to the forced relocation of civilian populations residing in the vicinity of the oil fields in the interest of a more secure environment for oil extraction by the GOS and its partners, which include Talisman Energy Inc."[106]

176.   International media and high profile NGOs also chastised Talisman.   In October 2001, the New York Times ran a series of articles on Talisman's investments,

---

[101] Madelaine Drohan, *Sudan Play Bad Timing For Talisman*, Globe & Mail, Oct. 27, 1999, at B2.

[102] Joel Baglole, Canada to Probe Talisman Energy on Sudan Business, Wall St. J., Oct. 27, 1999.

[103] *See* Canadian Ministry of Foreign Affairs, Human Security in Sudan: The Report of a Canadian Assessment Mission (Jan. 2000) ("Harker Report"), http://www.ecosonline.org/reports/2000/Human%20Security%20in%20Sudan.pdf.

[104] *Id.* at 26.

[105] *Id.* at 16 (emphasis added).

[106] *Id.* at 2.

focusing on the link between oil exploitation and the GOS's authoritarian repression.[107] The U.S. Committee for Refugees and Immigrants—an NGO focused on helping forced migrants—also castigated Talisman, saying that the company was guilty of "the worst form of Western corporate irresponsibility."[108]

177.    In its 2000 Corporate Social Responsibility Report, Talisman acknowledged that its oil facilities in Sudan were used for military purposes, saying that the GOS's "use of oil infrastructure for non-defensive military purposes [was] of great concern to Talisman."[109]

178.    Talisman's CEO cited public pressure hurting the company's stock price as a reason for exiting Sudan. Indeed, the announcement that the company would leave the GNPOC consortium raised its stock price by five percent, despite Sudan's being a small part of its operations.[110]

179.    Like Talisman, BNPP is a publicly held company, owned primarily by institutional investors. Like Talisman, BNPP's reputation, and hence the value of the company, would have been hurt by its Sudan business, had BNPP not affirmatively

---

[107] Norimitsu Onishi, Sudan Government Tops List of Those Causing Agony for Oil, N.Y. Times, Oct. 13, 2001; Bernard Simon, Oil Company Defends Role in Sudan, N.Y. Times, Oct. 17, 2001; Norimitsu Onishi, Oil Money Pulls Sudan Out of Its Isolation and Toward an Uncertain Future, N.Y. Times, Oct. 17, 2001.

[108] U.S. Committee for Refugees and Immigrants, U.S. Committee for Refugees World Refugee Survey 2000 – Sudan, at 8 (June 1, 2000). http://www.refworld.org/publisher,USCRI,,,3ae6a8d133,0.html.

[109] See Fritz Brugger, Extractive Industries in Fragile States: Fueling Development or Undermining the Future?, at 180 (Graduate Institute of International and Development Studies, Geneva, 2013, Thesis No. 10). http://repository.graduateinstitute.ch/record/279321/files/PHDDEVSTUDIES-2013-012.pdf

[110] Richard Bloom and Lily Nguyen, Talisman Shares Rise on Sudan Sale, Globe and Mail, Oct. 31, 2002, http://www.theglobeandmail.com/report-on-business/talisman-shares-rise-on-sudan-sale/article25697061/.

concealed its involvement at the time, including for example, by failing to disclose its involvement in its public announcements, its annual reports, and public filings, at the time.

180.    Lundin Oil, AB, a Swedish company, had the concession for Block 5A, just to the south of Block One.[111]   OMV, an Austrian company was Lundin's financial partner.[112] The GOS was responsible for significant violence in Block 5A, which was perpetrated to enable the concessioners to develop the oilfield.  In the process, the GOS and the militias it sponsored indiscriminately killed, raped, and brutalized the local population.[113]

181.    Like Talisman, Lundin's involvement in Sudan also generated significant negative publicity and public pressure to divest.  In 2001, Christian Aid, the Anglo-Irish relief and development agency, presented evidence to Lundin's board highlighting the company's involvement in the ongoing human rights crisis.[114]  Similarly, in 2003, Human Rights Watch issued a report drawing public attention to Lundin's actions in Block 5A.[115]

182.    By the end of 2003, Talisman, Lundin, and OMV had all terminated oil operations in Sudan due to the pressure of public awareness and international scrutiny of their direct role in enabling the GOS to use its oil revenues to commit atrocities.[116]  *In*

---

[111] Human Rights Watch, Sudan, Oil and Human Rights, at 2, 49 (2003).

[112] *Id.*

[113] *See* Human Rights Watch, Lundin: Willfully Blind to Devastation in Block 5A (2003), https://www.hrw.org/reports/2003/sudan1103/25.htm.

[114] Christian Aid, Christian Aid Presents Sudan Evidence to Lundin Oil Board (Mar. 23, 2001),   http://reliefweb.int/report/sudan/christian-aid-presents-sudan-evidence-lundin-oil-board.

[115] *See* Human Rights Watch, Lundin: Willfully Blind to Devastation in Block 5A (2003), https://www.hrw.org/reports/2003/sudan1103/25.htm.

[116] Human Rights Watch, Sudan, Oil, and Human Rights, at 33 (Nov. 24, 2003) https://www.hrw.org/report/2003/11/24/sudan-oil-and-human-rights.

*contrast, BNPP, operating illegally and in secret, had no such pressure and continued its faithful and invaluable service to the GOS.*

\*\*\*\*\*

183.    Reflecting the extensive international reporting of GOS atrocities and their connection to oil, internal BNPP memoranda show that its senior officials were well aware that Sudanese oil money was financing the GOS's human rights abuses and that its support for what the GOS was doing was unquestionably premeditated and intentional.

184.    BNPP officials discussed the economic environment created by burgeoning oil sales, referring to it as "financial dynamism," while also acknowledging what was happening in Sudan as a "human catastrophe."[117]

185.    In an August 2005 email, a senior compliance officer at BNPP warned that the satellite bank system was being used to evade the Sanctions against Sudan, stating that the practice "effectively means that we are circumventing or avoiding the U.S. embargo on transactions in USD [U.S. dollars] by Sudan."[118]

186.    The DFS investigation of BNPP found that, "in December 2005, when a settlement with U.S regulators and Dutch bank ABN AMRO was announced for violations of U.S. sanctions law, the Head of Ethics and Compliance for BNPP North America wrote, '**the dirty little secret isn't so secret anymore, oui?**'"[119]

---

[117] Press Release, Cuomo Administration Announces BNP Paribas to Pay $8.9 Billion, Including $2.24 Billion to NYDFS, Terminate Senior Executives, Restrict U.S. Dollar Clearing Operations for Violations of Law (June 30, 2014), p. 2 ("6/30/14 NYDFS Press Release").

[118] OFAC Settlement Agreement, Ex. H, ¶ 10 (alteration omitted).

[119] 6/30/14 NYDFS Press Release, p. 2.

187.    The DFS investigation showed that "BNPP's senior compliance personnel agreed to continue the Sudanese business and rationalized the decision by stating that 'the relationship with this body of counterparties is a historical one and the commercial stakes are significant.  For these reasons, Compliance does not want to stand in the way.'"[120]

188.    In 2007, a senior compliance officer at BNPP acknowledged that Sudanese banks with which BNPP dealt "play[ed] a pivotal part in the support of the Sudanese government which . . . refuses the United Nations intervention in Darfur."[121]

189.    When U.S. law enforcement officials warned BNPP that it was engaging in unlawful behavior, BNPP failed to cooperate honestly with the investigation.  It continued its unlawful conduct even after being told by U.S. regulators and its own legal advisors that it was violating the Sanctions, thereby facilitating the GOS's atrocities.

190.    Thus, BNPP continued to provide secret, essential, and illegal financial assistance to the GOS through 2007, and the GOS's atrocities and oil monetization were inseparable elements of an over-arching, depraved campaign in which BNPP willingly partnered.[122]

I.    **As a Result of an Array of Federal and State Investigations, BNPP Agreed to Two Criminal Guilty Pleas, Two Cease And Desist Orders, a Settlement Agreement, and a Consent Order**

191.    *Five* separate U.S. and New York State government entities—FRB-NY, OFAC, DFS, DANY, and the DOJ through the U.S. Attorney for the Southern District of

---

[120] *Id.*

[121] *Id.*

[122] Following BNPP's cessation of its financing of the GOS, Sudan's economy entered a recession.  Though the split with South Sudan was one cause of the recession, another was the loss of BNPP's financing as the U.S. Sanctions finally took hold.

New York—investigated BNPP's illicit financial dealings with the GOS and Sudan.[123]  Each made a determination to exercise its discretion to launch an investigation in BNPP's conduct. Each made a determination that its jurisdiction extended to BNPP and BNPP's conduct. Each made a determination that it had authority to take enforcement actions against, or prosecute, BNPP.  And each decided to exercise its discretion to take enforcement actions against, or prosecute, BNPP.  In other words, an overwhelming array of U.S. and New York government entities decided that they had authority to regulate BNPP's conduct and did so.

192.    These investigations culminated in two cease and desist orders, a settlement agreement, a consent order, and two criminal guilty pleas.  They also resulted in an approximately $8.9 billion criminal forfeiture.

### 1.    BNPP Pled Guilty to Violating U.S. Sanctions

193.    BNPP's years of financial dealings with Sudan and its banks, as well as its financial dealings with Iran and Cuba, ultimately led to a guilty plea in 2014 for violating the laws of the United States, specifically conspiring to violate E.O. 13067, E.O. 13412, the regulations implementing the two Executive Orders, the IEEPA, and the TWEA.[124]

---

[123] The key role that New York played in BNPP's conspiracy is also evidenced by the entities that conducted the investigations and the Sanctions they imposed.  The United States chose to marshal its New York-based resources, including FRB-NY and the U.S. Attorney for the Southern District of New York.  Further, many of the structural changes the federal regulators demanded of BNPP were New York-based.

[124] The U.S. Attorney's Office charged BNPP with this conspiracy on July 9, 2014.  *See* Information, *United States v. BNP Paribas* (S.D.N.Y., filed July 9, 2014) (Docket 14-CR-460-LGS No. 002), attached as Ex. A, and is incorporated herein as if set forth in its entirety. BNPP pled guilty 19 days later.  *See* Letter from Preet Bharara, United States Attorney for the Southern District of New York, Leslie Caldwell, Assistant Attorney General, Criminal Division, Department of Justice, and Jaikumar Ramaswamy, Chief, Asset Forfeiture and Money Laundering Section, Department of Justice, to Karen Patton Seymour, Esq., Sullivan & Cromwell LLP, *United States v. BNP Paribas, S.A.*, June 27, 2014, attached as Ex. B, and incorporated herein as if set forth in its entirety.

194.    BNPP did not dispute the charges against it.  Indeed, it stipulated that it had *conspired with GOS entities* to unlawfully facilitate transfers in U.S. dollars for Sudanese banks and engaged in devious conduct to avoid detection.  As set out in the stipulated SOF supporting its guilty plea, BNPP agreed that these facts would, at a trial, be proved beyond a reasonable doubt.  BNPP effectively admitted that it knowingly facilitated and supported the crimes of a lawless regime by providing the financial means by which the GOS committed widespread human rights violations against vulnerable citizens, including women and children.

195.    On May 1, 2015, the Honorable Judge Schofield of the District Court for the Southern District of New York entered judgment of the criminal conviction of BNPP and ordered BNPP to forfeit $8,833,600,000 to the United States and pay a $140,000,000 fine.  *The forfeiture was the single largest financial penalty ever imposed in a criminal case*.  It reflects the staggering amounts of money involved in BNPP's illegal activities in Sudan, Iran and Cuba and the seriousness of BNPP's crimes.  More than 70% of the forfeiture penalty related to BNPP's unlawful transactions with Sudanese banks, a penalty of such magnitude in the context of Sudan's economy that it further demonstrates that BNPP's actions were a substantial factor in the GOS's crimes.

196.    The stipulated SOF and the attached civil and criminal documents establish that, from as early as 1997, BNPP, its agents and affiliates, conspired with the SDNs, including those specifically designated by the Treasury Department as having their assets blocked from the U.S. financial system by virtue of being owned or controlled by, or acting for or on behalf of Sudan, to violate the Sanctions against the GOS by providing Sudanese

banks with access to the U.S. financial system through its New York branch and other affiliates.

197.    BNPPSA admitted that, at all relevant times, BNPP knew that the GOS was a rogue nation that supported international terrorism, and was subject to the Sanctions.  BNPP also knew or consciously disregarded numerous and authoritative accounts that GOS and its proxies engaged in human rights violations including forced displacement and extrajudicial killings.

198.    As admitted in the stipulated SOF, BNPP played a decisive role in financing Sudan's export of oil and was involved with at least a quarter of all exports and a fifth of all imports for Sudan.  BNPP provided crucial financial support and aid to the GOS knowing this support and aid was crucial to the GOS's ability to obtain the resources to persecute its disfavored civilians.  Indeed, BNPP's own compliance officer reminded other bank officers that the "Sudanese banks with which BNPP dealt 'play a pivotal part in the support of the Sudanese government which . . . refuses the United Nations intervention in Darfur,'"[125] and urged the bank to stop its support for Sudan's genocidal leadership.  BNPP thus knew that its aid to the GOS provided material assistance to the GOS in perpetrating the human rights violations and personal and property injuries suffered by Plaintiffs and the Class.

### 2.    BNPP Pled Guilty to Violating New York Law

199.    BNPP pled guilty to one count of Falsifying Business Records in the First Degree, in violation of Penal Law Section 175.10, and one count of Conspiracy in the Fifth

---

[125] SOF, Ex. C, ¶ 20.

Degree, in violation Penal Law Section 105.05.[126]  Under New York law, Falsifying Business Records is typically a class A misdemeanor under Penal Law Section 175.05.  However, it rises to the level of a felony when, as here, the falsification is done with the "intent to commit another crime or to aid or conceal the commission thereof."[127]

200.    Pursuant to the terms of the New York Plea, BNPP agreed to forfeit $2,243,400,000.[128]  BNPP also agreed to series of "conditions" of its plea, including: (*i*) that any report by a compliance consultant or monitor submitted to the Federal Reserve or DFS must also be submitted to the DANY;[129] (*ii*) implementing "compliance procedures and training designed to ensure that BNPP is made aware in a timely manner of any" request by any entity "to withhold or alter its name or other identifying information where the request or attempt appears to be related to circumventing or evading U.S. sanctions laws;"[130] (*iii*) reporting in a timely manner to DANY "any known attempts by any BNPP employees to circumvent or evade U.S. sanctions laws"[131] (iv) complying promptly with DANY's requests for documents, information, and to interview BNPP employees;[132] (*v*) complying with the investigations of other federal and state law enforcement and regulatory agencies;[133] and (*vi*) alerting DANY of "all criminal conduct by BNPP or any of its employees acting within the

---

[126] Plea Agreement Between BNP Paribas SA and the District Attorney of the County of New York, June 30, 2014, attached as Ex. D, ¶ 2 ("New York Plea") and is incorporated herein as if set forth in its entirety.

[127] New York Penal Law § 175.10.

[128] *See* New York Plea, Ex. D, ¶ 14.

[129] *See id.* at ¶ 15(a).

[130] *Id.* at ¶ 15(b).

[131] *Id.*

[132] *See id*. at ¶¶ 15(e), (f), (g), (h), (i), (j), (k).

