UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ENTESAR OSMAN KASHEF, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) Civil No. 1:16-cv-03228-AJN |
| | ) |
| -against- | ) Hon. Alison J. Nathan |
| | ) |
| BNP PARIBAS S.A., BNP PARIBAS S.A. | ) |
| NEW YORK BRANCH, BNP PARIBAS | ) |
| NORTH AMERICA, INC., and DOES 2-10, | ) |
| | ) |
| Defendants. | ) |

## DECLARATION OF FRANZ WERRO

I, Franz Werro, declare the following pursuant to 28 U.S.C. § 1746:

## I.     Introduction

1.   **PROFESSIONAL QUALIFICATIONS**

2.   I am a tenured Professor of Law (*Professor Ordinarius*) at Fribourg University Law
    School in Fribourg, Switzerland, where I hold the Chair of the Law of Obligations
    and European Private Law since 1994. I also serve as the Dean of International Stud-
    ies, a position I have held since 2006. Previously, I served as Fribourg's Vice Dean
    from 2006-2008, Co-Director of the *Institut de Droit Européen* from 1995-2006, and
    as an Associate Professor from 1992-1994. I have taught numerous Swiss law cours-
    es over the years, including Contracts, Tort, and Comparative Law. Since 1992, I
    have also been a visiting professor at the *Ecole Polytechnique Fédérale*, in Lausanne,
    Switzerland, where I teach an introduction to private law, including property law, to
    students who study architecture. Further, I am one of the founders and co-directors of
    the Masters of Laws (LL.M.) program in Cross-Cultural Business Practice at the
    Universities of Fribourg and Bern, both in Switzerland.

3.  I am also a tenured Professor of Law at the Georgetown University Law Center in Washington, D.C., a position I have held since 2001. At Georgetown, I have taught courses in International Sales Law, Privacy Law, and Comparative Law. I recently served as one of the two academic directors at the Center for Transnational Legal Studies in London, United Kingdom, where I taught a course on the International Law of Sales on behalf of the Georgetown University Law Center.

4.  I have been a Visiting Professor in Switzerland and abroad, including at the University of Tel-Aviv (2015), University of Vienna (2014), University of Sorbonne, Paris (2012), Bucerius Law School, Hamburg (2009 and 2011), International University College, Torino (2009 and 2016), Geneva University Law School (2007), Universita degli Studi, Trieste, Italy (2006), Scuola Superiore Santa Anna, University of Pisa, Italy (2004), Cornell Law School (2001), and the Universities of Bordeaux and Pau (1996, 1998, and 1999). I also served as a Lecturer at Cornell Law School's Summer Institute of International and Comparative Law in Paris (2003), Lecturer at the World Trade Institute ("WTI," Universities of Bern, Fribourg and Neuchatel) (2000 and 2002), and Professor at the Tulane Summer School Law Program in Paris from 2001 through 2009.

5.  I have frequently served as a consultant or as an arbitrator in international commercial contract disputes. I am a member of the Swiss Arbitration Association. I sit on the boards of several European law journals and, since January 2014, I have been one of the Editors-in-Chief of the American Journal of Comparative Law. I am also the first director of the newly founded Institute for Business Law at the University of Fribourg. I am the chair of the Tort Group in the Common Core of European Private Law Project, as well as member of the board of editors of HAVE, the leading Swiss Tort and Insurance Law Review.

6.  I have written a treatise on the general Swiss law of torts that is widely used by Swiss judges and lawyers, as well as a detailed case book on the Swiss law of contracts. With a Swiss colleague, I recently edited a book on new tort law develop-

ments in Switzerland. I have also written numerous contributions in French, English, and German on a variety of subjects in the laws of contract and tort. I am one of the two academic editors of the *Commentaire Romand* on the law of obligations, in which I wrote two large contributions: one is on the general law of tort; the other is on the law governing contracts for independent services. Together with an Italian colleague, I recently edited a two-volume handbook on European private law with contributions from scholars from several European jurisdictions.

