UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ENTESAR OSMAN KASHEF, et al.,

                        Plaintiffs,

            -against-

BNP PARIBAS S.A., BNP PARIBAS S.A. NEW
YORK BRANCH, BNP PARIBAS NORTH
AMERICA, INC., and DOES 2-10,

                        Defendants.

Civil No.: 1:16-Civ-03228-AJN

Hon. Alison J. Nathan

ECF Case


**DECLARATION OF NAGI IDRIS**

1

## Table of Contents

PART I ..................................................................................................................................3

    Introduction ......................................................................................................................3

    Brief Resume ....................................................................................................................3

    Examined Documents and Laws .......................................................................................4

    Reservations .....................................................................................................................6

    Purpose of this Declaration ..............................................................................................6

    Overview of the Facts ......................................................................................................6

PART II .................................................................................................................................7

    Scope of Applicable Sudanese Laws ...............................................................................7

    Historical Development of Sudanese Laws: .....................................................................8

PART III ..............................................................................................................................10

    Overview of the CTA ......................................................................................................10

    Elements of Tort Liability Under Sudanese Law: Giving Effect to
           Compensation for Injury Principle ......................................................................10

    Tortious Act ....................................................................................................................11

    Injury  12

    Liability to Compensate ..................................................................................................12

    Causation and Compensation ..........................................................................................15

    Direct and Indirect Tortfeasors ......................................................................................18

    Subsections 5(t), 5(u) 5(v) in conjunction with 5(z) .......................................................21

    Intent  21

    Joint Tortfeasors.............................................................................................................22

    Subsection 5(x) and the lawful exercise of rights (sections 28 and
           29 CTA) ..............................................................................................................25

PART IV ..............................................................................................................................29

    Summary of Claims against BNPP under Sudanese Law.................................................29

    Tort of Negligence under sections 138, 147, 151 and 154 CTA .....................................29

    Tort of Conspiracy to do an Unlawful Act under Sections 138, 151
           and 154 CTA, Sudanese common law and section 122 and
           123 of the Sudan Criminal Act 1991 ....................................................................29

    Unjust Enrichment under sections 164  and 165 CTA ....................................................30

    All claims enhanced by Constitutional Claims................................................................31

I, Nagi Idris, declare the following pursuant to 28 U.S.C. § 1746.

## PART I

### Introduction

1.    This expert declaration is presented in four Parts.   Part I provides a summary of my professional background and introduction to the relevant facts and documents which I address.   Part II examines the background of Sudanese laws relevant to the Complaint, including their historical development and interaction.   Part III examines each element of tortious liability under Sudanese law as it applies to this case. This includes a detailed analysis of tort element, the theory of liability, including distinctions between direct and indirect tortfeasors under Sudanese law, as well as the operation of the substantive and interpretative principles relevant to the Complaint.   Part IV discusses select claims cognizable under Sudanese laws borne out of the Complaint.

### Brief Resume

2.    I submit this Declaration as a Sudanese lawyer and practitioner of cross-boundary transactions and disputes.   For completeness I declare I am also a Solicitor of the Senior Court of England and Wales.   A copy of my curriculum vitae is attached as Exhibit A.

3.    My name is Nagi Idris.  My business address is 14 Old Square, Lincoln's Inn, London WC2A 3UE.

4.    I received my LLB (With Honours) from the University of Khartoum in 1994 and sat the Bar Exam in 1995.   After relocating from Sudan to England in 1999.   I completed the CPE Conversion Law Course at the City University, London.   I obtained further international practice diplomas from the International Bar Association and the College of Law of England and Wales in International Arbitration, International Capital Markets, International Mergers and Acquisitions, International Business Organisations and International Joint Ventures.

5.    I have practiced law for over 20 years in several private practices in London (focusing on Middle East and Africa transactions, especially Sudan) and in-house where I gained substantial experience with international contracts, such as international infrastructure development, education and healthcare management and international commercial law.

6.    I am currently the Co-Founder and Director of the London Centre of International Law Practice (LCILP) and a Visiting Professor at Link Campus University, Rome.   The LCILP is a body of practitioners, mostly from England and Wales, who undertake casework involving Africa and

3

the Middle East, and disputes utilizing international public and private law.  The practice draws on the expertise of a dozen disciplinary-themed groups housed in LCILP.

7.      I am a Fellow of the International Bar Association, a member of the Society for Legal Scholars and a member of the Constitutional Law Association.  I am also a member of the Society of International Economic Law and Human Rights Institute, the Arbitration Committee, the Oil and Gas Law Committee, the Water Law Committee, the War Crimes Committee and the Arab Regional Forum of International Bar Association.

8.      I include below a list of topics I have written about and presented on:

- The UK Experience in Countering Terrorism-Amsterdam Dialogue-Nov 2016
- The Curse of Military Regimes: Conflicts and State Disintegration in the Middle East and Africa-Istanbul at the Euroasian University Association, October 2016
- Oxford Energy Perspectives 2016: Policy Trends for Energy Sustainability in the Developing World (African and the Middle East), May 2016
- International Law and Non-State Actors in Africa, Africa Security Summit, Marrakesh, January 2017
- Arbitration in Energy Contracts at the Middle East Law Summit, Marrakesh, Dec 2016

**Examined Documents and Laws**

9.      In delivering this Declaration, I have examined the following documents:

- The Second Amended Complaint and accompanying exhibits, dated January 20, 2017 (the "**Complaint**") against BNP Paribas S.A., BNP Paribas S.A. New York Branch, and BNP Paribas North America, Inc. (collectively, "**BNPP**").
- Defendants' Memorandum of Law in Support of their Motion to Dismiss the Second Amended Complaint, dated March 21, 2017.
- The Declaration of Tayeb Hassabo in Support of Defendants' Motion to Dismiss the Second Amended Complaint ("**Hassabo's Declaration**").
- The Declaration of Tayeb Hassabo in Support of Defendants' Motion to Dismiss the First Amended Complaint.

4

10.     I have analyzed the following Sudanese statutes:

- The Civil Transactions Act, 1984.
- The Civil Procedures Act, 1983.
- The Criminal Act, 1991.
- The Criminal Procedures Act, 1991.
- The Evidence Act, 1994.
- The Interpretation of Statutes & General Clauses Act, 1974.
- The Regulation of Banking Activities Act, 2003.
- The Transitional Constitution of the Sudan, 2005.
- The Armed Forces Act, 2007.
- Sources of Judicial Decisions Act, 1983.

11.     In addition, I have examined:

- Case law and judicial precedents cited within the Declaration.
- The Common Law in Sudan, Mustafa Zaki, 1971, Oxford, Clarendon Press.
- Zaki Mustafa; Civil Law in the Sudan: Its History and Characteristics, Arab Research and Studies Institute of the League of Arab States, 1968.
- The Future of the English law in the Sudan, Galal Ali Lutfi, 1967, Sudan Law Journal & Reports (SLJR).
- Damages for Breach of Contract, Abdelazim Hassan, 2014, Currency Printing Press.
- Rules of Tortious Liability Under the Sudanese Law, Mohamed Altayeb Sarour, 2009.
- Tortious Liability: The Sudanese Experience, Professor Obaid Haj Ali, 2nd Edition 2017.
- Interpretation of The Rules of Civil Liability under Sharia Law and the Sudanese Civil Transactions Law 1984, Dr. Badria Abdelmoniem Hassouna, Supreme Court Judge, 2011.
- Interpretation of the Sudanese Civil Transactions Act, Mohamed Salih Ali, 1995.
- The Civil Procedures Act 1983, Mohamed Alshaikh Omar, 2006.
- The Encyclopedia of Civil Procedures Rules in Sudan in Ninety Years, translated and edited by Henry Riyad and Karam Shafiq, 1989.
- Introduction to the Law of Tort, Abdallah Nagib, First Edition 1973.
- The Sudanese Civil Procedures Act between Analysis and Application: Comparative Study, Professor Haider Ahmed Dafalla, the Chief Justice, 2016-2017.
- Alshawkani, Nail Alwatar, Dar Algeel, Burit 1973, vol. 5.

