18-1304-cv
*Kashef v. BNP Paribas S.A.*

N.Y.S.D. Case #
16-cv-3228(AJN)

# In the
# United States Court of Appeals
## For the Second Circuit

_____

August Term 2018

No. 18-1304

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: May 22 2019

ENTESAR OSMAN KASHEF, ALFADEL MOSABAL, ABUBAKAR ABAKAR, SIAMA
ABDELNABI HAMAD, ABBO AHMED ABAKAR, HAWA MOHAMED OMAR, JANE DOE,
NYANRIAK TINGLOTH, REVEREND ANDERIA LUAL, NICOLAS HAKIM LUKUDU,
TURJUMAN RAMADAN ADAM, JOHNMARK MAJUC, JOSEPH JOK, HALIMA SAMUEL
KHALIFA, AMBROSE MARTIN ULAU, SANDI (SUNDAY) GEORGARI MARJAN, SHAFIKA
G. HASSAN, JANE ROE, JUDY DOE, SARA NOURELDIRZ ABDALLA, and AMIR AHMED,

*Plaintiffs-Appellants,*

v.

BNP PARIBAS S.A., a French corporation, BNP PARIBAS NORTH AMERICA, INC., a
Delaware corporation, DOES 1–10, and BNP PARIBAS S.A., NEW YORK BRANCH,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Southern District of New York
No. 16-cv-3228, Alison J. Nathan, District Judge, Presiding.
(Argued December 12, 2018; Decided May 22, 2019)

1

CERTIFIED COPY ISSUED ON 05/22/2019

18-1304-cv
*Kashef v. BNP Paribas S.A.*

Before:   SACK, PARKER, and CHIN, *Circuit Judges.*

Defendants were convicted of federal and state felonies arising from their evasion of U.S. sanctions on Sudan. As Defendants admitted in pleading guilty, they had knowledge of the genocide and ethnic cleansing being perpetrated by the Sudanese regime and the consequences of providing the regime access to additional financial resources, which could be used to escalate the commission of atrocities. Nevertheless, Defendants illegally transacted with sanctioned entities and actively attempted to evade U.S. detection, thus providing the regime access to U.S. financial markets. Plaintiffs, victims of the Sudanese regime's atrocities, sued Defendants under New York tort law, alleging that Defendants conspired with and aided and abetted the Sudanese regime in its commission of widespread atrocities. The United States District Court for the Southern District of New York (Nathan, *J.*) dismissed Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6), reasoning that they were barred by the act of state doctrine and, in the alternative, were untimely. We **VACATE** and **REMAND**.

————

TOBIAS BARRINGTON WOLFF, University of Pennsylvania Law School, Philadelphia, PA (Kathryn Lee Boyd & Thomas B. Watson, McKool Smith, PC, Los Angeles, CA, *on the brief*), *for Plaintiffs-Appellants.*

CARMINE D. BOCCUZZI, JR. (Jonathan I. Blackman & Avram E. Luft, *on the brief*), Cleary Gottlieb Steen & Hamilton LLP, New York, NY, *for Defendants-Appellees.*

————

2

18-1304-cv
*Kashef v. BNP Paribas S.A.*

1    BARRINGTON D. PARKER, *Circuit Judge*:

2       Defendant BNP Paribas S.A., a French corporation, is the parent company

3 of various BNP Paribas subsidiaries across the world, including the other named

4 Defendants in this action (collectively "BNPP"). BNPP is a global leader in

5 banking and financial services, operating in 73 countries, including in the United

6 States. BNPP's annual revenue exceeds 40 billion euros and its total assets

7 amount to approximately 1.9 trillion euros, making it one of the five largest

8 banks in the world.[1]

9       Following a guilty plea, BNPP was convicted of federal and state felonies

10 for evading U.S. sanctions on Sudan. Plaintiffs, who are alleged victims of the

11 Sudanese regime's atrocities, sued BNPP in the United States District Court for

12 the Southern District of New York, bringing various tort claims under New York

13 law. They allege that BNPP conspired with and aided and abetted the Sudanese

14 regime in its commission of widespread atrocities, including murder, mass rape,

15 torture, and deliberate infection with HIV, among others. They also allege claims

16 of negligence per se, intentional infliction of emotional distress, and negligent

17 infliction of emotional distress.

