UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: MAR 0 3 2020
```

Entesar Osman Kashef, *et al.*,

               Plaintiffs,

       —v—

BNP Paribas SA, *et al.*,

               Defendants.

16-cv-3228 (AJN)

OPINION AND ORDER

ALISON J. NATHAN, District Judge:

This case arises out of horrific human-rights abuses committed by the Government of Sudan and militias operating in Sudan between 1977 and 2009. Plaintiffs are the victims of those abuses. They bring suit against BNP Paribas S.A., a French financial institution, several of its branches and subsidiaries, and individuals working for the bank (collectively, BNPP). They allege that BNPP engaged in illicit and fraudulent financial practices that allowed the Sudanese government to evade American sanctions. By sustaining the Sudanese regime and perpetuating the genocide, Plaintiffs allege that BNPP committed a host of state-law torts.

The Court must, as a preliminary matter, determine which jurisdiction's law applies to Plaintiffs' claims. The parties put forward four possibilities: federal law, New York State law, Swiss law, and Sudanese law. The Court concludes that Switzerland has the greatest interest in this litigation and Swiss law therefore governs Plaintiffs' claims. However, the parties have provided little briefing on the application of Swiss law to this case, and have rested instead on dueling and contradictory expert declarations. The Court therefore orders the parties to meet and confer regarding potential additional discovery as to the meaning of Swiss law and propose a briefing schedule. The Court will also schedule a hearing to determine whether Plaintiffs have

1

stated a claim for relief under Swiss law.

I.    **BACKGROUND**

A.  **Plaintiffs' Allege That BNPP Facilitated Atrocities**

For purposes of this motion to dismiss, the Court accepts Plaintiffs' well-pleaded allegations in the Second Amended Complaint (Compl.) as true. *See* Dkt. No. 49. Plaintiffs have also attached various exhibits to the Second Amended Complaint. Exhibits B and D contain BNPP's plea agreements with, respectively, the United States Attorney for the Southern District of New York and the District Attorney of the County of New York. These plea agreements resolved criminal charges against BNPP; Plaintiffs contend that these charges are related to the conduct alleged here. Exhibits C and E contain stipulations of fact that BNPP agreed to as part of these two plea agreements. These two stipulations of fact largely overlap. *See* Compl. ¶ 201. BNPP expressly "admit[ed] the facts set forth" in these stipulations. Compl. Ex. B at 2. And it agreed that these facts "[were] true and correct, and that had the matter gone to trial, the United States and New York State would have proved them beyond a reasonable doubt." Compl. Ex. C at 1. In its factual recitation, the Court therefore accepts the facts contained in these stipulations as true. *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("Documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered.").

In the 1980s, the Sudanese government and militia groups within Sudan began committing horrific human-rights violations. Compl. ¶¶ 69-70. Among other abuses, Plaintiffs suffered "beatings, maiming, sexual assault, rape, infection with HIV, loss of property, displacement from their homes, and watching family members be killed." Compl. ¶ 24; *see also id.* ¶¶ 30-50. As a result, the United States in 1997 imposed sanctions on Sudan aimed at cutting off the regime's access to the American financial market. Compl. ¶ 8. Under this sanctions

regime, banks operating in the United States could no longer broker U.S. dollar transactions for, or extend credit to, the Sudanese government and its agencies and instrumentalities.  Compl. ¶ 8.

These sanctions posed a serious obstacle to the Sudanese government.  Sudan is an oil-rich country, and for years had sold oil on the international market.  Compl. ¶¶ 4-5, 71-72.  The international oil market, however, is priced in U.S. dollars and clears transactions overwhelmingly through New York.  Compl. ¶¶ 6, 75-76.  Countries that trade oil in non-dollar currencies or are unable to clear transactions in the United States are severely disadvantaged.  Compl. ¶ 6.  They must either sell their oil at a below-market price or barter their oil in exchange for other goods or services, "both of which have significant drawbacks." Compl. ¶ 77, *see also id.* ¶ 12 ("Absent [access to the U.S. financial system], countries need to export commodities and import goods through barter or through use of secondary currencies, both of which are significantly less efficient and result in less revenue from exports and more costly imports.").  To maximize its oil revenue, Sudan therefore needed access to this America-centric market—which the sanctions regime had attempted to cut off.

The Sudanese government turned to BNPP for help.  BNPP's Geneva subsidiary used various financial tricks and fraud to permit the Sudanese government and banks to get around the sanctions and transact in dollars.  The Court details these practices at length, and takes special care to emphasize the location in which they occurred: Switzerland.

First, BNPP Geneva served as the sole correspondent bank for the Sudanese government and the primary European correspondent bank for all major Sudanese commercial banks.  A correspondent bank provides financial services on behalf of other financial institutions.  In this case, BNPP Geneva provided dollar-based services to Sudanese entities, such as serving as an intermediary for dollar transactions.  For example, the Sudanese government deposited money it

earned from selling oil into the Central Bank of Sudan's account at BNPP Geneva.  Compl.

¶ 105.  And "nearly all major Sudanese commercial banks had U.S. dollar accounts with BNPP."

Compl. ¶ 104.  The statement of facts that BNPP stipulated to as part of its federal criminal

proceeding makes clear that "BNPP Geneva" filled the role of correspondent bank, not any other

of BNPP's branches, like BNPP New York.  Ex. C. ¶ 19.

Second, BNPP Geneva established accounts with various banks in Africa, Europe, and

the Middle East.  BNPP Geneva then worked with these banks to "structure payments in highly

complicated ways, with no legitimate business purpose, to conceal" transactions that violated

American sanctions.  Ex. C ¶ 16(b).  These banks are variously called "regional banks" and

"satellite banks" in the parties' filings.  Once again, it was BNPP Geneva, not any other branch

or subsidiary, that "successfully used the satellite bank structure . . . to process thousands of U.S.

dollar transactions."  Ex. C ¶ 24; *see also* Ex. I ¶ 19 ("BNPP Geneva successfully used the

Regional Bank structure, which had no business purpose other than to help BNPP's Sudanese

clients evade the U.S. embargo, to process thousands of U.S. dollar transactions, worth billions

of dollars in total.").

Third, BNPP Geneva offered letters of credit that helped finance Sudanese exports and

imports.  Compl. ¶ 106.  Such letters protect against the risk of a party's non-performance in

large commercial transactions.  Compl. ¶ 80.  They are "an essential part of trade finance."

Compl. ¶ 80.  "BNPP Geneva developed a business in letters of credit for Sudanese banks," and

"letters of credit managed by BNPP Geneva represented approximately a quarter of all exports

and a fifth of all imports for Sudan."  Ex. C. ¶ 19.  These letters of credit served dual purposes:

they "enabled the [Sudanese government] to import weapons and other goods sold in dollars"

and "facilitated and increased revenues from Sudan's crude oil sales, which accounted for nearly

all of the country's exports." Compl. ¶ 108.  By "having access to dollars and dollar-denominated letters of credit to purchase goods to import, the [Government of Sudan] was able to purchase materially more imports than it otherwise would . . . BNPP's assistance gave the [Government of Sudan] more buying power than it otherwise would have had . . . U.S. Sanctions were intended to prevent this precise outcome." Compl. ¶ 109.

Fourth, BNPP Geneva agreed with sanctioned entities in Sudan "not to mention their names in U.S. dollar transactions processed through the United States," and instructed satellite banks to do the same. Ex. C. ¶¶ 16(c)-(e), 21-22, 27.  This helped "prevent the transactions from being blocked when they entered the United States." Ex. C ¶ 18.

Fifth, BNPP Geneva grew concerned that using BNPP's New York branch to clear dollars was too risky.  BNPP Geneva thus began using other, unaffiliated United States banks to conduct the transactions, so that "the problem of violating U.S. sanctions shifted to the unaffiliated U.S. bank." Ex. I ¶ 48 (internal quotation marks omitted).  Yet again, it was "BNPP Geneva employees [who] were instructed to have U.S. Dollar payments involving Sanctioned Entities cleared through" an unaffiliated American bank, and "the vast majority BNPP Geneva's transactions" were cleared through this bank. Ex. C. ¶¶ 29-31.

BNPP Geneva's financial chicanery created "a macabre feedback loop." Compl. ¶ 11.  Because of these schemes, Sudan was able to realize market value for its oil and other goods.  This in turn allowed the regime to "purchase planes, helicopters and weapons, to manufacture weapons, and fund militia [groups]." Compl. ¶ 11; *see also* Compl. ¶ 126 (Sudanese government "used the oil wealth that it acquired thanks to BNPP's criminal actions to embark on a major weapons acquisition spree"); ¶ 130 ("Further, the [Government of Sudan] used its oil revenue to establish a domestic weapons industry.").  And that equipment and financing allowed

government-supported militias like the Janjaweed to commit violence against "Sudanese civilians, including those who [the Government] perceived as ethnically and politically 'non-Arab,' and those who were in the way of oil development." Compl. ¶¶ 7, 30.  The Government of Sudan specifically targeted civilians living in oil-rich areas, as they presented an obstacle to "expand oil exploration and revenue." Compl. ¶ 69.  In short, "[o]il revenue was both the object and the sine qua non of [Sudanese government's] ability to carry out the mass destruction and extermination that it let loose on its own civilian population, including Plaintiffs and the Class." Compl. ¶ 7.

### B.  Procedural History

On April 29, 2016, Plaintiffs filed this lawsuit.  They claimed that BNPP committed twenty state-law torts through these financial schemes.  They alleged several primary torts: negligence per se, intentional infliction of emotional distress, negligent infliction of emotional distress, commercial bad faith, and unjust enrichment.  They also alleged that BNPP aided and abetted battery, assault, false arrest, conversion, and wrongful death.  And they alleged that BNPP conspired to commit those same torts.

BNPP then moved to dismiss for a host of reasons.  Dkt. No. 65.  On March 20, 2018, the Court granted BNPP's motion to dismiss, holding that Plaintiffs' claims were variously barred by the act-of-state doctrine, untimely, or failed to state a claim.  Dkt. No. 101; *Kashef v. BNP Paribas SA*, 316 F. Supp. 3d 770 (S.D.N.Y. 2018).  The act-of-state doctrine provides that "[e]very sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 416 (1964).  On May 22, 2019, the United States Court of Appeals for the Second Circuit reversed, holding that the act-of-state doctrine did not apply and that Plaintiffs' claims were timely.  *Kashef v. BNP*

6

*Paribas S.A.*, 925 F.3d 53 (2d Cir. 2019). The Second Circuit therefore vacated the Court's earlier decision and remanded for further proceedings. *Id.* at 62.

On June 12, 2019, BNPP renewed its motion to dismiss. Dkt. No. 111. The parties filed supplemental briefing and the Court held oral argument on October 24, 2019. *See* Dkt. Nos. 117-37.

## II.    LEGAL STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 547. On a motion to dismiss, a court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party, but gives "no effect to legal conclusions couched as factual allegations." *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017).

## III.    NEW YORK'S CHOICE OF LAW FRAMEWORK

Before the Court can decide whether Plaintiffs have stated a claim, it must decide which jurisdiction's law applies here. And because Plaintiffs invoke the Court's diversity jurisdiction, the parties agree that New York's choice-of-law rules govern this analysis. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941); *Fieger v. Pitney Bownes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001) ("A federal trial court sitting in diversity jurisdiction must apply the law of the forum state to determine the choice-of-law.").

7

New York uses an interest-analysis approach to choice of law: the law of the jurisdiction with the greatest interest usually applies. This framework is a "flexible approach intended to give controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157-58 (2d Cir. 2012) ("*Licci I*") (quoting *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (N.Y. 1993)); *accord Shaw v. Carolina Coach*, 82 A.D.3d 98, 100–01, 918 N.Y.S.2d 120, 123 (2011). Although the Second Circuit and New York courts have developed more specific rules governing cases like this one, interest analysis remains "the bedrock principle that underlies New York's entire choice-of-law regime." *Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 336–37 (2d Cir. 2005).

"[T]he first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *GlobalNet Financial.com, Inc v. Frank Crystal & Co.*, 449 F.3d 377, 382 (2d Cir. 2006) (internal quotation marks omitted); *accord Matter of Allstate Ins. Co. & Stolarz*, 81 N.Y.2d 219 (N.Y. 1993). Based on the information the parties have provided about Swiss and Sudanese law, and the Court's independent review of New York and federal law, such a conflict exists here.

For tort cases like this one, the Court must next determine whether the tort rules at issue regulate conduct or allocate loss. *See Cooney*, 81 N.Y.2d at 72, 595 N.Y.S.2d 919 (in applying the interest analysis, a "distinction [is made] between laws that regulate primary conduct (such as standards of care) and those that allocate losses after the tort occurs."); *see also DeMasi v. Rogers*, 34 A.D.3d 720, 826 N.Y.S.2d 106; *King v. Car Rentals, Inc.*, 29 A.D.3d 205, 209, 813 N.Y.S.2d 448. Conduct-regulating rules are those that "people use as a guide to governing their

primary conduct" and have "the prophylactic effect of governing conduct to prevent injuries from occurring," such as standards of care. *Licci II*, 739 F.3d at 49; *Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519, 522 (N.Y. 1994); s*ee also Cooney*, 81 N.Y.2d at 66. In contrast, "postevent remedial rules," like those governing vicarious liability, "allocate losses after the tort occurs." *Id.* The issue before the Court is whether Plaintiffs have stated a claim for a slew of New York torts—all rules that prospectively regulate parties' conduct.

New York has developed a specific choice-of-law inquiry for conduct-regulating tort rules. In most tort cases, both the tortious conduct and the injury occur in the same jurisdiction. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 739 F.3d 45, 50 (2d Cir. 2013) ("*Licci II*") (citing *Babcock*, 12 N.Y.2d at 477 n.2). In such cases, "[i]f conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Cooney*, 81 N.Y.2d at 72; *see also Shaw*, 82 A.D.3d at 101 ("If the conflicting laws regulate conduct, the law of the place of the tort almost invariably obtains because that jurisdiction has the greatest interest in regulating behavior within its borders.") (internal quotation marks omitted). This however is *not* one of those cases. Plaintiffs were injured in Sudan, but they allege that BNPP's tortious conduct occurred in Switzerland and New York. In such circumstances, the Second Circuit has held that "it is the place of the allegedly wrongful conduct that generally has superior 'interests in protecting the reasonable expectations of the parties who relied on [the laws of that place] to govern their primary conduct and in the admonitory effect that applying its law will have on similar conduct in the future.'" *Licci II*, 739 F.3d at 50-51 (quoting *Schultz*, 65 N.Y.2d at 198); *accord Niedernhofer v. Wittels*, 2018 WL 3650137, at *8 (S.D.N.Y. July 31, 2018) ("[I]n the context of conduct-regulating rules, where the wrongful conduct and the injury occur in different

states, the law of the state where the conduct occurred will typically apply."). This general rule is not determinative; courts must always weigh the interests of competing jurisdictions. *Id.*

## IV.     SWISS LAW GOVERNS THIS CASE

The parties raise four potential sources of law: federal law, New York State law, Sudanese law, and Swiss law. The Court concludes that Swiss law governs this case.

### A. BNPP's Tortious Conduct Occurred in Switzerland, so Switzerland Has the Greatest Interest

To determine the jurisdiction with the greatest interest, New York courts look primarily to where Defendants' allegedly tortious conduct took place. In this case, almost all of BNPP's tortious activity was committed in one location: Switzerland. Switzerland's interests in this litigation far outweigh those of New York, the federal government, and Sudan.

#### 1. New York's Choice-of-Law Principles Compel the Application of Swiss Law

As the Court detailed above, BNPP's Geneva branch committed the tortious conduct alleged here. First, BNPP Geneva served as the sole correspondent bank for the Sudanese government and the primary European correspondent bank for all major Sudanese commercial banks. Compl. ¶¶ 104, 105; Ex. C. ¶ 19. Second, BNPP Geneva established accounts with various banks in Africa, Europe, and the Middle East and worked with them to conceal transactions that violated American sanctions. Ex. C ¶ 16(b). Third, BNPP Geneva offered letters of credit that helped finance Sudanese exports and imports. Compl. ¶ 106; Ex. C. ¶ 19. Fourth, BNPP Geneva agreed with sanctioned entities in Sudan "not to mention their names in U.S. dollar transactions processed through the United States," and instructed satellite banks to do the same. Ex. C. ¶¶ 16(c)-(e), 18, 21-22, 27. And fifth, BNPP Geneva grew concerned that using BNPP's New York branch to clear dollars was too risky, and thus began using other, unaffiliated American banks to conduct the transactions. Ex. C. ¶¶ 29-31; Ex. I ¶ 48.

In short, the means by which BNPP helped Sudan evade American sanctions were conceived of and put into place in Switzerland. The aiding and abetting of, and the conspiring to commit, torts like conversion and assault occurred in Switzerland. The Second Circuit has made clear that, for cases like this one, "it is the place of the allegedly wrongful conduct that generally has superior 'interests in protecting the reasonable expectations of the parties who relied on [the laws of that place] to govern their primary conduct and in the admonitory effect that applying its law will have on similar conduct in the future.'" *Licci II*, 739 F.3d at 50-51 (quoting *Schultz*, 65 N.Y.2d at 198); *accord Niedernhofer v. Wittels*, 2018 WL 3650137, at *8 (S.D.N.Y. 2018). Because the relevant tortious conduct occurred in Switzerland, New York's choice-of-law rules strongly favor application of Swiss law.

Still, New York courts have cautioned that the choice-of-law inquiry is not formalistic, and the core inquiry remains one of interest balancing. If another jurisdiction has a greater interest in the application of its law in this case, that law could displace Swiss law—even though all the tortious conduct occurred in Switzerland. And the parties variously contend that the law of three other jurisdictions should govern here. The Court reviews and weighs these jurisdictions' interests in turn.

### 2. New York Has Little Interest in This Litigation

The Court first considers Plaintiffs' argument that New York law should govern this action. Plaintiffs point to two facts in support of this argument: federal and state prosecutors in New York brought criminal actions against BNPP, and BNPP cleared money through New York. The Court concludes that neither fact confers New York an interest substantial enough to displace Swiss law.

First, Plaintiffs argue that New York law applies because BNPP took actions to evade regulators in New York and was the subject of two criminal prosecutions in New York. Pl.

11

Supp. Br., Dkt. No. 125, at 3-4.  Because "Plaintiffs' claims arise out of BNPP's criminal

violation[s]," argue Plaintiffs, New York has a "compelling interest in providing a remedy for

victims of New York and federal crimes that occurred in New York." *Id.*

 The Court rejects this argument.  True enough, both New York County and the Southern

District of New York investigated, prosecuted, and reached plea agreements with BNPP

regarding its evasion of the Sudanese sanctions regime.  But this is irrelevant to the choice-of-

law inquiry.  To start, the rules governing venue in criminal cases vastly differ from New York's

choice-of-law principles.  As New York courts have explained, the governing choice-of-law rule

looks to the place of *tortious* activity.  Later criminal prosecutions do not change the location of

the underlying tortious conduct—here, Switzerland.  Moreover, to the extent New York and the

federal government have an interest in policing BNPP's criminal conduct, they have vindicated

that interest through these two lengthy criminal proceedings, each of which resulted in

substantial financial penalties.  *See* Ex. J at 1 ("As a result of [its] violations [of the U.S.

sanctions regime], BNPP pay will $8.9 billion to federal and state authorities . . . terminate senior

executives, and suspend U.S. dollar clearing operations for one year at business lines in which

the misconduct occurred.").

 Second, Plaintiffs argue that New York law should apply because BNPP cleared money

through New York financial institutions, including its own New York branch.  For example,

Plaintiffs allege that BNPP "agreed with the [Sudanese government] to evade sanctions by using

banks unaffiliated with BNPP or Sudan to process illicit transactions . . . BNPP often instructed

the satellite bank to wait a day or more to *clear the funds through New York*."  Compl. ¶ 112

(emphasis added); *see also id.* ¶ 1 (noting BNPP's "U.S. dollar clearing services through New

York); ¶ 209 (alleging that various BNPP branches, including BNPP Geneva, routed dollar

payments through New York); ¶ 210 (alleging that "the U.S. financial system, which is primarily based in New York, was integral to BNPP's actions, irrespective of where the illicit transactions originated."); ¶ 213 (alleging that "New York [was the] locus of BNPP's crimes" because various dollar-denominated payment messages were sent through New York-based banks).

This minor connection to New York is insufficient for the state's law to apply. In cases in which conduct cuts across several jurisdictions, the Second Circuit has made clear that the law of the jurisdiction with "the most significant contacts in [the] case" governs. *In re Thelan LLP*, 736 F.3d 213, 220 (2d Cir. 2013); *accord White Plains Coat & Apron Co. v. Cintas Corp.*, 460 F.3d 281, 284-85 (2d Cir. 2006) (applying New York law over that of New Jersey and Connecticut because "twenty-eight of the thirty-five customers involved are located in New York."); *SourceOne Dental, Inc. v. Patterson Co., Inc.*, 310 F. Supp. 3d 346, 352-53 (E.D.N.Y. 2018) (applying Texas law because Texas was where "the majority of the tortious conduct occurred," even though Defendants aided and abetted and conspired to commit tortious activity in New York and Arizona). New York courts agree that conduct should be weighed for choice-of-law purposes when it cuts across multiple jurisdictions. *See, e.g.*, *FIA Leveraged Fund Ltd. v. Grant Thorton, LLP*, 36 N.Y.S.3d 47 (Sup. Ct. N.Y. 2016) (applying New York law because the bulk of Defendants' accounting was performed in New York, even though some work was performed in the Cayman Islands). This weighing of conduct is in line with the core principle of New York's approach, interest balancing. The jurisdiction in which the bulk of tortious conduct took place will usually have a greatest interest in regulating that conduct.

The Court must therefore weigh BNPP's conduct in Switzerland against that in New York. As discussed, the conduct in Switzerland is at the heart of this litigation. BNPP Geneva served as a correspondent bank for Sudanese entities, worked with satellite banks to evade

American sanctions, and provided letters of credit to facilitate Sudanese trade.  In contrast, BNPP cleared money through New York—a process that is automated and ministerial.  Plaintiffs do not allege that BNPP and the Sudanese government entered into any agreements in New York.  Plaintiffs do not allege that any schemes to evade American sanctions were concocted in New York.  Plaintiffs do not even allege that a single conversation in furtherance of the conspiracy took place in New York.  Moreover, the New York Court of Appeals has held, in the context of *forum non conveniens*, that the "state's interest in the integrity of its banks is indeed compelling, but it is not significantly threatened every time one foreign national, effecting what is alleged to be a fraudulent transaction, moves dollars through a bank in New York . . . every major fraud case in the world in which dollars are involved [does not] belong[] in the New York courts." *Mashreqbakn PSC v. Ahmed Hamad Al Gosaibi & Bros. Co.*, 23 N.Y.3d 129, 137 (N.Y. 2014).  The State's highest court made clear that New York's interest in its banking system "is not a trump card to be played whenever a party to such a transaction seeks to use our courts for a lawsuit with little or no apparent contact with New York." *Id.* (internal quotation marks omitted).

Comparing these allegations and keeping in mind the Court of Appeals' guidance, the Court concludes that the conduct in Switzerland far outweighs that in New York.  Switzerland therefore has a greater interest than New York in application of its law to this case.

### 3.  The Federal Government Has Little Interest in This Litigation

The Court next addresses BNPP's argument that the federal government has the greatest interest in this litigation, and its law should therefore apply.[1]  The Court concludes that Switzerland's interest far outweighs that of the federal government.

---

[1] To be clear, BNPP does not argue that federal law *preempts* Plaintiffs' state-law claims.  At no point in its briefing did BNPP advance such an argument.  And at oral argument, BNPP

14

BNPP's argument in favor of federal law is premised on the Second Circuit's characterization of Plaintiffs' claims as stemming from violations of international-law norms. "A *jus cogens* norm, also known as a peremptory norm of international law, is a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character." *Carpenter v. Republic of Chile*, 610 F.3d 776, 780 n.4 (2d Cir. 2010). On appeal, the Second Circuit held that Plaintiffs' claims are predicated on violations of these norms: "There is no doubt that *jus cogens* norms were violated by the atrocities occurring in Sudan . . . All of Plaintiffs' claims are premised on these blatant violations of *jus cogens* norms." *Kashef*, 925 F.3d at 61. Because of this connection to international law, BNPP argues that Plaintiffs' claims "implicate uniquely federal interests" and "a state such as New York, as opposed to the federal government, has a limited interest in applying its law to such disputes." Def. Supp. Br., Dkt. No. 117, at 2-4. In response, Plaintiffs argue that this language is irrelevant because it relates to whether the act-of-state doctrine applies, not choice of law. Oral Arg. Tr. at 23-24. And they argue that the language is dicta because it was "not necessary to the Second Circuit's decision." Pl. Supp. Br. at 7.

Even if the Second Circuit's language was a holding, the federal government's interest in this litigation would not outweigh that of Switzerland. To be sure, courts have long recognized that international law is a part of federal, not state, law. *See Sosa*, 542 U.S. at 730 ("For two centuries we have affirmed that the domestic law of the United States recognizes the law of nations."); *Kadic v. Karadzic*, 70 F.3d 232, 246 (2d Cir. 1995) ("settled proposition that federal

---

expressly disavowed reliance on preemption. *See* October 24, 2019 Oral Argument Transcript (Tr.), Dkt. No. 137, at 67 (agreeing BNPP did not argue field preemption applied), 68 ("No, we're not arguing field preemption.").

common law incorporates international law").  The federal government thus has an interest in

policing certain violations of international law.  However, this generalized interest does not

mandate application of federal law whenever a case touches upon violations of international law.

At core, New York's interest analysis is a "flexible approach intended to give controlling effect

to the law of the jurisdiction which, because of its relationship or contact with the occurrence or

the parties, has the *greatest concern with the specific issue raised in the litigation*." *Licci I*, 672

F.3d at 157–58 (quoting *Cooney*, 81 N.Y.2d at 72, 595 N.Y.S.2d at 922) (emphasis added).

Here, the tortious conduct and the injury occurred exclusively in other jurisdictions.  As BNPP

itself recognizes, this case involves "claims premised on violations of international law by

*foreign* actors against *foreign* plaintiffs in *foreign* territories."  Def. Supp. Reply Br. at 5

(emphases added).  BNPP's tortious conduct occurred dominantly in Switzerland.  The federal

government's interest in international law does not extend to policing violations around the

entire globe.  The only connection between BNPP's tortious conduct and the federal government

is the same as discussed above—clearing money through the United States.  But that alone does

not mandate application of federal law.  In contrast, Switzerland has a strong stake in policing

and imposing liability for tortious conduct committed within its borders.  The Court thus

concludes that Switzerland's interest far exceeds that of the federal government.

### 4.  Sudan Has an Interest in This Litigation, but Swiss Law Still Applies

BNPP finally argues that Sudanese law should apply to this action.[2]  Although Sudan has

a stronger interest in this litigation than New York or the federal government, the Court rejects

this argument.

---

[2] Plaintiffs point out that "the location of many of the alleged torts is now in the Republic of
South Sudan, a separate country that seceded from Sudan in 2011," and thus argue that, on
BNPP's theory, South Sudanese law should apply here.  Pl. Br. at 20-21 n.108.  However, "the
pertinent time for purposes of choice-of-law analysis is the time of the tort rather than any later

Sudan certainly has an interest in this litigation.  At the time of the atrocities alleged, Plaintiffs were all Sudanese residents.  The actual violence committed against them occurred in Sudan.  And BNPP is alleged to have acted in concert with the Sudanese government.  However, the choice-of-law inquiry applicable here looks to the place of *conduct*, not injury.  The District Court in *Niedernhofer* explained that "in the context of conduct-regulating rules, where the wrongful conduct and the injury occur in different states, the law of the state where the conduct occurred will typically apply."  2018 WL 3650137 at *8.  Here, that jurisdiction is Switzerland. This would be a different case if Plaintiffs sued the actors that directly perpetrated violence against them—say, for example, members of the Janjaweed.  In such a case, the tortious conduct and injury would have occurred in the same jurisdiction, and Sudanese law would almost certainly govern.  But Plaintiffs instead brought suit against a financial entity that facilitated that violence through misconduct taking place far outside Sudan.  Switzerland is where that misconduct occurred and so has the greater interest in this litigation than Sudan.

### B.  Analogous Cases Support the Application of Swiss Law

The Court's conclusion that Swiss law governs this case finds substantial support in this Circuit's caselaw.  Faced with similar facts, the Second Circuit and Courts in this District have uniformly applied the law of the jurisdiction where the defendant-bank's conduct occurred.

To start, the *Licci* cases in the Second Circuit involved claims brought by victims of Hezbollah rocket attacks in Israel against the Lebanese Canadian Bank and its American correspondent bank, American Express.  *Licci I*, 672 F.3d at 155.  The plaintiffs alleged that

---

time."  *Youngman v. Robert Bosch LLC*, 923 F.Supp.2d 411, 420 (E.D.N.Y. 2013); *see also Gore v. Northeast Airlines, Inc.*, 373 F.2d 717, 722–24 (2d Cir. 1967); *Gutierrez v. Swaim Inc.*, 1994 WL 62843, at *2 (S.D.N.Y. Feb. 23, 1994) ("[F]or purposes of resolving choice of law issues, the relevant consideration is the residence of a plaintiff at the time of the accident.") (internal quotation marks omitted).  Plaintiffs allege torts that all occurred before South Sudan separated from Sudan, and the Court thus considers whether Sudanese law is applicable here.

Lebanese Canadian Bank maintained accounts for a Hezbollah affiliate and carried out wire transfers on its behalf. *Id.* at 156. And they alleged that AmEx facilitated those transfers. *Id.* The parties disagreed as to whether New York or Israeli law governed Plaintiffs' state-law negligence claim against AmEx. The Second Circuit concluded that New York had the "greatest interest in th[e] litigation" because "[a]ll of the challenged conduct undertaken by AmEx occurred in New York, where AmEx is headquartered and where AmEx administers its correspondent banking services." *Id.* at 158. The Court further noted that "New York, not Israel, has the stronger interest in regulating the conduct of New York-based banks operating in New York." *Id.* The Second Circuit later, on panel rehearing, doubled down, holding that "it is New York, and not Israel, that 'has an overriding interest in regulating' the conduct of banks operating 'within its borders.'" *Licci II*, 739 F.3d at 51 (quoting *Matter of Allstate Ins. Co.*, 81 N.Y.2d 219, 225, 613 N.E.2d 936, 938 (1993)).

The Second Circuit came to a similar conclusion when it considered alleged misrepresentations made by Citigroup in New York that harmed shareholders living in Florida. *See AHW Invest. P'ship, MFS, Inc. v. Citigroup Inc.*, 661 Fed. App'x 2, 3 (2d Cir. 2016). The issue in *AHW* was whether Florida or New York law applied to the state-law claims. The Court concluded New York law applied because "the allegedly wrongful conduct—the misrepresentations made by Citigroup and its officers—took place in New York, where Citigroup had its headquarters." *Id.* at 5.

District Courts have also followed this approach. In *Holborn Corp. v. Sawgrass Mut. Ins. Co.*, Sawgrass alleged that Holborn acted negligently and breached its fiduciary duty by failing to recommend and secure an insurance policy. 304 F. Supp. 3d 392 (S.D.N.Y. 2018). Although Holborn's conduct occurred in New York, Sawgrass was domiciled and injured in Florida. It

18

therefore argued that the law of the place of injury, Florida, should apply.  The Court rejected this view and "conclude[d] that [the Court] must follow the decision in *Licci* and presume that the state with the greatest interest in this case is the state in which the alleged wrongful conduct occurred."  *Id.* at 399.  Because Holborn's allegedly tortious conduct occurred in New York, the Court applied New York law.  *Id.* at 400-01.  Similarly, the plaintiffs in *Wultz v. Bank of China* alleged that a Chinese bank aided and abetted a Palestinian terrorist organization by facilitating its wire transfers.  865 F. Supp. 2d. 425 (S.D.N.Y. 2012).  The Court applied Chinese law because "the bulk of the actual banking services occurred in China . . . [i]n contrast, only a small fraction of the relevant banking conduct occurred in New York: the wire transfers to China may have incidentally passed through [the Chinese bank's] branch in New York."  *Id.* at 428.  Because "[t]he majority of the Bank's conduct occurred in China" and New York was just the location "through which the wire transfers passed only briefly," "China's interest in regulating bank conduct within its borders [was] dispositive" to the choice-of-law inquiry.  *Id.* at 429.

In all four of these cases, courts applied the law of the jurisdiction in which the defendant engaged in tortious conduct.  And courts did not apply the law of jurisdictions with merely incidental relations to that activity.  Here, BNPP engaged in tortious conduct almost exclusively in Switzerland, and only cleared money through New York.  These cases therefore all support application of Swiss law to Plaintiffs' claims.

* * * * *

The parties in this case put forward four possible jurisdictions for choice-of-law purposes: Switzerland, New York State, the federal government, and Sudan.  The Court concludes that of these four, Switzerland has the greatest interest in this litigation, and its law therefore applies to Plaintiffs' claims.

## V.   ON THIS RECORD, THE COURT CANNOT DETERMINE WHETHER PLAINTIFFS HAVE STATED A CLAIM UNDER SWISS LAW

The Court must next determine whether Plaintiffs have stated a claim under Swiss law. Because of the limited record before the Court regarding this issue, the Court orders additional briefing and schedules a hearing regarding the meaning of Swiss law.

Federal Rule of Civil Procedure 44.1 governs "the mode of determining foreign law in federal courts." *Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1873 (2018). Courts "may consider any relevant material or source . . . whether or not . . . admissible under the Federal Rules of Evidence" to ascertain foreign law. Fed. R. Civ. P. 44.1; *see Animal Sci. Prod.*, 138 S. Ct. at 1873. Courts may thus look to the parties' filings, witness testimony, and any foreign materials discovered through their own research. *See* Fed. R. Civ. P. 44.1 (Advisory Committee's note); *G & G Prods. LLC v. Rusic*, 902 F.3d 940, 948 (9th Cir. 2018). Courts can also hold hearings to determine the meaning of foreign law, even at the motion-to-dismiss stage. *See, e.g., Dedon GmbH v. Janus et Cie*, 2010 WL 4227309 (S.D.N.Y. 2010) (holding "a hearing with witnesses and argument" to determine issue of foreign law and allowing limited discovery prior to deciding Rule 12(b)(1) motion); *AIM Int'l Trading, L .L.C. v. Valcucine S.P.A.*, 2003 WL 21203503, at *5 (S.D.N.Y. 2003) ("Under Rule 44.1, determinations of foreign law are questions of law to be decided by the Court. In a typical litigation involving foreign law, a motion to dismiss may be an appropriate time to decide the substance of another country's law that bears on the case at hand." (internal citation omitted)).

The parties disagree about the import of Swiss law here. Yet they have provided little briefing on this issue, and instead rely heavily on dueling declarations from purported experts of Swiss law. BNPP has submitted a declaration from Vito Roberto, a professor at the University of St. Gallen in Switzerland and practicing Swiss attorney. *See* Dkt. No. 37. And Plaintiffs have

put forward on a declaration from Franz Werro, a professor of law at Friboug University Law School in Switzerland. *See* Dkt. No. 81. Roberto has also submitted a reply to Werro's declaration. *See* Dkt. No. 87.

These two experts make drastically different representations about how Swiss law treats Plaintiffs' claims. Roberto argues that a "Swiss court and, in any event, the Swiss Supreme Court would dismiss the claims described in the Complaint" for failure to comply with Swiss statutes and decisional law, including for failing to meet the tort causation standard. Dkt. No. 87 at 17. In contrast, Werro argues that Roberto has misconstrued various tort rules and that most of Plaintiffs' claims should survive dismissal. Each professor also accuses the other of misreading statutes and ignoring caselaw.

The parties have provided minimal briefing on this issue. The experts disagree on key issues, like the Swiss standard for causation. And the parties have not provided the Court with any Swiss-law primary sources, such as the judicial opinions referenced in the declarations, leaving the Court with little ability to determine "the persuasive force of the [expert] opinions." *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 92 (2d Cir. 1998). The Court is therefore not currently in a position to determine whether Plaintiffs have stated a claim under Swiss law.

## VI.    CONCLUSION

The parties are ordered to meet and confer regarding whether further discovery is needed as to the meaning of Swiss law, including depositions of the expert witnesses. Irrespective of whether the parties intend to conduct additional discovery, they must submit supplemental briefing on the following question: Does Plaintiffs' Second Amended Complaint state a claim for relief under Swiss law? The parties are ordered to submit a joint letter, no later than two weeks from the date of this Order, advising the Court whether they intend to conduct discovery,

proposing a briefing schedule, and providing mutually agreeable dates for a hearing.


        SO ORDERED.


Dated:  March ___3___, 2020
        New York, New York

_____
        ALISON J. NATHAN
        United States District Judge