UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ENTESAR OSMAN KASHEF, *et al.*,

                              Plaintiffs,

          -against-

BNP PARIBAS S.A., BNP PARIBAS S.A. NEW
YORK BRANCH, BNP PARIBAS NORTH
AMERICA, INC., and DOES 2-10,

                              Defendants.

Civil No. 1:16-Civ-03228-AJN

Hon. Alison J. Nathan

---

**SUPPLEMENTAL BRIEF OF DEFENDANTS BNP PARIBAS S.A. AND
BNP PARIBAS NORTH AMERICA, INC. IN FURTHER SUPPORT OF THEIR
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000

Attorneys for Defendants BNP Paribas S.A. and BNP
Paribas North America, Inc.

August 17, 2020

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

TABLE OF ABBREVIATIONS ................................................................................................... iii

PRELIMINARY STATEMENT .................................................................................................... 1

ALLEGATIONS OF THE COMPLAINT..................................................................................... 3

ARGUMENT .................................................................................................................................. 5

I.       The SAC Fails To State Any Primary Liability Claims Against The BNPP Defendants... 6

II.      The SAC Fails To State Any Secondary Liability Claims Against The BNPP
         Defendants ....................................................................................................................... 7

   A.    Plaintiffs Fail To Plausibly Allege Collective Conduct And Collective Fault. .................. 8

   B.    Plaintiffs' Claims Fail For The Additional Reason That The SAC Does Not, And Cannot,
         Plausibly Allege That The BNPP Defendants' Conduct Satisfies The Restrictive
         Causation Requirements Of Swiss Tort Law................................................................... 17

III.     The Claims Against "BNP Paribas S.A. New York Branch" And BNP Paribas North
         America Inc. Should Be Dismissed. ................................................................................ 23

CONCLUSION............................................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

Anti-Terrorism Act, 18 U.S.C. § 2333................................................................... 13

Federal Rule of Civil Procedure 12(b)(6) ........................................................... 1, 24


**Cases**

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009).......................................................................................... 12, 18

*Dubai Islamic Bank v. Citibank, N.A.,*
126 F. Supp. 2d 659 (S.D.N.Y. 2000)..................................................................... 14

*Freeman v. HSBC Holdings PLC,*
413 F. Supp. 3d 67 (E.D.N.Y. 2019) ...................................................................... 13

*In re Optimal U.S. Litig.,*
886 F. Supp. 2d 298 (S.D.N.Y. 2012)....................................................................... 1

*Kashef v. BNP Paribas S.A.,*
925 F.3d 53 (2d Cir. 2019)......................................................................................... 6

*O'Sullivan v. Deutsche Bank AG,*
No. 17 Civ. 8709 (LTS) (GWG), 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) ............. 13

*Ofisi v. BNP Paribas, S.A.,*
278 F. Supp. 3d 84 (D.D.C. 2017) ......................................................................... 20

*Owens v. BNP Paribas, S.A.,*
897 F.3d 266 (D.C. Cir. 2018)................................................................................. 20

*Rothstein v. UBS AG,*
708 F.3d 82 (2d Cir. 2013)....................................................................................... 19

*Tufaro v. City of N.Y.,*
No. 12 Civ. 7505 (AJN), 2014 WL 4290631 (S.D.N.Y. Aug. 28, 2014) .......................... 5

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| BNPP Br.[*] | Mem. of Law of Defs. BNP Paribas S.A. and BNP Paribas North America Inc. in Support of Their Mot. to Dismiss the Second Am. Compl. (Mar. 21, 2017), ECF No. 69 |
| Reply | Mem. of Law of Defs. BNP Paribas S.A. and BNP Paribas North America, Inc. in Further Support of Their Mot. to Dismiss the Second Am. Compl. (July 6, 2017), ECF No. 85 |
| Pl. Br. | Pls.' Opp. to Defs.' Mot. to Dismiss the Second Am. Compl. (May 22, 2017), ECF No. 80 |
| Ramamurthi Decl. | Declaration of Rathna J. Ramamurthi |
| Roberto Supp. Decl.[†] | Supplemental Declaration of Vito Roberto, dated August 13, 2020 |
| Roberto Supp. Reply | Supplemental Reply Declaration of Vito Roberto, dated August 13, 2020 |
| Roberto Decl. | Declaration of Vito Roberto, dated March 21, 2017, ECF No. 68 |
| Roberto Reply | Reply Declaration of Vito Roberto, dated July 6, 2017, ECF No. 87 |
| Werro Supp. Decl. | Corrected Supplemental Declaration of Franz Werro, dated July 23, 2020 |
| Werro Decl. | Declaration of Franz Werro, dated May 22, 2017, ECF No. 81 |
| Werro Tr. | Transcript of the Deposition of Franz Werro, dated July 31, 2020 |

---

[*] Capitalized terms not otherwise defined have the definitions given in the Mem. of Law of Defs. BNP Paribas S.A. and BNP Paribas North America Inc. in Support of Their Mot. to Dismiss the Second Am. Compl. (Mar. 21, 2017), ECF No. 69 and Mem. of Law of Defs. BNP Paribas S.A. and BNP Paribas North America, Inc. in Further Support of Their Mot. to Dismiss the Second Am. Compl. (July 6, 2017), ECF No. 85.

[†] Unless otherwise noted, all exhibits accompany the Supplemental Declaration of Vito Roberto, dated August 13, 2020 and/or the Supplemental Reply Declaration of Vito Roberto, dated August 13, 2020.

Pursuant to this Court's Orders dated March 3, 2020 and March 20, 2020, directing the parties to conduct additional discovery and submit supplemental briefing concerning Swiss law in connection with the BNPP Defendants' Motion to Dismiss the Second Amended Complaint, the BNPP Defendants submit this Supplemental Brief in Support of their Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

After conducting a choice of law analysis, this Court held that all of the claims in this action are governed by Swiss law and ordered supplemental briefing on "whether Plaintiffs have stated a claim under Swiss law."  Order at 20 (Mar. 3, 2020), ECF No. 151.  The Court concluded that Swiss law governs plaintiffs' claims because "Switzerland has a strong stake in policing and imposing liability for tortious conduct committed within its borders."  *Id.* at 16.[1] But just as "[t]he [U.S.] federal government's interest in international law does not extend to policing violations around the entire globe," *id.*, neither does Switzerland's interest in policing conduct within its borders create a private right of action for violations of other countries' sanctions regimes, which, at bottom, is what plaintiffs are asserting here.

Plaintiffs have identified no Swiss case imposing tort liability on a business for the human rights violations of a foreign government based solely on transactions by that business that resulted in the foreign government having greater access to hard currency.  Nor could they. Professor Vito Roberto's thorough review of a full century of Swiss Supreme Court tort cases

---

[1] In light of the Court's holdings that "the conduct in Switzerland is at the heart of this litigation" and "New York has little interest in this litigation," *id.* at 13, 11, dismissal may also be warranted on *forum non conveniens* grounds.  If the Court finds plaintiffs have stated any claim under Swiss law, the BNPP Defendants reserve the right to seek dismissal based on *forum non conveniens*.  *See In re Optimal U.S. Litig.*, 886 F. Supp. 2d 298, 302, 316 (S.D.N.Y. 2012) (dismissing for *forum non conveniens* following ruling "under relevant choice-of-law principles" that "Swiss law will most likely govern" because "the balance of factors has changed and now point strongly towards dismissal").

revealed no precedent imposing liability where, as here, there was no direct link between the injurious conduct (attacks on Sudanese citizens over a period of more than a decade) and the conduct engaged in by the foreign government's alleged accomplice (transactions with Sudanese banks that are alleged to have resulted in more "hard currency" coming into the country). While this litigation has been pending, plaintiffs' expert Professor Franz Werro published an article in which he set out a hypothetical modeled on the Complaint here and asserted that a bank in the position of the BNPP Defendants would be liable under Article 50(1) of the Swiss Code of Obligations. Tellingly, the article cites no Swiss law (or any) authority for that assertion. Professor Vito Roberto's analysis, by contrast, demonstrates plaintiffs have failed to state a claim because Swiss tort law does not recognize the Complaint's primary liability claims, and provides for secondary liability only under narrow circumstances, namely, where there is collective conduct, collective fault, and collective causation. Those elements are not satisfied here.

*First*, collective conduct and collective fault are not satisfied because the Complaint is devoid of factual allegations supporting a plausible claim that the BNPP Defendants "consciously cooperated" with the primary tortfeasors in committing the human rights violations suffered by plaintiffs. The BNPP Defendants—the purported accomplices here—did not engage in the same activity as the primary tortfeasors, or otherwise contribute willfully or immediately to the harm suffered by plaintiffs, and therefore cannot be held liable for plaintiffs' injuries.

*Second*, it is common ground among the experts in this case that collective causation has requirements much like the U.S. concept of proximate causation. The purported accomplice's contribution must have been sufficiently substantial and closely related to the plaintiffs' injuries. The Complaint, by contrast, sets out a purported causal chain between the BNPP Defendants'

conduct (transactions in violation of U.S. sanctions) and plaintiffs' injuries at the hands of multiple actors in Sudan that is far too attenuated to support liability under Swiss tort law.

Accordingly, as demonstrated in Professor Roberto's declarations, the cases cited there, and for the reasons below, the SAC fails to state any claims for relief under Swiss law.  The Court should therefore dismiss it.

## ALLEGATIONS OF THE COMPLAINT

The Complaint alleges a conspiracy among the BNPP Defendants, Sudanese financial institutions and the Sudanese government and various of its agents and affiliates.  *See* SAC ¶¶ 101-51.  It asserts that the BNPP Defendants "conspired with the SDNs . . . to violate the [U.S.] Sanctions against [Sudan] by providing Sudanese banks with access to the U.S. financial system through its New York branch," processing "thousands of illegal financial transactions in the United States," and "tak[ing] steps to conceal the fact that [the BNPP Defendants were] processing transactions in New York on [the Sudanese financial institutions'] behalf."  SAC ¶¶ 196, 298.  According to the Complaint, in processing these transactions in violation of U.S. sanctions that were "intended to stop Sudan's terrorist activities and human rights abuses," the BNPP Defendants provided "the financial means by which [Sudan] committed widespread human rights violations" over the course of more than a decade (between 1997 and 2009), *i.e.*, before and after the sanctions violations took place.  *E.g.*, SAC ¶¶ 1, 24, 69, 70, 148, 194.

The allegations in the Complaint concerning the BNPP Defendants are based almost exclusively on BNP Paribas's June 2014 guilty pleas to U.S. federal and New York State criminal charges and related civil settlements with U.S. federal and New York State banking regulators and the U.S. Office of Foreign Assets Control, addressing violations of U.S. sanctions prohibiting certain financial transactions with designated countries and SDNs.  *See, e.g.,* SAC ¶¶ 3, 101-14, 191-218.  The financial services that are the subject of the Complaint were

3

processed by a Swiss subsidiary of BNP Paribas, BNP Paribas (Suisse) S.A.  *See, e.g.*, SOF ¶¶ 19, 23-25, 27 (SAC Ex. D).  The Complaint does not allege that any of these financial services were in violation of Swiss sanctions.

The Complaint also does not contain any non-conclusory allegations sufficient to support the inference that the BNPP Defendants "agreed with [Sudan] and intended that the [torts against plaintiffs] be committed" or acted knowingly to injure plaintiffs.  *See* SAC ¶¶ 331, 361, 393, 421, 451, 509.  Nor does it contain any non-conclusory allegations supporting the conclusion that the BNPP Defendants consciously cooperated with Sudan to commit the alleged abuses. Likewise, there are no allegations that the BNPP Defendants committed, encouraged, or directed any attack, or otherwise controlled or even interacted with the militia members or other individuals in Sudan who did commit the attacks.  The injuries suffered by plaintiffs resulted from a range of activities that took place over a period of at least eleven years, *see, e.g.*, SAC ¶¶ 48, 30 (alleging attacks taking place in 1997 and 2008), in locations hundreds of miles apart, *see, e.g.,* SAC ¶¶ 41, 43, 50 (alleging injuries occurring in Juba and Wau, respectively 1,200 and 800 miles away from Khartoum, where other injuries are alleged to have occurred) and involving a range of actors in Sudan, *see* SAC ¶¶ 30, 41, 43, 50, 447, 460 (police personnel, Janjaweed, non-uniformed militias, for example).  The SAC does not link a single banking transaction involving the BNPP Defendants to any attack that injured plaintiffs.  Instead, the Complaint purports to connect the BNPP Defendants' conduct to plaintiffs' injuries by positing that because the BNPP Defendants provided financial services to Sudanese banks, that allowed them to access hard currency, and during that time period, as Sudan's oil revenues and military spending increased, the Sudanese government continued to arm various militant groups that committed various crimes against the civilian population.  SAC ¶¶ 101-51.  Had the BNPP Defendants

complied with U.S. sanctions, the SAC alleges, that would have "limit[ed] the GOS's ability to commit atrocities."  SAC ¶ 9.[2]

## ARGUMENT

Over the past 100 years, the Swiss Supreme Court—which is the highest court in Switzerland and which both experts agree is the decisive authority on Swiss law, *see* Roberto Supp. Reply ¶ 2; Werro Supp. Decl. ¶¶ 16, 18; Werro Tr. at 35:20-36:3—has consistently taken a restrictive approach to tort liability, giving great weight to the principle of "the loss lies where it falls" and stating repeatedly that Swiss courts should be careful to not let liability "get out of hand," Roberto Supp. Decl. ¶ 39 (citing Ex. 16, Supreme Court 4A_637/2015).

The methodology used by Professor Roberto in his expert declarations in this case—reviewing every Art. 50(1) CO decision by the Swiss Supreme Court to understand how the statute is applied by the Court, *id.* ¶ 42 n.18—has been praised by plaintiffs' expert himself, albeit indirectly.  At his deposition, Professor Werro praised his own former research assistant Vincent Perritaz for taking the same approach in his scholarship regarding a different statutory provision (Art. 51 CO), calling Perritaz's method of going "back and analyz[ing] every single Supreme Court decision on the subject matter . . . a clear sign . . . of quality."  Werro Tr. at 34:22-25; *id*. at 37:6-8 ("I think you understand really the law if you go back to the cases"); *id*. at 35:17-19 ("on the basis of these cases" one is "able to come up with a deep understanding of the whole thing"); *id*. at 43:19-21 ("[A] statute will often be silent or will be imprecise, and that's

---

[2] The Complaint contains several other conclusory, boilerplate allegations of causation: that Plaintiffs were injured "[a]s a direct and proximate result of Defendants" conduct, SAC ¶¶ 274, 321, 328, 349, 359, 381, 391, 411, 426, 438, 441, 449, 456, 470, 507, and the BNPP Defendants' conduct was "a substantial factor in causing Plaintiffs' injuries," SAC ¶ 2; *see, e.g.,* SAC ¶¶ 13, 51.  These are "legal conclusion[s] couched as [ ] factual allegation[s]," which a court is "not bound to accept as true." *Tufaro v. City of N.Y.*, No. 12-CV-7505 (AJN), 2014 WL 4290631, at *2 (S.D.N.Y. Aug. 28, 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

why you will need cases.").  Indeed, Professor Roberto's method is also consistent with another expert declaration by Professor Werro explaining how Swiss courts decide cases.  *See Kaufman v. Luzern,* No. 95 Civ. 3316 (RPP), 1997 WL 34460613, at *8 (S.D.N.Y. May 14, 1997) ("*Kaufman* Report") (Professor Werro opining that "the facts of decided cases are compared and contrasted with the facts of a new case for the purposes of argument and decision-making") (Ramamurthi Decl. Ex. D).[3]

# I.  THE SAC FAILS TO STATE ANY PRIMARY LIABILITY CLAIMS AGAINST THE BNPP DEFENDANTS

The SAC is devoid of any allegations that the BNPP Defendants committed the attacks against plaintiffs, directly caused plaintiffs' alleged emotional distress, or violated any Swiss law in providing financial services to Sudanese banks.  Nonetheless, it purports to allege four primary liability claims—for outrageous conduct causing emotional distress (Count 15), negligent infliction of emotional distress (Count 16), and negligence *per se* (Counts 1 and 2).[4] Because these claims are alleged as independent torts against the BNPP Defendants, to state a claim under Swiss law, plaintiffs must plead "that granting Sudanese banks access to USD transactions *by itself* caused" plaintiffs' harm.  Roberto Supp. Decl. ¶ 70.  Plaintiffs have not done so, which on its own requires dismissal of all four primary liability claims.

---

[3] By contrast, Professor Werro's Supplemental Declaration "focuses more on scholarly writings than on case law," Roberto Supp. Reply ¶ 3, which at his deposition Professor Werro described as an inferior form of analysis, Werro Tr. at 35:7-11 ("For civilians, very often you have people who do not do much more than just read what has been written by others.  Perritaz outstandingly did not do that.").  This focus on scholarly writing rather than case law led Professor Werro to erroneously conclude in his first declaration that Art. 50(1) CO was "an independent basis for imposing liability on joint tortfeasors," Werro Decl. ¶¶ 16, 20, a position he abandoned after Professor Roberto pointed out his error, including that one of the legal authorities Professor Werro cited for this proposition states the opposite.  Roberto Reply ¶¶ 12-19; Roberto Supp. Reply ¶ 3.  The majority of Swiss legal scholarly writings in any event do not help plaintiffs since they confirm the restrictiveness of Swiss tort law.  *See* Roberto Supp. Reply ¶ 23.

[4] Plaintiffs' claims for commercial bad faith (Count 17) and unjust enrichment (Count 18) are no longer at issue, as they were previously dismissed by this Court and plaintiffs did not challenge the dismissal on appeal.  *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 57 n.3 (2d Cir. 2019).

Counts 15 and 16 additionally fail because neither outrageous conduct causing emotional distress nor negligent infliction of emotional distress is a cognizable claim under Swiss law. Roberto Supp. Decl. ¶ 72; Roberto Decl. ¶¶ 37-39.  As to Counts 1 and 2, Swiss law only recognizes negligence per se where there is a predicate violation of certain Swiss criminal and administrative laws, and the Swiss law at issue was designed to protect the claimant.  Roberto Supp. Decl. ¶ 71; Roberto Decl. ¶ 36.  No such predicate exists or is alleged here.

Plaintiffs have not argued otherwise.  Plaintiffs' expert, who agrees that any claims of primary liability would need to arise under Art. 41 CO, Werro Supp. Decl. ¶¶ 20-23, makes no effort to claim that the BNPP Defendants could be liable as primary actors and offers no authority to suggest that the SAC's emotional distress and negligence *per se* claims are recognized under Swiss law.  Professor Werro characterizes plaintiffs' injuries as harms they "suffered as a consequence of the crimes that th[e] government [of Sudan] committed," Werro Tr. at 13:19-20, and thus limits his analysis to secondary liability under Art. 50(1) CO, implicitly (and correctly) conceding that the BNPP Defendants cannot be held liable under Swiss law on any primary liability theory.  *See* Werro Supp. Decl. ¶ 58 ("All of the causes of action in the Complaint are encompassed by Article 50 CO . . . . For this reason, I focus exclusively on Professor Roberto's flawed interpretation of Article 50 CO, and will not address other irrelevant matters."); Roberto Reply ¶ 5 ("Since Professor Werro's Declaration does not discuss the primary liability claims, I infer that that he has no disagreement with my analysis of those claims[.]").

## II.    THE SAC FAILS TO STATE ANY SECONDARY LIABILITY CLAIMS AGAINST THE BNPP DEFENDANTS

The parties agree that the applicable Swiss-law provision under which to analyze the

SAC's secondary liability claims is Art. 50(1) CO in connection with Art. 41 CO.[5]  Art. 50(1) CO provides that "[w]here two or more persons have together caused damage, whether as instigator, perpetrator or accomplice, they are jointly and severally liable to the person suffering damage."  Art. 50(1) CO (Ex. 3).  It is common ground that the BNPP Defendants could only be liable as accomplices.  Roberto Supp. Decl. ¶¶ 20-21; Werro Supp. Decl. ¶ 23; Werro Tr. at 48:18-49:9.  Accomplice liability under Swiss law requires collective conduct, collective fault, and collective causation.  Roberto Supp. Decl. ¶ 24.  Here, the Complaint fails to plead adequately any of these elements, which is not surprising, given that the Swiss Supreme Court has only upheld accomplice liability under narrow sets of circumstances, and never "based on facts similar to those at issue here[.]"  *Id.* ¶ 60.

> ### A.    Plaintiffs Fail To Plausibly Allege Collective Conduct And Collective Fault.

For the element of "collective conduct" under Art. 50(1) CO to be satisfied, an alleged accomplice must have consciously cooperated with the main tortfeasor in the injurious course of conduct.  *See, e.g.,* Locksmith Case, Supreme Court 4A_185/2007 at 7 (6.2.1) ("[T]he tortfeasors must have cooperated deliberately to arrive at this result.") (Ex. 5); Roberto Supp. Decl. ¶ 27.  A review of all decisions by the Swiss Supreme Court regarding Art. 50(1) CO demonstrates that the purported accomplice's contribution to the harm through cooperation with the main tortfeasors must be (i) willful and substantial or (ii) immediate and substantial (or both).  *See,*

---

[5] The secondary liability claims are conspiracy to commit battery (Counts 3 and 5), aiding and abetting battery (Counts 4 and 6), conspiracy to commit assault (Count 7), aiding and abetting assault (Count 8), conspiracy to commit false arrest and false imprisonment (Count 9), aiding and abetting false arrest and false imprisonment (Count 10), conspiracy to commit conversion (Counts 11 and 13), aiding and abetting conversion (Counts 12 and 14), conspiracy to commit wrongful death (Count 19) and aiding and abetting wrongful death (Count 20).  SAC ¶¶ 295-472, ¶¶ 503-529.  In addition to the deficiencies under Art. 50(1) CO described *infra*, Counts 19 and 20 are also subject to dismissal to the extent that they fail to allege that the claimant either lost a means of support as a result of the death of the decedent (Art. 45 CO), or had a close relationship to the decedent (Art. 47 CO).

*e.g.*, Roberto Supp. Decl. ¶ 44; *see also* Werro Tr. at 145:21-146:2 (Professor Werro agreeing

that "immediacy . . . is being discussed" in the Swiss Supreme Court's 2019 Swisscom decision).

   The joint tortfeasors must consciously cooperate *in the relevant course of conduct*.  *See*

Roberto Supp. Decl. ¶¶ 48-49, 53 (citing SCD 42 [1916] II 473 (three friends who roamed the

streets together throwing blaster balls jointly liable whether or not their specific blaster ball

injured the plaintiff, because they were at least negligent as to injuries that occurred in the course

of their shared activity) (Ex. 19); SCD 25 [1899] II 817 (brawl participants jointly liable for

injury inflicted in brawl) (Ex. 20); SCD 45 [1919] II 304 (same) (Ex. 22); Supreme Court

6B_473/2012 (same) (Ex. 29); SCD 104 [1978] II 184 (three children playing a bow and arrow

shooting game jointly liable when one child shot someone in the eye) (Ex. 12); SCD 79 [1953] II

66 (hockey players who organized or participated in an illicit hockey game jointly liable for

injuries from the game) (Ex. 21); SCD 38 [1912] II 471 (two boys throwing stones jointly liable

when bystander was hit by one of the stones) (Ex. 23); SCD 100 [1974] II 332 (boys playing

with matches jointly liable for fire) (Ex. 24)); *see also* Roberto Supp. Reply ¶ 21 ("The wording

in Professor Werro's textbook and commentary of 'consciousness of collaborating in the result'

('la conscience de collaborer au résultat') correctly describes that liability extends only to the

results of the type intended by the cooperation."); *accord* Werro Supp. Decl. ¶ 78 ("Indeed, what

triggers liability for an accomplice under Article 50 CO is to provide conscious assistance *to the

illicit act of the main perpetrator*." ) (emphasis added).

   Both experts in this case focused their analysis with respect to accomplice liability on

three decisions of the Swiss Supreme Court: the Carpenters' Strike Case, the Locksmith Case,

and the Shooting Contest Case.  Roberto Supp. Reply ¶¶ 26-28; Werro Supp. Decl. ¶¶ 38-43;

Werro Tr. at 163:15-164:9.  All three demonstrate that the Swiss Supreme Court has found Art.

50(1) CO liability only where the accomplice contributed willfully and substantially and/or immediately and substantially to the harmful course of conduct. *See* Carpenters' Strike Case, SCD 57 [1931] II 417 at 420 (affirming liability of union leader who intentionally instigated striking workers "to attempt to intimidate the strikebreakers by using physical violence," for injury sustained by a strikebreaker in an attack committed in that course of violent intimidation) (Ex. 28); Locksmith Case, Supreme Court 4A_185/2007 at 6.2.1 (corporation and intermediary jointly liable for locksmith business's trademark infringement because they "clearly acted in concert with respect to the harmful act" where they closely managed the locksmith business, substantially participated in its business affairs, and themselves used the infringing symbols) (Ex. 5); Shooting Contest Case, SCD 71 [1945] II 107 at 114 (innkeeper liable for injury of customer resulting from a shooting contest held by other customers, *i.e.*, drunken soldiers to whom the innkeeper repeatedly sold alcohol, where injury and all relevant conduct occurred on the inn's premises) (Ex. 25).

The required collective conduct is thus absent here. The SAC does not even remotely allege that the BNPP Defendants and the primary tortfeasors were committing human rights violations together, such that either is liable for attacks committed by the other. *See* Werro Tr. at 61:10-11 ("[C]learly it's not the bank that shot the victims or raped the people in Sudan"). And the BNPP Defendants did not cooperate in the relevant course of conduct (*i.e.*, the campaign of human rights violations) intentionally, deliberately, or knowingly—because they did not cooperate in the relevant course of conduct at all. As plaintiffs' expert concedes, there are no allegations that the BNPP Defendants encouraged or directed the primary tortfeasors to commit the attacks against plaintiffs. *See id*. at 164:25-165:2, 165:4-7 (Professor Werro agreeing that the Carpenter's Strike Case is distinguishable because he doesn't "see BNPP instigating the

genocide").  Plaintiffs' expert also concedes that the BNPP Defendants did not closely manage

or control the primary tortfeasors, or themselves commit any primary violations.  *See id*. at

96:13-97:4 (Professor Werro agreeing that "the facts are quite different" in the Locksmith Case

including because the BNPP Defendants did not commit primary infringements analogous to the

"common use of letterheads" containing trademark infringing symbols by the locksmith business

and accomplices).  And it is undisputed that the BNPP Defendants did not maintain premises on

which the plaintiffs were injured while they, the primary tortfeasors, and the BNPP Defendants

were all on those premises.  *See id*. at 124:18-125:7 (Professor Werro agreeing that "in the

shooting case, everything happened at the garden of an inn" but here "there's no reference to

BNPP or any BNPP person being on the scene.").

Indeed, unlike the accomplices in the Carpenters' Strike Case, the Locksmith Case, and

the Shooting Contest Case, who were in close proximity to and/or directly interacted with the

primary tortfeasors, the Complaint does not allege that the BNPP Defendants had *any* interaction

with the militia members, policemen, and other Sudanese individuals who injured plaintiffs.  *See

also* Roberto Supp. Decl. ¶ 59 (given the lack of immediacy, to state a claim under Swiss law,

plaintiffs would need to plausibly allege that "BNPP provided financial services to Sudanese

banks for the purpose and with the intent of aiding the GOS in committing" human rights

violations, offering "specific reasons and circumstances indicating that BNPP did in fact act with

the purpose and the intent to aid the GOS in committing these tortious acts.").

Plaintiffs' claims fail for the additional failure to plead that BNPP *consciously* cooperated

in the human rights abuses that injured plaintiffs.  As an initial matter, the Complaint's

boilerplate assertions that the BNPP Defendants "intentionally . . . conducted themselves toward

Plaintiffs," *e.g.*, SAC ¶ 476, are unsupported by any well-pleaded factual allegation and thus are

not entitled to a presumption of truth.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Complaint's only allegations regarding the BNPP Defendants' purported knowledge concerns a 2007 note by a senior BNP Paribas compliance officer stating "that Sudanese banks with which BNPP dealt 'play[ed] a pivotal part in the support of the Sudanese government which . . . refuses the United Nations intervention in Darfur,'" SAC ¶ 188, and otherwise focus on BNPP's knowledge that it was violating U.S. and New York law.  S*ee* SAC ¶¶ 183-90 (citing "international reporting of GOS atrocities" and excerpts from a 2014 press release, and a 2005 email as examples of the BNPP Defendants' knowledge that they were violating sanctions and of conditions in Sudan in the abstract).  But statements regarding Sudan's political stance vis-à-vis U.N. intervention are not remotely akin to well-pleaded, non-conclusory allegations that the BNPP Defendants even knew or should have known that they were cooperating in the conduct alleged to have caused plaintiffs' injuries, let alone that they did so consciously.

Unable to make the requisite showing that any of the BNPP Defendants consciously cooperated with the primary tortfeasors in the campaign of human rights violations, the SAC falls back to contending that the BNPP Defendants processed "thousands of illegal financial transactions in the United States" and that Sudan "directed BNPP to take steps to conceal the fact that BNPP was processing transactions in New York on their behalf."  SAC ¶¶ 298-99 (defining "the Conspiracy"); Werro Tr. at 65:16-21 (Professor Werro agreeing that the "conscious act by BNPP was participating in sanctions violations" and "that was the act that BNPP knew that it was doing").  In sum, plaintiffs allege that the BNPP Defendants "conspired with the SDNs . . . to violate [U.S.] Sanctions against [Sudan] by providing Sudanese banks with access to the U.S. financial system through its New York branch," SAC ¶ 196, and then leap to alleging that the BNPP Defendants "agreed with [Sudan] and intended that the [torts] be committed," *see, e.g.*,

SAC ¶¶ 331, 361, 393, 421, 451, 509.  But this attempt to conflate a conspiracy to violate U.S. sanctions—the only conspiracy that is and could be alleged here—with a conspiracy to commit human rights violations, does not help plaintiffs.[6]  There is no Swiss law case in which a purported accomplice who consciously cooperates in one course of conduct is held jointly liable where primary tortfeasors injure plaintiffs through a separate course of conduct.  *Cf.* Father-Son Robbery Case, Supreme Court 4A_573/2010 at 7(5) (in a father-son robbery duo, son was not liable for amounts stolen by father in a different city even if he "knew, or could have known" of those robberies, because they were outside the scope of father and son's cooperation) (Ex. 34).

Plaintiffs' expert's contrary view seems to be based on the false premise that the U.S. sanctions violated by the BNPP Defendants "had been issued to protect the victims from the crimes that the government of Sudan was engaging in" and that because the BNPP Defendants "admitt[ed] to knowing that the sanctions were there to protect the victims from the action of the government of Sudan" that "this is enough to accept or to know what they are doing" and therefore impose liability for the plaintiffs' injuries.  Werro Tr. at 119:21-23, 151:7-11.  As an initial matter, the U.S. sanctions certain of the BNPP Defendants violated have the purpose of proscribing certain conduct to prevent threats to national security.  *See* Exec. Order Nos. 13067, https://www.treasury.gov/resource-center/sanctions/Documents/13067.pdf (citing general threats to national security), 13400, https://www.treasury.gov/resource-center/sanctions/Documents/

---

[6] Courts in this Circuit have repeatedly rejected similar attempts to conflate a conspiracy to violate sanctions with a conspiracy to commit an act of international terrorism, in rejecting claims under the Anti-Terrorism Act, 18 U.S.C. § 2333.  *See O'Sullivan v. Deutsche Bank AG*, No. 17 Civ. 8709 (LTS) (GWG), 2019 WL 1409446, at *9 (S.D.N.Y. Mar. 28, 2019) (dismissing ATA conspiracy arguments premised on a conspiracy to evade U.S. sanctions because "the Complaint fail[ed] to allege plausibly the existence of an unlawful agreement to commit an act of international terrorism"); *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 88 (E.D.N.Y. 2019) (rejecting ATA conspiracy claims because plaintiffs at most "allege[d] that Defendants agreed to join a conspiracy with the sole purpose of evading U.S. sanctions and that some of the actors involved in this conspiracy were also members of a separate and distinct conspiracy to provide material support to Hezbollah.").

13400.pdf (same), 13412, https://www.treasury.gov/resource-center/sanctions/Documents/13412 .pdf (same).  They are not intended "to provide a benefit to any class of persons."  *See Dubai Islamic Bank v. Citibank, N.A.*, 126 F. Supp. 2d 659, 668 (S.D.N.Y. 2000).

Moreover, and critically, Professor Werro's equation of "knowledge" with liability, Werro Tr. at 56:7-11; Werro Supp. Decl. ¶¶ 26, 33, ignores black-letter Swiss law that knowledge alone is insufficient for liability under Art. 50(1) CO.[7]  In its 2019 Swisscom decision, the Swiss Supreme Court *denied* accomplice liability where Swisscom clearly knew that the primary violations of copyright infringement were occurring through the internet services it provided, as it had been made aware of the infringing content and refused to block access to it.  *See* Swisscom Case, SCD 145 [2019] III 72 at 72 (A.b.) (noting that the plaintiff "asked the defendant [Swisscom] to block access to these portals, but the defendant refused") (Ex. 15); Franz Werro & Virginie Sonney, *Les services internet et la responsabilité civile* [*Internet services and civil liability*], Zeitschrift für Kommunikationsrecht at 131 (Bertil Cottier et al. eds., 2008) ("[I]t is accepted that the sending of a notification to the [internet] provider is the basis for considering that the latter was aware of unlawful information.") (Ramamurthi Decl. Ex. E).  In so holding, the Swiss Supreme Court specifically *rejected* Professor Werro's view that liability would attach wherever a purported accomplice like Swisscom "knows or should have known" of illegal activity.  *See* Swisscom Case, SCD 145 [2019] III 72 at 79 (2.3.2) (Ex. 15) (rejecting Franz Werro & Virginie Sonney, *Les services internet et la responsabilité civile* [*Internet services and civil liability*], Zeitschrift für Kommunikationsrecht at 131 (Bertil Cottier et al. eds., 2008), in which Werro and Sonney state that under Swiss law "it would undoubtedly

---

[7] At times, Professor Werro seems to concede that knowledge is *not* all that is required.  *See* Werro Supp. Decl. ¶ 28 (describing Art. 50(1) CO as requiring *inter alia* that "the accomplice consciously assisted the perpetrator *and* knew or should have known that he was contributing to an illicit act") (emphasis added).

be easy to establish fault from the moment when the [internet] provider knows or should have known the content of the information it is helping to circulate (Art. 50 CO)." (Ramamurthi Decl. Ex. E)).[8]  *See also* Steel Boycott Case, SCD 90 [1964] II 501 at 508 (holding that "even if [steel supplier defendants] knew about the conducts of the [boycotting] suppliers and these conducts indirectly worked to their advantage*"* they still could not be liable because "[j]oint and several liability under art. 50 requires a collective conduct") (Ex. 32); Father-Son Robbery Case, Supreme Court 4A_573/2020 at 7(5) (Son was not liable for amounts stolen by father in another city even if he knew of those robberies) (Ex. 34); Roberto Supp. Reply ¶ 13 ("Mere knowledge does not, however, establish joint liability, neither according to Swiss case law . . . nor according to legal scholars") (citation omitted).

Plaintiffs' expert tries to evade the clear rejection of his "knew or should have known" standard by collapsing collective conduct and collective fault.  Under Art. 50(1) CO, if there is intentional, deliberate cooperation in a particular injurious course of conduct, intent with respect to the exact nature of each injury sustained in that course of conduct is not required; negligence can suffice.  Roberto Supp. Decl. ¶¶ 25-26; *accord* Werro Supp. Decl. ¶ 33 ("In short, under Article 50 CO, 'each person can be held liable for the collective fault, because each acted intentionally or negligently*, and* in conscious cooperation with the others.'") (emphasis added). That is why the Swiss Supreme Court will sometimes state in the same decision both that deliberateness is required and that negligence can be sufficient:  the former applies to the course of conduct and the latter to the specific damage.  *See* Locksmith Case, Supreme Court 4A_185/2007 at 7-8 (6.2.1-6.2.2) ("[T]he tortfeasors must have cooperated deliberately to arrive

---

[8] Unlike Professor Werro, most leading Swiss legal authors agree that, in addition to knowledge, willfulness is also required.  *See* Roberto Supp. Reply ¶¶ 15-18, 23 (citing Walter Fellmann, Andrea Kottmann, Roland Brehm) (Ex. 36, Werro Supp. Decl. Ex. 39).

at this result . . . . Article 50(1) of the CO *also* requires that the parties jointly commit an unlawful act.  Either all of the perpetrators sought that the damage should occur (intent), or they have at least considered that the damage may occur (recklessness), or they could have prevented it had they had paid due attention to the circumstances (negligence).") (emphasis added) (Ex. 5).  Professor Werro selectively cites out of context the Swiss Supreme Court's statements that intent is not required with respect to the *nature of each injury* once there is conscious cooperation in the relevant course of conduct, but outside of his work on this case, he has correctly recognized that collective fault presupposes collective conduct.  *See* Werro, La responsabilité civile, 3rd ed. 2017 ¶ 1701 ("[C]ommon fault presupposes 'an association in the harmful activity, the consciousness of collaborating in the result.'") (Ex. 37).

In fact, the only "authority" to state that a bank can be liable for acts of a client where it "knew or should have known . . . its contribution to the injurious act" is an article by Professsor Werro himself, which he wrote during the course of this litigation, and which Professor Werro admits that he wrote with this case in mind.  Franz Werro & Vincent Perritaz, *La pluralité de responsables: nouvelles conceptions et changements de jurisprudence* [*Joint liability: new concepts and changes in the case law*] at 291, Mélanges à la mémoire de Bernard Corboz 279 (Grégory Bovey & Benoît Chappuis & Laurent Hirsch eds., 2019) (Ramamurthi Decl. Ex. C); Werro Tr. at 59:22-60:2, 60:10-13.  The relevant portion of the article—a few lines at the end of a paragraph—does not cite any Swiss court decision or other authority, but instead sets forth the law as Professor Werro thinks it "should be applied."  Werro Tr. at 105:4-6; *id.* at 105:2-4 ("I hope that this opinion of mine will influence courts and will be taken into account by courts").  Of course, Professor Werro's wish that Swiss law embrace the broad theory of Art. 50(1) CO he has articulated in this case runs exactly counter to the reality that "[t]he Swiss Supreme Court has

consistently refused in the last few decades to broaden the scope of Art. 50 section 1 CO."
Roberto Supp. Decl. ¶ 60 (Professor Roberto stating that he "therefore [has] no doubt" that
claims such as those here would "be dismissed by a Swiss court").

**B.      Plaintiffs' Claims Fail For The Additional Reason That The SAC Does Not, And Cannot, Plausibly Allege That The BNPP Defendants' Conduct Satisfies The Restrictive Causation Requirements Of Swiss Tort Law.**

For an accomplice to be held liable under Art. 50(1) CO, its contribution must be deemed
a natural cause and an adequate cause of the plaintiffs' injury.  Roberto Supp. Reply ¶ 29; Werro
Supp. Decl. ¶ 27.  Both experts agree that natural and adequate causation are respectively
analogous to the concepts of "but-for" and proximate causation under U.S. law.  *See* Roberto
Supp. Decl. ¶ 33; Roberto Supp. Reply ¶ 29; Werro Supp. Decl. ¶ 27; Werro Tr. at 127:6-9
(stating that proximate causation "resembles adequate causation in very substantial ways"); *see
also Kaufman* Report at *11 (Professor Werro opining that "[c]ausation in Swiss law is,
theoretically at least, the same as the American legal principles of factual cause and proximate
cause.") (Ramamurthi Decl. Ex. D).  Like proximate causation, adequate causation "serves as a
corrective factor to the concept of causes in science, which may need to be restricted in order to
be acceptable for legal responsibility."  Swisscom Case, SCD 145 [2019] III 72 at 78 (2.3.1) (Ex.
15).  Its purpose is to "reasonably restrict liability" as "a legal limitation of a cause-in-fact."
Roberto Supp. Decl. ¶ 40 (citing Supreme Court 4A_7/2007 (Ex. 18)); Roberto Supp. Reply
¶ 29.  Accordingly, the purported accomplice's contribution must be substantial and closely
related to the harm.  *See* Swisscom Case, SCD 145 [2019] III 72 at 78 (2.3.1) ("[I]t is not enough
[for a purported accomplice] to just take any participatory action that is only 'somehow' a
supportive influence, but is not sufficiently closely related to the act [that injured the plaintiff]
itself.") (Ex. 15); Roberto Supp. Decl. ¶¶ 38-39 (Adequate causation requires the purported
accomplice's conduct to be "substantial," such that "it can fairly be considered the cause of the

kind of loss or damage that occurred . . . based on the usual course of events and common experience" and accordingly "the loss or damage can, in good faith, be attributed to the tortfeasor.").

Plaintiffs fail to meet this burden, notwithstanding the SAC's boilerplate allegations that plaintiffs were injured "[a]s a direct and proximate result of [the BNPP] Defendants" conduct, *e.g.*, SAC ¶¶ 274, 294, and that the BNPP Defendants' conduct was "a substantial factor in causing Plaintiffs' injuries," SAC ¶¶ 2, 13, 51, which, as non-particularized legal conclusions, are not entitled to the presumption of truth. *See Iqbal*, 556 U.S. at 678.  The SAC does not link a single banking transaction involving the BNPP Defendants to any attack that injured Plaintiffs. *Accord* Werro Tr. at 55:5-9.  It does not allege that the Sudanese banks with which the BNPP Defendants transacted themselves carried out the attacks that injured plaintiffs. *Accord id.* at 117:19-25.  And it does not allege that the BNPP Defendants directly transacted or otherwise interacted with the various militia members and/or non-uniformed actors who did carry out the attacks.  Instead, it alleges that the BNPP Defendants provided financial services to Sudanese banks, SAC ¶ 188; Sudan's oil revenues increased, SAC ¶ 117; during that time period, Sudan's military spending increased, SAC ¶¶ 108, 125; through this increased military spending, the Sudanese government continued to arm various militant groups, SAC ¶¶ 120, 132; the militant groups went out and committed various crimes against the civilian population, SAC ¶¶ 140, 142—and the BNPP Defendants are therefore liable for every human rights violation committed in Sudan during that time period.

There is no Swiss tort case in which joint liability has been upheld based on such a purported causal chain.  In fact, the Swiss Supreme Court just last year denied liability in the face of even less-attenuated causal facts, holding that the internet provider Swisscom was not

liable under Art. 50(1) CO for its refusal to block certain copyright infringing webpages,

including because Swisscom's conduct

> comes after [i] the person who obtains a copy of a copyrighted film, [ii] the person who stores it on a server, [iii] the person who makes the corresponding space available on the computer, [iv] the person who operates the portal, which makes finding this film easier, and after [v] the person who accesses this portal and consumes copyrighted works.

Swisscom Case, SCD 145 [2019] III 72 at 74 (2.1) (Ex. 15).  The BNPP Defendants' conduct

similarly comes "very far to the back" in the alleged "chain of actions," *see id.*, after the (i)

Sudanese banks that received financial services, (ii) exporters who utilized those services to sell

oil, (iii) Sudanese government officials who used the proceeds to purchase equipment, (iv)

sellers of equipment who transacted with them, (v) Sudanese military officials who distributed

that equipment to arm various militia groups, (vi) militia group leaders who directed their group

members to commit attacks, and (vii) militia members and others who attacked the plaintiffs—

*even further* from the "original wrongful act" than Swisscom's purported contribution, *see id*.

Accordingly, like Swisscom, the BNPP Defendants cannot be held liable for "infringements of

unknown third parties."  *See id.* at 80 (2.3.2) (Ex. 15).

Moreover, the BNPP Defendants' purported contribution to the harm was the provision

of access to hard currency, which, like internet access, does not offer the recipient "any specific

content" but only "grants . . . access" to "infrastructure to enable access" to other resources.  *See

id*.; Werro Tr. at 156:20-157:13.  It cannot be presumed the funds accessed by Sudan through the

BNPP Defendants' financial services were actually used for the attacks that injured plaintiffs.

As the Second Circuit has held, even where a government is accused of atrocities, "the fact

remains that [it] is a government, and as such it has many legitimate agencies, operations, and

programs to fund."  *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013) (affirming dismissal of

claims against bank for injuries in terrorist attacks because there was "no nonconclusory

allegation in the Complaint that plausibly shows that the moneys UBS transferred to Iran were in fact sent to Hizbollah or Hamas or that Iran would have been unable to fund the attacks by Hizbollah and Hamas without the cash provided by UBS.").[9]  Claims like plaintiffs' have been consistently rejected under U.S. federal and state law, which *a fortiori* requires dismissal here given plaintiffs' acknowledgement that Swiss law is more restrictive than U.S. law.  Pl. Br. at 22.  Here, the Complaint acknowledges that Sudan was committing human rights violations before and after the period in which the BNPP Defendants were violating U.S. sanctions, SAC ¶¶ 69, 70, 148, and alleges that the BNPP Defendants' compliance with U.S. sanctions would only have "*limit[ed]* the GOS's ability to commit atrocities, " and access to certain weapons, *e.g.*, SAC ¶¶ 9, 146 (emphasis added), 120, 266-67, not that it would have prevented the atrocities altogether.[10]  Accordingly, Plaintiffs likely haven't even satisfied the requirement of pleading but for causation.  Werro Tr. at 63:16-64-3 ("Q:  So your view that BNPP is liable under Article 50 is based on your understanding that without BNPP's financial services, there would have been no misconduct by the government of Sudan?  A:  No it is not.  I think the government of Sudan was evil enough to engage in its own activities, but I guess the magnitude of the act . . . was helped and favored by the support that the bank provided").

---

[9] *See also Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 276 (D.C. Cir. 2018) (affirming dismissal of claims against the BNPP Defendants *inter alia* because their provision of financial services to Sudanese entities, the same conduct at issue in this case, was not the proximate cause of injuries allegedly resulting from Sudanese state-sponsored terrorism); *Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84, 103 (D.D.C. 2017) (same); *see also* BNPP Br. at 28.  The SAC alleges that Sudan's military spending during the relevant period was less than four percent of GDP, further defeating any claim of a direct link between hard currency in the Sudan resulting from funds processed by the BNPP Defendants and the attacks on plaintiffs.  *See* SAC ¶ 121 ("Between 1997 and 2006, GOS military spending . . . as a share of GDP, went from less than 1% to nearly 3.4%.").

[10] The Complaint also does not allege that Sudan would have been unable to secure oil revenue without the BNPP Defendants' financial services, only that Sudan would have been unable to do so "at market prices."  SAC ¶ 9; SAC ¶¶ 6, 12, 77-78, 109, 118 (stating that if Sudan did not have access to U.S. dollar clearing for its transactions, it could barter or sell the oil in other, albeit less desirable, currencies).

Ignoring all authority to the contrary, Professor Werro asserts that there need not be a causal link between the purported accomplice's conduct and the injury so long as there is causation between the injury and the "cooperation" as a whole and the primary tortfeasor's conduct is "objectively foreseeable" to the accomplice.  Werro Supp. Decl. ¶¶ 27, 46, 80.  The Swiss Supreme Court foreclosed this theory in the Swisscom Case, specifically rejecting a publication by Professor Werro, SCD 145 III 72 at 79 (2.3.2) (Ex. 15), and holding instead that the injury must be "an adequate causal consequence *of [the purported accomplice's] contribution*," *id.* at 76 (2.2.1) (emphasis added) (Ex. 15); *see also* Werro Tr. at 73:9-12 (Professor Werro contradicting his own theory by stating in describing accomplice conduct, "[i]t doesn't matter what you do . . . as long as one can accept the notion that *your participation* is causal.") (emphasis added).  The Swiss Supreme Court's rejection of "objective foreseeability" as the standard for causation under Art. 50(1) CO in the Swisscom Case is unsurprising, given that the cases Professor Werro cites in support of this standard all arise in the context of primary liability.  *See* Werro Supp. Decl. ¶ 72 (citing Werro Supp. Decl. Ex. 8 at 73, c. 3.a, Werro Supp. Decl. Ex. 25 at 12-13).  Professor Werro cites these primary liability cases despite having himself previously explained that cases which "do not deal with joint liability involving several wrongdoers," are "clearly irrelevant to the present case," given that "[w]ith respect to joint liability, the Swiss Federal Tribunal's approach to causation is indeed significantly different."  Werro Decl. ¶ 38.

In his deposition testimony, plaintiffs' expert tried to distinguish the Swisscom Case as decided based on lack of conscious cooperation rather than inadequate causation, without explaining why the Swiss Supreme Court discussed the causation standard under Art. 50(1) CO at length if causation were irrelevant to its decision.  *See* Werro Tr. at 127:25-128:15.  Whether

stated in terms of immediacy of participation or substantiality of contribution, the fact remains that Art. 50(1) CO liability can only attach to results of the type aimed at by the tortfeasors' conscious cooperation, and not to other secondary, attenuated consequences.  *See* Roberto Supp. Reply ¶ 35; Franz Werro, La responsabilité civile, 3rd ed. 2017, ¶ 1701 (Ex. 37); Werro Tr. at 155:8-16 (Professor Werro agreeing that "given the court's views about how distant in the chain of events Swisscom was from the harm to the plaintiffs that Swisscom wasn't even rightfully considered a conscious collaborator for purposes of [sic] Article 50 . . . provided that we keep in mind that the court is not actually using any sort of test on causation").  The BNPP Defendants did not consciously cooperate with Sudan "to arrive at the result" of injuring plaintiffs, and accordingly cannot be held liable for those injuries.  *See* Locksmith Case, Supreme Court 4A_185/2007 at 7 (6.2.1) (Ex. 5).

The expansiveness of Professor Werro's "objective foreseeability" theory—exemplified by his contentions that liability under Art. 50(1) CO can extend to a person "marginal with respect to the infringement," *e.g.*, "the guy who carries the briefcase or the guy who opens the door," Werro Tr. at 68:14-15, 134:22-23, 73:6-7—stands in stark contrast to the restrictive approach to tort law taken by the Swiss Supreme Court, as confirmed by the majority of the leading Swiss tort law commentators.  *See* Roberto Supp. Reply ¶ 23.  Professor Werro's foreseeability theory also cannot be reconciled with his statements that adequate causation corresponds with proximate causation under U.S. law and that natural (or but-for) causation is also required.  Werro Supp. Decl. ¶ 27; *see also Kaufman* report at *11 (Ramamurthi Decl. Ex. D).  As demonstrated by authorities plaintiffs themselves have cited in the past, foreseeability alone is insufficient for proximate causation.  *See* Suppl. Reply Brief of Defs. BNP Paribas S.A. and BNP Paribas North America Inc. in Further Supp. of Their Mot. to Dismiss the Second Am.

Compl. at 3-4 (Aug. 9, 2019), ECF No. 128 (citing *inter alia* Pls. Suppl. Brief in Opp. to Defs. Mot. to Dismiss the Second Am. Compl. at 6 (July 26, 2019), ECF No. 125); *see also Kaufman* Report at *11 (Ramamurthi Decl. Ex. D) (Professor Werro opining in the context of a negligence claim that on the "question of what is a reasonably foreseeable consequence, Swiss judges are perhaps more favorable to the defendant than are some of their U.S. counterparts").

## III. THE CLAIMS AGAINST "BNP PARIBAS S.A. NEW YORK BRANCH" AND BNP PARIBAS NORTH AMERICA INC. SHOULD BE DISMISSED.

In addition to the reasons described *supra*, the claims against BNPP-NA should also be dismissed for the reasons shown in the BNPP Defendants' prior dismissal briefing, including that the SAC lacks any non-conclusory allegations about BNPP-NA's involvement in any of the wrongful conduct alleged; the June 2014 Agreements that provide the factual basis for the SAC do not mention BNPP-NA at all; and BNPP-NA was at no point otherwise charged with or convicted of violations of U.S. sanctions against Sudan.  *See* BNPP Br. at 35; Reply at 15.

Plaintiffs have also named as a defendant "BNP Paribas S.A. New York Branch" (the "Branch"), which is not a separate legal entity and accordingly is not amenable to suit.  The Court should dismiss plaintiffs' claims against the Branch for the reasons shown in the BNPP Defendants' prior dismissal briefing.  *See* BNPP Br. at 34; Reply at 15.

**CONCLUSION**

For all of the foregoing reasons, the Court should dismiss the Complaint with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).

Dated: New York, New York
   August 17, 2020

       CLEARY GOTTLIEB STEEN & HAMILTON LLP

       By: _____
         Carmine D. Boccuzzi, Jr.
         Jonathan I. Blackman
         One Liberty Plaza
         New York, New York 10006
         (212) 225-2000
         cboccuzzi@cgsh.com
         jblackman@cgsh.com

         *Counsel for Defendants BNP Paribas S.A. and BNP*
         *Paribas North America, Inc.*