USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/16/21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Entesar Osman Kashef, *et al*.,

                Plaintiffs,

      –v–

BNP Paribas SA, *et al*.,

                Defendants.

---

16-cv-3228 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

This putative class action is brought on behalf of victims of the Sudanese government's campaign of human rights abuses from 1997 to 2009. Plaintiffs bring various state law claims against Defendant financial institution and its subsidiaries for assisting the Sudanese government in avoiding U.S. sanctions, which Plaintiffs claim provided the Regime with funding used to perpetrate the atrocities. The Court previously granted the Defendants' motion to dismiss in light of the act of state doctrine and timeliness, but that decision was reversed by the Second Circuit. Dkt. Nos. 101, 106. Following remand, the Defendants renewed their motion to dismiss Plaintiffs' Second Amended Complaint for failure to state a claim. For the reasons described in this opinion, the motion is granted in part and denied in part.

## I.    BACKGROUND

### A.  Factual Background

Plaintiffs were victims of horrific human rights abuses undertaken by the Government of Sudan between 1997 and 2009, including "beatings, maiming, sexual assault, rape, infection with HIV, loss of property, displacement from their homes, and watching family members be killed." Second Amended Complaint ("SAC"), Dkt. No. 49, ¶ 24; *see also* SAC ¶¶ 30-50 (outlining

specific abuses suffered by each representative Plaintiff). The Defendants are BNP Paribas S.A., a French financial institution, as well as several of its branches and subsidiaries, as well as individual defendants working for the bank (collectively "BNPP").

Between 1992 and 1997, in response to the Government of Sudan's human rights abuses against its own people, the United States government took a series of steps aimed at stemming the abuses, including formal condemnation, designation as a state sponsor of terrorism, and eventually economic sanctions. SAC ¶¶ 85-89. In 2002, Congress passed the Sudan Peace Act, again condemning the ongoing atrocities in the Sudan and requiring the President to implement additional sanctions. SAC ¶¶ 90-92. Additional legislation and executive orders implemented further sanctions between 2004 and 2006. SAC ¶¶ 93-97.

Beginning in 1997 and continuing through 2007, BNPP became the primary bank of the Government of Sudan, through which it accessed U.S. financial markets and circumvented U.S. sanctions. SAC ¶¶ 102-14. BNPP created several schemes to avoid the sanctions, including removing information from financial documents identifying that a Sudanese entity was one of the parties involved in the financial transaction, SAC ¶ 111, and using satellite banks in the United States through which to funnel money, SAC ¶¶ 112-13. According to the Second Amended Complaint, Sudan's access to U.S. financial markets was critical to funding the government, including its continued atrocities against its people. SAC ¶¶ 115-51.

BNPP's actions were investigated by numerous state and federal agencies in the United States, and in 2014, BNPP pled guilty to conspiring to violate the laws of the United States in connection with circumventing U.S. sanctions on behalf of Sudan, Iran, and Cuba. SAC ¶¶ 191-98. BNPP also pled guilty to falsifying business records and conspiracy under New York law. SAC ¶¶ 199-201.

**B.  Procedural Background**

The operative complaint alleges twenty state-law claims against Defendants, including negligence per se, conspiracy to commit battery, aiding and abetting assault, and intentional infliction of emotional distress.  *See* SAC ¶¶ 247-529.  Defendants moved to dismiss the Second Amended Complaint in its entirety.  Dkt. No. 65.

On March 30, 2018, the Court granted Defendants' Motion to Dismiss.  Dkt. No. 101. The Court determined that the Act of State Doctrine barred Plaintiffs claims sounding in secondary liability, negligence per se, intentional infliction of emotional distress, and negligent infliction of emotional distress.  *Id.* at 9-10.  The Court dismissed the remaining claims because they were either time-barred or because Plaintiffs had failed to state a claim.  *Id.* at 15.  Plaintiffs appealed.  Dkt. No. 103.

The Second Circuit reversed the Court's decision, holding that Plaintiffs' claims were not barred by the Act of State Doctrine nor were they untimely.  Dkt. No. 106.  This Court then ordered supplemental briefing on the remaining claims in Defendants' Motion to Dismiss that were not addressed in the Court's original opinion, including the issue of whether New York, Sudanese, or Swiss Law applies to Plaintiffs' claims.  Dkt. No. 115.

In a prior Opinion & Order, this Court held that Swiss Law applies to Plaintiffs' claims. Dkt. No. 151.  The parties then conducted expert discovery on the meaning of Swiss law and submitted supplemental briefing on the issue of whether Plaintiffs had stated a claim under Swiss Law.  Dkt. No. 155.

**II.    DISCUSSION**

For the reasons explained below, the Court adopts Plaintiffs' expert's descriptions of the applicable Swiss law and determines that the Second Amended Complaint sufficiently states a claim for relief for all of Plaintiff's claims except those sounding in primary tort liability.

## A. Summary of the Swiss Law Applicable to this Case

Pursuant to Federal Rule of Civil Procedure 44.1, the parties provided the Court testimony of experts in Swiss Law on the question of whether the complaint should be dismissed. Plaintiffs' expert is Franz Werro, a tenured Professor of Law at the University of Fribourg and Georgetown University Law Center and President of the Council of the Swiss Institute of Comparative Law. *See* Werro Dec., Dkt. No. 174. Defendants have retained Vito Roberto, a Swiss lawyer and Professor at the University of St. Gall in Switzerland. *See* Roberto Dec., Dkt No. 169. Both experts have considerable experience and expertise in the area of Swiss tort law.

The parties' experts agree that the operative provision of Swiss Law in this case is Article 50.1 of the Swiss Code of Obligations. *See* Dkt. No. 172 at 7-8, Defendant's Supplemental Brief ("Def. Supp."); Dkt. No. 173 at 5, Plaintiff's Supplemental Brief in Opposition ("Pl. Opp."). Article 50.1 provides for secondary tort liability. The article requires that: "Where two or more persons have together caused damage, whether as instigator, perpetrator or accomplice, they are jointly and severally liable to the person suffering damage." Roberto Dec. ¶ 13 (quoting the Swiss Code of Obligations, Art 50.1). The parties also agree that the Second Amended Complaint alleges that BNPP is an "accomplice" and not a "perpetrator" as those terms are used in the article. Def. Supp. at 8.

The parties' experts also agree on the basic elements required to establish a claim under Article 50.1. They are: "(1) a main perpetrator committed an illicit act, (2) the accomplice consciously assisted the perpetrator and knew or should have known that he was contributing to

an illicit act, and (3) their culpable cooperation was the natural and adequate cause of the plaintiff's harm or loss."  Roberto Reply Dec., Dkt. No. 170 ¶ 6.

### B.  Plaintiffs' Primary Liability Tort Law Claims

A number of Plaintiffs' claims in the Second Amended Complaint sound in primary tort liability.  The parties' experts agree that Article 50.1 provides for secondary tort liability, as explained above, and that the provision in Swiss Law for primary tort liability is Article 41 of the Swiss Code of Obligations, which states that "[a]ny person who unlawfully causes damage to another, whether willfully or negligently, is obliged to provide compensation."  Roberto Dec. ¶ 13 (quoting the Swiss Code of Obligations, Article 41).  However, in their supplemental briefing, Plaintiffs do not claim that Article 41 applies to any of the claims in their Second Amended Complaint.  *See* Pl. Opp. at 5.  Therefore, Plaintiffs' claims alleging the independent torts of negligence *per se*, outrageous conduct causing emotional distress, and negligent infliction of emotional distress are dismissed for failure to state a claim under Swiss Law.

### C.  Plaintiff's Secondary Tort Law Claims

That leaves the Defendants' motion to dismiss Plaintiffs' remaining claims for failure to state a claim under Swiss Law.   As a preliminary matter, in determining the applicable legal standard, the Court generally found Professor Werro's testimony on the requirements of Article 50.1 to be credible and more accurate than Professor Roberto's.  Professor Werro has written extensively on Article 50.1 and has been cited by the Swiss Supreme Court on this precise provision.  Werro Dec. ¶ 10.  His authority has been recognized by other courts in this district. *See Mastercard Intern. Inc. v. FIFA*, 464 F. Supp. 2d 246, 303 (Judge Preska found Professor Werro's conclusions "to be the most persuasive and informative," and called him "eminently qualified" and adopted his opinions and conclusions "in their entirety.").  Though Professor

Roberto is a respected scholar and generally qualified to opine on matters of Swiss Tort Law, for the reasons explained in this section, the Court did not find his descriptions of the legal requirements of Article 50.1 to be persuasive.

The Court instead primarily adopts Professor Werro's description of the elements and applies them to the claims in Plaintiffs' Second Amended Complaint.  To survive Defendants' motion to dismiss, Plaintiffs must "state a claim for relief that is plausible on its face" under Swiss law.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim achieves "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  When considering a motion to dismiss for failure to state a claim, "a court must accept as true all of the [factual] allegations contained in [the] complaint."  *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937.

### 1.  Element One

The first element of an Article 50.1 claim is that a "main perpetrator commit an illicit act."  Roberto Reply Dec. ¶ 6.  The parties stipulate that this element is satisfied here.  *See* Def. Supp. at 8.  The main perpetrator is the Sudanese government and the illicit acts are the atrocious genocide and human rights violations it perpetrated for over a decade beginning in the early 1990s.  *See* SAC ¶ 4.

### 2.  Element Two

The Second Element of Article 50.1 requires that "the accomplice consciously assisted the perpetrator and knew or should have known that he was contributing to an illicit act."  Roberto Reply Dec. ¶ 6.

The Court first determines the meaning of this standard under Swiss Law.  While the parties' experts agree on this definition of the element, they provide varying interpretations of the culpable mental state required by it.  Professor Werro argues Article 50.1 requires that the accomplice either knew or should have known both that it was providing assistance and that the assistance was contributing to an illicit act.  Werro Dec. ¶ 33.  The accomplice need not desire or intend the assistance, nor need there be an express agreement.  *Id.*  Thus, as Professor Werro explains, "conscious assistance" includes various "culpable states of mind," including not only intentionality but also knowledge, recklessness and negligence.  *Id.*  Professor Roberto, however, disagrees with this interpretation.  He asserts that "conscious" assistance means cooperating "intentionally" and "deliberately."  Roberto Dec. ¶ 27.  Therefore, negligence, recklessness, or even "[m]ere knowledge" do not "establish joint liability" under his view.  *Id.*[1] He also claims that that the accomplice's participation must be either "willful or immediate" and must also be "substantial."  *Id.* at ¶ 59.

The Court determines that Professor Werro's position that an accomplice need only be negligent as to its cooperation in tort is the accurate description of how the Swiss Supreme Court has interpreted Article 50.1.  In contrast, Professor Roberto's interpretations of the Swiss case law in the record are flawed.  For his interpretation that "conscious assistance" means cooperating "intentionally or deliberately," Professor Roberto cites to what the experts refer to as "the Locksmith case."  In the Locksmith case, the Swiss Supreme Court said – according to Professor Roberto's own English translation – that an accomplice must have "cooperated deliberately" under Article 50.1.  Dkt. No. 169, Def. Exhibit 5.  But as Professor Werro explains

---

[1] Moreover, while the *act* of assistance must be intentional or deliberate, according to Professor Roberto the accomplice need only be negligent as to the "loss or damage that occurred," in that the accomplice either knew "or should have known that the collective conduct could lead to such loss or damage."  Roberto Dec. ¶ 30-31.

in response, in this precise paragraph of the Locksmith case, the court was in fact citing *his own* scholarly work, and he is confident that the court was not referring to intentional conduct.  The confusion, he argues, comes from Professor Roberto's mistranslation of that language.  Professor Roberto translates "les auteurs doivent avoir coopéré consciement," to "the tortfeasors must have cooperated deliberately."  Werro Dec. ¶ 25.  But the proper translation of "consciement" is actually "consciously," which Professor Werro explains includes unintentional conduct.  Werro Dec. ¶ 60.

Aside from whether his translation is accurate, Professor Roberto's selective quotation to the words "cooperating deliberately" for his proposition that intentionality is required under Article 50.1 is problematic.  The remainder of that paragraph of the opinion suggests that negligence is sufficient:  "each perpetrator must have known *or been capable of knowing, when exercising due care*, that the others were involved in the harmful act" and that Article 50.1 requires that "[e]ither all of the perpetrators sought that the damage should occur (intent), or they have at least considered that the damage may occur (recklessness), or they could have prevented it had they had paid due attention to the circumstances (negligence)."  *Id.* (emphasis added).

In addition to the Locksmith case, another case provided by Defendants, the "Shooting Contest Case," is demonstrably incompatible with Professor Roberto's contention that negligence is insufficient.  In that case, the innkeeper of a hotel was found liable under Article 50.1 when inebriated soldiers organized a shooting contest in the hotel garden and a nearby guest was struck in the eye by a stray bullet.  Dkt. No. 169, Def. Exhibit 23.  The Court held him liable despite a finding that the innkeeper may not have even known about the contest, reasoning that "[f]or there to be conscious collaboration, it is not necessary for the participants to consult with

each other," instead "[i]t is sufficient that they *should* recognize that their actions or their

omissions are the cause of the damage that occurs subsequently."  *Id.* (emphasis added).

The Court also declines to adopt Professor Roberto's view that an accomplice's

participation must be either "willful or immediate," as well as "substantial."  Roberto Dec. ¶ 59.

Professor Roberto does not cite to any case law or even a secondary source for this proposition.

In response to this criticism in Professor Werro's testimony, Professor Roberto admits in his

reply that these "requirements" are not elements articulated by the Swiss courts, but are instead

his own interpretation of the law as he believes it *should* be applied based on his analysis of the

cases.  Roberto Reply Dec. ¶ 25 ("My Supplemental Declaration presents the willfulness and

substantiality or immediateness and substantiality requirements as *descriptions* of the elements . .

. these elements demonstrate how art. 50 section 1 CO should be applied.").

The Court therefore finds Professor Werro's descriptions of Article 50.1 and the

surrounding case law to be coherent, credible, and supported by Swiss case law.  In contrast,

Professor Roberto's interpretation is unsupported by, and at times inconsistent with, those cases.

The Court adopts Professor Werro's view that Article 50.1 allows liability if an accomplice

"intentionally or unintentionally assists the illicit act of the perpetrator who himself is also at

fault."  Werro Dec. ¶ 33.   And the Court agrees that, as applied to this case, Plaintiffs must

"allege, at a minimum, that BNPP consciously cooperated with the Sudanese government by

providing financial support and that it knew or should have known, had it exercised due care,

that its support would contribute to the Sudanese government's violation of human rights."

Werro Dec. ¶ 35.

Next, the Court applies this standard to the facts alleged in the Second Amended

Complaint.   Plaintiffs have plausibly alleged that BNPP was, at the very least, negligent as to its

contribution to the Sudanese regime's tortious conduct.  First, the Second Amended Complaint contains sufficient facts showing BNPP was well aware (or at least should have been aware) of the horrific events in Sudan, and that it knew that the country had been sanctioned by the U.S. at least in part for that reason.  Plaintiffs allege that, beginning in the late 1990s, there was widespread, contemporaneous reporting in the international media and world governments on the human rights abuses being perpetrated by the Sudanese regime.  SAC ¶¶ 153-169.   They allege it was also well known at the time that the atrocities were being committed in pursuit of developing oil rich lands against the inhabitants there.  Indeed, Plaintiffs allege that a number of other Western companies doing business Sudan – in particular in the financial and oil industries – were chastised by the international media and their home governments to the point where they were forced to withdraw from Sudan because of public pressure.  SAC ¶¶ 170-190.

Moreover, Plaintiffs allege that the United States government had taken an open and clear stance condemning the Sudanese regime's atrocities at this point and had specifically recognized the link between the Sudanese government's oil industry and its perpetration of violence.  SAC ¶¶ 83-100.  To that end, Congress passed legislation and two Presidents issued a series of executive orders aiming to cut off all assistance and aid to the Sudanese government, in particular it's most critical industry – oil.  *Id.*  An Executive Order announcing the sanctions explicitly recognized that the "policies and actions of the Government of Sudan . . . violate human rights, in particular with respect to the conflict in Darfur."  SAC ¶ 111.  Most importantly, Plaintiffs allege that internal communications at BNPP will show that senior officials *expressly* recognized the human rights abuses in Sudan, referring to it as a "human catastrophe."  SAC ¶ 184.  Thus, based on the information that was allegedly available to BNPP at the time as an entity doing business in Sudan, Plaintiffs have sufficiently alleged that BNPP

either knew or at the very least should have known that the Sudanese government was engaging in a campaign of human rights abuses that was linked to its oil industry and that the U.S. Sanctions that Defendant was violating were imposed at least in part for the purpose of preventing the Regime's ability to continue that campaign.

To demonstrate negligence even further, Plaintiffs have also plausibly alleged that BNPP actively sought to hide its business activity in Sudan, suggesting that BNPP was in fact aware of the human rights atrocities going on there and that its financial assistance was contributing to those atrocities in violation of U.S. sanctions.  According to the Second Amended Complaint, BNPP used "deceptive procedures and transaction structures" to avoid detection by the U.S. government, such as omitting references to Sudanese entities in its transactions and using unaffiliated banks.  SAC ¶¶ 111-112.  Plaintiffs also point to alleged internal communications at BNPP where senior officials acknowledge that they were violating U.S. sanctions (a fact BNPP also pled guilty to in U.S. Court, SAC ¶ 17), referred to their activity in Sudan as a "dirty little secret," and acknowledged that their provision of financial services "played a pivotal part in the support of the Sudanese government which . . . refuses the United Nations intervention in Darfur."  SAC ¶ 183-189.

The Court therefore agrees with Plaintiffs that, assuming these factual allegations are true, it is at least plausible that BNPP knew or should have known:  that the Sudanese regime was engaged in a campaign of human rights abuses, that it was massively enriching the Regime by providing it access to U.S. dollars to sell its oil, that the profits from the relationship were being used to fund the military, that the military was committing atrocities in pursuit of obtaining more oil (which BNPP again would then allegedly help the Regime sell as part of their profitable business relationship), that its assistance to the Regime was in violation of U.S. sanctions, and

that those sanctions had been imposed in part to prevent the Regime's atrocities. Plaintiffs have therefore plausibly alleged that BNPP was at least negligent under Swiss law as to its contribution to tortious conduct.

### 3. Element Three

The third element of an Article 50.1 claims is that the accomplice's "culpable cooperation was the natural and adequate cause of the plaintiff's harm or loss." Roberto Reply Dec. ¶ 6. The parties' experts agree that the concepts of "natural" and "adequate" cause are similar to the concepts of "but for" and "proximate" cause in United States tort law. Werro Dec. ¶ 27; Roberto Reply Dec. ¶ 29.

### a. Natural Causation

Professor Werro describes "natural cause" as the requirement that "[a] natural causal link exists where the harm would not have occurred at the same time or in the same way or magnitude without the conduct alleged." Werro Dec ¶ 47. Professor Roberto does not address the issue of natural cause as it pertains to this case in his testimony, but Defendants argue in their motion to dismiss that "Plaintiffs likely haven't even satisfied the requirement of pleading but for causation" because "Sudan was committing human rights violations before and after the period in which the BNPP Defendants were violating U.S. sanctions." Def. Supp. at 20. Defendants point to no authority from either the Swiss or United States courts for their proposition that an accomplice is not a "but for" cause if the primary tortfeasor was still able to commit some torts against the plaintiff without the help of the accomplice. To the contrary, under Professor Werro's uncontested definition, Plaintiff's need only allege that the human rights abuses "would not have occurred at the same time or in the same way or magnitude without the conduct alleged" in order to satisfy natural causation. Werro Dec. ¶ 47; Roberto Reply Dec. ¶ (noting

that he and Mr. Werro's testimony differ with regard to their understanding of adequate causation but not disputing natural causation).

Plaintiffs have adequately alleged that the deaths, rapes, assaults, displacements, and other instances of tortious conduct would not have occurred in the same magnitude or frequency if BNPP had not provided the Sudanese regime with financial services.  The Second Amended Complaint explains that BNPP's role as the Sudanese government's "de facto central bank" directly fueled the atrocities:  BNPP helped the Regime subvert its ban from U.S. financial markets, which generated massive revenues in oil sales that allowed the Regime to "equip and mobilize armed forces," which then "committed ethnic cleansing in oil regions to obtain and sell more oil."  Pl. Opp. at 18.  In short, Plaintiffs' allege that BNPP was a core piece of the "oil-genocide nexus as its chief financier."  *Id.* at 19.

Though Defendants argue that "it cannot be presumed the funds accessed by Sudan through the BNPP Defendants' financial services were actually used for the attacks that injured plaintiffs," Def. Supp. at 19, that is in fact precisely what Plaintiffs here allege.  Plaintiffs claim that the revenue generated for the Sudanese government by BNPP's assistance exceeded its entire military budget, leading to a massive increase in military expenditures (ten times what it had been prior to the Sudanese government's partnership with BNPP), which is why the Regime's "attacks on civilian populations . . . occurred with greater frequency and velocity after BNPP agreed to partner with" it.  SAC ¶ 103, 120.   Plaintiffs also allege that the government of Sudan used its newfound access to U.S. financial markets provided by BNPP to import sophisticated weapons from major arms suppliers in China, Russia, Ukraine, Iran and Belarus. *Id.* at ¶¶ 127-128.  At this stage, those allegations are sufficient to demonstrate a factual causal link between BNPP and the increase in human rights abuses.

### b.  Adequate Causation

The parties' experts agree on the fundamental definition of adequate cause.  Professor Werro explains that "[a]n adequate causal link exists when the wrongdoer's conduct was capable, in the ordinary course of events and common experience, of leading to the kind of result that occurred."  Werro Dec. ¶ 48.  According to Professor Roberto, "an act is an adequate cause for a loss or damage if, based on the usual course of events and common experience, it can fairly be considered the cause of the kind of loss or damage that occurred."  Roberto Dec. ¶ 38.   In other words, the ultimate question of adequate cause is similar to that of proximate cause in United States common law, which is whether it is reasonable to consider this person's conduct the cause of the result that occurred.  *See CSX Transp., Inc. v. McBride*, 564 U.S. 685, 692, 131 S. Ct. 2630, 2637, 180 L. Ed. 2d 637 (2011) ("The term 'proximate cause' is shorthand for a concept: Injuries have countless causes, and not all should give rise to legal liability.").  Thus, also like proximate cause, the requirement of adequate cause works as a limit on legal liability in an otherwise infinite chain of but-for causal effects.  *See* Roberto Dec. ¶ 36.  According to Professor Roberto's (uncontested) translation of a Swiss Federal Supreme court case, "the answer to the question of adequacy is therefore based on a value judgment" in which the court decides whether a result "can reasonably be attributed the liable party."  *Id.*

However, the experts disagree on how a court is to make this value judgment.  Professor Werro argues that the test is whether the result was "objectively foreseeable."  Werro Dec. ¶ 50.[2] Professor Roberto argues that adequate cause "requires more than just foreseeability," as the contribution must also be "substantial," Roberto Dec. ¶¶ 31, 39.  Again, Professor Roberto

---

[2] Professor Werro cites only to a criminal law case for this proposition, which is not binding in the civil context. Werro Dec. ¶ 50, ¶ 48 n. 49.  However, he maintains that the civil courts nonetheless adhere to this framework, and Professor Roberto appears to agree that the concept of foreseeability is one aspect of the determination, though as explained above, he argues more is required.

provides no citations to support his claim that a conduct must be a "substantial" contribution to the harm in order to be an adequate cause, and instead this appears to be his own interpretation of when the Swiss courts have found liability based on his reading of those cases. Professor Werro, who the Court determines to be credible, denies that the Swiss courts demand that an act be "substantial" in order to constitute adequate cause. Werro Dec. ¶ 49. The Court therefore determines, based on the experts reports, that a finding of adequate cause under Swiss tort law requires determining whether it would be "reasonable" to hold BNPP responsible for causing at least some of human rights abuses in Sudan, which includes looking at the factor of whether those atrocities were foreseeable to BNPP at the time.

In applying this standard to the instant case, the Court notes that this type of fact-intensive inquiry is not usually resolved on a motion to dismiss for failure to state a claim. In U.S. courts, the similar issue of proximate cause "generally remains an issue of fact for the jury," *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F. Supp. 2d 79, 91 (S.D.N.Y. 2004) (citing *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 840-41 (1996)), and thus is not decided at the pleadings stage "unless only one conclusion may be drawn from the established facts and the question of legal cause may be decided as a matter of law." *Johnson v. Bryco Arms*, 304 F. Supp. 2d 383, 395 (E.D.N.Y. 2004). A plaintiff need only plausibly allege facts from which a jury could find that the defendant's conduct should reasonably be considered a cause of the subsequent harm. *See, e.g., In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 390 F. Supp. 3d 432, 450 (S.D.N.Y. 2019) ("Plaintiffs plausibly allege that the Exchanges' alleged misconduct was a proximate cause of the economic loss they suffered by trading in the manipulated securities markets" because "the zone of foreseeable risk created by the Exchanges' allegedly manipulative scheme included the risk that investors trading on the

Exchanges' platforms would be victimized by the very products and services that the scheme allegedly concealed.").  Nonetheless, a court may dismiss a compliant for failure to allege proximate clause if those allegations are wholly conclusory or if the set of facts alleged, even if true, are "too attenuated to satisfy the proximate cause requirement," or if the "chain of causation . . . is far too long to constitute proximate cause" or "rest[s] on mere conjecture" or "depend[s] on the intervention of multiple parties."  *MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 43 F. Supp. 3d 309, 314-15 (S.D.N.Y. 2014).  *See also In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 163 (2d Cir. 2016) (affirming dismissal where plaintiffs had not alleged that defendant "proximately cause[d] the claimed injury . . . because [plaintiffs'] alleged injuries are too remote.").  Here too, the Court will not dismiss Plaintiffs' claim for lack of adequate cause unless the facts alleged demonstrate a causal link that is far too attenuated or remote to be considered reasonable.

The Court determines that Plaintiffs have plausibly alleged adequate cause, meaning that, assuming those allegations to be true, a jury could find that BNPP's provision of illegal financial services to the Sudanese regime can be reasonably considered to have directly resulted in at least some of the harm done to Plaintiffs.  To be sure, Defendants correctly point out that the causal chain between BNPP conducting transactions for Sudan and the acts of murder, rape, assault, battery, displacement, and other horrendous acts of violence perpetrated on Plaintiffs has multiple links:  BNPP provided the Sudanese government with a means to evade U.S. sanctions so it could access U.S. financial markets, in turn this allowed the Sudanese regime to generate significant profits from its oil industry, which permitted them to mobilize and equip armed forces that the Regime then directed to commit violent atrocities to secure more oil.  SAC ¶¶ 101-135.

However, it is not just the mere *number* of links in the chain that determines whether it is reasonable to hold BNPP responsible, but also whether each subsequent link was the natural and foreseeable result of the former.  The facts alleged in Plaintiffs' Second Amended Complaint, assuming they are true, demonstrate that BNPP knew or at least should have known that the Sudanese government was committing horrific abuses, that those abuses were committed with weapons and soldiers that were bought with funds generated by its relationship with BNPP, that the Regime would not otherwise be able to obtain those funds without BNPP deciding to break the law, and that the purpose of that law was at least in part to prevent the Regime from continuing those abuses – which is why BNPP undertook measures to evade detection of its activities from the U.S. government, its shareholders, and the world.   SAC ¶¶ 101-114.

Moreover, according to the Second Amended Complaint, the violence committed by the Sudanese government and the transactions with BNPP are linked by more than just one-way flows of cash.  The Sudanese government was using its newly funded military force to monopolize the oil rich regions of Sudan, and in doing so engaged in ethnic cleansing, displacement, and murder of inhabitants of those regions.  SAC ¶ 143-147.  In other words, it was using the profits from its oil to obtain more oil.  *Id.* at ¶ 143 ("Much of the focus of the [regime's] attacks was on civilians living in the path of oil development.").  And the oil-centered focus of Sudan's human rights abuses, Plaintiffs allege, was widely reported at the time.  SAC ¶¶ 153-162.

This is a key part of the cycle alleged by Plaintiffs:  the more BNPP helped the Regime access U.S. dollars, the more money the Regime made from its oil industry, the more it could fund its military, the more oil it could produce by using armed forces to seize and develop oil rich lands, the more it needed access to U.S. dollars to sell the oil, the more money the Regime

and BNPP made, the more BNPP helped the Regime access U.S. dollars. *See id.* Thus, BNPP allegedly knew or should have known not just that the profits it was helping generate would go towards genocide, but that it was able to generate those profits for the Regime (taking a cut for itself) in part *because of* genocide. In other words, it is more reasonable to consider BNPP the adequate cause of the violence when the violence was allegedly perpetrated to *increase* and *continue* that profitable business relationship.

Defendants' remaining arguments are unpersuasive. First, they argue that Plaintiff has failed to state an Article 50.1 claim under what the parties refer to as the "Swisscom case." Def. Supp. at 18-19. In that case, which is the only case that Defendants' experts provided where a Swiss court has found that there was no adequate cause, the Swiss Federal Supreme Court declined to hold an internet servicer liable for the copyright infringement of third parties, even though it was aware of the infringement happening through the use of its platform and declined to block those webpages. *Id.* Defendants argue that this factual scenario is analogous to BNPP's conduct here, as it provided a "service" to the government of Sudan and thus should not be held liable as an accomplice for whatever the Regime did next. *Id.*

As Professor Werro persuasively explains, however, that case is factually distinguishable from this one. For one, the primary illegal conduct in that case under Swiss law was only the original uploading of the infringing material, not the subsequent consumption, and Swisscom did not become aware of the material until after it had already been uploaded. Werro Dec. ¶ 52, Pl. Opp. at 21. To the contrary, here, the atrocities were committed continually over almost a decade, allegedly both as a result of and in furtherance of BNPP's profitable financial relationship with the Regime. Most importantly, unlike the internet service provider in Swisscom and its hundreds of thousands of users, BNPP and the government of Sudan had a

direct contractual and *illegal* relationship.  It is therefore more reasonable to determine that BNPP is responsible for the harm caused by its transactions – transactions that were illegal specifically because they would result in that harm – than the internet company that provided a legal service to members of the general public through automated transactions, only some of whom decided to use that service nefariously.  The Court therefore cannot determine that the distinguishable Swisscom case alone bars Plaintiffs' claims at this stage of the litigation.

Lastly, Defendants point to cases in the United States in which BNPP and similar defendants prevailed on proximate cause at the motion to dismiss stage.  Defendants cite *Osifi v. BNP Paribas*, where the District Court for the District of Columbia declined to find BNPP liable for a 1998 terrorist bombing of the U.S. embassies in Africa by al Qaeda as a result of its transactions with the Sudanese government (which allegedly had a financial relationship with the al Qaeda).  *Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84, 91-92 (D.D.C. 2017).  The court in *Osifi* determined that the element of proximate cause, as that concept is defined in United States' common law, had not been met because plaintiffs failed to allege that "BNPP participated in the attacks or provided money directly to any terrorist group, that any money BNPP processed for Sudan or Sudanese banks was transferred to al Qaeda prior to the attacks, or that Sudan would have been unable to assist al Qaeda without the funds that BNPP processed."  *Id.* at 102.  This non-binding authority is factually distinct from Plaintiffs' claim here.  In their Second Amended Complaint, Plaintiffs allege that BNPP *directly* funded the perpetrator, i.e., the Sudanese regime itself, when it either knew or should have known what the perpetrator would do with those funds.  That is sufficient to state a claim under Swiss law.

Similarly, Defendants point to *Rothstein v. UBS AG*, where the Second Circuit affirmed a decision to dismiss plaintiffs' claims against a bank for engaging in transactions with Iran that

they alleged resulted in terrorist attacks by Hizbollah and Hamas, in part because the traditional proximate cause standard was not satisfied. 708 F.3d 82, 97 (2d Cir. 2013). This case is binding authority but readily distinguishable. The defendants in *Rothstein* were not alleged to have directly transacted with the perpetrators of the violence, Hamas and Hezbollah, and plaintiffs were not claiming that the government of Iran itself inflicted the atrocities. To the contrary, here, according to Plaintiffs' complaint, BNPP directly transacted with the Sudanese regime, which itself perpetrated the human rights abuses through its military, both with official armed forces and surrogate armed forces, which Plaintiffs sufficiently allege acted as de facto military. SAC ¶ 7, 14, 30, 120; *id.* at ¶ 33 (describing "backed militias wearing uniforms with a GOS insignia and carrying weapons, which he had seen them obtain from the police station and army barracks."). Plaintiffs have therefore sufficiently plead adequate causation under Swiss law.

\* \* \*

Plaintiffs have plausibly alleged that BNPP consciously cooperated with the Sudanese regime, either knew or should have known that its assistance was contributing to the Regime's human rights abuses, and that this assistance was the natural and adequate cause of Plaintiffs' injuries. Plaintiffs have therefore stated a claim for relief under the Article 50.1 of the Swiss Code of obligations. The following claims therefore survive: Conspiracy to Commit Battery, Aiding and Abetting Battery, Conspiracy to Commit Battery in Performance of a Public Duty or Authority, Aiding and Abetting Battery Committed in Performance of a Public Duty or Authority, Conspiracy to Commit Assault, Aiding and Abetting Assault, Conspiracy to Commit False Arrest and False Imprisonment, Aiding and Abetting False Arrest and False Imprisonment, Conspiracy to Commit Conversion, Aiding and Abetting Conversion, Conspiracy to Commit Wrongful Death, and Aiding and Abetting Wrongful Death Caused by Intentional Murder.

### III.     CONCLUSION

For the reasons stated above, Defendants motion to dismiss Plaintiffs claims for failure to state a claim under Swiss law is GRANTED IN PART AND DENIED IN PART.  This resolves Dkt. No. 65.  Discovery in this case was postponed pending resolution of the instant motion. Dkt. No. 24.  The Court will schedule an initial pretrial conference by subsequent order and provide instructions for submitting a proposed case management plan.


SO ORDERED.

Dated: February 16, 2021
     New York, New York

_____
ALISON J. NATHAN
United States District Judge