# EXHIBIT H



DEPARTMENT OF THE TREASURY
WASHINGTON, D.C. 20220

COMPL-2013-193659

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is made by and between the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") and BNP Paribas SA ("BNPP").

### I.   PARTIES

1.  OFAC administers and enforces economic sanctions against targeted foreign countries, regimes, terrorists, international narcotics traffickers, and persons engaged in activities related to the proliferation of weapons of mass destruction, among others. OFAC acts under Presidential national emergency authorities, as well as authority granted by specific legislation, to impose controls on transactions and freeze assets under U.S. jurisdiction.

2.  BNPP is a bank registered and organized under the laws of France.

### II.  FACTUAL STATEMENT

3.  For a number of years, up to and including 2012, BNPP processed thousands of transactions to or through U.S. financial institutions that involved countries, entities, and/or individuals subject to the sanctions programs administered by OFAC. BNPP appears to have engaged in a systematic practice, spanning many years and involving multiple BNPP branches and business lines, that concealed, removed, omitted, or obscured references to, or the interest or involvement of, sanctioned parties in U.S. Dollar ("USD") Society for Worldwide Interbank Financial Telecommunication ("SWIFT") payment messages sent to U.S. financial institutions. While these payment practices occurred throughout multiple branches and subsidiaries of the bank, BNPP's subsidiary in Geneva ("BNPP Suisse") and branch in Paris ("BNPP Paris") facilitated or conducted the overwhelming majority of the apparent violations of U.S. sanctions laws described in this Agreement. The specific payment practices the bank utilized in order to process certain sanctions-related payments to or through the United States included omitting references to sanctioned parties; replacing the names of sanctioned parties with BNPP's name or a code word; and structuring payments in a manner that did not identify the involvement of sanctioned parties in payments sent to U.S. financial institutions.

4.  During the course of an internal transaction and conduct review that began in 2007 and expanded in 2009, BNPP provided information indicating that some BNPP businesses replaced the names of sanctioned parties with BNPP's name or SWIFT Business Identifier Code ("BIC") in outgoing payments, including those destined for the United States, and sometimes BNPP simply omitted (and did not replace) sanctioned parties' names from payment messages pursuant to specific instructions from the sanctioned parties themselves. In addition to receiving and complying with instructions to omit references to sanctioned parties, BNPP identified examples in which it issued instructions (to other employees, to BNPP entities, and to sanctioned

BNP Paribas SA                                                                                           2
COMPL-2013-193659

banks) to conceal the involvement of sanctioned parties in transactions transiting the United States.

5.  In addition to complying with and issuing instructions pertaining to sanctions-related payments, BNPP appears to have utilized less transparent payment message types for transactions that involved sanctioned countries or entities. The bank's internal review determined that BNPP utilized more transparent serial payment messages (such as SWIFT MT103 payment messages) on a more frequent basis for transactions involving non-sanctioned parties in certain business lines at certain BNPP locations. Conversely, a number of business lines at certain BNPP locations tended to utilize less transparent cover payment messages (such as SWIFT MT202 payment messages) for transactions involving sanctioned parties. Certain BNPP locations populated specific data fields (such as the originating financial institution) with accurate information more often when the originating financial institution was a non-sanctioned party, versus often leaving optional data fields blank or filling mandatory data fields with BNPP's name if the originating financial institution was a sanctioned entity. Thus, by utilizing cover payment messages for transactions involving sanctioned parties, BNPP effectively removed, omitted, obscured, or otherwise failed to include references to sanctioned parties in certain USD payments sent to U.S. clearing banks.

6.  As early as June 2003, BNPP issued a "general procedure" that pertained to "Financial Embargoes," which stated that "US financial embargoes apply within the US territory, to any US national or resident and to any transaction in US Dollar." In addition, on several occasions during the period covered by the bank's internal review, BNPP sought external legal advice regarding its sanctions-related business, and specifically with regard to processing transactions on behalf of or involving sanctioned parties through the United States. Though not always consistent, the legal advice that BNPP received described OFAC's comprehensive sanctions and explained why BNPP should be careful in its business that involved parties subject to OFAC sanctions. Several BNPP entities developed procedures or utilized payment practices that contravened the bank's June 2003 "general procedure" and processed thousands of transactions to or through the United States in apparent violation of U.S. economic sanctions programs against Sudan, Iran, Cuba, and Burma.

7.  BNPP Suisse processed a majority of the transactions constituting apparent violations of U.S. sanctions requirements described in this Agreement. During the beginning of the period covered by BNPP's internal review, BNPP Suisse routinely processed transactions through U.S. banks on behalf of sanctioned parties by following instructions either from sanctioned parties or from BNPP employees that directed BNPP Suisse operators to omit references to the sanctioned parties in outgoing payment messages destined for the United States. BNPP stated to OFAC that among the BNPP Suisse employees interviewed during the bank's internal review, the "general consensus" was that prior to 2007 it was BNPP Suisse's practice to comply with such instructions from sanctioned parties. In practice, the bank's sanctioned customers sent payment orders directly to BNPP Suisse's Front Office, and the Front Office passed the instructions to the Back Office for processing. BNPP Suisse's Front Office periodically added their own instructions to the payment orders to ensure that the bank's Back Office processed the transactions in accordance with the sanctioned parties' instructions.

BNP Paribas SA  3
COMPL-2013-193659

8. At a September 23, 2004, meeting, BNPP Suisse decided to shift its USD clearing activity away from BNPP's New York branch ("BNPP New York") to a U.S. bank's New York branch in an apparent effort to shield BNPP New York from liability for violations of U.S. sanctions regulations. A BNPP Suisse Compliance representative present at the meeting stated that he or she believed that the bank made the decision "as a precautionary measure, in case the Bank's interpretation of U.S. sanctions laws might be incorrect."

9. During the period covered by the bank's internal review, BNPP Suisse maintained USD-denominated correspondent accounts for several Sudanese banks, including four banks identified by OFAC as Specially Designated Nationals. BNPP Suisse appears to have structured a two-part payment process involving non-Sudanese banks in order to facilitate USD payments from the Sudanese banks' correspondent accounts at BNPP Suisse to other non-U.S. accounts. By January 2005, BNPP Suisse had opened USD accounts for nine banks located in third countries (the "Regional Banks"). Based on the documentation and information submitted to OFAC, the Regional Banks appear to have used their accounts at BNPP Suisse to facilitate "USD clearing on behalf of Sudanese banks." BNPP identified certain Know Your Customer account opening documents stating that at least several of the Regional Banks' accounts were opened "in the context of the US embargo against Sudan" with the aim of "facilitating transfers of funds in USD for Sudanese banks." In order to process the Sudanese-related transactions to or through the United States, BNPP Suisse utilized a combination of book-to-book transfers and the Regional Banks' accounts that concealed the interest of the Sudanese parties in the underlying payments. First, acting on payment instructions from a Sudanese customer, BNPP Suisse processed a book transfer in USD from the Sudanese entity's account to a Regional Bank's account on BNPP Suisse's books. Subsequently, acting on payment instructions from the Regional Bank, BNPP Suisse processed a USD clearing transaction in the name of the Regional Bank (without referencing sanctioned parties or Sudan), to or through the United States. BNPP appears therefore to have conveyed the benefit of the services of the unwitting U.S. bank recipients to Sudan and directly or indirectly exported financial services from the United States to Sudan.

10. Beginning in or around mid-2005, some BNPP Suisse employees voiced concerns over the use of the Regional Banks' accounts to clear transactions through the United States. On August 5, 2005, a member of BNPP Suisse Compliance warned the bank's Front Office in writing that the Regional Bank transfers could be viewed as an attempt to circumvent or avoid U.S. sanctions: "[t]his practice effectively means that we are circumventing [or avoiding] the US embargo on transactions in USD by Sudan." In September 2005, a meeting took place in Geneva between BNPP Paris' Head Office Management and members of BNPP Suisse. A BNPP Suisse chronology of issues regarding Sudan (drafted several years later by a compliance member) noted that the "meeting had been called to express, to the highest level of the bank, the reservations of the Swiss Compliance office concerning the transactions executed with and for Sudanese customers." Specifically, BNPP Suisse Compliance conveyed its concerns to the former BNPP Group Chief Operating Officer. Based on the compliance member's written chronology of events, the former BNPP Group Chief Operating Officer purportedly asked BNPP Suisse Compliance whether "Switzerland has declared an embargo on Sudan." The chronology then states that the executive subsequently noted that there should be no doubts whatsoever concerning this matter and asked that no minutes be taken for that meeting. BNPP stated to

OFAC that "[a]ccording to a handwritten note taken after the meeting, the conclusion reached was that BNPP Geneva could 'continue current operations while respecting embargoes and exercising caution.'"

11. Almost a year later, on July 18, 2006, BNPP's Head Office General Management Credit Committee (which was chaired by the former BNPP Group Chief Operating Officer referenced above) held a meeting to discuss BNPP Suisse's "business relations with the Sudanese banks." The bank stated that the meeting notes "reflect the adoption of several recommendations from Group Compliance, including . . . 'complying strictly with the US embargo." In or around November 2006, BNPP Suisse Compliance proposed that the bank "close out certain Regional Bank accounts that were being used solely for USD clearing on behalf of Sudanese banks." Despite these recommendations, BNPP Suisse continued to operate accounts for, and process USD transactions to or through the United States on behalf of, its Sudanese bank customers. Following a recommendation from BNPP's Group Compliance in or around May 2007, BNPP Suisse reportedly "decided to withdraw entirely from Sudan." In June 2007, BNPP's Group Compliance Department issued its Group Policy on Sudan, immediately prohibiting all USD transactions involving, directly or indirectly, a U.S. person and a Sudanese entity, and expressing BNPP's decision to terminate its direct relationships with Sudanese banks and to discontinue all business with non-bank Sudanese entities and persons. However, it appears that BNPP continued processing Sudan-related USD transactions through at least December 2008.

12. BNPP Suisse also processed certain foreign exchange transactions on behalf of Sudanese banking clients followed by a subsequent USD payment to or through the United States. BNPP Suisse initiated the transactions by first processing book transfers involving the sanctioned parties' USD accounts and Euro accounts on BNPP Suisse's books (i.e., the sanctioned parties sold USD to, and purchased Euros from, BNPP Suisse) and subsequently originated USD transactions in BNPP Suisse's own name through the United States without referencing the sanctioned parties. BNPP acknowledged that the book transfers and USD transactions "had the same value dates and exchange rates." While this process was identical for both sanctioned and non-sanctioned clients of BNPP Suisse, the structured linking of transactions noted above concealed the involvement of the Sudanese banking clients in transactions that BNPP processed to or through the United States.

13. BNPP Paris participated with other banks in approximately eight credit facilities that involved Cuban parties and were designed to finance various Cuba-related activities and were not licensed by OFAC. BNPP cleared transactions pursuant to these facilities through the United States. Some payment messages related to the facilities contained instructions to conceal the involvement of Cuba. On December 17, 2007, BNPP formalized a Group Policy for Transactions with Cuba, with an effective date of February 11, 2008, which prohibited Cuba-related transactions denominated in USD. BNPP stated that in order to comply with the policy, the bank attempted to convert the remaining credit facilities into currencies other than USD. All but two Cuban facilities had been converted into Euros by May 2008. In September 2008, BNPP appointed a new Head of Global Compliance who was "heavily involved . . . with vetting options for repayment of outstanding USD Cuban Credit Facilities." Despite the new Head of Global Compliance's involvement in the conversion process, BNPP failed to convert one facility from

BNP Paribas SA 5
COMPL-2013-193659

USD until October 2010 and did not convert another facility from USD until August 2012. BNPP processed payments related to these facilities through the United States until December 2009, and January 2010, respectively.

14. On June 12, 2007, BNPP Paris opened an account for a company incorporated in the United Arab Emirates ("UAE") with an address listed in Dubai, UAE. An organizational chart submitted to BNPP Paris indicated that the company was part of a network of eight companies—four of which were incorporated in Iran—that comprised an Iranian energy group owned and controlled by an Iranian citizen ordinarily resident in Iran, who was also the sole beneficial owner of the company maintaining an account at BNPP Paris. According to BNPP Paris' account opening materials (and a report the company produced to BNPP Paris in 2007), many of the company's activities involved selling and transporting petroleum products to, from, or through Iran, and the company's General Business Plan described its goals to increase a number of Iran-related activities over the following three years (2007-2010). Based upon the available records, BNPP's outbound transactions through the United States on behalf of the company appear to have violated the prohibition contained in § 560.204 of the ITSR because the benefit of these transactions was received in Iran.

15. The company referenced above utilized its account at BNPP Paris to receive payments related to its sale of Turkmen liquefied petroleum gas to Iraq. Between November 2008 and November 2012, BNPP processed 114 transactions totaling approximately $415 million on behalf of the company to or through the United States. Although the messages related to the transfers sent through the United States did include references to the company's name, they did not include references to Iran or to the company's Iranian ownership or connections. Most of the USD transfers BNPP initiated on behalf of the company reached their intended beneficiary. On January 9, 2012, however, BNPP Paris originated a $500,000 wire transfer on behalf of the company, destined for a refinery in Turkmenistan, and an unaffiliated correspondent bank located in the United States stopped the transaction and requested additional details from BNPP New York. BNPP New York informed BNPP Paris that the unaffiliated correspondent bank was holding the payment "due to OFAC concern" and requested information about the payment, the company, the company's owners, and "anyway [sic] the transaction is related to Iran directly or indirectly." BNPP Paris contacted the company directly to relay the questions, and the response—which came from an email address belonging to the Iranian energy group noted above—denied any association between the company and Iran. A BNPP Paris compliance officer reviewed and approved the response for transmission to the unaffiliated correspondent bank without verifying the information or consulting the customer profile form ("CPF") for the company. At the time of the transaction, the CPF included a handwritten note for the company that read "Iranian ownership." In light of the available information, BNPP appears to have had reason to know of the company's connection to Iran, and it failed to pass any of that information on to the unaffiliated correspondent bank in response to its inquiry. Even after the rejected transaction described above, BNPP failed to subsequently investigate either the payment or the company, and BNPP Paris processed 64 additional transactions valued at over $292 million on behalf of the company through the United States between January 2012 and November 2012, at which time BNPP Group Compliance first learned about these transactions (BNPP closed the company's account on November 27, 2012).

BNP Paribas SA                                                                                                6
COMPL-2013-193659

    16.    In addition to the above, various BNPP branches routed other USD payments to or through the United States in apparent violation of U.S. sanctions programs, including the following:

    a. BNPP Suisse and BNPP Paris negotiated a variety of trade finance instruments on behalf of or that involved parties subject to U.S. sanctions on Sudan, Iran, Cuba, and Burma and routed USD payments to or through the United States pursuant to these instruments;

    b. BNPP Suisse, BNPP Paris, BNPP's branch in Rome, and BNPP's branch in Milan all processed correspondent banking or retail banking transactions to or though the United States that involved the interest of a person subject to U.S. sanctions on Sudan, Iran, Cuba, or Burma; and

    c. BNPP Suisse processed a number of payments to or though the United States related to syndicated loans involving Iranian parties, and BNPP's branch in Milan processed one transaction pertaining to a corporate and investment banking instrument in which a Cuban party had an interest through the United States.

    17.    BNPP solicited advice from multiple law firms over a number of years regarding the legality of the types of transactions leading to the apparent violations described in this Agreement. Some of this guidance, and in particular guidance received in September 2006, appears to indicate that BNPP's payment processes could result in apparent violations of U.S. sanctions laws. For example, in September 2006, BNPP received a memorandum from a U.S. law firm that indicated that non-U.S. branches of non-U.S. banks appeared to be prohibited from processing sanctions-related transactions through the United States. The same memorandum contained the following guidance, which appears to describe the potential implications of a non-U.S. bank attempting to shield its own U.S. branch from sanctions-related transactions:

> [W]here a transaction is a prohibited transaction because it is conducted through a bank in the U.S., albeit an unaffiliated bank, if the use of the unaffiliated bank were perceived to result from an effort by the foreign bank to avoid the involvement of its U.S. branch in handling prohibited transactions, there is a substantial risk either that regulators or prosecutors would attempt to make a case that the foreign bank is in some fashion a CACR or ITR Covered Person or that the foreign bank could be considered to be involved in an evasion of the OFAC sanctions. Evasions are specifically prohibited by the CACR sanctions as well as the ITR sanctions.

Notwithstanding this guidance, the bank continued to process hundreds of payments through the United States using practices that did not reveal the interest in those transactions of parties subject to sanctions programs administered by OFAC. The bank's conduct also continued for several years after OFAC contacted the bank directly (in 2007) regarding BNPP Suisse's USD business with Sudan and Iran.

BNP Paribas SA  7
COMPL-2013-193659

18. From on or about September 6, 2005, to on or about July 25, 2009, BNPP processed 2,663 electronic funds transfers in the aggregate amount of $8,370,372,624 to or through financial institutions located in the United States in apparent violation of the prohibitions against (i) the exportation or reexportation of services from the United States to Sudan, 31 C.F.R § 538.205; and/or (ii) dealing in property and interests in property of the Government of Sudan that "come within the United States," 31 C.F.R. § 538.201.

19. From on or about July 15, 2005, to on or about November 27, 2012, BNPP processed 318 electronic funds transfers in the aggregate amount of $1,182,075,543 to or through financial institutions located in the United States in apparent violation of the prohibitions against the exportation or reexportation of services from the United States to Iran, 31 C.F.R. § 560.204.

20. From on or about November 3, 2005, to on or about May 2009, BNPP processed seven electronic funds transfers in the aggregate amount of $1,478,371 to or through financial institutions located in the United States in apparent violation of the prohibition against the exportation or reexportation of financial services to Burma from the United States, 31 C.F.R. § 537.202.

21. From on or about July 18, 2005, to on or about September 10, 2012, BNPP processed 909 electronic funds transfers in the aggregate amount of $689,237,183 to or through financial institutions located in the United States in apparent violation of the prohibition on dealing in property in which Cuba or a Cuban national has an interest, 31 C.F.R. § 515.201.

22. The apparent violations described in paragraphs 18-21, *supra*, were not voluntarily self-disclosed to OFAC within the meaning of OFAC's Economic Sanctions Enforcement Guidelines. *See* 31 C.F.R. part 501, app A.

23. BNPP has taken global remedial actions by increasing the frequency and content of its employee training program, adding additional resources to the bank's Compliance units, enhancing its internal audit process, implementing a stronger compliance review of its client base, reinforcing the bank's existing internal controls (such as upgrading its interdiction filter to identify transactions where a sanctions target may have been removed from a set of payment instructions), and prioritizing compliance from the top levels of the bank's senior management. These efforts included policy changes, including terminating all business and prohibiting new business in any currency with sanctioned entities. In addition, BNPP relocated its group responsible for developing and strengthening sanctions policies from Paris to New York. BNPP has also taken substantial steps to discipline individuals who were involved in the conduct at issue, including terminating several employees, reducing bonus compensation, mandating training, and issuing warnings, among other types of discipline.

24. BNPP cooperated with OFAC by conducting an extensive internal investigation, executing a statute of limitations tolling agreement with multiple extensions, and agreeing to a limited waiver of attorney-client privilege in order to provide OFAC with relevant information.

25. OFAC has not issued a penalty notice or Finding of Violation to BNPP in the five years preceding the earliest date of the transactions giving rise to the apparent violations.

BNP Paribas SA                                                                                                                8
COMPL-2013-193659

### III.   TERMS OF SETTLEMENT

IT IS HEREBY AGREED by OFAC and BNPP that:

26.   BNPP has terminated the conduct outlined in paragraphs 3 through 21 above and BNPP has established, and agrees to maintain, policies and procedures that prohibit, and are designed to minimize the risk of the recurrence of, similar conduct in the future.

27.   BNPP agrees to provide OFAC with copies of all submissions to the Board of Governors of the Federal Reserve System (the "Board of Governors") in the same form provided to the Board of Governors pursuant to the "Order to Cease and Desist Issued upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended," to BNPP on June 30, 2014, by the Board of Governors (Docket No. 14-022-B-FB) relating to the OFAC compliance review. It is understood that the Autorité de Contrôle Prudentiel et de Résolution, as BNPP's home country supervisor, is assisting the Board of Governors in the supervision of its Order.

28.   Without this Agreement constituting an admission or denial by BNPP of any allegation made or implied by OFAC in connection with this matter, and solely for the purpose of settling this matter without a final agency finding that a violation has occurred, BNPP agrees to a settlement in the amount of $963,619,900 arising out of the apparent violations by BNPP of IEEPA, TWEA, the Executive orders, and the Regulations described in paragraphs 18-21 of this Agreement. BNPP's obligation to pay OFAC such settlement amount shall be deemed satisfied by its payment of a greater or equal amount in satisfaction of penalties assessed by U.S. federal, state, or county officials arising out of the same pattern of conduct.

29.   Should OFAC determine, in the reasonable exercise of its discretion, that BNPP has willfully and materially breached its obligations under paragraphs 27 or 28 of this Agreement, OFAC shall provide written notice to BNPP of the alleged breach and provide BNPP with 30 days from the date of BNPP's receipt of such notice, or longer as determined by OFAC, to demonstrate that no willful and material breach has occurred or that any breach has been cured. In the event that OFAC determines that a willful and material breach of this Agreement has occurred, OFAC will provide notice to BNPP of its determination, and this Agreement shall be null and void, and the statute of limitations applying to activity occurring on or after July 15, 2005, shall be deemed tolled until a date 180 days following BNPP's receipt of notice of OFAC's determination that a breach of the Agreement has occurred.

30.   OFAC agrees that, as of the date that BNPP satisfies the obligations set forth in paragraphs 27 and 28 above, OFAC will release and forever discharge BNPP and its subsidiaries, including BNPP Suisse, from any and all civil liability under the legal authorities that OFAC administers, in connection with the apparent violations described in paragraphs 18-21 of this Agreement.

31.   BNPP waives any claim by or on behalf of BNPP, whether asserted or unasserted, against OFAC, the U.S. Department of the Treasury, and/or its officials and employees arising out of the facts giving rise to this Agreement, including but not limited to OFAC's investigation of the apparent violations and any possible legal objection to this Agreement at any future date.

BNP Paribas SA                                                                                                                  9
COMPL-2013-193659

### IV.  MISCELLANEOUS PROVISIONS

32.  Except for any apparent violations arising from or related to the conduct described in paragraphs 18 through 21 above, the provisions of this Agreement shall not bar, estop, or otherwise prevent OFAC from taking any other action affecting BNPP with respect to any and all matters, including but not limited to any violations or apparent violations occurring after the dates of the conduct described herein.  The provisions of this Agreement shall not bar, estop, or otherwise prevent other U.S. federal, state, or county officials from taking any other action affecting BNPP.

33.  Each provision of this Agreement shall remain effective and enforceable according to the laws of the United States of America until stayed, modified, terminated, or suspended by OFAC.

34.  No amendment to the provisions of this Agreement shall be effective unless executed in writing and agreed to by both OFAC and by BNPP.

35.  The provisions of this Agreement shall be binding on BNPP and its successors and assigns.  To the extent BNPP's compliance with this Agreement requires it, BNPP agrees to use best efforts to ensure that all entities within BNPP comply with the requirements and obligations set forth in this Agreement, to the full extent permissible under locally applicable laws and regulations, and the instructions of local regulatory agencies.

36.  No representations, either oral or written, except those provisions as set forth herein, were made to induce any of the parties to agree to the provisions as set forth herein.

37.  This Agreement consists of 10 pages and expresses the complete understanding of OFAC and BNPP regarding resolution of the apparent violations arising from or related to the apparent violations described in paragraphs 18 through 21 above.  No other agreements, oral or written, exist between OFAC and BNPP regarding resolution of this matter.

38.  OFAC, in its sole discretion, may post on OFAC's Web site this entire Agreement or the facts set forth in paragraphs 3 through 25 of this Agreement, including the identity of any entity involved, the satisfied settlement amount, and a brief description of the apparent violations.  OFAC also may in its sole discretion issue a press release including this information, and any other information it deems appropriate.

39.  Use of facsimile signatures shall not delay the approval and implementation of the terms of this Agreement.  In the event any party to this Agreement provides a facsimile signature, the party shall substitute the facsimile with an original signature.  The Agreement may be signed in multiple counterparts, which together shall constitute the Agreement.  The effective date of the Agreement shall be the latest date of execution.

BNP Paribas SA      10
COMPL-2013-193659

40. All communications regarding this Agreement shall be addressed to:

| | |
|---|---|
| BNP Paribas SA | Office of Foreign Assets Control |
| 16 Boulevard des Italiens | U.S. Department of the Treasury |
| 75009 Paris | Attn. Sanctions Compliance & Evaluation |
| France | 1500 Pennsylvania Avenue, NW |
| | Washington, DC 20220 |

AGREED:

_____
BNPP's Duly Authorized Representative
Georges Dirani

Group General Counsel BNP Paribas SA
Title of Duly Authorized Representative

DATED: 6/28/14

_____
Adam J. Szubin
Director
Office of Foreign Assets Control

DATED: June 30, 2014