# EXHIBIT 1



# EXPERT TRANSLATION BUREAU, LLC

Telephone: **(312) 759-9999**   Facsimile: **(312) 283-1071**

18001 North Bay Road, Suite 506, Sunny Isles, FL  33160

*www.Expert-Translation.com*

## CERTIFICATE OF TRANSLATION

July 7, 2020

*I, John Moberg, hereby certify that I am competent in the English, the French and the German languages.*

*I further certify under penalty of perjury that translation of the aforementioned document:*

**[Annex 21_SFT 71 II 107 - Exhibit 29_English.pdf]**

*from the French and the German languages into the English language is accurate and correct to the best of my knowledge and proficiency.*

_____
John Moberg
**Professional Translator**

ALEXANDER GOFMAN
Commission # GG 329180
Expires August 25, 2023
Bonded Thru Troy Fain Insurance 800-385-7019

07. 07. 2020

But also the contract hidden behind the purchase contract and corresponding to the real will of the parties is null and void because it is not publicly 'certified' and, according to the above mentioned case law of the Federal Court, the fulfilment of the form for the simulated contract cannot replace the form required for the dissimulated transaction. If, therefore, the purchase contract is null and void due to simulation, the so-called escrow agreement for lack of compliance with the legally prescribed form, the transfer of ownership lacks the valid legal basis, which it requires as a causal legal act. It is therefore also void.

Thus, if the ownership of the disputed properties remained with the plaintiff despite the entry in the land register, the plaintiff is entitled pursuant to Art. 975 of the ZGB (Civil Code) to demand the correction of the entry in the land register which is not in accordance with the actual legal situation and the determination of his ownership.

4. — It might be wondered whether the defendant of the action based on simulation would not be subject to the defense of malice. In fact, the Federal Supreme Court has repeatedly ruled that if a lower purchase price than the one actually agreed upon is documented when purchasing real estate, neither party can invoke simulation and the consequent invalidity of the transfer of ownership after the transaction has been completed, as this would be contrary to good faith (BGE (Judgements of the Federal Court) 50 II 148). However, even if that view were to be maintained in principle, it would not prevent the present action from being protected. For here it is not the case that the parties agree on the content and scope of the agreements concluded between them in 1931 and only the question of simulation is disputed. Rather, the views of the parties on the points mentioned differ precisely in that, according to the plaintiff, the transfer of ownership was intended to be limited in

time, whereas the defendant claims that it should have been definitive. In these circumstances, the applicant's reliance on a formal defect inherent in the transfer of ownership cannot be regarded as improper. In addition, the defendant did not raise the objection of malice.

## 24. Judgement of the Court of 22 May 1945 in the case Schneider and Rey v. Haymoz.

*Art. 50 CO.*

Anyone who improvises a dangerous shooting, without taking precautions, is jointly and severally liable for accidental damage caused to a third party by a participant in the shooting (recital 2).

The innkeeper who tolerates a dangerous state of affairs in his place of business (improvised shooting) incurs liability in tort in the event of an accident (recital 3).

He is also contractually liable, as he is obliged to protect guests from danger; these two liabilities may be combined (recital 4).

*Art. 50 OR.*

Anyone who improvises a dangerous target shooting without taking precautions is jointly and severally liable for accidental damage caused to a third party by a participant in the shooting (Recital 2).

The innkeeper who tolerates a dangerous state of affairs in his place of business (improvised shooting) incurs liability in tort in the event of an accident (recital 3).

He is also contractually liable, as he is obliged to protect his guests from danger; these two liabilities may be combined (recital 4).

*Art. 50 CO.*

Chi improvvisa un tiro a segno senza le cautele richieste dalle circostanze è solidalmente responsabile del danno cagionato ad un estraneo da un participante al tiro (consid. 2).

L'oste che colposamente tolleri nel suo ristorante uno stato di cose pericoloso (nella speoie, un tiro a segno improwisato nel giardxno) è responsabile *ex delicto* in easo d'evento dannoso (consid. 3).

Egli è pure responsabile *ex contractu,* essendo nell'obbligo di preservare gli awentori dal pericolo. Le due responsabilità (aquiliana e eontrattuale) possono coesistére : concorso di azioni (consid. 4).

*A.* — On Sunday, 3 August 1941, an amateur theatre group, composed of military personnel and civilians, decided

to do an outdoor rehearsal. They met at 10 am in Fribourg, where they had their first drink. Then they set off for Villars-sur-Glâne. The group was made up of thirteen members, eight of them military personnel, including one officer, Lieutenant Michel Schneider, and five civilians, three of whom were ladies. The performers made a stop at the home of the officer's parents, who offered them an aperitif. At about half-past twelve, they arrived at their destination and settled down for a picnic in the garden of the Auberge de la Glâne. The innkeeper served them three liters of Swiss white wine, and then another three liters in the afternoon. The meal ended with coffee and liqueurs.

Instead of rehearsing the play, the group accepted the proposal to organize a Flobert pistol shooting made to Lt. Schneider by soldier André Banfi, who had brought a weapon, with 6 mm cartridges and targets. A target was fixed to a fir tree at the back of the garden, bordered on that side by the steep and deep ravine of the Glâne. The shooters stood 10 m away. Banfi and Schneider opened this impromptu match in which most members of the group took part, including two ladies who had never fired a shot before.

After it was their turn, one or the other shooter went to a room in the inn where there was dancing.

While shooting against the target, four young men from Fribourg, including eighteen-year-old Louis Haymoz, sat slightly backwards at a table about eight meters to the right of the shooters.

The shooting lasted for almost an hour when Lt. Schneider took as his target the glasses and bottles placed on the picnic table, no more than six meters in front of the shooters. These targets were also closer to the four young men. Schneider's example was emulated by several of his friends, including a lady. After playing this game for about a quarter of an hour, a bullet fired by André Banfi ricocheted off a glass and hit Louis Haymoz in his right eye. The

victim received prompt medical attention, but the complete functional loss of sight could not be prevented.

Banfi was brought before the 1st Division Military Court, and given a ten-day suspended sentence for reckless bodily harm.

***B.*** — On 18 November 1941, Haymoz sued Schneider and Rey jointly and severally before the Sarine District Criminal court for payment of the sum of CHF 38,813.50 with interest at 5% from 3 August 1941, subject to further processing costs and a review of the judgement for a period of two years.

The defendants concluded that the claim should be dismissed and, in the alternative, that a certain order of liability should be established, with André Banfi being prosecuted in the first instance.

On 23 March 1944, the Court ordered each of the defendants to pay the plaintiff the sum of CHF 34,558.50 with interest at 5% from 3 August 1941, with payment by one of the defendants extinguishing the debt of the other and the damage to be borne ultimately in the proportion of three quarters by Schneider and one quarter by Rey, subject to a possible right of recourse against other liable parties. The Court of Appeal of the Canton of Fribourg confirmed this decision by judgement of 19 December 1944, but accepted the solidarity among the two defendants. The operative part of the judgement is as follows:

« 1. Louis Haymoz is admitted in principle for the purposes of his conclusions, Michel Schneider and Elie Rey being ordered to pay him jointly and severally the sum of CHF 34,558.50 with interest at 5% from 3 August 1941.

» 2. The right of recourse, if any, of the two defendants against other persons liable for the damage is reserved, the defendants being liable to each other to pay compensation for the damage in the proportion of 3/4 in the case of Schneider and 1/4 in the case of Rey.

» 3. The costs shall jointly and severally be borne in full by the two defendants, in the same proportion as regards their internal relations;

» 4. The plaintiff shall be given notice of the reservation he has made for further processing costs and for the review of the judgement for a period of two years. »

The Court rejected all other submissions of the parties.

*G.* — The two defendants appealed against this judgement before the Federal Court, restating their original submissions.

The respondent concluded that the appeal was dismissed.

### *Legal grounds:*

1. — The direct perpetrator of the damage for which the plaintiff is claiming compensation is André Banfi. A bullet fired by him ricocheted off a glass and irreparably damaged Louis Haymoz's right eye. Banfi admitted his responsibility and, before the military authorities, stated his willingness to make compensation, within his limited means, for the damage caused by his recklessness. The plaintiff was not satisfied with this; he took action against one of the participants in the shooting and the innkeeper, both of whom he made jointly and severally responsible for the accident.

The judge is thus called upon to decide whether both defendants are liable to compensate the plaintiff and, if so, whether that liability is joint and several. The liability of each of the defendants must therefore be examined successively.

2. — The defendant Schneider can only be held liable for the accident under Art. 41 s. CO governing unlawful acts. Although he did not himself fire the bullet that hit the plaintiff, he may be liable to compensate for the damage if he committed a fault which is an adequate cause.

The proposal to organize a shooting with a Flobert pistol with 6 mm. bullets was the idea of soldier Banfi. But it was immediately accepted and approved by Schneider. This was a fault. Of course, the theatre group was not under military rule and Lt. Schneider had no command over it. Nevertheless, his status as an officer imposed duties on him even off duty and gave him moral and de facto authority. It is safe

to assume that if, instead of improvising a dangerous shooting spree in a publicly accessible hostel garden, he had opposed it, as he should have and could have done, Banfi and the other participants would not have ignored it. By acting as he did, the defendant assumed an important and even leading role in the most careless common adventure that caused the damage; for it was the shot itself, as improvised and executed, that appears to be the real cause of the accident, a bullet fired by the defendant having been able to hit the plaintiff just as the bullet fired by Banfi. This is all the more likely since the accident did not occur when aiming the target fixed against a tree at the back of the garden, but during the even more dangerous shooting at the bottles and glasses which were at a short distance from the shooters and third parties at the nearby table. The risk of ricocheting off hard, smooth objects is very high. And there is also the danger of shards of glass being thrown in all directions. According to the expert consulted privately by the plaintiff, but whose opinion was not disregarded by the cantonal court, shooting with the pistol used on the day of the accident requires special precautions: the shooting stand is supposed to be enclosed and no one in its vicinity (the bullets could have been fatal at 200 m.). In the present case, no precautionary measures were taken. The plaintiff states that a sentry was indeed placed at the entrance to the garden, but the cantonal judgement does not find this to be the case and in any event did not prohibit third parties from sitting in the vicinity of the shooters and the targets. This extremely reckless shooting at the glassware was not prevented by the defendant, who should have objected to it categorically if someone else had had the idea. Instead, it was he himself who inaugurated it with his own shot. He set an example by changing the target and incited the other shooters to imitate him by passing the weapon to them. In this way, he was the instigator and organizer of this

second part of the shooting. The fact that he then entered the café and was absent when the fatal shot was fired does not exonerate him; his duty would have been not to lose interest in the dangerous and deadly game proposed by him. By all his conduct he was guilty of a very serious recklessness which was, if not the sole, direct and immediate cause of the injury suffered by the plaintiff, at least an adequate and even leading cause.

The defendant has thus incurred liability, jointly and severally with Banfi and possibly other persons whose role in the present proceedings the Federal Court does not have to examine, except for defendant Rey (Art. 5000). With regard to the victim, Schneider is obliged to make full compensation for the damage.

In order to free himself, he referred to the judgement of the Federal Court of 14 April 1905 in the case of Müller v. Müller (RO 31 II 248). According to this judgement, joint and several liability does not exist when the perpetrator of the act which directly caused the damage is known, so that only Banfi could be prosecuted. However, the Federal Court did not maintain this case law in its absolute form. According to the judgement of 15 September 1931 in the case of Frick et al. v. Suter (RO 57 II 420), liability is established to the same degree for all the participants in an unlawful act and this also applies to the consequences of the act which were neither intended nor foreseen by some or all of them, as soon as they were or should have been aware of the common danger created. If — as was the case here — the fatal blow is inflicted by one of the participants, all those who could not have been unaware of this risk are obliged to compensate for the damage, subject to their reciprocal rights of recourse (Art. 50 para. 2 CO). The law does not distinguish, with respect to the injured party, between instigator, perpetrator and accomplice (Art. 50 para. 1). The extent to which each of them collaborated and the seriousness of the fault do not enter into consideration except in the settling of accounts between all of those liable.

There is no reason to depart from this case law, which is moreover in line with the general principle that a person who creates or maintains a dangerous state of affairs for another person is liable if the third party suffers damage.

Defendant Schneider cannot escape that liability.

3. — The Sarine District Criminal Court found the conduct of defendant Rey to be an unlawful act independent of that of

Schneider for lack of conscious collaboration, and ordered both the innkeeper and the officer to make compensation for the entire damage, the payment of one extinguishing the other's debt to the plaintiff. The Fribourg Court of Appeal, on the other hand, condemned the defendants jointly and severally.

The judges found that Rey had knowledge of the shooting organized and executed in his garden. There is also evidence that Rey did not object to this dangerous exercise.

He is at fault for this omission. Irrespective of his contractual obligations, which will be further examined, he had a duty not to contribute to creating or maintaining in his establishment a state of affairs in which, being a middle-aged man with military service as a rifleman, he should have recognized the risks, and which he in a position to prevent or put a stop to.

The presence of an officer mitigates his fault, but cannot completely exonerate him. He had to see that not only was the shooting not regulated and monitored methodically, but that no effective precautions were even taken. It could not have escaped his notice that the shooters were moving back and forth between the garden, the dance hall and the café, and that Lieutenant Schneider was not constantly in the garden either.

Despite these circumstances, the defendant did not intervene. His passive attitude implies a tacit automation

8 AS 71 n — 1945

by which he joined in the dangerous adventure, thus making himself an "accomplice" of the shooters, as defined in Art. 50 CO. For there to be conscious collaboration, it is not necessary for the participants to consult each other. It is sufficient that they should recognize that their acts or omissions are likely to cause the damage that subsequently occurs. And a positive fact may contribute to an omission, with one participant committing a negligent act and the other neglecting to oppose it as he should have.

The Cantonal Court does not consider it certain that the defendant had knowledge of the shooting at the glassware. It cannot be said, therefore, that by tolerating this dangerous game, the defendant has also joined in it. However, by neglecting to monitor or have someone monitor what was happening in the garden of his hostel, the innkeeper committed a fault which is not without causal connection with the accident. In view of the recklessness of the shooters toward the danger — thoughtlessness that the consumption of alcohol increased even more — the defendant should have anticipated negligent acts. Changing the target, in particular, was by no means impossible; it is well known that the shooters get tired of having the same target for a long time; — in the present case, the shooting at the target had lasted almost an hour.

In the accident of 3 August 1941, there is a chain of faults by commission and omission, all of which contributed to causing the damage suffered by the plaintiff in an adequate manner and which, under article 50 CO, render the defendants jointly and severally liable to make reparations.

As for the participants who are not prosecuted in the present proceedings, and who have therefore been unable to put forward their defenses, the Federal Court does not have to determine their liability.

*4.* — In addition to ***ex delicto,*** liability, defendant Rey incurred liability ***ex contractua.***

An innkeeper who receives a consumer in his hostel enters into a "sui generis" contract with him (known in

German terminology as "Gastaufnahmevertrag") which obliges him not only to offer him drinks and food of corresponding quality against cash payment, but also to allow him to consume them on the premises, without any harm to his health or a physical integrity, and this obligation is not ancillary but is principal in the same way as the others. Therefore, if the restaurant owner does not take all the measures required by the circumstances to ensure the safety of his guests, he does not fulfil his contractual obligations; he is obliged to compensate the resulting damage if he does not prove that no fault is attributable to him (Art. 97 CO). It is clear from recital 3 above that Rey did nothing to prevent the accident from occurring.

The pleas in law based on Articles 41 sv. and 97 sv. CO are not mutually exclusive in the present case and there is no legal provision preventing them from being combined. The plaintiff had an interest in first establishing the non-performance of the contract which assured him from the outset of compensation for the damage by the innkeeper without requiring him to prove fault; he also had an interest in establishing an extra-contractual fault in order to benefit from the joint and several liability established by Art. 50 CO.

5. — For the internal relationship between the two defendants, i.e. for the extent of the right of recourse of one against the other (Art. 50 para. 2 CO), the proportion of three quarters to be borne by defendant Schneider and one quarter to be borne by defendant Rey corresponds to the seriousness of the faults attributable to each of them. Schneider played a major role in the accident and aggravated his fault by disregarding his duties as an officer.

6. — (Determination of injury.)

### *On these grounds, the Federal Court*

partially admits the two appeals and reforms the cantonal judgement in the sense that interest on the sum of

CHF 34,558.50 jointly and severally owed by the defendants to the plaintiff runs from 1 October 1944.

For the rest, dismisses the appeals and confirms the contested judgement.

Vgl. auch Nr. 21, 22. — See also No. 21 and 22.

# V. PROCEDURAL LAW

## 25. Judgement of the I. Civil Division of April 12, 1945 in Flury v. Switzerland . Metallwerke Selve & Co.

*Admissibility of the appeal,* Art. 43 OG (Swiss Code of Obligations).
The *arbitration agreement* is subject to cantonal procedural law. An appeal against a decision on its validity is therefore not admissible.

*Judicial review,* Art. 43 OJ.
Since the arbitration agreement is governed by cantonal procedure, a judicial review is inadmissible against a decision on its validity.

*Ammissibilità del ricorso per riforma,* art. 43 OGF.
Il compromesso arbitrale essen do disciplinât© dal diritto procédurale cantonale, il ricorso per riforma contro una deeisione sulla sua validité è inammissibile.

The dispute of the parties is exclusively about the question of the validity of the arbitration clause contained in the contract of 10 June 1941.

According to the case law of the Federal Court of Justice, however, the arbitration agreement is not of a private law nature, but of a procedural nature, since the parties do not have any substantive rights and obligations through it, but merely aim to regulate the right to public legal protection (BGE (Judgement of the Federal Court) 41 II 537, 59 II 188). It is irrelevant whether the arbitration clause forms the subject matter of a separate agreement or,

whether it is combined with the main civil law contract to which it relates in a single document and thus appears externally as an integral part of the main contract. In this case, too, it constitutes an independent agreement of a special kind (BGE (Judgement of the Federal Court) 59 I 179). In view of its legal nature, the validity of an arbitration agreement is therefore governed by the relevant cantonal procedural law. However, this cannot be reviewed by the Federal Court as an appellate body. Rather, Art. 43 OG (Federal Legislation Act) declares the appeal to be admissible only for violation of the Federal Council. It is irrelevant that the previous instance examined the questions of whether the agreement of intent required for the conclusion of the contract had been submitted and whether the formal requirement of written form was satisfied in accordance with the provisions of the OR (Swiss Code of Obligations), i.e. federal civil law. This is because the previous instance thus merely used the terms of federal law as the content of cantonal law. An incorrect interpretation thereof would therefore not constitute an infringement of federal law.

---

## VI. EISENBAHNHAFTPFLICHT

## RAILWAY CIVIL LIABILITY

### 26. Judgement of the n. Civil Division of June 7, 1945 in Spiess v. Switzerland. Bundesbahnen.

*Railway liability,* Art. 1 EHG (Railway Liability Law).
*Self-inflicted* ,a 13-year-old cyclist who, when approaching an unguarded level crossing, does not slow down his ride and is not sure whether a train is approaching.
A *competing fault of the railway* does not lie in
— tolerating the construction of a building which impairs the clarity of the unguarded crossing,
— the failure to install a barrier or a flashing light system,
— the fact that the locomotive driver did not give a sufficient acoustic signal before the unclear intersection.

Aber auch der hinter dem Kaufvertrag versteckte, dem wirklichen Parteiwillen entsprechende Vertrag ist nichtig, weil er nicht öffentlich beurkundet ist und nach der oben erwähnten Rechtsprechung des Bundesgerichtes die Erfüllung der Form für den simulierten Vertrag die für das dissimulierte Geschäft erforderliche Form nicht zu ersetzen vermag. Ist mithin der Kaufvertrag wegen Simulation, der sogenannte Treuhandvertrag mangels Einhaltung der gesetzlich vorgeschriebenen Form nichtig, so entbehrt die Eigentumsübertragung des gültigen Rechtsgrundes, dessen sie als kausaler Rechtsakt bedarf. Sie ist daher ebenfalls nichtig.

Ist somit das Eigentum an den streitigen Liegenschaften trotz dem vorgenommenen Grundbucheintrag beim Kläger verblieben, so ist dieser gemäss Art. 975 ZGB befugt, die Berichtigung des mit der wirklichen Rechtslage nicht im Einklang stehenden Grundbucheintrags und die Feststellung seines Eigentums zu verlangen.

4. — Es könnte sich fragen, ob dem Beklagten der sich auf Simulation stützenden Klage gegenüber nicht die Einrede der Arglist zu Gebote stünde. Das Bundesgericht hat nämlich schon wiederholt entschieden, wenn bei einem Liegenschaftskauf ein niedrigerer Kaufpreis als der wirklich vereinbarte verurkundet werde, so könne nach erfolgter Erfüllung des Geschäftes keine Partei sich auf Simulation und daraus folgende Ungültigkeit der Eigentumsübertragung berufen, da dies gegen Treu und Glauben verstiesse (BGE 50 II 148). Selbst wenn man jedoch an dieser Auffassung grundsätzlich festhalten wollte, so stünde dies einem Schutz der vorliegenden Klage nicht entgegen. Denn hier verhält es sich nicht so, dass zwischen den Parteien Übereinstimmung bestünde über Inhalt und Tragweite der zwischen ihnen im Jahre 1931 abgeschlossenen Vereinbarungen und lediglich die Frage der Simulation streitig wäre. Vielmehr gehen die Auffassungen der Parteien über die erwähnten Punkte gerade auseinander, indem nach der Darstellung des

Klägers eine zeitlich beschränkte Eigentumsübertragung gewollt war, während der Beklagte behauptet, diese habe einen definitiven Charakter haben sollen. Unter diesen Umständen kann die Berufung des Klägers auf einen der Eigentumsübertragung anhaftenden Formmangel nicht als missbräuchlich angesehen werden. Zudem hat der Beklagte die Einrede der Arglist gar nicht erhoben.

---

**24. Arrêt de la I<sup>re</sup> Cour civile du 22 mai 1945** dans la cause
**Schneider** et **Rey** contre **Haymoz**.

*Art. 50 CO.*
Celui qui improvise un tir à balles dangereux, sans prendre de précautions, se rend solidairement responsable du dommage accidentel causé à un tiers par un participant au tir (consid. 2).
L'aubergiste qui tolère dans son établissement un état de choses dangereux (tir à balles improvisé) engage sa responsabilité délictuelle en cas d'accident (consid. 3).
Il engage aussi sa responsabilité contractuelle, étant tenu de mettre les consommateurs à l'abri du danger ; ces deux responsabilités peuvent se cumuler (consid. 4).

*Art. 50 OR.*
Wer ein gefährliches Scheibenschiessen improvisiert, ohne Vorsichtsmassregeln zu treffen, haftet solidarisch für den Unfallschaden, der durch einen Teilnehmer am Schiessen einem Dritten zugefügt wird (Erw. 2).
Der Wirt, der in seinem Unternehmen einen gefährlichen Zustand (improvisiertes Scheibenschiessen) duldet, haftet bei Unfall aus unerlaubter Handlung (Erw. 3).
Er haftet überdies aus Vertrag, da er verpflichtet ist, seine Gäste vor Gefahr zu schützen ; Kumulation beider Haftungsgründe ist möglich (Erw. 4).

*Art. 50 CO.*
Chi improvvisa un tiro a segno senza le cautele richieste dalle circostanze è solidalmente responsabile del danno cagionato ad un estraneo da un partecipante al tiro (consid. 2).
L'oste che colposamente tollera nel suo ristorante uno stato di cose pericoloso (nella specie, un tiro a segno improvvisato nel giardino) è responsabile *ex delicto* in caso d'evento dannoso (consid. 3).
Egli è pure responsabile *ex contractu*, essendo nell'obbligo di preservare gli avventori dal pericolo. Le due responsabilità (aquiliana e contrattuale) possono coesistere : concorso di azioni (consid. 4).

*A.* — Le dimanche 3 août 1941, une troupe théâtrale d'amateurs, composée de militaires et de civils, décida

de faire une répétition en plein air. Elle se réunit à 10 h. du matin à Fribourg où elle prit une première consommation. Puis elle se mit en route pour Villars-sur-Glâne. Treize personnes en faisaient partie, soit huit militaires dont un officier, le lieutenant Michel Schneider, et cinq civils dont trois demoiselles. Les acteurs firent une halte chez des parents de l'officier, qui leur offrirent un apéritif. Vers midi et demi, ils arrivèrent à destination et s'installèrent pour pique-niquer dans le jardin de l'Auberge de la Glâne. L'aubergiste leur servit trois litres de fendant, suivis de trois autres litres au cours de l'après-midi. Le repas se termina par des cafés avec liqueurs.

Au lieu de répéter la pièce de théâtre, la troupe accepta la proposition d'organiser un tir au pistolet-flobert faite au Lt. Schneider par le soldat complémentaire André Banfi, qui avait apporté l'arme, des cartouches de 6 mm. et des cibles. Une cible fut fixée à un sapin au fond du jardin, bordé de ce côté-là par le ravin abrupt et profond de la Glâne. Les tireurs se postèrent à 10 m. Banfi et Schneider ouvrirent ce match improvisé auquel participèrent la plupart des membres de la troupe, notamment deux demoiselles qui n'avaient jamais tiré.

Après avoir eu son tour, l'un ou l'autre tireur se rendait dans une salle de l'auberge où l'on dansait.

Pendant le tir contre la cible, quatre jeunes gens de Fribourg, parmi lesquels Louis Haymoz, âgé de dix-huit ans, s'assirent à une table se trouvant à huit mètres environ à droite des tireurs, légèrement en arrière.

Le tir durait depuis près d'une heure, lorsque le Lt Schneider prit pour objectif les verres et les bouteilles placés sur la table du pique-nique, à six mètres au plus en face des tireurs. Ces buts étaient aussi plus près des quatre jeunes gens. L'exemple donné par Schneider fut imité par plusieurs de ses camarades, y compris une demoiselle. Au bout d'un quart d'heure environ de ce jeu, une balle tirée par André Banfi fit ricochet sur un verre et vint atteindre Louis Haymoz à l'œil droit. La

victime reçut rapidement des soins médicaux, mais la perte fonctionnelle totale de l'œil ne put être empêchée.

Traduit devant le Tribunal militaire de la 1re division, Banfi fut condamné à dix jours d'emprisonnement avec sursis pour lésions corporelles causées par imprudence.

B. — Le 18 novembre 1941, Haymoz actionna Schneider et Rey solidairement devant le Tribunal de la Sarine en paiement de la somme de 38 813 fr. 50 avec intérêt à 5 % dès le 3 août 1941, sous réserve de plus amples frais de traitement et de la revision du jugement pendant deux ans.

Les défendeurs ont conclu au rejet de la demande et subsidiairement à la fixation d'un certain ordre des responsables, André Banfi étant recherchable en premier lieu.

Le 23 mars 1944, le Tribunal condamna chacun des défendeurs à payer au demandeur la somme de 34 558 fr. 50 avec intérêt à 5 % dès le 3 août 1941, le paiement fait par l'un des défendeurs éteignant la dette de l'autre et le dommage devant être supporté en définitive dans la proportion des trois quarts par Schneider et d'un quart par Rey, sous réserve d'un droit de recours éventuel contre d'autres personnes responsables.

La Cour d'appel du Canton de Fribourg a confirmé ce jugement par arrêt du 19 décembre 1944 en admettant toutefois la solidarité des deux défendeurs. Le dispositif de l'arrêt est le suivant :

« 1. Louis Haymoz est admis en principe dans les fins de ses conclusions, Michel Schneider et Elie Rey étant condamnés à lui payer solidairement la somme de 34 558 fr. 50 avec intérêt à 5 % dès le 3 août 1941.

» 2. Le droit de recours éventuel des deux défendeurs contre d'autres personnes responsables du dommage est réservé, l'un à l'égard de l'autre les défendeurs répondant de la réparation du dommage dans la proportion de 3/4 en ce qui concerne Schneider et de 1/4 en ce qui concerne Rey.

» 3. Les frais sont mis en entier à la charge des deux défendeurs solidairement, dans la même proportion quant à leurs rapports internes.

» 4. Acte est donné au demandeur de la réserve qu'il a faite pour de plus amples frais de traitement et pour la revision du jugement pendant deux ans. »

La Cour a rejeté toutes autres conclusions des parties.

C. — Les deux défendeurs ont recouru contre cet arrêt au Tribunal fédéral en reprenant leurs conclusions originaires.

L'intimé a conclu au rejet du recours.

*Considérant en droit :*

1. — L'auteur direct du dommage dont le demandeur réclame la réparation est André Banfi. Une balle tirée par lui a fait ricochet sur un verre et atteint irrémédiablement l'œil droit de Louis Haymoz. Banfi a reconnu sa responsabilité et, devant l'autorité militaire, s'est déclaré disposé à réparer, selon ses moyens peu considérables, le dommage causé par son imprudence. Le demandeur ne s'en contente pas ; il actionne l'un des participants au tir et l'aubergiste qu'il rend tous deux solidairement responsables de l'accident.

Le juge est ainsi appelé à dire si l'un et l'autre défendeurs sont tenus d'indemniser le demandeur et, dans ce cas, si cette obligation est solidaire. Il convient donc d'examiner successivement la responsabilité de chacun des défendeurs.

2. — Le défendeur Schneider ne peut être rendu responsable de l'accident qu'en vertu des art. 41 et sv. CO régissant les actes illicites. Bien qu'il n'ait pas tiré lui-même la balle qui atteignit le demandeur, il peut être tenu de réparer le dommage s'il a commis une faute qui en est une cause adéquate.

La proposition d'organiser un tir au pistolet-flobert avec balles de 6 mm. émanait du soldat complémentaire Banfi. Mais elle fut immédiatement acceptée et approuvée par Schneider. C'était une faute. Sans doute la troupe théâtrale n'était-elle pas soumise au régime militaire et le Lt Schneider n'y exerçait-il aucun commandement. Il n'en reste pas moins que sa qualité d'officier lui imposait des devoirs même en dehors des heures de service et lui conférait une autorité morale et de fait. On peut sans

hésiter admettre que si, au lieu de se prêter à l'improvisation d'un tir dangereux dans un jardin d'auberge accessible au public, il s'y était opposé, comme il aurait dû et pu le faire, Banfi et les autres participants n'auraient point passé outre. En agissant comme il l'a fait, le défendeur a assumé un rôle important et même prépondérant dans l'entreprise commune des plus imprudentes qui a causé le dommage ; car c'est le tir lui-même, tel qu'il était improvisé et exécuté, qui apparaît comme la véritable cause de l'accident, une balle tirée par le défendeur ayant pu atteindre le demandeur tout comme la balle tirée par Banfi. Cela est d'autant plus vraisemblable que l'accident ne s'est pas produit au cours du tir sur la cible fixée contre un arbre au fond du jardin, mais lors du tir encore plus dangereux sur les bouteilles et les verres se trouvant à une faible distance des tireurs et de tiers attablés à proximité. Le risque de ricochet sur des objets durs et lisses est particulièrement grand. Et il y a encore le danger d'éclats de verres projetés dans toutes les directions. Au dire de l'expert consulté à titre privé par le demandeur, mais dont l'avis n'a pas été écarté par la juridiction cantonale, le tir avec le pistolet utilisé le jour de l'accident exige des précautions spéciales : ciblerie enfermée et aucune personne dans son voisinage (les balles auraient pu être mortelles à 200 m.). En l'espèce, aucune mesure de prudence n'a été prise. Le demandeur affirme à la vérité qu'une sentinelle a été placée à l'entrée du jardin, mais le jugement cantonal ne constate pas ce fait et en tout cas elle n'a pas interdit à des tiers de s'asseoir dans le voisinage des tireurs et des buts. Or, ce tir extrêmement imprudent sur la verrerie, non seulement n'a pas été empêché par le défendeur qui aurait dû s'y opposer catégoriquement si une autre personne en avait eu l'idée, mais c'est lui-même qui l'a inauguré de son propre mouvement. Il a donné l'exemple en changeant de but et il a incité les autres tireurs à l'imiter en leur passant l'arme. De la sorte, il a été l'instigateur et l'organisateur de cette

seconde partie du tir. Le fait qu'il est ensuite entré dans le café et qu'il était absent au moment où le coup fatal a été tiré ne l'excuse point ; son devoir eût été de ne pas se désintéresser du jeu de massacre périlleux imaginé par lui. Par tout son comportement, il s'est rendu coupable d'une très grave imprudence qui a été sinon la cause unique, directe et immédiate de la lésion subie par le demandeur, du moins une cause adéquate et même primordiale.

Le défendeur a ainsi engagé sa responsabilité, solidairement avec Banfi et peut-être d'autres personnes dont, dans le présent procès, le Tribunal fédéral n'a pas à examiner le rôle, excepté celui du défendeur Rey (art. 50 CO). A l'égard de la victime, Schneider est tenu de réparer la totalité du préjudice.

Pour se libérer, il invoque l'arrêt du Tribunal fédéral du 14 avril 1905 dans la cause Müller contre Müller (RO 31 II 248). Suivant cet arrêt, la responsabilité solidaire n'existe pas lorsque l'auteur de l'acte qui a produit directement le dommage est connu, en sorte que Banfi pouvait seul être recherché. Mais le Tribunal fédéral n'a pas maintenu cette jurisprudence dans ce qu'elle avait d'absolu. Selon l'arrêt du 15 septembre 1931 en la cause Frick et consorts contre Suter (RO 57 II 420), la responsabilité est établie au même degré pour tous les participants à un acte illicite et cela aussi pour les conséquences de l'acte qui n'avaient été ni voulues ni prévues par certains d'entre eux ou par tous, dès qu'ils ont eu ou auraient dû avoir conscience du danger créé en commun. Lors donc que — comme ce fut le cas en l'espèce — le coup fatal a pour auteur un des participants, tous ceux qui ne pouvaient ignorer ce risque ont l'obligation de réparer le dommage, sous réserve de leurs droits de recours réciproques (art. 50 al. 2 CO). La loi ne distingue pas, par rapport au lésé, entre instigateur, auteur et complice (art. 50 al. 1er). L'importance de la collaboration de chacun d'eux, la gravité de la faute n'entrent en considération que pour le règlement de compte entre les coresponsables. Il n'y a pas de motif de s'écarter de cette jurisprudence qui est d'ailleurs conforme au principe général suivant lequel celui qui crée ou maintient un état de choses dangereux pour autrui est responsable si le tiers souffre dommage.

Le défendeur Schneider ne peut échapper à cette responsabilité.

3. — Le Tribunal de la Sarine a vu dans le comportement du défendeur Rey un acte illicite indépendant de celui de Schneider faute de collaboration consciente, et il a condamné l'aubergiste tout comme l'officier à réparer la totalité du dommage, le paiement de l'un éteignant la dette de l'autre envers le demandeur. La Cour d'appel fribourgeoise, en revanche, a condamné les défendeurs solidairement.

Les juges du fait constatent que Rey avait connaissance du tir organisé et exécuté dans son jardin. Il est d'autre part établi que Rey ne s'est pas opposé à cet exercice dangereux.

Cette omission lui est imputable à faute. Indépendamment de ses obligations contractuelles qui seront encore examinées, il avait le devoir de ne pas contribuer à créer ou à maintenir dans son établissement un état de choses dont, en homme d'âge mûr et ayant fait son service militaire comme fusilier, il devait reconnaître les risques et qu'il était en mesure d'empêcher ou de faire cesser.

La présence d'un officier atténue à la vérité sa faute, mais ne saurait le disculper complètement. Il a dû voir que non seulement le tir n'était pas réglé et surveillé méthodiquement, mais qu'aucune précaution effective n'était même prise. Il n'a pu lui échapper qu'il y avait un va-et-vient des tireurs entre le jardin, la salle de danse et le café, et que le lieutenant Schneider lui non plus n'était pas constamment au jardin.

Malgré ces circonstances, le défendeur n'est pas intervenu. Son attitude passive implique une autorisation

tacite par laquelle il s'est associé à l'entreprise dangereuse, en se rendant ainsi « complice » des tireurs, suivant l'expression de l'art. 50 CO. Pour qu'il puisse y avoir collaboration consciente, il n'est pas nécessaire que les participants se concertent. Il suffit qu'ils doivent reconnaître que leurs actes ou leurs omissions sont propres à causer le dommage qui se produit ensuite. Et un fait positif peut concourir avec une omission, l'un des participants commettant une imprudence et l'autre négligeant de s'y opposer comme il le devrait.

La Cour cantonale ne considère pas comme certain que le défendeur ait eu connaissance du tir sur la verrerie. On ne peut donc dire qu'en tolérant ce jeu périlleux, le défendeur s'y soit également associé. Mais en négligeant de surveiller ou de faire surveiller ce qui se passait dans le jardin de son établissement, l'aubergiste a commis une faute qui n'est pas sans relation de causalité avec l'accident. Vu l'insouciance du danger dont faisaient preuve les tireurs — légèreté que la consommation d'alcool augmentait encore — le défendeur devait craindre des imprudences. Un changement de but notamment n'était nullement impossible ; il est notoire que les tireurs se lassent d'avoir longtemps le même objectif ; — en l'espèce, le tir sur la cible avait duré près d'une heure.

Dans l'accident du 3 août 1941, il y a un enchaînement de fautes par commission et par omission qui ont toutes concouru à causer de manière adéquate le dommage subi par le demandeur et qui, en vertu de l'art. 50 CO, obligent solidairement les défendeurs à le réparer.

Quant aux participants qui ne sont pas recherchés dans le présent procès, et qui n'ont pu dès lors faire valoir leurs moyens de défense, le Tribunal fédéral n'a pas à fixer leur responsabilité.

4. — Outre une responsabilité *ex delicto*, le défendeur Rey a engagé sa responsabilité *ex contractu*.

L'aubergiste qui reçoit un consommateur dans son établissement conclut avec lui un contrat sui generis (appelé

dans la terminologie allemande « Gastaufnahmevertrag ») qui l'oblige non seulement à lui offrir contre espèces des boissons et aliments de qualité correspondante, mais à les lui laisser consommer sur place, sans qu'il en résulte un préjudice pour sa santé ou son intégrité corporelle, et cette obligation n'est pas accessoire, elle est principale au même titre que les autres. Lors donc que le restaurateur ne prend pas toutes les mesures commandées par les circonstances pour assurer à ses hôtes la sécurité voulue, il n'accomplit pas ses obligations contractuelles ; il est tenu de réparer le dommage en résultant, s'il ne prouve qu'aucune faute ne lui est imputable (art. 97 CO). Or, il ressort du considérant 3 ci-dessus que Rey n'a rien fait pour empêcher l'accident de se produire.

Les moyens tirés des art. 41 et sv. et des art. 97 et sv. CO ne s'excluent pas en l'espèce et aucune disposition légale ne s'oppose à leur cumul. Le demandeur avait intérêt à établir d'abord l'inexécution du contrat qui lui assurait d'emblée la réparation du dommage de la part de l'aubergiste sans qu'il ait besoin de faire la preuve d'une faute ; il avait intérêt à établir de plus une faute extracontractuelle pour pouvoir bénéficier de la solidarité instituée par l'art. 50 CO.

5. — Pour le rapport interne entre les deux défendeurs, c'est-à-dire pour l'étendue du droit de recours de l'un contre l'autre (art. 50 al. 2 CO), la proportion de trois quarts à la charge du défendeur Schneider et d'un quart à celle du défendeur Rey correspond à la gravité des fautes imputables à chacun d'eux. Schneider a joué un rôle primordial dans l'accident et il a aggravé sa faute en méconnaissant ses devoirs d'officier.

6. — (Détermination du dommage.)

*Par ces motifs, le Tribunal fédéral*

admet partiellement les deux recours et réforme l'arrêt cantonal dans ce sens que l'intérêt de la somme de

34 558 fr. 50 due solidairement par les défendeurs au demandeur court à partir du 1er octobre 1944.

Pour le surplus, rejette les recours et confirme l'arrêt attaqué.

Vgl. auch Nr. 21, 22. — Voir aussi n°s 21, 22.

# V. PROZESSRECHT

# PROCÉDURE

**25. Urteil der I. Zivilabteilung vom 12. April 1945 i. S. Flury gegen Schweiz. Metallwerke Selve & Co.**

*Zulässigkeit der Berufung*, Art. 43 OG.
Der *Schiedsgerichtsvertrag* untersteht dem kantonalen Prozessrecht. Gegen einen Entscheid über seine Gültigkeit ist die Berufung daher nicht zulässig.

*Recours en réforme*, art. 43 OJ.
Le compromis arbitral étant régi par la procédure cantonale, le recours en réforme est irrecevable contre une décision sur sa validité.

*Ammissibilità del ricorso per riforma*, art. 43 OGF.
Il compromesso arbitrale essendo disciplinato dal diritto procedurale cantonale, il ricorso per riforma contro una decisione sulla sua validità è inammissibile.

Der Streit der Parteien dreht sich ausschliesslich um die Frage der Gültigkeit der im Vertrag vom 10. Juli 1941 enthaltenen Schiedsgerichtsklausel.

Nach der Rechtsprechung des Bundesgerichts ist nun aber der Schiedsvertrag nicht privatrechtlicher, sondern prozessrechtlicher Natur, da die Parteien durch ihn nicht über materielle Rechte und Pflichten verfügen, sondern lediglich die Regelung des publizistischen Rechtsschutzanspruchs bezwecken (BGE 41 II 537, 59 II 188). Ob die Schiedsklausel Gegenstand einer separaten Vereinbarung bildet oder ob sie mit dem zivilrechtlichen Hauptvertrag, auf den sie sich bezieht, in einer einheitlichen Urkunde zusammengefasst wird und so äusserlich als Bestandteil des Hauptvertrages erscheint, ist unerheblich. Auch in diesem Falle stellt sie eine selbständige Abrede besonderer Art dar (BGE 59 I 179). Mit Rücksicht auf seine Rechtsnatur beurteilt sich die Gültigkeit eines Schiedsvertrages daher nach dem zuständigen kantonalen Prozessrecht. Dieses kann aber vom Bundesgericht als Berufungsinstanz nicht überprüft werden. Art. 43 OG erklärt vielmehr die Berufung nur zulässig wegen Verletzung des Bundesrechts. Dass die Vorinstanz die Fragen, ob die zum Vertragsschluss erforderliche Willenseinigung vorgelegen habe und ob dem Formerfordernis der Schriftlichkeit genügt sei, nach Massgabe der Bestimmungen des OR, also des Bundeszivilrechts geprüft hat, ist ohne Bedeutung. Denn die Vorinstanz hat damit lediglich die Begriffe des Bundesrechts als Inhalt des kantonalen Rechts verwendet. Eine unrichtige Auslegung derselben würde daher keine Verletzung von Bundesrecht darstellen.

# VI. EISENBAHNHAFTPFLICHT

# RESPONSABILITÉ CIVILE DES CHEMINS DE FER

**26. Urteil der II. Zivilabteilung vom 7. Juni 1945 i. S. Spiess gegen Schweiz. Bundesbahnen.**

*Eisenbahnhaftpflicht*, Art. 1 EHG.
*Selbstverschulden* eines 13jährigen Velofahrers, der bei der Annäherung an einem unbewachten Niveauübergang seine Fahrt nicht verlangsamt und sich nicht vergewissert, ob ein Zug herannahe.
Ein *konkurrierendes Verschulden der Bahn* liegt in casu
— nicht in der Duldung der Errichtung eines Gebäudes, das die Übersichtlichkeit der unbewachten Kreuzung verschlechtert,
— nicht in der Unterlassung der Anbringung einer Barriere oder einer Blinklichtanlage,
— wohl aber darin, dass der Lokomotivführer vor der unübersichtlichen Kreuzung kein genügendes akustisches Signal gege-