# EXHIBIT 2

**SDL***

## Certification of Translation

State of New York        )
                          )        ss:
County of New York        )

_____

This document is being provided by SDL to certify the documents listed below have been translated in accordance with SDL's terms and conditions for language services, available at https://www.sdl.com/about/terms-and-conditions/language-services.html ("Agreement").

The translations have been verified by a member of the Language Services division of SDL as being complete, created in a professional and workmanlike manner, and in accordance with the translation requirements of the Agreement.

Notwithstanding anything to the contrary in any confidentiality agreement between SDL and Client, SDL grants Client permission to make a reasonable number of copies of this certification and to: (i) retain and use these within client's organisation and within any entity owning, owned by or on common ownership with client's organisation; (ii) deliver this certification to any pertinent regulatory authority as required or requested by that authority; and/or (iii) deliver this certification to any clinical organisation with which client engages or may wish to engage concerning the provision or undertaking of clinical research studies to which the Document(s) relate.

On behalf of SDL Sheffield Limited/ FSG/ Language Solutions
SDL Entity

_____          _____
Signature                                   Paul M. Martinez
                                            Name

_____          _____
Team Lead                                   17th August, 2020
Title                                       Date

**Client Name: Hausfeld**
**Project Name/Code: 350459**

| Source Document Title | Translated Document Title | Source Language | Target Language |
|---|---|---|---|
| Exhibit 19_4A.185-2007_F.pdf | Exhibit 19_4A.185-2007_F.docx | French | English US |

Sworn to and signed before
me this 18th day of August, 2020

_____
Notary Public

ALBERT CASTRO
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01CA6067878
Qualified in Kings County
Commission Expires April 5, 2022

**Federal Supreme Court**



{T 0/2}
4A_185/2007 /ech

# Decision of September 20, 2007,
# First Civil Law Division

| | |
|---|---|
| Composition of the Court | Presiding Justice Corboz, Justices Klett and Rottenberg Liatowitsch. Registrar: Mr. Ramelet. |
| Parties to the proceedings | **X._____,** appellant, represented by Atty. Philippe Girod, **Y. _____ SA,** appellant, represented by Atty. Philippe Girod, **versus** **Z.M._____,** respondent, represented by Atty. Ute Bugnion. |
| Subject | unfair competition, infringement of trademark rights, multi-party liability in the event of malfeasance appeal in civil law proceedings against a decision of the Civil Chamber of the Canton Appeal Court of Geneva dated April 20, 2007. |

**Facts:**

**A.**

**A.a** A.M._____ incorporated in 1933, in the city of V._____, a sole proprietorship for the purpose of establishing a locksmith business, and setting up a service specialized at opening locks. Beginning in 1991, his son Z.M._____ operated the business, under the company name "*SOS Service Ouverture Serrures M.*" [SOS Lock Opening Service M.] For decades, the business' sign included the letters "SOS" painted in red on the business premises' windows, followed by the words "Lock opening service"; on the company's vehicles, the large red letters "SOS" were painted to clearly stand out from the white background on the vehicle body.

On November 26, 1993 and June 14, 1996, A.M._____ registered two figurative trademarks with the Federal Office of Intellectual Property, for classifications and activities related to locksmithing (areas of activity 6, 7 and 42), namely "SOS" in red letters with a blue key in the "O" and "SOS" without the key in the "O"; A.M. also obtained the indication of a priority derived from his use of the trademark since 1933.

Following proceedings founded primarily on the basis of the Trademark Act (LPM; RS 232.11) [*Loi sur la protection des marques* - Trademark Act] and the Unfair Competition Act (LCD; RS 241) [*Loi fédérale contre la concurrence déloyale* - Unfair Competition Act] – that were commenced in October 1996 by A.M._____ against B._____, who operated a locksmith business in the city of V._____ with the sign "*S.O.S Serruriers*" [SOS Locksmiths], the Canton Court of Justice of Geneva, by way of a decision dated May 23, 1997, which became enforceable, ordered the latter to no longer use the acronyms "SOS" or "S.O.S" on the grounds that there was a likelihood of confusion with A.M._____'s business, and also that B._____, by using a red and yellow crest with two diagonal keys drawn in an old-style font, gave inaccurate connotations about his business, which seemed to be official in nature.

B._____ had entrusted his business of opening and repairing locks to his employee at that time, C._____. The latter had been a business owner himself since January 9, 1995, having a sole proprietorship named "C._____" for the purposes of home locksmithing and troubleshooting.

**A.b** The purpose of Y.\_\_\_\_\_ SA (hereinafter: Y.\_\_\_\_\_), located within the city of V.\_\_\_\_\_, is the trade, import, export, financing and representation of all goods and products. It is managed by X.\_\_\_\_\_ and a third party.

The Court held that Y.\_\_\_\_\_, through the intermediary of X.\_\_\_\_\_, was responsible for conducting the accounting for the locksmith business operated by C.\_\_\_\_\_, that it possessed all of this business' accounting records and that it handled the locksmith's disputes and recovery of invoices; reminders and related debt collections were thus signed by X.\_\_\_\_\_ on behalf of "SOS Serruriers Y.\_\_\_\_\_ SA." The locksmith's invoices featured the header "*SOS (or SDS), Serruriers, Serruriers à domicile*" [SOS (or SOD) Locksmiths, Home Locksmiths] in bold and on three lines, with a crest very similar to the City of V.'s coat of arms. X.\_\_\_\_\_ paid some of the locksmith's fees, including invoices for newspaper advertising. Y.\_\_\_\_\_ had opened a bank account in the name of "*SOS Serrurier*" [SOS Locksmith]. Finally, in October 1997, Y.\_\_\_\_\_ leased vans used by C.\_\_\_\_\_ within the context of C.\_\_\_\_\_'s duties, which were registered in Y.\_\_\_\_\_'s name.

Investigations revealed that a couple, the spouses N.\_\_\_\_\_, sent a letter to Y.\_\_\_\_\_ on March 12, 1998, to the attention of C.\_\_\_\_\_, in which they explained that they had approached C.\_\_\_\_\_'s locksmith in January 1998, believing, due to an advertisement bearing the logo "SOS," that the former was A.M.\_\_\_\_\_'s partner or successor; they considered they had been deceived in this regard.

On March 30 and April 20, 1998, A.M.\_\_\_\_\_ filed a criminal complaint against unknown persons before the Geneva authorities, stating that a van, registered in the name of Y.\_\_\_\_\_, was being driven in the city of V.\_\_\_\_\_ with the inscription "*S.O.S Serruriers*" and a telephone number registered to C.\_\_\_\_\_. Firstly, A.M.\_\_\_\_\_ submitted advertisements to the court that had appeared in the press and produced a business card, which contained the inscription in question, with a crest imitating the city of V.\_\_\_\_\_'s coat of arms, and, secondly, extracts from webpages containing similar information. A.M.\_\_\_\_\_ also explained that a second vehicle was driving in V.\_\_\_\_\_ with the letters "*S.O.S Serruriers*," as well as the "®" logo attesting to the registration of a trademark. C.\_\_\_\_\_ was charged on June 25, 1998, with a breach of the LPM and the LCD.

In a hearing before the examining magistrate on June 5, 1998, X._____ stated, under oath, that Y._____ had taken over a locksmith business at the end of 1997 and that he managed the "locksmith" side of the aforementioned business, on C._____'s behalf.

**B.**

**B.a** On August 11, 1998, A.M._____ commenced parallel proceedings before the Court of Justice on the grounds of unfair competition, an infringement of trademark rights, an infringement of publicity rights, with an application for interim measures, brought against C._____, Y._____ and X._____ on the grounds of infringements that were identical to those committed by B._____ in 1997, and which had been perpetrated once again. A.M._____ argued that the infringements were unlawful, that they were prohibited, that the infringements had resulted in the defendants collecting illicit profits and that the defendants should be ordered, jointly and severally, to pay A.M._____ a minimum of 155,000 francs in capital, as compensation for all incurred damages.

By way of an order dated September 15, 1998, the Court of Appeal upheld its provisional measures of August 13, 1998, and prohibited the three defendants from using the logos "SOS" and "S.O.S" or any other combination of these letters with the word "locksmiths," as well as any logo bearing a likeness to the city of V.'s coat of arms. The Cantonal Court applied article 50 (1) of the CO [Code of Obligations], ruling that all of the defendants had been involved in the incriminating activities.

On February 12, 1999, the above-mentioned civil proceedings were stayed until such time as a decision was handed down in the criminal proceedings.

On December 25, 1999, A.M._____ passed away, leaving his estate to his three children, including Z.M._____.

Despite decisions handed down by the Court of Justice on August 13 and September 15, 1998, the "SOS" and "S.O.S" logos were not removed from vehicles registered in Y._____'s name and financed by Y._____ until the end of 2000.

**B.b** By way of a decision dated May 5, 2003, which became enforceable, the Criminal Chamber of the Court of Justice found C._____ guilty of breaches of articles 61 of the LPM and 23 of the LCD. It held that the convicted party, in addition to having knowingly infringed A.M._____'s trademark rights, as did B._____ in 1997, had deceived customers by suggesting that the proposed locksmith's business was an official one, and that the trademarks in use had been duly registered.

On August 18, 2003, the Court of Justice ordered the resumption of the civil proceedings initiated on August 11, 1998.

Z.M.\_\_\_\_\_, declaring that he waives the findings, prohibition and restitution of unlawful profits, requested that the three defendants be ordered to jointly and severally pay him 405,003.50 francs in damages, plus 5,000 francs as compensation for moral damages. Z.M.\_\_\_\_\_ submitted certificates from his two sisters, whereby they transferred their rights to him in respect of the application of August 11, 1998, filed by the late A.M.\_\_\_\_\_

The three defendants argued that their debts should be discharged.

By way of a decision dated April 20, 2007, the Civil Division of the Court of Justice, ruling as the cantonal court of first and final instance, found that Z.M.\_\_\_\_\_ now acting solely, had the status of plaintiff, and ordered C.\_\_\_\_\_, Y.\_\_\_\_\_ and X.\_\_\_\_\_ to jointly and severally pay said plaintiff the sum of 105,856 francs and ordered C.\_\_\_\_\_ to pay to Z.M. 7,900 francs. Reasons for this decision shall be discussed below to the extent deemed appropriate.

**C.**

X.\_\_\_\_\_ filed a civil appeal to the Federal Supreme Court against the aforementioned decision.

X.\_\_\_\_\_ sought dismissal of all of plaintiff Z.M.\_\_\_\_\_'s claims.

Y.\_\_\_\_\_, being represented by the same attorney as the defendant X.\_\_\_\_\_, filed a civil appeal, the content of which was identical to the former appeal, against the decision of April 20, 2007. It also argued that the plaintiff's claims should be dismissed.

By way of a decision dated June 21, 2007, the Presiding Justice of the First Civil Law Division rejected the applications to stay proceedings submitted by X.\_\_\_\_\_ and Y.\_\_\_\_\_.

The respondent Z.M.\_\_\_\_\_ submitted, in two similar briefs, that X.\_\_\_\_\_'s and Y.\_\_\_\_\_'s appeals should be dismissed.

Appellant X.\_\_\_\_\_ once more sought the granting of legal relief.

**The Federal Supreme Court hereby rules on the basis of the law:**

**1.**

The civil law appeals brought by the two defendants were brought against the same decision, against which they cited the same grounds, in such a manner that it is appropriate to join the appeals for reasons of procedural efficiency and to process them in a single decision (article 24 of the PCF [*Loi fédérale de procédure civile* - Federal Civil Procedure Act], in conjunction with article 71 of the FSCA [LTF/*Loi Sur Le Tribunal Fédéral* – FSCA/Federal Supreme Court Act]; refer also to ATF 124 III 382 recital 1a, 123 II 16 recital 1).

**2.**

The contested ruling was handed down after the entry into force, on January 1, 2007, of the Federal Supreme Court Act of June 17, 2005 (FSCA; RS 173.110), in such a way that the present appeals are subject to the new Act (article 132 (1) of the FSCA).

**3.**

**3.1** Two defendants, who were unsuccessful in their application for dismissal brought before the lower court, and who therefore had standing to appeal (article 76 (1) of the FSCA), filed civil appeals against the final decision (article 90 of the FSCA) handed down by the civil chamber (article 72 (1) of the FSCA) of a cantonal court of last resort (article 75 of the FSCA). Relating to a financial matter, the disputed value of which exceeded the minimum threshold of 30,000 francs (article 74 (1) (b) of the FSCA), the appeals were therefore, in principle, admissible as they were filed within the statutory timeframes (article 100 (1) of the FSCA), and in the form prescribed by law (article 42 of the FSCA).

Moreover, even if the disputed amount was below the minimum threshold, the appeals would nevertheless be admissible, as the plaintiff notably relied, in support of his claims, on the LPM, whose article 58 (3) requires that the cantons appoint a single court to hear civil cases (see article 74 (2) (b) of the FSCA) and the LCD, which provides, at article 12, that a causal link be established in such cases.

**3.2**    The appeal may be brought on the grounds of a violation of rights, as defined by articles 95 and 96 of the FSCA. The Federal Supreme Court applies the law *ex officio* (article 106 (1) of the FSCA). Thus, the Federal Supreme Court is not limited either by the arguments cited in the appeal or by the reasoning provided by the lower court; it may allow an appeal on grounds other than those that were argued in the lower court, and it may deny an appeal by adopting a different reasoning from that of the lower court (see ATF 130 III 297 recital 3.1). In light of the requirements for clear reasoning contained in article 42 (1) and (2) of the FSCA, failing which, the application shall be inadmissible (article 108 (1) (b) of the FSCA), the Federal Supreme Court, in principle, only considers the cited grounds; it is not obliged, as the lower courts are, to try all legal issues that arise when such issues are no longer argued before it. It is not required to deal with a breach of a constitutional law or a matter of cantonal or inter-cantonal law if the complaint has not been specifically raised and substantiated by the appellant (article 106 (2) of the FSCA).

**4.**

In the appealed decision, the cantonal court held that Z.M._____ was entitled to continue proceedings for damages based on article 41 of the CO which refers to articles 9 (3) of the LCD, 29 (2) of the CC [Civil Code] and 55 (2) of the LPM, that his father had commenced on August 11, 1998. The cantonal court then held that C._____ had acted unlawfully by engaging in acts of unfair competition and by infringing both trademark rights and the plaintiff's right to use a tradename. Further, these acts were also committed intentionally by C._____. Defendants Y._____ and X._____ were to be held jointly and severally liable with C._____ for the said illicit acts for the period between March 15, 1998, and December 31, 2000, pursuant to the provisions of article 50 of the CO. Determining the existence of a causal link between the defendant's unlawful conduct and damages incurred by the plaintiff, the cantonal judges established the amount of damages at 113,756 francs, broken down into 21,000 francs for advertising costs, 82,756 francs for lost earnings and 10,000 francs for damage to reputation. As the defendants Y._____ and X._____ were liable only for 33.5 months of the 36 months under consideration (i.e. from March 15, 1998, to December 31, 2000), they were ordered to jointly and severally, with C._____, pay a portion of the damages corresponding to this proportion, namely 105,856 francs, C._____ alone being ordered to pay the balance due and payable, of 7,900 francs (113,756 francs - 105,856 francs).

**5.**

The appellants firstly argued that the cantonal court arbitrarily ruled on the facts with respect to establishing the share of damages, principally with respect to their assessment of the respondent's lost earnings. Appearing all of a sudden to be invoking a breach of the legal principles governing how damages are calculated, the appellants argued that this court made its decision partly under the erroneous assumption that there were only two locksmiths in the city of V._____'s locksmith market during the period in question, namely when C._____ and the plaintiff were in competition. Moreover, the Geneva magistrates did not take into account the generally poor economic situation at the time.

**5.1** The Federal Supreme Court provided legal reasoning on the basis of facts established by the lower court (article 105 (1) of the FSCA). The Federal Supreme Court may depart from facts established earlier only in the event that such facts have been established in a manifestly inaccurate manner or in accordance with a violation of the law within the meaning of article 95 of the FSCA (article 105 (2) of the FSCA), and provided that the correction of the error is likely to affect the outcome of the case (article 97 (1) of the FSCA).

The aforementioned concept of "manifestly inaccurate" corresponds to that of arbitrariness within the meaning of article 9 of the CST [Swiss Federal Constitution]. (Message of February 28, 2001, in relation to an overhaul of the federal judicial system, FF 2001 page 4000 et seq., special edition 4135, chapter 4.1.4.2). According to case law, a decision is arbitrary when it is manifestly unacceptable, when it seriously disregards a clear and undisputed legal norm or principle, or when it runs shockingly counter to a sense of justice and fairness. It is insufficient for another solution to simply appear conceivable or even preferable. For a decision to be set aside on the ground of arbitrariness, it is insufficient that the stated reasons are unacceptable; however, the result of the decision must appear arbitrary (ATF 132 III 209 recital 2.1).

An appellant intending to depart from a lower court's findings must substantiate in detail the conditions for an exception to article 105 (1) of the FSCA, failing which, no new facts may be taken into consideration which differ from those contained in the appealed decision (see ATF 130 III 136 recital 1.4). No new facts or new evidence may be submitted unless they are included within a decision from a lower court (article 99 (1) of the FSCA).

**5.2**

**5.2.1** An estimate of damages made pursuant to article 42 (2) CO relies on the court's powers to review the facts and, therefore, falls within the scope of a review of factual elements (ATF 122 III 219 recital 3b page 222 s. and references).

In support of the appellant's claim that the court arbitrarily calculated damages incurred by the respondent, the appellants merely pitted their opinion against that of the cantonal court's, without demonstrating by way of any precise argument, that this decision was based on a manifestly unacceptable review of the evidence.

The claim of arbitrariness (article 9 of the CST.) is therefore inadmissible due to a lack of reasoning (article 106 (2) of the FSCA).

**5.2.2** With regard to the argument relating to legal principles governing an assessment of damages (see ATF 132 III 359 recital 4; 130 III 145 recital 6.2), this argument is unfounded.

In order to determine the plaintiff's lost earnings for the decisive period from January 1, 1998, to December 31, 2000, the cantonal magistrates, considering that a trademark owner's lost earnings do not necessarily correspond to profits made by an infringer, calculated the average profit margin made by the respondent's business from 2001 to 2003, when all infringements of the respondent's absolute rights had ceased. Their calculation was based on said business's turnover and profits recorded for those years, without any arbitrariness being employed in that regard. They established the profit margin at 22% by taking into consideration overall profits in turnover earned from 2001 to 2003. With regard to the same three-year period, these magistrates held, without any arbitrariness, that the locksmith business operated by C._____ earned a total turnover of 376,164 francs. They deduced that the respondent was deprived of profits corresponding to 22% of this amount, which represented 82,756 francs.

No attempt was made by the defendants to provide detailed reasons for how this rigorous method for calculating damage, which took into account the defendant's statements about the locksmith market in the city of V._____ and which was not merely limited to the plaintiff's business and C._____'s business, would contravene federal law.

As for the allegedly poor economic climate which had supposedly affected the locksmith business sector within the city of V._____, this was purely an allegation, which no evidence in the brief supports.

**6.**

The appellants alleged that the cantonal court contravened articles 41 and 50 of the CO. They argued that the cantonal court disregarded findings from the criminal trial, which had never been brought against them. The defendants pointed out that they had no direct control over C._____'s locksmith business and, consequently, over the use of the disputed signs. Furthermore, they stated that C._____ was criminally convicted, within the context of his locksmith's business, and not as any extension of Y._____. They argued that they did not commit any illicit acts or fault, even through negligence. The appellants further claimed that there was a difference between the scale and importance of C._____'s misdemeanors and their own. C._____ had actively used the disputed signs in his business, whereas they had provided simple administrative and accounting support. The appellants argued that this should prevent the application of article 50 CO.

**6.1** The appellants do not dispute that the plaintiff, as a result of C._____'s actions described in recital A.b of this decision, suffered infringements of his absolute rights as a result of the violation of his right to use a tradename and his trademark rights to the two trademarks registered on November 26, 1993, and June 14, 1996, nor that the plaintiff was a victim of acts of unfair competition committed by the aforementioned party. The appellants also admitted that C._____'s tortious liability (article 41 CO) was engaged for the damages resulting from these illicit acts. There is no need to rehash these points, which are now commonly acknowledged in the case (see article 42 (1) and (2) of the FSCA).

**6.2** It remains to be seen whether the defendants are liable for any damages caused by the illicit acts in question under the multi-party liability mechanism set out in article 50 CO.

According to article 50, para. 1 CO, where several parties have caused damage together, they are jointly and severally liable to make good such damage, without it being necessary to distinguish between the instigator, the principal perpetrator, and an accomplice. This case involved an incidence of passive joint and several liability arising from the law within the meaning of article 143 para. 2 CO.

**6.2.1** Firstly, article 50, para. 1 CO assumes that the damages resulted from an act caused by several parties. Therefore, each perpetrator must have known or been capable of knowing, when exercising due care,

that the others were involved in the harmful act. In other words, the participants must have cooperated consciously to arrive at this result. The intensity of the tortfeasor's involvement is irrelevant , with respect to the injured party (ATF 115 II 42 recital 1b; ANTON K. SCHNYDER, Basel commentary, 4th ed., No. 5 and 6 ad article 50 CO; FRANZ WERRO, *Commentaire romand* [Romandy commentary], No. 4 ad article 50 CO).

It follows from the determinative facts that the defendants and C._____ clearly acted in concert with respect to the harmful act. Defendant X._____ was responsible for preparing the accounts for C._____'s locksmith business. X._____ paid the business's invoices for newspaper advertising. All of the business' relevant accounting records were located on Y._____'s premises. The defendant was responsible for the payment of invoices and debt collection, whether by way of reminders or lawsuits, with letterheads in bold font, "*SOS (ou SDS), Serruriers, Serruriers à domicile*" [SOS or SDS, Locksmiths, Home Locksmiths], and with a crest similar to the city of V._____'s coat of arms. Y._____ still had a bank account with the heading "*SOS Serrurier*" and financed the locksmith business by entering into leasing agreements for vans used by C._____.

The important nature of the administrative and financial assistance provided by the appellants to C._____, who, in an illegal and conspicuous manner, used the plaintiff's trademarks and tradename within the context of C._____'s business, as B._____, for whom C._____ had worked, had done shortly before, demonstrated that the three defendants knew that they were cooperating to cause the damage ultimately suffered by the respondent.

**6.2.2**    Article 50, para. 1 CO also requires that the parties jointly commit an unlawful act. Either all of the perpetrators sought that the damage should occur (intent), or have at least considered that the damage may occur (recklessness), or could have prevented it had they paid due attention to the circumstances (negligence) (see ATF 127 III 257 recital 6a; ROLAND BREHM, Bernese commentary, No. 7 et seq. ad article 50 CO).

In this case, it was established that on March 12, 1998, Y._____ received a letter from the spouses N._____, whereby they stated that they had been deceived by an advertisement bearing the "SOS" logo publicized by C._____'s locksmith business, because they had believed, on the basis of this sign, that

C._____ was an associate or successor to A.M._____. Upon receipt of this eloquent letter, X._____, who admitted before the presiding magistrate on June 5, 1998, that he had managed C._____'s locksmith business on C._____'s behalf since the end of 1997, ought to have asked C._____ to stop using the "SOS" logo in its advertisements. By not doing so, X._____ committed an illicit act.

Furthermore, as the Cantonal Court has clearly observed, notwithstanding the interim decisions prohibiting, in particular, the two defendants from using the acronyms "SOS" and "S.O.S" or any combination of these letters with the word "locksmith" as well as any crest imitating the city of V._____'s coat of arms, these signs appeared on vehicles leased by Y._____ until the end of 2000. This failure to comply with a court decision shall constitute an illicit act, invoking defendant X._____'s personal liability and that of Y._____, where it has been held that X._____ was an *organe de fait* [de facto representative].

**6.2.3** Finally, article 50, para. 1 CO requires that there be an adequate causal relationship between the damages suffered by the injured party and the culpable collective cause (WERRO, op. cit., No. 6 ad article 50 CO).

This causal relationship has clearly been defined in this case. In the ordinary course of events and common experience, it was reasonably foreseeable that the defendants, by associating with C._____ would infringe the plaintiff's intangible rights, cause the plaintiff a significant loss of earnings, additional advertising costs, and damage his reputation (see, with respect to an adequate causal relationship, ATF 129 II 312 recital 3.3 page 318).

It follows that the entire argument is unfounded.

**7.**

Finally, the appellants argued that the Cantonal Court breached legislative provisions set out in article 41 CO. They alleged that the Geneva court magistrates examined the conditions establishing a causal relationship, prior to establishing whether any damages existed.

This criticism is entirely unfounded. For article 41 CO to apply, the four conditions for tortious liability must be satisfied: namely that damages were suffered, there was a causal relationship thereto, an illicit act or

act contrary to public mores, and fault, must be independently and cumulatively satisfied. A judge is therefore perfectly free to assess whether these conditions have been met in any order the judge deems appropriate.

**8.**

In sum, both appeals must be dismissed insofar as they are admissible.

As defendant X.\_\_\_\_\_'s appeal was doomed to failure, defendant X.\_\_\_\_\_'s application for legal relief must also be rejected (article 64 (1) of the FSCA). In light of the outcome of the dispute, each appellant shall be ordered to pay half of the court costs, or 5,000 francs, (article 66 (1) of the FSCA) and shall pay the respondent compensation for legal costs (article 68 (1) and (2) of the FSCA), which should be reduced to reflect the fact that counsel for the latter filed submissions containing almost identical content (article 8 (2) of the Regulation on costs awarded to the opposing party and compensation for legal representation in cases brought before the Federal Supreme Court, dated March 31, 2006, RS 173.110.210.3).

**For these reasons, the Federal Supreme Court hereby rules that:**

**1.**

X.\_\_\_\_\_'s appeal is dismissed to the extent that it is admissible.

**2.**

Y.\_\_\_\_\_'s appeal is dismissed to the extent that it is admissible.

**3.**

X.\_\_\_\_\_'s application for legal relief is dismissed.

**4.**

X.\_\_\_\_\_ shall be ordered to pay court costs of 5,000 francs.

**5.**

Y.\_\_\_\_\_ SA. shall be ordered to pay court costs of 5,000 francs.

**6.**

Appellant X._____ shall pay the respondent compensation of 3,000 francs for legal costs.

**7.**

Appellant Y._____ SA shall pay the respondent compensation of 3,000 francs for legal costs.

**8.**

A copy of this decision is hereby submitted to the parties' legal representatives and to the Civil Chamber of the Cantonal Court of Geneva.

Lausanne, September 20, 2007

On behalf of the First Civil Law Division of the Federal Supreme Court


Presiding Judge:                              The Registrar

**Bundesgericht**

**Tribunal fédéral**

**Tribunale federale**

**Tribunal federal**



{T 0/2}
4A_185/2007 /ech

# Arrêt du 20 septembre 2007
# Ire Cour de droit civil

| | |
|---|---|
| **Composition** | M. et Mmes les juges Corboz, Président, Klett et Rottenberg Liatowitsch.<br>Greffier: M. Ramelet. |
| **Parties** | **X._____,**<br>recourant, représenté par Me Philippe Girod,<br>**Y._____ SA,**<br>recourante, représentée par Me Philippe Girod,<br><br>**contre**<br><br>**Z.M._____,**<br>intimé, représenté par Me Ute Bugnion. |
| **Objet** | concurrence déloyale, violation du droit à la marque, responsabilité plurale en cas d'acte illicite,<br><br>recours en matière civile contre l'arrêt de la Chambre civile de la Cour de justice du canton de Genève du 20 avril 2007. |

**Faits :**

**A.**

**A.a** A.M._____ a fondé en 1933, dans la ville V._____, une entreprise individuelle ayant pour but la serrurerie et la mise sur pied d'un service spécialisé pour l'ouverture de serrures. A compter de 1991, c'est son fils Z.M._____ qui en assure l'exploitation, sous la raison sociale « SOS Service Ouverture Serrures M._____ ». Depuis des décennies, l'enseigne de l'entreprise est constituée par les lettres « SOS » peintes en rouge sur la vitrine du lieu d'exploitation, suivie des mots « Service d'ouverture de serrures »; sur les véhicules de ladite entreprise, les grandes lettres rouges « SOS » se détachent nettement du fond blanc de la carrosserie.

Les 26 novembre 1993 et 14 juin 1996, A.M._____ a obtenu auprès de l'Office fédéral de la propriété intellectuelle, pour les classifications et activités ayant trait à la serrurerie (domaines d'activité 6, 7 et 42), l'enregistrement de deux marques figuratives, soit « SOS » en lettres rouges avec une clef bleue dans le « O » et « SOS » non munie de la clé dans le « O »; A.M._____ a aussi obtenu la mention d'une priorité découlant d'un usage de la marque depuis 1933.

A la suite d'une action - fondée notamment sur la loi fédérale sur la protection des marques (LPM; RS 232.11) et la loi fédérale contre la concurrence déloyale (LCD; RS 241) - ouverte en octobre 1996 par A.M._____ contre B._____, lequel exploitait une serrurerie dans la ville V._____ à l'enseigne « S.O.S Serruriers », la Cour de justice du canton de Genève, par arrêt du 23 mai 1997 devenu définitif, a ordonné à ce dernier de ne plus utiliser les sigles « SOS » ou « S.O.S », aux motifs qu'un risque de confusion existait avec l'entreprise de A.M._____ et que B._____, par l'usage d'un écusson rouge et jaune comportant deux clés en diagonale dessinées à l'ancienne, donnait des indications inexactes sur son entreprise, dont l'activité paraissait officielle.

B._____ avait confié son service d'ouverture et de réparation de serrures à son employé d'alors C._____. Ce dernier est lui-même titulaire depuis le 9 janvier 1995 de la raison individuelle « C._____ » ayant pour but les travaux de serrurerie à domicile et le dépannage.

**A.b** Y._____ SA (ci-après: Y._____), sise à V._____, a pour but le commerce, l'importation, l'exportation, le financement et la représentation de toutes marchandises et produits. Elle est gérée par X._____ et un tiers.

Il a été retenu que Y._____, par l'entremise de X._____, se chargeait de la comptabilité de la serrurerie exploitée par C._____, qu'elle possédait toutes les pièces comptables de cette entreprise et qu'elle s'occupait du contentieux et du recouvrement des factures de la serrurerie; les rappels et les actes de poursuite en relation avec celle-ci étaient ainsi signés par X._____ au nom de « SOS Serruriers Y._____ SA ». Les factures de la serrurerie comportaient, en gras et sur trois lignes, l'en-tête « SOS (ou SDS), Serruriers, Serruriers à domicile » muni d'écussons similaires aux armoiries de la ville V._____. X._____ payait certains frais de la serrurerie, notamment les factures relatives à la publicité dans les journaux. Y._____ avait ouvert un compte bancaire à son nom sous la rubrique « SOS Serrurier ». Elle avait enfin pris en leasing en octobre 1997 les camionnettes utilisées par C._____ dans le cadre de son activité, lesquelles étaient immatriculées au nom de Y._____.

Il résulte des enquêtes que les époux N._____ ont adressé le 12 mars 1998 un courrier à Y._____, à l'attention de C._____, dans lequel ils ont expliqué s'être adressés en janvier 1998 à la serrurerie de C._____, croyant, en raison d'une publicité comportant le sigle « SOS », que le prénommé était l'associé ou le successeur de A.M._____; ils s'estimaient leurrés à cet égard.

Les 30 mars et 20 avril 1998, A.M._____ a déposé plainte pénale contre inconnu devant les autorités genevoises, en indiquant qu'une camionnette, immatriculée au nom de Y._____, circulait en ville de V._____ avec l'inscription « S.O.S Serruriers » et un numéro de téléphone dont l'abonné était C._____. A.M._____ a produit, d'une part, des annonces parues dans la presse et une carte de visite, qui contenaient l'inscription en question avec un écusson imitant les armoiries de la ville V._____, d'autre part des extraits de pages internet renfermant des indications analogues. Il a encore expliqué qu'un second véhicule roulait à V._____ avec les lettres « S.O.S Serruriers », ainsi que le sigle « ® » attestant l'enregistrement d'une marque. C._____ a fait l'objet d'une inculpation, le 25 juin 1998, pour violation de la LPM et de la LCD.

Entendu par le juge d'instruction le 5 juin 1998, X._____ a déclaré, sous la foi du serment, que Y._____ avait repris une entreprise de serrurerie à fin 1997 et qu'il gérait la partie « serrurerie » de la société susnommée, pour le compte de C._____.

**B.**

**B.a** Le 11 août 1998, A.M._____ a saisi la Cour de justice d'une action en concurrence déloyale, violation du droit à la marque et atteinte aux droits de la personnalité, avec requête de mesures provisionnelles, dirigée contre C._____, Y._____ et X._____, aux motifs que des actes identiques à ceux commis par B._____ en 1997 avaient été à nouveau perpétrés. A.M._____ a conclu à la constatation du caractère illicite des atteintes, à leur interdiction, à la remise des gains illicites et à la condamnation solidaire des défendeurs à lui verser, en réparation de tout le préjudice subi, un montant minimum de 155'000 fr. en capital.

Par ordonnance du 15 septembre 1998, la Cour de justice, confirmant ses mesures préprovisionnelles du 13 août 1998, a fait interdiction aux trois défendeurs d'utiliser les sigles « SOS » et « S.O.S » ou toute autre combinaison de ces lettres avec le mot « serruriers », ainsi que toute reproduction rappelant les armoiries de la ville V._____ La cour cantonale a appliqué l'art. 50 al. 1 CO en considérant que tous les défendeurs avaient été parties prenantes dans les activités incriminées.

Le 12 février 1999, le procès civil précité a été suspendu jusqu'à droit connu sur la procédure pénale.

Le 25 décembre 1999, A.M._____ est décédé, laissant pour héritiers ses trois enfants dont Z.M._____.

Malgré les décisions rendues par la Cour de justice les 13 août et 15 septembre 1998, les signes « SOS » et « S.O.S » n'ont été supprimés qu'à la fin 2000 sur les véhicules immatriculés au nom de Y._____ et financés par celle-ci.

**B.b** Par arrêt du 5 mai 2003 devenu définitif, la Chambre pénale de la Cour de justice a reconnu C._____ coupable d'infractions aux art. 61 LPM et 23 LCD. Elle a considéré que le condamné, outre d'avoir sciemment violé le droit à la marque de A.M._____, à l'instar de B._____ en 1997, avait trompé la clientèle en faisant croire que

l'activité de serrurerie proposée était officielle et que les marques utilisées avaient été dûment enregistrées.

Le 18 août 2003, la Cour de justice a prononcé la reprise du procès civil ouvert le 11 août 1998.

Z.M._____, déclarant renoncer aux conclusions en constatation, interdiction et en restitution des profits illicites, a requis que les trois défendeurs soient condamnés à lui verser solidairement le montant de 405'003 fr.50 à titre de dommages-intérêts, plus 5'000 fr. au titre du tort moral éprouvé. Il a produit des attestations émanant de ses deux soeurs, par lesquelles celles-ci lui cédaient leurs droits relatifs à la demande du 11 août 1998 déposée par feu A.M._____.

Les trois défendeurs ont conclu à libération.

Par arrêt du 20 avril 2007, la Chambre civile de la Cour de justice, statuant en instance cantonale unique, a constaté que désormais seul Z.M._____ revêtait la qualité de demandeur, condamné C._____, Y._____ et X._____ à payer solidairement audit demandeur la somme de 105'856 fr. et condamné C._____ à payer à Z.M._____ le montant de 7'900 fr. Les motifs de cette décision seront exposés ci-après dans la mesure utile.

**C.**
X._____ forme un recours en matière civile au Tribunal fédéral contre l'arrêt précité. Il requiert que le demandeur Z.M._____ soit débouté de toutes ses conclusions.

Y._____, représentée par le même avocat que le défendeur X._____, forme un recours en matière civile, de contenu identique au précédent, contre l'arrêt du 20 avril 2007. Elle conclut également au déboutement du demandeur.

Par décision du 21 juin 2007, le Président de la Ire Cour de droit civil a rejeté les requêtes d'effet suspensif présentées par X._____ et Y._____.

L'intimé Z.M._____ propose, dans deux mémoires presque similaires, le rejet du recours de X._____ et de celui de Y._____.

Le recourant X._____ sollicite encore l'octroi de l'assistance

judiciaire.

**Le Tribunal fédéral considère en droit:**

**1.**

Les recours en matière civile émanant de deux parties défenderesses sont dirigés contre le même arrêt à l'encontre duquel ils soulèvent les mêmes griefs, de sorte qu'il se justifie de les joindre pour des motifs d'économie de procédure et de les traiter dans un seul arrêt (art. 24 PCF, en relation avec l'art. 71 LTF; cf. ATF 124 III 382 consid. 1a, 123 II 16 consid. 1).

**2.**

L'arrêt critiqué a été rendu après l'entrée en vigueur, le 1er janvier 2007, de la loi fédérale sur le Tribunal fédéral du 17 juin 2005 (LTF; RS 173.110), de sorte que les présents recours sont soumis au nouveau droit (art. 132 al. 1 LTF).

**3.**

**3.1** Interjetés par deux défendeurs qui ont succombé dans leurs conclusions libératoires prises devant l'autorité précédente et qui ont donc qualité pour recourir (art. 76 al. 1 LTF), les recours en matière civile sont dirigés contre une décision finale (art. 90 LTF) rendue en matière civile (art. 72 al. 1 LTF) par une autorité cantonale de dernière instance (art. 75 LTF). Portant sur une affaire pécuniaire dont la valeur litigieuse dépasse le seuil de 30'000 francs (art. 74 al. 1 let. b LTF), les recours sont donc en principe recevables, puisqu'ils ont été déposés en temps utile (art. 100 al. 1 LTF) et dans les formes prévues par la loi (art. 42 LTF).

Au demeurant, même si la valeur litigieuse n'était pas atteinte, les recours seraient néanmoins recevables sous cet angle, puisque le demandeur invoque, à l'appui de ses prétentions, notamment la LPM, dont l'art. 58 al. 3 impose aux cantons la désignation d'un tribunal unique chargé de connaître des actions civiles (cf. art. 74 al. 2 let. b LTF) et la LCD, qui institue, à son art. 12, un for de la connexité dans une telle hypothèse.

**3.2** Le recours peut être interjeté pour violation du droit, tel qu'il est délimité par les art. 95 et 96 LTF. Le Tribunal fédéral applique le droit d'office (art. 106 al. 1 LTF). Il n'est donc limité ni par les arguments soulevés dans le recours, ni par la motivation retenue par l'autorité précédente; il peut admettre un recours pour un autre motif que ceux qui ont été invoqués et il peut rejeter un recours en adoptant une argumentation différente de celle de l'autorité précédente (cf. ATF 130 III 297 consid. 3.1). Compte tenu de l'exigence de motivation contenue à l'art. 42 al. 1 et 2 LTF, sous peine d'irrecevabilité (art. 108 al. 1 let. b LTF), le Tribunal fédéral n'examine en principe que les griefs invoqués; il n'est pas tenu de traiter, comme le ferait une autorité de première instance, toutes les questions juridiques qui se posent, lorsque celles-ci ne sont plus discutées devant lui. Il ne peut pas entrer en matière sur la violation d'un droit constitutionnel ou sur une question relevant du droit cantonal ou intercantonal si le grief n'a pas été invoqué et motivé de manière précise par la partie recourante (art. 106 al. 2 LTF).

**4.**
Dans l'arrêt déféré, l'autorité cantonale a considéré que Z.M._____ était légitimé à poursuivre seul l'action en dommages-intérêts fondée sur l'art. 41 CO    auquel renvoient les art. 9 al. 3 LCD, 29 al. 2 CC et 55 al. 2 LPM    que son père avait intentée le 11 août 1998. Elle a successivement admis que C._____ avait agi de manière illicite en perpétrant des actes de concurrence déloyale et en violant tout à la fois le droit à la marque et le droit au nom du demandeur. Ces agissements ont en outre été commis intentionnellement par C._____. Les défendeurs Y._____ et X._____ devaient répondre solidairement avec C._____ desdits actes illicites pour la période du 15 mars 1998 au 31 décembre 2000, par l'effet de l'art. 50 CO. Retenant l'existence d'un lien de causalité entre les comportements contraires au droit adoptés par les défendeurs et le dommage subi par le demandeur, les juges cantonaux ont fixé le préjudice à la somme de 113'756 fr., se décomposant en 21'000 fr. de frais publicitaires, 82'756 fr. de gain manqué et 10'000 fr. d'atteinte au renom. Comme la responsabilité aquilienne des défendeurs Y._____ et X._____ n'était engagée que pendant 33 mois et demi sur les 36 mois à prendre en compte (soit du 15 mars 1998 au 31 décembre 2000), ces derniers ont été condamnés à payer, solidairement avec C._____, la part du dommage correspondant à cette proportion, à savoir 105'856 fr., C._____ étant déclaré seul débiteur du solde dû, par 7'900 fr. (113'756 fr. - 105'856 fr.).

**5.**

Les recourants se plaignent en premier lieu que la cour cantonale aurait constaté arbitrairement les faits quant à la fixation de la quotité du dommage, principalement en ce qui concerne l'appréciation du gain manqué de l'intimé. Semblant tout d'un coup invoquer une violation des principes juridiques relatifs au calcul du dommage, ils font valoir que cette autorité serait partie de l'hypothèse erronée qu'il n'y avait que deux entreprises de serrurerie sur le marché de la ville V._____ à l'époque déterminante, à savoir celle de C._____ et celle du demandeur, alors qu'il y en avait un grand nombre qui se faisaient concurrence. De plus, les magistrats genevois n'auraient pas considéré dans leur calcul la mauvaise situation économique générale de l'époque.

**5.1** Le Tribunal fédéral conduit son raisonnement juridique sur la base des faits établis par l'autorité précédente (art. 105 al. 1 LTF). Il ne peut s'en écarter que si les faits ont été établis de façon manifestement inexacte ou en violation du droit au sens de l'art. 95 LTF (art. 105 al. 2 LTF), et pour autant que la correction du vice soit susceptible d'influer sur le sort de la cause (art. 97 al. 1 LTF).

La notion de "manifestement inexacte" évoquée ci-dessus correspond à celle d'arbitraire au sens de l'art. 9 Cst. (Message du 28 février 2001 concernant la révision totale de l'organisation judiciaire fédérale, FF 2001 p. 4000 ss, spéc. 4135, ch. 4.1.4.2). Selon la jurisprudence, une décision est arbitraire lorsqu'elle est manifestement insoutenable, lorsqu'elle méconnaît gravement une norme ou un principe juridique clair et indiscuté, ou encore heurte de manière choquante le sentiment de la justice et de l'équité. Il ne suffit pas qu'une autre solution paraisse concevable, voire préférable. Pour qu'une décision soit annulée pour cause d'arbitraire, il n'est pas suffisant que la motivation formulée soit insoutenable; encore faut-il que la décision semble arbitraire dans son résultat (ATF 132 III 209 consid. 2.1).

La partie recourante qui entend s'écarter des constatations de l'autorité précédente doit expliquer de manière circonstanciée en quoi les conditions d'une exception à l'art. 105 al. 1 LTF seraient réalisées, faute de quoi il n'est pas possible de tenir compte d'un état de fait qui diverge de celui contenu dans la décision attaquée (cf. ATF 130 III 136 consid. 1.4). Aucun fait nouveau ni preuve nouvelle ne peut être présenté à moins de résulter de la décision de l'autorité précédente (art. 99 al. 1 LTF).

**5.2**

**5.2.1** L'estimation du dommage d'après l'art. 42 al. 2 CO repose sur le pouvoir d'apprécier les faits, et, partant, relève de l'appréciation des éléments factuels (ATF 122 III 219 consid. 3b p. 222 s. et les références).

A l'appui de leur grief d'arbitraire dans la fixation du dommage subi par l'intimé, les recourants se limitent à opposer leur propre opinion à celle de l'autorité cantonale, sans démontrer par une argumentation précise que cette décision se fonderait sur une appréciation des preuves manifestement insoutenable.

Le grief d'arbitraire (art. 9 Cst.) est donc irrecevable, faute de motivation (art. 106 al. 2 LTF).

**5.2.2** Quant au pan du grief relatif aux principes juridiques d'évaluation du préjudice (cf. ATF 132 III 359 consid. 4; 130 III 145 consid. 6.2), il est dénué de fondement.

Pour déterminer le gain manqué du demandeur pour la période déterminante du 1er janvier 1998 au 31 décembre 2000, les juges cantonaux, prenant en compte que le bénéfice manqué du titulaire du droit à la marque ne correspond pas nécessairement au bénéfice réalisé par le contrefacteur, ont calculé la marge bénéficiaire moyenne réalisé par l'entreprise de l'intimé de 2001 à 2003, époque où les atteintes aux droits absolus de celui-ci avaient cessé. Ils se sont fondés sur les chiffres d'affaires et bénéfices de ladite entreprise tels qu'ils ont été constatés pour ces années, sans que l'arbitraire soit invoqué à ce propos. Ils ont arrêté la marge bénéficiaire à 22 % en rapportant le total des bénéfices aux chiffres d'affaires 2001 à 2003. En ce qui concerne la même période de trois ans, ces magistrats ont retenu, sans se voir taxer d'arbitraire, que la serrurerie exploitée par C._____ avait atteint un chiffre d'affaires total de 376'164 fr. Ils en ont déduit que l'intimé a été privé d'un gain correspondant au 22 % de ce montant, ce qui représente 82'756 fr.

On cherche vainement en quoi cette méthode rigoureuse de calcul du dommage, qui prend en considération    quoi qu'en disent les défendeurs    la circonstance que le marché de la serrurerie à V._____ ne se limitait pas aux entreprises du demandeur et de C._____, contreviendrait au droit fédéral.

Quant au prétendu climat morose qui aurait alors affecté le domaine de la serrurerie en ville de V._____, il s'agit de pures allégations, qu'aucun élément du dossier ne vient étayer.

**6.**
Les recourants soutiennent que l'autorité cantonale a enfreint les art. 41 et 50 CO. Ils font valoir qu'elle s'est écartée du résultat de la procédure pénale, laquelle n'a jamais été dirigée à leur encontre. Les défendeurs soulignent qu'ils n'avaient aucune emprise directe sur l'activité propre de la serrurerie de C._____ et, partant, sur l'utilisation des signes litigieux. En outre, continuent-ils, C._____ a été condamné pénalement dans le cadre de son entreprise de serrurerie, et non en tant qu'organe de Y._____. Ils en concluent qu'ils n'ont commis ni acte illicite ni faute, même par négligence. Les recourants prétendent encore que la différence entre l'ampleur et l'importance des actes réalisés par C._____, lequel a utilisé activement les signes litigieux dans son entreprise, et les agissements qui leur sont reprochés, lesquels relèvent d'un simple soutien administratif et comptable, devrait faire obstacle à l'application de l'art. 50 CO.

**6.1** Les recourants ne contestent pas que le demandeur, du fait des agissements de C._____ décrits au considérant A.b du présent arrêt, a subi des atteintes à ses droits absolus par la violation de son droit au nom et de ses droits aux deux marques enregistrées les 26 novembre 1993 et 14 juin 1996, ni qu'il a été victime d'actes de concurrence déloyale du précité. Ils admettent également que la responsabilité délictuelle (art. 41 CO) de C._____ est engagée pour les dommages consécutifs à ces actes illicites dont a souffert le demandeur. Il n'y a pas lieu de revenir sur ces points, qui sont désormais acquis au débat (cf. art. 42 al. 1 et 2 LTF).

**6.2** Il reste donc à vérifier si les défendeurs doivent répondre du préjudice engendré par les actes illicites en question en vertu du mécanisme de la responsabilité plurale institué par l'art. 50 CO.

A teneur de l'art. 50 al. 1 CO, lorsque plusieurs ont causé ensemble un dommage, ils sont tenus solidairement de le réparer, sans qu'il y ait lieu de distinguer entre l'instigateur, l'auteur principal et le complice. Il s'agit d'un cas de solidarité passive découlant de la loi au sens de l'art. 143 al. 2 CO.

**6.2.1** L'art. 50 al. 1 CO suppose tout d'abord que le dommage a été provoqué par une cause commune. Il faut donc que chaque auteur ait

connu ou pu connaître, en usant de l'attention nécessaire, la participa-
tion des autres à l'acte dommageable. Autrement dit, les auteurs doi-
vent avoir coopéré consciemment pour parvenir à ce résultat. L'inten-
sité de la participation des acteurs est sans importance sur le plan ex-
terne, c'est-à-dire à l'égard du lésé (ATF 115 II 42 consid. 1b; ANTON K.
SCHNYDER, Commentaire bâlois, 4e éd., n. 5 et 6 ad art. 50 CO; FRANZ
WERRO, Commentaire romand, n. 4 ad art. 50 CO).

Il résulte de l'état de fait déterminant qu'il y avait manifestement entre
les défendeurs et C._____ une association dans l'activité
dommageable. Le défendeur X._____ avait la charge de la
comptabilité de la serrurerie de C._____. C'est X._____ qui
payait les factures de cette entreprise ayant trait à la publicité parue
dans les journaux. Toutes les pièces comptables de l'entreprise en
cause se trouvaient dans les locaux de Y._____. La défenderesse
s'occupait du règlement des factures et de leur recouvrement, que ce
soit par voie de rappels ou de poursuites, notes dont l'en-tête était
libellé, en caractères gras, « SOS (ou SDS), Serruriers, Serruriers à
domicile », et accompagné d'écussons similaires aux armoiries de la
ville V._____. Y._____ détenait encore un compte bancaire
doté de la rubrique « SOS Serrurier » et finançait la serrurerie par la
conclusion de contrats de leasing portant sur les camionnettes dont se
servait C._____.

L'importante assistance administrative et financière octroyée par les
recourants à C._____, lequel utilisait sans droit et de manière
ostensible les marques et le nom du demandeur dans le cadre de son
entreprise, comme l'avait fait peu de temps avant B._____ pour
lequel C._____ avait travaillé, démontre que les trois défendeurs
savaient qu'ils coopéraient à faire naître le dommage subi en fin de
compte par l'intimé.

**6.2.2** L'art. 50 al. 1 CO requiert également une faute commune. Soit
tous les auteurs veulent la survenance du dommage (intention), soit ils
ont au moins pris en compte que le préjudice pouvait arriver (dol éven-
tuel), soit ils auraient pu l'écarter s'ils avaient prêté aux circonstances
l'attention requise (négligence) (cf. ATF 127 III 257 consid. 6a; ROLAND
BREHM, Commentaire bernois, n. 7 ss ad art. 50 CO).

En l'espèce, il a été retenu définitivement que Y._____ a reçu le
12 mars 1998 un courrier des époux N._____, par lequel ces
derniers estimaient avoir été trompés par une publicité comportant le
sigle « SOS » émanant de la serrurerie de C._____, car ils avaient

cru, sur la base de ce signe, que le prénommé était l'associé ou le successeur de A.M._____. A réception de ce courrier éloquent, X._____, qui a reconnu devant le juge d'instruction le 5 juin 1998 qu'il gérait la serrurerie de C._____ pour le compte de celui-ci depuis la fin 1997, aurait dû demander à C._____ de cesser de mentionner le sigle « SOS » dans sa publicité. Pour ne pas l'avoir fait, il a commis une faute.

A cela s'ajoute, comme l'a bien vu la cour cantonale, que, nonobstant les décisions provisionnelles faisant interdiction notamment aux deux défendeurs d'utiliser les sigles « SOS » et « S.O.S » ou toute combinaison de ces lettres avec le mot « serrurier » ainsi qu'un écusson imitant les armoiries de la ville V._____, ces signes ont figuré jusqu'à la fin 2000 sur les véhicules financés en crédit-bail par Y._____. Cette insoumission à une décision de justice constitue une faute caractérisée qui engage la responsabilité personnelle du défendeur X._____ et celle de Y._____, dont il a été constaté que X._____ était l'organe de fait.

**6.2.3** L'art. 50 al. 1 CO exige enfin qu'il y ait un rapport de causalité adéquate entre le préjudice subi par le lésé et la cause commune fautive (WERRO, op. cit., n. 6 ad art. 50 CO).

Ce lien est bien évidemment donné in casu. D'après le cours ordinaire des choses et l'expérience de la vie, il était raisonnablement prévisible que les défendeurs, en s'associant à C._____ pour en particulier porter atteinte aux droits immatériels du demandeur, provoquent chez ce dernier un important manque à gagner, lui occasionne des frais de publicité supplémentaires et portent atteinte à sa réputation (cf., sur la relation de causalité adéquate, ATF 129 II 312 consid. 3.3 p. 318).

Il suit de là que l'ensemble du moyen est dénué de fondement.

**7.**
Dans un dernier grief, les recourants font valoir que l'autorité cantonale a transgressé la systématique prévue par le législateur dans le cadre de l'application de l'art. 41 CO. Ils reprochent aux magistrats genevois d'avoir examiné la condition du lien de causalité avant celle de l'existence d'un dommage.

La critique n'a aucune consistance. Pour que l'art. 41 CO trouve application, les quatre conditions de la responsabilité délictuelle, à savoir un dommage, un rapport de causalité, un acte illicite ou contraire aux

moeurs et une faute, doivent être remplies séparément et cumulative-
ment. Le juge est donc parfaitement libre de contrôler la réalisation de
ces conditions dans l'ordre qu'il estime opportun.

**8.**
En définitive, les deux recours doivent être rejetés dans la mesure de
leur recevabilité.

Comme le recours du défendeur X._____ était voué à l'échec, sa
demande d'assistance judiciaire doit être rejetée (art. 64 al. 1 LTF). Vu
l'issue du litige, chaque recourant paiera la moitié des frais de justice,
par 5'000 fr., (art. 66 al. 1 LTF) et versera à l'intimé une indemnité de
dépens (art. 68 al. 1 et 2 LTF), qu'il convient de réduire pour tenir
compte que le conseil de celui-ci a déposé des mémoires de réponse
de contenu presque identique (art. 8 al. 2 du Règlement sur les dé-
pens alloués à la partie adverse et sur l'indemnité pour la représenta-
tion d'office dans les causes portées devant le Tribunal fédéral, du
31 mars 2006, RS 173.110.210.3).

**Par ces motifs, le Tribunal fédéral prononce:**

**1.**
Le recours de X._____ est rejeté dans la mesure où il est
recevable.

**2.**
Le recours de Y._____ SA est rejeté dans la mesure où il est
recevable.

**3.**
La requête d'assistance judiciaire formée par X._____ est rejetée.

**4.**
Un émolument judiciaire de 5'000 fr. est mis à la charge de
X._____.

**5.**
Un émolument judiciaire de 5'000 fr. est mis à la charge de
Y._____ SA.

**6.**

Le recourant X._____ versera à l'intimé une indemnité de 3'000 fr. à titre de dépens.

**7.**

La recourante Y._____ SA versera à l'intimé une indemnité de 3'000 fr. à titre de dépens.

**8.**

Le présent arrêt est communiqué en copie aux mandataires des parties et à la Chambre civile de la Cour de justice du canton de Genève.

Lausanne, le 20 septembre 2007

Au nom de la Ire Cour de droit civil
du Tribunal fédéral suisse

Le président:                    Le greffier: