# EXHIBIT 3

**SDL**⃰

## Certification of Translation

State of New York )
)          ss:
County of New York )

This document is being provided by SDL to certify the documents listed below have been translated in accordance with SDL's terms and conditions for language services, available at https://www.sdl.com/about/terms-and-conditions/language-services.html ("Agreement").

The translations have been verified by a member of the Language Services division of SDL as being complete, created in a professional and workmanlike manner, and in accordance with the translation requirements of the Agreement.

Notwithstanding anything to the contrary in any confidentiality agreement between SDL and Client, SDL grants Client permission to make a reasonable number of copies of this certification and to: (i) retain and use these within client's organisation and within any entity owning, owned by or on common ownership with client's organisation; (ii) deliver this certification to any pertinent regulatory authority as required or requested by that authority; and/or (iii) deliver this certification to any clinical organisation with which client engages or may wish to engage concerning the provision or undertaking of clinical research studies to which the Document(s) relate.

On behalf of SDL Sheffield Limited/ FSG/ Language Solutions
SDL Entity

_____          *Paul M. Martinez*
Signature                                                        Name

_____          23rd July, 2020
Team Lead                                                       Date
Title

**Client Name: Hausfeld**
**Project Name/Code: 339918**

| Source Document Title | Translated Document Title | Source Language | Target Language |
|---|---|---|---|
| Ex. 10_New Annex 36 (-º39)_FSC 107 II 82.pdf | Ex. 10_New Annex 36 (-º39)_FSC 107 II 82.docx | French/German | English US |

JENISE MUKTADIR
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01MU6292221
Qualified in Queens County
Commission Expires November 4, 2021

Sworn to and signed before
me this 23rd day of July, 2020

_____
Notary Public

Page **1** of **1**

## Introduction

107 II 82

12. Extract from the judgment of the First Civil Division dated 20 January 1981 in the matter of *Österreichische Rundfunk* (Austrian Broadcasting Corporation) vs. the Swiss Confederation (PTT companies) and Rediffusion AG (direct proceedings)

## Summary

  Infringement of copyright by the unauthorized dissemination of foreign broadcasts; action to refrain from an act.
  1. Jurisdiction of the Federal Supreme Court (see 1). Standing to defend a Swiss cable and telephone company; admissibility of an action for failure to act (see 2).
  2. Standing of a foreign issuing company whose programs do not constitute collections within the meaning of **Art. 3 Swiss Federal Copyright Act**, nor are they based on an independent copyright (see 3a); can general principles of law be used (see 3b)?
  3. Action by the issuing company undertaking to refrain from an act based on the transfer of copyright; how can such action be implemented, depending on whether it relates to protected or free programs (see 4)?
  4. Application of **Art. 12, paragraph 1 Ch. 6 of the Swiss Federal Copyright Act** and Art. 11bis, paragraph 1 Ch. 2 of the Berne Convention for the Protection of Literary and Artistic Works to a cable distribution company which rebroadcasts foreign broadcasts via its installations with the help of telephone services; joint and several liability of the telephone services (see 5 and 9a-b). Is the action abusive (see 9c)? Should the judgment be accompanied by a threat of punishment in the event of a contravention (see 10)?

Facts from page 83

BGE 107 II 82 p. 83

  **A.–** *Österreichische Rundfunk* (ORF) operates television broadcasting in Austria as an independent public institution. For

BGE 107 II 82 p. 84

these reasons, it has independently installed and maintains a large number of transmitters and auxiliary transmitters. The *Schweizerische Radio- und Fernsehgesellschaft* (Swiss Broadcasting Corporation—SRG), on the other hand, uses transmitters installed and maintained by the PTT companies. As cable television was expected to become widespread, since 1976 the PTT companies have also been building a directional beam network in order to be able to transmit foreign programs to companies operating television systems with communal antennas. This applies, in particular, to two Austrian TV programs that are picked up by reception equipment on the Uetliberg mountain and are able to be transmitted from the Albis hills to the Ulmizberg station, near Bern, by means of directional beams.
  Rediffusion AG operates numerous television systems in Switzerland, consisting, in particular, of a reception antenna and a cable network. In the Bern region, it supplies some 50,000 subscribers with programming via this type of system. It transmits a total of 11 VHF channels as well as three Swiss and two German, two Austrian and two French TV channels, all of which are transmitted to subscribers unmodified, in their entirety and simultaneously. Throughout Switzerland, around one million subscribers are estimated to be supplied by approximately 1700 larger or smaller television systems of this type.

  **B.–** On August 23, 1976, the ORF wrote to the PTT companies that it considered the retransmission of its broadcasts in the Bern area to be unlawful, unless a corresponding agreement was to be concluded. The PTT referred the ORF to the cable companies. Negotiations with Rediffusion AG did not yield any results; these negotiations failed partly because of a difference in principles, partly because of financial reasons. In a letter dated December 22, 1978, the ORF therefore banned the PTT companies and Rediffusion AG from broadcasting its programs in the Bern area. However, the ban was not observed.

**C.–** On May 11, 1979, the ORF brought an action before the Federal Supreme Court against the Swiss Confederation, represented by the PTT companies, and against Rediffusion AG, containing the following demands: 1. To prohibit the PTT, under appropriate penalty, from transmitting the plaintiff's television programs FS 1 and FS 2 to Rediffusion or to other companies using

BGE 107 II 82 p. 85

communal antennas for dissemination to subscribers in the Bern area without the plaintiff's consent; 2. To similarly prohibit Rediffusion from transmitting the plaintiff's programs via its distribution network in the Bern area without the plaintiff's consent.

The defendants requested that the action be dismissed. The PTT companies filed third-party notices to 15 municipalities and cable companies, eight of which intervened in the proceedings; meanwhile, a further intervention was rejected. For its part, Rediffusion filed third-party notices to six municipalities, which did not, however, intervene.

Recitals

The Federal Supreme Court considers the following:

**1.** The action is based on copyright law and thus concerns a civil claim. The jurisdiction of the Federal Supreme Court is recognized by all parties. For the PTT companies, this jurisdiction stems from Article 3(3)(a) of its Organization Act and from Article 14 of the accompanying regulation; for Rediffusion, this stems from **Article 41(c)(2) Swiss Code of Obligations (*Obligationenrecht—OG*)**, in conjunction with the agreement between the parties dated March 21, 1979.

In its response, Rediffusion argued that the complaint should be dismissed, but did not substantiate its view. In doing so, it subsequently limited itself to requesting that the action be dismissed.

**2.** Both defendants first contest the plaintiff's claim for injunctive relief via the defense that they are not capable of being sued and that the claim lacks precise information.

a) Contrary to the objections of the PTT companies, substantive law determines whether the capability of being sued can be affirmed and whether the plaintiff may bring an action against both defendants or only against one of them. Having capacity to sue and the capability of being sued are not conditions in terms of procedural requirements on which the admissibility of the action would depend; rather, they form part of the substantive merits of the action and, therefore, their absence results in the dismissal and not the rejection of the action (**BGE 100 II 169** E. 3, **BGE 97 II 100, B GE 86 II 45** E. 4a). If it is affirmed that the defendant is capable of being sued, this also simply means that the claim being brought is directed against the defendant; whether the further substantive requirements for a positive outcome of the action are also met, and whether the claim

BGE 107 II 82 p. 86

exists at all and to the extent claimed by the plaintiff and is still actionable has not yet been decided.

Rediffusion contested its capability of being sued even before the trial and also during the proceedings, because it was not Rediffusion, but the PTT companies that retransmitted the ORF's programs, if at all; whereas Rediffusion only assisted with reception. Its capability of being sued depends, in particular, on whether Rediffusion as another broadcasting company breaches the plaintiff's copyrights through public communication as defined by **Article 12(6) Copyright Act (*Urheberrechtsgesetz—URG.*)** This question forms part of the substantive examination of the dispute and should therefore be discussed in this context.

Initially, the plaintiff also accused the PTT companies of directly violating its copyrights because its directional beam network makes dissemination possible in the Bern area, and that this was also intended. The PTT companies dispute this, arguing that the network was set up for reasons relating to radio spectrum policy and construction law; it functions merely as a transport aid without participating in reception. In its reply, the plaintiff weakened its assertion to the effect that there was an indirect infringement of its rights, and that at the very least, the PTT companies had been complicit. As a result, only the allegation already made in the action—that the PTT companies acted jointly with Rediffusion, whether as instigators, participants or accomplices—has been upheld. If this is the case, joint and several liability exists between the defendants in the event of a copyright infringement; the PTT companies' capability of being sued must therefore also be affirmed.

b) The defendants rightly do not contest that the action for a restrictive injunction is admissible

against copyright infringement, even though this is not mentioned in the URG, by contrast to **Article 2 Unfair Competition Act (*Bundesgesetz gegen den unlauteren Wettbewerb—UWG*)**. As a matter of fact, an action for a restrictive injunction is the most frequently and effectively used means of defense in industrial property law (TROLLER, Immaterialgüterrecht II (Intellectual Property Rights II), p. 1109.) Its admissibility is also based on the general principles to which **Article 44 URG** refers, if an infringement of rights is found to exist or is to be anticipated in the future (VON TUHR/PETER, OR I, p. 442.) The ORF need not settle for a declaratory action that would clarify the legal situation but not lead to an enforceable judgment. An application for a restrictive injunction must state precisely what the defendant is to be prohibited from doing (**BGE 93 II 59** E. 4, **BGE 84 II 457** E. 6). The plaintiff's requests are not objectionable in this respect. The fact that the PTT companies appear to assume the opposite is obviously

BGE 107 II 82 p. 87

related to the question of having capacity to sue, which is also disputed but must be examined separately. Should the request for prohibition prove, in principle, to be justified in the substantive assessment, however its wording is too wide-ranging, this must be limited to the permissible extent in the judgment (**BGE 97 II 93** with references; TROLLER, II p. 1110); in any event, this is not a reason to deny the plaintiff's request.

  **3.** It is not disputed that the plaintiff can assert copyrights that have been assigned to it. Due to the legal and practical difficulties associated with this, since the second exchange of documents Rediffusion has based its capacity to sue primarily on the copyright to which it is entitled as a broadcasting company or as a result of transfer by those responsible for the overall program. As such, its television broadcasts are, due to the selection and organization of the material, intellectual creations and are at any rate protected as collective works as defined by **Article 3 URG** and Article 2(3) of the Bern Convention for the Protection of Literary and Artistic Works (RBUe) in accordance with the version revised in Brussels dated June 26, 1948 (AS 1955 pp. 1092 et seqq.) The defendants deny that overall programs constitute a "work", because they are not a closed unit subject to artistic individuality. A single program may be protected as a collective work, but not a daily program that forms part of a whole in which individual programs are unconnected to one another; even less can there any question of protecting an overall program.

  a) A collective work can only be said to be protectable under RBUe and URG if, as an example of intellectual individuality, it represents more and something other than the sum of the individual work (TROLLER, I p. 477; KUMMER, Das urheberrechtlich schützbare Werk [The Copyrightable Work], pp. 43 et seqq. and 139; F. CURCHOD, La Convention de Berne et la loi fédérale sur le droit d'auteur [The Berne Convention and the Federal Copyright Act], Diss. Lausanne 1969, pp. 113 et seqq.) The overall program of a broadcasting company does not meet this requirement. Its literary and artistic value is determined solely by the value of the individual broadcasts. The television subscriber does not choose between multiple overall programs, but between different individual broadcasts.

  The plaintiff makes reference to PEDRAZZINI's paper on Switzerland for its opposing view. Juristentag 1977 (The Swiss Jurists' Conference 1977) (ZSR 96/1977 II pp. 85 et seqq.) This author considers

BGE 107 II 82 p. 88

collecting, sorting and ordering activities relating to program planning to be relevant and considers there on average to be a restrained individuality that is necessary for the type of work (p. 88.) Elsewhere, however, he himself considers such an approach to be problematic and therefore recommends a special provision in a new ancillary copyright law (p. 95/6.) The literature on the URG and the RBUe also denies that entire radio or television programs can be considered a 'work' (KUMMER, p. 47; H.R. DENZLER, Der privatrechtliche Schutz der Rundfunksendung vor gewerblicher Verwertung (Protection of Broadcasting from Commercial Exploitation Under Private Law), Dissertation Zurich 1953, pp. 74 et seqq.; J.H. MÜLLER, Die Ausgestaltung des Leistungsschutzrechts der ausübenden Künstler, der Hersteller von Tonträgern und der Sendeunternehmen in der internationalen konventionsrechtlichen Entwicklung (The Structure of Ancillary Copyright Law for Performers, Producers of Phonograms and Broadcasting Organizations Within the Development of International Convention Law), Dissertation Basel 1974, pp. 164 and 170: J. POULAIN, La protection des émissions de radiodiffusion, Paris 1963, pp. 34 et seqq.) A ruling by the Hamburg Higher Regional Court dated 1952 submitted by the plaintiff does not concern an overall program, but the sequence of transmission by an author; in this case, the situation may be different.

  The fact that the RBUe, in particular, does not protect these types of broadcast as a work or

collective work is also the result of international efforts to protect the achievements of authors via special agreements. They include the 1961 International Convention for the Protection of Performers, Producers of Phonograms and Broadcasting Organizations (Article 13) and the 1960 European Agreement on the Protection of Television Broadcasts (Article 1), both of which grant specific protection rights to broadcasting companies; only the latter, however, against cable distribution (commentary NORDEMANN/VINCK/HERTIN, Internationales Urheberrecht (International Copyright Law), Düsseldorf 1977, pp. 263 et seqq. and 366 et seqq.; J.H. MÜLLER, pp. 111 et seqq. and 160 et seqq.; PEDRAZZINI, p. 99 et seq.) By contrast to Germany (Section 87 of the German Copyright Act), Switzerland has so far not entered into either of these conventions; it also does not have a corresponding national ancillary copyright law. According to the report by the competent federal office, it is also not yet possible to foresee in which direction state law will develop. According to the applicable law, however, the plaintiff cannot rely on independent copyright for its programs.

b) National and international efforts to protect the rights of broadcasting companies to broadcast programs

BGE 107 II 82 p. 89

and to create a legal basis for this also illustrate that corresponding loopholes in copyright or ancillary copyright cannot be closed on the basis of general legal norms. In a subsidiary reasoning, the plaintiff nonetheless invokes tort, unjust enrichment, management without due authority, and unfair competition. The defendants rightly object to this. It can remain unanswered as to whether the plaintiff could assert claims for damages under **Article 62** or **Article 423 OR**; because on the basis of these provisions, the plaintiff's requests for injunctive relief cannot be justified to begin with.

The plaintiff rightly invokes tort and violation of fair practices only in the event that the defendant's actions were prohibited by copyright law; however, it cannot in this way circumvent the lack of legitimation under copyright law. Nor can it derive anything from the provision against unfair competition to protect its programs, regardless whether the necessary condition—of competition between the parties—is fulfilled.

If the defendants benefit from the contested broadcasting services without infringing upon the plaintiff's own right to the programs, this does not yet constitute an infringement of good faith as defined by **Article 1(1) UWG** (**BGE 95 II 468**, 87 II 63.) Nor is it acceptable to use the Law Against Unfair Competition (Gesetz gegen den unlauteren Wettbewerb—UWG) to close gaps in the URG (TROLLER, II pp. 1056 and 1104.) For these reasons, the literature consistently denies the possibility of resolving the dispute on the basis of general legal norms (H.J. STERN, Die Weiterverbreitung von Radio- und Fernsehsendungen (The Retransmission of Radio and Television Broadcasts), Dissertation Zurich 1970, pp. 94 et seqq.; DENZLER, pp. 79 et seqq.; POULAIN, pp. 46 et seqq.) The differing view of B. NATER (Der künstlerische Leistungsschutz (Artistic Ancillary Copyright), Dissertation Zurich 1977, pp. 70 et seqq.) does not refer to broadcasting companies. As a result, the plaintiff cannot claim copyright for its programs on these grounds either.

**4.** It is rightly not disputed, however, that the plaintiff is entitled to injunctive relief in so far as programmers, authors and artists have assigned to the plaintiff their rights to individual works (**Article 9 URG**.) As can be seen from the standard agreements submitted, the plaintiff regularly concludes such agreements and thereby acquires not only the broadcasting rights for Austria but also those (wireless or otherwise) for

BGE 107 II 82 p. 90

foreign countries. This is clearly also in line with the SRG's approach (D. STAUFFACHER, Der Sendevertrag [The Broadcasting Agreement], Dissertation Zurich 1979, in particular pp. 155 et seqq.; STERN, Dissertation p. 122.)

a) However, the defendants are not content with this, and demand concrete statements and evidence for precisely identified works so that, in particular, the question of whether the works are worthy of protection can be examined. The plaintiff deems this to be impossible by the nature of the matter. This can be confirmed. Since it is a question of banning future broadcasts, it would have to prove this in detail; this is already ruled out in view of the changing program schedule. The "legal documentation" submitted by the plaintiff, consisting in particular of agreements and broadcasting records, clearly shows how extensive such an undertaking would be, even for a single broadcasting day.

Subsequently, it is recognized that not all parts of the program are protected by copyright and that, moreover, the plaintiff does not acquire the rights for all protected works in question here. According to its estimations, on May 10, 1979, for example, which it cites as the cut-off date, it had exclusive broadcasting rights to 40% of the FS 1 program and to 97% of the FS 2 program. The extent to

which broadcasts about current affairs, weather forecasts, sporting events, etc. can be regarded as protected works is disputed, but irrelevant. On the other hand, it should be noted that the plaintiff also holds broadcasting and cable rights abroad for a substantial proportion, however only some, of its programs.

b) The dilemma this poses for the judge is clear. Either, if the action is upheld, it <u>must also prohibit</u> the defendants from assuming broadcasts that are not protected or to which the plaintiff is not entitled; or, if the action is dismissed, it must accept the infringement of rights by the defendants with respect to the remaining broadcasts. This apparently prompted the plaintiff to declare that its request would need to be reduced to the extent recognized by the court and the determination of the relevant criteria, still to be specified in the enforcement proceedings. The defendants rightly submit that the judgment itself must indicate the prohibited acts and must not leave this to the enforcement proceedings (**BGE 97 II 93** with references.) This in turn cannot be

BGE 107 II 82 p. 91

realized for the same reasons that make it impossible for the plaintiff to substantiate its claim. Nor is it in the interests of the defendants to be obligated to continually review which of the plaintiff's programs they are permitted to use and which they are not, since they have always stressed that they use the plaintiff's programs as a whole, simultaneously and unchanged. They must also accept this argument, which they use to oppose their characterization as broadcasting companies, in this context. It can therefore remain unanswered whether suppressing certain parts would even be technically possible.

In realistic terms, the judge can therefore only choose between the two extreme solutions in cases such as this one. Either it prohibits the broadcasting of the programs per se, because this is not possible in some cases without infringing the plaintiff's protective rights, or it dismisses the action because a prohibition would also prevent the broadcasting of free program parts. Both are questions of substantive law. From the point of view of intellectual property rights and the authors' rights in question here, the former must be prioritized and the latter accepted. The ORF is therefore entitled to bring an action; otherwise, the enforcement of copyright in this area would be thwarted from the outset.

**5.** The parties are mainly in dispute about whether the defendants are permitted under applicable law to transmit the plaintiff's broadcasts without its consent, in particular to the subscribers of the distribution network operated by Rediffusion in the Bern area.

**Article 12 URG** gives the author the exclusive right to broadcast its work via radio (para. 1(5)) and to communicate it to the public "wirelessly or otherwise if this communication is carried out by a broadcaster other than the original broadcasting company" (para. 6); communication of the work to the public via television is equivalent to broadcasting via radio (para. 2.) These provisions have been consciously and literally adopted by Swiss legislators from **Article 11bis (1 and 2) RBUe** (message dated October 12, 1954 on the revision of the URG, BBl 1954 II 654.) With reference to **Articles 4(1) and 68bis URG**, the plaintiff rightly considers

BGE 107 II 82 p. 92

this convention to be directly applicable in this regard. While the PTT companies appear to share this view, Rediffusion is trying to infer something different from the reservation of national legislation in **Article 11bis (2) RBUe**, but admits that Switzerland has not made use of this reservation: it also acknowledges that doctrine and case law relating to conventions are also relevant to the interpretation of **Article 12 (5 and 6) URG**. For this reason, the parties refer to the development history of the adopted norms, to foreign judgments and international efforts to interpret the convention with respect to these points and update it in line with technical developments.

(This is followed by statements in accordance with **<u>BGE 107 II 63</u>** et seqq. E. 3-6 on the interpretation of **Article 11bis(1)**

**(1 and 2) RBUe**, on their significance for national law, and on the conditions under which the author may invoke broadcasting rights as defined by **Article 12(1)(6) URG.**)

**9.** In summary, the only question in the present case is therefore whether Rediffusion, as another business as defined by **Article 12(6) URG** and **Article 11bis(2) RBUe**, is carrying out a public communication by broadcasting the plaintiff's programs in particular via its installations in the Bern area, and whether the PTT is, at the least, providing assistance in this respect and must therefore be regarded as jointly liable and also subject to a ban. It also remains to be examined whether the plaintiff is pursuing a fraudulent purpose via the prohibitions.

a) Rediffusion is a company independent of the PTT and SRG. As such, it required a new copyright

permit for the cable distribution of the broadcasts, since this type of dissemination constitues public communication pursuant to **Article 12(6) URG** and **Article 11bis(2) RBUe** for the reasons set out in **BGE 107 II 63** et seqq. E. 3-6. By acting regardless of the necessary permit, it violated the rights reserved to the authors in these provisions. The plaintiff's legal claim must therefore in principle be protected with respect to Rediffusion.

It is not necessary to rule whether the PTT companies violate copyrights in operating the directional beam network. They are jointly and severally liable under **Article 50(1) OR** for the tort if they participate in the

BGE 107 II 82 p. 93

violation of rights by Rediffusion, even if only as an accomplice. Rediffusion is only able to effectively distribute ORF programs in the Bern area using the directional beam network made available to it by the PTT companies. It is true that the URG does not have a special participation provision, such as **Article 66(d) Patent Law** *Patentgesetz*—PatG) or **Article 24(d) Trademark Protection Act (*Markenschutzgesetz*—MSchG.)** However, the special provision of **Article 60 URG** provides that joint liability of several parties is possible; this stems from the general principles referenced in **Article 44 URG**, in particular **Article 50(1) OR** (**BGE 101 II 107**, **BGE 100 II 169** E. 3b; TROLLER, II p. 1026.) The fact that the defendants may have considered their actions to be licit does not exempt them.

Rediffusion requires, as do other cable companies, a license from the PTT companies for its activities. This license expressly reserves third-party rights and stipulates that the license holder "must itself pay for any copyrights." That this has only internal significance and does not exonerate the PTT companies vis-à-vis the plaintiff has rightly not been disputed by any party. On the other hand, it cannot be argued that the PTT companies, as owner of the catalog, is liable for Rediffusion with respect to the copyright, as is claimed in the action. Finally, it is irrelevant with respect to joint liability of the PTT companies whether the fees they charge for the operation of the directional beam network cover costs; there is therefore no need to discuss this further.

b) The action must therefore also be upheld against the PTT companies insofar as they acted together with Rediffusion. The request for a restrictive injunction against the PTT companies, however, goes beyond that against the co-defendant, since they are also to be prohibited from supplying other companies that operate television systems with communal antennas in the Bern area. These appear to be the companies to whom the PTT companies filed third-party notices, some of whom intervened in the proceedings. However, what has been said for the provision to Rediffusion cannot simply be applied to these companies; according to **BGE 107 II 70** E. 5, the requirements for public communication may not apply to small installations. This means that so far as distribution would be permitted in individual cases, there could also be no question of complicity by the PTT companies. In particular, it is not clear from the arguments put forward by the plaintiff,

BGE 107 II 82 p. 94

who is under an obligation to do so, what the situation is with regard to the other companies with communal antennas in the Bern area; this is to the plaintiff's disadvantage, with the result that said companies must be exempted from the ban.

Of course, the plaintiff could demand that the provision to other companies also be prohibited if the activities of the PTT companies alone were to be regarded as copyright infringement, regardless of the size of the communal antennas in operation. This would presuppose that the directional beam network of the PTT companies is as such relevant to copyright. Whether this is true can remain unanswered, however, as the plaintiff expressly dropped its allegation of direct copyright infringement by the PTT companies. Incidentally, the result would not change either way. It is true that the PTT companies also forward ORF broadcasts as another company; they also themselves broadcast and do not merely provide reception assistance, as they believe. However, that is not decisive to the ruling. Rather, the decisive factor is public communication, which is not possible using directional beams alone but requires special reception equipment and only takes place when the broadcast is disseminated via a cable network. This in turn depends on the individual characterization, which is known only for Rediffusion, but not for the systems of other companies.

c) The defendants consider the ORF's application for a restrictive injunction to be fraudulent as the plaintiff does not have legitimate interest; it is admittedly interested in broadcasting its programs in Switzerland and wishes only to use the ban as leverage in order to obtain unreasonable remuneration. There can be no serious question of fraud. The nature of copyright is that the entitled person has an exclusive right (TROLLER, I p. 74); it is basically at this person's discretion whether they wish to prohibit or allow the use of the copyrighted work and what conditions they wish to impose. This permission is the precise means by which remuneration is secured (J.F. EGLI, Le droit de la

radiodiffusion en Suisse (Broadcasting Law in Switzerland), in ZSR 87/1968 p. 334.) Since there is an infringement of rights, neither Rediffusion nor the PTT companies are entitled to demand that the plaintiff settle for remuneration that the latter has not freely determined,

BGE 107 II 82 p. 95

but that is reasonable and subject to judicial review. This would amount to granting the defendants a statutory license at the expense of the ORF, for which there is no legal basis because Switzerland has not made use of the possibility provided for by **Article 11bis(2) RBUe**.

This also removes the ground for all objections that the PTT companies derive from the new Austrian legislation: Section 59a of said legislation expressly provides for the licensing of the wired dissemination of foreign programs.

  Only if the action is upheld are the authors able to claim the higher remuneration to which they are entitled. Whether the plaintiff alone benefits from this in the interim is, on the other hand, of less importance and, moreover, the result of the agreements it has concluded. In this respect, it cannot be said from the outset that a prohibition would disadvantage the actual authors. Nor is there a disadvantage for authors who have themselves retained the foreign broadcasting or cable rights and who, as per the defendant's presentation, would be prevented from communicating directly with them. It is not clear how this would happen in practice, as the defendants would not know of the entitled persons in due time and the latter would have little information about the retransmission of their programs.

  **10.** The plaintiff claims that the bans should be accompanied by appropriate threats of penalty for the defendants; what these threats should consist of, it does not state. In principle, restrictive injunctions are to be combined ex officio with the threat of penalty for disobedience (**Article 76(1) Federal Civil Procedure (***Bundeszivilprozess*— **BZP)**; **BGE 90 II 163**.) However, this or a similar threat proves itself to be superfluous in the present case, as it is to be expected that the parties will continue their negotiations for the time being and seek an amicable solution. For understandable reasons, the plaintiff is also not interested in enforcing the judgment as quickly as possible. If it decides to do so, the PTT companies will undoubtedly offer their support for the enforcement of the judgment, even without any threat of penalty; otherwise, enforcement is guaranteed by the fact that the Federal Council will have to enforce the judgment through administrative law (**Article 77 BZP**.) If the PTT deactivates the plaintiff's broadcasts, the judgment is thus also executed with respect to Rediffusion.

BGE 107 II 82 p. 96

Dispositif

  The Federal Supreme Court therefore recognizes:
  In partially upholding the action:
  a) the PTT companies are prohibited from transmitting the plaintiff's television programs FS 1 and FS 2 to Rediffusion AG for broadcasting to its subscribers in the Bern area without the plaintiff's consent;
  B) Rediffusion AG is prohibited from distributing the plaintiff's television programs FS 1 and FS 2 to subscribers to its broadcasting network in the Bern area without the plaintiff's consent.
  Otherwise, the action is dismissed.

Chapeau

107 II 82

12. Auszug aus dem Urteil der I. Zivilabteilung vom 20. Januar 1981 i.S. Österreichischer Rundfunk gegen Schweizerische Eidgenossenschaft (PTT-Betriebe) und Rediffusion AG (Direktprozess)

Regeste

Violation de droits d'auteur par la diffusion non autorisée d'émissions étrangères; action tendant à l'abstention d'un acte.
1. Compétence du Tribunal fédéral (consid. 1). Qualité pour défendre d'une entreprise suisse de distribution par câble et des PTT; recevabilité d'une action tendant à l'abstention d'un acte (consid. 2).
2. Qualité pour agir d'une entreprise émettrice étrangère dont les programmes ne constituent pas des recueils au sens de l'**art. 3 LDA** ni ne se fondent sur un droit d'auteur indépendant (consid. 3a); peut-on recourir aux principes généraux du droit (consid. 3b)?
3. Action de l'entreprise émettrice tendant à l'abstention d'un acte, fondée sur la cession de droits d'auteur; de quelle manière une telle action peut-elle se concrétiser, selon qu'il s'agit de partie de programmes protégées ou libres (consid. 4)?
4. Application de l'**art. 12 al. 1 ch. 6 LDA** et de l'art. 11bis al. 1 ch. 2 de la Convention de Berne pour la protection des oeuvres littéraires et artistiques à une entreprise de distribution par câble qui rediffuse des émissions étrangères par l'intermédiaire de ses installations, avec l'aide du PTT; responsabilité solidaire des PTT (consid. 5 et 9a-b). L'action est-elle abusive (consid. 9c)? Le jugement doit-il être assorti d'une menace de peines en cas de contravention (consid. 10)?

Faits à partir de page 83

BGE 107 II 82 S. 83

**A.-** Der Österreichische Rundfunk (ORF) betreibt als selbständige öffentliche Anstalt das Fernsehen in Österreich. Zu

BGE 107 II 82 S. 84

diesem Zwecke erstellte und unterhält er selbst eine Vielzahl von Sendern und Hilfssendern. Die Schweizerische Radio- und Fernsehgesellschaft (SRG) dagegen benützt Sendeanlagen, die von den PTT-Betrieben errichtet und unterhalten werden. Da mit einem starken Aufkommen des Kabelfernsehens zu rechnen war, erstellten die PTT-Betriebe seit 1976 überdies ein Richtstrahlnetz, um auch ausländische Programme an Unternehmen, die Fernsehanlagen mit Gemeinschaftsantennen betreiben, weiterleiten zu können. Das gilt namentlich für die beiden österreichischen Fernsehprogramme, die mit Empfangsanlagen auf dem Uetliberg aufgefangen und kann vom Albis mittels Richtstrahlen an die Station Ulmizberg bei Bern gesendet werden.
Die Rediffusion AG betreibt in der Schweiz zahlreiche Fernsehanlagen, die insbesondere aus einer Empfangsantenne und einem Kabelnetz bestehen. In der Region Bern versorgt sie über eine solche Anlage etwa 50'000 Abonnenten mit Sendungen. Sie vermittelt insgesamt 11 UKW-Programme sowie drei schweizerische und je zwei deutsche, österreichische und französische Fernsehprogramme, die sie alle unverändert, als Ganzes und zeitgleich an die Abonnenten weiterleitet. In der ganzen Schweiz sollen rund eine Million Abonnenten über etwa 1700 grössere oder kleinere Fernsehanlagen dieser Art versorgt werden.

**B.-** Am 23. August 1976 schrieb der ORF den PTT-Betrieben, dass er die Weiterverbreitung seiner Sendungen im Raume Bern für unrechtmässig halte, solange nicht eine entsprechende Vereinbarung mit ihm abgeschlossen werde. Die PTT verwiesen den ORF an das Kabelunternehmen. Verhandlungen mit der Rediffusion AG führten zu keinem Ergebnis; sie scheiterten teils aus grundsätzlichen, teils aus finanziellen Überlegungen. Der ORF verbot deshalb mit Schreiben vom 22. Dezember 1978 den PTT-Betrieben und

der Rediffusion AG, seine Programme in den Raum Bern weiterzusenden. Das Verbot blieb jedoch unbeachtet.

**C.-** Am 11. Mai 1979 klagte der ORF beim Bundesgericht gegen die Schweiz. Eidgenossenschaft, vertreten durch die PTT-Betriebe, sowie gegen die Rediffusion AG mit den Begehren: 1. den PTT unter geeigneter Androhung zu verbieten, die Fernsehprogramme FS 1 und FS 2 des Klägers ohne dessen Zustimmung der Rediffusion oder anderen Betrieben mit

BGE 107 II 82 S. 85

Gemeinschaftsantennen zur Verbreitung an ihre Abonnenten im Raum Bern zuzuleiten; 2. der Rediffusion in gleicher Weise zu untersagen, die Programme des Klägers ohne dessen Zustimmung über ihr Verteilnetz im Raum Bern zu verbreiten.
  Die Beklagten beantragen, die Klage abzuweisen. Die PTT verkündeten 15 Gemeinden und Kabelunternehmen den Streit; von diesen traten acht dem Prozess bei, während eine weitere Intervention abzuweisen war. Die Rediffusion verkündete ihrerseits sechs Gemeinden den Streit, die jedoch nicht intervenierten.

## Considérants

Das Bundesgericht zieht in Erwägung:

**1.** Die Klage beruht auf Urheberrecht und betrifft damit einen zivilrechtlichen Anspruch. Die Zuständigkeit des Bundesgerichts ist von allen Parteien anerkannt. Sie folgt für die PTT aus Art. 3 Abs. 3 lit. a deren Organisationsgesetzes und aus Art. 14 der dazugehörigen Verordnung; für die Rediffusion ergibt sie sich aus **Art. 41 lit. c Abs. 2 OG** in Verbindung mit der Vereinbarung der Parteien vom 21. März 1979.
  Die Rediffusion fand in ihrer Klageantwort, die Klage sei von der Hand zu weisen; sie begründete ihre Auffassung jedoch nicht. In der Folge beschränkte sie sich auf den Antrag, die Klage abzuweisen.

**2.** Beide Beklagten widersetzen sich dem Unterlassungsanspruch des Klägers vorweg mit den Einreden, dass sie nicht passivlegitimiert seien und der Anspruch genauer Angaben entbehre.
  a) Ob die Passivlegitimation zu bejahen und der Kläger gegen beide Beklagten oder nur gegen eine von ihnen vorgehen darf, beurteilt sich entgegen den Einwänden der PTT nach materiellem Recht. Aktiv- und Passivlegitimation sind nicht Bedingungen im Sinne von Prozessvoraussetzungen, von denen die Zulässigkeit der Klage abhängen würde; sie gehören vielmehr zur materiellen Begründetheit des Klagebegehrens, weshalb ihr Fehlen zur Abweisung und nicht zur Zurückweisung der Klage führt (**BGE 100 II 169** E. 3, **BGE 97 II 100**, **BGE 86 II 45** E. 4a). Wird die Passivlegitimation eines Beklagten bejaht, so heisst das zudem bloss, dass der eingeklagte Anspruch sich gegen ihn richtet; ob auch die weiteren materiellen Voraussetzungen für einen Zuspruch der Klage erfüllt seien, der Anspruch überhaupt

BGE 107 II 82 S. 86

und in dem vom Kläger behaupteten Umfang bestehe und noch klagbar sei, ist damit noch nicht entschieden.
  Die Rediffusion bestritt schon vor dem Prozess und auch im Verfahren ihre Passivlegitimation, weil nicht sie, sondern höchstens die PTT die Programme des ORF weitersendeten und sie selbst nur Empfangshilfe leiste. Ihre Passivlegitimation hängt insbesondere davon ab, ob die Rediffusion als anderes Sendeunternehmen durch öffentliche Mitteilung im Sinne von **Art. 12 Ziff. 6 URG** Urheberrechte des Klägers verletze. Diese Frage gehört zur materiellen Prüfung der Streitsache und ist daher in diesem Zusammenhang zu erörtern.
  Den PTT-Betrieben warf der Kläger vorerst ebenfalls eine unmittelbare Verletzung von Urheberrechten vor, weil sie durch ihr Richtstrahlnetz die Verteilung im Raume Bern ermöglichen und das auch beabsichtigt sei. Die PTT bestreiten diese Argumentation, da das Netz aus frequenzpolitischen und baurechtlichen Gründen errichtet worden sei; es handle sich um reine Transporthilfe ohne Beteiligung am Empfang. In der Replik schwächte der Kläger seine Behauptung dahin ab, dass eine mittelbare Rechtsverletzung und zumindest Gehilfenschaft vorliege. Aufrechterhalten bleibt somit nur der schon in der Klage erhobene Vorwurf, die PTT handelten gemeinsam mit der Rediffusion, sei es als Anstifter, Teilnehmer oder Gehilfe. Trifft dies zu, so besteht im Falle einer Urheberrechtsverletzung solidarische Haftung zwischen den Beklagten; die Passivlegitimation der PTT ist daher ebenfalls zu bejahen.
  b) Die Beklagten bestreiten zu Recht nicht, dass die Unterlassungsklage gegen Urheberrechtsverletzungen zulässig ist, obschon sie im URG anders als etwa in **Art. 2 UWG** nicht genannt wird. Die Unterlassungsklage ist sogar das am meisten und wirksamsten eingesetzte Verteidigungsmittel

im gewerblichen Rechtsschutz (TROLLER, Immaterialgüterrecht II S. 1109). Ihre Zulässigkeit folgt auch aus den allgemeinen Grundsätzen, auf die **Art. 44 URG** verweist, wenn eine Rechtsverletzung gegeben oder für die Zukunft zu befürchten ist (VON TUHR/PETER, or I S. 442). Mit einer Feststellungsklage, die zwar der Rechtslage klären, aber nicht zu einem vollstreckbaren Urteil führen würde, braucht sich der ORF nicht zu begnügen. Eine Unterlassungsklage muss genau angeben, was dem Beklagten zu verbieten ist (**BGE 93 II 59** E. 4, **BGE 84 II 457** E. 6). Die Begehren des Klägers sind insoweit nicht zu beanstanden. Dass die PTT das Gegenteil anzunehmen scheinen, hängt offensichtlich

BGE 107 II 82 S. 87

mit der Frage der Aktivlegitimation zusammen, die ebenfalls bestritten, aber gesondert zu prüfen ist. Sollte sich das Verbotsbegehren bei der materiellen Beurteilung an sich als begründet, aber als zu umfassen formuliert erweisen, so ist es im Urteil auf das zulässige Mass einzuschränken (**BGE 97 II 93** mit Hinweisen; TROLLER, II S. 1110); das ist so oder anders kein Grund, auf die Begehren des Klägers nicht einzutreten.

  **3.** Dass der Kläger Urheberrechte geltend machen kann, die ihm abgetreten worden sind, ist unbestritten. Wegen der damit verbundenen rechtlichen und praktischen Schwierigkeiten stützt er seine Aktivlegitimation seit dem zweiten Schriftenwechsel in erster Linie auf das Urheberrecht, das ihm als Sendeunternehmen oder gestützt auf die Abtretung durch die Verantwortlichen am Gesamtprogramm zustehe. Seine Fernsehsendungen seien als solche wegen der Auswahl und Anordnung des Stoffes geistige Schöpfungen und jedenfalls als Sammelwerke im Sinne von **Art. 3 URG** und Art. 2 Abs. 3 der Berner Übereinkunft zum Schutze von Werken der Literatur und Kunst (RBUe) gemäss der am 26. Juni 1948 in Brüssel revidierten Fassung (AS 1955 S. 1092 ff.) geschützt. Die Beklagten bestreiten den Werkcharakter der Gesamtprogramme, weil es sich nicht um eine geschlossene Einheit handle, der künstlerische Individualität zukomme. Zwar kenne eine einzelne Sendung als Sammelwerk geschützt sein, nicht aber ein Tagesprogramm als Ganzes, in dem sich die einzelnen Sendungen beziehungslos aneinanderreihten; noch weniger könne vom Schutz eines Gesamtprogramms die Rede sein.
  a) Von einem schutzwürdigen Sammelwerk gemäss RBUe und URG kann erst gesprochen werden, wenn es als geistige Individualität mehr und anderes darstellt als die blosse Summe der Einzelwerke (TROLLER, I S. 477; KUMMER, Das urheberrechtlich schützbare Werk, S. 43 ff. und 139; F. CURCHOD, La Convention de Berne et la loi fédérale sur le droit d'auteur, Diss. Lausanne 1969, S. 113 ff.). Das Gesamtprogramm eines Sendeunternehmens genügt dieser Anforderung nicht. Sein literarisch künstlerischer Wert wird ausschliesslich durch den Wert der einzelnen Sendungen bestimmt. Der Fernsehabonnent wählt denn auch nicht zwischen mehreren Gesamtprogrammen, sondern zwischen verschiedenen Einzelsendungen.
  Der Kläger beruft sich für seine gegenteilige Auffassung auf das Referat von PEDRAZZINI am Schweiz. Juristentag 1977 (ZSR 96/1977 II S. 85 ff.). Dieser Autor hält die sammelnde,

BGE 107 II 82 S. 88

sichtende und ordnende Tätigkeit der Programmgestaltung für relevant und die für den Werkcharakter erforderliche bescheidene Individualität im Durchschnitt für gegeben (S. 88). An anderer Stelle erachtet er ein solches Vorgehen jedoch selber für problematisch und befürwortet daher eine Sonderregelung in einem neuen Leistungsschutzgesetz (S. 95/6). Im Schrifttum zum URG und zur RBUe wird der Werkcharakter ganzer Radio- oder Fernsehprogramme ebenfalls verneint (KUMMER, S. 47; H.R. DENZLER, Der privatrechtliche Schutz der Rundfunksendung vor gewerblicher Verwertung, Diss. Zürich 1953, S. 74 ff.; J.H. MÜLLER, Die Ausgestaltung des Leistungsschutzrechts der ausübenden Künstler, der Hersteller von Tonträgern und der Sendeunternehmen in der internationalen konventionsrechtlichen Entwicklung, Diss. Basel 1974, S. 164 und 170: J. POULAIN, La protection des émissions de radiodiffusion, Paris 1963, S. 34 ff.). Ein vom Kläger eingelegter Entscheid des Oberlandesgerichts Hamburg von 1952 betrifft kein Gesamtprogramm, sondern die Sendefolge eines einzelnen Autors; diesfalls kann es sich anders verhalten.
  Dass namentlich die RBUe derartige Sendungen nicht als Werk oder Sammelwerk schützt, ergibt sich ferner aus den internationalen Bemühungen, die Leistungen der Urheber durch besondere Abkommen zu schützen. Dazu gehören das Internationale Abkommen über den Schutz der Ausübenden Künstler, der Hersteller von Tonträgern und der Sendeunternehmen von 1961 (Art. 13) und das Europäische Abkommen zum Schutz von Fernsehsendungen von 1960 (Art. 1), die beide den Sendeunternehmen eigene Schutzrechte einräumen, gegen Kabelverbreitung allerdings nur das zweitgenannte (Kommentar NORDEMANN/VINCK/HERTIN, Internationales Urheberrecht, Düsseldorf 1977, S. 263 ff. und 366 ff.; J.H. MÜLLER, S. 111 ff. und 160 ff.; PEDRAZZINI, S. 99 f.). Im Unterschied zu Deutschland (§ 87 des deutschen URG) ist die Schweiz bisher weder dem einen noch dem andern dieser Abkommen beigetreten; sie besitzt auch kein entsprechendes nationales Leistungsschutzgesetz. Nach dem Bericht des

zuständigen Bundesamtes ist auch noch nicht abzusehen, in welcher Richtung sich das Landesrecht entwickeln wird. Gemäss dem geltenden Gesetz kann der Kläger sich für seine Programme aber nicht auf ein selbständiges Urheberrecht berufen.

b) Die nationalen und internationalen Bemühungen, die Rechte der Sendeunternehmen an den Sendungen zu schützen

BGE 107 II 82 S. 89

und dafür eine Grundlage zu schaffen, zeigen ferner, dass entsprechende Lücken im Urheberrecht oder im Leistungsschutz sich nicht gestützt auf allgemeine Rechtsnormen schliessen lassen. In einer Eventualbegründung beruft der Kläger sich gleichwohl auf unerlaubte Handlung, ungerechtfertigte Bereicherung, Geschäftsführung ohne Auftrag und unlauteren Wettbewerb. Die Beklagten widersprechen dem zu Recht. Es kann offen bleiben, ob der Kläger aus Art. 62 oder **Art. 423 OR** Ersatzansprüche geltend machen könnte; denn mit diesen Bestimmungen lassen sich die Unterlassungsbegehren des Klägers zum vorneherein nicht begründen.

Auf unerlaubte Handlung und Verstoss gegen die gute Sitte beruft sich der Kläger zu Recht nur für den Fall, dass das Vorgehen der Beklagten urheberrechtlich verboten wäre; er kann das Fehlen der urheberrechtlichen Legitimation jedoch nicht auf diese Weise umgehen. Ebensowenig kann er aus den Vorschriften gegen den unlauteren Wettbewerb etwas für den Schutz seiner Programme ableiten, gleichviel ob die dafür notwendige Voraussetzung, dass die Parteien miteinander im Wettbewerb stehen, erfüllt sei. Wenn die Beklagten von den streitigen Sendeleistungen profitieren, ohne dabei eigene Rechte des Klägers an den Sendungen zu verletzen, bedeutet das noch nicht einen Verstoss gegen Treu und Glauben im Sinne von **Art. 1 Abs. 1 UWG** (**BGE 95 II 468**, 87 II 63). Es geht auch nicht an, über das UWG Lücken im URG schliessen zu wollen (TROLLER, II S. 1056 und 1104). Aus diesen Gründen wird im Schrifttum die Möglichkeit, die Streitfrage gestützt auf allgemeine Rechtsnormen zu lösen, denn auch durchweges verneint (H.J. STERN, Die Weiterverbreitung von Radio- und Fernsehsendungen, Diss. Zürich 1970, S. 94 ff.; DENZLER, S. 79 ff.; POULAIN, S. 46 ff.). Die davon abweichende Auffassung von B. NATER (Der künstlerische Leistungsschutz, Diss. Zürich 1977, S. 70 ff.) bezieht sich nicht auf Sendeunternehmen. einen Schutz seiner Programme kann der Kläger daher auch unter diesen Gesichtspunkten nicht beanspruchen.

**4.** Zu Recht nicht bestritten ist dagegen, dass dem Kläger insoweit ein Unterlassungsanspruch zusteht, als Programmschaffende, Autoren und Künstler ihm Rechte an einzelnen Werken abgetreten haben (**Art. 9 URG**). Wie aus den vorgelegten Formularverträgen erhellt, schliesst der Kläger regelmässig solche Verträge und erwirbt dadurch ausser den Senderechten für Österreich auch jene mit oder ohne Draht für

BGE 107 II 82 S. 90

das Ausland. Das entspricht offenbar auch dem Vorgehen der SRG (D. STAUFFACHER, Der Sendevertrag, Diss. Zürich 1979, insbesondere S. 155 ff.; STERN, Diss. S. 122).

a) Die Beklagten wollen sich damit aber nicht begnügen, sondern verlangen konkrete Behauptungen und Beweise für genau zu bezeichnende Werke, damit namentlich auch die Frage der Schutzwürdigkeit überprüft werden könne. Der Kläger hält dies nach der Natur der Sache für unmöglich. Dem ist beizupflichten. Da es um das Verbot künftiger Sendungen geht, müsste er diese im einzelnen nachweisen; das ist schon angesichts des wechselnden Programmangebots ausgeschlossen. Die vom Kläger vorgelegte "Rechtsdokumentation", die namentlich aus Verträgen und Sendeprotokollen besteht, zeigt deutlich, wie umfangreich ein solches Unterfangen schon für einen einzigen Sendetag ist.

Anerkannt ist sodann, dass nicht alle Programmteile urheberrechtlich geschützt sind und dass der Kläger zudem nicht von allen geschützten Werke die Rechte erwirbt, die hier interessieren. Nach seiner Ermittlung standen ihm z.B. am 10. Mai 1979, den er als Stichtag anführt, an 40% des Programms FS 1 und an 97% des Programms FS 2 ausschliessliche Senderechte zu. Wieweit Sendungen über das Tagesgeschehen, die Wettervoraussage, Sportveranstaltungen usw. als geschützte Werke anzusehen sind, ist umstritten, jedoch unerheblich. Festzuhalten ist dagegen, dass der Kläger hinsichtlich eines erheblichen, aber eben nur eines Teils seiner Programme über die Sende- und Kabelrechte auch im Ausland verfügt.

b) Das Dilemma, das sich daraus für den Richter ergibt, ist offensichtlich. Entweder hat er bei Gutheissung der Klage den Beklagten auch die Übernahme von Sendungen zu untersagen, die nicht geschützt sind oder an denen nicht der Kläger berechtigt ist, oder er hat bei Abweisung der Klage die Rechtsverletzung durch die Beklagten hinsichtlich der übrigen Sendungen hinzunehmen. Das bewog den Kläger offenbar zur Erklärung, sein Begehren sei eventuell auf den gerichtlich anerkannten Umfang und die Bestimmung der massgebenden Kriterien, die noch in der Vollstreckung konkretisiert werden könnten, zu reduzieren. Dem halten die Beklagten mit Recht entgegen, dass das Urteil die verbotenen Handlungen

selbst anzugeben hat und das nicht dem Vollstreckungsverfahren überlassen darf (**BGE 97 II 93** mit Hinweisen). Dies wiederum ist aus den

BGE 107 II 82 S. 91

gleichen Gründen nicht zu verwirklichen, die dem Kläger eine Konkretisierung seines Anspruchs verunmöglichen. Es entspräche auch nicht den Interessen der Beklagten, dass sie fortlaufend zu prüfen hätten, welche Sendungen des Klägers sie übernehmen dürften und welche nicht, betonten sie doch stets, dass sie die Programme des Klägers als Ganzes, zeitgleich und unverändert übernähmen. Sie müssen sich dieses Argument, mit dem sie sich gegen die Charakterisierung als Sendeunternehmen wehren, auch in diesem Zusammenhang entgegenhalten lassen. Es kann daher offen bleiben, ob ein Ausblenden von Teilen technisch überhaupt möglich wäre.

Bei realistischer Betrachtung kann der Richter somit in Fällen wie hier nur zwischen den beiden Extremlösungen wählen. Entweder verbietet er die Übernahme der Sendungen schlechthin, weil sie in Teilbereichen nicht ohne Verletzung klägerischer Schutzrechte möglich ist, oder er weist die Klage ab, weil ein Verbot auch die Übernahme freier Programmteile verhindern würde. Beides sind Fragen des materiellen Rechts. Aus der Sicht des Immaterialgüterrechts und der hier im Vordergrund stehenden Autorenrechte muss ersteres vorgezogen und letzteres in Kauf genommen werden. Die Klageberechtigung des ORF ist daher zu bejahen, da eine Durchsetzung des Urheberrechts in diesem Bereiche sonst zum vorneherein vereitelt würde.

**5.** Die Parteien streiten sich hauptsächlich darüber, ob die Beklagten nach dem geltenden Recht die Sendungen des Klägers ohne dessen Zustimmung insbesondere den Abonnenten des Verteilnetzes, das die Rediffusion im Raum Bern betreibt, zuleiten dürfen.

**Art. 12 URG** sichert dem Urheber das ausschliessliche Recht, sein Werk durch Rundfunk zu senden (Abs. 1 Ziff. 5) und es zudem "mit oder ohne Draht öffentlich mitzuteilen, wenn diese Mitteilung von einem anderen als dem ursprünglichen Sendeunternehmen vorgenommen wird" (Ziff. 6); die öffentliche Mitteilung des Werkes durch eine Fernsehsendung ist der Rundfunksendung gleichgestellt (Abs. 2). Diese Bestimmungen sind vom schweizerischen Gesetzgeber bewusst und wörtlich aus **Art. 11bis Ziff. 1 und 2 RBUe** übernommen worden (Botschaft vom 12. Oktober 1954 zur Revision des URG, BBl 1954 II 654). Der Kläger hält dieses Abkommen hier unter Hinweis auf dessen **Art. 4 Abs. 1 und Art. 68bis URG** zu Recht

BGE 107 II 82 S. 92

für unmittelbar anwendbar. Während die PTT diese Ansicht offenbar teilen, versucht die Rediffusion aus dem Vorbehalt der nationalen Gesetzgebung in **Art. 11bis Abs. 2 RBUe** etwas Abweichendes abzuleiten, räumt aber ein, dass die Schweiz von diesem Vorbehalt keinen Gebrauch gemacht hat: sie anerkennt ferner, dass Lehre und Rechtsprechung zum Abkommen auch für die Auslegung von **Art. 12 Ziff. 5 und 6 URG** von Bedeutung sind. Deswegen berufen die Parteien sich denn auch auf die Entstehungsgeschichte der übernommenen Normen, auf ausländische Urteile und internationale Bemühungen, das Abkommen in diesen Punkten auszulegen und der technischen Entwicklung gemäss fortzubilden.

(Es folgen Ausführungen gemäss **BGE 107 II 63** ff. E. 3-6 über die Auslegung von **Art. 11bis Abs. 1 Ziff. 1 und 2 RBUe**, über deren Bedeutung für das Landesrecht sowie über die Voraussetzungen, unter denen der Urheber sich auf Senderechte im Sinne von **Art. 12 Abs. 1 Ziff. 6 URG** berufen kann.)

**9.** Zusammenfassend kann sich im vorliegenden Fall somit bloss fragen, ob die Rediffusion als ein anderes Unternehmen im Sinne von **Art. 12 Ziff. 6 URG** und **Art. 11bis Ziff. 2 RBUe** eine öffentliche Mitteilung vornehme, indem sie im Raume Bern insbesondere Sendungen des Klägers über ihre Anlagen verbreitet, und ob die PTT ihr dabei zumindest Hilfe leisten, deswegen als mitverantwortlich anzusehen sind und sich ebenfalls ein Verbot gefallen lassen müssen. Zu prüfen bleibt ferner, ob der Kläger mit den Verboten einen missbräuchlichen Zweck verfolge.

a) Die Rediffusion ist ein von den PTT und der SRG unabhängiges Unternehmen. Als solches bedurfte sie für die Kabelverbreitung der Sendungen einer neuen Urhebererlaubnis, da eine solche Verbreitung aus den in **BGE 107 II 63** ff. E. 3-6 angeführten Gründen eine öffentliche Mitteilung gemäss **Art. 12 Ziff. 6 URG** und **Art. 11bis Ziff. 2 RBUe** darstellt. Indem sie unbekümmert um die nötige Erlaubnis handelte, verletzte sie die den Urhebern in diesen Bestimmungen vorbehaltenen Rechte. Das Rechtsbegehren des Klägers ist ihr gegenüber daher grundsätzlich zu schützen.

Ob die PTT durch den Betrieb ihres Richtstrahlnetzes an sich schon Urheberrechte verletzen, braucht nicht entschieden zu werden. Sie haften aus **Art. 50 Abs. 1 OR** solidarisch für die unerlaubte Handlung, wenn sie auch nur als Gehilfe an der

BGE 107 II 82 S. 93

Rechtsverletzung der Rediffusion teilhaben. Diese Voraussetzung ist erfüllt; die Rediffusion kann die ORF-Sendungen im Raum Bern nur mit Hilfe des Richtstrahlnetzes, das ihr die PTT zur Verfügung halten, gleichwertig verbreiten. Das URG kennt zwar keine besondere Teilnahmevorschrift wie etwa **Art. 66 lit. d PatG** oder **Art. 24 lit. d MSchG**. Die Sonderregelung von **Art. 60 URG** setzt eine gemeinsame Haftung mehrerer aber als möglich voraus, und diese ergibt sich nach der Verweisung in **Art. 44 URG** aus allgemeinen Grundsätzen, insbesondere aus **Art. 50 Abs. 1 OR** (**BGE 101 II 107**, **BGE 100 II 169** E. 3b; TROLLER, II S. 1026). Dass die Beklagten ihr Vorgehen möglicherweise für rechtmässig gehalten haben, befreit sie nicht.

Die Rediffusion bedarf wie andere Kabelunternehmen für ihre Tätigkeit einer Konzession der PTT. Diese Konzession behält Drittrechte ausdrücklich vor und bestimmt, dass die Konzessionärin "allfällige Urheberrechte selber abzugelten hat". Dass dies lediglich interne Bedeutung hat und die PTT dem Kläger gegenüber nicht entlastet, ist zu Recht von keiner Seite bestritten worden. Dagegen lässt sich nicht sagen, dass die PTT schon als Inhaberin des Regals für die Beachtung der Urheberrechte durch die Rediffusion einzustehen hätten, wie in der Klage behauptet wird. Unerheblich für die Mitverantwortung der PTT ist schliesslich, ob die von ihr erhobenen Gebühren für den Betrieb des Richtstrahlnetzes kostendeckend sind, weshalb darauf nicht näher einzutreten ist.

b) Die Klage ist daher auch gegenüber den PTT gutzuheissen, soweit diese zusammen mit der Rediffusion gehandelt haben. Das Unterlassungsbegehren gegen die PTT geht allerdings über jenes gegen die Mitbeklagte hinaus, da ihnen auch die Versorgung der anderen Unternehmen, die im Raum Bern Fernsehanlagen mit Gemeinschaftsantennen betreiben, verboten werden soll. Es handelt sich dabei offenbar um die Unternehmen, denen die PTT den Streit verkündet haben und die teilweise dem Prozess beigetreten sind. Das für die Versorgung der Rediffusion Gesagte lässt sich indes nicht ohne weiteres auf diese Unternehmen übertragen, weil nach **BGE 107 II 70** E. 5 bei kleinen Anlagen das Erfordernis der öffentlichen Mitteilung fehlen kann. Soweit danach im Einzelfall die Verbreitung erlaubt wäre, könnte auch nicht von einer Gehilfenschaft der PTT die Rede sein. Wie es sich damit bei den anderen Unternehmen

BGE 107 II 82 S. 94

mit Gemeinschaftsantennen im Raume Bern verhält, ist insbesondere den Vorbringen des Klägers, der dafür behauptungspflichtig ist, nicht zu entnehmen; das wirkt sich zu seinem Nachteil aus mit der Folge, dass diese Unternehmen vom Verbot auszunehmen sind.

Freilich könnte der Kläger verlangen, dass auch die Versorgung von weiteren Unternehmen verboten wird, wenn die Tätigkeit der PTT schon für sich allein, unbekümmert um die Grösse der angeschlossenen Gemeinschaftsantennen als Urheberrechtsverletzung anzusehen wäre. Das würde voraussetzen, dass das Richtstrahlnetz der PTT als solches urheberrechtlich relevant ist. Ob das zutrifft, kann aber offen bleiben, da der Kläger den Vorwurf einer unmittelbaren Urheberrechtsverletzung durch die PTT ausdrücklich fallenliess. Am Ergebnis würde sich übrigens so oder anders nichts ändern. Zwar leiten auch die PTT die ORF-Sendungen als anderes Unternehmen weiter; sie senden sogar und leisten nicht blosse Empfangshilfe, wie sie meinen. Das ist aber nicht entscheidend. Massgebend ist vielmehr die öffentliche Mitteilung, die mit Richtstrahlen allein nicht möglich ist, sondern eine besondere Empfangsanlage erfordert und erst durch die Verbreitung der Sendung über ein Kabelnetz stattfindet. Dafür ist wiederum die individuelle Charakterisierung massgebend, die nur für die Rediffusion, nicht aber für die Anlagen anderer Unternehmen bekannt ist.

c) Die Beklagten halten die Unterlassungsklage des ORF für missbräuchlich, weil dem Kläger ein schutzwürdiges Interesse fehle; er sei zugegebenermassen an einer Verbreitung seiner Programme in der Schweiz interessiert und wolle das Verbot nur als Druckmittel zur Erlangung unangemessener Vergütungen einsetzen. Von Missbrauch kann im Ernst indes keine Rede sein. Das Wesen des Urheberrechts besteht darin, dass der berechtigte einen ausschliesslichen Anspruch hat (TROLLER, I S. 74); es steht grundsätzlich in seinem Belieben, ob er die Benützung seines Werkes untersagen oder ob er sie erlaube und welche Bedingungen er dafür stellen will. Die Erlaubnis ist geradezu das Mittel, um sich eine Vergütung zu sichern (J.F. EGLI, Le droit de la radiodiffusion en Suisse, in ZSR 87/1968 S. 334). Da eine Rechtsverletzung vorliegt, haben weder die Rediffusion noch die PTT einen Anspruch darauf, dass der Kläger sich mit einer nicht frei von ihm festgesetzten,

BGE 107 II 82 S. 95

sondern angemessenen und gerichtlich zu überprüfenden Vergütung abfindet. Das liefe darauf hinaus, den Beklagten zulasten des ORF eine gesetzliche Lizenz zu erteilen, für die jede Rechtsgrundlage fehlt, weil die Schweiz von der in **Art. 11bis Abs. 2 RBUe** gebotenen Möglichkeit keinen Gebrauch gemacht hat. Damit ist auch allen Einwänden der Boden entzogen, welche die PTT der neuen österreichischen Gesetzgebung entnehmen: diese sieht für die Drahtverbreitung ausländischer Sendungen in § 59a ausdrücklich eine Lizenz vor.

Nur die Gutheissung der Klage ermöglicht den Urhebern, die ihnen zustehenden höheren Vergütungen zu beanspruchen. Ob in einer Zwischenphase der Kläger allein davon profitiert, ist demgegenüber weniger von Belang und zudem die Folge der von ihm abgeschlossenen Verträge. Insoweit kann im vornherein nicht gesagt werden, durch ein Verbot würden die eigentlichen Urheber benachteiligt. Eine Benachteiligung ergibt sich auch nicht für Autoren, welche die ausländischen Sende- oder Kabelrechte für sich zurückbehalten haben und nach der Darstellung der Beklagten gehindert würden, sich direkt mit ihnen zu verständigen. Wie das praktisch vor sich gehen sollte, ist unerfindlich, da die Beklagten die Berechtigten nicht rechtzeitig kennen und diese von der Weiterverbreitung kaum etwas erfahren werden.

**10.** Der Kläger beantragt, die Verbote an die Beklagten mit geeigneten Androhungen zu versehen; worin diese bestehen sollen, sagt er nicht. Grundsätzlich sind Unterlassungsurteile von Amtes wegen mit der Androhung von Ungehorsamstrafe zu verbinden (**Art. 76 Abs. 1 BZP**; **BGE 90 II 163**). Eine solche oder ähnliche Androhung erweist sich vorliegend jedoch für überflüssig, da zu erwarten ist, dass die Parteien vorerst ihre Verhandlungen weiterführen und eine gütliche Lösung suchen werden. Auch der Kläger ist aus verständlichen Gründen nicht daran interessiert, das Urteil möglichst rasch durchzusetzen. Entschliesst er sich dazu, werden die PTT zu dessen Vollstreckung zweifellos auch ohne Androhung Hand bieten; andernfalls ist der Vollzug schon dadurch sichergestellt, dass der Bundesrat das Urteil verwaltungsrechtlich zu vollstrecken hat (**Art. 77 BZP**). Schalten die PTT die Sendungen des Klägers ab, so ist damit das Urteil auch der Rediffusion gegenüber vollzogen.

BGE 107 II 82 S. 96

Dispositif

Demnach erkennt das Bundesgericht:
In teilweiser Gutheissung der Klage wird:
a) den PTT verboten, die Fernsehsendungen FS 1 und FS 2 des Klägers ohne dessen Zustimmung der Rediffusion AG zur Verbreitung an deren Abonnenten im Raum Bern zuzuleiten;
b) der Rediffusion AG verboten, die Fernsehsendungen FS 1 und FS 2 des Klägers ohne dessen Zustimmung an die Abonnenten ihres Verteilnetzes im Raum Bern zu verbreiten.
Im übrigen wird die Klage abgewiesen.