UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
KASHEF, et al.,

                               Plaintiffs,

              -against-

BNP PARIBAS S.A., et al.,

                               Defendants.
-----------------------------------------------------------------X

**ORDER**

**16-CV-3228 (AKH) (JW)**

**JENNIFER E. WILLIS, United States Magistrate Judge:**

       Before the Court are several outstanding discovery disputes regarding (1) the de-pseudonymization of certain documents; (2) the production of correspondence between Defendants and the DOJ discussing said pseudonymization; and (3) the production of certain documents produced to the DOJ during the course of that agency's investigation of Defendants, over which Defendants now assert a combination of the attorney-client privilege and the work product privilege. The Court DENIES Plaintiffs' motions to compel the de-pseudonymization, as well as the production of correspondence with the DOJ regarding that pseudonymization, but GRANTS Plaintiffs' motions to compel the production of documents produced to the DOJ.

## BACKGROUND

       Plaintiffs are victims of the genocide in Sudan, alleging that the French and American branches of BNP Paribas ("BNPP" or "Defendants") effectively facilitated the genocide by processing financial transactions on behalf of Sudanese entities in violation of U.S. sanctions. Some years ago, a criminal case was pursued by the U.S.

Department of Justice ("DOJ") and the N.Y. District Attorney's Office ("DANY"), and in 2014 BNPP pled guilty to the violations of sanctions. This civil case was brought in 2016, with Plaintiffs seeking recovery for damages they suffered in the course of the genocide.

The immediate issue before the Court consists of several discovery disputes that have arisen between the parties, as initially raised in a series of letter motions to the Court. The first letter motion, filed on December 1, 2021, concerned certain documents which BNPP had produced, albeit in a heavily redacted and pseudonymized form. See Plaintiffs' Letter Motion dated December 1, 2021 (Dkt. No. 258) ("December 1 Letter"). These 37 documents were produced to the DOJ during its criminal investigation. Id. In the December 1 Letter, Plaintiffs moved to compel Defendants to investigate and disclose the identities of pseudonymized persons in the documents, to produce the key to the pseudonymization, and to produce correspondence with the DOJ regarding redactions and pseudonymization during that initial production. Id.

Plaintiffs' second and third letter motions concerned documents that were produced to the DOJ, but that have not been produced to Plaintiffs. See Plaintiffs' Letter Motion dated January 5, 2022 (Dkt. No. 271) ("January 5 Letter"); Plaintiffs' Letter Motion dated March 14, 2022 (Dkt. No. 300) ("March 14 Letter"). Defendants have asserted some combination of attorney-client privilege or the work-product privilege over these documents. Id. For the seven documents at issue in the January 5 Letter, Plaintiffs argued that (1) the privilege had been waived in the course of the

production of the documents to the government; (2) the documents contained relevant and inaccessible fact work product; and/or (3) the crime-fraud exception to the privilege applied. See generally Jan. 5 Letter. The Mar. 14 Letter regarded another ten documents, which Plaintiffs similarly claim had suffered a waiver of privilege, may or may not have constituted work product, and/or were relevant and inaccessible fact work product. See generally Mar. 14 Letter. A hearing on these letter motions was held on March 28, 2022, and a schedule was set for further briefing.

Defendants filed their Opposition to the Letter Motions on April 8, 2022. Dkt. No. 317 ("Opp."). Plaintiffs filed their Reply on May 2, 2022. Dkt. No. 331 ("Reply"). A subsequent hearing was held on May 11, 2022 (the "May 11 Hearing"). This decision follows.

## DISCUSSION

### I. De-Pseudonymization of the French and Swiss Documents.

In the original production to the DOJ during the precedent criminal investigation, Defendants pseudonymized the identities of various entities, employees, and bank clients when producing documents. In producing those documents to Plaintiffs, Defendants maintained the same pseudonymization used previously. Plaintiffs now seek to have Defendants de-pseudonymize those documents.

Plaintiffs argue that the pseudonyms prevent them from carrying out discovery over witnesses who would have relevant knowledge of information related to the claims and defenses in this case. Reply at 2. Defendants state that the

pseudonyms are necessary for them to remain in compliance with French, Swiss, and European laws. Opp. at 6. Both parties submitted supplemental briefing on the issue, including expert reports from individuals with knowledge of the foreign legal regimes implicated in this question.

To begin any analysis of whether foreign law stands as a bar to discovery, the party opposing production bears "the burden of proving what that law is and demonstrating why it impedes production." S.E.C. v. Gibraltar Glob. Secs., Inc., No. 13-cv-2575 (GBD) (JCF), 2015 WL 1514746 at *2 (S.D.N.Y. Apr. 1, 2015) (collecting cases). If a conflict is found, the Court must then perform a comity analysis using several factors. Five of those factors come from the U.S. Supreme Court's decision in Société Nationale Industrielle Aérospatiale v. U.S. District Court for the Southern District of Iowa, 482 U.S. 522 (1987):

> "(1) The importance to the . . . litigation of the documents or other information requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of securing the information; and (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located." Id. at 544 n. 28.

In First Am. Corp. v. Price Waterhouse LLP, 154 F.3d 16 (2d Cir. 1998), the Second Circuit identified two other considerations to be factored into the comity query:

> "[T]he hardship that compliance would impose on the party or witness from whom discovery is sought" and (7) "the good faith of the party resisting discovery." Id. at 22.

Generally, the most important factors are "the competing interests of the countries involved and the hardship imposed by compliance." In re Commodity Exch., Inc.,

4

Nos. 14-md-2548 (VEC) and 14-mc-2548 (VEC), 2019 WL 1988525, at *2 (S.D.N.Y. May 6, 2019) (quoting Minpeco, S.A. v. Conticommodity Servs., Inc., 116 F.R.D. 517, 522 (S.D.N.Y. 1987)).

**A. Conflict with Foreign Law.**

Defendants have identified six foreign laws that, they allege, prevent the discovery Plaintiffs are now seeking. These laws are: (1) the French Bank Secrecy Law; (2) the French Evidence Law; (3) the General Data Protection Regulation ("GDPR"); (4) the Swiss Bank Secrecy Law; (5) the Swiss Consolidated Supervision Law; and 6) the Swiss Economic Espionage Law. Defendants further suggest that the proper means by which Plaintiffs should seek this information is via the mechanisms established in the Convention of March 18, 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters ("Hague Convention"). In support of their argument Defendants submitted declarations from Professor Noëlle Lenoir (Dkt. No. 319) ("Lenoir Decl."), an expert on French and European law, as well as from Professor Luc Thévenoz (Dkt. No. 320) ("Thévenoz Decl."), an expert on Swiss banking and finance law. In response, Plaintiffs submitted declarations from French attorney William Bourdon (Dkt. No. 332) ("Bourdon Decl."), and Professor Alexandre Richa, a Swiss attorney with expertise in U.S. discovery in Switzerland (Dkt. No. 333) ("Richa Decl.").

At the May 11 Hearing the parties both agreed that Swiss law was no longer applicable to this particular question. See May 11 H'ng Tr. at 6:18-25; 20:6-10. As such, the Court will examine French and European law for any conflict.

5

*i.   French Law*

Defendants have adequately demonstrated a conflict with the French laws at issue in this case. Plaintiffs' Reply only briefly touches on the question of whether French law bars disclosure here, citing to a single email that they allege admits that the bank secrecy law is inapplicable. Defendants present a compelling argument, however, that French law does apply here. The French Bank Secrecy Law protects data held by French banks including customer lists and other information connected to a customer's identity. See In re Commodity Exch., 2019 WL 1988525, at *2. As the information sought by Plaintiffs is this very customer data, there is a conflict between U.S. discovery law and the French law. Furthermore, the French blocking statute places limits on the taking of foreign discovery in France. Lenoir Decl. ¶¶20–29. Plaintiffs have not rebutted the applicability of French law in these circumstances, and as such Defendants have met their burden.

*ii.   European Law*

The GDPR is a landmark data privacy law enacted by the European Union in 2016. Plaintiffs argue that the GDPR "expressly allows disclosure of the information at the center of this motion," as the GDPR does not apply where "the transfer [of information] is necessary for the establishment, exercise or defence of legal claims." Reply at 5. However, this exception to the GDPR's provisions does not give carte blanche to American-style discovery. Federal Rule of Civil Procedure 26 states that discovery is allowed to the extent that it is relevant, and "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). As noted, however, the GDPR requires further

6

consideration of *necessity* along with the two concepts already contemplated in the Federal Rules. See Lenoir Decl. ¶¶ 77-78. Thus, a conflict exists, as the GDPR places a further analytical requirement on the production of data that is not contemplated in the U.S. discovery regime.

**B. The Comity Analysis.**

Since Defendants have demonstrated the existence of a conflict, the Court must then turn to a comity analysis. As discussed more fully below, the comity analysis weighs against de-pseudonymization.

The first three factors, as listed above, weigh against compulsion. Plaintiffs have not shown that the wholesale unmasking of the identities of the pseudonymized individuals and entities is important to their case. See In re Commodity Exch., 2019 WL 1988525 at *7 (finding that the de-pseudonymization of all identities, most irrelevant to the case, was too burdensome, and instructing Plaintiffs to proceed via specific requests). In particular, Defendants have already conceded that they will provide the pseudonyms for any deponents. Opp. at 17–18 ("Although Plaintiffs may require certain employees to be de-pseudonymized in order to seek to depose them, that does not support unmasking the names of hundreds of individuals in the Government Productions."). As such, Plaintiffs will be provided with targeted de-pseudonymization to the extent that it is actually necessary for their case. As for specificity, Plaintiffs have not clearly articulated for what they are asking. During the May 11 Hearing, Plaintiffs listed more than one hundred entities or persons, split into several categories, which they would like unredacted. Plaintiffs did not

articulate a clear reason why all those identities are important to their action, and instead rely upon generalizations. Factor three similarly weighs against compulsion, as the documents did not originate in the United States.

Of the seven factors, this proceeding turns most on factors five and six: namely, "the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located" and "the hardship that compliance would impose on the party or witness from whom discovery is sought."

Factor five warrants further discussion, though ultimately it also weighs in Defendants' favor. Here there are two questions: (1) is there a United States interest that would be undermined in the case of noncompliance, and (2) what is the French and European interest in compliance. The United States does have an "interest in the application of federal law to discovery in its courts." See In re Commodity Exch., 2019 WL 1988525 at *5. The United States also has an interest in the pursuit of justice for victims of genocide. United States v. BNP Paribas S.A., No. 14-cv-460, H'ng Tr. at 9:10–14 (S.D.N.Y. May 1, 2015). However, that interest is limited by whether the pseudonymized information is "actually material to Plaintiffs' efforts" to pursue their remedy, and "whether that information can be obtained through alternative means." Id. In contrast, France and the European Union have demonstrated a strong interest in data privacy, and concurrently have an interest in having their laws apply to banks operating within their borders. See Lenoir Decl. at

8

¶ 54 ("The rights to privacy and data protection are fundamental rights in the European Union."); ¶ 59 (noting that "France has implemented the GDPR in national law"). As the U.S. interest is low and the foreign interest is high, this factor does not weigh in favor of de-pseudonymization.

Factor six is also persuasive. Plaintiffs are, in effect, asking Defendants to break the laws of the countries in which they operate. While both sides concede that prosecutions in this area have been all-but-nonexistent, the laws still exist and Defendants and the producing entities could expose themselves to potential liability, however slight. See Lenoir Decl. at ¶¶ 84–100. This represents a hardship to Defendants, and Plaintiffs have not made a showing of need sufficient to overcome it. This potential liability also supports the analysis for factor seven, namely that Defendants are acting in good faith in resisting discovery in this instance.

Finally, there is factor four: the availability of other means to obtain the information. Even if this factor were to swing in Plaintiffs' favor, it would not overcome the persuasiveness of the other factors in aggregate. However, an alternative means for obtaining the information sought is available through the Hague Convention.

In light of the comity analysis, the Court declines to compel noncompliance with the foreign laws at issue and DENIES the December 1 Letter Motion to Compel.

## II. Production of Documents over which Defendants Claim Privilege.

Plaintiffs seek the production of seventeen documents which Defendants previously produced to the DOJ, over which Defendants now claim attorney-client privilege, work product privilege, or both. Plaintiffs' first argument is that, by previously producing these documents to the DOJ, Defendants waived any privilege they may have had over the documents. See Reply at 20. Defendants argue that the production of those privileged documents was made with the understanding that there was no waiver of the privileges. See Opp. at 21. The Court finds that Defendants did waive the privilege.

The controlling case on the question of waiver due to disclosure in a prior investigation is In re Steinhardt Partners, L.P., 9 F.3d 230 (2d Cir. 1993). In Steinhardt, the party opposing disclosure had previously disclosed the document at issue to the SEC, while standing in an adversarial position to the SEC. Id. at 234 ("The determinative fact in analyzing the adversarial nature of the relationship is that Steinhardt knew that it was the subject of an SEC investigation, and that the memorandum was sought as part of this investigation . . . [T]he fact that Steinhardt cooperated voluntarily does not transform the relationship from adversarial to friendly."). The Second Circuit further noted that "[t]he waiver doctrine provides that voluntary disclosure of work product to an adversary waives the privilege as to other parties." Id. at 235. In light of both the adversity of the parties and the voluntary disclosure of the document, the Second Circuit found that the privilege had been waived and the document had to be produced to the civil litigants. Id. at 236.

Defendants correctly note that the Court in <u>Steinhardt</u> declined "to adopt a *per se* rule that all voluntary disclosures to the government waive [privilege] protection," and that "[c]rafting rules relating to privilege in matters of governmental investigations must be done on a case-by-case basis." <u>Steinhardt</u>, 9 F.3d at 236. The Second Circuit identified two circumstances that would preserve the privilege: first, where the "disclosing party and the government may share a common interest;" and second, "situations in which the [government] and the disclosing party have entered into an explicit agreement that the [government] will maintain the confidentiality of the disclosed materials." <u>Id</u>. Neither of those two scenarios is present here.

**C. Defendants have not Shown an Explicit Agreement Existed.**

Defendants focus their argument on the latter of those two possibilities; namely, that BNPP and the authorities had a "mutual understanding at the time of production" that the documents would be kept confidential. Opp. at 21-22. In support of this, they cite to certain statements made by the DOJ and the DANY in prior FOIA/FOIL proceedings for these very same documents. <u>Id</u>. at 22. The statements are as follows:

- "DOJ provided an express or implied assurance of confidentiality to BNPP, and there were no express or implied indications at the time these records were submitted that DOJ would publicly disclose the information." Opp. at 22 (quoting Defs.' Ex. C, the "Vaughn Index").[1]

- "BNPP provided the material to DANY as a target cooperating with DANY in the course of a Grand Jury investigation, with the

---

[1] This Exhibit, along with those that follow, were attached to the Declaration of Carmine D Boccuzzi, Jr. dated April 8, 2022 (Dkt. No. 318).

11

understanding that it would remain confidential." Opp. at 22 (quoting Defs.' Ex. E, Aff. of Christopher Conroy).

- "[T]he records were provided to DANY under a general umbrella of confidentiality." Opp. at 22 (quoting Defs.' Ex. F, Letter from DANY).

- "[S]ome of the records provided by BNPP may contain protected attorney communications." Opp. at 22 n. 16 (quoting Defs.' Ex. H, Respondant's Verified Answer to Article 78 Petition).

None of these statements constitutes an "explicit agreement" as required by Steinhardt. The first statement from the Vaughn Index in fact notes that the assurance may have been "implied;" that would be the opposite of an "explicit agreement." Defs.' Ex. C. Courts in this circuit require more. See, e.g., In re Natural Gas Commodity Litig., No. 03-cv-6186 (VM) (AJP), 2005 WL 1457666, at *8 (S.D.N.Y. June 21, 2005) (noting that an explicit written confidentiality and non-waiver agreements "goes a long way towards a finding of non-waiver"); In re Initial Pub. Offering Sec. Litig., 249 F.R.D. 457, 466 (S.D.N.Y 2008) (finding that even the existence of a confidentiality agreement was not enough to support an argument selective waiver, and that the adversarial nature of the proceeding was the more salient factor). The Conroy Affirmation states simply that there was an "understanding" that the documents were confidential, but provides no color as to what formed the basis of this understanding, nor who held that understanding. Defs.' Ex. E. The Letter from DANY is even vaguer, simply noting the existence of a "general umbrella of confidentiality;" again, a far cry from an explicit agreement. Defs.' Ex. F. Furthermore, the Letter goes on to note that "BNPP and DANY were in legally antagonistic positions regarding DANY's investigation—and ultimate

12

prosecution—of BNPP." Id. at 3.  Finally, the DANY Answer to the Article 78 Petition states that the documents "may" contain attorney communications protected by a privilege.  Defs.' Ex. H.  As it stands, Defendants have not submitted any explicit evidence that, at the time the documents were produced to the government, there was an explicit, mutual agreement that they would remain confidential.

The cases cited by Defendants underscore this absence.  In Winfield v. City of New York, in addition to deposition testimony taken in the case communicating an express, contemporaneous understanding of confidentiality, the parties also provided a contemporaneous letter memorializing that understanding.  No. 15-cv-5236 (LTS) (KHP), 2018 WL 716013, at *13 (S.D.N.Y. Feb. 1, 2018).  In Maruzen Co., Ltd. v. HSBC USA, Inc., the party opposing production submitted a declaration attesting to the agreement, as well as a letter from the AUSA who handled the government investigation supporting the existence of an agreement between the party and the government.  Nos. 00-cv-1079 (RO) and 00-cv-1512 (RO), 2002 WL 1628782, at *1 (S.D.N.Y. July 23, 2002).

Here, Defendants have not submitted any direct support for their assertion that an explicit agreement existed.  Defendants have proffered various submissions from their FOIA/FOIL actions, in which the agencies make the representatives noted above.  However, no declarations, affidavits or testimony to that effect have been submitted directly to the Court in *this* case.  The burdens and interests at issue in a FOIA/FOIL action differ from those that arise in the context of civil discovery, and as such those submissions, even if they did contain sufficiently explicit statements

13

attesting to an agreement, would not necessarily suffice to resolve the issue before the Court in this action.

As the Court finds that Defendants did waive privilege, the Court does not find it necessary to rule on the fact-work-product argument or the crime-fraud exception argument, both of which were raised by Plaintiffs in the alternative. The Court GRANTs IN PART Plaintiffs' January 5 and March 14 Letter Motions, to the extent they request production of documents that were previously produced to the investigating agencies in the criminal cases.

### III. Correspondence with the DOJ.

Plaintiffs also seek correspondence between BNPP and the DOJ "detailing the nature of the pseudonyms used" in the initial production to the government. Dec. 1 Letter at 3, n. 12. At the May 11, Hearing, Plaintiffs explained that they had requested these communications in order to better understand the pseudonymization process. May 11 H'ng Tr. at 42:25-43:12. Plaintiffs conceded that a sworn declaration from Defendants summarizing the salient information contained in the correspondence would serve the same purpose. Id. at 51:24-52:4. The Court therefore DENIES Plaintiffs' motion to compel with respect to this correspondence and leaves it to Defendants to provide Plaintiffs with this information either via a voluntary production, an interrogatory, or a sworn declaration, as Defendants see fit.

## CONCLUSION

In sum, Defendants will not be compelled to de-pseudonymize thirty-seven documents, but will be compelled to produce the seventeen documents over which

they currently claim the protection of privilege. With respect to the first issue, however, to the extent there are any inconsistencies in the pseudonymizations Defendants must provide Plaintiffs with a method to reconcile those differences across the pseudonymized documents. See Opp. at 5 (noting that the pseudonyms in documents produced from France do not match those produced from Switzerland). Furthermore, should pseudonymized documents be presented to deponents, Defendants are instructed to find some approach that will allow witnesses to meaningfully engage with the pseudonymized documents. Finally, where Plaintiffs have identified a witness for deposition, Defendants must provide Plaintiffs with that witness's pseudonymized identifier if applicable.

Regarding the seventeen documents now compelled for production, Defendants are instructed to provide Plaintiffs with this production by noon on **Wednesday, May 25, 2022**. The Court will consider any outstanding discovery issues at the conference scheduled for May 26, 2022.

The Court of Clerk is respectfully requested to terminate the Letter Motions at Dkt. Nos. 257, 258, 271, 298, 299, and 300.

SO ORDERED.

DATED:   New York, New York
         May 23, 2022

*Jennifer E. Willis*
JENNIFER E. WILLIS
United States Magistrate Judge