**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ENTESAR OSMAN KASHEF, *et al.*,

        Plaintiffs,

    -against-

BNP PARIBAS S.A., BNP PARIBAS S.A.
NEW YORK BRANCH, and BNP PARIBAS
US WHOLESALE HOLDINGS, CORP.,

        Defendants.

No. 1:16-cv-03228-AKH-JW

Hon. Alvin K. Hellerstein

## <u>MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION</u>

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

STATEMENT OF FACTS ..................................................................................................... 7

    I.      From coup to embargo: BNP Paribas ████████████████ Sudan's violent military-Islamist dictatorship. ................................................................. 7

    II.    BNPP conspires with the Bashir Regime to circumvent the U.S. embargo, knowing it was intended to halt human rights abuses. ........................................................... 12

        A.   BNPP's ███████████████████ ............................................................. 12

            1.   The ███████████████████████████████ ...... 14

            2.   BNPP evades U.S. sanctions through falsified documents and shell bank accounts. ......... 16

            3.   The Bashir Regime generates ████████████████ from its partnership with BNPP. ................................................................................ 19

        B.   BNPP becomes the chief financier of mass atrocities in Sudan. ................................ 21

            1.   The War Chest █████████████████████ .............................. 22

            2.   Bags of Cash and Barrel Bombs: BNPP fuels a 3000% increase in military spending, fueling the escalation in the Regime's mass atrocities. ........................ 23

            3.   ███████████████ the Bashir Regime's arms procurement network used on a mass scale against civilians. ............................................................ 25

            4.   Airfields and Armored Trucks: ████████████████████ .................. 28

                a.   ███████████████████████████ ................................ 28

                b.   ██████████ GIAD, the "Crown Jewel" of Sudan's homegrown "Defense Industries System." ............................................................................. 31

        C.   The Oil-Genocide Nexus: Funded by BNPP, the Bashir Regime escalates its campaign of mass atrocities, killing and displacing millions. ......................................... 35

            1.   The Regime uses BNPP-enabled resources to escalate atrocities after 1997. .................... 39

            2.   Torture in "Ghost Houses": Police state of terror. ............................................. 41

            3.   "Kill a slave by using another slave": Dividing and conquering South Sudan's Black African population. ................................................................... 42

            4.   Scorched earth in the oil regions. ........................................................... 43

            5.   Genocide in Darfur. ......................................................................... 44

        D.   Aware of the atrocities, BNPP persists in ████████████████ ........................ 50

            1.   "Save Darfur": The U.S. declares the atrocities a genocide. ............................... 50

2.    "The Dirty Little Secret": Advised by ▓▓▓▓▓▓ BNPP finds new ways to evade U.S. sanctions. ........................................................... 50

3.    Take No Notes: BNPP Head Office in Paris overrides compliance warnings about Sudan. ........................................................... 52

4.    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ............................................. 55

5.    "I Can't Even Get U.S. Dollars Now": OFAC forces BNPP out of Sudan while BNPP continues support for the Bashir Regime. ........................................ 57

E.    A Pattern of broken bodies and lost homes: a legacy of trauma for Sudanese-Americans ........ 61

PROCEDURAL BACKGROUND ........................................................... 65

LEGAL STANDARDS ........................................................... 67

I.    Accomplice liability under Article 50.1 of the Swiss Code of Obligations ................ 67

II.    Class Certification Standards ........................................................... 69

ARGUMENT ........................................................... 71

I.    The Class Satisfies Rule 23(a) ........................................................... 71

A.    Numerosity: the Estimated Class of 25,800 is Sufficiently Numerous and Joinder is Impracticable ........................................................... 71

B.    Commonality: Plaintiffs' case raises common questions on every element of Article 50 .......... 77

C.    Typicality: Plaintiffs and the Class have identical Article 50 claims arising from the same conspiracy between BNPP and the Regime ........................................ 82

D.    Adequacy: Plaintiffs Will Fairly and Adequately Represent the Class ..................... 85

II.    The Class Satisfies Rule 23(b)(3) ........................................................... 91

A.    Common Questions Predominate ........................................................... 92

1.    The scope and scale of BNPP's conspiracy with the Regime during its campaign of persecution is a common, predominant question ........................................ 93

2.    The Class can establish causation on a classwide basis ................................ 94

a.    Classwide proof of the Regime's genocidal campaign predominates................... 94

b.    Classwide proof of BNPP's complicity predominates.............................. 95

c.    Classwide proof of attribution predominates: the U.S. government has already attributed forced displacement to the Regime for 92.8% of the Class ...................... 97

3.    All class members suffered the common injury of forced displacement and are entitled to damages for the harm to human dignity they suffered..................... 102

4.    Individualized damages determinations will not defeat class certification...................... 106

B.    Class Treatment is a Superior Method to Resolve the Dispute.............................. 108

C.    The Class is ascertainable through objective criteria ................................. 111

III.    In the alternative, a Rule 23(c)(4) class should be certified as to particular issues .......... 114

IV.       Appointment of Class Counsel ........................................................................ 117

CONCLUSION................................................................................................................... 119

Table of Authorities

**Page(s)**

**Cases**

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
   No. 06-MD-1175 (JG) (VVP), 2015 WL 5093503 (E.D.N.Y. July 10, 2015) .....................119

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
   No. 06-MD-1775 (JG)(VVP), 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) ...........70, 81, 119

*Amchem Prod., Inc. v. Windsor*,
   521 U.S. 591 (1997) .................................................................................................105, 108

*American Pipe & Construction Co. v. Utah*,
   414 U.S. 538 (1974) ................................................................................................110

*Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*,
   568 U.S. 455 (2013) ................................................................................................70

*Ansoumana v. Gristede's Operating Corp.*,
   201 F.R.D. 81 (S.D.N.Y. 2001) ...........................................................................76, 77

*Batalla Vidal v. Wolf*,
   501 F. Supp. 3d 117 (E.D.N.Y. 2020) ...................................................................73

*Belfiore v. Proctor & Gamble Co.*,
   311 F.R.D. 29 (E.D.N.Y. 2015) ..............................................................................78

*Bellin v. Zucker*,
   19 Civ. 5694 (AKH), 2022 WL 4592581 (S.D.N.Y. Sept. 30, 2022) ....................................114

*Berger v. Iron Workers Reinforced Rodmen, Loc. 201*,
   170 F.3d 1111 (D.C. Cir. 1999) ..............................................................................5, 94

*Betances v. Fischer*,
   304 F.R.D. 416 (S.D.N.Y. 2015) ............................................................................107

*Brecher v. Republic or Argentina*,
   806 F.3d 22 (2d Cir. 2015) ....................................................................................112

*Brown v. Kelly*,
   609 F.3d 467 (2d Cir. 2010) ..............................................................................82, 94

*Butler v. Sears, Roebuck & Co.*,
   727 F.3d 796 (7th Cir. 2013) ...............................................................................107

*Carnegie v. Household Int'l, Inc.*,
    376 F.3d 656 (7th Cir. 2004) ............................................................................111

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
    504 F.3d 229 (2d Cir. 2007)................................................................................71

*Charron v. Pinnacle Grp. N.Y. LLC*,
    269 F.R.D. 221 (S.D.N.Y. 2010) ......................................................................115

*Chhab v. Darden Rests., Inc.*,
    No. 11 Civ. 8345 (NRB), 2016 WL 3004511 (S.D.N.Y. May 20, 2016)............109

*Consol. Rail Corp. v. Town of Hyde Park*,
    47 F.3d 473 (2d Cir. 1995)..................................................................................71

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
    502 F.3d 91 (2d Cir. 2007)..............................................................81, 85, 91, 92

*Dial Corp. v. News Corp.*,
    314 F.R.D. 108 (S.D.N.Y. 2015) ................................................................82, 108

*Dodge v. County of Orange*,
    208 F.R.D. 79 (S.D.N.Y. 2002) ..........................................................................81

*Does I v. The Gap Inc.*,
    No. CV–01–0031, 2002 WL 1000073 (D. N. Mar. Is. May 10, 2002)........................ *passim*

*Ebin v. Kangadis Food Inc.*,
    297 F.R.D. 561 (S.D.N.Y. 2014) ........................................................................87

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011).............................................................................................67

*In re Facebook, Inc. IPO Secs. & Deriv. Litig.*,
    312 F.R.D. 332 (S.D.N.Y. 2015) ........................................................................82

*Fikes Wholesale, Inc. v. Visa U.S.A. Inc.*,
    62 F.4th 704 (2d Cir. 2023) ...................................................................7, 61, 112

*In Re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    407 F. Supp. 3d 422 (S.D.N.Y. 2019)...............................................................115

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
    13 Civ. 7789 (LGS), 2022 WL 3971006 (S.D.N.Y. Aug. 31, 2022)..............113, 115, 116

*Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*,
    317 F.R.D. 374 (S.D.N.Y. 2016) ......................................................................105

*Hampton v. Mow Sun Wong*,
  426 U.S. 88 (1976) ..................................................................................101

*Harutyunyan v. Gonzales*,
  421 F.3d 64 (1st Cir. 2005) ....................................................................100

*Hilao v. Est. of Marcos*,
  103 F.3d 767 (9th Cir. 1996) .........................................................108, 113

*Jacob v. Duane Reade, Inc.*,
  602 Fed. App'x 3 (2d Cir. 2015) ...............................................................78

*Johnson v. Nextel Commc'ns Inc.*,
  780 F.3d 128 (2d Cir. 2015) ......................................................................78

*K.A. v. City of New York*,
  413 F. Supp. 3d 282 (S.D.N.Y. 2019) .......................................................78

*Kashef v. BNP Paribas S.A.*,
  442 F. Supp. 3d 809 (S.D.N.Y. 2020) .................................................44, 65

*Kashef v. BNP Paribas S.A.*,
  925 F.3d 53 (2d Cir. 2019) ............................................................ *passim*

*Kashef v. BNP Paribas SA*,
  No. 16-CV-3228 (AJN), 2021 WL 603290 (S.D.N.Y. Feb. 16, 2021) ........................... *passim*

*Khan v. Holder*,
  727 F.3d 1 (1st Cir. 2013) .........................................................................99

*Langan v. Johnson & Johnson Consumer Cos. Inc.*,
  No. 3:13-cv-1470, 2017 WL 985640 (D. Conn. Mar. 13, 2017) ................................85

*Levi v. Commonwealth Land Title Ins. Co.*,
  No. 09CIV.8012 (SHS), 2013 WL 5708402 (S.D.N.Y. Oct. 21, 2013) ......................94

*Leyse v. Lifetime Entertainment Services*,
  No. 13 Civ. 5794 (AKH), 2015 WL 5837897 (S.D.N.Y. Sept. 22, 2015) ...................114

*In Re Libor-Based Fin. Instruments Antitrust Litig.*,
  299 F. Supp. 3d 430 (S.D.N.Y 2018) .........................................77, 78, 81, 93

*Lowell v. Lyft, Inc.*,
  No. 17-CV-06251 (PMH), 2023 WL 2622925 (S.D.N.Y. Mar. 24, 2023) ..................73

*M.A. v. U.S. I.N.S.*,
  899 F.2d 304 (4th Cir. 1990) ...................................................................100

*Marisol A. v. Giuliani*,
  126 F.3d 372 (2d. Cir. 1997)................................................................................86

*Mendoza v. Casa de Cambio Delgado, Inc.*,
  No. 07CV2579 (HB), 2008 WL 3399067 (S.D.N.Y. Aug. 12, 2008) ....................................91

*Menocal v. GEO Grp., Inc.*,
  882 F.3d 905 (10th Cir. 2018) ...................................................................... *passim*

*Moreno v. Deutsche Bank Americas Holding Corp.*,
  15CIV.9936, 2017 WL 3868803 (S.D.N.Y. Sept. 5, 2017)................................................78

*In re Nassau Cnty. Strip Search Cases*,
  461 F.3d 219 (2d Cir. 2006)............................................................................ *passim*

*In re Nassau Cnty. Strip Search Cases*,
  742 F. Supp. 2d 304 (E.D.N.Y. 2010) ...................................................................104

*In re Nassau Cnty. Strip Search Cases*
  Nos. 99-CV-3126 (DRH), 99-CV-2844 (DRH), 99-CV-4238 (DRH), 2008
  WL 850268 (E.D.N.Y. Mar. 27, 2008)...........................................................6, 94, 104, 105

*Ortiz-Araniba v. Keisler*,
  505 F.3d 39 (1st Cir. 2007)................................................................................99

*In re Petrobras Sec.*,
  862 F.3d 250 (2d Cir. 2017)........................................................................... *passim*

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
  226 F.R.D. 456 (S.D.N.Y. 2005) ..................................................................... *passim*

*Ramirez v. Riverbay Corp.*,
  39 F. Supp. 3d 354 (S.D.N.Y. 2014)......................................................................86

*Ret. Fund v. J.P. Morgan Chase & Co.*,
  301 F.R.D. 116 (S.D.N.Y. 2014) .........................................................................77

*Roach v. T.L. Cannon Corp.*,
  778 F.3d 401 (2d Cir. 2015)..............................................................................106

*Robidoux v. Celani*,
  987 F.2d 931 (2d Cir. 1993)...................................................................73, 76, 77

*Robinson v. Metro-N. Commuter R.R. Co.*,
  267 F.3d 147 (2d Cir. 2001)..............................................................................115

*Ruffo v. Adidas Am. Inc.*,
  15 Civ. 5989 (AKH), 2016 WL 4581344 (S.D.N.Y. Sept. 2, 2016)......................................114

*In re Sumitomo Copper Litig.*,
    182 F.R.D. 85 (S.D.N.Y. 1998) ........................................................................82

*Sykes v. Mel S. Harris and Assocs. LLC*,
    780 F.3d 70 (2d Cir. 2015) ...................................................................6, 78, 107

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ...................................................................................101

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) ...............................................................................92, 106

*In re U.S. Foodservice Inc. Pricing Litig.*,
    729 F.3d 108 (2d Cir. 2013) ...................................................................92, 109

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001) .........................................................................107

*In re Vitamin C Antitrust Litig.*,
    279 F.R.D. 90 (E.D.N.Y. 2012) ....................................................................87

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017) .............................................................................69

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2012) ......................................................................................77

*Westchester Indep. Living Ctr., Inc. v. SUNY, Purchase Coll.*,
    331 F.R.D. 279 (S.D.N.Y. 2019) ..................................................................73

*Xenides-Arestis v. Turkey*,
    Case No. 46347/99, ECtHR (2005) .....................................................103, 105

*Yi Xiang v. Inovalon Holdings, Inc.*,
    327 F.R.D. 510 (S.D.N.Y. 2018) ..................................................................70

**Statutes**

8 U.S.C. § 1101(a)(42)(A) ...............................................................72, 97, 98

*Comprehensive Peace in Sudan Act of 2004*, Pub. L. 108-497, 118 Stat. 4012
    (2004) ..........................................................................................................53

Sudan Peace Act of 2002, Pub. L. No. 107, 116 Stat. 1503 (Oct. 21, 2002) ...................36, 39, 44

**Other Authorities**

Alvin K. Hellerstein et al., *Managerial Judging: The 9/11 Responders' Tort
    Litigation*, 98 Cornell L. Rev. 127, 144-146 (2012) .......................................108, 109

*Blocking Property of and Prohibiting Transactions with the Government of Sudan*, Exec. Order No. 13412, 71 Fed. Reg. 61369 (Oct. 17, 2006) ...................................57

Blocking Sudanese Government Property and Prohibiting Transactions with Sudan, Exec. Order No. 13067, 62 Fed. Reg. 59989 (Nov. 3, 1997). .......................................9

*The Crisis in Darfur,* Testimony Before the Senate Foreign Relations Committee by Secretary Colin L. Powell, Sept. 9, 2004 ...........................................................................36

Fed. R. Civ. P. 23 .............................................................................................................. *passim*

Fed. R. Civ. P. 26 ...................................................................................................................98

Fed. R. Civ. P. 44 ...................................................................................................................68

Swiss Code of Obligations (2023) .........................................................................................67

# INTRODUCTION

███████████████████████████████████████████████████
███████████████████████████████████████████████████

– BNP Paribas SA's Rule 30(b)(6) witness Dan Cozine[1]

Between 1997 and 2011, the military Islamist dictatorship of Sudan, funded by a criminal conspiracy with Defendant BNP Paribas, S.A. ("BNPP") to evade a U.S. financial embargo, engaged in a brutal and genocidal campaign of persecution of millions of ethnic Africans, killing, torturing, mass raping, and displacing millions.[2] Of those millions of forcibly displaced people, an estimated 25,800 Sudanese individuals fled to the United States. This group of survivors – the Plaintiffs and the proposed Class they represent – are now U.S. citizens, lawful permanent residents, and lawfully admitted refugees and asylees. All share a common injury: forced displacement, causing harm to human dignity. And most have suffered similar additional injuries from common patterns of violence unique to Sudan's sadistic persecution of its citizens allowed to escalate as a result of BNPP's clandestine conspiracy: a conspiracy to which it pled guilty in this District and paid the largest fine in U.S. history, $8.9 billion.

Their common injury has a common cause. For 92.8% of them, the U.S. government made a final determination that they were forcibly displaced by Sudan's dictatorship, granting them refugee or asylee status. Their displacement was fully funded by BNPP, which ████████████ ████████████████████████████████, and facilitated ████████████████████████

---

[1] Ex. 57, Deposition of Dan Cozine ("Cozine Dep.") at 123:11-15. All exhibits are to the Declaration of Brent W. Landau in Support of Class Certification ("Landau Decl.").

[2] Defendant BNP Paribas SA ("BNPP France") pleaded guilty to a conspiracy with the Government of Sudan, acting through and in concert with its branches and subsidiaries in Geneva, BNP Paribas (Suisse) SA ("BNPP Suisse"), London ("BNPP London"), and its North American Territory, including Defendants BNP Paribas New York Branch ("BNPP-NY") and BNP Paribas North America, Inc. (now called BNP Paribas US Wholesale Holdings, Corp.). Plaintiffs refer to these entities collectively as "BNPP," pursuant to the plea agreement. *See* Ex. 43, Stipulated Statement of Fact ("SSOF") ¶¶ 14-16, 19-20.

███████████, through a sanctions-evasion conspiracy. Plaintiffs now seek to certify a class of all 25,800 of BNPP's Sudanese-American victims.

BNPP ████████████████████████████ while genocide raged.[3] For over a decade – from 1997 to at least 2009 – BNPP conspired with the military-Islamist regime of Omar al-Bashir (the "Bashir Regime") to circumvent a U.S. economic embargo "aimed at halting the genocide," as determined by the Second Circuit. *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 55 (2d Cir. 2019). "For the sake of humanity," proclaimed Nobel Laureate and Holocaust survivor Elie Wiesel in a 2006 rally on the National Mall, "save Darfur."[4]

But BNPP did not care to save Darfur or any of Sudan's victims; ████████████
████████████████████████████████████████████████████████████.[5]
The bank's relationship with the Bashir Regime was ████████████████████████
███████████" so BNPP compliance in Paris ██████████████████████[6] ████████
████████████████████████████████████████
████████████████████████████████.[7] ██████████████████
████████████████████████████████████████████████████ fueling a 3000% increase in military spending and a drastic escalation in the Regime's atrocities. ████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████ was enough to pay for every bullet, every bomb, every militia raid, and every

---

[3] Ex. 110, BNPP-KASHEF-00024869.
[4] Brian Fitzgerald, BU Today, May 2, 2006, Elie Wiesel urges U.S. action on Darfur, https://shorturl.at/ainR1.
[5] BNPP knew that ██████████████████████████ *See* Ex. 119, BNPP-KASHEF-00038899 at 38909.
[6] Ex. 43, SSOF ¶ 37.
[7] *See infra* at 14-17; Ex. 105, BNPP-KASHEF-00014451 at 14457.

"ghost house" detention center that the Regime used in a nationwide campaign of persecution against civilians deemed "undesirable" under its racist ideology of Arab supremacy, including Black Africans, Christians, and moderate Muslims.



[8] Yet BNPP chose to remain "a core piece of the 'oil-genocide nexus as its chief financier.'"[9]

Plaintiffs brought suit against BNPP on April 29, 2016. Since then, BNPP has failed to obtain dismissal after three motions to dismiss on the act of state doctrine, timeliness, failure to state a claim, and forum non conveniens.[10] A year ago, this Court rejected BNPP's unconstitutional argument that the Plaintiffs lacked a bona fide tie to the United States "as Sudanese refugees, seemingly to suggest that [the Court] treat then differently based on their national origin."[11] Noting BNPP's "bad faith," the Court observed in May 2022 that this "case has been ongoing for six years now, with Defendants making every effort to avoid actually litigating and resolving the dispute."[12] With discovery now closed, a class action is the best way to bring this case to resolution. Plaintiffs respectfully move for the Court to certify the following Class:

> All U.S. citizens, lawful permanent residents, or lawfully admitted refugees or asylees who formerly lived in Sudan or South Sudan and who were subjected to human rights abuses (including forced displacement, genocide, battery, assault, unlawful imprisonment, sexual abuse, threats of violence and/or deprivation of property) perpetrated by the Government of Sudan ("GOS") and its agents

---

[8] Ex. 54, Deposition of Louis Bazire ("Bazire Dep.") at 87:24-25, 88:3-12.

[9] *Kashef v. BNP Paribas SA*, No. 16-CV-3228 (AJN), 2021 WL 603290, at *6 (S.D.N.Y. Feb. 16, 2021), reconsideration denied, No. 16-CV-03228 (AJN), 2021 WL 1614406 (S.D.N.Y. Apr. 26, 2021).

[10] *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 55 (2d Cir. 2019) (reversing dismissal on act of state and timeliness); *Kashef*, 2021 WL 603290, at *1 (holding plaintiffs state a claim for relief under Swiss law), reconsideration denied, 2021 WL 1614406; Order, ECF No. 338 (May 3, 2022) (denying *forum non conveniens* dismissal).

[11] Order, ECF No. 338 (May 3, 2022) at 5.

[12] *Id.* at 9.

(including the Janjaweed and other GOS militia) from November 1997 through December 2011.[13]

Plaintiffs satisfy the requirements of Federal Rule of Civil Procedure 23(a) and (b)(3).

***Numerosity is met***. The proposed class has an estimated 25,800 members.[14] ***Commonality is met***. For all class members, there is just one cause of action: accomplice liability for violations of absolute rights under Article 50.1 of the Swiss Code of Obligations ("CO"). Article 50.1 CO has just three elements.[15] And there are common questions on all three, including BNPP's conspiracy with the Regime, its impact on the genocide, and BNPP's knowledge of the Regime's human rights abuses. ***Typicality is met***. The Plaintiffs and the Class have identical Article 50.1 CO claims arising from the same conspiracy and the same pattern of displacement and other human rights abuses.

***Adequacy is met***. The Plaintiffs will fairly and adequately represent the Class: there are no conflicts and they have already shown their commitment to represent the Class by prosecuting the action, participating in discovery, and enduring lengthy, traumatizing depositions.

***Predominance is met.*** Common questions predominate on all elements of Article 50.1 liability—from illicit act to collective fault to collective causation—including an award of moral damages to each Class member for the dignity harms inherent in forced displacement. The central focus in any classwide trial will be on BNPP's own illicit conduct and knowledge and its role in

---

[13] This class definition is the same as in Paragraph 220 of the Third Amended Complaint ("TAC") except for the start and end of the proposed class period, which in the TAC was defined as "from 1997 through at least 2009, depending on discovery and according to proof." ECF No. 241, ¶ 220. U.S. sanctions on Sudan were imposed on November 3, 1997. And now that fact and expert discovery have been completed, Plaintiffs propose an end date of December 2011 to include the period in which the deadly effects of BNPP's conspiracy continued, as set forth below. *See infra* at 61.

[14] *See infra* at 72-78.

[15] BNPP stipulated that Article 50.1 only has three elements, as held by the Court: "To state a claim for secondary liability under Article 50(1) of the Swiss Code of Obligations, a plaintiff needs to allege that '(1) a main perpetrator committed an illicit act, (2) the accomplice consciously assisted the perpetrator and knew or should have known that he was contributing to an illicit act, and (3) their culpable cooperation was the natural and adequate cause of the plaintiff's harm or loss.'" Defs.' Mem. in Supp. of Mot. for Partial Recons., Mar. 2, 2021, ECF No. 198, at 2; *Kashef*, 2021 WL 1614406 (reconsideration denied).

the escalation of the magnitude and ferocity of the mass atrocities being committed by its co-conspirator, the Bashir Regime, not on matters affecting only particular class members.

**Common questions on causation predominate**. BNPP's complicity was both systemic, in that key institutions funded by BNPP were used to perpetrate the Regime's campaign of persecution, and systematic, in that the Regime committed patterns of violence to displace and terrorize targeted populations from which the Plaintiffs and the Class come. Classwide proof will show that BNPP's sanctions-evasion conspiracy ████████████████████████

████████████████████████████████████████████████████████

████████████████████████

Class members will prove they were forcibly displaced by the Regime on a classwide basis. The U.S. government has made a final and binding determination that 92.8% of the Class members met the legal requirements for admission as refugees or asylees, including that they were forcibly displaced by the Regime.[16] This provides a classwide inference of causation.[17] And although BNPP speculates that perhaps refugees were fleeing someone other than the Regime, it has no evidence that any other actor had the persecutory motive or the means to forcibly displace racial and religious groups *en masse*. A few cherry-picked incidents of rebel abuses do not overcome the consensus view of the United States, United Nations, and International Criminal Court that Regime atrocities drove the mass exodus.[18] After more than a year of discovery, BNPP has failed to identify

---

[16] As Plaintiffs' immigration expert Prakash Khatri explains, "displacement is in the very definition of a refugee" that every refugee and asylee must satisfy in order to be admitted to the United States. Ex. 3, Reply Report of Prakash Khatri ("Khatri Reply") at 2 (citing 8 U.S.C. § 1101(a)(42)(A)). And every refugee's persecution or well-founded fear of persecution leading to their forcible displacement must be attributable to a foreign state or its agents. *See infra* at 99.

[17] *See Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 920 (10th Cir. 2018) (private prison policy supported classwide inference that detainees' labor was coerced); *Berger v. Iron Workers Reinforced Rodmen, Loc. 201*, 170 F.3d 1111, 1138 (D.C. Cir. 1999) (racially discriminatory mandatory training policy supported classwide inference of distress).

[18] *See infra* at 49-50 & n.254.

a single person who fled Sudan during the class period and was admitted to the United States as a refugee or asylee—but did *not* suffer or fear persecution by the Regime. Not one.

***Common questions on damages also predominate***. Forced displacement is cognizable as moral injury to dignity under Swiss law.[19] Just as in the analogous *Nassau Country Strip Search Cases*, where a class of detainees subjected to a strip search policy all shared an injury to their dignity and were awarded common damages on that basis, here the predominance requirement is met because all class members have suffered displacement and an "injury to human dignity" entitling them to at least some compensation.[20]

***Superiority is met***. Staged proceedings would permit classwide adjudication of liability and damages for forced displacement, followed by a phase—as in the *Nassau County Strip Search Cases*—to determine what additional damages class members, or groups of class members, sustained from other abuses. As established by expert testimony of Dr. Jok Madut Jok, these include: (1) killing or disappearing of family members; (2) arbitrary abductions and detention in "ghost house" detention centers; (3) rape and sexual violence against women and men; (4) torture; (5) targeted attacks on civilians; (6) looting and destruction of property; (7) aerial bombings; (8) deprivation of food, water, or medical aid.[21] As the Second Circuit has held, the presence of some individualized damages issues does not defeat class certification.[22] This approach is superior to the alternative: a multitude of lawsuits, with each plaintiff using the same evidence to address the same questions. It is also more equitable for the "vulnerable population[]" of immigrant class

---

[19] *See infra* at 104-06.
[20] *In re Nassau Cnty. Strip Search Cases* Nos. 99-CV-3126 (DRH), 99-CV-2844 (DRH), 99-CV-4238 (DRH), 2008 WL 850268, at *3-4 (E.D.N.Y. Mar. 27, 2008).
[21] Ex. 4, Jok Report at 12-37; *see also* Ex. 7, Baldo Report at 29-42.
[22] *Sykes v. Mel S. Harris and Assocs. LLC*, 780 F.3d 70, 81 (2d Cir. 2015).

members, who have "limited understanding of the law, limited English skills, [and] geographical dispersal" throughout the country.[23] For many, no class action would mean no action at all.

*Ascertainability is met*. Finally, the class is ascertainable through objective criteria: the class members know when, where, and how they were forcibly displaced or suffered other abuses, and they all can obtain their immigration files from the U.S. government. As the Second Circuit made clear in 2017 and 2023, there is no "administrative feasibility" requirement for ascertainability, and nothing more is needed for the Court to certify the Class.[24]

In the alternative, should the Court elect not to certify a Rule 23(b)(3) class, Plaintiffs propose a Rule 23(c)(4) issues class to resolve the numerous common questions in one proceeding. Finally, Interim Co-Lead Class Counsel respectfully request that the Court appoint them as Class Counsel pursuant to Federal Rule of Civil Procedure 23(g).

## STATEMENT OF FACTS

### I.    From coup to embargo: BNP Paribas ██████████████ Sudan's violent military-Islamist dictatorship.

In 1989, Sudan's former dictator Omar al-Bashir seized power in a coup and installed a military-Islamist regime.[25] "The Bashir Regime combined the worst elements of authoritarianism, radical Islamist extremism, and kleptocracy," noted Plaintiff's expert Cameron Hudson, former Director for African Affairs on the U.S. National Security Council ("NSC").[26] Animated by a racist ideology of Arab supremacy, the Regime "declared a *jihad* (holy war) against the largely Christian"

---

[23] *Menocal*, 882 F.3d at 915.
[24] *In re Petrobras Sec.*, 862 F.3d 250, 265 (2d Cir. 2017); *Fikes Wholesale, Inc. v. Visa U.S.A. Inc.*, 62 F.4th 704, 716-17 (2d Cir. 2023).
[25] Ex. 5, Verhoeven Report at 8; Ex. 9, Expert Report of Cameron Hudson ("Hudson Report") ¶ 34. Bashir's party was the National Islamic Front, later called the National Congress Party.
[26] Ex. 9, Hudson Report ¶ 34.

Black African population of the south.[27] The Regime targeted the unarmed civilian population seen as the support base for the armed opposition Sudan People's Liberation Army's ("SPLA").[28]

At the same time, al-Bashir harbored Osama bin Laden and other al-Qaeda terrorists.[29] In 1993, the United States designated Sudan a state-sponsor of terrorism.[30] Sudan became an international pariah, sending the economy into a tailspin.[31] The war with the south ███████ ███████████████████████████[32] And at a time when Sudan was ██████████████ █████[33] and its weaponry, it lacked the foreign currency reserves—U.S. dollars—needed to sustain imports.[34] Sudan's external debt grew to $15 billion and the Sudanese pound collapsed due to the lack of foreign exchange.[35]

The Regime found itself "saddled with the costs of the protracted civil war"[36] and with an arsenal of "aging NATO and Warsaw Pact weapon systems"—much of it "degraded and of no use on the battlefield."[37] To hold power, the arsenal needed to be replenished, militias needed to be paid, and, to maintain the Regime's patronage state, loyalties needed to be bought.[38] As Columbia University's Dr. Harry Verhoeven, Plaintiffs' expert on Sudan's political economy, explains, "the bill was coming due," but the Regime could not pay.[39]

On November 3, 1997, the United States imposed an economic embargo on Sudan. The embargo was intended "to deny the Bashir Regime access to the U.S. financial system and deprive

---

[27] Ex. 7, Baldo Report ¶ 165; Ex. 5, Verhoeven Report at 19-21; Ex. 4, Jok Report ¶¶ 3-11.
[28] Ex. 7, Baldo Report ¶¶ 7-8; Ex. 4, Jok Report ¶ 107; Ex. 5, Verhoeven Report at 10-11.
[29] Ex. 5, Verhoeven Report at 12, 31.
[30] Ex. 9, Hudson Report ¶ 37.
[31] Ex. 11, Fogarty Report ¶¶ 54-59; Ex. 9, Hudson Report ¶ 45.
[32] Ex. 105, BNPP-KASHEF-00014451.
[33] Ex. 66, BNPP-KASHEF-00000023 at 29.
[34] Ex. 5, Verhoeven Report at 13-15; Ex. 16, Patey Report at 4.
[35] Ex. 9, Hudson Report ¶ 43; Ex. 5, Verhoeven Report at 13.
[36] Ex. 9, Hudson Report ¶ 43; Ex. 5, Verhoeven Report at 13.
[37] Ex. 19, Austin Reply ¶ 113.
[38] Ex. 5, Verhoeven Report at 2, 13.
[39] Ex. 5, Verhoeven Report at 2.

it of U.S. dollars as a means to defund its support for terrorism and human rights violations."[40]

Halting human rights abuses was explicit in Executive Order 13067:

> I, WILLIAM J. CLINTON, President of the United States of America, find that the policies and actions of the Government of Sudan, including continued support for international terrorism; ongoing efforts to destabilize neighboring governments; and the prevalence of human rights violations, including slavery and the denial of religious freedom, constitute an unusual and extraordinary threat to the national security and foreign policy of the United States, and hereby declare a national emergency to deal with that threat.

The Clinton and Bush Administrations ramped up the embargo throughout the class period. Dozens of Sudanese entities and individuals were added to the list of Specially Designated Nationals ("SDN") by the Treasury Department's Office of Foreign Assets Control ("OFAC"). The Sudanese SDNs were determined by the U.S. government to be ████████████████████████ ████████████████████████████████████████ [41]

The U.S. embargo was a dagger aimed at Bashir's last, best hope to hold power: oil. For years, Sudan's oil remained locked in the ground—the instability was too risky for the foreign oil companies and financiers needed to develop Sudan's oil industry.[42] To exploit and sell its oil, the Regime needed three things: (1) It needed foreign investors to dig wells and build pipelines. (2) It needed a bank willing to break the U.S. embargo and finance oil exports in the global currency of reference—the U.S. dollar.[43] And (3) it needed military resources to subjugate the non-Arab oil regions.

In 1997, the Bashir Regime found its oil infrastructure partners. It formed the Greater Nile Petroleum Operating Company ("GNPOC"), an oil consortium involving the Sudan National Petroleum Corporation ("Sudapet")—the regime's state-owned oil company; the China National

---

[40] Ex. 9, Hudson Report ¶55.
[41] Ex. 89, BNPP-KASHEF-00007994 at 7994.
[42] Ex. 16, Patey Report at 3-4.
[43] Ex. 5, Verhoeven Report at 35-36; Ex. 16, Patey Report at 6-7.

Petroleum Corporation ("CNPC")—China's state-owned oil company; Malaysia's state-owned oil company Petronas; and Canadian oil company, Arakis, which was later acquired by Talisman Energy.[44] Work began on a pipeline to link Port Sudan on the Red Sea to the oil concessions in Unity State, South Kordofan, and South Darfur, which straddled the traditional divide between the Arab north and Black African south.[45]

The Regime also found a financier was willing to find a way around the U.S. embargo. While other foreign banks pulled out of Sudan, ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████[46]

Within days of the U.S. Embargo being imposed by the Clinton Administration in 1997, ████████████████████████████████████████████████████████ ████████████████████[47]████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████████████[48] ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

---

[44] Ex. 16, Patey Report at 5-6; Ex. 7, Baldo Report ¶ 81; Ex. 5, Verhoeven Report at 34-35.
[45] Ex. 16, Patey Report at 6.
[46] *See* Ex. 5, Verhoeven Report at 29-30; Ex. 14, Koch Report ¶¶ 135-36, 142; Ex. 43, SSOF ¶ 19.
[47] Ex. 43, SSOF ¶ 19.
[48] Ex. 102, BNPP-KASHEF-00014129 at 14132; Ex. 57, Cozine Dep. at 214:15-23 ████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████

[REDACTED] [49] Thus began a decade-long practice of "wire-stripping," as discussed below.



And finally, as BNPP would admit in its guilty plea and [REDACTED]

[REDACTED] this partnership was based on a criminal conspiracy to evade U.S. sanctions aimed

---

[49] Ex. 103, BNPP-KASHEF-00014196. [REDACTED]

[50] Ex. 14, Koch Report ¶¶ 135-36; Ex. 121, BNPP-KASHEF-00046435 at 46449.
[51] Ex. 71, BNPP-KASHEF- 00000177 at 182.
[52] Ex. 14, Koch Report ¶ 135.
[53] *See* Ex. 14, Koch Report ¶¶ 137-38, 148.
[54] Ex. 105, BNPP-KASHEF-00014451 at 14456; Ex. 5, Verhoeven Report at 42; Ex. 14, Koch Report ¶ 136, n. 58.
[55] Ex. 43, SSOF ¶ 37; *see infra* at 53-55.

at halting human rights abuses—and thus the Regime found the ability to obtain the military

resources it needed to try to subjugate the non-Arab regions of Sudan that were home to Plaintiffs

and the Class.[56]

**II.    BNPP conspires with the Bashir Regime to circumvent the U.S. embargo, knowing it was intended to halt human rights abuses.**

     **A.    BNPP's** ███████████████████████████

   Following the U.S. embargo in 1997, ███████████████████████████

██████████████████████████████████████[57]██████████████████

███████ "then directed all major commercial banks located in Sudan to use BNPP Geneva as their

primary correspondent bank in Europe. As a result, "all or nearly all major Sudanese banks had

U.S. dollar accounts with BNPP Geneva."[58] This arrangement was analyzed by Plaintiffs'

compliance expert, Barry Koch (former Chief Compliance Officer at Western Union, Chief

Counsel for Global AML Compliance at JPMorgan Chase, and Global Head of AML Compliance

at American Express). "Under this agreement," Mr. Koch explains, "the Government of Sudan

would place the majority of its foreign currency reserves and a bulk of Sudan's foreign trade in the

hands of BNPP."[59] Indeed, ████████████████████████████████████

███████████████████████[60]

    Through this exclusive partnership with the Bashir Regime, BNPP provided the

instruments of trade finance that enabled the Sudanese economy to expand, rather than contract,

---

[56] Ex. 57, Cozine Dep. at 119: 15-19, 123:12-1; Ex. 43, SSOF ¶¶ 14, 20, 41; *see also* Ex. 15, Koch Reply ¶¶ 91-92.
[57] Ex. 67, BNPP-KASHEF-00000034 at 38.
[58] Ex. 43, SSOF ¶ 19.
[59] Ex. 14, Koch Report ¶ 142.
[60] Ex. 72, BNPP-KASHEF-00000201 at 206.

in the face of the U.S. trade embargo.[61] As Mr. Koch explains, BNPP provided "standard banking products which BNPP subverted to unlawful ends, for the benefit of the regime in Khartoum and for the bank's enrichment."[62] BNPP provided letters of credit to finance export and import trade.[63] It set up and provided international payment systems (including correspondent banking and cover payments) to transfer funds into and out of ███████████████ and other Sudanese banks.[64]

███████████████████████████████████████████[65] ███████████████

███████████████████████████████████████████[66] ██

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████[67] ████████████████

████████████████████████████████████████████████[68] ███████

████████████████████████████████████████████████████

████[69] At the center of this foreign trade was oil.

---

[61] Ex. 9, Hudson Report ¶¶ 25, 232, 239; Ex. 5, Verhoeven Report at 38-40 (explaining that BNPP's trade financing was "especially" important for a poor nation with a bad reputation such as Sudan).

[62] Ex. 14, Koch Report ¶ 101.

[63] Ex. 14, Koch Report ¶¶ 120-133.

[64] Ex. 14, Koch Report ¶¶ 103-114.

[65] *See, e.g.*, Ex. 119, BNPP-KASHEF-00038899 at 38909 ████████████████████████████████████ ████████████

[66] *See, e.g.*, Ex. 96, BNPP-KASHEF-00013603 at 13604.

[67] *See, e.g.*, Ex. 85, BNPP-KASHEF-00005625 at 5629.

[68] Ex. 120, BNPP-KASHEF-00042444 at 42460-62; Ex. 16, Patey Report at 12; Ex. 12, Fogarty Reply ¶ 102.

[69] *See* Ex. 79, BNPP-KASHEF-00004293 at 4302.

1.    **The** 

Throughout the class period, ███████████████████████████████

███████████████████████████████████████████████████[70]██

████████████████████████████████████[71]

Under the Bashir Regime's production sharing agreements with the GNPOC and other oil
consortia, the Regime licensed concessions for the exploitation of Sudan's oil blocks. In exchange,
the Regime received an 80% share of the crude oil (once its partners' costs were reimbursed). The
Regime directly exported its share of the oil through the state-owned oil company Sudapet.



---

[70] Ex. 112, BNPP-KASHEF-00028707 at 28711.
[71] Ex. 105, BNPP-KASHEF-00014451 at 14457.
[72] Ex. 119, BNPP-KASHEF-00038899 at 38911-12; Ex. 105, BNPP-KASHEF-00014451 at 14457.
[73] Ex. 104, BNPP-KASHEF-00014325 at 14329.
[74] *See e.g.,* Ex. 11, Fogarty Report at ¶ 263.



Indeed, the U.S. Embassy in Khartoum flagged BNPP's central role in financing and laundering the Regime's oil revenue. In a 2007 diplomatic cable, verified by former NSC member Cameron Hudson, a State Department economic officer gleaned the following information from a Sudanese Ministry of Finance official who served on the Sudanese government's "Oil Revenue Technical Committee ... under the National Petroleum Commission":

> Econ officer asked how the money from petroleum sales is received by the government. El Hassan said that money from the sales of oil are [sic]first deposited at the Central Bank of Sudan account at Bank Paribas in Geneva. From there, the money is transferred to the Bank headquarters in Khartoum, . . .[78]

---

[75] Ex. 96, BNPP-KASHEF-00013603 at 13605 (emphasis added); *see* Ex. 12, Fogarty Reply ¶ 107 ▮▮▮▮▮ *see also* Ex. 80, BNPP-KASHEF-00004373 at 4376 ▮▮▮▮▮

[76] Ex. 71, BNPP-KASHEF-00000177 at 183. ▮▮▮▮▮ Ex. 108, BNPP-KASHEF-00015261 at 15262; Ex. 115, BNPP-KASHEF-00030053; *see also* Ex. 110, BNPP-KASHEF-00024869.

[77] *See e.g.,* Ex. 12, Fogarty Reply ¶112 ▮▮▮▮▮ Ex. 16, Patey Report at 7-8; Ex. 5, Verhoeven Report at 36.

[78] Ex. 7, Baldo Report ¶ 85 (quoting Diplomatic Cable from U.S. Embassy, Sudan to Intergovernmental Authority on Development and U.S. Secretary of State, Oil Revenue: 2007 GNU Budget Based on Questionable Assumptions, (Feb. 9, 2007), section 5., https://wikileaks.org/plusd/cables/07KHARTOUM194_a.html (published by Wikileaks)).

███████████ [79] The "petrodollar" was king in the oil trade: stable, convertible, and highly desired by oil-producing states as a foreign reserve currency.[80] The U.S. dollar was also the currency of choice—and necessity—for the Regime, which needed dollars for cash purchases of arms.[81]

However, the oil industry's dependence on the petrodollar gave the United States a unique position as financial gatekeeper. All foreign exchange in U.S. dollars must at some point be "cleared" through a U.S. financial institution.[82] This was the true power of the U.S. embargo on Sudan—the Regime needed access to U.S. financial markets to obtain petrodollars. And for that it needed BNPP.

### 2.    BNPP evades U.S. sanctions through falsified documents and shell bank accounts.

To give the Central Bank of Sudan and other co-conspirators access to U.S. financial markets, BNPP "created deceptive schemes and transaction structures to conceal thousands of illegal Sudanese transactions from scrutiny by U.S. financial institutions, regulators and authorities."[83] BNPP's corporate representative testified under oath that ███████████
███████████████████████████████ [84]

BNPP circumvented U.S. sanctions through several means. As banking compliance expert Barry Koch explained, "BNPP engaged in wire-stripping: removing or omitting the identities of sanctioned parties from payment messages so that a bank's automated monitoring tools will not

---

[79] Ex. 57, Cozine Dep. at 110:19-20; Ex. 54, Bazire Dep. at 15:11-15.
[80] Ex. 17, Patey Reply at 6-7.
[81] *See* Ex. 50, Deposition of Enrico Carisch ("Carisch Dep.") at 58:4-25-59:1-16.
[82] *See* Ex. 9, Hudson Report ¶ 52; Ex. 14, Koch Report ¶ 106; Ex. 88, BNPP-KASHEF-00006845 at 6848.
[83] Ex. 44, *In re BNP Paribas, S.A. New York Branch*, *Consent Order Under New York Banking Law § 44*, New York State Department of Financial Services ("DFS Consent Order") at ¶ 10.
[84] Ex. 57, Cozine Dep. at 117:1-2.

detect the offending parties."[85] The wire-stripping began ███████████

████████████████████[86]

    In its guilty plea, BNPP admitted that its Head Office in Paris not only authorized this practice, it required it. Until at least 2003, "BNPP's internally published policy for processing US. dollar payments involving Sudan stated: 'Do not list in any case the name of Sudanese entities on messages transmitted to American banks or to foreign banks installed in the U.S.'"[87] BNPP admitted that wire-stripping "enabled BNPP to manage or finance billions of dollars' worth of U.S. dollar denominated letters of credit for Sudanese entities."[88]

    BNPP also employed a "classic money-laundering technique" where it opened accounts for so-called "Satellite Banks" ████████████████████████ to serve as front company accounts for illicit Sudanese transactions.[89] The guilty plea admits: "BNPP worked with other financial institutions to structure payments in highly complicated ways, with no legitimate business purpose, to conceal the involvement of Sanctioned Entities in order to prevent the illicit transactions from being blocked when transmitted through the United States."[90]

    BNPP used the Satellite Bank front-company structure as a circuit to funnel billions of U.S. dollar import and export transactions in and out of Sudan without being blocked by the U.S. embargo. The Satellite Bank scheme used book-to-book transfers, an accounting method where BNPP would move funds within the same bank branch by debiting the sending client's account and then crediting the receiving client's account.[91] ████████████████████████

---

[85] Ex. 14, Koch Report ¶ 159.
[86] Ex. 43, SSOF ¶¶ 18-19; Ex. 14, Koch Report ¶ 161; Ex. 103, BNPP-KASHEF-00014196.
[87] Ex. 43, SSOF ¶ 22; Ex. 70, BNPP-KASHEF-0000160 at 164.
[88] Ex. 43, SSOF ¶ 18; *see also* Ex. 14, Koch Report ¶¶ 148-157, 161-63 ████████████████████ ████████████████████████████ Ex. 15, Koch Reply ¶ 95, n. 147.
[89] Ex. 14, Koch Report ¶¶ 183-196; Ex. 9, Hudson Report ¶ 60.
[90] Ex. 43, SSOF ¶ 16.
[91] Ex. 14, Koch Report ¶¶ 197-201.



As BNPP admitted in its Consent Order with the New York Department of Financial

Services:

> As a result of BNPP's conduct, the Government of Sudan and numerous banks connected to the Government of Sudan, including SDNs, were able to access the U.S. financial system and engage in billions of dollars' worth of U.S. dollar-based financial transactions, significantly undermining the U.S. embargo.[97]

---

[92] Ex. 5, Verhoeven Report at 40; Ex. 14, Koch Report ¶¶ 115-19.

[93] *See* Ex. 14, Koch Report ¶¶ 115-19; Ex. 11, Fogarty Report ¶ 250.

[94] Ex. 87, BNPP-KASHEF-00005700 at 5706.

[95] Ex. 87, BNPP-KASHEF-00005700 at 5708.

[96] Ex. 12, Fogarty Reply ¶¶ 62, 72; Ex. 11, Fogarty Report ¶¶ 103, 249, and Ex. 1. ███████████████████████████████ Ex. 12, Fogarty Reply ¶ 72. ███████████████████ *Id.* at ¶ 73.

[97] Ex. 44, DFS Consent Order at ¶ 25.

BNPP's chief defense appears to be: "If we didn't do it, another bank would"—a consistent refrain of their experts.[98] But it already admitted in its guilty plea that without BNPP, the Sudanese government would not have had access to the U.S. financial system—the lynchpin of its petrodollar revenue: "BNPP's willingness to engage in U.S. dollar transactions involving Sudan significantly undermined the U.S. embargo and provided the Sudanese government and Sudanese banks with access to the U.S. financial system that they otherwise would not have had."[99]



**3.    The Bashir Regime generates** ████████████████
        **from its partnership with BNPP.**

---

[98] *See e.g.,* Ex. 15, Koch Reply ¶¶ 12, 99-118 (addressing this argument raised by BNPP's expert Teresa Pesce); Ex. 6, Verhoeven Reply at 10 (addressing this argument raised by BNPP's expert Dr. Philip Verleger).
[99] Ex. 43, SSOF ¶ 41.
[100] Ex. 15, Koch Reply ¶ 115, n. 187; Ex. 96, BNPP-KASHEF-00013603 at 13607 ████████████████
████████████████ Ex. 119, BNPP-KASHEF-00038899 ████████████████
[101] *See* Ex. 71, BNPP-KASHEF-00000177 at 183; Ex. 11, Fogarty Report ¶¶ 260-63; Ex. 12, Fogarty Reply ¶ 128; Ex. 16, Patey Report at 26.
[102] UNSC Panel of Experts Report (2008), ¶ 283, https://shorturl.at/dtyES

19



[103]

[104]

[105]

[106] BNPP has never disclosed the total amount of Sudanese transactions it processed between 1997 and 2009, not to the U.S. government and not to Plaintiffs. But the Sudanese U.S.-dollar transactions it has disclosed exceed [107]

Because BNPP lost or destroyed pre-2002 records of Sudanese transactions—and shielded others behind Swiss bank secrecy laws—

[108]

[109] The U.S.

---

[103] Ex. 96, BNPP-KASHEF-00013603 at 13604.
[104] Ex. 12, Fogarty Reply. ¶ 127 (emphasis added); *see, e.g.*, Ex. 122, BNPP-KASHEF-00048093 at 48099

and *id.* at 48105

[105] Ex. 50, Carisch Dep. at 275:17-276:13.
[106] Ex. 43, SSOF ¶ 19; Ex. 80, BNPP-KASHEF-00004373 at 4376-77.
[107] Ex. 12, Fogarty Reply ¶ 62.
[108] *See* Ex. 57, Cozine Dep. at 67:8-25; 68:1-12; Ex. 43, SSOF ¶ 72.
[109] Ex. 71, BNPP-KASHEF-00000177 at 183.

Department of Justice described BNPP's support for the Regime as so pervasive and systemic that BNPP was "a de facto central bank for the government of Sudan."[110]

### B.    BNPP becomes the chief financier of mass atrocities in Sudan.

BNPP is no ordinary financier: it is a felon convicted of the largest sanctions crime in U.S. history. Even BNPP's own compliance expert, ex-SDNY prosecutor Teresa Pesce, admits that she "probably would have" prosecuted BNPP.[111] And the Regime it financed was no ordinary government: it was a military dictatorship embarking on a genocidal campaign against Black Africans and a violent, paranoid purge of perceived dissidents.[112]



███████ according to BNPP expert Enrico Carisch, █████████████████████████████ [113]

The Central Bank of Sudan was no ordinary financial institution: it was dominated by National Islamic Front stalwarts such as Sabir Mohammad Hassan.[114] Sudan's banks and oil companies were no ordinary corporations: according to BNPP expert Enrico Carisch, ████████████████

---

[110] Ex. 14, Koch Report ¶36; Ex. 9, Hudson Report ¶ 208.
[111] Ex. 51, Deposition of Teresa Pesce ("Pesce Dep.") at 76:21-25, 77:1-4.
[112] Ex. 4, Jok Report ¶¶ 3-6, 43; Ex. 7, Baldo Report ¶¶ 8, 108.
[113] Ex. 50, Carisch Dep. at 310:4-6; Ex. 61, Enrico Carisch, *UN Sanctions, Peace and the Private Sector*, 6 JOURNAL OF INT'L PEACE OPERATIONS 18 (2010).
[114] Ex. 16, Patey Report at 5.
[115] Ex. 50, Carisch Dep. at 312:8-14; Ex. 61, Enrico Carisch, *UN Sanctions, Peace and the Private Sector*, 6 JOURNAL OF INT'L PEACE OPERATIONS 17 (2010).

1.    **The War Chest:** 

Even BNPP's own UN sanctions expert Enrico Carisch has confirmed that ███████████████ ████████████████████████████████████████████████. He reported to the UN Security Council that in 2007 the military budget was "about 3 percent" of Sudan's gross domestic product, estimated at $80 billion, *i.e.*, $2.4 billion.[117] A BNPP internal document reports that ███ ██████████████████████████████████████████████████████████████ ██████████████████████████[118] ████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████████[119] In a 2008 report to the UN Security Council,    defense expert Carisch wrote: "Sudan's revenues from oil,

---

[116] Ex. 11, Fogarty Report ¶ 260; Ex. 12, Fogarty Reply ¶ 128; Ex. 16, Patey Report at 18; Ex. 19, Austin Reply ¶ 80.
[117] Ex. 50, Carisch Dep. at 257:14-258:8; UNSC Panel of Experts Report (2008), https://shorturl.at/dtyES.
[118] Ex. 71, BNPP-KASHEF-00000177 at 183.
[119] Ex. 50, Carisch Dep. at 257:14-266:20.

agricultural exports and regular taxations allows the State to fully fund its military presence in Darfur, its actions against the Darfur rebels and support for Chadian armed opposition groups."[120]

U.S. State Department documents confirm that ███████████████████████ ███████████ were used for military spending for the perpetrators of genocide. As the State Department reported to Congress in 2003, the "Government of Sudan states that oil revenues are placed in the central bank and pooled with other revenue sources, and used for general government expenditures."[121] Those expenditures were "dominated by spending" on the military, national security services, and militias—the institutions used nationwide to commit the Regime's genocidal campaign.[122] Indeed, in 2007, the U.S. embassy in Khartoum reported to Washington that Sudan's "budget allocate[d] substantial revenue to military and security expenditures, leaving relatively small amounts available for development, health and education."[123]

**2.    Bags of Cash and Barrel Bombs: BNPP fuels a 3000% increase in military spending, fueling the escalation in the Regime's mass atrocities.**

███████████████████████████████████████████ 3000% increase in military spending—from $97.7 million in 1997, the year the U.S. embargo began, to over $3.1 billion in 2009.[124] Sudan's civilian victims paid the price. According to a 2008 UN report co-authored by BNPP's expert Enrico Carisch, "[t]he arsenal of weaponry used by Government forces

---

[120] Ex. 50, Carisch Dep. at 275 :21-276 :4; UNSC Panel of Experts Report (2008), ¶ 284, https://shorturl.at/dtyES.

[121] U.S. Dept of State, *Sudan Peace Act Report*, April 21, 2003, https://2001-2009.state.gov/p/af/rls/rpt/2003/19790.htm.

[122] Ex. 7, Baldo Report ¶ 86.

[123] Ex. 7, Baldo Report ¶ 86 n.60 (quoting Diplomatic Cable from U.S. Embassy, Sudan to Intergovernmental Authority on Development and U.S. Secretary of State, Oil Revenue: 2007 GNU Budget Based on Questionable Assumptions, (Feb. 9, 2007), Section 5., https://wikileaks.org/plusd/cables/07KHARTOUM194_a.html (published by Wikileaks)).

[124] Ex. 19, Austin Reply ¶ 96.

in their premeditated and deliberate attacks includes both air and ground military assets and continues to expand as the purchase of new technologies continues unabated year upon year."[125]

The U.S. dollars generated by BNPP's sanctions-evasion scheme were critical to this expansion. ████████████████████████████████████████ ████████████████████ [126] ██████████████████████████████████ ████████████████████████████████████████████ [127] BNPP's scheme gave the Regime the U.S. dollars it needed to fill those suitcases. As a BNPP memorandum explains, ████████████████████████████████████████ ████████████████████████████████████████████████ [128]

Even before Sudan began exporting oil in 1999, it was borrowing against future oil extraction to finance weapons purchases.[129] The arms deals expanded dramatically after the Regime embarked on its sanctions-evasion conspiracy with BNPP and the laundered U.S. dollars began to flow back to Khartoum. From 1997 to 2011, the Bashir Regime imported more than $100 million in small arms, light weapons, and ammunition ("small arms")[130] ██████████████ ██████████████████████

Flush with U.S. dollars from BNPP, the Regime imported dozens of attack helicopters and combat aircraft; dozens of tanks and armored-personnel carriers; hundreds of military trucks; fleets

---

[125] UNSC Panel of Experts Report (2008), ¶ 33, https://shorturl.at/dtyES.
[126] *See* Ex. 50, Carisch Dep. at 58:8-59:16.
[127] *Id.*
[128] Ex. 76, BNPP-KASHEF-00000885 at 896.
[129] *See* Ex. 16, Patey Report at 8 ("Now able to use future oil production as collateral for international loans, GoS bought heavy military weapons and aircraft from Iran, China, Russia, and elsewhere in order to wage war and depopulate oil regions."); Ex. 9, Hudson Report at ¶¶ 79-81, *citing* Pub. L. 107-245 §§ 2(8), 6(b)(2)(C); *Sudan Peace Act*, Statement of Representative Bachus, 107 Cong. Rec. H7102 (Daily ed. Oct. 7, 2002) at H7108; Statement of Representative Smith, 107 Cong. Rec. H7102 (Daily ed. Oct. 7, 2002) at H7105 (emphasis added); Statement of Representative Johnson, 107 Cong. Rec. H7102 (Daily ed. Oct. 7, 2002) at H7109, https://www.congress.gov/107/crec/2002/10/07/CREC-2002-10-07-pt1-PgH7102-2.pdf.
[130] Ex. 19, Austin Reply ¶ 99.

of Land Rovers and Land Cruisers used for desert combat; and Antonov cargo planes used to drop barrel bombs on villages, hospitals, schools, and other civilian areas.[131]

In the 1990s, the Bashir Regime stated its intention to develop a domestic arms industry financed by future oil proceeds from unlawful transactions that were being processed by BNPP. For example, in April 1999, *Agence France Presse* reported on a speech where Hassan al-Turabi, ideological head of the ruling party, announced: "'We are currently building several factories to produce our needs in weapons, and we plan to manufacture tanks and missiles to defend ourselves against conspirators.'"[132] Enriched by the sanctions-evasion conspiracy, the Regime carried out that promise. According to a 2006 report from BNPP's expert Carisch's UN Panel, "[o]ver the last decade, Sudan has significantly increased its ability to produce its own light weapons and ammunition."[133] The deadly consequences for Sudan's civilians were made clear by BNPP expert Victor Menaldo: "the size of the military reflects . . . the ability to mete out repression against citizens and the opposition. . . . "[134] The "opposition" in the case of Sudan being the civilian populations in Darfur and the south, labeled "non-Arab" by the regime and from which Plaintiffs and the Class come.[135]

**3.** █████████████████ **the Bashir Regime's arms procurement network used on a mass scale against civilians.**

████████████████████████████████████████████

████████████████████████████ As UN arms expert Kathi Austin explains, ███████████

---

[131] *See e.g.,* Ex. 19, Austin Reply ¶¶ 99-102, 114-117, 121; Ex. 5, Verhoeven Report at 26; Ex. 11, Fogarty Report ¶ 110; Ex. 9, Hudson Report ¶¶ 87-88.

[132] Ex. 6, Verhoeven Reply at 29, n. 68 (quoting Agence France Presse, *Sudan to Manufacture Tanks, Missiles: Assembly Speaker*, Khartoum, April 30, 1999).

[133] Ex. 19, Austin Reply ¶ 190.

[134] Ex. 52, Deposition of Victor Menaldo ("Menaldo Dep.") at 18:16-20; Michael Albertus and Victor Menaldo, *Coercive Capacity and the Prospects for Democracy,* 154 (Jan. 2012), https://faculty.washington.edu/vmenaldo/Articles%20in%20Journals/CP%20Article.pdf.

[135] *See* Ex. 4, Jok Report ¶¶ 8, 41, 97.

██████████████████████████████████████████████████████████

████████████████████ [136] The government operatives typically involved in exchanging bags of cash for weapons were military attachés operating out of consulates and embassies.[137] Their wire transfers were often disguised as tuition fees or other non-commercial payments used as fronts for military-linked transactions.[138]



[136] Ex. 19, Austin Reply ¶ 177
[137] *See* Ex. 19, Austin Reply ¶¶ 62, 177-82.
[138] *See* Ex. 19, Austin Reply ¶ 62.
[139] *See* Ex. 114, BNPP-KASHEF-00029502 at 29510; Ex. 113, BNPP-KASHEF-00028936 at 28970.
[140] Ex. 19, Austin Reply ¶ 177.
[141] Ex. 7, Baldo Report ¶ 88; Ex. 19, Austin Reply ¶ 3; Ex. 10, Expert Reply Report of Cameron Hudson ("Hudson Reply") ¶ 115; Ex. 5, Verhoeven Report at 46-47.
[142] Ex. 58, Cozine Dep. Ex. 253 "Kashef v. BNP Paribas – Topic 10 Entities," at 2.
[143] Ex. 19, Austin Reply ¶ 182.



[144]

[145]

[146]

[147]

[148] At his deposition, BNPP's 30(b)(6) witness Dan Cozine baldly asserted that ██████████████

██████████████████████████████████████

██████████████████████████████████████

██████ [149]

Contrary to Mr. Cozine's claims, ██████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████ [150]

---

[144] Ex. 19, Austin Reply ¶ 174.
[145] Ex. 71, BNPP-KASHEF-00000177 at 190.
[146] Ex. 99, BNPP-KASHEF-00013989 at 13995.
[147] Ex. 57, Cozine Dep. at 243:24-244:2.
[148] Ex. 19, Austin Reply ¶ 174.
[149] Ex. 57, Cozine Dep. at 161:5-162:7, 258:9-259:18.
[150] Ex. 71, BNPP-KASHEF-00000177 at 190.

████████████████████████████████████████████

██████████████████████████[151]

Plaintiffs' banking compliance expert Barry Koch found ████████████████████

████████████████████████████████████████████

████████████████████████████████████████[152]

████████████████████████████████████████████

██[153]██████████████████████████████████████

████████████████████████████████████████████

██████████████[154]████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████[155]████████████████████████████████

████████████████████████████████████[156]████

█████████████.

**4.    Airfields and Armored Trucks:** ████████████████
████████████████████████████

**a.** ████████████████████████████
████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[151] *Id.*
[152] Ex. 14, Koch Report ¶¶ 258-62.
[153] Ex. 14, Koch Report ¶¶ 259-62.
[154] Ex. 14, Koch Report ¶¶ 259-62.
[155] Ex. 53, Deposition of Patrice de Saint André ("de Saint André Dep.") at 59:12-24.
[156] Ex. 57, Cozine Dep. at 135:145:13; 174:20-176:23.



Sudan's Civil Aviation Authority ("CAA"), under the command of the Ministry of Defense, managed the airports used by the Sudanese air force to launch aerial attacks on civilian populations,

despite being sanctioned by the U.S. government.[159]

As Sudanese renowned human rights expert Suliman Baldo explains:

> The SAF's air force, including its combat and transport arms, relied on civilian aviation infrastructure. The principal SAF airbase was at Khartoum International Airport, with another major base north of Khartoum in Wadi Sayyidna. The air force also maintained air bases at regional civilian airports, including in El Fasher in Darfur and Juba in Southern Sudan. Other air bases included Nyala Air base in South Darfur and Heglig Airbase in the oil producing region.[160]

The Bashir Regime used these ██████████ air bases to bomb Sudan's disfavored civilian populations into submission, exile, or extermination. As Dr. Baldo confirms, "A standard practice was to roll crude barrel bombs—barrels packed with shrapnel and explosives—from the cargo hatches of Antonov-26 and Antonov-32 cargo planes."[161] In addition, the air force

---

[157] Ex. 19, Austin Reply ¶¶ 160-163.
[158] Ex. 50, Carisch Dep. at 225:21-226:10; Ex. 7, Baldo Report ¶ 56.
[159] *See* Ex. 122, BNPP-KASHEF-00048093 at 48099; Ex. 50, Carisch Dep. at 236:11-21

[160] Ex. 7, Baldo Report ¶ 55.
[161] Ex. 7, Baldo ¶ 60.

"employed helicopters for air-to ground rocket and strafing attacks."[162] The UN team of BNPP's

expert Mr. Carisch took photographs of military operations at CAA-managed airports.[163]

Photo 6
**Azza Transport aircraft delivering military supplies to El Fasher airport,
30 August 2008**



Photo 14
**White Mi-171 helicopter on military apron at El Fasher airport**



Photo 16
**Military supply dump including bombs at El Fasher airport, 12 March 2008**



███████████████████████████████████████

███████████████████████████████████████

████████████████████████████ but the UN Panel of Experts on Sudan

reported that at civilian airports, "SAF personnel sometimes convey aircraft bombs to SAF

Antonov aircraft . . . using ordinary airport luggage trolleys."[164] ████████████████

███████████████████████████████████████

---

[162] *Id.*
[163] UNSC Panel of Experts Report (2008), ¶¶ 24-36, https://shorturl.at/dtyES.
[164] Ex. 50, Carisch Dep. at 71:23-72:12, 171,7-23, 224:14-226:10, UNSC Panel of Experts Report (2011), ¶¶ 165-67, https://tinyurl.com/4v59r3rs. As an expert for the UN, Mr. Carisch also witnessed the military operations being conducted in the civil airports where he and his UN Panel of Experts flew in and out of. Ex. 50, Carisch Dep. at 71:23-72:12, 171,7-23, 224:14-226:10.

████████████████████████████████████████████████████

████████████████████████████████████[165]

**b.** ████████████████ **GIAD, the "Crown Jewel" of Sudan's homegrown "Defense Industries System."**

At the height of the Darfur genocide, from 2004 until at least December 2008, ████

████████████████████████████████████████████████████

████████████████████████[166] Called the "crown jewel of the Defense Industries System" by U.S. Senator Chris Coons,[167] GIAD was at the time controlled by the Sudanese military and sanctioned by the U.S. government.[168] GIAD was used to outfit imported vehicles, specifically Renault trucks, into armored vehicles mounted with weaponry, and used across Sudan against the targeted civilian populations from which Plaintiffs and the Class come.[169]



---

[165] Ex. 7, Baldo Report ¶ 55; Ex. 60, Carisch Report ¶ 99.

[166] Ex. 19, Austin Reply ¶¶ 136-148; Ex. 7, Baldo Report ¶ 87; Ex. 10, Hudson Reply ¶¶ 113-114; Ex. 5, Verhoeven Report at 53.

[167] Chris Coons, et al., *Targeted Sanctions Can Help Restore Democracy in Sudan*, Foreign Policy, Feb. 28, 2022, https://foreignpolicy.com/2022/02/28/sudan-targeted-sanctions-can-help-restore-democracy/.

[168] *See* Ex. 19, Austin Reply ¶ 138; U.S. Dept. of the Treasury, *Treasury Designation Targets Sudanese Government, Rebel Leader*, May 29, 2007, https://home.treasury.gov/news/press-releases/hp426.

[169] UNSC Panel of Experts Report (2008), https://shorturl.at/dtyES; UNSC Panel of Experts Report (2009), https://shorturl.at/pQW59; Ex. 18, Austin Report ¶ 130; *see also* Ex. 5, Verhoeven Report at 53 ("GIAD manufactured Sudan's first domestic tank – the Bashir – and plenty of other lethal kit.").

[170] Ex. 19, Austin Reply ¶139; *see, e.g.*, Ex. 109, BNPP-KASHEF-00024439 at 24439-40.

[171] BNPP's Responses and Objections to Plaintiffs' Requests for Admissions ██████████████████ Ex. 64, BNPP Defendants' Responses and Objections to Plaintiffs' Requests for Admission No. 222, at 180-81. Ex. 111, BNPP-KASHEF-00027592 and Ex. 78, BNPP-KASHEF-00003882 ███████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████ [172] Those products included Midlum 4x4s marketed as "*véhicules civils militarisables*," meaning commercial vehicles that can be militarized.[173] In the hands of GIAD, Renault Midlums were not just militarized, they were deployed by military and militia forces in attacks against non-Arab civilians.

In 2007, Sudanese journalist Nima Elbagir—now CNN's Chief International Investigative Correspondent—traveled to the base camp of Hemmeti, one of the leaders of the *Janjaweed* Arab militia serving as auxiliary forces of the Regime, to film a documentary that aired on the UK Channel 4. She filmed as the *Janjaweed* forces showed off their GIAD-branded models of Renault Midlum 4x4s fitted with anti-aircraft guns.[174] The following images are screenshots from Ms. Elbagir's documentary *Meet the Janjaweed*.[175]

 

GIAD Truck with anti-aircraft gun (Darfur, Sudan) (Channel 4)    GIAD Truck with anti-aircraft gun (Darfur, Sudan) (Channel 4)

---

[172] Ex. 55, Deposition of Philippe Maillard ("Maillard Dep.") at 149:10-20 ████████████████

████████████████████████████████████████████████████

[173] Ex. 19, Austin Reply ¶ 142.
[174] Ex. 20, Declaration of Nima Elbagir ("Elbagir Decl.") ¶¶ 31-33.
[175] Ex. 20, Elbagir Decl. ¶40.



GIAD Truck with anti-aircraft gun (Darfur, Sudan) (Channel 4)

Hemmeti informed Ms. Elbagir that the weapons and vehicles had been supplied by the Bashir Regime—admitting to a violation of the UN arms embargo that could have subjected him to targeted sanctions by the UN Security Council:

> [Commander Hemetti] said that in fact, the government had recruited him personally to fight against the Darfuri rebels in 2003 and made his men part of the regular armed forces as "Border Intelligence." If we wanted proof, he said we should look around at his men's weapons. He said, "Does it seem logical to you that we magic these weapons and these brand new cars out of air? Of course, the government gave them to us."[176]

The 2008 UN Panel of Experts report, co-authored by BNPP's expert Carisch, reached the same conclusion. It confirmed that GIAD trucks were employed by the Sudanese Armed Forces in Darfur, even noting that they appeared to have been "originally manufactured by Renault Truck Company, Man, and possibly a third company."[177] Mr. Carisch's report included photographic proof, reproduced here.[178]

---

[176] Ex. 20, Elbagir Decl. at ¶ 57.
[177] UNSC Panel of Experts Report (2008), ¶ 170, https://shorturl.at/dtyES.
[178] UNSC Panel of Experts Report (2009), ¶ 45 https://shorturl.at/pQW59;

Photos 32 and 33
**GIAD trucks used by SAF in Darfur**

 

███████████████████████████

GIAD, the Sudanese counterparty to millions of dollars in revolving credit, was linked to the Sudanese military and its atrocities. A notorious 2001 report by Christian Aid, *The Scorched Earth: Oil and War in Sudan*, reported that GIAD was "inaugurated by President Omar al-Bashir . . . 12 months after oil began flowing through the pipeline" at a cost of "$450 million."[179] According to the publicly available report, in an opening ceremony, President Bashir "said the complex was already producing rocket-propelled grenades, machine-guns and mortars - and was still expanding. 'We will produce mortars and tanks,' he said. 'Then we will go on to warplanes and rockets.'"[180] Even if somehow BNPP missed Al Bashir's speech, GIAD's 2005 Annual Report disclosed that it was partly owned by the "Military Industrial Corporation" and in March 2005, Jane's Defence Weekly—a popular defense industry journal—reported that GIAD was assembling imported trucks for Sudan's Ministry of Defense for military purposes.[181] ███████████████

███████████████████████

In May 2007, the U.S. Treasury Department added GIAD to the SDN list, announcing that it had "supplied armored vehicles to the Sudanese government for military operations in

---

[179] Christian Aid, *The Scorched Earth: Oil and War in Sudan*, Mar. 14, 2001, https://reliefweb.int/report/sudan/scorched-earth-oil-and-war-sudan.
[180] *Id.*
[181] *See* Ex. 19, Austin Reply ¶ 147.

Darfur."[182] 

Sudan's military and security apparatus, which was carrying out the campaign of persecution against the disfavored groups from which Plaintiffs and the Class come.

.

### C.    The Oil-Genocide Nexus: Funded by BNPP, the Bashir Regime escalates its campaign of mass atrocities, killing and displacing millions.

Between 1997 and 2011, the Bashir Regime waged a genocidal campaign of persecution against disfavored racial (non-Arab), religious (Christians and moderate Muslim), and social groups (civil society professionals) perceived by the military-Islamist Regime as opponents. This nationwide campaign was waged by key institutions of the state funded by

---

[182] U.S. Dept of the Treasury, *Treasury Designation Targets Sudanese Government, Rebel Leader*, May 29, 2007, https://home.treasury.gov/news/press-releases/hp426. Even before May 2007, GIAD was covered by the Sudan country sanctions that had been in effect since 1997.
[183] Ex. 117, BNPP-KASHEF-00031982.
[184] Ex. 57, Cozine Dep. at 266: 1-7; Ex. 58, Cozine Dep. Ex. 253 at 5.

████ in common patterns of violence and repression, including torture, rape, and the forcible displacement and killing of millions of civilians including Plaintiffs and the Class.

Previously in this case, the Second Circuit took judicial notice that the "atrocities . . . in Sudan are widely known and have been condemned by both the United States and the international community as genocide." *Kashef,* 925 F.3d at 55 (citing H.R. Con. Res. 467, 108th Cong. (2004) (enacted); S. Con. Res. 133, 108th Cong. (2004) (enacted)).

In the Sudan Peace Act of 2002, Pub. L. No. 107-245, 116 Stat. 1503 (Oct. 21, 2002), Congress determined that the Regime's campaign of atrocities in southern Sudan "constitute[d] genocide as defined by the Convention on the Prevention and Punishment of the Crime of Genocide," *id.* § 2(10). In 2004, the Executive Branch made the same determination after the Regime expanded its campaign to Darfur in western Sudan.[185] And in 2010, the Appellate and Pre-Trial Chambers of the International Criminal Court made the same determination, issuing an arrest warrant for President Omar al-Bashir on charges of genocide, crimes against humanity, and war crimes.[186]

Taking off after 1997, this campaign was executed nationwide by the same "repressive apparatus of military, security and militia forces controlled and funded by the State" – supported by the State's financier, BNPP.[187] As detailed by Plaintiffs' expert Suliman Baldo, an eminent Sudanese human rights scholar, anti-corruption researcher, and witness before the International Criminal Court, this apparatus included Sudan's feared secret police, the National Intelligence and

---

[185] U.S. Department of State, *The Crisis in Darfur,* Testimony Before the Senate Foreign Relations Committee by Secretary Colin L. Powell, Sept. 9, 2004, https://2001-2009.state.gov/secretary/former/powell/remarks/36042.htm
[186] Prosecutor v. Omar Al-Bashir, Appeals Chamber Judgment, ICC-02/05-01/09-73, Feb. 3, 2010, ¶¶38-39, https://www.icc-cpi.int/court-record/icc-02/05-01/09-73; Second Decision on the Prosecution's Application for a Warrant of Arrest, ICC-02/05-01/09-94, ICC Pre-Trial Chamber I, July 12, 2010, ¶43; https://www.icccpiint/sites/default/files/CourtRecords/CR2010_04825.PDF.
[187] Ex. 7, Baldo Report ¶¶ 41, 79.

Security Service ("NISS"); the Sudanese Armed Forces ("SAF"); various police forces; and an array of paramilitary and militia forces mobilized under Sudanese law, including:

- the Central Reserve Force;
- Popular Defense Forces;
- Border Intelligence;
- the SPLA factions of Riek Machar and Kerubino Bol (a.k.a. the South Sudan Defense Forces);[188] and
- the Arab tribal militias, commonly called the Janjaweed, Murahalin, Mujahidin, and Baggara, which were institutionalized by the Regime.[189]

These government agents operated under the "supreme command and control" of Omar al-Bashir, "the President of the Republic, head of the [National Islamic Front], and Commander in Chief of the Sudanese Armed Forces."[190] The military-security apparatus was coordinated by the National Security Council and organized under Sudanese law, which provided a legal framework for the mobilization of paramilitaries and militias.[191]

Throughout Sudan, and throughout the class period, this apparatus targeted segments of the civilian population deemed threats to the Regime's grip on power and its control over oil and other economic resources.[192] Plaintiffs and the Class are members of these targeted groups. The targeting was animated by the Regime's ideology of Salafi Islamist extremism and racist Arab

---

[188] As discussed *infra* at 43-44, in the 1990s the Regime recruited splinter factions from the SPLA to defect to the government's side and form a joint military force.

[189] *See* Ex. 7, Baldo Report ¶¶ 44-78; 165-68.

[190] Ex. 7, Baldo Report ¶ 42.

[191] *See* Ex. 7, Baldo Report ¶¶ 7, 41-78 (referencing, *inter alia*, the Constitution of the Republic of Sudan, the National Security Force Act of 1999, the Popular Police Force Act of 1992, and the Popular Defense Forces Act of 1989); Ex. 5, Verhoeven Report at 9-11. The Bashir Regime promulgated the Popular Defense Forces Act in November 1989, providing the legal framework for mobilizing, arming, and funding militias as auxiliaries to the SAF, the formal military. *See* Ex. 7, Baldo Report ¶¶ 69-70; Ex. 8, Baldo Reply ¶¶ 40-41, 65.

[192] Ex. 4, Jok Report ¶¶ 8, 29, 43, 97; Ex. 7, Baldo Report ¶¶ 108, 117-121, 130, 133, 136, 144, 160-63, 190-93; Ex. 8, Baldo Reply ¶¶ 54-60, 127-32; Ex. 9, Hudson Report ¶¶ 11, 24, Ex. 5, Verhoeven Report at 17-18.

supremacism.[193] "Sudanese Christians and those Muslims who supported secularism" and religious freedom were considered enemies of the state and rebel sympathizers.[194] The Regime saw itself as a bulwark of the Arab elites against the indigenous Black African populations.[195] As Plaintiffs' expert, the South Sudanese-American anthropologist and Syracuse University professor Dr. Jok Madut Jok explains, there "is ample documentation showing that the al-Bashir regime intentionally terrorized and decimated Black African ethnic groups . . . on racial, religious, and ideological grounds."[196] Indigenous African tribes including the Nuer, Dinka, Nuba, Fur, Zaghawa, and Masalit came within the Regime's cross-hairs. President Bashir himself "suggested that non-Arabs should feel honored to be raped by his followers."[197]

In addition to perceived or actual non-Muslims and Black Africans, Bashir also targeted civil society members who might oppose the Regime, subjecting "lawyers, journalists, medical doctors, university professors, other citizens from all walks of life, and student activists" to arbitrary detention, interrogation, and torture.[198]

This nationwide campaign of persecution was part of what anthropologist Dr. Jok calls the Regime's "Two-Front Violence."[199] On one front, the Regime fought a civil war against rebel guerillas from the Southern People's Liberation Army (SPLA) in the south and the Justice and Equality Movement ("JEM") and the Sudan Liberation Army ("SLA") in Darfur.[200] On the second

---

[193] Ex. 4, Jok Report ¶¶ 3-6 (noting that the Regime's "extremist Salafi ideology" led it to "carr[y] out acts of extreme violence, harassment, and genocide against non-Muslim and moderate Muslim communities for not enforcing a strict Islamic code."); *id.* ¶ 26 (noting the regime's "racist and extreme religious ideology").

[194] Ex. 7, Baldo Report ¶ 146.

[195] Ex. 7, Baldo Report ¶¶ 103-04, 108-09; Ex. 4, Jok Report ¶ 4.

[196] Ex. 4, Jok Report ¶¶ 107-14 (summarizing evidence).

[197] Ex. 4, Jok Report ¶ 9 (citing media reports on a speech given by al-Bashir).

[198] Ex. 7, Baldo Report ¶ 19; *see also id.* ¶ 144 (the Regime targeted "[r]ights defenders and intellectuals who advocated for the entitlement of the Sudanese for the fundamental rights of freedoms of thought, conscious, and religio[n]").

[199] Ex. 4, Jok Report ¶¶ 25-26.

[200] Ex. 4, Jok Report ¶ 25; Ex. 7, Baldo Report ¶ 12.

front, the Regime subjected "undesirable" civilians to "a counterinsurgency strategy of 'draining the sea to catch the fish'"—using its BNPP-funded military and security apparatus to terrorize, massacre, and displace the targeted "civilian population perceived to be the base of support for opposition movements" including Plaintiffs and the Class.[201]

### 1.    The Regime uses BNPP-enabled resources to escalate atrocities after 1997.

The Regime had abused human rights since the 1989 coup—for that reason the U.S. imposed sanctions in 1997 aimed at curbing those abuses. But after its conspiracy with BNPP neutralized the U.S. embargo in 1997 and started channeling funds to Khartoum, the Regime's atrocities ramped up to genocidal proportions. The Congressional Sudan Peace Act of 2002 recalled that the Regime had "repeatedly" stated its intention "to use the expected proceeds from future oil sales to increase the tempo and lethality of the war."[202] And it did just that. After 1997, the Regime leveraged the promise of future oil proceeds, ████████████████████████ to launch a domestic arms industry and import arms from China and Iran.[203] The Regime then used the new helicopter gunships, Antonov planes, and other weapon systems ████████████ ████████████ to rapidly expand its military operations in the South "directed at forcibly clearing and possessing oil regions and then garrisoning them with troops."[204]

Dr. Baldo describes how the Regime "launched a strategy of 'coordinated attacks on civilian settlements in which aerial bombardment and raids by helicopter gunships are followed by ground attacks from Government backed militias and Government troops.'"[205] The intensity

---

[201] Ex. 7, Baldo Report ¶ 8.
[202] *Sudan Peace Act*, Pub. L. No. 107-245, 116 Stat. 1503 (2002), https://www.govinfo.gov/content/pkg/PLAW-107publ245/pdf/PLAW-107publ245.pdf.
[203] *See* Ex. 5, Verhoeven Report at 25-27; Ex. 11, Fogarty Report ¶ 105; Ex. 19, Austin Reply ¶ 96.
[204] Ex. 18, Expert Report of Kathi Austin ("Austin Report") ¶ 269; Ex. 7, Baldo Report ¶ 161 (describing the Regime's "depopulation strategy" in southern Sudan).
[205] Ex. 7, Baldo Report ¶179.

and frequency of these attacks against civilians "dramatically increased after 1997" as the Regime sought to "exploit[] the oil wells" and "to exert full control over the oil areas."[206] Indeed, "the prospect of oil flowing to the central government of Khartoum" lead to an "urgency to clear these areas" and a resulting increase in "the indiscriminate targeting of civilians" in these regions.[207] These attacks escalated as Sudan continued to develop its oil infrastructure.[208] By 2002, an estimated 174,200 people had been displaced from oil regions in Abyei and South Sudan.[209] The resulting flow of internally displaced persons created yet further increases in violence, including in and around the "pockets of shanty camps" near Khartoum in which many displaced persons lived.[210] The Regime subjected these disfavored populations to a systematic persecution.[211]

Similarly, the Regime used the new resources and funding made available to it through its criminal conspiracy with BNPP to expand its campaign of mass atrocities geographically to Darfur in western Sudan.[212] According to expert Cameron Hudson, the Regime increased the "tempo" of atrocities in this period, reaching 10,000 killings a month in Darfur, a "tempo of violence that

---

[206] Ex. 46, Deposition of Suliman Baldo ("Baldo Dep.") at 198:23-199:5.

[207] *Id.* at 207:1-209:14.

[208] *See, e.g.*, Ex. 11, Fogarty Report ¶ 110 (by 1999, the population of Ruweng County, located in an oil-producing region's population had decreased by 50%), ¶ 113 (the discovery of additional reserves in 1999 lead "to a significant escalation of conflict and displacement of populations from prospective oil fiends as the government doubled down on its efforts to control and improve oil production"), ¶¶ 114-116 (citing reports concerning human rights violations connected to oil development); Ex. 9, Hudson Report ¶ 63 (citing the United States 1998 US Annual Human Rights report, which notes that the Sudanese "government or government-associated forces" destroying villages and driving out inhabitants in oil-producing regions), ¶¶ 64-69 (summarizing reports from non-government organizations concerning human rights abuses related to oil development in Sudan); Ex. 7, Baldo Report ¶ 166-68 (describing the Regime's "divide and conquer strategy" stoking violence in oil-producing regions), ¶ 183 (describing "waves of well-documented campaigns" designed "to depopulate the oil blocks"). *See also id.* ¶¶ 171-185 (setting forth an overview of these oil-fueled campaigns).

[209] Ex. 7, Baldo Report ¶ 183.

[210] *Id.*

[211] *Id.*

[212] Ex. 46, Baldo Dep. at 194:22-196:19 (the Regime lacked the ability to conduct a multi-front war prior to 1997); Ex. 5, Verhoeven Report at 25-27 (explaining that the Regime's military spending doubled to support the war in Darfur).

exceeded the tempo of violence that we saw over a longer period of time in South Sudan."[213] The Regime conducted more than 1,800 documented aerial bombing attacks on civilian targets between 1999 and 2012.[214] By 2007, the U.S. National Security Council was aware that "the totality of the sanctions that [were] in place since 1997 [had] not helped us to impact the tempo of violence in Darfur." The sanctions could not abate the atrocities, so long as BNPP undermined them. Indeed, buoyed by BNPP's assistance, the Regime's tempo of violence in Darfur only began "to sort of stabilize . . . because [by 2007] most towns were ransacked and people were displaced," such that there was no longer a "need to carry on with that level of viciousness, because the goal had been achieved."[215]

### 2.    Torture in "Ghost Houses": Police state of terror.

A centerpiece of the Regime's genocidal campaign was its secret police force, the NISS. According to BNPP's expert Mr. Carisch, the NISS is "the single entity on which to pin responsibility for the decade-long mayhem in the Sudan . . . ."[216] In a 2010 article, Mr. Carisch reports that "former and current NISS officials" were "at the helm of all major Sudanese companies"; had "full control over" state institutions; and were "affiliated" with "dozens of the largest public corporations" in Sudan, ███████████████████████████ "most of the major national banks"; "the Sudan National Petroleum Corporation, which controls the state's entire oil and gas industry"; and the "automotive conglomerate, GIAD."[217]

---

[213] Ex. 48, Deposition of Cameron Hudson ("Hudson Dep.") at 163 :6-25.
[214] Ex. 7, Baldo Report ¶¶ 179-180.
[215] Ex. 45, Deposition of Jok Madut Jok ("Jok Dep.") at 232:24-233:15. That goal was "essentially interning the entire Darfur population in a camp and taking their land from underneath them in order to house the Arabs." *Id.*
[216] Ex. 61, Enrico Carisch, *UN Sanctions, Peace and the Private Sector*, 6 JOURNAL OF INT'L PEACE OPERATIONS 17 (2010).
[217] *Id.* at 17-18; Ex. 50, Carisch Dep. at 307:9-312:19.

Throughout the BNPP years (1997-2009), NISS "practiced a policy of extrajudicially arresting civilians on suspicion that they were sympathetic to opposition groups."[218] As CNN journalist and former detainee Nima Elbagir explains: "NISS was the key apparatus of repression in Khartoum."[219] NISS employed a common *modus operandi*: abducting civilians, often at night, and taking detainees to "secretive detention centers, often inside army barracks, security offices, and special houses."[220] NISS agents would interrogate detainees and subject them to brutal torture, often employing sexual violence and rape against women and men.[221] These centers were called "ghost houses" because they "produced humans who are but ghosts of their former selves."[222]

### 3. "Kill a slave by using another slave": Dividing and conquering South Sudan's Black African population.

In 1997, the Regime launched a new divide-and-conquer strategy to bring to heel the Nuer and Dinka peoples of South Sudan—a Black African, predominantly Christian population. Exploiting a rift in the SPLA rebels, the Regime recruited, armed, and paid off certain SPLA factions to defect to the government side. "Under the 1997 Khartoum Peace Agreement, an array of southern militias were armed and organized by the regime to terrorize civilians in SPLA controlled areas, under an umbrella group called the South Sudan Defense Forces."[223] The Regime's strategy of turning tribes and ethnic groups against one another by arming and funding rival militias succeeded in sowing destruction and instability in the south.[224] In 1997, one of the regime-armed militias "ravaged villages and crops around Wau, contributing to a massive famine

---

[218] Ex. 4, Jok Report ¶ 47.
[219] Ex. 20, Elbagir Decl. ¶ 16.
[220] Ex. 4, Jok Report ¶ 47.
[221] Ex. 7, Baldo Report ¶¶ 108-39; Ex. 4, Jok Report ¶¶ 46-76.
[222] Ex. 4, Jok Report ¶ 48.
[223] Ex. 7, Baldo Report ¶ 167.
[224] *See* Ex. 7, Baldo Report ¶¶ 161-69.

in Bahr El Ghazal that killed tens of thousands in 1998."[225] That same year, the Regime deployed Nuer militias to attack the civilian population in the oil producing region of West Upper Nile, eventually pitting one government-armed militia against another.[226] The Bashir Regime's divide and conquer strategy, as Plaintiffs' cultural anthropology expert wrote, hewed to "an old northern Sudanese adage: 'Kill a slave by using another slave.'"[227]

### 4. Scorched earth in the oil regions.

After 1997, "[o]il became the cause of, and main objective of, an intensification in the Bashir Regime's assault on civilians."[228] Controlling the south meant controlling the oil reserves, which straddled the north-south border in Abyei, Unity State, South Kordofan, and Darfur. The Regime pursued a strategy of depopulating the oil region of "undesirable" ethnic groups by mobilizing *mujahedeen* (holy warriors) backed by SAF infantry, aerial bombing, and helicopter gunships.[229] In May 1999, Sudan's Energy and Mining Minister Dr. Awad al-Jaz ████████ ███████████████████████████—"oversaw the deployment" of the paramilitary "'Protectors of the Oil Brigade' to the oil fields."[230]

The Regime's scorched earth campaign in the oil region drew worldwide condemnation and could not have escaped BNPP's attention. As Dr. Baldo notes, a 2001 Canadian investigation reported that:

> coordinated attacks on civilian settlements in which aerial bombardment and raids by helicopter gunships are followed by ground attacks from Government backed militias and Government troops. These ground forces burn villages and crops, loot livestock and kill and abduct men, women, and children.[231]

---

[225] Ex. 7, Baldo Report ¶ 168.
[226] Ex. 7, Baldo Report ¶ 168.
[227] Ex. 7, Baldo Report ¶ 169 (quoting Jok Madut Jok, *Sudan, Race, Religion, and Violence* 176 (2007)).
[228] Ex. 7, Baldo Report ¶ 174.
[229] Ex. 7, Baldo Report ¶¶ 175-79.
[230] Ex. 7, Baldo Report ¶ 175.
[231] Ex. 7, Baldo Report ¶ 179 (quoting John Ryle and Georgette Gagnon, "Report of an Investigation in Oil Development, Conflict, and Displacement in Western Upper Nile, Sudan," OTTAWA, October 2001.).

In response to attacks such as this, President Bush signed the Sudan Peace Act in October 2002, which, according to NSC member Cameron Hudson, "explicitly recognized that Sudan's oil revenue was fueling a vicious cycle in which the Regime waged a 'war on civilians' in order to secure oil revenue to finance further atrocities."[232] The Act made a congressional finding that the "Government of Sudan has repeatedly stated that it intends to use the expected proceeds from future oil sales to increase the tempo and lethality of the war against the areas outside of its control."[233] It directed the President to "take all necessary and appropriate steps . . . to deny the Government of Sudan access to oil revenues to ensure that the Government of Sudan neither directly nor indirectly utilizes any oil revenues to purchase or acquire military equipment or to finance any military activities."[234] The congressional debate noted a macabre feedback loop, where the Regime used oil proceeds to commit atrocities to secure more oil: "for the first time, there will be a link made officially between the genocide and the slaughter in Sudan and oil money." [235]

### 5.    Genocide in Darfur

The intensification of the Bashir Regime's mass atrocities culminated in what came to be known worldwide as the Darfur Genocide. In 2002, as the Regime engaged in U.S.-brokered peace talks with the southern rebels, a new rebellion emerged in the western region of Darfur. The Regime responded with a brutal campaign of ethnic cleansing against civilians belonging to the

---

[232] Ex. 9, Hudson Report ¶ 79.

[233] *Sudan Peace Act*, Pub. L. No. 107-245 § 2(8), 116 Stat. 1503 (2002), https://www.govinfo.gov/content/pkg/PLAW-107publ245/pdf/PLAW-107publ245.pdf.

[234] *Sudan Peace Act,* Pub. L. No. 107-245 § 6(b)(2)(C), 116 Stat. 1503 (2002), https://www.govinfo.gov/content/pkg/PLAW-107publ245/pdf/PLAW-107publ245.pdf.

[235] *Sudan Peace Act*, Statement of Representative Bachus, 107 Cong. Rec. H7102 (Daily ed. Oct. 7, 2002) at H7108, https://www.congress.gov/107/crec/2002/10/07/CREC-2002-10-07-pt1-PgH7102-2.pdf.; *see also Kashef v. BNP Paribas S.A.*, 442 F. Supp. 3d 809, 815 (S.D.N.Y. 2020) ("BNPP Geneva's financial chicanery created "a macabre feedback loop." (internal citation omitted).

same Black African ethnic groups—the Fur, Masalit, and Zaghawa—as members of the two rebel movements, the SLA and the JEM.[236]

In or around May 2003, the Regime's National Security Council "'issued an emergency plan that formed the basis for the [Government] to launch its counterinsurgency campaign'" calling for the use of "'Arab tribes to target members of the non-Arab tribes that were accused of supporting the rebellion, as well as residential areas where rebels were believed to be hiding.'"[237] The Regime employed the same strategies it used to terrorize and ethnically cleanse the south and the oil regions. To implement a policy of depopulating Darfur of its non-Arab inhabitants, the Regime mobilized, armed, and funded Arab tribal militia—called *Janjaweed* by the Black African populations—in concert with SAF ground troops, the air force, and other paramilitaries.[238] The National Security Council passed "instructions from the central government, including in particular the Ministry of the Interior, Ministry of Defence and the NISS, to local civilian and military officials through the Darfur Security Committee . . ."[239] Government documents obtained by international investigators confirmed this chain of command.[240] Indeed, regime officials—including the head of NISS—publicly admitted to mobilizing the Janjaweed.[241]

A March 6, 2004 cable from the U.S. embassy in Khartoum confirmed that the Janjaweed were deployed as an auxiliary government force: "When the Sudanese Armed Forces was unable to defeat the SLA following the April 2003 attack on El Fasher, the GOS engaged a proxy force of

---

[236] Ex. 7, Baldo Report ¶ 12.

[237] Ex. 8, Baldo Reply ¶ 57 (quoting *Prosecutor v. Ali Kushayb*, Prosecutor's Trial Brief of 4 February 2022, Case No. 02/05-01/20, ICC Trial Chamber I, ¶ 57, https://www.icc-cpi.int/sites/default/files/CourtRecords/0902ebd1801f86f5.pdf).

[238] Ex. 9, Hudson Report ¶¶ 110-121; Ex. 7, Baldo Report ¶ 193; Ex. 4, Jok Report ¶¶ 27-41.

[239] Ex. 8, Baldo Reply ¶ 55 (quoting *Prosecutor v. Ali Kushayb*, Prosecutor's Trial Brief of 4 February 2022, Case No. 02/05-01/20, ICC Trial Chamber I, ¶ 56 (the "Trial Brief"), https://www.icc-cpi.int/sites/default/files/CourtRecords/0902ebd1801f86f5.pdf).

[240] Ex. 7, Baldo Report ¶ 73 n.46; Ex. 8, Baldo Reply ¶¶ 61-62.

[241] Ex. 7, Baldo Report ¶ 73.

Arab militia which, because they ride horses and camels, are known as the jinjaweed. While the air force has bombed towns, the jinjaweed, working in concert with the army, have continued on the rampage."[242]

> NEGOTIATION ARE UNDER INTENSE PRESSURE FROM THE MILITARY. IT ALSO APPEARS THAT THE JINJAWEED HAVE BEEN EXPANDING THEIR ATTACKS SINCE PRESIDENT BASHIR LAUNCHED HIS DARFUR "INITIATIVE" ON FEBRUARY 9 AND ARE USING MORE BRUTAL TACTICS REMINISCENT OF THE LRA IN UGANDA - INCLUDING MASS RAPES AND KILLINGS OF DEFENSELESS CIVILIANS (ESPECIALLY DISPLACED PEOPLE). GIVEN REPORTS FROM THE FIELD INCREASINGLY POINTING TO ARMY COMPLICITY IN THE COORDINATION AND IMPLEMENTATION OF ATTACKS, THERE SEEMS LITTLE WAY TO AVOID THE CONCLUSION THAT THE GOVERNMENT OF SUDAN IS PURSUING A FULL-FLEDGED WAR ON THE NON-ARAB PEOPLES OF DARFUR WHILE THE INTERNATIONAL COMMUNITY IS FOCUSED ON THE IGAD PEACE PROCESS.

*Figure 1: Screenshot of March 6, 2004 U.S. Embassy Cable (emphasis added)*

Startled by the escalation of Regime violence, the U.S. government launched the Atrocities Documentation Project, sending teams of investigators to interview over 1,000 Sudanese refugees who had fled Darfur into neighboring Chad.[243] According to NSC member Cameron Hudson, the Project "provided confirmation that the mass killing and displacement was not the product of random acts of banditry, as the Government of Sudan portrayed them in communications with U.S. officials."[244] Rather, the "attacks on African villages in Darfur were widespread and systematic, following patterns indicating that they were organized by design and reflecting a racially motivated intent to destroy and displace."[245]

Hundreds of villages were destroyed by government forces using a consistent *modus operandi*: in a typical attack, Janjaweed mounted on horseback or Toyota land-cruisers fitted with machine guns would raid Fur, Masalit, or Zaghawa villages, often supported by SAF infantry in

---

[242] U.S. Embassy Khartoum Cable to Secretary of State, "The Jinjaweed" March 6, 2004, https://nsarchive.files.wordpress.com/2016/03/document-4-20040306-the-jinjaweed.pdf, quoted in Ex. 9, Hudson Report ¶ 102.
[243] *See* Ex. 9, Hudson Report ¶¶ 104, 108-122.
[244] Ex. 9, Hudson Report ¶ 113.
[245] Ex. 9, Hudson Report ¶ 113.

armored vehicles and military trucks. They would torch homes, kill inhabitants, and destroy or pillage property and livestock. Often, SAF would use gunship helicopters to strafe civilians and would drop bombs from Antonov cargo planes, literally rolling barrels packed with explosives out the ramp onto Black African villages below. Some inhabitants would be rounded up and detained, with many subjected to rape and torture. Some detainees would be taken by security forces and transferred out of Darfur for further interrogation and torture in NISS "ghost houses" and detention centers. Mortality estimates by U.S. government agencies and contractors ranged from 98,000 to 400,000 killed, in addition to 1.8 million internally displaced persons and 200,000 refugees.[246]

The perpetrators of this systematic, racially motivated violence were unmistakably agents of the State. In 2004, Musa Hilal, a Janjaweed leader, told the journalist Nima Elbagir that he "answered my government's call" and organized Arab tribal militia under the "*defaa al-shabi"*— the legal framework for pro-government militias.[247] Asked about his men raping African women, he laughed: "It is not rape with slave girls because they have no honor."[248] Although international investigators documented sporadic, opportunistic instances of abuses by non-government-affiliated rebels, they found no evidence that such rebels were engaging in mass violence against civilians, much less the displacement and destruction of the rebels' own Black African communities.[249] As summarized by Plaintiffs' expert Dr. Baldo, a 2005 report by the UN Commission of Inquiry on Darfur:

> (1) found that the GOS/Janjaweed were entirely responsible for the forced displacement of civilians in Darfur, (2) found no cases of rape by rebels, (3) found no information indicating the use of torture by rebels, (4) found no evidence that

---

[246] Ex. 9, Hudson Report ¶¶ 103, 116.
[247] Ex. 20, Elbagir Decl. ¶26.
[248] Ex. 20, Elbagir Decl. ¶28.
[249] *See generally* Ex. 8, Baldo Reply ¶¶ 66-195. As Dr. Baldo notes, "rebels had an interest in maintaining good relations with local communities in areas of their control or their transient passage as they relied on local populations for their food, shelter, and upkeep." *Id.* ¶105.

abduction by rebels was widespread or systematic, and (5) found that incidents of rebels killing civilians have been few.[250]

The record evidence shows there is no equivalence between the amply documented, widespread, and systematic abuses committed by Regime military, security, and militia forces, and the scattered incidents of isolated and opportunistic abuses by opposition rebels.

BNPP—like its co-conspirator, the Bashir Regime—has tried to exaggerate the role of rebels in the crisis, pin blame on amorphous "inter-ethnic violence" or "banditry," and question the ability of Sudanese victims to differentiate between "a rebel of African roots and tribal militia member of Arab heritage."[251] But as Dr. Baldo notes, "[b]andits and common criminals generally do not haul people off to jails and accuse them, under torture, of supporting rebel groups."[252] Nor do bandits "conduct aerial bombing or joint ground operations with Sudanese Armed Forces."[253]

As discussed below, after more than a year of discovery, BNPP has not identified a single Sudanese refugee or asylee admitted to the United States who was displaced from Sudan during the class period but did not suffer or fear persecution by the Regime. Nor has BNPP produced evidence that any entity other than the Bashir Regime's forces engaged in a systematic campaign of persecution against civilian populations, maintained a police state network of torture centers, or conducted aerial bombardment of civilian areas.

BNPP's experts cite isolated incidents of abuses by opposition rebels, but disregard the bulk of U.S. government, UN, and NGO findings that the Regime military, security, and militia

---

[250] Ex. 8, Baldo Reply ¶¶ 118-22, 154, 160-65. Dr. Baldo quotes extensively from the Commission's findings.
[251] *See* Ex. 8, Baldo Reply ¶33 (responding to Defendants' experts Enrico Carisch, Swiss law professor Christoph Muller, and U.S. law professor Stephen Yale-Loehr).
[252] Ex. 8, Baldo Reply ¶ 33.
[253] Ex. 8, Baldo Reply ¶ 26.

forces (such as the Janjaweed) were responsible for widespread and systematic atrocities.[254] Indeed, BNPP's experts have relied on suspect sources, including a registered lobbyist for the Sudanese government, notorious for wearing a "Hang Mandela" t-shirt.[255] And they have misrepresented the reports of Carisch's own UN Panel of Experts and the international Commission of Inquiry on which he relies. The UN Panel of Experts reports, including those co-authored by Mr. Carisch, leave no doubt that "[i]nternally displaced persons have overwhelmingly alleged that the Government of the Sudan security forces and the Janjaweed commit the majority of violations." [256]

---

[254] As Dr. Baldo notes, the UN Commission of Inquiry "attributed forced displacement exclusively to GOS/Janjaweed operations." Ex. 8, Baldo Reply ¶ 154; *see also id.* ¶ 86 (explaining that "the GOS maintained unchallenged military supremacy over armed groups," and the "[i]ndiscriminate aerial bombardment of civilian populations were the main cause of forced displacements in the war in South Sudan, Nuba Mountains, Blue Nile, and Darfur regions."); Ex. 7, Baldo Report ¶ 170 ("Unlike the Government, the SPLA and its allied militias did not pursue the same deliberate, organizational strategy of exterminating or displacing civilian populations as a war aim."); *id.* at ¶ 163 ("The duration, magnitude, and persecutory intent of the government's targeting of civilians distinguished state violence from the intermittent and more opportunistic abuses committed by the SPLA and splinter factions."); Ex. 9, Hudson Report ¶¶ 69-72 (noting that Human Rights Watch concluded that even the violence committed by rival factions was attributable to the GOS's divide and conquer strategy); *id.* ¶¶ 78-81 (noting that the scale of violence by rebel forces was dwarfed by the "many widespread and systematic abuses by the GOS and its militias") (internal quotation marks omitted); Ex. 6, Verhoeven Reply at 35 ("[T]he overwhelming academic consensus and indeed that of most actors in the international community – including the ICC, the U.S. Government and U.S. Congress – was that one actor in particular bore the brunt of responsibility and was the driver of the great majority of war crimes, crimes against humanity and genocidal violence: the Al-Ingaz regime which pursued its objectives through SAF, NISS and auxiliary forces such as the Janjaweed."); *id.* at 38 ("[D]uring Sudan's Second Civil War like during the genocidal violence in Darfur, there is only one side that had access to Antonov planes to bomb villages, that used helicopter gunships to ethnically cleanse the oil producing areas and that could run an ironfisted intelligence service that would arrest, torture and disappear thousands of its own citizens from urban centres and from rural zones."); Ex. 19, Austin Reply ¶¶ 24-26 ("Al-Bashir case records point to the reasonable grounds for believing that a core component of the genocide was conducted through GoS forces, including the Sudanese Armed Forces and their allied Janjaweed militia, the Sudanese Police Forces, the National Intelligence and Security Service (NISS) and the Humanitarian Aid Commission (HAC)."); Ex. 45, Jok Dep. at 109:2-8, 211:11-14.
[255] Ex. 8, Baldo Reply ¶ 110.
[256] United Nations Security Council, *Report of the Panel of Experts established pursuant to resolution 1591 (2005) concerning the Sudan*, UN Doc. S/2008/647, 11 Nov. 2008, ¶¶ 26, 158, https://tinyurl.com/4v59r3rs.

**D.      Aware of the atrocities, BNPP persists in** ███████████████████████

**1.      "Save Darfur": The U.S. declares the atrocities a genocide.**

In July 2004, the Save Darfur campaign was launched by Holocaust survivor and Nobel Laureate Elie Wiesel, the U.S. Holocaust Memorial Museum, and American Jewish World Service.[257] BNPP's expert Enrico Carisch publicly accused these advocates of being "shrill" and using "public relations firms . . . to raise even more money."[258] But their outcry was heard. By 2010, more than 3,300 articles about the Darfur genocide had been published by newspapers in eight western countries.[259] ██████████████████████████[260] In Paris, *Le Monde* covered the Regime's "scorched earth policy."[261]

On September 9, 2004, Secretary of State Colin Powell formally designated the atrocities in Darfur a genocide under Article VIII of the Genocide Convention: "genocide has been committed in Darfur and . . . the Government of Sudan and the Jingaweit bear responsibility."[262]

**2.      "The Dirty Little Secret": Advised by** █████████████**, BNPP finds new ways to evade U.S. sanctions.**

In the fall of 2004, BNPP was not concerned with saving Darfur. ██████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

---

[257] *See* Ex. 50, Carisch Dep. at 341:22-342:9.

[258] Enrico Carisch, and Loraine Rickard-Martin, *UN Natural Resources and Other Sanctions: Who Benefits?*, 82(4) Social Research: An International Quarterly, 983 (2015), discussed in Ex. 50, Carisch Dep. at 334:5-350:15.

[259] Ex. 9, Hudson Report ¶ 199.

[260] *See, e.g.,* Ex. 53, De Saint André Dep. at 79:20-80:5, 85:11-20, 89:21-90:6, 104:7-17, 107:12-21; Ex. 54, Bazire Dep. at 192:2-11, 204:7-20; Ex. 55, Maillard Dep. at 74:9-75:17; Ex. 56, Deposition of Jacques d'Estais ("d'Estais Dep.") at 62:7-2.

[261] Ex. 9, Hudson Report ¶ 198.

[262] U.S. Department of State, *The Crisis in Darfur Testimony Before the Senate Foreign Relations Committee by Secretary Colin L. Powell*, Sept. 9, 2004, https://2001-2009.state.gov/secretary/former/powell/remarks/36042.htm



---

[263] Ex. 98, BNPP-KASHEF-00013941 at 13944.

[264] *Id.*

[265] *Id.*

[266] *Id.*

[267] Ex. 66, BNPP-KASHEF-00000023 at 29.

[268] Ex. 66, BNPP-KASHEF-00000023 at 25.

[269] According to BNPP's counsel, ███████████████████████████████████████████████████████████████████████████

Ex. 118, BNPP-KASHEF-00031347 at 31360.

That same month, ████████████████████████████ provided BNPP a legal memorandum giving its imprimatur to another sanctions-evasion technique.[270] In late September 2004 "two senior BNPP Paris executives and BNPP Geneva executives" had decided that dollar-clearing for sanctioned Sudanese payments should be routed through a non-BNPP bank—████████████—rather than BNPP New York, hoping to avoid "problems BNP NY encountered with U.S. authorities."[271] ████████████ October 2004 memorandum gave comfort to that decision, "suggest[ing] that BNPP may have been able to protect itself from being penalized by U.S. authorities if it conducted these prohibited transactions through another U.S. bank."[272]

████████ was proved wrong. In 2005, the Dutch bank ABN Amro was fined $80 million by OFAC for engaging in wire-stripping to evade sanctions—the same technique employed by BNPP since 1997.[273] In reaction, ████████████, BNPP's Head of Compliance for North America, wrote another compliance employee: "The dirty little secret isn't so secret anymore, oui?"[274]

### 3.    Take No Notes: BNPP Head Office in Paris overrides compliance warnings about Sudan.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████[275] ████

---

[270] *Id.*; Ex. 43, SSOF ¶ 30; Ex. 14, Koch Report ¶ 217; Ex. 15, Koch Reply ¶ 50.
[271] Ex. 43, SSOF ¶ 30.
[272] Ex. 43, SSOF ¶ 30.
[273] *See* Ex. 14, Koch Report ¶ 219.
[274] Ex. 69, BNPP-KASHEF-00000146; Ex. 44, DFS Consent Order ¶ 8.
[275] ████████████████████████████████████████████



[277]

Congress had a less favorable view: the Comprehensive Peace in Sudan Act of 2004 directed the Secretary of State to submit a report on "the ability of the Government of Sudan to finance the war with the proceeds of the oil exploration."[278] The UN Security Council also took a dim view. In March 2005, it referred Sudan to the International Criminal Court for prosecution.[279]



[280]

[281]

---

[276] Ex. 81, BNPP-KASHEF-00004780 at 4782.
[277] *Id.*
[278] *Comprehensive Peace in Sudan Act of 2004*, Pub. L. 108-497, 118 Stat. 4012 (2004), § 8(a)(1), https://www.govinfo.gov/content/pkg/PLAW-108publ497/pdf/PLAW-108publ497.pdf; *see* Ex. 9, Hudson Report ¶132.
[279] S.C. Res. 1593, U.N. Doc. S/RES/1593 (Mar. 31, 2005), http://unscr.com/en/resolutions/doc/1593; *see Ex.* 9, Hudson Report ¶ 210 (citing same).
[280] Ex. 119, BNPP-KASHEF-00038899 at 38909; Ex. 106, BNPP-KASHEF-00014532 at 14540-41 .
[281] *See* Ex. 14, Koch Report ¶157.

Ex. 86, BNPP-KASHEF-00005642 at 5645-46.



BNPP's guilty plea admits that: "In September 2005, senior compliance officers at BNPP Geneva arranged a meeting of BNPP executives 'to express, to the highest level of the bank, the reservations of the Swiss Compliance office concerning the transactions executed with and for Sudanese customers.' The meeting was attended by several senior BNPP Paris and Geneva executives. At the meeting, a senior BNPP Paris executive dismissed the concerns of the compliance officials and **requested that no minutes of the meeting be taken**."[285] That senior executive was ████████████████████████████████████████[286]

---

[282] *Id.*

[283] *Id.*

[284] Ex. 68, BNPP-KASHEF-00000066 at 73 (emphasis added).

[285] Ex. 43, SSOF ¶ 33 (emphasis added); Ex. 76, BNPP-KASHEF-00000885 at 892; Ex. 75, BNPP-KASHEF-00000326 at 335; Ex. 116, BNPP-KASHEF-00030213 at 30215.

[286] Ex. 75, BNPP-KASHEF-00000326 at 337.

**4.** ████████████████████████████████████

███████████████████████████████████████ As determined by the Second Circuit, BNPP's guilty plea "conceded that it had knowledge of the atrocities being committed in Sudan and of the consequences of providing Sudan access to U.S. financial markets." *Kashef*, 925 F.3d at 56. BNPP admitted that its "central role in providing Sudanese financial institutions access to the U.S. financial system, despite the Government of Sudan's role in supporting terrorism and committing human rights abuses, was recognized by BNPP employees."[287]



---

[287] Ex. 43, SSOF ¶ 20.

[288] Ex. 66, BNPP-KASHEF-00000023 at 29.

[289] Ex. 83, BNPP-KASHEF-00005435 at 5438. ██████████████████████████████████████████████████████████████████ Ex. 9, Hudson Report ¶ 208; *see, e.g.*, Ex. 90, BNPP-KASHEF-00011365 at 11373 ███████████ Ex. 89, BNPP-KASHEF-00007994 ██████████████████

[290] Ex. 74, BNPP-KASHEF-00000210 at 213.

[291] Ex. 54, Bazire Dep. at 87:24-25, 88:3-12 (emphasis added).



In a 2007 memorandum, a BNPP Paris executive warned: "In a context where the International Community puts pressure to bring an end to the dramatic situation in Darfur, no one would understand why BNP Paribas persists

---

[292] Ex. 65, BNPP-KASHEF-00000007 at 13.
[293] Ex. 107, BNPP-KASHEF-00014655 at 14658.
[294] Ex. 119, BNPP-KASHEF-00038899 at 38909.
[295] Ex. 72, BNPP-KASHEF-00000201 at 206.
[296] Ex. 110, BNPP-KASHEF-00024869.

there which could be interpreted as supporting the leaders in place."[297] █████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████[298]

### 5. "I Can't Even Get U.S. Dollars Now": OFAC forces BNPP out of Sudan while BNPP continues support for the Bashir Regime.

On October 17, 2006, President Bush issued additional sanctions aimed at the Bashir Regime's ability to finance genocide with oil revenues.[299] Executive Order 13412 prohibited "all transactions by United States persons relating to the petroleum or petrochemicals industries in Sudan."[300] In May 2007, the United States launched a new sanctions strategy "targeting the oil and military-industrial complex and Sudan's international accomplices."[301] OFAC announced that it would pursue "aggressive investigation of the methods and accomplices that the Government of Sudan may be using to circumvent our sanctions and access the U.S. financial system illegally."[302]



████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████[303] █████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

---

[297] Ex. 43, SSOF ¶ 20; Ex. 73, BNPP-KASHEF-00000207 at 209.
[298] Ex. 84, BNPP-KASHEF-00005469 at 5472.
[299] Ex. 9, Hudson Report ¶¶ 140-142.
[300] *Blocking Property and Prohibiting Transactions with the Government of Sudan*, Exec. Order No. 13412, 71 Fed. Reg. 61369 (Oct. 17, 2006), https://www.govinfo.gov/content/pkg/FR-2006-10-17/pdf/06-8769.pdf
[301] Ex. 9, Hudson Report ¶ 165.
[302] U.S. Department of the Treasury, *Prepared Remarks of Adam J. Szubin Director of the Treasury Department's Office of Foreign Assets Control*, May 29, 2007, https://home.treasury.gov/news/press-releases/hp427.
[303] Ex. 123, BNPP_KASHEF-00037990 at 37994.



Clamping off the flow of U.S. dollars from BNPP to Khartoum had an immediate impact on the Bashir Regime. In Fall 2007, Sudan's Finance Minister flew to Washington, DC and requested a meeting with Plaintiffs' expert Cameron Hudson and National Security Council staff

304 Ex. 73, BNPP-KASHEF-00000207 at 209.
305 Ex. 77, BNPP-KASHEF-00001184.
306 Ex. 77, BNPP-KASHEF-00001184 at 1185.
307 *See* Ex. 14, Koch Report ¶¶ 235-241.
308 Ex. 112, BNPP-KASHEF-00028707 at 28710.
309 *Id.*
310 *Id.*at 28711.

58

to protest the sanctions. As Mr. Hudson recounts, "Clearly upset, Finance Minister Al-Hassan argued: 'All transfers are affected and now cost us more. I can't even get U.S. dollars now.'"[311]



[311] Ex. 9, Hudson Report ¶ 172.
[312] Ex. 110, BNPP-KASHEF-00024869 at 24869-70.
[313] Ex. 115, BNPP-KASHEF-00030053 at 56.



A year later, the clock was still ticking. ████████████████████████

The deadly effects of BNPP's conspiracy with the Regime continued through at least 2011. As Plaintiffs' expert Dr. Verhoeven explained, "providing the regime with oil dollars all these years ago continued to have lethal consequences for beleaguered populations for a long time thereafter."[318] ████████████████████████████ ████████████████████████ According to Mr. Verhoeven, "the arsenal acquired by SAF during the peak oil years of the early 2000s was vital for the [Regime] when war resumed in South Kordofan and Blue Nile State in June 2011; some of the fighter jets, artillery and ammunitions that were purchased in the early to mid-2000s with petrodollars were used in bombardments of civilian areas."[319]

Meanwhile, as U.S. authorities continued to investigate BNPP's role in Sudan, the bank delayed and frustrated their efforts. BNPP admits it "failed to provide the [U.S.] Government with

[314] Ex. 97, BNPP-KASHEF-00013746 at 13749.
[315] Ex. 101, BNPP-KASHEF-00014068 at 14081.
[316] Ex. 100, BNPP-KASHEF-00014009 at 14014.
[317] Ex. 12, Fogarty Reply ¶¶ 99-102; Ex. 11, Fogarty Report ¶ 250, and Ex. 6.
[318] Ex. 5, Verhoeven Report at 57.
[319] *Id.* at 56.

meaningful materials from BNPP Geneva until May 2013, and the materials were heavily redacted due to bank secrecy laws in Switzerland."[320] BNPP admitted that its "delay in producing these materials significantly impacted the [U.S.] Government"s ability to bring charges against responsible individuals, Sudanese Sanctioned Entities, and the satellite banks."[321]

Ultimately, the investigation by federal and New York state authorities resulted in two criminal guilty pleas, a settlement with OFAC, and a consent order with the New York Department of Financial Services.[322] As summarized by the Second Circuit:

> In 2015, the Federal Government and New York State secured convictions of BNPP for federal and state felonies. BNPP pled guilty to conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371, by conspiring to violate the IEEPA and the Trading with the Enemy Act, 50 U.S.C. § 4303 et seq. BNPP also pled guilty to New York state crimes of falsifying business records in the first degree, in violation of Penal Law § 175.10, and conspiracy in the fifth degree, in violation of Penal Law § 105.05. BNPP was required to pay almost nine billion dollars in forfeitures and fines, the largest financial penalty ever imposed in a criminal case.

*Kashef*, 925 F.3d at 55–56.

### E.     A Pattern of broken bodies and lost homes: a legacy of trauma for Sudanese-Americans

From NISS's network of "ghost houses," to the oil fields of Abyei and South Sudan, to the torched villages of Darfur, the Bashir Regime's nationwide campaign of persecution forcibly displaced millions of Sudanese citizens. They were displaced, as Plaintiffs' expert Dr. Jok explains,

---

[320] Ex. 43, SSOF ¶ 72.

[321] *Id.*

[322] Letter from Preet Bharara, United States Attorney for the Southern District of New York, Leslie Caldwell, Assistant Attorney General, Criminal Division, Department of Justice, and Jaikumar Ramaswamy, Chief, Asset Forfeiture and Money Laundering Section, Department of Justice, to Karen Patton Seymour, Esq., Sullivan & Cromwell LLP, *United States v. BNP Paribas, S.A.*, June 27, 2014 (ECF No. 241-2); Plea Agreement Between BNP Paribas SA and the District Attorney of the County of New York, June 30, 2014 (ECF No. 241-4); Settlement Agreement between the U.S. Department of Treasury's Office of Foreign Asset Control (OFAC) and BNP Paribas SA (BNPP), COMPL-2013-193659 (ECF No. 241-8); Ex. 44, DFS Consent Order.

"through the destruction of their means of livelihood and theft of their land and cattle, through the raids on their villages, and the terror of the police state."[323] Even those the Regime did not directly rape, beat, or bomb were driven into exile by a Regime policy of denying "undesirable" populations access to humanitarian aid and food.[324]

Hundreds of thousands gathered in internally displaced persons ("IDP") camps within Sudan or sought refuge across international borders, sheltering in squalid refugee camps in Chad and Egypt.[325] Dr. Jok, who has performed extensive ethnography with South Sudanese and Darfuri populations, observes that "[l]ife in IDP and foreign refugee camps is disorganized, brutal and dehumanizing."[326] The UN High Commission on Refugees ("UNHCR") coordinated the resettlement of Sudanese refugees to other countries that were willing to take them, in a process described by Plaintiffs' expert Prakash Khatri, who served as the U.S. Department of Homeland Security's Citizenship and Immigration Services Ombudsman from 2003 to 2008.[327] "UNHCR was intimately engaged in the Sudanese crisis," Mr. Khatri writes, and "[w]ith respect to the situation in Darfur, the UNHCR recommended in 2006 that there should be a 'presumption of eligibility to refugee status' for non-Arab Darfurians"—a recognition of the Regime's racial persecution.[328]

The United States provided refuge and asylum to thousands of Sudanese civilians forcibly displaced by the Bashir Regime. As Mr. Khatri explains, an estimated 25,800 victims who fled

---

[323] Ex. 4, Jok Report ¶ 117.

[324] *See* Ex. 7, Baldo Report ¶ 212 ("During the period of focus in this case there were many instances during which GOS agents interfered with the operations, supplies, and personnel of international humanitarian organizations who attempted to deliver essential relief supplies to war victims and those victims who were forcibly evicted from their villages and homes in rural areas of Southern Sudan, South Kordofan, Blue Nile, and Darfur regions.").

[325] Ex. 4, Jok Report ¶¶ 117-28.

[326] Ex. 4, Jok Report ¶ 118.

[327] Ex. 2, Expert Report of Prakash Khatri ("Khatri Report") at 11-12, App'x. A.

[328] Ex. 2, Khatri Report at 12.

Sudan during the 1997 to 2011 period were admitted to the United States, in 92.8% of those cases "with an explicit U.S. government finding" that they "suffered or faced persecution at the hands of the Government of Sudan or its agents."[329]

These 25,800 victims of forced displacement form the proposed Class in this case. They all share a common injury to human dignity.[330] As Dr. Jok explains, raids by government forces "not only caused destroyed buildings, stolen cattle, and killed family members, the dispersal of community and ensuing grief deeply injured the identity and human dignity of the populace who were told in word and deed that they were not only inferior humans compared to the Sudanese ruling racial class, but also that they were unwelcome and unsafe in their ancestral homelands."[331]

What drove forced displacement from Sudan during the class period (1997-2011) was a common pattern of abuses committed by the Regime against disfavored racial, religious, and social groups, including:

- Abduction and arbitrary detention in "ghost houses";
- Torture by military, security, or militia forces;
- Killing or disappearing family members;
- Rape and other forms of sexual violence against women and men;
- Aerial bombing of civilian targets;
- Targeted attacks on civilians by infantry, artillery, cavalry, or armored vehicles;
- Pillage of property and livestock and poisoning of wells;
- Deprivation of food, water, or medical aid.[332]

As explained by Plaintiffs' medical trauma experts—Dr. Allen Keller from the Bellevue/NYU Program for Survivors of Torture and Dr. Barry Rosenfeld from Fordham University—all of the

---

[329] Ex. 3, Khatri Reply at 12 n.24, 18.
[330] Ex. 4, Jok Report ¶ 118.
[331] Ex. 4, Jok Report ¶ 115.
[332] *See* Ex. 4, Jok Report at 12-37; Ex. 4, Baldo Report at 29-42.

class members share the experience of "trauma inherent in displacement, fearing for their safety and being forced to flee their homes and country[.]"[333]

Displacement stripped Sudanese civilians from all regions of ties to ancestral land and communities. Based on his ethnographic studies, Dr. Jok concludes that:

> The loss of ancestral lands is a unique and deeply felt injury to Sudanese sense of self, identity, pride and worth as a human. Loss of ancestral lands, lands of forefathers, with their sacred shrines and burial grounds, amounts to a visceral loss of identity for Sudanese refugees. The loss of their community connections through the social fabric of the elders unable to pass on generations of knowledge and cultural wisdom amounts to an intentional obliteration of their culture, and thereby, of their dignity and self-worth as a unique culture.[334]

Being reduced to refugees is, in Dr. Jok's words, "humiliating for anyone steeped in Sudanese culture, which prizes formality, propriety, decency, work, and provision for the family."[335] The resettlement process itself has traumatic effects specific to Sudanese cultural norms. As Dr. Jok explains: "During the application process, Sudanese refugees are required to bare their souls to complete strangers in retelling the abuses they suffered; however, in Sudanese culture this type of disclosure is taboo. . . ; many feel debased by talking about intimate and humiliating experiences in front of strangers."[336] "Through displacement," he concludes, the Regime "succeeded in its goal of robbing the displaced Sudanese of sense of self, human dignity, and cultural continuity."[337]

The 25,800 class members share this common injury to dignity due to forced displacement. Their displacement had a common cause: the Regime's nationwide campaign of persecution. And this campaign had a common source of funding: the billions BNPP fed to Sudan's authorities

---

[333] Ex. 13, Expert Report of Dr. Allen Keller and Dr. Barry Rosenfeld ("Keller & Rosenfeld Report") at 9-10.
[334] Ex. 4, Jok Report ¶ 116.
[335] Ex. 4, Jok Report ¶ 118.
[336] Ex. 4, Jok Report ¶ 120.
[337] Ex. 4, Jok Report ¶ 123.

through their sanctions-evasion conspiracy. Every fact set forth above will be proven through common evidence on a classwide basis.

## PROCEDURAL BACKGROUND

As this Court held last year in denying BNPP's motion to dismiss on *forum non conveniens* grounds: "This case has been ongoing for six years now, with Defendants making every effort to avoid actually litigating and resolving the dispute. . . . Thus, there is simply no reason to impose a disproportionate (or any) burden on Plaintiffs . . . and, to delay any recovery to which they may be entitled—by granting the motion to dismiss." ECF No. 338 at 9-10.

On April 29, 2016, "Plaintiffs, who now reside lawfully in the United States, sued BNPP in the Southern District of New York on behalf of a putative class of victims of the genocide in Sudan" also residing in the United States. *Kashef*, 925 F.3d at 57. In 2019, the Second Circuit reversed this Court's initial dismissal of this case, holding that the act of state doctrine does not preclude judicial review of universally prohibited acts of genocide. *Id.* at 58-62. The Second Circuit also held that Plaintiffs' claims were timely under N.Y.C.P.L.R. § 215(8)(a), which gives crime victims one year from the date of conviction to bring related civil claims. *Id.* at 62-63.

On remand, this Court held that under New York conflicts of law principles, substantive Swiss law applied to Plaintiffs' claims. *Kashef*, 442 F. Supp. 3d at 824. In February 2021, after months of Swiss law expert discovery, supplemental briefing, and oral argument, this Court denied in large part BNPP's motion to dismiss. *Kashef,* 2021 WL 603290 at *9. Specifically, the Court held that Plaintiffs "stated a claim for relief" under Article 50.1 of the Swiss Code of Obligations ("CO"), which provides for tortious accomplice liability (*see infra* at 67-70). *Kashef*, 2021 WL 603290, at *9.

Discovery opened on May 6, 2021, and BNPP began producing to Plaintiffs the same set of Sudan-related documents previously produced to the U.S. government, in the same tampered state: "heavily redacted" purportedly "due to bank secrecy laws in Switzerland."[338] Defense counsel also informed Plaintiffs that BNPP did not retain records predating 2002—██████

██████████████████████████████████████████

██████████████████████████████████████[339]

BNPP waited six years into the litigation, and until Judge Nathan was nominated for the Second Circuit, to move to dismiss the case under *forum non conveniens* in December 2021. This Court denied BNPP's motion on May 5, 2022. The Court declined BNPP's invitation to treat the African-American Plaintiffs as second-class citizens due to their being Sudanese refugees: "Defendants . . . endeavor to undermine Plaintiffs' connections to New York and the United States by characterizing them as Sudanese refugees, seemingly to suggest that I should treat them differently based on their national origin." ECF No. 338 at 5. Noting the "bad faith of defendants," the Court observed that "[t]his case has been ongoing for six years now, with Defendants making every effort to avoid actually litigating and resolving the dispute." *Id.* at 9.

Discovery is now complete and the case has now been ongoing for seven years. Plaintiffs believe the case should proceed expeditiously, with no further delay from BNPP allowed. Certification of the class under Rule 23 offers the best path to efficient, streamlined proceedings. It would also ensure that BNPP—which has already pleaded guilty and paid the largest fine in U.S. history—is not permitted to protract this litigation for another seven years.

---

[338] *See* Ex. 43, SSOF ¶ 72.
[339] *E.g.*, Ex. 103, BNPP-KASHEF-00014196; Ex. 9, Hudson Report ¶ 54.

## LEGAL STANDARDS

### I.     Accomplice liability under Article 50.1 of the Swiss Code of Obligations

The class certification analysis "begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). This case involves just a single cause of action. Under Swiss law, secondary tort liability for accomplices is governed by Article 50.1 CO:

> Where two or more persons have together caused damage, whether as instigator, perpetrator or accomplice, they are jointly and severally liable to the person suffering damage.[340]

In her February 6, 2021 opinion, the Court adopted the views of Plaintiffs' Swiss law expert, Professor Franz Werro, finding his "descriptions of Article 50.1 and the surrounding case law to be coherent, credible, and supported by Swiss case law." *Kashef*, 2021 WL 603290, at *4.[341] In contrast, the Court rejected the statutory interpretation offered by BNPP's Swiss law expert.

Specifically, the Court rejected BNPP's argument that Article 50.1 should be construed to include additional "requirements" that "are not elements articulated by the Swiss courts[.]" *Id.* The Court rejected BNPP's arguments that Article 50.1 CO does not create an independent basis for accomplice liability, that an accomplice must also be a perpetrator of an illicit act, and that the statute imposes heightened mental state and causation requirements. BNPP's purported "requirements" were "unsupported by, and at times inconsistent" with "Swiss case law." *Id.*

---

[340] Ex. 1, Declaration of Professor Franz Werro ("Werro Decl.") ¶17. The Swiss Code of Obligations is published online by the Swiss government, in an unofficial English translation: Federal Act on the Amendment of the Swiss Civil Code (Feb. 9, 2023), https://www.fedlex.admin.ch/eli/cc/27/317_321_377/en.

[341] Professor Werro is a tenured Professor of Law at Fribourg University Law School in Switzerland, where he has held the Chair of the Law of Obligations and European Private Law since 1994. Ex. 1, Werro Decl. ¶ 2. He is also a tenured Professor of Law at Georgetown University Law Center, where he has taught International Sales Law, Privacy Law, and Comparative Law since 2001. *Id.* In 2019, the Swiss Government appointed Professor Werro as the President of the Council of the Swiss Institute of Comparative Law. *Id.*

The Defendants took a second bite at the apple by hiring a new Swiss law expert for its *forum non conveniens* motion, but this Court rejected her position that Article 50.1 CO was too difficult for an American court to apply, noting that "Judge Nathan has done so ably." ECF No. 338 at 11. Nevertheless, BNPP apparently believes it is not bound by this Court's decision. The Defendants have hired a third Swiss law expert and attempts once again to pass off "his own interpretation of the law as he believes it *should* be applied," despite being "demonstrably incompatible" with Swiss case law. *Kashef*, 2021 WL 603290, at \*4. Plaintiffs now present a Declaration from Professor Werro, who, as the Court previously noted, "has written extensively on Article 50.1 and has been cited by the Swiss Supreme Court on this precise provision." *Id.* at \*3. As Professor Werro explains, Judge Nathan's interpretation and application of Article 50.1 CO is and remains entirely correct. It is also the law of the case. *See* Fed. R. Civ. P. 44.1 ("The court's determination [of foreign law] must be treated as a ruling on a question of law.").

Article 50.1 CO has three elements, as BNPP conceded in its unsuccessful motion for partial reconsideration:

> To state a claim for secondary liability under Article 50(1) of the Swiss Code of Obligations, a plaintiff needs to allege that '(1) a main perpetrator committed an illicit act, (2) the accomplice consciously assisted the perpetrator and knew or should have known that he was contributing to an illicit act, and (3) their culpable cooperation was the natural and adequate cause of the plaintiff's harm or loss.'[342]

In short, the elements of accomplice liability under Article 50.1 CO are (1) an unlawful act by the perpetrator, (2) collective fault, and (3) collective causation. *See* Ex. 1, Werro Decl. at i-ii.

> **Element 1. *Unlawful Act*—**"Plaintiffs must prove that their rights were violated by an unlawful act of the Sudanese government." *Id.* ¶ 64. For purposes of Article 50.1 CO, an act is unlawful "when it infringes an 'absolute right, such as life, bodily integrity, or property." *Id.* (quotations omitted). As explained at length by Professor Werro, forced displacement is "a cognizable violation of absolute rights" actionable under Swiss law. *Id.* ¶¶ 69-76.

---

[342] Defs.' Mem. in Supp. of Mot. for Partial Recons., Mar. 2, 2021, ECF No. 198, at 2.

**Element 2. *Collective Fault***—As Judge Nathan held, to establish collective fault, Plaintiffs must prove "at a minimum, that BNPP consciously cooperated with the Sudanese government by providing financial support and that it knew or should have known, had it exercised due care, that its support would contribute to the Sudanese government's violation of human rights." *Kashef*, 2021 WL 603290, at *4.

**Element 3. *Collective Causation***—As Judge Nathan held, Plaintiffs must establish that the "accomplice's culpable cooperation was the natural and adequate cause of the plaintiff's harm or loss." *Id.* at *6.

***Natural Cause.*** A "natural causal link exists where the harm would not have occurred at the same time or in the same way or magnitude without the conduct alleged." *Id.* "The conduct need not be the "sole or immediate cause. . . [i]t is sufficient if the act in question was a partial cause, which—together with other causes—led to the damage incurred." Ex. 1, Werro Decl. ¶113 (citing case law). Indeed, as BNPP's latest Swiss law expert has previously written, "[i]t is not necessary that each tortfeasor has directly contributed to the occurrence of the injury[.]" *Id.* ¶ 118 (quoting Christoph Müller, *La responsabilité extracontractuelle*, ¶ 839).

***Adequate Cause.*** As Judge Nathan held, "[a]n adequate causal link exists when the wrongdoer's conduct was capable, in the ordinary course of events and common experience, of leading to the kind of result that occurred." *Kashef*, 2021 WL 603290, at *7. "[A] finding of adequate cause under Swiss tort law requires determining whether it would be 'reasonable' to hold BNPP responsible for causing at least some of human rights abuses in Sudan, which includes looking at the factor of whether those atrocities were foreseeable to BNPP at the time." *Id.* As Professor Werro explains, this is not complicated: "ordinarily, giving someone money is not the type of action that results in someone being killed. However, giving a very large sum of money to a known mass murderer is, as a matter of common sense, an action that could lead to someone being killed." Ex. 1, Werro Decl.  ¶129.

## II.    Class Certification Standards

To certify a class, the plaintiff must establish by a preponderance of the evidence that each of the four elements of Rule 23(a) and one of the bases for certification under Rule 23(b) are satisfied. *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017). Rule 23(a) provides that a class may be certified if the plaintiff demonstrates numerosity, commonality, typicality, and adequacy of the representative plaintiffs. Fed. R. Civ. P. 23(a). In addition, Rule 23(b)(3) permits a case to be litigated as a class action if (1) "questions of law or fact common to class members

predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

While the Court may consider merits questions to the extent "that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied," Rule 23 does not grant courts a license "to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 466 (2013). "In determining the propriety of a class action, the question is not whether the plaintiff . . . will prevail on the merits, but rather whether the requirements of Rule 23 are met." *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1775 (JG)(VVP), 2014 WL 7882100, at *29 (E.D.N.Y. Oct. 15, 2014) (quoting *Eisen v. Carlisle and Jacqueli*n, 417 U.S. 156, 178 (1974)). Therefore, the Court may not assess the weight of the evidence concerning a common merits question if failure of the necessarily common evidence "ends the case for the class and for all individuals alleged to compose the class." *Amgen*, 568 U.S. at 474 (holding that court of appeals erred in requiring plaintiffs to prove materiality in order to obtain certification of securities fraud class action).

"The Second Circuit has directed district courts to apply Rule 23 according to a liberal rather than a restrictive interpretation, and doubts concerning the propriety of class certification should be resolved in favor of class certification." *Yi Xiang v. Inovalon Holdings, Inc.*, 327 F.R.D. 510, 519 (S.D.N.Y. 2018) (cleaned up). As demonstrated below, the proposed class in this case satisfies all the requirements of Rule 23(a) and Rule 23(b)(3) and should therefore be certified.

## ARGUMENT

### I.    The Class Satisfies Rule 23(a)

#### A.    Numerosity: the Estimated Class of 25,800 is Sufficiently Numerous and Joinder is Impracticable

Rule 23(a)(1) requires the class to be "so numerous that joinder of all members is impracticable." Importantly, this requirement "does not mandate that joinder of all parties be impossible—only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244-45 (2d Cir. 2007). "[N]umerosity is presumed at a level of 40 members." *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).

Based on a class period from November 1997 through December 2011, Plaintiffs' expert, Prakash Khatri,[343] estimates that there are over 25,800 class members, 92.8% of whom are admitted refugees and asylees who have already been found by the U.S. government to have suffered or feared persecution from the Government of Sudan or its agents.[344] Mr. Khatri arrives at this estimate using official immigration data from the U.S. Department of Homeland Security ("DHS") and drawing from the processes by which refugees, asylees, and other immigrants gain admission to the United States.

Refugees and asylees—in order to be lawfully admitted to the United States by the U.S. government—must be outside their country of nationality and have suffered or feared persecution,

---

[343] Mr. Khatri served as the nation's first Citizenship and Immigration Services Ombudsman at the newly formed DHS, and in that role personally worked with immigration data to make strategic decisions and recommend courses of action to the immigration agencies. Ex. 2, Khatri Report at 1.

[344] Ex. 3, Khatri Reply at 12 n.24. Mr. Khatri also estimated the number of class members based on a class period from November 1997 through December 2009, concluding that approximately 21,680 individuals "suffered or faced persecution at the hands of the Government of Sudan or its agents, with an explicit U.S. government finding on that claim in at least 92.5% of cases." Ex. 3, Khatri Reply at 18. Mr. Khatri notes that he "could use this same methodology for any class period ultimately determined by the Court." Ex. 2, Khatri Report, App'x C.

on account of a protected ground, perpetrated by their government, its agents, or those the government is unwilling or unable to control.[345] Because the concept of forcible displacement is "built into the very definition of 'refugee,'"[346] all refugees and asylees have by definition suffered forcible displacement, the injury common to all members of the proposed class. And because of the law's other threshold requirements, the U.S. government has necessarily found that the Government of Sudan or its agents were responsible for displacing or otherwise perpetrating harm on all admitted refugees and asylees.[347]

Mr. Khatri estimated the number of refugees in the class—all of whom *must* have satisfied U.S. legal requirements by virtue of their admission as refugees—by totaling the number of refugees who entered the United States over the thirteen-year period between 2002 and 2015 (*i.e.*, four years after leaving Sudan during the period between 1998 and 2011),[348] and then averaging that figure with the total number of refugees arriving in other close-in-time periods to account for variation.[349] Mr. Khatri's method for estimating the number of asylees is similar but uses a two-year average period between seeking and receiving asylum, based on processing timelines during the period.[350] Finally, though representing less than 8% of class members, Mr. Khatri estimates the number of immigrants who were forcibly displaced from Sudan and admitted to the United States

---

[345] Ex. 2, Khatri Report at 4-6; Ex. 3, Khatri Reply at 2-3, 6-10; *see also* 8 U.S.C. § 1101(a)(42)(A) (defining a "refugee" under U.S. law).

[346] Ex. 3, Khatri Reply at 2.

[347] Ex. 2, Khatri Report at 6; Ex. 3, Khatri Reply at 8-10.

[348] Mr. Khatri uses a four-year average to anchor his estimate, based on the average time taken by the nineteen named plaintiffs to arrive in the United States after leaving Sudan, further informed by U.S. government priorities and anticipated processing timelines during the relevant period. Ex. 2, Khatri Report at 7-9, 15; Ex. 3, Khatri Reply at 10-11. The fiscal year used in DHS data begins on October 1 of the prior calendar year; FY 1998 therefore began on October 1, 1997, shortly before the start of the class period. Ex. 2, Khatri Report at 3 n.2.

[349] Ex. 2, Khatri Report at 24-25 & App'x C; Ex. 3, Khatri Reply at 12 & n.24.

[350] Ex. 2, Khatri Report at 24 & App'x C.

using the diversity visa process by calculating the average number of diversity visa recipients who indicated a place of residence outside Sudan when they applied.[351]

"Courts have not required evidence of exact class size or identity of class members to satisfy the numerosity requirement." *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993). Instead, "[c]ourts within this Circuit have frequently relied on reasonable inferences based on statistical data to establish numerosity." *Westchester Indep. Living Ctr., Inc. v. SUNY, Purchase Coll.*, 331 F.R.D. 279, 288-89 (S.D.N.Y. 2019) (citing cases); *see also Lowell v. Lyft, Inc.*, No. 17-CV-06251 (PMH), 2023 WL 2622925, at *8 (S.D.N.Y. Mar. 24, 2023); *Batalla Vidal v. Wolf*, 501 F. Supp. 3d 117, 134 (E.D.N.Y. 2020) (relying on immigration data showing "an average of about 32,000 renewal applications pending at any given time" to find numerosity satisfied even though "the exact number of individuals who had pending applications before USCIS" was "unknown").

Mr. Khatri's estimate of over 25,800 class members is more than 645 times the level of 40 class members at which numerosity is presumed. *See Lowell*, 2023 WL 2622925, at *8 ("The data permissibly relied on by Magistrate Judge Krause here shows that the number of class members in each proposed class exceeds the threshold amount of 40 more than a hundred times over. . . . For the estimates to be so inaccurate that numerosity is not met by the statistics, more than 99% of the people included in them would have to be excluded. There is no plausible explanation for how the estimates could be so skewed. If class action plaintiffs could use only statistical evidence that establishes numerosity by *more than a factor of one hundred*, they would never be able to use statistical evidence and, in any event, there is no requirement that numerosity be established to a precise number.") (emphasis in original).

---

[351] *Id.* at 25-26 & App'x C.

Moreover, the estimate is consistent with the views of BNPP's own immigration expert, Stephen Yale-Loehr. He testified that he "assume[s] there were thousands" of immigrants and, "[d]epend[ing] on the time frame," even "tens of thousands," who were "forced to flee their homes due to the action of the government of Sudan and its agents" and "were later able to enter the United States as refugees or asylees."[352] He also agrees, based on the data, that "in each year there are hundreds or often thousands of Sudanese refugees who arrive in the United States."[353]

None of Mr. Yale-Loehr's criticisms of Mr. Khatri's methodology for estimating the class size undermine the conclusion that the class is sufficiently numerous to satisfy Rule 23(a)(1) and has more than forty members.[354]

- *Four-Year Average.* Mr. Yale-Loehr challenges Mr. Khatri's use of a four-year average period between when refugees left Sudan and when they entered the United States.[355] But as Mr. Khatri explains, his use of the four-year average to anchor his estimate is consistent with the experience of the class representatives and is otherwise well-supported by U.S. processing priorities and the anticipated timelines for individuals with valid (*i.e.*, ultimately accepted) claims. Ex. 3, Khatri Reply at 10-11. At his deposition, Mr. Yale-Loehr admitted that the same statistical tool on which he relied to suggest that Mr. Khatri's sample size was too small shows that with a sample of 19 plaintiffs who had an average displacement of four years, "we know with 95 percent certainty that the average is between 3.1 and 4.9 years."[356] In any event, Mr. Khatri demonstrates that his methodology reasonably estimates the class size regardless of the assumption made

---

[352] Ex. 49, Deposition of Stephen Yale-Loehr ("Yale-Loehr Dep.") at 49:20-50:23 (objections omitted).
[353] *Id.* at 125:19-23.
[354] Several of his criticisms relate to common questions of causation and damages in addition to numerosity and will be addressed below under predominance. *See infra* at 98-103 (discussing refugees and asylees being forcibly displaced by definition, displacement and other harms based on a well-founded fear of future persecution as well as past persecution, and speculation about the role of non-governmental actors).
[355] Ex. 59, Expert Report of Stephen Yale-Loehr ("Yale-Loehr Report") ¶¶ 41-53.
[356] Ex. 49, Yale-Loehr Dep. at 148:9-149:5, 153:17-154:8.

regarding the time between departure and arrival, resulting in a sufficiently numerous class estimate under any scenario.[357]

- ***Derivative Refugees.*** Mr. Yale-Loehr contends that the estimate of class size should not include "derivative" refugees (*i.e.,* spouses and minor children of the "primary" refugee applicant).[358] But these intimate derivative family members are counted as refugees by law.[359] As Mr. Khatri explains, "the family unit experiences the persecution or fear as a unit . . . . If human rights abuse forces a family member to leave his or her home, this abuse necessarily forces spouses and children to leave, too, in order to maintain family unity."[360] Mr. Yale-Loehr admits that "[h]aving family units stay together is an important priority of U.S. immigration law."[361] While there is no reason to distinguish primary and derivative applicants in terms of class membership, Mr. Khatri describes how the size of each group can be estimated, with both independently satisfying the numerosity threshold.[362]

- ***Diversity Visas.***[363] Finally, Mr. Yale-Loehr disputes the inclusion in the class estimate of Sudanese immigrants who entered on diversity visas as opposed to refugees or asylees.[364] Mr. Khatri has set out the methodology he used for estimating the subset of diversity visa recipients, based only on those who were displaced from Sudan and why Mr. Yale-Loehr's

---

[357] Ex. 3, Khatri Reply at 13-14.

[358] Ex. 59, Yale-Loehr Report ¶¶ 59-65.

[359] Ex. 2, Khatri Report at 16-17 (citing 8 U.S.C. § 1157 and 8 C.F.R. § 207.7); Ex. 3, Khatri Reply at 14.

[360] Ex. 3, Khatri Reply at 14-15; *see also, e.g.*, 61 Fed. Reg. 35984-01 (noting that the derivative process serves to "expedite the reunification of refugee families and ensure the removal of spouses and children of refugees from a country subjecting them to persecution on the basis of that relationship").

[361] Ex. 49, Yale-Loehr Dep. at 104:23-105:3; *see also id.* at 41:24-42:8 ("Q. You are not suggesting that [one of the plaintiffs] could or should have left her four-year old daughter in Sudan, are you? A. No. Q. They were fleeing together, weren't they? A. Yes.") (objection omitted).

[362] Ex. 3, Khatri Reply at 15.

[363] Every year, the United States admits up to 55,000 "diversity" immigrants (i.e. the green card lottery) from a pool of "any national of any country from which the United States received less than 50,000 immigrants in the preceding five years." Ex. 2, Khatri Report at 22-23.

[364] Ex. 59, Yale-Loehr Report ¶¶ 67-77.

criticisms miss the mark.[365] In any event, these individuals make up less than 8% of class members and so would not impact the finding of numerosity even if they were excluded.[366]

Even though hundreds of class members or more would file separate claims in the absence of class certification, joinder of all 25,800 class members would be impracticable. As this Court has noted, "the standard is 'impracticable,' not 'impossible.'" *Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81, 86 (S.D.N.Y. 2001) (Hellerstein, J.) (quoting *Robidoux,* 987 F.2d at 936). "Determination of practicability depends on all the circumstances surrounding a case, not on mere numbers." *Robidoux*, 987 F.2d at 936. "Relevant considerations include judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members." *Id.*

As set forth in more detail in the superiority section below, *see infra* at 109-12, class certification here would promote judicial economy by avoiding a multiplicity of actions. *Id.* ("Consolidating in a class action what could be over 100 individual suits serves judicial economy."). In addition, class members are a subset of the total population of Sudanese American immigrants, whom BNPP's expert Mr. Yale-Loehr agrees are "geographically dispersed throughout the United States."[367]

Many Class members are closely following this case and would choose to bring their own claims. But for many others, as this Court held in *Ansoumana*, it is "fair to consider that the members of this group would not be likely to file individual suits. Their lack of adequate financial resources or access to lawyers, their fear of reprisals (especially in relation to the immigrant status

---

[365] Ex. 3, Khatri Reply at 16-17.
[366] *Id.* at 17.
[367] Ex. 49, Yale-Loehr Dep. at 119:8-120:2, 121:13-24.

of many), the transient nature of their work, and other similar factors suggest that individual suits as an alternative to a class action are not practical." 201 F.R.D. at 85-86; *see also Robidoux*, 987 F.2d at 936 ("They are also economically disadvantaged, making individual suits difficult to pursue."); Declaration of Kathryn Lee Boyd in Support of Class Certification ("Boyd Decl.") ¶¶ 46-51. As Mr. Yale-Loehr testified:

> Q. Many class members will not bring individual claims; is that correct?
> A. Perhaps, yes.
> Q. So even if those bringing individual claims eventually obtain compensation, the bank will have avoided compensating many others who could have been part of the class action, correct?
> A. If that's how [sic] the end result, yes.

Ex. 49, Yale-Loehr Dep. at 70:25-72:4 (objections omitted). It would be a harsh result for thousands of Sudanese-Americans displaced by the Bashir Regime's genocidal violence to lose the practical ability to seek compensation from the bank that conspired with that Regime.

### B.    Commonality: Plaintiffs' case raises common questions on every element of Article 50

The second requirement of Rule 23(a) is that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). While this commonality requirement is satisfied by "even a single common question," here there are numerous common questions. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2012); *In Re Libor-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 462 (S.D.N.Y 2018) ("The existence of a single common question suffices to establish commonality"). As such, the commonality requirement, which is "easily met in most cases," *Jones v. Ford Motor Credit Co.,* is also easily met here. No. 00CIV.8330RJHKNF, 2005 WL 743213, at *6 (S.D.N.Y March 5, 2015).

"Courts in this district have characterized the commonality requirement as a 'low hurdle.'" *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 131 (S.D.N.Y. 2014).

A question is common to the class if it is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Libor*, 299 F. Supp. 3d at 460 (quoting *Dukes*, 564 U.S. at 350); *K.A. v. City of New York*, 413 F. Supp. 3d 282, 302 (S.D.N.Y. 2019). The "relevant inquiry is whether a classwide proceeding is capable of 'generat[ing] common *answers* apt to drive the resolution of the litigation.'" *Jacob v. Duane Reade, Inc.*, 602 Fed. App'x 3, 6 (2d Cir. 2015) (emphasis in original).

"Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137-38 (2d Cir. 2015). This is exactly the case here. Each class member's Article 50 claim depends on a common course of conduct, by the same defendant, giving rise to the same kind of claims – namely, BNPP's conspiracy to violate U.S. sanctions, which funded its co-conspirator the Government of Sudan's campaign of horrific human rights abuses, causing all class members to be forcibly displaced.[368]

It is not required that the common questions "address each element of each of the[] claims," and commonality '"does not mean that all issues must be identical as to each [class] member.'" *Sykes*, 780 F.3d 70 at 86 (2d Cir. 2015); *Moreno v. Deutsche Bank Americas Holding Corp.*, 15CIV.9936 (LGS), 2017 WL 3868803, at *5 (S.D.N.Y. Sept. 5, 2017). Even so, here, nearly every element of Article 50 liability—from illicit act to collective fault to collective causation—is common, up to and including moral damages for the dignity harms inherent in forced

---

[368] That individual class members were also injured by additional human rights abuses does not defeat the commonality requirement of Rule 23(a)(2), as "[n]ot all questions of law or fact raised need be common." *Belfiore v. Proctor & Gamble Co.*, 311 F.R.D. 29, 61 (E.D.N.Y. 2015) (citation omitted); *see also Does I v. The Gap Inc.,* No. CV–01–0031, 2002 WL 1000073, at *2 (D. N. Mar. Is. May 10, 2002) (finding commonality where class members' "injuries, although different, all stem from the same alleged conspiracy . . . .").

displacement. The only individualized issues are the additional damages of those class members who experienced other human rights abuses beyond forced displacement. Nevertheless, the law to apply to the damages element, both compensatory and punitive, is common to all Class members.[369]

Thus, Plaintiffs' Article 50 claim gives rise to several common legal and factual issues that all Plaintiffs and class members have an interest in seeing adjudicated in this one forum, including:

**Element One: Unlawful Act by the Perpetrator**[370]

1. Whether the Government of Sudan pursued a genocidal campaign of persecution against disfavored ethnic, religious, and social groups employing the same key state institutions between November 1997 and December 2011?

2. Whether the Sudanese Armed Forces, National Security forces, paramilitaries, and auxiliary tribal militias (including the Janjaweed and SPLA co-opted factions of Riek Machar and Kerubino Bol) were agents of the Government of Sudan?

3. Whether the Government of Sudan's campaign of persecution inflicted common patterns of abuses, such as torture, rape, murder, arbitrary detention, aerial bombing, pillage, and theft?

4. Whether "the atrocious genocide and human rights violations [the Government of Sudan] perpetrated for over a decade beginning in the early 1990s", including forced displacement, constitute violations of absolute rights protected under Swiss law, and hence "illicit acts" for Article 50 CO purposes?[371]

**Element Two: Collective Fault**[372]

5. Whether BNP Paribas, with or through its branches and subsidiaries, consciously assisted the Government of Sudan by conspiring to evade U.S. sanctions and providing it financial support?

---

[369] Ex. 1, Werro Decl. ¶¶ 143-180 (explaining the types of compensable damages under Swiss law).

[370] *Kashef*, 2021 WL 603290, at *3 ("The parties stipulate that this element is satisfied here. . . . The main perpetrator is the Sudanese government and the illicit acts are the atrocious genocide and human rights violations it perpetrated for over a decade beginning in the early 1990s.").

[371] *Id.*

[372] *Id.* ("The Second Element of Article 50.1 requires that "the accomplice consciously assisted the perpetrator and knew or should have known that he was contributing to an illicit act.").

6. Whether BNPP knew or should have known that its sanctions-evasion conspiracy and financial support would contribute to the Government of Sudan's campaign of persecution and human rights violations?

**Element Three: Collective Causation**

7. Whether the Government of Sudan's genocidal campaign of persecution, including forced displacement of targeted populations, would not have occurred at the same time or in the same way or magnitude without BNPP's financial support and criminal conspiracy?[373]

8. Whether "help[ing] the Regime subvert its ban from U.S. financial markets . . . generated massive revenues in oil sales that allowed the Regime to 'equip and mobilize armed forces'" that carried out the campaign of human rights violations?[374]

9. Whether "the revenue generated for the Sudanese government by BNPP's assistance" contributed to or exceeded Sudan's "entire military budget"?[375]

10. Whether the revenue generated by BNPP's assistance contributed to the Regime's commission of "ethnic cleansing in oil regions to obtain and sell more oil"?

11. Whether the revenue generated by BNPP's assistance led "to a massive increase in military expenditures" by the Regime?

12. Whether the Regime's "attacks on civilian populations" occurred with greater frequency and magnitude after BNPP agreed to partner with it?

13. Whether BNPP directly financed aviation infrastructure managed by the Civil Aviation Authority and used by the Sudanese Armed Forces in the genocidal campaign of persecution?

14. Whether BNPP directly financed GIAD's import of armored vehicle components used in the genocidal campaign of persecution?

15. Whether the U.S. embargo on Sudan was imposed, in part, to "prevent the Regime from continuing" its human rights abuses?[376]

---

[373] *Id.* at *6.
[374] *Id.*
[375] *Id.*
[376] *Id.* at *8.

16. Whether it was objectively foreseeable that by circumventing an embargo aimed at halting the genocide, BNPP would facilitate the protraction of that genocide?

17. Whether BNPP knew, or should have known, "not just that the profits it was helping generate would go towards genocide, but that it was able to generate those profits for the Regime (taking a cut for itself) in part *because* of genocide"?[377]

18. Whether the Government of Sudan's genocidal campaign of persecution resulted in the forcible displacement and other patterns of injuries of the class members?

**Damages**

19. Whether and to what extent class members are entitled to damages for the moral harm to dignity inherent in their forced displacement?

20. Whether class members are entitled to punitive damages given the egregiousness of BNPP's conduct, and what law applies to the availability of such punitive damages?

This common core of questions arises directly from the central issue of the case: the existence, scope, and impact of BNPP's conspiracy on the Bashir Regime's genocidal campaign. The answers for each Class member will be the same regardless of their individual circumstances. Thus, numerous essential questions of law and fact are common to the Article 50 claim of each Plaintiff and Class member, thereby satisfying Rule 23(a)(2)'s commonality requirement. *See Libor*, 299 F. Supp. 3d at 586 ("the question of whether a conspiracy . . . existed is a common one, thereby satisfying Rule 23(a)(2)'s commonality requirement."). [378]

---

[377] *Id.*

[378] *See also Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 105 (2d Cir. 2007) ("allegations of the existence of . . . conspiracy are susceptible to common proof"); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06–MD–1175 (JG)(VVP), 2014 WL 7882100, at *30 (E.D.N.Y. Oct. 15, 2014) (finding questions about the "existence, scope, and impact" of an antitrust conspiracy to be "important and fundamentally common questions"); *see also Dodge v. County of Orange,* 208 F.R.D. 79, 88 (S.D.N.Y. 2002) (finding that common questions are present where there are "legal or factual disputes pertaining to the defendants' 'unitary course of conduct,' since such questions tend to give rise to answers that are broadly applicable to the entire class.").

### C.    Typicality: Plaintiffs and the Class have identical Article 50 claims arising from the same conspiracy between BNPP and the Regime

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "This requirement 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" *Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010) (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d. Cir. 1997)). "Factual differences in the amount of damages . . . and other such concerns will not defeat class certification when plaintiffs allege that the same unlawful course of conduct affected all members of the proposed class." *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 92 (S.D.N.Y. 1998). The standard is "not highly demanding." *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 113 (S.D.N.Y. 2015).

Here, each Class member's claim arises from the same course of events—BNPP's criminal conspiracy with the Government of Sudan and contribution to its human rights abuses—and each Class member asserts the identical claim under Article 50. *See Does I v. The Gap Inc.,* No. CV–01–0031, 2002 WL 1000073, at *3 (D. N. Mar. Is. May 10, 2002) ("although the injuries allegedly sustained by the class representatives are not identical to the class members, they are similar in character because class representatives and class members allegedly suffered economic and other damages, either directly and indirectly, as a result of the defendants' alleged pattern of racketeering activity, conspiracy, and violation of statutory, constitutional, and human rights").

While "[t]ypicality may be found to fail in cases where the named plaintiff was not harmed by the conduct alleged to have injured the class," *In re Facebook, Inc. IPO Secs. & Deriv. Litig.*, 312 F.R.D. 332, 343 (S.D.N.Y. 2015), that is not the case here, where each named plaintiff was at a minimum forcibly displaced by the Bashir Regime, as evidenced by their admission to the United States as refugees.

The named Plaintiffs, like other class members, were targeted by the Bashir regime because of their protected characteristics, including their race,[379] religion,[380] or association with particular social groups.[381] As a result of their forced displacement, the named Plaintiffs, like other class members, suffered injury to their dignity (and more) by being reduced to refugees.[382] Once resettled, the named Plaintiffs, like other Class members, "suffer from the loss of contact with their larger family, left behind in Sudan, or in other camps," a loss that "is uniquely poignant for Sudanese refugees, which values large and connected families above all else."[383]

In addition to their forced displacement, the named Plaintiffs, like other Class members, suffered from common patterns of injuries inflicted by the Government of Sudan.[384] These included:

- o Ghost Houses: "entire neighborhoods were terrorized by armed government soldiers, secret intelligence, and informants. People were abducted from their homes in the dark

---

[379] *E.g.*, Ex. 34, Deposition of Hawa Omar ("Omar Dep.") at 47:18-28:20 (Fur); Ex. 21, Deposition of Abbo Abakar ("Abbo Abakar Dep.") at 51:6-9 (Massalit); Ex. 22, Deposition of Abubakar Abakar ("Abubakar Abakar Dep.") at 65:5-7 (Massalit); Ex. 24, Deposition of Abulgasim Abdalla ("Abdalla Dep.") at 102:20-22 (Massalit); Ex. 38, Deposition of Ambrose Ulau ("Ulau Dep.") at 41:15-16 (Balanda); Ex. 31, Deposition of Entesar "Kashef Dep.") at 57:21-23 (Fur); Ex. 37, Deposition of Nyanriak Tingloth ("Tingloth Dep.") at 41:13-14 (Dinka); Ex. 25, Deposition of John Doe ("John Doe Dep.") at 85:5 (Fur); Ex. 28, Deposition of Isaac Ali ("Ali Dep.") at 37:21-22 (Bongo); Ex. 35, Deposition of Kuol Shbur ("Shbur Dep.") at 67:3-5 (Abyei); Ex. 23, Deposition of Hamdan Abakar ("Hamdan Abakar Dep.") at 44:19-21 (Massalit); Ex. 39, Deposition of Jane Roe ("Jane Roe Dep.") at 49:14-15 (Kuku); Ex. 32, Deposition of Halima Khalifa ("Khalifa Dep.") at 32:24-33:1 (Baka); Ex. 27, Deposition of Turjuman Adam ("Adam Dep.") at 60:1-61:16 (Kresh).

[380] *E.g.*, Ex. 22, Abubakar Abakar Dep. at 86:1-12 (explaining that he refused to become "Al Mujahideen" (a religious warrior)); Ex. 38, Ulau Dep. at 53:23-54:1 (Christian preacher); Ex. 37, Tingloth Dep. at (Christian family); Ex. 32, Khalifa Dep. at 51:13-18 (Christian); Ex. 39, Jane Roe Dep. at 49:19-20 (Christian); Ex. 35, Shbur Dep. at 40:13-14 (Christian); Ex. 33, Lukudu Dep. at 44:13-18 (Christian); Ex. 37, Tingloth Dep. at 48:5-6 (Christian).

[381] Ex. 27, Adam Dep. at 13:21-24, 69:15-71:3 (explaining that as a judge he was appointed to "the special courts" designed to prosecute opposition leaders, and refused the assignment); Ex. 38, Ulau Dep. at 58:23-59:23 (explaining that she was tortured for being a Bible school teacher and pastor accused of converting Muslims); Ex. 22, Abubakar Abakar Dep. at 88:19-89:21 (explaining that the Sudanese army would recruit teachers, and try to kill those who refused).

[382] *E.g.*, Ex. 26, Deposition of Jane Doe ("Jane Doe Dep.") at 84:5-85:3, 123:25-128:16; Ex. 29, Deposition of Shafika Hassan ("Hassan Dep.") at 94:2-95:21, 97:14-98:19; Ex. 25, John Doe Dep. at 162:22-163:16; Ex. 36, Deposition of Judy Doe ("Judy Doe Dep.") at 61:23-62:10; Ex. 27, Adam Dep. at 128:8-129:25.

[383] Ex. 4, Expert Report of Dr. Jok Madut Jok ("Jok Report") ¶ 128.

[384] *See* Ex. 4, Jok Report at 5.

of night, often never to be heard from again. . . .  The abductees would be taken to the garrisons and ghost houses for interrogation, and torture, which regularly included rape." Ex. 4, Jok Report ¶ 46.[385]

o  <u>Arbitrary Detention</u>: "The NISS and GOS sanctioned" arbitrary arrests based on "false accusations," or none at all. Ex. 4, Jok Report ¶ 75.[386]

o  <u>Killing or Disappearing Family Members</u>: "[T]he GOS was killing wantonly non-Arab Black African ethnic groups and others it considered undesirable on a large-scale." Ex. 4, Jok Report ¶ 72.[387]

o  <u>Theft of Property</u>: "GOS agents would often raid the homes of detainees and steal their property." Ex. 4, Jok Report ¶ 78.[388]

o  <u>Torture</u>: The GOS engaged in widespread torture "to break their sense of cohesion and community, so that they would disperse and disappear." Ex. 4, Jok Report ¶ 81.[389]

---

[385] Plaintiffs suffered a variety of injuries at ghost houses, including: abduction (Ex. 28, Ali Dep. at 78:19-82:15; Ex. 25, John Doe Dep. at 77:20-79:6; Ex. 26, Jane Doe Dep. at 100:6-102:5; Ex. 35, Shbur Dep. at 53:1-58:10; Ex. 33, Lukudu Dep. at 67:17-74:10; Ex. 38, Ulau Dep. at 54:22-57:21; Ex. 39, Jane Roe Dep. at 80:8-82:4); torture (Ex. 28, Ali Dep. at 82:19-97:23; Ex. 25, John Doe Dep. at 79:4-83:23; Ex. 26, Jane Doe Dep. at 102:19 -106:12; Ex. 35, Shbur Dep. at 58:14-62:6, 83:17-88:25, 92:11-99:21; Ex. 33, Lukudu Dep. at 76:2-86:18; Ex. 38, Ulau Dep. at 57:19-73:24, 80:2-13; Ex. 39, Jane Roe Dep. at 82:15-89:6); and rape (Ex. 25, John Doe Dep. at 53:21-58:2; Ex. 26, Jane Doe Dep. at 102:19-106:12; Ex. 35, Shbur Dep. at 58:14-62:6, 83:17-88:25, 92:11-99:21; Ex. 33, Lukudu Dep. at 76:2-86:18; Ex. 38, Ulau Dep. at 57:19-73:24, 80:2-13; Ex. 39, Jane Roe Dep. at 82:15-89:6).

[386] The alleged reasons for Plaintiffs' arrests varied, including: allegedly supporting rebels (Ex. 39, Jane Roe Dep. at 82:22-84:6; Ex. 38, Ulau Dep. at 59:20-60:9; Ex. 28, Ali Dep. at 87:25-90:11); allegedly being a spy (Ex. 25, John Doe Dep. at 79:10-14; Ex. 35, Shbur Dep. at 60:17-61:15; Ex. 27, Adam Dep. at 100:13-101:2; Ex. 26, Jane Doe Dep. at 103:2-10; Ex. 31, Kashef Dep. at 98:2-12); allegedly converting Muslims to Christianity (Ex. 38, Ulau Dep. at 58:23-60:9, 61:24-63:11); allegedly trading guns (Ex. 33, Lukudu Dep. at 81:18-82:9); selling tea (Ex. 31, Kashef Dep. at 117:3-118:8); and no reason at all (Ex. 28, Ali Dep. at 79:15-80:11).

[387] Ex. 34, Omar Dep. at 101:9-16; Ex. 35, Shbur Dep. at 148:15-22; Ex. 37, Tingloth Dep. at 60:4-19, 110:25-112:7; Ex. 23, Hamdan Abakar Dep. at 67:1-23, 77:12-78:8, 88:8-89:6; Ex. 26, Jane Doe Dep. at 95:3-11; Ex. 31, Kashef Dep. at 77:23-86:5.

[388] Ex. 33, Lukudu Dep. at 92:9-20; Ex. 37, Tingloth Dep. at 107:7-15; Ex. 29, Hassan Dep. at 110:17-111:5; Ex. 28, Ali Dep. at 48:2-49:8; Ex. 25, John Doe Dep. at 154:3-158:18; Ex. 27, Adam Dep. at 123:25-126:3; Ex. 39, Jane Roe Dep. at 73:10-74:21; Ex. 38, Ulau Dep. at 37:15-39:4.

[389] Plaintiffs: were beaten with rubber hoses (Ex. 28, Ali Dep. at 91:7-93:25; Ex. 38, Ulau Dep. at 63:12-64:21; Ex. 25, John Doe Dep. at 55:7-23, 58:13-59:8, 79:4-22); were beaten with the butts of guns or plastic sticks (Ex. 26, Jane Doe Dep. at 104:9-13; Ex. 33, Lukudu Dep. at 76:22-25, 80:2-81:17, 82:10-84:2; Ex. 38, Ulau Dep. at 63:12-64:21; Ex. 31, Kashef Dep. at 109:5-12); beaten with belts (Ex. 31, Kashef Dep. at 119:10-23, 120:5-14); were burnt with cigarettes (Ex. 31, Kashef Dep. at 109:5-12; Ex. 35, Shbur Dep. at 86:9-86:18, 94:15-94:18, 118:2-119:7); were hung upside down (Ex. 38, Ulau Dep. at 64:13-23); whipped (Ex. 32, Khalifa Dep. at 55:3-55-13, 88:16-88:22); had their nails removed (Ex. 32, Khalifa Dep. at 89:6-89:11; Ex. 35, Shbur Dep. at 118:2-119:7); had their genitals beaten (Ex. 32, Khalifa Dep. at 89:23-90:2); were doused with dirty and/or cold water (Ex. 25, John Doe Dep. at 50:3-53:6, 55:7-23, 79:4-80:25; Ex.

o <u>Sexual Abuse and Violence</u>: For the Al-Bashir regime, "rape was its policy, and its weapon." Ex. 4, Jok Report ¶ 89. "[R]ape was part of the ghost house modus operandi of the GOS and NISS." *Id.* ¶ 91. Rape was also used as a weapon of war by the GOS and its agents. Ex. __, Deposition of Jok Madut Jok ("Jok Dep.") at 268:5-269:10 (explaining that the GOS "larger scale, mass rape as an instrument" of violence "against women in areas where they want to win against those people").[390] "For men, rape and sexual assault in the ghost houses frequently involved sodomy with both objects and penises." Ex. 4, Jok Report ¶ 91.[391] The GOS rubbed red pepper on women's genitals as a means to torture, humiliate, and degrade detainees. *Id.* ¶ 80. Rape was so common that "any Sudanese person would (correctly) assume that any woman who had been detained had been raped." *Id.* ¶ 91.[392]

Plaintiffs therefore satisfy the typicality requirement of Rule 23(a)(3).

## D.    Adequacy: Plaintiffs Will Fairly and Adequately Represent the Class

Fed. R. Civ. P. 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." The adequacy determination focuses on whether: "1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Cordes*, 502 F.3d at 99. "A conflict 'between named parties and the class they seek to represent' will be sufficient to defeat class certification only if the conflict is 'fundamental.'" *Langan v. Johnson & Johnson Consumer Cos.*

---

35, Shbur Dep. at 86:9-86:24, 94:1-3); had their testicles electrocuted (Ex. 35, Shbur Dep. at 95:8-95:21); and had red pepper rubbed into their vagina (Ex. 32, Khalifa Dep. at 83:20-84:4, 85:17-86:2).

[390] Plaintiffs, like absent Class members, are reluctant to talk about the sexual crimes they suffered: "Due to Sudanese culture's strict and traditional gender roles influenced by strong religious beliefs, being a rape victim was horrendously shameful for the detainees, and the shame would frequently lead to the breakdown of family units due to the shame that carried over into the family of the rape victim." Ex. 4, Jok Report ¶ 91. This furthered the regime's goal of humiliating and breaking their perceived opponents "as well as to serve as 'payment' for services rendered to the SAF and Khartoum government by the militias." Ex. 5, Expert Report of Dr. Harry Verhoeven ("Verhoeven Opening Report") at 7.

[391] Ex. 25, John Doe Dep. at 53:11-54:24.

[392] Ex. 31, Kashef Dep. at 109:8-111:14; Ex. 26, Jane Doe Dep. at 97:3-98:4; Ex. 29, Hassan Dep. at 37:20-43:5, 53:8-54:7; Ex. 30, Deposition of Judy Roe ("Judy Roe Dep.") at 64:21-69:11; Ex. 39, Jane Roe Dep. at 84:7-92:19; Ex. 36, Judy Doe Dep. at 84:25-86:10, 87:2-93:12; Ex. 32, Khalifa Dep. at 85:12-86:2, 92:16-93:1, 128:12-129:11.

*Inc.*, No. 3:13-cv-1470, 2017 WL 985640, at *12 (D. Conn. Mar. 13, 2017) (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig*, 574 F.3d 29, 35 (2d Cir. 2009)).[393]

Here, there is no "conflict of interest between the named plaintiffs and other members of the plaintiff class." *Marisol A.*, 126 F.3d at 378. Rather, the named Plaintiffs have the same interest as every other member of the class in establishing BNPP's liability and obtaining damages for the same patterns of injuries suffered by the same campaign of violence and persecution of the genocidal Bashir regime, including forced displacement. *See Ramirez v. Riverbay Corp.*, 39 F. Supp. 3d 354, 372 (S.D.N.Y. 2014) (finding no conflict where named plaintiffs would assert claims in addition to the common class claim). They live in close-knit communities, by and among the absent class members they seek to represent. *See, e.g.*, Ex. 36, Judy Doe Dep. at 98:1-99:16 (explaining that "[w]e, as the Sudanese, we always gather in one area, and we know each other" and are "one community"); Boyd Decl. ¶ 38.

To be considered as adequate representatives for the entire class, "[i]t is enough that the representative [plaintiffs] exhibit an understanding of the purpose of [the] action and that they share common interests with the absent class members." *Does I*, 2002 WL 1000073, at *4. Class representatives need not have a "formal education and knowledge of the English language and American legal system." *Id.* Rather, what matters is that they "exhibit an understanding that this action is for the protection of all [members of the class] because it seeks to remedy the alleged abuses of the [members of the class]." *Id.* (certifying a class of foreign garment workers on Saipan who suffered alleged labor abuses).

---

[393] The named plaintiffs and proposed class representatives are: Entesar Osman Kashef; Abubakar Abakar; Abbo Ahmed Abakar; Hawa Mohamed Omar; Jane Doe; Shafika G. Hassan; Nyanriak Tingloth; Jane Roe; Nicolas Hakim Lukudu; Turjuman Ramadan Adam; Judy Doe; Ambrose Martin Ulau; Halima Samuel Khalifa; John Doe; Hamdan Juma Abakar; Judy Roe; Abulgasim Suleman Abdalla; Isaac Ali; and Kuol Shbur. Four of the named plaintiffs are proceeding anonymously. *See* ECF No. 245, ¶ 1.

Plaintiffs are fully cognizant of the claims and purpose of this action, and have demonstrated their deep commitment to their responsibilities on behalf of the class for years.[394] Indeed, they volunteered to serve as class representatives because of their profound conviction and commitment to seeking justice for themselves and their entire community.[395] This is entirely in keeping with core Sudanese social, cultural, and ethical values that place family and community networks at the center of Sudanese life.[396]

Named Plaintiffs can "demonstrate[] their commitment to pursue . . . claims on behalf of class members" in many ways, including "by responding to extensive written discovery requests and sitting for lengthy depositions," "review[ing] and comment[ing] on the complaint before it [i]s filed," and confirming that they are "willing to testify at trial" and "committed" to being a class representative going forward. *See Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 566 (S.D.N.Y. 2014); *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 100 (E.D.N.Y. 2012) ("a named plaintiff must exhibit enough integrity and credibility to convince the court that the named plaintiff will diligently perform its fiduciary duties to the class"). There is no question that the named Plaintiffs are committed to pursuing classwide claims.

---

[394] *E.g.*, Ex. 31, Kashef Dep. at 33:7-16 (explaining her role as a class representative); Ex. 32, Khalifa Dep. at 14:19-15:13 (explaining that the community chose the Plaintiffs to represent them); Ex. 27, Adam Dep. at 25:23-26:23 (explaining that he was an attorney and judge in Sudan and is therefore "very qualified to represent others in this case," which "is not only representing the Sudanese of San Diego, but it represents all the affected people of Sudan in the U.S."); Ex. 37, Tingloth Dep. at 138:16-22 (explaining that the decision to become a named plaintiff "was my decision. I decided and I went and registered"); Ex. 38, Ulau Dep. at 14:11-18 (testifying that there was a "discussion among the Sudanese community, and then we learned and then we decided to – you know, to raise the case").

[395] *E.g.*, Ex. 36, Judy Doe Dep. at 29:3-5 ("I want my voice to be heard."); Ex. 30, Judy Roe Dep. at 14:5-16:25 (explaining that she wanted to join the lawsuit "[b]ecause I suffered a lot from the government of Sudan" and wanted to assist others that also faced oppression in Sudan); Ex. 33, Lukudu Dep. at 20:1-14 (explaining that he volunteered to serve as a named plaintiff because "[i]t is something that happened to me and all the other Sudanese"); Ex. 29, Hassan Dep. at 116:10-16 ("I am one of the strong people who stood up and said I will – I will defend my right and the right of the other people in the community who have come as refugees.").

[396] Ex. 4, Jok Report ¶¶ 51, 73, 87, 98, 118, 133.

As an initial matter, Plaintiffs overcame considerable obstacles to bring this suit at all. All are refugees fleeing unimaginable atrocities and often have endured years in refugee camps and similar temporary and difficult living conditions before resettling in the United States.[397] After fleeing their homes, Sudanese refugees were mistreated in refugee camps,[398] were separated from their families,[399] were forced to rely on the charity of international aid donors, have difficulty adapting to their host country (here the United States), suffer from depression and loneliness,[400] and have high rates of family issues such as divorce and children struggling to integrate into their host countries.[401] Following resettlement in the United States, many Plaintiffs (like other Class members) have been beset with difficulties: few employment opportunities, lack of financial resources, cramped and dangerous living conditions, and racism. Boyd Decl. ¶¶ 47-51. These experiences are "humiliating for anyone steeped in Sudanese culture, which prizes formality, propriety, decency, work, and provision for the family."[402]

Despite these enormous obstacles, from as far back as 2015 when BNPP's guilty plea was announced, Plaintiffs engaged first with Department of Justice-sponsored efforts to provide compensation to Sudanese victims of BNPP's criminal activity through BNPP's record-setting $8.9 billion asset forfeiture. Boyd Decl. ¶ 16. Then, when Congress reallocated those funds,

---

[397] *E.g.*, Ex. 22, Abubakar Abakar Dep. at 153:10-155:2 (four to five years in a refugee camp); Ex. 23, Hamdan Abakar Dep. at 104:7-108:9 (eight years in refugee camps); Ex. 24, Abdalla Dep. at 21:21-25, 62:14-63:15 (seven years in refugee camps); Ex. 21, Abbo Abakar Dep. at 48:23-49:3, 115:13-116:23 (years in various places in Chad, Niger, and Ghana, including refugee camps).

[398] *E.g.*, Ex. 29, Hassan Dep. at 86:7-99:4; Ex. 39, Jane Roe Dep. at 100:9-101:11; Ex. 26, Jane Doe Dep. at 111:11-125:22; Ex. 25, John Doe Dep. at 139:23-142:18; Ex. 27, Adam Dep. at 121:3-122:18.

[399] *E.g.*, Ex. 26, Jane Doe Dep. at 84:5-85:3, 123:25-128:16; Ex. 29, Hassan Dep. at 94:2-95:21, 97:14-98:19; Ex. 25, John Doe Dep. at 162:22-163:16; Ex. 36, Judy Doe Dep. at 61:23-62:6; Ex. 27, Adam Dep. at 128:8-129:25.

[400] *E.g.*, Ex. 39, Jane Roe Dep. at 92:4-7; Ex. 29, Hassan Dep. at 81:3-16; Ex. 22, Abubakar Abakar Dep. at 40:11-41:22, 45:7-12; Ex. 24, Abdalla Dep. at 27:23-28:5; Ex. 34, Omar Dep. at 30:5-32:15; Ex. 36, Judy Doe Dep. at 63:9-13, 114:4-16.

[401] *See* Ex. 4, Jok Report ¶¶ 117-143; *see also* Boyd Decl. ¶ 46.

[402] Ex. 4, Jok Report ¶ 118.

Plaintiffs participated in grassroots advocacy to ensure this civil suit was brought and BNPP is held to account. *Id.* ¶¶ 17-18, 37-38. To that end, they provided leadership for their communities and the Class by helping to organize and attend many of the two dozen community meetings held for the putative Class to educate them on the case and their rights. *Id.* ¶¶ 22, 38. They are regularly in contact with Interim Co-Lead Class Counsel Kathryn Lee Boyd and have invited her into their homes many times. *Id.* ¶¶ 21-28, 40.

Moreover, the named Plaintiffs have abundantly demonstrated their qualifications to represent the class by vigorously prosecuting the action for many years. They provided information and confirmation for the dozens of complaints, amended complaints, and other filings made in this litigation.[403] *Id.* ¶ 41. They responded to a total of 247 interrogatories, provided detailed information about their losses in their initial disclosures, which were amended three times and supplemented once, responded to 42 requests for production and produced 242 documents to Defendants, and responded to 747 requests for admission, which responses totaled 480 pages. *Id.*

Plaintiffs' extensive involvement in this litigation culminated in the depositions they endured in June 2022, when every Plaintiff sat for what Plaintiffs' medical and trauma experts described as re-traumatizing depositions using cross-examination tactics reminiscent of treatment by authorities of the brutal Bashir Regime. Boyd Decl. ¶¶ 42-44. As Defendants' own expert testified, interviewing refugees and human rights victims requires a "common sense" approach that is sensitive to the trauma that such persons suffered as well as their unique cultural aspects. *See* Ex. 49, Yale-Loehr Dep. 26:1-28:1.[404] These techniques are widely known. Plaintiffs' medical

---

[403] *E.g.*, Ex. 36, Judy Doe Dep. at 33:21-24; Ex. 27, Adam Dep. at 25:18-22; Ex. 22, Abubakar Abakar Dep. at 121:9-12; Ex. 38, Ulau Dep. at 14:2-10; Ex. 31, Kashef Dep. at 33:18-35:11; Ex. 32, Khalifa Dep. at 122:9-10; Ex. 33, Lukudu at 28:7-13.

[404] Mr. Yale-Loehr trains his students on how to elicit information from survivors of human rights abuses. Ex. 49, Yale-Loehr Dep. at 26:1-27:14. He testified that advocates must be "sensitive in how they

expert Dr. Keller testified that he often works with law firms in their own pro bono work with refugees and asylum seeking, including the defense firms here, and has trained "asylum officers," "judges, immigration judges, judges in other courts," and "lawyers doing pro bono services, including lawyers" at defense counsel's firms in the "standard practice" of evaluating the "totality of information" of a refugee's claims.[405] At the request of Plaintiffs' counsel based on the questioning tactics used by BNPP's counsel, medical and torture survivors' counseling professionals attended the depositions.[406]

Unfortunately, defense counsel asked insensitive, repetitive, close-ended questions, often with a skeptical and accusing demeanor toward Plaintiffs. *See* Boyd Decl. ¶ 42. The nature of the process made the depositions a "very, very stressful, difficult experience for" Plaintiffs, and "traumatizing" for many.[407] One Plaintiff had to be hospitalized from the strain of reliving her abuse during her deposition.[408] At the continuation of that deposition on another day, although Jane Doe was distraught that she was being forced to testify as to her rape "in front of the – the men," BNPP's counsel "pushed [her] and pushed [her]."[409] The exchange was so painful that Ms. Doe

---

communicate," use "common sense" including "allowing the person to take breaks when needed," and "allow[] the individual to be able to become comfortable with the law student so they can trust them to let them tell their full story." *Id.* at 28:4-11, 28:3-10, 29:25-30:12.

[405] Ex.47, Deposition of Dr. Allen Keller ("Keller Dep.") at 28:5-29:5, 235:9-23; *see also* Ex. 2, Khatri Report at 14 (describing training USCIS officers receive in how to interview human rights victims).

[406] Boyd Decl. ¶ 43; Ex. 47, Keller Dep. at 22:7-23:17 (explaining that he attended six depositions in San Diego to provide triage services such as "making recommendations" about whether a Plaintiff "should go to the emergency room").

[407] Ex. 47, Keller Dep. at 140:4-141:14; *see E.g.,* Ex. 32, Khalifa Dep. at 121:12-128:5 (counsel repeatedly pressing for further information on sexual assault despite Ms. Khalifa testifying that her head hurt and that she did not remember specifics concerning the numerous sexual assaults she suffered); Ex. 21, Abbo Abakar Dep. at 109:14-111:5 (counsel suggesting that he abandoned his wife and children); Ex. 23, Hamdan Abakar Dep. at 116:8-121:24 (counsel suggesting that he was better off in the U.S. than he was in Sudan); Ex. 25, John Doe Dep. at 55:7-58:21 (counsel ignoring objections that the questioning was retraumatizing Mr. Doe). Defendants' expert Mr. Yale-Loehr did not "review the depositions taken by BNPP's counsel to see how they attempted to elicit information from the plaintiffs about the human rights abuses they suffered." Ex. 49, Yale-Loehr Dep. at 31:7-13.

[408] Ex. 26, Jane Doe Dep. at 64:16-21.

[409] Ex. 26, Jane Doe Dep. at 153:18-158:20.

attempted to plead with BNPP's counsel: "You are the same age like my daughters. Why don't you – and I put you as one of my daughters. Why don't you consider that you are hurting me? And you keep repeating the same question again and again."[410]

Yet, despite the immense personal and emotional toll on the Plaintiffs—all survivors of brutal atrocities—they continue to stand strong in the face of years of delay and a traumatizing process in order to seek justice on behalf of themselves and thousands of other Sudanese Americans victimized by the Regime and its criminal conspiracy with BNPP: "I don't need a break right now. I need my voice to be heard."[411] There can be no doubt that the named Plaintiffs are adequate representatives for the Class.

Finally, "plaintiff's attorneys are qualified, experienced and able to conduct the litigation," *Cordes*, 502 F.3d at 99, as set forth below in the section on appointment of class counsel. *See infra* at 118-21; *see also Mendoza v. Casa de Cambio Delgado, Inc.*, No. 07CV2579(HB), 2008 WL 3399067, at *6 n.6 (S.D.N.Y. Aug. 12, 2008) ("the adequacy of class counsel is now considered under Fed. R. Civ. P. 23(g) rather than as part of the adequacy requirement of Fed. R. Civ. P. 23(a)(4)".

## II.    The Class Satisfies Rule 23(b)(3)

Fed. R. Civ. P. 23(b)(3) requires that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and effectively adjudicating the controversy." Rule 23(b)(3) was designed to "encompass[] those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly

---

[410] *Id.* at 158:2-5.
[411] Ex. 36, Judy Doe Dep. at 39:15-16.

situated, without sacrificing procedural fairness or bringing about other undesirable results." Fed. R. Civ. P. 23(b)(3), adv. comm. n. to 1966 amend. This is such a case.

### A.    Common Questions Predominate

"The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (internal quotations omitted). Predominance is satisfied "'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013). A plaintiff does not have "'to prove that each element of her claim is susceptible to classwide proof,'" but need only show "'that common questions *predominate* over any questions affecting only individual [class] members.'" *In re Petrobras Sec.*, 862 F.3d 250, 268 (2d Cir. 2017) (quoting *Amgen*, 568 U.S. at 455) (emphasis in original); *see also Cordes*, 502 F.3d at 107-8 ("Even if the district court concludes that the issue of injury-in-fact presents individual questions, however, it does not necessarily follow that they predominate over common ones and that class action treatment is therefore unwarranted.").

Here, Plaintiffs will prove each element of their claim through common evidence: BNPP's conscious cooperation with the Government of Sudan, the causal connection between BNPP's conduct and the Government of Sudan's campaign of human rights abuses, and the forcible displacement perpetrated by the Government of Sudan and its agents and suffered by every Class

member. Any individualized questions as to *additional* damages due to particular class members do not defeat class certification.[412]

### 1.    The scope and scale of BNPP's conspiracy with the Regime during its campaign of persecution is a common, predominant question

As set out in detail above, *see supra* at 8-66, Plaintiffs will use exclusively common evidence to prove BNPP's conduct, including its criminal scheme to evade U.S. sanctions, its knowledge of human rights abuses in Sudan, and the profits it generated for the Regime and for itself. This common evidence includes BNPP's guilty plea admissions, contemporaneous documents, witness testimony including admissions by bank employees, and expert opinions. Whether there is one trial or one thousand, each Class member would put on identical proof of the conspiracy. For this reason, courts in this district have readily found that "the existence of a conspiracy is a common question." *Libor*, 299 F. Supp. 3d at 590.

The fact that BNPP has pled guilty to the conspiracy to evade U.S. sanctions, implemented to prevent the very injuries suffered by Plaintiffs, does not defeat predominance. *See In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 229 (2d Cir. 2006) ("we hold that defendants' concession of liability does not eliminate that otherwise common issue"). Moreover, to the extent that BNPP now seeks to disavow stipulated facts—notably BNPP France's responsibility for the criminal scheme—this raises important questions of admissions and collateral estoppel subject to common

---

[412] *See Does I*, 2002 WL 1000073, at *7 ("The plaintiff Does' alleged injuries, although different, all stem from the same alleged conspiracy amongst the defendants to dominate and control the garment work force of Saipan. The plaintiffs argued, and the court agrees, that they will need to present common evidence to prove the defendants' alleged conspiracy and common course of conduct to prove their RICO, ATCA and Anti–Peonage Act claims, RICO enterprises, predicate acts and injuries, and compensatory, punitive and exemplary damages. Finally, just as the proof required to prove the alleged conspiracy is class wide, so is the evidence that will be used to show class wide economic and non-economic damages. The court finds plaintiffs' argument persuasive that individual proof is not required from each class member and that damages can be proven by using expert testimony, representative sampling, polling, and statistical analysis. These methods provide for the fair distribution of monetary damages to the class members, if and when liability is established, and protects all class members' due process rights. In conclusion, the court finds that common questions predominate and certification of the class is proper at this time.").

proof. *See id.; Levi v. Commonwealth Land Title Ins. Co.*, No. 09CIV.8012 (SHS), 2013 WL 5708402, at *5 (S.D.N.Y. Oct. 21, 2013) (estopping defendant from denying conspiracy admitted in guilty plea).

## 2.     The Class can establish causation on a classwide basis

The Second Circuit has long noted that a case where Plaintiffs are "aggrieved by a single policy of the defendants" and there is a "strong commonality of the violation and the harm" is "precisely the type of situation for which the class action device is suited." *Brown*, 609 F.3d at 484 (affirming certification of a class subjected to a city-wide policy of enforcing an unconstitutional loitering law) (internal quotations omitted). Where a common policy violates fundamental rights— as here, *see supra* at 36-40—the case is particularly suited to classwide resolution. *See, e.g.*, *Nassau Cnty.*, 461 F.3d at 229 (prison strip-search policy); *Menocal,* 882 F.3d 905 at 920 (private prison forced labor policy); *Berger*, 170 F.3d at 1138 (racially discriminatory mandatory training policy supported classwide inference of distress). This is because the inherent dignity of a human being does not vary from person to person. *See In re Nassau Cnty. Strip Search Cases,* No. 99-CV-2844 (DRH), 2008 WL 850268, at *3-7 (E.D.N.Y. Mar. 27, 2008).

Here, common issues predominate throughout the causal chain linking the forced displacement and injuries to all class members to the Regime's genocidal campaign, funded by BNPP's conspiracy.

### a.     Classwide proof of the Regime's genocidal campaign predominates

Every class member will use the same expert and documentary evidence to prove that between 1997 and 2011, the Bashir Regime adopted a nationwide policy of "draining the sea to catch the fish"[413]—eliminating opposition movements by waging a campaign of persecution

---

[413] Ex. 7, Baldo Report ¶ 160.

against disfavored ethnic, religious, and social groups. As cultural anthropology expert Dr. Jok Madut Jok, human rights expert Dr. Suliman Baldo, and former U.S. National Security Council member Cameron Hudson will testify, the Regime (1) used a common apparatus of military, security, and auxiliary forces; (2) animated by a common racist, extremist ideology; (3) to subject a common set of disfavored group; (4) to a common pattern of human rights abuses, including abduction, torture, rape, murder, and pillage; (5) resulting in classwide forcible displacement. *See supra* at 36-50. The existence of a "blanket policy, practice and custom" is a predominating common issue. *Nassau Cnty*, 461 F.3d at 229.

### b.    Classwide proof of BNPP's complicity predominates

Similarly, every class member will use the same documentary evidence and fact and expert witnesses to establish that BNPP's financial support of the Regime was so pervasive that ████████████████████████████████████████████████████████████, leading to a 3000% increase in military spending from 1997 to 2009, with lethal consequences through at least 2011. *See supra* at 24-26.

In denying BNPP's motion to dismiss, this Court has already held that such pervasive complicity—████████████████████████████████—would establish that "funds accessed by Sudan through the BNPP Defendants' financial services were actually used for the attacks that injured plaintiffs." *Kashef*, 2021 WL 603290, at *6. This is even more than Swiss law requires for establishing natural causation. As explained by Professor Werro—whose writings on Article 50 causation are cited by the Swiss Supreme Court: "Article 50 does not require that the accomplice directly cause the injury; instead it requires a causal link between the combined efforts of all participants and the injury."[414] Thus, no individualized assessment is required to establish

---

[414] Ex. 1, Werro Decl. at 45.

the scale of BNPP's financial support and whether the forced displacement "would not have occurred at the same time or in the same way or magnitude" without BNPP's conspiracy and systemic role as "the Sudanese government's de facto central bank." *Kashef*, 2021 WL 603290, at *6.

The pervasive and systemic scale of BNPP's support to the Regime distinguishes this case from the predominance analysis in BNPP's principal authority, *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 226 F.R.D. 456, 461 (S.D.N.Y. 2005) ("Talisman"). In *Talisman*, certification was sought for a sprawling putative class of nearly 250,000 victims—primarily residing in Sudan—bringing complex international law claims under the Alien Tort Statute against Talisman, a minority owner of just one of the Government of Sudan's oil consortia. *Id.* at 461-62. Determining causation on a classwide basis would have required linking the personal injuries of hundreds of thousands of victims to the contribution of $195 million in oil royalties paid by Talisman to the Sudanese government. *Id.* at 461.

BNPP dwarfs Talisman's role as Regime financier. Talisman's $195 million in financial complicity from oil-producing royalties is ███████████████████████████████ ████████████████████████████████████████████████████████████ ████████[415] There is simply no comparison in kind or in scale. The pervasive magnitude of BNPP's complicity, as this Court previously observed, greatly simplifies establishing causation. *See Kashef*, 2021 WL 603290, at *6. Moreover, unlike in *Talisman*, the class here has just one cause of action, Article 50 CO, with just three elements. Finally, unlike BNPP, Talisman was not criminally charged and convicted.

---

[415] Ex. 11, Expert Report of Timothy J. Fogarty Sr. ("Fogarty Report") ¶ 260.

c.    **Classwide proof of attribution predominates: the U.S. government has already attributed forced displacement to the Regime for 92.8% of the Class**

The United States' admission of Class members as refugees and asylees is classwide proof that they were forcibly displaced by the Regime and its agents. As Plaintiffs' immigration expert, Prakash Khatri, has explained, the U.S. government has *already determined* that 92.8% of the over 25,800 class members were forcibly displaced by the Government of Sudan or its agents during the class period.[416]

Refugee or asylee status is proof of forced displacement. As Mr. Khatri explains, "displacement is in the very definition of a refugee" that every refugee and asylee must satisfy in order to be admitted to the United States.[417] In other words, no refugee or asylee can be admitted to the United States without the U.S. government having found—for each and every refugee and asylee—that they were outside their country of nationality (*i.e.*, were displaced) and suffered or feared persecution, such that they were unable to return (*i.e.*, the displacement was forcible).[418] As addressed *supra* at 76 & n.354, the same is true for "derivative" refugees—the spouses and minor children of the "primary" refugee applicant" who are counted as refugees by law and have been forcibly displaced as a family unit.[419]

Defense expert Yale-Loehr may dispute this now, but he acknowledges it in his own immigration law textbook.[420] And before BNPP hired him, Mr. Yale-Loehr could not have been more clear on this point, writing in *USA Today* that "[b]y definition, refugees have fled

---

[416] Ex. 3, Khatri Reply at 12 n.24, 18.
[417] Ex. 3, Khatri Reply at 2 (citing 8 U.S.C. § 1101(a)(42)(A)); *id.* at 3 n.5 (citing statements of international authorities).
[418] *Id.* at 2-3, 6-10; 8 U.S.C. § 1101(a)(42)(A).
[419] *See* Ex. 59, Yale-Loehr Report ¶¶ 59-65; Ex. 2, Khatri Report at 16-17 (citing 8 U.S.C. § 1157 and 8 C.F.R. § 207.7); Ex. 3, Khatri Reply at 14.
[420] Ex. 3, Khatri Reply at 2 n.3 (citing Mr. Yale-Loehr's textbook).

persecution," and telling an audience in a panel discussion that "worldwide 84 million individuals have been forcibly displaced because of persecution, conflict, violence, or human rights violations," and "of those 84 million forcibly displaced individuals, 33 million are refugees, meaning they have fled their own countries to another country." Ex. 49, Yale-Loehr Dep. at 91:7-92:6, 96:3-97:5; *see also id.* at 90:4-18 (agreeing with statement that refugees and asylum seekers were "[f]orced to leave their homes").[421]

The adjudication of refugee or asylee status is also proof of attribution to the Regime. When the U.S. government determined that refugees or asylees met the statutory criteria, it necessarily established that class members' forcible displacement is attributable to the Government of Sudan or its agents.[422] Under the threshold legal criteria, refugees and asylees must establish both that persecution was inflicted "on account of a protected ground," 8 U.S.C. § 1101(a)(42)(A), and that the persecution was committed by the government, its agents, or a third party that the government is "unwilling or unable" to control.[423]

The record shows no evidence that any class member was displaced by a third-party that the Regime was "unwilling or unable to control." This is a high bar: Mr. Yale-Loehr explains that "unable" means that the government is "completely helpless," and "unwilling" means the government is "complicit in the conduct constituting the persecution by condoning or granting its

---

[421] In the parties' May 3, 2023 joint letter to the Court, BNPP contended that it was "misleading[]" to quote Mr. Yale-Loehr's prior statements because they were not made in the context of this litigation and "had nothing to do with Sudanese refugees." ECF No. 414 at 5 n.5. But Mr. Yale-Loehr's prior, non-litigation statements – which he confirmed during his deposition in this case, and which encompass all refugees, including those from Sudan – are if anything more probative than any contrary statements he later made when BNPP was paying him $795 per hour. Ex.49, Yale-Loehr Dep. at 20:9-11. Notably, Mr. Yale-Loehr's report does not include the required "list of all publications authored in the previous 10 years," Fed. R. Civ. P. 26(a)(2)(B)(iv); he testified that "I do not include every single thing I have written in the last ten years" because he "write[s] too much": 100-150 publications in that time. Ex. 49, Yale-Loehr Dep. at 14:5-23.

[422] Ex. 3, Khatri Reply at 12 n.24, 18.

[423] Ex. 3, Khatri Reply at 8.

imprimatur to the conduct."[424] The Bashir Regime was not "completely helpless" against the SPLA or other armed rebels, but was actively fighting a war against them.[425]

Nevertheless, Mr. Yale-Loehr speculates that some refugees and asylees admitted to the United States may have been injured not by the Government of Sudan or its agents, but by rebel groups in Sudan such as the SPLA.[426] Yet Mr. Yale-Loehr admits that he is not an expert on Sudanese history, politics, and culture and has never been to Sudan.[427] The actual experts on Sudan in this case have refuted Mr. Yale-Loehr's speculative assertions with evidence that only the Regime drove the mass forced displacement from Sudan.[428]

---

[424] Ex. 59, Yale-Loehr Report ¶ 57; *see also* Ex. 3, Khatri Reply at 9.

[425] *See* Ex. 3, Khatri Reply at 9. A government's active effort to combat the threat of a third-party is sufficient to defeat an asylum or refugee application. *See Khan v. Holder*, 727 F.3d 1, 8 (1st Cir. 2013) (affirming the denial of asylum to applicant attacked by the Taliban because "the evidence shows that the Pakistani government has actively sought to protect [the petitioner] from the Taliban and that it has been to some extent successful in controlling the Taliban in the Swat valley, even if it has not eradicated the threat the Taliban poses"); *Ortiz-Araniba v. Keisler*, 505 F.3d 39, 43 (1st Cir. 2007) (affirming denial of asylum based on gang violence in El Salvador based on the Salvadoran government's willingness and ability to prosecute and incarcerate gang members). And to the extent the Sudanese government was "condoning or granting its imprimatur" to SPLA splinter groups supporting and encouraged by the government, those splinter groups were acting as agents of the Government of Sudan and their victims fit within the class definition. *See* Ex. 8, Expert Reply Report of Dr. Suliman Baldo ("Baldo Reply") ¶ 113 ("The GOS recruited, armed, and paid SPLA splinter factions to fight as GOS-aligned militia, as part of the GOS's longstanding militia strategy."); Ex. 6, Expert Reply Report of Dr. Harry Verhoeven ("Verhoeven Reply") at 44-45 (describing "violence directed at the behest of the Al-Ingaz regime and certainly enabled – through weapons, pay and/or legal immunity – by its security services").

[426] Ex. 59, Yale-Loehr Report ¶¶ 31-38, 57-58. Mr. Yale-Loehr also suggests that some refugees and asylees included in Mr. Khatri's estimate may not have been harmed if they established only a well-founded fear of future persecution as opposed to past persecution. Ex. 59, Yale-Loehr Report ¶¶ 54-56. But the concept of "well-founded fear" implicates significant harms and often includes past persecution. Ex. 3, Khatri Reply at 6-7. And Mr. Yale-Loehr himself argued previously that "the refugee facing torture, serious bodily injury, or cruel, inhuman or degrading treatment faces a serious affront to her dignity." *See infra* note 438. Even so, anyone forced to leave their homes due to a well-founded fear of persecution has been forcibly displaced and therefore fits within the class definition. Ex. 3, Khatri Reply at 7; *see also* Ex. 49, Yale-Loehr Dep. at 106:2-21 (agreeing that "[s]omeone who fears persecution believes that they can't safely return home" and "if they are found to have a well-founded fear that's why they are granted asylum to . . . start a new life in the U.S." if they also "meet all of the requirements . . . to qualify for asylum status").

[427] Ex. 49, Yale-Loehr Dep. at 130:19-131:6.

[428] *See* Ex. 8, Baldo Reply at 20-63; Ex. 6, Verhoeven Reply at 43-45; *see also supra* note 254.

Indeed, Defendants can point to no record evidence that *any* Sudanese refugees or asylees who left Sudan during the class period and were actually admitted to the United States did *not* suffer or fear persecution by the Government of Sudan or its agents. Nor is there record evidence that rebel groups acted with the requisite persecutory motive or engaged in a widespread or systematic campaign of abuses.[429] Based on the legal requirements and country conditions, all refugees and asylees from Sudan who made it through the difficult process to be lawfully admitted to the United States have already been found to have been forcibly displaced by the Government of Sudan or its agents and therefore fit within the class definition.[430]

Furthermore, this prior immigration adjudication is classwide circumstantial evidence of causation. As the Tenth Circuit made clear in *Menocal*, "when a class member could individually establish causation based on circumstantial evidence, a court may likewise allow a class to rely on circumstantial evidence that the class shares to establish causation on a classwide basis." 882 F.3d at 919. In *Menocal*, the causation issue was whether immigration detainees were coerced to perform cleaning services while in the custody of a government contractor. *Id.* at 920. The contractor had a "uniform policy subjecting detainees who refused to perform such uncompensated work to discipline." The fact that the detainees were on notice of this policy supported a "classwide inference of causation" that their labor was forced by the policy. *Id.* at 922.

---

[429] As Mr. Khatri explains, "violence by private actors is not enough to demonstrate a claim to protection," and Mr. Yale-Loehr's own treatise calls this "the most difficult barrier to refugee status" because "[p]rivate disputes, including violence arising from criminal activity, will not alone suffice," and "[h]arm arising from general conditions such as anarchy, civil strife, or mob violence is not persecution on account of a protected ground[.]" Ex. 3, Khatri Reply at 8 (quoting Charles Gordon, et al., *Immigration Law & Procedure* § 33.04 (co-authored by Mr. Yale-Loehr)); *see also Harutyunyan v. Gonzales*, 421 F.3d 64, 68-69 (1st Cir. 2005) ("not all horrific experiences translate into persecution"); *M.A. v. U.S. I.N.S.*, 899 F.2d 304, 314–15 (4th Cir. 1990) ("courts have consistently rejected applications for political asylum based on fear grounded in general violence or unrest in one's native country"); *see also* Ex. 49, Yale-Loehr Dep. at 107:25-109:8 (agreeing that "to qualify for asylum it isn't sufficient to have just come from a country where persecution is occurring") (objection omitted).

[430] Mr. Yale-Loehr testified that all refugees from Sudan went through "extreme vetting," Ex. 49, Yale-Loehr Dep. at 92:7-18, and that it is "hard to win asylum," *id.* at 97:24-98:7, 99:4-12.

Here, there is even stronger evidence giving rise to a classwide inference that the Class was forcibly displaced by the Sudanese government. This is because the U.S. government has already attributed the forced displacement of 92.8% of the class to the Regime through immigration adjudication. That adjudication is bolstered by common proof of the Regime's campaign and BNPP's complicity. Together, this nucleus of common proof supports a powerful classwide inference that Regime persecution was the driver of forcible displacement, including for the remaining 7.2% of class members who entered on a diversity visa.[431] This provides the link missing in *Talisman*, making attribution "solvable with a uniform piece of circumstantial evidence." *Menocal*, 882 F.3d at 921.

Nevertheless, BNPP complains that the U.S. government's decision to admit class members as refugees or asylees "did not afford Defendants any opportunity to be heard" and was "not subject to the standards and procedures governing civil litigation[.]" ECF No. 414 at 5. But in this forum, BNPP cannot challenge the U.S. government's now-final determination that these immigrants satisfied the legal criteria for admission, or the statutory immigration processes more generally. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2418 (2018) ("For more than a century, [the Supreme] Court has recognized that the admission and exclusion of foreign nationals is a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.") (citation and internal quotation marks omitted); *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 n. 2 (1976) ("the power over aliens is of a political character").

---

[431] As set forth in the numerosity section above, *see supra* at 72-78, Mr. Khatri has separately estimated the number of class members who were refugees, asylees, and diversity visa recipients. Ex. 3, Khatri Reply at 14-17. He has also separately estimated the number of primary versus derivative applicants. *Id.* at 15. All of these categories of immigrants have suffered the common injury of forced displacement. *See supra* at 97-103 (rebutting Mr. Yale-Loehr's arguments to the contrary). But to the extent the Court finds that common questions predominate only as to certain of these categories, it can narrow the class definition or create subclasses as necessary. *See Petrobras*, 862 F.3d at 274 (noting "management strategies" such as bifurcating proceedings, severing claims, or certifying subclasses).

Indeed, BNPP's immigration expert, Mr. Yale-Loehr, made clear that he is not suggesting that any of the named plaintiffs were improperly admitted as refugees. Ex. 49, Yale-Loehr Dep. at 35:12-36:3, 37:17-38:4, 39:15-25, 42:15-44:7, 46:12-21, 47:7-48:15. BNPP has no more basis to argue that any class member who the U.S. government found met the statutory requirements and decided to admit as a refugee or asylee was not properly admitted to this country. It certainly should not be permitted to manufacture individualized defenses based on this speculative and baseless assertion.

### 3. All class members suffered the common injury of forced displacement and are entitled to damages for the harm to human dignity they suffered

As explained above, common questions predominate as to BNPP's conduct and the causal link between that conduct and the campaign of human rights abuses by the Government of Sudan and its agents that forcibly displaced the class members. Common questions likewise predominate as to the common injury of forced displacement and as to damages for the harm to human dignity that is common to all class members.

Plaintiffs' Swiss law expert, Professor Werro, opines that "[t]he emotional suffering caused by forced displacement and the loss of home, family, and social ties is compensable under Swiss law."[432] All class members can therefore be "compensated for the emotional pain and suffering that resulted from them being forced to flee their homes, families, careers, and homeland by the Sudanese government's violent persecution. This forced displacement clearly infringes an absolute right protected in the Swiss legal order."[433] And "the case law of the European Court of Human Rights – which is part of the Swiss legal system – is abundant and has on many occasions awarded

---

[432] Ex. 1, Werro Decl. at 29.
[433] *Id.* ¶ 69.

compensation to victims of displacement for non-pecuniary damage such as emotional suffering."[434]

To be sure, many class members suffered further damages from injuries for which BNPP is responsible *in addition to* the common injury of forcible displacement. But since all class members suffered the baseline injury of forcible displacement and therefore are entitled to *some* compensation from BNPP, those individualized questions relate only to the *amount* of damages, not the *fact* of compensable injury. As explained in the section below, individualized damages questions do not defeat predominance. And as Professor Werro has opined, "[i]t is no impediment under Swiss law that each plaintiff has at least one harmful injury in common: each was forcibly displaced by the Sudanese government's campaign of repression. This is an injury which gives rise to compensation for moral harm as recognized under Swiss law and the European Court of Human Rights' jurisprudence that is part of Swiss law." *Id.* ¶ 12.[435]

In the analogous *Nassau County Strip Search Cases*, where the proposed class consisted of arrestees who had been strip searched at the Nassau County Correctional Center, the Second Circuit instructed the district court to certify a class as to liability and to further consider whether that certification should be extended to damages as well. *Nassau Cnty*, 461 F.3d at 231. On remand,

---

[434] *Id.*; *see also id.* ¶¶ 70-76. For example, Professor Werro cites *Xenides-Arestis v. Turkey*, in which the petitioner was "forced by Turkish military forces to leave Famagusta with her family and abandon their home, property, and possessions. Since then she has been prevented from having access to, using and enjoying her home and property, which are under the occupation and control of the Turkish military forces." Ex. 1, Werro Decl. ¶ 72 (citing *Xenides-Arestis v. Turkey*, Case No. 46347/99, Judgment, ECtHR, Dec. 22, 2005, ¶ 11, https://hudoc.echr.coe.int/fre#). "The Court held this was a violation of the petitioner's rights to property and home and private life, and awarded an "equitable assessment" of 50,000 EUR in compensation for non-pecuniary damage, 'in respect of the anguish and feelings of helplessness and frustration which the applicant must have experienced over the years in not being able to use her property as she saw fit and to enjoy her home.'" Ex. 1, Werro Decl. ¶ 72 (citing Xenides-Arestis v. Turkey, Case No. 46347/99, Just Satisfaction Judgment, ECtHR, Dec. 7, 2006, ¶ 47, https://hudoc.echr.coe.int/fre#).
[435] Mr. Yale-Loehr agreed at his deposition that "the refugee definition is interpreted with assistance from developments in international law and standards," including "international guidance provided by UNHCR." Ex. 49, Yale-Loehr Dep. at 109:24-111:20, 112:21-113:11.

the district court certified the class as to both liability and damages, agreeing with the plaintiffs that predominance was satisfied because all class members had suffered an "injury to human dignity" that entitled them to at least some compensation. *In re Nassau County Strip Search Cases*, Nos. 99-CV-3126 (DRH), 99-CV-2844 (DRH), 99-CV-4238 (DRH), 2008 WL 850268, at *3-4 (E.D.N.Y. Mar. 27, 2008). The parties agreed to a bench trial that resulted in a baseline award of $500 per strip search for between 17,000 and 23,000 class members; these damages were "attributable to the affront to human dignity necessarily entailed in being illegally strip searched," with any additional damages for "injuries sustained by individual class members to be resolved in a subsequent damages phase or phases of the proceeding." *In re Nassau Cnty. Strip Search Cases*, 742 F. Supp. 2d 304, 307 (E.D.N.Y. 2010).

Here, all class members here have suffered the common injury of forced displacement that entitles them to damages under Swiss law.[436] These "damages for the moral harm" caused by forced displacement derive from the right, enshrined in Article 8 of the European Convention on Human Rights (which is "an integral part of Swiss law"), "to respect for his private and family life, his home and his correspondence."[437] Indeed, BNPP's own expert, Mr. Yale-Loehr, has argued that "the refugee *facing* torture, serious bodily injury, or cruel, inhuman or degrading treatment faces a serious affront to her dignity."[438] And Plaintiffs' expert, Dr. Jok, described how forced displacement "is uniquely humiliating for anyone steeped in Sudanese culture, which prizes formality, propriety, decency, work, and provision for the family."[439]

---

[436] Ex. 1, Werro Decl. ¶ 12.

[437] *Id.* ¶¶ 70, 73.

[438] John R. Mills, Kristen M. Echemendia, and Stephen Yale-Loehr, "*Death is Different*" *and a Refugee's Right to Counsel*, 42 Cornell Int'l L.J. 361, 374 (2009) (emphasis added); *see also* Ex. 3, Khatri Reply at 6-7.

[439] Ex. 4, Jok Report ¶ 118; *see also id.* ¶ 123 ("Through displacement, GOS succeeded in its goal of robbing the displaced Sudanese of sense of self, human dignity, and cultural continuity.").

It follows that all class members—each of whom has been forcibly displaced by the BNPP-funded Government of Sudan and its agents—are entitled to baseline damages for the "moral harm" and "injury to human dignity" caused by that displacement. As in the *Nassau County Strip Search Cases*, this presents a predominating common issue for which damages can be awarded on a classwide basis.

This also distinguishes this case from *Talisman*. Here, the common injury of forced displacement makes common questions predominate because it is a dignity injury, not a physical injury. It does not share the same causation problems that predominated in *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591 (1997) and *Talisman*, 226 F.R.D. at 474. In physical injury cases, individual causation issues can predominate because of differences in class members' pre-existing conditions; differences in the type, frequency, and duration of exposure to toxic substances; or differences in competing causes (*e.g.*, the pack-a-day smoker). *See Amchem*, 521 U.S. at 624. But here the measure of dignity is the same for each class member and, as this Court held in *In re Nassau County Strip Search Cases*, general dignity damages are distinct from additional individualized damages claims that class members might pursue, for their distinct physical or psychological injuries. 2008 WL 850268 at *6-7.

This distinction between dignity injury, which can be determined on a classwide basis, and additional injuries is best addressed through multi-phased proceedings. At the class certification stage, "all that is required . . . is that plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability." *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 317 F.R.D. 374, 393 (S.D.N.Y. 2016). While the actual damages figure would be determined at trial, if each of the over 25,800 class members were to receive an amount of baseline damages for their forcible displacement only (as in *Xenides-Arestis v. Turkey*, *see supra*

105

at 104 n.423), the first phase of proceedings would result in an aggregate classwide damages award.[440]

Once this first phase is completed, the next phase—as in the *Nassau County Strip Search Cases*—would determine what *additional* damages class members sustained on account of the other injuries set forth in the class definition: "genocide, battery, assault, unlawful imprisonment, sexual abuse, threats of violence and/or deprivation of property."[441] While these subsequent proceedings would entail some proof that may vary by individual or category, as explained in the next section that is no impediment to class certification. Common issues therefore predominate as to the forcible displacement suffered by all class members.

### 4. Individualized damages determinations will not defeat class certification

The Supreme Court has recognized that common questions still predominate even when some individualized questions may need to be tried separately, such as damages or affirmative defenses specific to some class members. *See Tyson Foods*, 577 U.S. at 453; *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (collecting cases) ("'the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification' under Rule 23(b)(3)") (internal citation omitted). Thus, the presence here of some categories of individualized damages issues does not defeat class certification when common liability issues predominate.

---

[440] This excludes any award of punitive damages based on the egregiousness of BNPP's conduct. Although Swiss law applies to Plaintiffs' claims, whether New York law applies as to availability of punitive damages presents an additional classwide legal issue.

[441] *See* Ex. 49, Yale-Loehr Dep. at 117:16-118:13 ("A. The complaint says who form[er]ly lived in Sudan or South Sudan and who are subject to the human rights abuses, including forced displacement yada, yada, yada. So there's more to that paragraph. Q. Right. Well, just for the record the yada, yada is the list of human rights abuses, forced displacement, genocide, battery, assault, unlawful imprisonment, sexual abuse, threats of violence and/or deprivation of property. Do you see that? A. I do see that.").

*Sykes*, 780 F.3d 70 at 82 ("The Supreme Court has explicitly determined that it is 'clear that individualized monetary claims belong in Rule 23(b)(3).'") (quoting *Dukes*, 564 U.S at 362).

As an initial matter, as set forth in the section on typicality, Plaintiffs and Class members suffered from common patterns of injuries. *See supra* at 83-86 (discussing the use of ghost houses, arbitrary detention, killing or disappearing family members, theft, torture, and sexual abuse). While such acts constitute gross abuses when inflicted on any group, these particular violations were intended as a policy of the Bashir Regime to inflict unique harms based on shared Sudanese social, cultural, and ethical norms.[442] These give rise to compensable moral harm (*i.e.*, pain and suffering damages).[443] Damages for these types of injuries are susceptible to common proof. *See, e.g., Betances v. Fischer*, 304 F.R.D. 416, 431–32 (S.D.N.Y. 2015) (holding that "general damages . . . may be calculated on a class-wide basis").

More fundamentally, as the Second Circuit Court of Appeals has explained, "[t]here are a number of management tools available to a district court to address any individualized damages issues that might arise in a class action, including: (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001) (footnote omitted). One available option is to determine damages for Class members who experienced particular categories of harms. *See Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013) (discussing the use of "separate hearings to determine –

[442] Ex. 4, Jok Report ¶¶ 86-88, 101-06.
[443] Ex. 1, Werro Decl. ¶¶ 145-56 (explaining that certain types of injuries – including, among others, physical injury, kidnapping and arbitrary detention and arrest, deaths of family members – result in moral harm under Swiss law).

107

if liability is established – the damages of individual class members, or *homogeneous groups* of class members") (emphasis added); *Hilao v. Est. of Marcos*, 103 F.3d 767, 783 (9th Cir. 1996) (discussing the use of a special master who recommended damages for class members in the categories of torture, summary execution, and disappearance); *see also* Alvin K. Hellerstein et al., *Managerial Judging: The 9/11 Responders' Tort Litigation*, 98 Cornell L. Rev. 127, 144-146 (2012) (describing a "method for comparatively evaluating the severities of the injuries suffered by the various plaintiffs").

 In any event, the Court need not decide now, at the class certification stage, precisely which of these identified judicial approaches should be used to handle any individualized damages issues that may arise later. *See News Corp.*, 314 F.R.D. at 120-21 ("To the extent that individual issues arise, they can be addressed as this litigation unfolds. . . . While [dividing class members into three categories] may offer a template for a later stage in this litigation, predominance under Rule 23(b)(3) is satisfied for purposes of this class certification motion.").

### B. Class Treatment is a Superior Method to Resolve the Dispute

 When, as in this case, common issues predominate over individual issues, a class action will generally also be a superior method for adjudicating the class members' claims. *See Amchem*, 521 U.S. at 615-16. The superiority inquiry examines: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

 A case satisfies the superiority test if "'the class device will achieve economies of scale, conserve judicial resources, preserve public confidence in the integrity of the judicial system by avoiding the waste and delay of repetitive proceedings, and prevent inconsistent adjudications of

similar claims.'" *Chhab v. Darden Rests., Inc.*, No. 11 Civ. 8345 (NRB), 2016 WL 3004511, at *3 (S.D.N.Y. May 20, 2016) (quoting *Gonqueh v. Leros Point to Point, Inc.*, No. 1:14-CV-5883 (GHW), 2015 WL 9256932, at *3 (S.D.N.Y. Sept. 2, 2015)). Superiority is "explicitly comparative in nature: courts must ask whether 'a class action is *superior to other available methods* for fairly and efficiently adjudicating the controversy.'" *Petrobras*, 862 F.3d at 268 (quoting Fed. R. Civ. P. 23(b) (emphasis in original)).

Here, the other available method for adjudicating the controversy is through litigation of hundreds or thousands of claims brought in separate lawsuits. Akin to a mass tort, each of those claims would need to have motion practice, discovery, jury selection, and trial – although the trials would be nearly identical to one another, with the exception of the plaintiffs' own testimony. This would consume a significant amount of the parties' and the Court's resources. Even then, "[n]either the parties nor the court can manage 10,000 cases arising from a mass tort" without "[s]ome method . . . devised to sample a manageable number, somehow thought to be reflective of the whole." Alvin K. Hellerstein, et al., *The 9/11 Litigation Database: A Recipe for Judicial Management*, 90 Wash. U. L. Rev. 653, 663 (2013).

Given this alternative, "substituting a single class action for numerous trials in a matter involving substantial common legal issues and factual issues susceptible to generalized proof will achieve significant economies of 'time, effort and expense, and promote uniformity of decision.'" *U.S. Foodservice*, 729 F.3d at 130-31; *see also Does I*, 2002 WL 1000073, at *9 ("The alternatives to class action—thousands of individual suits, the pending FLSA action, and DOLI administrative remedies—are not reasonable alternatives for the putative class members."). Put another way, a class action here would be far more manageable than a multitude of individual claims brought in separate lawsuits.

Nevertheless, and notwithstanding the clear efficiency of the class action, there is likely to be a multitude of individual claims brought anyway. This is because many class members will be forced to file separate lawsuits during the pendency of this class certification motion, due to BNPP's unwillingness to entertain a stipulation to toll the statute of limitations. For all of the reasons stated in this memorandum, the Court should grant class certification. But out of an abundance of caution, class members need to protect themselves against the possibility that the motion may be denied. Until then, the limitations period remains tolled for all class members under the doctrine of *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 554 (1974). Should it begin to run again, class members may have very limited time to bring a separate claim and still be within the limitations period.[444] To ensure that their claims are timely, many class members would choose to file those lawsuits now.

Last month, Plaintiffs' counsel wrote to BNPP's counsel to propose that the parties enter into a stipulation regarding tolling, but BNPP refused this offer. Ex. 62, May 16, 2023 Letter from Brent W. Landau to Carmine D. Boccuzzi, Jr. and Karen Patton Seymour; Ex. 63, May 31, 2023 E-mail from Charity E. Lee.[445] As a result, individual class members represented by Plaintiffs' counsel will shortly begin to file lawsuits and will continue to do so throughout the pendency of

---

[444] The Second Circuit held in this case that "[b]ecause BNPP's judgment of conviction was entered on May 1, 2015 and the Plaintiffs' civil action was filed on April 29, 2016, the Adult Plaintiffs' claims are timely under [N.Y.C.P.L.R.] § 215(8)(a)," which states that "the plaintiff shall have at least one year from the termination of the criminal action as defined in section 1.20 of the criminal procedure law in which to commence the civil action notwithstanding that the time in which to commence such action has already expired or has less than a year remaining." *Kashef*, 925 F.3d at 62-63.

[445] Plaintiffs proposed "that the parties stipulate that, in the event class certification is denied, for claims previously tolled by the pendency of the class action, the statute of limitations will remain tolled until sixty (60) days after the latest of the following: (a) the date of the Court's order denying class certification; (b) the date of an order from the Court of Appeals denying a Rule 23(f) petition from the denial of class certification; (c) if a Rule 23(f) petition is granted and the denial of class certification is affirmed, the date the mandate issues from the Court of Appeals; or (d) if a Rule 23(f) petition is granted following the denial of class certification and the Court of Appeals remands for further proceedings, and the Court subsequently denies class certification, the date of the Court's second order denying class certification." Ex. 62, May 16, 2023 Letter from Brent W. Landau to Carmine D. Boccuzzi, Jr. and Karen Patton Seymour.

this motion, unless BNPP agrees to reverse course and consent to a tolling stipulation. The progression of these separate cases will underscore the superiority of a class action here, and should a class be certified, these plaintiffs could proceed as absent class members instead.

Of course, for many class members who do not bring their own lawsuits, the "realistic" alternative to a class action is no action at all. *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("a class action has to be unwieldy indeed before it can be pronounced an inferior alternative—no matter how massive the fraud or other wrongdoing that will go unpunished if class treatment is denied—to no litigation at all"); *see supra* at 77-78. This is one reason why "the class action device is especially pertinent to vulnerable populations" such as the Sudanese-Americans who are members of the proposed class and have "limited understanding of the law, limited English skills, [and] geographical dispersal" throughout the country. *Menocal*, 882 F.3d at 915.

### C.    The Class is ascertainable through objective criteria

There is no "administrative feasibility" requirement in this Circuit. In *Petrobras*, the Second Circuit announced: "We conclude that a freestanding administrative feasibility requirement is neither compelled by precedent nor consistent with Rule 23, joining four of our sister circuits in declining to adopt such a requirement." 862 F.3d at 265. Rather, the "ascertainability requirement, as defined in this Circuit, asks district courts to consider whether a proposed class is defined using objective criteria that establish membership with definite boundaries." *Id.* at 269. Ascertainability "will only preclude certification if a proposed class definition is indeterminate in some fundamental way." *Id.*

This is a "modest threshold requirement." *Id.* The objective criteria must provide "a clear sense of who is suing about what." *Id.* As the Second Circuit held earlier this year, "all that is

needed" is for the class definition to provide "the timeframe . . . and place . . . in which a particular group . . . was allegedly harmed." *Fikes Wholesale,* 62 F.4th at 716 (2d Cir. 2023).

The class here is defined using objective criteria and provides the timeframe (November 1997 to December 2011) and place (Sudan or South Sudan) in which a particular group (U.S. citizens, permanent residents, and lawfully admitted refugees and asylees who suffered forcible displacement or other human rights abuses perpetrated by the Government of Sudan or its agents) was allegedly harmed. As in *Fikes Wholesale*, that is "all that is needed." *Id.*

While some cases have examined whether class membership could be ascertained for each class member in an "administratively feasible" way without "mini-hearings," as noted above the Second Circuit made clear in 2017 that this is not the law in this Circuit. *Petrobras*, 862 F.3d at 264. In doing so, the Second Circuit explained that *dicta* in *Brecher v. Republic or Argentina*, 806 F.3d 22, 24 (2d Cir. 2015), about "administrative feasibility" and "mini-hearings" "was not strictly part of the holding, and was not intended to create an independent element of the ascertainability test[.]" *Petrobras*, 862 F.3d at 266-67.

Thus, "[a]scertainability does not directly concern itself with the plaintiffs' ability to offer proof of membership under a given class definition, an issue that is already accounted for in Rule 23." *Id.* at 269. Whatever the "practicality" of determining whether "each putative class member" satisfies the class definition, "the ascertainability analysis is limited to the narrower question of whether those determinations are objectively possible." *Id.* at 270. For members of the class here, it is objectively possible—and indeed straightforward—for these Sudanese Americans to establish

when they were subjected to human rights abuses (including when they were displaced from Sudan) and the identity of their perpetrator (the Government of Sudan or its agents).[446]

As demonstrated by the discovery responses of the named plaintiffs in this case, any class member can confirm that their injuries (including when they were displaced from Sudan) occurred during the class period.[447] And as demonstrated by the deposition testimony of the named plaintiffs, class members can readily identify their persecutors as the Government of Sudan and its agents.[448] Even that is unnecessary for the 92.8% of class members admitted as refugees or asylees for whom the U.S. government has already made this determination. *See supra* at 63-64, 97-98. Moreover, any class member has the right to request a copy of his or her immigration file, which provides further objective proof of class membership.[449]

Because there is no "administrative feasibility" requirement in this Circuit, even if individual affidavits, testimony, or documentation is needed, the "difficulty of proof does not prevent a class from being ascertainable . . . . For example, a class of consumers who purchased a particular product is ascertainable, even though they may need to produce a receipt or testify about a years-old transaction to prove class membership." *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, 13 Civ. 7789 (LGS), 2022 WL 3971006, at *3 (S.D.N.Y. Aug. 31, 2022); *see also Hilao*, 103 F.3d at 774 (where a class consisted of "Philippines citizens who were (or whose

---

[446] That military, security, and auxiliary forces (such as the Janjaweed) acted as "agents" of the Government of Sudan will be established through common proof that does not vary by class member, including the testimony of Plaintiffs' experts and the Congressional testimony and publications of BNPP's expert Mr. Carisch.

[447] *See, e.g.*, Ex. 40, Plaintiff Hamdan Juma Abakar's Objections and Resps. to Defs' First Set of Interrogs. (Nos. 1-4) Resp. No. 1; Ex. 41, Plaintiff Isaac Ali's Objections and Resps. to Defs' First Set of Interrogs. (Nos. 1-4) Resp. No. 1; Ex. 42, Plaintiff Nyanriak Tingloth's Objections and Resps. to Defs' First Set of Interrogs. (Nos. 1-4) Resp. No. 1.

[448] The named plaintiffs testified that they recognized uniforms and outfits, recognized markings on vehicles, know the armed forces used by the GOS through history and context, and know the security services used by the GOS through history and context. *See* Ex. 4, Jok Report ¶ 114 (citing Plaintiffs' extensive testimony).

[449] Ex. 2, Khatri Report at 11.

decedents were) tortured, summarily executed or 'disappeared' while in military custody during a 14–year period . . . . following the trial on liability a total of 10,059 detailed and verified claim forms were received. In the end, 9,539 of the claims were found valid and awarded damages in the subsequent stages of the trial.").[450]

## III.    In the alternative, a Rule 23(c)(4) class should be certified as to particular issues

Should the Court decline to certify a Rule 23(b)(3) class, Plaintiffs respectfully request that the Court certify an issues-class under Rule 23(c)(4) for all common issues. Doing so would, at a minimum, accelerate and materially advance the litigation, since, as the Court observed, the "case has been ongoing for six years now, with Defendants making every effort to avoid actually litigating and resolving the dispute." ECF No. 338 at 9.

Rule 23(c)(4) permits "an action [to] be brought or maintained as a class action with respect to particular issues." Courts in the Second Circuit have used Rule 23(c)(4) certification to resolve

---

[450] Plaintiffs are aware that this Court has previously denied class certification in other cases on ascertainability grounds. Two of those opinions predated *Petrobras*. In *Leyse v. Lifetime Entertainment Services*, No. 13 Civ. 5794(AKH), 2015 WL 5837897 (S.D.N.Y. Sept. 22, 2015), *aff'd*, 679 Fed. Appx. 44 (2d Cir. 2017) (non-precedential), class membership turned on phone calls "made over a two day period more than six years ago" when there was "no copy of the list of called numbers." *Id.* at *5 (citing the *dicta* in *Brecher*, 2015 WL 5438797 at *2, but without the benefit of the Second Circuit's later opinion in *Petrobras*). In a non-precedential order affirming, the Second Circuit likewise cited *Brecher*'s reference to "mini-hearings"; *Petrobras* would be decided just five months later. 679 Fed. Appx. at 47. In *Ruffo v. Adidas Am. Inc.*, 15 Civ. 5989 (AKH), 2016 WL 4581344 (S.D.N.Y. Sept. 2, 2016), where class membership depended on whether a consumer had purchased a particular pair of shoes, which would be "near impossible," the Court relied on the "administratively feasible" language later rejected by the Second Circuit in *Petrobras*. *Id.* at *2. Needless to say, the horrific human rights abuses suffered by class members, including their forced displacement from their homes, are significantly more memorable than whether someone received a phone call on a particular day or purchased a particular pair of shoes. But even those cases may have been decided differently under *Petrobras*. One additional case, *Bellin v. Zucker*, 19 Civ. 5694 (AKH), 2022 WL 4592581 (S.D.N.Y. Sept. 30, 2022), was decided after *Petrobras*, but the defendants' briefs urged the Court to apply the "administrative feasibility" standard without disclosing that the Second Circuit had rejected that standard in *Petrobras*, ECF Nos. 101 & 102 in 19 Civ. 5694, and the Court did not cite *Petrobras* in its opinion. In addition, the class definition in *Bellin* turned on a subjective, not objective, criteria: whether each class member "believed" that the number of care hours received were "adequate." 2022 WL 4592581, at *5. Here, class membership is defined in terms of objective criteria as set forth above.

common issues efficiently, even where other issues in the case may require individualized proof. *See Nassau Cnty.*, 461 F.3d at 226; *In Re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 CIV. 7789 (LGS), 2022 WL 3971006, *8 (S.D.N.Y. Aug. 31, 2022).

Courts "have authority to certify issues narrower than 'liability' as a whole in order to 'home in on threshold classwide inquiries.'" *In Re Foreign Exch.,* 2022 WL 3971006 at *5 (*citing Petrobras*, 862 F.3d at 274). The key question for Rule 23(c)(4) certification is whether "resolution of the particular common issues would materially advance the disposition of the litigation as a whole." *In Re Foreign Exch. Benchmark Rates Antitrust Litig.*, 407 F. Supp. 3d 422, 437 (S.D.N.Y. 2019). The Second Circuit has instructed that district courts "take full advantage of" Rule 23(c)(4) to "reduce the range of disputed issues in complex litigation and achieve judicial efficiencies." *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 167 (2d Cir. 2001) (internal quotations omitted). For particular issues to be certified pursuant to Rule 23(c)(4), "the requirements of Rules 23(a) and (b) must be satisfied only with respect to those issues." *Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 239 (S.D.N.Y. 2010).

As an alternative to a Rule 23(b)(3) class, Plaintiffs propose an issues class to resolve the numerous common questions identified above on pages 79-81. Each Plaintiff and class member asserts an identical claim under Article 50, arising from the same conspiracy between BNPP and the Government of Sudan, and raising these common issues. Whether classwide or individual, the vast majority of the time in any trial will be spent answering these core questions, using common proof. Individual issues, for example regarding damages, will in any trial (whether classwide or individual) be substantially less time consuming than the common issues, for example regarding the scale and financial impact of BNPP's conspiracy. *Cf. In re Foreign Exch.,* 2022 WL 3971006 at *6 ("The most complex and consequential issue in this case is whether [defendant] joined a . . .

115

conspiracy, and the individual issues surrounding class membership are minor by comparison [so] [f]ollow-on individual proceedings here will be more straightforward."). Indeed, an individual plaintiff is not expected to spend more than one day testifying as to their injuries, making Rule 23(c)(4) certification as to the other questions appropriate.

The efficiency of issue-class certification is particularly clear in cases involving conspiracies, given the overlap of common issues. *See, e.g.*, *In Re Foreign Exch.*, 2022 WL 3971006 at *6 (finding that "[r]esolution of [defendant]'s participation in the conspiracy will materially advance the resolution of the litigation as a whole[,]" including by "defining the timeline" of the conspiracy "on a classwide basis" and "completely and finally" determining defendant's participation in it).

The alternative—having individual plaintiffs, in potentially thousands of individual lawsuits, repeatedly re-litigate the common issues thousands of times over would unnecessarily consume the Court's and the parties' time and resources. Instead, resolution of these common issues would materially advance the litigation by disposing of the largest issues, including the nature and effect of BNPP's conspiracy.[451]

*Talisman* does not counsel against certification of a Rule 23(c)(4) issues class because the financial impact of BNPP's complicity dwarfs that of Talisman.[452] As Judge Nathan observed in denying BNPP's motion to dismiss, BNPP is directly tethered to all abuses carried out by the Regime during the class period because "the revenue generated for the Sudanese government by BNPP's assistance exceeded its entire military budget[.]" *Kashef*, 2021 WL 603290, at *6. In

---

[451] Regarding the Rule 23(a) and (b)(3) requirements, the issues class would be just as numerous as the proposed class discussed above, would feature the same common issues, and the class representatives would assert typical claims and be adequate representatives for the same reasons. *See supra* at 72-92. Common issues would predominate because by definition there would be only common issues. And class certification would be the superior method of adjudicating the controversy for the reasons set forth in this section.
[452] *See supra* at 97.

contrast, the *Talisman* court found that a "general determination that a campaign of genocide existed and that [the defendant] participated in it ***on occasion*** and ***to some degree*** is insufficiently tethered to [the defendant's] liability to an individual class member to have value." 2005 WL 2278076 at *5. Unlike Talisman, BNPP funded the entire genocidal campaign, not mere individual attacks, not on occasion, and not to some degree. Because the Regime, and the genocide, had a systemic dependence on BNPP, the system of their conspiracy—the "oil-genocide nexus"—is highly relevant to establishing its joint and several liability to every class member under Article 50 CO.  As Judge Nathan observed:

> This is a key part of the cycle alleged by Plaintiffs: the more BNPP helped the Regime access U.S. dollars, the more money the Regime made from its oil industry, the more it could fund its military, the more oil it could produce by using armed forces to seize and develop oil rich lands, the more it needed access to U.S. dollars to sell the oil, the more money the Regime and BNPP made, the more BNPP helped the Regime access U.S. dollars.

*Kashef*, 2021 WL 603290, at *8. Talisman was a bit player in that cycle. BNPP was a "core piece of the oil-genocide nexus as its chief financier." *Id.* at *6 (quotation marks omitted). Therefore, in the event that the Court elects not to certify a class as to all issues, Plaintiffs respectfully request, as an alternative, certification of a Rule 23(c)(4) issues class that will drive the efficiency of overall resolution.

## IV.    Appointment of Class Counsel

A court that certifies a class must appoint class counsel. Fed. R. Civ. P. 23(g). In appointing class counsel, the Court "(A) must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class [and] (B) may consider any other matter pertinent to counsel's ability to  fairly and adequately

represent the interests of the class." Fed. R. Civ. P. 23(g)(1). The Court must also determine that class counsel will "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4).

Judge Nathan previously determined that "Brent W. Landau and Kathryn Lee Boyd satisfy the requirements of Rule 23(g)" in appointing them as Interim Co-Lead Class Counsel on June 25, 2020. ECF No. 167 at 1. Since then, Ms. Boyd and her team at Hecht Partners, and Mr. Landau and his team at Hausfeld, have done extensive work on and committed substantial resources to this matter, all of which further demonstrates why they should now be appointed as Class Counsel. Boyd Decl. ¶¶ 29-36. Together, Hecht Partners and Hausfeld have worked over 27,900 hours on this case and advanced over $3 million in costs. Boyd Decl. ¶ 30; Landau Decl. ¶ 22.[453]

As detailed in Ms. Boyd's declaration, she is the original counsel to the proposed class representatives, has spent years developing deep ties with Sudanese refugee communities all over the United States, and has communicated extensively with class members about this litigation. Boyd Decl. ¶¶ 3, 14-28. She has three decades of experience advocating on behalf of human rights victims, was a tenured member of the faculty of the Pepperdine University Caruso School of Law, and has litigated more than thirty jury trials. *Id.* ¶¶ 4-5. She leads a team of accomplished litigators, including Partners David Hecht, Maxim Price, and Kristen Nelson, Senior Counsel Theodor Bruening, Of Counsel Conor McDonough, and Senior Associate Michael Eggenberger. *Id.* ¶¶ 7-12.

Mr. Landau is Global Managing Partner of Hausfeld, which has over 160 lawyers in eleven offices in the United States and Europe and has recovered billions of dollars for plaintiffs in class action cases. Landau Decl. ¶¶ 1-4. He has over two decades of experience litigating and managing

---

[453] This is in addition to another 8,700 hours worked by other firms with which Ms. Boyd was formerly associated. Boyd Decl. ¶ 30.

complex cases, has been named a "Titan of the Plaintiffs Bar" by *Law360*, and is an Adjunct Professor of Law at the University of Pennsylvania Carey Law School. *Id.* ¶¶ 5-8. The Hausfeld team includes Of Counsel Scott Gilmore – an accomplished human rights lawyer who has successfully represented victims of genocide, war crimes, and environmental abuses in national and international proceedings and is an Adjunct Professor of Law at Georgetown University Law Center – as well as Partner Amanda Lee-DasGupta, Counsel Mary Sameera Van Houten Harper, Associate Claire Rosset, Senior Counsel Richard Lewis, and Chair Emeritus Michael Hausfeld. *Id.* ¶¶ 9-21.

Interim Co-Lead Class Counsel have ably litigated this matter and are prepared to continue to commit the time and money needed to see this case to its conclusion. They should therefore be appointed as Class Counsel for the certified class. *See In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175 (JG) (VVP), MDL No. 1775, 2014 WL 7882100, at *66 (E.D.N.Y. Oct. 15, 2014) ("Based on the extensive and competent work that the interim class counsel [including Mr. Landau] have already put into this case over the years, coupled with their ample experience in the relevant fields, the court recommends that they be appointed counsel for the class."), *report and recommendation adopted*, *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175 (JG) (VVP), 2015 WL 5093503, at *1 (E.D.N.Y. July 10, 2015).

## CONCLUSION

Plaintiffs, on behalf of themselves and 25,800 fellow Sudanese-Americans, have been pursuing justice in this case for seven long years. It is time for a resolution of their claims to compensation for their forced displacement and other grave injuries caused by BNPP's criminal conspiracy with the genocidal Bashir Regime. Because all of the requirements of Rule 23(a) and (b)(3) have been met, and because a class action is far superior to the alternative of separate

litigation of hundreds or thousands of individual claims, the Court should grant Plaintiffs' motion,

certify the proposed Class, and appoint Class Counsel.

Dated: June 9, 2023                                             Respectfully submitted,


*/s/ Kathryn Lee Boyd*                                         */s/ Brent W. Landau*
Kathryn Lee Boyd                                               Brent W. Landau
Conor McDonough                                               HAUSFELD LLP
Theodor Bruening                                              325 Chestnut Street, Suite 900
Michael Eggenberger                                          Philadelphia, PA 19106
HECHT PARTNERS LLP                                           (215) 985-3273
125 Park Avenue, 25th Floor                                  blandau@hausfeld.com
New York, NY 10017
(646) 502-9515
(857) 557-5204
(646) 396-6452                                               Michael D. Hausfeld
(646) 777-2489                                               Scott A. Gilmore
lboyd@hechtpartners.com                                      Amanda E. Lee-DasGupta
cmcdonough@hechtpartners.com                                 Claire A. Rosset
tbruening@hechtpartners.com                                  HAUSFELD LLP
meggenberger@hechtpartners.com                               888 16th Street NW, Suite 300
                                                             Washington, DC 20006
                                                             (202) 540-7200
                                                             mhausfeld@hausfeldllp.com
Kristen Nelson                                               sgilmore@hausfeld.com
HECHT PARTNERS LLP                                           alee@hausfeld.com
6420 Wilshire Boulevard, 17th Floor                          crosset@hausfeld.com
Los Angeles, CA 90048
(646) 490-2408
knelson@hechtpartners.com


                                                             *Counsel for Plaintiffs*