UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ENTESAR OSMAN KASHEF *et al.*, <br><br> Plaintiffs, <br><br> -against- <br><br> BNP PARIBAS S.A., BNP PARIBAS S.A. NEW YORK BRANCH, and BNP PARIBAS US WHOLESALE HOLDINGS, CORP., <br><br> Defendants. | Civil No. 1:16-Civ-03228-AKH <br><br> Hon. Alvin K. Hellerstein <br><br> **Oral Argument Requested** |

**MEMORANDUM OF LAW IN SUPPORT OF BNP PARIBAS S.A.
AND BNP PARIBAS US WHOLESALE HOLDINGS, CORP.'S *DAUBERT* MOTION TO
EXCLUDE THE PROPOSED EXPERT TESTIMONY OF PRAKASH KHATRI**

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
T: 212-225-2000

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
T: 212-558-3196

*Counsel for Defendants BNP Paribas, S.A. and BNP Paribas US Wholesale Holdings, Corp.*

July 21, 2023

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..........1

ARGUMENT ..........2

A. Mr. Khatri's Opinions Are Speculative and Unfounded. ..........2

B. Mr. Khatri's Novel, Untested Methodology for Estimating the Size of the Putative Class Is Unreliable. ..........7

CONCLUSION ..........10


## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Amorgianos* v. *Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002) ................................................................................................. 7, 10

*Boucher* v. *U.S. Suzuki Motor Corp.*,
  73 F.3d 18 (2d Cir. 1996) ............................................................................................................ 2

*Daubert* v. *Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ........................................................................................................ 2, 5, 7, 10

*In re Mirena IUD Prods. Liability Litig.*,
  169 F. Supp. 3d 396 (S.D.N.Y. 2016) ........................................................................................ 10

*In re Mirena Ius Levonorgestrel-Related Prods. Liability Litig.*,
  341 F. Supp. 3d 213 (S.D.N.Y. 2018) ........................................................................................ 10

*In re Namenda Indirect Purchaser Antitrust Litig.*,
  2021 WL 100489 (S.D.N.Y. Jan. 12, 2021) ................................................................................. 2

*Ring* v. *BNP Paribas S.A.*,
  No. 1:23-cv-05552 (S.D.N.Y.) ..................................................................................................... 9

*Sherf* v. *BNP Paribas S.A.*,
  No. 1:23-cv-049886 (S.D.N.Y.) ................................................................................................... 9

*Tardif* v. *City of New York*,
  344 F. Supp. 3d 579 (S.D.N.Y. 2018) .......................................................................................... 7

*United States* v. *Williams*,
  506 F.3d 151 (2d Cir. 2007) ......................................................................................................... 1

**Statutes**

Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42) .................................................... 3, 4, 5

**Other Authorities**

Fed. R. Evid. 702 ............................................................................................................ 1, 2, 7, 10

## PRELIMINARY STATEMENT

Plaintiffs seek to certify a sprawling class of more than 25,000 individuals currently in the United States who formerly lived in Sudan and who were subjected to human rights abuses by the Government of Sudan ("GOS") or its agents from November 1997 to December 2011. But the only way to determine whether each of these individuals now residing in the United States suffered harms at the hands of the GOS or its agents is to examine individually each of their disparate claims. Recognizing this insurmountable obstacle to certification, Plaintiffs resort to their proposed immigration law expert, Prakash Khatri, who makes the sweeping conclusion that the GOS or its agents "forcibly displaced" *every single member* of the putative class during a period of 14 years based *solely* on the individuals' statuses as refugees or asylees. Mr. Khatri goes even further by concluding that the U.S. government explicitly made this determination. Because Mr. Khatri's conclusions and methodologies are neither "based on sufficient facts or data" nor "the product of reliable principles and methods," Fed. R. Evid. 702(b)–(c), Plaintiffs have failed to satisfy their burden to establish by a preponderance of the evidence that Mr. Khatri's testimony meets all of the admissibility requirements of Fed. R. Evid. 702. *See United States* v. *Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

*First*, Mr. Khatri invokes U.S. immigration law to try to support his speculative conclusions, but the statutory language on which he relies says absolutely nothing about "forced displacement." Based on his own "review" of the heavily redacted immigration records of the 19 named Plaintiffs and a misreading of Congressional reports, Mr. Khatri concludes that the U.S. government explicitly found that the GOS or its agents forcibly displaced every single refugee and asylee in the putative class — including a primary applicant's family members who never lived in Sudan.

*Second*, Mr. Khatri tries to estimate the size of the putative class, which Plaintiffs define in terms of *when* the GOS or its agents "forcibly displaced" the putative class members from Sudan. But the immigration records Mr. Khatri relies on provide only the date of *arrival* of an immigrant to the United States, not his or her date of *departure* from Sudan. Mr. Khatri thus invents a methodology — based on erroneous assumptions and a statistically insignificant and non-random sample of data limited to the 19 named Plaintiffs — to derive his estimate of about 24,000 refugees and asylees in the putative class.[1]

Under Fed. R. Evid. 702 and *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Mr. Khatri's testimony should be excluded.[2]

## ARGUMENT

**A.     Mr. Khatri's Opinions Are Speculative and Unfounded.**

In an attempt to create the illusion of commonality, Mr. Khatri offers two opinions that rely on insufficient facts and draw unfounded conclusions, rendering these opinions "speculative" and "conjectural" and therefore inadmissible. *Boucher* v. *U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996).

---

[1]     Plaintiffs and Mr. Khatri estimate that the proposed class consists of approximately 25,800 members. (Ex. 76 (Khatri Reply) at 12 n.24; *see also* ECF No. 431 at 62–63.) In addition to approximately 24,000 refugees and asylees, Mr. Khatri's estimate includes approximately 1,850 "diversity" visa recipients who immigrated to the United States on visas through the annual green card lottery designed to distribute immigrant visas to nationals of countries with historically low rates of immigration. (*See* ECF No. 431 at 75–76 & n.363, 101; Ex. 75 (Khatri Report) at 22–23.) It is beyond dispute that the U.S. government made no finding that these individuals were "forcibly displaced."

[2]     The "heavy weight of authority" recognizes that, where parties rely upon expert testimony at the class certification stage, that testimony must satisfy the requirements of Rule 702 and *Daubert*. *In re Namenda Indirect Purchaser Antitrust Litig.*, 2021 WL 100489, at *8 (S.D.N.Y. Jan. 12, 2021). "It would be incongruous to rule that an expert's opinion can be relied upon in support of class certification but — later in the litigation — determine that the same expert cannot be relied upon for purposes of summary judgment or trial." *Id.* at *7.

*First*, Mr. Khatri opines that *every* refugee and asylee from Sudan within the proposed class period has been "forcibly displaced." (*See, e.g.*, Ex. 76 (Khatri Reply) at 2.)³ As an initial matter, Mr. Khatri never even provided a clear definition of "forced displacement" or explained whether there is a difference between being "displaced" or "forcibly displaced." (*See* Ex. 77 (Khatri Dep. Tr.) at 81:18–22, 86:12–19 (Q: "Is that your definition of forced displacement?" A: "I don't define — I'm basically referencing what is stated by both U.S. law and the general definitional context of a refugee.").) Setting aside this threshold issue, Mr. Khatri bases his opinion *exclusively* on the fact that these individuals satisfied the statutory definition of the term "refugee" within the Immigration and Nationality Act (INA). (*Id.* at 95:19–96:2.) While insisting that forced displacement is "in the very definition of 'refugee,'" Mr. Khatri concedes, as he must, that the statutory language makes no reference to "forced displacement." (Ex. 76 (Khatri Reply) at 2; Ex. 77 (Khatri Dep. Tr.) at 93:12–19.) Indeed, the INA states only that a refugee must be "outside any country of such person's nationality . . . and who is unable or unwilling to return to . . . that country" due to past persecution or a well-founded fear of persecution, but says absolutely nothing about the circumstances under which refugees *left* their country. (Ex. 76 (Khatri Reply) at 2 (quoting 8 U.S.C. § 1101(a)(42)).)

As just one example, under Mr. Khatri's interpretation of the INA, individuals who left Sudan in 1999 to study as students in the United States but then received a grant of asylum in 2003 due to a well-founded fear of persecution if they were to return to Sudan were "forcibly displaced." But Mr. Khatri conceded at his deposition that certain categories of asylees who satisfy the statutory definition of a "refugee" have *not* been forcibly displaced, including asylees who initially

---

³   Unless otherwise stated, references to "Ex." are to the exhibits to the Declaration of Charity E. Lee submitted in support of the BNPP Defendants' Motion for Summary Judgment, Rule 56.1 Statement, Opposition to Plaintiffs' Motion for Class Certification, and *Daubert* Motion.

arrived in the United States on various "non-immigrant" visas, such as student and tourist visas, which do not confer the right to reside permanently in the United States. (Ex. 77 (Khatri Dep. Tr.) at 108:22–109:21, 218:5–221:6.) Although Mr. Khatri opines that "[m]ost, if not all" asylees within the proposed class entered the United States on these kinds of non-immigrant visas (Ex. 75 (Khatri Report) at 18), these putative class members were not "forcibly displaced" because if they had been, they would not have been able to demonstrate, as they must, that when they entered the United States they intended to return to Sudan when their visas expired. (Ex. 77 (Khatri Dep. Tr.) at 113:12–114:4.)

Moreover, Mr. Khatri's opinion that every single putative class member was "forcibly displaced" ignores that approximately 60% of the total refugee population from Sudan within the proposed class period were the spouses and children of the primary applicants, known as "derivative" refugees. (Ex. 76 (Khatri Reply) at 15.) According to Mr. Khatri, "derivative" spouses and children were "forcibly displaced" in all circumstances, even when they left Sudan some time well after the principal family member applied for refugee status. (Ex. 77 (Khatri Dep. Tr.) at 100:11–101:3.) But Mr. Khatri readily admitted at his deposition that "derivative" refugees and asylees are *not required* to satisfy the definition of a "refugee" under the INA, and that the U.S. government makes no finding on whether they faced or feared persecution. (*Id.* at 240:20–241:13.) In fact, at least two of the named Plaintiffs traveled to the United States with children born outside of Sudan who were admitted as "derivative" refugees. (*See* Ex. 25 at PLA-001839; Ex. 26 at PLA-001316–1318.) Under Mr. Khatri's interpretation of the INA, these children were "forcibly displaced" from Sudan. Thus, Mr. Khatri's opinion that every single putative class member was "forcibly displaced" by virtue of their status as a refugee or asylee finds no support

in the INA, and his deposition testimony confirmed the this opinion does not "rest[] on a reliable foundation." *Daubert*, 508 U.S. at 597.

*Second*, Mr. Khatri, who conceded that he has no expertise when it comes to Sudan, opines that *every* refugee or asylee admitted to the United States during a period of 14 years "suffered or faced persecution at the hands of the Government of Sudan or its agents," and that the U.S. government explicitly made this determination. (Ex. 76 (Khatri Reply) at 18; Ex. 77 (Khatri Dep. Tr.) at 71:7–18.) Mr. Khatri testified that he based this conclusion on his review of the heavily redacted immigration records of the 19 named Plaintiffs and his general understanding of "how the U.S. Government processes applications for refugee status." (*See* Ex. 77 (Khatri Dep. Tr.) at 144:19–21, 149:5–14.) This is a patently insufficient basis for his conclusion that the GOS or its agents forcibly displaced *every member* of the putative class. Nor has Mr. Khatri even explained how he was able to "determine" that the nearly 24,000 refugees and asylees "fit into the groups and classifications" demonstrating persecution by the GOS solely by looking at such records of the 19 Plaintiffs. (*Id.* at 145:5–14.) Likewise, Mr. Khatri claimed that the U.S. President's annual reports to Congress showed that the U.S. government had often explicitly made this finding. (*Id.* at 122:1–123:4.) But even when there was no reference to persecution by the GOS in these reports, Mr. Khatri still insisted during his deposition that the *fact* of admission as a refugee amounted to a finding by the U.S. government of persecution by the GOS or its "agents" during the proposed class period. (*Id.* at 125:1–22.)[4] Because the U.S. government did not make any specific finding on persecution even as to certain of the named Plaintiffs, (*see, e.g.*, Ex. 41 (Lukudu Dep. Tr.) at

---

[4] Q: "But if there's no specific reference in the report to Congress about persecution by the Government of Sudan, on what basis are you concluding there was, in fact, such persecution?" . . . A: "The admission of the refugee or refugees in that year. I mean, the basic fact that the refugees were admitted from Sudan acknowledges that fact." (Ex. 77 (Khatri Dep. Tr.) at 125:1-10.)

60:21–61:8), Mr. Khatri drew an unfounded conclusion — based on redacted records of 19 named Plaintiffs — that all named Plaintiffs were forcibly displaced by the GOS or its agents, and then applied that conclusion to all of the nearly 24,000 refugees and asylees in the putative class.

This opinion cannot be reconciled with the fact that the United States permitted valid refugee and asylum claims based on persecution by non-governmental actors that the GOS was "unwilling or unable to control." (*See* Ex. 75 (Khatri Report) at 6; Ex. 76 (Khatri Reply) at 8; Ex. 77 (Khatri Dep. Tr.) at 90:1–14.) As Mr. Khatri conceded at his deposition, "[t]here is *no way* for [him] to be able to state" that every single refugee and asylee who left Sudan over a span of 14 years was subjected to actual or feared persecution by the GOS or its agents. (Ex. 77 (Khatri Dep. Tr.) at 144:16–19 (emphasis added).) He further conceded that immigration officers must look at every application *on an individual basis*, including applications claiming persecution by third-party non-governmental actors, because "in every scenario it's a little different." (*Id.* at 90:3–14.) And while Mr. Khatri testified that there were *no* "non-government entities that the [Sudanese government] did not consider their agents," (*id.* at 139:19–21), he later admitted that he was "not familiar" with the Sudan People's Liberation Army (SPLA), the militarized rebel group that fought a civil war against the GOS for over 20 years, (*id.* at 156:1–7), and was recognized by the U.S. Department of State as having committed violence against Sudanese civilians during the putative class period.[5]

Because Mr. Khatri assumed that the GOS *must have* been responsible for the persecution claimed by every refugee and asylee admitted from Sudan during a 14-year period, he wholly failed to account for the possibility that *any* of those refugees and asylees might have claimed

---

[5] *See* Ex. 96 (Yale-Loehr Report) ¶¶ 32, 34 (citing annual human reports on Sudan published by the U.S. State Department documenting incidences of death, kidnapping, detention, physical injury, and forced conscription perpetrated by the SPLA during the proposed class period).

persecution by a non-governmental actor. "While an expert need not rule out every potential cause in order to satisfy *Daubert*, the expert's testimony must at least address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant." *Tardif* v. *City of New York*, 344 F. Supp. 3d 579, 601 (S.D.N.Y. 2018) (internal quotation omitted). Plaintiffs' proposed expert failed to do so. Thus, Mr. Khatri's opinion that the U.S. government explicitly found that the GOS or its agents forcibly displaced nearly 24,000 Sudanese refugees and asylees during a 14-year period is "based on data, a methodology, or studies that are simply inadequate to support the conclusions reached," and "*Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos* v. *Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).

**B.     Mr. Khatri's Novel, Untested Methodology for Estimating the Size of the Putative Class Is Unreliable.**

As stated in his opening report, Mr. Khatri was asked to provide a "reasonable estimate" of the number of individuals "who were displaced from Sudan during the proposed class period and who were thereafter lawfully admitted to the United States, as refugees or otherwise." (Ex. 75 (Khatri Report) at 3.) However, the immigration records relied upon by Mr. Khatri only provide the date of *arrival* of an immigrant to the United States, not his or her date of *departure* from Sudan. (Ex. 96 (Yale-Loehr Report) ¶ 41.) For this reason, Mr. Khatri devised an untested methodology, admittedly "in the face of little or no real data" (Ex. 77 (Khatri Dep. Tr.) at 225:15–16) that relies on an assumption that refugees, on average, spent the same estimated length of time — four years — between leaving Sudan and arriving in the United States. (Ex. 75 (Khatri Report) at 23–24.) Mr. Khatri explained that the "only thing [he] had to rely on was these 19 cases" of the named Plaintiffs, who themselves spent an average of four years between leaving Sudan and arriving in the United States, and that he extrapolated the experiences of these 19 named Plaintiffs

to arrive at a conclusion that he claims is applicable to nearly 24,000 refugees and asylees in the putative class. (Ex. 77 (Khatri Dep. Tr.) at 223:1–17, 226:8–13.) Purporting to use this four-year estimate as an "anchor" (Ex. 76 (Khatri Reply) at 10), Mr. Khatri attempts to estimate the number of refugees within the putative class by averaging the number of refugee *arrivals* over an arbitrary number of "close-in-time" 14-year periods.[6] Mr. Khatri relies on a similar assumption that asylum claimants spent, on average, two years between their date of arrival in the United States and a successful grant of asylum, but offers no support or data underlying this assumption whatsoever. (Ex. 75 (Khatri Report) at 24.)

As an initial matter, the sample on which Mr. Khatri exclusively relies is neither statistically significant nor random, given that the sample size is too small and that the 19 named Plaintiffs volunteered to participate in this litigation. (*See* Ex. 96 (Yale-Loehr Report) ¶ 43.) And critically, Mr. Khatri's methodology cannot function as a reliable way to estimate the size of the putative class because it fails to account for the concrete possibility that Sudanese refugees or asylees who *arrived* in the United States within the blocks of time underlying his estimates did not actually *leave* Sudan during the proposed class period of November 1997 to December 2011. The experiences of the 19 named Plaintiffs, as alleged, make clear that the length of time each refugee spent between leaving Sudan and arriving in the United States is highly variable. Several of the named Plaintiffs spent one year or less in a third country after leaving Sudan and before arriving in the United States, including for a period of only a few months, while another named Plaintiff spent 10 years in a third country before arrival. (Ex. 75 (Khatri Report) at Ex. 1.) Likewise, the

---

[6] Specifically, to estimate the size of a putative class defined to include all refugees who left Sudan between 1998 and 2011, Mr. Khatri estimated the number of refugee arrivals in the United States during the following periods: 2004–2017, 2003–2016, 2002–2015, 2001–2014, and 2000–2013. (Ex. 76 (Khatri Reply) at Ex. 3a.)

allegations of numerous plaintiffs in related actions recently brought by Plaintiffs' counsel, all of whom are alleged to be part of the putative class, further underscore that Mr. Khatri fails to account for this variability. *See, e.g.*, Compl. (ECF No. 1), *Sherf* v. *BNP Paribas S.A.*, No. 1:23-cv-049886 (S.D.N.Y.) ¶ 57 (allegedly arriving in 2017 after six years in third country), ¶ 65 (allegedly arriving in 2016 after 10 years in third country); Compl. (ECF No. 1), *Ring* v. *BNP Paribas S.A.*, No. 1:23-cv-05552 (S.D.N.Y.) ¶ 119 (allegedly arriving in 2016 after 12 years in third country), ¶ 121 (allegedly arriving in 2016 after 12 years in third country).

In the absence of sufficient data to derive any reliable estimate of the proposed class in this litigation, Mr. Khatri has presented an untested methodology that is based "on the mean of the 19 [named Plaintiffs]," which he admitted is "*not an accurate, but rather a way* to estimate the amount of time." (Ex. 77 (Khatri Dep. Tr.) at 223:21–224:2 (emphasis added).)  Even Mr. Khatri's own reply report concedes the unreliability of this methodology.  In his reply report, Mr. Khatri explains that his initial estimate was inaccurate, and revised his estimate downward substantially to reflect that around 3,500 refugees known as the "Lost Boys" were granted admission to the United States during the relevant period but are not part of the proposed class because they left Sudan in the 1980s and early 1990s. (*See* Ex. 76 (Khatri Reply) at 11–12.)  Mr. Khatri admitted at his deposition that he revised his estimate after Defendants' expert identified this methodological defect.  (Ex. 77 (Khatri Dep. Tr.) at 135:5–136:2.)  Mr. Khatri cannot exclude the possibility that there are other refugees from Sudan who arrived in the United States during the proposed class period under analogous circumstances.  More fundamentally, Mr. Khatri's methodology ignores that it simply is not possible to estimate an "average" refugee timeline due to the highly individualized circumstances facing refugee applicants, including the conditions of the country where they

applied for refugee status, the capacity of U.S. refugee officers to conduct interviews, and the contents of their applications. (*See* Ex. 96 (Yale-Loehr Report) ¶¶ 51–53.)

Thus, Mr. Khatri's testimony regarding the estimated size of the putative class is inadmissible because it relies on a methodology that was "developed solely for litigation." *In re Mirena IUD Prods. Liability Litig.*, 169 F. Supp. 3d 396, 430 (S.D.N.Y. 2016). Mr. Khatri was "given a conclusion by lawyers"[7]—*i.e.*, that it is even *possible* to calculate a "reasonable estimate" of the size of the proposed class—"and worked backwards to hypothesize a mechanism" by which it might be possible to do so. *Id.* at 430. "Opinions that assume a conclusion and reverse-engineer a theory to fit that conclusion are . . . inadmissible." *In re Mirena Ius Levonorgestrel-Related Prods. Liability Litig.*, 341 F. Supp. 3d 213, 241 (S.D.N.Y. 2018) (internal quotation omitted). In any event, Mr. Khatri's arbitrary decision not to subject his methodology to any further testing after erroneously including the Lost Boys in his initial class-size estimate renders it wholly unreliable, and "*any* step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *Amorgianos*, 303 F.3d at 267 (emphasis in original).

## CONCLUSION

For the foregoing reasons, Mr. Khatri's testimony is inadmissible under Fed. R. Evid. 702 and *Daubert* and should be excluded.

---

[7] According to the metadata associated with Mr. Khatri's opening report, one of the lawyers for named Plaintiffs was listed as the author. (Ex. 77 (Khatri Dep. Tr.) at 51:15–22.)

Dated: July 21, 2023
New York, NY

Respectfully submitted,

/s/ *Carmine D. Boccuzzi, Jr..*
Carmine D. Boccuzzi, Jr.
Abena Mainoo
Charity Lee
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York  10006
(212) 225-2000
cboccuzzi@cgsh.com
amainoo@cgsh.com
charitylee@cgsh.com

/s/ *Karen Patton Seymour*
Karen Patton Seymour
Suhana S. Han
Alexander J. Willscher
John C. Wynne
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
(212) 558-4000
seymourk@sullcrom.com
hans@sullcrom.com
willschera@sullcrom.com
wynnej@sullcrom.com

Oliver W. Engebretson-Schooley (*pro hac vice*)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C.  20006
(202) 956-7500
engebretsono@sullcrom.com

*Counsel for Defendants BNP Paribas S.A. and BNP Paribas US Wholesale Holdings, Corp.*