Exhibit 105

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

Entesar Osman Kashef, *et al.*,

Plaintiffs,

- against -

BNP Paribas S.A.; BNP Paribas S.A.
New York Branch; BNP Paribas North
America, Inc.; and Does 2–10,

Defendants.

Civil No. 1:16-cv-03228-AJN

Hon. Alison J. Nathan

---

## SUPPLEMENTAL DECLARATION OF FRANZ WERRO,

## PROFESSOR OF LAW AT THE UNIVERSITY OF FRIBOURG AND GEORGETOWN UNIVERSITY LAW CENTER AND PRESIDENT OF THE COUNCIL OF THE SWISS INSTITUTE OF COMPARATIVE LAW

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................................1

II.   SUMMARY OF QUALIFICATIONS AND BASIS FOR EXPERTISE....................3

III.   GENERAL LEGAL PRINCIPLES ......................................................................5

    A.   The Swiss Legal Order................................................................................5
    B.   Tort liability of a perpetrator under Article 41 CO.....................................6
    C.   Tort liability of an accomplice under Article 50 CO ..................................8

IV.   THE SECOND AMENDED COMPLAINT STATES A CLAIM FOR RELIEF
     UNDER ARTICLE 50 CO. ..................................................................................10

    A.   The Sudanese government is the perpetrator of illicit acts that violate absolute rights to
       life, bodily integrity, and property protected in the Swiss legal order.......................10
    B.   Collective fault: BNPP is an accomplice of the Sudanese government's illicit and
       culpable acts....................................................................................................13
    C.   BNPP's culpable cooperation with the Sudanese government was a natural and
       adequate cause of Plaintiffs' injuries. .................................................................19

V.   PROFESSOR ROBERTO'S CREATIVE INTERPRETATION OF ARTICLE 50
    CO IS INACCURATE AND AT TIMES MISLEADING. ........................................23

    A.   Professor Roberto's creative interpretation of collective fault....................24
    1.   Misleading translations and non-existent criteria......................................24
    2.   Erroneous inferences: the accomplice's participation need not be intentional,
       immediate, or substantial. ...........................................................................26
    B.   Professor Roberto's creative interpretation of adequate causation............31
    C.   Standing for claims based on killed family members. .................................32

VI.   CONCLUSION.................................................................................................33

I, Franz Werro, hereby declare pursuant to 28 U.S.C. § 1746 as follows:

## I.  Introduction

This declaration makes several non-substantive corrections to my Supplemental Declaration of May 22, 2020.

1.      I have been asked by counsel for Plaintiffs to respond to the question posed in the Court's Opinion of March 3, 2020 (Dkt. No. 151) ("Opinion"): "Does Plaintiffs' Second Amended Complaint state a claim for relief under Swiss law?"

2.      As alleged in Plaintiffs' Second Amended Complaint ("Complaint"), BNPP[1] "engaged in illicit and fraudulent financial practices that allowed the Sudanese government to evade American sanctions" and fund genocidal attacks on civilians. Opinion at 1. BNPP knew or should have known, based on warnings it received, that its sanction-evasion services were "sustaining the Sudanese regime and perpetuating the genocide." *Id.*; Compl. ¶¶ 152, 183, 189. As a result, Plaintiffs were subjected to "horrific human-rights violations," which the Sudanese government could not have committed in the same way or magnitude without BNPP's support. Opinion at 1; Compl. ¶¶ 107-09, 117-121.

3.      In the present declaration, I address the following question:

> Does the Complaint state a claim under Swiss tort law to oblige BNPP to pay damages for the harms suffered by Plaintiffs as a consequence of its complicity in the human rights violations committed by the Sudanese government against Plaintiffs?

4.      In my opinion, yes. The facts in the Complaint, accepted as true, state a claim for relief under Article 50 para. 1 of the Swiss Code of Obligations ("Article 50 CO").[2] This provision

---

[1] I refer to all Defendants in this case as "BNPP."

[2] Ex. 2 at 4, Ex. 3 at 4, CODE DES OBLIGATIONS [CO] [CODE OF OBLIGATIONS] Mar. 30, 1911, RS 220, art. 50, para. 1 (Switz.).

imposes joint and several liability on accomplices who are intentionally *or* unintentionally complicit in harm inflicted on a victim by a tortfeasor. As I explain below, the Complaint alleges in detail all elements of civil liability under Article 50 CO: (1) an illicit act of a tortfeasor, (2) collective fault, and (3) an adequate causal link between the collective fault and Plaintiffs' injuries.

5.      Specifically, the Complaint alleges that the Sudanese government violated Plaintiffs' absolute rights to life, bodily integrity, and property—illicit acts that are actionable in Swiss law. It alleges "collective fault," *i.e.*, that BNPP consciously cooperated with the Sudanese government and knew, or should have known, that its financial support was contributing to genocide and other violations of absolute rights. Finally, it alleges that the conscious cooperation between BNPP and the Sudanese government (their collective fault) was both a natural cause (*conditio sine qua non*) of the injuries and an adequate cause: a reasonable observer could predict that financing the Sudanese government—at the height of a genocide—would result in further genocidal violence. These facts, accepted as true, would establish that BNPP is liable in tort as an accomplice under Article 50 CO for the entire amount of Plaintiffs' damages.

6.      I concur with BNPP's expert, Professor Vito Roberto, that Article 50 CO applies to this case. I disagree, however, with his interpretation of Article 50 CO, which bears remarkably little resemblance to what the law actually requires according to case law and doctrinal work. In my opinion, Professor Roberto's declaration does not give the Court an accurate statement of Swiss law because it: (1) seeks to impose heightened intent and causation requirements that no court or other jurist currently requires, (2) refers to no caselaw or doctrinal work for key propositions that rest *ipse dixit* on Professor Roberto's own opinion, and (3) relies on logical fallacies to draw erroneous inferences from cases that, on closer inspection, contradict Professor Roberto's own position.

7.     In Part II of this declaration, I will present a brief outline of my qualifications. To assist the Court, in Part III, I will give a brief overview of the Swiss legal system and give context to the statutes, case law, and scholarship that apply to this case. In Part IV, I will present the Swiss law governing the civil liability of accomplices and analyze why, on the basis of Article 50 CO, the Complaint states a claim for relief to hold BNPP liable in tort for the entirety of Plaintiffs' damages. In Part V, I will respond to the Supplemental Declaration of Professor Roberto. Part VI states my final conclusions.

## II.     Summary of Qualifications and Basis for Expertise

8.     I submit this declaration as a tenured Professor of Law at Fribourg University Law School in Switzerland, where I have held the Chair of the Law of Obligations and European Private Law since 1994. I am also a tenured Professor of Law at Georgetown University Law Center, where I have taught International Sales Law, Privacy Law, and Comparative Law since 2001. Since my last Declaration, the Swiss Government has appointed me as the President of the Council of the Swiss Institute of Comparative Law. Since 2014, I have served as one of the two co-editors-in-chief of the American Journal of Comparative Law. Since 1995, I have served as an arbitrator or as a consultant in a number of commercial disputes, in Switzerland and in the United States.

9.     I have published extensively in the field of civil liability. Since 2000, I have edited ten books on tort law; authored a leading textbook on torts, LA RESPONSABILITÉ CIVILE (3rd ed. 2017); and co-edited (with Luc Thévenoz) and authored in part a widely used commentary, COMMENTAIRE ROMAND, CODE DES OBLIGATIONS I (2d ed. 2012; 3d ed. forthcoming in 2020). My

publications cover key issues in this case, including complicity and joint liability under Article 50 CO.[3]

10.     My scholarship is regularly cited by Switzerland's highest court, the Federal Supreme Court (in French the "*Tribunal fédéral*," in German the "*Bundesgericht*"),[4] on matters of tort or contract law. Indeed, my work is cited as authority in numerous cases relied upon, and often misconstrued, by Professor Roberto in his Supplemental Declaration.[5] My legal opinion on Swiss law also has been adopted in its entirety in other proceedings in this judicial district. *See MasterCard Int'l Inc. v. Fed'n Internationale De Football Ass'n*, 464 F. Supp. 2d 246, 303 n.27 (S.D.N.Y. 2006); *Weiss v. La Suisse, Societe D'Assurances Sur La Vie*, 293 F. Supp. 2d 397, 407 (S.D.N.Y. 2003).

11.     I am fluent in French, German, and English.

12.     For the remainder of my qualifications, I refer the Court to my previous Declaration (Dkt. No. 81), and to my CV and list of publications, included as Exhibit 1.

---

[3] My most recent publications on joint liability include: Franz Werro, Vincent Perritaz, *La pluralité des responsables : nouvelles conceptions et changements de jurisprudence* [*Joint liability: new concepts and changes in the case law*], *in* MÉLANGES À LA MÉMOIRE DE BERNARD CORBOZ 279 (Grégory Bovey & Benoît Chappuis & Laurent Hirsch eds. 2019); Franz Werro, Vincent Perritaz, *Droit suisse des obligations : La responsabilité contractuelle et la responsabilité plurale selon le projet CO2020 : une nouvelle approche ?* [*Contractual Liability and Shared Liability Under the Draft 2020 Code of Obligations: A New Approach?*], 3 REVUE DE DROIT DES AFFAIRES INTERNATIONALES [Int'l Bus. L.J.] 217 (2018); and Franz Werro, *La pluralité des responsables – quelques principes et distinctions* [*Joint Liability – some principles and distinctions*]*, in* PLURALITE DES RESPONSABLES : COLLOQUE DE DROIT DE LA RESPONSABILITE CIVILE 2007, UNIVERSITE DE FRIBOURG, BERN 15 (Franz Werro ed. 2009).

[4] Although not a literal translation, the term "Federal Supreme Court" ("FSC") will be used here, in accordance with the Bluebook. *See* BLUEBOOK T2.40, p. 464. Cases are published in different official reporters, depending on the language of the decision: the French reporter is the ATF (ARRÊTS DU TRIBUNAL FÉDÉRAL SUISSE), the German reporter is the BGE (ENTSCHEIDUNGEN DES SCHWEIZERISCHEN BUNDESGERICHTS). Cases published in the official reporter are cited by volume number, part number, and page number. Thus, a decision officially reported in German and beginning on page 72 of part III of volume 145 is cited as BGE 145 III 72, in French as ATF 145 III 72. Within the decision, legal considerations are numbered by section and subsection. These are cited as "c." following the relevant page number. Swiss courts do not use party names in case citations. For purposes of clarity, however, I will use subject matter descriptions to help identify the relevant cases.

[5] *E.g.*, Ex. 16, FSC, Feb. 8, 2019, BGE 145 III 72 at 82, c. 2.3.2; Ex. 20, FSC, Feb. 25, 2019, 4A_38/2018 at 5, c. 3.1; Ex. 24, FSC, Nov. 13, 2018, 4A_594/2017 at 10, c. 4.3.2; Ex. 22, FSC, Jan. 7, 2015, 4A_455/2014 at 8, c. 3.2; at 10, c. 5.1; Ex. 19, FSC, Sept. 20, 2007, 4A_185/2007 at 11, c. 6.2.1; at 12, c. 6.2.3.

13. In preparing this declaration, I relied upon my extensive knowledge of Swiss tort law, on established methodologies of legal analysis, and on statutes, case law, and widely accepted doctrinal scholarship. Plaintiffs' counsel provided me with the following documents to review: (1) the Complaint and accompanying exhibits, dated January 20, 2017, (2) Defendants' Memorandum of Law in Support of their Motion to Dismiss the Second Amended Complaint, dated March 21, 2017, (3) the Declaration and Reply Declaration of Vito Roberto in Support of Defendants' Motion to Dismiss, (4) the Opinion, and (5) the Supplemental Declaration of Vito Roberto ("Supp. Roberto Decl." or "Roberto").

14. I am being compensated at CHF 900 per hour. My compensation is not dependent upon the opinions expressed in this Declaration.

## III. General Legal Principles

### A. The Swiss legal order

15. Switzerland has three official languages in which federal codes and statutes are published: French, German, and Italian.[6]

16. The highest court in Switzerland is the Federal Supreme Court. As a court of last instance, it provides the ultimate meaning of federal law, with the exception of rare cases decided by the European Court of Human Rights.

17. Article 1 of the Swiss Civil Code ("CC") lists the various sources of law:

> [1] Statutes govern all legal matters to which the letter or spirit of one of its provisions relates.
>
> [2] In the absence of a statutory rule, judges shall decide in the light of customary law, and in the absence of customary law, according to the

---

[6] The Swiss government provides an unofficial English translation of codes and statutes online, but these versions lack legal force: https://www.admin.ch/opc/en/classified-compilation/19110009/202004010000/220.pdf.

> rules they would apply if they were in charge of drafting them as law makers.

> [3] Judges shall find inspiration in solutions established by scholarly work and cases previously decided.[7]

18.     Swiss codes and statutes provide general principles and norms.[8] Judicial opinions express the concrete rules that derive from these norms and principles. Therefore, in order to understand the implications of statutory law, one has to refer to the judgments that have applied it in particular cases.[9] The relevant meaning of statutory provisions is the one courts have given them in the process of deciding cases with the help of scholarly writing.

19.     Scholarly writing ("doctrine") thus plays an important role in judicial decision-making. In a way unparalleled in common law jurisdictions, authors of treatises, monographs, and other doctrinal articles are widely referred to in courts' opinions. Often, the Federal Supreme Court will decide a controversial issue by relying on what the majority of academic and scholarly authorities consider to be the correct interpretation of the law.

**B.     Tort liability of a perpetrator under Article 41 CO**

20.     Swiss tort law is governed essentially, but not exclusively, by the Swiss Code of Obligations ("CO") and the Civil Code. Section Two of the CO sets out "Obligations in Tort" in

---

[7] Ex. 4 at 1, Ex. 5 at 1, CODE CIVIL [CC] [CIVIL CODE] Dec. 10, 1907, RS 210, art. 1 (Switz.) (My own translation):

[1]  La loi régit toutes les matières auxquelles se rapportent la lettre ou l'esprit de l'une de ses dispositions.

[2]  À défaut d'une disposition légale applicable, le juge prononce selon le droit coutumier et, à défaut d'une coutume, selon les règles qu'il établirait s'il avait à faire acte de législateur.

[3] Il s'inspire des solutions consacrées par la doctrine et la jurisprudence.

[8] These sources of law include the federal constitution and statutes, as well as cantonal statutes and constitutions, and international law. International treaties that Switzerland has ratified constitute an integral part of Swiss law and do not require a specific act of parliament to be binding. Ex. 14, FSC, June 27, 1996, BGE 122 II 234 at 237, c. 4; Ex. 23, FSC, Aug. 11, 2009, 4A_56/2009 at 9-10, c. 5.2.

[9] *See* Ex. 38, Franz Werro, *Article 1 CC*, *in* COMMENTAIRE ROMAND, CODE CIVIL I, at 5 (Pascal Pichonnaz & Benedict Foëx eds. 2010).

Articles 41-61 CO. Unlike American law, Swiss tort law does not specifically define distinct causes of action, such as trespass, battery, or various torts of negligence. Instead, Swiss tort law operates in principle under a general clause of liability contained in Article 41, para. 1 CO ("Article 41 CO"), that imposes liability for illicit acts based on the defendant's fault. Some additional rules impose liability in some specific instances. For example, Article 55 CO imposes vicarious liability on the employer for the acts of its employee.[10] As we will see, Article 50 CO imposes fault based liability on accomplices and instigators for illicit acts of the tortfeasor who appears as the main perpetrator.

21.     Article 41 CO provides the general rule imposing liability on a person who directly causes harm or loss willfully or negligently, through his personal unlawful conduct:

> [1] Any person who unlawfully causes damage to another, whether willfully or negligently, is obliged to provide compensation.[11]

22.     As I explain more fully below, the perpetrator's act or omission must be illicit ("*widerrechtlich*," "*illicite*") and must rest on fault ("*Verschulden*," "*faute*"). An act is illicit (*i.e.*, unlawful) when it is in violation of the plaintiff's absolute rights.[12] As a separate requirement, fault refers to the blameworthy conduct of the defendant. Fault can be either intentional (willful) or negligent. *See* Ex. 33, Franz Werro, *Article 41 CO*, *in* COMMENTAIRE ROMAND, CODE DES OBLIGATIONS I, at 56-57 (Franz Werro & Luc Thévenoz eds. 2012). In the law of tort, "negligence"

---

[10] Under Article 55 CO, employers are liable for tortious acts committed by their employees. Ex. 2 at 5, 3 at 5, Article 55 CO (« 1. L'employeur est responsable du dommage causé par ses travailleurs ou ses autres auxiliaires dans l'accomplissement de leur travail, s'il ne prouve qu'il a pris tous les soins commandés par les circonstances pour détourner un dommage de ce genre ou que sa diligence n'eût pas empêché le dommage de se produire. »).

[11] Ex. 2 at 2, 3 at 2, Article 41 CO: « Celui qui cause, d'une manière illicite, un dommage à autrui, soit intentionnellement, soit par négligence ou imprudence, est tenu de le réparer. » The translation provided is from the unofficial English version. at https://admin.ch.

[12] I explain the concept of absolute rights in more detail in paragraphs 30-32. An act can also be illicit in other circumstances not relevant to this case.

("*négligence*," "*Fahrlässigkeit*") refers to an objective unreasonable behavior as well as to a subjective mental state: fault is an element of the tort, not the tort itself. Finally, under Article 41 CO, the illicit act or omission must be the natural and adequate cause of the victim's harm or loss.[13]

23.     Swiss tort law extends civil liability beyond the direct perpetrator in certain circumstances. A corporation (S.A.), for example, is liable for the tortious acts or omissions of its officers or those authorized to represent it, under Article 722 CO and Article 55, para. 2 CC.[14] And, critically for this case, on the basis of their fault and that of the main perpetrator, accomplices—such as BNPP—are jointly and severally liable for assisting a tortfeasor in causing a harmful injury, under Article 50 CO.

### C.     Tort liability of an accomplice under Article 50 CO

24.     Article 50, para. 1 CO provides:

> [1] Where two or more persons have together caused damage, whether as instigator, perpetrator or accomplice, they are jointly and severally liable to the person suffering damage.[15]

25.     As stated above, Article 50 CO imposes liability on the basis of a collective action. Article 50 CO requires collective fault ("*faute commune*," "*gemeinsames Verschulden*").[16] What

---

[13] The concepts of "natural" and "adequate" causation are roughly analogous to "actual" and "proximate" causation in American law, but with key differences that I will explain below in paragraphs 46-48.

[14] Ex. 2 at 6, 3 at 6, Article 722 CO ("The company is liable for unlawful acts committed in the management of its affairs by a person authorized to manage or represent it.") (my own translation) (« La société répond des actes illicites commis dans la gestion de ses affaires par une personne autorisée à la gérer ou à la représenter.»).

[15] Ex. 2 at 4, 3 at 4, Article 50 CO (« Lorsque plusieurs ont causé ensemble un dommage, ils sont tenus solidairement de le réparer, sans qu'il y ait lieu de distinguer entre l'instigateur, l'auteur principal et le complice. ») The German version of the same provision states : « Haben mehrere den Schaden gemeinsam verschuldet, sei es als Anstifter, Urheber oder Gehilfen, so haften sie dem Geschädigten solidarisch. »

[16] In the German version of the text, one refers to fault (« gemeinsam verschuldet »), whereas in the French one, one refers to cause (« causé ensemble »). As we will see, these terms are used interchangeably. Collective cause or collective fault mean the same. *See* Ex. 31, VINCENT PERRITAZ, LE CONCOURS D'ACTIONS ET LA SOLIDARITE [CONCURRENT ACTIONS AND JOINT AND SEVERAL LIABILITY] 71, at n. 243 (2017); Ex. 30, Christoph Müller, *La solidarité parfaite* [*Perfect Joint and Several Liability*], *in* PLURALITE DES RESPONSABLES : COLLOQUE DE DROIT DE LA RESPONSABILITE CIVILE 2007, UNIVERSITE DE FRIBOURG, BERN 31, 35 (Franz Werro ed. 2009).

justifies liability on all persons involved is the very fact that they engaged collectively in unreasonable behavior. The main perpetrator acts—intentionally or not—in an illicit way and the accomplice consciously assists him, whether he intends to cause harm or not. Collective fault is that culpable cooperation.[17]

26.    "Culpable cooperation in causing damage . . . requires that everyone involved is aware of the other's contribution or could have been aware if he had exercised due care."[18] Ex. 9, FSC, Dec. 14, 1978, BGE 104 II 225 at 230, c. 4.a. The assistance must be conscious. Ex. 19, FSC, Sept. 20, 2007, 4A_185/2007 at 11, c. 6.2.1 ("the participants must have cooperated consciously to arrive at this result.").[19] This means that the accomplice is or should have been aware of his involvement. It does not require him to intend the harm inflicted by the main perpetrator: "even negligent complicity can establish joint and several liability pursuant to Article 50 CO."[20] Ex. 27, FSC, Sept. 15, 1931, BGE 57 II 417 at 420, c. 2.

27.    Article 50 CO also requires a natural and adequate causal link between the collective fault and the damage incurred. There must be "a chain of faults by commission [or] omission, all of which contributed to causing the damage suffered by the plaintiff in an adequate

---

[17] *See* Ex. 35, Franz Werro, *Article 50 CO*, *in* COMMENTAIRE ROMAND, CODE DES OBLIGATIONS I, at 3 (Franz Werro & Luc Thévenoz eds. 2012); Ex. 39 , Roland Brehm, *Art. 50 / Erster Teil Art. 50 Abs. 1: Die Solidarhaftung* [*Article 50 / First Part Art. 50 Para. 1: Joint and Several Liability*], *in* DIE ENTSTEHUNG DURCH UNERLAUBTE HANDLUNGEN [IN: EMERGENCE THROUGH UNLAWFUL ACTIONS], ART. 41 - 61 OR 630-31, at n. 9-12 (4d ed. 2013); Ex. 19, 4A_185/2007 at c. 6.2.2.

[18] « Ein schuldhaftes Zusammenwirken bei der Schadensverursachung setzt jedoch entgegen der Auffassung der Klägerschaft voraus, dass jeder Schädiger vom Tatbeitrag des andern Kenntnis hat oder bei der erforderlichen Aufmerksamkeit Kenntnis haben könnte. »

[19] « [L]es auteurs doivent avoir coopéré consciemment pour parvenir à ce résultat. » Here, "participants" ("auteurs") refers to those who have associated themselves in the tortious activity committed by the main perpetrator. *See* Ex. 40, Vincent Perritaz, *L'art. 50 al. 1 CO : une norme qui fonde la responsabilité ?*, *in* AKTUELLE JURISTISCHE PRAXIS (AJP) 795, at 796 (2018).

[20] « Das spielt indessen keine Rolle, da selbst eine fahrlässige Gehilfenschaft die solidarische Haftbarkeit gemäss - Art. 50 OR begründet. »

manner."[21] Ex. 29, FSC, May 22, 1945, BGE 71 II 107 at 114, c. 3. I will explain below the legal standards for natural and adequate causation, which by and large correspond to "actual" and "proximate" causation in American law. Under Article 50 CO, the causal link must exist between the culpable cooperation and the harm, not between the harm and the individual acts of the various persons involved.

28.     In sum, Article 50 CO imposes joint and several liability on all persons involved whose culpable cooperation is the cause of the harm suffered by the plaintiff, whether they wanted to cause the harm or not. To hold an accomplice liable under Article 50 CO, a plaintiff must prove that: (1) a main perpetrator committed an illicit act, (2) the accomplice consciously assisted the perpetrator and knew or should have known that he was contributing to an illicit act, and (3) their culpable cooperation was the natural and adequate cause of the plaintiff's harm or loss.

## IV.     The Second Amended Complaint states a claim for relief under Article 50 CO.

29.     In this Section, I apply Article 50 CO to the facts of this case. In my opinion, the Complaint pleads all of the required elements to hold BNPP liable under Article 50 CO as an accomplice to the rights-violations committed by the Sudanese government.

### A.     The Sudanese government is the perpetrator of illicit acts that violate absolute rights to life, bodily integrity, and property protected in the Swiss legal order.

30.     Article 50 CO presupposes an illicit act by the perpetrator, causing damage to the plaintiff. Ex. 39, Brehm, *supra* note 17, at 629, n. 6 (4d ed. 2013). The act of the accomplice, however, need not be illicit, so long as it assists the perpetrator in causing damage. Ex. 10, FSC, Jan. 20, 1981, BGE 107 II 82 at 93, c. 9.a; Ex. 17, FSC, Sept. 27, 1916, BGE 42 II 473 at 479, c.

---

[21] « [I]l y a un enchaînement de fautes par commission et par omission qui ont toutes concouru à causer de manière adéquate le dommage subi par le demandeur et qui, en vertu de l'Article 50, obligent solidairement les défendeurs à le réparer. »

3.[22] In addition to other conduct that is not relevant here, an act is illicit when it violates an "absolute right, such as life, bodily integrity, or property."[23] Ex. 11, FSC, Mar. 11, 1986, BGE 112 II 118 at 128, c. 5.e. As the Federal Supreme Court explains, the "legal order directly protects these rights, without it being necessary to determine in each case whether the perpetrator of the injury violated a specific prohibition."[24] *Id.* Unlike other civil law jurisdictions, Swiss law does not enumerate a list of absolute rights that are actionable under Article 41 CO.[25] These absolute rights are, however, undisputed. They are the rights that enjoy protection from the legal order in its entirety.

31. The rights to life, bodily integrity, privacy, and property, including freedom from rape and torture, are protected under Swiss law and actionable under Article 41 CO. These rights

---

[22] In Ex. 10, BGE 107 II 82, the Federal Supreme Court observed that a TV broadcast network provider need not have itself violated copyright to be held liable under Article 50 CO; it suffices that it knowingly or negligently helped a re-transmitter to broadcast infringing content through its infrastructure. In Ex. 17, BGE 42 II 473 c. 3, three individuals were throwing explosive balls, one of which injured the plaintiff. It was impossible to establish who had thrown the ball in question, and hence had committed the illicit act. Nevertheless, the Court held that Article 50 CO does not require the commission of an illicit act by each participant, so long as there is collective fault. The view that the accomplice's act need not be illicit is widely shared in doctrine. *See, e.g.*, Ex. 40, Perritaz, *supra* note 19, at 798 (2018) ; Ex. 41, H.-U. BRUNNER, DIE ANWENDUNG DELIKTSRECHTLICHER REGELN AUF DIE VERTRAGSHAFTUNG [THE APPLICATION OF TORT RULES IN CONTRACT LIABILITY] 129 (1991); Ex. 52, Stephan Weber, *Kausalität und Solidarität - Schadenszurechnung bei einer Mehrheit von tatsächlichen oder potentiellen Schädigern [Causation and Joint and Several Liability – Damage Attribution in a Multiplicity of Actual or Potential Injurers]*, *in* REAS 115-27 (2010).

[23] « L'illicéité est en effet réalisée, en tout cas, lorsque l'acte incriminé porte atteinte à un bien protégé par un droit absolu, tel que la vie, l'intégrité corporelle ou la propriété. » An act can also be illicit if it violates a regulation of conduct created to protect third parties, but such regulations principally protect against economic loss and are not relevant here. *See* Ex. 39, Brehm, *supra* note 17, at 629, n. 6 (4d ed. 2013).

[24] « L'ordre juridique protège directement ces droits, sans qu'il soit nécessaire de rechercher dans chaque cas si l'auteur du dommage a violé une injonction déterminée. » *See also* Ex. 36, FRANZ WERRO, LA RESPONSABILITE CIVILE 107-09, at n. 339-46 (3d ed. 2017).

[25] Article 41 CO contrasts with Germany's analogous tort statute, Article 823, para. 1, which states that "A person who, intentionally or negligently, unlawfully injures the life, body, health, freedom, property or another right of another person is liable to make compensation to the other party for the damage arising from this." (« Wer vorsätzlich oder fahrlässig das Leben, den Körper, die Gesundheit, die Freiheit, das Eigentum oder ein sonstiges Recht eines anderen widerrechtlich verletzt, ist dem anderen zum Ersatz des daraus entstehenden Schadens verpflichtet. »). BÜRGERLICHES GESETZBUCH [BGB] [Civil Code], § 823, para. 1, *translation at* http://www.gesetze-im-internet.de/englisch_bgb/index.html (Ger.).

are protected in tort law,[26] the federal Constitution,[27] the Swiss Criminal Code,[28] and international law directly incorporated into Swiss law, such as the Geneva Conventions, [29] the Convention Against Torture, [30] the International Covenant on Civil and Political Rights, [31] European Convention on Human Rights,[32] and customary international law.[33] Notably, the Federal Supreme Court has stated that "the prohibition of genocide is part of mandatory customary international law." Ex. 15, FSC, Jan. 21, 2000, BGE 126 II 145 at 165, c. 4.d. Victims of a violation of such absolute rights may sue for compensation; indeed, Swiss tort law even goes so far as to compensate a plaintiff who is injured indirectly (*e.g.*, by a nervous shock) by the violation of a third party's right to life.[34]

---

[26] As but one example, see Ex. 42, FSC, Jan. 18, 2000, BGE 126 III 113 at 115, c. 2.a.a (holding that the obligation to avoid causing an accident results from "the general duty to respect the right to life and bodily integrity as an absolute right.") (le « devoir général de respecter le droit à la vie et à l'intégrité corporelle, en tant que droit absolu »).

[27] CONSTITUTION FÉDÉRALE [CST] [CONSTITUTION] Apr. 18, 1990, RO 101, art. 10 (Switz.) ("1 Every person has the right to life. The death penalty is prohibited. / 2 Every person has the right to personal liberty and in particular to physical and mental integrity and to freedom of movement. / 3 Torture and any other form of cruel, inhuman or degrading treatment or punishment are prohibited.") https://www.admin.ch/opc/en/classified-compilation/19995395/index.html

[28] *See, e.g.*, CODE PÉNAL SUISSE [CP] [CRIMINAL CODE] Dec. 21, 1937, RO 311, Ex. 6 at 3, Ex. 7 at 3, art.122 (assault); Ex. 6 at 7, Ex. 7 at 6, art. 190 (rape); Ex. 6 at 6, 7 at 5, art. 185ᵇⁱˢ (enforced disappearance); Ex. 6 at 8, Ex. 7 at 8, art. 264 (genocide); Ex. 6 at 8, Ex. 7 at 8, art. 264a (crimes against humanity); Ex. 6 at 10, Ex. 7 at 11, art. 264c–h (war crimes). Unofficial English translation available at: https://www.admin.ch/opc/en/classified-compilation/19370083/202003030000/311.0.pdf; Official French version available at: https://www.admin.ch/opc/fr/classified-compilation/19370083/202003030000/311.0.pdf.

[29] Ratified 31 March 1950, https://bit.ly/2WRELVV.

[30] Ratified 2 Dec 1986, https://bit.ly/2zialTF.

[31] Ratified 18 June 1992, https://bit.ly/36hYPE1.

[32] Ratified 28 November 1974, https://www.admin.ch/opc/fr/classified-compilation/19500267/index.html.

[33] *See, e.g.*, Ex. 32, FSC, May 29, 1985, BGE 111 Ib 68 at 70, c. 2.a (recognizing a foreigner's right under international law not to be returned to a country where he is threatened with a grave violation of human rights).

[34] *See, e.g.*, Ex. 11, BGE 112 II 118 at c. 5.e (holding that an award of damages cannot be refused on the basis that the damage was "indirect" and that, "regarding the consequences of a nervous shock suffered by a father following the accidental death of two young sons, adequate causation cannot be denied").

32.     To establish this element of Article 50 CO, Plaintiffs must plead that their absolute rights were violated by the Sudanese government (Article 41 CO). These allegations appear in the Complaint. As this Court observed: "Among other abuses, Plaintiffs suffered 'beatings, maiming, sexual assault, rape, infection with HIV, loss of property, displacement from their homes, and watching family members be killed." Opinion at 1 (citing Compl. ¶¶ 24, 30–50). There is no question that damages under Article 50 CO cover the harms suffered as a consequence of violations of absolute rights.

### B.     Collective fault: BNPP is an accomplice of the Sudanese government's illicit and culpable acts.

33.     Collective fault is established when the accomplice intentionally or unintentionally assists the illicit act of the perpetrator who himself is also at fault. "Each defendant must have known or could have known, through exercising due care, of the others' contribution to the harmful act." [35] Ex. 19, 4A_185/2007 at c. 6.2.1. The assistance must be given consciously ("*consciemment*"). *Id.* ("[T]he defendants must have cooperated consciously to arrive at this result."), meaning the accomplice knows or should know he is cooperating. [36] However, the accomplice need not have desired to cause the damage inflicted. [37] Ex. 27, FSC, Sept. 15, 1931, BGE 57 II 417 at 421. In the same vein, conscious assistance does not require an express agreement between the defendants. Ex. 29, BGE 71 II 107 at c. 3. Because intention is not required, Article

---

[35] « Il faut donc que chaque auteur ait connu ou pu connaître, en usant de l'attention nécessaire, la participation des autres à l'acte dommageable. » For a discussion of the degrees of collective fault, see Ex. 39, Brehm, *supra* note 17, at 630-32, n. 8-15 (4d ed. 2013). *See also* Ex. 9, BGE 104 II 225 at 230, c. 4.

[36] « [L]es auteurs doivent avoir coopéré consciemment pour parvenir à ce résultat. » *See also* Ex. 22, FSC, Jan. 7, 2015, 4A_455/2014 at 10, c. 5.1 ("Where two or more persons have together caused damage, they are jointly and severally liable to the injured party (art. 50 paragraph 1 CO). This perfect joint and several liability presupposes a common fault, i.e. association in the harmful activity and, consequently, the awareness of collaborating in the result."), citing FRANZ WERRO, LA RESPONSABILITE CIVILE 121, at n. 405 (2d ed. 2011).

[37] Ex. BGE 57 II 417 at 421: "Allein angesichts der damals herrschenden Erbitterung, die ihm als Arbeitersekretär und Streikführer nicht entgangen sein konnte, musste er, zumal da er wusste, dass Hitzkopfe unter den Streikenden waren, damit rechnen, dass seine Aufforderung zu Tatlichkeiten Ausschreitungen zeitigen konnte."

50 CO encompasses a range of culpable states of mind without distinction: the complicity can be done knowingly, recklessly, or negligently. *See* Ex. 35, Werro, *supra* note 17, at 3 (2012); Ex. 39, Brehm, *supra* note 17, at 630-31, n. 8-12 (4d ed. 2013); Ex. 19, 4A_185/2007 at c. 6.2.2. Moreover, the "intensity of the tortfeasors' involvement is irrelevant, with respect to the injured party." Ex. 19, 4A_185/2007 at c. 6.2.1 (citing Ex. 35, Werro, *supra* note 17, at 4 (2012)).[38] In short, under Article 50 CO, "each person can be held liable for the collective fault, because each acted intentionally or negligently, and in conscious cooperation with the others."[39]

34.    These are the *only* criteria for collective fault that the Federal Supreme Court has ever required. Professor Roberto misstates the law when he claims, without authority, that an accomplice's participation must also be "willful or immediate" and "substantial." Roberto ¶ 56. These so-called requirements do not appear in any of the cases cited by Professor Roberto, nor in any of the leading commentaries or well-regarded studies.[40] His confidence in these "requirements" is surprising, since the cases he relies upon directly contradict his position, as I explain more fully below in Section V.

35.    To sufficiently plead collective fault, Plaintiffs need to allege, at a minimum, that BNPP consciously cooperated with the Sudanese government by providing financial support and that it knew or should have known, had it exercised due care, that its support would contribute to

---

[38] « L'intensité de la participation des acteurs est sans importance sur le plan externe, c'est-à-dire à l'égard du lésé. » *See also* Ex. 43, Frederic Krauskopf, *Art. 144 / III. Pflicht jedes Solidarschuldners zur Leistung (Art. 144 Abs. 2 OR)* [*Obligation of all joint and several debtors to perform*], *in* DIE SOLIDARITÄT, ART. 143 - 150 OR, 106 at n. 43 (3d ed. 2016) ("the full liability applies also to those joint and several debtors who must bear only a negligible part or only a small part of the damages in terms of the internal relationship (according to their share of responsibility).")

[39] Ex. 41, BRUNNER, *supra* note 22, at n. 310 (1991).

[40] *See, e.g.,* Ex. 39, Brehm, *supra* note 17, at 625-44 (4d ed. 2013); Ex. 43, Krauskopf, *supra* note 38, at n. 43 (3d ed. 2016); Ex. 41, BRUNNER, *supra* note 22, at n. 309-13 (1991); Ex. 34, Franz Werro, *Introduction aux articles 50-51 CO*, *in* COMMENTAIRE ROMAND, CODE DES OBLIGATIONS I, at ¶¶ 2-32 (Franz Werro & Luc Thévenoz eds. 2012).

the Sudanese government's violations of human rights. BNPP will thus be liable if it engaged in knowing, reckless, or even negligent complicity.

36.     In my opinion, the Complaint clearly alleges that BNPP consciously cooperated with the Sudanese government. As I understand, BNPP has already admitted that it conspired with the Sudanese government to evade U.S. sanctions designed to prevent human rights abuses in Sudan. *See* Compl. ¶¶ 194, 197. This is not a case where two tortfeasors inadvertently and independently injure the same victim: BNPP gave this assistance consciously to the Sudanese Government, making it an accomplice for purposes of Article 50 CO.[41]

37.     The Complaint also alleges that BNPP's assistance was alternatively knowing, reckless, or negligent. Any one of these degrees of fault would be sufficient. *Firstly*, the Complaint alleges that BNPP was knowingly complicit, that is, even if it did not intend to inflict human rights abuses on Sudanese civilians, it knew that the Sudanese government was using BNPP's assistance to fund such abuses. *See* Compl. ¶¶ 8, 15, 70, 141, 152, 183, 189; Compl. Ex. C, Statement of Facts dated June 30, 2014, Ex. 2 to Plea Agreement, Dkt. No. 14-CR-00460-LGS ¶ 20. The Federal Supreme Court routinely finds accomplices liable under Article 50 CO when they knowingly assist main perpetrators in illicit acts—as alleged here.

38.     For example, in the *Locksmith Case*, Ex. 19, 4A_185/2007, "Y Inc." handled accounting and debt collection for a locksmith business that was infringing the "SOS" trademark of a competitor. *Id.* at 6.2.1. Like BNPP, Y Inc. provided significant "administrative and financial assistance" to the main perpetrator. Y Inc. "financed the locksmith business by entering into leasing agreements," had a bank account using the infringing tradename "SOS," and collected

---

[41] This contrasts with other cases where the Federal Supreme Court has found that there was no collective fault when the defendants were unaware of each other's involvement. For example, in Ex. 9, BGE 104 II 225 at c. 4.a, the Court held there was no collective fault between a lawyer who assisted in drafting a defamatory article and an editor who published it, because the editor was unaware of the lawyer's role.

debts using letterhead containing the infringing mark. Just as BNPP knew that its financial assistance was contributing to human rights violations, Y Inc. knew it was contributing to property rights violations: it received a customer letter complaining they had been deceived by the locksmith's infringing logo. *Id.* at 6.2.2. The Federal Supreme Court found that Y Inc. had knowingly cooperated in the "genesis of the damage" and was thus jointly liable for the infringement. *Id.*

39.     *Secondly*, the Complaint alleges facts that, if true, would support a finding of recklessness ("*dol éventuel*," "*Eventualvorsatz*"). Collective fault can be established through recklessness when the accomplice accepts the risk that the damage will occur, and still assists the perpetrator.[42] The Complaint states that BNPP "continued its unlawful conduct even after being told by U.S. regulators and its own legal advisers that it was violating the Sanctions, thereby facilitating the GOS's atrocities." Compl. ¶ 189.

40.     The Federal Supreme Court has held accomplices and instigators jointly and severally liable for acts of violence committed by others when the "dangerous nature" was "clearly evident," but they nevertheless persisted. In the *Carpenters' Strike Case*, the plaintiff was a strikebreaking worker who was attacked by striking carpenters armed with brass knuckles. Ex. 27, BGE 57 II 417 at c. 418. He sued the attackers, as well as a labor organizer who had made provocative speeches to the strikers before the attack. The Federal Supreme Court held that all defendants were jointly and severally liable, even if the labor organizer might not have intended "such a brutal abuse": "Herzog may not have had the excesses in mind that occurred in the present case. But in light of the acrimony prevailing at the time, which cannot have escaped his attention

---

[42] *See* Ex. 35, Werro, *supra* note 17, at 3 (2012); Ex. 39, Brehm, *supra* note 17, at 630, n. 10 (4d ed. 2013); Ex. 19, 4A_185/2007 at c. 6.2.2.

as a labor secretary and strike leader, he had to expect that his incitement to physical violence could bring about such excesses, all the more so because he knew that there were hotheads among the strikers." *Id.* at 420–21, c. 421.

41. If Plaintiffs establish that BNPP was aware of the risk that its support would contribute to human rights abuses, then BNPP will be liable for damages under Article 50 CO, like the labor organizer. BNPP might not have intended the harm resulting from a genocide, but neither did the labor organizer intend a brutal brass knuckles attack. Regardless, by accepting the risk of foreseeable harms, an accomplice or instigator jointly causes injury through collective fault.

42. *Finally*, the Complaint alleges that BNPP was negligently complicit. Nothing more is required. As the Federal Supreme Court has held, "even negligent complicity can establish joint liability pursuant to Article 50 CO." Ex. 27, BGE 57 II 417 at c. 420. There is such complicity when the accomplice neither desires nor consciously accepts the risk, but could have known about it had he exercised due care. Ex. 9, BGE 104 II 225 at c. 4.a.[43]

43. The *Shooting Contest Case*, an important decision under Article 50 CO, illustrates BNPP's liability for negligent complicity. In this case, the Federal Supreme Court held that an innkeeper who failed to stop a shooting contest organized in his garden became an accomplice through his negligent conduct. Ex. 29, BGE 71 II 107. Through his omission, he contributed to causing injury to a victim when a bullet ricocheted off of glassware. The court found that even if he did not participate in the contest, and might not have known they were hitting glassware, his

---

[43] Ex. 9, BGE 104 II 225 at c. 4.a. ("Culpable cooperation in causing damage requires . . . that each participant is aware of the other's contribution or could have been aware if he had exercised due care.") ( « Ein schuldhaftes Zusammenwirken bei der Schadensverursachung setzt jedoch entgegen der Auffassung der Klägerschaft voraus, dass jeder Schädiger vom Tatbeitrag des andern Kenntnis hat oder bei der erforderlichen Aufmerksamkeit Kenntnis haben könnte. »); Ex. 13, FSC, Jan. 31, 1989, BGE 115 II 42 at 45, c. 1.b. ("each participant knows or at least could have known of the wrongful action of the others.") (« jeder Schädiger um das pflichtwidrige Verhalten des andern also weiss oder jedenfalls wissen könnte. »).

failure to monitor and intervene implied "a tacit approval, by which he joined in the dangerous adventure, making himself an 'accomplice' of the shooters within the meaning of Article 50 CO." *Id*. at 113-14.

44.     The facts alleged in the Complaint, accepted as true, would make BNPP liable under Article 50 CO, because they would establish that BNPP, like the innkeeper in the *Shooting Contest Case*, "contribute[d] to creating or maintaining . . . a state of affairs . . . in which [it] should have recognized the risks." Ex. 29, BGE 71 II 107 at c. 3. The Complaint alleges that BNPP, like the innkeeper, provided necessary elements of the chain of acts leading to Plaintiffs' injuries: the financing and financial services that made Sudan's militarization against its civilian population possible. Had the innkeeper monitored the situation, he would have been aware of the risks of the contest and could have withheld his support; had BNPP done due diligence, it could have withheld its services.

45.     The allegations in the Complaint, in my opinion, establish BNPP's complicity under Swiss tort law and make it liable for the harms the victims suffered as a consequence of the Sudanese Government's violation of their absolute rights. As I understand, BNPP already confessed that it knowingly aided the Sudanese government.[44] Even if it did not actually know that the Sudanese government was using its assistance to engage in harmful conduct, it should have known that this could happen.

---

[44] BNPP admitted in its guilty plea agreement that its "central role in providing Sudanese financial institutions access to the U.S. financial system, despite the Government of Sudan's role in supporting terrorism and committing human rights abuses, was recognized by BNPP employees." Compl. Ex. C, Statement of Facts dated June 30, 2014, Ex. 2 to Plea Agreement, Dkt. No. 14-CR-00460-LGS ¶ 20.

### C. BNPP's culpable cooperation with the Sudanese government was a natural and adequate cause of Plaintiffs' injuries.

46.     Causation under Article 50 CO focuses on the conjunction of the various actions or omissions of the persons involved—their collective fault—not on each individual's actions. As the Federal Supreme Court has observed, "it is not only the behavior of the direct perpetrator, but rather of all persons who participated in such an undertaking—regardless of the degree of their collaboration—that is causally linked to the resulting effects."[45] Ex. 27, BGE 57 II 417 at c. 2.

47.     The collective fault—here the culpable cooperation between accomplice and perpetrator—must be a natural and adequate cause of the damage. A natural causal link exists where the harm would not have occurred at the same time or in the same way or magnitude without the conduct alleged. Ex. 21, FSC, Mar. 22, 2011, 4A_444/2010 at 4-5, c. 2.1.[46] The conduct need not be the "sole or immediate cause"; it is sufficient if the act in question was a partial cause, which—together with other causes—led to the damage incurred. Ex. 21, 4A_444/2010 at c. 2.1.; Ex. 26, FSC, June 21, 2001, 4C_79/2001 at 8-9, c. 3.a.; Ex. 28, FSC, Sept. 7, 2012, 6B_253/2012 at 8, c. 3.3.1.

48.     An adequate causal link exists "when the wrongdoer's conduct was capable, in the ordinary course of events and common experience, of leading to the kind of result that occurred."

---

[45] « In solchen Fällen erscheint nun aber, wie das Bundesgericht schon mehrfach entschieden hat (vgl. BGE 25 II S. 824; 42 II S. 475 ff.), nicht nur das Verhalten des unmittelbaren Täters, sondern Aller, die an einem derartigen Unternehmen teilgenommen haben – unbekümmert um das Mass ihrer Mitwirkung – als für die eingetretenen Wirkungen kausal. »

[46] "A natural causal relationship exists if the damaging action represents a necessary condition (*conditio sine qua non*) for the damage that has occurred, *i.e.*, the result could not have occurred without the relevant behavior, or it could not have occurred in the same way or at the same time." (internal citations omitted). (« Ein natürlicher Kausalzusammenhang ist gegeben, wenn das schadensstiftende Verhalten eine notwendige Bedingung (conditio sine qua non) für den eingetretenen Schaden ist, d.h. das fragliche Verhalten nicht weggedacht werden kann, ohne dass auch der eingetretene Erfolg entfiele bzw. nicht als in gleicher Weise bzw. Zur gleichen Zeit als eingetreten gedacht werden könnte. »)

Ex. 28, 6B_253/2012 at c. 3.3.2;[47] Ex. 8, FSC, Apr. 29, 1975, BGE 101 II 69 at 73, c. 3.a.[48] The

Federal Supreme Court has explained how a judge should analyze adequate causality:

> Adequate causation depends on *objective predictability*: the question is whether
> a neutral third party observer, seeing the wrongdoer act in the circumstances in
> which he did, could predict that the conduct in question would very likely have
> the consequences that it actually had, even though he could not predict the
> course of the causal chain down to the smallest detail . . . . The act must be
> capable, according to an objective assessment, of bringing about such a result
> or of promoting its occurrence, so that reason naturally leads to the result being
> attributed to the commission of the act.
>
> Adequate causation will be accepted even if the conduct of the perpetrator is
> not the direct or sole cause of the result. It does not matter whether the result is
> due to other causes, including the victim's condition, his own conduct or that
> of third parties . . . .
>
> The adequate causal link will only be broken, and the sequence of events will
> then lose its legal significance, if another concurrent cause, for example a force
> of nature, the behaviour of the victim or of a third party, constitutes a
> completely exceptional circumstance or appears so extraordinary that it could
> not have been expected. The unpredictability of a concurrent act is not in itself
> sufficient to interrupt the adequate causal relationship. This act must also be of
> such importance that it is the most probable and immediate cause of the event
> in question, relegating to the background all the other factors which contributed
> to its occurrence, and in particular the conduct of the perpetrator . . . .
>
> Ex. 44, FSC, May 18, 2005, BGE 131 IV 145 at 147-48, c. 5.1-5.2 (omitting
> internal citations).[49]

---

[47] « Le rapport de causalité peut être qualifié d'adéquat si, d'après le cours ordinaire des choses et l'expérience de la vie, le comportement était propre à entraîner un résultat du genre de celui qui s'est produit. »

[48] "Causation is adequate if, in the ordinary course of events and common experience, the act in question was capable of leading to the kind of effect that occurred, and generally seems to have furthered the occurrence of that result." « La causalité est adéquate si, d'après le cours ordinaire des choses et l'expérience de la vie, le fait considéré était propre à entraîner un effet du genre de celui qui s'est produit, la survenance de ce résultat paraissant de façon générale favorisée par une telle circonstance. »

[49] I note that the Court's decision was given in a criminal case, and hence is not binding in a civil context. Indeed, under Article 53 CO, the civil judge decides independently of the provisions of the Swiss Criminal Code and he or she is not bound by decisions taken by criminal courts. The fact that tort law judges will often find inspiration in the judgments of their criminal law colleagues does not contradict the principled independence these two fields of law

49.     These are the *only* criteria for causation. Professor Roberto mischaracterizes the law when he claims, without authority, that "a contributor to a tort is only liable if his contribution is substantial." Roberto ¶ 39. He claims this is "[a]ccording to case law," but the three cases he cites neither actually state this requirement nor even turn on the substantiality of the contribution. My research has found no case or scholarly work that states that an act must be "substantial enough" to constitute an adequate cause.

50.     Regardless, the Complaint alleges that the value of BNPP's support for the Sudanese government totaled billions of dollars and that these funds primarily paid for military and security expenditures. Compl. ¶¶ 107–09, 117, 121–23.[50] These facts, accepted as true, would no doubt establish that BNPP's financial contributions to the Sudanese government were the *sine qua non* of that government's ability to subject Plaintiffs and the other class members to abuses on such a widespread scale. In the words of the Federal Supreme Court, the violations "could not have occurred in the same way." Ex. 21, 4A_444/2010 at c. 2.1. BNPP's contribution was thus a natural cause of the injuries.

51.     In the case at hand, one must *not* consider whether providing financial services was the "sole or immediate" cause of violations of human rights including genocide. Ex. 21, 4A_444/2010 at c. 2.1. Quite the opposite. One must consider whether providing financial services

---

have in relation to one another. In this instance, the Court's reasoning is an accurate summation of the objective predictability analysis that is applied in civil cases, and therefore a relevant source of inspiration.

[50] Specifically, the Complaint alleges that BNPP alone enabled Sudan to sell its primary export, oil, which is sold internationally in U.S. dollars. Compl. ¶¶ 105-06. It is alleged that, as a result of BNPP's assistance, Sudan's oil revenue increased from less than 2 billion dollars to nearly 10 billion dollars between 2002 and 2007, *id.* ¶ 117, and that between 1997 and 2006, Sudan's military spending increased nearly tenfold. *Id.* ¶ 121. The bulk of the Sudanese government's budget allegedly went to the military: "In 2007, Sudan's budget allocate[d] substantial revenue to military and security expenditures, leaving relatively small amounts available for development, health and education." *Id.* ¶ 123. It is alleged that without BNPP's actions, in 2007 alone, the Sudanese government would have lost approximately 30% of its military spending. *Id.* ¶ 118.

to a country which perpetrates violations of absolute rights enables it to carry on doing so, and if this was objectively foreseeable. It is for the judge to determine whether this causal link was objectively foreseeable. But it appears likely that a neutral observer would conclude that enabling a government to circumvent an embargo designed to prevent it from violating human rights would "generally seem[] to have furthered" the violations that occurred.

52.     On this point, this case is unlike the *Swisscom Copyright Case*, where the Federal Supreme Court had to determine whether or not Swisscom (an internet access provider) could be held liable as an accomplice under Article 50 CO for providing users access to illegally uploaded content. Ex. 16, FSC, Feb 8, 2019, BGE 145 III 72 at 74-75, c. 2.1. Ultimately, the Federal Supreme Court denied adequate causation because it could not be established that Swisscom had made any causal contribution. First, the Court considered that the copyright infringements happened as soon as the content was illegally uploaded to the internet, *without* Swisscom's help. Second, it noted that there was neither a direct nor contractual relationship between the main perpetrators and Swisscom. *Id.* at c. 2.3.2.

53.     Unlike in *Swisscom*, the Complaint alleges that BNPP's contribution to the illicit acts committed by the Sudanese Government is causal. Indeed, the allegations show that the violations of Plaintiffs' absolute rights were facilitated *through* the financial services provided by BNPP, meaning the bank had to act *before* the perpetration of these violations (unlike Swisscom, which provided access to the websites *after* the copyright-infringing uploads had occurred). In addition, there is a direct link between BNPP and the Sudanese Government, since Sudanese banks were clients and therefore contractual partners of BNPP. Finally, one should note that the Federal Supreme Court was not keen to admit Swisscom's liability, because it wanted to prevent the systematic and unforeseeable liability of access providers. In my opinion, this was a matter of

public policy. Very different considerations and motives would lead the Federal Supreme Court in a case involving the cooperation of a bank with a government engaging in genocide. This is more true than ever, after the revelation of Swiss banks' involvement with the Nazi regime.

54.     Lastly, Professor Roberto is plainly wrong that Swiss law requires the accomplice's contribution to be substantial in order to constitute an adequate cause. Roberto ¶ 59. To the contrary, it is an intervening cause, such as the independent fault of a third party, that must be substantial enough to interrupt adequate causation. As I explain in my book, a "cause ceases to be adequate when another cause becomes so overwhelming that it relegates the first one into the background." Ex. 37, FRANZ WERRO, LA RESPONSABILITE CIVILE 83, 85-86, at n. 271, 279-82 (2d ed. 2011). But those are not the facts alleged in the Complaint.

55.     In sum, accepting all facts in the Complaint as true, Plaintiffs have stated a claim for relief under Article 50 CO. The Complaint alleges that BNPP is jointly and severally liable for the collective fault, since it was an accomplice, willfully, knowingly, recklessly, or at least negligently, in a conscious cooperation with the Sudanese government that adequately caused the harms resulting from violations of Plaintiffs' absolute rights to life, bodily integrity, and property.

## V.     Professor Roberto's creative interpretation of Article 50 CO is inaccurate and at times misleading.

56.     In this section, I will address Professor Roberto's Supplemental Declaration, which, in many ways, raises fundamental objections. In my opinion, it is a deeply flawed and inaccurate description of joint and several liability as it is actually applied by the Federal Supreme Court and construed by the majority of leading commentators and scholars. In general, Professor Roberto's analysis mostly rests, *ipse dixit*, on no authority other than himself. The key elements which he claims are required to establish "collective conduct"—that the contribution be substantial and either willful or immediate and that the cooperation be intentional—are not found in any case or

scholarly work, and he cites none. Instead, he relies on misleading translations and erroneous inferences and proposes criteria for joint and several liability that are not actually required in any statute, case, or doctrinal work.

57.     Professor Roberto's opinion is stated with great confidence and is perhaps appealing in its simplicity, but it does not reflect the current state of the law. As an academic, Professor Roberto is welcome to propose how the law *ought* to be applied. In the context of this dispute, however, his task was to identify what Article 50 CO *actually* requires to state a claim for relief, according to the statute,  case law, and doctrine. He has failed.

58.     Before I expose Professor Roberto's principal errors, I must note he starts his analysis by asking the wrong question, namely, whether Swiss law provides the same causes of action as those alleged in the Complaint. If one searches for common law causes of action in a civil law system, one will not find them. All of the causes of action in the Complaint are encompassed by Article 50 CO, because all tort claims involving multiple parties causing damage through collective fault are addressed through this article, whether the claims involve intentional personal injury (*Carpenters' Strike*, Ex. 27,  BGE 57 II 417), negligent personal injury (*Shooting Contest*, Ex. 29, BGE 71 II 107), or damage to intellectual property (*Locksmith*, Ex. 19, 4A_185/2007; *Swisscom Copyright,*  Ex. 16, BGE 145 III 72). For this reason, I focus exclusively on Professor Roberto's flawed interpretation of Article 50 CO, and will not address other irrelevant matters.

### A.     Professor Roberto's creative interpretation of collective fault

#### 1.     Misleading translations and non-existent criteria

59.     A defining characteristic of Article 50 CO is that it does not require intentionality. As Dr. Perritaz, with others, has shown, the Federal Supreme Court has consistently held since 1919 that "Article 50 CO applies equally in the presence of the collective negligence of the

defendants."[51] Yet Professor Roberto asserts without authority that Article 50 CO requires the accomplice to cooperate both "consciously and intentionally with the primary tortfeasor." Roberto ¶ 27. Although he claims this dual requirement is "well founded in the Swiss Supreme Court's decisions," he does not cite a single case that states that the cooperation must be conscious *and* intentional. *Id.* His claim is wrong for two reasons: it relies on a mistaken or misleading mistranslation and it is contradicted by the cases cited elsewhere in Professor Roberto's report.

60.     Professor Roberto translates the same concept (consciousness) in two different ways, making it appear that cooperation must be both conscious and intentional. Quoting one case, he translates "wenn das Zusammenwirken der Beteiligten *bewusst* war" as "if the cooperation of the parties involved was *deliberate*." *Id.* ¶ 27 (emphasis added). In the very next citation, he translates "in *bewusstem* Zusammenwirken" as "in a *conscious* cooperation." *Id.* (emphasis added). In other words, in the same passage, he has provided different English terms for two German words with the same root. This error is either careless or disingenuous. His French translation is just as misleading. Referring to the *Locksmith Case*, Ex. 19, 4A_185/2007 at c. 6.2.1, he translates "les auteurs doivent avoir coopéré *consciemment*," as "[T]he tortfeasors must have cooperated *deliberately*." Roberto ¶ 27 (emphasis added). This phrase, however, literally means "the participants must have cooperated *consciously*."[52] In effect, "conscious" and "deliberate" do not refer to the same notion, and clearly conscious action does not mean an intent to act and harm.

---

[51] Ex. 31, PERRITAZ, *supra* note 16, at 72, n. 245 (2017) (« le Tribunal fédéral a en effet jugé que l'art. 50 CO s'applique également en présence d'une négligence commune des responsables. »).

[52] Note that his next citation translates the same French root word "conscience" this time as "awareness." Roberto ¶ 27.

I am confident that intentionality is not required, because the Federal Supreme Court was in fact citing me for this proposition. (Ex. 35, Werro, *supra* note 17, at 3-4 (2012)).[53]

61.     Mistranslations aside, Professor Roberto's claim that the cooperation must be both conscious and intentional is contradicted by the very cases he cites. These cases clearly state the opposite, as they emphasize that negligence as a lack of attention is enough ("*négligence*"). For example, he quotes the *Locksmith Case*, Ex. 19, 4A_185/2007 at c. 6.2.1 to support his claim that cooperation must be intentional. But he omits the preceding sentence: "each perpetrator must have known *or been capable of knowing, when exercising due care*, that the others were involved in the harmful act." *Id.* (emphasis added). As this case shows, the Federal Supreme Court could not be more clear that cooperation can be either intentional or unintentional.

### 2.     Erroneous inferences: the accomplice's participation need not be intentional, immediate, or substantial.

62.     Professor Roberto further concludes that an accomplice can be liable under Article 50 CO only if two additional requirements are met. According to him, the contribution of the accomplice needs to be willful or immediate, and substantial. In his view, a person would escape from liability under Article 50 CO, if his cooperation were unintentional or only indirect and unsubstantial. *See* Roberto ¶¶ 58-59.

63.     Professor Roberto is alone in reading his purported requirements into the statute. The Federal Supreme Court has never held this. None of the leading treatises on Article 50 CO even mention these purported criteria. In fact, Professor Roberto does not cite a single work of

---

[53] "Collective fault presupposes an association in the dangerous activity, i.e., the awareness of cooperating in the result." (« La faute commune suppose une association dans l'activité préjudiciable, soit la conscience de collaborer au résultat. »)

doctrinal scholarship in his report, failing to present to the Court an entire source of law pursuant to Article 1, paragraph 3 of the Civil Code.[54]

64.     Instead, Professor Roberto attempts to infer these criteria from the facts of various cases applying Article 50 CO. His attempt fails. Although he does indeed summarize numerous Federal Supreme Court "decisions regarding the requirements" of Article 50 CO, he has not found a single case that adopted his purported requirements. Roberto ¶ 42. Not one of the cases he cites actually states that the accomplice *must* have "actively participated in the harmful conduct" either "immediately and substantially" or "willfully and substantially." *Id.* ¶ 44.  Every one of these requirements is the product of Professor Roberto's invention.

65.     To the contrary, the Federal Supreme Court has specifically rejected the argument that the participation must be intentional *or* immediate. In the *Striking Carpenters Case*, which Professor Roberto cites, the court held: "It is also not possible to accept the argument that, because the encouragement in question was not directed to the strikers by Herzog on the same day that the incident to be adjudicated today occurred, it is no longer possible to speak of a causal connection; instead, it is sufficient that this speech occurred in the course of the same strike campaign."[55] Ex. 27, BGE 57 II 417 at 421. In other words, the instigator was jointly and severally liable, even though his incitement was not immediate. Nor was it intentional: "it may indeed be true that the Defendants for their part had not intended such a brutal abuse of the Plaintiff."[56] *Id.* at 420.

---

[54] *See* paragraphs 17-19 above.

[55] « Es kann auch nicht anerkannt werden, dass deshalb, weil die fragliche Aufmunterung nicht am selben Tage, da der heute zu beurteilende Vorfall sich ereignete, von Herzog an die Streikenden gerichtet worden war, von einem Kausalzusammenhang nicht mehr gesprochen werden konne; vielmehr genügt, dass diese im Verlaufe derselben Streikaktion erfolgte. »

[56] «Nun mag ja richtig sein, dass die Beklagten ihrerseits eine derart brutale Misshandlung des Klägers nicht beabsichtigt hatten.»

66.     Professor Roberto's argument that the participation must be substantial has also been consistently rejected by the Federal Supreme Court since at least 1945. The *Shooting Contest Case*, cited by Professor Roberto, explicitly held the opposite of his so-called criteria: "The extent to which each of them collaborated and the seriousness of the fault do not enter into consideration except in the settling of accounts between all of those liable." Ex. 29, BGE 71 II 107 at c. 2. The *Locksmith Case*, also cited by Professor Roberto, similarly rejects his position: the "intensity of the tortfeasors' involvement is irrelevant, with respect to the injured party." Ex. 19, 4A_185/2007 at c. 6.2.1 (citing Ex. 35, Werro, *supra* note 17, at 4).[57]

67.     It is astonishing that he makes the sweeping assertion that "the Swiss Supreme Court has never found liability under art. 50 CO where a defendant only negligently and indirectly contributed to tortious acts of another party." Roberto ¶ 58. In the very same section, he cites the *Shooting Contest Case*, the famous judgment where an innkeeper was found liable for a shooting which he did not intend and in which his contribution was neither immediate nor direct: he did not hand the shooter the bullets, supply pistols, arrange the bottles, nor even propose the contest. All the innkeeper did was fail to monitor his garden and put a stop to the match.

68.     Clearly, the accomplice's contribution need not be substantial. The rule is quite the opposite: the Federal Supreme Court denies the defendant the right to invoke the minor nature of his own fault as a defense to joint and several liability. *See* Ex. 12, FSC, June 24, 1986, BGE 112 II 138 at 143–44; Ex. 34, Werro, *supra* note 40, at 22. The Federal Supreme Court will only consider an exception to this principle outside the scope of Article 50 CO, in the case of multiple tortfeasors acting independently from each other under Article 51 CO,[58] where the "fault of the

---

[57] « L'intensité de la participation des acteurs est sans importance sur le plan externe, c'est-à-dire à l'égard du lésé. »

[58] Ex. 2 at 4, Ex. 3 at 4, Article 51 CO provides :

defendant appears so *de minimis* and so disproportionate to that of the third party, that it would be manifestly unjust and shocking to make the prosecuted party bear the whole of the damage." Ex. 12, BGE 112 II 138 at c. 4.a. [59] If the accomplice has only made a lesser contribution to the damage, he may seek indemnification from the other tortfeasors under Article 50, para. 2 CO: "The respective faults of the two responsible parties, from that point on, only plays a role in the internal allocation of the amount paid to the plaintiff." *Id.*[60] Regardless, in the present case, Professor Roberto's "additional requirements" are both wrong and irrelevant. The Complaint clearly alleges that Defendants' contribution was far from *de minimis*.

69.  Rather than presenting these rules, Professor Roberto seeks to convince the Court that his proposed requirements are implicit in the fact patterns he summarizes. *See* Roberto ¶ 44. However, the "requirement" Professor Roberto infers from a handful of cases rest on a logical fallacy of conflating sufficient conditions with necessary conditions. Just because certain facts (*e.g.*, the immediacy or intentionality of an accomplice) were *sufficient* to support Article 50 CO

---

[1]  Where two or more persons are liable for the same damage on different legal grounds, whether under tort law, contract law or by statute, the provision governing recourse among persons who have jointly caused damage is applicable mutatis mutandis.

[2]  As a rule, compensation is provided first by those who are liable in tort and last by those who are deemed liable by statutory provision without being at fault or in breach of contractual obligation.

(« 1 Lorsque plusieurs répondent du même dommage en vertu de causes différentes (acte illicite, contrat, loi), les dispositions légales concernant le recours de ceux qui ont causé ensemble un dommage s'appliquent par analogie. 2 Le dommage est, dans la règle, supporté en première ligne par celle des personnes responsables dont l'acte illicite l'a déterminé et, en dernier lieu, par celle qui, sans qu'il y ait faute de sa part ni obligation contractuelle, en est tenue aux termes de la loi. »)

[59] Ex. 12, BGE 112 II 138 at c. 4.a (« où la faute de l'auteur recherché apparaîtrait si peu grave et dans une telle disproportion avec celle du tiers qu'il serait manifestement injuste et choquant de faire supporter au défendeur l'entier du dommage en appliquant à la lettre les rigueurs propres à la solidarité. »).

[60] Ex. 12, BGE 112 II 138 at c. 4.a (« Les fautes respectives des deux responsables ne pourront dès lors jouer de rôle que dans la répartition interne du montant alloué à la demanderesse. »).

liability in *one* case does not mean those same conditions are *necessary* to support Article 50 CO liability in *every* case.[61]

70.     In addition, Professor Roberto erroneously uses cases pertaining to the civil consequences of having been criminally liable for complicity under Swiss law, stating that the "secondary actors found liable uniformly acted willfully." Roberto ¶ 53. Yet the very first case he cites under this heading is the *Carpenters' Strike Case* (BGE 57 II 417), where the Federal Supreme Court specifically held that lacking an intent to do harm "does not matter, since even negligent complicity can establish joint and several liability pursuant to Art. 50 CO."[62] His use of the second case is also misleading. Ex. 45, FSC, Feb. 21, 2013, 6B_473/2012 is a criminal case. Swiss criminal law only punishes intentional complicity; negligent complicity is not punishable.[63] It is no surprise then that the accomplices convicted in this case "acted willfully." Regardless, under Article 53 CO, the civil judge decides independently of the provisions of the Swiss Criminal Code and he or she is not bound by decisions taken by criminal courts. Although a tort law judge may draw inspiration from the decision of a criminal law colleague, the requirements of criminal law cannot be imposed in a civil case.

---

[61] Ex. 18, FSC, May 28, 1919, BGE 45 II 304, cited by Professor Roberto, illustrates his logical error. There the Court noted: "The Federal Supreme Court has always assumed that active participation in a brawl leading to bodily injury . . . also renders that person who only contributed as an accomplice liable under Art. 50 CO, without it being possible to prove direct bodily injury by him." *Id.* at 308, c. 3. It is a fallacy to say that because the Court has "always assumed that active participation" renders an accomplice liable, an accomplice can *only* be liable if he has actively participated. Active participation may be sufficient, but it is not necessary.

[62] "Das spielt indessen keine Rolle, da selbst eine fahrlässige Gehilfenschaft die solidarische Haftbarkeit gemass Art. 50 OR begründet."

[63] Ex. 6 at 2, Ex. 7 at 2, Article 25 CP [Criminal Code] ("Complicity / Any person who wilfully assists another to commit a felony or a misdemeanour is liable to a reduced penalty.")  (« Complicité / La peine est atténuée à l'égard de quiconque a intentionnellement prêté assistance à l'auteur pour commettre un crime ou un délit. »).

71.    In short, nothing in doctrinal work or case law indicates that an accomplice can only be liable under Article 50 CO if he intentionally and substantially contributes to the harm or immediately and substantially contributes to the harm.

**B.    Professor Roberto's creative interpretation of adequate causation.**

72.    Professor Roberto also misrepresents the standard for causation under Article 50 CO. Professor Roberto claims that adequate causality requires that "the contribution be substantial enough in order to attribute the loss or damage to the tortfeasor." Not only does he cite no authority for this, but he fails to inform the Court of the substantial body of jurisprudence and doctrine holding that adequate causation depends upon "objective foreseeability," Ex. 8, FSC, Apr. 29, 1975, BGE 101 II 69 at 73, c. 3.a (my own translation); *see* Ex. 25, FSC, Sept. 12, 2001, 4C.77/2001 at 12-13, c. 2.d.bb, not on how substantial the contribution is.

73.    As I explained above, the Federal Supreme Court has made abundantly clear that the intensity of the accomplice's or instigator's contribution is irrelevant to their joint and several liability under Article 50 CO. Moreover, as I explained in paragraphs 62-66, the Federal Supreme Court considers even indirect and partial causes to be adequate for liability, so long as there is a natural causal link and their contribution to the harmful result is objectively foreseeable.[64] It is thus the cooperation of the perpetrator and his accomplice that needs to be the cause for the damage that occurred, not each act separately.

74.    In other words, judges must decide on the question of causation based on the acts of all the perpetrators in conjunction. So long as this requirement is fulfilled, there is no need for the secondary tortfeasor's act alone to have caused the damage or harm that occurred. In his recent

---

[64] See *supra* paragraphs 42-43 of this Declaration and cited case law. For an extended discussion of causation in Swiss tort law, see § 2 of my treatise LA RESPONSIBILITÉ CIVILE (2d ed. 2011) attached as Ex. 37.

and much praised monograph,[65] Dr. Perritaz for example explains that "the fact that a defendant has committed an act resting on fault in causal connection with the harm (or part of it) is not in itself decisive. It is sufficient that this act be part of a cooperation resting on fault with a view to causing the harm for art. 50 CO to apply."[66] Professor Roberto's characterization of adequate causation is therefore inaccurate when he claims that "collective causation means that the contributions not only of the primary tortfeasor but also of the secondary tortfeasor must each be an 'adequate' cause of the loss or damage." Roberto ¶ 56. Again this is Professor Roberto's idiosyncratic proposal of how causation *should* be applied, not a faithful description of how it is *actually* applied by the Federal Supreme Court, which makes it clear that the act of the accomplice need only be a partial cause in the conjunction of acts or omissions that lead to the perpetrator inflicting injury upon the victim.

### C. Standing for claims based on killed family members.

75.     There is no support for Professor Roberto's conclusory assertion that Plaintiffs' claims for the killing of loved ones would be dismissed for lack of standing. Someone who has lost a loved one to homicide is entitled to compensation for financial loss, such as funeral costs and lost financial support, under Article 45 CO. *See* Ex. 50, FRANZ WERRO, LA RESPONSABILITE CIVILE 338-351, at n. 1194-1244 (3d ed. 2017) and references cited.

76.     Article 47 CO provides "satisfaction," also known as moral damages, to the family of a relative killed by homicide, to compensate for pain and suffering: "The court may, taking into

---

[65] The monograph I refer to is his doctoral dissertation (Fribourg 2017) that received several academic and professional Swiss awards.

[66] "Ainsi, le fait qu'un responsable ait accompli un acte fautif en lien de causalité avec le dommage (ou une partie de celui-ci) n'est en soi pas décisif. Il suffit en effet que cet acte s'inscrive dans une « coopération fautive » en vue de la production du préjudice pour que l'art. 50 CO trouve application." Ex. 31, PERRITAZ, *supra* note 16, at 72, n. 244 (2017).

account the particular circumstances, award equitable compensation by way of satisfaction to the victim of personal injuries or, in the case of homicide, to the family."[67] Professor Roberto claims, without authority, that Article 47 CO only "grants dependents with a close relationship" moral damages. He is, however, inserting the criteria "dependent" into the statute. The unofficial English translation of the Code of Obligations does refer to the "dependents of the deceased," but those terms are not found in the official French version and they have no legal force. As the case law shows, the Federal Supreme Court has awarded pain and suffering to surviving spouses, unmarried couples (Ex. 46, FSC, Feb. 2, 2012, BGE 138 III 157), parents, children (Ex. 47, FSC, Apr. 9, 1946, BGE 72 II 165), as well as to brothers or sisters, when they were living with the deceased and there was special affection between them (Ex. 48, FSC, Oct. 15, 1963, BGE 89 II 396) or to parents-in-law (Ex. 49, FSC, Nov. 13, 1962, BGE 88 II 455). Whether someone is entitled to damages for pain and suffering under Article 47 CO depends exclusively on the affective relationship and attachment between the deceased and the plaintiff. Ex. 51, FRANZ WERRO, LA RESPONSABILITE CIVILE 410, at n. 1455 (3d ed. 2017).

## VI.   Conclusion

77.    In summary, Article 50 CO imposes joint and several liability on any person who participates in a harmful illicit act. To establish the liability of an accomplice, three main requirements must be met.

---

[67] I note that the unofficial English translation of the Code of Obligations differs materially from the French original and cannot be applied as law. The French version provides: « Le juge peut, en tenant compte de circonstances particulières, allouer à la victime de lésions corporelles ou, en cas de mort d'homme, à la famille une indemnité équitable à titre de réparation morale. » My translation above is literal. The unofficial English translation, which Professor Roberto appears to rely on, states: "In cases of homicide or personal injury, the court may award the victim of personal injury or the dependents of the deceased an appropriate sum by way of satisfaction." The term "dependents" does not appear in the official text of the statute.

78.     First, the main perpetrator must have committed an illicit act under Article 41 CO. Whether the accomplice has acted illicitly or whether his or her act alone is the cause of the harm suffered is not relevant. Indeed, what triggers liability for an accomplice under Article 50 CO is to provide conscious assistance to the illicit act of the main perpetrator. Therefore, an accomplice may be held liable under Article 50 CO even if his act alone would not have constituted a tort.

79.     Second, there must be a collective fault. As stated above, this is established when the accomplice intentionally or unintentionally supports the illicit act of the main perpetrator, including degrees of fault such as intention, recklessness (*dol éventuel*), and lack of attention. Contrary to Professor Roberto's declaration, intention is not required for the accomplice to be held liable. It is sufficient that the accomplice should have known that the main perpetrator was engaging in illicit conduct and that his assistance would help the main perpetrator to cause the harm that occurred.

80.     Third, the collective fault must have been a natural and adequate cause of the harm or loss. Contrary to Professor Roberto's assertion, it is not necessary that the accomplice's contribution be "substantial enough" and it need not be the sole or direct cause. What matters for adequate causation is whether it was objectively foreseeable that the accomplice's contribution would, in conjunction with the actions of the other perpetrators, help bring about the harmful result.

81.     As demonstrated, Professor Roberto's analysis of case law and methodology are not only erroneous, but also misleading, since he infers requirements which do not exist and are not supported by any relevant scholarly authorities or case law.

82.     Given the foregoing analysis, it is my opinion that the Complaint states a claim for relief under Article 50 CO. Accepting Plaintiffs' allegations as true, BNPP would be liable under Swiss law as accomplices in the violations of the absolute rights to life, bodily integrity, and

property that Plaintiffs and the class members suffered as a consequence of BNPP's financial support of the Sudanese government.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 23 day of July, 2020.

_____

Franz Werro