UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ENTESAR OSMAN KASHEF, *et al.*,<br><br>*Plaintiffs*,<br><br>-against-<br><br>BNP PARIBAS S.A. and BNP PARIBAS US WHOLESALE HOLDINGS, CORP.,<br><br>*Defendants*. | No. 1:16-cv-03228-AKH-JW<br><br>Hon. Alvin K. Hellerstein |

**PLAINTIFFS' SUPPLEMENTAL BRIEF REGARDING EXECUTIVE BRANCH REFUGEE AND ASYLEE DETERMINATIONS**

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................................. 1

    A.   The Nonreviewability and Plenary Power Doctrines Preclude Any Review or Challenge of the Factual Foundation of Refugee and Asylee Determinations. ............................................ 3

    B.   Refugee/Asylee Status Will Only be Used to Prove Forced Displacement, Not Damages or Individual Aggravating Injuries, and are Admissible for That Purpose. ................................. 7

II.  CONCLUSION ................................................................................................................... 11

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Makaaseb General Trading Co., Inc. v. Christopher*,
  1995 WL 110117, (S.D.N.Y. March 13, 1995) ............................................................................. 5

*Am. Acad. of Religion v. Napolitano*,
  573 F.3d 115 (2d Cir. 2009) ............................................................................................. 1, 3, 4, 6

*Antonenko v. Dep't of State*,
  2004 WL 1080159 (D.C. Cir. May 13, 2004) ........................................................................... 5

*D.A.M. v. Barr*,
  486 F. Supp. 3d 404 (D.D.C. 2020) ............................................................................................. 4

*Dep't of Homeland Sec. v. Thuraissigiam*,
  591 U.S. 103 (2020) ..................................................................................................................... 3

*Doan v. I.N.S.*,
  160 F.3d 508 (8th Cir. 1998) ....................................................................................................... 3

*Dong v. Ridge*,
  2005 WL 1994090 (S.D.N.Y. Aug. 18, 2005) ............................................................................. 5

*Fiallo v. Bell*,
  430 U.S. 787 (1977) ..................................................................................................................... 3

*Kerry v. Din*,
  576 U.S. 86 (2015) .................................................................................................................. 3, 6

*Kleindienst v. Mandel*,
  408 U.S. (1972) ........................................................................................................... 1, 3, 4, 6

*Lleshi v. Kerry*,
  127 F. Supp. 3d 196 (S.D.N.Y. 2015) ......................................................................................... 3

*Ngassam v. Chertoff*,
  590 F. Supp. 2d 461 (S.D.N.Y. 2008) ................................................................................. 3, 4, 5

*Rivera de Gomez v. Kissinger*,
  534 F.2d 518 (2d Cir. 1976) ........................................................................................................ 3

*Saavedra Bruno v. Albright*,
  197 F.3d 1153 (D.C. Cir. 1999) .................................................................................. 3

*Sesay v. United States*,
  984 F.3d 312 (4th Cir. 2021) ...................................................................................... 5

*Shaughnessy v. United States ex rel. Mezei*,
  345 U.S. 206 (1953) ................................................................................................ 1, 3

*Trump v. Hawaii*,
  585 U.S. 667 (2018) ..................................................................................................... 3

*U.S. ex rel. Knauff v. Shaughnessy*,
  338 U.S. 537 (1950) ..................................................................................................... 3

*U.S. ex rel. London v. Phelps*,
  22 F.2d 288 (2d Cir. 1927) ......................................................................................... 3

*United States v. Santos*,
  947 F.3d 711 (11th Cir. 2020) .................................................................................. 10

*United States v. Torralba-Mendia*,
  784 F.3d 652 (9th Cir. 2015) .................................................................................... 10

*Wan Shih Hsieh v. Kiley*,
  569 F.2d 1179 (2d Cir. 1978) ..................................................................................... 3

**Statutes**

8 U.S.C. § 1101(a)(42) ............................................................................................... 1, 2, 8

8 U.S.C. § 1252 ............................................................................................................. 4, 6

**Rules**

Federal Rules of Evidence .............................................................................................. 10

**Regulations**

8 C.F.R. § 207 ............................................................................................................... 4, 6

**Other Authorities**

Alvin K. Hellerstein et al., *The 9/11 Litigation Database: A Recipe for Judicial Management*,
  60 Wash. U. L. Rev. 653 (2013) ................................................................................. 7

I.      INTRODUCTION

Between 1997 and 2011, millions of Sudanese nationals were displaced by a Government of Sudan ("GOS") campaign of persecution. Some 20,000 or more refugee or asylee Class Members were admitted to the United States by the Executive Branch, exercising its plenary power to decide whether to admit or exclude foreign nationals. In doing so, the Executive Branch necessarily determined that each and every Class Member met the criteria for refugee status under 8 U.S.C. § 1101(a)(42):

> The term "refugee" means (A) any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . .

This determination is "final and conclusive" and cannot be collaterally attacked or judicially reviewed. *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953). The Supreme Court and Second Circuit have long held that the nonreviewability and plenary power principles "foreclose any inquiry as to supporting evidence by stating that courts will not 'look behind' the decision of the Executive Branch" to admit or exclude noncitizens. *Am. Acad. of Religion v. Napolit*ano, 573 F.3d 115, 134, 137 (2d Cir. 2009) (quoting *Kleindienst v. Mandel*, 408 U.S. 770 (1972)).[1]

In the Class Trial in this case, the Executive Branch's determinations of refugee and asylee status are binding as to one narrow, but key issue: whether the Class Members were unable to

---

[1] As Ms. Boyd stated to the Court at the May 7th hearing and now provides the relevant pages, Class Counsel addressed the nonreviewability of immigration determinations on pages 5; 71-72; 97-98 & nn. 416-421; 101-02 of their Motion for Class Certification opening brief (ECF No. No. 421) and on pages 1-2 & nn. 4-6, 7-8; 4-5; 15-19 & nn. 67, 71-76; 27-28 & nn. 117-121; 38 of their reply (ECF No. 457).

return due to GOS persecution or fear of GOS persecution. In other words, the jury would be instructed to accept as true that the statutory criteria were met: each Class Member was (1) outside of their country of origin, Sudan, and (2) "unable or unwilling to return to, and . . . unable or unwilling to avail himself or herself of the protection of [Sudan] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."[2]

But this does not end the Class Trial or preclude the jury from considering whether, under Swiss law, the Class Members suffered injury and should receive damages.[3] The jury still must find—under all evidence presented at trial on the GOS campaign of persecution, including the fact of their refugee/asylee status—that the Class Members were *injured* by their forcible displacement, in violation of their fundamental rights under Swiss law, and are entitled to damages. Under Swiss law, the injury from forced displacement—the inherent harm of being unable to return to families and homes—is separate and apart from any individualized, aggravating injuries from specific abuses such as torture or rape.[4]

In the Class Trial, only proof of refugee/asylee status will be offered into evidence (*e.g.*, the Customs and Border Patrol entry stamp)—not the underlying records. These routine, non-testimonial documents are admissible as self-authenticating public records. In the subsequent trials on individual aggravating injuries, refugee/asylee status will play little, if any, role. Plaintiffs have

---

[2] 8 U.S.C. § 1101(a)(42)(A); *see also* 1951 United Nations Convention Relating to the Status of Refugees, Art. 1(A)(2); 1967 United Nations Protocol Relating to the Status of Refugees; H.R. Rep. 96-781 (Conf. Rep.), at 19–20 (1980), as reprinted in 1980 U.S.C.C.A.N. 160, 160–62.

[3] *See infra* at 10 and n. 15.

[4] *See* ECF No. 505, Order on Motion for Class Certification (May 9, 2024) at 1-2 ("2. The common questions for trial are the following . . . (d) Whether such acts of BNPP proximately caused the forcible displacement of members of the class from their homes and property, . . . .").

no need to use immigration files, such as the out-of-court statements in interview notes, to prove injuries: they will testify directly to their torture, rape, and murdered loved ones.

Thus, the fact that the Class Members' refugee/asylee status is binding does not leave Defendants without a defense to the element of damages. Defendants are free to present evidence, as BNPP counsel has previously argued, that the Class Members' lives were enriched and improved by persecution and displacement, and they deserve no damages. The jury will decide.

### A. The Nonreviewability and Plenary Power Doctrines Preclude Any Review or Challenge of the Factual Foundation of Refugee and Asylee Determinations.

It is well-settled that no court can second-guess the decision of an "executive officer" whether "to admit or to exclude an alien." *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950). "[B]ecause the action of the executive officer under such authority is final and conclusive . . . 'it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government.'" *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953).[5]

This doctrine of executive officer nonreviewability "finds its origins in 'Congress' plenary power in the regulation of immigration and admission of aliens into the United States.'" *Lleshi v. Kerry*, 127 F. Supp. 3d 196, 200 (S.D.N.Y. 2015);[6] *Trump v. Hawaii*, 585 U.S. 667, 702 (2018)

---

[5] Although decided under the Immigration Act of 1891, the Supreme Court, still applies *Knauff* and *Mezei* as good law. *See Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020). The consular nonreviewability and plenary power doctrines are enshrined in an unbroken line of cases. *See, e.g.*, *Kerry v. Din*, 576 U.S. 86, 104 (2015); *Fiallo v. Bell*, 430 U.S. 787 (1977); *Kleindienst v. Mandel*, 408 U.S. 753 (1972); *United States v. Shaughnessy*, 338 U.S. 537 (1950); *Am. Acad. of Religion v. Napolitano*, 573 F.3d 115, 123 (2d Cir. 2009); *Wan Shih Hsieh v. Kiley*, 569 F.2d 1179, 1181 (2d Cir. 1978); *Rivera de Gomez v. Kissinger*, 534 F.2d 518, 519 (2d Cir. 1976) (per curiam); *U.S. ex rel. London v. Phelps*, 22 F.2d 288, 290 (2d Cir. 1927); *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1160 (D.C. Cir. 1999); *Lleshi v. Kerry*, 127 F. Supp. 3d 196, 199 (S.D.N.Y. 2015); *Ngassam v. Chertoff*, 590 F. Supp. 2d 461, 466 (S.D.N.Y. 2008).

[6] The non-reviewability and plenary power principles have been applied to all Executive officers exercising congressionally delegated immigration authority. *See, e.g.*, *Kleindienst v. Mandel*, 408 U.S. 753, 769–70 (1972) (holding that court may not "look behind" a "facially legitimate and bona fide" decision by the Attorney General to refuse an inadmissibility waiver). Although often styled as "consular nonreviewability," courts apply this doctrine to immigration determinations made by consular officials as well as any "Executive Branch official, located outside the

("[T]he admission and exclusion of foreign nationals is a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control") (citation and internal quotation marks omitted). Congress has delegated this exclusive authority to the Executive Branch and delineated narrow procedures for review, providing very limited judicial review for asylum and none for refugees. *See* 8 C.F.R. § 207.4 ("There is no appeal from a denial of refugee status."); *D.A.M. v. Barr*, 486 F. Supp. 3d 404, 412 (D.D.C. 2020) (explaining that 8 U.S.C. § 1252, which governs judicial review after a denial of asylum status, "is one of the most comprehensive jurisdiction-stripping statutes in the United States Code") (quotation marks and citations omitted).

The Supreme Court and Second Circuit hold that nonreviewability and plenary power principles "foreclose any inquiry as to supporting evidence by stating that courts will not 'look behind' the decision of the Executive Branch." *Am. Acad. of Religion v. Napolit*ano, 573 F.3d 115, 134, 137 (2d Cir. 2009) (quoting *Kleindienst v. Mandel*, 408 U.S. 770 (1972)).[7] Defendants are thus precluded from mounting a collateral attack on the bases for the Class Members' refugee and asylee status. As this Court has repeatedly held, "such a challenge cannot be divorced from an attack of the decision itself." *Ngassam v. Chertoff*, 590 F. Supp. 2d 461, 466 (S.D.N.Y. 2008).

---

United States, deciding questions of admissibility brought before him by aliens who are also located outside the United States." *Doan v. I.N.S.*, 160 F.3d 508, 509 (8th Cir. 1998). It appears to be an open question whether consular officials are absolutely immune from review, while other executive officers are subject only to the limited "facially legitimate" review prescribed by *Mandel*. In any event, as the Second Circuit held in American *Academy of Religion v. Napolitano*, *Mandel* prohibits "look behind" review of any "exclusion decisions" of non-consular executive officers, such as the Attorney General. *See* 573 F.3d 115, 137 (2d Cir. 2009). In addition, plenary power deference and non-reviewability extends to various types of immigration status determinations, including refugees, *see e.g.*, *Doan*, 160 F.3d at 509 (application to USCIS Bangkok office for refugee waiver); asylees at or between ports of entry, *see e.g.*, *Thuraissigiam*, 591 U.S. at 139 (asylum application after entry into U.S. without inspection), and their derivatives, *see, e.g.*, *Ngassam v. Chertoff*, 590 F. Supp. 2d 461, 466 (S.D.N.Y. 2008) (derivative asylee application).

[7] Courts recognize a narrow exception when a third-party U.S. citizen claims that the exclusion of an alien violates a First Amendment right to hear him express his views in this country. But even, "courts may not 'look behind'" the exclusion decision and can only determine whether it is "facially legitimate." *Am. Acad. of Religion v. Napolitano*, 573 F.3d 115, 137 (2d Cir. 2009) (quoting Mandel, 408 U.S. 753, 92 (1972).

Equally, the nonreviewability principle forecloses any litigant, such as BNPP, from disputing or challenging a refugee/asylee status decision's factual support. In *Dong v. Ridge*, for example, an asylee's son was denied admission as a derivative asylee because he was over the age of 21. 2005 WL 1994090 at *8 (S.D.N.Y. Aug. 18, 2005). Rather than seek to reverse that decision, the plaintiff sought a declaratory judgment that his son was in fact a "child." *Id.* This Court held it was barred from reconsidering the factual underpinnings as doing so would "inexorably propel this Court into the proscribed territory of reviewing consular visa decisions." *Id.* at *4. Similarly, in *Al Makaaseb General Trading Co., Inc. v. Christopher*, this Court rejected a denied visa-applicant's request to review if he was properly placed on a State Department watch list—the factual basis for the immigration decision. 94 CIV. 1179 (CSH),1995 WL 110117, at *2 (S.D.N.Y. March 13, 1995).

These constitutional principles also preclude second-guessing the reliability of methods used by executive officers in immigration determinations. For example, in *Antonenko v. Dep't of State*, the D.C. Circuit affirmed that visa applicants denied admission due to irregular signatures "were not entitled to a writ of mandamus compelling appellees to forward appellants' visa petitions and signature specimens to a federal document forensics laboratory for analysis . . . ." No. 03-5327, 2004 WL 1080159, at *1 (D.C. Cir. May 13, 2004).

In short, no litigant, including BNPP, can "make an end-run around nonreviewability of the decision by challenging its foundation." *Ngassam*, 590 F. Supp. 2d at 466. As the Fourth Circuit held: "For the doctrine of consular nonreviewability to have any meaning, we may not peer behind the decisional curtain and assess the wisdom of the consular determination." *Sesay v. United States*, 984 F.3d 312, 316 (4th Cir. 2021).

5

BNPP cannot ask the jury to find that consular or other immigration officers were wrong, presumably by cross-examining those officials, nor can it contend that refugees and asylees could safely return home. *See, e.g.*, Tr. at 31:25-32:7. BNPP cannot ask the jury to second-guess the non-reviewable determination that it was the GOS that threatened the class with persecution.[8] And BNPP cannot ask the jury to find that consular or other immigration officers used unreliable methods.[9]

Putting these questions to the jury would raise serious separation-of-powers and political-question concerns. Worse still, for BNPP to test the foundation of the determination, it would need to subpoena the consular or USCIS official who interviewed the victim and subject him or her to cross-examination. Doing so would trench on the political branches' exclusive authority to admit or exclude foreign nationals. *See Kerry v. Din*, 576 U.S. 86, 106 (2015) (Kennedy, J., concurring) ("[R]espect for the political branches' broad power over the creation and administration of the immigration system extends to determinations of how much information the Government is obliged to disclose about a consular officer's denial of a visa to an alien abroad.").

Ultimately, Plaintiffs have found no case where a court ever permitted a third-party to seek a searching, *de novo* review of an Executive Officer's decision to admit an alien. This Court should not be the first to allow a third party to collaterally attack the *granting* of refugee or asylee status, when even the Government cannot seek review of such a determination.[10]

---

[8] *See id.* at 31:6-8 ("[B]ut, your Honor, maybe, maybe someone was being persecuted by one of the rebel groups and not by the government of Sudan.") The Court correctly informed BNPP that persecution or fear of persecution by the GOS was *a necessary element* of the refugee and asylee determination. *Id.* at 31:21-24. And BNPP conceded the point. *Id.* at 31:25 ("Correct, your honor.").

[9] *See id.* at 32:4-6 (questioning whether interpreters were present).

[10] *See* 8 C.F.R. § 207 *et seq.* (providing no appeal for grants of refugee status); 8 U.S.C. § 1252 (permitting judicial review *only* where there is a final removal order, *i.e.*, a *denial* of asylum, thus precluding DHS from appealing grants of asylum once affirmed by the Board of Immigration Appeals). Even where a third-party U.S. citizen claims that the exclusion of an alien violates a First Amendment right to hear him express his views in this country, "courts

6

These clear precedents foreclose BNPP from asking the jury to "look behind" the refugee and asylee status determinations and second-guess whether the Class was unable to return due to the GOS campaign of persecution.

**B.    Refugee/Asylee Status Will Only be Used to Prove Forced Displacement, Not Damages or Individual Aggravating Injuries, and are Admissible for That Purpose.**

To address the admissibility of the refugee/asylee status determinations, Plaintiffs will illustrate how such proof will be used in the bifurcated proceedings ordered by the Court. Per the Court's class certification order, proceedings in this case will be bifurcated into two phases. ECF No. 505, Order ¶¶ 4-5. In the first phase, the Class Trial will address the common issues in the Court's certification order with common evidence: the GOS campaign of persecution, BNPP's knowledge, general causation, and injury and baseline damages under Swiss law for forcible displacement. In the second phase, individualized claims for special damages from additional, aggravating injuries (*e.g.*, torture, sexual violence, lost property) will be tried as a mass tort to one or more juries according to categories and severity of injuries developed by a special master, using bellwether trials as needed. *Cf.* Alvin K. Hellerstein et al., *The 9/11 Litigation Database: A Recipe for Judicial Management*, 60 Wash. U. L. Rev. 653 (2013).

The binding refugee and asylee status determinations will play one factual role in the class trial, but little if any role in the bellwether trials for aggravating injuries and special damages. The first element of the Class's Swiss Article 50.1 claim is the "illicit act" by the GOS.[11] The jury will be instructed that under Swiss law, a violation of a fundamental right is an actionable illicit act.

---

may not 'look behind' exclusion decisions, whether the decision is the Attorney General's exercise of discretion . . . or the consular officer's decision . . ." *Am. Acad. of Religion v. Napolitano*, 573 F.3d 115, 137 (2d Cir. 2009) (quoting *Mandel*, 408 U.S. 753, 92 (1972).

[11] All references to the Swiss code are to the Swiss Code of Obligations.

7

Forcible displacement is an illicit act for Article 50.1 purposes, because it violates the right to family life and the home enshrined in the European Convention on Human Rights. *See* ECF 435-104, March 2, 2023 Declaration of Franz Werro at 29-32. Under Swiss law, individuals are forcibly displaced when they are "unable to return" to family, home, or homeland due to unjustifiable state coercion. *Case of Chiragov and Others v. Armenia*, Case No. 13216/05, Judgment, Grand Chamber, ECtHR, June 16, 2015, ¶¶ 206-208, 220.[12]

Accordingly, a key triable issue in the Class Trial will be whether the 23,000 refugees and asylees admitted to the U.S. were unable to return home due to past persecution or a well-founded fear of persecution by the GOS—*i.e.*, were forcibly displaced. Class Counsel will establish this through evidence that the Islamist militarist GOS conducted a nationwide campaign of persecution and ethnic cleansing, the individual testimony of the representative plaintiffs on their displacement, Plaintiffs' expert testimony on the widespread nature, severity, and impact of displacement,[13] as well as the fact of the Class Representatives' refugee/asylee status as determined by U.S. immigration officials.[14]

The jury will be instructed on the statutory definition of a "refugee" under Section 101(a)(42) of the Immigration and Nationality Act (which also applies to asylees). Plaintiffs' immigration expert Prakash Khatri will testify on the elements of this definition and the application process. Because the Executive Branch determinations are binding and their foundation cannot be

---

[12] Available at https://hudoc.echr.coe.int/eng?i=001-155353. The European Court of Human Rights is Switzerland's court of last resort on matters of human rights. *See* ECF No. 435-104, Declaration of Professor Franz Werro Decl. at ¶¶ 69-76. The parallels between *Chiragov* and this case are striking as both involve ethnic cleansing and military threats to entire populations: "The Court's findings of violations . . . in the present case relate to a general situation which involves the flight of practically all Azerbaijani citizens, presumably most of them Muslims, . . . and their *inability to return* to these territories." *Chiragov* at ¶ 220 (emphasis added).

[13] *See* Expert Report of Drs. Keller and Rosenfeld, ECF No. 458-7, and Expert Report of Dr. Jok Madut Jok, ECF No. 458-5.

[14] *See* 8 U.S.C. § 1101(a)(42)(A).

challenged, the jury will be instructed to accept as true that each Class Member (1) was outside of Sudan and (2) was unable to return to Sudan and unable to avail themselves of the protection of the GOS, due to (3) "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.*

This approach is hardly controversial. BNPP appears to concede that refugee or asylee status establishes these facts. At the May 7th hearing, BNPP's counsel admitted they "are not challenging" the status. Tr. at 43:8-9. They conceded this status means the Class Members were "unable to return," Tr. at 28:25-29:4. And they conceded this was due to state action, after being corrected by the Court that, by definition, the persecution must involve the GOS. Tr. at 31:21-25. ("Correct, your honor.").

The jury must then decide two questions. *First,* based on the evidence of the GOS campaign of persecution, the binding refugee/asylee determinations, victim testimony, and the testimony of the Plaintiffs' experts, the jury must decide whether there was injury under Swiss law; in other words, whether the GOS aided by BNPP unjustifiably interfered with the Class's right to their family integrity, homes, and homeland under Swiss law. *Second*, based on the testimony of the victims and their experts, the jury must then find whether the Class has proven the amount of any damage resulting from that injury under Swiss law.

Class Counsel will present common proof at trial in response to these two questions. This evidence will establish that the entire Class suffered what Swiss law terms "moral harm" under Article 49—*i.e.*, an affront to human dignity from forcible displacement. That displacement was common to each of the refugee/asylees individually and collectively. *See* ECF No. 435-104, Werro Decl. at 29 ("This forced displacement clearly infringes on an absolute right protected in the Swiss legal order, which is the cause of moral harm under Article 49 CO."). The parties took substantial

9

discovery on the impact of forcible displacement common to Class Members and distinct from other abuses.[15] Consequently, baseline damages can be awarded to the Class as a whole, arising out of the forced displacement. These damages are separate and apart from special damages for individualized aggravating injuries, which will be determined through subsequent bellwethers. *See* ECF No. 457, Pls' Reply at 35-36.

Thus, refugee/asylee status will be used as class-wide evidence for a narrow purpose. In the Class Trial, the fact of the refugee and asylee determinations is admissible under Federal Rule of Evidence ("FRE") 401 as highly probative of forcible displacement. And the tangible proof of status—in the form of entry stamps and other routine immigration documents—are self-authenticating under FRE 902 and admissible as public records under FRE 803(8).[16]

Finally, in the subsequent trials on individual aggravating injuries other than displacement, refugee and asylee determinations will play little, if any, role, and their admissibility need not be addressed at this time. Plaintiffs will rely on their testimony and the testimony of their experts, not the contents of immigration files, to prove they were bombed, tortured, raped, or otherwise injured

---

[15] Plaintiffs' damages experts opined on the inherent impact of displacement as distinct from individualized injuries, such as PTSD or other medical conditions, and how it had a culturally specific impact on every member of the Class. Dr. Allen Keller from NYU/Bellevue and Dr. Barry Rosenfeld from Fordham—experienced practitioners on the treatment of refugees—opined on the "commonality evident in . . . the nature and extent of their traumatic experiences" including the "trauma inherent in displacement, fearing for their safety and being forced to flee their homes and country." ECF No. 458-7, Keller & Rosenfeld Expert Report at 9-10; 12-13. Syracuse University cultural anthropologist Dr. Jok Madut Jok addressed the culturally specific humiliation of "becoming a refugee . . . for anyone steeped in Sudanese culture." ECF No. 458-5, Jok Expert Report at ¶¶ 116, 118, 120, 123. Counsel for BNPP deposed these Experts and the Class Representatives on this very topic. *See, e.g.*, ECF No. 435-73, Jok Dep. at 44:7-12.

[16] Routine immigration records such as passport stamps or I-94 forms are admissible for these purposes under the public records exception to the hearsay rule, FRE 803(8). *See United States v. Santos*, 947 F.3d 711, 725 (11th Cir. 2020) (holding "routinely and mechanically kept [immigration] records that are maintained in an alien's A-file may be admitted into evidence under the public records exception.") (internal quotation marks omitted). Further, like other immigration forms routinely admitted under the public records exception, these documents are non-testimonial, not made in anticipation of litigation, and reflect "simply a routine, objective cataloging of an unambiguous factual matter." *United States v. Torralba-Mendia*, 784 F.3d 652, 666-67 (9th Cir. 2015) (holding that immigration form with non-citizen's biographical data and arrival/departure was admissible under public records exception) (internal quotation marks and citations omitted).

10

by the GOS. Plaintiffs do not contend that the refugee or asylee determinations preclude BNPP from disputing these aggravating injuries, which are distinct from injury and damages arising out of the forcible displacement itself.

## II.     CONCLUSION

In short, BNPP cannot collaterally attack the Executive Branch's nonreviewable refugee and asylum determinations. But this does not deprive BNPP of due process or a jury trial on the Swiss Article 50.1 element of injury or damages. BNPP is free to argue to the jury that Sudan's displaced victims were materially improved by their persecution. BNPP will apparently claim that refugees fleeing genocide suffer "close to no damage" and are comparable to their counsel leaving Texas for the greener pastures of Wall Street firm Sullivan & Cromwell. *See* Tr. at 44:3-13. As it did in depositions, BNPP will perhaps ask genocide survivors if life as refugees is better than in Sudan. The jury will hear survivors like Plaintiff Entesar Kashef—a multiple gang rape victim whose family was slaughtered before her eyes—testify: "It's not better. I ran away from death."[17] The jury will decide.

What BNPP cannot do is present evidence to challenge or contend that the Class Members were wrongfully admitted to the United States, did not meet the criteria of the refugee definition, and did not suffer persecution or a well-founded fear of persecution by the GOS.

---

[17] ECF 435-40, Deposition of Entesar Kashef at 43:13-17.

12

| | |
|---|---|
| Dated: May 21, 2024 | Respectfully submitted, |
| <u>*Kathryn Lee Boyd*</u> | <u>*Michael D. Hausfeld*</u> |
| Kathryn Lee Boyd | Michael D. Hausfeld |
| Theodor Bruening | Scott A. Gilmore |
| Michael Eggenberger | Amanda E. Lee-DasGupta |
| HECHT PARTNERS LLP | Claire A. Rosset |
| 125 Park Avenue, 25th Floor | Mary S. Van Houten Harper |
| New York, NY 10017 | HAUSFELD LLP |
| (646) 502-9515 | 888 16th Street NW, Suite 300 |
| (646) 396-6452 | Washington, DC 20006 |
| (646) 777-2489 | (202) 540-7200 |
| lboyd@hechtpartners.com | mhausfeld@hausfeld.com |
| tbruening@hechtpartners.com | sgilmore@hausfeld.com |
| meggenberger@hechtpartners.com | alee@hausfeld.com |
| Kristen Nelson | crosset@hausfeld.com |
| HECHT PARTNERS LLP | mvanhouten@hausfeld.com |
| 6420 Wilshire Boulevard, 17th Floor | |
| Los Angeles, CA 90048 | |
| (646) 490-2408 | |
| knelson@hechtpartners.com | *Counsel for Plaintiffs* |

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of May 2024, I caused the foregoing Plaintiffs' Supplemental Brief Regarding Executive Branch Refugee and Asylee Determinations to be filed on this Court's CM/ECF system, which will provide notification of filing to all counsel of record.

/s/ Michael D. Hausfeld
Michael D. Hausfeld