[133] *See* New York Plea ¶¶ 15(f), (i), (k).

scope of their employment related to DANY's [i]nvestigation" and "any administrative, regulatory, civil, or criminal proceeding or investigation of BNPP relating to DANY's [i]nvestigation."[134]

201. As part of the New York Plea, BNPP also admitted a series of facts in the "Factual Statement," which set forth its criminal conduct. These facts are largely similar to those set forth in the SOF.[135]

### 3. BNPP Entered into Agreements with Federal and State Regulators Admitting Substantial Wrongdoing and Agreeing to Substantial Penalties

202. In 2004, FRB-NY and the DFS "identified systematic failures in BNPP's compliance with the Bank Secrecy Act," a federal statute that prevents money laundering, "and specifically highlighted deficiencies in [BNPPNY's] monitoring of transactions with overseas clients, including the processing of U.S. dollar transactions for overseas clients."[136] To address BNPP's failures, FRB-NY and the DFS entered into a Memorandum of Understanding BNPP that required, *inter alia*, BNPPNY to "improve its systems for compliance with U.S. bank secrecy and sanctions laws."[137] But at this time, the scope of BNPP's actions were apparently not known by the federal or New York state authorities.

---

[134] *See* New York Plea ¶¶ 15(m), (n).

[135] *See* Exhibit A to Plea Agreement Between BNP Paribas SA and the District Attorney of the County of New York, June 30, 2014, attached as Ex. E, and is incorporated herein as if set forth in its entirety.

[136] SOF, Ex. C, ¶ 28.

[137] *Id.*

203.    On June 30, 2014, BNPP entered into a cease and desist order with both the Board of Governors of the Federal Reserve System (the "Board") and the Autorité de Contrôle Prudential et de Résolution (the "ACPR"), one of BNPP's French regulators.[138]

204.    In the Joint Cease and Desist Order, the Board and the ACPR demanded that BNPP make a number of changes to the bank's structure.  BNPP made extensive use of New York's financial sector in order to carry out its federal and New York State crimes.  This fact is supported by the substantial structural changes set forth in the Joint Cease and Desist Order.  On information and belief, the regulators would not have required BNPP to make such modifications in New York if they had not thought that such internal structures and regulations in New York would have made BNPP's criminal activities less likely to have occurred.

205.    Another required change was that BNPP had to relocate part of its compliance function to New York.[139]  This group, known as "Group Financial Security," is "ultimately responsible for [BNPP's] OFAC Compliance Program."[140]  The regulators ensured that the group had the tools necessary to help prevent and catch future sanctions violations.  These included: (*i*) "audit[ing] any transaction and overall compliance efforts by any branch,

---

[138] *See* Cease and Desist Order Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended; Supervisory Cooperation Decision Applying the Joint Statement of French and US Banking Supervisors of May 24, 2004, Dkt. No. 14-022-B-FB, attached as Ex. F ("Joint Cease and Desist Order") and is incorporated herein as if set forth in its entirety.

[139] Though the Joint Cease and Desist Order states that BNPP shall relocate the portion of the Group Financial Security responsible for OFAC compliance to the United States, the Settlement Agreement makes clear that the relocation is to New York.  *See* Settlement Agreement, Ex. H, *infra*.

[140] Joint Cease and Desist Order, Ex. F, ¶ 1(a).

affiliate, or business line [of BNPP];"[141] (*ii*) "serv[ing] as the ultimate arbiter of U.S. Sanctions issues and hav[ing the] authority to compel [BNPP's] branches, affiliates, and global business lines to comply with the OFAC Compliance Program;"[142] (*iii*) "establish[ing] norms and procedures for [BNPP's] global compliance with the U.S. OFAC Compliance Program;"[143] (*iv*) "review[ing] high-level alerts escalated from [BNPP's] monitoring and sanctions filtering processes, to the extent that there is a U.S. Sanctions component;"[144] (*v*) "specifically regarding USD clearing, oversee[ing] and supervis[ing] compliance with the U.S. OFAC Compliance Program by [BNPP's] USD clearing and payment business lines, including all USD clearing for [BNPP] processed globally, defin[ing] the standard compliance processes for USD clearing and payments as relevant to the U.S. OFAC Compliance Program, and provid[ing] a second level of control to ensure appropriate implementation of those compliance processes."[145]

206.    That same day, June 30, 2014, BNPP also entered into a second cease and desist order with just the Board.[146]  In this second order, the Board found that

> [f]rom at least 2002 through at least January 2010, [BNPP] developed and implemented policies and procedures for processing certain U.S. dollar ("USD") denominated funds through the [BNPPNY] and through other unaffiliated U.S. financial institutions involving parties subject to OFAC Regulations that omitted or concealed relevant information from payment messages that was necessary for the Branch and other U.S. financial

---

[141] *Id.* at ¶ 1(a)(i).

[142] *Id.* at ¶ 1(a)(iii).

[143] *Id.* at ¶ 1(a)(iv).

[144] *Id.* at ¶ 1(a)(v).

[145] *Id.* at ¶ 1(a)(vi).

[146] *See* Order to Cease and Desist and Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended, Dkt. Nos. 14-022-B-FB, 14-022-CMP-FB, attached as Ex. G ("Cease and Desist Order") and is incorporated herein as if set forth in its entirety.

institutions to determine whether these transactions were carried out in a manner consistent with U.S. law. Although [BNPP] made certain efforts in 2007 and 2008 in an attempt to comply with OFAC Regulations, [BNPP] continued to process certain USD denominated funds transfers through the [BNPPNY] involving a party subject to OFAC Regulations through 2012.[147]

207. Because of BNPP's "unsafe or unsound practices and violations of law,"[148] the Board assessed a civil penalty in the amount $508 million. It also barred BNPP from employing those individuals who were the relationship managers for the GOS.[149]

208. That same day, BNPP also entered into a settlement agreement with OFAC.[150] The Settlement Agreement found that "[f]or a number of years, up to and including 2012, BNPP processed thousands of transactions to or through U.S. financial institutions that involved countries, entities, and/or individuals subject to the sanctions programs administered by OFAC."[151] Crucially, OFAC found that New York was an indispensable part of BNPP's conspiracy to violate U.S. sanctions law. BNPP used the financial system based in New York to process transactions on behalf of the GOS and the SDNs throughout the relevant period.[152]

209. OFAC also described how BNPP's branches, including its branch in Switzerland, "routed [ ] USD payments to or through the United States in apparent violation

---

[147] Cease and Desist Order, Ex. G, at 2.

[148] See id.

[149] *See id.* at 4.

[150] *See* Settlement Agreement between the U.S. Department of Treasury's Office of Foreign Asset Control ("OFAC") and BNP Paribas SA ("BNPP"), COMPL-2013-193659, attached as Ex. H (the "Settlement Agreement") and is incorporated herein as if set forth in its entirety.
[151] *Id.* at ¶ 3.

[152] *Id.* at ¶ 8.

U.S. sanctions."[153]  BNPP's use of the United States' financial system, which, on information and belief, principally refers to New York, included the following:

> a. BNPP Suisse and BNPP Paris negotiated a variety of trade finance instruments on behalf of or that involved parties subject to U.S. sanctions on Sudan . . . and routed USD payments to or through the United States pursuant to these instruments; [and]
>
> b. BNPP Suisse, BNPP Paris, BNPP's branch in Rome, and BNPP's branch in Milan all processed correspondent banking or retail banking transactions to or through the United States that involved the interests of a person subject to U.S. sanctions on Sudan . . . .[154]

210. Thus, the Settlement Agreement makes clear that the U.S. financial system, which is primarily based in New York, was an integral to BNPP's actions, irrespective of where the illicit transactions originated.

211. In addition to terminating its unlawful conduct,[155] BNPP agreed to a settlement in the amount of $963,619,900 "arising out of the apparent violations by BNPP of IEEPA, TWEA," and the Executive Orders and regulations relating to sanctions on, *inter alia*, Sudan.[156]

212. The day before, June 29, 2014, BNPP also entered into an extensive consent order with the DFS for its violations of New York banking law and the DFS's regulations.[157] The DFS found that BNPP's "conduct violated U.S. national security and foreign policy and raised serious safety and soundness concerns for regulators, including the obstruction of

---

[153] Settlement Agreement, Ex. H, ¶ 16.

[154] *Id*. at ¶¶ 16(a), (b).

[155] *See* Settlement Agreement, Ex. H, ¶ 26.

[156] *Id.* at ¶ 28.

[157] *See In re BNP Paribas, S.A. New York Branch*, *Consent Order Under New York Banking Law § 44*, New York State Department of Financial Services, attached as Ex. I (the "Consent Order") and is incorporated herein as if set forth in its entirety.

governmental administration, failure to report crimes and misconduct, offering false instruments for filing, and falsifying business records."[158]

213.   The Consent Order stressed the New York locus of BNPP's crimes, stating that BNPP:

> engaged in a systematic practice, as directed from high levels of the Bank's group management, of removing or omitting the Sudanese . . . information from U.S. dollar-denominated payment messages that it sent through [BNPPNY] and other non-affiliated New York-based U.S. financial institutions to "guarantee the confidentially [sic] of the messages and to avoid their disclosure to any potential investigatory authorities."[159]

214.   BNPP agreed that during the relevant time period, its New York-based compliance team "intentionally" "did not have adequate legal and compliance authority to ensure that activities conducted from [BNPP's] offices outside of the United States complied with New York and U.S. laws and regulations."[160]  Indeed, one BNPP employee was quoted in the Consent Order as describing an "omission" procedure purposefully designed to "avoid[ ] putting [BNPPNY] in a position to uncover these transactions [on behalf of Sudan], to block them, and to submit reports to the regulator."[161]

215.   In the Consent Order, BNPP agreed that it violated numerous New York banking laws and regulations—New York banking laws and regulations that it might not have violated had it not intentionally structured its legal and compliance departments to be insufficient to the bank's needs—in the course of processing financial transactions for Sudan. Specifically, BNPP agreed that it: (*i*) "failed to maintain or make available at [BNPPNY] true and accurate books, accounts and records reflecting all transactions and actions in violation

---

[158] *Id.* at 2.

[159] Consent Order, Ex. I, ¶ 3.

[160] Consent Order, Ex. I, ¶ 7.

[161] *Id.*

of Banking Law § 200-c;"[162] (*ii*) "made false entries in BNPP's books, reports and statements and willfully omitted to make true entries of material particularly pertaining to the U.S. dollar clearing business of BNPP at its [BNPPNY] with the intent to deceive" federal and state regulators "appointed to examine BNPP's conditions and affairs at its New York Branch in violation of Banking Law § 672.1;"[163] (*iii*) failed to inform the DFS "immediately upon the discovery of fraud, dishonesty, making of false entries and omission of true entries, and other misconduct, whether or not a criminal offense," in violation of DFS regulation 3 NYCCRR § 300.1;[164] (*iv*) actively flouted its agreement in the MOU to "remediate, among other things, [its] systems for compliance" with various banking laws and regulations;[165] and (*v*) caused the cancellation of the MOU by FRB-NY and DFS based on the provision of "falsified facts," including failing to inform the regulators of "BNPP's continuing and longstanding efforts to conduct secret transactions" for, *inter alia*, Sudan.[166]

216.   As a result of its illegal conduct, the DFS fined BNPP over $2 billion and ordered BNPP to "make payment of reparations and restitution to the Department and the State of New York in the amount of $1,050,000,000.00 for injury caused by its wrongful conduct."[167]   BNPP was required to suspend its U.S. dollar clearing services through the New

---

[162] Consent Order, Ex. I, ¶ 43.

[163] *Id.* at ¶ 44.

[164] *Id.* at ¶ 45.

[165] *Id.* at ¶¶ 46-47.

[166] *Id.* at ¶ 50.

[167] *See* Consent Order, Ex. I, ¶¶ 51-52.   The $1.05 billion fine was satisfied by BNPP's payment to the DANY.   *See id.* at ¶ 52.

York branch on behalf of various other BNPP entities for one year and on behalf of unaffiliated third party banks in New York and London for two years.[168]

217.   BNPP also agreed to extend for two years the term of an independent consultant on site in the New York Branch that DFS required pursuant to the terms of a 2013 memorandum of understanding.   Initially, the consultant was charged with reviewing BNPP's compliance with various anti-money laundering laws and regulations and OFAC's rules and regulations.   Under the terms of the Consent Agreement, the consultant's mandate was extending to "oversee[ing], evaluat[ing] and test[ing] BNPP's remediation efforts, the implementation of BNPP's efforts to streamline the global U.S. dollar clearing through the New York Branch and the U.S. dollar suspension requirements contained in" the Agreement.[169]   Finally, BNPP agreed to terminate or punish 45 employees.[170]

218.   In sum, the two guilty pleas and the three other agreements BNPP entered into establish the egregious nature of BNPP's criminal conduct and conspiring with the GOS. They also make clear not only the role that New York played in that criminal conduct, but also New York's continuing interest in regulating BNPP's conduct, after its convictions.

## V.   CLASS ALLEGATIONS

219.   Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated as members of a proposed Class pursuant to Rule 23 of the Federal Rules of Civil Procedure.   This action satisfies the numerosity, adequacy, typicality and commonality requirements of Rule 23(a), and the predominance and superiority requirements of Rule

---

[168] *See id.* at ¶¶ 53-54.

[169] *Id.* at ¶ 56.

[170] *See id.* at ¶ 57.

23(b)(3).  In the alternative, core issues of liability and the nature and source of injury are appropriate for Class action treatment under Rule 23(c)(4).

### A.    Class Definition

220.    Plaintiffs seek certification of a Class comprised of representatives from regions in Darfur and southern Sudan (now the Republic of South Sudan), including but not limited to, the states and provinces of Jonglei, the Equatorias, Western Bahr el Ghazal, Northern Bahr el Ghazal, Unity, and the contested border region Abyei, and Khartoum, who suffered injuries to their persons and their property.  The Class is defined as all Sudanese persons lawfully residing in the United States or who are U.S. citizens who were injured by human rights abuses, genocide, battery, assault, unlawful imprisonment, sexual abuse, and/or deprivation of property perpetrated by the GOS and its agents, including the Janjaweed and other proxy GOS militia, from 1997 through at least 2009, depending on discovery and according to proof.

221.    None of the Class members have received any compensation as a result of the numerous fines that BNPP had to pay to New York State and federal authorities.

222.    Class members are ascertainable through U.S. Customs and Immigration Service and the Department of Homeland Security records kept by the U.S. government for resettled refugees.

223.    The representative Plaintiffs from Darfur include Plaintiffs Kashef, Abdalla, Mosabal, Abakar, Hamad, Abbo Abakar, Omar, and Jane Doe.

224.    The representative Plaintiffs from southern Sudan, areas now located in the Republic of South Sudan, including but not limited to the states and provinces of Jonglei, the Equatorias, Western Bahr el Ghazal, Northern Bahr el Ghazal, Unity, and the contested border region of Abyei include Plaintiffs Adam, Majuc, Jok, Marjan, and Jane Roe.

225.     The representative Plaintiffs residing in Khartoum at the time they were harmed include Plaintiffs Jane Doe, Hassan, Tingloth, Lual, Jane Roe, Lukudu, Ulau, Khalifa, and Ahmed.

226.     Representative Plaintiffs Abdalla and Ahmed were under the age of eight (18) at times relevant to the claims asserted herein.  As such, the accrual dates for statute of limitations purposes may differ for these Plaintiffs' claims and the claims of those they represent.

227.     The following are excluded from the Class: (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns and successors; (2) the judge to whom this case is assigned and any member of the judge's immediate family; and (3) the attorneys of record in this case and their immediate families.

228.     Plaintiffs reserve the right to amend the Class definitions, including if discovery and further investigation reveal that the Class should be expanded, limited, or otherwise modified.

### A.     Numerosity

229.     On information and belief, the Class consists of the thousands of individuals now in the United States who were harmed as a direct and foreseeable result of BNPP's unlawful conduct in New York in concert with the GOS, making joinder impracticable. These individuals can be identified and notified through administratively feasible means, including but not limited to records of non-governmental resettlement agencies, such as the International Rescue Committee, the U.N. High Commissioner for Refugees, and Sudanese-American local community groups, and U.S. government immigration records.  There is also an extensive network of Sudanese-American community centers and other organizations,

including religious and sports organizations, that would assist in identifying and notifying members of the Class.  Further, Class members can be informed of the pendency of this action by targeted print, Internet, and broadcast notice.

### B.    Typicality

230.    The claims of the representative Plaintiffs are typical of the claims of the Class in that the representative Plaintiffs, like all Class members, have suffered physical, economic, and property injuries proximately caused by and resulting from BNPP's unlawful conduct.

231.    Further, the factual bases of BNPP's conduct are common to all Class members and represent a common issue of misconduct resulting in injury to all Class members.

### C.    Adequacy

232.    Representative Plaintiffs will fairly and adequately represent and protect the interest of the Class.  Plaintiffs have retained counsel who has substantial experience in prosecuting human rights injury and property claims involving multinational corporations, in prosecuting complex financial cases, and in prosecuting complex class actions.

233.    Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class, and Plaintiffs' counsel has the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Class.

### D.    Commonality and Predominance of Common Issues

234.    There are numerous questions of law and fact common to all Class members, and those questions predominate over any questions that may affect only individual Class members and satisfy the requirements of Rule 23(a)(2) and 23(b)(3).

235. BNPP has already been criminally convicted of violating U.S. Sanctions against Sudan based on stipulated facts that are common to all Class members.

236. BNPP has already been criminally convicted of violating New York law based on stipulated facts that are common to all Class members.

237. Each Class member's claim arises from the same course of planning, decisions, and actions, and each Class member will make similar legal and factual arguments to prove BNPP's outrageous, willful, reckless, wanton, deplorable, intentional, and/or negligent conduct and liability.

238. The predominant, common questions of law and fact include the following:

    (a)    Whether the Class members were the intended beneficiaries of the Sanctions;

    (b)    Whether the Class members were the intended beneficiaries of New York Penal Law 175.10;

    (c)    Whether BNPP breached a legal duty to Class members when it violated the Sanctions;

    (d)    Whether BNPP breached a legal duty to Class members when it violated New York Penal Law Section 175.10;

    (e)    Whether the Class members are "crime victims" within the meaning of NY CPLR § 213-b and/or NY Exec. Law § 632-a 1(e)(D);

    (f)    Whether BNPP's violations of the U.S. Sanctions were a substantial factor causing injury to the Class;

(g)     Whether the injuries to the Class were foreseeable by BNPP when BNPP violated U.S. Sanctions and New York Penal Law Section 175.10;

(h)     Whether BNPP knew that its transactions and extensions of credit in New York on behalf of the GOS and its agents during 1997-2007 would be used to facilitate the GOS's atrocities and would result in injuries to members of the Class and other Sudanese civilians;

(i)     Whether BNPP reasonably should have known that its violations of U.S. Sanctions in New York during 1997-2007 on behalf of the GOS and/or its agents and controlled entities would be used to facilitate the GOS's atrocities and would result in injuries to members of the Class and other Sudanese civilians;

(j)     Whether BNPP engaged in an actionable civil conspiracy with the GOS by agreeing to conduct transactions in violation of U.S. Sanctions in New York during 1997-2007 on behalf of the GOS and/or its agents and controlled entities knowing that a material purpose of such transactions was to enable GOS atrocities and abuses against members of the Class and other Sudanese civilians;

(k)     Whether BNPP aided and abetted the GOS in perpetrating atrocities and abuses against members of the Class and other civilians by conducting transactions in violation of U.S. Sanctions in New York during 1997-2007 on behalf of the GOS and/or its agents and controlled entities knowing that a material purpose of such

transactions was to enable GOS atrocities and abuses against members of the Class and other Sudanese civilians;

(l)  Whether BNPP was negligent per se by violating the Sanctions and New York Penal Law 175.10 during 1997-2007 because BNPP violated the standards of care established by those laws and was a substantial factor in causing injury to members of the Class and other Sudanese civilians;

(m)  Whether BNPP conspired with the GOS in its use of the instrumentalities of the state to commit battery on members of the Class;

(n)  Whether BNPP conspired with the GOS in its use of the instrumentalities of the state to assault members of the Class;

(o)  Whether BNPP conspired with the GOS in its use of the instrumentalities of the state to falsely arrest of members of the Class without the right to do so;

(p)  Whether BNPP conspired with the GOS to its use of the instrumentalities of the state to convert the property of members of the Class;

(q)  Whether BNPP aided and abetted the GOS's use of the instrumentalities of the state to commit battery upon members of the Class;

(r)     Whether BNPP conspired with the GOS in its use of the instrumentalities of the state to cause the wrongful deaths of family members of the Class;

(s)     Whether BNPP aided and abetted the GOS's use of the instrumentalities of the state to assault members of the Class;

(t)     Whether BNPP aided and abetted the GOS in its use of the instrumentalities of the state to falsely arrest of members of the Class without the right to do so;

(u)     Whether BNPP aided and abetted the GOS in its use of the instrumentalities of the state to convert of property of members of the Class;

(v)     Whether BNPP aided and abetted the GOS in its use of the instrumentalities of the state to cause wrongful deaths of family members of the Class;

(w)     Whether BNPP's conduct was so shocking and outrageous that it is liable for Plaintiffs' resulting emotional distress;

(x)     Whether BNPP negligently and unreasonably exposed members of the Class to physical harm, which they suffered, and was a substantial factor in causing that harm;

(y)     Whether BNPP acted in bad faith by processing transactions during 1997-2007 on behalf of the GOS and/or its agents and controlled entities;

(z)     Whether and in what amount was BNPP unjustly enriched at the expense of members of the Class, including but not limited to its profits from its Sanctions violations and violations of in New York Penal Law 175.10 during 1997-2007 and for at least two more years, 2008-2009 on behalf of the GOS and/or its agents and controlled entities;

(aa)    Whether BNPP's deceptive conduct prevented members of the Class from discovery of its decisive role in causing their injuries until not earlier than the May 1, 2015 press release statements by the DOJ and the launch of the usvbnpp.gov website requesting information from victims of Sudan;

(bb)    Whether the claims of members of the Class accrued on May 1, 2015, when the DOJ alerted them to their status as potential victims of BNPP's crimes by press release and the launch of the usvbnpp.gov website;

(cc)    If their claims did not accrue on May 1, 2015, on what date did they accrue; and

(dd)    Whether and what amount of BNPP's profits earned from its illegal and wrongful conduct are subject to disgorgement as restitution to the Class.

239.    Common questions of fact also exist with respect to BNPP's liability for punitive damages, including: whether BNPP's conduct was outrageous, willful, reckless, and wanton that warrants an award of punitive damages; the calculation of the amount of punitive

damages commensurate with the scope and consequences of BNPP's conduct and due process; and the most practicable and most equitable allocation and utilization of such damages on account of BNPP's wrongful conduct toward members of the Class and society, in fulfillment of the deterrent policy and purpose of punitive damages.

### E.     Superiority

240.     Absent class treatment, members of the Class will continue to suffer harm without any remedy as a result of BNPP's unlawful and wrongful conduct.  Indeed, Class members have not and shall not receive any part of the multi-billion dollar fine paid by BNPP.

241.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Without a class action, individual Class members would face prohibitive litigation expenses, deterring them from bringing suit or adequately protecting their rights.  Because of the ratio of the economic value of the individual Class members' claims in comparison to the high litigation costs in complex tort cases against well-financed defendants such as those in this litigation, few Class members, if any, could or would likely seek their rightful legal recourse on their own.

242.     The common questions of liability and source and nature of injury predominate over individual questions of personal or property injury, making a class action superior to other available methods for efficiently adjudicating the overall controversy, and making the entire case appropriate for certification under Rule 23(b)(3).

243.     In the alternative, the issues of liability and source and nature of injury are common to all Class members.  A collective determination of those issues would greatly benefit the Court and the Parties making it appropriate to maintain this case as a class action with respect to those issues pursuant to Rule 23(c)(4).

244.     In comparable situations of a large class with both essential uniformity of underlying liability issues but individual damages issues, Federal and State courts have developed practical approaches to the resolution and settlement of disputes, such as a centralized claims process overseen by a Court-appointed Special Master.   Procedures designed to maximize efficiency and standardization can take into account the special circumstances of the victim group, and include awards based on type and severity of injury, streamlined challenge and appeal procedures following individual claim review, and equitable principles for fair allocation and distribution consistent with due process.

245.     The members of the Class have a fundamental interest in class adjudication rather than individual adjudication because of the strong community ties among the Class members, their overlapping rights vis-à-vis BNPP, and similar types of injuries suffered at the hands of the BNPP-facilitated GOS.   It is highly desirable to concentrate the resolution of these claims in this single forum because it would be difficult and highly unlikely that the affected Class members would be able to protect their rights on their own without class action treatment.   Management of the Class will be efficient and far superior to the management of individual lawsuits.

246.     BNPP has already been criminally convicted of violating U.S. Sanctions and New York law under stipulated facts that are common to all Class members.   Consideration of the effect of the guilty pleas and stipulated facts and the remaining common questions of fact and law on a class-wide basis will conserve judicial resources and promote a fair and consistent resolution of these claims.

## VI.   THE CAUSES OF ACTION ALLEGED HEREIN ACTION ARE TIMELY

247.    The applicable statutes of limitations as well as the applicable equitable doctrines demonstrate that Plaintiffs and the Class have brought their claims alleged herein in a timely manner:

248.    The general statute of limitations in New York for personal or property injury is three (3) years.  NY CPLR § 214(4)-(5).

249.    New York enacted a special provision for crime victims of felonies.  *See* NY CPLR § 213-b.  Under this rule, the applicable statute of limitations is either (*i*) seven years from the date of any crime, or (*ii*) ten years from the date on which a defendant was convicted of a specified set of crimes.

250.    Plaintiffs and the Class are entitled to the benefit of the ten and/or seven-year statute of limitation in this special provision:  As set out herein, Plaintiffs and the Class were victims of BNPP's crimes, including but not limited to its violations of Penal Law Section 175.10, the TWEA, the IEEPA, and the violent and property crimes alleged herein.  BNPP has also been convicted of crimes, which are the subject of this civil action.  BNPP's crimes were a substantial factor causing the injuries suffered by Plaintiffs and the Class, and were foreseeable by BNPP.  Moreover, the legislative history of CPLR § 213-b makes clear that the statute is intended to be expansive and to reach the victims of crimes committed in New York State, regardless of whether such crimes are ultimately prosecuted in state or federal court.

251.    Further, the statutes of limitations are subject to tolling for those Plaintiffs who were under 18 at the time of their injuries.  In fact, there are numerous Class members who are still minors.

252.     Equitable doctrines, including the doctrines of equitable tolling and equitable estoppel, also establish that Plaintiffs' claims are timely.  This is true given the Plaintiffs did not know about their claims and that BNPP took elaborate, successful, and illegal efforts to keep its actions secret.  From the adverse public experiences of Talisman, Lundin and OMV, BNPP knew or should have known that its extensive financial involvement with and support of the GOS were facts material to investors, regulations and the public.  Yet years of required public financial reports prior to 2015 failed to disclose these facts.

253.     In New York, for statutes of limitation purposes, a claim accrues from the date of discovery of both the injury and its cause, including the identity of the persons legally responsible.  Here, Plaintiffs could not reasonably have discovered this information until, at earliest, May 1, 2015, at the sentencing of BNPPSA, when the DOJ publicly announced the creation of a website to collect information regarding victims' claims for the purposes of a potential "Victims' Compensation Fund" from the BNPP criminal forfeiture monies.[171]

254.     Further, in its May 1, 2015 press release (and the simultaneous setup of the usvbnpp.com website and informational phone lines), the DOJ made clear that BNPP's financial crimes not only violated U.S. Sanctions but also caused quantifiable, compensable harm to the victims of the GOS's abuses.  For example, the Press Release stated that, "the [DOJ] is exploring ways to use the forfeited funds to compensate individuals who may have been harmed by the sanctioned regimes of Sudan, Iran and Cuba."  No similar statements were included with the announcement of the plea bargains and other admissions of civil liability negotiated between BNPP and federal and state authorities.

---

[171] DOJ May 1, 2015 Press Release, attached hereto as Ex. K and incorporated herein as if set forth in its entirety.

255.    Thus, it was at this time that Plaintiffs first learned that BNPP's actions were a substantial cause of their injuries, and that there could be redress in the U.S. legal system. Accordingly, Plaintiffs could not have reasonably known of their claims against Defendants until May 1, 2015.  This is particularly true given that Plaintiffs all arrived in the United States as refugees fleeing the horrific destruction of their personal and civic lives.  Some were children at the time of their injuries.  Many did not speak English.  None were aware of BNPP's illegal transactions with the GOS or of the connection between those transactions and his/her own injuries.  Before they arrived in the United States, they had no access to the U.S. legal system and were ignorant of U.S. law and legal process.  Indeed, prior to May 1, 2015, Plaintiffs did not know, and had no reason to suspect, that BNPP's connections to the atrocities perpetrated against them by the GOS could provide a basis under the U.S. legal system to seek redress from BNPP.

256.    Plaintiffs proceeded with reasonable diligence thereafter.  Thus, for all the reasons stated herein, Plaintiffs' claims are timely.

## VII.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### FOR NEGLIGENCE PER SE

**Negligence Per Se – Violation Of The International Emergency Economic Powers Act (codified At Title 50, United States Code, Section 1701 et seq.), The Trading With The Enemy Act (codified at Title 50, United States Code, Section 4303 et seq.), And Executive Orders 13067, 13400, And 13412 And Regulations Issued Thereunder**

**(All Plaintiffs Against All Defendants)**

257.    Plaintiffs reallege and incorporate the preceding paragraphs by reference, as if fully set forth herein.

258.    Plaintiffs and the Class belong to the class of intended beneficiaries of the following laws, executive orders, and regulations issued pursuant to those laws:

a.     The IEEPA (codified at Title 50, United States Code, Section 1701 et seq.);

b.     The TWEA (codified at Title 50, United States Code Section 4303 et seq.);

c.     E.O. 13067, as further implemented by the "Sudanese Sanctions Regulations" issued by OFAC, 31 C.F.R. Part 538, which provide detailed and specific prohibitions, rules, and penalties derived from E.O. 13067 to regulate the conduct of persons and firms in the United States seeking to do business with the GOS and the SDNs;

d.     E.O. 13400 as further implemented by the "Darfur Sanctions Regulations" issued by OFAC, 31 C.F.R. Part 546, which provide detailed and specific prohibitions, rules, and penalties derived from E.O. 13400 to regulate the conduct of persons and firms in the United States seeking to do business with the SDNs connected with the extreme violence then in progress in Darfur; and

e.     E.O. 13412, as further implemented by the "Sudanese Sanctions Regulations" issued by OFAC, 31 C.F.R. Part 538, as amended effective October 31, 2007, to adjust the conduct regulated by the Sudanese Sanctions Regulations by permitting most transactions with the then-regional government of South Sudan, a governmental entity distinct from the GOS.

259.   The three Executive Orders were expressly designed to implement the IEEPA and the TWEA by imposing legal duties and standards of care upon, and directly regulating the conduct of, persons and entities engaged in, or contemplating, trade with GOS and the SDNs.  Among other things, they imposed the duty to refrain from engaging in clearing U.S. dollar transactions and facilitating trade that would afford Sudan the economic wherewithal to perpetrate human rights abuses against politically and ethnically disfavored Sudanese civilians, including Plaintiffs and the Class.

260.   The U.S. Sanctions collectively and severally define the standard of conduct and due care that reasonable individuals and entities in the United States or doing business in the United States must observe with respect to trading, doing business, and/or offering financial services to the GOS and the SDNs.

261.   The Sanctions resulted from the Congressional and Executive determination that by imposing a comprehensive embargo on the GOS that would cripple Sudan's economy

and curtail the GOS's exploitation of its oil resources, the Sanctions would stop or greatly hinder the GOS's atrocities against disfavored civilians, including Plaintiffs and the Class. Congress and the Executive intended and expected this result would come to fruition.

262.    Thus, Plaintiffs and the Class—as politically and ethnically disfavored Sudanese civilians living in Sudan at the time when the U.S. Sanctions were in effect and subject to the GOS's atrocities—were the express and legislatively intended beneficiaries of those Sanctions.

263.    BNPP violated the U.S. Sanctions—the IEEPA, the TWEA, the three Executive Orders, and the implementing regulations, collectively and severally—as well as the duties and standards of care imposed by each of them.  BNPP has admitted that it did so and has been criminally convicted of doing so.  Those criminal acts include carrying out thousands of illegal transactions worth billions of dollars with the GOS and the SDNs during at least 1997 through 2007.  These violations were not reasonable or excused in any way, and BNPP has no reason to excuse or justify its non-compliance with the Sanctions.

264.    BNPP's violations of each of the U.S. Sanctions, collectively and severally, as well as BNPP's departure from the duties and standards imposed by each of them, were a reasonably foreseeable and substantial factor in proximately causing and/or bringing about the injuries and harm suffered by Plaintiffs and the Class, including the harm described above to the Plaintiffs.

265.    For example, BNPP's violations of U.S. Sanctions substantially and foreseeably enabled the GOS to sustain and dramatically expand its human rights abuses against Plaintiffs and the Class by allowing the GOS to purchase and build advanced weapons systems that it would not have had access to without BNPP's illegal conduct.

266.    By illegally providing the GOS access to the U.S. dollar market through its New York Branch and other New York based banks, among other financial services, BNPP—aware and accepting of the GOP's depraved and deadly internal repression of its own citizens—created, expanded, and then preserved the GOS's economic resources from oil exploitation, providing substantial resources to the GOS that it otherwise would not have had and that it used to commit human rights abuses, including those committed against Plaintiffs and the Class.  Integral to the GOS's oil exploration and development that BNPP knowingly financed was the fact that the GOS committed human rights abuses, including those committed against Plaintiffs and the Class, in order to exploit its oil.  The GOS then used its increased economic resources, obtained in substantial part through BNPP's assistance, to acquire weapons and fund militias that were then used against its disfavored civilians, including Plaintiffs and the Class.

267.    This proximate, causal connection between the GOS's exploitation of its oil resources and its human rights abuses is widely recognized by experts as well as by the U.S. Government.  In the 2002 Sudan Peace Act, Congress made an explicit determination that there was a direct and immediate causal link between the GOS's increased oil revenue and the GOS's horrific human rights abuses.  This causal connection was a decisive fact that explicitly animated the Peace Act itself, the 2004 Comprehensive Peace in Sudan Act, and the Sanctions that followed.  Indeed, Congress and the Executive, in their determination that the Sanctions would stop or greatly hinder the GOS's atrocities against its disfavored civilians, implicitly recognized that violation of the Sanctions would result in increased atrocities.

268.    Importantly, Congress's determination in the 2002 Sudan Peace Act of this causal link occurred precisely during the time that BNPP was secretly aiding the GOS.  Thus, Congress's determination properly applies directly to BNPP's conduct at that time.

269.    In light of what could be reasonably foreseen, BNPP acted unreasonably by violating the Sanctions and providing a substantial factor in the GOS's atrocities.

270.    The elaborate care taken by BNPP to conceal its corrupt partnership with the GOS further evidences its consciousness of its wrongs and its understanding of the direct impact its actions had on the civilian abuses happening on the ground in Sudan.  BNPP agreed that, during the relevant time period, its New York-based compliance team "intentionally" "did not have adequate legal and compliance authority to ensure that activities conducted from [BNPP's] offices outside of the United States complied with New York and U.S. laws and regulations."  And, from the costly and humiliating public experiences of Talisman, Lundin, and OMV, which were each forced to exit oil exploitation activities in Sudan because of international repugnance, BNPP knew it could continue to profit from its criminal enterprise with the GOS only so long as the enterprise was kept secret.  It accordingly did all it could do, including criminally falsifying its business records, to conceal its involvement from regulators and the public.

271.    The effects of BNPP's U.S. Sanctions violations began in 1997 and continued to be felt in Sudan until at least 2009.

272.    The injuries suffered by the Plaintiffs and the Class resulted from the very type of occurrence that the Sanctions were designed to prevent, *i.e.*, the use of the U.S. financial system, principally based in New York, to process oil transactions to fund the brutal repression of the Sudanese people, including Plaintiffs and the Class.

273.    A right of action for negligence per se is consistent with and furthers the purpose of the Sanctions.  A principal purpose of the Sanctions was to stop the GOS's human rights abuses.  Providing a civil remedy for the victims of those human rights abuses, in which BNPP's actions were a substantial factor, furthers the purpose of the U.S. Sanctions and would provide a substantial deterrent to future entities that consider violating U.S. Sanctions.  This furthering of the purpose of the Sanctions is particularly true where, as here, the Plaintiffs and the Class have received no compensation whatsoever for the harm BNPP caused them.

274.    As a direct and proximate result of Defendants' negligence per se, Plaintiffs and the Class suffered and continue to suffer physical injury, emotional distress, loss of property and income, and loss of the enjoyment of living, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
## FOR NEGLIGENCE PER SE

### Negligence Per Se – Violation of New York Penal Law § 175.10

### (All Plaintiffs Against All Defendants)

275.    Plaintiffs reallege and incorporate the preceding paragraphs by reference, as if fully set forth herein.

276.    Under New York State Penal Law Section 175.05, it is illegal to falsify business records:

A person is guilty [of the misdemeanor offense] of falsifying business records in the second degree when, with the intent to defraud he:

1. Makes or causes a false entry in the business records of an enterprise; or 2. Alters, erases, obliterates, deletes, removes or destroys a true entry in the business records of an enterprise; or 3. Omits to make a true entry in the business records of an enterprise in violation of a duty to do so which he knows to be imposed upon him by law or by the nature of his position; or 4.

> Prevents the making of a true entry or causes the omission thereof in the business records of an enterprise.   Falsifying business records in the second degree is a class A misdemeanor.

277.    The falsification becomes a felony when it is done with "an intent to commit another crime or to aid or conceal the commission thereof."  Specifically, New York State Penal Law Section 175.10 provides:

> A person is guilty of falsifying business records in the first degree when he commits the crime of falsifying business records in the second degree, and when his intent to defraud includes an intent to commit another crime or to aid or conceal the commission thereof.

> Falsifying business records in the first degree is a class E felony.

278.    In enacting New York Penal Law Section 175.10, the New York legislature provided enhanced penalties if the person who falsified the business records did so with an intent to commit, aid, or conceal another crime.  Thus, Section 175.10 is intended to protect and benefit not just the victims of the business records falsification but also the victims of the underlying crime.

279.    New York Penal Law Sections 175.05 and 175.10, collectively and severally, define the standard of conduct and due care that reasonable individuals and entities in New York or doing business in New York must observe with respect to the truthfulness of business record.  Section 175.10 also defines the standard of conduct and due care that reasonable individuals and entities in New York or doing business in New York must observe with respect to the truthfulness of business records where those records are falsified with an intent to commit, aid, or conceal another crime.

280.    BNPP violated New York State Penal Law Section 175.10 and the lesser included offense of 175.05.  BNPP falsified its business records in at least the following ways:

a.      BNPP used deceptive procedures and transaction structures to avoid U.S. screening procedures that identified and blocked transactions involving sanctioned entities, such as the GOS and SDNs.  For example, BNPP removed and omitted references to such entities in payment messages.

b.      In violation of New York Banking Law § 200-c, BNPP failed to maintain or make available at the New York Branch true and accurate books, accounts, and records reflecting all transactions and actions.

c.      In violation of New York Banking Law § 672(1), BNPP made false entries in its books, reports, and statements and willfully omitted to make true entries of material particularly pertaining to its U.S. dollar clearing business at the New York Branch.

281.    BNPP admitted that it violated Section 175.10, a Class E felony, and it was criminally convicted of doing so.

282.    These violations were not reasonable or excused in any way, and BNPP has no reasons excusing or justifying non-compliance with Sections 175.05 and 175.10.

283.    BNPP's violations of Sections 175.05 and 175.10, collectively and severally, as well as its departure from the duties and standards imposed by each of them, were a substantial factor in proximately causing and/or bringing about the injuries and harm suffered by Plaintiffs and the Class, including the harm described above to the Plaintiffs.

284.    The impact of BNPP's violations of Section 175.05 and 175.10 began in 1997 and continued to be felt in Sudan through at least 2009.

285.    BNPP violated Section 175.10 because it falsified business records and its intent to defraud included an intent to commit, aid, and/or conceal other crimes.  BNPP admitted that it had the requisite intent to defraud.  For example, BNPP agreed that its New York-based compliance team "intentionally" "did not have adequate legal and compliance authority to ensure that activities conducted from [BNPP's] offices outside of the United States complied with New York and U.S. laws and regulations."  Indeed, one BNPP employee was quoted in the Consent Order as describing an "omission" procedure

purposefully designed to "avoid[ ] putting [BNPPNY] in a position to uncover these transactions [on behalf of Sudan], to block them, and to submit reports to the regulator."

286.   The other crimes that BNPP intended to commit, aid, and/or conceal included its violation of U.S. Sanctions, New York Banking Law, and its intent to aid and/or conceal the crimes committed by the GOS against Plaintiffs and the Class:

287.   First, BNPP had an "intent to defraud" that included "an intent to commit" violations of the Sanctions and to "conceal the commission" of violations of the Sanctions. As set out above, BNPP's Sanctions violations were a substantial factor in the injuries to Plaintiffs and the Class.  By falsifying business records in violation of Section 175.10, BNPP concealed its intent to violate the Sanctions and conceal its actual violations of them from the public and New York and federal authorities.

288.   Second, BNPP had "an intent to defraud" that included "an intent to commit" the crimes of aiding and abetting and conspiracy to commit battery, assault, false imprisonment, conversion, and murder as well as other crimes being committed by the GOS in its oil exploitation efforts and with the money provided to it by BNPP, and to "conceal the commission" of those same crimes.  As set out herein, which allegations are incorporated herein, BNPP's aiding and abetting and conspiracy to commit battery, assault, false imprisonment, conversion, and murder as well as other crimes being committed by the GOS in its oil exploitation efforts and with the money provided to it by BNPP, were a substantial factor in the injuries to Plaintiffs and the Class.

289.   Third, BNPP had "an intent" "to aid" the crimes being committed by the GOS against civilians, including Plaintiffs and the Class, because BNPP, in exchange for profits, intended to provide the means to the GOS to continue and to increase its oil exploitation, part

and parcel of which were GOS's atrocities.  These crimes include battery, assault, false imprisonment, conversion, and murder as well as other crimes being committed by the GOS, including violations of international law, in its oil exploitation efforts and with the money provided to it by BNPP.  As set out herein, BNPP's actions provided aid to the GOS in its commission of crimes against Plaintiffs and the Class and were a substantial factor in the injuries to Plaintiffs and the Class.

290.    As set out above, the injuries suffered by Plaintiffs and the Class were reasonably foreseeable by BNPP when it violated the Sanctions.  BNPP's actions were also a substantial factor in those injuries: Had BNPP not falsified its business records, the public, New York authorities, and/or federal authorities would have prevented and/or stopped the Sanctions' violations and the resultant harm to Plaintiffs and the Class.  In light of what could be foreseen reasonably, BNPP acted unreasonably by violating the Sanctions, assisting the GOS to commit atrocities, and then falsifying its business records to cover up its actions.

291.    Thus, the injuries suffered by the Plaintiffs and the Class resulted from an event the nature of which Section 175.10 was designed to prevent, and the Plaintiffs and the Class, which suffered harm to their lives, safety, and property, were among the class of persons for whose protection Section 175.10 was enacted because BNPP's falsification of business records was done with an intent to commit, aid, and/or conceal crimes of which Plaintiffs and the Class were victims.

292.    Further, by violating Sections 175.05 and 175.10, BNPP demonstrated that it knew that its actions had serious, injurious consequences to Plaintiffs.

293.    A right of action for negligence per se is consistent with and furthers the legislative purpose of Sections 175.05 and 175.10.  Among other things, New York seeks to

protect victims of violations of Section 175.10 by providing a longer statute of limitations in which to bring a civil suit for criminal violations thereof.

294.    As a direct and proximate result of BNPP's violation of Penal Law Sections 175.05 and 175.10, Plaintiffs and the Class suffered and continue to suffer physical injury, emotional distress, loss of property and income, and loss of the enjoyment of living, in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
## FOR CONSPIRACY TO COMMIT BATTERY

### (All Plaintiffs Against All Defendants)

295.    Plaintiffs reallege and incorporate the preceding paragraphs by reference, as if fully set forth herein.

296.    In 1997, BNPP entered into an agreement with the GOS and the SDNs to commit wrongful acts.  BNPP agreed to provide banking and financial services to the GOS and SDNs in violation of U.S. Sanctions and to enable and facilitate the GOS's exploitation of its oil and its foreseeable commission of human rights abuses and other crimes in exchange for revenue and profits for itself and its affiliates.

297.    Among other things, this agreement is evidenced by documentation for the illicit financial transactions, is implied by the conduct of the parties—including BNPP, the GOS, and the SDNs—and/or may be inferred from circumstances, including the nature of the acts done, the relationships between the parties, and the interests of the alleged co-conspirators.

298.    Throughout this period, BNPP, the GOS, and the SDNs intentionally engaged in numerous overt acts in furtherance of the Conspiracy.  The GOS and the SDNs requested, and BNPP completed, the processing of thousands of illegal financial transactions in the

United States, most of which went through New York.  The GOS and the SDNs also directed BNPP to take steps to conceal the fact that BNPP was processing transactions in New York on their behalf.  For example, Defendants omitted any reference to Sudan in the payment messages for these transactions.

299.    As BNPP agreed in the SOF, its plea agreements with the DOJ and DANY and the Consent Order, this corrupt agreement constituted a conspiracy, and continued from 1997 through 2007 ("the Conspiracy").  The effects of Defendants' Conspiracy continued for at least two more years thereafter.  At all times, BNPP participated in the conspiracy to further its own financial gain.

300.    Throughout this period, the GOS committed battery against civilian populations in Sudan, including Plaintiffs Kashef, Abdalla, Jane Doe, Hassan, Lual, Jane Roe, Lukudu, Adam, Ulau, Marjan, Khalifa, and Judy Doe and the Class.  Such battery was foreseeable by Defendants.  In fact, the GOS, and/or the militias under its control, physically harmed Plaintiffs and the Class by touching them, including but not limited to sexual assault, rape, physical attacks, beatings, torture, maiming, and forced relocation, with the intent to harm and offend them.

301.    Plaintiffs and the Class did not consent to the contacts and touchings.

302.    Plaintiffs and the Class were harmed and offended by the contacts and touchings.  The conduct was clearly harmful.

303.    As a direct and proximate result of BNPP's conspiracy with the GOS, Plaintiffs and the Class suffered and continue to suffer from the effects of the intentional, offensive bodily contact that resulted in physical injury, emotional distress, loss of property and income, and loss of the enjoyment of living, in an amount to be determined at trial.

304.    Defendants were aware that the GOS committed and planned to continue committing battery against civilians in Sudan, a group that included Plaintiffs and the Class.

305.    Defendants' agreement with the GOS and their intention that the battery be committed was expressed through its explicit approval of the GOS's battery and/or tacitly through its continued financing of the GOS.

306.    The harm to Plaintiffs and the Class was reasonably foreseeable by BNPP when it entered into the Conspiracy with the GOS.  The GOS was engaged in a prolonged campaign of committing atrocities against its population.  Defendants knew or should have known that by providing the GOS with access to more resources and by assisting the GOS in its exploitation of its oil resources, the GOS would use those resources to secure its hold on power over Sudan and increase the intensity of its atrocities.

307.    Accordingly, Defendants, as co-conspirators, are liable for the harm to Plaintiffs and the Class.

308.    By their conduct, Defendants acted willfully, outrageously, and with malice, oppression, bad faith, and conscious disregard of the rights of Plaintiffs and the Class, and the probability of severe injury to Plaintiffs and the Class, justifying an award of punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar conduct.

## FOURTH CAUSE OF ACTION
## FOR AIDING AND ABETTING BATTERY

### (All Plaintiffs Against All Defendants)

309.    Plaintiffs reallege and incorporate the preceding paragraphs by reference, as if fully set forth herein.

310.   As set out above, from 1997 through at least 2009, the GOS committed battery against disfavored civilians, including Plaintiffs Kashef, Abdalla, Jane Doe, Hassan, Lual, Jane Roe, Lukudu, Adam, Ulau, Marjan, Khalifa, and Judy Doe and the Class.  The GOS, and its militias under its control, harmed Plaintiffs and the Class by touching them, including but not limited to sexual assault, rape, physical attacks, beatings, torture, maiming, and forced relocation, with the intent to harm and offend them.

311.   Plaintiffs and the Class did not consent to the contacts and touchings.

312.   Plaintiffs and the Class were harmed and offended by the contacts and touchings.  The conduct was clearly harmful.

313.   Defendants aided and abetted the batteries committed against Plaintiffs and the Class.  Defendants did so by providing organized and systematic financial and other practical assistance and encouragement to a campaign of human rights abuses by a rogue regime, all of which had a substantial effect on the perpetration of horrific crimes.

314.   As set out above, Defendants knowingly, actively, and unlawfully provided substantial assistance to the GOS, facilitating GOS imports and exports and giving the GOS the means to exploit its oil resources, which, as BNPP knew, involved committing atrocities to displace, harm, and murder disfavored civilians, including Plaintiffs and the Class here.

315.   Among the GOS's atrocities, enabled as a result of Defendants' assistance, were intentional, offensive contacts and touchings against Sudanese civilians, including Plaintiffs and the Class.  These offensive contacts and touchings, which included but were not limited to, sexual assault, rape, physical attack, beating, torture, maiming, and forced relocation, constituted battery.

316.    Throughout the time period from 1997 through 2007, Defendants knew that the GOS was committing battery and planning to continue committing battery.

317.    Defendants provided their assistance from 1997 through 2007 and the effect of their assistance continued for an additional two years until at least 2009.  At all times, Defendants acted in furtherance of its own financial gain.

318.    Defendants knew that their illegal transactions would provide substantial assistance to the GOS that would enable it to exploit Sudan's oil resources on the international oil market.  Defendants knew or should have known that the GOS would use its new revenues to purchase weapons and other advanced military systems, to support and equip its own troops, and to support and equip proxy militias.  Defendants knew or should have known that the GOS would then have its troops and militias turn these weapons on its own citizens, including Plaintiffs and the Class, perpetrating gruesome violence as a result.

319.    Defendants' assistance to the GOS was a substantial factor in causing harm to Plaintiffs and the Class.

320.    The harm to Plaintiffs and the Class was reasonably foreseeable by Defendants.  The GOS was engaged in a prolonged campaign of committing atrocities against its population.  Defendants knew or should have known that by providing the GOS with access to more resources and by assisting the GOS in its exploitation of its oil resources, the GOS would use those resources to secure its hold on power over Sudan and increase the intensity of its atrocities.

321.    As a direct and proximate result of Defendants' encouragement and aid to the GOS by and through its violations of the U.S. Sanctions, Plaintiffs suffered and continue to suffer from the effects of the offensive bodily contact.  This suffering included physical

injury, emotional distress, loss of property and income, and loss of the enjoyment of living, in an amount to be determined at trial.

322.    Further, when Defendants engaged in the acts described herein, they knew that they violated U.S. and New York law, including the U.S. Sanctions.  By virtue of that knowledge, Defendants' acts were carried out deliberately, maliciously, and with reckless disregard for Plaintiffs' rights to be free of bodily harm, including battery.

323.    By their conduct, Defendants acted willfully, outrageously and with malice, oppression, bad faith and conscious disregard of the rights of Plaintiffs and the Class, and the probability of severe injury to Plaintiffs and the Class, justifying an award of punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar conduct.

## FIFTH CAUSE OF ACTION
## FOR CONSPIRACY TO COMMIT BATTERY
## IN PERFORMANCE OF
## PUBLIC DUTY OR AUTHORITY

### (All Plaintiffs Against All Defendants)

324.    Plaintiffs reallege and incorporate the preceding paragraphs by reference, as if fully set forth herein.

325.    BNPP agreed in the SOF, its plea agreements with the DOJ and the DANY, and the Consent Order, it entered into a Conspiracy with the GOS that continued at all times from 1997 through 2007.  The effects of this Conspiracy continued to be felt in Sudan through at least 2009.

326.    As set out above, throughout this period, Defendants and the GOS intentionally engaged in numerous overt acts in furtherance of the Conspiracy.

327.     Throughout this period, the GOS committed battery against civilian populations in Sudan, including Plaintiffs Kashef, Abdalla, Jane Doe, Hassan, Lual, Jane Roe, Lukudu, Adam, Ulau, Marjan, Khalifa, and Judy Doe and the Class.  Such battery was foreseeable by Defendants.  In fact, the GOS, and/or the militias under its control, physically harmed Plaintiffs and the Class by touching them, including but not limited to sexual assault, rape, physical attacks, beatings, torture, maiming, and forced relocation, with the intent to harm and offend them.  At all times, the force used by the GOS was excessive and was not reasonable, justified, or privileged.

328.     As a direct and proximate result of Defendants' Conspiracy with the GOS to commit battery, Plaintiffs and the Class suffered and continue to suffer intentional, offensive bodily contact resulting in physical injury, emotional distress, loss of property and income, and loss of the enjoyment of living, in an amount to be determined at trial.

329.     Defendants were aware that the GOS was committing and planned to continue committing battery against Sudanese civilians, including Plaintiffs and the Class.

330.     The GOS used its state power and resources to commit such intentional, offensive bodily contacts against its own civilians, including Plaintiffs and the Class.  The force the GOS used was not reasonable or justified under any circumstances.

331.     Because of their knowledge of the GOS's purposes, Defendants agreed with the GOS and intended that the battery be committed using, at least in part, resources that their actions enabled the GOS to have.  Defendants' agreement was expressed through their explicit approval of the GOS's battery and/or tacitly through their continued financing of the GOS.

332. The harm to Plaintiffs and the Class was reasonably foreseeable by Defendants when they entered into their agreement with the GOS. The GOS was engaged in a prolonged campaign of committing atrocities against its population. Defendants knew or should have known that by providing the GOS with access to more resources and by assisting the GOS in its exploitation of its oil resources, the GOS would use those resources to secure its hold on power over Sudan and increase the intensity of its atrocities.

333. Accordingly, Defendants, as co-conspirators, are liable for the harm to Plaintiffs and the Class.

334. Further, when Defendants engaged in the acts described herein, they knew that they violated U.S. and New York law, including the U.S. Sanctions. By virtue of that knowledge, Defendants' acts were carried out deliberately, maliciously, and with reckless disregard for Plaintiffs' rights to be free of bodily harm, including battery.

335. By their conduct, Defendants acted willfully, outrageously and with malice, oppression, bad faith and conscious disregard of the rights of Plaintiffs and the Class, and the probability of severe injury to Plaintiffs and the Class, justifying an award of punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar conduct.

## SIXTH CAUSE OF ACTION
## FOR AIDING AND ABETTING BATTERY
## COMMITTED IN PERFORMANCE OF
## PUBLIC DUTY OR AUTHORITY

### (All Plaintiffs Against All Defendants)

336. Plaintiffs reallege and incorporate the preceding paragraphs by reference, as if fully set forth herein.

337.    As set out above, from 1997 through at least 2009, the GOS committed battery against civilian populations in Sudan, including Plaintiffs Kashef, Abdalla, Jane Doe, Hassan, Lual, Jane Roe, Lukudu, Adam, Ulau, Marjan, Khalifa, and Judy Doe and the Class. The GOS, and its militias under its control, harmed Plaintiffs and the Class by touching them, including but not limited to sexual assault, rape, physical attacks, beatings, torture, maiming, and forced relocation, with the intent to harm and offend them.  At all times, the force used by the GOS was excessive and was not reasonable, justified, or privileged.

338.    Plaintiffs and the Class did not consent to the touching.

339.    Plaintiffs and the Class were harmed and offended by the touching.  The conduct was clearly harmful.

340.    Defendants aided and abetted the batteries committed against Plaintiffs and the Class.  Defendants did so by providing organized and systematic financial and other practical assistance and encouragement to a campaign of human rights abuses by a rogue regime, all of which had a substantial effect on the perpetration of horrific crimes.

341.    As set out above, Defendants knowingly, actively, and unlawfully provided substantial assistance to the GOS, facilitating GOS imports and exports and enabling the GOS to exploit its oil resources and commit atrocities to displace, harm, and murder disfavored civilians, including Plaintiffs and the Class here.

342.    Among the GOS's atrocities, enabled as a result of Defendants' assistance, were intentional, offensive contacts and touching against Sudanese civilians, including Plaintiffs and the Class.  These offensive contacts and touchings, which included but were not limited to  sexual assault, rape, physical attack, beating, torture, maiming, and forced relocation, constituted battery.

343. Throughout the time period from 1997 through 2007, Defendants knew that the GOS was committing battery and planning to continue committing battery.

344. Defendants provided their assistance from 1997 through 2007. At all times, Defendants acted in furtherance of its own financial gain.

345. Defendants knew that their illegal transactions would provide substantial assistance to the GOS that would enable it to exploit Sudan's oil resources on the international oil market. Defendants knew or should have known that the GOS would use its new revenues to purchase weapons and other advanced military systems, to support and equip its own troops, and to support and equip proxy militias. Defendants knew or should have known that the GOS would then have its troops and militias turn these weapons on its own citizens, including Plaintiffs and the Class, perpetrating gruesome violence as a result.

346. Defendants' substantial assistance to the GOS was a substantial factor in causing harm to Plaintiffs and the Class. The effects of Defendants' assistance began in 1997 and continued through at least 2009.

347. The harm to Plaintiffs and the Class was reasonably foreseeable by Defendants. The GOS was engaged in a prolonged campaign of committing atrocities against its population. Defendants knew or should have known that by providing the GOS with access to more resources and by assisting the GOS in its exploitation of its oil resources, the GOS would use those resources to secure its hold on power over Sudan and increase the intensity of its atrocities.

348. The GOS used its state power and resources to commit such intentional, offensive bodily contacts against its own civilians, including Plaintiffs and the Class. The

force the GOS used was not reasonable or justified under any circumstances. Defendants knew that the GOS intended to perform these offensive contacts.

349.    As a direct and proximate result of Defendants' encouragement and aid to the GOS by and through its violations of the U.S. Sanctions, Plaintiffs suffered and continue to suffer from the effects of the offensive bodily contact that included physical injury, emotional distress, loss of property and income, and loss of the enjoyment of living, in an amount to be determined at trial.

350.    Further, when Defendants engaged in the acts described herein, they knew that they violated U.S. and New York law, including the U.S. Sanctions. By virtue of that knowledge, Defendants' acts were carried out deliberately, maliciously, and with reckless disregard for Plaintiffs' rights to be free of bodily harm, including battery.

351.    By their conduct, Defendants acted willfully, outrageously and with malice, oppression, bad faith and conscious disregard of the rights of Plaintiffs and the Class, and the probability of severe injury to Plaintiffs and the Class, justifying an award of punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar conduct.

## SEVENTH CAUSE OF ACTION
## FOR CONSPIRACY TO COMMIT ASSAULT

### (All Plaintiffs Against All Defendants)

352.    Plaintiffs reallege and incorporate the preceding paragraphs by reference, as if fully set forth herein.

353.    BNPP agreed in the SOF, its plea agreements with the DOJ and the DANY and the Consent Order, it entered into a Conspiracy with the GOS that continued at all times

from 1997 through 2007. The effects of this Conspiracy continued to be felt in Sudan through at least 2009.

354. As set out above, throughout this period, Defendants and the GOS intentionally engaged in numerous overt acts in furtherance of the Conspiracy.

355. Throughout this period, the GOS committed assault against civilian populations in Sudan, including Plaintiffs Kashef Abdalla, Mosabal, Omar, Jane Doe, Hassan, Tingloth, Lual, Jane Rose, Lukudu, Adam, Majuc, Ulau, Marjan, Khalifa, Judy Doe, Hamad, and Abbo Abakar and the Class. Such assault was foreseeable by Defendants. In fact, the GOS intentionally threatened to cause harmful and offensive contact to Plaintiffs and the Class, and the GOS acted, intending to cause harmful and offensive contact to Plaintiffs and the Class.

356. Plaintiffs and the Class reasonably believed that the GOS had the real and apparent ability to bring about that harmful or offensive bodily contact, that the GOS was about to carry out its threats, and that the GOS was about to touch them in a harmful and offensive manner.

357. The GOS's actions were made with the intent to make Plaintiffs and the Class apprehensive, and Plaintiffs and the Class did become apprehensive.

358. Plaintiffs and the Class did not consent to the GOS's conduct.

359. As a direct and proximate result of Defendants' conspiracy with the GOS, Plaintiffs and the Class suffered and continue to suffer physical and mental injury, emotional distress, loss of property, and loss of the enjoyment of living, in an amount to be determined at trial.

360.    Defendants were aware that the GOS was committing and planned to continue committing assault against civilians in Sudan, a group that included Plaintiffs and the Class.

361.    Because of their knowledge of the GOS's purposes, Defendants agreed with the GOS and intended that the assault be committed using, at least in part, resources that their actions enabled the GOS to have.  Defendants' agreement was expressed through their explicit approval of the GOS's assault and/or tacitly through their continued financing of the GOS.

362.    The harm to Plaintiffs and the Class was reasonably foreseeable by Defendants when they entered into their agreement with the GOS.  The GOS was engaged in a prolonged, often indiscriminate campaign of committing atrocities against its population. Defendants knew or should have known that by providing the GOS with access to more resources, it would use those resources to secure its hold on power over Sudan and increase the intensity of its atrocities.  It is reasonable that such an increase would lead to widespread fear of imminent bodily harm.

363.    Accordingly, Defendants, as co-conspirators, are liable for the harm to Plaintiffs and the Class.

364.    Further, when Defendants engaged in the acts described herein, they knew that they violated U.S. and New York law, including the U.S. Sanctions.  By virtue of that knowledge, Defendants' acts were carried out deliberately, maliciously, and with reckless disregard for Plaintiffs' rights to be free of fear of bodily harm.

365.    By their conduct, Defendants acted willfully, outrageously and with malice, oppression, bad faith and conscious disregard of the rights of Plaintiffs and the Class, and the probability of severe injury to Plaintiffs and the Class, justifying an award of punitive

damages in an amount appropriate to punish Defendants and deter others from engaging in similar conduct.

## EIGHTH CAUSE OF ACTION
## FOR AIDING AND ABETTING ASSAULT

### (All Plaintiffs Against All Defendants)

366.   Plaintiffs reallege and incorporate the preceding paragraphs by reference, as if fully set forth herein.

367.   As set out above, from 1997 through 2007, the GOS committed assault against civilian populations in Sudan, including Plaintiffs Kashef, Abdalla, Mosabal, Omar, Jane Doe, Hassan, Tingloth, Lual, Jane Rose, Lukudu, Adam, Majuc, Ulau, Marjan, Khalifa, Judy Doe, Hamad, and Abbo Abakar and the Class.

368.   The GOS intentionally threatened to cause harmful and offensive contact to Plaintiffs and the Class, and the GOS acted, intending to cause harmful and contact to Plaintiffs and the Class.

369.   Plaintiffs and the Class reasonably believed that the GOS had the real and apparent ability to bring about that harmful or offensive bodily contact, that the GOS was about to carry out its threats, and that the GOS was about to touch them in a harmful and offensive manner.

370.   The GOS's actions were made with the intent to make Plaintiffs and the Class apprehensive, and Plaintiffs and the Class did become apprehensive.

371.   Plaintiffs and the Class did not consent to the GOS's conduct.

372.   Plaintiffs and the Class were harmed.

373.   Defendants aided and abetted the assaults committed against Plaintiffs and the Class.  Defendants did so by providing organized and systematic financial and other practical

assistance and encouragement to a campaign of human rights abuses by a rogue regime, all of which had a substantial effect on the perpetration of horrific crimes.

374.    As set out above, Defendants knowingly, actively, and unlawfully provided substantial assistance to the GOS, facilitating its exports and imports and enabling it to exploit its oil resources and commit atrocities to displace, harm, and murder disfavored civilians, including Plaintiffs and the Class.

375.    Among the GOS's atrocities, enabled as a result of Defendants' assistance, were assault against Sudanese civilians, including Plaintiffs and the Class.

376.    Throughout the time period from 1997 through 2007, Defendants knew that the GOS was committing assault and planning to continue committing assault.

377.    Defendants provided their assistance from 1997 through 2007.  The effects of Defendants' assistance continued for at least two additional years thereafter.  At all times, Defendants acted in furtherance of its own financial gain.

378.    Defendants knew that their illegal transactions would provide substantial assistance to the GOS that would enable it to exploit Sudan's oil resources on the international oil market.  Defendants knew or should have known that the GOS would use its new revenues to purchase weapons and other advanced military systems, to support and equip its own troops, and to support and equip proxy militias.  Defendants knew or should have known that the GOS would then have its troops and militias turn these weapons on its own citizens, including Plaintiffs and the Class, perpetrating gruesome violence as a result.

379.    Defendants' substantial assistance to the GOS was a substantial factor in causing harm to Plaintiffs and the Class.

380.    The harm to Plaintiffs and the Class was reasonably foreseeable by Defendants.  The GOS was engaged in a prolonged campaign of committing atrocities against its population.  Defendants knew or should have known that by providing the GOS with access to more resources and by assisting the GOS in its exploitation of its oil resources, the GOS would use those resources to secure its hold on power over Sudan and increase the intensity of its atrocities.

381.    As a direct and proximate result of Defendants' encouragement and aid to the GOS by and through its violations of the U.S. Sanctions, Plaintiffs suffered and continue to suffer from the effects of the fear of offensive bodily contact that included physical injury, emotional distress, loss of property and income, and loss of the enjoyment of living, in an amount to be determined at trial.

382.    Further, when Defendants engaged in the acts described herein, they knew that they violated U.S. and New York law, including the U.S. Sanctions.  By virtue of that knowledge, Defendants' acts were carried out deliberately, maliciously, and with reckless disregard for Plaintiffs' rights to be free of bodily harm, including battery.

383.    By their conduct, Defendants acted willfully, outrageously and with malice, oppression, bad faith and conscious disregard of the rights of Plaintiffs and the Class, and the probability of severe injury to Plaintiffs and the Class, justifying an award of punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar conduct.

# NINTH CAUSE OF ACTION
## FOR CONSPIRACY TO COMMIT FALSE ARREST AND FALSE IMPRISONMENT

**(All Plaintiffs Against All Defendants)**

384. Plaintiffs reallege and incorporate the preceding paragraphs by reference, as if fully set forth herein.

385. BNPP agreed in the SOF, its plea agreements with the DOJ and the DANY and the Consent Order, it entered into a Conspiracy with the GOS that continued at all times from 1997 through 2007. The effects of this Conspiracy continued to be felt in Sudan through at least 2009.

386. As set out above, throughout this period, Defendants and the GOS intentionally engaged in numerous overt acts in furtherance of the Conspiracy.

387. Throughout this period, the GOS intentionally falsely arrested and falsely imprisoned civilians in Sudan, including Plaintiffs Kashef, Jane Doe, Lual, Jane Roe, Lukudu, Adam, Ulau, Marjan, Khalifa, and Judy Doe and the Class. Such false arrest was foreseeable by Defendants.

388. Plaintiffs and the Class were conscious of the confinement.

389. Plaintiffs and the Class did not consent to the confinement.

390. The confinement was not otherwise privileged.

391. As a direct and proximate result of Defendants' conspiracy with the GOS to detain them unlawfully, Plaintiffs suffered and continue to suffer from the effects of the false arrests and false imprisonments, including grievous bodily injuries (ranging from the loss of limbs to blindness and infertility), lost wages, and severe mental trauma, in an amount to be determined at trial.

392. Defendants were aware that the GOS was making and planned to continue making false arrests and false imprisonments against disfavored civilians, including Plaintiffs and the Class.

393. Because of their knowledge of the GOS's purposes, Defendants agreed with the GOS and intended that the false arrests and false imprisonments be committed using, at least in part, resources that their actions enabled the GOS to have. Defendants' agreement was expressed through their explicit approval of the GOS's assault and/or tacitly through their continued financing of the GOS.

394. The harm to Plaintiffs and the Class was reasonably foreseeable by Defendants when they entered into their agreement with the GOS. The GOS was engaged in a prolonged, often indiscriminate campaign of committing atrocities against its population, including unlawful detentions. Defendants knew or should have known that by providing the GOS with access to more resources, it would use those resources to secure its hold on power over Sudan and increase the intensity of its atrocities.

395. Accordingly, Defendants, as co-conspirators, are liable for the harm to Plaintiffs and the Class.

396. Further, when Defendants engaged in the acts described herein, they knew that they violated U.S. and New York law, including the U.S. Sanctions. By virtue of that knowledge, Defendants' acts were carried out deliberately, maliciously, and with reckless disregard for Plaintiffs' rights to be free of fear of bodily harm.

397. By their conduct, Defendants acted willfully, outrageously and with malice, oppression, bad faith and conscious disregard of the rights of Plaintiffs and the Class, and the probability of severe injury to Plaintiffs and the Class, justifying an award of punitive

damages in an amount appropriate to punish Defendants and deter others from engaging in similar conduct.

## TENTH CAUSE OF ACTION
## AIDING AND ABETTING FALSE ARREST
## AND FALSE IMPRISONMENT

### (All Plaintiffs Against All Defendants)

398.    Plaintiffs reallege and incorporate the preceding paragraphs by reference, as if fully set forth herein.

399.    As set out above, from 1997 through 2007, the GOS falsely arrested and falsely imprisoned civilians in Sudan, including Plaintiffs Kashef, Jane Doe, Lual, Jane Roe, Lukudu, Adam, Ulau, Marjan, Khalifa, and Judy Doe and the Class.

400.    The GOS did so by intended to confine Plaintiffs and the Class.

401.    Plaintiffs and the Class were conscious of the confinement.

402.    Plaintiffs and the Class did not consent to the confinement.

403.    The confinement was not otherwise privileged.

404.    Defendants aided and abetted the false arrests and false imprisonments committed against Plaintiffs and the Class. Defendants did so by providing organized and systematic financial and other practical assistance and encouragement to a campaign of human rights abuses by a rogue regime, all of which had a substantial effect on the perpetration of horrific crimes.

405.    As set out above, Defendants knowingly, actively, and unlawfully provided substantial assistance to the GOS, facilitating its exports and imports and enabling it to exploit its oil resources and commit atrocities to displace, harm, and murder disfavored civilians, including Plaintiffs and the Class.

130

406.    Among the GOS's atrocities, enabled as a result of Defendants' assistance, were false arrests and false imprisonments of civilians, including Plaintiffs and the Class.

407.    Throughout the time period from 1997 through 2007, Defendants knew that the GOS was making false arrests and planned to continue making false arrests and false imprisonments.   Defendants provided their assistance from 1997 through 2007, and the effects of that assistance continued for another two years.   At all times, Defendants acted in furtherance of its own financial gain.

408.    Defendants knew that their illegal transactions would provide substantial assistance to the GOS that would enable it to exploit Sudan's oil resources on the international oil market.   Defendants knew or should have known that the GOS would use its new revenues to purchase weapons and other advanced military systems, to support and equip its own troops, and to support and equip proxy militias.   Defendants knew or should have known that the GOS would then have its troops and militias turn these weapons on its own citizens, including Plaintiffs and the Class, perpetrating gruesome violence as a result.

409.    Defendants' substantial assistance to the GOS was a substantial factor in causing harm to Plaintiffs and the Class.

410.    The harm to Plaintiffs and the Class was reasonably foreseeable by Defendants.   The GOS was engaged in a prolonged campaign of committing atrocities against its population.   Defendants knew or should have known that by providing the GOS with access to more resources and by assisting the GOS in its exploitation of its oil resources, the GOS would use those resources to secure its hold on power over Sudan and increase the intensity of its atrocities.   Those atrocities included making false arrests and false imprisonments.

411.    As a direct and proximate result of Defendants' encouragement and aid to the GOS by and through its violations of the U.S. Sanctions, Plaintiffs suffered and continue to suffer from the effects of the false arrests, including grievous bodily injuries (ranging from the loss of limbs to blindness and infertility), lost wages, and severe mental trauma, in an amount to be determined at trial.

412.    Further, when Defendants engaged in the acts described herein, they knew that they violated U.S. and New York law, including the U.S. Sanctions.  By virtue of that knowledge, Defendants' acts were carried out deliberately, maliciously, and with reckless disregard for Plaintiffs' rights to be free of bodily harm, including battery.

413.    By their conduct, Defendants acted willfully, outrageously and with malice, oppression, bad faith and conscious disregard of the rights of Plaintiffs and the Class, and the probability of severe injury to Plaintiffs and the Class, justifying an award of punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar conduct.

## ELEVENTH CAUSE OF ACTION
## FOR CONSPIRACY TO COMMIT CONVERSION
## –WRONGFUL TAKING

### (All Plaintiffs Against All Defendants)

414.    Plaintiffs reallege and incorporate the preceding paragraphs by reference, as if fully set forth herein.

415.    BNPP agreed in the SOF, its plea agreements with the DOJ and the DANY and the Consent Order, it entered into a Conspiracy with the GOS that continued at all times from 1997 through 2007.  The effects of this Conspiracy continued to be felt in Sudan through at least.

416.    As set out above, throughout this period, Defendants and the GOS intentionally engaged in numerous overt acts in furtherance of the Conspiracy.

417.    Throughout this period, the GOS converted property from civilians in Sudan—including Plaintiffs Kashef, Mosabal, Abakar, Omar, Jane Doe, Hassan, Tingloth, Lual, Jane Roe, Lukudu, Adam, Majuc, Jok, Ulau, Marjan, Khalifa, Judy Doe, Hamad, Abbo Abakar and the Class—owned or had possessory interests in significant movable and immovable property in Sudan, including without limitation, land used for agriculture, residential, and business purposes, homes, businesses and business assets, livestock, farming implements, personal belongings including jewelry and household items, cash, bank accounts, and other items of movable and immovable property.  Such conversion was foreseeable by Defendants.

418.    The GOS intentionally, non-consensually, and without lawful justification took dominion over and interfered with Plaintiffs' and the Class's respective movable and immovable property in derogation of the rights of Plaintiffs and the Class.  The GOS forcibly removed Plaintiffs and the Class from their respective home and lands, unlawfully detained them without charge, committed and threatened to commit intentional and harmful acts of violence against them, forced them to flee from their homes and businesses leaving all their property behind and prevented them from returning to claim it, and/or took their respective property.  The GOS engaged in such interference knowing that the property belonged to Plaintiffs and the Class and that such interference would allow it to exercise full control over Plaintiffs' and the Class's respective property.

419.    As a result of Defendants' conspiracy with the GOS, Plaintiffs have suffered, and continue to suffer, irreparable economic injuries that continue today, as well as physical

and mental injury, emotional distress, and loss of property, income, and the enjoyment of living, in an amount to be determined at trial.

420. Defendants were aware that the GOS was committing and planned to continue committing conversion of property from Sudanese civilians, including Plaintiffs and the Class.

421. Because of their knowledge of the GOS's purposes, Defendants agreed with the GOS and intended that the conversions be committed using, at least in part, resources that their actions enabled the GOS to have. Defendants' agreement was expressed through their explicit approval of the GOS's assault and/or tacitly through their continued financing of the GOS.

422. The harm to Plaintiffs and the Class was reasonably foreseeable by Defendants when they entered into their agreement with the GOS. The GOS was engaged in a prolonged, often indiscriminate campaign of committing atrocities against its population, including conversion. Defendants knew or should have known that by providing the GOS with access to more resources, it would use those resources to secure its hold on power over Sudan and increase the intensity of its atrocities, including conversion. It is reasonable that such an increase would lead to widespread conversion of civilian property.

423. Accordingly, Defendants, as co-conspirators, are liable for the harm to Plaintiffs and the Class.

424. Further, when Defendants engaged in the acts described herein, it knew that they violated U.S. and New York law, including the U.S. Sanctions. By virtue of that knowledge, Defendants' acts were carried out deliberately, maliciously, and with reckless disregard for Plaintiffs' rights to maintain control over their property.

425. By their conduct, Defendants acted willfully, outrageously and with malice, oppression, bad faith and conscious disregard of the rights of Plaintiffs and the Class, and the probability of severe injury to Plaintiffs and the Class, justifying an award of punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar conduct.

426. Thus, as a direct and proximate result of Defendants' conspiracy to convert the personal and real property of Plaintiffs and the Class, Plaintiffs and the Class suffered economic injuries that continue today, as well as physical and mental injury, emotional distress, loss of property and income, and loss of the enjoyment of living, in an amount to be determined at trial.

## TWELFTH CAUSE OF ACTION
## FOR AIDING AND ABETTING CONVERSION
## –WRONGFUL TAKING

### (All Plaintiffs Against All Defendants)

427. Plaintiffs reallege and incorporate the preceding paragraphs by reference, as if fully set forth herein.

428. As set out above, from 1997 through 2007, the GOS converted property from civilians in Sudan, including Plaintiffs Kashef, Mosabal, Abakar, Omar, Jane Doe, Hassan, Tingloth, Lual, Jane Roe, Lukudu, Adam, Majuc, Jok, Ulau, Marjan, Khalifa, , Judy Doe, Hamad, Abbo Abakar and the Class.

429. Plaintiffs, and the Class, owned or had possessor interests in significant movable and immovable property in Sudan, including without limitation, land used for agriculture, residential, and business purposes, homes, businesses and business assets,

livestock, farming implements, personal belongings including jewelry and household items, cash, bank accounts, and other items of movable and immovable property.

430.    The GOS intentionally, non-consensually, and without lawful justification took dominion over and interfered with Plaintiffs' and the Class's respective movable and immovable property in derogation of the rights of Plaintiffs and the Class.  The GOS forcibly removed Plaintiffs and the Class from their respective home and lands, unlawfully detained them without charge, committed and threatened to commit intentional and harmful acts of violence against them, forced them to flee from their homes and businesses leaving all their property behind and prevented them from returning to claim it, and/or took their respective property.  The GOS engaged in such interference knowing that the property belonged to Plaintiffs and the Class and that such interference would allow it to exercise full control over Plaintiffs' and the Class's respective property.

431.    Defendants aided and abetted the conversions committed against Plaintiffs and the Class.  Defendants did so by providing organized and systematic financial and other practical assistance and encouragement to a campaign of human rights abuses by a rogue regime, all of which had a substantial effect on the perpetration of horrific crimes.

432.    As set out above, Defendants knowingly, actively, and unlawfully provided substantial assistance to the GOS, facilitating its exports and imports and enabling it to exploit its oil resources and commit atrocities to displace, harm, and murder disfavored civilians, including Plaintiffs and the Class.

433.    Among the GOS's atrocities, enabled as a result of Defendants' assistance, were the conversion of property belonging to Sudanese civilians, including Plaintiffs and the Class.

434.    Defendants provided their assistance from 1997 through 2007.  The effects of this assistance continued for at least another two years thereafter.  At all times, Defendants acted in furtherance of its own financial gain.

435.    Defendants knew that their illegal transactions would provide substantial assistance to the GOS that would enable it to exploit Sudan's oil resources on the international oil market.  Defendants knew or should have known that the GOS would use its new revenues to purchase weapons and other advanced military systems, to support and equip its own troops, and to support and equip proxy militias.  Defendants knew or should have known that the GOS would then have its troops and militias turn these weapons on its own citizens, including Plaintiffs and the Class, perpetrating gruesome violence as a result.

436.    Defendants' substantial assistance to the GOS was a substantial factor in causing harm to Plaintiffs and the Class.

437.    The harm to Plaintiffs and the Class was reasonably foreseeable by Defendants.  The GOS was engaged in a prolonged campaign of committing atrocities against its population.  Defendants knew or should have known that by providing the GOS with access to more resources and by assisting the GOS in its exploitation of its oil resources, the GOS would use those resources to secure its hold on power over Sudan and increase the intensity of its atrocities.

438.    As a direct and proximate result of Defendants' encouragement and aid to the GOS by and through its violations of the U.S. Sanctions, Plaintiffs have suffered and continue to irreparable economic injuries, as well as physical injury, emotional distress, loss of property and income, and loss of the enjoyment of living, in an amount to be determined at trial.

439.    Further, when Defendants engaged in the acts described herein, they knew that they violated U.S. and New York law, including the U.S. Sanctions.  By virtue of that knowledge, Defendants' acts were carried out deliberately, maliciously, and with reckless disregard for Plaintiffs' rights to maintain control over their property.

440.    By their conduct, Defendants acted willfully, outrageously and with malice, oppression, bad faith and conscious disregard of the rights of Plaintiffs and the Class, and the probability of severe injury to Plaintiffs and the Class, justifying an award of punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar conduct.

441.    Thus, as a direct and proximate result of Defendants' conspiracy to convert the personal and real property of Plaintiffs and the Class, Plaintiffs and the Class suffered economic injuries that continue today, as well as physical and mental injury, emotional distress, loss of property and income, and loss of the enjoyment of living, in an amount to be determined at trial.

## THIRTEENTH CAUSE OF ACTION
## FOR CONSPIRACY TO COMMIT CONVERSION
## – WRONGFUL DETENTION, USE OR DISPOSAL
## WHERE POSSESSION WAS LAWFULLY OBTAINED

### (All Plaintiffs Against All Defendants)

442.    Plaintiffs reallege and incorporate the preceding paragraphs by reference, as if fully set forth herein.

443.    BNPP agreed in the SOF, its plea agreements with the DOJ and the DANY and the Consent Order, it entered into a Conspiracy with the GOS that continued at all times from 1997 through 2007.  The effects of this Conspiracy continued to be felt in Sudan through at least 2009.

444. As set out above, throughout this period, Defendants and the GOS intentionally engaged in numerous overt acts in furtherance of the Conspiracy.

445. Throughout this period, the GOS converted property from civilians in Sudan, including Plaintiffs Kahsef, Jane Doe, Jane Roe, Lukudu, Ulau, Marjan, Khalifa, Judy Doe, and Abbo Abakar and the Class. Such conversion was foreseeable by Defendants.

446. Plaintiffs, and those they represent, owned or had possessory interests in significant movable and immovable property in Sudan, including without limitation, land used for agriculture, residential, and business purposes, homes, businesses and business assets, livestock, farming implements, personal belongings including jewelry and household items, cash, bank accounts, and other items of movable and immovable property.

447. The GOS through its security officers, police officers, government-sponsored militia, and military, as well as weapons, including without limitation guns, bombs, swords, tanks, attack aircraft and missiles, came lawfully into possession of the property of Plaintiffs and the Class.

448. The GOS intentionally, non-consensually, and without lawful justification took dominion over and interfered with Plaintiffs' and the Class's respective movable and immovable property in derogation of the rights of Plaintiffs and the Class by refusing to return it, disposing of it, misusing it, and/or otherwise dealing with it in a manner inconsistent with the owner's rights. This includes the GOS forcibly removing Plaintiffs and the Class from their respective home and lands, unlawfully detaining them without charge, committing and threatening to commit intentional and harmful acts of violence against them, forcing them to flee from their homes and businesses leaving all their property behind and preventing them from returning to claim it, and/or taking their respective property. The GOS

engaged in such interference knowing that the property belonged to Plaintiffs and the Class and that such interference would allow it to exercise full control over Plaintiffs' and the Class's respective property.

449.   As a direct and proximate result of Defendants' conspiracy with the GOS, Plaintiffs have suffered, and continue to suffer, irreparable economic injuries, as well as physical and mental injury, emotional distress, loss of property and income, and loss of the enjoyment of living, in an amount to be determined at trial.

450.   Defendants were aware that the GOS was committing and planned to continue committing conversion of property from Sudanese civilians, including Plaintiffs and the Class.

451.   Because of their knowledge of the GOS's purposes, Defendants agreed with the GOS and intended that the conversions be committed using, at least in part, resources that their actions enabled the GOS to have.  Defendants' agreement was expressed through its explicit approval of the GOS's assault and/or tacitly through their continued financing of the GOS.

452.   The harm to Plaintiffs and the Class was reasonably foreseeable by Defendants when they entered into their agreement with the GOS.  The GOS was engaged in a prolonged, often indiscriminate campaign of committing atrocities against its population, including conversion.  Defendants knew or should have known that by providing the GOS with access to more resources, it would use those resources to secure its hold on power over Sudan and increase the intensity of its atrocities, including conversion.  It is reasonable that such an increase would lead to widespread conversion of civilian property.

453.     Accordingly, Defendants, as co-conspirators, are liable for the harm to Plaintiffs and the Class.

454.     Further, when Defendants engaged in the acts described herein, they knew that they violated U.S. and New York law, including the U.S. Sanctions.  By virtue of that knowledge, Defendants' acts were carried out deliberately, maliciously, and with reckless disregard for Plaintiffs' rights to maintain control over their property.

455.     By their conduct, Defendants acted willfully, outrageously and with malice, oppression, bad faith and conscious disregard of the rights of Plaintiffs and the Class, and the probability of severe injury to Plaintiffs and the Class, justifying an award of punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar conduct.

456.      Thus, as a direct and proximate result of Defendants' conspiracy to convert the personal and real property of Plaintiffs and the Class, Plaintiffs and the Class suffered economic injuries that continue today, as well as physical and mental injury, emotional distress, loss of property and income, and loss of the enjoyment of living, in an amount to be determined at trial.

**FOURTEENTH CAUSE OF ACTION
FOR AIDING AND ABETTING CONVERSION
– WRONGFUL DETENTION, USE OR DISPOSAL
WHERE POSSESSION WAS LAWFULLY OBTAINED**

**(All Plaintiffs Against All Defendants)**

457.     Plaintiffs reallege and incorporate the preceding paragraphs by reference, as if fully set forth herein.

458.    As set out above, from 1997 through 2007, the GOS converted property from civilians in Sudan, including Plaintiffs Kahsef, Jane Doe, Jane Roe, Lukudu, Ulau, Marjan, Khalifa, Judy Doe, and Abbo Abakar and the Class.

459.    Plaintiffs, and the Class, owned or had possessory interests in significant movable and immovable property in Sudan, including without limitation, land used for agriculture, residential, and business purposes, homes, businesses and business assets, livestock, farming implements, personal belongings including jewelry and household items, cash, bank accounts, and other items of movable and immovable property.

460.    The GOS through its security officers, police officers, government-sponsored militia, and military, as well as weapons, including without limitation guns, bombs, swords, tanks, attack aircraft and missiles, came lawfully into possession of the property of Plaintiffs and the Class.

461.    The GOS intentionally, non-consensually, and without lawful justification took dominion over and interfered with Plaintiffs' and the Class's respective movable and immovable property in derogation of the rights of Plaintiffs and the Class by refusing to return it, disposing of it, misusing it, and/or otherwise dealing with it in a manner inconsistent with the owner's rights.  This includes the GOS forcibly removing Plaintiffs and the Class from their respective home and lands, unlawfully detaining them without charge, committing and threatening to commit intentional and harmful acts of violence against them, forcing them to flee from their homes and businesses leaving all their property behind and preventing them from returning to claim it, and/or taking their respective property.  The GOS engaged in such interference knowing that the property belonged to Plaintiffs and the Class

and that such interference would allow it to exercise full control over Plaintiffs' and the Class's respective property.

462.    Defendants aided and abetted the conversions committed against Plaintiffs and the Class.  Defendants did so by providing organized and systematic financial and other practical assistance and encouragement to a campaign of human rights abuses by a rogue regime, all of which had a substantial effect on the perpetration of horrific crimes.

463.    As set out above, Defendants knowingly, actively, and unlawfully provided substantial assistance to the GOS, facilitating its exports and imports and enabling it to exploit its oil resources and commit atrocities to displace, harm, and murder disfavored civilians, including Plaintiffs and the Class.

464.    Among the GOS's atrocities, enabled as a result of Defendants' assistance, were the conversions of property from Sudanese civilians, including Plaintiffs and the Class.

465.    Throughout the time period from 1997 through 2007, Defendants knew that the GOS was converting property from civilians and planning to continue converting property from civilians.

466.    Defendants provided their assistance from 1997 through 2007.  The effects of this assistance continued for at least two years thereafter.  At all times, Defendants acted in furtherance of its own financial gain.

467.    Defendants knew that their illegal transactions would provide substantial assistance to the GOS that would enable it to exploit Sudan's oil resources on the international oil market.  Defendants knew or should have known that the GOS would use its new revenues to purchase weapons and other advanced military systems, to support and equip its own troops, and to support and equip proxy militias.  Defendants knew or should

have known that the GOS would then have its troops and militias turn these weapons on its own citizens, including Plaintiffs and the Class, perpetrating gruesome violence as a result.

468.    Defendants' substantial assistance to the GOS was a substantial factor in causing harm to Plaintiffs and the Class.

469.    The harm to Plaintiffs and the Class was reasonably foreseeable by Defendants.  The GOS was engaged in a prolonged campaign of committing atrocities against its population.  Defendants knew or should have known that by providing the GOS with access to more resources and by assisting the GOS in its exploitation of its oil resources, the GOS would use those resources to secure its hold on power over Sudan and increase the intensity of its atrocities.

470.    As a direct and proximate result of Defendants' encouragement and aid to the GOS by and through its violations of the U.S. Sanctions, Plaintiffs suffered and continue to suffer from the effects of the offensive bodily contact that included physical injury, emotional distress, loss of property and income, and loss of the enjoyment of living, in an amount to be determined at trial.

471.    Further, when Defendants engaged in the acts described herein, they knew that they violated U.S. and New York law, including the U.S. Sanctions.  By virtue of that knowledge, Defendants' acts were carried out deliberately, maliciously, and with reckless disregard for Plaintiffs' rights to maintain control over their property.

472.    By their conduct, Defendants acted willfully, outrageously and with malice, oppression, bad faith and conscious disregard of the rights of Plaintiffs and the Class, and the probability of severe injury to Plaintiffs and the Class, justifying an award of punitive

damages in an amount appropriate to punish Defendants and deter others from engaging in similar conduct.

## FIFTEENTH CAUSE OF ACTION
## OUTRAGEOUS CONDUCT CAUSING EMOTIONAL DISTRESS

**(All Plaintiffs Against All Defendants)**

473.   Plaintiffs reallege and incorporate the preceding paragraphs by reference, as if set forth herein.

474.   Defendants' illegal violation of the U.S. Sanctions knowing that the GOS was using their assistance to perpetrate mass human rights violations was no mere routine or mere commercial banking activity.  Rather, Defendants' thousands of illegal financial transactions in New York were criminal violations of the Sanctions designed to protect Sudanese civilians, including Plaintiffs and the Class, against the GOS's well publicized violence against its disfavored civilian populations.  Defendants intentionally violated U.S. Sanctions by giving the GOS and the SDNs unlawful access to the New York-based U.S. financial system and concealing its criminal acts for a decade.  Defendants knew or should have known that the GOS was using their transactions to prop up Sudan's economy, without which such mass brutality toward Plaintiffs and the Class could not have occurred.

475.   When they engaged in the acts described herein, Defendants knew that they violated New York law and U.S. Sanctions against Sudan, and further knew that those acts would substantially provide Sudan the means to continue its campaign of violence and human rights abuses against disfavored groups such as the non-Arab, black African citizens. By virtue of that knowledge, Defendants knew they were undermining the U.S. Sanctions that were designed to prevent the horrors that occurred in Sudan.

476.    Despite continued reports of violence toward Plaintiffs after BNPP agreed to become Sudan's sole correspondent bank in 1997—the year the U.S. Sanctions were implemented—Defendants intentionally, recklessly, and with the purpose of causing severe emotional distress conducted themselves toward Plaintiffs and the Class in a manner so shocking and outrageous that it exceeds all reasonable bounds of decency.  In fact, Defendants' conduct has been condemned not only by the United States and the DANY through their criminal prosecution, but by the international community.  Respected members of the international community routinely refer to the human suffering caused by the GOS and Defendants as "genocidal."   Such suffering would have been stopped or substantially curtailed, had Defendants not concealed their criminal activity in providing the GOS access to U.S. financial markets.

477.    Defendants knew and intended that from 1997 onward, that as a consequence of its unlawful conduct, the GOS acquired the means and instrumentalities by which it carried out violence and human rights abuses against is targeted population, including Plaintiffs and the Class, causing them to incur physical and psychological injury, loss of property, lost earnings and profits, loss of liberty, and/or severe emotional distress.  The effects of Defendants' actions continued to be felt two years after they left Sudan in 2007.

478.    Specifically, Defendants engaged in extreme and outrageous conduct, including unlawful conduct.  This conduct had a causal connection.

479.    As a result, Plaintiffs and the Class suffered severe emotional distress.

480.    By their conduct, Defendants acted willfully, outrageously and with malice, oppression, bad faith and conscious disregard of the rights of Plaintiffs and the Class, and the probability of severe injury to Plaintiffs and the Class, justifying an award of punitive

damages in an amount appropriate to punish Defendants and deter others from engaging in similar conduct.

### SIXTEENTH CAUSE OF ACTION
### FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS – BYSTANDER/ZONE OF DANGER THEORY

**(All Plaintiffs Against All Defendants)**

481.    Plaintiffs reallege and incorporate the preceding paragraphs by reference, as if fully set forth herein.

482.    Defendants conducted thousands of illegal financial transactions in New York that they knew or should have known were criminal violations of U.S. Sanctions designed to protect civilians from the GOS's well publicized discriminatory violence against its disfavored civilian groups. Defendants violated U.S. Sanctions by giving the GOS and the SDNs unlawful access to the U.S. financial system and concealing its criminal acts. While Defendants knew or should have known that the GOS was using their transactions to perpetrate violence, so as to prop up the GOS economy, without which such mass brutality toward Plaintiffs and the Class could not have occurred.

483.    When they engaged in the acts described herein, Defendants knew that they violated New York law and U.S. Sanctions against Sudan, and further knew that those acts would substantially provide Sudan the means to continue its campaign of violence and human rights abuses against disfavored groups such as the non-Arab, black African citizens. By virtue of that knowledge, Defendants knew they were undermining the U.S. Sanctions that were designed to prevent the horrors that occurred in Sudan.

484.    Despite continued reports of violence toward Plaintiffs after BNPP agreed to become Sudan's sole correspondent bank in 1997—the year the U.S. Sanctions were

147

implemented—Defendants intentionally, recklessly, and with the purpose of causing severe emotional distress conducted themselves toward Plaintiffs and the Class in a manner so shocking and outrageous that it exceeds all reasonable bounds of decency. In fact, Defendants' conduct has been condemned not only by the United States and the DANY through their criminal prosecution, but by the international community. Respected members of the international community routinely refer to the human suffering caused by the GOS and Defendants as "genocidal." Such suffering would have been stopped or substantially curtailed, had Defendants not concealed their criminal activity in providing the GOS access to U.S. financial markets.

485. Defendants knew and intended that from 1997 onward, that as a consequence of its unlawful conduct, the GOS acquired the means and instrumentalities by which it carried out violence and human rights abuses against is targeted population, including Plaintiffs and the Class, causing them to incur physical and psychological injury, loss of property, lost earnings and profits, loss of liberty, and/or severe emotional distress. The effects of Defendants' actions continued to be felt two years after they left Sudan in 2007.

486. Specifically, as set out above, Defendants engaged in extreme and outrageous conduct, including unlawful conduct. This conduct had a causal connection to the injuries to Plaintiffs and the Class.

487. Defendants negligently caused, and negligently disregarded the substantial probability of causing, severe emotional distress to Plaintiffs and the Class.

488. As a result, Plaintiffs and the Class suffered severe emotional distress.

489.    Defendants acted with gross negligence and with conscious, reckless disregard of Plaintiffs' rights and the probability of severe injury to Plaintiffs, causing injuries at an amount to be determined at trial.

## SEVENTEENTH CAUSE OF ACTION
## FOR COMMERCIAL BAD FAITH

**(All Plaintiffs Against All Defendants)**

490.    Plaintiffs reallege and incorporate the preceding paragraphs by reference, as if fully set forth herein.

491.    Defendants and its executive and principals completed thousands of illegal financial transactions in New York from 1997 through 2007, in violation of New York and U.S. laws intended to protect plaintiffs, giving the GOS and the SDNs unlawful access to the U.S. financial system and aiding and abetting Sudan's campaign of violence and human rights abuses against its disfavored non-Arab, black African citizens, including Plaintiffs.

492.    Defendants' executives and principals, knowing that the U.S. Sanctions were being violated by Defendants and knowing that such violations were directly enabling the GOS to wage protracted campaigns of violence against Plaintiffs and the Class, nevertheless engaged in a continued pattern of falsifying business records and other fraudulent conduct in order to conceal from authorities and the public their illegal actions.

493.    Indeed, it is undisputed that Defendants' executives knew that U.S. Sanctions were being fraudulently violated and that these violations were resulting in harm to the Plaintiffs and the Class.  As the DFS investigation found, "in December 2005, when a settlement with U.S regulators and Dutch bank ABN AMRO was announced for violations of U.S. sanctions law, the Head of Ethics and Compliance for BNPP North America wrote, "the dirty little secret isn't so secret anymore, oui?"  Another BNPP executive acknowledged that

the Sudanese banks with which BNPP dealt "'play[ed] a pivotal part in the support of the Sudanese government which . . . refuses the United Nations intervention in Darfur.'"

494.     Starting in 1997, Defendants provided the GOS with secret access to the U.S. financial markets to develop its oil resources, to increase its oil exports and revenue, and to give it dollars with which to import goods.  As a result, the GOS, rather than being crippled by the Sanctions, saw its revenues increase dramatically.  With Defendants' knowledge, the GOS used that money to clear new oil fields, to acquire military hardware, and to stay in power by committing unspeakable atrocities against its people, including to intentionally and non-consensually detain and/or arrest Plaintiffs and the Class without a lawfully obtained arrest warrant and without any charges, legal process, or trial.

495.     The harmful effects of Defendants' acts of commercial bad faith continued to be felt in Sudan through 2009.

496.     As a consequence of Defendants' unlawful conduct, the GOS did in fact acquire the means and instrumentalities by which it carried out violence and human rights abuses against its black citizens, including Plaintiffs and the Class, and caused them to incur physical and psychological injury, loss of property, and/or loss of liberty

### EIGHTEENTH CAUSE OF ACTION
### FOR UNJUST ENRICHMENT

**(All Plaintiffs Against All Defendants)**

497.     Plaintiffs reallege and incorporate the preceding paragraphs by reference, as if fully set forth herein.

498.     Plaintiffs and the Class have suffered torts as alleged herein, including battery, assault, false arrest, conversion, intentional and negligent infliction of emotional distress.

499.    Defendants completed thousands of illegal financial transactions in New York, in violation of the U.S. Sanctions and New York law designed to protect Plaintiffs and the Class, thereby giving the GOS and the SDNs access to the U.S. financial system and aiding and abetting Sudan's campaign of violence and human rights abuses against its citizens, including Plaintiffs and the Class.

500.    When they engaged in the acts described herein, Defendants knew that they violated the U.S. Sanctions and that their violations would the GOS in its discriminatory campaign of violence and human rights abuses against its own people.  By virtue of that knowledge, Defendants knew they were undermining the U.S. Sanctions that were designed to prevent the horrors occurring in Sudan.

501.    Defendants violated U.S. Sanctions designed to protect Plaintiffs and the Class as described herein and took such willful actions for their own benefit and enrichment, and at the expense of the Plaintiffs and the Class.  Defendants unjustly benefited from their violation of the U.S. Sanctions, which provided substantial assistance to the GOS's campaign of violence against Plaintiffs and the Class at their expense.  As a result of Defendants' illegal conduct, it earned fees and income from processing more than $190 billion in transactions in violation of the U.S. Sanctions on behalf of the GOS and/or the SDNs from 1997 to 2007, when BNPP's illegal clandestine conduct was detected.  Defendants appreciated the benefit of their illegal actions, knew the harm it was causing Plaintiffs, and retained the value of their actions.  The harmful effects of Defendants' Sanctions violations continued through 2009.

502.    Defendants acted willfully, maliciously, outrageously, in bad faith, and with conscious disregard of the interests of Plaintiffs by engaging in the conduct described above

in order to enrich themselves unjustly at the expense of Plaintiffs.  It is against equity and good conscience to permit BNPP to retain what they unlawfully obtained as the result of completing thousands of unlawful financial transactions as alleged herein.  Plaintiffs therefore seek an order compelling Defendants to disgorge the profits they have realized or may realize as a result of their improper conduct.

## NINETEENTH CAUSE OF ACTION
## FOR CONSPIRACY TO COMMIT WRONGFUL DEATH

### (All Plaintiffs Against All Defendants)

503.    Plaintiffs reallege and incorporate the preceding paragraphs by reference, as if fully set forth herein.

504.    As set out above, in 1997, BNPP entered into a corrupt agreement with the GOS that constituted a Conspiracy, and that Conspiracy continued at all times from 1997 through 2007.

505.    As set out above, throughout this period, Defendants and the GOS intentionally engaged in numerous overt acts in furtherance of the Conspiracy.

506.    Throughout this period, the GOS engaged in a campaign of violence that included the intentional and negligent killing of civilians, including the killings of loved ones and family members of Plaintiffs and the Class.  The GOS committed these killings without lawful excuse or privilege to do so.

507.    As a direct and proximate result of Defendants' conspiracy with the GOS, Plaintiffs Kashef, Omar, Jane Doe, Tingloth, Lual, Jane Roe, Marjan, Khalifa, Ahmed, Hamad, Abbo Abakar and the Class, families members of those killed by the GOS, have suffered severe and permanent economic damages, including but not limited to pecuniary losses, past and future wage losses, loss of support, loss of services, loss of parental care and

guidance, and loss of prospective inheritance. Such wrongful death and its consequences were foreseeable by Defendants when they entered into their agreement with the GOS.

508. Defendants were aware that the GOS was committing, and planned to continue committing, killings of civilians in Sudan.

509. Because of their knowledge of the GOS's purposes, Defendants agreed with the GOS and intended that the conversions be committed using, at least in part, resources that their actions enabled the GOS to have. Defendants' agreement was expressed through its explicit approval of the GOS's assault and/or tacitly through their continued financing of the GOS.

510. The harm to Plaintiffs and the Class was reasonably foreseeable by Defendants. The GOS was engaged in a prolonged, often indiscriminate campaign of committing atrocities against its population, including conversion. Defendants knew or should have known that by providing the GOS with access to more resources, it would use those resources to secure its hold on power over Sudan and increase the intensity of its atrocities, including killings. It is reasonable that such an increase would lead to widespread killings.

511. Accordingly, Defendants, as co-conspirators, are liable for the harm to Plaintiffs and the Class.

512. Plaintiffs and the Class, as surviving members or heirs of those wrongfully killed, are entitled to recover damages from Defendants for these illegal and wrongful deaths. They are entitled to recover full damages incurred as described above, as fair and just compensation for the injuries resulting from these wrongful deaths.

513. Further, when Defendants engaged in the acts described herein, they knew that they violated U.S. and New York law, including the U.S. Sanctions. By virtue of that knowledge, Defendants' acts were carried out deliberately, maliciously, and with reckless disregard.

514. By their conduct, Defendants acted willfully, outrageously and with malice, oppression, bad faith and conscious disregard of the rights of Plaintiffs and the Class, and the probability of severe injury to Plaintiffs and the Class, justifying an award of punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar conduct.

## TWENTIETH CAUSE OF ACTION
## FOR AIDING AND ABETTING WRONGFUL DEATH
## CAUSED BY INTENTIONAL MURDER

**(All Plaintiffs Against All Defendants)**

515. Plaintiffs reallege and incorporate the preceding paragraphs by reference, as if fully set forth herein.

516. As set out above, from 1997 through 2007, the GOS engaged in a campaign of violence that included the intentional and negligent killing of civilians, including the killings of family members of Plaintiffs and the Class. The GOS committed these killings without lawful excuse or privilege to do so.

517. As a result of the wrongful deaths of the decedents, Plaintiffs Kashef, Omar, Jane Doe, Tingloth, Lual, Jane Roe, Marjan, Khalifa, Ahmed, Hamad, Abbo Abakar and the Class, as family members of those killed by the GOS, have suffered severe and permanent economic damages, including but not limited to pecuniary losses, past and future wage

losses, loss of support, loss of services, loss of parental care and guidance, and loss of prospective inheritance.

518.    Defendants aided and abetted the wrongful deaths committed against the family members of Plaintiffs and the Class.  Defendants did so by providing organized and systematic financial and other practical assistance and encouragement to a campaign of human rights abuses by a rogue regime, all of which had a substantial effect on the perpetration of horrific crimes.

519.    As set out above, Defendants knowingly, actively, and unlawfully provided substantial assistance to the GOS, facilitating its exports and imports and enabling it to exploit its oil resources and commit atrocities to displace, harm, and murder disfavored civilians, including Plaintiffs and the Class.

520.    Among the GOS's atrocities, enabled as a result of Defendants' assistance, where the killings of civilians, including the family and loved ones of Plaintiffs and the Class.

521.    Throughout the time period from 1997 through 2007, Defendants knew that the GOS was killing its civilians and planning to continue killing its civilians both intentionally and negligently and without excuse or privilege to do so.

522.    Defendants provided their assistance from 1997 through 2007.  The effects of Defendants' assistance continued to be felt through at least 2009.  At all times, Defendants acted in furtherance of its own financial gain.

523.    Defendants knew that their illegal transactions would provide substantial assistance to the GOS that would enable it to exploit Sudan's oil resources on the international oil market.  Defendants knew or should have known that the GOS would use its

new revenues to purchase weapons and other advanced military systems, to support and equip its own troops, and to support and equip proxy militias. Defendants knew or should have known that the GOS would then have its troops and militias turn these weapons on its own citizens, including the family and loved ones of Plaintiffs and the Class, perpetrating gruesome violence as a result.

524.    Defendants' substantial assistance to the GOS was a substantial factor in causing harm to Plaintiffs and the Class.

525.    The harm to Plaintiffs and the Class was reasonably foreseeable by Defendants.  The GOS was engaged in a prolonged campaign of committing atrocities against its population.  Defendants knew or should have known that by providing the GOS with access to more resources and by assisting the GOS in its exploitation of its oil resources, the GOS would use those resources to secure its hold on power over Sudan and increase the intensity of its atrocities, resources, and by assisting the GOS in its exploitation of its oil resources, the GOS would use those resources to commit, and increase the intensity of, atrocities against civilians in Sudan.

526.    Plaintiffs and the Class, as surviving family members or heirs of those wrongfully killed, are entitled to recover damages from Defendants for these illegal and wrongful deaths.  They are entitled to recover full damages incurred as described above, as fair and just compensation for the injuries resulting from these wrongful deaths.

527.    As a direct and proximate result of the wrongful deaths of the decedents, Plaintiffs and the Class, as families members of those killed by the GOS, have suffered financially and been deprived of all future aid, income, assistance, services, comfort, companionship, affection and financial support of their loved ones.

528.    Further, when Defendants engaged in the acts described herein, they knew that they violated U.S. and New York law, including the U.S. Sanctions.  By virtue of that knowledge, Defendants' acts were carried out deliberately, maliciously, and with reckless disregard.

529.    By their conduct, Defendants acted willfully, outrageously and with malice, oppression, bad faith and conscious disregard of the rights of Plaintiffs and the Class, and the probability of severe injury to Plaintiffs and the Class, justifying an award of punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar conduct.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, each and every Plaintiff prays for judgment against each Defendant as follows:

(a)    For certification of a class pursuant to Fed. R. Civ. P. Rule 23(a) and (b)(3);

(b)    That judgment be entered against Defendants determining that they have committed the violations of law as alleged in this Second Amended Complaint;

(c)    An award of damages including general and special damages, to the full extent legally available, in an amount to be determined at trial;

(d)    An award of restitution to Plaintiffs as victims of BNPP's crimes;

(e)    A disgorgement of profits made as a result of Defendants' illegal and wrongful conduct as alleged herein;

(f)    An award of punitive or exemplary damages to the full extent legally available, in an amount to be determined at trial;

(g)     For costs of suit, including attorneys' fees, pre-judgment and post-judgment interest, expert witness fees, consultant fees, and other costs as and to the extent permitted by law; and

(h)     For such other and further relief as the Court may deem just and proper.

Dated: January 20, 2017                    Respectfully submitted,


By: /s/Kathryn Lee Crawford
        Kathryn Lee Crawford (NY SBN 2370443)
        Thomas B. Watson (admitted pro hac vice)
        McKool Smith, P.C.
        One California Plaza
        300 S. Grand Avenue, Suite 2900
        Los Angeles, California  90071
        Tel: 213-694-1095
        Fax: 213-694-1234
        lboyd@mckoolsmith.com
        twatson@mckoolsmith.com


        *Of Counsel:*

        Robert L. Palmer
        McKool Smith, P.C.
        One California Plaza
        300 S. Grand Avenue, Suite 2900
        Los Angeles, California  90071
        Tel: 213-694-1095
        Fax: 213-694-1234
        rpalmer@mckoolsmith.com

        Matthew P. Rand
        McKool Smith, P.C.
        One Bryant Park
        47th Floor
        New York, New York 10036
        Tel: 212-402-9400
        Fax: 212-402-9444
        mrand@mckoolsmith.com

        *Attorneys for Plaintiffs*