7. I was born and raised in Switzerland, where I attended college and university. I was a law student at the University of Fribourg, where I received a *licence en droit* (J.D. equivalent) in 1979 and a doctorate (PhD equivalent) *summa cum laude* in 1986. In 1985/1986, I attended the LL.M. program at the Boalt Hall School of Law at the University of California in Berkeley and received a degree accordingly. After passing the Swiss bar exam, I practiced law in Fribourg. In 1986/1987, I worked as a special assignment attorney at Farella, Braun & Martell, a law firm with offices in San Francisco and Beijing. After returning to Switzerland in 1990, I published a post-doctoral thesis (a substantial monography required for tenured positions in some Swiss law schools), and worked for Lalive and Budin, a Swiss law firm specializing in international commercial arbitration. In 1992, I joined the law faculty of Fribourg; as noted above, I hold a Chair in the Law of Obligations and European Private Law since 1994. After being invited as a visiting professor at Georgetown (1999/2000) and at Cornell Law School (2001), I was hired by the Georgetown University Law Center as a permanent professor. I split my professional life between Switzerland and the United States.

8. I have received several awards for my work, including the Swiss Grand Prix Walter Hug, for my contribution to the effects of European law on the development of national contract law. A full list of my publications and awards are set forth in my CV, which is attached as Exhibit A to this declaration.

9. **STATEMENT OF INDEPENDENCE AND SCOPE OF WORK**

10. I have been retained in this matter as an independent expert witness by McKool Smith, P.C., counsel for Entesar Osman Kashef, et al. (collectively, "Plaintiffs") in their suit against BNP Paribas, S.A., BNP Paribas, S.A. New York Branch and BNP North America, Inc. (collectively, "Defendants" or "BNPP") filed in the United States District Court, Southern District of New York.

11. Georgetown University, Fribourg University, and I do not have a present or contemplated future interest in the outcome of this controversy. I am aware that, in giving this Declaration, my duty is to the Court and not to the persons from whom I received instructions or by whom I am compensated.

12. I am being compensated at CHF 900 per hour. My compensation is not dependent upon the opinions expressed in this Declaration.

13. Plaintiffs' counsel provided me with the following documents to review: (1) the Second Amended Complaint and accompanying exhibits, dated January 20, 2017 (the "Complaint"), filed by Plaintiffs; (2) Defendants' Memorandum of Law in Support of their Motion to Dismiss the Second Amended Complaint, dated March 21, 2017; and (3) the Declaration of Vito Roberto in Support of Defendants' Motion to Dismiss ("Roberto Declaration" or "Roberto Decl.").

14. Plaintiffs' counsel engaged me (1) to provide the Court with my own assessment of the Swiss claim or claims that would be available to Plaintiffs should they have brought this suit against Defendants in a Swiss court, and (2) to respond to Prof. Roberto's analysis. In providing my opinions, Plaintiffs' counsel instructed me to assume that all of the facts set forth in the Complaint and the accompanying exhibits are true and correct.

## II.     The Question

15. The question I will address here is whether under Swiss law BNPP can be held civilly liable for the harm caused to the victims of the GOS for having supported financially the tortious acts of the GOS.

## III.    Summary of Opinion

16. Plaintiffs have set forth allegations sufficient to sustain a claim under art. 50 section 1 of the Swiss Code of Obligation ("CO"). Art. 50 is an independent basis for imposing liability on joint tortfeasors. It is satisfied when a plaintiff shows that several tortfeasors collectively caused that plaintiff harm. There is no need to show that the joint tortfeasor acted intentionally. All that is required is showing that given the circumstances, the joint tortfeasor should have known that the plaintiff would have suffered the harm that he or she suffered as a result of that collective action. As explained in greater detail below, the facts in the Complaint satisfy these elements.

17. Prof. Roberto argues that art. 50 section 1 CO is satisfied only if the plaintiff can show that the joint tortfeasor's contribution to the harm was substantial and either willful or immediate. Prof. Roberto's position is wrong as it is unsupported by Swiss law.

## IV.    Legal Analysis: Joint Liability Based on Art. 50 CO

18. The question I will address requires an analysis on the basis of art. 50 CO. I will first present some background information on art. 50 CO (A.). I will then present the various elements that must be met for art. 50 CO to apply (B.). Finally, I will apply art. 50 to the instant dispute (C.).

A.   **Background Information on Art. 50 CO**

19.  Art 50 CO imposes joint liability on any person who participates in a wrongful and harmful collaboration. Specifically, it states in the (unofficial) English translation of the Code of obligations of the Swiss Government's website:

> Section 1. Where two or more persons have together caused damage, whether as instigator, perpetrator or accomplice, they are jointly and severally liable to the injured party.
>
> Section 2. The court determines at its discretion whether and to what extent they have a right of recourse against each other.
>
> Section 3. Beneficiaries are liable in damages only to the extent that they received a share in the gains or caused loss or damage due to their involvement.[1]

20.  Art 50 section 1 CO imposes liability on persons other than the main perpetrator. By doing so, this norm establishes an independent basis for liability ("Haftungsnorm") on the other persons involved even if their act alone would not have constituted a tort (see W. Fellmann/A. Kottmann, Schweizerisches Haftpflichtrecht, Vol. I, Berne 2012, n. 2760, 2816, 2872 ss; S. Weber, Kausalität und Solidarität– Schadenszurechnung bei einer Mehrheit von tatsächlichen oder potenziellen Schädigern, REAS 2010, 115 ss; C. Müller, La responsabilité civile extracontractuelle, Bâle 2013, n. 835 and 837 ff ; H.-U. Brunner, Die Anwendung deliktsrechtlicher Regeln auf die Vertragshaftung, Fribourg 1991, p. 129, who quite eloquently states that "art. 50 CO creates liability that otherwise would not exist" (our adaptation of: « Art. 50 I ist eine haftungsbegründende Norm, und zwar insofern, als sie eine Verantwortlichkeit vorsieht, die sonst nicht bestehen würde »)).

---

[1] See https://www.admin.ch/opc/en/classified-compilation/19110009/201704010000/220.pdf.

21. Thus, art. 50 CO imposes joint liability on any person involved in a tortious coopera-
tion, such as an instigator or accomplice. This joint liability is independent of the lia-
bility that governs that of the main perpetrator. That liability will, most often but not
necessarily, be governed by art. 41 CO. Thus, Prof. Roberto is incorrect in arguing
that an accomplice's or an instigator's liability is "based on art. 50 CO in connection
with art. 41 section 1 CO" (Roberto Decl. ¶ 10).

22. Art. 50 section 1 CO specifically deals with the situation where two or more persons
have together caused someone to suffer a loss. It states that all involved, whether as
perpetrator, instigator, or accomplice, are jointly and severally liable to compensate
the victim for the harm suffered. Art. 50 section 2 CO adds that the person who paid
damages to the victim may have the right to take redress against the other joint tort-
feasors. The extent of that redress depends on various factors, including the degree of
involvement and fault of each person.

**B.      Requirements for Joint Liability Under Art. 50 CO**

23. To establish liability under art. 50 section 1 CO, the plaintiff must show tortious co-
operation between several people or entities, often referred to as "collective fault",
which caused a third party to suffer harm or loss (Werro, CR I OR, Art. 50, N 3).

24. Art. 50 section 1 CO describes three roles in the tortious cooperation: instigator; per-
petrator; and accomplice. It does not differentiate between the roles or provide a hier-
archy as to who is liable primarily to the injured party. Accordingly, each participant
in the "tortious cooperation" is fully liable, no matter his respective role in the coop-
eration. Thus, an accomplice may have to compensate the victim entirely, regardless
of how peripheral his action was. In effect, art. 50 section 1 CO is designed to en-
hance the protection of the victim of collective wrongdoing. To help ensure this, it al-
lows the injured party to seek full compensation from the defendant of his choice
(Krauskopf, ZK OR, Art, 144, N 43; Werro, CR I OR, Intro Art. 50-51, N 4). As Prof.
Roberto conceded that BNPP would be the accomplice of the Government of Sudan

–7–

("GOS") (Roberto Decl. ¶ 13), this question does not require any further analysis here.

25. Because Prof. Roberto also does not challenge whether Plaintiffs suffered a harm or loss, I do not deal with that element here.

26. I discuss in more detail below the elements that are contested by Prof. Roberto, collective fault and causation.

**1.   Prof. Roberto's explanation of art. 50 CO's requirements does not find any support under Swiss law**

27. Prof. Roberto argues that to be liable under art. 50 section 1 CO, "[t]here must be (1) collective conduct; (2) collective fault; and (3) collective causation" (Roberto Decl. ¶ 14). Prof. Roberto defines collective conduct as the requirement "that each party knew or should have known of the other party's contribution. Thus, the parties have to be conscious of their cooperation" (*Id.* (emphasis omitted)). He defines collective fault as the requirement that "each party has acted willfully or negligently. Each party must have wanted the loss or damage, must have taken it into account or should have known that the collective conduct might lead to loss or damage" (*Id.* (emphasis omitted)). Prof. Roberto defines collective causation as the requirement "that each party's conduct has contributed, in a legally meaningful way, to the loss or damage that has occurred. The contribution in question must be an 'adequate' cause for the loss or damage (similar to the concept of 'proximate cause')—that is, the contribution must be substantial enough in order to attribute the loss or damage to the tortfeasor" (*Id.* (emphasis omitted)).

28. Prof. Roberto concludes that an accomplice can be liable under art. 50 section 1 CO only if two additional requirements are met. According to him, the contribution of the accomplice needs to be willful or immediate, and substantial. Thus, under art. 50 section 1 CO, a person would escape from liability if its cooperation were unintentional or only indirect and unsubstantial (*Id.* ¶ 8).

29. With this analysis, Prof. Roberto misconstrues the elements under art. 50 section 1 CO. Specifically, the law does not require an accomplice to have acted wilfully, or in such a way that his contribution be immediate and substantial. In the following developments, I will discuss why Prof. Roberto is wrong.

**2.   Collective fault**

30. Art. 50 section 1 CO requires that several persons together cause someone else to suffer an illegal harm. This tortious cooperation is referred to as *collective fault* (gemeinsames Verschulden / faute commune). For joint liability to be established under art. 50 section 1 CO, it is enough to show that the secondary tortfeasor knew (intentional cooperation) or should have known (unintentional cooperation) of the outcome of its support of the primary tortfeasor (see Werro, CR OR I Intro art. 50-51, N 16; SFT 104 II 225, pt. 4). Thus, the tortfeasors need not intend the harm suffered so long as that harm was foreseeable.

31. The Swiss Federal Tribunal, Switzerland's highest court, has consistently held that collective fault is established under art. 50 section 1 CO whenever the involved defendants knew about the harmful conduct of the other or at least should reasonably have known about it (see e.g. SFT 104 II 225, pt. 4: "Collective fault in causing harm requires each tortfeasor to know about the act of the other or to have reasonably the possibility to know about it." (My own translation of the original German language: "Ein schuldhaftes Zusammenwirken bei der Schadensverursachung setzt voraus, dass jeder Schädiger vom Tatbeitrag des anderen Kenntnis hat oder bei der erforderlichen Aufmerksamkeit Kenntnis haben könnte.")).

32. The Swiss Federal Tribunal has thus found the requirement of collective fault to be fulfilled in cases of "fahrlässige Unkenntnis" (see for example SFT 71 II 107), which means that the defendant was "unintentionally ignorant" of the consequences of its actions. Thus, according to the Swiss Federal Tribunal, an accomplice is at fault if he should have foreseen the outcome of his support of the primary tortfeasor (Brehm, BK-OR 41-61, art. 50, N 27). Any party involved in such a tortious cooperation, be it

with the intent to cause the ultimate outcome or not, becomes liable. It is not required that there be an explicit agreement between the parties to act jointly; tacit or unintentional complicity is sufficient.

33. SFT 71 II 107 is an example of the Swiss Federal Tribunal's approach to collective fault. In this case, which is discussed in further detail below, a restaurant owner let some guests of his restaurant organise a shooting competition in the garden. One of the other guests was accidentally injured as a result of a stray bullet. The owner was found to be unintentionally unaware of the consequences of his actions and nonetheless held liable for the other guest's injuries.

34. Thus, contrary to what Prof. Roberto claims (Roberto Decl. ¶ 28), case law shows that even a careless accomplice acting indirectly can be held liable. What is required is that an accomplice engages intentionally or unintentionally in a tortious cooperation and that there is causation between the collective fault and the damage incurred. There need not be an agreement between the tortfeasors that a particular harm occurs.

**3.    Causation between collective fault and the loss**

35. Art. 50 section 1 CO further requires a causal link between the collective fault and the loss.

36. I address this causal link in two steps. First, I explain why Prof. Roberto's argument that the joint tortfeasor's conduct must be substantial and either willful or immediate is unfounded. Second, I set forth the correct measure of causation, whether the harm suffered was the natural and adequate consequence of the tortfeasor's actions.

*a)    Prof. Roberto's argument is unfounded*

37. With regard to the causation requirement, Prof. Roberto states that Swiss tort law tends to limit liability by insisting on a strict approach to causation. He draws the conclusion that the plaintiff has to prove that the wrongdoer's contribution to the causal link was "substantial" (Roberto Decl. ¶ 15). Prof. Roberto relies on two cases,

TF 4A_7/2007 and TF 4A_637/2015, to support his restrictive approach to causation (*Id.* ¶ 18).

38.  Prof. Roberto's analysis is clearly irrelevant to the present case. Chosen out of many, the two cases cited by him involve general issues of causation and do not deal with joint liability involving several wrongdoers. With respect to joint liability, the Swiss Federal Tribunal's approach to causation is indeed significantly different.

39.  In matters of joint liability, actual causation does not have to be established between each wrongdoer's actions. An instigator or an accomplice may have to compensate entirely the victim even if their action did not directly cause the loss. Joint liability allows the injured party to hold liable all actors in full, regardless of the degree of their involvement (as instigator, perpetrator, or accomplice) in the commitment of the tortious act.

40.  Prof. Roberto's statement that "the Swiss Supreme Court will only find liability under art. 50 section 1 CO in cases with multiple parties when the secondary actor's contributions are either willful and substantial or immediate and substantial" (Roberto Decl. ¶ 20 (emphasis omitted)) is thus clearly wrong. Under Swiss law, immediacy of a person's action is not required to be held jointly liable. Rather, a causal link between the tortious cooperation and the damage or loss that occurred is sufficient. If such a causal link is established, each party is liable for the loss or damage, regardless of its involvement in the cooperation. Therefore, contrary to what Prof. Roberto claims (*id.* ¶ 28), an accomplice may have to entirely compensate the victim, even if his contribution was unintentional and indirect.

41.  Other cases cited by Prof. Roberto show that his approach to causation is incorrect. For example, he relies on SFT 57 II 417 for his contention that the actor's contribution must be substantial and immediate for the court to find liability (*Id.* ¶ 22). In this case, the Swiss Federal Tribunal, held collectively liable a group of striking workers involved in the assault of a non-striking colleague who suffered a severe blow to his head. However, in his case summary, Prof. Roberto omits that the Swiss Federal Tri-

bunal also held liable the head of the union who had recommended the use of violence against those who did not strike.

42. The Tribunal found the union head acted as an instigator under art. 50 section 1 CO. The Tribunal did not consider whether he participated in the violence or whether he wanted the specific result that occurred, that is, the head injury to the colleague. In other words, the Tribunal held the union head liable even though his contribution to the victim's actual injury was not immediate, willful, or substantial. Indeed, these factors are not part of the analysis under art. 50 section 1 CO.

43. Prof. Roberto omits other cases that make clear that his standard of causation is inaccurate. For example, the case mentioned above in paragraph 33, involved a shooting competition organized by a group of soldiers in the garden of a restaurant. During the shooting, one of the bullets bounced off a tree and seriously injured a patron sitting on the terrace. The Tribunal found all of the soldiers liable for the patron's injury, including those who did not shoot. But, and this is the important point, the Tribunal also held the owner of the restaurant liable for having been careless: he let the shooting competition take place in the garden of his restaurant without taking the proper safety measures. Thus, the Tribunal found that the restaurant owner was liable as an accomplice, even though the owner did not act immediately, willfully, or substantially.

*b)*   *"Natural" and "adequate" causation*

44. Swiss law requires both "natural" and "adequate" causation to establish liability under art. 50 section 1 CO (for a general presentation, see Werro, La responsabilité civile, Berne 2011, N. 190 ss).

45. A natural causal link exists where the harm would not have occurred at the same time or in the same way or magnitude as it did without the conduct alleged (Swiss Federal Tribunal, 4A_444/2010, pt. 2.1). It is sufficient if the act in question was a partial cause, which—together with other causes—led to the damage incurred (Swiss Federal Tribunal 4C_79/2001 pt. 3a; 6B_253/2012 pt. 3.3.1).

46. Furthermore, Swiss law requires that causation also be adequate in order to give rise to liability of the acting person (SFT 129 II 312, pt. 3.3; 119 Ib 334 pt. 3c; Werro, CR-OR I, art. 41, N 43). Not all natural causes are legally relevant. In order for them to be, they need to be adequate. In the language of the Swiss Federal Tribunal (the translation is my own), "an act is an adequate cause for a loss or damage if, based on the usual course of events and common experience, it can reasonably be considered to be the cause of the kind of loss or damage that occurred and therefore seems to generally have favored the damage" (SFT 101 II 68/73; 102 II 232/237).

47. The standard of natural and adequate causation will be met if the person's àct was one of the causes of the harm suffered, and if the harm would not have occurred in the same way without that act. Whether other causes existed is irrelevant (Supreme Court 4C_79/2001 pt. 3a; 6B_253/2012 pt. 3.3.1). Thus, any cause is sufficient, even if it is only an indirect one and only led to the damage together with other causes (SFT 60 II 416/419; Supreme Court 4C_108/2005, pt. 3.1; 4A_444/2010, pt. 2.1). The intensity of the cause does not matter either (see SFT 57 II 36/39; Brehm, BK-OR 41-61, N 124 ad art. 41; Werro, CR-OR I, art. 50, N 5).

48. The evaluation of adequacy takes the concrete damage that occurred as a starting point. By going back from that very point in time, the Court will analyse whether the conduct of the defendant was likely to be a relevant cause of the damage (retrospective prognosis, SFT 87 II 117/127; "objective retrospective predictability", SFT 101 II 69/73; 6S_55/2005, E. 5.1; Supreme Court, 4C_223/1998, pt. 4b/bb; Werro, CR-OR I, art. 41, N 43).

**C.    Application of Art. 50 Section 1 CO to the Instant Dispute**

49. In the following paragraphs, I will apply the foregoing analysis to the instant dispute and show if and how BNPP acted in tortious cooperation with the GOS to cause the harm that Plaintiffs suffered. Prof. Roberto rightly conceded that BNNPP would be the accomplice of the government of Sudan (Roberto Decl. ¶ 13). He wrongly argued however that BNPP could not be considered as a joint tortfeasor as it has not acted

wilfully. On the basis of an irrelevant analysis of causation (see above at pt. 38), he also argued that BNNP's involvement would not be sufficient to make it be liable as a joint tortfeasor under art. 50 CO.

50. It appears instead from the documents in the present matter that by providing financial services to the GOS BNPP was clearly involved in a tortious cooperation. As the record shows, this permitted the GOS to access the U.S. dollar market and sell its oil for a higher price than it would be able to without that access. The GOS then used this money to finance its attacks on its own citizens, including Plaintiffs.

51. Based on my review of the Complaint, Plaintiffs allege therefore sufficient information to show tortious cooperation within the meaning of art. 50 CO on the part of BNPP. Statements by BNPP's employees that were released in connection with BNPP's deliberate violations of the U.S sanctions against the GOS and BNPP'S criminal prosecutions make clear that BNPP knew that the GOS was using BNPP's cooperation to enrich itself and harm its citizens on a scale that it was previously unable to achieve (Compl. ¶¶ 183-90). Moreover, it was well-known generally and in the business community specifically that the GOS used the growth of its oil revenue to harm its citizens (id. ¶¶ 153-82). Clearly, BNPP at best should have known that it was assisting the GOS as a main perpetrator of torts and it that it was therefore participating in a collective fault as described above.

52. Causation within the meaning of art. 50 CO is also clearly given in the present case. Indeed, a Swiss court would evaluate whether BNPP's actions naturally and adequately caused the harm Plaintiffs suffered. Specifically, a Swiss court would ask the following questions:

- Were BNPP's actions a natural cause of the harm Plaintiffs suffered, i.e., did BNPP's actions cause the harm to occur at a different time or in a different way or magnitude?

- Were BNPP's actions an adequate cause of the harm Plaintiffs suffered, i.e., could Plaintiffs' injuries be reasonably attributed fully or partially to the collective collaboration of the GOS and BNPP in the given circumstances?

- Did the financial services provided by BNPP to Sudanese banks directly or indirectly aid the GOS in committing tortious acts or in some way contribute to committing such acts?

- Did BNPP know or should it have known that its financial services would be used by the GOS to commit tortious acts?

53. Based on my review of the Complaint, I believe that a Swiss court would answer all these questions positively. Plaintiffs put forward sufficient evidence to satisfy both types of causation. Indeed, without BNPP's actions, the GOS's ability to harm its own citizens would not have occurred at the time or in the same way and dimension. This is because BNPP gave the GOS access to the U.S. financial market, which allowed the GOS to sell its oil at a higher rate, giving it more resources to use to engage in its campaign of violence (Compl. ¶¶ 101-51). Its actions were an adequate cause because it was reasonably foreseeable that the GOS would use its access to the U.S. financial system to fuel its attacks against its own citizens (Compl. ¶¶ 152-90).

## V.   Conclusion

54. It follows from the above that under Swiss case law, an unintentional and indirect conduct of an accomplice can meet the requirements of art. 50 section 1 CO. Any person mentioned in art. 50 section 1 CO, be it as perpetrator, instigator, or accomplice is fully liable for the harm suffered as a consequence of a tortious cooperation. All of them are equally liable, as long as their collective behavior is a natural and adequate cause of the damage and as long as the parties were aware, or should have been aware, of the other parties' contributions. This is in line with the longstanding legal practice that the Courts have applied for decades.

55. The two alternative criterions for joint liability that are invoked by Prof. Roberto ("willfulness" and "immediacy") find no basis in any doctrinal authority. They are not relevant for the case at hand, as the case law cited in support thereof is in no way comparable to the Complaint. Prof. Roberto's case law analysis may serve as an illustration that multiple parties' liability is indeed not a straightforward issue, but concluding that art. 50 section 1 CO requires willful or immediate contributions by the accomplice adds a criterion that is not recognized under Swiss law.

56. Therefore, under Swiss law, the main issue of the case presented in the Complaint is not to determine whether or not the conduct of BNPP was willful or immediate. The issue is much more to determine whether BNPP, by providing financial services to the GOS and banks owned by the GOS, intentionally or negligently provided support to GOS for committing tortious acts.

57. All things considered, in order to hold BNPP jointly liable with the GOS as primary tortfeasor, Plaintiffs need to prove that:

   - BNPP's financial services for the GOS made it part of a tortious cooperation, since BNPP was aware or should have been aware that its financial services

would support or even enable the GOS in committing tortious acts (collective fault), and

- The tortious acts that were directly committed by the GOS and were supported or enabled by the financial services of BNPP, are causal to the damage incurred (natural and adequate causation).

58. Again, I understand that the Complaint puts forward such allegations, together with supporting evidence.

## VI.    Declaration

59. This Declaration sets out my independent opinion on all matters within my knowledge and expertise which are relevant to the questions that have been posed to me. I assume that the facts I have stated herein are true, and confirm that the opinions I have expressed represent my true and complete professional opinion.

60. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on this 22nd day of May, 2017


FRANZ WERRO