- Ali Alkhafif; Aldhaman fi Alfiqh Islami (Indemnification under Islamic Jurisprudence).
- Sayed Amin, Tortious Liability for the Act of Others in the Islamic Comparative Jurisprudence.

### Reservations

12.  I have been instructed to assume that all facts as stated in the Complaint are true.

13.  This Declaration is confined only to the laws and judicial practices of Sudan, and does not express any opinion on the laws or judicial practice of the United States or any other jurisdiction.

14.  In the preparation of this Declaration, I have engaged help from several individuals from LCILP.  This help encompassed research assistance on modern English tort law and translation assistance of certain Arabic texts. I also undertook some of this research and translation directly.  This assistance was done under my direction and control.

15.  I have also discussed aspects of Sudanese law with several senior jurists in Sudan, which included at least a dozen conversations with Mohammed Eltayeb Sarour whose work is cited in my Declaration and the Declaration of Mr Hassabo.  Where I base my opinion on information or a source other than that in my direct knowledge, including from discussions with Professor Sarour, I state so.

16.  I am being compensated at a rate of USD $250 per hour.  My compensation is not dependent upon the opinions I express herein.

### Purpose of this Declaration

17.  Broadly, this Declaration will respond to the question whether Plaintiffs have any cognizable claim under Sudanese law stemming from the facts in the Complaint against BNPP.  My analysis will be affirmative on the basis of my own knowledge, experience and research.  I will specifically highlight where my analysis departs from that of Mr Hassabo by referring to specific paragraphs of the Hassabo Declarations.

### Overview of the Facts

18.  I understand the facts to be as follows.  The Plaintiffs are Sudanese individuals of specific backgrounds who previously resided in conflict-affected parts of Darfur, Southern Kordofan, Blue Nile, and South Sudan.

19.  The Complaint relates to violations by BNPP of the US sanctions imposed on the Government of Sudan ("**GOS**") and related Specially Designated

Nationals ("**SDNs**") for the perpetration of human rights violations against certain civilians of Sudan. The sanctions were implemented through several successive legislations and sought to ban under penalty of crime US entities from doing business, and thus enabling the GOS, in the commission of human rights violations.

20. From the public records, namely the Statement of Facts which are incorporated by reference into the Federal Plea Agreement, it is apparent that between the period of 1997 to 2007 BNPP provided credit and banking clearing services to both the GOS and other SDNs, in clear violation of these sanctions.

21. The Plaintiffs allege that the financial services offered by BNPP enabled the GOS to sustain and increase its attacks on Plaintiffs, causing the Plaintiffs to suffer damage.

22. It is understood from the Federal Plea Agreement that BNPP has admitted to breaching sanctions. It has admitted to secret dealings and conspiracy with the GOS and further has pled guilty to falsification of business records to evade detection of its sanctions violations.

## **PART II**

### **Scope of Applicable Sudanese Laws**

23. I agree that the principal legislation for examination of torts is the Civil Transactions Act 1984 ("**CTA**") as informed by Sudanese common law. However the CTA covers many other areas of civil claims that are pertinent to the facts outside of the tort claim. The CTA is the key legislation on remedies flowing from BNPP's liability in tort and, separately and in addition to, unjust enrichment. It is also relevant for analyzing BNPP's defences, such as the lawful exercise of rights.

24. BNPP's admission to the crime of falsification of business records, and admission to conspiracy, also forms the basis of an action for the tort of unlawful means conspiracy colorable under Sudanese law. On this topic I consider the Criminal Act 1991.

25. I will refer to other legislation for demonstrating the operation of certain CTA sections, including interpretative principles within the CTA itself, and the Interpretation Act 1974.

26. I also consider principles from the Sudanese Constitution that inform the operation and effect of Sudanese law.

**Historical Development of Sudanese Laws:**

27.     While the Hassabo Declarations place emphasis on the significance and history of the sources shaping Sudanese law, I do not follow the same approach.  My approach has been to analyze the claims through direct and current Sudanese legislation where possible.  That is because political ideology has coloured the history of Sudanese law through its multiple colonial periods, and relatedly, the version and strictness of Shari'a principles which was enforced.  The civil war in Sudan also affected the composition of the judiciary and introduced new legislation reinforcing the prevailing political ideology.[1]

28.     Tensions remain in the way Sudanese courts look to persuasive authorities when no express legislation exists. A judge would first look at the statute, and where there is no express provision would supplement from the Sudanese common law. The Sources of Judicial Decisions Act 1983 also declares that where a matter has no specific legislation, recourse should be made to Shari'a principles, custom, judicial precedents and principles of justice.  There is no determinative hierarchy of these sources that has been uniformly accepted by the Sudanese courts to date.

29.     By way of background, from the independence of Sudan in 1956 until 1971 English common law was directly applicable in Sudan.   In the leading case of *Khartoum Municipal Council v. Michel Cotran*, the Court of Appeal Judge ended the delivery of judgment by saying "*the principles of English law should be applied against a background of fairness, equity and justice.*"[2]  It was necessary for Sudanese judges to recourse to other systems of law when Sudanese law did not cover the cases before them.

30.     The period of English control led to the development of the common law of the Sudan, which was heavily influenced by, and borrowed from, the English Law.

31.     The late Dr Zaki Mustafa, one of the most prominent Sudanese lawyers and scholars, asserted that "*the rule of equity, justice and good conscience, despite being referred to as residual, but in practice it represents almost the entire body of substantive law in the most important branches.*"[3]

32.     The implementation of English common law into Sudanese law proper was achieved through section 9 of the Civil Justice Ordinance 1929, which stated that in all matters not provided for by legislation "*the court shall act*

---

[1] Mark Fathi Massoud, *Law's Fragile State: Colonial, Authoritarian, and Humanitarian Legacies in Sudan* (Cambridge University Press, 2013)

[2] *Khartoum Municipal Council v. Michel Cotran* (SLJR 1958, page 85)

[3] Zaki Mustafa, *Civil Law in the Sudan: Its History and Characteristics, Arab Research and Studies Institute of the League of Arab States* (1968).

*according to justice, equity and good conscience.*[4]   It has to be noted that section 6 of the Civil Procedures Act 1983 ("**CPA**") provides courts with the same level of flexibility to reach justice in the absence of statutory provision.

33.   In 1971, Babiker Awadalla, the Prime Minister and Minister of Justice, imposed the Civil Law of Egypt as the civil law of Sudan.  The effect of civil law on the long history of common law in Sudan caused substantial confusion.  However it was repealed after two years and the rules of common law were reintroduced. In 1983 the Nimiri Regime declared that Islamic Shari'a should be the basis of Sudanese legislation. This did not seek to undermine the status of the Sudanese common law as had developed, but it required interpretation in harmony with Shari'a principles. This codification of Sudanese civil law, with the stated purpose of harmony with Shari'a principles, became the Civil Transaction Act 1984 ("**CTA**").  However, in the view of some, common law should have continued on its trajectory without the additional requirement of harmonization with Shari'a law.

34.   Considering the above history, I take no view on the correctness of the approach by Mr Hassabo in relying for clarificatory effect of the CTA on the Egyptian code and the Justice Judgments Journal ("**JJJ**"), which shares the same (Turkic era) origin.  I note that historically in Sudanese law, Egyptian code was usually looked to for analogy to procedural rather than substantive matters, and was directly in effect for only two years.  I repeat my position that in the Sudanese context, political ideology is sometimes inextricable from the choice of sources informing the law.

35.   However, I recognize that the CTA itself was introduced by an Islamist government, and it brings to a statutory position many key principles of Shari'a law.  Shari'a law places great reliance on natural justice, often in much broader ways than the rules of common law/equity would provide.

36.   As a matter of practice, there is a clear record of Sudanese courts taking into account other sources of law that are not based on Shari'a, including the English common law which continues to be pervasively cited in Sudanese court decisions.  Modern Sudanese courts continue to consider English common law, for example in cases on business transactions concerning sophisticated business parties.   In addition, most of the legislation concerning corporate matters (e.g. Company Law Ordinance, Partnership Registration Ordinance, laws on negotiable instruments and mortgages, Securities laws, IP and Trademark laws and others) has not been repealed from their original implementation into Sudanese law during the English colonial period.

---

[4] *Civil Justice Ordnance 1929,* section 9.

## PART III

## Overview of the CTA

37. The CTA is approximately 250 pages and covers most areas of civil law, including terms and conditions of contracts, sale of goods, employment, agency, bailment, insurance, security, land law, estates and mortgages, as well as customary and Shari'a specific types of transactions relating to barter and trade. Part III is devoted to tort and comprises ss. 138 – 163. Part IV covers Unjust Enrichment and comprises only two sections ss. 164 – 166 (inclusive).

38. The relative shortness of the provisions on tort in the CTA are not surprising, given that by the time of its implementation a robust body of Sudanese common law on tort was already in existence. The CTA was not intended to override Sudanese common law. It was an attempt at codification of the common law on civil matters, with an additional purpose of seeking to harmonize interpretation of the common law with Shari'a principles. This purpose was accomplished by stating some (but not all) provisions of Shari'a custom in legislative terms. This purpose did not align in perfect drafting harmony with certain substantive provisions of the CTA that reflected the position of Sudanese common law as it came to be by then. Some of these drafting tensions are discussed in paragraphs 73 to 85 below.

## Elements of Tort Liability Under Sudanese Law: Giving Effect to Compensation for Injury Principle

39. In Islamic law and jurisprudence, according to Dr Sayed Amin, "*the tortious liability is based on the breach of one general legal obligation that does not change which is the obligation not to cause damage to others. It is therefore the breach of a general legal obligation not to cause harm to others*"[5] to him "*the harmful act which result in tortious liability is an actual voluntary act that falls within the matters of facts, but is executed in contravention to the will of the legislature. The tortious liability is therefore based on the breach of one general legal obligation that does not change which is the obligation not to cause damage to others. It is therefore the breach of a general legal obligation not to cause harm to others.*"[6]

---

[5] Sayed Amin, *Tortious Liability for the act of others in the Islamic Comparative Jurisprudence* (2001), p31.

[6] Amin, p32.

40.     The law's desire to find compensation for injury is a fundamental principle of Islamic law.[7]  The principle is pervasive throughout the CTA.

41.     Section 138 CTA, the cornerstone of tort provides:

*Liability for Personal Acts: Compensation for Injury*

*138. Every act, which causes injury to others shall bind whoever has committed the same, with compensation, regardless of legal capacity.[8]*

42.     Section 22(8) CTA concerns capacity for civil claims, provides that:

*A person one of whose inherent person rights has unlawfully been infringed may apply for the cessation of the infringement, together with <u>compensation for any injury</u>, as may be suffered thereby.* (emphasis added)

43.     Section 153 (1) further expressly creates a link between moral injury and compensation:

*153(1) <u>Compensation shall include moral injury</u>; thus every assault on others' liberty, honour, dignity, reputation, social standing or financial position shall render the aggressor <u>liable for compensation</u>.*

(in each case, emphasis added)

44.     The basing of torts on the principle that an injury requires compensation widens the scope of actionable torts in Sudan beyond those satisfying the often-recognized common law requirements of: (i) duty, (ii) breach and (iii) causation.  Rather, requirements for a claim under section 138 CTA are: (i) an act, (ii) an injury, and (iii) liability to compensate.  As I discuss in greater detail below, I disagree with the Hassabo Declaration's equivalence of liability with causation (¶31- 40).  In giving effect to the principle that injury requires compensation, the CTA imposes liability in broader ways than legal and factual causation would do.  I will discuss each of the three requirements in turn.

## <u>Tortious Act</u>

45.      Article 138 CTA requires the showing of a tortious act.  Under Sudanese law, a tortious act is one that causes damage.  Both in judicial practice and jurisprudence, the tortious act encompasses both a positive and negative act (i.e. omission).  Omissions are covered by section 140 CTA.

---

[7] Dr. Mohamed Altayeb Sarour, *Rules of Tortious Liability Under Sudanese Law* 2016, (Sudan Currency Printing Company, 2016), p71.
[8] The final requirement as to capacity is typically seen to refer to the age of the tortfeasors.

46.     I agree with the observation in the Hassabo Declaration (¶27) that "the act" under the CTA is of the widest scope:  it is more comprehensive than the term "wrongful act".  In my opinion this is entirely consistent with the policy behind the CTA of giving effect to the "compensation for injury" principle discussed above.

## Injury

47.     Section 138 CTA requires proof of injury to establish liability.  I broadly agree with the observations in the Hassabo Declaration (¶¶28-29) save to add that Sudanese law expressly recognizes physical as well as economic, emotional and reputational injuries (Section 153 CTA).

48.     For completeness, it should be noted that Sudanese law adopts an even wider approach to compensation for moral injury than Islamic jurisprudence, which doesn't recognize emotional or reputational damage and therefore not compensate for it.  The scope of injury under Sudanese law considers compensation as a form of financial restitution, which is aimed at returning the injured person to the status quo ante, and done on the basis of (like for like) whenever possible.

## Liability to Compensate

49.     Mr Hassabo fails to consider the liability to compensate principle, the significance of which is shown by many of the CTA's provisions.  In my opinion, this is a vital oversight.

    The principle arises from section 138 CTA.  The Hassabo Declaration does not consider the significance of the liability to compensate provision of Section 138 CTA.   Section 138 CTA provides that a tort can be committed "regardless of the legal capacity of the actor".  This differs from the English common law rule that a tortfeasor must be legally competent to be held liable for a tort.  Under the CTA, liability could be imposed on minors and mentally incapacitated individuals.  While public policy might try to seek to avoid prosecution of minors, the significance of this provision is to demonstrate the legislative objectives of the CTA - which puts paramount focus on availing redress to injured parties, regardless of limiting factors such as mental or legal capacity.

50.     Recognition of these very objectives, and relatedly, the broadness of section 138 CTA have been affirmed by the Former Chief Justice, Obaid Haj Ali (Obaid), who stated "*The objective of this law is to compensate the injured party for the damage caused by the act of others.*"[9]

---

[9] Professor Obaid Haj Ali, *Tortious Liability: The Sudanese Experience* (2nd edition, 2017), p. 48.

51. As a general rule, Islamic jurisprudence does not look at the element of fault when considering tortious acts. This is expressly reflected by section 6 CTA:

*Basic Rules for Passing Judgments*

*6. Upon passing any judgment in application of the provisions of this Act the courts shall be bound by the following basic rules:*

*(a) rights shall be restored and injustice shall be prevented;*

*(b) Damage caused in the process of recovery of rights and remedying injustice shall be removed...*

52. Key to section 6 CTA is the law's desire to compensate for injury. Obaid explains the position of compensation and the objective approach of basing liability on damage rather than fault in Islamic law by stating "*the legality of damages in Islamic Jurisprudence has not passed through stages of development, but was revealed as part of the Quran in a number of verses and prophet's statements (Ahadeeth), as deduced by Islamic jurists in a number of rules. This is because under Shari'a law the damage is both the cause on which compensation is established and the reason for it.*"[10] This excerpt reflects what is known as objective responsibility, which is an essential rather an exceptional principle of Islamic law.

53. Basing liability on damage rather than fault is significant when it comes to establishing liability for actions of public authorities or corporate bodies. According to Obaid, "*while many governmental departments and other charity bodies undertake some activities that are aimed at serving the public, they are not exempted from liability if they do not take the necessary degree of care and precaution to avoid causing damage to others. The Surgeon who operates [on] his patients; and the municipal and rural councils, which provide their services to the public, do that with good intention, but good intention alone is not enough, as it should be accompanied by a reasonable degree of care and caution to avoid harming others.*"[11]

54. Sudanese case law also reflects the importance of this principle. In the case of *Khartoum Municipal Council v. Michel Cotran*[12], the court decided statutory authority conferred to the council could not be invoked to deprive defendants from their right to stop the damage and seek redress. In that case, the defendant dug a drain, which was left uncovered and

---

[10] Obaid, *Haj Ali*, pp. 64-65
[11] Obaid, p. 77
[12] SLJR 1958, p. 85

unguarded.  The claimant fell and sustained severe injuries to his foot, and, after treatment, was left partially disabled.  Liability to compensate for injury was the basis of this decision.

55.   In another landmark case on tort, *Adminstratrix of Costas Zis v. German and Swiss Engineering and Construction Company and Phoenix Assurance Company,*[13] the court held that the defendants were negligent for not providing adequate warning to the users of the highway about the existence of the ditch.  The court confirmed that the defendants' duty was to give an adequate warning to the users of the highway about the existence of the ditch.  The court also confirmed that giving adequate warning would have sufficed to discharge the duty of care as the defendants cannot ensure that no accident can happen.

56.   In the *Adminstratrix of Costas case*, the deceased, cycling home after dark, fell into a ditch which extended into the middle of the road and which had been dug by the first defendants on behalf of the Khartoum Municipal Council.  He was seriously injured and died five days later.  On one side the ditch was bordered by a mound of earth and on the other by a wooden barricade where a hurricane lamp was hung, but these did not cover its whole length, so that there was in the road an unguarded opening into which the deceased fell.  The defendants were held negligent in tort in failing to provide adequate warning of the existence of the danger to the users of the highway.  Liability to compensate for injury was also the basis for this decision.

57.   This concept of objective liability has been applied in the recent Sudanese case of *Blue Nile Construction Corporation v. Ikhlas Elasadig Dao Elbait-Supreme Court.*[14]   In that case a truck, owned by applicant for the review in this case, collided with a bus where the plaintiff was one of the passengers.  The truck was loaded with heated asphalt, which caused burns and injures to the plaintiff who stayed at the hospital for eight months.  She also lost belongings in the accident.  The incident resulted in a criminal case and a civil case.  In the criminal case, the court convicted the bus driver and cleared the truck driver of negligence.  The case was brought against: the first defendant-the bus owner; the 2nd defendant-the bus driver and the insurance company with which the bus was insured, jointly with the owner of the truck, the applicant in this review, driver and the insurance company with which the truck insured.  The truck driver defended liability on the basis that the criminal court has cleared him of negligence.  The plaintiffs brought this review to the Supreme Court.  The Supreme Court drew a differentiation between the criminal liability under

---

[13] *Adminstratrix of Costas Zis v. German and Swiss Engineering and Construction Company and Phoenix Assurance Company* (SLJR, 1960), 141.
[14] *Blue Nile Construction Corporation v. Ikhlas Elasadig Dao Elbait-Supreme Court*, Sudan Law Journal Review (2000), p129. Quoted also in Obaid, page 46.

the Traffic Act 1983 and the tortious liability under the CTA and held him liable for tort. Three main principles were recognized from this case: (i) the criminal acquittal is no bar for a civil claim for tort; (ii) the application of section 151 CTA in relation to the joint tortfeasors; and (iii) the application of the objective approach of basing liability on damage.

58.     In sum, liability to compensate is a key principle that flows throughout the CTA and must be considered as part of any discussion of liability under the Act. Sudanese law starts from the proposition that where there is damage, there must be liability. Substantive provisions in the CTA are always interpreted in a manner that is consistent with this proposition.

## Causation and Compensation

59.     Section 138 CTA refers to causation between the act and the injury. Causation is not limited to situations where the actions directly caused the injury. The CTA recognizes vicarious and secondary liability.

60.     I agree with the Hassabo Declarations about the broad relevance of causation in tort. Causation is a staple element of common law torts, yet the operation of the CTA does not require causation to give effect to the "liability to compensation for injury" principle. That is because causation and compensation are distinct under Sudanese law.

61.     I agree with the Hassabo Declaration (¶33) that causation under Sudanese common law recognizes the "substantial factor" formula. However I disagree and take issue with the reference to section 152 CTA, which indeed says nothing about causation and certainly does not restrict tort claims to injuries that are (only) "direct." In fact, section 152 CTA is not about causation but about assessment of <u>compensation</u>. Liability to pay compensation does not determine causation: it may be due even where causation is not established if the "compensation for injury" principle is to be given full effect.

62.     Section 152 provides:

*Assessment of compensation*

*152. The court shall assess the compensation as to such extent of injury, as may have affected the injured party and such earning, as he may have lost, giving due regard to the surrounding circumstances, and on condition that such injury, as may have affected the injured person shall be the natural consequences of the tortious act. Were it not easy therefore to finally assess the amount of compensation, it may preserve for the injured person the right to claim the revision of the assessment within a fixed period of time.*

63.     Equally the concept of "natural consequence" is only relevant to the assessment of compensation, not causation.   Even in that context of compensation, the "natural consequences" formula is not absolute but qualified by the phrase that the Courts, when awarding compensation should give "due regard to the surrounding circumstances." The concept of "natural consequences" must be understood in the context of the factual and circumstantial setting for each case.   In other words, a Court may decide to assess compensation more permissively, giving regard to the specific settings of the case.   The "natural consequence" formula gives Courts greater discretion to order compensation even when the rules of causation may not have been fulfilled.

64.     As another indicator of the compensation for injury principle, Sudanese law provides for judicial discretion about the method of compensation other than lump sum payments, to include payments by installment, payment by kind, or the provision of security. [15] For example, in a case where the defendant is ordered to pay damages but is destitute, a Court has the legislative authority by interpreting the compensation principle to order security over a certain amount of future income (e.g. a proportion of harvest, salary, or business profits). Thus the law seeks to find compensation where it is due in any form.

65.     While of course I recognize that Sudanese common law distinguishes different degrees of negligence between tortfeasors (which will be discussed under a separate section regarding "direct and indirect tortfeasors" below), there is nothing in the CTA, or Sudanese common law, that restricts causation to only those situations where injury was caused directly.   If correct, such restriction would eliminate all possibility for actions founded on vicarious liability or other secondary liability principles which are underlined expressly recognized by the CTA: section 163 concerns vicarious liability, and section 161 concerns personal, occupational and professional liability.

66.     Indeed as I observe above, the significance of the liability to compensate principle is to relax, rather than to restrict, the rules on causation.  This can be seen through a seminal case from Sudanese common law.  In the *Blue Nile Construction Corporation v. Ikhlas Elasadig Dao Elbait-Supreme Court Case*, a claimant successfully established liability under section 151 CTA but failed to establish causation.  That is because the CTA reflects Shari'a goals of availing redress and removal of injury, which is a cornerstone of Islamic civil liability.  On the removal of injury basis for establishing liability, causation is not always required.  Commenting on *Ikhlas Case*, Professor Obaid stated that "*the defendant in the case of objective liability is liable irrespective of any fault from his part, as long as the damage is a result of his activity.  The defendant's success in*

---

[15] Section 154 (2) CTA

> *rebutting the fault, or in proving an alien cause does not therefore help, as the liability is (strict) in this case.*"[16]

67.    This is particularly pertinent to the allegations made in the Complaint, where liability can arise for the indirect infliction of injury.   Similar situations can be found in respect of injury caused by environmental factors such as pollution.   Under Shari'a law, and as reflected in section 138 CTA, the emphasis is to remedy the damage through compensation. Damage is always a matter of fact, to be proved by all evidential means.

68.    Several jurists have sought to reconcile the proper position of causation (as understood by the common law) in the context of (often complex) torts adjudicated using Shari'a principles.   This area of the law is still developing, where most cases are decided through public policy or other rules of interpretation to give effect to the Shari'a principles.   A prominent jurist Dr Elsanhouri has even suggested that in such situations causation may be treated as a rebuttable presumption.   He stated "*the exceptions imposed by law are rebuttable presumptions of causation.   If the law establishes a rebuttable or irrebuttable presumption of fault, it also establishes a presumption of causation, which is always rebuttable*".[17]

69.    Another commentary on the objective liability approach from Professor Obaid, the Former Chief Justice is instructive: "[T]he rapid economic development of the 20th century had major impact on the development of tortious liability.   The industrial and technical development; coupled with advanced communication and transportation means, meant that the risk of using these innovations has become greater than it was in the past.   This meant the prominence of the (damage) element of the tortious liability over the (fault) element.   The standard has therefore become an (objective) where the wrongdoer is held liable on the basis of the public interest's considerations rather than a personal one, where the wrongdoer is held liable on the basis of his personal fault."[18]

70.    In a related context of explanation that liability may not always require the showing of causation, Dr Sarour has also observed that "*if a plaintiff proves the existence of a tortious act and the presence of damage, a presumption of causation arises in his favour which shifts the burden of proof on to the defendant to prove the lack of causation between the damage and the tortious act…[I]f the liability is based on a presumed fault, then a presumption of causation arises in addition to the presumption of fault.   To rebut the presumption of causation, the tortfeasor*

---

[16] *Obaid*, p. 46.
[17] Abdelraziq Elsanhouri, *Alwaseet in Interpreting the Civil Code, part 1* (7th ed. 2007).
[18] Obaid, pp. 44-45.

*will be required to prove the existence of an independent cause. These situations most typically arise in cases where injustice must be avoided.*"[19]

71.     In this respect, a departure from classic requirements of causation can also be seen in the landmark case of the United Kingdom Supreme Court (then known as the House of Lords), *Fairchild v Glenhaven Funeral Services Ltd*[20]. The *Fairchild* case is a classic case on tort in the English common law and would be considered persuasive in Sudanese courts also. It stands for the broad proposition that the orthodox approach to proof of causation can be relaxed to avoid an injustice, explained by the *Fairchild* court an outcome that would be "deeply offensive to instinctive notions of what justice requires and fairness demands."

72.     In summary, I disagree with three aspects in the Hassabo Declaration about the causation under Sudanese law. First, he does not address the cardinal principle of compensation for injury. This principle can lead to liability to compensate even where causation is not present. Second, the very presence of CTA sections on direct and indirect tort liability undermines Mr Hassabo's analysis that causation can only be established through a direct act causing the injury. This is incorrect: if this were true, there would never be causation for indirect acts. Third, I disagree that the "substantial factor" test of causation is satisfied only where injury is a "natural consequence" of the defendant's actions. It is not correct to see consider "natural consequence" as part of causation. "Natural consequences" is only relevant to assessment of compensation, not causation. Liability to compensate can arise even where causation is not present (see above).

## Direct and Indirect Tortfeasors

73.     Though Mr Hassabo is correct in stating that the CTA does make some distinction between direct and indirect tortfeasors (Hassabo Declaration ¶41), he is incorrect in stating that this concept forecloses liability for BNPP under the CTA.

74.     Section 5 of the CTA contains some limited language that distinguishes between direct and indirect tortfeasors. Specifically, Mr Hassabo relies on subsections 5(t), 5(u), and 5(v):

        *The basic rules for application of the [CTA]*

---

[19] Dr. Mohamed Altayeb Sarour, *Rules of Tortious Liability Under Sudanese Law* (Sudan Currency Printing Company, 2016), pp. 160-161.
[20] [2002] UKHL 22, [2003] 1 AC 32

*5. Without affecting the generality of the provisions of Section 3, the following general principles shall be the basic rules for applying the provisions of the [CTA]: -*

*...*

*5(t) He who does an act directly is liable for it even if it is done unintentionally;*

*5(u) He who commits an act indirectly is not liable for it unless it is done intentionally ;*

*5(v) If the direct doer of an act and the one who causes it indirectly act jointly only the former shall be liable for it'*
*...*

75. Section 5, which is comprised of 25 subsections, incorporates certain Shari'a principles into the CTA. However, none of the subsections create new positive obligations or override the common law or other substantive provisions of the CTA. As such, I disagree with Mr Hassabo who grounds his analysis on these sections, thereby ignoring Sudanese principles of legal interpretation.

76. In Sudan, the interpretation of legal provisions is set forth in the Interpretation of Statutes and General Clauses Act, 1974. Section 6 of this Act provides:

- Section 6(1): "*the preferred interpretation of any statute is the one that achieves the objective of its enactment*"; and

- Section 6(4): "*Any special law or any special provision in any law in respect of any matter shall be deemed an exception to any general law or general provision in any law governing such matter*".

77. As stated throughout, the purpose of the CTA is to ensure that where there is damage, there is liability to compensate. Reading subsections 5(t), 5(u), and 5(v) of the CTA in the manner of the Hassabo Declaration would contravene that principle. Furthermore, section 6(4) of the 1974 Act establishes that *specific* provisions of the CTA act as an exception to *general* provisions of the CTA. The substantive provisions of the CTA, including section 138, are such specific provisions that trump the more general provisions of section 5.

78. The sections of the CTA pertaining to its interpretation concur with this analysis. Section 3 CTA provides:

*Interpretation*

> *3. In applying the provisions of this Act, interpreting the words and phrases, set out therein; and also in cases not provided for by any law, the courts shall be guided by the principles of Sharia, and follow the rules provided for in the Judicature (Origins of Judgments) Act, 1983.*

79.    Section 819 CTA concurs with 6(4), providing: "precedence should be given to private (specific) laws, and the general principles and provisions of this law should be based on them as that is provided for."

80.    Even a subsection of 5, z, states: "*No independent judgment of interpretation shall be allowed in cases where there is express law on issue.*" Thus interpretation principles cannot introduce the requirement of intent in tort because it would override express law, which is silent about intent.

81.    Although section 5 CTA refers to the "basic rules of application of the CTA", section 6 CTA refers to the "basic rules for passing judgments":

> *Basic Rules for Passing Judgments*
>
> *6. Upon passing any judgment in application of the provisions of this Act the courts shall be bound by the following basic rules:*
>
> *(a) rights shall be restored and injustice shall be prevented;*
>
> *(b) Damage caused in the process of recovery of rights and remedying injustice shall be removed...*

82.    Section 6 CTA reinforces the statutory objective of the CTA by providing for "*removal of injustice and recovery of rights whoever they belong to, when issuing any judgment under this act.*"  As observed above, the perspective of Islamic jurisprudence is to compensate damage sustained irrespective of external factors such as capacity.  There is no precedent to suggest that subsections 5(t), 5(u), and 5(v) can displace this principle.

83.    Mr Hassabo also appears to recognize the limits of relying on section 5 as a substantive obligation because he states at ¶41 that these principles go no further than having potential relevance ("*could be applicable*" to the secondary allegations in the Complaint) (emphasis added); and describes in footnote 12 a methodology of looking not at the operation of these sections in Sudanese law but at the JJJ which has no direct application in Sudanese law (see paragraph 33 of my Declaration).

84.    As explained in Part II of my Declaration, the persuasive value of foreign law sources for Sudanese law, including legal scholarship, is also debatable given the complex political history shaping Sudanese law.  I will therefore refer to Sudanese legislation in so far as possible to explain the

20

position in this area, supplemented by Sudanese jurists' statements where available.

85.    Having explained generally, why the subsections Mr Hassabo relies on do not supersede the more specific sections that impose liability, I now turn to other issues relating to direct and indirect liability.

## Subsections 5(t), 5(u) 5(v) in conjunction with 5(z)

86.    The Hassabo Declaration only discusses sections 5(t), 5(u) and 5(v) CTA but overlooks the potential significance of section 5(x). and 5(z). Subsection 5(x) states, "*Whoever exercises his right in an illegal manner shall be liable for compensation*" and subsection 5(z) states: *No independent judgment of interpretation shall be allowed in cases where there is express law on issue.*"  I turn to each of these in turn.

## Intent

87.    Subsections 5(t), 5(u), and 5(v) contain the only references to "intent" in respect of torts, and "direct" and "indirect" distinctions within the entirety of the CTA.  None of the substantive provisions on tort within the CTA refer to intent, namely:

- Section 138 CTA regarding the elements of torts;
- Section 152 CTA regarding assessment of compensation in torts; and
- Section 153 CTA regarding torts causing moral injury.

88.    In my opinion, it is instructive that the substantive provisions of the CTA were drafted without the introduction of a requirement of intent.  Indeed it would be surprising if intent were included as it is not a common element of torts and does not feature in Sudanese common law.

89.    There is thus a conflict between substantive provisions of the law (which do not include intent) and the general provisions of section 5 (which includes intent).  When such conflicts arise, Sudanese law would look to the interpretative provisions within the Act presenting a conflict, and to other statutory provisions.

90.    In light of the interpretative principles laid out above, in my opinion, a Sudanese court would more likely look to the substantive provisions of the CTA, including section 138, which has broad elements regarding the culpability of an actor who causes injury to another and does not require a showing of intent, than rely on the general provisions of subsection 5(t), (u), and (v).

**Joint Tortfeasors**

91.   As with "intent," the distinctions made in subsections 5(t), 5(u), and 5(v) between "direct" and "indirect" actors must also be recognized as general provisions only.  No substantive CTA provisions refer to the concept of directness.

92.   As explained throughout, Mr Hassabo errs in reading these subsections to require directness for a finding of liability (Hassabo Declaration ¶¶ 52 – 54). If the concepts of direct and indirect actions set forth in sections 5(t), 5(u), and 5(v) are followed, it would undermine express provisions that provide for joint tortfeasor liability, which covers situations where different tortfeasors contribute to damage in different proportions without reference to the concept of directness.

93.   Section 151 CTA is an example of an express provision, which, on Mr Hassabo's interpretation, would be contravened by section 5 (which, as explained above, is prohibited).  It provides:

*Joint tortfeasors*

*151.(1) Where whoever may be liable for the tortious acts of others are several, they shall jointly be liable for compensating the injury.*

*(2) Liability between joint tortfeasors shall be equal unless the court has specified the respective share of each of them in the compensation.*

*(3) The provisions of sub-section (1) and (2) shall apply to all types of tortious acts, including personal, occupational and professional liability, provided for in Chapter V, hereof.*

94.   For section 151 CTA to be engaged, each tortfeasor must commit a tortious act.  It need not be the same act but must contribute to the same injury (for which compensation is due) so long as one of the acts is not a *novus actus interveniens.*

95.   This section has yielded a robust body of cases including those on economic torts.[21]  The principles arising from these cases show *inter alia*, that:

- it is not necessary to have a prior agreement between tortfeasors to establish joint liability;

---

[21] Dr. Badria Abdelmoniem Hassouna, *Interpretation of The Rules of Civil Liability under Sharia Law and the Sudanese Civil Transactions Law 1984* (Supreme Court Judge, 2011), pp. 105-107.

- joint tortfeasors are not required to bear equal liability for the wrongful act, as the act of one might be slighter or graver;

- the wrongful acts do not need to be of the same type. The tortious act could be independent for each tortfeasor, such as the case of two factories causing nuisance to the neighborhood. While the noise of one of them might be tolerable by the neighbours, the joint noise is not.

- the acts could also be different in nature as one of them could be criminal and the other civil.[22]

96.  Section 147 CTA is another provision that would be undermined by Mr Hassabo's interpretation. This section concerns the right of one joint tortfeasor to claim compensation in full from the other joint tortfeasor. This is known as the "right to revert." The section states: *"Whoever may be liable for the acts of others shall have the right to revert with such* <u>*compensation, as he may have paid, for the injury caused by such others.*</u>*"* (emphasis added).

97.  In this regard Dr Elsanhouri says, "*The injured party, based on the principle of joint liability is free to choose one of the wrongdoers to satisfy the compensation from, as long as the wrongdoers jointly, by their act or omission, have caused the damage.*"[23]

98.  I fundamentally disagree with the tenet of discussion in the Hassabo Declaration (¶54 – 58) where subsection 5(v) is treated to modify the normal rules on liability so that in situations where direct and indirect actors have contributed to damage "<u>*only the direct actor shall be liable.*</u>" Mr Hassabo supports this proposition with a source on the interpretation of The Rules of Islamic Jurisprudence, which has no direct bearing on Sudanese law. The discussion of the *Naiyma Case* also does not provide authority as the context was specific to land title registrations. Given the prevalence of conflicts in Sudan, many of which include land title questions resulting from forced evacuations, this decision is widely considered to have been decided on public policy grounds. Indeed it appears that the *Naiyma* court specifically clarified the discretionary effect of section 5. The learned Judge referred to section 5 as "*general principles…As such, they are considered as public policy which this court has the right to invoke.*"[24] Lastly, I note the *Naiyma* case has not been applied in any cases concerning physical or economic torts, which are relevant to the Plaintiffs' case.

---

[22] Dr Badria above, pages 105-107

[23] Dr. Abdulraziq Elsanhouri *Interpretation of New Civil Law (*Alhalbi Press, Beirut, 2000), vol 1 part 2, p1048.

[24] *Omburman Land Registry v Naiyma Ismail Hassan* (SLJR, 2009), p129.

99.     Furthermore, if the proposition advanced by Mr Hassabo that "only the
        direct actor shall be liable" was correct, it would render nugatory
        the express CTA provisions on joint tortfeasors (as only the direct actor would
        ever be liable).  But ample situations in Sudanese common law capture
        torts where the degree of negligence differs among tortfeasors – e.g.
        multiple vehicle collision situations, insurer/claimant cases, nuisance
        cases; several such cases are recited below.

100.    The entire basis of section 147 CTA (Right to Revert) would also be
        rendered nugatory.  This section contemplates recovery for compensation
        paid in respect of injury "caused by others."  This section is often invoked
        in cases where claimants chose, for any number of reasons (but typically
        for 'deep pockets' reasons), to pursue a claim against a specific party but
        not all of them.

101.    By way of example, select cases may be examined.  In *General Motor
        Insurance Company v Saeed Hassan*[25], the Supreme Court decided that in
        cases of joint and several liability, there is nothing that prevents rendering
        a verdict against the owner of the car without a decision against the driver
        as long as the accident is proved; it is not important for the driver to be a
        party to the claim.  The defendant in this case was hit by the plaintiff's car,
        which was driven by the driver.  He brought a direct compensation claim
        against the plaintiff.   The Court of First Instance awarded him a
        compensation of 5000 pounds for the injuries he sustained.  The plaintiff
        appealed to the Supreme Court, which dismissed his appeal.  The court
        affirmed the findings of the Court of Appeal that the significance of the
        case of *Khartoum Municipal Council v. Michel Cotran*, is that it sets out
        the principles that each case has to be tried on the basis of its
        circumstances so it is no defence against a claim that another tortfeasor
        could have been sued instead.

102.    Concurring with Dafalla Alradi, J, Abdalla Alamin, J., stated, "*I concur
        with the determination of the learned Judge, Dafalla Alradi, and add that
        this court had in past allowed the claimant to sue the insurance company
        directly, without the need to sue the tortfeasor, as long as the damage has
        occurred to the claimant.*"[26]

103.    In the case of the *General Insurance Company v. Alsharief Alshaikh
        Ahmed Norain,* the Supreme Court differentiated between vicarious
        liability and the joint tortfeasors situation by confirmed that, the master, in
        the case of vicarious liability, has no role in the damage or injury or the
        fault, while in cases on joint tortfeasors the master is liable for the
        damage.  The court also confirmed that the liability of the master can only

---

[25] General Motor Insurance Company v Saeed Hassan, (SC/CA/1977/259)
[26] *Ibid*

be established when the liability of the servant is established, but nothing prevents suing the master directly.[27]

104. In the case of *Sudan Insurance Co. Ltd v. Shama Mohamed Baseer*,[28] the Supreme Court decided that in accordance with article 64 of the Civil Procedures Act, in the event of several respondents, where one or more attended, while one or more were absent, the court shall proceed with the trial of the case and pass one verdict against all respondents, present or absent.

105. In conclusion, the controlling sections of the CTA do not distinguish between direct and indirect tortfeasors.  Either party can be liable for the injury.

## Subsection 5(x) and the lawful exercise of rights (sections 28 and 29 CTA)

106. Mr Hassabo argues that because BNPP's "provision of financial services to Sudanese banks constitute[d] 'lawful exercises of right' under Sudanese law," it "would not be held liable vis-à-vis Plaintiffs in a Sudanese court." (Hassabo Declaration ¶ 73).  This conclusion is incorrect because Mr Hassabo does not properly consider whether BNPP's actions were legal under the Regulation of Banking Transactions Act, 2004.  Mr Hassabo also failed to consider whether BNPP's falsification of business records made its actions unlawful.

107. The CTA contains a number of provisions relating to the lawful exercise of rights.  Section 28(1) CTA provides the general rule: "*Lawful exercise negates liability; thus whoever lawfully exercises his right shall not be liable even when damage ensues from that exercise*".  Section 28(2) CTA expressly provides that the exercise of right does not extend to causing damage to others, and affirms the objective of the CTA of achieving justice and removing damage: "*No injury and no prejudice; and injury shall be removed*".  Section 28(3) further affirms, "*Prejudice shall not abolish the right of others*." Section 28(5) provides, "*Public injury is repelled by private injury; and the most grievous by the slightest*".

108. Section 29 CTA encompasses four exceptions to Section 28 CTA:

*Abuse of right*

*29. (1) Redress shall be upon whoever unlawfully uses his own right.*

*(2) Use of right shall be unlawful in the following cases, where:*

*(a) the intention to assault is present;*

---

[27] General Insurance Company v. Alsharief Alshaikh Ahmed Norain, (SC/CA/1976/509)
[28] Sudan Insurance Co. Ltd v. Shama Mohamed Baseer (SC/CA/91/1984)

*(b) the benefit expected from the act is illegal;*

*(c) the benefit thereof is not proportionate to such injury, as may be*

*caused to the others;*

*(d) the same exceeds custom and usage.*

109.    Subsection 5(x) discusses the exercise of rights but from the perspective of the illegal exercise of rights.  Specifically, it says: "*Whoever exercises his right in an illegal manner shall be liable for compensation.*"  The Hassabo Declaration does not engage with subsection 5(x), though it is relevant to the discussion of the purported lawful exercise of rights under sections 28 and 29 CTA.

110.    Under the CTA, if a party lawfully exercises its rights, it is not liable for any injuries that result from that exercise.  However, if the party unlawfully exercises its rights *or* the exercise falls into one of the four exceptions set forth in section 29 CTA, then the party can still be liable.

111.    Mr Hassabo argues that BNPP lawfully exercised its right under section 13 of the Regulating Banking Transactions Act, 2004 ("**RBTA**") (Hassabo Declaration ¶ 62).  This argument is incorrect as the Act does not apply to BNPP.

112.    The RBTA applies to any bank, which is defined in section 4 RBTA as, "*any company, registered under the provisions of the Companies Act, 1925, or an institution, or corporation, established by law, <u>or any foreign bank, licensed to practise banking business, under the provisions of this Act.</u>*" (emphasis added).

113.    BNPP could only come within the remit of banking practice in Sudan if it held a licence under section 5 (1) RBTA and by going through the registration process under section 10 (1) of the same Act.

114.    Section 5 (1) RBTA provides: "*No person shall practice banking business, or any part thereof, in the Sudan, unless he is in possession of a final written licence, issued under the provisions of the Bank of Sudan Act, and this Act, and satisfies all the conditions, provided for in the licence, this Act and the regulations made thereunder.*"

115.    Section 10 (1) RBTA provides for the procedures of opening a foreign bank branch in Sudan: "*No foreign bank shall open a branch in the Sudan, for practice of banking business, save after obtaining a licence, from the Bank, and remitting such amount, as the Bank may specify for this end, to the Sudan….*"

116.    Mr Hassabo put forward no evidence showing that BNPP satisfied the requirements of the RBTA.  Nor could he as, based on my own research, BNPP has not registered as a bank branch in Sudan.  Therefore, the basis of lawfulness of its conduct under Sudanese law applied in the Hassabo Declaration (¶62) is wrong.  As BNPP is neither a Sudanese bank, nor a foreign bank registered under Sudanese law, it has no rights that it can "lawfully" exercise under section 28(1) of the CTA or sections 5 and 13 RBTA.

117.    In my opinion, not only can't BNPP avail itself of the presumption of lawfulness under RBTA, its conduct offends other specific provisions of Sudanese laws, especially section 29 as assisted by subsection 5(x) CTA.

118.    BNPP cannot rely on the purported lawful exercise of its *contractual* rights either.  That is because it entered into a contract that was in purposeful disregard of the laws applicable to it (sanctions), but also because it knew or should have known through the aim of the sanctions that the scheme for which GOS utilized vital funding would cause atrocities of the types made in the Complaint.

119.    Furthermore, I note that according to the Factual Statement of the Settlement Agreement between the U.S. Department of the Treasury's Office of Foreign Asset and BNPP signed on June 28 and June 30 2014, BNPP admits to having engaged in systematic practices involving concealing, removing, omitting, or obscuring references to, or interest or involvement of parties in violation of law and banking practices.  According to the New York District Attorney's Office Plea Agreement dated 27 June 2014, BNPP pled guilty to one count of Falsifying Business Records in violation of the applicable laws of New York.

120.    Although it is not necessary to be established independently in the Sudanese courts to find that BNPP did not exercise its contractual rights lawfully, it is noted that transactions involving forgery or falsification of records (irrespective of the object of the transaction) are also crimes under section 122 and 123 of the Sudan Criminal Act 1991 which provides that any person who commits this crime will be sentenced to a maximum imprisonment of 5 years or must pay a fine.

121.    Sudanese courts have held banks that are involved in acts involving falsification of records criminally liable.  An example is the *Neilain Bank Case*.[29]  The bank admitted to committing acts and presenting fraudulent documents about the amount stated in receipts that were not deposited.  The court held the bank was criminally liable as the act of falsification contravened banking laws.

---

[29] Cited in Dr Badria, p. 172

122. In the case of *The Sudanese Gharb Islamic Bank*,[30] the Supreme Court decided that the Sudanese Gharb Islamic Bank was responsible for all tortious acts committed by its officer, as the customer originally deals with the bank and not the officer. The bank was therefore held liable because it breached banking laws, as it did not credit the customer's deposits to his account.

123. Thus, independent of the question whether the contract itself was lawful, the very act of falsification of business records about the contract would be unlawful under Sudanese law. No civil right can exist where a crime has been committed: BNPP cannot rely on section 28 CTA because it did not exercise its contractual rights lawfully.

124. Additionally, BNPP's conduct well exceeded the custom of banking activities, which would come under a specific contravention of section 29(2)(d) which renders a right unlawful if it exceeds custom and usage. This is because BNPP assisted the Government of Sudan in a way that neither the Central Bank nor any other commercial bank in Sudan could have done in the face of economic sanctions. For example, Sudanese banks, at the height of their weakness, circulated a notice to their branches informing them that many international banks had closed their accounts in compliance with economic sanctions, and that monies involved in any foreign transaction would be confiscated or forfeited.[31]

125. As BNPP cannot rely on the lawful exercise of rights exception, it would be liable under the substantive section on tort - 138 CTA - as discussed above. The auxiliary principle in subsection 5(x) yields a similar result: "*Whoever exercises his right in an illegal manner shall be liable for compensation.*"

126. In summary, BNPP is a foreign bank that has unlawfully provided banking business and financial services to the GOS. The exercise of right under section 28 (1) is not "lawful" unless it satisfies two conditions: (i) being in accordance with the law and (ii) does not cause damage to others or their properties. In my opinion if it were to seek to rely on section 28, BNPP would fail on both fronts. First, its conduct of falsification of records was not in accordance with US laws and would not be in accordance with Sudanese laws either. Moreover, the object of the contract was unlawful, as BNPP's performance under the contract entailed participation in a scheme which caused damage to people and property as detailed in the Complaint.

127. Furthermore, premeditation and (criminal) intent to commit falsification of records to obfuscate the breach of sanctions would also be factors of

---

[30] Cited in Dr. Badria, p. 170
[31] A Circular issued by the Farmer Commercial Bank to its branches (No 11/2011)

evidence for establishing BNPP's liability for compensation of injury under section 138 CTA.   Under section 151 CTA, it would also be evidence of its role as a joint tortfeasor. As discussed below, it could also be seen as evidence of the tort of a conspiracy to do an unlawful act. The auxiliary subsection 5(X) yields harmonious interpretation as he who breaks the law cannot exercise his rights lawfully and shall be liable for compensation.

## PART IV

## Summary of Claims against BNPP under Sudanese Law

## Tort of Negligence under sections 138, 147, 151 and 154 CTA

128.   In Sudan, civil liability can be based on negligence whenever there is a duty of care not to be negligent between the defendant and the plaintiff, and a breach of this duty that causes damages to the plaintiff.   The duty can therefore be classified in two categories:

- Special duty of care imposed by certain laws or regulations (statutory negligence).
- General duty toward public at large when you exercise reasonable care not to harm others.   This is judged by standard of prudence of an ordinary man.

129.   Section 138 of the CTA provides for this general duty of care.   It imposes a duty not to cause damage and to compensate for any damage.   Sections 28(2) and the general principles in 5(a) also provide for the same. Negligence also arises in breach of section 151 of the CTA in case of joint tortfeasors and under section 153 of the CTA in case of moral injury. Section 147 CTA allows for recovery against any tortfeasor.

130.   For all the reasons stated above, on examining BNPP's actions, the case law on negligence, and the position of leading jurists, I am of the opinion that Sudanese law would recognize a cause of action for negligence by the plaintiffs against BNPP.

## Tort of Conspiracy to do an Unlawful Act under Sections 138, 151 and 154 CTA, Sudanese common law and section 122 and 123 of the Sudan Criminal Act 1991

131.   The elements for discussion of torts under the section "Negligence" above are repeated.

132.   In addition, falsification of records about a contract, or proceeds of a contract which includes the GOS as a counterparty engages Sudanese law. On the admitted facts of BNPP's falsification of records, the Sudanese

courts would likely also find the commission of a crime for falsification of business records under section 122 and 123 of the Criminal Act 1991.

133. Falsification could be seen as evidence of a (civil) conspiracy to participate in the scheme arising from the transactions between BNPP and GOS. The entire purpose of the economic sanction was to stifle the ability of the GOS to carry out atrocities of the kind described in the Complaint. BNPP does not deny knowledge of the existence, or the purpose of the economic sanctions. BNPP's falsification could thus be evidence of its awareness that the proceeds of the contract in which it was a party would be deployed for unlawful means.

134. As stated above, an unlawful act is basis of civil liability in tort for which liability to compensate is due.

135. A common law conspiracy to do an unlawful act requires showing;[32]

(i)     A common agreement or understanding on a course of action between two or more parties;

(ii)    Either intent to act unlawfully or intent to injure an innocent party;

(iii)   An over act by one or more of the parties in furtherance of the common agreement; and

(iv)    Damage to that party.

136. In the case of *First Subsea Ltd v Balltec Ltd and others [2014] EWHC 866 (Ch)*, which would be persuasive in Sudanese courts, the UK High Court held that a party does not need agreement that the relevant acts or "means" are unlawful to incur liability for unlawful means conspiracy. The evidence of BNPP's falsification of records (which is in itself a crime) could infer awareness of the illicit nature of the transactions that the contract enabled, causing damage.

## Unjust Enrichment under sections 164 and 165 CTA

137. Section 164 (1) of the CTA provides for unjust enrichment claims against "others" who are unfairly enriched at the expense of others, including minors, provided that the defendant's enrichment was without lawful

---

[32] Although the tort of conspiracy has not received much judicial treatment in Sudanese court, the tort is provided for by section 138 CTA and section 151 CTA. The elements of the tort are set out in Butterworths at [ 29.68] – [29.71]. The tort of conspiracy exists widely under English law and would be persuasive as part of Sudanese Common law.

cause.  The term "others" includes legal as well as natural persons for the purpose of this section.  Specifically, section 164 provides:

*"Without prejudice to any criminal proceedings that may be taken, any person, even a non-distinguishing minor, who is enriched at the expense of others, without lawful cause, or who, at the time of the promulgation of this Act, has enriched himself at the expense of others, shall within the limits of such as he may have enriched, compensate such other person for such loss, as has been caused to him.  Such obligation shall remain, even though the enrichment has subsequently been removed, or the relationship between the enriched person with others has terminated, or the enriched person dies."*

138.    It is clear that section 164 adopts a holistic approach to unjust enrichment.  The following aspects of the section are relevant to the instant dispute:

*First*:  The broad remedial provisions, such as the fact that even minors can recover, reinforces the fact that section 138 CTA does not require mental capacity to impose compensation on the tortious actor.

*Second*:  Section 164 provides that the injured party cannot recover more than the amount by which the injured party was unjustly enriched.

*Third*:  It also maintains the injured party's right to pursue criminal cases without prejudice to the right to compensation.  This enables the plaintiffs to bring cases under section 164 of the CTA without prejudice to any case that they bring against BNPP under any other cause of action.

139.    According to section 165 of the CTA, the enrichment is deemed to be unlawful if it results in extorting the money from another, obtaining it through a void contract, or in contravention of the law.  The admission of BNPP to falsifying financial records in order to undertake financial transactions renders financial contracts between BNPP and GOS void.  Profits resulting from these transactions will be deemed to be "unlawful" and therefore constitutes "unjust" enrichment under sections 164 and 165 of CTA.

## All claims enhanced by Constitutional Claims

140.    The GOS has a constitutional duty is to protect citizens - especially people hailing from specific backgrounds.  It is my understanding that Plaintiffs hail from such backgrounds.   The Constitution 2005 provides the following rights to Plaintiffs: (1) personal liberty under Article 29; (2) equality before law under Article 31; (3) sanctity from torture under Article 33; (4) right to resort to litigation and access to justice under

section 35; and (5) right to develop particular culture, customs and beliefs under section 47.

141.    In the First Hassabo Declaration, at paragraph 74, Mr Hassabo listed the president of Sudan's constitutional rights under various sections, including declaring war and a state of emergency.  However, the case of *Khartoum Municipal Council v. Michel Cotran* established the duty of care that governmental agencies have to discharge by deciding that statutory authority conferred to the council cannot be invoked to deprive the defendants from their right to stop the damage and seek redress.  It is similarly true that the president's authority cannot deprive the plaintiffs from their legal and constitutional rights under the provisions highlighted in this section.  The acts of the government of Sudan are therefore illegal and infringe the plaintiff's constitutional legal rights.

## SUMMARY AND CONCLUSIONS

142.    Having considered the facts of this case, the relevant substantive and procedural laws, judicial precedents, and opinions of learned jurists, I conclude that Plaintiffs have stated facts sufficient to sustain causes of action under the laws of Sudan.  These causes of action include: (1) tort of negligence (2) tort of conspiracy; and (3) unjust enrichment.

143.    I reserve the right to amend or supplement my Declaration.

32

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 22nd day of May, 2017.

Nagi-Idris