---

[1]      The information on BNPP's structure, operations, and finances are publicly known and available through BNPP's website and its various filings with regulatory agencies.

1    The District Court (Nathan, *J.*) dismissed Plaintiffs' claims under Federal

2    Rule of Civil Procedure 12(b)(6), reasoning that they were barred by the act of

3    state doctrine and, for the Plaintiffs who were adults at the time of injury (the

4    "Adult Plaintiffs"), otherwise untimely.  Because we conclude that the District

5    Court misapplied the act of state doctrine and erroneously determined that the

6    Adult Plaintiffs' claims were untimely, we vacate and remand for further

7    proceedings.

8                                          **BACKGROUND**

9    The atrocities taking place in Sudan are widely known and have been

10   condemned by both the United States and the international community as

11   genocide.  *See, e.g.*, H.R. Con. Res. 467, 108th Cong. (2004) (enacted); S. Con. Res.

12   133, 108th Cong. (2004) (enacted).  In 1997 and 2006, pursuant to the International

13   Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, the U.S.

14   Government imposed sanctions on Sudan aimed at halting the genocide.  *See*

15   Exec. Order No. 13,412 § 1, 71 Fed. Reg. 61,369 (Oct. 17, 2006); Exec. Order No.

16   13,067 § 1, 62 Fed. Reg. 59,989 (Nov. 5, 1997); *see generally* 31 C.F.R. pt. 538.

17   Nevertheless, as BNPP itself admitted, from 2002 to 2007, it "conspired with

18   numerous Sudanese banks and entities as well as financial institutions outside of

4

1    Sudan to violate the U.S. embargo by providing Sudanese banks and entities

2    access to the U.S. financial system."  Stipulated Statement of Facts ¶ 17, *United*

3    *States v. BNP Paribas, S.A.*, No. 14-cr-00460-LGS (S.D.N.Y. 2015), ECF No. 13 Ex. 2**.**

4        In 2015, the Federal Government and New York State secured convictions

5    of BNPP for federal and state felonies.  BNPP pled guilty to conspiracy to commit

6    an offense against the United States in violation of 18 U.S.C. § 371, by conspiring

7    to violate the IEEPA and the Trading with the Enemy Act, 50 U.S.C. § 4303 *et seq.*

8    BNPP also pled guilty to New York state crimes of falsifying business records in

9    the first degree, in violation of Penal Law § 175.10, and conspiracy in the fifth

10    degree, in violation of Penal Law § 105.05.  BNPP was required to pay almost

11    nine billion dollars in forfeitures and fines, the largest financial penalty ever

12    imposed in a criminal case.[2]

13        BNPP admitted, in a Stipulated Statement of Facts (the "SSOF"), that the

14    allegations in the federal and state criminal informations were true, as were

15    additional facts set forth in the SSOF, and that had the matter gone to trial, the

16    Federal Government and New York State would have proven them beyond a

17    reasonable doubt.  BNPP conceded that it "continued to process transactions

18    involving Sudanese Sanctioned Entities—despite being well aware that its

[2]    Press Release, Dep't of Justice, *BNP Paribas Sentenced for Conspiring to Violate the International Emergency Economic Powers Act and the Trading with the Enemy Act* (May 1, 2015).

5

1    conduct violated U.S. law—because the business was profitable" and BNPP "did

2    not want to risk its longstanding relationship with Sudanese clients." SSOF ¶ 24;

3    *see also id.* ¶¶ 59–73 (outlining the evidence of BNPP's knowledge of its illegal

4    conduct).

5        BNPP admitted that it employed many sophisticated methods to violate

6    U.S. law. First, it "carried out transactions with Sanctioned Entities and evaded

7    the U.S. embargo" against Sudan by "deliberately modifying and omitting

8    references to Sudan in the payment messages accompanying these transactions."

9    *Id.* ¶ 18. Second, in cooperation with Sudanese entities, it utilized complicated

10   payment structures with no legitimate business purpose to mask transaction

11   information that could trigger scrutiny. *Id.* ¶ 16. Third, it moved "illicit

12   transactions through unaffiliated satellite banks" to "disguise the involvement of

13   Sanctioned Entities in U.S. dollar transactions," *id.* ¶¶ 18, 23–26, and went as far

14   as coordinating with satellite banks to institute waiting periods between transfers

15   so that "U.S. authorities would be unable to link the payments to the involved

16   Sanctioned Entit[ies]," *id.* ¶ 24.

17       BNPP also conceded that it had knowledge of the atrocities being

18   committed in Sudan and of the consequences of providing Sudan access to U.S.

1    financial markets.  Specifically, BNPP admitted that its "central role in providing

2    Sudanese financial institutions access to the U.S. financial system, despite the

3    Government of Sudan's role in supporting terrorism and committing human

4    rights abuses, was recognized by BNPP employees."  *Id.* ¶ 20.  For example, in

5    2004, a manager at BNPP described the political environment in Sudan as

6    "dominated by the Darfur crisis" and called it a "humanitarian catastrophe."  *Id.*

7    In April 2006, a senior BNPP compliance officer stated in a memorandum that

8    "the growth of revenue from oil is unlikely to help end the conflict" and that "it

9    is probable that Sudan will remain torn up by insurrections and resulting

10   repressive measures for a long time."  *Id.*  In 2007, a BNPP compliance officer told

11   other high-level compliance and legal personnel that the Sudanese entities with

12   which BNPP dealt "play a pivotal part in the support of the Sudanese

13   government which . . . has hosted Osama Bin Laden and refuses United Nations

14   intervention in Darfur."  *Id.*  A few months later, a BNPP executive warned in a

15   memorandum that "in a context where the International Community puts

16   pressure to bring an end to the dramatic situation in Darfur, no one would

17   understand why BNP Paribas persists in Sudan which could be interpreted as

18   supporting the leaders in place."  *Id.*  The SSOF makes clear that despite BNPP's

7

1    understanding of the likely consequences of its involvement with Sudan, it

2    persisted in illegal conduct on a wide scale because its "business [with Sudan]

3    was profitable." *Id.* ¶ 37.

4          Plaintiffs, who now reside lawfully in the United States, sued BNPP in the

5    Southern District of New York on behalf of a putative class of victims of the

6    genocide in Sudan.   They allege, and we must accept as true, that BNPP

7    circumvented U.S. sanctions and provided Sudan with financial resources

8    knowing that Sudan was committing atrocities, knowing that the purpose of the

9    sanctions was to prevent Sudan from acquiring funds with which to carry out

10   those atrocities, and knowing that Sudan's likely purpose in using the U.S.

11   financial markets for illegal oil sales was to acquire billions of U.S. dollars to

12   purchase the weapons and materials used by militia forces.

13         Specifically, Plaintiffs allege that they were the victims of atrocities

14   including mass rape, torture, deliberate infection with HIV, and being forced to

15   watch the murder and rape of their family members.   Second Amended

16   Complaint ¶¶ 22–52, *Kashef v. BNP Paribas SA*, 316 F. Supp. 3d 770 (S.D.N.Y.

17   2018) (No. 16-cv-03228-AJN), ECF No. 49**.**  One plaintiff alleges that militia forces

18   invaded her home, brutally beat her family, and murdered her father in front of

8

18-1304-cv
*Kashef v. BNP Paribas S.A.*

1   her children.  *Id.* ¶ 37.  She and her children found themselves in camps where

2   they were detained separately, starved, tortured, subjected to chemical weapons,

3   beaten, and raped.  *Id.*  Two of her children died in the camps, and the plaintiff

4   was forced to search for them among dead bodies being held in refrigerators on

5   site.  *Id.*  Her teenage son, she alleges, had been locked alive in a  freezer for three

6   days.  *Id.*

7       Another plaintiff alleges that she was kidnapped from her home,

8   blindfolded, and locked in a room without food, light, or water.  *Id.* ¶ 41**.**  She

9   was raped and tortured for days, causing infection with HIV and the miscarriage

10  of an existing pregnancy.  *Id.*  Her husband was arrested, tortured, and

11  eventually murdered.  *Id.*  All the Plaintiffs allege similar injuries at the hands of

12  militia forces, which were armed and dispatched using the money and resources

13  made available as a consequence of  BNPP's violation of U.S. sanctions on Sudan.

14      In the Second Amended Complaint (the "SAC"), Plaintiffs asserted twenty

15  claims arising under New York tort law. [3]  Claims 1, 2, 15, and 16 were primary

16  liability claims that BNPP was negligent per se and inflicted emotional distress

17  on Plaintiffs.  Claims 3 through 14, 19, and 20 were secondary liability claims that

---

[3]      The District Court dismissed Claim 17, for commercial bad faith, and Claim 18, for unjust enrichment, for failure to state a claim.  Plaintiffs do not challenge the dismissal of these claims on appeal.

18-1304-cv
*Kashef v. BNP Paribas S.A.*

1    BNPP conspired with or aided and abetted Sudan in its commission of battery,

2    battery in performance of public duty, assault, false arrest and imprisonment,

3    conversion through wrongful taking, conversion through wrongful detention,

4    and wrongful death.

5           BNPP moved to dismiss the claims.  The District Court dismissed Claims 1

6    through 16, 19, and 20 under the act of state doctrine.  *Kashef*, 316 F. Supp. 3d at

7    779.  The Court reasoned that determining BNPP's wrongdoing under New York

8    tort law would require it to either find an underlying tort committed by the

9    Sudanese regime (for secondary liability claims) or inquire into the harm to

10   Plaintiffs caused by the regime (for primary liability claims).  *Id.* at 777–78.  The

11   District Court concluded that it was prohibited from so doing by the act of state

12   doctrine, which forbids U.S. courts from questioning the validity of official acts of

13   foreign sovereigns.  *Id.*  As applied to only the Adult Plaintiffs,[4] the District Court

14   alternatively dismissed Claims 3 through 10 and 15 as untimely under New

15   York's one-year statute of limitations for intentional torts.  *Id.* at 782.  The District

16   Court declined to apply New York C.P.L.R. § 213-b, under which the Adult

17   Plaintiffs' claims would be timely.  *Id.* at 780–81.

---

[4]        Plaintiffs Sara Noureldirz Abdalla and Amir Ahmed were minors when they were injured.  The
remaining Plaintiffs were over the age of 18 at the time of their alleged injuries.

18-1304-cv
*Kashef v. BNP Paribas S.A.*

1   Plaintiffs appeal, arguing that the District Court erred in its application of

2   the act of state doctrine and in its conclusion that the Adult Plaintiffs' claims are

3   time-barred.  We  agree and we vacate the judgment.

4   **STANDARD OF REVIEW**

5   We review *de novo* a district court's grant of a motion to dismiss brought

6   under Rule 12(b)(6), accepting all factual allegations in the complaint as true and

7   drawing all reasonable inferences in the plaintiff's favor.  *Nicosia v. Amazon.com,*

8   *Inc.*, 834 F.3d 220, 230 (2d Cir. 2016).   "To survive a motion to dismiss, a

9   complaint must contain sufficient factual matter, accepted as true, to state a claim

10  to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

11  (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

12  **DISCUSSION**

13  *Act of State Doctrine*

14  The act of state doctrine bars U.S. courts from declaring invalid, and thus

15  ineffective as a rule of decision, the official act of a foreign sovereign.  *W.S.*

16  *Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990).  "Whether

17  to invoke the act of state doctrine is ultimately and always a judicial question."

18  *Republic of Philippines v. Marcos*, 806 F.2d 344, 358 (2d Cir. 1986).  The doctrine has

11

18-1304-cv
*Kashef v. BNP Paribas S.A.*

1    been applied where, for instance, parties sought to challenge the validity of

2    formalized, official expropriation decrees of foreign sovereigns.  *See, e.g., Banco*

3    *Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964).  Similarly, the doctrine has been

4    applied where parties challenged the official orders of a sovereign's highest

5    commander.  *See Underhill v. Hernandez*, 168 U.S. 250 (1897).

6         The Supreme Court has made clear that the act of state doctrine has

7    important boundaries.  It is not a categorical rule of abstention that prohibits

8    courts from deciding cases or controversies whenever issues of foreign relations

9    arise.  *Kirkpatrick*, 493 U.S. at 409 ("The act of state doctrine does not establish an

10   exception for cases and controversies that may embarrass foreign

11   governments.").  The doctrine should not, the Supreme Court instructs, be

12   casually expanded "into new and uncharted fields." *Id.*

13        In dismissing Plaintiffs' claims, the District Court reasoned that "claims

14   against private entities may be barred when the causal chain between a

15   defendant's alleged conduct and plaintiff's injury cannot be determined without

16   an inquiry into the motives of the foreign government."  *Kashef*, 316 F. Supp. 3d

17   at 776.  In so concluding, the District Court painted with too broad a brush and

18-1304-cv
*Kashef v. BNP Paribas S.A.*

1  misapplied the doctrine in the exact way the Supreme Court warned against in

2  *Kirkpatrick.*

3                                                 **I**

4        The Supreme Court has determined that when the validity of a foreign

5  state's action is not the question being litigated, and the inquiry is simply

6  whether the conduct in question occurred, the act of state doctrine is not

7  implicated.  *Kirkpatrick*, 493 U.S. at 405.  In other words, the doctrine applies only

8  when "the relief sought or the defense [raised] would have *required* a court in the

9  United States to declare invalid the official act of a foreign sovereign performed

10  within its own territory."  *Id.* at 405 (emphasis added).  Adjudicating the claims

11  in this action involves no such requirement.

12        In *Kirkpatrick*, U.S. defendants had secured a contract with the Nigerian

13  government by promising to pay a bribe.  *Id.* at 402.  Following an investigation,

14  defendants pled guilty to violations of the Foreign Corrupt Practices Act.  *Id.*  The

15  plaintiff, an unsuccessful bidder for the Nigerian government contract, then sued

16  the defendants under federal and state racketeering and unfair competition

17  statutes.  *Id.*  To prevail, the plaintiff had to prove that Nigerian officials received

18  an unlawful bribe.  *Id.* at 406.

18-1304-cv
*Kashef v. BNP Paribas S.A.*

1    The Supreme Court held that the act of state doctrine did not bar the

2    claims because, in considering them, the district court was not required to rule on

3    the legality of the contract itself. *Id.* at 406.  It was only required to determine

4    whether Nigerian officials had received bribes, an inquiry that did not trigger the

5    act of state doctrine even if it "would impugn or question the nobility of a foreign

1    nation's motivations." *Id.* at 408.[5]  In fashioning the contours of the doctrine,

2    Justice Scalia, writing for the Court, drew from *Sharon v. Time, Inc.*, 599 F. Supp.

3    538 (S.D.N.Y. 1984), for the proposition that the act of state doctrine is not

4    implicated when the litigated issue "is not whether the alleged acts are valid, but

5    whether they occurred." *Kirkpatrick*, 493 U.S. at 406 (quoting *Time*, 599 F. Supp. at

6    546).  In *Time*, Ariel Sharon, then-Minister of Defense of Israel, sued Time

7    Magazine for defamation following Time's coverage of a report on Sharon's

8    alleged participation in the murder of innocent Palestinians.  599 F. Supp. at 542.

9    To adjudicate the claim, the district court had to determine whether claims that

10   Sharon was complicit in murder were false, which would implicate the actions of

---

[5]    Moreover, the Supreme Court explained that even though a finding that Nigerian officials had received bribes supported a finding that the contract was invalid, the act of state doctrine was still not implicated because the parties never formally disputed the legality of the contract itself. *See Kirkpatrick*, 493 U.S. at 406 ("Specifically, [petitioners] note that in order to prevail respondent must prove that petitioner Kirkpatrick made, and Nigerian officials received, payments that violate Nigerian law, which would, they assert, support a finding that the contract is invalid under Nigerian law.  Assuming that to be true, it still does not suffice [to trigger the act of state doctrine].").

18-1304-cv
*Kashef v. BNP Paribas S.A.*

1    Israel and Lebanon.  *Id.* at 553.  The district court determined that the act of state

2    doctrine did not apply, reasoning that

3    No one is suggesting that these acts—by which Time claims Sharon
4    condoned the massacre of unarmed noncombatant civilians—have
5    validity in the sense that they cannot be attacked.  All agree—Israel,
6    the United States, and the world community—that such actions, if
7    they occurred, would be illegal and abhorrent.  The issue in this
8    litigation is not whether such acts are valid, but whether they
9    occurred.

10   *Id.* at 546.

11   The reasoning of *Kirkpatrick* is directly applicable to this case.  By BNPP's

12   own concession, the acts of Sudan to which BNPP asks us to defer are the

13   atrocities committed against innocent civilians.  Oral Arg. R. at 23:14–40 ("The

14   alleged official acts are . . . running their militias that inflicted violence on these

15   plaintiffs . . . other acts of sexual violence, mass rape, and . . . genocide.").  No

16   one here—the parties, the U.S. government, Sudan (in its own Constitution), or

17   the international community—contends that genocide, mass rape, and ethnic

18   cleansing are "valid."[6]  Instead, the issue is simply whether the atrocities

---

[6]    *See, e.g.,* H.R. Con. Res. 467, 108th Cong. (2004) (enacted) (declaring Sudan's genocide); S. Con. Res. 133, 108th Cong. (2004) (enacted) (same); Exec. Order No. 13,412 (sanctioning Sudan for its violations of human rights); THE INTERIM NATIONAL CONSTITUTION OF THE REPUBLIC OF SUDAN (2005); CONSTITUTION OF THE REPUBLIC OF SUDAN (1998); *see also Sarei v. Rio Tinto, PLC,* 487 F.3d 1193, 1210 (9th Cir. 2007) (discussing how violations of *jus cogens* norms cannot constitute rules of decision entitled to act-of-state deference); *Warfaa v. Ali,* 33 F. Supp. 3d 653, 661–62 (E.D. Va. 2014) (same), *aff'd,* 811 F.3d 653 (4th Cir. 2016); *Garcia v. Chapman,* 911 F. Supp. 2d 1222, 1242 (S.D. Fla. 2012) (same).

occurred.   This inquiry into occurrence rather than validity is precisely what the

Supreme Court in *Kirkpatrick* held was not precluded by the act of state doctrine.

To be sure, to prevail on their secondary liability claims against BNPP, the

plaintiffs will need to establish primary torts committed by the Sudanese regime.

Proof of these primary tort claims, as the SAC suggests, will be based on the

widespread and widely known genocide perpetrated in Sudan.  The act of state

doctrine cannot shield this genocide from scrutiny by the courts of the United

States because, as we will discuss in depth below, both Sudan's own laws and a

universal international consensus prohibit us from deeming genocide an "official

act" of Sudan, or for that matter, of any state, that could supply or support a rule

of decision for our courts.

## II

*Kirkpatrick* makes clear that the act of state doctrine only applies if

adjudicating the claims in question would require a court to declare invalid a

sovereign's "official act."  *Kirkpatrick*, 493 U.S. at 405.  To qualify as "official," an

act must be imbued with some level of formality, such as authorization by the

foreign sovereign through an official "statute, decree, order, or resolution."

*Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 695 (1976).  A level

18-1304-cv
*Kashef v. BNP Paribas S.A.*

1    of formality has featured in every Supreme Court case in which the act of state

2    doctrine has been applied.  For example, in *Banco Nacional de Cuba v. Sabbatino*,

3    the Supreme Court applied the doctrine to an official and formalized government

4    expropriation decree.  376 U.S. at 406; *see also Oetjen v. Central Leather Co.*, 246 U.S.

5    297 (1918) (applying the act of state doctrine to an official government

6    expropriation decree); *Ricaud v. American Metal Co.*, 246 U.S. 304 (1918) (same).

7    Similarly, in *Underhill v. Hernandez*, the Supreme Court applied the act of state

8    doctrine to an official order by the highest military commander of a U.S.-

9    recognized government not to issue a passport.  168 U.S. at 254.  Cases in our

10    Circuit have also required this formality to trigger act-of-state deference.

11    *Konowaloff v. Metro. Museum of Art*, 702 F.3d 140, 147 (2d Cir. 2012) (applying the

12    act of state doctrine to an official government expropriation decree); *Fed. Treasury*

13    *Enter. Sojuzplodoimport v. Spirits Int'l B.V.*, 809 F.3d 737, 743 (2d Cir. 2016) (same),

14    *cert. denied*, 137 S. Ct. 160 (2016).

15        BNPP makes absolutely no showing that the atrocities committed against

16    the Plaintiffs were the officially sanctioned policies of Sudan.  They point to no

17    statute, decree, order, resolution, or comparable evidence of sovereign

18    authorization for any of the actions in question.  On the contrary, the atrocities

17

18-1304-cv
*Kashef v. BNP Paribas S.A.*

1    alleged to have occurred unquestionably violated Sudanese law.  *See, e.g.*, THE

2    INTERIM NATIONAL CONSTITUTION OF THE REPUBLIC OF SUDAN pts. 1–2;

3    CONSTITUTION OF THE REPUBLIC OF SUDAN pts. 1–2.  In *Filartiga v. Pena-Irala*, we

4    made clear that "we doubt whether action by a state official in violation of [its]

5    Constitution and laws . . . and wholly unratified by [its] government, could

6    properly be characterized as an act of state." 630 F.2d 876, 889 (2d Cir. 1980).

7    Similarly, in *Kadic v. Karadzic*, we noted that "the appellee has not had the

8    temerity to assert in this Court that the acts [of torture] he allegedly committed

9    are the officially approved policy of a state."  70 F.3d 232, 250 (2d Cir. 1995).

10   Given our precedent, acts that flagrantly violate a foreign state's own laws

11   cannot, at the same time, constitute official acts entitled to deference.

12        Considering the lack of evidence introduced by BNPP that genocide is the

13   official policy of Sudan, and the countervailing evidence that genocide blatantly

14   violates Sudan's own laws, we conclude that there is simply no "official act" that

15   a court would be required to "declare invalid" in order to adjudicate Plaintiffs'

16   claims. *Kirkpatrick,* 493 U.S. at 405.

18-1304-cv
*Kashef v. BNP Paribas S.A.*

1          **III**

2          There is an equally steep hurdle that BNPP fails to overcome.  We are

3    prohibited from deeming valid, for purposes of act-of-state deference, atrocities

4    such as genocide, mass rape, and ethnic cleansing, which violate *jus cogens*

5    norms.  "A *jus cogens* norm, also known as a peremptory norm of international

6    law, is a norm accepted and recognized by the international community of states

7    as a whole as a norm from which no derogation is permitted and which can be

8    modified only by a subsequent norm of general international law having the

9    same character."  *Carpenter v. Republic of Chile*, 610 F.3d 776, 780 n.4 (2d Cir. 2010).

10   "*Jus cogens* embraces customary laws considered binding on all nations, and is

11   derived from values taken to be fundamental by the international community,

12   rather than from the fortuitous or self-interested choices of nations."  *Siderman de*

13   *Blake v. Republic of Argentina*, 965 F.2d 699, 715 (9th Cir. 1992).  Accordingly, we

14   have previously explained that these norms may not be violated, "irrespective of

15   the consent or practice of a given State."  *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 179

16   (2d Cir. 2009).  "Because *jus cogens* norms do not depend solely on the consent of

17   states for their binding force, they enjoy the highest status within international

18   law."  *Siderman*, 965 F.2d at 715.

1    There is no doubt that *jus cogens* norms were violated by the atrocities

2    occurring in Sudan.  *See, e.g.*, *Abdullahi*, 562 F.3d at 179; *Pena-Irala*, 630 F.2d at 884;

3    *Comm. of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 941 (D.C. Cir.

4    1988); *Siderman*, 965 F.2d at 714; *Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 130

5    (E.D.N.Y. 2000); *Hirsh v. State of Israel*, 962 F. Supp. 377, 381 (S.D.N.Y. 1997), *aff'd*,

6    133 F.3d 907 (2d Cir. 1997).  All of Plaintiffs' claims are premised on these blatant

7    violations of *jus cogens* norms.  A dismissal of the claims based on the act of state

8    doctrine would require, as a predicate, that the violations in question be

9    "deemed valid" by courts of this country, *see Kirkpatrick*, 493 U.S. at 409,

10   regardless of the universal (and uncontroversial) understanding that genocide is

11   unlawful.  Because our precedent prohibits us from deeming valid violations of

12   non-derogable *jus cogens* norms, "irrespective of the consent or practice of a given

13   State," *Abdullahi*, 562 F.3d at 179, we conclude that the atrocities to which BNPP

14   asks us to defer can never be the basis of a rule of decision capable of triggering

15   the act of state doctrine.[7]

---

[7]    This conclusion is consistent with those of other courts that have directly considered the question.
*See, e.g.*, *Siderman*, 965 F.2d at 714 (determining that torture violates *jus cogens* norm); *Sarei v. Rio Tinto, PLC*,
671 F.3d 736, 757 (9th Cir. 2011), *vacated on other grounds sub nom. Rio Tinto PLC v. Sarei*, 569 U.S. 945 (2013);
*Yousuf v. Samantar*, 699 F.3d 763, 776 (4th Cir. 2012); *Warfaa v. Ali*, 33 F. Supp. at 661–62; *Garcia v. Chapman*,
911 F. Supp. 2d at 1242; *cf. Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 106 (2d Cir. 2000).

18-1304-cv
*Kashef v. BNP Paribas S.A.*

1                                              *Timeliness*

2          In addition to dismissing Plaintiffs' claims under the act of state doctrine,

3   the District Court alternatively dismissed the intentional tort claims of the Adult

4   Plaintiffs as untimely under New York C.P.L.R. § 215.  Plaintiffs argue that their

5   claims are timely under § 215(8)(a) or § 213-b.  We hold that Plaintiffs' claims are

6   timely under § 215(8)(a).

7          New York C.P.L.R. § 215(8)(a) provides:

8          Whenever it is shown that a criminal action against the same
9          defendant has been commenced with respect to the event or
10         occurrence from which a claim governed by this section arises, the
11         plaintiff shall have at least one year from the termination of the
12         criminal action as defined in section 1.20 of the criminal procedure
13         law in which to commence the civil action notwithstanding that the
14         time in which to commence such action has already expired or has
15         less than a year remaining.

16

17         In *Clemens v. Nealon*, a New York appellate court explicitly rejected the

18  theory that "the tolling provisions of CPLR 215(8) are exclusively for the benefit

19  of the victims of the crime charged in the criminal proceeding."  608 N.Y.S.2d

20  370, 371 (App. Div. 1994).  Instead, § 215(8)(a) is satisfied so long as "(1) a

21  criminal action has been commenced, (2) against the same defendants, and (3)

22  concerning the same event or transaction from which the civil action arose." *Id.*

23  The "termination of the criminal action" is measured from the date on which the

21

1    defendant was sentenced.  *Dynamic Chemicals, Inc. v. Ackerman Mech. Servs., Inc.*,

2    867 N.Y.S.2d 820, 822 (App. Div. 2008).

3         Plaintiffs did not raise the § 215(8)(a) argument before the District Court.

4    However, we have "discretion to consider waived arguments" and should

5    exercise this discretion "where the argument presents a question of law and there

6    is no need for additional fact-finding."  *Bogle-Assegai v. Connecticut*, 470 F.3d 498,

7    504 (2d Cir. 2006).  In this case, the issue is a simple question of law—whether

8    § 215(8)(a) applies.  The factual predicate for the question has been fully briefed

9    by both parties and there has been no contention that additional fact-finding is

10   required or that any of the relevant facts are in dispute.  We therefore exercise

11   our discretion to consider the argument.

12        BNPP is the same defendant that federal authorities prosecuted in a

13   criminal action, satisfying the first and second prongs of § 215(8)(a).

14   Additionally, the Plaintiffs' causes of action arise out of the same occurrence as

15   the criminal prosecution: BNPP's conspiracy with Sudan to violate U.S.

16   sanctions.  Indeed, the Plaintiffs' theory is that BNPP was illegally funding

17   Sudan's commission of atrocities by avoiding U.S. sanctions put in place to

18   protect the Plaintiffs and the purported class, knowing that the funds would be

22

18-1304-cv
*Kashef v. BNP Paribas S.A.*

1    used by Sudan to continue the perpetration of atrocities. SAC ¶¶ 1–15. The third

2    prong is thus satisfied and § 215(8)(a) applies. Because BNPP's judgment of

3    conviction was entered on May 1, 2015 and the Plaintiffs' civil action was filed on

4    April 29, 2016, the Adult Plaintiffs' claims are timely under § 215(8)(a).

5                                    **CONCLUSION**

6         For the reasons set forth, we **VACATE** the judgment of the District Court

7    and **REMAND** for further proceedings consistent with this opinion.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit