**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ENTESAR OSMAN KASHEF, *et al.*,<br><br>                    Plaintiffs,<br><br>        -against-<br><br>BNP PARIBAS S.A., BNP PARIBAS S.A.<br>NEW YORK BRANCH, and BNP PARIBAS<br>US WHOLESALE HOLDINGS, CORP.,<br><br>                    Defendants. | No. 1:16-cv-03228-AKH-JW<br><br>Hon. Alvin K. Hellerstein |

## PLAINTIFFS' COUNTERSTATEMENTS OF MATERIAL FACTS AND STATEMENT OF ADDITIONAL MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. i

PLAINTIFFS COUNTERSTATEMENT OF MATERIAL FACTS ........................................ 1

V.    MATERIAL FACTS CONCERNING RELEVANT SUDANESE HISTORY AND
      POLITICS[1] ...................................................................................................... 1

      A.    Sudan's Geography and Demographics ...................................................... 1

      B.    Sudan Achieves Independence and Enters Its First Civil War (1955–1972) ......... 5

      C.    Sudan's Second Civil War (1983–2005) ...................................................... 6

            1.    Background and Timeline ................................................................. 6

            2.    Human Rights Abuses and Displacement in Sudan Before, During and
                  After the Proposed Class Period ...................................................... 16

      D.    Key Constituencies Throughout Sudan ..................................................... 22

VI.   MATERIAL FACTS CONCERNING ARMS IN SUDAN BEFORE AND DURING THE
      PROPOSED CLASS PERIOD ............................................................................. 33

      A.    Arms Available to the GOS and Paramilitaries ........................................... 33

      B.    Arms Proliferation to Non-GOS Actors .................................................... 44

VII.  MATERIAL FACTS CONCERNING THE SUDANESE GOVERNMENT'S FINANCES
      ..................................................................................................................... 46

      A.    Macroeconomic Data Concerning the Sudanese Government's Revenues
            and Expenditures ................................................................................. 46

      B.    Sudanese Oil Industry ........................................................................... 51

VIII. MATERIAL FACTS CONCERNING BNP PARIBAS ENTITIES ................................. 57

      A.    BNP Paribas Group Corporate Structure .................................................. 57

      B.    BNP Paribas and BNPP Suisse Evidence ................................................... 60

IX.   MATERIAL FACTS CONCERNING PLAINTIFFS' CLAIMS ..................................... 64

      A.    Plaintiffs ............................................................................................. 64

      B.    Plaintiff Abubakar Abakar ("Mr. Abubakar Abakar") ................................. 94

      C.    Plaintiff Turjuman Ramadan Adam ("Mr. Adam") .................................... 101

      D.    Plaintiff Halima Samuel Khalifa ("Ms. Khalifa") ..................................... 110

      E.    Plaintiff Isaac Ali ("Mr. Ali") .............................................................. 119

      F.    Plaintiff Judy Roe ("Ms. Judy Roe") ..................................................... 128

---

[1] The headings in ECF No. 437 do not conform with those found in the table of contents of ECF No. 437.  This adopts the headings found in the body of ECF No. 437.

G.  Plaintiff Abulgasim Suleman Abdalla ("Mr. Abdalla") ....................................132

H.  Plaintiff Ambrose Ulau ("Mr. Ulau") ................................................................143

I.  Plaintiff Judy Doe ("Ms. Judy Doe")................................................................148

J.  Plaintiff Jane Roe ("Ms. Jane Roe") .................................................................151

K.  Plaintiff Nyanriak Tingloth ("Ms. Tingloth") ..................................................158

L.  Plaintiff Hawa Mohamed Omar ("Ms. Omar")..................................................163

M.  Plaintiff Abbo Ahmed Abakar ("Mr. Abbo Abakar")........................................169

N.  Plaintiff Jane Doe ("Ms. Jane Doe")................................................................176

O.  Entesar Osman Kashef ("Ms. Kashef") ............................................................183

P.  Plaintiff Hamdan Juma Abakar ("Mr. Hamdan Abakar")...................................192

Q.  Plaintiff Kuol Shbur ("Mr. Shbur").................................................................203

R.  Plaintiff Nicolas Hakim Lukudu ("Mr. Lukudu").............................................207

S.  Plaintiff Shafika G. Hassan ("Ms. Hassan") ....................................................212

T.  Plaintiff John Doe ("Mr. Doe").......................................................................217

**PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS............................223**

**I.  BNPP has historic ties with Sudan. .......................................................................223**

**II.  The United States imposes an economic embargo aimed at halting the atrocities of
Sudan's Bashir Regime. .........................................................................................226**

1).  U.S. Sanctions Imposed on Sudan.................................................................226

2).  Consequences of the U.S. Sanctions imposed on Sudan..................................228

3).  BNPP is willing to help. ...............................................................................229

**III.  BNPP conspires with the Regime to evade the U.S. embargo through money
laundering structures and falsified documents.........................................................231**

1).  BNPP plead guilty to a conspiracy with the GOS...........................................231

2).  How BNPP conducted the conspiracy. ...........................................................232

a).  Wire stripping. ..................................................................................233

b).  Satellite Banks. .................................................................................234

3).  BNPP's financial support for the Regime. ......................................................235

a).  BNPP held all the Regime's accounts, providing the Regime access to
otherwise unavailable U.S. dollars. ...................................................235

b).  Support for Sudan. .............................................................................237

c).  Undermining the Embargo. .................................................................239

d).  Profitable for BNPP. ..........................................................................240

IV.     **BNPP is the Regime's "Oil Bank."**..................................................................**241**

    1).    Impact of U.S. sanctions on Sudan's oil...................................................241

    2).    Sudan needed U.S. dollars.......................................................................242

    3).    "From the first barrel," BNPP is the Regime's exclusive "oil bank." ...........243

    4).    Sudan's oil revenue.................................................................................246

V.     **The Government of Sudan's campaigns of human rights violations.**........................**247**

    1).    The campaign of violations of the Bashir Regime. .................................247

        a).    Campaign of violations..................................................................247

        b).    Apparatus that conducted the campaign of violations..........................249

    2).    Direct link between revenue generated and campaign of human rights violations. ...............................................................................................252

        a).    Intent to use Petrodollars on violations. ..........................................252

        b).    Purchase of arms..........................................................................254

    3).    Violations committed by the Regime. ....................................................255

        a).    Ethnic cleansing of non-Arab populations from oil regions. .................255

        b).    Torture in "Ghost Houses." ...........................................................258

        c).    Genocide in Darfur. .....................................................................258

VI.     **BNPP and the Government of Sudan's Co-Conspirators.** ...........................................**261**

    1).    BNPP directly supported the Regime's military-security apparatus. .................261

    2).    BNPP directly financed Regime military operations, equipment, and procurement networks used against civilians. ...........................................................263

        a).    Military Attaches. ........................................................................263

        b).    Sudan's Civil Aviation Administration. ....................................................264

        c).    GIAD. .........................................................................................265

    3).    BNPP's screening for military links. ....................................................268

    4).    BNPP's willful blindness.......................................................................270

VII.    **BNPP knew of the Regime's human rights violations in Sudan.**................................**271**

    1).  BNPP knew it was contributing to the Regime's human rights violations in Sudan.271

        a). BNPP knew of the Regime's atrocities in Sudan. ............................................271

        b). BNPP could not ignore the Regime's atrocities in Darfur.............................272

        c). BNPP knew it was contributing to the atrocities in Sudan.............................274

**VIII.   BNPP's conspiracy was global.** ....................................................................**276**

    1).     BNPP Paris oversaw the conspiracy. ...........................................276

         a).  BNPP Paris approved loans. ................................................276

         b). BNPP Paris approved practices. ..........................................278

         c). BNPP Paris had ultimate authority on the Sudanese business. .....................279

    2).     BNPP Wholesale also contributed to Sudan's embargo-breaking scheme. ..........281

**IX.   BNPP refused to end the conspiracy.** ...........................................................**287**

    1).     BNPP perpetuated the conspiracy despite the U.S. genocide determination's of genocide in Sudan. ..............................................................287

    2).     New sanctions on Sudan in 2007. ..............................................289

    3).     BNPP gets investigated. ........................................................290

    4).     But BNPP does not stop. .......................................................291

**X.   Effects of BNPP's Conspiracy.** .......................................................................**293**

    1).     Lasting effects. ................................................................293

    2).     Forced Displacement. ..........................................................294

**XI.   Plaintiffs' Injuries.** ........................................................................................**296**

iv

## PLAINTIFFS COUNTERSTATEMENTS OF MATERIAL FACTS

Pursuant to Local Rule 56.1 of the Local Rules of Civil Practice of the U.S. District Court for the Southern District of New York, Plaintiffs, through their undersigned counsel, files this Response to Defendants' Statement of Material Facts as to Which There Is No Genuine Issue Pursuant to Local Civil Rule 56.1 (ECF No. 437, "Defs. SMF") submitted by Defendants BNP Paribas, S.A. ("BNPP France"), BNP Paribas, S.A. New York Branch ("BNPP NY"), and BNP Paribas US Wholesale Holdings, Corp. ("BNPP Wholesale," and collectively "BNPP"),[2] and submit their Statement of Additional Material Facts in Opposition to Defendants' Motion for Summary Judgment ("SAMF"), and states as follows:

## V.   MATERIAL FACTS CONCERNING RELEVANT SUDANESE HISTORY AND POLITICS[3]

### A.   Sudan's Geography and Demographics

1.     Prior to its split with South Sudan in 2011, Sudan was the largest country in Africa. Ex. 58, Expert Report of Enrico Carisch dated Jan. 6, 2023 ¶ 21 ("Carisch Report").

**Plaintiffs' Response**: Uncontroverted but irrelevant. The geographic size of Sudan, both prior to and after its split with South Sudan in 2011, has no bearing on the allegations or defenses in this action.

---

[2] BNPP argues that "Plaintiffs' claims against BNPP NY and BNP Paribas are 'one and the same.'" Defs. SMF at 1 n.1 (quoting *Bayerische Landesbank, N. Y. Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 51 (2d Cir. 2012)). On the understanding, which BNPP now concedes, that BNPP France is therefore liable for any acts or omissions of BNPP NY, Plaintiffs do not contest this proposed fact.

[3] The headings in ECF No. 437 do not conform with those found in the table of contents of ECF No. 437. This adopts the headings found in the body of ECF No. 437. Further, starting on page 35, Defs. SMF's numbering goes from Proposed Fact No. 253 to Proposed Fact No. 302. Plaintiffs have followed the numbering in Defs. SMF herein.

2.   Prior to its split with South Sudan in 2011, Sudan was approximately 2.4 million square kilometers, roughly the size of Western Europe.3 Ex. 135, Land area (sq. km), The World Bank (July 21, 2023)4 ("Land area (sq. km) – The World Bank").4

**Plaintiffs' Response**: Uncontroverted but irrelevant.  The geographic size of Sudan, both prior to and after its split with South Sudan in 2011, has no bearing on the allegations or defenses in this action.

3.   Sudan's Darfur region alone is approximately 440,000 square kilometers, roughly the size of France. Ex. 130, Darfur, Britannica (July 18, 2023);6 Ex. 135, Land area

---

[4] In its Rule 56.1 Statement, BNPP improperly requests judicial notice not just of specific facts but also the entirety of the documents in which they appear. *See* ECF No. 437 n.5 (requesting "judicial notice of certain documents and facts contained therein") (emphasis added). "Central to Rule 201 is the notion that federal courts take judicial notice of facts, not documents." *CITGO Petroleum Corp. v. Starstone Ins. SE*, 2023 WL 2525651, at *5 (S.D.N.Y. Mar. 15, 2023) (cleaned up). To the extent BNPP is incorporating a particular fact into a paragraph of its Rule 56.1 statement, Plaintiffs have indicated whether or not that fact is controverted. But Plaintiffs object to any broader use of such documents and their contents. Moreover, BNPP does not specify exactly which documents it contends are appropriate sources for judicial notice, merely referring generally to "a World Bank almanac, an encyclopedia, and official Sudanese government documents." ECF No. 437 n.5. While it is not completely clear, presumably the "World Bank almanac" reference is to a web page maintained by the World Bank, Lee Decl. Ex. 135, and the "encyclopedia" reference is to an entry on "Darfur" from an online version of the Encyclopedia Brittanica, Lee Decl. Ex. 130, which has already been revised in the time since BNPP attached it. *See* https://www.britannica.com/place/ Darfur/additional-info (last visited Aug. 14, 2023). BNPP does not explain what it means by "Sudanese government documents," but BNPP's attorney declaration does identify three possibilities. One is the Comprehensive Peace Agreement, which spans nearly 300 pages, but the declaration from BNPP's counsel does not describe from what official source this copy was obtained, if any. *See* Lee Decl. Exs. 125-129; *see also CITGO*, 2023 WL 2525651, at *8 ("the truth of statements concerning geopolitical conflict, without evidence definitively proving the indisputability of the given assertions, is generally an inappropriate subject for judicial notice"). Another is an undated, anonymously-authored web page of a Sudanese government ministry, which does not appear to be an "official" government "document" at all. *See* Lee Decl. Ex. 133. Yet another is a census report apparently published by an agency of the Government of South Sudan, but again BNPP does not describe from what official source the report was obtained, if any, Lee Decl. Ex. 137, and it omits information contained in other publications about the same census describing various challenges encountered in its preparation. *See* Southern Sudan Counts: Tables from the 5th Sudan Population and Housing Census, 2008, at 4, available at https://nbs.gov.ss/wp-content/uploads/2021/05/South-Sudan-Census-Tables.pdf (last visited Aug. 14, 2023); *see also CITGO*, 2023 WL 252651, at *8 ("that a statement appears in a government document does not necessarily mean that it is judicially noticeable"). Because BNPP does not assert that this information is "generally known within the trial court's territorial jurisdiction," and because it has not disclosed the underlying "sources whose accuracy cannot reasonably be questioned," judicial notice is inappropriate. Fed. R. Evid. 201(b); *see also CITGO*, 2023 WL 252651, at *5 ("Several courts have noted that a party requesting judicial notice bears the burden of persuading the trial judge that the fact is a proper matter for judicial notice.") (cleaned up).

(sq. km) – The World Bank.

**Plaintiffs' Response**: Uncontroverted but irrelevant.  The geographic size of the Darfur region of Sudan has no bearing on the allegations or defenses in this action.

4.   The region that now comprises South Sudan is approximately 630,000 square kilometers, larger than the size of France.  Ex. 135, Land area (sq. km) – The World Bank.

**Plaintiffs' Response**: Uncontroverted but irrelevant.  The geographic size of South Sudan, both prior to and after its split with Sudan in 2011, has no bearing on the allegations or defenses in this action.

5.   Sudan's population as of the last official census, published in 2009 (also including present-day South Sudan), was approximately 39 million.  Ex. 137, *5th Sudan Population and Housing Census*, Central Bureau of Statistics, Apr. 26, 2009, at 3.

**Plaintiffs' Response**: Uncontroverted but irrelevant except as historical fact.  The population of Sudan in 2009 has no bearing on the allegations or defenses in this action.

6.   As of 2008, the federal state of Khartoum, which encompasses the metropolitan area of Khartoum, Sudan's capital city, had a population of approximately five million.  Ex. 137, *5th Sudan Population and Housing Census*, Central Bureau of Statistics, Apr. 26, 2009, at 8.

**Plaintiffs' Response**: Uncontroverted but irrelevant.  The population of the federal state of Khartoum in 2008 has no bearing on the allegations or defenses in this action.

7.   As of 2008, the city of Juba, South Sudan's capital city, had a population of approximately 372,000.  Ex. 137, *5th Sudan Population and Housing Census*, Central Bureau of Statistics, Apr. 26, 2009, at 15.

**Plaintiffs' Response**: Uncontroverted but irrelevant.  The population of Juba in 2008 has no bearing on the allegations or defenses in this action.

3

8.      There are over 500 ethnic groups in Sudan and South Sudan, with over 400
languages spoken. Ex. 58, Carisch Report ¶ 21; Ex. 73, Jok Tr. at 137:9–138:15.

**Plaintiffs' Response**: Controverted and incomplete.  The precise number of ethnic groups,

language, and religions in Sudan and South Sudan is unknown, and estimates range from

approximately 150 ethnic groups and languages, to "potentially hundreds" of ethnic groups and

languages and "thousands" of religions, to over 500 ethnic groups and 400 languages.  ECF No.

435-93, Expert Report of Dr. Harry Verhoeven ("Verhoeven Report") at 4; ECF No. 435-58,

Expert Report of Enrico Carisch ("Carisch Report") ¶ 21; Ex. 73, Jok Tr. at 137:9–138:15; *see*

*also* Ex. 5, Jok Report ¶ 108 & n.50 (noting Sudan has over 115 languages, and debating whether

Nuba is a dialect or distinct language).  The GOS weaponized Sudan's ethnic and linguistic

differences by pitting ethnic and cultural Arabs Muslims against Sudan's black African population,

who were often referred to as "slaves."  ECF No. 435-93, Verhoeven Report at 17-20; ECF No.

435-54, Baldo Report ¶¶ 12-13, 103, 108-09, 163; Ex. 5, Jok Report ¶¶ 4-11, 29, 41.  The

Government of Sudan ("GOS" or the "Regime") recruited militias on ethnic grounds, including

and especially the Janjaweed, who came from Arab-identifying nomad groups and were armed

and empowered by the GOS to commit ethnic cleansing against Sudan's black African population.

ECF No. 435-54, Expert Report of Dr. Suliman Baldo ("Baldo Report") ¶¶ 7, 69-73; ECF No. 435-

93, Verhoeven Report at 17-21; Ex. 5, Jok Report ¶¶ 20-24.  The Regime also targeted ethnic and

religious minorities with other organs of state violence, including the intelligence services such as

the National Intelligence and Security Service ("NISS").  Ex. 5, Jok Report ¶¶ 46-57, 72, 75; ECF

No. 435-54, Baldo Report ¶¶ 207-10.  The use of ethnic division by the GOS was especially

apparent in the targeted use of rape and sexual violence as a weapon of war and tool of ethnic cleansing.  Ex. 5, Jok Report ¶¶ 90-102; ECF No. 435-93, Verhoeven Report at 56-57; ECF No. 435-54, Baldo Report ¶¶ 161, 201-03.  Indeed, Sudan's President Omar al-Bashir suggested that non-Arabs should feel honored to be raped by his followers.  Ex. 5, Jok Report ¶ 90.

**B.      Sudan Achieves Independence and Enters Its First Civil War (1955–1972)**

9.      From 1898 to 1956, the British and Egyptian governments jointly ruled Sudan as a colony.  Ex. 58, Carisch Report ¶ 21.

**Plaintiffs' Response**: Uncontroverted but irrelevant except as historical background.

10.     Sudan achieved independence on January 1, 1956.  Ex. 58, Carisch Report ¶¶ 22-23.

**Plaintiffs' Response**: Uncontroverted but irrelevant except as historical background.

11.     After achieving independence, Sudan was initially ruled by a coalition government. Ex. 58, Carisch Report ¶¶ 22–23.

**Plaintiffs' Response**: Uncontroverted but irrelevant except as historical background.

12.     At the time of independence on January 1, 1956, Sudan was embroiled in its First Civil War, which began in 1955.  Ex. 58, Carisch Report ¶ 22.

**Plaintiffs' Response**: Controverted and incomplete. Scholars believe that the First Civil War started in either August 1955 or January 1956.  Ex. 170, Deposition of Harry Verhoeven ("Verhoeven Dep.") at 220:3-10.  On the first day of independence, soldiers from the Torit garrison in Southern Sudan rebelled against the government, fearing that the government in Khartoum would recolonize Southern Sudan and strip it of the relative independence it had enjoyed under British rule.  ECF No. 435-93, Verhoeven Report at 6-7.

13.     In  1969,  Colonel  Jaafar  Nimeiry  seized  power  in  another  coup,  disbanding

parliament and outlawing all political parties except his own Sudanese Socialist Union.  Ex. 58, Carisch Report ¶ 23.

**Plaintiffs' Response**: Uncontroverted but irrelevant.

14.     Sudan's First Civil War lasted approximately 17 years.  Ex. 58, Carisch Report ¶ 22.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Sudan's First Civil War ended after the Nimeiri regime committed to regional autonomy for the South in exchange for rebels laying down their arms, integrating into the Sudan Armed Forces ("SAF"), and participating in national politics.  ECF No. 435-93, Verhoeven Report at 6-7.  The formal end of the conflict was in 1972 with the signing of the Addis Ababa Peace Agreement.  Ex. 170, Verhoeven Dep. at 220:11-14.

15.     Sudan's First Civil War resulted in an estimated 500,000 deaths.  Ex. 58, Carisch Report ¶ 22.

**Plaintiffs' Response:** Uncontroverted.

## C.     Sudan's Second Civil War (1983–2005)

### 1.     Background and Timeline

16.     In 1983, after only eleven years of relative peace, the Second Civil War between Sudan's northern and southern regions broke out following an uprising by southern soldiers in Bor, a village in southern Sudan.  Ex. 58, Carisch Report ¶ 24.

**Plaintiffs' Response**: Uncontroverted but incomplete.  In 1983, SAF units garrisoned in Bor, Pibor, and Pashala rebelled due to the decision of the GOS to deploy those units to Northern Sudan.  ECF No. 435-55, Expert Reply Report of Dr. Suliman Baldo ("Baldo Reply") ¶ 81.

17.     The causes of the Second Civil War related to, *inter alia*, claims by the southern Dinka and Nuer tribal groups that they were being marginalized by the Sudanese government in Khartoum.  Ex. 58, Carisch Report ¶ 25.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Other causes of the Second Civil War include Nimeiri's growing authoritarianism, his regime's revocation of regional autonomy for southern Sudan, unmet promises of infrastructure development, the introduction of strict Sharia Law, and the systemic oppression of and discrimination against the black African population.  ECF No. 435-93, Verhoeven Report at 7; ECF No. 435-54, Baldo Report ¶ 159.

18.     The principal rebel group fighting against the Sudanese government in the conflict was the Sudan People's Liberation Army ("SPLA").  Ex. 58, Carisch Report ¶ 25.

**Plaintiffs'  Response**: Partially  controverted.   The  Sudan  People's  Liberation Army/Movement ("SPLA/M"), with its overarching ideology of a democratic, socialist, and secular Sudan, was the primary opposition to the GOS during the Second Civil War in what was then southern Sudan.  ECF No. 435-93, Verhoeven Report at 7.

19.     The SPLA was led by Lieutenant Colonel John Garang.  Ex. 58, Carisch Report ¶ 25.

**Plaintiffs' Response**: Uncontroverted that the SPLA/M was led by Lieutenant Colonel John Garang.  ECF No. 435-55, Baldo Reply ¶ 81.

20.     During the 22 years-long conflict, the SPLA would split into various factions, sometimes fighting against each other.  Ex. 58, Carisch Report ¶ 26.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  At various points in time, the GOS exploited ethnic and other divisions among the SPLA/M.  Initially, the GOS recruited from the faction that lost the battle that led to the formation of the SPLA/M.  ECF No. 435-54, Baldo Report ¶ 63. By the late 1990s, the Sudanese army had 30 southern tribal militias under its command and control, including SPLA factions and splinter groups who carried out some

7

of the worst atrocities against civilians.  ECF No. 435-54, Baldo Report ¶ 65; ECF No. 435-93,

Verhoeven Report at 19-20; ECF No. 435-55, Baldo Reply ¶ 73.

> 21.    For example, in 1991, the SPLA split into the Dinka and Nuer factions, with Garang leading the Dinka-dominated SPLA-Torit faction and Riek Machar leading the Nuer- dominated SPLA-Nasir faction, which would then evolve into the South Sudan Independence Movement/Army ("SSIM/A").  Ex. 58, Carisch Report ¶ 26.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading, and irrelevant

except as historical background since the event occurred six years prior to 1997.  Defendants'

expert Enrico Carisch notes that the SPLA-Nasir faction would go on to form the SSIM/A and

later the South Sudan Defense Force ("SSDF"), an element of the GOS military.  *See* ECF No.

435-58, Carisch Report ¶ 26.  In 1997, the start of the Class Period, the GOS and two Southern

faction leaders, Riek Machar and Kerubino Kuanyin Bol, signed the 1997 Khartoum Peace

Agreement, under which a group of southern militias were armed and organized by the GOS

regime into the South Sudan Defense Forces.  ECF No. 435-54, Baldo Report ¶ 167.  This GOS

fighting would go on to terrorize the Bahr El Ghazal and Upper Western Nile regions in the late

1990s and early 2000s at the direction of the GOS, including contributing to a massive famine

around the city of Wau that killed tens of thousands.  ECF No. 435-54, Baldo Report ¶ 168.  Those

militias were paid and equipped by the GOS.  ECF No. 435-54, Baldo Report ¶ 169.

> 22.    The SPLA's inter-factional fighting accounted for a significant proportion of the violence and death in the Second Civil War.  Ex. 58, Carisch Report ¶¶ 26, 44.

**Plaintiffs' Response**: Controverted and misleading, and irrelevant except as historical

background insofar as the alleged events occurred prior to 1997.  The purported "interfactional

8

fighting" was principally between GOS-recruited and mobilized militias composed of former rebels against SPLA members who remained opposed to the GOS. *See, e.g.*, Ex. #, Deposition of Cameron Hudson ("Hudson Dep.") at 114:19-117:24.  The massive scale of violence perpetrated by the GOS and its allies against the targeted population – including, at various times, SPLA splinter cells backed by the GOS – dwarfed any violence conducted by SPLA inter-factional fighting.  ECF No. 435-94, Expert Reply Report of Dr. Harry Verhoeven ("Verhoeven Reply") at 38; ECF No. 435-93, Verhoeven Report at 7-12, 19-20; ECF No. 435-54, Baldo Report ¶ 163. Calling it a "war" is a "misnomer for the conflict," which pitched the SPLA/M's guerilla attacks against GOS supply lines and oil fields, on the one hand, against the GOS's one-sided "attacks on unarmed civilians," "bombing to terrorise civilian populations in SPLA-controlled areas," and using the national security forces to "carr[y] out repressive raids, detention, and torture," on the other hand  ECF No. 435-54, Baldo Report ¶¶ 159-61.  Nor was the SPLA/M capable of the scale of violence perpetuated by the GOS, as "there is only one side that had access to Antonov planes to bomb villages, that used helicopter gunships to ethnically cleanse the oil producing areas and that could run an ironfisted intelligence service that would arrest, torture and disappear thousands of its own citizens from urban centres and from rural zones."  ECF No. 435-94, Verhoeven Reply at 38.  Much of the inter-factional fighting was fomented by the GOS, which deliberately pitted factions against each other as part of its divide-and-conquer strategy and recruited, armed, and paid SPLA splinter groups to fight alongside the Sudanese army.  ECF No. 435-55, Baldo Reply ¶¶ 113-15; ECF No. 435-58, Carisch Report ¶ 26.  Additionally, many of the incidents cited in

support of this statement concerning SPLA's "inter-factional" fighting occurred before the start of

the Proposed Class Period in 1997.  *See* ECF No. 435-55, Baldo Reply ¶¶ 111-12.

> 23.     Plaintiffs' proposed expert Jok Madut Jok co-authored a publication that stated in part that, as of 1999, "the number of Dinka and Nuer who have died in these fratricidal conflicts and in other South-on-South confrontations since the re-eruption of full-scale civil war in Sudan in 1983 exceeds those lost to atrocities committed by the Sudanese army."  Ex. 134, Jok Madut Jok and Sharon Elaine Hutchinson, *Sudan's Prolonged Second Civil War and the Militarization of Nuer and Dinka Ethnic Identities*, 42 Afr. Stud. R. 125, 127 (1999).

**Plaintiffs' Response**: Uncontroverted but incomplete, misleading, and irrelevant insofar

as it refers to historical events occurring prior to 1997.  The authors go on to state: "These include

deaths resulting from attacks by independent rebel bands known as Anyanya II on Dinka SPLA

recruits on route to Ethiopia during the early years of this war, by the SPLA's hammering of

government-sponsored Mundari militias, and the post-1991 Dinka and Nuer confrontations."  Ex.

134, Jok Madut Jok and Sharon Elaine Hutchinson, *Sudan's Prolonged Second Civil War and the

Militarization of Nuer and Dinka Ethnic Identities*, 42 Afr. Stud. R. 125, 127 (1999).  The first two

of these categories involve confrontations between the SPLA/M and GOS-sponsored militias.  *See*

ECF No. 435-54, Baldo Report ¶ 63.  The last of these, the 1991 SPLA split, was "actively fanned"

by the GOS as part of "the government's propaganda efforts to portray the destruction of the South

as the result of internal tendencies toward 'tribalism,' rather than as the consequence of its own

discriminatory policies."  Ex. 134, Jok Madut Jok and Sharon Elaine Hutchinson, *Sudan's

Prolonged Second Civil War and the Militarization of Nuer and Dinka Ethnic Identities*, 42 Afr.

Stud. R. 125, 128 (1999).  Moreover, by the start of the Class Period, this split had largely been

rectified.  *See id.* at 127.  At his deposition, Dr. Jok testified that these "tribal skirmishes" were

"very quickly reconcilable and very limited in the scale of destruction," and that "more people got

killed by the [GOS] than fighting by the Dinka and Nuer" "by far."  Ex. 169, Deposition of Dr.

Jok Madut Jok ("Jok Dep.") at 45:11-46:2.  The quoted portion of the article refers only to "that

period of time when the Nuer and Dinka were fighting, and it's referring to the two specific ethnic

groups."  *Id.* at 48:12-16.  "The scale of death and the scale of viciousness of attacks on civilians

by the Sudanese State far, far, far outweigh what the tribal conflicts can cost."  *Id.* at 49:15-18.

24.    In 1985, a popular uprising led the installation of a coalition government led by
       Prime Minister Sadiq al-Mahdi.  Ex. 58, Carisch Report ¶¶ 23–24.

**Plaintiffs' Response**: Uncontroverted and irrelevant except as historical background.

25.    In 1989, Brigadier Omar Hassan Ahmed al-Bashir led another military coup,
       ousting al-Mahdi.  Ex. 58, Carisch Report ¶ 24.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Brigadier al-Bashir was a frontman

for the Islamist Movement, formerly known as the National Islamic Front, which was aligned with

the Muslim Brotherhood and lead by Sheikh Dr. Hassan al-Turabi.  ECF No. 435-93, Verhoeven

Report at 8; ECF No. 435-54, Baldo Report ¶ 4.  The Islamist Movement established the National

Congress Party as the sole political party in Sudan, and President al-Bashir served as Commander

in Chief and had full control over the national security services, SAF, and related auxiliary

paramilitary and militia forces.  *Id.*  The Islamist Movement enforced a strict interpretation of

Islam, where women and members of religious and ethnic minorities were victimized by the

enforcement of harsh Shari'a laws.  ECF No. 435-54, Baldo Report ¶ 49.  The Movement sought

11

a complete overhaul of Sudanese economic, political, and social structure, and its solution to every

problem was Islam.  ECF No. 435-93, Verhoeven Report at 8-9.

> 26.     The 1989 coup followed months of growing discontent and confrontations between
> the army and al-Mahdi over the government's handling of the Second Civil War, as
> well as economic struggles and famine.  Ex. 58, Carisch Report ¶ 24.

**Plaintiffs' Response:** Uncontroverted.

> 27.     There were struggles for control between senior leaders within al-Bashir's
> government.  Ex. 93, Expert Report of Harry Verhoeven dated Sept. 30, 2022 at 16
> ("Verhoeven Opening Report").

**Plaintiffs' Response**: Uncontroverted but incomplete, misleading, and irrelevant.  The

radical Islamist policy of the Bashir Regime led to growing international isolation, including the

United States designating Sudan as a state sponsor of terrorism in 1993, and the reversal of its

early military gains against the SPLA/M.  ECF No. 435-93, Verhoeven Report at 13-15.  By

December 1999, Dr. Turabi was removed from power, and many of his allies were removed from

key institutions.  *Id.* at 16.  Al-Bashir consolidated his power, but lost some control over Darfur,

where Dr. Turabi was popular with the large Zaghawa ethnic group and had empowered many of

their Islamist leaders.  *Id.* at 17.

> 28.     In 1997, the Sudanese government signed the Khartoum Peace Agreement with the
> SSIM/A  and other rebel groups.  Ex. 54, Expert Report of Suliman Baldo dated
> Sept. 30, 2022 ¶ 167 ("Baldo Opening Report"); Ex. 58, Carisch Report ¶ 26.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  The Khartoum

Peace Agreement was signed by the GOS and various rebel factions, mostly among Nuer tribes.

Ex. 134, Jok Madut Jok and Sharon Elaine Hutchinson, *Sudan's Prolonged Second Civil War and*

*the Militarization of Nuer and Dinka Ethnic Identities*, 42 Afr. Stud. R. 125, 128-29 (1999).  The

GOS failed to call a regional referendum on Southern Sudanese independence, as required, and

used that time to gain political and military control over oil fields in Nuer lands.  *Id.* at 130.  By

1998, the GOS announced the completion of an oil pipeline from oil fields in Nuer lands to

refineries and export terminals in Northern Sudan, which pipeline came online by 1999.  *Id.*

29.    The Khartoum Peace Agreement merged the signatory rebel groups into the South
       Sudan Defense Forces ("SSDF"), which would coordinate with the Sudanese
       Armed Forces ("SAF").  Ex. 54, Baldo Opening Report ¶ 167.

**Plaintiffs' Response**: Uncontroverted but incomplete.  The GOS used the SSDF to

terrorize civilians in SPLA/M controlled areas, including when the forces of warlord and

Khartoum Peace Agreement signatory Kerubino Kuanyin Bol destroyed villages and crops around

the city of Wau, contributing to a famine that killed tens of thousands.  ECF No. 435-54, Baldo

Report ¶¶ 167-68.

30.    Garang's SPLA faction did not sign the Khartoum Peace Agreement.  Ex. 54, Baldo
       Opening Report ¶ 167.

**Plaintiffs' Response:** Uncontroverted.

31.    In 2005, the Sudanese government signed the Comprehensive Peace Agreement
       with the SPLA and other rebel groups, formally ending the Second Civil War.  Ex.
       58, Carisch Report ¶¶ 25–26; Exs. 125–129, Comprehensive Peace Agreement, The
       Government of the Republic of The Sudan-The Sudan People's Liberation
       Movement/Sudan People's Liberation Army, 2005 ("CPA").

**Plaintiffs' Response**: Uncontroverted but incomplete and irrelevant except as historical

background.  The CPA called for elections of executive and legislative authorities in both northern

and southern regions of Sudan, but those elections did not take place until April 2010, leaving

control over the entire country to the Bashir Regime.  ECF No. 435-68, Expert Report of Cameron

Hudson ("Hudson Report") ¶ 21.

> 32.     The CPA provided a wealth- and power-sharing arrangement between the northern
>         and southern regions.  Ex. 125, CPA at 9–63.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Following the signing of the CPA,

BNPP reached out to Governor Sabir Mohammed Hassan of the Central Bank of Sudan to ascertain

his opinion on the wealth sharing arrangement and how it will affect BNPP's management of oil

assets.  ECF No. 435-93, Verhoeven Report at 54. The Central Bank of Sudan assured BNPP that

there would be no change to their arrangement and that they would recommend BNPP to the

SPLA/M so as to keep both sides with BNPP.  *Id.*

> 33.     Per International Monetary Fund data, the Sudanese government transferred
>         approximately $19.5 billion to regional governments from 1997–2009 as part of the
>         peace process, primarily for "payment of civil servants' salaries" and "recurrent
>         costs for judiciary, higher education and police."  Ex. 84, Expert Report of John
>         Llewellyn dated Jan. 6, 2023 ¶ 58 & n.58 ("Llewellyn Report").

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  From 1997-2004,

the GOS transferred just under $1 billion to all regional governments.  Ex. 84, Llewellyn Report

Ex. 2 (Supplemental Analysis, Rev and Expenses tab).  At all times between 1997 and 2011,

government salaries were indispensable to the campaign of mass atrocities perpetrated by the GOS

against Plaintiffs, the Class, and targeted civilian populations, as they include payments to police

and other members of the military-security apparatus that carried out mass atrocities and

repression. ECF No. 435-68, Hudson Report ¶ 240 (the Regime's support came from "the affluent

urban elite, a salaried urban middle class that had benefitted from the oil boom after 1999, and the

14

army and rival security bodies," whose needs al-Bashir "had to satisfy . . . on a continuous basis");
*id.* ¶¶ 241-42 ("because al-Bashir "needed to fund this patronage network," the U.S. sanctions would have crippled the regime, if they had not been undermined by BNPP's collusion with Khartoum," who instead were able to "buy the loyalty of their subordinates and clients—including the militias"); Ex. 170, Verhoeven Dep. at 313:2-25 ("it was important for the Al-Ingaz Regime to make sure that the Army was firmly aligned with it," so "the leadership of the Regime," including al-Bashir, "improved the conditions under which Army officers and recruits were doing their job and also increase salaries"). Salaries, along with other perks such as upgraded facilities and vehicles, were used by the GOS to maintain control: "Successive salary bumps, bulging discretionary funds for political leaders and allowing civil servants to work in more comfortable conditions, as well as dollops of cash for myriad consultancy services (usually delivered by trusted pro-regime figures and corporations) helped nourish loyalties where few had previously existed." ECF No. 435-93, Verhoeven Report at 24. This was part of the GOS's tamkeen ("empowerment"), fast-tracking those with the right political, ethnic, and social background over others. *Id.* at 11. The influx of oil revenue in 1999 caused an immediate spike in current expenditures, including wages, and by 2007, wages alone accounted for 7% of GDP, and total recurrent expenditures another 20% of GDP. *Id.* The SAF alone increased its total budget, including salaries, from $100-$200 million before 1997 to over $1 billion by 1999, $2 billion by 2004, and $3 billion by 2008, not including the myriad means by which the SAF was able to top up its budget. *Id.* at 25; *see also id.* at 27 (discussing NISS salary increases); ECF No. 435-68, Hudson Report ¶ 240 (the Regime's

support came from "the affluent urban elite, a salaried urban middle class that had benefitted from the oil boom after 1999, and the army and rival security bodies," whose needs al-Bashir "had to satisfy . . . on a continuous basis"); *id.* ¶¶ 241-42 ("because al-Bashir "needed to fund this patronage network," the U.S. sanctions would have crippled the regime, if they had not been undermined by BNPP's collusion with Khartoum," who instead were able to "buy the loyalty of their subordinates and clients—including the militias"); Ex. 170, Verhoeven Dep. at 313:2-25 ("it was important for the Al-Ingaz Regime to make sure that the Army was firmly aligned with it," so "the leadership of the Regime," including al-Bashir, "improved the conditions under which Army officers and recruits were doing their job and also increase salaries").

34.    The CPA provided for a future referendum for Sudan's southern region to decide on its independence. Ex. 125, CPA at 2.

**Plaintiffs' Response**: Uncontroverted but irrelevant except as historical background.

35.    On July 9, 2011, following a referendum earlier that year, Sudan's southern region seceded and formed an independent nation, South Sudan. Ex. 58, Carisch Report ¶ 21.

**Plaintiffs' Response**: Uncontroverted but irrelevant except as historical background.

**2.    Human Rights Abuses and Displacement in Sudan Before, During and After the Proposed Class Period**

36.    Plaintiffs' proposed expert Dr. Verhoeven admitted that rebel groups and other non-government actors committed human rights abuses during Sudan's Second Civil War, including during the Proposed Class Period. Ex. 94, Expert Reply Report of Harry Verhoeven dated Mar. 2, 2023 at 38 ("Verhoeven Reply Report").

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading. Dr. Verhoeven noted that the "basic observation" that "the Government of Sudan did not commit each and every

16

single human rights violation during this civil war" is "correct . . . but it is above all hugely

incomplete" because "it conveniently covers up the overwhelming responsibility of the military-

Islamist regime in Khartoum."  ECF No. 435-94, Verhoeven Reply at 38.  *See also* ECF No. 435-

93, Verhoeven Report at 7-12, 21-22 (cataloging GOS atrocities).  During the Second Civil War,

there was "only one side that had access to Antonov planes to bomb villages, that used helicopter

gunships to ethnically cleanse the oil producing areas and that could run an ironfisted intelligence

service that would arrest, torture and disappear thousands of its own citizens."  ECF No. 435-94,

Verhoeven Reply at 38.  Accordingly, "the overwhelming majority of human rights reports

compiled on Sudan for the 1997-2009 period . . . make it abundantly clear that they hold the

government and its security apparatus responsible for the vast majority of abuses."  *Id.* at 44 &

n.103 (citing reports).  There is no record evidence of military operations by the SPLA in Darfur,

Khartoum, or anywhere outside of the limited areas of Southern Sudan that the SPLA controlled

during Sudan's Second Civil War.

37.     Dr. Verhoeven opined that "the Government of Sudan did not commit each and
        every single human rights violation during the civil war."  Ex. 94, Verhoeven Reply
        Report at 38.  Instead, "a multitude of other groups engaged in all sorts of criminal
        behaviour which often ended up gravely harming civilians."  Ex. 94, Verhoeven
        Reply Report at 38.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  Dr. Verhoeven

noted that the "basic observation" that "the Government of Sudan did not commit each and every

single human rights violation during this civil war" is "correct . . . but it is above all hugely

incomplete" because "it conveniently covers up the overwhelming responsibility of the military-

Islamist regime in Khartoum." ECF No. 435-94, Verhoeven Reply at 38. *See also* ECF No. 435-93, Verhoeven Report at 7-12, 21-22 (cataloging GOS atrocities). During the Second Civil War, there was "only one side that had access to Antonov planes to bomb villages, that used helicopter gunships to ethnically cleanse the oil producing areas and that could run an ironfisted intelligence service that would arrest, torture and disappear thousands of its own citizens." ECF No. 435-94, Verhoeven Reply at 38. Accordingly, "the overwhelming majority of human rights reports compiled on Sudan for the 1997-2009 period . . . make it abundantly clear that they hold the government and its security apparatus responsible for the vast majority of abuses." *Id.* at 44 & n.103 (citing reports). There is no record evidence of military operations by the SPLA in Darfur, Khartoum, or anywhere outside of the limited areas of Southern Sudan that the SPLA controlled during Sudan's Second Civil War.

> 38. Dr. Verhoeven stated that the Sudanese government used "ghost houses" "[i]n the weeks and months after June 1989," when al-Bashir came to power. Ex. 93, Verhoeven Opening Report at 8.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading to the extent it is used to suggest that the GOS could and would have continued operating ghost houses in the same way or magnitude if the U.S. embargo had not been undermined by BNPP or that BNPP's support for the GOS did not fund, facilitate, and encourage al-Bashir Regime's continued and escalated operation of ghost houses in the years following, and as a result of, the BNPP conspiracy. Also misleading is the notion that BNPP would not have known about the Regime's human rights abuses, including the use of ghost houses, after it came into power in 1989, as they were widely

reported and one of the impetuses for the imposition of U.S. sanctions.  ECF No. 435-68, Hudson

Report ¶¶ 184-85.  Further, the Regime's system of security agents, offices, and detention facilities,

including ghost houses, required significant resources, arms, and vehicles.  ECF No. 435-54, Baldo

Report ¶ 125.  The increased revenues available to the GOS due to the BNPP conspiracy – rather

than the U.S. sanctions curtailing the Regime's spending capacity as intended, ECF No. 435-68,

Hudson Report ¶¶ 241-42 – led to "soaring expenditure" on the NISS that "included a dramatic

expansion in its capabilities thanks to petrodollars."  ECF No. 435-93, Verhoeven Report at 27.

The additional money was used, "above all, to organize the close surveillance and repression of

the civilian population" during the Proposed Class Period.  *Id.*

> 39.   Plaintiffs' proposed expert Dr. Baldo testified that, by 1994, the National
> Intelligence and Security Services ("NISS"), a Government of Sudan ("GOS")
> agency responsible for internal security operations, was operating "ghost houses"
> "[a]cross Sudan," including in Port Sudan, Kosti (in Central Sudan), El-Obeid (in
> Kordofan), and Juba.  Ex. 56, Baldo Tr. at 225:19–226:12.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading to the extent it is

used to suggest that the GOS could and would have continued operating ghost houses in the same

way or magnitude if the U.S. embargo had not been undermined by BNPP or that BNPP's support

for the GOS did not fund, facilitate, and encourage the continued and escalated operation of ghost

houses.  Dr. Baldo testified that the GOS operated ghost houses across Sudan during and after

1997, and that those ghost houses were "very active."  Ex. 56, Baldo Dep. at 227:11-228:18.

.

> 40.   Plaintiffs have adduced no admissible evidence regarding the number of ghost
> houses before, during or after the Proposed Class Period.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Dr. Baldo testified that the GOS operated ghost houses across Sudan before, during, and after 1997, and that those ghost houses were "very active."  Ex. 56, Baldo Dep. at 227:11-228:18.  Moreover, ghost houses were, by their very nature, "secret," "clandestine," "unofficial," and "untraceable and in secret locations."  ECF No. 435-54, Baldo Report ¶¶ 5, 32, 110; ECF No. 435-52, Austin Report ¶¶ 46; Ex. 5, Jok Report ¶ 50.  Their clandestine nature was deliberate, as it left victims "with no evidence, no recourse, no traces, and no-one to complain to."  Ex. 5, Jok Report ¶ 50.  Accordingly, statistics for things like the number of people who survived ghost houses versus the number who died are unavailable.  *Id.* ¶ 59.  Nevertheless, the NISS's use of ghost houses throughout Sudan was "rampant, particularly in areas that are in conflict zones," "from the capital Khartoum to garrison towns in the south and in Darfur," including Port Sudan, Kosti, El-Obeid, and Juba.  ECF No. 435-54, Baldo Report ¶ 5; Ex. 151, Excerpts of Deposition of Dr. Suliman Baldo ("Baldo Dep.") at 225:14-227:7.

41.     Dr. Baldo testified that he did not know the number of ghost houses in Khartoum, or in all of Sudan, in 1997.  Ex. 56, Baldo Tr. at 227:23–228:5.

**Plaintiffs' Response**: Uncontroverted but irrelevant to the claims and defenses in this action.  *See* Plaintiffs' Response to Proposed Fact No. 40.

42.     Dr. Baldo testified that he "can't recall" if the scale of ghost houses operating in Sudan increased following 1997.  Ex. 56, Baldo Tr. at 227:11–24.

**Plaintiffs' Response**: Uncontroverted but incomplete and  misleading to the extent it is used to suggest that the GOS could and would have continued operating ghost houses in the same way or magnitude if the U.S. embargo had not been undermined by BNPP or that BNPP's support

for the GOS did not fund, facilitate, and encourage the continued and escalated operation of ghost

houses.  Dr. Baldo testified that he could not recall if the use of ghost houses "increased or was at

a normal level," and that 1997 was a "period when the ghost houses were very active."  Ex. 56,

Baldo Dep. at 227:11-22.  This proposed fact is also irrelevant because it does not constitute

evidence that the Regime's ghost house network and activity reduced or stayed the same after

1997.  Dr. Baldo wrote that "[a]buses by National Security forces proliferated in periods of

political tension," and gave as an example the 2008 abuses conducted against Darfuris, especially

those from the Zaghawa tribe, following a 2008 JEM raid on Khartoum.  ECF No. 435-54, Baldo

Report ¶ 130.

      43.      Dr. Baldo further testified that he was not able to "quantify . . . the number of ghost houses operating in Sudan."  Ex. 56, Baldo Tr. at 228:19–24.

**Plaintiffs' Response**: Controverted and incomplete and misleading to the extent it is used

to suggest that the GOS could and would have continued operating ghost houses in the same way

or magnitude if the U.S. embargo had not been undermined by BNPP or that BNPP's support for

the GOS did not fund, facilitate, and encourage the continued and escalated operation of ghost

houses.  Dr. Baldo testified that he was unable "*at this time* to quantify . . . the number of ghost

houses operating in Sudan."  Ex. 56, Baldo Dep. at 228:22-24 (emphasis added).  This proposed

fact is also irrelevant to the claims and defenses in this action because it does not evidence that the

Regime's ghost house network and activity reduced or stayed the same after 1997 and because the

number of ghost houses does not indicate the intensity of their usage.

### D.    Key Constituencies Throughout Sudan

44.    **Sudan Liberation Army ("SLA").**  Originally founded in 2002 as the Darfur Liberation Front, the SLA was a major rebel group that led an uprising against the GOS in Darfur and subsequently fought the GOS and GOS-aligned tribal militias in the region.  Ex. 58, Carisch Report ¶ 31.a.

**Plaintiffs' Response:** Controverted, incomplete, and misleading.  In April 2003, SLA was involved in an attack against GOS military forces and equipment stationed at El Fasher airport.  ECF No. 435-68, Hudson Report ¶ 102.  El Fasher was home to the Western Command and the 6th Division, and the civilian airport was used by the GOS military, including conveying "aircraft bombs to SAF Antonov aircraft at El Fasher airport using ordinary airport luggage trolleys."  ECF No. 435-54, Baldo Report ¶¶ 55-58.  When the GOS was unable to defeat the SLA following the El Fasher attack, it ramped up its strategy on relying on ethnically based militias that eventually became known as the Janjaweed.  *See* ECF No. 435-68, Hudson Report ¶ 102.  There is no record evidence that the SLA committed abuses against Plaintiffs or members of the Proposed Class.  A 2005 UN Commission of Inquiry report ("COI Report") "did not find a systematic or widespread pattern to violations committed by rebels," including the SLA; rebel violations were "episodic and opportunistic."  ECF No. 435-69, Expert Reply Report of Cameron Hudson ("Hudson Reply") ¶¶ 80, 137.

45.    The SLA split into factions, with at least one faction aligning itself with the GOS for a limited period of time.  Ex. 58, Carisch Report ¶ 74.

**Plaintiffs' Response**: Incomplete and misleading.  The faction that aligned with the GOS was the SLA faction led by Minni Minawi.  ECF No. 435-58, Carisch Report ¶ 74; ECF No. 435-

68, Hudson Report ¶ 138.  Under a 2006 peace agreement brokered by the United States, the UN,

and African allies, the GOS promised to disarm the Janjaweed in return for the SLA withdrawing

into specified areas in support of a ceasefire.  ECF No. 435-68, Hudson Report ¶ 138.  There is no

record evidence that the Minawi-led SLA faction committed any human rights abuses on account

of its agreement with the GOS and even if it did such abuses would be attributable to the GOS's

campaign of violence against civilian populations.

46.    **Justice and Equality Movement ("JEM").**  Founded in 2003, the JEM was also a
       major rebel group fighting against the GOS and GOS-aligned tribal militias in
       Darfur.  Ex. 58, Carisch Report ¶ 31.b.

**Plaintiffs' Response:** Controverted, incomplete, and misleading.  In April 2003, the JEM

was involved in an attack against GOS military forces and equipment stationed at El Fasher airport.

ECF No. 435-68, Hudson Report ¶ 102.  El Fasher was home to the Western Command and the 6th

Division, and the civilian airport was used by the GOS military, including conveying "aircraft

bombs to SAF Antonov aircraft at El Fasher airport using ordinary airport luggage trolleys."  ECF

No. 435-54, Baldo Report ¶¶ 55-58.  When the GOS was unable to defeat the JEM following the

El Fasher attack, it ramped up its strategy on relying on ethnically based militias that eventually

became known as the Janjaweed.  *See* ECF No. 435-68, Hudson Report ¶ 102.  There is no record

evidence that the JEM committed abuses against Plaintiffs or members of the Proposed Class.  A

2005 UN Commission of Inquiry report ("COI Report") "did not find a systematic or widespread

pattern to violations committed by rebels," including the SLA; rebel violations were "episodic and

opportunistic."  ECF No. 435-69, Hudson Reply ¶¶ 80, 137.There is no record evidence that the

23

JEM committed abuses against Plaintiffs or members of the proposed class.

47.    **Sudan People's Liberation Army ("SPLA").**  The SPLA was principally involved in the Second Civil War, *see supra* § I.C., and provided arms supplies and insurgency trainings to Darfurian rebels, including a March 2002 training of 1,500 Darfurian rebels in the SPLA-controlled bahr el-Ghazal region.  Ex. 58, Carisch Report ¶ 31.c.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  The scale of arms and supplies available to rebel forces in Darfur – who possessed no institutional infrastructure for generating revenues, such as oil, which could be used to purchase weapons – paled in comparison to the resources available to the GOS and its allies.  ECF No. 435-55, Baldo Reply ¶ 85.  "JEM has consistently claimed that a major source of arms, ammunition and vehicles for their movement is battlefield acquisitions from SAF. There is no record evidence of military operations by the SPLA in Darfur, Khartoum, or anywhere outside of the limited areas of Southern Sudan that the SPLA controlled during Sudan's Second Civil War.  There is no record evidence that the SPLA committed abuses against Plaintiffs or members of the proposed class.

48.    **Popular Defense Forces ("PDF").**  The PDF refers to a number of GOS-aligned paramilitary forces.  Ex. 58, Carisch Report ¶ 74; Ex. 56, Baldo Tr. at 69:14–17; 70:16–18.

**Plaintiffs' Response**: Controverted.  The PDF was a state organ; it was  not merely "aligned" with the GOS.  "In 1989, the GOS formalized and institutionalized the militias as organs of the state in the Popular Defense Forces Act (1989). Article 4 states that 'Paramilitary forces known as the 'Popular Defence Forces' shall be established under the authority of the Commander-in-Chief and shall be made up of Sudanese citizens who satisfy the criteria laid down in the present

Act.'" ECF No. 435-55, Baldo Reply ¶40.ECF No. 435-93, Verhoeven Report at 10; ECF No. 435-54, Baldo Report ¶ 70.  The PDF were integral to the GOS's depopulation strategy in Southern Sudan and other oil critical areas throughout Sudan, as well as  in the recruitment and provisioning of the Janjaweed in Darfur.  ECF No. 435-54, Baldo Report ¶¶ 73, 161, 174-75.

49.     Dr. Baldo testified that PDF fighters were "not . . . soldiers in uniform and bound by regulations" or a "hierarchy that is very formal and strict."  Ex. 56, Baldo Tr. at 69:18-70:2.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  In the very sentence quoted, Dr. Baldo goes on to note that the PDF is "still under the command of the Army in the sense that the Army could mobilize them, could deploy them . . . when there are situations of conflict at the determination of the Sudan Armed Forces."  Ex. 56, Baldo Dep. at 69:18-70:2.  In addition, the PDF was a state organ. "In 1989, the GOS formalized and institutionalized the militias as organs of the state in the Popular Defense Forces Act (1989). Article 4 states that 'Paramilitary forces known as the 'Popular Defence Forces' shall be established under the authority of the Commander-in-Chief and shall be made up of Sudanese citizens who satisfy the criteria laid down in the present Act.'" ECF No. 435-55, Baldo Reply ¶40.

50.     **"Janjaweed."**  Plaintiffs' proposed experts admitted that the term "Janjaweed" does not refer to a monolithic entity or organized armed force. Ex. 56, Baldo Tr. at 110:23– 111:8 ("[T]he term 'Jangaweed' is a generic term for multiple militias."); Ex. 93, Verhoeven Opening Report at 17 (describing the "Janjaweed" as "a motley crew of former PDF fighters, self-declared self-defence units of nomadic tribes, mercenaries and the protective guard of important local powerbrokers.").

**Plaintiffs' Response**:

Controverted. The 2009 UN Panel of Experts report co-authored by BNPP's proposed

expert Enrico Carisch explicitly determined the Arab tribal militia/Janjaweed were organized as "Government of the Sudan auxiliary forces." Ex. 174, U.N. S.C., Letter dated 27 October 2009 from the Chairman of the Security Council Committee established pursuant to resolution 1591 (2005) addressed to the President of the Security Council, U.N. Doc. S/2009/562 at 75-88 (Oct. 29, 2009) ("2009 POE Report") (attributing to the GOS the "[f]ailure to disarm auxiliary forces (Janjaweed)"). The report confirms that the Janjaweed were part of the Regime's fighting forces in Darfur: "the Government of the Sudan has repeatedly stated to the Panel that all Janjaweed have been integrated into their auxiliary forces." *Id.* "The Popular Defense Forces Act provided the legal framework for the GOS to organize and exercise command and control over the various Arab tribal militias it recruited throughout the 1990s and early 2000s, including the Baggara Arab tribal militias known colloquially as the "*murahilin.*" The GOS "utilized the Popular Defense Forces framework to mobilize Arab tribal militias in Darfur. Informally, and with regional variations, these tribal militias were called the *murahaleen*, *mujahadeen*, *fursan*, and in Darfur, the *janjaweed*." Baldo Reply ¶41. The International Criminal Court confirmed that the "Militia/Janjaweed" were a body of the GOS: in April 2007, the International Criminal Court issued an arrest warrant for Ahmad Harun, Sudan's Minister of State for the Interior of the Government of Sudan, finding reasonable grounds to conclude that he "was in charge of the management of the 'Darfur Security Desk' thereby coordinating the different bodies of the Government involved in the counter-insurgency, including the Police, the Armed Forces, the National Security and Intelligence Service and the Militia/Janjaweed." Ex. 217, *Prosecutor v.*

*Ahmad Muhammad Harun*, Warrant of Arrest for Ahmad Harun, ICC-02/05-01/07 Apr. 27, 2007,

at 5, https://www.icc-cpi.int/sites/default/files/CourtRecords/CR2007_02902.PDF.   The UN's

Panel of Expert reports from 2008 and 2009, co-authored by Defendants' expert Enrico Carisch,

both confirmed that the Janjaweed were supplied by and under the command of the GOS.  Ex. 175,

2008 POE Report ¶¶ 136-42, 158-63.The 2009 POE Report separately clarified that the term

"Janjaweed" encompassed groups that subjectively identified as "Arab" who "chose to join . . .

forces organized by the Government of Sudan in order to gain access to land and enhance their

socio-political status," and thus became known "as insurgents, outsiders or Janjaweed Ex. 174,

2009 POE Report at 14.   In his deposition, Mr. Carisch agreed that the witnesses the POE

interviewed consistently defined "Janjaweed" to be "militias coming from those communit[ies]

perceived 'Arab.'"  Ex. 153, Deposition of Enrico Carisch ("Carisch Dep.") at 216:18-217:4. IN

2013, the GOS renamed the Janjaweed militia the "Rapid Support Forces." ECF No. 435-59

Declaration of Nima Elbagir ¶64 ("Elbagir Dec.").

> 51.     Dr. Verhoeven also testified that "'Janjaweed' is a term that has been used in the
> context of Sudan to refer to a combination of different groups of people, some of
> whom were people who were drawn from some of the tribal militias . . . some of
> whom were people who were consisting of kind of [self] defense units that had been
> formed in Darfur . . ." Ex. 95, Verhoeven Tr. at 370:9–18.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading for the reasons stated

in Counter-statement 50.  Dr. Verhoeven goes on to note that other members of the Janjaweed are

former PDF members, and that the Janjaweed "was under the control and under the specific

military instructions of the Al-Ingaz Regime" and was "a primary instrument of genocidal

repression in Darfur, from late 2002 onwards." Ex 95, Verhoeven Dep. at 370:10-371:18.  Further,

members of the Janjaweed were identifiable through self-identification, through their later formal

integration with the GOS as part of the Rapid Support Forces, and through their ethnic and cultural

Arab heritage.  *Id.* at 371:19-375:6.

> 52.    Dr. Baldo also testified that there were "core groups" of Janjaweed and others that
>        were merely "encouraged by the government. For their security and political
>        agenda." Ex. 56, Baldo Tr. at 111:2–7.

**Plaintiffs' Response**: Controverted.  Dr. Baldo did not distinguish between the level of

involvement of the various groups as is suggested by adding "merely" to the quotation.  Dr. Baldo

was clear that the term "Janjaweeed" is a "generic name" that applies to "all the government

aligned fighters." Ex. 56, Baldo Dep. at 104:16-21.  Dr. Baldo was asked to provide "an example

of a militia that was considered part of the Janjaweed in Darfur," which he took to mean a "typical

representation of a Janjaweed group," which was the "sense of [the examiner's] question." *Id.* at

105:19-106:11.  Dr. Baldo then went on to give two more examples of "the most notorious

commanders of the Janjaweed," but at no point in time did he insinuate that other members of the

Janjaweed were any less encouraged or supported by the GOS. *Id.* at 106:12-10-111:11.  In his

report, Dr. Baldo was clear that "the Janjaweed were recruited, trained, armed, and coordinated by

the GOS army and other regular forces." ECF No. 435-54, Baldo Report ¶ 193.

> 53.    Even so-called "Janjaweed" militias that did receive funding or other support from
>        the Sudanese government were not always operating under the control of, or in
>        conjunction with, the government.  Ex. 56, Baldo Tr. at 108:12–24 (testifying
>        regarding one Janjaweed faction breaking away from the GOS); Ex. 94, Verhoeven
>        Reply Report at 37 (stating that the Janjaweed's "relationship with the Al-Ingaz
>        regime and security apparatus evolved over time, with a minority of tribal leaders

briefly rebelling in 2007 and 2009").

**Plaintiffs' Response**: Controverted.  The record contains no evidence of the existence of a "'Janjaweed' Militia" that did not receive funding or other support from the Sudanese government. Dr. Baldo testified that Musa Hilal broke away from the GOS in 2014, well after the Class Period.  Ex. 56, Baldo Dep. at 108:12-24. Nima Elbagir testified that Janjaweed leader Hemeti mutinied for better pay and subsequently rejoined the GOS after his demands were met. ECF No. 435-59, Elbagir Dec. ¶62. Dr. Verhoeven stated that "the vast majority of Janjaweed fighters and leaders were very closely aligned with, supported by, and receiving instructions from, the Al-Ingaz regime," including especially between 2002 and 2007 when most human rights violations took place in Darfur, and to suggest that "the Janjaweed were anything else than firmly on the government's side and doing its bidding in the genocidal counter-insurgency campaign is simply a gross misrepresentation of the historical record."  ECF No. 435-94, Verhoeven Reply at 37.  Defendants' expert Mr. Carisch testified that the Janjaweed were the "auxiliaries" of the SAF. Ex. 153, Carisch Dep. at 192:2-9.  The 2008 POE Report notes: "Overstretched by an extended ongoing conflict in southern Sudan and facing mounting defeats in Darfur, the [GOS] adapted its approach and responded to rebel field success by allying itself with and arming militias composed from 'Arab tribes' in the region later commonly referred to as 'the Janjaweed.'"  Ex. 175, 2008 POE Report ¶ 26 n.2.

54.     Dr. Verhoeven admitted that some Janjaweed leaders rebelled against the government. Ex. 94, Verhoeven Reply Report at 37.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  Dr. Verhoeven

went on to note that "the vast majority of Janjaweed fighters and leaders were very closely aligned

with, supported by, and receiving instructions from, the Al-Ingaz regime," including especially

between 2002 and 2007 when most human rights violations took place, and to suggest that "the

Janjaweed were anything else than firmly on the government's side and doing its bidding in the

genocidal counter-insurgency campaign is simply a gross misrepresentation of the historical

record." ECF No. 435-94, Verhoeven Reply at 37.

55. Dr. Baldo also testified that "Janjaweed" militia commander Mohamed Hamdan
    Dagalo (generally referred to as "Hemedti") broke away from the Sudanese
    government. Ex. 56, Baldo Tr. at 111:23–112:2.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading. Dr. Baldo testified

that he did not recall when Hemeti broke away from the Sudanese government, and noted that it

is "on the public record." Ex. 151, Jok Dep. at 111:23-112:2. Dr. Baldo further testified that

"Hemedti" broke away from the GOS due to a payment dispute, and once he was paid by the GOS

he returned and continued to attack civilians in Darfur on behalf of the GOS. *Id.* at 105:19-107:3.

ECF No. 435-59, Elbagir Dec. ¶62 (interviewing Hemeti).

56. **Foreign Governments.** Sharing Zaghawa ethnicity with the JEM leadership, then-
    Chadian president Idriss Deby provided JEM fighters arms and other supplies,
    including anti-aircraft guns, rocket-propelled grenades, machine guns, small arms
    and vehicles. Ex. 58, Carisch Report ¶ 31.b.

**Plaintiffs' Response**: Controverted and irrelevant to the extent it is used to suggest that

Chad armed the GOS. The source cited in Mr. Carisch's report makes no claim concerning the

alleged support offered by then-Chadian president Idriss Deby besides a single line noting his

alleged support for a 2008 JEM attack on Khartoum; there is no mention of regular provision of

arms, much less "anti-aircraft guns, rocket-propelled grenades, machine guns, small arms and vehicles."  Ex. 177, Ahmad Slkalnga, *'The World's Worst Humanitarian Crisis': Understanding the Darfur Conflict*, ORIGINS (Feb. 2009), https://origins.osu.edu/article/worlds-worst-humanitarian-crisis-understanding-darfur-conflict?language_content_entity=en.  Whatever arms were available to JEM through Chad were dwarfed by the resources available to the GOS and its allies.  ECF No. 435-55, Baldo Reply ¶ 85.  For example, JEM "didn't have access to aircrafts."  Ex. 153, Carisch Dep. at 178:5-17.  Mr. Carisch, both in his book and in his deposition, admitted that "[i]t was self-evident that the [GOS] was the most frequent violator [of the arms embargo], as the expert panel quickly found out once they commenced monitoring in the main towns of Darfur."  Ex. 176, Enrico Carisch et al., *The Evolution of UN Sanctions*, at 368 (Springer 2017); Ex. 153, Carisch Dep. at 174:2-18.  His book also noted that "the Janjaweed was the principal violator of international norms, and that the [GOS] was negligent in its responsibility to uphold human rights and protect civilians in Darfur."   Ex. 176, *The Evolution of UN Sanctions* at 365 (summarizing a UN Security Council resolution).  There is no record evidence that JEM committed abuses against Plaintiffs or member of the proposed class.

> 57.    Dr. Baldo testified that from approximately 2007 to 2010, in response to the Sudanese government providing support to rebels in Chad, the Chadian government provided support to Darfur rebel groups to engage in attacks in Sudan.  Ex. 56, Baldo Tr. at 177:19–178:5.

**Plaintiffs' Response**: Uncontroverted but incomplete and irrelevant to the extent it is used to suggest that Chad armed the GOS.  Dr. Baldo went on to note that support was of "limited means" such as Kalashnikovs and small truck mounted weapons to support a "low intensity"

rebellion involving "regional cross-border exchanges of conflict."  Ex. 56, Baldo Dep. at 179:9-180:12.  There is no record evidence that Darfur rebel groups that received support from the Chadian government committed abuses against Plaintiffs or members of the Proposed Class.

58.     Until 2010, the Chadian government provided JEM fighters protection within the immediate vicinity of refugee camps in Chad.  Ex. 58, Carisch Report ¶ 31.b.

**Plaintiffs' Response**: Controverted and misleading and irrelevant to the extent it is used to suggest that Chad armed the GOS.  The source cited in Mr. Carisch's report notes that "until early 2006 there were few overt signs that rebel groups were actively recruiting or otherwise affecting the civilian character of the camps."  Ex. 178, *Violence Beyond Borders: The Human Rights Crisis in Eastern Chad*, HUMAN RIGHTS WATCH, at 12 (June 22, 2006), https://www.hrw.org/legacy/backgrounder/africa/chad0606/chad0606.pdf.

59.     The Eritrean government provided the SLA support.  Ex. 58, Carisch Report ¶ 31.a.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading and irrelevant to the extent it is used to suggest that Eritrea armed the GOS.  The source cited in Mr. Carisch's report notes that the SLA was "initially" supported by the SPLA and Eritrea, but as of the date of the report had little foreign funding.  Ex. 179, *Sudan Liberation Army-Abdul Wahid (SLA-AW)*, SMALL ARMS SURVEY (Sept. 6, 2011), https://smallarmssurvey.org/sites/default/files/HSBA-Armed-Groups-SLA-AW.pdf.  In 1996, the United States approved the provision of non-lethal aid to the SPLA through Eritrea, Ethiopia, and Uganda.  ECF No. 435-55, Baldo Reply ¶ 84.  Mr. Carisch, both in his book and deposition, admitted that "[i]t was self-evident that the [GOS] was the most frequent violator [of the arms embargo], as the expert panel quickly found

32

out once they commenced monitoring in the main towns of Darfur."  Ex. 176, *The Evolution of UN Sanctions* at 368; Ex. 153, Carisch Dep. at 174:2-18.  His book also noted that "the Janjaweed was the principal violator of international norms, and that the [GOS] was negligent in its responsibility to uphold human rights and protect civilians in Darfur."  Ex. 176, *The Evolution of UN Sanctions* at 365 (summarizing a UN Security Council resolution).

## VI.   MATERIAL FACTS CONCERNING ARMS IN SUDAN BEFORE AND DURING THE PROPOSED CLASS PERIOD

### A.   Arms Available to the GOS and Paramilitaries

60.   The Sudanese government began to increase its purchases of new weapons from China in the early 1980s, prior to al-Bashir taking power. Ex. 65, Fogarty Tr. at 112:19–113:6.

**Plaintiffs' Response**: Uncontroverted but incomplete.  The examiner went on to quote from a Human Rights Watch report that "these and other purchases have risen in the 1990s due to Sudan's enhanced capacity to pay for new arms as a result of financial support from Iran and Malaysia and enhanced international credit based upon efforts to exploit the country's oil reserves."  Ex. 65, Fogarty Dep. at 113:12-18.

61.   Dr. Verhoeven testified that, from the period of 1989 to 1997, the GOS had access to a "very wide range of weapons systems," including "AK-47s," "Kalashnikov[s]," and "other forms of rifles."  Ex. 95, Verhoeven Tr. at 221:14–225:15, 230:23–231:2.

**Plaintiffs' Response**: Uncontroverted but incomplete and irrelevant because it refers to historical events occurring over a decade before 1997.  During his testimony, Dr. Verhoeven was clear that the weapon systems available to the GOS had "problems" because of the nature of the "regional market," where arms went to "who has money" at any given time, and that by the

accounts of the SAF "were insufficient for its needs."  Ex. 95, Verhoeven Dep. at 221:14-231:2.

He went on to note that the supply issues "begin to change once [the GOS] was able to get its

hands on oil money and was able to make a number of purchases . . . from other suppliers,"

including by purchasing "new equipment, more lethal equipment."  *Id.*  Moreover, "[i]t is not

credible" to claim that the GOS relied on its pre-1997 stockpiles of arms throughout the civil war

in the South and the conflict in Darfur, as much of it was in a "decrepit state" and "degraded and

of no use on the battlefield"; in contrast, the BNPP conspiracy allowed the GOS to acquire "more

modern and effective - i.e., deadly - material," "including Hind helicopter gunships, Antonov

medium bombers, MiG 23 fighter aircraft, mobile artillery pieces, and light assault weapons." ECF

No. 435-53, Austin Reply ¶¶ 112-118.  BNPP's conspiracy with the Regime funded a 3000%

increase in military spending—from $97.7 million in 1997, the year the U.S. embargo began, to

over $3.1 billion in 2009.  Exhibit 53, Austin Reply ¶ 96. The Regime imported dozens of attack

helicopters and combat aircraft; dozens of tanks and armored-personnel carriers; hundreds of

military trucks; fleets of Land Rovers and Land Cruisers used for desert combat; and Antonov

cargo planes used to drop barrel bombs on villages, hospitals, schools, and other civilian areas.

*See e.g.,* ECF No. 435-53, Austin Reply ¶¶ 99-105, 114-117, 121; ECF No. 435-93, Verhoeven

Report at 26; ECF No. 435-63, Expert Report of Timothy Fogarty ("Fogarty Report") ¶ 109; ECF

No. 435-68, Hudson Report ¶¶ 87-88.  *See also* Plaintiffs' Response to Proposed Fact No. 107(c)-

(d) (detailing the military and other materials that the GOS was able to acquire with BNPP's

financial assistance).

62.　　In 1992, Ethiopia provided the Sudanese government a fleet of T-54 and T-55 Soviet model tanks and other equipment through a barter transaction. Ex. 65, Fogarty Tr. at 130:5–19.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading if used to suggest that such tanks could be continuously operated without maintenance, spare parts, fuel and replenishment of ammunition. Following the influx of oil money by way of the BNPP conspiracy, the GOS was able to procure many more additional and more modern tanks from Russia, China, and others, and produced its own versions of the T-55 tank. ECF No. 435-93, Verhoeven Report at 22, 26-27, 37; ECF No. 435-58, Carisch Report ¶ 113; ECF No. 435-52, Austin Report ¶¶ 85, 118-22, 180-81; ECF No. 435-53, Austin Reply Report ¶¶ 102-03, 121; *see also* ECF No. 435-53, Austin Reply ¶¶ 112-18.

63.　　In 1992, there were as many as 2,000 Iranian political advisors in Khartoum training mainly Sudan's PDF paramilitary forces. Ex. 65, Fogarty Tr. at 119:4–13.

**Plaintiffs' Response**: Uncontroverted but incomplete. The PDF was modeled on the Iranian Guardians of the Revolution to provide the GOS with "a convenient tool to indoctrinate the population to the Jihadist ideology espoused by the Islamist Movement, the power behind the Bashir Regime." ECF No. 435-54, Baldo Report ¶ 70. The assistance of BNPP allowed the GOS "to transform its military from a small band of poorly equipped troops to a sizable force with a steady supply of new, more reliable – and more deadly – SALW [small arms and light weapons] and associated ammunition." ECF No. 435-52, Austin Report ¶ 221. During the Class Period, Iran was the second largest exporter of SALW to Sudan, surpassed only by China, with 99.67% of that imported to Sudan after 1999 when Sudan started to export oil with the financial support of

BNPP's conspiracy. *Id.* ¶¶ 214-15; ECF No. 435-53, Austin Reply ¶ 99 & n.177.

> 64.    In 1996, Russia provided two squadrons of Sukhoi bomber aircrafts, with sixteen aircrafts in each squadron. Ex. 65, Fogarty Tr. at 121:23–123:5.

**Plaintiffs' Response**: Controverted and incomplete and misleading if used to suggest that such aircraft could be continuously operated without maintenance, spare parts, fuel and replenishment of ammunition. The only source of this claim is alleged to be a single unnamed former Sudanese Army officer. Ex. 180, *Arms Transfers to the Government of Sudan*, HUMAN RIGHTS              WATCH              (1998),              https://www.hrw.org/legacy/ reports98/sudan/Sudarm988-05.htm#P689_130077 ("Arms Transfers"). His report is contrary to the UN Registration of Convention Arms, which notes that the only military aircraft delivery to the GOS between 1992 (the earliest date for which UN Registration of Convention Arms information is available) and 1998 is six Mi-24 helicopters from Belarus in 1996. *See* Plaintiffs' Response to Proposed Fact No. 70; ECF No. 435-52, Austin Report ¶ 160. Moreover, there is no record evidence of any Sukhoi bomber aircraft attacking Sudanese civilians. To the extent that the GOS had fighter jets prior to 1997, many "were considered by the Sudan Armed Forces to be aging and missing spare parts or no longer fit for service," and for that reason upgrading this capability was "one of the priorities of the Sudan Armed Forces after acquiring extra means, predominantly through oil or the revenues of oil." Ex. 170, Verhoeven Dep. at 235:2-24. The financial assistance of BNPP allowed the GOS to acquire modern weapon systems that were used in atrocities against civilians, such as Hind helicopter gunships, Antonov bombers, MiG 23 fighter aircraft, mobile artillery, and light assault weapons. ECF No. 435-53, Austin Reply ¶ 114; *see also* ECF No. 435-

53, Austin Reply ¶¶ 112-18. BNPP's conspiracy with the Regime funded a 3000% increase in military spending—from $97.7 million in 1997, the year the U.S. embargo began, to over $3.1 billion in 2009. ECF No. 435-53, Austin Reply ¶ 96. The Regime imported dozens of attack helicopters and combat aircraft; dozens of tanks and armored-personnel carriers; hundreds of military trucks; fleets of Land Rovers and Land Cruisers used for desert combat; and Antonov cargo planes used to drop barrel bombs on villages, hospitals, schools, and other civilian areas. *See e.g.,* ECF No. 435-53, Austin Reply ¶¶ 99-105, 114-117, 121; ECF No. 435-93, Verhoeven Report at 26; ECF No. 435-63, Fogarty Report ¶ 109; ECF No. 435-68, Hudson Report ¶¶ 87-88. *See also* Plaintiffs' Response to Proposed Fact No. 107(c)-(d), *infra* (detailing the military and other materials that the GOS was able to acquire with BNPP's financial assistance).

> 65. At approximately the same time in 1996, Russia transported ten Mi-24 helicopter gunships to Sudan. Ex. 65, Fogarty Tr. at 123:6–12.

**Plaintiffs' Response**: Controverted and incomplete and misleading if used to suggest that such helicopters could be continuously operated without maintenance, spare parts, fuel and replenishment of ammunition. The only known delivery of military aircraft between 1992 and 1998 is six Mi-24 helicopters from Belarus in 1996. *Infra* ¶ 70; ECF No. 435-52, Austin Report ¶ 160. By 2000, the GOS had the same six attack helicopters. ECF No. 435-93, Verhoeven Report at 26. A Human Rights Watch report noted that "[o]il difference has made the all-importance difference" as the GOS was able to more than triple its attack helicopter fleet (from six to twenty) by 2002. *Id. See also* ECF No. 435-63, Fogarty Report ¶ 108 (listing 2001 and 2002 Russian helicopter sales to the GOS); ECF No. 435-52, Austin Report ¶ 160 (same). Moreover, the GOS

37

was able to acquire HIND helicopters which were not in their inventory prior to 1999.  ECF No. 435-68, Hudson Report ¶ 73 & n.54; ECF No. 435-63, Fogarty Report ¶ 266.  This increased capability due to oil revenue (facilitated by BNPP) allowed the GOS to use multiple gunship formations of attack helicopters during its attacks on civilians in South Sudan and elsewhere.  ECF No. 435-54, Baldo Report ¶¶ 178, 185; ECF No. 435-68, Hudson Report ¶ 73; ECF No. 435-52, Austin Report ¶ 166.  For example, a 1999 campaign "characterized by bombing runs and helicopter gunships flying low enough to kill people" resulted in 50% of the population of Ruweng County, a crucial oil-producing region, being killed or displaced.  ECF No. 435-63, Fogarty Report ¶ 110; *see also* ECF No. 435-53, Austin Reply ¶¶ 112-18.

> 66. In 1995, Libya provided the Sudanese government with heavy artillery.  Ex. 65, Fogarty Tr. at 127:21–25.

**Plaintiffs' Response**: Controverted and incomplete and misleading if used to suggest that such aircraft could be continuously operated without maintenance, spare parts, and replenishment of ammunition..  The source for this is a single interview with an unnamed Eritrean official.  Ex. 180, Arms Transfers.  The source provides no information about the quantity or quality of any such artillery.  *Id.*  In any event, the GOS continued to acquire artillery systems throughout the Proposed Class Period with increasing velocity, including through imports and domestic production.  ECF No. 435-93, Verhoeven Report at 20, 26, 56; ECF No. 435-63, Fogarty Report ¶ 108; ECF No. 435-52, Austin Report ¶¶ 85, 118, 148, 158, 216, 271; ECF No. 435-53, Austin Reply ¶¶ 99, 103, 114, 121.  Without the oil funds made available by BNPP, the Bashir regime would not have been able to acquire the number of "artillery, ammunition, and helicopter gunships

that it did, in actual fact, acquire for its repression efforts in Darfur, South Kordofan, Blue Nile and Southern Sudan." ECF No. 435-94, Verhoeven Reply at 30; *see also* ECF No. 435-53, Austin Reply ¶¶ 112-18.

67.     In 1995, a U.S. company was said to have shipped to the Sudanese government $120 million in arms, including Howitzers, mortars and tank ammunition. Ex. 65, Fogarty Tr. at 128:23–129:7.

**Plaintiffs' Response**: Controverted and misleading if used to suggest that artillery could be continuously operated without maintenance, spare parts, fuel and replenishment of ammunition. The source for this claim is a single unnamed, and unlinked, article from a May 12, 1995 edition of Africa Confidential. *See* Ex. 180, Arms Transfers.  There is no indication of the name of the company, which was allegedly owned by a Saudi national, nor is there any information on the source of the arms, their number and type, or whether they were actually delivered.  There is no record evidence that any of these supposed arms were used in Sudan.  *See also* ECF No. 435-53, Austin Reply ¶¶ 112-18.

68.     In 1996, India supplied arms to the Sudanese government.  Ex. 65, Fogarty Tr. at 126:23–127:2.

**Plaintiffs' Response**: Controverted.  The arms supplied were either spare parts for former Soviet Union equipment or ammunition for G-3 rifles that was shipped by a private company and not the government of India.  Ex. 180, Arms Transfers.  The only other record evidence of India supplying the GOS with arms is a 2005 agreement by Indian company Ashok Leyland Ltd. to supply 100 army trucks to the Sudan Defense Ministry.  ECF No. 435-53, Austin Reply ¶ 147; *see also* ECF No. 435-53, Austin Reply ¶¶ 112-18.

69.    In 1996, Belarus provided the Sudanese government with nine Russian-made T-55 battle tanks.  Ex. 65, Fogarty Tr. at 125:15–21.

**Plaintiffs' Response**: Uncontroverted but incomplete.  It is undisputed that the regime had some access to weapons prior to the BNPP conspiracy in 1997 and that those weapons were used prior to 1997 to commit human rights abuses which were reported internationally and, in part, the impetus for the imposition of US sanctions in 1997. *See* ECF No. 435-68, Hudson Report ¶¶ 184-85.  Following the influx of oil money by way of BNPP, the GOS was able to procure many more additional and more modern tanks from Russia, China, and others, and produced its own versions of the T-55 tank.  ECF No. 435-93, Verhoeven Report at 22, 26-27, 37; ECF No. 435-58, Carisch Report ¶ 113; ECF No. 435-52, Austin Report ¶¶ 85, 118-22, 180-81; ECF No. 435-53, Austin Reply ¶¶ 96, 102-03, 112-18, 121.

70.    In 1997, Belarus provided the Sudanese government with six Russian-made Mi-24B attack helicopters.  Ex. 65, Fogarty Tr. at 125:15–21.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading if used to suggest that such helicopters could be continuously operated without maintenance, spare parts, fuel and replenishment of ammunition.  This delivery of six Mi-24 attack helicopters was the only known delivery of military aircraft between 1992 (the earliest date for which UN Registration of Convention Arms information is available) and 1998.  ECF No. 435-52, Austin Report ¶ 160.  By 2000, the GOS had the same six attack helicopters.  ECF No. 435-93, Verhoeven Report at 26; *see also* ECF No. 435-53, Austin Reply ¶¶ 112-18.

71.    In 1996, India supplied arms to the Sudanese government.  Ex. 65, Fogarty Tr. at 126:22–127:2.

**Plaintiffs' Response**: Controverted and misleading if used to suggest that such unidentified arms could be continuously used without maintenance, spare parts, fuel and replenishment of ammunition.  The arms supplied were either spare parts for former Soviet Union equipment or ammunition for G-3 rifles that was shipped by a private company and not the government of India.  Ex. 180, Arms Transfers.  The only other record evidence of India supplying the GOS with arms is a 2005 agreement by Indian company Ashok Leyland Ltd. to supply 100 army trucks to the Sudan Defense Ministry, during the time BNPP was funding the GOS.  ECF No. 435-53, Austin Reply ¶ 147; *see also* ECF No. 435-53, Austin Reply ¶¶ 112-18.

> 72.    Prior to 1997, Iran supplied the Sudanese government with G3 assault rifles, mortars and ammunition. Ex. 65, Fogarty Tr. at 115:2–21.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading if used to suggest that such rifles could be continuously used without maintenance, spare parts, and replenishment of ammunition.  It is undisputed that the Regime had some access to weapons prior to the BNPP conspiracy in 1997 and that those weapons were used to commit human rights abuses which were the impetus for the imposition of US sanctions in 1997.  *See* ECF No. 435-68, Hudson Report ¶¶ 184-85.  The G3 assault rifles provided by Iran "were of such poor quality that the [GOS] was shifting to Kalashnikov assault rifles." Ex. 180, Arms Transfers.  By 1999, Iran (along with China) was one of the few significant international connections that Sudan had left.  *Id.*  Moreover, any such pre-1997 acquisitions were dwarfed by the petrodollars used to purchase additional Chinese and Iranian support during the Proposed Class Period and also to expand the GOS's domestic military industrial capability, including the manufacture of small arms, ammunition, tanks, rocket

propelled grenades, armored infantry fighting vehicles, and other lethal kit.  ECF No. 435-93,

Verhoeven Report at 26; ECF No. 435-55, Baldo Reply ¶ 74; *see also* ECF No. 435-53, Austin

Reply ¶¶ 112-18.

> 73.  Dr. Verhoeven admitted that, between 1989 and 1997, the Sudanese Armed Forces used: "Antonov planes," Ex. 95, Verhoeven Tr. at 230:13–16, Ex. 93, Verhoeven Opening Report at 26; "helicopter gunships," Ex. 95, Verhoeven Tr. at 230:17–22; "Kalashnikov rifles," Ex. 95, Verhoeven Tr. at 230:23–231:2; "various types of artillery," Ex. 95, Verhoeven Tr. at 222:23; and "AK-47s and other forms of rifles," Ex. 95, Verhoeven Tr. at 223:7–9.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading if used to suggest

that such arms could be continuously operated without maintenance, spare parts, fuel and

replenishment of ammunition.  It is undisputed that the Regime had some access to weapons prior

to the BNPP conspiracy in 1997 and that those weapons were used to commit human rights abuses

which were reported internationally and, in part, the impetus for the imposition of US sanctions in

1997.  *See* ECF No. 435-68, Hudson Report ¶¶ 184-85.  Dr. Verhoeven did not testify as to the

quality or quantity of such arms used by the SAF between 1989 and 1997.  Moreover, Dr.

Verhoeven was unequivocal in opining that the oil revenue facilitated by BNPP allowed the GOS

to vastly expand its military budget and purchase "fancy new kit that served to not only kill

insurgents but also terrorize populations," buy the loyalty of key regime institutions, and fund its

network of militias through which it engaged in massive human rights abuses.  ECF No. 435-93,

Verhoeven Report at 24-27; ECF No. 435-94, Verhoeven Reply at 13-14, 32-33; *see also* ECF No.

435-53, Austin Reply ¶¶ 112-18.

> 74.  Dr. Verhoeven admitted in his deposition that, between 1989 and 1997, the PDF

used: "tanks," Ex. 95, Verhoeven Tr. at 226:17; "various kinds of mobile [ammunition] systems by which rockets or missiles can be fired from trucks that move around," Ex. 95, Verhoeven Tr. at 226:18– 21; "land cruisers," Ex. 95, Verhoeven Tr. at 226:23, 229:13–18; "various types of rifles," Ex. 95, Verhoeven Tr. at 227:13; "grenades," Ex. 95, Verhoeven Tr. at 227:14; "various types of mortars," Ex. 95, Verhoeven Tr. at 227:15; "[land]mines," Ex. 95, Verhoeven Tr. at 227:16; and "[a]mmunition . . . for the weapon systems," Ex. 95, Verhoeven Tr. at 227:18– 20.

**Plaintiffs' Response**: Controverted.  The errata to Dr. Verhoeven's deposition transcript makes clear that he stated that the PDF relied on "land cruiser or various types of pickup trucks" "in contrast to modern armies, which like to rely on tanks."  Ex. 170, Verhoeven Dep. at 226:16-25.  Accordingly, Dr. Verhoeven did not admit that the PDF used "tanks" between 1989 and 1997, or any other time.  Moreover, Dr. Verhoeven was clear that the financial largesse enabled by BNPP made "unprecedented means available to . . . militia such as the PDF (and later the Janjaweed)." ECF No. 435-93, Verhoeven Report at 27.  Payments to the PDF were part of the regime's "tamkeen" – explicit favoritism of pro-regime constituencies in employment, credit provisions, contracting, and more – that was used to cement loyalty to the regime.  ECF No. 435-94, Verhoeven Reply at 17-18.  PDF forces received weapons and ammunition from the GOS, and were used by the GOS to distribute weapons and ammunition to other regime-aligned militias. *Id.* at 38.  It is undisputed that the Regime had some access to weapons prior to the BNPP conspiracy in 1997 and that those weapons were used to commit human rights abuses which reported internationally and, in part, were the impetus for the imposition of US sanctions in 1997.  *See* ECF No. 435-68, Hudson Report ¶¶ 184-85; *see also* ECF No. 435-53, Austin Reply ¶¶ 112-18.

75.     Dr. Verhoeven admitted that, between 1989 and 1997, the NISS used "various types

of pistols, rifles, [and] guns." Ex. 95, Verhoeven Tr. at 228:14–17.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading if used to suggest that such arms could be continuously operated without maintenance, spare parts, and replenishment of ammunition.  It is undisputed that the Regime had some access to weapons prior to the BNPP conspiracy in 1997 and that those weapons were used to commit human rights abuses which were reported internationally and, in part, the impetus for the imposition of US sanctions in 1997.  *See* ECF No. 435-68, Hudson Report ¶¶ 184-85.  Dr. Verhoeven testified that NISS was rarely involved in battle, and so at that time was not equipped "to engage in actual combat with opposing forces," although that would later change.  Ex. 170, Verhoeven Dep. at 228:7-13.  By 2007, the NISS was well armed, enough that it saved the regime from a surprise rebel raid from Darfur that almost succeeded in capturing Central Khartoum.  ECF No. 435-93, Verhoeven Report at 27; *see also* ECF No. 435-53, Austin Reply ¶¶ 112-18.

**B.     Arms Proliferation to Non-GOS Actors**

76.     Dr. Verhoeven testified that, during the period of 1989–1997, there were "weapons that were in circulation in the broader region of the Horn of Africa": "The Horn of Africa has long been a conflict-torn region with wars in Ethiopia and what is now Eritrea, Chad, Uganda, [and] a range of other countries.  And there was a lot of trafficking, and a lot of back and forth between those weapons, because you have kind of this regional market depending on who has money.  You may be able to source weapons that yesterday you had to sell or find spare parts, *et cetera*.  That, too, was a source of problems of some of the weapons that went to the Sudan Armed Forces."  Ex. 95, Verhoeven Tr. at 223:10–224:2.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading and irrelevant.  In his testimony, Dr. Verhoeven was clear that the weapon systems available to the GOS pre-1997

44

had "problems" because of the nature of the "regional market," where arms went to "who has money" at any given time, and that by the accounts of the SAF "were insufficient for its needs." Ex. 95, Verhoeven Dep. at 221:14-231:2.  He went on to note that the supply issues "begin to change once [the GOS] was able to get its hands on oil money and was able to make a number of purchases . . . from other suppliers," including by purchasing "new equipment, more lethal equipment."  *Id.; see also* ECF No. 435-53, Austin Reply ¶¶ 112-18.

> 77.    During the Proposed Class Period, there were millions of weapons in circulation in Sudan among civilians and actors that were not part of the formal state security services or the country's many armed groups.  Ex. 58, Carisch Report ¶ 51.

**Plaintiffs' Response**: Controverted and misleading and irrelevant if used to suggest that the GOS was armed by non-GOS civilians.  The source cited by Mr. Carisch was an April 2007 report published by the Small Arms Survey, and therefore does not support that there were millions of weapons in circulation "[d]uring the Proposed Class Period," which runs from 1997 to 2011. *See* ECF No. 435-58, Carisch Report ¶ 51 & n.86.  Moreover, the estimations for the firearms are subject to a "number of caveats," including that "armed forces are not transparent" and the estimates "do not differentiate between weapon type or calibre."  Ex. 137, *The Militarization of Sudan*,     SMALL     ARMS     SURVEY,     at     8-9     (Apr.     2007), https://www.smallarmssurvey.org/sites/default/files/resources/HSBA-IB-06-militarization.pdf. Finally, the estimated gun ownership rate for "[c]ivilians" was five per 100 residents, compared to over one gun per member of the SAF, PDF, Intelligence and Security services, "Oil Police," and other armed groups.  *Id.* at 9 Table 3; *see also* ECF No. 435-53, Austin Reply ¶¶ 112-18.

45

## VII.   MATERIAL FACTS CONCERNING THE SUDANESE GOVERNMENT'S FINANCES

### A.   Macroeconomic Data Concerning the Sudanese Government's Revenues and Expenditures

78.   As a result of oil exports and domestic oil sales, the GOS's oil revenues generally increased from the first export of oil in 1999 until 2011. Ex. 84, Llewellyn Report at 23, Fig. 2.

**Plaintiffs' Response**: Controverted and misleading. Figure 2 of the Llewellyn Report shows "Oil Revenues" increasing from 1999 until 2008, when they drop sharply to 2009, which is the last year of the chart. Nor does Figure 2 identify the reason that the GOS's oil revenues rose, which was a direct result of the GOS's sole correspondent bank, BNPP's financial support in the international oil markets. ECF No. 435-88, Patey Report at 3; ECF No. 435-63, Fogarty Report ¶¶ 108, 253-65; ECF No. 435-93, Verhoeven Report at 44.

79.   During the same period, the GOS's non-oil revenues increased. Ex. 84, Llewellyn Report at 24, Fig. 3.

**Plaintiffs' Response**: Controverted and misleading. The GOS's non-oil revenues did not increase in every year in the Proposed Class Period. *See* Ex. 84, Llewellyn Report at 24, Fig. 3. Moreover, according to the 2008 POE Report, to which Defendants' expert Mr. Carisch contributed, *see* Ex. 175, 2008 POE Report ¶ 8, and on which he relied in preparing his expert report and opinions in this action, *see* Ex. 153, Carisch Dep. at 45:24-25, "[t]he most lucrative single source of income for the Sudan and Chad are derived from their recently established oil production and exportation capacity," and "the Sudan's revenues from oil, agricultural exports and regular taxations [sic] allows the State to fully fund its military presence in Darfur, its actions

against the Darfur rebels and support for Chadian armed opposition groups." *Id.* ¶¶ 283-84.  He

further testified that "the most lucrative single source of income for the Sudan" was "derived from

its oil production and exportation capacity."  Ex. 153, Carisch Dep. at 253:10-24.  Further, Mr.

Carisch admitted that it is "[m]ost likely" that Sudan's increased tax revenue was generated from

an oil extraction tax.  *Id.* at 276:14-23.

> 80.     The GOS spent its oil and non-oil revenues—collected together in a common fund,
> as is the general practice for governments around the world—on various
> expenditures.  Ex. 84, Llewellyn Report ¶¶ 24, 57–58.

**Plaintiffs' Response**: Uncontroverted but misleading because it omits, among other things,

that the GOS used its oil revenues and related taxes to fund military-security operations against

civilian populations and arms embargo violations.  BNPP's own proposed expert, Mr. Carisch,

authored two UN reports that state that "[t]he principal source of funding for arms embargo

violations committed in the Darfur region . . . is largely based on the two involved States' [Sudan

and Chad] ability to legitimately raise taxes and other revenue," Ex. 175, 2008 POE Report ¶¶ 8,

283, and that "[a]lmost all the documented ammunition, vehicles and aviation equipment, and

much other military materiel is of post-embargo production, which clearly also post-dates the

deployment, if it ever took place, of SAF troops to South Sudan."  Ex. 174, 2009 POE Report ¶¶

9, 177.  Further, "[o]n 22 July [2009], the Panel observed over 100 technicals in use by the [GOS]

forces, all of them late-model Toyota Land Cruisers that were manufactured after the imposition

of the arms embargo," and that the Panel "documented SAF units using 7.62 mm and 12.7 mm

ammunition of post-embargo production."  2009 POE Report ¶¶ 204-06.

The GOS allocated substantial revenue on the military, national security services, and militias.  ECF No. 435-54, Baldo Report ¶ 86 (citing to U.S. Dept of State, Sudan Peace Act Report, April 21, 2003, https://2001-2009.state.gov/p/af/rls/rpt/2003/19790.html) ("Since the Government of Sudan's line-item budget and resource allocation (how oil revenues are spent versus tax or other revenues) are uncertain, it is assumed that an increase in government revenue translates into at least proportionally increased military expenditures. For example, Sudan's acquisition of HIND helicopters is a recent phenomenon. This weaponry was not in Sudan's inventory prior to 1999. It can be assumed that oil revenue enabled Khartoum to purchase weapons systems"); *id.* ¶ 86 n.60 (In 2007, the U.S. embassy in Khartoum reported to Washington that Sudan's "budget allocate[d] substantial revenue to military and security expenditures, leaving relatively small amounts available for development, health and education."); *see also* ECF No. 435-53, Austin Reply ¶¶ 99-105.

81.     From the period 1997–2009, non-military expenditures accounted for the majority of the GOS's public expenditure (on average 76.2% of total expenditures). Ex. 84, Llewellyn Report ¶ 58.  Those non-military expenditures included: $19.5 billion on transfers to regional governments as part of the peace process to end the Second Civil War, Ex. 84, Llewellyn Report ¶¶ 33, 58, n.58; $10 billion on building the Merowe dam, per Dr. Verhoeven's admission, Ex. 93, Verhoeven Opening Report at 24–25; $1 billion on raising the height of the Roseires dam, Ex. 93, Verhoeven Opening Report at 24–25; and USD $3.5 billion on repaying loans, Ex. 85, (*Supplementary Analysis, Sudan Central Government revenue and expenses* (Exhibit 2 to Expert Report of John Llewellyn (Jan. 6, 2023)). The GOS additionally spent significantly on other investments in infrastructure and social programs (*e.g.*, health and education).  Ex. 84, Llewellyn Report ¶ 58.

**Plaintiffs' Response**: Plaintiffs object that the foregoing paragraph 81 as noncompliant with Local Civil Rule 56.1(a).  The multiple propositions are controverted.  Contested that,

between 1997–2009, non-military expenditures accounted for the majority of the GOS's public expenditure.  The GOS allocated substantial revenue on the military, national security services, and militias.  *See* Plaintiffs' Response to Proposed Facts No.80.  Contested that these other specific expenditures are "non-military."  The cited portions of Dr. Verhoeven's report explain that these expenditures were used to "benefit the regime's chosen groups of friends and allies" and "grease the wheels of tamkeen [empowerment of Sudan's Islamist elite patronage system which underpinned the Regime's military and security power] and its favouring of select social classes and pro-regime constituencies."  ECF No. 435-93, Verhoeven Report at 24.  The dam program, including Merowe and Roseires, "became the main instrument to pursue tamkeen."  *Id.* at 25.  Money "from the public treasury ended up in the accounts of contractors related through party ties or family connections to the ruling elite in Khartoum and in the pockets of consultancy agencies owned by Sudan's Islamists and the security apparatus."  ECF No. 435-94, Verhoeven Reply at 19.  Further, these projects resulted in gross human rights abuses, including the displacement of up to 150,0000 Sudanese citizens, "and directly contributed to violent conflict."  *Id.* at 18-19.  The GOS deliberately murdered Sudanese who dared to protest against their corrupt development projects.  *Id.* at 20.  BNPP was aware of the human rights issues involved with the Merowe Dam project, including that it led to forcible displacement.  ECF No. 435-94, Verhoeven Reply at 20, n. 51.

      82.    Al-Bashir and his associates additionally diverted at least $4 billion in assets for their personal use, which the GOS confiscated after his arrest. Ex. 88, Expert Report of Luke Patey dated Sept. 30, 2022 at 19 ("Patey Opening Report").

**Plaintiffs' Response**: Uncontroverted but misleading if used to suggest that the financial

support of Sudan's Commander in Chief of the military, security, and security forces, who was

indicted by the International Criminal Court for genocide, did not contribute to the GOS's mass

atrocities against Plaintiffs, the proposed class, and targeted civilian populations. Ex. #, Second

Decision on the Prosecution's Application for a Warrant of Arrest, ICC-02/05-01/09-94, ICC Pre-

Trial Chamber I, July 12, 2010, ¶43. *See* Plaintiffs' Response No. 25. The full context of the cited

text provides that "[a]t the same time" that oil revenues skyrocketed and easily exceeded defense

and military spending:

> Sudan's oil industry was a venue for extreme corruption.  A vast number of
> companies controlled by the ruling National Congress Party (NCP, formerly called
> the NIF), the Sudan Armed Forces, and the security services were harnessed to
> profit from their official positions.  This took place through corruptly awarding
> government contracts, the sale of land to commercial groups, and the control of the
> import and export of oil and other commodities.  High-level NCP officials
> reportedly funneled billions in government funds abroad in banks to the United
> Arab Emirates, the United Kingdom, and Malaysia.  After his downfall and arrest,
> reports indicate that some $4 billion in assets was confiscated from President Bashir
> and his associates.  President Bashir's brothers, Ali Hassan Ahmed al-Bashir and
> Abdella Hassan Ahmed al-Bashir, stood behind the Hi-Tech Group which held over
> 20 companies active in petroleum, construction, cement, telecommunications, and
> banking.  The company was known in oil circles for charging inflated sums for
> setting up camps for oil companies and other construction work, but nonetheless
> was apt at winning contracts thanks to its political connections.  *BNPP's
> maximaziation of Sudan's oil revenues both enabled and enhanced these levels of
> corruption*.

ECF No. 435-88, Patey Report at 18-19 (emphasis added).  The GOS's corruption was

done to maintain the Regime's control over the government, economy, and oil resources and was

for  "benefit the regime's chosen groups of friends and allies" and "grease the wheels of tamkeen

and its favouring of select social classes and pro-regime constituencies."   ECF No. 435-93,

Verhoeven Report at 24.

> 83.     In 2011, South Sudan seceded and took approximately 75% of Sudan's oil territory. Ex. 95, Verhoeven Tr. at 302:15–23; Ex. 88, Patey Opening Report at 19.

**Plaintiffs' Response**: Uncontroverted but relevant only as historical background.

**B.     Sudanese Oil Industry**

> 84.     The first barrels of crude oil were exported from Sudan in August 1999. Ex. 88, Patey Opening Report at 7.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  The GOS leveraged

anticipated future oil revenues – such as the March 1997 agreement with Chinese and Malaysian

petroleum firms, a Canadian exploration firm, and Sudapet, Sudan's national oil company – to

increase military spending, including beginning construction on its domestic weapon production

facilities prior to August 1999.  ECF No. 435-93, Verhoeven Report at 26, 37; ECF No. 435-94,

Verhoeven Reply at 29-30; ECF No. 435-52, Austin Report ¶¶ 81, 270; ECF No. 435-63, Fogarty

Report ¶¶ 64, 101, 106; ECF No. 435-68, Hudson Report ¶ 48; Ex. 170, Verhoeven Dep. at 264:12-

265:10.  BNPP was a "lynchpin" for the GOS in financing arms-for-oil deals with China and

Malaysia, and later transitioning "to cash payments facilitated by BNPP and likely requiring the

GoS to pay for future Chinese arms through the GoS war chest. "  ECF No. 435-53, Austin Reply

¶ 184 n.303.

> 85.     Though the U.S. dollar is the standard currency for oil pricing, there is no reason that crude oil must be priced and traded in U.S. dollars. Ex. 62, Expert Report of Philip K. Verleger dated Jan. 6, 2023 ¶ 40 ("Verleger Report").

**Plaintiffs' Response**: Uncontroverted but misleading, speculative, and irrelevant.  BNPP's

own executives testified that the Sudanese oil transactions were transacted in U.S. dollars (a/k/a petrodollars).  *See* Ex. 125, Deposition of Jacques d'Estais ("d'Estais Dep.") at 91:13-18 ("largely dealing in dollars"); Ex. 123, Deposition of Louis Bazire ("Bazire Dep.") at 14:25-15:13 (the GOS conducted its oil business with petrodollars); ECF No. 435-63, Fogarty Report ¶ 129 (explaining that "the term 'petrodollars' became associated with all oil revenues of oil producing nations and oil became priced and traded in dollars (i.e. it became the 'reference currency' for oil)").  "Because of this fundamental relationship between oil and the U.S  dollar that exists to this day, sellers of oil must expect to be paid in dollars, and therefore must have access to dollar deposit accounts at international commercial banks to receive the dollars from their oil exports," and oil exporters without "sufficient access to dollar accounts . . . especially those with limited options like Sudan . . . would be severely constrained from conducting effective, large-scale exports."  ECF No. 435-63, Fogarty Report ¶ 130.  Over 90% of the oil transactions flowing through BNPP were denominated, paid, and processed in U.S. dollars. Ex. 22, BNPP-KASHEF-00000177 at 183; ECF No. 435-63, Fogarty Report ¶ 260; ECF No. 435-88, Patey Report at 6-7, 9-10; ECF No. 435-83, Expert Report of Barry Koch ("Koch Report") ¶ 147; ECF No. 435-1, Stipulated Statement of Facts, *United States v. BNP Paribas, S.A.*, 14 Cr. 460 (LGS) (June 30, 2014) ("SSOF") ¶ 19.

     86.     Countries would not necessarily generate less revenue from pricing and/or settling crude oil trades in non-dollar currencies.  Ex. 62, Verleger Report ¶¶ 40, 42.

**Plaintiffs' Response**: Controverted, and the proposition is irrelevant and speculative, as whether "[c]ountries" other than Sudan "would not necessarily generate less revenue from pricing and/or settling crude oil trades in non-dollar currencies" is not at issue in this action.  Irrelevant

because, in fact, Sudan was very keen to trade its oil in U.S. dollars and, even when encouraged

by BNPP to switch to Euro transactions, the Sudanese refused and persisted in using the U.S.

dollar. ECF No. 435-89, Patey Reply at 4-6. Moreover, such a switch is not possible in most

circumstances for the reasons set forth in Plaintiffs' Response to Proposed Fact 85, *supra*. Further,

a switch to another currency was not possible for a country like Sudan facing international

sanctions. ECF No. 435-63, Fogarty Report ¶ 130. Additionally, Sudan required U.S. dollars for

imports of goods and services; in 2006, 84% of BNPP's Sudanese transactions were transacted in

U.S. dollars. ECF No. 435-94, Verhoeven Reply at 13. Crucially, "[t]he global arms trade is very

dollar dependent and many key exporters (such as China, Russia and Belarus) have long insisted

on US dollars as payments for their goods and services." *Id. See also* ECF No. 435-68, Hudson

Report 153 (U.S. dollars were required for "arms, telecommunications, aviation, and military

equipment"); ECF No. 435-52, Austin Report ¶¶ 161, 181, 183, 185, 215, 261 (China was by far

Sudan's most significant supplier of military and dual-use goods); ECF No. 435-58, Carisch

Report ¶ 243 ("China exported a significant amount of military weapons, goods, services, and

dual-use goods to Sudan.").

> 87.    Since the 1990s, certain countries have traded their crude oil in non-U.S. dollar
> currencies, which did not necessarily generate less revenue. Ex. 62, Verleger
> Report ¶ 40.

**Plaintiffs' Response**: Controverted, and the cited materials do not support the proposition

for which they are cited. The proposition is also irrelevant, as the conduct of the governments of

unnamed "certain countries" is not at issue in this action; only the conduct of the GOS and its co-

conspirator, BNPP, are.  Irrelevant because, in fact, Sudan was very keen to trade its oil in U.S.

dollars and, even when encouraged by BNPP to switch to Euro transactions, the Sudanese persisted

in using the U.S. dollar. ECF No. 435-89, Patey Reply at 4-6.  Dr. Verleger notes that "[t]he

currency/ies of pricing and settling crude oil contracts is typically determined by the country

exporting the oil."  Ex. 62, Verleger Report ¶ 43.  Here, Sudan insisted on transacting in U.S.

dollars for the reasons stated in Plaintiffs' Response to Proposed Fact Nos. 85-86, *supra*.

Moreover, the examples given by Dr. Verleger included pre-1974 Persian Gulf countries (price in

U.S. dollars but paid in British pounds), Iraq post-2000 (Euros), and since 2006 China, Iran, and

Syria (Euros).  As explained by Plaintiffs' expert Dr. Verhoeven, these examples are "not

instructive – because it is not a like-for-like comparison" between Sudan's fledgling oil industry

versus, for example, the track record of Iraq, with over ten times the production and concomitant

market power and a well-established track record in the oil trade, not to mention the corruption-

plagued Oil-for-Food program run in large part by BNPP.  ECF No. 435-94, Verhoeven Reply at

14-15.

> 88.    For example, Iraq traded its oil in euros, and generated greater revenues than it
> would have in dollars due to the euro's favorable exchange rate during that time.
> Ex. 62, Verleger Report ¶ 40.

**Plaintiffs' Response**: Controverted, and the cited materials do not support the proposition

for which they are cited.  The proposition is also irrelevant, as the conduct of the governments of

unnamed "certain countries" is not at issue in this action; only the conduct of the GOS and its co-

conspirator, BNPP, are.  Irrelevant because, in fact, Sudan was very keen to trade its oil in U.S.

dollars and, even when encouraged by BNPP to switch to Euro transactions, the Sudanese persisted in using the U.S. dollar. ECF No. 435-89, Patey Reply at 4-6.  Moreover, Iraq is "not instructive – because it is not a like-for-like comparison" between Sudan's fledgling oil industry versus the track record of Iraq, with over ten times the production and concomitant market power and a well-established track record in the oil trade, not to mention the corruption-plagued Oil-for-Food program run in large part by BNPP.  ECF No. 435-94, Verhoeven Reply at 14-15.  Additionally, Iraq did not begin trading oil for euros until "November 1, 2000," Ex. 62, Verleger Report ¶ 40, well after Sudan began to develop its oil industry and export oil.  ECF No. 435-93, Verhoeven Report at 37.

89.  Figure 4 of Dr. Patey's report shows that the GOS continued to receive significant oil export revenues after July 2007. Ex. 88, Patey Opening Report at 25, Fig. 4.

**Plaintiffs' Response**: Uncontroverted but misleading.  BNPP continued to process many hundreds of millions of petrodollars for Sudanese banks and foreign oil companies well into 2009 (and likely later) during the bank's wind-down of its criminal conspiracy with the GOS.  ECF No. 435-93, Verhoeven Report at 55-56; Ex. 90, BNPP-KASHEF-00030053 (existence of an escrow account with BNPP which, in the six months following BNPP's purported withdrawal from Sudan, channeled funds with an "exchange value of more than USD 0.5 billion" to "the Sudanese government" making BNPP one of Sudan's significant channels for the supply of cash). BNPP London facilitated $6.7 billion in Sudan transactions from 2008 through 2010—transactions that BNPP admitted violated U.S. sanctions. ECF No. 435-64, Expert Reply Report of Timothy Fogarty ("Fogarty Reply") ¶¶ 99-102; ECF No. 435-63, Fogarty Report ¶ 250 & Ex. 6. Additionally, the

impact of BNPP's support, including on the development of Sudan's oil industry, "continued to channel huge sums of cash to the Salvation government well after June 2007."  ECF No. 435-93, Verhoeven Report at 56.  For example, BNPP London facilitated $6.7 billion in Sudan transactions from 2008 through 2010—transactions that BNPP admitted violated U.S. sanctions. ECF No. 435-64, Fogarty Reply at ¶¶ 99-102; ECF No. 435-63, Fogarty Report at ¶ 250, and Ex. 6. The equipment that the GOS was able to purchase as a result of the conspiracy was used to kill civilians and commit human rights abuses long after the end of the criminal conspiracy, such as the June 2011 use of fighter jets, artillery, and ammunition in South Kordofan and Blue Nile State and 2016-17 bombings in Darfur.  *Id.* at 56-57.

> 90.    Dr. Verhoeven testified that Sudan continued to export oil from 1999 at least until 2011.  Ex. 95, Verhoeven Tr. at 302:15–23.

**Plaintiffs' Response:** Uncontroverted but incomplete. BNPP continued to process hundreds of millions of petrodollars for Sudanese banks and foreign oil companies well into 2009 (and likely later) during the bank's wind-down of its criminal conspiracy with the GOS.  ECF No. 435-93, Verhoeven Report at 55-56; Ex. 90, BNPP-KASHEF-00030053 (existence of an escrow account with BNPP which, in the six months following BNPP's purported withdrawal from Sudan, channeled funds with an "exchange value of more than USD 0.5 billion" to "the Sudanese government" making BNPP one of Sudan's significant channels for the supply of cash). BNPP London facilitated $6.7 billion in Sudan transactions from 2008 through 2010—transactions that BNPP admitted violated U.S. sanctions. ECF No. 435-64, Fogarty Reply ¶¶ 99-102; ECF No. 435-63, Fogarty Report ¶ 250 & Ex. 6.

## VIII.   MATERIAL FACTS CONCERNING BNP PARIBAS ENTITIES

### A.   BNP Paribas Group Corporate Structure

91.   **BNP Paribas, SA ("BNP Paribas").**  BNP Paribas is a company incorporated in, and organized under the laws of, France.  Ex. 11, BNPP Defs.' Resps. and Objs. to Pls.' First Set of Reqs. for Admis., Resp. to Req. No. 6 at 16–17; Ex. 9, BNPP Defs.' Second Suppl. Resps. and Objs. to Pls.' Second Set of Interrogs., Suppl. Resp. to Interrog. No. 17 at 66.

**Plaintiffs' Response:** Uncontroverted.

92.   BNP Paribas is the parent company and, either directly or through a wholly owned subsidiary, owner of BNPP Suisse[7] (defined herein) and BNPP Wholesale (defined herein). Ex. 9, BNPP Defs.' Second Suppl. Resps. and Objs. to Pls.' Second Set of Interrogs., Suppl. Resp. to Interrog. No. 17 at 66–67.

**Plaintiffs' Response:** Uncontroverted.[5]

93.   BNP Paribas became a corporate entity in 2000 when the previously distinct French banks Banque Nationale de Paris and Paribas merged.  Ex. 9, BNPP Defs.' Second Suppl. Resps. and Objs. to Pls.' Second Set of Interrogs., Suppl. Resp. to Interrog. No. 4 at 15; Ex. 35, Cozine Tr. at 112:3–17.

**Plaintiffs' Response:** Uncontroverted. The combined company has had many affiliates and subsidiaries, including United European Bank ("UEB"), a Swiss bank that had been a joint venture of BNP and Dresdner Bank before becoming wholly-owned by BNPP. ECF No. 435-63, Fogarty Report ¶ 212. BNPP Suisse is the "successor in interest" to United Overseas Bank, also known as United European Bank. Ex. 150, BNPP Defendants' Resps. and Objs. to Pls' Request

---

[5] BNPP claims that: "Due to a small minority of historic shareholders, BNPP owns 99.99% of the shares of BNPP Suisse. Ex. 9, The BNPP Defendants' Second Suppl. Resps. and Objs. to Pls.' Second Set of Interrog., Suppl. Resp. to Interrog. No. 17 at p. 66 n.4."  Defs. SMF at 15 n.7.  Plaintiffs do not contest this proposed fact.

for Admissions ("RFAs") No. 10.

94.    Prior to the merger, BNP Paribas did not exist as a corporate entity.

**Plaintiffs' Response:** Uncontroverted that the corporate entity "BNP Paribas" did not exist

prior to the merger. BNPP Suisse is the "successor in interest" to United Overseas Bank, also

known as United European Bank. Ex. 150, BNPP Defendants' Responses and Objections to

Plaintiffs' Request for Admissions ("RFAs"), No. 10, at 18-19. Misleading insofar as BNP Paribas

SA pleaded guilty to adopting, continuing, and perpetuating the violation of the U.S. embargo on

Sudan by its predecessors in interest, branches, business lines, and subsidiaries. *See, e.g.*, ECF No.

241-8, OFAC Settlement Agreement ¶3; ECF No. 435-1, SSOF ¶¶ 18-19.

95.    **BNP Paribas, SA New York Branch ("BNPP NY").**  BNPP NY is a licensed foreign bank branch of BNP Paribas. Ex. 11, BNPP Defs.' Resps. and Objs. to Pls.' First Set of Reqs. for Admis., Resp. to Req. No. 11 at 19.

**Plaintiffs' Response:** Uncontrovered.

96.    BNPP NY is not a distinct or separate legal entity from BNP Paribas. Ex. 11, The BNPP Defs.' Resps. and Objs. to Pls.' First Set of Reqs. for Admis., Resp. to Req. No. 11 at 19; Ex. 9, BNPP Defs.' Second Suppl. Resps. and Objs. to Pls.' Second Set of Interrogs., Suppl. Resp. to Interrog. No. 17 at 66.

**Plaintiffs' Response:** Uncontroverted.

97.    **BNP Paribas US Wholesale Holdings, Corp. ("BNPP Wholesale").**  BNPP Wholesale is a corporation organized under the laws of Delaware. Ex. 9, BNPP Defs.' Second Suppl. Resps. and Objs. to Pls.' Second Set of Interrogs., Suppl. Resp. to Interrog. No. 17 at 66.

**Plaintiffs' Response:** Uncontroverted.

98.    BNPP Wholesale is a fully-owned subsidiary of BNP Paribas USA, Inc., which in turn is a fully-owned subsidiary of BNP Paribas. Ex. 9, BNPP Defs.' Second Suppl.

Resps. and Objs. to Pls.' Second Set of Interrogs., Suppl. Resp. to Interrog. No. 17 at 67.

**Plaintiffs' Response:** Uncontroverted.

99.   **BNP Paribas (Suisse) SA ("BNPP Suisse").**   BNPP Suisse is a corporation organized under the laws of Switzerland.  Ex. 9, BNPP Defs.' Second Suppl. Resps. and Objs. to Pls.' Second Set of Interrogs., Suppl. Resp. to Interrog. No. 17 at 67.

**Plaintiffs' Response:** Uncontroverted.

100.   BNPP Suisse is a fully-owned subsidiary of BNP Paribas.  Ex. 9, BNPP Defs.' Second Suppl. Resps. and Objs. to Pls.' Second Set of Interrogs., Suppl. Resp. to Interrog. No. 17 at 66.

**Plaintiffs' Response:** Uncontroverted.

101.   BNPP Suisse is not a party to this Action.  Third Amended Complaint ¶¶ 1, 53– 57, ECF No. 241.

**Plaintiffs' Response:** Uncontroverted that BNPP Suisse was not named as a Defendant in this Action. In pleading guilty to the conduct of BNPP Suisse, BNP Paribas assumed responsibility for the conduct of its subsidiary. Ex. 126, Deposition of Danny Cozine ("Cozine Dep.") at 97:14-22. BNPP admitted that it created deceptive schemes and transaction structures to conceal thousands of illegal Sudanese transactions, valued at more than $20 billion dollars, from scrutiny by U.S. financial institutions, regulators and authorities. Ex. 1, *In re BNP Paribas, S.A. New York Branch, Consent Order Under New York Banking Law § 44*, New York State Department of Financial Services ("DFS Consent Order"), dated June 29, 2014 ¶ 10; *see also* ECF No. 435-1, SSOF ¶ 17. BNP Paribas maintained the embargo-breaking scheme and "satellite bank" structure of its pre-merger predecessors. ECF No. 435-1, SSOF ¶ 19; ECF No. 435-83, Koch Report ¶¶ 134-36; Ex. 126, Cozine Dep. at 112:11-17; 126:3-12; 222:9- 223:2.

**B.  BNP Paribas and BNPP Suisse Evidence**

102.  In connection with the U.S. government's investigation culminating in BNP Paribas's 2014 guilty plea, BNP Paribas conducted a comprehensive review (the "Transaction Review") of potentially impermissible transactions[8] for, *inter alia*, BNP Paribas and BNPP Suisse.  Ex. 61, Expert Report of Gary B. Goolsby dated Jan. 6, 2023 ¶¶ 26–27 ("Goolsby Report"); Ex. 63, Expert Report of Timothy J. Fogarty Sr. dated Sept. 30, 2022 ¶ 224 ("Fogarty Opening Report").

**Plaintiffs' Response:** Controverted.[6]  In connection with the U.S. government's investigation culminating in BNP Paribas's 2014 guilty plea, BNP Paribas conducted a limited review of BNP Paribas' and BNPP Suisse's transactions related to Sudan beginning in 2002. The

---

[6] In footnote 8 on page 16/paragraph 102, BNPP submits the following proposed fact:

The Transaction Review defined "impermissible transactions" "as, for the period of 2002 through 2009, (1) "payments that involved an OFAC country nexus" (here, limited to Sudan); (2) a U.S. nexus; and (3) either a payment not covered by a general OFAC license or for trade sanctions involving U.S. origin goods, payments involving a U.S. person and/or a port of loading or unloading in a sanctioned country (here, limited to Sudan) or the U.S.). *See* Ex. 61, Goolsby Report at ¶ 38 n.33; Ex. 63, Fogarty Opening Report, Exhibit 1 n.3; Ex. 21, BNPP-KASHEF-00044856 at 44946; Ex. 23, BNPP-KASHEF-00046989 at 47104.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  Uncontroverted that the Transaction Review defines "impermissible transactions" with respect to Sudan as stated.  These characterizations were "solely those of BNPP, made during the time it was under criminal investigation, and for which there is no evidence that such characterization was accepted by the U.S. Government during the criminal investigation." ECF No. 435-64, Fogarty Reply ¶ 72; *see also* Ex. 126, Cozine Dep. at 181-82 ("I don't know how or if a governmental entity accepts it or not. I know it was shared with. I don't know if they did any independent verification. It was shared with them."). In addition, BNPP represented that it was still "investigating" $13.4 billion in payments involving Sudanese U.S. dollar vostro accounts. ECF No. 435-64, Fogarty Reply ¶ 72.  BNPP's Rule 30(b)(6) representative did not know whether that investigation had concluded nor the outcome.  Ex. 126, Cozine Dep. at 196:3-16.  Moreover, "out of the over $81 billion of transactions, $57.37 billion, equivalent to approximately 70%, were not sufficiently explained by BNPP, and Goolsby does not provide any independent evidence that such transactions were indeed 'out-of-scope or permissible.' Rather, it was BNPP itself – not the U.S. government or anyone else – that 'deemed' these transactions 'out-of-scope' or 'permissible.'" ECF No. 435-64, Fogarty Reply ¶ 73.  And "whether or not the unexplained $57.37 billion in transactions themselves violated U.S. sanctions, they were nevertheless Sudanese transactions that BNPP facilitated." *Id.*; *see also id.* ¶ 80 ("all of the transactions (whether or not BNPP argued to the U.S. government that they were 'permissible' or 'out of scope') – including book-to-book transactions in USD – did indeed support the Sudanese government's financial activities, including but not limited to oil exports"); *id.* ¶ 84 ("All we have is BNPP's own say-so that these transactions were, according to Goolsby, 'determined to be either out-of-scope or permissible.'").

characterization of "impermissible" was made by BNPP as a self-serving representation to law

enforcement, prosecutors, and regulators, during a time it was under criminal investigation, and

for which there is no record evidence that such a characterization was accepted by the U.S.

Government during the criminal investigation. ECF No. 435-64, Fogarty Reply ¶ 72. All of the

transactions related to Sudan, whether "permissible or impermissible," as characterized by BNPP

were, in fact, for the benefit of Sudanese customers, specifically the GOS. *Id.* ¶¶ 62-66; ECF No.

435-63, Fogarty Report ¶¶ 224-252.  A similar transaction review was also conducted for BNPP

branches in London and Rome. ECF No. 435-63, Hudson Report ¶¶ 250-51.  The Transaction

Review was not "comprehensive" because it did not include any pre-2002 transactions, it did not

include transactions in currencies other than U.S. dollars, and it defined many transactions as "out

of scope." ECF No. 435-64, Hudson Reply ¶ 63; Fogarty Report ¶¶ 229, 249.

> 103. For BNP Paribas and BNPP Suisse, the Transaction Review identified a sub-category of transactions with Sudanese counterparties related to oil ("oil-related transactions").  *See* Ex. 20, BNPP-KASHEF-00042444 at 42460–42466; Ex. 22, BNPP-KASHEF-00046285 at 46316.

**Plaintiffs' Response:** Controverted. The Transaction Review created by BNPP during a

time it was under criminal investigation identified a sub-category of U.S. dollar transactions with

Sudanese counterparties between 2002 and 2009 that related to oil. ECF No. 435-64, Fogarty

Reply ¶¶ 63, 72. BNPP self-servingly labeled over $20 billion in unidentified book-to-book

transfers and foreign currency transactions as "out of scope" or left unexplained in the Transaction

Review its lawyers prepared for U.S. government investigators. ECF No. 435-63, Fogarty Report

¶ 249; ECF No. 435-64, Fogarty Reply ¶ 117. Not all of BNPP's transactions with Sudanese

counterparties related to oil were identified under that sub-category of the Transaction Review. ECF No. 435-64, Fogarty Reply at ¶ 117-119.

> 104.    The total amount of Sudanese oil-related transactions identified in the Transaction Review was $6.63 billion.  *See* Ex. 61, Goolsby Report ¶ 55; *see* Ex. 63, Fogarty Opening Report ¶ 230, 234-35.

**Plaintiffs' Response:** Controverted, incomplete and misleading. The transaction review did not identify all Sudan transactions and the $6.63 billion in Sudanese oil-related transactions excluded all Sudanese oil-related transactions that BNPP self-servingly deemed "permissible." *See* Plaintiffs' Response 102. At least $6.63 billion in U.S. Dollar Transactions from 2002 through 2009 that BNPP admits violated U.S. sanctions related to oil exports. ECF No. 435-63, Fogarty Report ¶¶ 230, 259, 261. This number significantly understates BNPP's actual role in facilitating oil revenues for the Sudanese government. *Id.* ¶¶ 253-265.  BNPP handled all of the Sudanese government's oil revenue reflected in IMF reports. *Id.* ¶¶ 253-256; ECF No. 435-64, Fogarty Reply ¶¶ 109-112 (citing Ex. 62, BNPP-KASHEF-00013603; Ex. 71, BNPP-KASHEF-00014451; Ex. 45, BNPP-KASHEF-00005625; Ex. 70, BNPP-KASHEF-00014325; BNPP-KASHEF-00000177; Ex. 97, BNPP-KASHEF-00038899; Ex. 98, BNPP-KASHEF-00038913; Ex. 105, BNPP-KASHEF-00048093). BNPP underreported handling of Sudanese oil proceeds by $15.6 billion, which are likely included in the over $20 billion in unidentified book-to-book transfers and other transactions listed as "out of scope" or left unexplained in the Transaction Review. ECF No. 435-64, Fogarty Reply ¶¶ 117-119.

> 105.    BNP Paribas was responsible for approximately $130 million of the total Sudanese oil-related transactions identified in the Transaction Review, which is 2% of the

total $6.63 billion Sudanese oil-related transactions identified in the Transaction Review. *See* Ex. 61, Goolsby Report ¶ 55; Ex. 63, Fogarty Opening Report ¶¶ 230, 235, Exhibit 6; Ex. 20, BNPP-KASHEF-00042444 at 42460–42466; Ex. 22, BNPP-KASHEF-00046285 at 46316.

**Plaintiffs' Response:** Controverted. At a minimum, BNP Paribas handled approximately $130 million in Sudanese oil-related transactions but the Transaction Review does not contain the "total" amount of Sudanese oil-related transactions handled by BNPP. *See* Plaintiffs' Response to Proposed Fact No. 104. BNPP is responsible for all the transactions in the Transaction Review because it oversaw the conspiracy, had ultimate authority on whether to end the conspiracy, and assumed responsibility for the conduct of its subsidiary BNPP Suisse and predecessors. Ex. 126, Cozine Dep. at 97:14-22; Ex. 1, DFS Consent Order ¶ 10; ECF No. 435-1, SSOF ¶¶ 17, 71 ("BNPP agreed to conduct an internal investigation into business conducted with countries subject to U. S. sanctions at a number of its subsidiaries and branches and covering the time period January 1, 2002 through December 3 1, 2009, including in Paris, London, Milan, Rome and Geneva."); ECF No. 435-83, Koch Report ¶ 157; Ex. 6, Expert Reply Report of Barry Koch ("Koch Reply") ¶ 95.

106.   BNPP Suisse was responsible for approximately $6.5 billion in Sudanese oil-related transactions, which is approximately 98% of the total $6.63 billion Sudanese oil-related transactions identified in the Transaction Review. *See* Ex. 61, Goolsby Report ¶¶ 22, 30–31, 40; Ex. 20, BNPP-KASHEF-00042444 at 42460–42466; Ex. 22, BNPP-KASHEF-00046285 at 46316.

**Plaintiffs' Response:** Controverted, incomplete, and misleading. The Transaction Review significantly understates BNPP's actual role in facilitating oil revenues for the Sudanese government. *See* Plaintiffs' Response 103. At a minimum, BNPP Suisse handled approximately $6.5 billion in Sudanese oil-related transactions but the Transaction Review does not contain the

"total" amount of Sudanese oil-related transactions handled by BNPP. *See* Plaintiffs' Response to Proposed Fact No. 104. BNPP is responsible for all the transactions in the Transaction Reviews, because it oversaw the conspiracy, had ultimate authority on whether to end the conspiracy, and assumed responsibility for the conduct of its subsidiary BNPP Suisse. Ex. 126, Cozine Dep. at 97:14-22; Ex. 1, DFS Consent Order ¶ 10; ECF No. 435-1, SSOF ¶¶ 17, 71 ("BNPP agreed to conduct an internal investigation into business conducted with countries subject to U. S. sanctions at a number of its subsidiaries and branches and covering the time period January 1, 2002 through December 3 1, 2009, including in Paris, London, Milan, Rome and Geneva."); ECF No. 435-83, Koch Report ¶ 157; Ex. 6, Koch Reply ¶ 95.

## IX.   MATERIAL FACTS CONCERNING PLAINTIFFS' CLAIMS

### A.   Plaintiffs

> 107.   There is no evidence that any BNPP Defendant processed transactions for the purchase of weapons that the GOS used to injure any Plaintiff.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1. In any event, it is controverted, incomplete, and misleading. *See generally*, ECF No. 435-52, Austin Report (opining on the al-Bashir Regime's increased intensity and means of procuring foreign arms, arming and financing its military, militia, and security forces, and developing a domestic arms industry after 1997 used against its civilian population were a direct result of BNPP's sanctions evasion and financial and transactional support for the GOS); ECF No. 435-53, Austin Reply (discussing "unchanged" conclusions "that BNPP not only funded GOS military operations and mass

atrocities, but also directly financed the acquisition of military and dual-use goods by the GOS").

Specifically:

    a. Starting in 1997, BNPP provided the GOS billions in revenue through intentional schemes to avoid U.S. sanctions that BNPP admittedly knew were causally linked to human rights violations.

        o ECF No. 435-1, SSOF ¶ 19 ("In 1997, shortly after the imposition of U.S. sanctions against Sudan, BNPP Geneva agreed to become the sole correspondent bank in Europe for" the CBOS);

        o *Id.* ¶¶ 20-31 ("BNPP's central role in providing Sudanese financial institutions access to the U.S. financial system, despite the [GOS's] role in supporting terrorism and human rights abuses, was recognized by BNPP employees" and "known and condoned by senior compliance and business managers at both BNPP Geneva and BNPP Paris," and "senior BNPP compliance and legal personnel repeatedly recognized BNPP's role in circumventing U.S. sanctions against Sudan, and yet allowed these transactions to continue . . . .");

        o *Id.* ¶¶ 34-41 (BNPP knowingly violated U.S. sanctions "because the business was profitable");

        o Ex. 126, Cozine Dep. at 105:22-106:16 (agreeing that BNPP plead guilty to violating U.S. sanctions with the knowledge that "the purpose or the concern underlying those sanctions was the prevalence of human rights violations, including slavery and denial of religious freedom");

        o *Id.* at 106:18-107:18 (agreeing that "violations of human rights and international humanitarian law in the Darfur region, and the failure of the Government of Sudan to disarm Janjaweed militiamen and apprehend and bring to justice Janjaweed leaders and their associates who have carried out human rights and international humanitarian law violations and other atrocities" was a purpose underlying the U.S. sanctions);

        o *Id.* at 108:15-190:2, 109:4-13 (agreeing that BNPP plead guilty to breaking "a number of sanctions-related laws, and that was in connection with U.S. dollar transactions," notwithstanding that U.S. sanctions "were meant to restrict U.S. dollar-related transactions for Sudan");

        o *Id.* at 119:15-123:15 ("[W]hat we did, what we pled guilty to, there is no dispute

in [BNPP's] supporting the Sudanese government, which was using funds to support terrorism and committing human rights abuses");

o   ECF No. 435-68, Hudson Report ¶¶ 18-21 ("BNPP's internal documents reveal that BNPP knew that the Bashir Regime was committing atrocities in the 1990s and 2000s.");

o   *Id.* ¶¶ 178-226 (detailing international reporting on Sudan and BNPP's internal documents and testimony to conclude that "BNPP knew not just that the Bashir Regime was violating human rights on a massive scale, but also that BNPP's services were serving as a pillar of support for the regime");

o   ECF No. 435-52, Austin Report ¶ 19 & n.18 ("BNPP documents demonstrate that from the near inception of the U.S.-imposed economic sanctions on Sudan, BNPP entered into banking relationships with Sudanese entities that the U.S. expressly prohibited by placing them on a Specially Designated Nationals (SDNs) listing; some of these entities played a significant role in the conduct and financing of GoS military activities…." "Oil profits, among other financial resources provided by the joint BNPP-GoS conspiracy, substantially fueled Sudan's military capacity, budget, and foreign purchases of military vehicles, aviation assets, and weapons that enabled various GoS military forces and their proxy militias to engage in war and other militarized activities against ordinary Sudanese people. An extensive body of literature exists documenting GoS military and security operations at this time, which included indiscriminate and targeted killings, bombing campaigns, torture, forcible displacement, and the scorched earth destruction of villages and livelihoods, which in turn led to famine and death by mass starvation and disease. Throughout the period of the joint conspiracy, BNPP was aware of the Bashir regime's highly militarized and lethal conduct. BNPP also knew that the financial transactions and revenue streams it facilitated for prohibited Sudanese entities directly contributed to that conduct, making it complicit with the GoS.");

o   *Id.* ¶ 19 n. 18 (Citing BNPP's witness admitting it was  aware that in pleading guilty to violating sanctions that these were enacted in response to Sudan's human rights violations, acknowledging that sanctions BNPP violated were enacted as result of GoS violations of international humanitarian law and human rights, and that BNPP thwarted the objectives of US sanctions against GoS, that that access to US dollars would allowed Sudan to develop its oil industry and that BNPP personnel were aware that BNPPs assistance to GoS was supporting human rights violations.);

o *Id.* ¶ 30 (discussing BNPP's financial payment schemes and structures used to willfully ignore the arms embargoes and directly fund GOS entities procuring arms and equipment for military operations).

o ECF No. 435-93, Verhoeven Report at 34-36 (notwithstanding "Sudan's dreadful human rights reputation," BNPP was the only "financial institution" with the requisite "particular technical and commercial expertise" that was willing to not only work with the GOS, but "serve as its main financial services partner");

o *Id.* at 38-42 (the GOS required "a bank to deposit their dollars and from whence, in secret, payments to USD accounts of trusted clients or creditors could be made," and found a willing partner in BNPP);

o *Id.* at 52 (during the intensification of the genocide in Darfur, BNPP "further intensified its lucrative collaboration and expanded its partnerships" with the GOS");

o ECF No. 435-63, Fogarty Report ¶ 229 & n.154 (From just 2002 to 2007, BNPP processed over $81 billion in transactions involving Sudanese U.S. dollar vostro accounts; a vostro account "is an account provided by an international correspondent bank [BNPP], acting as an intermediary, to a bank that does not have its own foreign bank branches [CBOS], permitting that bank to handle financial activity denominated in currencies [U.S. dollars] other than its home currency.");

o ECF No. 435-68, Hudson Report ¶¶ 61-82 ("BNPP's sanctions-evasion scheme" led to BNPP processing "more than $80 billion in U.S. dollar transactions . . . through Sudanese parties' accounts at BNPP" between just 2002 and 2009);

o ECF No. 435-64, Fogarty Reply ¶ 127 ("even prior to 2001, BNPP exclusively handled all of Sudan's foreign exchange earnings from 'oil, oil products, telephone fees, gold revenues and agricultural products' and in 2001, it added Sudan's overflight fees, which BNPP processed for Sudan's Civil Aviation Authority") (quoting Ex. 105, BNPP-KASHEF-00048093 at 00048099);

o ECF No. 435-52, Austin Report ¶ 18 & n.17 ("…between 2002 and 2009, BNPP processed more than $6 billion in oil revenue involving what appears to be Sudan's Central Bank (CBOS) and Sudan's national oil company, Sudapet");

- o *Id.* ¶ 26 (discussing a December 2007 email estimating BNPP Geneva was "feeding" the GOS with approximately USD $60 million per month representing about 10 percent of GoS revenue which played a "significant part" in allowing the GOS "to keep things runing [sic] in Khartoum");

- o ECF No. 435-53, Austin Reply ¶ 30 ("BNPP handled a sizable percentage of all Sudanese imports and exports: By 2006, letters of credit managed by BNPP Geneva represented approximately a quarter of all exports and a fifth of all imports for Sudan. Over 90% of these letters of credit were denominated in U.S. dollars. BNPP provided trade finance for $11 billion in Sudan transactions and processed over $80 billion in total transactions in USD vostros between 2002 and 2007.") (cleaned up);

- o ECF No. 435-83, Koch Report ¶¶ 153-55 (BNPP knew that, due to the U.S. embargo on Sudan, it should no longer process Sudanese payment orders in U.S. dollars);

- o *Id.* ¶¶ 159, 161, 162 (BNPP's wire-stripping began within days of the U.S. embargo first being imposed in November 1997 and was done to prevent transactions from being rejected or blocked in the U.S. due to the U.S. embargo against Sudan);

- o *Id.* ¶¶ 161-73 (BNPP deliberately modified and omitted references to Sudan in the payment messages accompanying the U.S. dollar wire payments for sanctioned Sudanese entities);

- o *Id.* ¶¶ 148-57, 161-63 (BNPP's Head Office in Paris not only authorized this wire-stripping practice, it required it) (discussing examples of BNPP Paris' approval of and participation in wire-stripping);

- o *Id.* ¶¶ 174-82 (BNPP's wire-stripping practice enabled BNPP to manage or finance billions of dollars' worth of U.S. dollar denominated letters of credit for Sudanese entities);

- o *Id.* ¶¶ 174-82 (BNPP also had a consistent, unlawful practice of resubmitting stopped payments for sanctioned Sudanese entities);

- o *Id.* ¶¶ 183-96 (BNPP opened accounts for so-called "Satellite Banks"—nine unaffiliated banks in Africa, Europe, and the Middle East—to serve as front company accounts for illicit Sudanese transactions, which is a classic money-laundering technique);

68

- *Id.* ¶ 36 (The U.S. Deputy Attorney General described BNPP as acting as "a *de facto* central bank for the Government of Sudan");

- *Id.* ¶ 147 (Over 90% of the oil transactions flowing through BNPP were denominated, paid, and processed in U.S. dollars);

- *Id.* ¶¶ 177-79 (BNPP's Head of Compliance, Mr. Strombelline, was well aware of the weaknesses in BNPP's compliance function that permitted non-US BNPP affiliates to evade U.S. sanctions and provide the Government of Sudan with access to U.S. dollars)

- *Id.* ¶¶ 207-08 (BNPP, including members of BNPP's General Management like ███████████████ (former Group Head of Compliance); ███████████ (former Global Head of ECEP), ███████████ (former Chief Executive Officer); ███████████ (former Head of Corporate and Investment Bank); and ███████████ (former Group Chief Operating Officer) had ample access to information about human rights abuses in Sudan);

- *Id.* ¶¶ 246-47 (BNPP's compliance program was defective by design and rendered ineffective by putting unqualified, uninformed employees in compliance management roles, where they were not competent to address the bank's compliance risks);

- *Id.* ¶¶ 265-62 ("[T]he bank had no due diligence procedures in place before it developed its KYC [Know Your Customer] review for banks in 2002" and its "post-2002 due diligence procedures consisted largely of 'putting the fox in charge of the hen house");

- Ex. 6, Koch Reply ¶ 3  (BNPP's ineffective compliance program was intentionally ignored by BNPP's senior management, the result of which facilitated BNPP's criminal scheme in support of the Government of Sudan.)

- *Id.* ¶¶ 65-66 (There is no record evidence that any BNPP employees actually followed any policies or procedures ensuring that BNPP avoid financing arms);

- *Id.* ¶ 115, n.187 (The conspiracy with the Regime was profitable for BNPP).

b. Those billions were sufficient to fund the GOS's entire military, militia, and security operations – oil revenues alone exceeded the GOS's entire military expenditures by over $4.4 billion (146% of expenditures).

o ECF No. 435-63, Fogarty Report ¶ 270 (from 1999-2009, oil export revenues were on average 146% of military expenditures, exceeding them by over $4.4 billion);

o ECF No. 435-88, Patey Report at 16-17 (oil revenues went from accounting for 8% of government revenues in 1999 to accounting for 68% by 2008);

o ECF No. 435-93, Verhoeven Report at 22-27 (noting linear relationship between oil revenue, government expenditures, and military spending, including in Darfur from 2003 onwards);

o ECF No. 435-53, Austin Reply ¶ 69 ("The War Chest: BNPP directly contributed to the mass atrocities in Sudan by channeling more than $20 billion in oil revenue into the GOS war chest that funded all military and security operations in the relevant period, including a new BNPP document showing that *all* of the GOS's main foreign currency revenue streams—meaning tens of billions of dollars—flowed through BNPP's conspiracy and partnership with the GOS.") (cleaned up);

o *Id.* ¶ 71 (noting Mr. Carisch's report for the UN Panel of Experts on Sudan documents that "'Sudan's revenues from oil, agricultural exports and regular taxations allows the State to fully fund its military presence in Darfur, its actions against the Darfur rebels and support for Chadian armed opposition groups.'" His report also states: 'The arsenal of weaponry used by Government forces in their premeditated and deliberate attacks includes both air and ground military assets and continues to expand as the purchase of new technologies continues unabated year upon year.'");

o ECF No. 435-52, Austin Report ¶ 77 ("Once the GoS oil revenue was deposited by BNPP into the Central Treasury via CBOS, this money was pooled for various GoS expenditures including for the military, intelligence, and security forces.");

o *Id.* ¶ 77 (noting that "[a]ccording to the IMF, U.S. government, and other reliable reporting, GoS expenditures were overwhelmingly committed to the military budget, which in turn was used to grow and sustain military operations, foreign arms procurement, and a domestic arms industry);

o *Id.* ¶ 86 (discussing during the class period BNPP directly and intentionally facilitated the receipt of oil revenue for the GOS totaling double digit billions

of USD in direct violation of U.S. sanctions which in turn allowed the GOS to excessively spend billions on military budgets,  prioritize its military budget and expenditures in order to specifically carry out acts of genocide and commit human rights abuses and repression as well as to continue enjoying the fruits of the oil profits);

o   *Id.* ¶ 87 (discussing publicly available data showing Sudan's oil revenues exceeded the country's budgeted military expenditures by as much as 217 percent, "retain[ing] billions in BNPP-transacted oil revenues that it could rely upon should the costs of its genocidal acts, human rights abuses, and repression rise");

o   ECF No. 435-64, Fogarty Reply ¶¶ 120-33 (discussing that the money the GOS received by way of the BNPP conspiracy "represents fungible monies available to fund military expenditures," and that "[o]ver the entire period from 1999-2009, government revenues from oil exports exceeded military expenditures by 46% on average");

o   *Id.* ¶¶ 254-65 (discussing BNPP's transactional facilitation of GOS relationship with Chinese state-owned companies, noting: "BNPP acknowledged the importance of oil revenues to GoS in a memorandum to its Internal Credit Committee in or around August or September 2005, stating that "the oil sector [had] become the cornerstone of the Sudanese economy." The memorandum went on to note that this development had resulted in a "beneficial effect on foreign political relations," including "[g]rowing support and protection from China, India and Russia."483 Two of those countries — China and Russia — were among the chief suppliers of weapons and military assets to GoS.");

o   *Id.* ¶ 271 (discussing that immediately after the BNPP-GOS conspiracy to violate U.S. financial sanctions, "[t]he World Food Program (WFP) estimated that from 1998 to 2002, nearly 175,000 Sudanese were displaced from two oil areas alone. Many of the forcibly displaced during Sudan's war fled after being bombed by GoS use of Antonov planes and helicopters. Within a year of Sudan receiving its first USD revenue from oil profits in 1999, the GoS began acquiring new weapons from abroad, and President Bashir announced that the GoS would build a domestic arms industry to supplement the government's already growing arsenal. In 2001 alone, Sudan procured sixteen new attack helicopters from Russia, approximately tripling its fleet. The U.S. State Department Peace Act Report of 2003 assumed that oil revenue was used to acquire HIND helicopters that were not in Sudan's inventory prior to 1999. The

UN Register of Conventional Arms indicates that Belarus reported exporting 46 large-caliber artillery systems — including howitzers and multiple launch rocket systems — to Sudan between in or about 2002 to in or about 2003.The GoS domestic arms industry also began production in earnest.");

o   ECF No. 435-53, Austin Reply ¶ 3 ("For more than a decade, BNPP channeled more than $21 billion in oil revenue and other proceeds to its co-conspirator, the Central Bank of Sudan. This revenue was commingled with other public funds and made available for military use and the GOS's campaigns of repression. The oil proceeds alone were sufficient to fully fund the GOS's military operations.");

o   *Id.* ("The sanctions-evasion conspiracy launched in 1997 by the GC8 team that formed BNPP's Sudan desk enabled the GOS to circumvent the U.S. embargo and prevented the embargo from deterring the GOS's human rights abuses by starving the al-Bashir Regime of financial resources. With the embargo thwarted, the GOS's access to the U.S. financial system gave it resources to expand military expenditures and intensify scorched earth campaigns in the south in the late 1990s and early 2000s.");

o   *Id.* ¶ 30 ("For the in-scope period, from 1999-2009, Sudanese oil export revenue exceeded military expenditure.") (cleaned up);

o   *Id.* ¶ 80 (discussing "BNPP-enabled GOS revenue streams fully funded the mass atrocities alleged in this case"… "given that oil was just one of the GOS revenue streams handled enabled revenue exceeded government defense by BNPP, the amount by which BNPP- spending is likely far greater");

o   *Id.* ¶¶ 82-94 (discussing BNPP experts' "disregard of international standards on terrorist financing which make clear that providing fungible funds to a violent criminal enterprise is a form of reverse money laundering that directly contributes to attacks");

o   *Id.* ¶¶ 95-98 ("My investigations in the late 1990s, early 2000s, and during the period since 2016 revealed that as the GOS was enriched by fungible oil proceeds, it massively increased its military expenditures. As the FATF guidance makes clear, the causal link is the same regardless of whether the GOS specifically allocated oil revenue on defense spending, or if oil revenue freed up other funds, making them available for defense spending.");

o *Id.* ¶¶ 108-11 (referencing and discussing fact that BNPP channeled enough oil revenue, among other revenue streams, to the GOS to cover both the legitimate and illicit actions of the defense and security forces, although BNPP experts point to little if any legitimate military spending);

o ECF No. 435-93, Verhoeven Report at 26-27 (much of the revenues received by the GOS were "spent on fancy new kit that served to not only kill insurgents but also terrorize populations," including the establishment of a domestic military industrial complex);

o *Id.* at 27-28 (revenue was spent on enhancing the capabilities of the NISS and other security agencies);

o ECF No. 435-54, Baldo Report ¶¶ 177-85 (documenting the use of "new weapons systems" such as helicopter gunships and Antonov airplanes, a reinforced armored brigade, and the purchase of "the loyalty of proxies" as attributable to "oil revenue");

o *Id.* ¶¶ 193-201 (same for atrocities in Darfur);

o ECF No. 435-52, Austin Report ¶ 45 ("With the use of newly acquired helicopter gunships, airplanes, and weapons, GoS military forces, with the support of their armed proxies like the Janjaweed, attacked, bombed, killed, and displaced people; sowed terror; and destroyed homes, villages, and livelihoods.");

o *Id.* ¶ 78 (discussing the rapid rise of defense expenditures by GOS once receiving revenue from oil transactions processed by BNPP compared to public welfare expenditures);

o *Id.* ¶¶ 159-67 (detailing the GOS's new military aviation era once BNPP began financing and helping the GOS sell its oil on the international market the revenues with which the GOS purchased new attack jets and helicopters resulting in the death and injury of innocent people as well as the destruction of their homes and livelihoods. For example, "[i]n 2001 alone, Russia exported 12 attack helicopters to Sudan, tripling the GoS attack helicopter fleet.");

o *Id.* ¶ 164 ("Official trade statistics reported by Sudan to the UN Comtrade database paint a fuller picture of the country's spending on aircraft procurement over the relevant time period. These statistics show that the total value of aircraft and related parts imported by Sudan trended upward between 1999 and

2011, rising from nearly USD \$8 million to about USD \$135 million, an increase of nearly 1,600 percent.");

- o *Id.* ¶ 166 ("The same types of military aircraft that GoS purchased during the period of focus were regularly employed by GoS in the commission of human rights abuses. In or around January 2005, a UN International Commission of Inquiry on Darfur studied reports from governments, the UN, and other sources and concluded that there had been 'consistent accounts of a recurrent pattern of attacks on villages and settlements, sometimes involving aerial attacks by helicopter gunships and fixed-wing aircraft (Antonov and MIG), including bombing and strafing with automatic weapons.'");

- o *Id.* ¶¶ 213-221 (discussing "because BNPP directly assisted the GoS with selling its oil on the international market, generating revenues that fed the Sudan's Central Treasury, GoS was able to purchase small arms and light weapons for use in attacks on civilians");

- o ECF No. 435-53 ¶ 43 ("The principal source of funding for arms embargo violations committed in the Darfur region and for supporting non-State armed groups that operate in the wider Sudanese-Chadian region is largely based on the two involved States' ability to raise legitimately taxes and other revenues. The most lucrative single source of income for the Sudan and Chad are derived from their recently established oil production and exportation capacity.") (citing UN Security Council, Report S/2008/647, Letter dated 7 November 2008 from the Chairman of the Security Council Committee established pursuant to resolution 1591 (2005) addressed to the President of the Security Council (11 November 2008) (authored by BNPP expert Carisch), ¶ 283);

c. The GOS used its military, militia, and security services to conduct a brutal ethnic cleansing campaign against the targeted populations from which Plaintiffs come.

- o ECF No. 435-54, Baldo Report ¶ 86 (Sudan's "oil proceeds were pooled with other sources of revenue and used for general expenditures—and those expenditures were dominated by spending on the SAF, National Security, and militias—the perpetrators of the human rights abuses and atrocities");

- o *Id.* ¶ 108 (the Regime "targeted ethnic and religious minorities in South Sudan, Nuba Mountains, Blue Nile, and Darfur regions to assert and impose its version of Islam and Arabism on minority groups of African origin as the dominant religion and culture of the country.");

74

- ○ *Id.* ¶¶ 116-21 (the Regime targeted political dissidents for detention and torture);

- ○ *Id.* ¶¶ 130 & 209 (describing the roundup of Zaghawa following a 2008 JEM attack on Khartoum);

- ○ *Id.* ¶ 136 (describing "sweeps" of "war and famine refugees," mostly coming from marginalized groups);

- ○ *Id.* ¶¶ 143-48 (the Regime cultivated ties to extremist Muslim groups and considered Christians and liberal Muslims to be enemies of the Regime);

- ○ *Id.* ¶¶ 151-52 (morality police attacked women, especially non-Muslims);

- ○ *Id.* ¶¶ 167-70 (the Regime stoked existing ethnic rivalries, including between the Dinka and Nuer);

- ○ *Id.* ¶ 174 ("Oil became the cause of, and main objective of, an intensification in the Bashir Regime's assault on civilians" in the southern Sudan, Nuba Mountains, and South Kordofan regions, as oil money allowed the Regime to deploy "the regular army, Islamist militias from the North, as well as the paramilitary PDF);

- ○ *Id.* ¶¶ 177-85 (documenting the use of "new weapons systems" such as helicopter gunships and Antonov airplanes, a reinforced armored brigade, and the purchase of "the loyalty of proxies" as attributable to "oil revenue");

- ○ *Id.* ¶ 178 (Oil added "Russian-built Hind Mi-24V attack helicopters were used to clear tens of thousands of Sudanese away from the oil fields in Upper Western Nile and Abyei—and later in the villages of Darfur");

- ○ *Id.* ¶ 185 (noting the "dramatic escalation of state violence--involving the regime['s] new weapons systems acquired with oil wealth");

- ○ *Id.* ¶¶ 186-91 ("The intensification of the Bahir Regime's campaign of violence and abuse culminated in what was to be known as the Darfur Genocide.");

- ○ *Id.* ¶¶ 190-203 (describing the Regime's "ethnic cleansing campaign" in Darfur);

- ○ *Id.* ¶ 190 (In response to an SLM attack at the El Fasher airport in the capital of

Darfur, the GOS launched a "massive and brutal campaign" primarily targeting civilians from specific ethnic groups);

o *Id.* ¶ 197 (The GOS launched a coordinated joint air and ground attacks on the villages of Birmaza and Abu Sakin in late 2006 killing dozens of people);

o *Id.* ¶ 198 (Janjaweed and SAF coordinated attacks resulted in every village within 150 kilometers of the Chadian border being completely or partially burned);

o *Id.* ¶ 201 (GOS and allied militias launched large scale joint air and ground attacks in February 2008, killing more than a hundred civilians in the towns of Sirba, Silea, and Abu Suruj, in northern West Darfur);

o *Id.* ¶ 202 (GOS and allied militias killed many civilians and abducted and raped many women in an attack on Dirba in eastern Jebel Marra in December 2006);

o ECF No. 435-55, Baldo Reply ¶ 86 (Indiscriminate aerial bombardment of civilian populations were the main cause of forced displacements in the war in South Sudan, Nuba Mountains, Blue Nile, and Darfur regions);

o *Id.* ¶149 (GOS army and paramilitary PDF routinely raided villages and abducted children from conflict areas in southern Sudan, Blue Nile state, and South Kordofan Nuba Mountains area—and took them to northern Sudan);

o *Id.* ¶ 150 (it was government forces and armed militia, "primarily the Janjaweed but also other GOS henchmen," that were responsible for the displacement of millions in Western Sudan during the Class Period);

o *Id.* ¶ 152 (U.N. Commission of Inquiry found "one of the objectives of the displacement was linked to the counterinsurgency policy of the Government, . . . . to remove the actual or potential support base of the rebels [where] [t]he displaced population belongs predominantly to the three tribes known to make up the majority in the rebel movements, namely the Masaalit, the Zaghawa and the Fur, who appear to have been systematically targeted and forced off their lands. The areas of origin of the displaced coincide with the traditional homelands of the three tribes, while it is also apparent that other tribes have practically not been affected at all");

o ECF No. 435-93, Verhoeven Report at 16-17 (the al-Bashir Regime's precarious situation led it to double down on its repression of civilians as it entered into its

conspiracy with BNPP);

o *Id.* at 16-18 ("it was not a coincidence that most killed and displaced [in Darfur] belonged to the Fur, Zaghawa and Masaalit ethnic groups, who were most clearly associated, in the warped perception of the Al-Ingaz leadership, with the Insurgency");

o *Id.* at 20-21 ("the road to petrodollars was paved through ethnic cleansing" where Arab pastoralist Misseriya were promised "lucrative compensation" for siding with Khartoum on raids against the SPLA and local populations, many of whom were Dinka);

o *Id.* at 20 (In early 1999, "in a 10-day offensive, government forces swept through Ruweng county in Western Upper Nile, attacking and killing scores of civilians with Antonov bombers, helicopter gunships, tanks and artillery, abducting hundreds and burning over 6,000 homes, with a view to clearing a 100-km swath of territory around the oilfields");

o *Id.* (In the "oil-rich North-South borderzone", Heglig, Melut, Abyei, and Rubkona, there was a systematic campaign pursued through aerial bombardment, militia raiding and the deliberate destruction of property, "while murdering and kidnapping the 'recalcitrant' civilian population");

o *Id.* at 20-21 (Between 5,000 and 15,000 Dinka children and women were abducted and transferred to Baggara (Misseriya) tribesmen where they were abused, tortured, raped and killed);

o *Id.* at 21 (After the April-June 1999 offensive led by more than 1,000 government soldiers in Ruweng county, there was least 50% decline in local population, and human and material losses included the destruction of 17 churches);

o *Id.* at 26-27 (much of the revenues received by the GOS were "spent on fancy new kit that served to not only kill insurgents but also terrorize populations," including the establishment of a domestic military industrial complex);

o *Id.* at 27-28 (revenue was spent on enhancing the capabilities of the NISS and other security agencies);

o *Id.* at 33 (the Regime launched new offensives in 1998 and 1999 in the Nuba Mountains, Blue Nile, and Bahr al-Ghazal as it was "[r]eassured financially and

psychologically by the bank's assistance in blunting the impact of sanctions");

o *Id.* at 33-34 (the Regime's oil-clearing operations "targeted both the SPLA rebels and a civilian population that was assumed to sympathize with the insurgents and thus needed to be 'punished'");

o *Id.* at 37 ("There is no debate" among "embassies, NGOs, reporters and academics" that "both the enablement of the exploitation of oil and the revenues that accrued from it moved the conflict and commensurate repression of civilians into (much) higher gear.");

o *Ex. 5*, Jok Report ¶¶ 9-11 ("The GOS targeted non-Arab ethnic groups, moderate Muslims, and non-Muslims with vehemence.");

o *Id.* ¶ 12 ("After 1997, with access to modern weapons and vehicles, the military was able to inflict much greater violence and was a source of terror and constant fear to Sudanese citizens."), 23 (the GOS was better able to fund the Janjaweed after 1997);

o *Id*. ¶ 14 (Barrel bombings from Antonovs were "extremely common" in Southern Sudan, the Nuba Mountains, and the Abeyei region);

o *Id.* ¶ 16 (SAF used helicopters as part of the genocide in attacks in the Nuba mountains, in Abyei, and Upper Nile while GOS used them in Darfur, specifically in West Darfur, in the Zagawa territory);

o *Id.* ¶ 27 ("In and after 2003, the SAF increased the scale of destruction, displacement, and civilian casualties and suffering exponentially.");

o *Id.* ¶ 29 (the GOS and Janjaweed "targeted members of ethnically undesirable and inferior groups occupying valuable lands");

o *Id.* ¶ 42 (hearing firsthand accounts of state violence against residents from Abyei, Nuba Mountains, Kurmuk, and Damazin);

o *Id.* ¶ 97 (Christian women in Southern Kordofan, the Nuba Mountains and Southern Nile, as non-Muslim and non-Arab, were targeted by the regime for sexual violence);

o *Id.* ¶¶ 94-106 (describing sexual violence and insults targeted at "slaves" such as Christians and non-Arab Black African men and women);

- ECF No. 435-94, Verhoeven Reply at 34 ((noting the "hurricane of violence" that the GOS unleashed in the early 2000s in Western Sudan);

- ECF No. 435-52, Austin Report ¶ 21 (BNPP provided financial support to oil consortium member, Petronas during the period in which Petronas supplied jet fuel to GOS military aircraft in Darfur);

- *Id.* ¶ 43 (GOS used growing military capability to clear civilian populations from oil blocks and provinces containing oil blocks);

- *Id.* ¶ 45 (the GOS continued to strengthen its offensive capability to conduct large-scale indiscriminate and civilian-targeted aerial and ground assaults during the wars in the South and Darfur during the relevant period);

- *Id.* ¶ 47 (By 2004, there was widespread and international knowledge of the conduct of the Janjaweed and Sudan's paramilitary and military forces, in committing egregious human rights violations and atrocities in Darfur and elsewhere);

- *Id.* ¶ 71 (discussing BNPP's admissions that "BNPP's exclusive financial support to the GoS, the Sudan Central Bank (CBOS), Sudanese commercial banks, and other Sudanese state-controlled enterprises, particularly in Sudan's profitable oil sector, enabled the GoS military and security forces to inflict direct and massive harm on Sudanese civilians, including slavery, religious persecution, human rights violations, war crimes, crimes against humanity, and genocide.");

- *Id.* ¶¶ 75-78 & n.117 (discussing BNPP transactions' links to GOS's military activity, including "[a]t the broadest level, BNPP directly managed all of the GoS oil revenue out of the Geneva-based CBOS account that in turn directly "fed" the GoS Central Treasury with the budgetary funds required by Sudan's military and security forces to carry out their harmful activities [against the targeted civilian populations].");

- *Id.* ¶ 158 (In February 2007, the GOS leased aircraft operated by commercial freight company, Azza, and flew from Khartoum to El Geneina Airport in Darfur, carrying military personnel and materiel, and Trans Attico leased aircraft to the SAF and carried 66 Land Cruisers to Darfur between October 2006 and January 2007);

- *Id.* ¶ 178 (Ford Motor Company, who has a Land Rover subsidiary, noted to the

U.S. Securities and Exchange Commission in 2006 that there were "reports that machine-gun mounted Land Rover vehicles [had] been used by the Janjaweed and [GOS] in incursions against the civilian population of Darfur");

o ECF No. 435-53, Austin Reply ¶ 3 ("Enriched with revenue laundered through BNPP, the GOS intensified its acquisition of arms, intensified the atrocities committed by military, security, and militia forces, and opened a new battle front in Darfur that intensified into what the ICC determined to be large-scale genocide, war crimes, and crimes against humanity, resulting in the ICC issuing arrest warrants for President al- Bashir and other officials.");

o *Id.* ¶ 142 ("The products that Renault supplied to GIAD in that time period include militarizable logistics trucks used by the SAF and Janjaweed militias");

o *Id.* ¶¶ 151-57 (The Sudanese Armed Forces used civilian airport infrastructure in Darfur to stage aerial bombing attacks, transport supplies, and deploy materiel including Land Cruisers fitted with heavy machine guns or rocket launchers, including at airports in El Fasher, Nyala, and El Geneina, which "were maintained and equipped by BNPP's client the CAA").

o Ex. 7, Keller & Rosenfeld Report at 9 ("The plaintiffs were primarily from the region now known as the country of South Sudan or from the Darfur region of western Sudan. They identified as members of a wide range of Sudanese tribes, including Massalit, Fur, Baka, Dinka, Kuku, Bari and Balanda. Most plaintiffs identified as being of Christian or Muslim faith backgrounds.").

d. BNPP also directly processed transactions for both GOS military, including weapons and dual use equipment, as well as facially non-military and capital goods, used against the targeted populations.

o ECF No. 435-93, Verhoeven Report at 45-46 (discussing BNPP's transactions with the CAA, and "how the CAA helped military operations," as noted by the UN);

o ECF No. 435-54, Baldo Report ¶¶ 55-60 (discussing the "commingling of civilian and military air infrastructure");

o Ex. 126, Cozine Dep. at 243:14-244:2 (BNPP's Rule 30(b)(6) witness Dan Cozine testifying that "within [Sudan] at this time, there was a lack of true distinction between something that may be considered civil and something that may be considered military");

80

- ECF No. 435-52, Austin Report ¶ 20 (detailing BNPP's banking relationships with Sudanese SDNs under the control of military institutions directly involved in the genocidal violence);

- *Id.* ¶ 21 (discussing a BNPP 2005 transaction list indicating ECEP Paris's expected pre-export deal related to Petronas in Sudan during the period in which Petronas supplied jet fuel to GOS military aircraft in Darfur);

- *Id.* ¶ 82 (discussing "military material acquired by the GoS military during BNPP's more than decade long criminal conduct continued to be demonstrably deployed against Sudanese civilians long after BNPP ceased its Sudan business");

- *Id.* ¶ 83 ("Besides acting as the primary financial lifeline for the Central Treasury, BNPP also provided financial support to other GoS agencies that directly supported the military objectives of the Bashir regime, including the Ministry of Finance, Ministry of Defense, Ministry of Energy and Mining, Ministry of Culture and Information, foreign embassies, and military attachés");

- *Id.* ¶ 84 (discussing BNPP's facilitated transactions' history with State-Controlled Enterprises (SCEs), complex commercial fronts designed to conceal their true beneficiaries from public purview since most of the beneficiaries included the military, intelligence, and security forces as well as other economic engines powering the GOS security apparatus with direct links to human rights abuses);

- *Id.* ¶ 89 ("It is likely that most of the BNPP transactions concerning Omdurman Bank directly or indirectly financed military activities and violations of arms embargoes on Sudan that in turn were used specifically for carrying out human rights abuses and repression against Sudanese civilians. Other known banks that BNPP transacted with included the Bank of Khartoum, Bank of Sudan, El Nilein Industrial Development Bank, Farmers Commercial Bank, and Islamic Cooperative Development Bank, which were all on the SDN list due to their direct link to human rights abuses and repression);

- *Id.* ¶ 94 (discussing BNPP- arranged vostro accounts likely helped the GOS conduct military-related transactions outside the country through its foreign military attachés);

81

o *Id.* ¶ 97 ("Based on my veteran experience investigating corruption and arms embargo violations, these non-normal vostro accounts are highly likely an indicator of arms embargo busting and/or corrupt channels for directing funds to certain key individuals, including GoS military beneficiaries, outside of normative state structures.");

o *Id.* ¶ 99 (discussing BNPP's transactional support for the GOS's post-U.S. sanctions scheme helped the Regime to shift from direct to indirect institutional financial control through an outward appearance of privatization for concealment purposes of State Controlled Entities involvement in arms embargo violations.);

o *Id.* ¶ 101 ("The GoS used SCEs to funnel revenues to military, intelligence, and security force beneficiaries, all of which bore responsibility for human rights abuses during the relevant period.");

o *Id.* ¶ 102 -104 (discussing the SCEs (many of them SDNs) supported by BNPP facilitated transactions);

o *Id.* ¶¶ 107-10 (discussing BNPP financial transactional support for Ministry of Defense and attaches in arms purchases: "My veteran knowledge of the arms brokering process has taught me countries worldwide generally rely upon their embassies, and in particular their military attachés, to broker and transact arms transfers, particularly those involving government-related arms transfers. Russia, Ukraine and Belarus are prime examples, and all three provided government authorized arms transfers to Sudan. For example, the GoS purchase of Russian MiGs from the Russian Aviation Corporation (RSK MiG), which was authorized by both exporting and importing governments and allegedly was brokered by the GoS attaché in Moscow and processed on USD accounts.");

o *Id.* ¶¶ 112-17 (discussing BNPP facilitated transactions and direct support for Sudanese military vis-à-vis the GOS's "bank of the armed forces" Omdurman Bank and Omdurman-linked SCEs which "acted as the banking epicenter for GoS military financial support, [and] had a direct and foreseeable causal link to the human right abuses and violence that the GoS military carried out on the Sudanese civilian population.");

o *Id.* ¶¶ 118-20 (discussing BNPP's financial and transactional support to the GOS oil sector and Omdurman National Bank enabling the GOS to build up its domestic capacity to manufacture arms and other military assets, which were

used to commit the human rights abuses against Sudan's civilian population)

o *Id.* ¶ 121 (discussing BNPP's transactional support for Sudan's Military Industry Corporation ("MIC"), Sudan's overarching military production and procurement organization, which during the period of focus "operated five military plants near Khartoum that produced or assembled the type of weapons documented to have been used in human rights abuses against Sudanese people, such as ammunition, light infantry weapons, military vehicles and aircraft, and Sudanese versions of the T-55 tank.");

o *Id.* ¶¶ 126-31 (detailing BNPP's financial transaction history with military conglomerate GIAD, responsible for dual-use military machinery (weaponized civilian vehicles) used by the GOS in the Darfur genocide);

o *Id.* ¶¶ 132-36 (discussing BNPP's financial and transactional history with High Tech Petroleum, a petrochemical company belonging to High Tech Group (High Tech) which was also placed under U.S. sanctions for providing the GOS with funds that enabled it "to purchase arms and further fuel the fighting in Darfur" and "likely contributed to GoS military operations against civilians vis-a-vis High Tech's ownership interest in companies that maintained and/or produced military and dual-use vehicles and aircraft");

o *Id.* ¶¶ 137-51 (detailing BNPP's financial transaction history directly supporting Sudan's Civil Aviation Authority's whose militarized aviation operations, including transporting Sudanese Armed Forces' weapons into Darfur in violation of arms embargoes, were used against Sudan's civilian populations from which the Plaintiffs came);

o *Id.* ¶ 140 (noting "[i]t is highly likely that the use of CAA registration numbers on Sudanese Armed Forces aircraft was an attempt by GoS to hide its transport of military equipment into Darfur in violation of the UN arms embargo. Military flights suspected by the UN Panel [of which BNPP expert Enrico Carisch was a member] of carrying arms and military equipment into Darfur were also logged by the CAA.");

o *Id.* ¶ 141 ("Evidence collected by the UN Panel [of BNPP expert Carisch] and admissions from the Sudanese Armed Forces indicate that the Sudanese Armed Forces contracted commercial airfreight companies and their planes for the regular transport of light and heavy weaponry and large numbers of 4x4 vehicles into Darfur.");

- ○ *Id.* ¶¶ 157-58 (detailing BNPP's financial transaction history with GOS leasing of foreign aircraft used to carry out military activities and operations against the targeted civilian populations during the relevant time period);

- ○ *Id.* ¶¶ 168-73 (detailing BNPP's financial relationship with the Malaysian petroleum company Petronas, one of the main suppliers of jet aviation fuel to GoS aircraft used to perpetrate the Darfur genocide beginning as early as 1998 noting "*Amnesty International* reported in 2004 that the "Sudanese Air Force [...] was able to fly and remain operational because of fuel supplied by oil companies for its planes who launched deliberate and indiscriminate aerial bombardment of civilians." The importance of fuel for GoS military aircraft was underscored in 2007, when the UN Panel [of BNPP expert Carisch] recommended that the UN Security Council issue a demand for all States to "take the necessary measures to prevent the sale or supply [...] of aviation fuel for military aircraft of the government of the Sudan operating in Darfur.");

- ○ *Id.* ¶ 174 ("Military and dual-use vehicles were a linchpin of GoS efforts to violently depopulate oilfields of civilians in the southern and western parts of the country and carry out other human rights abuses . . . .  BNPP helped GoS purchase both types of vehicles as well as manufacture military vehicles by providing forms of payment security for Sudanese banks that in turn facilitated GoS procurement of vehicles and associated parts. BNPP's business with the Sudanese auto sector was substantial: According to an internal memo, vehicles were one of the main imports covered by the more than $570 million in Sudan-related L/Cs from BNPP Geneva over a three-year period ending in 2004. It is highly likely that BNPP L/Cs covered a substantial amount of Sudan's military and dual-use vehicle imports beginning as early as 1998 given their priority to the GoS.");

- ○ *Id.* ¶¶ 174-92 (detailing BNPP financial transactions facilitating the GOS's massive increase in vehicle imports. In 2011, Sudan reported importing about $1.11 billion in vehicles, an increase of about 790 percent from 1997, when it imported nearly $126 million, according to UN Comtrade. In total, Sudan reported importing more than $11.3 billion in vehicles over that 15-year span. And noting, "[v]ehicles used by the military allowed for the efficient movement of troops, weapons, and supplies to GoS military staging grounds for use in subsequent attacks against civilians and villages. The security forces also relied upon vehicles to assist them in forcibly detaining individuals and other acts of repression.");

o  *Id.* ¶ 208 (summing up prior paragraphs detaling the GOS's increased procurement of Antonov aircraft during the class period and noting "[i]n all likelihood, GoS would not have had the financial resources or the access to international markets that was necessary for the procurement and maintenance of Antonovs were it not for BNPP assistance. The financial support provided by BNPP to Sudan's civil aviation sector, as well as BNPP's willingness to feed the Sudanese treasury with oil revenues, provided GoS the requisite funds to keep its Antonovs in the air bombing civilian targets. The flow of money through BNPP also enabled GoS in 2009 to establish a domestic facility where Antonovs and other aircraft could be manufactured and maintained and thereby extend the shelf life of military aviation assets for longer use against civilian populations.");

o  *Id.* ¶¶ 209-12 (discussing BNPP's transactional relationship with Sudanese entities in the communications sector — such as Sudatel and the Sudan National Broadcasting Corporation and the Ministry of Culture — on the U.S.'s SDN list due to the use of telecommunications in the human rights abuses and repression of the Plaintiffs' populations);

o  *Id.* ¶ 242 ("BNPP processed Sudanese trade transactions it specifically referenced as 'equipment' and 'capital goods.' I've written extensively on arms deliveries that were either purposefully mislabeled or generically labeled as forms of 'equipment' to avoid sanctions- monitoring detection. Based on my veteran experience uncovering similar instance of UN arms embargo violations in the DRC and Liberia, and elsewhere, I believe it is highly likely that at least some of these transactions pertained to the importation of military and/or dual use equipment and were intentionally labeled in such generic fashion as a BNPP sanctions-evasion tactic.");

o  *Id.* ¶ 248 ("Of particular note is the transactional accounts recorded by BNPP that overlap with a Bank 4 LORI account, an 'Unknown Individual', referred to as an 'economic beneficiary of an airline,' a UAE corporate, and a Sudan Corporate. Although the identities of each node are concealed, the particular characteristics fit the profile of a sanctions-busting, gunrunning operation under the direction of the Russian arms trafficker Victor Bout, who I knew to be operating in Sudan from my own past research in the region.");

o  ECF No. 435-53, Austin Reply ¶ 3 ("Through credit facilities and international funds transfers, BNPP (1) facilitated the acquisition of armored vehicle components by GIAD (a sanctioned state-controlled entity), (2) financed the

importing of aviation infrastructure equipment by Civil Aviation Authority, which provided the air bases used for aerial bombardment of the civilian population, and (3) provided financial services to key nodes in Sudan's network in the international arms trade and military-industrial complex, including military attaches, the Ministry of Defense, and other state-controlled entities including Omdurman National Bank—which is "commonly known in the Sudan as the bank of the Sudanese Armed Forces" according to a report of the UN Panel of Experts on Sudan, Carisch's previous employer.");

o *Id.* ¶ 46 ("Inherent in the nature of a number of industries is a distinct potential for supplying, directly or indirectly, willingly or unwillingly, belligerent parties to the Darfur conflict. They are arms and ammunition manufacturers, manufacturers of 4x4 vehicles and heavy trucks, air and sea transportation companies, providers of communication services (telephone and e-mail) and website providers.") (citing UN Security Council, Report S/2009/562, Letter dated 27 October 2009 from the Chairman of the Security Council Committee established pursuant to resolution 1591 (2005) addressed to the President of the Security Council (29 October 2009) (authored by BNPP's expert Carisch, ¶ 363);

o *Id.* ¶ 58 (discussing BNPP Compliance Officers expressing concern for BNPP's handling transactions with "companies that could have, directly or indirectly, a connection with the arms industries" in the "Chinese context," and the internal failures to exclude transactions that would inhibit such an illicit activity. Mr. Carisch also fails to consider the reasons as to why BNPP had not de-risked from Chinese transactions when it considered its Chinese transactions, in essence, militarized.") (citing BNPP documents);

o *Id.* ¶ 61 (discussing BNPP expert's failure to account for BNPP financial transactional support to Sudanese entities listed as Unknown Individuals and Unknown Corporates, "allow[ing] for the likelihood that these entities were connected to the GoS and related GoS military activities");

o *Id.* ¶ 62 (discussing "BNPP transactions that in a sanctions-busting context would be scrutinized as potentially being used as fronts for GoS military activities or having GoS military links, especially in light of BNPP's own recognition of their 'sensitive' nature. These include, among others, payments for 'tuition fees,' 'military attachés,' and 'charities.'");

o *Id.* ¶ 65 (discussing BNPP expert's failure "to grasp the common meaning of

86

prohibited items and activities under national and multilateral arms embargoes and sanctions regime. For example, … to recognize BNPP Paris' 'financial assistance' to the Ministry of Defense, the primary government agency responsible for conducting GoS military activities, as de facto support to the Government of Sudan's military activities in both letter and intent under the applicable 2004 EU arms embargo on Sudan" prohibiting…'*to provide financing or financial assistance related to military activities, including in particular grants, loans and export credit insurance, for any sale, supply, transfer or export of arms and related materiel, or for any grant, sale, supply, or transfer of related technical assistance, directly or indirectly to any person, entity or body in, or for use in Sudan..'"*);

o  *Id.* ¶ 67 (discussing BNPP expert's failure to "account for BNPP's admitted lack of knowledge concerning the customers of its client banks for whom BNPP processed transactions, which possibly included military suppliers, arms dealers, Janjaweed, and/or other entities with military linkages to the GoS given Sudan's historical support for terrorism and widely reported GoS linkages to such entities");

o  *Id.* ¶ 68 (discussing BNPP's expert's overlooking "a significant document concerning BNPP's process for arms embargo screening that demonstrates BNPP's wholly unacceptable screening standard of reliance solely on how 'well-established' the GoS suppliers are, without evaluating the goods in question or their purported or potential end-use);

o  *Id.* ¶¶ 74-75 (discussing "numerous BNPP documents reveal that "from the first barrel," BNPP handled **all** of the GOS's proceeds from its share of crude oil and oil products exports.") (emphasis added);

o  *Id.* ¶ 78 (discussing BNPP's failure to identify the nature of the transactions related to the  "$22.2 billion in GOS oil and additional revenue in agriculture exports, BNPP facilitated" and the "GOS revenue derived from the foreign exchange received by the export of goods and services, as well as customs duties and tariffs" processing "more than $81 billion in transactions involving Sudanese U.S. dollar vostro accounts between 2002 and 2009, including over $11 billion in disclosed trade finance payments and over $21 billion in unexplained book- to-book transfers");

o  *Id.* ¶¶ 99-107 (discussing the specific weapons' systems procured by GOS through BNPP-transactions, including  "small arms, light weapons, associated

ammunition, and military weapons and parts (collectively SALW) from 1997 through 2011", "dual-use vehicles, aircraft, and technology," "military aircraft", "military vehicles", "domestic arms", "domestic arms manufacturing", "paying, training, and equipping military personnel and allied militias", and "maintaining logistical supply lines to theaters of combat in the South and Darfur");

o *Id.* ¶ 135 ("BNPP's internal documents reveal that BNPP (1) financed international transactions supplying GIAD, Sudan's leading armored vehicle manufacturer; (2) issued credit to the Sudanese Civil Aviation Authority, which managed the airbases used by the Sudanese air force to launch attacks against civilian populations; and (3) issued credit and made wire transfers for key participants in Sudan's military-industrial complex and arms trade network—transactions that BNPP has buried in a mass of $81 billion in transactions involving Sudan.");

o *Id.* ¶¶ 136-44 (discussing that "[d]uring the peak years of the Darfur genocide, BNPP Paris financed the export of "militarizable" truck parts to Sudan's principal manufacturer of armored vehicles, GIAD" used against civilian populations from which Plaintiffs come);

o *Id*. ¶ 148 ("In short, BNPP internal documents and admissions, cross-referenced against other sources, leave no doubt that BNPP directly financed the GOS's acquisition of militarizable trucks from Renault and that these vehicles, fitted with heavy weaponry, were supplied by the GOS to its Janjaweed forces in the field in Darfur. Under the FATF framework on fungible material support, BNPP's financing of Renault- GIAD transactions significantly contributed to the GOS's capability to mount attacks against civilians in Darfur, either through the direct use of BNPP-financed GIAD army trucks in such attacks, or the freeing up of other resources used in the attacks.");

o *Id.* ¶¶ 149-66 (in-depth discussion of "BNPP Paris and BNPP Geneva jointly financed Sudan's Civil Aviation Authority infrastructure—an agency Mr. Carisch admits was "commandeered" by the military and used for aerial bombing and logistics" during the Darfur Genocide);

o *Id*. ¶ 152 (pointing out BNPP expert Mr. Carisch "is well aware, the UN Panel documented the GOS using civilian airports in Darfur as "bases for offensive military flights." The GOS used the airports at El Fasher, Nyala, and EL Geneina in Darfur for "aerial bombardment and the delivery of arms by air."

These airports were maintained and equipped by BNPP's client the CAA. Mr. Carisch's 2008 UN Panel Report observed: SAF military Antonovs also continue to operate in Darfur in a military support role. Antonov-26 aircraft with the tail numbers 7705, 7710 and 7777 have been observed by the Panel at the Nyala, El Fasher and El Geneina airports throughout the 2008 mandate. These aircraft are mainly white and carry no identifiable military markings apart from their tail numbers and are operated and serviced by SAF personnel. Seen by the Panel typically parked beside military supply dumps, it is these aircraft that are suspected of carrying out Government bombing of areas throughout Darfur.");

o   *Id*. ¶ 158 (BNPP was "the main bank" of the Civil Aviation Authority, according to a document produced by BNPP after opening report showing BNPP transactions directly helped the CAA maintain the aviation infrastructure used by the GOS for aerial attacks on civilians and for supplying its regular and auxiliary ground forces, including the Janjaweed);

o   *Id*. ¶ 172 (discussing likelihood that BNPP hidden transactions were for military or dual-use goods noting Plaintiff's expert report of Timothy Fogarty summarizing BNPP Geneva's 527 USD transactions, valued at $154.3 million, involving the import of "Equipment" to Sudan between 2002 and 2009);

o   *Id.* ¶ 176 (noting the existence of "[o]nly one scrap of data has been produced in unredacted form by BNPP regarding this relationship and this credit facility [to the Ministry of Defense]." With "[t]he true significance of this document is not the amount of 'final risk,' it is the fact that BNPP extended credit to Sudan's Ministry of Defense at the height of reporting on the Darfur genocide ....");

o   *Id.* ¶¶ 185-86 (discussing BNPP expert Carisch's admissions "that China delivered "a significant amount of military weapons, goods, services and dual-use goods to Sudan" during the in-scope period, including "bladed weapons, military weapons, other firearms, weapons parts, and [...] special purpose vehicles and delivery vehicles. . . . ." and the "evidence demonstrating BNPP's role in supporting China's interests as partners in the Sudanese oil sector");

o   *Id.* ¶ 191 ("It is no coincidence that between 1996 and 2006, Sudan was able to significantly increase its ability to produce small arms and ammunition. During this decade, the GOS was flooded with oil revenue and U.S. currency, channeled through BNPP's sanctions-evasion scheme. The causal link between these events—and the mass atrocities they enabled—is the same link drawn by

the FATF guidance on fungibility. The oil revenue enabled by BNPP's criminal conspiracy with the GOS sustained—in numerous ways—the capability of the GOS to commit atrocities against the civilian population on a massive scale, across a massive territory, for more than a decade. The flow of BNPP-enabled revenue enabled the GOS to conduct aerial bombing from airports maintained by BNPP's client the Civil Aviation Authority. It enabled the GOS to mount artillery on Renault trucks retrofitted by GIAD and deployed to the GOS's Janjaweed militias in Sudan. It enabled the GOS to recruit, arm, train, equip, and transport military and paramilitary forces. And it enabled the GOS to maintain the military bases and NISS headquarters from which the GOS carried out its campaign of attacks and persecution against tens of thousands of civilians, including the plaintiffs and the class members.");

o ECF No. 435-63, Fogarty Report ¶¶ 150-51 ("BNP Paribas did little due diligence and was willfully blind to the risk that US dollars flowing from Sudan to China, through BNP Paribas accounts, were being used to purchase military equipment or weapons.");

e. BNPP's sanctions violations also provided revenue that the GOS used to entrench itself and purchase the loyalty of the SAF, security services, and militias such as the Janjaweed all which committed atrocities against the targeted civilian populations.

o ECF No. 435-93, Verhoeven Report at 11-13 ("tamkeen" is the "idea of fast-tracking some constituencies and individuals," such as "prominent Islamists," "more biddable individuals," and loyalists such that "[d]oing business at a meaningful scale in Sudan in the 1990s meant having to engage – and often partner with – parts of the military-Islamist regime");

o *Id.* at 24-27 (the Regime "splashed out on fiscal stimulus," lavished capital expenditures to "benefit the regime's chosen groups of friends and allies," and "looked after its security services");

o *Id.* at 30-31 ("the financial sector remained in the hands of an increasingly entrenched party-state");

o *Id.* at 46-50 (describing banks that "mostly served the capital-based politico-military and economic elite and helped organize tamkeen," including Omdurman National Bank, the bank of the SAF, Kenana Sugar Company, and Sudatel, Sudan's largest telecommunications company);

o ECF No. 435-94, Verhoeven Reply at 18-20 (Regime spending was "simply throwing some red meat to supporters of the ruling political party, including the Merowe dam project);

o ECF No. 435-63, Fogarty Report ¶ 109 (the GOS used its increased revenues "to purchase the loyalty of southern militias with arms, supplies, and funding");

o ECF No. 435-68, Hudson Report ¶ 25 ("The surplus of [GOS] revenue on top of defense and security spending fed the patronage system that was the key to Bashir's survival," including that "Sudan's state security services controlled upwards of 80 percent of the country's economic sectors as varied as oil, banking, agriculture, livestock, and transportation.");

o *Id.* ¶¶ 84-85 (the Regime's "patronage networks widened" once oil exports began in 1999);

o *Id.* ¶¶ 239-52 (describing, in detail, the Regime's "patronage system that was the key to Bashir's survival," including "strategically placed tribal chiefs and local officials, political allies and militia leaders," and "Arab tribes in Darfur");

o ECF No. 435-89, Patey Reply at 41 (noting the increase in wages and "discretionary funds for political leaders" and "dollops of cash for myriad constituency services . . . helped nourish loyalties," and "consolidated power in Khartoum" through spending);

o ECF No. 435-69, Hudson Reply ¶ 54 (noting that BNPP's proposed expert Hufbauer "does not dispute that to remain in power, Sudan needed to simultaneously sustain its military/security forces with loyalty of militias and its entire corrupt patronage system," which were the Regime's "central financial demands," which "were met during the BNPP years");

o ECF No. 435-52, Austin Report ¶¶ 44-45 (discussing UN reports on Sudan's use of "parastatal" companies to maintain close control over its economy);

o *Id.* ¶¶ 123-26 (Sudan's military industrial complex [MIC] was a "complex web of SCE [state controlled enterprises] built to generate revenue . . . to sustain repressive military activities and operations against Sudanese civilians" where the MIC owned at least 14 SCE, some co-owned with other GOS agencies and/or instrumentalities involved in oil development, security, and banking, reflecting "the overarching reach of the Sudanese military into various sectors of Sudan's economy");

- o *Id.* ¶ 148 (the Regime provided Renault trucks to the Janjaweed);

- o ECF No. 435-54, Baldo Report ¶ 5 ("NISS also exercised significant control over the economy by dominating private industry, whether by outright beneficial ownership or control of financial institutions and businesses, or informal patronage and corruption. Military leaders were simultaneously involved in the private economic sector.");

- o *Id.* ¶ 13 ("The GOS recruited, armed, and bankrolled tribal militias from clans that self-identified as Arabs whom their victims called "janjaweed." The GOS paid and supplied these militias directly, using logistical ground and aerial supply chains to reach the remote western region of Darfur.");

- o *Id.* ¶¶ 43-46 (the NISS were under the command of the National Security Council, headed by al-Bashir);

- o *Id.* ¶¶ 73-75 ("The Government-Janjaweed nexus was an open secret" that was publicly admitted by "Musa Hilal, the paramount Janjaweed commander," and "the head of Sudan's security agency Sallah Gosh");

- o *Id.* ¶¶ 108-12 (the "National Security forces" were "an ever-present part of daily life in Sudan," including controlling education curricula, operating state-controlled mass media outlets, and monitoring civilians).

f.   Plaintiffs can identify their perpetrators as the GOS and its agents financed by BNPP.

- o *See* Plaintiffs' Responses to Proposed Fact Nos. 109-450;

- o Ex. 5, Jok Report ¶ 22 (the "Janjaweed are easily identifiable by the Sudanese population during the relevant time-period.");

- o *Id.* ¶ 53 (security forces sometimes "would show identification for intimidation purposes");

- o *Id.* ¶¶ 109-111 ("there is a baseline knowledge among the Sudanese population which is strictly hierarchical with which it can identify the government agents, whether they are military, security, or Janjaweed," "intimate connectivity between its citizens" allowing them to "be able to identify the attackers and torturers with specificity," including through the "actions" of "NISS agents");

- o *Id.* ¶ 113 ("The regular military is identified by Sudanese citizens by its insignia,

markings and uniforms.");

- o *Id.* ¶ 114 & nn.53-57 (cataloging how Plaintiffs identified their attackers, including through recognition of uniforms, markings on vehicles, and knowledge of history and context of the armed forces and security services);

- o ECF No. 435-54, Baldo Report ¶ 123 ("Any suggestion that victims detained by the NISS had no way of knowing they were being held by this state agency because their captors often were not in uniform or did not identify themselves as national security agents is baseless.");

- o *Id.* ¶ 127 (sometimes, national security agents self-identified, while other times "victims could identify their captors through circumstantial indicators");

- o ECF No. 435-55, Baldo Reply ¶ 26 ("thousands of victims of raided Fur, Zaghawa, Masalit communities identified their perpetrators as "Janjaweed" and used that term to describe the Arab tribal militias mobilized by the GOS");

- o *Id.* ¶¶ 26-36 (discussing ability of Plaintiffs to identify perpetrators and concluding that "the military, security, and militia forces who subjected the Plaintiffs to abuse are state actors, as defined by the UN Articles cited by Mr. Muller");

- o *Id.* ¶ 47 (the UN "Panel of Expert reports [authored by BNPP proposed expert Mr. Carisch] are unequivocal in identifying the GOS and its auxiliary militia/Janjaweed as the main perpetrators of atrocities").

108.   There is no evidence that any revenues processed by any BNPP Defendant were used to purchase weapons that injured any Plaintiff.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.   In any event, it is controverted, incomplete, and misleading for the reasons stated in Plaintiffs' Response to Proposed Fact No. 107, *supra*.

B.      **Plaintiff Abubakar Abakar ("Mr. Abubakar Abakar")**

   i.      *Alleged Attacks and Injuries*

            a.      **Nyala, South Darfur, circa 1998 or 1999**

109.    Mr. Abubakar Abakar testified that, in 1998 or 1999, individuals he identified as "security people" came to his home in Nyala to recruit him to fight in the Second Civil War. Ex. 28, Abubakar Abakar Tr. at 85:22–86:12; 87:16–19; 90:15–20; 93:18–94:1.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading. Mr. Abubakar is a member of the Masalit tribe, the largest of many tribes in the South Darfur region and targeted by the GOS for genocide. Ex. 131, Deposition of Abubakar Abakar ("Abubakar Abakar Dep.") at 65:11-20, 67:14-68:19; Ex. 5, Jok Report ¶ 11; ECF No. 435-55, Baldo Reply ¶ 152. He was required to receive military training to receive a salary, and the GOS frequently conscripted students such as Mr. Abubakar Abakar. *Id.* at 88:24-89:21; *see also* ECF No. 435-54, Baldo Report ¶ 70. Mr. Abubakar Abakar and other students at his university in Nyala were being conscripted to "be jihad" and fight in Juba in Southern Sudan. Ex. 7, Keller & Rosenfeld Report App'x C2 ("Abubakar Abakar App'x") at 2. He testified that, as a person with "a conscience as a human being," he refused to "go to fight in the south without any reason" by being conscripted into "Al Majahideen," Islamic warriors. Ex. 131, Abubakar Abakar Dep. at 86:1-21, 90:1-20. The "security people" that were sent to apprehend Mr. Abubakar Abakar were from the GOS and were known to Mr. Abubakar Abakar by name. *Id.* at 86:22-88:5.

110.    Nyala, the capital city of South Darfur, is not in an oil concession block. Ex. 138, Plaintiff Location Maps.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading. This proposed fact

is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local

Rule 56.1. Defendants' Exhibit 138 has been adulterated and is not a true and correct copy.    South

Darfur is an oil producing state, containing the oil concession Block 6, which, according to the

U.S. State Department, was licensed to the China National Petroleum Corporation, a client of

BNPP's.  Ex. 221, U.S. Department of State, Humanitarian Information Unit, "Southern Sudan:

Aerial Bombing by GOS (2002) in Relation to Oil Concessions", Apr. 30, 2003, published by

United      Nations      Office      for      the      Coordination      of      Humanitarian      Affairs,

https://reliefweb.int/map/sudan/southern-sudan-bombing-relation-oil-concessions-2002    ("State

Dept.   Map");   Ex.   253,   USAID   2001   Map,   University   of   Texas   Library,

https://maps.lib.utexas.edu/maps/africa/sudan_oil_usaid_2001.pdf.  ("USAID Map"); ECF No.

435-93, Verhoeven Report at 34 n.103; BNPP-KASHEF-00005440; BNPP-KASHEF-00005700.

Moreover, Darfur was of strategic importance to the Regime's control of Sudan's oil region

because of the discovery of important oil reserves in the desert. Ex. 123, Bazire Dep. at 87:24-

88:12 (Louis Bazire, Former Head of Territory for BNPP in Switzerland, testified: "From what I

remember, the intensity of communication about Darfur was higher in the years 2006, 2007. There

were demonstrations in the street, et cetera. I don't remember the reasons why, at this time, this

conflict was more intense. Probably part of this was coming from the fact that some important

reserves of oil were discovered in the desert. This is more or less what I remember")..

> 111.    Mr. Abubakar Abakar testified that he attended Nyala University with the
> individuals who he alleges attempted to recruit him.  Ex. 28, Abubakar Abakar Tr.

at 87:15–17.[7]

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  Mr. Abubakar Abakar testified that he fled from the "security people" attempting to "catch" him and forcibly conscript him into the GOS-backed Mujahideen, or kill him if he refused.  Ex. 131, Abubakar Abakar Dep. at 86:1-89:21.  The "security people" that were sent to apprehend Mr. Abubakar Abakar were from the GOS and were known to Mr. Abubakar Abakar by name. *Id.* at 86:22-88:5.  Mr. Abubakar Abakar went on to testify that he "used to be with that at university." *Id.* at 87:16-17.

> 112.    There is no evidence that the individuals used any weapons purchased with revenues processed by any BNPP Defendant in connection with this recruitment attempt.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.   In any event, it is controverted, misleading, and irrelevant.  The revenues provided to the GOS by the BNPP criminal conspiracy enabled the Regime to acquire weapons, purchase loyalty, and stay in power to enable it and its agents to commit sweeping human rights abuses against targeted populations in Sudan. *See* Plaintiffs' Response to Proposed Fact Nos. 107-08.  Moreover, the GOS required that "[c]ertain categories of the populations," including teachers and university students, to take mandatory PDF training sessions.  ECF No. 435-54, Baldo Report ¶ 70.  The PDF were integral to the GOS's depopulation strategy in Southern Sudan, oil important areas throughout Sudan, and

---

[7] The citation to "Ex. *23*, Abubakar Abakar," Defs. SMF ¶ 111 (emphasis added), appears to be a typo.

in the recruitment and provisioning of the Janjaweed in Darfur.  ECF No. 435-54, Baldo Report

¶¶ 73, 161, 174-75.  The revenues available to the GOS by way of its criminal conspiracy with

BNPP were used to lavish spending on the PDF and other security services employed against Mr.

Abubakar Abakar and those similarly situated.  ECF No. 435-93, Verhoeven Report at 25-27.

113.   Mr. Abukar Abakar testified that, after this recruitment attempt, he left Nyala for
Sulu, and eventually Baidha.  Ex. 28, Abubakar Abakar Tr. at 94:2–10; 95:23–96:7.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Mr. Abubakar Abakar left Nyala

for Sulu, where he remained for approximately one year, and returned to Gereida.  Ex. 131,

Abubakar Abakar Dep. at 94:2-95:7.  He left Gereida again after three months as it was unsafe,

and seven months later ended up in Baidha, where some friends from university lived.  *Id.* at 85:8-

96:7.  While living in Baidha, Mr. Abubakar Abakar witnessed airplanes from Khartoum and arms

being distributed from the local army barracks to the Janjaweed.  *Id.* at 126:2-23; Ex. 7, Abubakar

Abakar App'x at 2.

### c.   Danajour, West Darfur, November 2003

114.   Mr. Abubakar Abakar testified that, in November 2003, individuals he identified as
"Janjaweed" attacked Danajour.  Ex. 28, Abubakar Abakar Tr. at 103:25–104:24.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  Mr. Abubakar

Abakar witnessed the Janjaweed sweep in from the west and the north, arriving on horses and

camel and wearing a variety of civilian clothes, military uniforms, and jabeli (a long uniform for

men common among the Janjaweed).  Ex. 131, Abubakar Abakar Dep. at 117:7-118:1.  After they

set fire to the village, he saw smoke rising from the schoolhouse in Baidha where he and his wife

lived, approximately three kilometers away.  105:7-16, 123:7-15.  Mr. Abubakar Abakar knew

many of the men personally, including the Janjaweed leader Dabouk (a/k/a Dabuke) whose children Mr. Abubakar Abakar taught. *Id.* at 126:9-23. The Janjaweed killed 13 in Danajour, including three members of Mr. Abubakar Abakar's wife's family and one of his students. *Id.* at 126:9-23.

> 115.    Danajour, a village in West Darfur near Baidha, is not in an oil concession block. Ex. 138, Plaintiff Location Maps.

**Plaintiffs' Response:** Uncontroverted but incomplete misleading and irrelevant. This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1. Defendants' Exhibit 138 has been adulterated and is not a true and correct copy. Darfur was of strategic importance to the Regime's control of Sudan's oil region because of the discovery of important oil reserves in the desert. Ex. 221, State Dept. Map; Ex. 253, USAID Map; Ex. 123, Bazire Dep. at 87:24-88:12 (Louis Bazire, Former Head of Territory for BNPP in Switzerland, testified: "From what I remember, the intensity of communication about Darfur was higher in the years 2006, 2007. There were demonstrations in the street, et cetera. I don't remember the reasons why, at this time, this conflict was more intense. Probably part of this was coming from the fact that some important reserves of oil were discovered in the desert. This is more or less what I remember").

> 116.    Mr. Abubakar Abakar testified that the individuals burned the mill he operated in Danajour. Ex. 28, Abubakar Abakar Tr. at 109:2–10.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading. Mr. Abubakar Abakar testified that the Janjaweed burned down the mill that he owned in Danajour. Ex. 131,

Abubakar Abakar Dep. at 98:22-99:17, 109:2-10, 111:2-21; Ex. 232, Pl. Abubakar Abakar's Obj.

& Resp. to Defs. First Set of Interrogatories (Nos. 1-4) ("Abubakar Abakar Rog.") No. 1.

> 117.    There is no evidence that the individuals used any weapons purchased with revenues processed by any BNPP Defendant in connection with this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as

required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.   In any event, it is

controverted, misleading, and irrelevant.  The revenues provided to the GOS by the BNPP criminal

conspiracy enabled the Regime to acquire weapons, purchase loyalty, and stay in power to enable

it and its agents to commit sweeping human rights abuses against targeted populations in Sudan.

*See* Plaintiffs' Response to Proposed Fact Nos. 107-08.  Using the revenues from the BNPP

conspiracy, the GOS funded and equipped the Janjaweed during the Proposed Class Period.  ECF

No. 435-93, Verhoeven Report at 25-27; ECF No. 435-52, Austin Report ¶¶ 44-45, 148; ECF No.

435-54, Baldo Report ¶¶ 13, 73-75.

> 118.    Mr. Abubakar Abakar testified that the individuals held "Kalashnikov," "Jim," and other guns.  Ex. 28, Abubakar Abakar Tr. at 118:7–13.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Mr. Abubakar Abakar was able to

recognize the types of weapons due to his military training, and the types of guns used in the attack

were "well-known."  Ex. 131, Abubakar Abakar Dep. at 118:7-13.  He witnessed the Janjaweed

take weapons from the army barracks in Baidha on the morning of the attack in Danajour; the

Janjaweed taking weapons from the army barracks was "the normal thing."  *Id.* at 126:2-23.  AK-

type and G3-type assault rifles were common among the "GoS armed forces and allied militias

between 1999 and 2008."  ECF No. 435-52, Austin Report ¶ 218.

119.    Mr. Abubakar Abakar testified that he stayed in Baidha for "four to six months" and eventually went to Goz Beida, a refugee camp in Chad, and then the United States. Ex. 28, Abubakar Abakar Tr. at 152:3–16; 129:24–130:1.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Mr. Abubakar Abakar fled Baidha for the Goz Beida, a refugee camp in Chad, from which he was transferred to the Gaga refugee camp and then to a camp in Abeche, Chad.  Ex. 131, Abubakar Abakar Dep. at 154:15-155:2.  In 2010, Mr. Abubakar Abakar, his wife, and his children arrived in San Diego as refugees. *See* Ex. 195, PLA-000830 at 0831–33.

  *ii.    Damages*

120.    Mr. Abubakar Abakar has adduced no documentary evidence concerning his ownership or the value of any real or personal property for which he alleges he is entitled to compensation in this Action.

**Plaintiffs' Response**: Controverted and misleading.   Whether Mr. Abubakar Abakar possessed documents concerning his ownership of real or personal property nearly twenty years after he was forcibly displaced from Sudan is not determinative of his ability to prove damages. Indeed, Mr. Abubakar Abakar submitted detailed listings of his losses, including real and personal property, including a description of the farmland, homes, mill, and livestock that the Janjaweed burned or stole, including their use, size, and approximate value.  Ex. 249, Pls.' Suppl. Initial Disclosures (Dec. 21, 2022), at 6-7.

C.      **Plaintiff Turjuman Ramadan Adam ("Mr. Adam")**

  i.      *Alleged Attacks and Injuries*

    a.      **Wau, Western Bahr el Ghazal, 1998**

121.    Mr. Adam testified that, in 1998, individuals he identified as the "Intelligence [services]" detained him in Wau after a politician publicly denounced him. Ex. 31, Adam Tr. at 93:23–97:8.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  Mr. Adam is from the Kresh tribe, an indigenous African group from southern Sudan targeted by the GOS.  Ex. 136, Deposition of Turjuman Ramadan Adam ("Adam Dep.") at 60:1-61:16; ECF No. 435-54, Baldo Report ¶ 108.  In 1983, he moved to Khartoum to attend the Islamic University of Omdurman from which he earned a bachelor's degree in law in 1987, and worked as a teacher for two years in Atbara in the Northern State.  Ex. 136, Adam Dep. at 62:17-64:11, 67:1-68:1. Mr. Adam served as a judge in family and civil courts for two years, after which he was appointed to a "special court" used to prosecute political dissidents.  *Id.*  Rather than "work[ing] for the dictators to oppress people," Mr. Adam instead resigned, opened his own law firm in Wau, and became a successful lawyer with several cases against the GOS and its agencies.  *Id.* at 69:18-22, 71:14-72:5, 86:12-90:2.  Ex. 7, Keller & Rosenfeld Report App'x C5 ("Adam App'x") at 2.  Mr. Adam was also involved with reporting on the GOS's human rights abuses, and eventually was branded an opponent of the government for resigning from the judiciary.  Ex. 136, Adam Dep. at 72:10-23, 93:7-20.  In 1998, Mr. Adam refused an invitation from a Wau politician due to time constraints and was arrested by intelligence services men armed with Kalashnikov rifles on the false allegation of being an opponent of the Government of Sudan; he managed to get word to the local governor,

101

who happened to be a blood relative and secured Mr. Adam's release. *Id.* at 94:6-97:3.  Mr. Adam

was informed by an intelligence officer that he personally knew that he was arrested because of

the politician whose invitation Mr. Adam had refused. *Id.* at 94:15-23.

> 122.    Wau, the capital city of Western Bahr el Ghazal province, is not in an oil concession
>         block.  Ex. 138, Plaintiff Location Maps.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  This proposed fact

is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local

Rule 56.1. Defendants' Exhibit 138 has been adulterated and is not a true and correct copy.   Wau

was of strategic importance to the Regime's control of Sudan's oil producing region, as it was a

populous city and administrative capital.  *See* Ex. 221, State Dept. Map; Ex. 253, USAID Map;

ECF No. 435-54, Baldo Report ¶ 168; ECF No. 435-93, Verhoeven Report at 33-34.  As well, the

Southern Command of the SAF was based in Juba, the capital of what is now South Sudan, ECF

No. 435-54, Baldo Report ¶ 53, and Sudan's National Intelligence and Security Service ("NISS")

and military intelligence operated in southern Sudan, which includes Wau and Juba. *Id.* ¶¶ 5, 63.

> 123.    There is no evidence that the individuals used any weapons purchased with
>         revenues processed by any BNPP Defendant to perpetrate this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as

required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.    In any event, it is

controverted, misleading, and irrelevant.  The revenues provided to the GOS by the BNPP criminal

conspiracy enabled the Regime to acquire weapons, purchase loyalty, and stay in power to enable

it and its agents to commit sweeping human rights abuses against targeted populations in Sudan.

102

*See* Plaintiffs' Response to Proposed Fact Nos. 107-08.  The GOS, through the National Security Council headed by al-Bashir and subordinate institutions, controlled, funded, and equipped the GOS's security organs during the Proposed Class Period.  ECF No. 435-93, Verhoeven Report at 25-27; ECF No. 435-54, Baldo Report ¶¶ 5, 43-46, 108-12.  The GOS funneled money it derived from its conspiracy with BNPP to its intelligence services and other agencies: "salaries were increased, new vehicles were purchased and offices were renovated . . . especially for NISS," where "soaring expenditure" lead to "a dramatic expansion in its capabilities thanks to petrodollars."  ECF No. 435-93, Verhoeven Report at 27.

124.   Mr. Adam testified that the men who detained him carried Kalashnikovs and drove Land Cruisers. Ex. 31, Adam Tr. at 96:13–23.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Mr. Adam also testified that an officer from "Intelligence" who was personally known to Mr. Adam informed him that "Intelligence" had arrested Mr. Adam due to his refusal of the politician's invitation.  Ex. 136, Adam Dep. at 94:15-23.

125.   Mr. Adam testified that he was detained for three hours in a jail and that he was not harmed during this detention. Ex. 31, Adam Tr. at 93:23–97:14.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Mr. Adam managed to get word to the governor, a blood relative, during the course of his arrest.  Ex. 136, Adam Dep. at 94:6-97:3.  The governor secured Mr. Adam's release from detention.  *Id.*

126.   Mr. Adam testified that he was released after the governor, his relative, intervened. Ex. 31, Adam Tr. at 93:23–97:8.

**Plaintiffs' Response**: Uncontroverted.

### b.   Wau, Western Bahr el Ghazal, 2000

127.   Mr. Adam testified that, in 2000, he was again detained in Wau after he filed a lawsuit against the government.  Ex. 31, Adam Tr. at 99:21–101:22.

**Plaintiffs' Response**: Uncontroverted, but incomplete and misleading.  In 2000, following a petition on behalf of a woman whose home was being confiscated by the GOS, Mr. Adam was arrested again, this time held for several days during which he was beaten and abused to the point of unconsciousness and requiring stitches in his face. Ex. 136, Adam Dep. at 99:21-101:17; Ex. 7, Adam App'x at 2.  He was specifically warned by army generals (including one named "Abdalla") to stop reporting on the GOS's secret killing of its suspected political enemies. Ex. 136, Adam Dep. at 100:3-102:13.  Mr. Adam's life was spared due to his connection to the governor and local recognition. *Id.* at 102:10-13.

128.   There is no evidence that the individuals who detained him used any weapons purchased with revenues processed by any BNPP Defendant.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.   In any event, it is controverted, misleading, and irrelevant. *See* Plaintiffs' Response to Proposed Fact No. 123.

### c.   Wau, Western Bahr el Ghazal, 2002

129.   Mr. Adam testified that, in 2002, members of the Sudanese military intelligence service unlawfully detained him in Wau after he filed a lawsuit against the military intelligence service.  Ex. 31, Adam Tr. at 104:14–19.

**Plaintiffs' Response**: Uncontroverted, but incomplete.  Mr. Adam was arrested again in 2002 and 2003, each time by security forces in civilian clothing who warned him not to talk about the killings that the Regime's forces were committing. Ex. 136, Adam Dep. at 104:14-106:21.

130.   There is no evidence that the individuals used any weapons purchased with revenues processed by any BNPP Defendant to perpetrate this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.   In any event, it is controverted, misleading, and irrelevant.  *See* Plaintiffs' Response to Proposed Fact No. 123.

131.   Mr. Adam testified that the men who detained him carried Kalashnikovs and drove Land Cruisers.  Ex. 31, Adam Tr. at 104:20–105:3.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Mr. Adam testified that the men were associated with military intelligence, and he was not taken before a judge, even though the military intelligence service personnel had accused Mr. Adam "of being a spy for the rebels."  Ex. 136, Adam Dep. at 104:17-105:9.

132.   Mr. Adam testified that he was he was detained for three hours in the army's headquarters and was not injured during his detention. Ex. 31, Adam Tr. at 105:12–13; 104:17– 105:18.

**Plaintiffs' Response**: Controverted.  Mr. Adam testified that the men, who were associated with the Sudanese military intelligence service, did not take him before a judge, despite that they had accused him "of being a spy for the rebels."  Ex. 136, Adam Dep. at 105:4-9.  His captors imposed conditions on Mr. Adam's release; specifically, they told him "not to talk about the killing that [he] saw for the detainees."  *Id*. at 105:23-106:3.

133.   Mr. Adam testified that he was released after the governor intervened on his behalf.  Ex. 31, Adam Tr. at 104:17–105:18.

**Plaintiffs' Response**: Uncontroverted, but incomplete and misleading.   Mr. Adam's captors imposed conditions on Mr. Adam's release; specifically, they told Mr. Adam "not to talk

about the killing that [he] saw for the detainees."  Ex. 136, Adam Dep. at 105:23-106:3.

### d.     Wau, Western Bahr el Ghazal, 2003

134.     Mr. Adam testified that, in 2003, he was again detained in Wau because he filed a lawsuit against the government.  Ex. 31, Adam Tr. at 106:22–110:25.

**Plaintiffs' Response**: Uncontroverted, but incomplete and misleading.  In 2003, Mr. Adam was detained by the Sudanese government because, in his capacity as an attorney, he filed an action against the Sudanese government on behalf of his client, a man whose business the Sudanese government had wrongfully seized.  Ex. 136, Adam Dep. at 106:22-5.  The Attorney General had Mr. Adam arrested.  *Id.* at 107:21-24.

135.     There is no evidence that the individuals used any weapons purchased with revenues processed by any BNPP Defendant to perpetrate this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.   In any event, it is controverted, misleading, and irrelevant.  *See* Plaintiffs' Response to Proposed Fact No. 123.

136.     Mr. Adam testified that the men who detained him carried Kalashnikovs and drove Land Cruisers.  Ex. 31, Adam Tr. at 108:16–18, 109:23–25.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Mr. Adam testified that the men were associated with military intelligence.  Ex. 136, Adam Dep. at 108:16-109:25.

137.     Mr. Adam testified that was detained for three days and that during this detention he was beaten.  Ex. 31, Adam Tr. at 110:18–111:2.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Mr. Adam was "detained in a very small cell with so many people in it for 11 days."  Ex. 136, Adam Dep. at 107:25-108:3.  While detained, Mr. Adam "saw so many sufferings, like physical and verbal attack [*sic*]."  *Id.* at 108:3-

5.  He was detained "[i]n the security forces headquarters," which is "by the riverside" in Wau, at which "they used to kill people and throw them in the river." *Id.* at 108:9-15. He was then transferred to Khartoum by military cargo plane, where he was held for an additional three days. *Id.* at 110:1-20; Ex. 239, Pl. Turjuman Adam's Obj. & Resp. to Defs. First Set of Interrogatories (Nos. 1-4) ("Adam Rog.") No. 1. The Director General of the Wau regional national security forces transferred Mr. Adam by military aircraft to Khartoum, and Mr. Adam's law offices in Wau were shut down. *Id.* at 112:14-113:23.

138.  Mr. Adam testified that he was eventually released due to his political connections. Ex. 31, Adam Tr. at 107:25–108:8.

**Plaintiffs' Response**: Controverted. Mr. Adam testified that the military officer that greeted Mr. Adam upon his arrival in Khartoum happened to be a former university classmate, who was able to release him the next day on a technicality. Ex. 136, Adam Dep. at 114:1-115:10.

### e.  Wau, Western Bahr el Ghazal, and Khartoum, Sudan, late 2003 or early 2004

139.  Mr. Adam testified that, in approximately late 2003 or early 2004, he was again detained in Wau in response to his filing of a lawsuit against the government. Ex. 31, Adam Tr. at 111:15–115:13.

**Plaintiffs' Response**: Uncontroverted but incomplete. In late 2003 or early 2004, after filing a petition on behalf of his client against GOS security forces, Mr. Adam was arrested in Wau by security forces armed with Kalashnikov rifles. Ex. 136, Adam Dep. at 111:8-112:7. He knew many of his captors personally, including some from his tribe. *Id.* at 112:8-13.

140.  There is no evidence that the individuals who detained him used any weapons purchased with revenues processed by any BNPP Defendant.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.    In any event, it is controverted, misleading, and irrelevant. *See* Plaintiffs' Response to Proposed Fact No. 123.

141.    Mr. Adam testified that the men who arrested him carried Kalashnikovs. Ex. 31, Adam Tr. at 112:2–7.

**Plaintiffs' Response**: Uncontroverted.

142.    Mr. Adam testified that he was detained in Wau for eleven days before he was transferred by military aircraft to Khartoum. Ex. 31, Adam Tr. at 112:20–113:1.

**Plaintiffs' Response**: Uncontroverted.

143.    Mr. Adam testified that he was not injured while detained in Khartoum. Ex. 31, Adam Tr. at 117:14–19.

**Plaintiffs' Response**: Controverted.  On the same night of his arrest, five men from the security services went to Mr. Adam's house and raped his wife, Plaintiff Judy Doe, and infected her with HIV.  Ex. 31, Adam Tr. at 118:7-120:2.

144.    Mr. Adam testified that he was released after spending one day in detention in Khartoum because a high-ranking officer there was a friend of his.  Ex. 31, Adam Tr. at 114:1–115:13.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Mr. Adam testified that the military officer that greeted Mr. Adam upon his arrival in Khartoum happened to be a former university classmate, who was able to release him the next day on a technicality.  Ex. 136, Adam Dep. at 114:1-115:10.  Further, Mr. Adam testified that after he was released, he "became a target for the security forces," and he "really feared for [him]self."  *Id.* at 115:14-19.  He was too fearful to return to Wau because he "thought that maybe one day they will arrest" him "and kill [him] secretly

without anybody know [*sic*]." *Id.* at 115:19-21.  Turjuman explained that the security forces acting

unlawfully by arresting attorneys for bringing actions on behalf of their clients.  *Id.* at 115:22-

116:1.  He was also fearful to remain in Khartoum because it was riddled with "crimes, and they

have places where they detain people. They call it ghost houses.  And they use these detention

places to get rid of people, kill them, and so many lawyers have lost their lives." *Id.* at 116:2-10.

> 145.   Mr. Adam testified that, in March 2004, he left Sudan for Cairo, Egypt.  Ex. 31, Adam Tr. at 120:12–121:2.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Mr. Adam was determined to leave

Sudan following his latest arrest, and so he summoned his family (his wife, Plaintiff Judy Doe and

their daughter) to Khartoum, and they left for Cairo, Egypt in March 2004, where they lived for

approximately one year.  Ex. 136, Adam Dep. at 118:1-3, 120:12-121:2.  While in Cairo, their

daughter died following routine treatment for an infection at a local Egyptian hospital.  *Id.* at 128:8-

129:15; Ex. 7, Adam App'x at 2-3.  Mr. Adam also received threats from Sudanese security officers

by way of the local embassy, threatening that if he did not voluntarily return to Sudan they would

use their connections with the Egyptian government to have him sent back to Sudan.  Ex. 136,

Adam Dep. at 121:3-123:13.  Mr. Adam reported those threats to the UN High Commission for

Refugees, and his refugee application was expedited.  *Id.*

> 146.   Mr. Adam testified that he arrived in the United States in 2005.  Ex. 31, Adam Tr. at 30:22–24.

**Plaintiffs' Response**: Uncontroverted. *See* Ex. 198, PLA-001145-46.

*ii.*   *Damages*

147.   Mr. Adam has adduced no documentary evidence concerning his ownership or the

value of any real or personal property for which he alleges he is entitled to compensation in this Action.

**Plaintiffs' Response**: Controverted and misleading.  Whether Mr. Adam possessed documents concerning his ownership of real or personal property nearly twenty years after he was forcibly displaced from Sudan is not determinative of his ability to prove damages.  Indeed, Mr. Adam submitted detailed listings of his losses, including real and personal property, including a description of his homes, land, and vehicles.  Ex. 249, Pls.' Suppl. Initial Disclosures (Dec. 21, 2022), at 7.

**D.      Plaintiff Halima Samuel Khalifa ("Ms. Khalifa")**

    *i.      Alleged Attacks and Injuries*

        **a.      Juba, Central Equatoria, 1998**

148.      Ms. Khalifa testified that, in 1998, individuals she identified as wearing the "clothes of the military" raided her home in Juba.  Ex. 42, Khalifa Tr. at 121:12–122:10; 128:14– 129:5; 143:12–14.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Ms. Khalifa is a member of the Baka ethnic group, an African ethnic group traditionally from what is now South Sudan and which was racially targeted by the GOS.  Ex. 141, Deposition of Halima Samuel Khalifa ("Khalifa Dep.") at 37:22-38:16; ECF No. 435-54, Baldo Report ¶ 108.  GOS soldiers with "big guns" attacked her home, forcing her and her family to flee to Zaire.  Ex. 141, Khalifa Dep. at 34:8-35:15.

149.      Juba, the capital city of present-day South Sudan, is not in an oil concession block.  Ex. 138, Plaintiff Location Maps.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading. This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local

Rule 56.1. Defendants' Exhibit 138 has been adulterated and is not a true and correct copy. Juba was of strategic importance to the Regime's control of Sudan's oil producing region, as it was a populous city and administrative capital. *See* Ex. 221, State Dept. Map; Ex. 253, USAID Map; ECF No. 435-54, Baldo Report ¶ 168; ECF No. 435-93, Verhoeven Report at 33-34. The Southern Command of the SAF was based in Juba, the capital of what is now South Sudan, and Sudan's National Intelligence and Security Service ("NISS") and military intelligence operated in southern Sudan, which includes Wau and Juba. ECF No. 435-54, Baldo Report ¶¶ 5, 53, 63. The Sudanese air force operated an airport in Juda, and Juba Air Cargo confirmed to the UN that a company leased aircraft for Sudanese Armed Forces flights. *Id.* ¶ 55; ECF No. 435-52, Austin Report ¶ 158. Ms. Khalifa testified that while she was in Juba, she witnessed many bombings from aircraft, and that the army was free to shoot civilians on the streets, and "[t]here is nobody" who shot back at the SAF. Ex. 141, Khalifa Dep. at 132:7-133:6.

150. Ms. Khalifa testified that the individuals came into her home and assaulted her, including sexual assault. Ex. 42, Khalifa Tr. at 128:14–24; 143:7–13.

**Plaintiffs' Response**: Uncontroverted but incomplete. Ms. Khalifa testified that "three or even more people" wearing military uniforms raped her. Ex. 141, Khalifa Dep. at 128:14–24; 143:7–13. The men raped both Ms. Khalifa and her mother in front of Ms. Khalifa's children. Ex. 227, Pl. Khalifa Samuel Khalifa's Obj. & Resp. to Defs. First Set of Interrogatories (Nos. 1-4) ("Khalifa Rog.") No. 1.

151. There is no evidence that the individuals used any weapons purchased with revenues processed by any BNPP Defendant to perpetrate this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.    In any event, it is controverted, misleading, and irrelevant.  The revenues provided to the GOS by the BNPP criminal conspiracy enabled the Regime to acquire weapons, purchase loyalty, and stay in power to enable it and its agents to commit sweeping human rights abuses against targeted populations in Sudan. *See* Plaintiffs' Response to Proposed Fact Nos. 107-08.  The GOS, through the National Security Council headed by al-Bashir and subordinate institutions, controlled, funded, and equipped the GOS's security organs during the Proposed Class Period.  ECF No. 435-93, Verhoeven Report at 25-27; ECF No. 435-54, Baldo Report ¶¶ 5, 43-46, 108-12.  The GOS funneled money it derived from its conspiracy with BNPP to its intelligence services and other agencies: "salaries were increased, new vehicles were purchased and offices were renovated . . . especially for NISS," where "soaring expenditure" lead to "a dramatic expansion in its capabilities thanks to petrodollars."  ECF No. 435-93, Verhoeven Report at 27.

152.    Ms. Khalifa testified that she and her family left Juba for Zaire, Sudan, and then to Jabel Awulia, a refugee camp in the Khartoum area.  Ex. 42, Khalifa Tr. at 42:14–43:14.

**Plaintiffs' Response**: Uncontroverted.

**b.    Khartoum, Sudan, 1999**

153.    Ms. Khalifa testified that individuals she identified as "army," police," and "security" demolished the camp in Jabel Awulia.  Ex. 42, Khalifa Tr. at 54:25–55:13; 60:15– 61:11; 63:10–17.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Ms. Khalifa further testified that

the government forces that demolished the homes in the camp used a tractor, had guns, and wore uniforms, green for the military and light gray for the police.  Ex. 141, Khalifa Dep. at 60:21-62:6. They arrived in open pickup trucks, some with mounted guns that they aimed at civilians "so people would not cause problems with them when they came."  *Id.* at 62:10-63:2.  They beat women, and collapsed homes on top of children.  *Id.* at 63:12-63:21.

154.   Khartoum, Sudan's capital city, is not in an oil concession block.  Ex. 138, Plaintiff Location Maps.

**Plaintiffs' Response**: Uncontroverted but incomplete, misleading, and irrelevant. This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1. Defendants' Exhibit 138 has been adulterated and is not a true and correct copy.    There is no dispute that Khartoum is not in an oil concession block. Ex. 221, State Dept. Map; Ex. 253, USAID Map. However, control of Khartoum was essential to control of the oil industry: the Ministry of Energy and Petroleum that controlled the entire oil industry of Sudan is based in Khartoum. Ex. 43, KASHEF-00005435 at 38 (recounting meeting with Minister of Energy in Khartoum). And the Khartoum refinery was based in Khartoum. ECF No. 435-89, Patey Reply at 11. Nor is there a dispute that at all times during the Class Period, the GOS and its agents were the only armed actors to exercise control over Khartoum.  Moreover, Khartoum was one of the primary cities in which the GOS and its agents directly targeted victims like Ms. Khalifa, and as the capital city of Sudan, it was the principal location from which the Regime's orders to target its opponents nationwide emanated. ECF No. 435-54, Baldo Report ¶¶ 5, 12, 29, 50, 52-53, 55, 62, 68, 74, 104, 121, 127, 129-33, 137, 166, 181, 213.  According to the U.S. Embassy in

113

Khartoum, funds BNPP transferred to the Regime went through Sudan's Central Bank Headquarters and other commercial banks in Khartoum.   *Id.* ¶¶ 85-86.

155.   There is no evidence that the individuals used any weapons purchased with revenues processed by any BNPP Defendant to perpetrate this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.   In any event, it is controverted, misleading, and irrelevant.  The revenues provided to the GOS by the BNPP criminal conspiracy enabled the Regime to acquire weapons, purchase loyalty, and stay in power to enable it and its agents to commit sweeping human rights abuses against targeted populations in Sudan. *See* Plaintiffs' Response to Proposed Fact Nos. 107-08.  The GOS routinely targeted IDP camps for demolition without advanced warning using "heavy earth moving equipment and trucks to bulldozer their makeshift homes to the ground."  ECF No. 435-54, Baldo Report ¶ 224.

156.   Ms. Khalifa testified that the individuals who came and destroyed property were carrying different types of guns, and that some of them came in a car with something that looked "like [a] camera."  Ex. 42, Khalifa Tr. at 62:10–63:2.

**Plaintiffs' Response**: Uncontroverted but incomplete.   *See* Plaintiffs' Response to Proposed Fact No. 153.

### c.   Gedaref, al-Gedaref, 1999

157.   Ms. Khalifa testified that, in 1999, individuals she identified as the "military" assaulted her in Gedaref.  Ex. 42, Khalifa Tr. at 68:19–69:22.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Ms. Khalifa went searching for her husband, who had been working on a remote farm near Gedaref, where she was told by someone there that her husband was taken somewhere, there were gunshots, and nobody returned.  Ex. 141,

Khalifa Dep. at 66;22-67:18.  While in Gedaref, Ms. Khalifa was assaulted by government military

personnel wearing green uniforms and boots and carrying guns, who kicked and beat her with the

butt of their guns, and warned her not to return.  *Id.* at 78:5011; Ex. 7, Keller & Rosenfeld Report

App'x C13 ("Khalifa App'x") at 3.

> 158.   Gedaref, the capital city of al-Gedaref province, is not in an oil concession block
> Ex. 138, Plaintiff Location Maps.

**Plaintiffs' Response**: Uncontroverted but incomplete misleading and irrelevant. This

proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil

Procedure 56 and Local Rule 56.1. Defendants' Exhibit 138 has been adulterated and is not a true

and correct copy.  Darfur was of strategic importance to the Regime's control of Sudan's oil region

because of the discovery of important oil reserves in the desert. Ex. 221, State Dept. Map; Ex. 253,

USAID Map; Ex. 123, Bazire Dep. at 87:24-88:12 (Louis Bazire, Former Head of Territory for

BNPP in Switzerland, testified: "From what I remember, the intensity of communication about

Darfur was higher in the years 2006, 2007. There were demonstrations in the street, et cetera. I

don't remember the reasons why, at this time, this conflict was more intense. Probably part of this

was coming from the fact that some important reserves of oil were discovered in the desert. This

is more or less what I remember").

> 159.   Ms. Khalifa testified that the individuals "hit[]" and "whipp[ed]" her.  Ex. 42,
> Khalifa Tr. at 55:3–13.

**Plaintiffs' Response**: Controverted.  The cited testimony references what happened to Ms.

Khalifa at the Jabel Awulia camp.  See Plaintiffs' Reponses to Proposed Fact No. 153, supra.

During the assault in Gedaref, Ms. Khalifa was assaulted by government military personnel wearing green uniforms and boots and carrying guns, who kicked and beat her with the butt of their guns, and warned her not to return.  *See* Plaintiffs' Response to Proposed Fact No. 157.

160.    There is no evidence that the individuals used any weapons purchased with revenues processed by any BNPP Defendant to perpetrate this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.   In any event, it is controverted, misleading, and irrelevant.  The revenues provided to the GOS by the BNPP criminal conspiracy enabled the Regime to acquire weapons, purchase loyalty, and stay in power to enable it and its agents to commit sweeping human rights abuses against targeted populations in Sudan. *See* Plaintiffs' Response to Proposed Fact Nos. 107-08.  The GOS, through the National Security Council headed by al-Bashir and subordinate institutions, controlled, funded, and equipped the GOS's security organs during the Proposed Class Period.  ECF No. 435-93, Verhoeven Report at 25-27; ECF No. 435-54, Baldo Report ¶¶ 5, 43-46, 108-12.  The GOS funneled money it derived from its conspiracy with BNPP to its intelligence services and other agencies: "salaries were increased, new vehicles were purchased and offices were renovated . . . especially for NISS," where "soaring expenditure" lead to "a dramatic expansion in its capabilities thanks to petrodollars."  ECF No. 435-93, Verhoeven Report at 27.

### d.    Khartoum, Sudan October, 1999

161.    Ms. Khalifa testified that, in October 1999, individuals she identified as "two men" followed her home and, two days later, men broke into her house.  Ex. 42, Khalifa Tr. at 67:9–18; 76:1–14.

**Plaintiffs' Response**: Controverted and incomplete.  Ms. Khalifa testified that two men from Gedaref, where she was assaulted and her husband was likely killed, followed her to her home in Kalakala.  Ex. 141, Khalifa Dep. at 66:7-14, 66:22-67:18, 75:15-76:14, 82:20-83:9.  The night after she returned home, four men in military uniforms broke into her home, and beat her, her mother, and her children.  *Id.*  The men raped Ms. Khalifa and her mother, each multiple times, in front of her son.  *Id.* at 75:15-76:14.  They shoved hot peppers in her genitals, and scarred her legs through their use of "clippers" to hold her legs in place.  *Id.* at 83:20-84:4; Ex. 7, Khalifa App'x at 3.

162.    Ms. Khalifa testified that the men assaulted her, including sexual assault.  Ex. 42, Khalifa Tr. at 67:9–18; 76:1–14.

**Plaintiffs' Response**: Uncontroverted but incomplete.  The men raped Ms. Khalifa and her mother, each multiple times, in front of her son.  Ex. 141, Khalifa Dep. at 75:15-76:14.  They shoved hot peppers in her genitals, and scarred her legs through their use of "clippers" to hold her legs in place.  *Id.* at 83:20-84:4; Ex. 7, Khalifa App'x at 3.

163.    Ms. Khalifa testified that she was removed from the house and brought to a secondary location, where she was assaulted.  Ex. 42, Khalifa Tr. at 87:2–7; 88:6–90:11; 92:16– 25.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Ms. Khalifa testified that a bag filled with red pepper was placed over her head, and she was driven to a prison-like complex in Jabel Awulia, an hour away.  Ex. 141, Khalifa Dep. at 87:2-88:10.  Once there, she was placed in a room, where her nails were removed with pliers, and clamps were put on her feet to attempt to force a false confession that she was supporting rebels.  *Id.* at 89:6-11, 90:16-91:3; Ex. 7, Khalifa

117

App'x at 3.  She was detained for four days, during which time she was beaten, whipped, kicked, hit with the back of a gun, and repeatedly raped by multiple men.  *Id.* at 88:16-22, 89:21-90:2, 92:16-93:2; Ex. 7, Khalifa App'x at 3.

> 164.   Ms. Khalifa testified that the individuals carried guns.  Ex. 42, Khalifa Tr. at 83:16–24.

**Plaintiffs' Response**: Uncontroverted.

> 165.   There is no evidence that the individuals used any weapons purchased with revenues processed by any BNPP Defendant to perpetrate this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.   In any event, it is controverted, misleading, and irrelevant. *See* Plaintiffs' Response to Proposed Fact No. 160.

> 166.   Ms. Khalifa testified that, in 2000, she left Sudan for Egypt.  Ex. 42, Khalifa Tr. at 95:21–25; 96:6–9.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Following her release on a road near her home in Kalakala, Ms. Khalifa recovered at her mother's home for a month, unable to afford to see a doctor and instead relying only on salt water.  Ex. 141, Khalifa Dep. at 93:16-85:5. She spoke with a neighbor, who was able to help her secure a passport, and she fled to Egypt around November 2000.  *Id.* at 95:21-96:9.

> 167.   Ms. Khalifa testified that she arrived in the United States in 2005.  Ex. 42, Khalifa Tr. at 134:6–10.

**Plaintiffs' Response**: Uncontroverted. *See* Ex. 202, PLA-001407 at 118-19.

*ii.*     *Damages*

> 168.   Ms. Khalifa has adduced no documentary evidence concerning her ownership or

the value of any real or personal property for which she alleges she is entitled to compensation in this Action.

**Plaintiffs' Response**: Controverted and misleading. Whether Ms. Khalifa possessed documents concerning his ownership of real or personal property nearly twenty years after he was forcibly displaced from Sudan is not determinative of his ability to prove damages. Indeed, Ms. Khalifa submitted detailed listings of her losses, including real and personal property, including a description of her home and the home of her mother. Ex. 249, Pls.' Suppl. Initial Disclosures (Dec. 21, 2022), at 10.

**E.    Plaintiff Isaac Ali ("Mr. Ali")**

  *i.    Alleged Attacks and Injuries*

  **a.    Wau, Western Bahr el Ghazal, 1998**

169.    Mr. Ali testified that his uncle was killed in Juba in 1998 on the suspicion that he had been attempting to overthrow the government. Ex. 32, Ali Tr. at 54:6–9; 60:23–25. Mr. Ali testified that, in 1998, following the death of his uncle, "security forces" began following his father in Wau. Ex. 32, Ali Tr. at 61:11–19. He testified that some of these individuals wore "khaki" uniforms, some wore military uniforms, and others were civilians. Ex. 32, Ali Tr. at 61:20–23.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading. Mr. Ali is a member of the Bongo tribe, an African ethnic group traditionally from southern Sudan and which was racially targeted by the GOS. Ex. 137, Deposition of Isaac Ali ("Ali Dep.") at 37:22-38:16; ECF No. 435-54, Baldo Report ¶ 108. He testified that his uncle was falsely charged with taking part in a coup, when in fact the GOS was using that false allegation as a pretense to "get rid of those influential leaders, high government officers who were living in Khartoum, but who are from South Sudan." Ex. 137, Ali Dep. at 54:10-56-6. The practice of targeting people from what was

then southern Sudan "was actually a very common known exercise by the government to get rid of those influential people." *Id.* at 56:9-14. *See also* ECF No. 435-54, Baldo Report ¶¶ 145-46 (the GOS routinely accused Christians and non-Arabs from southern Sudan to be working with rebels on the basis of their ethnicity or religion). The "security forces" that followed his father in Wau also broke into the family home, broke the door, repeatedly came back to the family home, and were identified by Mr. Ali's father's security detail as military intelligence. Ex. 137, Ali Dep. at 61:11-64:1. Mr. Ali testified that the "security forces" wore khaki, military, and/or army uniforms and "[s]ome others were civilians." *Id.* at 61:21-23, 62:12-17. This is consistent with the "modus operandi of the National Security service," whose "agents, sometimes in uniform, sometimes in plain clothes, would conduct home raids, load victims into vehicles, blindfold them, and transport them to detention centers." ECF No. 435-54, Baldo Report ¶ 125. Later, security forces wearing khaki military uniforms broke into Mr. Ali's home and shot his father. *See* Plaintiffs' Response to Proposed Fact 173.

> 170.    Wau, the capital city of Western Bahr el Ghazal province, is not in an oil concession block. Ex. 138, Plaintiff Location Maps.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading. This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1. Defendants' Exhibit 138 has been adulterated and is not a true and correct copy. Western Bahr el Ghazal province contains part of oil block 5. Ex. 221, State Dept. Map; Ex. 253, USAID Map. Wau was of strategic importance to the Regime's control of Sudan's oil producing region, as it was a populous city and administrative capital. *See* ECF No. 435-54, Baldo Report ¶

168; ECF No. 435-93, Verhoeven Report at 33-34.  As well, the Southern Command of the SAF

was based in Juba, the capital of what is now South Sudan, ECF No. 435-54, Baldo Report ¶ 53,

and Sudan's National Intelligence and Security Service ("NISS") and military intelligence

operated in southern Sudan, which includes Wau and Juba.  *Id.* ¶¶ 5, 63.

> 171.    Mr. Ali testified that six men he observed to be members of the Sudanese military
> broke down the door of his family's house in Wau.  Ex. 32, Ali Tr. at 66:20–67:9.
> He testified that five men were wearing "khaki" uniforms, and one man was wearing
> civilian clothing.  Ex. 32, Ali Tr. at 67:10–15.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Mr. Ali testified that the men in

uniforms had "military hats with – with the military logo."  Ex. 137, Ali Dep. at 69:8-11.

> 172.    He testified that the five men wearing "khaki" uniforms carried "long guns."  Ex.
> 32, Ali Tr. at 68:20–69:4.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  Mr. Ali testified

that the man wearing "civilian clothes" had a handgun.  Ex. 137, Ali Dep. at 69:2-6.

> 173.    Mr. Ali testified that the men killed his father in 1998.  Ex. 32, Ali Tr. at 65:9–11;
> 70:4–11; 71:2–13; 71:19–72:5.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  Mr. Ali testified

that as he hid in his bedroom and pretended to be asleep after observing the men kick in the door

to his family's home, he heard two gunshots.  Ex. 137, Ali Dep. at 70:5-11.  His father's security

detail was suspiciously missing that day, and did not guard the house.  *Id.* at 73:15-21.  Mr. Ali

hid in his room until the morning, when he heard his mother scream that Mr. Ali's father was dead.

*Id.* at 71:16-72:1.  Mr. Ali's family reported the murder to law enforcement, but were told that the

police could not investigate the case.  *Id.* at 75:5-13.  His family was not allowed to perform burial

rites.   Ex. 7, Keller & Rosenfeld Report App'x C6 ("Ali App'x") at 2.   GOS military forces

continued to monitor Mr. Ali and his family after murdering his father, and so in 1999 Mr. Ali's

mother sent him and his sister to live with their aunt in Khartoum.   Ex. 137, Ali Dep. at 75:21-

76:10.

> 174.   There is no evidence that the individuals used any weapons purchased with
> revenues processed by any BNPP Defendant to perpetrate this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as

required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.    In any event, it is

controverted, misleading, and irrelevant.   The revenues provided to the GOS by the BNPP criminal

conspiracy enabled the Regime to acquire weapons, purchase loyalty, and stay in power to enable

it and its agents to commit sweeping human rights abuses against targeted populations in Sudan.

*See* Plaintiffs' Response to Proposed Fact Nos. 107-08.   The GOS, through the National Security

Council headed by al-Bashir and subordinate institutions, controlled, funded, and equipped the

GOS's security organs during the Proposed Class Period.   ECF No. 435-93, Verhoeven Report at

25-27; ECF No. 435-54, Baldo Report ¶¶ 5, 43-46, 108-12.   The GOS funneled money it derived

from its conspiracy with BNPP to its intelligence services and other agencies: "salaries were

increased, new vehicles were purchased and offices were renovated . . . especially for NISS,"

where "soaring expenditure" lead to "a dramatic expansion in its capabilities thanks to

petrodollars."   ECF No. 435-93, Verhoeven Report at 27.

> 175.   Mr. Ali testified that he moved from Wau to Khartoum in 1999. Ex. 32, Ali Tr. at
> 75:21–76:10.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  Mr. Ali's mother sent him and his sister to live with their aunt in Khartoum because GOS military forces continued to monitor Mr. Ali and his family after they murdered his father.  Ex. 137, Ali Dep. at 75:21-76:10.

### b.      Khartoum, Sudan, 1999

176.     Mr. Ali testified that, in 1999, individuals he identified as "police" arrested him in Khartoum, detaining him for four days before releasing him.  Ex. 32, Ali Tr. at 78:19–79:24; 80:15–81:12.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Mr. Ali was arrested by men in police uniforms while playing a game of soccer.  Ex. 137, Ali Dep. at 78:19-79:14.  The police identified Mr. Ali by his full name, but never told them why he was being detained; confusingly, the only thing the police asked him was why he was being detained.  *Id.* at 79:20-82:7.  After four days, the local prosecutor released Mr. Ali without telling him why he was held.  *Id.* at 81:5-14.

177.     Khartoum, Sudan's capital city, is not in an oil concession block.  Ex. 138, Plaintiff Location Maps.

**Plaintiffs' Response**: Uncontroverted but incomplete, misleading, and irrelevant. This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1. Defendants' Exhibit 138 has been adulterated and is not a true and correct copy.    There is no dispute that Khartoum is not in an oil concession block. Ex. 221, State Dept. Map; Ex. 253, USAID Map. However, control of Khartoum was essential to control of the oil industry: the Ministry of Energy and Petroleum that controlled the entire oil industry of Sudan is based in Khartoum. Ex. 43, KASHEF-00005435 at 38 (recounting meeting with Minister of Energy in Khartoum). And the Khartoum refinery was based in Khartoum. ECF No. 435-89,

Patey Reply at 11. Nor is there a dispute that at all times during the Class Period, the GOS and its agents were the only armed actors to exercise control over Khartoum. Moreover, Khartoum was one of the primary cities in which the GOS and its agents directly targeted victims like Isaac, and as the capital city of Sudan, it was the principal location from which the Regime's orders to target its opponents nationwide emanated. ECF No. 435-54, Baldo Report ¶¶ 5, 12, 29, 50, 52-53, 55, 62, 68, 74, 104, 121, 127, 129-33, 137, 166, 181, 213. According to the U.S. Embassy in Khartoum, funds BNPP transferred to the Regime went through Sudan's Central Bank Headquarters and other commercial banks in Khartoum. *Id.* ¶¶ 85-86.

178.    Mr. Ali testified that he was not physically harmed while in detention. Ex. 32 Ali Tr. at 82:16–18.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading. Mr. Ali testified that he was not physically harmed during his 1999 arrest. He was subsequently tortured following his arrest in 2000 and described further, *infra*.

179.    There is no evidence that the individuals who detained him used any weapons purchased with revenues processed by any BNPP Defendant.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1. In any event, it is controverted, misleading, and irrelevant. *See* Plaintiffs' Response to Proposed Fact No. 174.

### c.    Khartoum, Sudan, 2000

180.    Mr. Ali testified that, in January 2000, individuals he identified as "civilians in Sudanese dress" pulled him over in an unmarked vehicle and took him to a place where they detained him for approximately three months. Ex. 32, Ali Tr. at 82:19–83:12; 84:1–2; 85:12–21; 91:17–18.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  Mr. Ali testified that the men were all wearing a black Sudanese suit – short sleeve, like a suit but open on the side – and arrived in an unmarked Toyota pickup truck.  Ex. 137, Ali Dep. at 82:19-84:7.  Each were carrying pistols.  *Id.*

181.   He testified that three men wearing civilian "Sudanese dress" and carrying pistols asked him to get in their vehicle, blindfolded him, and brought him to a place where he was detained in a big room.  Ex. 32, Ali Tr. at 82:19–84:14; 84:24–85:1; 85:12–21.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  After arriving at their destination blindfolded, Mr. Ali was shoved into a large room containing around 16 other people, who proceeded to ask Mr. Ali what he was doing there; none of the detainees knew why they had been detained.  Ex. 137, Ali Dep. at 86:20-87:16.

182.   Mr. Ali testified that while he was in detention, he was assaulted multiple times.  Ex. 32, Ali Tr. at 91:7–16.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  Mr. Ali testified that he was interrogated by people wearing the same Sudanese suit as the men who had pulled him over, and armed with a handgun or pistol.  Ex. 137, Ali Dep. at 87:17-88:16.  He was repeatedly questioned about his uncle and any association with or knowledge of rebels.  *Id.* at 88:17-90:11.  At each interrogation session, Mr. Ali was assaulted – two to three times per week for approximately three months – with a black rubber water hose across his legs and back, hot pepper on his face and eyes, rifle butts to his arms and shoulders, electrical shocks, suffocation, and racist and religious insults.  *Id.* at 91:7-94:6; Ex. 231, Pl. Ali Ali's Obj. & Resp. to Defs. First Set of

Interrogatories (Nos. 1-4) ("Ali Rog") No. 1.

> 183.   There is no evidence that the individuals used any weapons purchased with revenues processed by any BNPP Defendant to perpetrate this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.   In any event, it is controverted, misleading, and irrelevant. *See* Plaintiffs' Response to Proposed Fact No. 174.

> 184.   Mr. Ali testified that he was assaulted with a black rubber hose, the bottoms or backs of AK-47 guns, hot pepper and a bayonet. Ex. 32, Ali Tr. at 91:19–25; 92:4–93:11; 99:16–100:8.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.   Mr. Ali was assaulted – two to three times per week for approximately three months – with a black rubber water hose across his legs and back, hot pepper on his face and eyes, rifle butts to his arms and shoulders, and racist and religious insults.   Ex. 137, Ali Dep. at 91:7-94:6.

> 185.   Mr. Ali testified that he was released after approximately three months.  Ex. 32, Ali Tr. at 97:2–4.   He testified that at the time of his release, he was asked to report to an office on a weekly basis.   Ex. 32, Ali Tr. at 97:20–23.   He testified that he reported to this office four or five times, and each time he was asked to confess that he was affiliated with the rebellion, which he denied.   Ex. 32, Ali Tr. at 98:2–16.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.   Upon his release following three months of detention and torture, Mr. Ali was handed a paper stating that he was required to report to an office weekly.   Ex. 137, Ali Dep. at 97:17-98:20.   He was racially and religiously insulted, accused of being a member of the rebellion, and asked to confess at each report. *Id.*

> 186.   Mr. Ali testified that, following his detention, an individual he identified as

affiliated with the Sudanese government threatened him.  Ex. 32, Ali Tr. at 102:24–103:22.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  The individual at Mr. Ali's weekly check in was not the same person he normally reported to, and pulled Mr. Ali's file and asked Mr. Ali if he was the son of his father.  Ex. 137, Ali Dep. at 102:24-103:22.  When Mr. Ali confirmed that he was, the person said that "the outcome would not be in [Mr. Ali's] best benefit, and it would not be good."  *Id.*  Mr. Ali was asked to call the man when he returned home, and upon doing so was informed that if he stayed in Sudan he would be killed like his father and uncle had been, and that he should leave the country.  *Id.*

187.    Mr. Ali testified that he left Sudan for Egypt in January 2001.  Ex. 32, Ali Tr. at 101:19–22.

**Plaintiffs' Response:** Uncontroverted.

188.    Mr. Ali testified that he arrived in the United States on January 28, 2004.  Ex. 32, Ali Tr. at 110:4–11.

**Plaintiffs' Response:** Uncontroverted.  *See* Ex. 199, PLA-001228 at 1229–30.

*ii.    Damages*

189.    Mr. Ali has adduced no documentary evidence concerning his ownership or the value of any real or personal property for which he alleges he is entitled to compensation in this Action.

**Plaintiffs' Response**: Controverted and misleading.   Whether Mr. Ali possessed documents concerning his ownership of real or personal property nearly twenty years after he was forcibly displaced from Sudan is not determinative of his ability to prove damages.  Indeed, Mr. Ali submitted detailed listings of his losses, including real and personal property, including a

description of his property in Khartoum.  Ex. 249, Pls.' Suppl. Initial Disclosures (Dec. 21, 2022),

at 15.

**F.      Plaintiff Judy Roe ("Ms. Judy Roe")**

   *i.      Alleged Attacks and Injuries*

      **a.      Khartoum, Sudan, November 1999**

190.   Ms. Judy Roe testified that, in approximately November 1999, individuals she
       identified as driving "military cars" and wearing "[m]ilitary clothing" attacked her
       and her ex-husband at their home in Khartoum. Ex. 46, Judy Roe Tr. at 61:3–62:11,
       67:16–19.

**Plaintiffs' Response**: Controverted, incomplete, and misleading.   Ms. Judy Roe is

originally from Juba, and is a Christian and of indigenous African descent, two characteristics that

were targeted by the GOS for its campaign of violence.  Ex. 139, Deposition of Judy Roe ("Judy

Roe Dep.") at 36:3-10; Ex. 5, Jok Report ¶ 97.  After marrying her husband, the couple moved to

Khartoum.  Ex. 139, Judy Roe Dep. at 22:1-9, 36:16-37:19, 38:17-39:21.  In November 1999, Ms.

Judy Roe, her husband, two brothers, and sister were assaulted at their home in Khartoum shortly

after dinner.  Ex. 139, Judy Roe Dep. at 61:3-21.  Two military vehicles with green and blue

markings pulled up in front of their house, and many men in green military uniforms kicked in

the fence, and demanded to see her husband.  *Id.* at 62:4-65:25; Ex. 7, Keller & Rosenfeld Report

App'x C7 ("Judy Roe App'x") at 2.  The men beat everyone, including Ms. Judy Roe's young

son, and tied up Ms. Judy Roe's husband, two brothers, and sister; her sister escaped with the

help of a neighbor.  *Id.*  They beat her husband and brothers with the butts of their guns, hauled

her husband away, and left Ms. Judy Roe's brothers tied up in the yard. Ex. 139, Judy Roe Dep.

at 62:4-65:25.

191.    Khartoum, Sudan's capital city, is not in an oil concession block.  Ex. 138, Plaintiff Location Maps.

**Plaintiffs' Response**: Uncontroverted but incomplete, misleading, and irrelevant.  This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1. Defendants' Exhibit 138 has been adulterated and is not a true and correct copy.   There is no dispute that Khartoum is not in an oil concession block. Ex. 221, State Dept. Map; Ex. 253, USAID Map. However, control of Khartoum was essential to control of the oil industry: the Ministry of Energy and Petroleum that controlled the entire oil industry of Sudan is based in Khartoum. Ex. 43, KASHEF-00005435 at 38 (recounting meeting with Minister of Energy in Khartoum). And the Khartoum refinery was based in Khartoum. ECF No. 435-89, Patey Reply at 11.   Nor is there a dispute that at all times during the Class Period, the GOS and its agents were the only armed actors to exercise control over Khartoum.  Moreover, Khartoum was one of the primary cities in which the GOS and its agents directly targeted victims like Ms. Judy Roe, and as the capital city of Sudan, it was the principal location from which the Regime's orders to target its opponents nationwide emanated. ECF No. 435-54, Baldo Report ¶¶ 5, 12, 29, 50, 52-53, 55, 62, 68, 74, 104, 121, 127, 129-33, 137, 166, 181, 213.   According to the U.S. Embassy in Khartoum, funds BNPP transferred to the Regime went through Sudan's Central Bank Headquarters and other commercial banks in Khartoum.  *Id.* ¶¶ 85-86.

192.    Ms. Judy Roe also testified that the individuals entered her home, demanding money or gold and assaulting her, including sexual assault.  Ex. 46, Judy Roe Tr. at 66:1–6; 11– 23.

**Plaintiffs' Response**: Uncontroverted but incomplete.  The same night as the initial attack, while Ms. Judy Roe's brothers were still tied up in the yard, five men in green military uniforms and carrying guns returned to her home. *Id.* at 66:1-13.  They drug her into her marital bedroom, beat her, and each of the five proceeded to brutally rape her.  *Id.* at 67:9-68:19.  One man bit off a piece of her right breast, another cut her neck so hard she was not sure if they did it to "slaughter" her, and they called her a "slave" and said "you don't have to be right [sic] in this country."  *Id.* at 67:9-69:14; Ex. 7, Judy Roe App'x at 2.  When they were done, they pushed Ms. Judy Roe to the floor, where her head hit a metal doorstop and she lost consciousness; she carries physical and emotional scars to this day.  Ex. 7, Judy Roe App'x at 8.  Her nine-year old son was hiding in the bedroom closet during the rape.  Ex. 139, Judy Roe Dep. at 67:9-69:14; Ex. 243, Pl. Judy Roe's Obj. & Resp. to Defs. First Set of Interrogatories (Nos. 1-4) ("Judy Roe Rog.") No. 1.

193.    There is no evidence that the individuals used any weapons purchased with revenues processed by any BNPP Defendant to perpetrate this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.   In any event, it is controverted, misleading, and irrelevant.  The revenues provided to the GOS by the BNPP criminal conspiracy enabled the Regime to acquire weapons, purchase loyalty, and stay in power to enable it and its agents to commit sweeping human rights abuses against targeted populations in Sudan. *See* Plaintiffs' Response to Proposed Fact Nos. 107-08.  The GOS, through the National Security Council headed by al-Bashir and subordinate institutions, controlled, funded, and equipped the GOS's security organs during the Proposed Class Period.  ECF No. 435-93, Verhoeven Report at

25-27; ECF No. 435-54, Baldo Report ¶¶ 5, 43-46, 108-12.  The GOS funneled money it derived from its conspiracy with BNPP to its intelligence services and other agencies: "salaries were increased, new vehicles were purchased and offices were renovated . . . especially for NISS," where "soaring expenditure" lead to "a dramatic expansion in its capabilities thanks to petrodollars."  ECF No. 435-93, Verhoeven Report at 27.

> 194.    Ms. Judy Roe testified that the men who came to her home carried guns on their shoulders.  Ex. 46, Judy Roe Tr. at 64:6–8.

**Plaintiffs' Response**: Uncontroverted but incomplete.

> 195.    Ms. Judy Roe testified that these men injured her with the back of a gun and knife.  Ex. 46, Judy Roe Tr. at 66:3–6, 22–23.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  During her rape, one of the men bit off a piece of her breast, and another almost cut her head off with a knife.  Ex. 139, Judy Roe Dep. at 67:9-69:14; Ex. 7, Judy Roe App'x at 2.  Skin was hanging off of her face, she had lost consciousness and a lot of blood, and she required stiches and a week of hospitalization; she has emotional and physical scars to this day, and was infected with HIV by her rapists.  Ex. 139, Judy Roe Dep. at 69:4-25, 74:13-76:3; Ex. 7, Judy Roe App'x at 2, 8.

> 196.    Ms. Judy Roe testified that she left Khartoum in June 2000 for Egypt.  Ex. 46, Judy Roe Tr. at 88:19–21.

**Plaintiffs' Response**: Uncontroverted but incomplete.  After Ms. Judy Roe recovered at a pastor's house for six weeks, and another two months at her aunt's house, the pastor arranged for her husband to be released from prison and sent to Egypt.  Ex. 139, Judy Roe Dep. at 69:4-25, 70:4-72:1.  Ms. Judy Roe was able to join her husband in Egypt around June 2000.  *Id.* at 88:19-

89:11. Judy Roe was admitted to the United States as a refugee in 2001.  *See* Ex. 212, PLA-012583 at 85-86.

      *ii.*    *Damages*

    197.    Ms. Judy Roe has adduced no documentary evidence concerning her ownership or the value of any real or personal property for which she alleges she is entitled to compensation in this Action.

**Plaintiffs' Response**: Controverted and misleading.  Whether Ms. Judy Roe possessed documents concerning her ownership of real or personal property nearly twenty years after she was forcibly displaced from Sudan is not determinative of her ability to prove damages.  Indeed, Ms. Judy Roe submitted detailed listings of her losses, including real and personal property, including a description of her home, land, and vehicle.  Ex. 249, Pls.' Suppl. Initial Disclosures (Dec. 21, 2022), at 14.

**G.**    **Plaintiff Abulgasim Suleman Abdalla ("Mr. Abdalla")**

    *i.*    *Alleged Attacks and Injuries*

        **a.**    **Dowiet, West Darfur, 1999**

    198.    Mr. Abdalla testified that, in 1999, individuals he identified as the "People's Defense Force," "People's Armed Forces," and the "Janjaweed" attacked his village of Doweit. Ex. 30, Abdalla Tr. at 71:20–22; 77:19–23.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading. Mr. Abdalla is a member of the Masalit tribe, the largest of many tribes in the South Darfur region and targeted by the GOS for genocide. Ex. 133, Deposition of Abulgasim Suleman Abdalla ("Abdalla Dep.") at 102:18-22; Ex. 5, Jok Report ¶ 11; ECF No. 435-55, Baldo Reply ¶ 152.  He testified that in 1999, members of the "People's Armed Forces" (the SAF), Popular Defense Forces (the PDF), and the

Janjaweed attacked his village Doweit.  Ex. 133, Abdalla Dep. at 75:19-81:13.  Mr. Abdalla was in a nearby market shopping when the attack occurred and saw smoke rising from the village. *Id.* at 75:19-81:13, 85:14-18.  He snuck back near the village and hid in a tree, where he witnessed the attackers pillage the valuable property, steal all the livestock, and set fire to homes and the entire village.  *Id.* at 82:9-84:25.  Mr. Abdalla recognized the uniforms; each force was wearing a slightly different version of a khaki uniform.  *Id.* at 75:19-81:13. The Janjaweed were on horseback, while the government forces and militia had Toyotas, and they were all armed.  *Id.* at 82:21-83:7.

> 199.    Dowiet, a village in West Darfur, is not in an oil concession block. Ex. 138, Plaintiff Location Maps.

**Plaintiffs' Response**: Uncontroverted but incomplete misleading and irrelevant. This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1. Defendants' Exhibit 138 has been adulterated and is not a true and correct copy.  Darfur was of strategic importance to the Regime's control of Sudan's oil region because of the discovery of important oil reserves in the desert. Ex. 221, State Dept. Map; Ex. 253, USAID Map; Ex. 123, Bazire Dep. at 87:24-88:12 (Louis Bazire, Former Head of Territory for BNPP in Switzerland, testified: "From what I remember, the intensity of communication about Darfur was higher in the years 2006, 2007. There were demonstrations in the street, et cetera. I don't remember the reasons why, at this time, this conflict was more intense. Probably part of this was coming from the fact that some important reserves of oil were discovered in the desert. This is more or less what I remember").

200. Mr. Abdalla testified that the individuals destroyed property during the alleged attack.  Ex. 133 (Abdalla Dep. at 88:1–17).

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  In addition to the attack described in Plaintiffs' Response to Proposed Fact No. 198, *supra*, Mr. Abdalla also witnessed a helicopter delivering supplies to the attackers. Ex. 133, Abdalla Dep. at 86:3-87:25. He also saw an airplane dropping bombs on people fleeing the village: "From far away, you see plane – you see the plane dropping down bombs on people who are fleeing . . . and then there will be explosions, explosions of the people."  *Id.* at 87:4-25.  These barrel bombs were dropped on civilians as they sought shelter or attempted to flee.  Ex. 133, Abdalla Dep. at 91:19-23 ("Usually, they drop bombs on areas where there are a lot of residents.  There were groups of people who were fleeing, a lot of them.  They don't waste a bomb on one person.").

201. There is no evidence that the individuals used any weapons purchased with revenues processed by any BNPP Defendant to perpetrate this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.   In any event, it is controverted, misleading, and irrelevant.  The revenues provided to the GOS by the BNPP criminal conspiracy enabled the Regime to acquire weapons, purchase loyalty, and stay in power to enable it and its agents to commit sweeping human rights abuses against targeted populations in Sudan. *See* Plaintiffs' Response to Proposed Fact Nos. 107-08.  Using the revenues from the BNPP conspiracy, the GOS funded and equipped the Janjaweed during the Proposed Class Period.  ECF No. 435-93, Verhoeven Report at 25-27; ECF No. 435-52, Austin Report ¶¶ 44-45, 148; ECF No.

435-54, Baldo Report ¶¶ 13, 73-75.  during the Proposed Class Period, the GOS increased its procurement of Antonov aircraft, which were used in attacks throughout oil areas, southern Sudan, and Darfur, and "[i]n all likelihood, GoS would not have had the financial resources or the access to international markets that was necessary for the procurement and maintenance of Antonovs were it not for BNPP assistance."  ECF No. 435-52, Austin Report ¶ 208; *see also id.* ¶¶ 166 (noting the use of fixed wing aircraft in attacks in Darfur), 271 (same concerning the Second Civil War); ECF No. 435-53, Austin Reply ¶¶ 112-18 (the BNPP conspiracy allowed the GOS to acquire "more modern and effective - i.e., deadly - material," "including Hind helicopter gun ships, Antonov medium bombers, MiG 23 fighter aircraft, mobile artillery pieces, and light assault weapons"), 152 (the UN Panel documented the GOS's use of Antonov aircraft for bombardment from civilian airports in Darfur); ECF No. 435-54, Baldo Report ¶¶ 177-85 (documenting use of "new weapons systems" such as helicopter gunships and Antonov airplanes). Using revenues received from the BNPP conspiracy, the GOS acquired a fleet of new helicopters, including more than tripling its existing fleet of Mi-24 helicopters and acquiring HIND helicopters not previously in their inventory, that were used to devastating effect on civilians in the oil regions, southern Sudan, and Darfur.  ECF No. 435-93, Verhoeven Report at 26 (the GOS tripled its Mi-24 fleet); ECF No. 435-63, Fogarty Report ¶ 108 (same); ECF No. 435-52, Austin Report ¶¶ 160 (same), 159-67 (detailing the Regime's acquisition and use of new helicopters, among other lethal equipment), 271 (same); ECF No. 435-54, Baldo Report ¶¶ 178, 185 (detailing use of helicopter gunships against civilians); ECF No. 435-68, Hudson Report ¶ 73 (same); ECF No. 435-63,

Fogarty Report ¶ 110.

> 202.   Mr. Abdalla testified that he saw individuals riding horses, and that other people arrived in Dowiet in Toyota vehicles with "DShK" guns.  Ex. 30, Abdalla Tr. at 81:18–25; 82:21–83:1.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  *See* Plaintiffs'

Response to Proposed Fact Nos. 198, 200.

> 203.   Mr. Abdalla testified that he saw one helicopter and one "Antonov" airplane flying over Dowiet.  Ex. 30, Abdalla Tr. at 86:3–14.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  *See* Plaintiffs'

Response to Proposed Fact Nos. 198, 200.

> 204.   Mr. Abdalla testified that, following the attack on Dowiet in 1999, he left Sudan for Chad.  Ex. 30, Abdalla Tr. at 92:20–93:1.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Following the attack, Mr. Abdalla

had no idea here his wife and other family members were; eventually, he found them in Chad. Ex.

7, Expert Report of Dr. Allen Keller and Dr. Barry Rosenfeld App'x C4 ("Abdalla App'x") at 2;

Ex. 133, Abdalla Dep. at 92:20-93:16.

> 205.   Mr. Abdalla testified that he was in Chad for a short period before returning to Dowiet.  Ex. 30, Abdalla Tr. at 93:8–20.

**Plaintiffs' Response**: Uncontroverted but incomplete.  The GOS lured him, his family,

and other community members back with a state-controlled radio message announcing that if

people returned they would not be further attacked.  Ex. 133, Abdalla Dep. at 93:24-95:5.  Mr.

Abdalla and his family returned and built a small brick house in an area nearby to Doweit.  *Id.* at

95:6-24.

### b.     Dowiet, West Darfur, 2003

206.     Mr. Abdalla testified that in 2003, individuals he identified as "the government" attacked Dowiet.  Ex. 30, Abdalla Tr. at 96:2–4; 101:6–12.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  In 2003, Doweit was attacked again; Mr. Abdalla was at a nearby market when he saw a mass of people fleeing: "I could not go back because they told me they burned everything.  There is no way to go back."  Ex. 133, Abdalla Dep. at 96:2-98:16.  When he tried to search for his family, he saw Janjaweed on horseback and GOS soldiers in military vehicles burning the village, accompanied by a helicopter flying overhead.  Ex. 229, Pl. Abdalla Suleman Abdalla's Obj. & Resp. to Defs. First Set of Interrogatories (Nos. 1-4) ("Abdalla Rog.") No. 1.  Mr. Abdalla, separated from his family, had no choice but to flee on foot to Murnay where he met his wife and children; he never saw his parents or siblings again.  Ex. 133, Abdalla Dep. at 98:21-99:24.

207.     Mr. Abdalla testified that he was at a nearby market during the attack and did not see it happening, but that he saw people running who told him the area had been burned.  Ex. 30, Abdalla Tr. at 96:24–98:10.  He testified that he did not return to Dowiet after the attack.  Ex. 30, Abdalla Tr. at 96:24–98:10.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  *See* Plaintiffs' Response to Proposed Fact No. 206.

208.     There is no evidence that the individuals used any weapons purchased with revenues processed by any BNPP Defendant to perpetrate this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.   In any event, it is controverted, misleading, and irrelevant.  *See* Plaintiffs' Response to Proposed Fact No. 201.

209.   Mr. Abdalla testified that, following the alleged attack, he left Dowiet for Murnay [9], West Darfur, where he met his family, who had arrived in Murnay separately. Ex. 30, Abdalla Tr. at 98:20–99:13.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.[8]  Mr. Abdalla's wife and children arrived in Murnay separately, but Mr. Abdalla never saw his parents or siblings again following the 2003 attack on Doweit.  Ex. 133, Abdalla Dep. at 98:21-99:24.

### c.   Murnay, West Darfur, to Nyala, South Darfur, 2003

210.   Mr. Abdalla testified that, while traveling from Murnay, West Darfur, to Nyala, South Darfur, on a lorry truck, individuals he identified as "Janjaweed" assaulted him. Ex. 30, Abdalla Tr. at 101:13–21; 102:3–14; 102:24–25.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  Mr. Abdalla and his family attempted to flee from Murnay to Nyala in a lorry, but were stopped by around ten or more Janjaweed wearing khaki uniforms, riding horses, and accompanied by a Toyota.  Ex. 133, Abdalla Dep. at 59:6-60:15, 101:13-104:4.  The first thing they asked was whether he "belong[ed] to one of the four tribes" (the Masalit, Fur, Zaghawa, and Midob), and when he responded that he was Masalit, they took him to a nearby forest and beat him with the butts of their guns.  *Id.* at 102:18-103:15.  The Janjaweed stated that they did not want or need Masalit in Sudan, and as they beat him said they would kill members of the four tribes.  *Id.* They struck him repeatedly in the head and legs with the butts of Kalashnikov and Jim 3 rifles, and knocked him unconscious.  *Id.* at 105:1-106:8; Ex. 7, Abdalla App'x at 2-3.  The beating continued until a Red Cross car happened across the road; the GOS was afraid of being videotaped committing human rights abuses, and

---

[8] Uncontroverted that "Murnay" is also "[s]pelled 'Mornei' and 'Morney' elsewhere in the record."  Defs. SMF at 29 n.9.

they helped Mr. Abdalla to escape to the road.  Ex. 133, Abdalla Dep. at 106:19-108:9.  The Red

Cross assisted Mr. Abdalla back onto the lorry, and accompanied the truck all the way to the IDP

camp in Nyala.  *Id.* "[T]hat's how, with the help of the Red Cross, I was saved.  I escaped death."

*Id.* at 107:2-3.  Mr. Abdalla received surgery at a hospital in Nyala for his leg and head injuries,

and required follow up surgery in 2015 in the United States on his right leg.  *Id.* at 108:10-109:14

211.    Murnay, a city in West Darfur, is not in an oil concession block.  Ex. 138, Plaintiff
Location Maps.

**Plaintiffs' Response**: Uncontroverted but incomplete misleading and irrelevant. This

proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil

Procedure 56 and Local Rule 56.1. Defendants' Exhibit 138 has been adulterated and is not a true

and correct copy.     Darfur was of strategic importance to the Regime's control of Sudan's oil

region because of the discovery of important oil reserves in the desert. Ex. 221, State Dept. Map;

Ex. 253, USAID Map; Ex. 123, Bazire Dep. at 87:24-88:12 (Louis Bazire, Former Head of

Territory for BNPP in Switzerland, testified: "From what I remember, the intensity of

communication about Darfur was higher in the years 2006, 2007. There were demonstrations in

the street, et cetera. I don't remember the reasons why, at this time, this conflict was more intense.

Probably part of this was coming from the fact that some important reserves of oil were discovered

in the desert. This is more or less what I remember".

212.    Nyala, the capital city of South Darfur, is not in an oil concession block.  Ex. 138,
Plaintiff Location Maps.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  This proposed fact

139

is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local

Rule 56.1. Defendants' Exhibit 138 has been adulterated and is not a true and correct copy.   South

Darfur is an oil producing state, containing the oil concession Block 6, which, according to the

U.S. State Department, was licensed to the China National Petroleum Corporation, a client of

BNPP's.  Ex. 221, State Dept. Map; Ex. 253, USAID Map; ECF No. 435-93, Verhoeven Report

at 34 n.103;  BNPP-KASHEF-00005440;  BNPP-KASHEF-00005700.  Moreover, Darfur was of

strategic importance to the Regime's control of Sudan's oil region because of the discovery of

important oil reserves in the desert. Ex. 123, Bazire Dep. at 87:24-88:12 (Louis Bazire, Former

Head of Territory for BNPP in Switzerland, testified: "From what I remember, the intensity of

communication about Darfur was higher in the years 2006, 2007. There were demonstrations in

the street, et cetera. I don't remember the reasons why, at this time, this conflict was more intense.

Probably part of this was coming from the fact that some important reserves of oil were discovered

in the desert. This is more or less what I remember".

213.    There is no evidence that the individuals used any weapons purchased with
        revenues processed by any BNPP Defendant to perpetrate this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as

required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.    In any event, it is

controverted, misleading, and irrelevant.  *See* Plaintiffs' Response to Proposed Fact No. 201.

214.    Mr. Abdalla testified that the individuals hit him with the bottoms and backs of
        Kalashnikov and "Jim 3" guns.  Ex. 30, Abdalla Tr. at 105:1–6; 105:20–106:5.

**Plaintiffs' Response**:  Controverted.  While in the forested area, out of view from the lorry,

140

the attackers beat Mr. Abdalla on his head, feet, and legs with the bottoms and backs of their guns. Ex. 133, Abdalla Dep. at 104:18-105:6.  As a result, his "head was bleeding a lot of blood," and his "legs were all swelling up a lot."  *Id.* at 105:7-10.  The attackers used the same guns that "the government uses," "the Klash" and the "Jim 3."  *Id.* at 105:20-25.

215.  Mr. Abdalla testified that after arriving in Nyala, he and his family lived in a camp called the Siraif camp.  Ex. 30, Abdalla Tr. at 110:3–9; 110:19–22.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Mr. Abdalla and his family settled in the Siraif IDP camp, "for internally displaced people," near Nyala.  Ex. 133, Abdalla Dep. at 110:3-9, 110:19-22.

### c.    Nyala, South Darfur

216.  Mr. Abdalla testified that individuals he identified as the "government," "the Janjaweed," and the "People's Defense," attacked the Siraif camp in Nyala while he was living there.   Ex. 30, Abdalla Tr. at 110:10–12.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  While Mr. Abdalla was at work, the SAF, PDF, and Janjaweed attacked the Siraif camp, kicked out the aid organizations that were there, and burned down "all of it." Ex. 133, Abdalla Dep. at 110:10-111:17. He returned from work to find them surrounding the IDP camp, with "cars belonging to the army and to the Janjaweed and to the People's Defense [Force]." *Id.*  Following the attack near Nyala, Mr. Abdalla and his family fled to Camp Kauda, an IDP in Sudan.  *Id.* at 62:18-63:7.

217.  Mr. Abdalla testified that he did not observe the attack on the Siraif camp as it happened while he was at work.  Ex. 30, Abdalla Tr. at 110:13–18.

**Plaintiffs' Response**: Uncontroverted but incomplete.  *See* Plaintiffs' Response to Proposed Fact No. 216.

218.   There is no evidence that the individuals used any weapons purchased with revenues processed by any BNPP Defendant to perpetrate this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.   In any event, it is controverted, misleading, and irrelevant.  *See* Plaintiffs' Response to Proposed Fact No. 201.

219.   He testified that the camp was surrounded by "cars." Ex. 30, Abdalla Tr. at 110:19–22.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Mr. Abdalla returned from work to find "cars belonging to the army and to the Janjaweed and to the People's Defense [Force]" surrounding the camp.  Ex. 133, Abdalla Dep. at 110:10-111:17.

220.   Mr. Abdalla testified that he arrived in the United States as a refugee in December 2013.  Ex. 30, Abdalla Tr. at 21:21–22:3.

**Plaintiffs' Response**: Uncontroverted. *See* Ex. 211, PLA-001837 at 1837.

*ii.    Damages*

221.   Mr. Abdalla has adduced no documentary evidence concerning his ownership or the value of any real or personal property for which he alleges he is entitled to compensation in this Action.

**Plaintiffs' Response**: Controverted and misleading.   Whether Mr. Abdalla possessed documents concerning his ownership of real or personal property nearly twenty years after he was forcibly displaced from Sudan is not determinative of his ability to prove damages.  Indeed, Mr. Abdalla submitted detailed listings of his losses, including real and personal property, including a description of his home, farm, and livestock.  Ex. 249, Pls.' Suppl. Initial Disclosures (Dec. 21, 2022), at 14-15.

### H.     Plaintiff Ambrose Ulau ("Mr. Ulau")

#### i.     *Alleged Attacks and Injuries*

##### a.     Khartoum, Sudan, December 1999

222.   Mr. Ulau testified that, in approximately December 1999, in Khartoum three individuals he claims identified themselves as members of the Sudanese security forces took him from his home, detained him for approximately eleven days, and interrogated him. Ex. 51, Ulau Tr. at 54:12–55:4; 55:15–23; 56:13–20; 57:18–21; 57:25–58:4; 61:6–11.

**Plaintiffs' Response**: Controverted, misleading, and incomplete.  Mr. Ulau is of Balenda ethnic origin, and is a Christian, both being targeted groups by the GOS. Ex. 147, Deposition of Ambrose Ulau ("Ulau Dep.") at 41:15-19, 45:7-18; ECF No. 435-54, Baldo Report ¶¶ 108, 144-46.  Mr. Ulau was the chairman of the St. Stephen's Bible Society and head of the Holy Bible Association in Haj Youssef-Al Takamol Square.  Ex. 147, Ulau Dep. at 53:10-18.  In or around October 1999, two Muslims enrolled with the Holy Bible Association, expressing a desire to learn more about Christianity.  Ex. 147, Ulau Dep. at 54:2-11.  On or about November 30, 1999, the two Muslim men went missing, and Mr. Ulau began searching for them. Ex. 147, Ulau Dep. at 54:12-21.

On Thursday, December 2, 1999, "very late at night[,] three policemen and people from the intelligence," who self-identified as such, with guns raided Mr. Ulau's home and took him to a detention center blindfolded.  Ex. 147, Ulau Dep. at 54:22-25, 55:15-19, 57:11-23.  At the detention center, the Sudanese security forces interrogated Mr. Ulau, hitting and slapping him and pouring cold water on his face, and accusing him of "heading an association for Muslims [to]

143

rebound to Christianity." Ex. 147, Ulau Dep. at 57:18-58:4, 58:12-59:23.  While in detention, they

searched his home, and used a letter from Mr. Ulau's older brother to accuse Mr. Ulau of being an

agent for the SPLM.  Ex. 147, Ulau Dep. at 51:14-52:16, 60:2-9, 62:8-21.  While in detention, he

was physically tortured daily, verbally abused, deprived of rest and food, beaten on his stomach,

head, and soles of his feet with a plastic hose and with the butts of guns, doused with water at

nighttime, and hung upside down for 10-15 minutes.  Ex. 147, Ulau Dep. at 51:14-52:16, 60:2-9,

62:8-21; Ex. 230, Pl. Ambrose Martin Ulau's Obj. & Resp. to Defs. First Set of Interrogatories

(Nos. 1-4) ("Ulau Rog.") No. 1; Ex. 7, Keller & Rosenfeld Report App'x C16 ("Ulau App'x") at

2.  His captors threatened Mr. Ulau and his family: "they say if I don't confess they are going to

kill me . . . not only you, we can even kill your family."  Ex. 7, Ulau App'x at 2.

> 223.   Khartoum, Sudan's capital city, is not in an oil concession block. Ex. 138, Plaintiff
>         Location Maps.

**Plaintiffs' Response**: Uncontroverted but incomplete, misleading, and irrelevant.  This

proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil

Procedure 56 and Local Rule 56.1. Defendants' Exhibit 138 has been adulterated and is not a true

and correct copy.   There is no dispute that Khartoum is not in an oil concession block. Ex. 221,

State Dept. Map; Ex. 253, USAID Map. However, control of Khartoum was essential to control

of the oil industry: the Ministry of Energy and Petroleum that controlled the entire oil industry of

Sudan is based in Khartoum. Ex. 43, KASHEF-00005435 at 38 (recounting meeting with Minister

of Energy in Khartoum). And the Khartoum refinery was based in Khartoum. ECF No. 435-89,

Patey Reply at 11.  Nor is there a dispute that at all times during the Class Period, the GOS and its

agents were the only armed actors to exercise control over Khartoum. Moreover, Khartoum was one of the primary cities in which the GOS and its agents directly targeted victims like Mr. Ulau, and as the capital city of Sudan, it was the principal location from which the Regime's orders to target its opponents nationwide emanated. ECF No. 435-54, Baldo Report ¶¶ 5, 12, 29, 50, 52-53, 55, 62, 68, 74, 104, 121, 127, 129-33, 137, 166, 181, 213. According to the U.S. Embassy in Khartoum, funds BNPP transferred to the Regime went through Sudan's Central Bank Headquarters and other commercial banks in Khartoum. *Id.* ¶¶ 85-86.

224.    Mr. Ulau testified he was assaulted. Ex. 51, Ulau Tr. at 58:1–4; 58:12–22; 59:12–19; 64:3–8; 64:11–16.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading. *See* Plaintiffs' Response to Proposed Fact No. 222.

225.    Mr. Ulau testified that some of the individuals were carrying small handguns and one had a "big gun." Ex. 51, Ulau Tr. at 55:17–19; 56:1–5.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading. *See* Plaintiffs' Response to Proposed Fact No. 222.

226.    There is no evidence that the individuals used any weapons purchased with revenues processed by any BNPP Defendant to perpetrate this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1. In any event, it is controverted, misleading, and irrelevant. The revenues provided to the GOS by the BNPP criminal conspiracy enabled the Regime to acquire weapons, purchase loyalty, and stay in power to enable it and its agents to commit sweeping human rights abuses against targeted populations in Sudan.

*See* Plaintiffs' Response to Proposed Fact Nos. 107-08.   Moreover, the GOS required that "[c]ertain categories of the populations," including teachers and university students, were required to take mandatory PDF training sessions.  ECF No. 435-54, Baldo Report ¶ 70.  The PDF were integral to the GOS's depopulation strategy in Southern Sudan, oil important areas throughout Sudan, and in the recruitment and provisioning of the Janjaweed in Darfur.  ECF No. 435-54, Baldo Report ¶¶ 73, 161, 174-75.  The revenues available to the GOS by way of its criminal conspiracy with BNPP were used to lavish spending the PDF and other security services employed against Mr. Ulau and those similarly situated.  ECF No. 435-93, Verhoeven Report at 25-27.

> 227.   Mr. Ulau testified that after his release, he would report to a security headquarters building in the Bahri area of Khartoum.  Ex. 51, Ulau Tr. at 69:2–10.  Mr. Ulau testified that when he reported to this building, he would be assaulted.  Ex. 51, Ulau Tr. at 72:15–73:5.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  *See* Plaintiffs' Response to Proposed Fact No. 222.  Further, Mr. Ulau testified that he was released on December 13, 1999 on four conditions punishable by death: 1) stop preaching Christianity; 2) collect and pass on information about rebels; 3) report to his interrogators three times per week; and 4) tell no one about his detention.  Ex. 147, Ulau Dep. at 66:7-67:8.  When Mr. Ulau attempted to comply by reporting, he was again tortured, questioned, threatened with death, and beaten.  Ex. 147, Ulau Dep. at 72:11-73:2.

> 228.   Mr. Ulau testified that following his release, security personnel would show up at his house and take him to ride along in their vehicle at night.  Ex. 51, Ulau Tr. at 74:15–22.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  Despite Ulau's

attempted compliance with his release conditions, the government security personnel still came to

Ulau's home unannounced "at night" after his release, and took him into their cars to be questioned

for hours about rebels and religion.  Ex. 147, Ulau Dep. at 74:15-75:18.  Ulau feared for his life

on each occasion, and eventually hid at a friend's house until he could make arrangements to leave

Sudan.  *Id.* at 75:22-77:2.

229.  Mr. Ulau testified that he left Sudan for Egypt in January 2000.  Ex. 51, Ulau Tr. at 22:22–24; 75:19–21.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  Ulau sought the

help of his pastor, who provided Ulau with some cash to facilitate Ulau's escape.  Ex. 147, Ulau

Dep. at 75:19-77-12.  Ulau left Khartoum in January  2000. *Id.* at 75:19-21..

230.  Mr. Ulau testified that he arrived in the United States in September 2004.  Ex. 51, Ulau Tr. at 25:5–10.

**Plaintiffs' Response**: Uncontroverted. *See* Ex. 209, PLA-001726 at 1727–28.

ii.  *Damages*

231.  Mr.  Ulau has adduced no documentary evidence concerning his ownership or the value of any real or personal property for which he alleges he is entitled to compensation in this Action.

**Plaintiffs' Response**: Controverted and misleading.  Whether Ulau possessed documents

concerning his ownership of real or personal property nearly twenty years after he was forcibly

displaced from Sudan is not determinative of his ability to prove damages.  Indeed, Ulau submitted

detailed listings of his losses, including real and personal property, including a description of his

home in Haj Yousif.  Ex. 249, Pls.' Suppl. Initial Disclosures (Dec. 21, 2022), at 12-13.

I.     **Plaintiff Judy Doe ("Ms. Judy Doe")**

   i.     *Alleged Attacks and Injuries*

      a.     **Wau, Western Bahr el Ghazal, early 2000s**

232.   Ms. Judy Doe testified that, at various times during the early 2000s, individuals she identified as "soldiers" arrested her husband in Wau.  Ex. 38, Judy Doe Tr. at 69:5–70:25; 72:3–10; 74:2–21; 101:13–21; 104:2–16.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  Plaintiff Judy Doe ("Judy Doe") is from Wau in what is now South Sudan and of indigenous African descent, a group targeted for violence by the GOS.  Ex. 145, Deposition of Judy Doe ("Judy Doe Dep.") at 36:3-10; Ex. 5, Jok Report ¶ 97; ECF No. 435-54, Baldo Report ¶ 108.  In 1990, Ms. Judy Doe married Plaintiff Turjuman Adam.  *Id.* at 38:6-13.  Her husband became a target of the Regime due to his resignation from the judiciary and taking cases against the GOS and its agencies.  *See* Plaintiffs' Response to Proposed Fact Nos. 121, 127, 129, 134.  He was arrested by armed men in green camouflage military uniforms with "the logo of the military" frequently throughout the late 1990s and early 2000s, so much so that Ms. Judy Doe knew that "[i]f he didn't come home, then I know that he has been arrested."  Ex. 145, Judy Doe Dep. at 64:17-65:16, 70:6-21, 75:24-76:16; Ex. 7, Keller & Rosenfeld Report App'x C18 ("Judy Doe App'x") at 2; Ex. 242, Pl. Judy Doe's Obj. & Resp. to Defs. First Set of Interrogatories (Nos. 1-4) ("Judy Doe Rog.") No. 1.  Although she did not know the specifics of why he was arrested each time, she saw that "[h]e suffered.  And I saw that suffering in him and I saw that suffering in me."  Ex. 145, Judy Doe Dep. at 65:10-16.

233.   Wau, the capital city of Western Bahr el Ghazal, is not in an oil concession block.  Ex. 138, Plaintiff Location Maps.

148

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading. Wau was of strategic importance to the Regime's control of Sudan's oil producing region, as it was a populous city and administrative capital. *See* ECF No. 435-54, Baldo Report ¶ 168; ECF No. 435-93, Verhoeven Report at 33-34. As well, the Southern Command of the SAF was based in Juba, the capital of what is now South Sudan, ECF No. 435-54, Baldo Report ¶ 53, and Sudan's National Intelligence and Security Service ("NISS") and military intelligence operated in southern Sudan, which includes Wau and Juba. *Id.* ¶¶ 5, 63.

234. Ms. Judy Doe testified that, on one occasion, "soldiers" came to her home and assaulted her, including sexual assault. Ex. 38, Judy Doe Tr. at 84:23–85:4.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading. In 2004, Mr. Adam was arrested in Wau following his filing of a petition against GOS security forces; he was taken past his home on the way to confinement by nine green military uniformed men with assault weapons, including Kalashnikovs and the "dushka" rifle. Ex. 145, Judy Doe Dep. at 75:24-76:12, 77:20-85:13. The men were driving a Toyota Land Cruiser with an open back and a large "torchka" weapon in the middle of the back. *Id.* at 72:3-20. Later that night, uniformed men returned to Ms. Judy Doe's house and raped her repeatedly. *Id.* at 84:23-86:10. She later learned that she became infected with HIV as a result of her rape by GOS soldiers. Ex. 145, Judy Doe Dep. at 88:22-90:4.

235. There is no evidence that the individuals used any weapons purchased with revenues processed by any BNPP Defendant to perpetrate this alleged assault.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as

required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.    In any event, it is controverted, misleading, and irrelevant.  The revenues provided to the GOS by the BNPP criminal conspiracy enabled the Regime to acquire weapons, purchase loyalty, and stay in power to enable it and its agents to commit sweeping human rights abuses against targeted populations in Sudan. *See* Plaintiffs' Response to Proposed Fact Nos. 107-08.  The GOS, through the National Security Council headed by al-Bashir and subordinate institutions, controlled, funded, and equipped the GOS's security organs during the Proposed Class Period.  ECF No. 435-93, Verhoeven Report at 25-27; ECF No. 435-54, Baldo Report ¶¶ 5, 43-46, 108-12.  The GOS funneled money it derived from its conspiracy with BNPP to its intelligence services and other agencies: "salaries were increased, new vehicles were purchased and offices were renovated . . . especially for NISS," where "soaring expenditure" lead to "a dramatic expansion in its capabilities thanks to petrodollars."  ECF No. 435-93, Verhoeven Report at 27.

236.    Ms. Judy Doe testified that the men who came to her home brandished Kalashnikovs and a weapon called "dushka."  Ex. 38, Judy Doe Tr. at 76:4–12.

**Plaintiffs' Response**: Uncontroverted but incomplete.  *See* Plaintiffs' Response to Proposed Fact No. 234.

237.    Ms. Judy Doe testified that the individuals came to her home in a Land Cruiser with a weapon called a "torchka" on it.  Ex. 38, Judy Doe Tr. at 72:6–19; 78:24–79:4.

**Plaintiffs' Response**: Uncontroverted but incomplete.  *See* Plaintiffs' Response to Proposed Fact No. 234.

238.    Ms. Judy Doe testified that she arrived in the United States in 2005.  Ex. 38, Judy Doe Tr. at 15:12–24; 54:22–24.

**Plaintiffs' Response**: Uncontroverted, but incomplete.  In 2004, Ms. Judy Doe and her

family fled to Egypt by train. Ex. 145, Judy Doe Dep. at 42:20:43:3.  While in Egypt, her eldest

daughter was killed, after receiving an overdose of medication at the El Zamalek hospital.  *Id*. at

61:23-62:10.  Ms. Judy Doe was admitted to the United States as a refugee on March 16, 2005. *Id*.

at 15:9-24.  *See* Ex. 207, PLA-001647 at 1648–50.

    *ii.*    *Damages*

239.    Ms. Judy Doe has adduced no documentary evidence concerning her ownership or
the value of any real or personal property for which she alleges she is entitled to
compensation in this Action.

**Plaintiffs' Response**: Controverted and misleading.  Whether Ms. Judy Doe possessed

documents concerning her ownership of real or personal property nearly twenty years after she

was forcibly displaced from Sudan is not determinative of her ability to prove damages.  Indeed,

Ms. Judy Doe submitted detailed listings of her losses, including real and personal property,

including a description of her homes, land, and vehicles.  Ex. 249, Pls.' Suppl. Initial Disclosures

(Dec. 21, 2022), at 19.

**J.**    **Plaintiff Jane Roe ("Ms. Jane Roe")**

    *i.*    *Alleged Attacks and Injuries*

        **a.**    **Juba, Central Equatoria, 2001**

240.    Ms. Jane Roe testified that, in 2001, individuals she identified as "people from the
government" began following her and her husband in Juba.  Ex. 45, Jane Roe Tr. at
66:2–67:6; 93:15–19.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Ms. Jane Roe is of Kuku ethnic

origin, and a Christian, both groups which were targets of the GOS.  Ex. 148, Deposition of Jane

Roe ("Jane Roe Dep.") at 49:14-15, 49:19-20; Ex. 5, Jok Report ¶¶ 96-98; ECF No. 435-54, Baldo

Report ¶¶ 108, 165; ECF No. 435-68, Hudson Report ¶¶ 11, 41.  She testified that while living in

Juba, on several occasions, people from the government, wearing khaki cloths and driving khaki

colored vehicles and carrying police identification badges, "would come and ask about" her

husband, who he had been meeting with, and what they had been talking about.  Ex. 148, Jane Roe

Dep. at 66:4-70:22.  The visits terrified Ms. Jane Roe, who like "[a]ll the people in Sudan" had

heard tales of the GOS attacking civilians in their homes, beating and killing people along with

their children.  *Id.* at 69:13-70:3.  This monitoring lead her husband to suggest that the couple

move to Khartoum in 2001.  *Id.* at 75:7-8.

> 241.  Juba, the capital city of present-day South Sudan, is not in an oil concession block.
> Ex. 138, Plaintiff Location Maps.

**Plaintiffs' Response**: Uncontroverted but incomplete.  The Southern Command of the

SAF was based in Juba, the capital of what is now South Sudan, and Sudan's National Intelligence

and Security Service ("NISS") and military intelligence operated in southern Sudan, which

includes Wau and Juba.  ECF No. 435-54, Baldo Report ¶¶ 5, 53, 63.  The Sudanese air force

operated an airport in Juda, and Juba Air Cargo confirmed to the UN that a company leased aircraft

for Sudanese Armed Forces flights.  *Id.* ¶ 55; ECF No. 435-52, Austin Report ¶ 158.

> 242.  There is no evidence that the individuals used any weapons purchased with
> revenues processed by any BNPP Defendant in connection with these incidents.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as

required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.   In any event, it is

controverted, misleading, and irrelevant.  The revenues provided to the GOS by the BNPP criminal

conspiracy enabled the Regime to acquire weapons, purchase loyalty, and stay in power to enable

it and its agents to commit sweeping human rights abuses against targeted populations in Sudan.

*See* Plaintiffs' Response to Proposed Fact Nos. 107-08.  The GOS, through the National Security

Council headed by al-Bashir and subordinate institutions, controlled, funded, and equipped the

GOS's security organs during the Proposed Class Period.  ECF No. 435-93, Verhoeven Report at

25-27; ECF No. 435-54, Baldo Report ¶¶ 5, 43-46, 108-12.  The GOS funneled money it derived

from its conspiracy with BNPP to its intelligence services and other agencies: "salaries were

increased, new vehicles were purchased and offices were renovated . . . especially for NISS,"

where "soaring expenditure" lead to "a dramatic expansion in its capabilities thanks to

petrodollars."  ECF No. 435-93, Verhoeven Report at 27.

> 243.  Ms. Jane Roe testified that she did not suffer any physical harm as a result of these alleged incidents.  Ex. 45, Jane Roe Tr. at 72:7–23.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Ms. Jane Roe testified that she

suffered emotional harm and was terrified from the harassment from the GOS.  Ex. 148, Jane

Roe Dep. at 72:14-23.  Further, her family's home in Juba was later looted and destroyed.  *Id.* at

73:2-23.

> 244.  Ms. Jane Roe testified that, following these incidents, she and her husband relocated to Khartoum.  Ex. 45, Jane Roe Tr. at 65:22–66:5.

**Plaintiffs' Response**: Uncontroverted but incomplete.  *See* Plaintiffs' Response to

Proposed Fact No. 240.

### b.     Khartoum, Sudan, January 2003

245.    Ms. Jane Roe testified that, in January 2003, individuals she identified as the
"police" detained her for several days in Khartoum. Ex. 45, Jane Roe Tr. at 77:5–
11; 80:8– 89:10.

**Plaintiffs' Response**: On or about January 3, 2003, four security men with long guns and

wearing khaki uniforms with hats with the insignia of the GOS broke down the door to Ms. Jane

Doe's home. Ex. 148, Jane Roe Dep. at 77:21-78:14, 79:4-19, 120:13-121:6. Her husband escaped

through a window, and she has not seen him since. *Id*. at 78:2-10. When she informed the men

that her husband had not returned from Wau, they accused her of lying to them, blindfolded her,

and took her in a car to an unknown location, leaving her daughter behind alone. *Id*. at 80:8-23,

81:5-82:21. Upon arrival at the unknown location, Ms. Jane Roe was locked in a cell, still

blindfolded. *Id.* at 81:5-82:21.

The next day, Ms. Jane Roe was interrogated about her husband's supposed accomplices

and visitors, during which she was continually blindfolded and unable to see, slapped, kicked,

whipped, and verbally insulted. Ex. 148, Jane Roe Dep. at 82:21-84:22, 91:1-12. On the second

day of her detention, Ms. Jane Roe was sexually harassed and then raped "repeatedly" for days,

and contracted HIV as a result. *Id*. at 84:7-15, 105:15-25; Ex. 241, Pl. Jane Roe's Obj. & Resp. to

Defs. First Set of Interrogatories (Nos. 1-4) ("Jane Roe Rog.") No. 1. Her captors were brutal:

"each time men came back after that, they would rape her. She would pass out and they would

shake her to wake her up." Ex. 7, Keller & Rosenfeld Report App'x C19 ("Jane Roe App'x") at

3. She was released a couple of days later on three conditions: (1) not to tell anyone about her

detention; (2) to inform the interrogators of her husband's whereabouts to the extent he contacted her; and (3) not to leave Khartoum without the interrogators' prior permission. *Id.* at 84:7-15. The Sudanese security forces told Ms. Jane Roe that if she "open[ed] her mouth" to discuss "anything" about her detention, they would "kill all [her] relatives." *Id.* at 86:11-18. She was blindfolded, placed, in a car, and dropped off in Haj Yusuf. *Id.* at 86:11-18. While en route to Haj Yusuf from the detention center, while still in the custody of the Sudanese security forces, Ms. Jane Roe experienced a miscarriage. *Id.* at 86:11-18, 87:8-21, 88:2-11; Ex. 241, Jane Roe Rog No. 1; Ex. 7, Jane Roe App'x at 3.

After she was removed from the detention facility on January 6, 2003, Ms. Jane Roe was blindfolded, placed into a car, and dropped off in Haj Yusuf, and she proceeded to her uncle's home in Omdurman. Ex. 148, Jane Roe Dep. at 86:11-18. After arriving at her uncle's home, Ms. Jane Roe was reunited with her daughter, and she remained there with her uncle in Omdurman until her travel documents were secured. Ex. 148, Jane Roe Dep. at 89:21-90:12.

246.   Khartoum, Sudan's capital city, is not in an oil concession block. Ex. 138, Plaintiff Location Maps.

**Plaintiffs' Response**: Uncontroverted but incomplete, misleading, and irrelevant. There is no dispute that Khartoum is not in an oil concession block. Nor is there a dispute that at all times during the Class Period, the GOS and its agents were the only armed actors to exercise control over Khartoum. Moreover, Khartoum was one of the primary cities in which the GOS and its agents directly targeted victims like Ms. Jane Roe, and as the capital city of Sudan, it was the principal location from which the Regime's orders to target its opponents nationwide emanated.

155

ECF No. 435-54, Baldo Report ¶¶ 5, 12, 29, 50, 52-53, 55, 62, 68, 74, 104, 121, 127, 129-33, 137, 166, 181, 213.  According to the U.S. Embassy in Khartoum, funds BNPP transferred to the Regime went through Sudan's Central Bank Headquarters and other commercial banks in Khartoum.  *Id.* ¶¶ 85-86.

> 247.   Ms. Jane Roe testified that the individuals who detained her assaulted her, including sexual assaults. Ex. 45, Jane Roe Tr. at 80:8–89:10.

**Plaintiffs' Response**: Uncontroverted but incomplete.  *See* Plaintiffs' Response to Proposed Fact No. 245.

> 248.   There is no evidence that the individuals used any weapons purchased with revenues processed by any BNPP Defendant to perpetrate this alleged detention and assault.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.   In any event, it is controverted, misleading, and irrelevant.  The revenues provided to the GOS by the BNPP criminal conspiracy enabled the Regime to acquire weapons, purchase loyalty, and stay in power to enable it and its agents to commit sweeping human rights abuses against targeted populations in Sudan. *See* Plaintiffs' Response to Proposed Fact Nos. 107-08.  The GOS, through the National Security Council headed by al-Bashir and subordinate institutions, controlled, funded, and equipped the GOS's security organs during the Proposed Class Period.  ECF No. 435-93, Verhoeven Report at 25-27; ECF No. 435-54, Baldo Report ¶¶ 5, 43-46, 108-12.  The GOS funneled money it derived from its conspiracy with BNPP to its intelligence services and other agencies: "salaries were increased, new vehicles were purchased and offices were renovated . . . especially for NISS,"

where "soaring expenditure" lead to "a dramatic expansion in its capabilities thanks to petrodollars." ECF No. 435-93, Verhoeven Report at 27.

249.    Ms. Jane Roe testified that these individuals had "long guns" and that they also beat her with a whip and their legs.  Ex. 45, Jane Roe Tr. at 79:18–19; 91:5–6.

**Plaintiffs' Response**: Uncontroverted but incomplete.  *See* Plaintiffs' Response to Proposed Fact No. 245.

250.    Ms. Jane Roe testified that her uncle told her that her house in Khartoum was burned down at some point after this incident, but that she does not know how that came to be. Ex. 45, Jane Roe Tr. at 93:15–94:4.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Ms. Jane Roe testified that her uncle told her that the house had been burned down when he went to get Ms. Jane Roe's daughter from a neighbor's house following her detention and torture.  Ex. 148, Jane Roe Dep. at 93:15-94:4.

251.    Ms. Jane Roe testified that, after this incident, she and her child left Khartoum for Egypt.  Ex. 45, Jane Roe Tr. at 94:17–22.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  Less than two months after her arrest and torture, Ms. Jane Roe fled to Egypt with her daughter; scarred in her "mind is the torture that [she] went through, that [her] daughter went through."  Ex. 148, Jane Roe Dep. at 68:10-23.

252.    Ms. Jane Roe testified that she arrived in the United States in 2006.  Ex. 45, Jane Roe Tr. at 12:23–13:1.

**Plaintiffs' Response**: Uncontroverted. *See* Ex. 185, PLA-000223 at 0226; Ex. 210, PLA-001780 at 1781.

ii.    *Damages*

253.    Ms. Jane Roe has adduced no documentary evidence concerning her ownership or the value of any real or personal property for which she alleges she is entitled to compensation in this Action.

**Plaintiffs' Response**: Controverted and misleading.   Whether Ms. Jane Roe possessed documents concerning her ownership of real or personal property nearly twenty years after she was forcibly displaced from Sudan is not determinative of her ability to prove damages.   Indeed, Ms. Jane Roe submitted detailed listings of her losses, including real and personal property, including a description of her homes, land, and vehicle.   Ex. 249, Pls.' Suppl. Initial Disclosures (Dec. 21, 2022), at 11-12.

**K.    Plaintiff Nyanriak Tingloth ("Ms. Tingloth")**

i.    *Alleged Attacks and Injuries*

a.    **Khartoum, Sudan, 2002**

302.    Ms. Tingloth testified that, in 2002, individuals she identified as "people at the government" came to her home in Khartoum and arrested and assaulted her husband.   Ex. 50, Tingloth Tr. at 89:17–90:10; 98:3–5.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.   Ms. Tingloth is a member of the Dinka tribe and a Christian, two characteristics that were targeted by the GOS for its campaign of violence.   Ex. 146, Deposition of Nyanriak Tingloth ("Tingloth Dep.") at 41:14, 48:1-9; Ex. 7, Keller & Rosenfeld Report App'x C15 ("Tingloth App'x") at 2; ECF No. 435-54, Baldo Report ¶¶ 7, 63, 64, 94, 167; ECF No. 435-93, Verhoeven Report at 7, 20, 33-34; ECF No. 435-68, Hudson Report ¶¶ 69-70, 190, 196.   Ms. Tingloth testified that government security forces arrested, detained, and tortured her husband (Plaintiff Kuol Shbur), who went into hiding upon his release.

Ex. 146, Tingloth Dep. at 89:17-98:18; Plaintiffs' Response to Proposed Fact No. 408; Ex. 237, Pl.

Nyanriak Tingloth's Obj. & Resp. to Defs. First Set of Interrogatories (Nos. 1-4) ("Tingloth Rog.")

No. 1.  Ms. Tingloth, alone with her minor children, was repeatedly visited by GOS security forces

inquiring as to her husband's whereabouts, became afraid for her safety, and fled to the village of

Romamer near Abyei to be near family.  Ex. 146, Tingloth Dep. at 101:2-106:5.

> 303.  There is no evidence that the individuals used any weapons purchased with revenues
> processed by any BNPP Defendant in connection with this detention and assault.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as

required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.   In any event, it is

controverted, misleading, and irrelevant.  The revenues provided to the GOS by the BNPP criminal

conspiracy enabled the Regime to acquire weapons, purchase loyalty, and stay in power to enable

it and its agents to commit sweeping human rights abuses against targeted populations in Sudan.

*See* Plaintiffs' Response to Proposed Fact Nos. 107-08.  The GOS, through the National Security

Council headed by al-Bashir and subordinate institutions, controlled, funded, and equipped the

GOS's security organs during the Proposed Class Period.  ECF No. 435-93, Verhoeven Report at

25-27; ECF No. 435-54, Baldo Report ¶¶ 5, 43-46, 108-12.  The GOS funneled money it derived

from its conspiracy with BNPP to its intelligence services and other agencies: "salaries were

increased, new vehicles were purchased and offices were renovated . . . especially for NISS,"

where "soaring expenditure" lead to "a dramatic expansion in its capabilities thanks to

petrodollars."  ECF No. 435-93, Verhoeven Report at 27.

304.   Ms. Tingloth testified that she left Khartoum, Sudan for Abyei, Sudan in 2003.  Ex. 50, Tingloth Tr. at 106:18–107:1, 109:6–7.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  *See* Plaintiffs'

Response to Proposed Fact No. 302.

305.   Ms. Tingloth testified that, at some point after leaving, she returned to visit Khartoum and saw that the house she had lived in was converted into a place for studying the Quran.  Ex. 50, Tingloth Tr. at 107:7–15.

**Plaintiffs' Response**: Uncontroverted.

### b.      Romamer, Abyei, April 2003

306.   Ms. Tingloth testified that, in April 2003, individuals she identified as "Mujahadeen" and "Omar al-Bashir's militia" engaged in a succession of two or more attacks in Romamer, and that two of her brothers and her grandmother were killed in these attacks.  Ex. 50, Tingloth Tr. at 110:16–18; 111:20–112:7; 118:11–13; 123:2–7.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  Ms. Tingloth had

seen the training camp that the *mujahadeen* militia used to train; high school students were forced

to train in order to receive their diploma.  Ex. 146, Tingloth Dep. at 116:2-9.  She had previously

seen *mujahadeen* in the area wearing military clothing and hats with "the eagle that was known as

the eagle of Sudan."  *Id.* at 112:2-4.  During the first attack, Ms. Tingloth "saw the Mujahadeen in

khaki" carrying guns as she fled the village; her brother Ring was shot in his head and back and

killed, his body left face-down on the ground.  *Id.* at 117:1-4.  She witnessed children around 8-9

years old drown in a branch of the Nile River trying to escape capture.  Ex. 7, Tingloth App'x at

3.

Later in the same month, the Regime attacked her village again with a combination of aerial

bombing and a ground attack by militia forces.  *Id.* at 120:4-121:23.  Ms. Tingloth heard the

Antonov: "I heard the Antonov . . . you think it's going to fall on you and the noise is too much.

So you just run . . . and if you are lucky, you will survive."  *Id.*  She witnessed the aftermath of the

bombing: "When she arrived at her grandmother's house it was destroyed and on fire, and she saw

her grandmother on fire, still alive.  She watched as her grandmother died."  Ex. 7, Tingloth App'x

at 3; Ex. 237, Tingloth Rog. No. 1.  Her brother's "body was broken" from cuts all over, and he

perished.  Ex. 146, Tingloth Dep. at 120:4-13.  The entire village was destroyed, and "[t]here were

no homes left."  *Id.* at 122:25.

> 307.    Ms. Tingloth testified that the house she was living in was destroyed during these attacks.
> Ex. 50, Tingloth Tr. at 122:23–123:2.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  *See* Plaintiffs'

Response to Proposed Fact No. 306.

> 308.    Ms. Tingloth testified that there were Antonovs involved in at least one of the alleged
> attacks.  Ex. 50, Tingloth Tr. at 117:12–14.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  *See* Plaintiffs'

Response to Proposed Fact No. 306.

> 309.    Ms. Tingloth testified that the individuals carried guns.  Ex. 50, Tingloth Tr. at 127:7–12.

**Plaintiffs' Response**: Uncontroverted, but the cited testimony does not support the

proposed fact.  The forces that attacked Ms. Tingloth's village were armed.  Ex. 146, Tingloth

Dep. at 117:12-14, 119:18-23; Plaintiffs' Response to Proposed Fact No. 306.

> 310.    There is no evidence that the individuals used any weapons purchased with revenues
> processed by any BNPP Defendant in connection with these attacks.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.   In any event, it is controverted, misleading, and irrelevant.  The revenues provided to the GOS by the BNPP criminal conspiracy enabled the Regime to acquire weapons, purchase loyalty, and stay in power to enable it and its agents to commit sweeping human rights abuses against targeted populations in Sudan. *See* Plaintiffs' Response to Proposed Fact Nos. 107-08.   Using the revenues from the BNPP conspiracy, the GOS funded and equipped the Janjaweed during the Proposed Class Period.  ECF No. 435-93, Verhoeven Report at 25-27; ECF No. 435-52, Austin Report ¶¶ 44-45, 148; ECF No. 435-54, Baldo Report ¶¶ 13, 73-75.   During the Proposed Class Period, the GOS increased its procurement of Antonov aircraft, which were used in attacks throughout oil areas, southern Sudan, and Darfur, and "[i]n all likelihood, GoS would not have had the financial resources or the access to international markets that was necessary for the procurement and maintenance of Antonovs were it not for BNPP assistance."   ECF No. 435-52, Austin Report ¶ 208; *see also id.* ¶¶ 166 (noting the use of fixed wing aircraft in attacks in Darfur), 271 (same concerning the Second Civil War); ECF No. 435-53, Austin Reply ¶¶ 112-18 (the BNPP conspiracy allowed the GOS to acquire "more modern and effective - i.e., deadly - material," "including Hind helicopter gun ships, Antonov medium bombers, MiG 23 fighter aircraft, mobile artillery pieces, and light assault weapons"), 152 (the UN Panel documented the GOS's use of Antonov aircraft for bombardment from civilian airports in Darfur); ECF No. 435-54, Baldo Report ¶¶ 177-85 (documenting use of "new weapons systems" such as helicopter gunships and Antonov airplanes).

311.   Ms. Tingloth testified that, following these alleged attacks, she left Abyei for Khartoum, where she stayed for "months" before going to Egypt in December 2004.  Ex. 50, Tingloth Tr. at 125:5–24.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  Ms. Tingloth stayed with her aunt's daughter in Khartoum for several months before traveling with her children to Egypt to reunite with her husband.  Ex. 146, Tingloth Dep. at 125:2-24.

312.   Ms. Tingloth left Egypt and was admitted to the United States as a refugee on August 1, 2005.  Ex. 48, Shbur Tr. at 126:21–22.

**Plaintiffs' Response**: Uncontroverted. *See* Ex. 208, PLA-001688 at 1689-90.

ii.   *Damages*

313.   Ms. Tingloth has adduced no documentary evidence concerning her ownership or the value of any real or personal property for which she alleges she is entitled to compensation in this Action.

**Plaintiffs' Response**: Controverted and misleading.  Whether Ms. Tingloth possessed documents concerning her ownership of real or personal property nearly twenty years after she was forcibly displaced from Sudan is not determinative of her ability to prove damages.  Indeed, Ms. Tingloth submitted detailed listings of her losses, including real and personal property, including a description of her home, family-owned land, and livestock.  Ex. 249, Pls.' Suppl. Initial Disclosures (Dec. 21, 2022), at 12.

## L.   Plaintiff Hawa Mohamed Omar ("Ms. Omar")

i.   *Alleged Attacks and Injuries*

### a.   Sulu,  West Darfur, circa June 2002

314.   Ms. Omar testified that, in approximately June 2002, individuals she identified

as "Janjaweed" raided her village of Sulu.  Ex. 44, Omar Tr. at 86:15–87:3;
88:20–25; 89:17–23.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading. Ms. Omar is a
member of the Fur tribe, an ethnic African group traditionally based in Darfur, which was targeted
by the Regime for genocide.  Ex. 143, Deposition of Hawa Mohamed Omar ("Omar") at 48:12-
20; ECF No. 435-54, Baldo Report ¶¶ 72, 152, 191; ECF No. 435-68, Hudson Report ¶ 91; ECF
No. 435-93, Verhoeven Report at 17-18.  She testified that she witnessed the Janjaweed arrive
from the east, round up cattle and other animals outside of her village, and abscond with the
animals, including her family's cattle, sheep, and goats.  Ex. 143, Omar Dep. at 86:15-91:12.  The
Janjaweed were wearing khaki uniforms with an insignia on the shoulder, carrying "Jim" and
"Kalesh" (likely Kalashnikov) guns, and rode on camels and horses.  *Id.*  People from the village
followed for a while to attempt to take back some of the animals, but the Janjaweed fired their
weapons, and the people, including Ms. Omar, fled.  *Id.* at 91:13-93:6; Ex. 234, Pl. Hawa Omar's
Obj. & Resp. to Defs. First Set of Interrogatories (Nos. 1-4) ("Omar Rog.") No. 1.

315.    Sulu, a village in West Darfur, is not in an oil concession block.  Ex. 138, Plaintiff
        Location Maps.

**Plaintiffs' Response**: Uncontroverted but incomplete misleading and irrelevant. Darfur
was of strategic importance to the Regime's control of Sudan's oil region because of the
discovery of important oil reserves in the desert. Ex. 123, Bazire Dep. at 87:24-88:12 (Louis
Bazire, Former Head of Territory for BNPP in Switzerland, testified: "From what I remember,
the intensity of communication about Darfur was higher in the years 2006, 2007. There were

demonstrations in the street, et cetera. I don't remember the reasons why, at this time, this conflict

was more intense. Probably part of this was coming from the fact that some important reserves

of oil were discovered in the desert. This is more or less what I remember").

316.   Ms. Omar testified that the individuals stole property during the alleged attack. Ex. 44, Omar Tr. at 88:12–89:8.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  *See* Plaintiffs'

Response to Proposed Fact No. 314.

317.   Ms. Omar testified that the individuals took her family's livestock by rounding them up with horses and camels, but that the individuals did not use cars or other vehicles. Ex. 44, Omar Tr. at 89:20–90:6.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  *See* Plaintiffs'

Response to Proposed Fact No. 314.

318.   Ms. Omar testified that, based on other locals' description of the weapons, she understood that the individuals had "jim" and "kalesh" guns. Ex. 44, Omar Tr. at 90:23–91:10.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  Ms. Omar testified

that she saw the guns that the Janjaweed used, and that "[t]he people whose cattle were taken by

the Janjaweed" knew the names of the guns, the "Jim" and "Kalesh" (likely Kalashnikov).  Ex.

143, Omar Dep. at 90:20-91:12.

319.   There is no evidence that the individuals used any weapons purchased with revenues processed by any BNPP Defendant to perpetrate this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as

required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.   In any event, it is

controverted, misleading, and irrelevant.  The revenues provided to the GOS by the BNPP criminal conspiracy enabled the Regime to acquire weapons, purchase loyalty, and stay in power to enable it and its agents to commit sweeping human rights abuses against targeted populations in Sudan. *See* Plaintiffs' Response to Proposed Fact Nos. 107-08.  Using the revenues from the BNPP conspiracy, the GOS funded and equipped the Janjaweed during the Proposed Class Period.  ECF No. 435-93, Verhoeven Report at 25-27; ECF No. 435-52, Austin Report ¶¶ 44-45, 148; ECF No. 435-54, Baldo Report ¶¶ 13, 73-75.

### b.  Sulu, West Darfur, circa December 2003

320.  Ms. Omar testified that, in approximately December 2003, individuals she identified as "Janjaweed" attacked Sulu.  Ex. 44, Omar Tr. at 81:15–21; 82:2–7.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  Ms. Omar saw the Janjaweed enter her village on camouflage vehicles, horses, and camels, and wearing khaki camouflage with a shoulder patch and boots.  Ex. 143, Omar Dep. at 74:13-18, 79:10-15, 80:8-9, 90:17-18.  Camouflage military planes circled overhead, and Ms. Omar heard bombs going off as the Janjaweed burned Sulu: "I have seen people being shot and places being burned, and you could be running and you could see somebody falling in front of you who has been shot. And sometimes you will see women being raped. You would just be running. And if God has not saved you, you could be in the same situation as well."  *Id.* at 81:10-24.  The entire village was burned to the ground, including her family's farm and home.  *Id.*

321.  Ms. Omar testified that the individuals damaged property during the alleged attack.  Ex. 44, Omar Tr. at 82:2–7.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading. *See* Plaintiffs'

Response to Proposed Fact No. 320.

> 322.    Ms. Omar testified that she saw a plane and that she heard the sound of bombs,
> but that she was running and did not see the plane drop bombs. Ex. 44, Omar Tr.
> at 75:20–76:4.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading. *See* Plaintiffs'

Response to Proposed Fact No. 320.

> 323.    There is no evidence that the individuals used any weapons purchased with revenues
> processed by any BNPP Defendant to perpetrate this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as

required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.   In any event, it is

controverted, misleading, and irrelevant. *See* Plaintiffs' Response to Proposed Fact No. 319.

Moreover, during the Proposed Class Period, the GOS increased its procurement of Antonov

aircraft, which were used in attacks throughout oil areas, southern Sudan, and Darfur, and "[i]n all

likelihood, GoS would not have had the financial resources or the access to international markets

that was necessary for the procurement and maintenance of Antonovs were it not for BNPP

assistance." ECF No. 435-52, Austin Report ¶ 208; *see also id.* ¶ 166 (noting the use of fixed wing

aircraft in attacks in Darfur); ¶ 271 (same concerning the Second Civil War); ECF No. 435-53,

Austin Reply ¶¶ 112-18 (the BNPP conspiracy allowed the GOS to acquire "more modern and

effective - i.e., deadly - material," "including Hind helicopter gun ships, Antonov medium

bombers, MiG 23 fighter aircraft, mobile artillery pieces, and light assault weapons"); ¶ 152 (the

UN Panel documented the GOS's use of Antonov aircraft for bombardment from civilian airports in Darfur); ECF No. 435-54, Baldo Report ¶¶ 177-85 (documenting use of "new weapons systems" such as helicopter gunships and Antonov airplanes).

> 324.    Ms. Omar testified that, following the alleged December 2003 attack, she and her family left Sulu for Mornay, West Darfur, followed by Zalingei, West Darfur. Ex. 44, Omar Tr. at 108:16–109:23.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  Ms. Omar and her family fled to Mornay where she lived underneath a tree with no food, toilers, or water, and then relocated to the Zalingei refugee camp in West Darfur.  Ex. 7, Expert Report of Dr. Allen Keller and Dr. Barry Rosenfeld App'x C8 ("Omar App'x") at 3.

> 325.    Ms. Omar testified that she and her daughter left Zalingei for Goz Beida, a refugee camp in Chad, in 2005.  Ex. 44, Omar Tr. at 113:5–114:6.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Ms. Omar took her daughter to Goz Beida, a refugee camp in Chad, in 2005 to meet with her husband, who was already at Goz Beida. Ex. 7, Omar App'x at 3.

> 326.    Ms. Omar testified that she, her daughter, her husband Plaintiff Abubakar Abakar, her husband's other wife Halima, and Halima's niece then left Goz Beida for Gaga, another refugee camp in Chad, in 2007.  Ex. 44, Omar Tr. at 117:17–118:5.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  Ms. Omar and her family were relocated from Goz Beida to Gaga by "the people of Immigration" because the Gaga refugee camp "was for people who were going to go – to be resettled in the U.S."  Ex. 143, Omar Dep. at 118:6-11.

327.   Ms. Omar testified that she and her family left Chad and were admitted to the United States as refugees in 2009.  Ex. 44, Omar Tr. at 123:11–14.

**Plaintiffs' Response**: Uncontroverted. *See* Ex. 204, PLA-001506 at 1507–08

*ii.    Damages*

328.   Ms. Omar has adduced no documentary evidence concerning her ownership or the value of any real or personal property for which she alleges she is entitled to compensation in this Action.

**Plaintiffs' Response**:  Controverted  and  misleading.    Whether  Ms.  Omar  possessed documents concerning her ownership of real or personal property nearly twenty years after she was forcibly displaced from Sudan is not determinative of her ability to prove damages.  Indeed, Ms. Omar submitted detailed listings of her losses, including real and personal property, including a description of her home, multiple farms, and livestock.  Ex. 249, Pls.' Suppl. Initial Disclosures (Dec. 21, 2022), at 11.

**M.     Plaintiff Abbo Ahmed Abakar ("Mr. Abbo Abakar")**

*i.     Alleged Attacks and Injuries*

### a.      Bawudah, West Darfur, circa 2003

329.   Mr. Abbo Abakar testified that, in approximately 2003, individuals he identified as "Janjaweed" attacked his village of Bawudah.  Ex. 27, Abbo Abakar Tr. at 58:20–59:15; 80:15–17; 93:25–94:4.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  Mr. Abbo Abakar is a member of the Masalit tribe, one of the tribes targeted by the GOS for genocide.  Ex. 130, Deposition of Abbo Ahmed Abakar ("Abbo Abakar Dep.") at 73:19-21; Ex. 5, Jok Report ¶ 11; ECF No. 435-55, Baldo Reply ¶ 152.  In 2003, Mr. Abbo Abakar regularly saw Janjaweed and

GOS forces near his village: "These are people who would come with the government. Sometimes they will come with cars. They come with helicopters. Or sometimes they will ride horses."  Ex. 130, Abbo Abakar Dep. at 76:18-77:11.  Around July 2003, Mr. Abbo Abakar saw men in vehicles and other fighters on horseback attack from the south, supported by a black and green painted helicopter.  *Id.* at 87:12-102:23.  The GOS forces wore khaki military uniforms with green patches called "mufarga" or all green, while the Janjaweed were garbed in the "jalabiya" (a long white robe worn by Janjaweed men).  *Id.*  Mr. Abbo Abakar and his wife and children fled the village to the north on foot, abandoning his successful tailoring business.  *Id.*; Ex. 228, Pl. Abbo Ahmed Abakar's Obj. & Resp. to Defs. First Set of Interrogatories (Nos. 1-4) ("Abbo Abakar Rog.") No. 1.

> 330.    Bawudah, a village in West Darfur, is not in an oil concession block.  Ex. 138, Plaintiff Location Maps.

**Plaintiffs' Response**: Uncontroverted but incomplete misleading and irrelevant. Darfur was of strategic importance to the Regime's control of Sudan's oil region because of the discovery of important oil reserves in the desert. Ex. 123, Bazire Dep. at 87:24-88:12 (Louis Bazire, Former Head of Territory for BNPP in Switzerland, testified: "From what I remember, the intensity of communication about Darfur was higher in the years 2006, 2007. There were demonstrations in the street, et cetera. I don't remember the reasons why, at this time, this conflict was more intense. Probably part of this was coming from the fact that some important reserves of oil were discovered in the desert. This is more or less what I remember").

> 331.    There is no evidence that the individuals used any weapons purchase with revenues

processed by any BNPP Defendant to perpetrate this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.   In any event, it is controverted, misleading, and irrelevant.  The revenues provided to the GOS by the BNPP criminal conspiracy enabled the Regime to acquire weapons, purchase loyalty, and stay in power to enable it and its agents to commit sweeping human rights abuses against targeted populations in Sudan. *See* Plaintiffs' Response to Proposed Fact Nos. 107-08.  Using the revenues from the BNPP conspiracy, the GOS funded and equipped the Janjaweed during the Proposed Class Period.  ECF No. 435-93, Verhoeven Report at 25-27; ECF No. 435-52, Austin Report ¶¶ 44-45, 148; ECF No. 435-54, Baldo Report ¶¶ 13, 73-75.  During the Proposed Class Period, the GOS increased its procurement of Antonov aircraft, which were used in attacks throughout oil areas, southern Sudan, and Darfur, and "[i]n all likelihood, GoS would not have had the financial resources or the access to international markets that was necessary for the procurement and maintenance of Antonovs were it not for BNPP assistance."  ECF No. 435-52, Austin Report ¶ 208; *see also id.* ¶¶ 166 (noting the use of fixed wing aircraft in attacks in Darfur), 271 (same concerning the Second Civil War); ECF No. 435-53, Austin Reply ¶¶ 112-18 (the BNPP conspiracy allowed the GOS to acquire "more modern and effective - i.e., deadly - material," "including Hind helicopter gun ships, Antonov medium bombers, MiG 23 fighter aircraft, mobile artillery pieces, and light assault weapons"), 152 (the UN Panel documented the GOS's use of Antonov aircraft for bombardment from civilian airports in Darfur); ECF No. 435-54, Baldo Report ¶¶ 177-85 (documenting use of

"new weapons systems" such as helicopter gunships and Antonov airplanes).

332.    Mr. Abbo Abakar testified that he left Bawudah with his wife and children during the attack, did not return to Bawudah after the attack and does not know what happened to his house or property. Ex. 27, Abbo Abakar Tr. at 96:15–22; 100:13–20; 102:2–103:2.

**Plaintiffs' Response**: Controverted and misleading. Mr. Abbo Abakar testified that he heard from "the people who were behind" that "[e]verything that was left, either it was taken or burned." Ex. 130, Abbo Abakar Dep. at 100:21-101:15. He and his family fled, leaving everything behind and heading to Kassaross. *Id.* at 101:18-25.

333.    Mr. Abbo Abakar testified that, following the alleged attack in Bawudah, he and his family moved to the village of Kassaross, Sudan. Ex. 27, Abbo Abakar Tr. at 103:13–16.

**Plaintiffs' Response**: Uncontroverted but incomplete. *See* Plaintiffs' Response to Proposed Fact No. 332.

### b.    Kassaross, West Darfur, 2005

334.    Mr. Abbo Abakar testified that, in 2005, individuals attacked Kassaross. Ex. 27, Abbo Abakar Tr. at 103:17–22.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading. Mr. Abbo Abakar was tending cattle outside of Kassaross when he saw smoke and heard a commotion. Ex. 130, Abbo Abakar Dep. at 103:17-104:17. As he approached the village, he saw his uncle dead on the ground, and the village was burning and full of smoke. *Id.* at 104:18-106:5. Mr. Abbo Abakar fled into the wilderness and away from the "area of death." *Id.* at 110:16-111:2. Mr. Abbo Abakar's wife and children were in the village when it was attacked; he never saw them again. *Id.* at 110:16-

111:5, 114:5-15.

> 335.   Kassaross, a village a two-hour walk north of Bawudah, West Darfur, is not in an oil concession block.  Ex. 27, Abbo Abakar Tr. at 67:10–22; Ex. 138, Plaintiff Location Maps.

**Plaintiffs' Response**: Uncontroverted but incomplete misleading and irrelevant. Darfur was of strategic importance to the Regime's control of Sudan's oil region because of the discovery of important oil reserves in the desert. Ex. 123, Bazire Dep. at 87:24-88:12 (Louis Bazire, Former Head of Territory for BNPP in Switzerland, testified: "From what I remember, the intensity of communication about Darfur was higher in the years 2006, 2007. There were demonstrations in the street, et cetera. I don't remember the reasons why, at this time, this conflict was more intense. Probably part of this was coming from the fact that some important reserves of oil were discovered in the desert. This is more or less what I remember").

> 336.   There is no evidence that the individuals used any weapons purchased with revenues processed by any BNPP Defendant to perpetrate this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.   In any event, it is controverted, misleading, and irrelevant.  *See* Plaintiffs' Response to Proposed Fact No. 331.  Additionally, during the Proposed Class Period, the GOS increased its procurement of Antonov aircraft, which were used in attacks throughout oil areas, southern Sudan, and Darfur, and "[i]n all likelihood, GoS would not have had the financial resources or the access to international markets that was necessary for the procurement and maintenance of Antonovs were it not for BNPP assistance." ECF No. 435-52, Austin Report ¶ 208; *see also id.* ¶¶ 166 (noting the use of fixed wing aircraft in

173

attacks in Darfur), 271 (same concerning the Second Civil War); ECF No. 435-53, Austin Reply ¶¶ 112-18 (the BNPP conspiracy allowed the GOS to acquire "more modern and effective - i.e., deadly - material," "including Hind helicopter gun ships, Antonov medium bombers, MiG 23 fighter aircraft, mobile artillery pieces, and light assault weapons"); *id.* ¶ 152 (the UN Panel documented the GOS's use of Antonov aircraft for bombardment from civilian airports in Darfur); ECF No. 435-54, Baldo Report ¶¶ 177-85 (documenting use of "new weapons systems" such as helicopter gunships and Antonov airplanes).

> 337.   Mr. Abbo Abakar testified that he was not present during the alleged Kassaross attack. Ex. 27, Abbo Abakar Tr. at 104:2–17.

**Plaintiffs' Response**: Controverted, incomplete, and misleading. *See* Plaintiffs' Response to Proposed Fact No. 334.

> 338.   Mr. Abbo Abakar testified that he does not know whether his wife and two sons had been injured in the attack because he did not see them and does not know what happened to them. Ex. 27, Abbo Abakar Tr. at 105:6–22.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading. *See* Plaintiffs' Response to Proposed Fact No. 334. Mr. Abbo Abakar was terrified to return to Kassaross because "[t]hey can kill me if they see me in any moment." Ex. 130, Abbo Abakar Dep. at 111:1-2. Mr. Abbo Abakar was told by family members that his wife and children had been killed, and that they had performed funeral rites for them. Ex. 7, Keller & Rosenfeld Report App'x C1 ("Abbo Abakar App'x") at 3.

> 339.   Mr. Abbo Abakar testified that, after the alleged attack on Kassaross, he left Sudan for Chad. Ex. 27, Abbo Abakar Tr. at 109:4–8.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Mr. Abbo Abakar traveled by foot to Chad carrying only his clothes and the money in his pocket.  Ex. 130, Abbo Abakar Dep. at 109:4-13.

340.    Mr. Abbo Abakar testified that he eventually left Chad for Accra, Ghana.  Ex. 27, Abbo Abakar Tr. at 115:13–116:1; 116:9–21.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Mr. Abbo Abakar stayed in Chad for approximately one month, then eventually traveled over the course of several months by lorry (an open truck) to the periphery of Accra.  Ex. 130, Abbo Abakar Dep. at 115:13-116:21.  While in Accra, he was accosted by criminals, who struck him in the head and hospitalized him.  *Id.* at 116:21-117:4.

341.    Mr. Abbo Abakar testified that he arrived in the United States as a refugee in approximately April 2009.  Ex. 27, Abbo Abakar Tr. at 42:15–21.

**Plaintiffs' Response**: Uncontroverted. *See* Ex. 194, PLA-000756 at 758–59

ii.    *Damages*

342.    Mr. Abbo Abakar has adduced no documentary evidence concerning his ownership or the value of any real or personal property for which he alleges he is entitled to compensation in this Action.

**Plaintiffs' Response**: Controverted and misleading.  Whether Mr. Abbo Abakar possessed documents concerning his ownership of real or personal property nearly twenty years after he was forcibly displaced from Sudan is not determinative of his ability to prove damages.  Indeed, Mr. Abbo Abakar submitted detailed listings of his losses, including real and personal property, including a description of his farm, home, business, joint family garden, and livestock.  Ex. 249,

Pls.' Suppl. Initial Disclosures (Dec. 21, 2022), at 5-6.

**N.      Plaintiff Jane Doe ("Ms. Jane Doe")**

   *i.      Alleged Attacks and Injuries*

         **a.      Marla, South Darfur, 2003**

   343.   Ms. Doe testified that, in 2003, individuals she identified as "Janjaweed" and the
          "army" attacked her village of Marla, South Darfur.  Ex. 36, Jane Doe Tr. at
          82:20–83:7; 87:16– 21.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  Ms. Jane Doe is a

member of the Fur tribe, an ethnic African group traditionally based in Darfur, which was targeted

by the Regime for genocide.  ECF No. 435-54, Baldo Report ¶¶ 72, 152, 191; ECF No. 435-68,

Hudson Report ¶ 91; ECF No. 435-93, Verhoeven Report at 17-18.  Ms. Jane Doe testified that in

November 2003, SAF soldiers and the Janjaweed raided Marla in the early morning hours.  Ex.

135, Deposition of Jane Doe ("Jane Doe Dep.") at 87:4-88:5.  The SAF was wearing camouflage

uniforms and driving camouflage vehicles with large guns mounted on top, while the Janjaweed

were on horseback and foot and wearing long "galabia" robes (these are likely the same robes that

Mr. Abbo Abakar described, see Plaintiffs' Response to Proposed Fact No. 329).  *Id.* at 87:8-14.

A helicopter circled overhead.  *Id.* at 88:6-21.  The attackers screamed "kill the slaves" as they

opened fire on civilians and set fire to the village, and roamed around looting and pillaging.  *Id.* at

88:22-90:12.  Ms. Jane Doe witnessed the attackers burn down her home and saw her father and

uncle lying dead on the ground; she ran with her mother and daughters.  *Id.* at 92:14-16, 95:8-11;

Ex. 7, Keller & Rosenfeld Report App'x C9 ("Jane Doe App'x") at 2.  The Janjaweed and SAF

caught them, broke her daughter's arm with the butt of a gun, beat her son on his head, and multiple

men raped each of Ms. Jane Doe and her mother.  Ex. 135, Jane Doe Dep. at 92:22-93:3, 95:8-11;

Ex. 240, Pl. Jane Doe's Obj. & Resp. to Defs. First Set of Interrogatories (Nos. 1-4) ("Jane Doe

Rog.") No. 1.  The rapists were "wearing the uniform of the military," and referring to Ms. Jane

Doe and her mother as "you slaves."  Ex. 135, Jane Doe Dep at 152:18-25, 153:6-7, 158:9-20.

344.    Marla, a village in South Darfur, is not in an oil concession block.  Ex. 138, Plaintiff
        Location Maps.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  South Darfur is an

oil producing state, containing the oil concession Block 6, which, according to the U.S. State

Department, was licensed to the China National Petroleum Corporation, a client of BNPP's.  Ex.

221, Aerial Bombing; ECF No. 435-93, Verhoeven Report at 34 n.103; Ex. 165, BNPP-KASHEF-

00005440; Ex. 47, BNPP-KASHEF-00005700.

345.    Ms. Doe testified that the individuals assaulted her during the alleged attack.  Ex.
        36, Jane Doe Tr. at 82:20–83:7.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  *See* Plaintiffs'

Response to Proposed Fact No. 343.

346.    Ms. Doe testified that the individuals destroyed property during the alleged
        attack. Ex. 36, Jane Doe Tr. at 95:12–18; 96:10–16.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  *See* Plaintiffs'

Response to Proposed Fact No. 343.

347.    Ms. Doe testified that during the attack in Marla, she saw one helicopter and cars
        with "a gun on top."  Ex. 36, Jane Doe Tr. at 88:15–18; 89:5–13.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading. *See* Plaintiffs'
Response to Proposed Fact No. 343.

> 348.   Ms. Doe testified that the individuals came in horses and cars.  Ex. 36, Jane
> Doe Tr. at 87:8–88:1.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading. *See* Plaintiffs'
Response to Proposed Fact No. 343.

> 349.   There is no evidence that the individuals used any weapons purchased
> with revenues processed by any BNPP Defendant to perpetrate this
> alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as
required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.   In any event, it is
controverted, misleading, and irrelevant.  The revenues provided to the GOS by the BNPP criminal
conspiracy enabled the Regime to acquire weapons, purchase loyalty, and stay in power to enable
it and its agents to commit sweeping human rights abuses against targeted populations in Sudan.
*See* Plaintiffs' Response to Proposed Fact Nos. 107-08.   Using the revenues from the BNPP
conspiracy, the GOS funded and equipped the Janjaweed during the Proposed Class Period.  ECF
No. 435-93, Verhoeven Report at 25-27; ECF No. 435-52, Austin Report ¶¶ 44-45, 148; ECF No.
435-54, Baldo Report ¶¶ 13, 73-75.  Using revenues received from the BNPP conspiracy, the GOS
acquired a fleet of new helicopters, including more than tripling its existing fleet of Mi-24
helicopters and acquiring HIND helicopters not previously in their inventory, that were used to
devastating effect on civilians in the oil regions, southern Sudan, and Darfur.  ECF No. 435-93,

Verhoeven Report at 26 (the GOS tripled its Mi-24 fleet); ECF No. 435-63, Fogarty Report ¶ 108

(same); ECF No. 435-52, Austin Report ¶¶ 160 (same), 159-67 (detailing the Regime's acquisition

and use of new helicopters, among other lethal equipment), 271 (same); ECF No. 435-54, Baldo

Report ¶¶ 178, 185 (detailing use of helicopter gunships against civilians); ECF No. 435-68,

Hudson Report ¶ 73 (same); ECF No. 435-63, Fogarty Report ¶ 110.

> 350.   Ms. Doe testified that, following the alleged 2003 attack, she and her family left
> Marla for Kalma, South Darfur, and later to Khartoum.  Ex. 36, Jane Doe Tr. at
> 98:2–11; 100:6– 16.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  While in the Kalma

internally displaced persons camp, Ms. Jane Doe met Dutch UN official Jan Pronk, who was

known to be outspoken about the Regime and was eventually expelled by the GOS in 2006.  Ex.

135, Jane Doe Dep. at 106:13-107:23; ECF No. 435-54, Baldo Report ¶ 219.  Pronk hired Ms. Jane

Doe to work as his assistant and messenger in Khartoum, and Ms. Jane Doe and her mother and

children moved to Omdurman near Khartoum.  Ex. 135, Jane Doe Dep. at 107:7-108:23.

### b.   Omdurman/Khartoum, Sudan, late 2004 or early 2005

> 351.   Ms. Doe testified that, in approximately late 2004 or early 2005, individuals she
> identified as "security forces" unlawfully detained her in Khartoum.  Ex. 36, Jane
> Doe Tr. at 100:6–101:13; 103:25–104:5.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  On February 28,

2005, Ms. Jane Doe was arrested by men in plain clothes with guns at their hips who announced

themselves: "We are from security, and you cooperate with us."  Ex. 135, Jane Doe Dep. at 101:8-

13, 105:15-106:12.  She was detained and severely tortured for days, stripped naked and beaten all

over her body with sticks and black plastic truncheons, punched and kicked in the pelvis, boxed in

the face, and slammed into the wall. Ex. 135, Jane Doe Dep. at 103:25-104:13; Ex. 7, Jane Doe

App'x at 3.  Following her detention, Ms. Jane Doe fled to Egypt with her mother and children

with Pronk's assistance. Ex. 135, Jane Doe Dep. at 109:7-23.

> 352.    Khartoum, Sudan's capital city, is not in an oil concession block. Ex. 138, Plaintiff
> Location Maps.

**Plaintiffs' Response**: Uncontroverted but incomplete, misleading, and irrelevant.  There

is no dispute that Khartoum is not in an oil concession block.  Nor is there a dispute that at all

times during the Class Period, the GOS and its agents were the only armed actors to exercise

control over Khartoum.  Moreover, Khartoum was one of the primary cities in which the GOS and

its agents directly targeted victims like Ms. Jane Doe, and as the capital city of Sudan, it was the

principal location from which the Regime's orders to target its opponents nationwide emanated.

ECF No. 435-54, Baldo Report ¶¶ 5, 12, 29, 50, 52-53, 55, 62, 68, 74, 104, 121, 127, 129-33, 137,

166, 181, 213.  According to the U.S. Embassy in Khartoum, funds BNPP transferred to the

Regime went through Sudan's Central Bank Headquarters and other commercial banks in

Khartoum.  *Id.* ¶¶ 85-86.

> 353.    Ms. Doe testified that the individuals assaulted her during this attack. Ex. 36,
> Jane Doe Tr. at 104:9–106:4.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading. *See* Plaintiffs'

Response to Proposed Fact No. 351.

> 354.    Ms. Doe testified that the individuals injured her with "sticks" and "long black

plastics."  Ex. 36, Jane Doe Tr. at 104:9–13.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  *See* Plaintiffs' Response to Proposed Fact No. 351.

> 355.    Ms. Doe testified that the individuals carried "small guns or pistols."  Ex. 36, Jane Doe Tr. at 106:1–4.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Ms. Jane Doe testified that her torturers were "from the security of the Sudanese government," wearing non-military clothes, and armed with small guns or pistols on their hips.  Ex. 135, Jane Doe Dep. at 105:15-106:12.

> 356.    There is no evidence that the individuals used any weapons purchased with revenues processed by any BNPP Defendant to perpetrate this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.    In any event, it is controverted, misleading, and irrelevant.  The revenues provided to the GOS by the BNPP criminal conspiracy enabled the Regime to acquire weapons, purchase loyalty, and stay in power to enable it and its agents to commit sweeping human rights abuses against targeted populations in Sudan.  *See* Plaintiffs' Response to Proposed Fact Nos. 107-08.  The GOS, through the National Security Council headed by al-Bashir and subordinate institutions, controlled, funded, and equipped the GOS's security organs during the Proposed Class Period.  ECF No. 435-93, Verhoeven Report at 25-27; ECF No. 435-54, Baldo Report ¶¶ 5, 43-46, 108-12.  The GOS funneled money it derived from its conspiracy with BNPP to its intelligence services and other agencies: "salaries were increased, new vehicles were purchased and offices were renovated . . . especially for NISS,"

where "soaring expenditure" lead to "a dramatic expansion in its capabilities thanks to petrodollars." ECF No. 435-93, Verhoeven Report at 27.

### c.      Cairo, Egypt, late 2005

357.   Ms. Doe testified that she and her family members sustained injuries and were detained in connection with her participation in the 2005 protests in Mustapha Mahmoud Park in Cairo, Egypt. Ex. 36, Jane Doe Tr. at 114:5–15; 117:3–12; 124:5–125:18.

**Plaintiffs' Response**: Controverted and misleading. Ms. Jane Doe was clear that the 2005 event at Mustapha Mahmoud Park in Cairo, Egypt "wasn't a demonstration," but instead a gathering of "poor people . . . asking for help from the United Nations." Ex. 135, Jane Doe Dep. at 114:5-15. While in Egypt, Ms. Jane Doe suffered deplorable conditions: she was beaten, attacked with chemicals, imprisoned, separated from all but her youngest child, and slandered with vile, racist insults. *Id.* at 116:17-118:3. The attacks at the park began shortly after the Sudanese vice-president, Osman Mohammed Taha, implored the crowd of mostly Sudanese people to return to Sudan. *Id.* at 118:21-119:9.

358.   Ms. Doe identified her attackers as Egyptian "police." Ex. 36, Jane Doe Tr. at 117:3–7.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading. *See* Plaintiffs' Response to Proposed Fact No. 357. She continued to suffer deplorable conditions in Egypt until 2007, when she was admitted to the United States as a refugee. *See* Ex. 197, PLA-001027 at 1029–30.

### ii.      Damages

359.   Ms. Doe has adduced no documentary evidence concerning her ownership or the value of

any real or personal property for which she alleges she is entitled to compensation in this Action.

**Plaintiffs' Response**: Controverted and misleading.  Whether Ms. Jane Doe possessed documents concerning her ownership of real or personal property nearly twenty years after she was forcibly displaced from Sudan is not determinative of her ability to prove damages.  Indeed, Ms. Jane Doe submitted detailed listings of her losses, including real and personal property, including a description of her farms, land, homes, businesses, and livestock.  Ex. 249, Pls.' Suppl. Initial Disclosures (Dec. 21, 2022), at 7-8.

**O.**     **Entesar Osman Kashef ("Ms. Kashef")**

> *i.     Alleged Attacks and Injuries*

>> **a.     Kutum, North Darfur, 2003**

> 360.     Ms. Kashef testified that, in 2003, individuals she identified as "men wearing . . . military uniform" attacked Kutum.  Ex. 40, Kashef Tr. at 66:1–7; 68:15–16.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  Ms. Kashef is a member of the Fur tribe, an ethnic African group traditionally based in Darfur, which was targeted by the Regime for genocide.  Ex. 140, Deposition of Entesar Osman Kashef ("Kashef Dep.") at 57:23-23; ECF No. 435-54, Baldo Report ¶¶ 72, 152, 191; ECF No. 435-68, Hudson Report ¶ 91; ECF No. 435-93, Verhoeven Report at 17-18.  In 2003, her village was attacked with SAF aerial bombing followed by Janjaweed forces on horseback and pickup trucks bearing military insignias.  Ex. 140, Kashef Dep. at 66:1-70:22.  The planes were painted green camouflage, the horsemen wore camouflage military uniforms, and the fighters in pickup trucks wore green camouflage as

well. *Id.* at 68:2-12, 71:14-73:21. The village was torched, and her grandmother's house was destroyed. *Id.* at 66:1-12. The family stayed and rebuilt, but was terrified of further attacks: sleeping with their shoes on, with peanuts in their pockets and water ready to run, "like a corpse, waiting to be dead. Ex. 7, Keller & Rosenfeld Report App'x C12 ("Kashef App'x") at 2.

361.  Kutum, a town in North Darfur, is not in an oil concession block. Ex. 138, Plaintiff Location Maps.

**Plaintiffs' Response**: Uncontroverted but incomplete misleading and irrelevant. Darfur was of strategic importance to the Regime's control of Sudan's oil region because of the discovery of important oil reserves in the desert. Ex. 123, Bazire Dep. at 87:24-88:12 (Louis Bazire, Former Head of Territory for BNPP in Switzerland, testified: "From what I remember, the intensity of communication about Darfur was higher in the years 2006, 2007. There were demonstrations in the street, et cetera. I don't remember the reasons why, at this time, this conflict was more intense. Probably part of this was coming from the fact that some important reserves of oil were discovered in the desert. This is more or less what I remember").

362.  Ms. Kashef testified that she was not physically injured during the course of the attack on Kutum. Ex. 40, Kashef Tr. at 74:22–75:1.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading. *See* Plaintiffs' Response to Proposed Fact No. 360.

363.  Ms. Kashef testified that her grandmother's property was destroyed and stolen during the course of the attack on Kutum. Ex. 40, Kashef Tr. at 66:4–6; 66:8–12.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  *See* Plaintiffs'

Response to Proposed Fact No. 360.

> 364.    Ms. Kashef testified that airplanes attacked Kutum by air and that people riding
> horses attacked Kutum by land.  Ex. 40, Kashef Tr. at 66:20–22.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  *See* Plaintiffs'

Response to Proposed Fact No. 360.

> 365.    Ms. Kashef also testified that some individuals arrived in trucks.  Ex. 40,
Kashef Tr. at 72:1–11.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  *See* Plaintiffs'

Response to Proposed Fact No. 360.

> 366.    There is no evidence that the individuals used any weapons purchased
with revenues processed by any BNPP Defendant to perpetrate this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as

required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.    In any event, it is

controverted, misleading, and irrelevant.  The revenues provided to the GOS by the BNPP criminal

conspiracy enabled the Regime to acquire weapons, purchase loyalty, and stay in power to enable

it and its agents to commit sweeping human rights abuses against targeted populations in Sudan.

*See* Plaintiffs' Response to Proposed Fact Nos. 107-08.  Using the revenues from the BNPP

conspiracy, the GOS funded and equipped the Janjaweed during the Proposed Class Period.  ECF

No. 435-93, Verhoeven Report at 25-27; ECF No. 435-52, Austin Report ¶¶ 44-45, 148; ECF No.

435-54, Baldo Report ¶¶ 13, 73-75.  During the Proposed Class Period, the GOS increased its procurement of Antonov aircraft, which were used in attacks throughout oil areas, southern Sudan, and Darfur, and "[i]n all likelihood, GoS would not have had the financial resources or the access to international markets that was necessary for the procurement and maintenance of Antonovs were it not for BNPP assistance."  ECF No. 435-52, Austin Report ¶ 208; *see also id.* ¶¶ 166 (noting the use of fixed wing aircraft in attacks in Darfur), 271 (same concerning the Second Civil War); ECF No. 435-53, Austin Reply ¶¶ 112-18 (the BNPP conspiracy allowed the GOS to acquire "more modern and effective - i.e., deadly - material," "including Hind helicopter gun ships, Antonov medium bombers, MiG 23 fighter aircraft, mobile artillery pieces, and light assault weapons"), 152 (the UN Panel documented the GOS's use of Antonov aircraft for bombardment from civilian airports in Darfur); ECF No. 435-54, Baldo Report ¶¶ 177-85 (documenting use of "new weapons systems" such as helicopter gunships and Antonov airplanes).

367.    Ms. Kashef testified that after leaving Kutum for al-Fasher following the 2003 attack, she eventually returned to Kutum with her grandmother and sister. Ex. 40, Kashef Tr. at 75:2–20; 76:6–14.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  *See* Plaintiffs' Response to Proposed Fact No. 360.

### b.    Kutum, North Darfur, 2008

368.    Ms. Kashef testified that, in 2008, three men entered her family home in Kutum and killed family members. Ex. 40, Kashef Tr. at 78:14–79:18; 80:12–19.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  Ms. Kashef's father

served in the SAF and did not live with the family in Kutum, but in April 2008 visited for the first time since her childhood.  Ex. 140, Kashef Dep. at 79:9-10.  One evening during dinner, three men wearing military uniforms and speaking Sudanese Arabic arrived on horseback asking to see her father.  *Id.* at 78:14-18.  Her father ran inside the house, and the men shot and killed Ms. Kashef's grandmother, father, sister, and uncle; Ms. Kashef, a teenager, hid under a bed until the next morning.  *Id.* at 78:19-79:18; Ex. 7, Kashef App'x at 3; Ex. 233, Pl. Entesar Osman Kashef's Obj. & Resp. to Defs. First Set of Interrogatories (Nos. 1-4) ("Kashef Rog.") No. 1.  A neighbor helped Ms. Kashef and sent her to live in Khartoum with a relative of the neighbor.  Ex. 140, Kashef Dep. at 89:23-25.  The neighbor's relative, Harun, came from the Zaghawa tribe, an ethnic African tribe in Darfur targeted by the Regime for extermination.  *Id.* at 90:1-6; ECF No. 435-55, Baldo Reply ¶¶ 130, 209; ECF No. 435-55, Baldo Reply ¶ 26; ECF No. 435-93, Verhoeven Report at 16-18; Ex. 133, Abdalla Dep. at 102:18-103:15.

369.    There is no evidence that the individuals used any weapons purchased with revenues processed by any BNPP Defendant to perpetrate this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.    In any event, it is controverted, misleading, and irrelevant.  *See* Plaintiffs' Response to Proposed Fact No. 366.

370.    Ms. Kashef testified that she had seen the men arrive in Kutum on horseback. Ex. 40, Kashef Tr. at 85:3–5.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  *See* Plaintiffs' Response to Proposed Fact No. 368.

371.   Ms. Kashef testified that the individuals carried "big guns." Ex. 40, Kashef Tr. at 82:6–9.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  *See* Plaintiffs'

Response to Proposed Fact No. 368.

372.   Ms. Kashef testified that following the death of her family members, she moved
to Khartoum in 2008, where she lived with Harun, the brother of her neighbor in
Kutum, and his family.  Ex. 40, Kashef Tr. at 89:14–25, 90:1–6.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  *See* Plaintiffs'

Response to Proposed Fact No. 368.

### c.   Khartoum, Sudan, 2008

373.   Ms. Kashef testified that, in 2008, individuals she identified as members of the
"Justice and Equality Movement" ("JEM"), a rebel group fighting against the
GOS and pro-GOS militias, raided the home where she was staying in Khartoum.
Ex. 40, Kashef Tr. at 60:6–13; 91:21–24; 94:14–19; Ex. 58, Carisch Report ¶ 31.b.

**Plaintiffs' Response**: Controverted and misleading.  Ms. Kashef testified that in 2008,

JEM attacked Omdurman.  Ex. 140, Kashef Dep. at 91:9-20.  The May 10, 2008 attack by JEM,

comprised primarily of members of the Zaghawa tribe such as Ms. Kashef's host Harun, was "the

only occasion in Sudan's long conflicts in the south and in Darfur when rebels managed an

incursion into Khartoum."  ECF No. 435-54, Baldo Report ¶¶ 130, 209; ECF No. 435-58, Carisch

Report ¶ 31(b).  Government security forces, led by a newly armed NISS, finally repelled the attack

in pitched battles using tanks and helicopters.  ECF No. 435-54, Baldo Report ¶ 208; ECF No.

435-93, Verhoeven Report at 27.  Following the attack, Ms. Kashef was swept up in a massive

arrest of hundreds of Zaghawa and other Darfuris, most of whom, like Ms. Kashef, "randomly fell

in the dragnet." ECF No. 435-54, Baldo Report ¶¶ 130-33, 209. "[T]hey had come to Omdurman and they were looking for the Zaghawa tribes, people." Ex. 140, Kashef Dep. at 94:14-19.

> 374. Khartoum, Sudan's capital city, is not in an oil concession block. Ex. 138, Plaintiff Location Maps.

**Plaintiffs' Response**: Uncontroverted but incomplete, misleading, and irrelevant. There is no dispute that Khartoum is not in an oil concession block. Nor is there a dispute that at all times during the Class Period, the GOS and its agents were the only armed actors to exercise control over Khartoum. Moreover, Khartoum was one of the primary cities in which the GOS and its agents directly targeted victims like Ms. Kashef, and as the capital city of Sudan, it was the principal location from which the Regime's orders to target its opponents nationwide emanated. ECF No. 435-54, Baldo Report ¶¶ 5, 12, 29, 50, 52-53, 55, 62, 68, 74, 104, 121, 127, 129-33, 137, 166, 181, 213. According to the U.S. Embassy in Khartoum, funds BNPP transferred to the Regime went through Sudan's Central Bank Headquarters and other commercial banks in Khartoum. *Id.* ¶¶ 85-86.

> 375. Ms. Kashef testified that individuals arrested her and detained her for approximately three months. Ex. 40, Kashef Tr. at 92:24–93:4; 109:22–110:2.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading. Following her arrest by GOS forces, Ms. Kashef was held for approximately three months at a police station, which was manned by officers in uniform and in plainclothes. Ex. 140, Kashef Dep. at 93:6-11, 110:1-5. She was interrogated about Harun, including who he was meeting with, what time he came home, and how she knew him. *Id.* at 95:5-12. Ms. Kashef, a teenager at the time, was

tortured and raped multiple times every single day: "It became like a meal for them.  In the morning, in the evening, and at night.  Every day."  *Id.* at 111:13-14.  Her torturers wore military uniforms and attacked her two at a time, beating her, striking her with rifle butts, burning her with cigarettes, and raped her.  *Id.* at 109:2-21.  One of her captors burned his initials into her back, thighs, and hands using hot metal. Ex. 7, Kashef App'x at 3-4.  She was threatened and told she should report back to the police if she saw people meeting.  Ex. 140, Kashef Dep. at 111:22-112:16.  Following her release, she woke up in the hospital unsure of how they had arrived, and with lapses of consciousness.  *Id.* at 113:2-17.

> 376.    Ms. Kashef testified that the individuals assaulted her, including sexual assault.
> Ex. 40, Kashef Tr. at 109:2–12.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  *See* Plaintiffs' Response to Proposed Fact No. 375.

> 377.    There is no evidence that the individuals used any weapons purchased with revenues processed by any BNPP Defendant to perpetrate this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.   In any event, it is controverted, misleading, and irrelevant.  The revenues provided to the GOS by the BNPP criminal conspiracy enabled the Regime to acquire weapons, purchase loyalty, and stay in power to enable it and its agents to commit sweeping human rights abuses against targeted populations in Sudan.  *See* Plaintiffs' Response to Proposed Fact Nos. 107-08.  The GOS, through the National Security Council headed by al-Bashir and subordinate institutions, controlled, funded, and equipped the

190

GOS's security organs during the Proposed Class Period.  ECF No. 435-93, Verhoeven Report at 25-27; ECF No. 435-54, Baldo Report ¶¶ 5, 43-46, 108-12.  The GOS funneled money it derived from its conspiracy with BNPP to its intelligence services and other agencies: "salaries were increased, new vehicles were purchased and offices were renovated . . . especially for NISS," where "soaring expenditure" lead to "a dramatic expansion in its capabilities thanks to petrodollars."  ECF No. 435-93, Verhoeven Report at 27.

### d.      Khartoum, Sudan, 2008

378.   Ms. Kashef testified, less than a month after release from the prior alleged detention, individuals she identified as "police" detained her for a few days.  Ex. 40, Kashef Tr. at 116:23–117:7; 141:11–22.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  Ms. Kashef was arrested along with other women working in a market in Khartoum and taken to the same police station where she had previously been held and tortured; she recognized one of the men who arrested her from her prior detention.  Ex. 140, Kashef Dep. at 116:1-118:25.  She was held for several days, where she was once again subjected to torture, including being tied up, hung upside down, and whipped on her back with a belt by a uniformed police officer.  *Id.* at 119:17-28, 120:5-22.

379.    Ms. Kashef testified that the individuals assaulted her.  Ex. 40, Kashef Tr. at 119:14–18.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  *See* Plaintiffs' Response to Proposed Fact No. 378.

380.    There is no evidence that the individuals used any weapons purchased with revenues processed by any BNPP Defendant to perpetrate this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.   In any event, it is controverted, misleading, and irrelevant.  *See* Plaintiffs' Response to Proposed Fact No. 377.

381.   Ms. Kashef testified that, following her release from her second detention, she left Sudan for Egypt.  Ex. 40, Kashef Tr. at 121:24–122:2.

**Plaintiffs' Response**: Uncontroverted.

382.   Ms. Kashef testified that she arrived in the United States in 2015.  Ex. 40, Kashef Tr. at 122:3–6.

**Plaintiffs' Response**: Uncontroverted. *See* Ex. 201, PLA-001313 at 1313-16.

ii.   *Damages*

383.   Ms. Kashef has adduced no documentary evidence concerning his ownership or the value of any real or personal property for which he alleges he is entitled to compensation in this Action.

**Plaintiffs' Response**: Controverted and misleading.   Whether Ms. Kashef possessed documents concerning her ownership of real or personal property nearly twenty years after she was forcibly displaced from Sudan is not determinative of his ability to prove damages.  Indeed, Ms. Kashef submitted detailed listings of her losses, including real and personal property, including a description of her home, farm, and livestock.  Ex. 249, Pls.' Suppl. Initial Disclosures (Dec. 21, 2022), at 10.

**P.**     **Plaintiff Hamdan Juma Abakar ("Mr. Hamdan Abakar")**

i.     *Alleged Attacks and Injuries*

### a.   Abu Daheia, West Darfur, February 2003

384.   Mr. Hamdan Abakar testified that, in February 2003, individuals he identified as "Janjaweed" attacked his village of Abu Daheia.  Ex. 29, Hamdan Abakar Tr. at 58:3–59:10.

**Plaintiffs' Response:** Uncontroverted but incomplete and misleading.   Mr. Hamdan Abakar is a member of the Masalit tribe, one of the tribes targeted by the GOS for genocide, and like most of his community, Mr. Hamdan Abakar grew up Muslim.  Ex. 132, Deposition of Hamdan Juma Abakar ("Hamdan Abakar Dep.") at 38:17-39:18; Ex. 5, Jok Report ¶ 11; ECF No. 435-55, Baldo Reply ¶ 152.  In February 2003, Mr. Hamdan Abakar was tending to cattle outside Abu Daheia when Janjaweed on horses and camels and the Sudanese army in Land Cruisers attacked the village by the hundreds.  Ex. 132, Hamdan Abakar Dep. at 58:24-60:8.  This pattern of attack – beginning with GOS soldiers in Land Cruisers and other military vehicles and followed by Janjaweed forces on horse and camel – was repeated throughout Darfur, which colloquially became known as the "Land Cruiser War." ECF No. 435-52, Austin Report ¶ 188; ECF No. 435-54, Baldo Report ¶ 129; Ex. 5, Jok Report ¶ 114 n.57.  Some of the Janjaweed wore khaki military-like uniforms, and they were all armed with the same types of weapons used by the military – machine guns, Kalashnikovs, and DShKs.  Ex. 132, Hamdan Abakar Dep. at 60:9-61:10.  Mr. Hamdan Abakar recognized the army's vehicles, their camouflage green color uniforms, and the insignia emblazoned on their shoulders and hats from an earlier encounter with the army.  *Id.* at 52:14-22, 61:11-24.

385.   Abu Daheia, a village in West Darfur, is not in an oil concession block. Ex. 138, Plaintiff

Location Maps.

**Plaintiffs' Response**: Uncontroverted but incomplete misleading and irrelevant. Darfur was of strategic importance to the Regime's control of Sudan's oil region because of the discovery of important oil reserves in the desert. Ex. 123, Bazire Dep. at 87:24-88:12 (Louis Bazire, Former Head of Territory for BNPP in Switzerland, testified: "From what I remember, the intensity of communication about Darfur was higher in the years 2006, 2007. There were demonstrations in the street, et cetera. I don't remember the reasons why, at this time, this conflict was more intense. Probably part of this was coming from the fact that some important reserves of oil were discovered in the desert. This is more or less what I remember").

386.   Mr. Hamdan Abakar testified that the individuals shot him during the attack.  Ex. 29, Hamdan Abakar Tr. at 59:7–8; 59:11–13.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  Mr. Hamdan Abakar was shot in the leg by the Janjaweed forces coming from the south with a bullet later identified as having come from a Kalashnikov rifle.  Ex. 132, Hamdan Abakar Dep. at 62:1-23. Mr. Hamdan Abakar recognized that the Janjaweed were far better armed than they had been during a 1997 attack by ethnically Arab nomadic raiders.  Ex. 7, Expert Report of Dr. Allen Keller and Dr. Barry Rosenfeld App'x C3 ("Hamdan Abakar App'x") at 2.  The Janjaweed burned the village and stole the livestock.  Ex. 132, Hamdan Abakar Dep. at 66:5-21.  Mr. Hamdan Abakar saw the fires rising from Abu Daheia as he lay on the ground.  *Id.*  His grandfather was shot in the head in front of Mr. Hamdan Abakar's sister, mother, and grandmother by the attackers.  *Id.* at

67:1-25. Mr. Hamdan Abakar had surgery in the nearby city Habila to remove the bullet (identified as a "Kalesh" bullet upon extraction), and after several weeks returned to Abu Daheia where he recovered for three more months. *Id.* at 68:3-22; Ex. 7, Hamdan Abakar App'x at 2; Ex. 226, Pl. Hamdan Juma Abakar's Obj. & Resp. to Defs. First Set of Interrogatories (Nos. 1-4) ("Hamdan Abakar Rog.") No. 1.

> 387.   There is no evidence that the individuals used any weapons purchased with revenues processed by any BNPP Defendant to perpetrate this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.    In any event, it is controverted, misleading, and irrelevant.  The revenues provided to the GOS by the BNPP criminal conspiracy enabled the Regime to acquire weapons, purchase loyalty, and stay in power to enable it and its agents to commit sweeping human rights abuses against targeted populations in Sudan. *See* Plaintiffs' Response to Proposed Fact Nos. 107-08.   Using the revenues from the BNPP conspiracy, the GOS funded and equipped the Janjaweed during the Proposed Class Period.  ECF No. 435-93, Verhoeven Report at 25-27; ECF No. 435-52, Austin Report ¶¶ 44-45, 148; ECF No. 435-54, Baldo Report ¶¶ 13, 73-75.

> 388.   Mr. Abakar testified that the individuals used "Kalashnikov" guns. Ex. 29, Hamdan Abakar Tr. at 70:7–9.

**Plaintiffs' Response**: Controverted and misleading.  *See* Plaintiffs' Response to Proposed Fact No. 387.

> 389.   He testified that the bullet he was shot with was identified as a "Kalash" bullet when it was extracted.  Ex. 29, Hamdan Abakar Tr. at 63:17–8.

**Plaintiffs' Response**: Controverted and misleading.  *See* Plaintiffs' Response to Proposed

Fact No. 387.

> 390.   Mr. Hamdan Abakar testified that he left Abu Daheia a few months after the
> attack.  Ex. 29, Hamdan Abakar Tr. at 70:20–23.

**Plaintiffs' Response**: Controverted and misleading.  *See* Plaintiffs' Response to Proposed

Fact No. 387.

### b.   Danajour, Sudan, August 2003

> 391.   Mr. Hamdan Abakar testified that, in August 2003, individuals he identified as
> "Janjaweed" attacked Danajour.  Ex. 29, Hamdan Abakar Tr. at 72:6–73:20;
> 74:1–2; 76:16–24.

**Plaintiffs' Response:** Uncontroverted but incomplete and misleading.  In approximately

August 2003, Mr. Hamdan Abakar witnessed another attack by the GOS army and Janjaweed, this

time on the nearby village Danajour (where Plaintiff Abubakar Abakar owned a mill, *see* Plaintiffs'

Response to Proposed Fact No. 116).  Ex. 132, Hamdan Abakar Dep. at 70:25-71:10.   Three

camouflage green helicopters with the flag of Sudan – red, green, and black – on the side bombed

the village, while the Janjaweed attacked from the south on horse and camel back.  *Id.* at 73:8-

76:24, 78:9-15.  The attack lasted "a very long time because the entire village was burned down,"

including "[e]lderly people" and Mr. Hamdan Abakar's aunt.  *Id.* at 76:10-77:24.  Mr. Hamdan

Abakar helped bury the 45 dead.  *Id.*

> 392.   Danajour, a village in West Darfur, is not in an oil concession block.  Ex. 138, Plaintiff
> Location Maps.

**Plaintiffs' Response:** Uncontroverted but incomplete misleading and irrelevant. Darfur was of strategic importance to the Regime's control of Sudan's oil region because of the discovery of important oil reserves in the desert. Ex. 123, Bazire Dep. at 87:24-88:12 (Louis Bazire, Former Head of Territory for BNPP in Switzerland, testified: "From what I remember, the intensity of communication about Darfur was higher in the years 2006, 2007. There were demonstrations in the street, et cetera. I don't remember the reasons why, at this time, this conflict was more intense. Probably part of this was coming from the fact that some important reserves of oil were discovered in the desert. This is more or less what I remember").

393.    Mr. Hamdan Abakar testified that there were three helicopters present at the alleged attack, and that the helicopters dropped bombs. Ex. 29, Hamdan Abakar Tr. at 73:10–14; 75:25–76:4.

**Plaintiffs' Response:** Uncontroverted but incomplete and misleading. *See* Plaintiffs' Response to Proposed Fact No. 391.

394.    There is no evidence that the individuals used any weapons purchased with revenues processed by any BNPP Defendant to perpetrate this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.   In any event, it is controverted, misleading, and irrelevant. *See* Plaintiffs' Response to Proposed Fact No. 387.  Additionally, during the Proposed Class Period, the GOS increased its procurement of Antonov aircraft, which were used in attacks throughout oil areas, southern Sudan, and Darfur, and "[i]n all likelihood, GoS would not have had the financial resources or the

197

access to international markets that was necessary for the procurement and maintenance of Antonovs were it not for BNPP assistance." ECF No. 435-52, Austin Report ¶ 208; *see also id.* ¶¶ 166 (noting the use of fixed wing aircraft in attacks in Darfur), 271 (same concerning the Second Civil War); ECF No. 435-53, Austin Reply ¶¶ 112-18 (the BNPP conspiracy allowed the GOS to acquire "more modern and effective - i.e., deadly - material," "including Hind helicopter gun ships, Antonov medium bombers, MiG 23 fighter aircraft, mobile artillery pieces, and light assault weapons"), 152 (the UN Panel documented the GOS's use of Antonov aircraft for bombardment from civilian airports in Darfur); ECF No. 435-54, Baldo Report ¶¶ 177-85 (documenting use of "new weapons systems" such as helicopter gunships and Antonov airplanes). Using revenues received from the BNPP conspiracy, the GOS acquired a fleet of new helicopters, including more than tripling its existing fleet of Mi-24 helicopters and acquiring HIND helicopters not previously in their inventory, that were used to devastating effect on civilians in the oil regions, southern Sudan, and Darfur. ECF No. 435-93, Verhoeven Report at 26 (the GOS tripled its Mi-24 fleet); ECF No. 435-63, Fogarty Report ¶ 108 (same); ECF No. 435-52, Austin Report ¶¶ 160 (same), 159-67 (detailing the Regime's acquisition and use of new helicopters, among other lethal equipment), 271 (same); ECF No. 435-54, Baldo Report ¶¶ 178, 185 (detailing use of helicopter gunships against civilians); ECF No. 435-68, Hudson Report ¶ 73 (same); ECF No. 435-63, Fogarty Report ¶ 110.

395.    Mr. Hamdan Abakar testified that after the attack on Danajour, he left for Habila, West Darfur. Ex. 29, Hamdan Abakar Tr. at 78:16–19.

**Plaintiffs' Response:** Uncontroverted but incomplete and misleading.   *See* Plaintiffs'

Response to Proposed Fact No. 391.

### c.    Habila, West Darfur, September 2003

396.    Mr. Hamdan Abakar testified that, in September 2003, individuals he identified as "Janjaweed" and "government soldiers" attacked Habila. Ex. 29, Hamdan Abakar Tr. at 84:7– 11; 91:17–20; 92:14–18.

**Plaintiffs' Response:** Uncontroverted, but incomplete and misleading.   In September

2003, less than a month after Mr. Hamdan Abakar had moved to Habila and built a home, a white

Antonov airplane circled the city several times before dropping four bombs in the residential area

where they lived.  Ex. 132, Hamdan Abakar Dep. 84:7-86:6, 87:22-88:4.  Mr. Hamdan Abakar

witnessed four woman, including a woman pregnant with twins ripped apart by bombs, pieces of

their bodies strewn across their home, tree, and neighborhood.  *Id.*; Ex. 7, Hamdan Abakar App'x

at 3.  Mr. Hamdan Abakar's father, who was three houses away, was killed in the attack, along

with 50 other people.  Ex. 132, Hamdan Abakar Dep. at 86:7-89:6.  Mr. Hamdan Abakar's wife

was injured, and carries a scar from the attack to this day.  *Id.* at 89:7-18.  The following day, as

Mr. Hamdan Abakar and others attempted to bury the dead, Janjaweed and SAF attacked from the

west of the city by the hundreds, the former on horse and camel back, and the latter on Land

Cruisers, shooting people, burning houses, and even dragging a man through the street behind a

horse.  *Id.* at 92:9-95:10.  Following up airstrikes with a ground attack of soldiers and Janjaweed

in Land Cruisers was a common tactic used by combined GOS and Janjaweed forces in Darfur.

ECF No. 435-52, Austin Report ¶ 167.  Mr. Hamdan Abakar's furniture was stolen and his house

was burned down.  *Id.*

397.   Habila, a village in West Darfur, is not in an oil concession block.  Ex. 138, Plaintiff Location Maps.

**Plaintiffs' Response:** Uncontroverted but incomplete misleading and irrelevant. Darfur was of strategic importance to the Regime's control of Sudan's oil region because of the discovery of important oil reserves in the desert. Ex. 123, Bazire Dep. at 87:24-88:12 (Louis Bazire, Former Head of Territory for BNPP in Switzerland, testified: "From what I remember, the intensity of communication about Darfur was higher in the years 2006, 2007. There were demonstrations in the street, et cetera. I don't remember the reasons why, at this time, this conflict was more intense. Probably part of this was coming from the fact that some important reserves of oil were discovered in the desert. This is more or less what I remember").

398.   Mr. Hamdan Abakar testified that an Antonov plane dropped bombs during the alleged attack.  Ex. 29, Hamdan Abakar Tr. at 84:11–13.

**Plaintiffs' Response:** Uncontroverted but incomplete and misleading.  *See* Plaintiffs' Response to Proposed Fact No. 396.

399.   Mr. Hamdan Abakar testified that there were also government vehicles involved, along with machine guns, "DShK," hand grenades and other weapons.  Ex. 29, Hamdan Abakar Tr. at 93:6–18.

**Plaintiffs' Response:** Uncontroverted but incomplete and misleading.  *See* Plaintiffs' Response to Proposed Fact No. 396.

400.   There is no evidence that the individuals used any weapons purchased with revenues processed by any BNPP Defendant to perpetrate this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.   In any event, it is controverted, misleading, and irrelevant.  *See* Plaintiffs' Response to Proposed Fact No. 394.

### d.   Simbila, Sudan, November 2003

401.   Mr. Hamdan Abakar testified that, while he was visiting his sister in November 2003, individuals he identified as the "government" and "Janjaweed" attacked his sister's village of Simbila.  Ex. 29, Hamdan Abakar Tr. at 97:1–5; 99:7–9.

**Plaintiffs' Response:** Uncontroverted but incomplete and misleading.  In November 2003, Mr. Hamdan Abakar went to visit his sister in the nearby city of Simbila, a 20-minute walk south of Habila.  Ex. 132, Hamdan Abakar Dep. at 97:1-98:16.  The morning after Mr. Hamdan Abakar's arrival, the Janjaweed and army attacked Simbila; the Janjaweed arrived on horse and camel back, while the army arrived in Land Cruisers, with three tanks, and two camouflage green helicopters with the Sudanese flag.  *Id.* at 98:15-100:8.

402.   Simbila, a village in West Darfur, is not in an oil concession block.  Ex. 138, Plaintiff Location Maps.

**Plaintiffs' Response:** Uncontroverted but incomplete misleading and irrelevant. Darfur was of strategic importance to the Regime's control of Sudan's oil region because of the discovery of important oil reserves in the desert. Ex. 123, Bazire Dep. at 87:24-88:12 (Louis Bazire, Former Head of Territory for BNPP in Switzerland, testified: "From what I remember, the intensity of communication about Darfur was higher in the years 2006, 2007. There were demonstrations in the street, et cetera. I don't remember the reasons why, at this time, this conflict was more intense.

Probably part of this was coming from the fact that some important reserves of oil were discovered in the desert. This is more or less what I remember").

> 403.    Mr. Hamdan Abakar testified that he was not injured during the attack.  Ex. 29, Hamdan Abakar Tr. at 100:9–13.

**Plaintiffs' Response:** Uncontroverted that Mr. Hamdan Abakar was not physically injured during the November 2003 attack on Simbila.  Controverted to the extent Defendants suggest that Mr. Hamdan Abakar was not injured by the GOS in any attack.  *See* Plaintiffs' Responses to Fact Nos. 384, 391, 396.

> 404.    Mr. Hamdan Abakar testified that he saw helicopters during the alleged attack, which did not drop any bombs.  Ex. 29, Hamdan Abakar Tr. at 99:19–100:13.

**Plaintiffs' Response:** Uncontroverted but incomplete and misleading.  *See* Plaintiffs' Response to Proposed Fact No. 401.

> 405.    There is no evidence that the individuals used any weapons purchased with revenues processed by any BNPP Defendant to perpetrate this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.   In any event, it is controverted, misleading, and irrelevant.  *See* Plaintiffs' Response to Proposed Fact No. 394.

> 406.    Mr. Hamdan Abakar testified that he returned to Habila, then went to the Nuba Mountains, followed by several other towns in Sudan before traveling to Loki, Kenya, in about 2006.  Ex. 29, Hamdan Abakar Tr. at 100:14–105:12.

**Plaintiffs' Response:** Uncontroverted but incomplete.  After the attack on Simbila, Mr. Hamdan Abakar fled to the Nuba Mountains.  Ex. 132, Hamdan Abakar Dep. at 100:14-108:13.

He and his family were moved around by agencies, eventually ending up the Kakuma refuge camp in Kenya around 2006.  *Id.*  Mr. Hamdan Abakar and his wife and children were admitted to the United States in 2014 as refugees.  *Id.* at 108:8-13. *See* Ex. 196, PLA-000924 at 0924–25.

> *ii.*    *Damages*

407.    Mr. Hamdan Abakar has adduced no documentary evidence concerning his ownership or the value of any real or personal property for which he alleges he is entitled to compensation in this Action.

**Plaintiffs' Response**: Controverted and misleading.  Whether Mr. Hamdan Abakar possessed documents concerning his ownership of real or personal property nearly twenty years after he was forcibly displaced from Sudan is not determinative of his ability to prove damages.  Indeed, Mr. Hamdan Abakar submitted detailed listings of his losses, including real and personal property, including a description of his home, farm, and livestock.  Ex. 249, Pls.' Suppl. Initial Disclosures (Dec. 21, 2022), at 14.

## Q.    **Plaintiff Kuol Shbur ("Mr. Shbur")**

> *i.*    *Alleged Attacks and Injuries*

### a.    **Khartoum, Sudan, circa 2001–2002**

408.    Mr. Shbur testified that, in approximately 2001 or 2002, three individuals he identified as "security people" in "civilian clothing" took him from his home in Khartoum and detained him.  Ex. 48, Shbur Tr. at 53:1–10; 53:19–21; 58:7–10; 58:23–59:1; 133:16–134:2.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  Mr. Shbur is a member of the Dinka tribe and a Christian, two characteristics that were targeted by the GOS for its campaign of violence.  Ex. 144, Deposition of Kuol Shbur ("Shbur Dep.") at 40:13-24; Ex. 7, Keller

& Rosenfeld Report App'x C17 ("Shbur App'x") at 2; ECF No. 435-54, Baldo Report ¶¶ 7, 63, 64, 94, 167; ECF No. 435-93, Verhoeven Report at 7, 20, 33-34; ECF No. 435-68, Hudson Report ¶¶ 69-70, 190, 196.   In 2001, two "security people" knocked on Mr. Shbur's door and, upon confirming his identity, pointed a handgun at him, shoved him into a dark-colored vehicle recognizable as GOS-issued, and blindfolded.   Ex. 144, Shbur Dep. at 53:1-54:2.   He was left overnight in a small cell at an unidentified location, along with two other Southern Sudanese men. *Id.* at 3.

> 409.   Khartoum, Sudan's capital city, is not in an oil concession block.  Ex. 138, Plaintiff Location Maps.

**Plaintiffs' Response**: Uncontroverted but incomplete, misleading, and irrelevant. There is no dispute that Khartoum is not in an oil concession block.  Nor is there a dispute that at all times during the Class Period, the GOS and its agents were the only armed actors to exercise control over Khartoum.  Moreover, Khartoum was one of the primary cities in which the GOS and its agents directly targeted victims like Mr. Shbur, and as the capital city of Sudan, it was the principal location from which the Regime's orders to target its opponents nationwide emanated. ECF No. 435-54, Baldo Report ¶¶ 5, 12, 29, 50, 52-53, 55, 62, 68, 74, 104, 121, 127, 129-33, 137, 166, 181, 213.  According to the U.S. Embassy in Khartoum, funds BNPP transferred to the Regime went through Sudan's Central Bank Headquarters and other commercial banks in Khartoum.  *Id.* ¶¶ 85-86.

> 410.   Mr. Shbur testified that individuals assaulted him during the alleged detention. Ex. 48, Shbur Tr. at 86:9–18; 94:6–95:21.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  While in detention, Mr. Shbur was interrogated about his association with anyone working in the Sudanese government, and accused of being a "fifth columnist" for the SPLA, which Mr. Shbur denied, and questioned about Dinka political and cultural events that took place at the Comboni Ground Club in Khartoum.  Ex. 144, Shbur Dep. at 53:1-54:2, 102:15-105.  Mr. Shbur was brought to a large room with a large table, tied up, and beaten on top of the table with a rubble hose until he fell off the table and unconscious.  *Id.*  Mr. Shbur was later brought back to the same room, beaten, had his toenails removed, and had cigarettes extinguished on his face.  Ex. 7, Shbur App'x at 3; Ex. 235, Pl. Kuol Shbur's Obj. & Resp. to Defs. First Set of Interrogatories (Nos. 1-4) ("Shbur Rog.") No. 1.  Removal of toenails was a typical and unique form of torture used by the Sudanese security services.  Ex. 5, Jok Report ¶ 79.  His genitals were subjected to burning, electrocution, and pinching with pliers.  Ex. 7, Shbur App'x at 2-3.  He was held for three weeks, during which he was interrogated and tortured twice more, and by the end of his detention, his "body was swelling and it was painful" as a result of the torture; he "was limping" as a result of his right knee being hit, his left leg being burned, and his toenails being removed. Ex. 144, Shbur Dep. at 118:2-22.

411.    There is no evidence that the individuals used any weapons purchased with revenues processed by any BNPP Defendant to perpetrate this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.    In any event, it is controverted, misleading, and irrelevant.  The revenues provided to the GOS by the BNPP criminal

conspiracy enabled the Regime to acquire weapons, purchase loyalty, and stay in power to enable it and its agents to commit sweeping human rights abuses against targeted populations in Sudan. *See* Plaintiffs' Response to Proposed Fact Nos. 107-08.  The GOS, through the National Security Council headed by al-Bashir and subordinate institutions, controlled, funded, and equipped the GOS's security organs during the Proposed Class Period.  ECF No. 435-93, Verhoeven Report at 25-27; ECF No. 435-54, Baldo Report ¶¶ 5, 43-46, 108-12.  The GOS funneled money it derived from its conspiracy with BNPP to its intelligence services and other agencies: "salaries were increased, new vehicles were purchased and offices were renovated . . . especially for NISS," where "soaring expenditure" lead to "a dramatic expansion in its capabilities thanks to petrodollars."  ECF No. 435-93, Verhoeven Report at 27.

412.   Mr. Shbur testified that the men who unlawfully detained him carried handguns and rifles.  Ex. 48, Shbur Tr. at 54:25; 87:13–16.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  *See* Plaintiffs' Responses to Proposed Fact Nos. 408, 410.

413.   Mr. Shbur testified that, during his unlawful detention, individuals injured him with ice water, burning cigarettes and electric shocks and used a "dispenser" to squeeze his nail.  Ex. 48, Shbur Tr. at 86:9–18; 94:11–14.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  *See* Plaintiffs' Responses to Proposed Fact Nos. 408, 410.

414.   Mr. Shbur testified that, following the alleged detention, he left Sudan for Egypt.  Ex. 48, Shbur Tr. at 122:18–23; 124:8–10.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading.  Following his detention, Mr. Shbur was released on the condition that he report back to the same office, daily, for thirty days, after which his conditions would be reevaluated.  Ex. 144, Shbur Dep. at 98:25-99:17.  A few months after his arrest, Mr. Shbur traveled by bus, afraid of being stopped, until he was able to escape to Aswan in Egypt.  *Id*. at 122:18-23, 124:8-10.

415.   Mr. Shbur testified that he arrived in the United States in 2005.  Ex. 48, Shbur Tr. at 126:21–22.

**Plaintiffs' Response**: Uncontroverted. *See* Ex. 206, PLA-001587 at 1589.

ii.   *Damages*

416.   Mr. Shbur has adduced no documentary evidence concerning his ownership or the value of any real or personal property for which he alleges he is entitled to compensation in this Action.

**Plaintiffs' Response**: Controverted and misleading.   Whether Mr. Shbur possessed documents concerning his ownership of real or personal property nearly twenty years after he was forcibly displaced from Sudan is not determinative of his ability to prove damages.  Indeed, Mr. Shbur submitted detailed listings of his losses, including real and personal property, including a description of his land and home in Khartoum.  Ex. 249, Pls.' Suppl. Initial Disclosures (Dec. 21, 2022), at 15-16.

**R.**   **Plaintiff Nicolas Hakim Lukudu ("Mr. Lukudu")**

i.   *Alleged Attacks and Injuries*

a.   **Khartoum, Sudan, February 2004**

417.   Mr. Lukudu testified that, in February 2004, four men he identified as "military forces"

came to his office in Khartoum and arrested him.  Ex. 41, Lukudu Tr. at 67:21–68:1;
68:15–69:1; 132:14–19.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Mr. Lukudu is a member of the
Pojulu tribe, one of a number of tribes who speak Bari and traditionally hail from around Juba in
what is now South Sudan, and an ethnicity targeted by the GOS.  Ex. 142, Deposition of Nicolas
Lukudu ("Lukudu Dep.") at 42:3-43:4; ECF No. 435-54, Baldo Report ¶ 108.  He testified that in
February 2004, four armed members of the Sudanese military, wearing khaki uniforms with
military insignia and names on the uniforms, arrested him at his company's office in Khartoum.
Ex. 142, Lukudu Dep. at 67:14-69:10; Ex. 236, Pl. Nicolas Lukudu's Obj. & Resp. to Defs. First
Set of Interrogatories (Nos. 1-4) ("Lukudu Rog.") No. 1.  They were carrying Jim 3s and MP5s.
Ex. 142, Lukudu Dep. at 71:1-73:9.  The four men asked employees where Mr. Lukudu was
located, put handcuffs on him, lead him outside, covered his head with a black hood, and put him
into a khaki military Toyota Land Cruiser, a vehicle commonly used by the GOS and its agents.
*Id.* at 69:25-74:8; ECF No. 435-52 Austin Report ¶ 188; ECF No. 435-54 Baldo Report ¶ 129; Ex.
5, Jok Report ¶ 114 n.57.  They took Mr. Lukudu to an unknown location and placed him in a
windowless cell with a metal door.  Ex. 142, Lukudu Dep. at 77:25-79:13.

418.    Khartoum, Sudan's capital city, is not in an oil concession block.  Ex. 138, Plaintiff
        Location Maps.

**Plaintiffs' Response**: Uncontroverted but incomplete, misleading, and irrelevant.  There
is no dispute that Khartoum is not in an oil concession block.  Nor is there a dispute that at all
times during the Class Period, the GOS and its agents were the only armed actors to exercise

control over Khartoum.  Moreover, Khartoum was one of the primary cities in which the GOS and

its agents directly targeted victims like Mr. Lukudu, and as the capital city of Sudan, it was the

principal location from which the Regime's orders to target its opponents nationwide emanated.

ECF No. 435-54, Baldo Report ¶¶ 5, 12, 29, 50, 52-53, 55, 62, 68, 74, 104, 121, 127, 129-33, 137,

166, 181, 213.  According to the U.S. Embassy in Khartoum, funds BNPP transferred to the

Regime went through Sudan's Central Bank Headquarters and other commercial banks in

Khartoum.  *Id.* ¶¶ 85-86.

> 419.    There is no evidence that the individuals used any weapons purchased with revenues
> processed by any BNPP Defendant to perpetrate this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as

required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.   In any event, it is

controverted, misleading, and irrelevant.  The revenues provided to the GOS by the BNPP criminal

conspiracy enabled the Regime to acquire weapons, purchase loyalty, and stay in power to enable

it and its agents to commit sweeping human rights abuses against targeted populations in Sudan.

*See* Plaintiffs' Response to Proposed Fact Nos. 107-08.  The GOS, through the National Security

Council headed by al-Bashir and subordinate institutions, controlled, funded, and equipped the

GOS's security organs during the Proposed Class Period.  ECF No. 435-93, Verhoeven Report at

25-27; ECF No. 435-54, Baldo Report ¶¶ 5, 43-46, 108-12.  The GOS funneled money it derived

from its conspiracy with BNPP to its intelligence services and other agencies: "salaries were

increased, new vehicles were purchased and offices were renovated . . . especially for NISS,"

where "soaring expenditure" lead to "a dramatic expansion in its capabilities thanks to

petrodollars."  ECF No. 435-93, Verhoeven Report at 27.

> 420.     Mr. Lukudu testified that the men who arrested him were carrying "Jim 3" and "MP5" firearms.  Ex. 41, Lukudu Tr. at 71:1–7.

**Plaintiffs' Response**: Uncontroverted but incomplete.  *See* Plaintiffs' Response to

Proposed Fact No. 417.

> 421.     Mr. Lukudu testified that also saw members of the Sudanese military carry "Jim 3" and "MP5" firearms back in the 1980s.  Ex. 41, Lukudu Tr. at 73:5–18.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Mr. Lukudu testified that the Jim 3

military guns are "an old *type* of gun" and that he did not know whether the MP5 was an old or new

gun.  Ex. 142, Lukudu Dep. at 71:12-13 (emphasis added), 72:24-5.  The Sudanese military carry

the Jim 3 and MP5 guns in the streets "[a] lot." *Id.* at 73:10-15.  *See also* Plaintiffs' Response to

Proposed Fact Nos. 72, 73, 75.

> 422.     Mr. Lukudu testified that the men put him into a Land Cruiser and took him to a facility where they unlawfully detained him for two months.  Ex. 41, Lukudu Tr. at 73:19–74:2, 85:9–11.

**Plaintiffs' Response**: Uncontroverted but misleading and incomplete. The four military

men who arrested Mr. Lukudu took him in a Land Cruiser to an unknown location and placed him

in a windowless cell with a metal door.  Ex. 142, Lukudu Dep. at 77:25-79:13.  The four military

members were joined by three security persons wearing civilian clothing and armed with

handguns.  *Id.* at 79:15-80:1.  The three security persons beat Mr. Lukudu with Jim 3s from the

military members, repeatedly hitting him with the bottom of the gun all over his body.  *Id.* at 80:2-

81:17.  For the next three days, the same three security persons would return to beat Mr. Lukudu,

including by tying his feet and then beating the soles with plastic sticks and threatening to unleash

caged rats on him.  *Id.* at 80:2-84:9; Ex. 7, Keller & Rosenfeld Report App'x C14 ("Lukudu

App'x") at 2; Ex. 236, Lukudu Rog. No. 1.  Beating the soles of the feet, or *falaqa*, was a common

method of torture used by the GOS and its security organs.  ECF No. 435-54, Baldo Report ¶ 126.

Mr. Lukudu was questioned daily about trading guns with rebels, which he repeatedly denied, for

approximately two months, after which the same four military members released a barefoot Mr.

Lukudu in the middle of the night to an open space in the Sahara desert.  Ex. 142, Lukudu Dep. at

80:2-84:9, 85:9-86:7.

> 423.   Mr. Lukudu testified that the "security people" at the detention facility were
> wearing carrying handguns.  Ex. 41, Lukudu Tr. at 79:19–80:14.

**Plaintiffs' Response**: Uncontroverted but incomplete.  *See* Plaintiffs' Response to Proposed

Fact No. 422.

> 424.   Mr. Lukudu testified that, during his detention he was injured with the bottoms
> of "Jim 3" guns and plastic sticks.  Ex. 41, Lukudu Tr. at 80:15–81:4; 83:8–17.

**Plaintiffs' Response**: Uncontroverted but incomplete.  *See* Plaintiffs' Response to Proposed

Fact No. 422.

> 425.   Mr. Lukudu testified that, following his alleged detention, he left Sudan for
> Egypt in March 2004.  Ex. 41, Lukudu Tr. at 98:5–7; 132:6–12.

**Plaintiffs' Response**: Uncontroverted.

426.   Mr. Lukudu testified that he arrived in the United States in 2004.  Ex. 41, Lukudu Tr. at

139:18–20.

**Plaintiffs' Response**: Uncontroverted.

*ii.*   *Damages*

427.   Mr. Lukudu has adduced no documentary evidence concerning his ownership or the value of any real or personal property for which he alleges he is entitled to compensation in this Action.

**Plaintiffs' Response**: Controverted and misleading.   Whether Mr. Lukudu possessed documents concerning his ownership of real or personal property nearly twenty years after he was forcibly displaced from Sudan is not determinative of his ability to prove damages.   Indeed, Mr. Lukudu submitted detailed listings of his losses, including real and personal property, including a description of his home in Khartoum.   Ex. 249, Pls.' Suppl. Initial Disclosures (Dec. 21, 2022), at 11.

**S.    Plaintiff Shafika G. Hassan ("Ms. Hassan")**

*i.*   *Alleged Attacks and Injuries*

**a.    Khartoum, Sudan, 2004**

428.   Ms. Hassan testified that, in 2004, individuals she identified as "security of the country" came to her home in Khartoum multiple times. Ex. 39, Hassan Tr. at 51:4–52:25; 53:23–54:7.

**Plaintiffs' Response:** Uncontroverted but incomplete and misleading. Ms. Hassan is a member of the Fur tribe, an ethnic African group traditionally based in Darfur, which was targeted by the Regime for genocide.   Ex. 7, Keller & Rosenfeld Report App'x C11 ("Hassan App'x") at 2; ECF No. 435-54, Baldo Report ¶¶ 72, 152, 191; ECF No. 435-68, Hudson Report ¶ 91; ECF

No. 435-93, Verhoeven Report at 17-18.  She testified that in April 2004, she woke up to find that her husband, whom the GOS falsely suspected as passing information to rebels, was gone. Ex. 138, Deposition of Shafika Hassan ("Hassan Dep.") at 50:11-22, 58:4-59:1, 127:20-22; Ex. 7, Hassan App'x at 3; Ex. 138, Pl. Shafika Hassan's Obj. & Resp. to Defs. First Set of Interrogatories (Nos. 1-4) ("Hassan Rog.") No. 1.  Members of the GOS military intelligence armed with small guns "around their hips," carrying government badges, and wearing boots commonly worn by members of the government came to her home while she and her children were sleeping.  Ex. 138, Hassan Dep. at 50:24-52:2, 62:19-22, 63:9-14, 77:8-11.  They searched her house for documents, asking her where the information was that her husband was passing to rebels," turned her house upside down, and stole her gold.  *Id.* at 61:1962:5; Ex. 7, Hassan App'x at 3. When they did not find documents, they started to beat Ms. Hassan, kicking her, slapping her, twisting her arm, and grabbing her breasts.  Ex. 138, Hassan Dep. at 52:19-25; 71:15-72:18, 73:14-19.  Her children stopped the men from raping her, and the men threw two of them, hit one in the back, and kicked and slapped them.  *Id.* at 53:17-22, 69:8-24; Ex. 138, Hassan Rog. No. 1. Other members of GOS military intelligence, also wearing badges, returned to Ms. Hassan's home on several occasions following the initial assault.  Ex. 138, Hassan Dep. at 53:23-54:4.  They would ask "[w]here are the papers?" and when she did not have any papers to give them, they threatened her and her children.  *Id.* at 54:18-55:1.  During these occasions, the men would grab her breasts, beat her, step on her, and "deman[d] she tell them about her husband's contacts with rebel groups in Darfur." *Id.* at 53:2-10; Ex. 7, Hassan App'x at 3.

429.   Khartoum, Sudan's capital city, is not in an oil concession block.  Ex. 138, Plaintiff Location Maps.

**Plaintiffs' Response**: Uncontroverted but incomplete, misleading, and irrelevant.  There is no dispute that Khartoum is not in an oil concession block.  Nor is there a dispute that at all times during the Class Period, the GOS and its agents were the only armed actors to exercise control over Khartoum.  Moreover, Khartoum was one of the primary cities in which the GOS and its agents directly targeted victims like Ms. Hassan, and as the capital city of Sudan, it was the principal location from which the Regime's orders to target its opponents nationwide emanated.  ECF No. 435-54, Baldo Report ¶¶ 5, 12, 29, 50, 52-53, 55, 62, 68, 74, 104, 121, 127, 129-33, 137, 166, 181, 213.  According to the U.S. Embassy in Khartoum, funds BNPP transferred to the Regime went through Sudan's Central Bank Headquarters and other commercial banks in Khartoum.  *Id.* ¶¶ 85-86.

430.   Ms. Hassan testified that, on at least one occasion, the individuals who came to her home assaulted her.  Ex. 39, Hassan Tr. at 52:19–25; 69:3–19; 73:14–19.

**Plaintiffs' Response:** Uncontroverted but incomplete and misleading. *See* Plaintiffs' Response to Proposed Fact No. 428.

431.   Ms. Hassan testified that the individuals engaged in physical combat, *e.g.*, hitting and kicking.  Ex. 39, Hassan Tr. at 52:19–25; 69:3–19; 70:5–11; 73:14–19.

**Plaintiffs' Response:** Uncontroverted but incomplete and misleading. *See* Plaintiffs' Response to Proposed Fact No. 428.

432.   Ms. Hassan testified that the individuals carried "small handgun[s] . . . [n]ot the big guns."  Ex. 39, Hassan Tr. at 77:9–11; 77:23–78:4.

**Plaintiffs' Response:** Uncontroverted but incomplete and misleading. *See* Plaintiffs'

Response to Proposed Fact No. 428.

> 433.    There is no evidence that the individuals used any weapons purchased with revenues
> processed by any BNPP Defendant to perpetrate this alleged attack.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as

required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.   In any event, it is

controverted, misleading, and irrelevant.  The revenues provided to the GOS by the BNPP criminal

conspiracy enabled the Regime to acquire weapons, purchase loyalty, and stay in power to enable

it and its agents to commit sweeping human rights abuses against targeted populations in Sudan.

*See* Plaintiffs' Response to Proposed Fact Nos. 107-08.  The GOS, through the National Security

Council headed by al-Bashir and subordinate institutions, controlled, funded, and equipped the

GOS's security organs during the Proposed Class Period.  ECF No. 435-93, Verhoeven Report at

25-27; ECF No. 435-54, Baldo Report ¶¶ 5, 43-46, 108-12.  The GOS funneled money it derived

from its conspiracy with BNPP to its intelligence services and other agencies: "salaries were

increased, new vehicles were purchased and offices were renovated . . . especially for NISS,"

where "soaring expenditure" lead to "a dramatic expansion in its capabilities thanks to

petrodollars."  ECF No. 435-93, Verhoeven Report at 27.

> 434.    Ms. Hassan testified that she and her family left Khartoum for Cairo, Egypt at
> some point in 2004.  Ex. 39, Hassan Tr. at 127:15–22.

**Plaintiffs' Response:** Controverted and misleading.  Ms. Hassan testified that she "left in

2004" for "Egypt." Ex. 138, Hassan Dep. at 127:15-22.

### b.  Cairo, Egypt, 2005

435.  Ms. Hassan testified that she and her family members sustained injuries and were detained in 2005 in Mustapha Mahmoud Park in Cairo, Egypt.  Ex. 39, Hassan Tr. at 87:6–20.

**Plaintiffs' Response**: Uncontroverted but incomplete, misleading, and irrelevant.  Ms. Hassan was hit in the head and kidney, and her lip was damaged by the bayonet of a gun.  Ex. 138, Hassan Dep. at 88:24-89:10, 92:3-7, 94:2-5.  Ms. Hassan's baby son also almost died from asphyxiation when someone landed on top of him.  *Id.* at 95:10-21.

436.  Ms. Hassan identified her attackers as "Egyptian police."  Ex. 39, Hassan Tr. at 88:24–89:10; 92:11–21.

**Plaintiffs' Response**: Controverted, incomplete, and irrelevant.  Ms. Hassan testified that while it was the Egyptian police who hit her head and tore her lip, it was not on the authority of the Egyptian government.  Ex. 138, Hassan Dep. at 88:24-89:10, 92:11-15.  She testified that she was hit because Osman Mohammed Taha, the vice president of the Sudanese government had come to the park and told the people to vacate it and that they had shamed him.  *Id.* at 92:16-93:7.

437.  Ms. Hassan testified that she and her family left Cairo and were admitted to the United States as refugees in 2010.  Ex. 39, Hassan Tr. at 104:10–23.

**Plaintiffs' Response**: Uncontroverted. *See* Ex. 200, PLA-001279 at 1280–81

*ii.*  *Damages*

438.  Ms. Hassan has adduced no documentary evidence concerning her ownership or the value of any real or personal property for which she alleges she is entitled to compensation in this Action.

**Plaintiffs' Response**: Controverted and misleading.  Whether Ms. Hassan possessed

documents concerning her ownership of real or personal property nearly twenty years after she

was forcibly displaced from Sudan is not determinative of her ability to prove damages.  Indeed,

Ms. Hassan submitted detailed listings of her losses, including real and personal property,

including a description of her home in Khartoum, vehicles, and livestock.  Ex. 249, Pls.' Suppl.

Initial Disclosures (Dec. 21, 2022), at 9-10.

**T.**      **Plaintiff John Doe ("Mr. Doe")**

    *i.*      *Alleged Attacks and Injuries*

        **a.**      **Khartoum, Sudan, April 2004**

    439.   Mr. Doe testified that, on April 15, 2004, four individuals he identified as "part
        of the Omar al-Bashir security" and "Janjaweeds" detained him in Khartoum.
        Ex. 37, John Doe Tr. at 77:11–78:1; 83:18–25.

**Plaintiffs' Response**: Uncontroverted but misleading and incomplete.  Mr. John Doe is a

member of the Fur tribe, an ethnic African group traditionally based in Darfur, which was targeted

by the Regime for genocide.  Ex. 134, Deposition of John Doe ("John Doe Dep.") at 85:5; ECF

No. 435-54, Baldo Report ¶¶ 72, 152, 191; ECF No. 435-68, Hudson Report ¶ 91; ECF No. 435-

93, Verhoeven Report at 17-18.   On April 15, 2004, four men armed with handguns and

Kalashnikov rifles, dressed in plain clothes, and arriving in a white Toyota Land Cruiser with

tinted windows knocked on Mr. John Doe's door late at night.  Ex. 134, John Doe Dep. at 78:15-

24, 81:25-83:9.   The men asked for Mr. John Doe by name, and when he confirmed his

identification, Mr. John Doe was handcuffed, blindfolded, pushed into the vehicle, and driven off.

*Id.*  Mr. John Doe identified his captors as being from the security services and the Janjaweed in

part because of the language they used; it was not a regular language.  Ex. 134, John Doe Dep. at

84:13-18; Jok Report ¶ 114 n.57.  Mr. John Doe was driven a short distance, taken into a building,

and left in a room with his blindfold left on.  Ex. 134, John Doe Dep. at 78:25-79:9.

> 440.    Khartoum, Sudan's capital city, is not in an oil concession block.  Ex. 138, Plaintiff
>         Location Maps.

**Plaintiffs' Response**: Uncontroverted but incomplete, misleading, and irrelevant.  There

is no dispute that Khartoum is not in an oil concession block.  Nor is there a dispute that at all

times during the Class Period, the GOS and its agents were the only armed actors to exercise

control over Khartoum.  Moreover, Khartoum was one of the primary cities in which the GOS and

its agents directly targeted victims like Mr. John Doe, and as the capital city of Sudan, it was the

principal location from which the Regime's orders to target its opponents nationwide emanated.

ECF No. 435-54, Baldo Report ¶¶ 5, 12, 29, 50, 52-53, 55, 62, 68, 74, 104, 121, 127, 129-33, 137,

166, 181, 213.  According to the U.S. Embassy in Khartoum, funds BNPP transferred to the

Regime went through Sudan's Central Bank Headquarters and other commercial banks in

Khartoum.  *Id.* ¶¶ 85-86.

> 441.    Mr. Doe testified that the individuals who detained him assaulted him, including
>         sexual assaults.  Ex. 37, John Doe Tr. at 53:7–14; 79:20–80:19.

**Plaintiffs' Response**: Uncontroverted but misleading and incomplete.  Mr. John Doe was

detained and interrogated for about two weeks, during which time he was beaten and accused of

being a spy and transporting secret documents, all of which he denied.  Ex. 134, John Doe Dep. at

79:10-12, 80:4-6, 107:12-12, 160:12-19; Ex. 7, Keller & Rosenfeld Report App'x C10 ("John Doe

App'x") at 2.  His interrogators threatened him and his family.  Ex. 134, John Doe Dep. at 79:15-19.  They repeatedly beat him with gun butts and hoses, whipped him on the soles of his feet, kicked him in the knee and on his back, forced him to crawl on stones while beating his back, and doused him with dirty water.  *Id*. at 28:25-29:3, 58:14-21.  He overheard his captors say that they could go and kill his children if he did not tell them the truth. *Id.* at 79:23-80:3; Ex. 244, Pl. John Doe's Obj. & Resp. to Defs. First Set of Interrogatories (Nos. 1-4) ("John Doe Rog.") No. 1.  Mr. John Doe's captors started to "violently sexually assault" him, raping him anally and orally at least three times, while telling him that "if he [did not] confess, they are going to kill [him] or they are going to kill [his] family."  Ex. 134, John Doe Dep. at 55:24-58:12, 80:7-9.  After that, they left him for a long period of time in a "dark, filthy place" with no water or food.  *Id.* at 80:12-15.  To this day, Mr. John Doe has not told his wife of his sexual abuse; he is ashamed to tell her.  Ex. 7, John Doe App'x at 2. After 14 days in detention, his captors blindfolded him, placed him in the back of a pick-up truck, and drove him to an isolated area.  Ex. 134, John Doe Dep. at 107:10-17.  They told him he was being released on the condition that he should report to the general security headquarters every Monday and that he should not leave the country.  *Id.* at 108:3-8.  He agreed and they left him. *Id.* at 109:20-24.

442.    There is no evidence that the individuals used any weapons purchased with revenues processed by any BNPP Defendant to perpetrate these alleged assaults.

**Plaintiffs' Response**: This proposed fact is unsupported by admissible evidence as required by Federal Rule of Civil Procedure 56 and Local Rule 56.1.   In any event, it is controverted, misleading, and irrelevant.  The revenues provided to the GOS by the BNPP criminal

conspiracy enabled the Regime to acquire weapons, purchase loyalty, and stay in power to enable it and its agents to commit sweeping human rights abuses against targeted populations in Sudan. *See* Plaintiffs' Response to Proposed Fact Nos. 107-08.  The GOS, through the National Security Council headed by al-Bashir and subordinate institutions, controlled, funded, and equipped the GOS's security organs during the Proposed Class Period.  ECF No. 435-93, Verhoeven Report at 25-27; ECF No. 435-54, Baldo Report ¶¶ 5, 43-46, 108-12.  The GOS funneled money it derived from its conspiracy with BNPP to its intelligence services and other agencies: "salaries were increased, new vehicles were purchased and offices were renovated . . . especially for NISS," where "soaring expenditure" lead to "a dramatic expansion in its capabilities thanks to petrodollars."  ECF No. 435-93, Verhoeven Report at 27.

443.   Mr. Doe testified that the individuals who detained him were carrying pistols, handguns and a Kalashnikov rifle.  Ex. 37, John Doe Tr. at 78:15–24; 82:25–83:2.

**Plaintiffs' Response**: Uncontroverted but incomplete.  *See* Plaintiffs' Response to Proposed Fact No. 439.

444.   Mr. Doe testified that these individuals assaulted him with the butts of their rifles, their feet, dirty water, a hose and a whip.  Ex. 37, John Doe Tr. at 50:8–12; 52:2–6; 52:16–20; 55:12–18; 58:14–16.

**Plaintiffs' Response**: Uncontroverted but incomplete.  *See* Plaintiffs' Response to Proposed Fact No. 441.

445.   Mr. Doe testified that during his time in Sudan, he never saw anybody use bombs, missiles, or any type of military equipment.  Ex. 37, John Doe Tr. at 161:15–162:13.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Mr. John Doe testified that he saw the GOS on the street carrying machine guns.  Ex. 134, John Doe Dep. at 161:15-19.

> 446.    Mr. Doe testified that, following the alleged detention, he left Sudan for Egypt in 2004.  Ex. 37, John Doe Tr. at 96:7–9; 117:11–16.

**Plaintiffs' Response**: Uncontroverted but incomplete and misleading. After Mr. John Doe was released from detention, he had to hitch a ride to a friend's house who then helped him arrange passports and visas for him and his family to escape Sudan for Egypt.  Ex. 134, John Doe Dep. at 114:1-118:6.

### b.    Cairo, Egypt, 2005

> 447.    Mr. Doe testified that he sustained injuries in 2005 in Mustapha Mahmoud Park in Cairo, Egypt.  Ex. 37, John Doe Tr. at 162:19–25.

**Plaintiffs' Response**: Uncontroverted but incomplete.  Converted, incomplete, misleading, and irrelevant.  Mr. John Doe testified that when he was in "Egypt" he was part of a "sit in" in front of the UNHCR that was neither a protest nor a demonstration. John Doe Dep. at 162:17-21. In response to a question as to "who . . . forcefully dispersed the protest," Mr. John Doe responded that Elsadig Elmamdi and Sudan's Vice President, Ali Osman Mohamed Taha, visited those participating in the sit in, and then the next day, Mr. John Doe and others were "forcefully dispersed" by being "sprayed with water, with hose and people were hit," including Mr. John Doe in the head.  *Id.* at 162:22-163:8.  Mr. John Doe then identified those that removed him from in front of the UNCHR as the Egyptian government.  *Id*.

448.    Mr. Doe identified his attackers as the "Egyptian government."  Ex. 37, John Doe Tr. at
        163:14–16.

**Plaintiffs' Response**: Uncontroverted but incomplete.  *See* Plaintiffs' Response to

Proposed Fact No. 447.

449.    Mr. Doe testified that he arrived in the United States in 2010.  Ex. 37, John Doe Tr. at
        17:19–20.

**Plaintiffs' Response**: Uncontroverted. *See* Ex. 134, John Doe Dep. at 107:13–109:24

ii.    *Damages*

450.    Mr. Doe has adduced no documentary evidence concerning his ownership or the value of
        any real or personal property for which he alleges he is entitled to compensation in this
        Action.

**Plaintiffs' Response**: Controverted and misleading.  Whether Mr. John Doe possessed

documents concerning his ownership of real or personal property nearly twenty years after he was

forcibly displaced from Sudan is not determinative of his ability to prove damages.  Indeed, Mr.

John Doe submitted detailed listings of his losses, including real and personal property, including

a description of his two homes in Salama, land in Soba, and three vehicles.  Ex. 249, Pls.' Suppl.

Initial Disclosures (Dec. 21, 2022), at 13.  Moreover, fMr. John Doe gave testimony concerning

his property losses, including his multiple homes, land, and multiple cars that he owned.  Ex. 134,

John Doe Dep. at 153:3-158:23.

## PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS

### I. BNPP has historic ties with Sudan.

1.      BNP Paribas, S.A. is the largest bank in France, with a reported €2.666 trillion in assets as of April 2023. https://www.spglobal.com/marketintelligence/en/news-insights/research/europes-50-largest-banks-by-assets-2023

2.      BNP Paribas, S.A.'s Head Office is located in Paris, France, and it has subsidiaries, affiliates and branches around the world, including a "99.9%" owned Swiss subsidiary based in Geneva, BNP Paribas (Suisse) S.A. ("BNPP Suisse"). ECF No. 435-1, SSOF at ¶ 1; Ex. 126, Deposition of Dan Cozine ("Cozine Dep.") at 72:21-25.

3.      BNP Paribas SA violated the U.S. embargo on Sudan through multiple branches, business lines, and subsidiaries of the BNPP Group, including, but not limited to, its Head Office in Paris, BNPP Suisse, United European Bank ("UEB" sometimes referred to as United Overseas Bank), BNP Paribas SA New York Branch, and BNP Paribas US Wholesale Holdings, Corp. (collectively "BNPP"). ECF No. 435-1, SSOF at ¶ 1; ECF No. 241-8, OFAC Settlement Agreement ¶3; Ex. 83 to Decl. of Charity E. Lee, ECF No. 435-83, Expert Report of Barry Koch ("Koch Report") at ¶¶ 41, 135-42.

4.      BNP Paribas S.A. was formed in 2000 by the merger of Banque Nationale de Paris ("BNP") and Bank Paribas ("Paribas"). ECF No. 435-83, Koch Report at ¶ 135; Ex. 126, Cozine Dep. at 112:3–17.

5.      BNPP had a privileged and historical relationship with Sudan dating back to the 1980s. ECF No. 435-1, SSOF at ¶ 31; ECF No. 435-83, Koch Report at ¶ 135.

6.      BNPP's relationship with Sudan was principally managed by a business line called Energy Commodities Export Project ("ECEP") that focused on, among other things, providing

financing related to oil, petroleum gas and other commodities. ECF No. 435-1, SSOF at ¶ 1; ECF No. 435-83, Koch Report at ¶¶ 135-37; Ex. 101, BNPP-KASHEF-00046435 at 46449.

7.      The Global Head of ECEP was Dominique Remy at BNPP's Head Office in Paris. ECF No. 435-83, Koch Report at ¶ 137, 148; Ex. 97, BNPP-KASHEF-00038899; *see* Dominique Remy, BNP Paribas: A Worldwide Leader in Energy, Commodities, Export & Project Finance (Mar. 26, 2007), https://invest.bnpparibas/document/diapositives-de-la-presentation-98.

8.      From Paris, Dominique Remy managed Commercial Group 8 ("GC8"), a dedicated desk at BNPP Suisse in Geneva for which the Sudan was one of the largest customers. ECF No. 435-83, Koch Report at ¶¶ 135-37, 148; Ex. 101, BNPP-KASHEF-00046435 at 46449; Ex. 97, BNPP-KASHEF-00038899.

9.      This Sudan desk was originally part of BNPP's predecessor bank, Banque Nationale de Paris through its joint venture in Switzerland, UEB. ECF No. 435-83, Koch Report at ¶¶ 135-36; ECF No. 435-93, Verhoeven Report at 42; Ex. 101, BNPP-KASHEF-00046435 at 46449; ECF No. 435-63, Fogarty Report at ¶¶ 212-213.

10.     BNPP Suisse is the "successor in interest" to United Overseas Bank. Ex. 150, BNPP Defendants' Responses and Objections to Plaintiffs' Request for Admissions, No. 10, at 18-19; ECF No. 435-83, Koch Report at ¶ 135.

11.     The GC8 desk was integrated into BNPP Suisse after the merger. ECF No. 435-63, Fogarty Report at ¶¶ 135, 213; Ex. 123, Deposition of Louis Bazire ("Bazire Dep.") at 82; Ex. 161, BNPP Defendants' Second Supplemental Responses and Objections to Plaintiffs' Second Set of Interrogatories No. 8, dated July 22, 2022 ("BNPP Suisse inherited banking relationships with customers engaged in commercial transactions in Sudan when UEB United European Bank ("UEB," also previously known as United Overseas Bank) merged with BNPP Suisse on March

30, 2001. UEB had been conducting Sudan-related business since the 1990s, well before the imposition of U.S. sanctions on U.S.-dollar transactions. After the merger, Sudan-related business was a small portion of BNPP Suisse's overall business, and was run by a limited number of former UEB employees – who worked primarily in Commercial Group 8 at BNPP Suisse ("CG8").).

12.   After the merger, the GC8 desk's employees (including ████████████) were also integrated into BNPP Suisse. Ex. 22, BNPP-KASHEF- 00000177 at 182; ECF No. 435-83, Koch Report at ¶¶ 135-36; ECF No. 435-63.

13.   After the merger, BNPP assumed and perpetuated its predecessors' conspiracies with the Regime and Sudan. ECF No. 435-1, SSOF at ¶ 17-19; ECF No. 435-83, Koch Report at ¶¶ 134-36; Ex. 126, Cozine Dep. 112:11-17; 126:3-12; 222:9- 223:2.

14.   After the merger, the Sudanese clients became BNPP's clients. ECF No. 435-68, Hudson Report at ¶ 45, n. 17; Ex. 126, Cozine Dep. at 72:24-73:2.

15.   BNPP's partnership with Sudan was based on intimacy. Ex. 71, BNPP-KASHEF-00014451 at 14456; ECF No. 435-93, Verhoeven Report at 42.

16.   BNPP's partnership with Sudan was forged through GC8's frequent visits to Khartoum and meetings with leaders of the Central Bank of Sudan, the Sudanese Finance Ministry, the Sudanese Energy Ministry, and others. Ex. 71, BNPP-KASHEF-00014451 at 14456; ECF No. 435-93, Verhoeven Report at 42; ECF No. 435-83, Koch Report at ¶ 136, n. 58; Ex. 39, BNPP-KASHEF-00005144 (noting that one BNPP employee traveled to Sudan five times a year); Ex. 75, BNPP-KASHEF-00014693 (listing visits performed, including a visit to a Sudanese Government Department).

**II. The United States imposes an economic embargo aimed at halting the atrocities of Sudan's Bashir Regime.**

**1). U.S. Sanctions Imposed on Sudan.**

17.     In 1989, Sudan's former dictator Omar al-Bashir seized power in a coup and installed a kleptocratic, military-Islamist regime in Sudan (the "Regime"). ECF No. 435-93, Verhoeven Report at 8; ECF No. 435-68, Hudson Report at ¶ 34.

18.     The Regime launched a campaign of human rights abuses, using rape, torture, murder, and ethnic cleansing to hold power. ECF No. 435-54, Expert Report of Dr. Suliman Baldo ("Baldo Report") at ¶ 165; ECF No. 435-93, Verhoeven Report at 19-21; Ex. 5, Expert Report of Dr. Jok Madut Jok ("Jok Rep.") ¶¶ 3-11; *see also* Plaintiffs' Response to Proposed Fact No. 107.

19.     Al-Bashir hosted Osama bin Laden and other al-Qaeda terrorists. ECF No. 435-93, Verhoeven Report at 12; ECF No. 435-83, Koch Report at ¶ 240; Ex. 122, Deposition of Patrice de Saint Andre ("De Saint Andre Dep.") at 132-133:24-5.

20.     Beginning in 1993, the United States took a series of steps to halt the human rights abuses being committed by the Regime. ECF No. 435-83, Koch Report at ¶ 52; ECF No. 435-54, Report at ¶ 165; ECF No. 435-93, Verhoeven Report at 31.

21.     In 1993, the United States designated Sudan a state-sponsor of terrorism. ECF No. 435-93, Verhoeven Report at 31; ECF No. 435-68, Hudson Report at ¶ 37.

22.     On November 3, 1997, President Clinton issued Executive Order 13067, imposing a comprehensive trade embargo on Sudan. ECF No. 435-68, Hudson Report at ¶ 55; ECF No. 435-93, Verhoeven Report at 31; ECF No. 435-83, Koch Report at ¶ 56.

23.     This embargo was intended to deny the Bashir Regime access to the U.S. financial system and deprive it of U.S. dollars. ECF No. 435-68, Hudson Report at ¶ 55; Ex. 126, Cozine Dep. at 108:15-190:2, 109:4-13.

24.     The U.S. sanctions were intended to halt the Regime's human rights abuses. ECF No. 435-68, Hudson Report at ¶¶ 53-4 (citing Executive Order 13067 – Blocking Sudanese Government Property and Prohibiting Transactions with Sudan (Nov. 4, 1997) ("I, WILLIAM J. CLINTON, President of the United States of America, find that the policies and actions of the Government of Sudan, including continued support for international terrorism; ongoing efforts to destabilize neighboring governments; and the prevalence of human rights violations, including slavery and the denial of religious freedom, constitute an unusual and extraordinary threat to the national security and foreign policy of the United States, and hereby declare a national emergency to deal with that threat.")); Ex. 68, BNPP-KASHEF-00014129 at 14130 (quoting Secretary of State Madeline Albright as saying the "sanctions were intended to put pressure on Sudan's Islamist government for … its effort to destabilise neighbouring countries and its abysmal record on human rights."); Ex. 126, Cozine Dep. at 105:22-106:16 ("the purpose or the concern underlying those sanctions was the prevalence of human rights violations, including slavery and the denial of religious freedom").

25.     Dozens of Sudanese entities and individuals were added to the list of Specially Designated Nationals ("SDN") by the Treasury Department's Office of Foreign Assets Control ("OFAC"). ECF No. 435-83, Koch Report at ¶¶ 64, 152; ECF No. 435-63, Fogarty Report at ¶¶ 117-118, 144; Ex. 80, BNPP-KASHEF-00022706 at 22707; Ex. 50, BNPP-KASHEF-00007994 at 7994; Ex. 38, BNPP-KASHEF-00005080.

26.     SDNs are individuals and entities that are owned or controlled by the governments of sanctioned countries, or are so closely associated with a sanctioned country that OFAC considers them to be 'acting for or on behalf of' that sanctioned country. ECF No. 435-83, Koch Report at ¶ 64; Ex. 93, BNPP-KASHEF-00031347 at 31360.

27.     The Sudanese SDNs were determined by the U.S. government to be individuals or organizations that are owned or controlled by, or act on behalf of, the Government of Sudan. Ex. 50, BNPP-KASHEF-00007994 at 7994; ECF No. 435-63, Fogarty Report at ¶¶ 117-118, 144.

**2). Consequences of the U.S. Sanctions imposed on Sudan.**

28.     The U.S. sanctions worsened Sudan's precarious economic situation. ECF No. 435-63, Fogarty Report at ¶¶ 54-58; ECF No. 435-68, Hudson Report at ¶ 43; ECF No. 435-93, Verhoeven Rep. at 13-14.

29.     Sudan was an international pariah state. ECF No. 435-63, Fogarty Report at ¶¶ 54-58, 141; ECF No. 435-68, Hudson Report at ¶ 45; ECF No. 435-93, Verhoeven Report at 44.

30.     The Regime was saddled with the cost of a civil war against separatist rebels of the Sudan People's Liberation Army ("SPLA") in the South. ECF No. 435-68, Hudson Report at ¶ 43; ECF No. 435-93, Verhoeven Rep. at 8, 15.

31.     The war with the South had drained the Regime's foreign currency reserves. Ex. 71, BNPP-KASHEF-00014451; ECF No. 435-68, Hudson Report at ¶ 237.

32.     Sudan's external debt grew to $15 billion and the Sudanese pound collapsed due to the lack of foreign exchange. ECF No. 435-68, Hudson Report at ¶ 43.

33.     The Regime had an aging arsenal of NATO and Warsaw Pact weapons systems. Ex. 53 to Decl. of Charity E. Lee, ECF No. 435-53, Expert Reply Report of Kathi Austin ("Austin Reply") at ¶ 113, dated March 2, 2023.

34.     Sudan was importing all its energy needs and its weaponry but lacked the foreign currency reserves needed to sustain imports. ECF No. 435-94, Verhoeven Reply at 29-30; Ex. 88 to Decl. of Charity E. Lee, ECF No. 435-88, Expert Report of Dr. Luke Patey ("Patey Report") at 4; Ex. 12, BNPP-KASHEF-00000023 at 29; ECF No. 435-68, Hudson Report at ¶¶ 45-46.

35.     To hold power, the Regime's arsenal needed to be replenished, and security forces and militias needed to be paid. ECF No. 435-93, Verhoeven Report at 2, 44.

36.     To hold power, loyalties to the Regime needed to be bought through a patronage system. ECF No. 435-93, Verhoeven Report at 2, 11, 13, 44; ECF No. 435-94, Verhoeven Reply at 31.

37.     The Regime needed hard currency to sustain its capacity for war and repression, including through weapons purchases. ECF No. 435-93, Verhoeven Report at 2, 13-14; ECF No. 435-68, Hudson Report at ¶ 47; Ex. 153, Deposition of Enrico Carisch ("Carisch Dep.") at 58:8-59:16.

**3). BNPP is willing to help.**

38.     BNPP knew that, due to the U.S. embargo, it should no longer process Sudanese payment orders in U.S. dollars. Ex. 68, BNPP-KASHEF-00014129 at 14132; Ex. 126, Cozine Dep. at 214:15-23; ECF No. 435-83, Koch Report at ¶¶ 153-55; Ex. 6, Koch Reply at ¶¶ 44-45; Ex. 20, BNPP-KASHEF-0000160 at 162 ("This Country is subject to US embargo. . . . All transactions in USD are forbidden[.]").

39.     On November 10, 1997, a UEB bank employee called OFAC after reading a Reuters article about the embargo and received confirmation that Sudanese payment orders were indeed blocked on November 4, 1997 in accordance with Clinton's order. Ex. 68, BNPP-KASHEF-00014129 at 14132; Ex. 126, Cozine Dep. at 214:15-23 (confirming that "this article was in the possession at that time of the predecessor to BNP Geneva Suisse").

40.     BNPP was willing to support the Regime in circumventing the U.S. sanctions. ECF No. 435-1, SSOF at ¶ 41 ("BNPP's willingness to engage in U.S. dollar transactions involving Sudan significantly undermined the U.S. embargo and provided the Sudanese government and Sudanese banks with access to the U.S. financial system that they otherwise would not have had.").

41.     BNP Paribas engaged in a systematic practice, as directed from high levels of the Bank's group management, of removing or omitting Sudanese, Iranian, or Cuban information from U.S. dollar denominated payment messages that it sent through the New York Branch and other nonaffiliated New York-based U.S. financial institutions to "guarantee the confidentiality of the messages and to avoid their disclosure to any potential investigatory authorities.  Ex. 1, In re BNP Paribas, S.A. New York Branch, Consent Order Under New York Banking Law § 44, New York State Department of Financial Services ("DFS Consent Order") at ¶ 3.

42.     Within days of the U.S. embargo being imposed on Sudan in 1997, UEB –the predecessor to BNPP-conspired with Sudan to evade the sanctions. ECF No. 435-1, SSOF at ¶ 19; ECF No. 435-68, Hudson Report at ¶¶ 45, 59-60.

43.     BNPP assumed this conspiracy upon its merger in 2000. ECF No. 435-1, SSOF ¶ at 19; ECF No. 435-83, Koch Report at ¶¶ 134; 156-57.

44.     BNPP's wire-stripping began within days of the U.S. embargo first being imposed in November 1997. ECF No. 435-83, Koch Report at ¶¶ 159, 161; Ex. 69, BNPP-KASHEF-00014196.

45.     On November 13, 1997, a telex from a Sudanese bank asked Fakhri Hejazi (CH NPR-E7), then of UEB and later of BNPP Suisse, to remove all reference to the Sudanese bank in wire payment messages. Ex. 69, BNPP-KASHEF-00014196.

46.     BNPP's wire stripping was done to prevent transactions from being rejected or blocked in the U.S. due to the U.S. embargo against Sudan. Ex. 1, DFS Consent Order at ¶ 15; Ex. 69, BNPP-KASHEF-00014196; Ex. 126, Cozine Dep. at 217:25-218:1 ("Likely the intent is so that the payment would not be blocked."); ECF No. 435-83, Koch Report at ¶ 159, 162.

47.     BNPP's relationship with many of the satellite banks also began shortly after the imposition of the U.S. sanctions against Sudan in 1997. ECF No. 435-1, SSOF at ¶ 23; ECF No. 435-83, Koch Report at ¶ 183.

### III. BNPP conspires with the Regime to evade the U.S. embargo through money laundering structures and falsified documents.

### 1). BNPP plead guilty to a conspiracy with the GOS.

48.     BNPP was investigated for processing transactions for Sudanese entities in violation of the U.S. embargo. ECF No. 435-83, Koch Report at ¶¶ 77, 96; ECF No. 435-1, SSOF at ¶ 71-72.

49.     The investigation resulted in two criminal guilty pleas, a settlement agreement with OFAC, and a consent order with the New York Department of Financial Services. ECF No. 435-83, Koch Report at ¶¶ 77-94.

50.     BNP Paribas SA pleaded guilty to conspiring with the Sudanese government and other entities to violate U.S. sanctions on Sudan, Iran, and Cuba, and to falsifying business records. ECF No. 435-83, Koch Report at ¶¶ 77-94; Ex. 126, Cozine Dep. at 119:15-123:15 ("[W]hat we did, what we pled guilty to, there is no dispute in [BNPP's] supporting the Sudanese government, which was using funds to support terrorism and committing human rights abuses"); Ex. 122, De Saint André Dep. at 194:5-9 ("Q: How did you react when you learned that BNPP pleaded guilty to violating the US sanctions? A: I think, I always think that anyone has to pay for its mistakes").

51.     BNPP plead guilty to knowingly, intentionally and willfully violating the U.S. sanctions, including those sanctions imposed on Sudan. ECF No. 435-1, SSOF at ¶¶ 14, 16, 41; Ex. 6, Expert Reply Report of Barry Koch ("Koch Reply") at ¶ 30, dated March 2, 2023.

52.     During its investigation, BNPP failed to provide the U.S. government with meaningful materials from BNPP Geneva until May 2013, and the materials were heavily redacted. ECF No. 435-1, SSOF at ¶ 72.

53.     This delay significantly impacted the U.S. Government's ability to bring charges against responsible individuals, Sudanese Sanctioned Entities, and the satellite banks. ECF No. 435-1, SSOF at ¶ 72.

54.     BNPP was required to pay almost nine billion dollars in forfeitures and fines, the largest financial penalty ever imposed in a criminal case. *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 56 (2d Cir. 2019); *see also* Ex. 6, Koch Reply at ¶¶ 2, 114 & Chart 2 ("BNPP's fine was more than 100 times the fine assessed against ABN Amro").

55.     BNPP's compliance expert, ex-SDNY prosecutor Teresa Pesce, "probably would have" prosecuted BNPP. Ex. 154, Deposition of Teresa Pesce at 76:21-77:4.

56.     BNPP agreed it would not contradict in any proceedings the facts contained in the Factual Statement incorporated by reference in its Plea Agreement with the District Attorney of the County of New York. Ex. 2, Plea Agreement Between BNP Paribas SA and the District Attorney of the County of New York, (June 30, 2014), at ¶¶ 2, 7, 22 ("BNPP expressly agrees that it shall not, through its attorneys, board of directors, agents, officers or employees . . . make any public statement contradicting the acceptance of responsibility by BNPP set forth in this Agreement or any statement of fact in the Factual Statement.").

**2). How BNPP conducted the conspiracy.**

57.     BNPP created deceptive schemes and transaction structures to conceal thousands of illegal Sudanese transactions from scrutiny by U.S. financial institutions, regulators, and authorities. Ex. 1, DFS Consent Order at ¶ 10.

**a). Wire stripping.**

58.     BNPP used "wire-stripping" to clear U.S. dollar wire payments for sanctioned Sudanese entities through BNPP in New York. ECF No. 435-1, SSOF at ¶¶ 18, 22; ECF No. 435-83, Koch Report at ¶¶ 161-73.

59.     Wire-stripping is removing or omitting the identities of sanctioned parties from payment messages so that a bank's automated monitoring tools will not detect the offending parties. ECF No. 435-1, SSOF at ¶ 22; ECF No. 435-83, Koch Report at ¶ 159.

60.     BNPP deliberately modified and omitted references to Sudan in the payment messages accompanying the U.S. dollar wire payments for sanctioned Sudanese entities. ECF No. 435-1, SSOF at ¶¶ 18, 22; ECF No. 435-83, Koch Report at ¶¶ 161-73; Ex. 11, BNPP-KASHEF-00000018.

61.     BNPP's Head Office in Paris not only authorized this wire-stripping practice, it required it. ECF No. 435-1, SSOF at ¶ 22 ("BNPP's internally published policy for processing US dollar payments involving Sudan stated: 'Do not list in any case the name of Sudanese entities on messages transmitted to American banks or to foreign banks installed in the U.S.'"); ECF No. 435-83, Koch Report at ¶¶ 148-57, 161-63 (discussing examples of BNPP Paris' approval of and participation in wire-stripping); Ex. 20, BNPP-KASHEF-0000160 at 164; Ex. 15, BNPP-KASHEF-00000075; Ex. 19, BNPP-KASHEF-00000153; Ex. 1 DFS Consent Order at ¶ 3.

62.     BNPP's wire-stripping practice enabled BNPP to manage or finance billions of dollars' worth of U.S. dollar denominated letters of credit for Sudanese entities. ECF No. 435-1, SSOF at ¶ 18; ECF No. 435-83, Koch Report at ¶¶ 162, 173.

63.     BNPP also had a consistent, unlawful practice of resubmitting stopped payments for sanctioned Sudanese entities. ECF No. 435-83, Koch Report at ¶¶ 174-82; Ex. 49, BNPP-KASHEF-00007574.

**b). Satellite Banks.**

64.     BNPP worked with other financial institutions to structure payments in highly complicated ways, with no legitimate business purpose, to conceal the involvement of sanctioned entities in order to prevent the illicit transactions from being blocked when transmitted through the United States. ECF No. 435-1, SSOF at ¶ 16.

65.     BNPP opened accounts for so-called "Satellite Banks"—nine unaffiliated banks in Africa, Europe, and the Middle East—to serve as front company accounts for illicit Sudanese transactions. ECF No. 435-1, SSOF at ¶¶ 18, 23-27; ECF No. 435-83, Koch Report at ¶¶ 183-96; ECF No. 435-68, Hudson Report at ¶ 60.

66.     This is a classic money-laundering technique. ECF No. 435-83, Koch Report at ¶ 183; ECF No. 435-68, Hudson Report at ¶ 60.

67.     The Satellite Bank scheme used book-to-book transfers, an accounting method where BNPP would move funds within the same bank branch by debiting the sending client's account and then crediting the receiving client's account. ECF No. 435-1, SSOF at ¶ 24; ECF No. 435-83, Koch Report at ¶¶ 183-201.

68.     To exchange the foreign currency for U.S. dollars, BNPP would perform the dollar clearing through a secondary transaction, in its own name, disguising the presence of the Sudanese government or other sanctioned entity. ECF No. 435-1, SSOF at ¶ 24; ECF No. 435-93, Verhoeven Report at 40; ECF No. 435-83, Koch Report at ¶¶ 183-201.

69.     The Satellite Bank accounts were opened primarily for the purpose of covertly transferring funds in circumvention of the U.S. sanctions on Sudan. ECF No. 435-1, SSOF at ¶¶ 24, 26; ECF No. 435-83, Koch Report at ¶¶ 183, 185; Ex. 8, BNPP-KASHEF-00000006 ("As requested we hereby confirm that we wish to open the account to facilitate transfers of funds for our mutual Sudanese customers"); Ex. 10, BNPP-KASHEF-00000014 ("opening US Dollar

Account with your esteem Bank [i]n order to facilitate transactions in US Dollar for some of our Correspondents who maintain[] accounts with you.").

### 3). BNPP's financial support for the Regime.

**a). BNPP held all the Regime's accounts, providing the Regime access to otherwise unavailable U.S. dollars.**

70.     After the U.S. embargo was imposed in 1997, the Central Bank of Sudan appointed BNPP as its sole correspondent bank in Europe. ECF No. 435-1, SSOF at ¶ 19; Ex. 13, BNPP-KASHEF-00000034 at 38.

71.     The Central Bank of Sudan then directed all major commercial banks located in Sudan to use BNPP Geneva as their primary correspondent bank in Europe. ECF No. 435-1, SSOF at ¶ 19; Ex. 13, BNPP-KASHEF-00000034 at 38.

72.     As a result, all or nearly all major Sudanese banks had U.S. dollar accounts with BNPP. ECF No. 435-1, SSOF at ¶ 19; *see e.g.* Ex. 92, BNPP-KASHEF-00030230 (listing nine Sudanese banks that have accounts with BNPP).

73.     The Government of Sudan placed the majority of its foreign currency reserves and a bulk of Sudan's foreign trade in the hands of BNPP. ECF No. 435-83, Koch Report at ¶ 142.

74.     BNPP's Global Compliance in Paris described BNPP's role in Sudan's foreign commerce as "exclusive." Ex. 24, BNPP-KASHEF-00000201 at 202.

75.     BNPP set up and provided international payment systems (including correspondent banking and cover payments) to transfer funds into and out of the Central Bank of Sudan and other Sudanese banks. ECF No. 435-83, Koch Report at ¶¶ 103-14.

76.     BNPP transferred international payments in and out of Sudan. ECF No. 435-83, Koch Report at ¶¶ 103-14.

77.     BNPP also provided letters of credit to finance export and import trade. ECF No. 435-1, SSOF at ¶ 19; ECF No. 435-83, Koch Report at ¶¶ 120-33.

78.     BNPP issued credit facilities to finance the Regime's imports and projects. *See, e.g.*, Ex. 97, BNPP-KASHEF-00038899 at 38909 ($150 million credit facility for oil infrastructure and equipment).

79.     BNPP managed accounts to receive payments and hold the Regime's foreign currency reserves. *See, e.g.*, ECF No. 435-83, Koch Report at ¶¶ 184, 229; Ex. 62, BNPP-KASHEF-00013603 at 13604.

80.     The Regime's foreign trade earnings—from crude oil, oil products, gold, agricultural exports, telephone fees and, after 2001, overflight fees—were managed by BNPP in accounts maintained for the Central Bank of Sudan:

> The Crude Oil proceeds account,
> The Oil Products proceeds account,
> The Banks Clearing account,
> The Statutory Reserve account,
> The Gold Proceeds account,
> The Cotton Proceeds account
> The Over Flying Fees account

ECF No. 435-64, Fogarty Reply ¶ 127; Ex. 62, BNPP-KASHEF-00013603 at 13604; Ex. 105, BNPP-KASHEF-00048093 at 48099 ("Centralization of [Civil Aviation Authority] flying fees on our books in 2001 completed the already existing domiciliation for the country's principal foreign exchange earnings, namely oil, oil products, telephone fees, gold revenues and agricultural products."); Ex. 6, Koch Reply at ¶ 111; ECF No. 435-83, Koch Report at ¶ 143.

81.     All of the principal sources of non-tax revenue for the Government of Sudan flowed through BNPP's books. ECF No. 435-64, Fogarty Reply at ¶ 127; *see, e.g.*, Ex. 105, BNPP-KASHEF-00048093 at 48099, 48105 ("[W]e are the main banker of the country, with Sudanese

revenues from oil, petroleum products, telephone fees, gold and agricultural products on our books."); Ex. 22, BNPP-KASHEF-00000177 at 178 ("In practice, these L/C are, as far as we can tell in Switzerland, entirely held in the accounts of BNPP Geneva, which means it centralizes a crucial proportion of Sudan's foreign currency earnings.").

82.     BNPP came to hold more than 70% of the Regime's foreign currency reserves. Ex. 22, BNPP-KASHEF-00000177 at 183; ECF No. 435-83, Koch Report at ¶ 229.

83.     BNPP also helped the Regime generate indirect tax revenue from trade in the form of tariffs and custom duties from the crude oil exports. ECF No. 435-63, Fogarty Report at ¶ 255; Ex. 153, Carisch Dep. at 275:17-276:13.

84.     In 2006 alone, BNPP financed a quarter of all exports and a fifth of all imports—for the entire country, not just for the Regime. ECF No. 435-1, SSOF at ¶ 19; Ex. 26, BNPP-KASHEF-00000210 (duplicate of BNPP-KASHEF-00004373 except it contains handwritten notes).

85.     BNPP financed and transferred to the Sudanese government all of the Sudanese government's oil revenue. ECF No. 435-63, Fogarty Report at ¶¶ 253-256; ECF No. 435-64, Fogarty Reply at ¶¶ 109-112 (citing Ex. 62, BNPP-KASHEF-00013603; Ex. 71, BNPP-KASHEF-00014451; Ex. 45, BNPP-KASHEF-00005625; Ex. 70, BNPP-KASHEF-00014325; Ex. 22, BNPP-KASHEF-00000177; Ex. 97, BNPP-KASHEF-00038899; Ex. 98, BNPP-KASHEF-00038913; Ex. 105, BNPP-KASHEF-00048093); *see also* Plaintiffs' Responses to Proposed Fact Nos. 103-106.

**b). Support for Sudan.**

86.     The conspiracy with BNPP was enormously profitable for the Regime. ECF No. 435-64, Fogarty Reply at ¶¶ 62, 72 ("BNPP's financial support for Sudan exceeded $90 billion");

ECF No. 435-63, Fogarty Report at ¶¶ 103, 249, and Ex. 1 (scheme allowed Sudan to evade U.S. sanctions and carry out more than $80 billion in U.S.-dollar denominated).

87.     BNPP has never disclosed the total amount of Sudanese transactions it processed since 1997. *See* Ex. 126, Cozine Dep. at 67:8-25, 68:1-12; ECF No. 435-63, Fogarty Report at ¶ 229; ECF No. 435-64, Fogarty Reply at ¶ 63.

88.     At a minimum, in just the 2002 to 2007 period, BNPP processed over $81 billion in transactions involving Sudanese U.S. dollar vostro accounts. ECF No. 435-63, Fogarty Report ¶ 229 & Ex. 1; ECF No. 435-64, Fogarty Reply at ¶ 72; ECF No. 435-68, Hudson Report at ¶¶ 61-82.

89.     A vostro account is an account provided by an international correspondent bank, acting as an intermediary, to a bank that does not have its own foreign bank branches, permitting that bank to handle financial activity denominated in currencies other than its home currency. ECF No. 435-63, Fogarty Report ¶ 229, n.154.

90.     Of the $81 billion, BNPP admitted that $10.35 billion violated U.S. sanctions, while $57.37 billion, equivalent to approximately 70%, were not sufficiently explained by BNPP. ECF No. 435-64, Fogarty Reply at ¶¶ 72-73.

91.     All of the Regime's revenue from the sale of oil—an estimated $22.2 billion—was financed and processed by BNPP. See Ex. 22, BNPP-KASHEF-00000177 at 183; ECF No. 435-63, Fogarty Report at ¶¶ 260-63; ECF No. 435-64, Fogarty Reply at ¶ 128.

92.     The U.S. Deputy Attorney General described BNPP as acting as "a *de facto* central bank for the Government of Sudan." ECF No. 435-83, Koch Report at ¶ 36; ECF No. 435-68, Hudson Report at ¶ 208.

**c). Undermining the Embargo.**

93.     BNPP's conduct significantly undermined the U.S. embargo. ECF No. 435-1, SSOF at ¶ 41; Ex. 1, DFS Consent Order at ¶ 25; ECF No. 435-68, Hudson Report at ¶¶ 227-28.

94.     BNPP provided the Regime and Sudanese bank access to the U.S. financial system that they otherwise would not have had. ECF No. 435-1, SSOF at ¶ 41.

95.     BNPP allowed the Regime to profit from the foreign trade the U.S. embargo was designed to block. Ex. 24, BNPP-KASHEF-00000201 at 206; ECF No. 435-68, Hudson Report at ¶¶ 25, 232, 239; ECF No. 435-93, Verhoeven Report at 38-40 (explaining that BNPP's trade financing was "especially" important for a poor nation with a bad reputation such as Sudan); Ex. 126, Cozine Dep. at 119:15-19, 123:12-15 ("BNP's role allowed the Sudanese government to have access to funds. The U.S.'s view was that those funds were then being used by the Sudanese government to repress their people. . . . [W]hat we did, what we pled guilty to, there is no dispute in [BNPP's] supporting the Sudanese government, which was using funds to support terrorism and committing human rights abuses.")

96.     BNPP provided the instruments of trade finance that enabled the Sudanese economy to expand, rather than contract, in the face of the U.S. trade embargo. ECF No. 435-68, Hudson Report at ¶¶ 25, 232, 239; ECF No. 435-93, Verhoeven Report at 38-40.

97.     BNPP knew it was undermining the embargo. ECF No. 435-1, SSOF at ¶ 37 (BNPP was "well aware that its conduct violated U.S. law"); Ex. 16, BNPP-KASHEF-00000086 at 86 ("From what I understand, we have a number of banks from the Arab world (9 identified) in our books that only carry out clearing transactions for Sudanese banks in dollars. The movements are IN/OUT and are virtually identical in number and amount. This practice places us in the position of participating in a circumvention of the U.S. embargo on US-dollar denominated transactions carried out by Sudan. . .  I also note that we perform the same type of clearing in USD, but in our

own books, between the [Sudanese Bank] and the Sudanese commercial banks. Again, we are in the position of circumventing the embargo."); Ex. 126, Cozine Dep. at 117:1-2 ("as a result of our structures, dollars flowed to the Sudanese government.").

98.     As a result of BNPP's conduct, the Government of Sudan and numerous banks connected to the Government of Sudan, including SDNs, were able to access the U.S. financial system and engage in billions of dollars' worth of U.S. dollar-based financial transactions, significantly undermining the U.S. embargo. Ex. 1, DFS Consent Order at ¶ 25.

99.     By 2007, the U.S. National Security Council was aware that "the totality of the sanctions that [were] in place since 1997 [had] not helped us to impact the tempo of violence in Darfur." Ex. 152, Deposition of Cameron Hudson ("Hudson Dep.") at 163:25-164:19.

100.     The U.S.  sanctions could not abate the atrocities, so long as BNPP undermined them. ECF No. 435-68, Hudson Report at ¶ 242; ECF No. 435-64, Fogarty Reply at ¶ 34.

**d). Profitable for BNPP.**

101.     The conspiracy with the Regime was profitable for BNPP. ECF No. 435-1, SSOF at ¶ 37; Ex. 6, Koch Reply at ¶ 115, n. 187; Ex. 62, BNPP-KASHEF-00013603 at 13607 ("The profitability of our Sudanese operations is extremely high."); Ex. 97, BNPP-KASHEF-00038899 at 38905 (the Sudanese business was "[a] strategic, diverse and highly profitable business"); Ex. 22, BNPP-KASHEF-00000177 at 177 (the Sudanese business generated a "major source of income" for BNPP).

102.     BNPP continued to process transactions involving Sudanese Sanctioned Entities because the business was profitable. ECF No. 435-1, SSOF at ¶ 37.

103.     BNPP also continued to process transactions involving Sudanese Sanctioned Entities because it did not want to risk its longstanding relationship with Sudanese clients. ECF No. 435-1, SSOF at ¶ 37.

**IV. BNPP is the Regime's "Oil Bank."**

**1). Impact of U.S. sanctions on Sudan's oil.**

104.    Before exporting its oil in 1999, Sudan was importing all its energy needs. ECF No. 435-68, Hudson Report at ¶¶ 46, 237; Ex. 12, BNPP-KASHEF-00000023 at 29.

105.    For years since oil was discovered in Sudan in the 1980s, Sudan had been unable to extract it. ECF No. 435-88, Patey Report at 3-4; ECF No. 435-68, Hudson Report at ¶ 43.

106.    The Regime's reputation and instability scared off foreign investors needed to bring Sudanese crude to market. ECF No. 435-88, Patey Report at 3-4; *see also* ECF No. 435-68, Hudson Report at ¶ 43.

107.    To exploit and sell its oil, the Regime needed foreign investors to dig wells and build pipelines. ECF No. 435-93, Verhoeven Report at 35-36; ECF No. 435-88, Patey Report at 6-7.

108.    To exploit and sell its oil, the Regime needed a bank willing to break the U.S. embargo and finance oil exports in U.S. dollars. ECF No. 435-93, Verhoeven Report at 38-40; ECF No. 435-88, Patey Report at 6-7.

109.    To exploit and sell its oil, the Regime needed military resources to subjugate the predominantly non-Arab populations in whose historic lands Sudan's oil reserves were located. ECF No. 435-93, Verhoeven Report at 36-37; ECF No. 435-88, Patey Report at 7-9.

110.    In 1997, the Regime formed the Greater Nile Petroleum Operating Company ("GNPOC"), an oil consortium involving the Sudan National Petroleum Corporation ("Sudapet")—the Regime's state-owned oil company; the China National Petroleum Corporation ("CNPC")—China's state-owned oil company; Malaysia's state-owned oil company Petronas; and Canadian oil company, Arakis, which was later acquired by Talisman Energy. ECF No. 435-88,

Patey Report at 5-6; ECF No. 435-54, Baldo Report at ¶ 81; *see also* ECF No. 435-93, Verhoeven Report at 34-35, 53.

111.    Work began on a pipeline to link Port Sudan on the Red Sea to the oil concessions in Unity State, South Kordofan, and South Darfur, which straddled the traditional divide between the Arab north and Black African south. ECF No. 435-88, Patey Report at 6.

112.    In 1999, with its pipeline complete, Sudan began to export oil. ECF No. 435-88, Patey Report at 7.

## 2). Sudan needed U.S. dollars.

113.    In the oil trade, the U.S. dollar, commonly called the "petrodollar" is the standard currency because it is stable, convertible, and highly desired by oil-producing states as a foreign reserve currency. Ex. 89 to Decl. of Charity E. Lee, ECF No. 435-89, Expert Reply Report of Dr. Luke Patey ("Patey Reply") at 6-7, dated March 2, 2023.

114.    The U.S. dollar has been the currency of reference in the oil trade since World War II. ECF No. 435-63, Fogarty Report at ¶ 129; ECF No. 435-89, Patey Reply at 6-7.

115.    The U.S. dollar remains the standard currency for oil sales. ECF No. 435-63, Fogarty Report at ¶¶ 129-130; ECF No. 435-89, Patey Reply at 6-7; Ex. 126, Cozine Dep. at 110:19-20; Ex. 123, Bazire Dep. at 15:11-15.

116.    BNPP executives recognized the importance of the U.S. dollar to an oil exporting country like Sudan. Ex. 125, Deposition of Jacques d'Estais ("d'Estais Dep.") at 91:13-18; *see also* Ex. 123, Bazire Dep. at 14:25-15:13.

117.    The U.S. dollar was the preferred currency of Regime. ECF No. 435-89, Patey Reply at 5; Ex. 87, BNPP-KASHEF-00029502.

118.    The U.S. dollar was the "historical currency of account" in Sudan. Ex. 22, BNPP-KASHEF-00000177 at 179.

119.    U.S. dollars were required for telecommunications, aviation, and military equipment. ECF No. 435-68, Hudson Report at ¶¶ 153, 230.

120.    The U.S. dollar was the currency used to traffic arms into Sudan. Ex. 153, Carisch Dep. at 58:4-59:16; ECF No. 435-68, Hudson Report at ¶¶ 153, 230.

121.    The Regime refused to move away from transactions in U.S. dollars, even when prompted by BNPP. ECF No. 435-89, Patey Reply at 4-6, 10.

122.    In 2008, when BNPP's Sudanese partners started to execute a policy of switching over to Euros and other currencies, to reduce the dangers of continuing with the U.S. dollar, this was regarded as a "temporary arrangement." ECF No. 435-89, Patey Reply at 5-6.

123.    All foreign exchange in U.S. dollars must at some point be "cleared" through a U.S. financial institution. ECF No. 435-83, Koch Report at ¶ 106; ECF No. 435-68, Hudson Report at ¶ 52.

124.    To amass petrodollars, the Regime needed to circumvent U.S. sanctions. *See* ECF No. 435-63, Fogarty Report at ¶ 130 ("By providing access to U.S. dollar accounts to Sudan, BNP Paribas provided the fundamental means for the Bashir regime to gain revenues from oil exports."); ECF No. 435-93, Verhoeven Report at 39-40.

125.    Over 90% of the oil transactions flowing through BNPP were denominated, paid, and processed in U.S. dollars. Ex. 22, BNPP-KASHEF-00000177 at 183; ECF No. 435-63, Fogarty Report at ¶ 260; ECF No. 435-88, Patey Report at 6-7, 9-10; ECF No. 435-83, Koch Report at ¶ 147; ECF No. 435-1, SSOF at ¶ 19.

**3). "From the first barrel," BNPP is the Regime's exclusive "oil bank."**

126.    Oil was the most lucrative single source of income for the Regime. ECF No. 435-53, Austin Reply at ¶ 43; Ex. 153, Carisch Dep. at 45:24-25, 253:10-24.

127.    Under the Bashir Regime's production sharing agreements with the GNPOC and other oil consortia, the Regime licensed concessions for the exploitation of Sudan's oil blocks. ECF No. 435-63, Fogarty Report at ¶ 255.

128.    Under its oil concession agreements, the Regime took a 60-80% share of the crude, which it sold on the international market as pure government revenue. ECF No. 435-63, Fogarty Report ¶ 255.

129.    The Regime directly exported its share of the oil through the state-owned oil company Sudapet. ECF No. 435-63, Fogarty Report at ¶ 255; Ex. 83, BNPP-KASHEF-00025838.

130.    Those oil trades relied on letters of credit: a guarantee from a bank that a seller will be paid upon receipt of goods. ECF No. 435-83, Koch Report at ¶¶ 120-24.

131.    Those letters of credit were issued by BNPP. ECF No. 435-83, Koch Report at ¶¶ 120-24.

132.    BNPP was the Regime's exclusive "oil bank," as a Sudanese official put it. Ex. 85, BNPP-KASHEF-00028707 at 28708; *see also* Ex. 62, BNPP-KASHEF-00013603 at 13604.

133.    BNPP played an exclusive role as chief trade financier of Sudan's oil industry. Ex. 85, BNPP-KASHEF-00028707 at 28711; Ex. 13, BNPP-KASHEF-00000034.

134.    BNPP was the Regime's only banker from the first barrel. Ex. 71, BNPP-KASHEF-00014451 at 14457.

135.    From the first barrel exported, every single oil export of the Regime was financed by letters of credit handled by BNPP. Ex. 97, BNPP-KASHEF-00038899 at 38905 ("From the first barrel exported, we have provided support in setting up oil L/Cs [letters of credit] and have benefited from housing the government's oil account on our books, and, as a result, all related L/Cs . . . . all L/Cs linked to crude oil exports from the country are opened by BNP Paribas and are also

housed on our books."); Ex. 71, BNPP-KASHEF-00014451 at 14457; Ex. 70, BNPP-KASHEF-00014325 at 14329.

136.    Even the small fraction of the Regime's oil exports priced in British pounds. was handled by BNPP. ECF No. 435-63, Fogarty Report at ¶ 263.

137.    BNPP also helped the Regime generate indirect tax revenue in the form of tariffs and duties from imports and exports—which BNPP's expert Enrico Carisch concedes related to oil. Ex. 153, Carisch Dep. at 275:17-276:13.

138.    All of the Regime's oil proceeds were concentrated in BNPP's hands. *See e.g.,* ECF No. 435-64, Fogarty Reply at ¶112 (itemizing various documents produced by BNPP establishing that it handled all of the Sudanese government's oil revenue); ECF No. 435-88, Patey Report at 7-8; ECF No. 435-93, Verhoeven Report at 36.

139.    All of the proceeds from the marketing of the Sudanese crude oil portion along with the Oil Products exports are paid to accounts on BNPP's books, through the Central Bank of Sudan and Sudapet. Ex. 62, BNPP-KASHEF-00013603 at 13605; ECF No. 435-64, Fogarty Reply at ¶ 107 (identifying Sudanese entities); Ex. 26, BNPP-KASHEF-00000210 (describing the "centralization of oil revenue at BNPP Geneva").

140.    BNPP Geneva housed the Bashir Regime's oil account, which received the "direct sales by Sudan of its share of crude oil from the oil field operations." Ex. 22, BNPP-KASHEF-00000177 at 178.

141.    BNPP also managed an escrow account for the PETRODAR oil consortium and distributed oil proceeds to its members, including the Regime. ECF No. 435-89, Patey Reply at 15; Ex. 76, BNPP-KASHEF-00015261 at 15262; Ex. 90, BNPP-KASHEF-00030053; *see also* Ex. 82, BNPP-KASHEF-00024869.

142.     BNPP had a central role in financing the Regime's oil revenue. ECF No. 435-54, Baldo Report at ¶ 85 ("Econ officer asked how the money from petroleum sales is received by the government. El Hassan said that money from the sales of oil are [sic]first deposited at the Central Bank of Sudan account at Bank Paribas in Geneva. From there, the money is transferred to the Bank headquarters in Khartoum. . .").

**4). Sudan's oil revenue.**

143.     BNPP viewed the oil revenue financed and transferred for the Regime as an "oil godsend" for Sudan. ECF No. 435-93, Verhoeven Report at 39, 42; Ex. 30, BNPP-KASHEF-00000885 at 889; ECF No. 435-64, Fogarty Reply at ¶ 128.

144.     The Regime's military was fully funded by oil and other foreign exchange revenue (e.g., gold and agricultural exports) and the taxes (e.g., rents, tariffs, duties) derived from oil and other imports and exports. Ex. 153, Carisch Dep. at 257:14-276:4; Ex. 175, 2008 POE Report, at ¶ 284 ("Sudan's revenues from oil, agricultural exports and regular taxations allows the State to fully fund its military presence in Darfur, its actions against the Darfur rebels and support for Chadian armed opposition groups.").

145.     The oil proceeds alone were sufficient to fully fund the Regime's military operations. ECF No. 435-53, Austin Reply at ¶¶ 3, 30; *see also* ECF No. 435-63, Fogarty Report at ¶ 130.

146.     Between 1999 and 2009, the $22.2 billion in oil revenue generated by the Regime exceeded the Regime's entire military budget of $15.1 billion by 46% on average. ECF No. 435-64, Fogarty Reply at ¶ 128; *see also* ECF No. 435-63, Fogarty Report at ¶ 260; ECF No. 435-88, Patey Report at 18; ECF No. 435-53, Austin Reply at ¶ 80; Ex. 153, Carisch Dep. at 257:14-258:8; Ex. 175, 2008 POE Report, at ¶ 284 (in 2007, Sudan's military budget was "about 3 percent" of Sudan's gross domestic product estimated at $80 billion, i.e., $2.4 billion).

147.    In 2006 alone, BNPP handled the "USD equivalent of $2.5 billion" in "oil proceeds." Ex. 22, BNPP-KASHEF-00000177 at 178.

## V. The Government of Sudan's campaigns of human rights violations.

### 1). The campaign of violations of the Bashir Regime.

#### a). Campaign of violations.

148.    Between 1997 and 2011, the Regime waged a campaign of mass atrocities to control oil and other resources, and impose a racist and extreme religious ideology of Arab supremacy over Black African, Christian, moderate Muslim populations, and social groups (civil society professionals) perceived by the military-Islamist Regime as opponents. Ex. 5, Jok Report at ¶ 26; *see also id.* ¶¶ 8, 29, 43, 97; ECF No. 435-54, Baldo Report at ¶¶ 108, 117-121, 130, 133, 136, 144, 160-63, 190-93; ECF No. 435-55, Baldo Reply at ¶¶ 54-60, 127-32; ECF No. 435-68, Hudson Report at ¶¶ 11, 24, ECF No. 435-93, Verhoeven Report at 17-18.

149.    Throughout Sudan, the Regime targeted segments of the civilian population deemed threats to the Regime's grip on power and its control over oil and other economic resources. Ex. 5, Jok Report at ¶¶ 8, 29, 43, 97; ECF No. 435-54, Baldo Report at ¶¶ 108, 117-121, 130, 133, 136, 144, 160-63, 190-93; ECF No. 435-55, Baldo Reply at ¶¶ 54-60, 127-32; ECF No. 435-68, Hudson Report at ¶¶ 11, 24, ECF No. 435-93, Verhoeven Report at 17-18.

150.    The Regime's campaign of persecution targeted disfavored racial groups (indigenous African populations including the Dinka, Nuer, Nuba, Fur, Masalit, and Zaghawa), religious groups (Christians and moderate Muslim), and social groups (civil society professionals) perceived by the Regime as enemies of the ruling Arab, Islamist elite in Khartoum. Ex. 5, Jok Report at ¶ 26. *See also id.* ¶¶ 8, 29, 43, 97; ECF No. 435-54, Baldo Report at ¶¶ 108, 117-121, 130, 133, 136, 144, 160-63, 190-93; ECF No. 435-55, Baldo Reply at ¶¶ 54-60, 127-32; ECF No. 435-68, Hudson Report at ¶¶ 11, 24, ECF No. 435-93, Verhoeven Report at 17-18.

151. This nationwide campaign of persecution was the Regime's "Two-Front Violence." Ex. 5, Jok Report at ¶¶ 25-26.

152. On one front, the Regime fought a civil war against rebel guerillas from the Southern People's Liberation Army ("SPLA") in the south and the Justice and Equality Movement ("JEM") and the Sudan Liberation Army ("SLA") in Darfur. Ex. 5, Jok Report at ¶ 25; ECF No. 435-54, Baldo Report at ¶ 12.

153. The Regime also targeted the unarmed civilian population seen as the support base for the SPLA. ECF No. 435-54, Baldo Report at ¶¶ 7-8; Ex. 5, Jok Report at ¶ 107; ECF No. 435-93, Verhoeven Report at 10-12.

154. On the second front, the Regime subjected "undesirable" civilians to "a counterinsurgency strategy of 'draining the sea to catch the fish'"—using its BNPP-funded military and security apparatus to terrorize, massacre, and displace the targeted "civilian population perceived to be the base of support for opposition movements." ECF No. 435-54, Baldo Report at ¶ 8.

155. The Regime declared a jihad (holy war) against the largely Christian Black African population of the south of Sudan. ECF No. 435-54, Baldo Report at ¶ 165.

156. The Regime sought to impose Arab supremacy over indigenous Black Africans, whose ancestral lands in the South and in parts of Darfur contained Sudan's most prized resource: oil. ECF No. 435-54, Baldo Report at ¶¶ 165, 174; ECF No. 435-93, Verhoeven Report at 10-11, 19-21; Ex. 5, Jok Report at ¶¶ 3-11; ECF No. 435-88, Patey Report at 8-9.

157. The targeting was animated by the Regime's ideology of Salafi Islamist extremism and racist Arab supremacism. Ex. 5, Jok Report at ¶¶ 3-6 (noting that the Regime's "extremist Salafi ideology" led it to "carr[y] out acts of extreme violence, harassment, and genocide against

non-Muslim and moderate Muslim communities for not enforcing a strict Islamic code."); id. ¶ 26 (noting the regime's "racist and extreme religious ideology").

158.    The Regime saw itself as a bulwark of the Arab elites against the indigenous Black African populations. ECF No. 435-54, Baldo Report at ¶¶ 103-04, 108-09; Ex. 5, Jok Report at ¶ 4.

159.    The Regime intentionally terrorized and decimated Black African ethnic groups on racial, religious, and ideological grounds. Ex. 5, Jok Report at ¶ 107 (summarizing evidence).

160.    President Bashir himself "suggested that non-Arabs should feel honored to be raped by his followers." Ex. 5, Jok Report at ¶ 9 (citing media reports on a speech given by al-Bashir).

161.    In addition to perceived or actual non-Muslims and Black Africans, Bashir also targeted civil society members who might oppose the Regime, subjecting "lawyers, journalists, medical doctors, university professors, other citizens from all walks of life, and student activists" to arbitrary detention, interrogation, and torture. ECF No. 435-54, Baldo Report at ¶ 19; *see also id.* ¶ 144 (the Regime targeted "[r]ights defenders and intellectuals who advocated for the entitlement of the Sudanese for the fundamental rights of freedoms of thought, conscious, and religio[n]").

162.    Sudanese Christians and those Muslims who supported secularism and religious freedom were considered enemies of the state and rebel sympathizers. ECF No. 435-54, Baldo Report at ¶ 146.

**b). Apparatus that conducted the campaign of violations.**

163.    The Regime's campaign was executed nationwide by an apparatus of military, security, and militia forces controlled and funded by the State. ECF No. 435-54, Baldo Report at ¶¶ 41, 79.

164.    The campaign was executed by a military-security apparatus composed of the Sudanese Armed Forces ("SAF"), the secret police force the National Intelligence and Security Service ("NISS"), and an array of paramilitary and militia forces mobilized by the Regime:

- the Central Reserve Force;
- Popular Defense Forces;
- Border Intelligence;
- the SPLA factions of Riek Machar and Kerubino Bol (a.k.a. the South Sudan Defense Forces); and
- the Arab tribal militias, colloquially referred to as Janjaweed, Murahalin, Mujahidin, and Baggara, which were institutionalized by the Regime.

*See* ECF No. 435-54, Baldo Report at ¶¶ 44-78, 165-68; ECF No. 435-93, Verhoeven Report at 9-11.

165.    The military-security apparatus operated under the supreme command and control of Omar al-Bashir, the President of the Republic, head of the National Islamic Front, and Commander in Chief of the Sudanese Armed Forces. ECF No. 435-54, Baldo Report at ¶ 42; *see also id.* at ¶¶ 43-46 (the NISS were under the command of the National Security Council, headed by al-Bashir).

166.    The military-security apparatus was coordinated by the National Security Council and organized under Sudanese law, which provided a legal framework for the mobilization of paramilitaries and militias. *See* ECF No. 435-54, Baldo Report at ¶¶ 7, 41-78 (referencing, *inter alia*, the Constitution of the Republic of Sudan, the National Security Force Act of 1999, the Popular Police Force Act of 1992, and the Popular Defense Forces Act of 1989); ECF No. 435-93, Verhoeven Report at 10.

167.    The Regime promulgated the Popular Defense Forces Act in November 1989, which provided the legal framework for mobilizing, arming, and funding militias as auxiliaries to

the SAF. *See* ECF No. 435-54, Baldo Report at ¶¶ 69-70; ECF No. 435-55, Baldo Reply at ¶¶ 40-41, 65.

168.    All of these forces operated through a chain of command, supply train, and payroll linking tribal horseman in Darfur, paramilitaries and rebel defectors in the South, interrogators in police stations, and SAF generals in Khartoum to the commander in chief, President Bashir, and the Central Bank of Sudan. ECF No. 435-54, Baldo Report at 10-21.

169.    The Regime military, security, and militia forces (such as the Janjaweed) were responsible for widespread and systematic atrocities in Sudan. ECF No. 435-55, Baldo Reply at ¶ 154; *see also id.* ¶ 86 (explaining that "the GOS maintained unchallenged military supremacy over armed groups," and the "[i]ndiscriminate aerial bombardment of civilian populations were the main cause of forced displacements in the war in South Sudan, Nuba Mountains, Blue Nile, and Darfur regions."); ECF No. 435-54, Baldo Report at ¶ 170 ("Unlike the Government, the SPLA and its allied militias did not pursue the same deliberate, organizational strategy of exterminating or displacing civilian populations as a war aim."); *id.* at ¶ 163 ("The duration, magnitude, and persecutory intent of the government's targeting of civilians distinguished state violence from the intermittent and more opportunistic abuses committed by the SPLA and splinter factions."); ECF No. 435-68, Hudson Report at ¶¶ 69-72 (noting that Human Rights Watch concluded that even the violence committed by rival factions was attributable to the GOS's divide and conquer strategy); *id.* ¶¶ 78-81 (noting that the scale of violence by rebel forces was dwarfed by the "many widespread and systematic abuses by the GOS and its militias") (internal quotation marks omitted); ECF No. 435-94, Verhoeven Reply at 35 ("[T]he overwhelming academic consensus and indeed that of most actors in the international community – including the ICC, the U.S. Government and U.S. Congress – was that one actor in particular bore the brunt of responsibility and was the driver of the great

majority of war crimes, crimes against humanity and genocidal violence: the Al-Ingaz regime which pursued its objectives through SAF, NISS and auxiliary forces such as the Janjaweed."); *id.* at 38 ("[D]uring Sudan's Second Civil War like during the genocidal violence in Darfur, there is only one side that had access to Antonov planes to bomb villages, that used helicopter gunships to ethnically cleanse the oil producing areas and that could run an ironfisted intelligence service that would arrest, torture and disappear thousands of its own citizens from urban centres and from rural zones."); ECF No. 435-53, Austin Reply at ¶¶ 24-26 ("Al-Bashir case records point to the reasonable grounds for believing that a core component of the genocide was conducted through GoS forces, including the Sudanese Armed Forces and their allied Janjaweed militia, the Sudanese Police Forces, the National Intelligence and Security Service (NISS) and the Humanitarian Aid Commission (HAC)."); Ex. 45, Jok Dep. at 102:9-17.

170.    The SPLA was not responsible for displacing civilians. Ex. 169, Deposition of Dr. Jok Madut Jok ("Jok Dep.") at 109:2-8.

**2). Direct link between revenue generated and campaign of human rights violations.**

**a). Intent to use Petrodollars on violations.**

171.    In the 1990s, the Regime stated its intention to develop a domestic arms industry. ECF No. 435-94, Verhoeven Reply at 29, n. 68 (quoting Agence France Presse, *Sudan to Manufacture Tanks, Missiles: Assembly Speaker*, Khartoum, April 30, 1999 (Hassan al-Turabi, ideological head of Bashir's ruling party, announced: "'We are currently building several factories to produce our needs in weapons, and we plan to manufacture tanks and missiles to defend ourselves against conspirators.'")).

172.    After 1997, the Regime leveraged the promise of future oil proceeds to launch a domestic arms industry and import arms from China and Iran. *See* ECF No. 435-93, Verhoeven

Report at 25-27; ECF No. 435-94, Verhoeven Reply at 29-30; ECF No. 435-63, Fogarty Report at ¶ 105; ECF No. 435-53, Austin Reply at ¶ 96; ECF No. 435-88, Patey Report at 8.

173.    The Regime intended to use the oil proceeds to conduct mass atrocities. ECF No. 435-68, Hudson Report at 23 (citing Ex. 252, Sudan Peace Act of 2002, Pub. L. 107-245, 116 STAT. 1505 ("The Government of Sudan has repeatedly stated that it intends to use the expected proceeds from future oil sales to increase the tempo and lethality of the war against the areas outside of its control" and directing the President to "take all necessary and appropriate steps . . . to deny the Government of Sudan access to oil revenues to ensure that the Government of Sudan neither directly nor indirectly utilizes any oil revenues to purchase or acquire military equipment or to finance any military activities.")).

174.    The Regime's oil revenues were used for the Regime's expenditures. ECF No. 435-64, Fogarty Reply at ¶¶ 120-33 (discussing that the money the GOS received by way of the BNPP conspiracy "represents fungible monies available to fund military expenditures").

175.    The Regime's expenditures were dominated by spending on the military, national security services, and militias. ECF No. 435-63, Fogarty Report at ¶ 266 (referencing the U.S. Dept of State, Sudan Peace Act Report, April 21, 2003 (the "Government of Sudan states that oil revenues are placed in the central bank and pooled with other revenue sources, and used for general government expenditures.")); ECF No. 435-54, Baldo Report at ¶ 86 & n.60 (In 2007, the U.S. embassy in Khartoum reported to Washington that Sudan's "budget allocate[d] substantial revenue to military and security expenditures, leaving relatively small amounts available for development, health and education."); *see also* ECF No. 435-53, Austin Reply at ¶¶ 98-105; ECF No. 435-93, Verhoeven Report at 26-28.

176.    Congress recognized a nexus between Sudan's oil revenue and human rights abuses: the Regime waged a war on civilians in order to secure oil revenue to finance further atrocities. ECF No. 435-68, Hudson Report at ¶¶ 79-80 (citing Sudan Peace Act, Statement of Representative Bachus, 107 Cong. Rec. H7102 (Daily ed. Oct. 7, 2002) at H7108 ("for the first time, there will be a link made officially between the genocide and the slaughter in Sudan and oil money.")).

**b). Purchase of arms.**

177.    From 1997 to 2011, the Regime imported more than $100 million in small arms, light weapons, and ammunition. ECF No. 435-53, Austin Reply at ¶ 99.

178.    Petrodollars were critical to this expansion. Ex. 30, BNPP-KASHEF-00000885 at 896; ECF No. 435-53, Austin Reply at ¶ 190-91 ("[o]ver the last decade, Sudan has significantly increased its ability to produce its own light weapons and ammunition.").

179.    BNPP's conspiracy with the Regime funded a 3,000% increase in military expenditures—from $97.7 million in 1997, the year the U.S. embargo began, to over $3.1 billion in 2009. ECF No. 435-53, Austin Reply at ¶ 96.

180.    From 1999-2009, the Regime's revenues from oil exports, financed and transferred by BNPP, were on average 146% of military expenditures, exceeding them by over $4.4 billion. ECF No. 435-63, Hudson Report ¶ 270.

181.    The Regime bought weapons from arms traders in cash, deals often involving millions of U.S. dollars. *See* Ex. 153, Carisch Dep. at 58:8-59:16.

182.    The Regime imported dozens of attack helicopters and combat aircraft; dozens of tanks and armored-personnel carriers; hundreds of military trucks; fleets of Land Rovers and Land Cruisers used for desert combat; and Antonov cargo planes used to drop barrel bombs on villages, hospitals, schools, and other civilian areas. *See e.g.,* ECF No. 435-53, Austin Reply at ¶¶ 99-102,

114-117, 121; ECF No. 435-93, Verhoeven Report at 26; ECF No. 435-63, Fogarty Report at ¶ 110; ECF No. 435-68, Hudson Report at ¶¶ 87-88.

183.    Military size is a valid and reliable metric of the institutionalized coercive force used by dictators to consolidate their authority. Ex. 155, Deposition of Victor Menaldo at 22:21-23:2.

### 3). Violations committed by the Regime.

### a). Ethnic cleansing of non-Arab populations from oil regions.

184.    After 1997, oil became the cause of, and main objective of, an intensification in the Bashir Regime's assault on civilians. ECF No. 435-54, Baldo Report at ¶ 174.

185.    The intensity and frequency of attacks against civilians dramatically increased after 1997 as the Regime sought to exploit the oil wells and to exert full control over the oil regions. Ex. 151, Deposition of Suliman Baldo ("Baldo Dep.") at 198:23-199:5.

186.    The prospect of oil flowing to the central government of Khartoum lead to an increase in the indiscriminate targeting of civilians in these regions. Ex. 151, Baldo Dep. at 198:23-199:5.

187.    The Regime used the new helicopter gunships, Antonov planes, and other weapon systems to rapidly expand its military operations in the South directed at forcibly clearing and possessing oil regions and then garrisoning them with Regime troops. Ex. 52 to Decl. of Charity E. Lee, ECF No. 435-52, Expert Report of Kathi Austin ("Austin Report") ¶ 269, dated September 30, 2022; ECF No. 435-54, Baldo Report at ¶ 161 (describing the Regime's "depopulation strategy" in southern Sudan).

188.    Controlling the south, central, and west of Sudan meant controlling the bulk of the oil reserves, which straddled the north-south border in Abyei, Unity State, South Kordofan, and Darfur. ECF No. 435-88, Patey Report at 8-9.

189.    Taking off after 1997, the campaign was executed nationwide by the repressive apparatus of military, security and militia forces controlled and funded by the State. ECF No. 435-54, Baldo Report at ¶¶ 41, 79.

190.    The Regime pursued a strategy of depopulating the oil regions of undesirable ethnic groups by mobilizing Arab tribal militia and SPLA splinter groups backed by SAF ground and air forces (including aerial bombing, and helicopter gunships). ECF No. 435-54, Baldo Report at ¶¶ 161, 175-79.

191.    These attacks escalated as Sudan continued to develop its oil infrastructure. *See, e.g.*, ECF No. 435-63, Fogarty Report at ¶ 110 (by 1999, the population of Ruweng County, located in an oil-producing region's population had decreased by 50%), ¶ 113 (the discovery of additional reserves in 1999 lead "to a significant escalation of conflict and displacement of populations from prospective oil fiends as the government doubled down on its efforts to control and improve oil production"), ¶¶ 114-116 (citing reports concerning human rights violations connected to oil development); ECF No. 435-68, Hudson Report at ¶ 63 (citing the United States 1998 US Annual Human Rights report, which notes that the Sudanese "government or government-associated forces" destroying villages and driving out inhabitants in oil-producing regions), *id.* at ¶¶ 64-69 (summarizing reports from non-government organizations concerning human rights abuses related to oil development in Sudan); ECF No. 435-54, Baldo Report at ¶ 166-68 (describing the Regime's "divide and conquer strategy" stoking violence in oil-producing regions), ¶ 183 (describing "waves of well-documented campaigns" designed "to depopulate the oil blocks"); *see also id.* ¶¶ 171-185 (setting forth an overview of these campaigns).

192.    In May 1999, Sudan's Energy and Mining Minister Dr. Awad al-Jaz oversaw the deployment of the paramilitary 'Protectors of the Oil Brigade' to the oil fields. ECF No. 435-54, Baldo Report at ¶ 175.

193.    Sudan's Energy and Mining Minister Dr. Awad al-Jaz was one of BNPP's personal collaborators in the Regime. Ex. 43, BNPP-KASHEF-00005435 (recounting meeting with Minister of Energy in Khartoum).

194.    The Regime's scorched earth campaign in the oil region drew worldwide condemnation. ECF No. 435-54, Baldo Report at ¶ 179.

195.    By 2002, an estimated 174,200 people had been displaced from oil regions in Abyei and South Sudan. ECF No. 435-54, Baldo Report at ¶ 183.

196.    The resulting flow of internally displaced persons created yet further increases in violence, including in and around the "pockets of shanty camps" near Khartoum in which many displaced persons lived. ECF No. 435-54, Baldo Report at ¶ 183.

197.    The Regime subjected these disfavored populations to a systematic persecution. ECF No. 435-54, Baldo Report at ¶ 183.

198.    Similarly, the Regime used the new resources and funding made available to it through its criminal conspiracy with BNPP to expand its campaign of mass atrocities geographically to Darfur in western Sudan. Ex. 151, Baldo Dep. at 194:22-196:19 (the Regime lacked the ability to conduct a multi-front war prior to 1997); ECF No. 435-93, Verhoeven Report at 25-27 (explaining that the Regime's military spending doubled to support the war in Darfur).

199.    The Regime increased the "tempo" of atrocities in this period, reaching 10,000 killings a month in Darfur, a "tempo of violence that exceeded the tempo of violence that we saw

over a longer period of time in South Sudan." Ex. 152, Deposition of Cameron Hudson ("Hudson Dep.") at 163:6-25.

200.    The Regime conducted more than 1,800 documented aerial bombing attacks on civilian targets between 1999 and 2012. ECF No. 435-54, Baldo Report at ¶¶ 179-180.

**b). Torture in "Ghost Houses."**

201.    A centerpiece of the Regime's genocidal campaign was its secret police force, the NISS. Ex. 153, Carisch Dep. at 308:13-310:1 (The NISS is the "single entity on which to pin responsibility for the decade-long mayhem in the Sudan . . . ."); ECF No. 435-59, Declaration of Nima Elbagir ("Elbagir Decl.") at ¶ 16 ("NISS was the key apparatus of repression in Khartoum.").

202.    Between 1997 and 2009, NISS practiced a policy of extrajudicially arresting civilians on suspicion that they were sympathetic to opposition groups. Ex. 5, Jok Report at ¶ 47.

203.    NISS employed a common *modus operandi*: abducting civilians, often at night, and taking detainees to secretive detention centers, often inside army barracks, security offices, and special houses. Ex. 5, Jok Report at ¶ 47.

204.    These centers were called "ghost houses" because they produced humans who are but ghosts of their former selves. Ex. 5, Jok Report at ¶ 48.

205.    NISS agents would interrogate detainees and subject them to brutal torture, often employing sexual violence and rape against women and men. ECF No. 435-54, Baldo Report at ¶¶ 108-39; Ex. 5, Jok Report at ¶¶ 46-76.

**c).  Genocide in Darfur.**

206.    In 2002, as the Regime engaged in U.S.-brokered peace talks with the southern rebels, a new rebellion emerged in Darfur. ECF No. 435-54, Baldo Report at ¶ 12.

207.    In or around May 2003, the Regime's National Security Council issued an emergency plan that formed the basis for the Government to launch its counterinsurgency

campaign, calling for the use of Arab tribes to target members of the non-Arab tribes that were accused of supporting the rebellion, as well as residential areas where rebels were believed to be hiding. ECF No. 435-55, Baldo Reply at ¶ 57 (quoting Ex. 15, *Prosecutor v. Ali Kushayb*, Prosecutor's Trial Brief of 4 February 2022, Case No. 02/05-01/20, ICC Trial Chamber I, ¶ 57, https://www.icc-cpi.int/sites/default/files/CourtRecords/0902ebd1801f86f5.pdf).

208.    The Regime mobilized, armed, and funded Arab tribal militia—called *Janjaweed* by the Black African populations—in concert with SAF ground troops, the air force, and other paramilitaries. ECF No. 435-68, Hudson Report at ¶¶ 110-121; ECF No. 435-54, Baldo Report at ¶¶ 73, 193; Ex. 5, Jok Report at ¶¶ 27-41.

209.    The National Security Council passed instructions from the central government, including in particular the Ministry of the Interior, Ministry of Defense and the NISS, to local civilian and military officials through the Darfur Security Committee. ECF No. 435-55, Baldo Reply at ¶ 55 (quoting *Prosecutor v. Ali Kushayb*, Prosecutor's Trial Brief of 4 February 2022, Case No. 02/05-01/20, ICC Trial Chamber I, ¶ 56, https://www.icc-cpi.int/sites/default/files/CourtRecords/0902ebd1801f86f5.pdf); *see also* ECF No. 435-54, Baldo Report at ¶ 73 n.46; ECF No. 435-55, Baldo Reply at ¶¶ 61-62.

210.    The Janjaweed were deployed as an auxiliary government force. ECF No. 435-68, Hudson Report at ¶ 102 ("When the Sudanese Armed Forces was unable to defeat the SLA following the April 2003 attack on El Fasher, the GOS engaged a proxy force of Arab militia which, because they ride horses and camels, are known as the jinjaweed. While the air force has bombed towns, the jinjaweed, working in concert with the army, have continued on the rampage."); ECF No. 435-55, Baldo Reply at ¶ 48.

211.    Regime officials—including the head of NISS—publicly admitted to mobilizing the Janjaweed. ECF No. 435-54, Baldo Report at ¶ 73.

212.    The mass killing and displacement was not the product of random acts of banditry, as the Government of Sudan portrayed them in communications with U.S. officials. ECF No. 435-68, Hudson Report at ¶ 113.

213.    The attacks on African villages in Darfur were widespread and systematic, following patterns indicating that they were organized by design and reflecting a racially motivated intent to destroy and displace. ECF No. 435-68, Hudson Report at ¶ 113.

214.    Hundreds of villages were destroyed by government forces using a consistent *modus operandi*: in a typical attack, Janjaweed mounted on horseback or Toyota land-cruisers fitted with machine guns would raid Fur, Masalit, or Zaghawa villages, often supported by SAF infantry in armored vehicles and military trucks. ECF No. 435-68, Hudson Report at ¶ 95.

215.    Mortality estimates by U.S. government agencies and contractors ranged from 98,000 to 400,000 killed, in addition to 1.8 million internally displaced persons and 200,000 refugees. ECF No. 435-68, Hudson Report at ¶¶ 103, 116.

216.    The military, security, and militia forces who subjected the Plaintiffs to abuse are state actors. ECF No. 435-55, Baldo Reply at ¶ 36; ECF No. 435-59, Elbagir Decl. at ¶ 26 (in 2004, Musa Hilal, a Janjaweed leader, told the journalist Nima Elbagir that he "answered my government's call" and organized Arab tribal militia under the "*defaa al-shabi"*—the legal framework for pro-government militias).

217.    The GOS/Janjaweed were entirely responsible for the forced displacement of civilians in Darfur. ECF No. 435-55, Baldo Reply at ¶¶ 118-22, 154, 160-65.

218.    Internally displaced persons have overwhelmingly alleged that the Government of the Sudan security forces and the Janjaweed commit the majority of violations. ECF No. 435-55, Baldo Reply at ¶ 49.

219.    There is no evidence that non-government-affiliated rebels were engaging in mass violence against civilians, much less the displacement and destruction of the rebels' own Black African communities. *See generally* ECF No. 435-55, Baldo Reply at ¶¶ 66-195; ECF No. 435-55, Baldo Reply at ¶¶ 118-22, 154, 160-65 (a 2005 report by the UN Commission of Inquiry on Darfur found no cases of rape by rebels, found no information indicating the use of torture by rebels, found no evidence that abduction by rebels was widespread or systematic, and found that incidents of rebels killing civilians have been few).

220.    There is no record evidence that a single Sudanese refugee or asylee admitted to the United States, who was displaced from Sudan during the class period, did not suffer or fear persecution by the Regime.

221.    There is no record evidence that any entity other than the Regime and its apparatus engaged in a systematic campaign of persecution against civilian populations, maintained a police state network of torture centers, or conducted aerial bombardment of civilian areas.

**VI. BNPP and the Government of Sudan's Co-Conspirators.**

**1). BNPP directly supported the Regime's military-security apparatus.**

222.    BNPP's Sudanese clients were intimately linked through their boards and financial structure with various Regime apparatuses. ECF No. 435-93, Verhoeven Report at 48-50.

223.    Members of Sudan's secret police, the NISS, took the helm of all major Sudanese companies. Ex. 153, Carisch Dep. at 310:4-9; Ex. 149, Enrico Carisch, UN Sanctions, Peace and the Private Sector, 6 JOURNAL OF INT'L PEACE OPERATIONS 17-18 (2010); ECF No. 435-54, Baldo Report at ¶ 5 ("NISS also exercised significant control over the economy by dominating

private industry, whether by outright beneficial ownership or control of financial institutions and businesses, or informal patronage and corruption. Military leaders were simultaneously involved in the private economic sector.").

224.    Members of Sudan's secret police, the NISS, were affiliated with dozens of the largest public corporations in Sudan: most of the major national banks; the Sudan National Petroleum Corporation, which controls the state's entire oil and gas industry; and the automotive conglomerate, GIAD. Ex. 153, Carisch Dep. at 309:14-312:19; Ex. 149, Enrico Carisch, UN Sanctions, Peace and the Private Sector, 6 JOURNAL OF INT'L PEACE OPERATIONS 17 (2010). *Id.* at 17-18.

225.    The Central Bank of Sudan was led by top ranked figures within the National Islamic Front, such as Sabir Mohammad Hassan. ECF No. 435-88, Patey Report at 5.

226.    Even putatively civilian clients were part of the Regime's military-industrial complex. Ex. 126, Cozine Dep. at 243:14-244:2 ("within [Sudan] there was a lack of true distinction between something that may be considered civilian and something that may be considered military.").

227.    BNPP had dealings with Sudan's Ministry of Defense and Omdurman National Bank. Ex. 33, BNPP-KASHEF-00003542; ECF No. 435-54, Baldo Report at ¶¶ 85, 88; ECF No. 435-53, Austin Reply at ¶¶ 3, 175; ECF No. 435-69, Expert Reply Report of Cameron Hudson ("Hudson Reply") ¶ 115; ECF No. 435-93, Verhoeven Report at 46-47.

228.    Omdurman National Bank is the "army's bank." ECF No. 435-54, Baldo Report at ¶ 88 & n. 70.

229.    Many of the major Sudanese banks that had accounts at BNPP were public companies or had, as main shareholders, Sudanese government departments. Ex. 92, BNPP-KASHEF-00030230.

## 2). BNPP directly financed Regime military operations, equipment, and procurement networks used against civilians.

### a). Military Attaches.

230.    BNPP extended at least one credit facility to Sudan's Ministry of Defense. ECF No. 435-53, Austin Reply at ¶ 176; Ex. 33, BNPP-KASHEF-00003542.

231.    BNPP has not identified (i) the total amount or total period of credit extended to the Ministry of Defense; (ii) the ostensible purpose and true nature of the underlying transactions; or (iii) what if any screening procedures were undertaken, and by whom, to ensure that the credit was not being used to fund military-related activities.

232.    BNPP transferred non-commercial payments from Sudan's Ministry of Defense to military attachés in China, Egypt, Pakistan, and Russia. Ex. 87, BNPP-KASHEF-00029502 at 29510.

233.    China, Egypt, Pakistan, and Russia are four of Sudan's main arms suppliers and military attachés that are typically used for illicit arms transfers. ECF No. 435-53, Austin Reply at ¶ 177.

234.    BNPP has not identified (i) the total amount or total value of transactions processed by BNPP involving Sudan's Ministry of Defense and military attaches; (ii) the ostensible purpose and true nature of the underlying transactions; or (iii) what if any screening procedures were undertaken, and by whom, to ensure that the transactions did not involve military-related activities.

235.    A military attaché is commonly considered a member of a country's armed forces. ECF No. 435-53, Austin Reply at ¶ 177.

236.     It is also very likely that prior to 2006 BNPP facilitated payments relating to arms procurement and other military activities through Sudan's military attachés. ECF No. 435-53, Austin Reply at ¶¶ 181-82; Ex. 22, BNPP-KASHEF-00000177 at 188.

**b). Sudan's Civil Aviation Administration.**

237.     BNPP provided support to Sudan's air force through the Civil Aviation Authority ("CAA"). ECF No. 435-53, Austin Reply at ¶¶ 160-163.

238.     Sudan's CAA was under the command of the Ministry of Defense. Ex. 153, Carisch Dep. at 225:21-226:10; ECF No. 435-54, Baldo Report at ¶ 56.

239.     Sudan's CAA was sanctioned by the U.S. government. ECF No. 435-53, Austin Reply at ¶ 164.

240.     Beginning in 2001, the CAA was fully funded by overflight fees collected and transferred by BNPP. ECF No. 435-53, Austin Reply at ¶ 159; Ex. 105, BNPP-KASHEF-00048093 at 48099.

241.     In 2005 and 2006, BNPP Paris and BNPP Geneva jointly extended a $25 million credit facility to CAA for the purported purchase of civil aviation equipment and infrastructure. ECF No. 435-53, Austin Reply at ¶ 162; ECF No. 435-93, Verhoeven Report at 45; Ex. 126, Cozine Dep., Exhibit 253.

242.     The fees BNPP channeled to the CAA funded the infrastructure for Sudan's airbases. ECF No. 435-54, Baldo Report at ¶ 87.

243.     The SAF's air force, including its combat and transport arms, relied on civilian aviation infrastructure. ECF No. 435-54, Baldo Report at ¶ 55.

244.     At civilian airports, SAF personnel sometimes conveyed aircraft bombs to SAF Antonov aircraft using ordinary airport luggage trolleys. Ex. 153, Carisch Dep. at 71:23-72:12,

171,7-23,  224:14-226:10;  Ex.  250,  UNSC  Panel  of  Experts  Report  (2011),  ¶¶  165-67,

https://www.icc-cpi.int/sites/default/files/RelatedRecords/CR2012_07641.PDF.

245.    The CAA managed the airports used by the Sudanese air force to launch aerial

attacks on civilian populations. Ex. 153, Carisch Dep. at 225:21-226:10; ECF No. 435-54, Baldo

Report at ¶ 56.

246.    The principal SAF airbase was at Khartoum International Airport, with another

major base north of Khartoum in Wadi Sayyidna. ECF No. 435-54, Baldo Report at ¶ 55.

247.    The air force also maintained air bases at regional civilian airports, including in El

Fasher in Darfur and Juba in Southern Sudan, and Nyala Air base in South Darfur and Heglig

Airbase in the oil producing region. ECF No. 435-54, Baldo Report at ¶ 55.

248.    The Bashir Regime used these air bases to bomb Sudan's disfavored civilian

populations into submission, exile, or extermination. "A standard practice was to roll crude barrel

bombs—barrels packed with shrapnel and explosives—from the cargo hatches of Antonov-26 and

Antonov-32 cargo planes." ECF No. 435-54, Baldo Report at ¶ 60.

**c). GIAD.**

249.    At the height of the Darfur genocide, from 2004 until at least December 2008,

BNPP financed the import of armored truck components to Sudan's leading manufacturer of

armored vehicles: the GIAD conglomerate. ECF No. 435-53, Austin Reply at ¶¶ 136-48; ECF No.

435-54, Baldo Report at ¶ 87; ECF No. 435-69, Hudson Reply at ¶¶ 113-114; ECF No. 435-93,

Verhoeven Report at 53.

250.    GIAD was called the "crown jewel of the Defense Industries System" by U.S.

Senator Chris Coons. ECF No. 435-54, Baldo Report at ¶ 87; ECF No. 435-53, Austin Reply at ¶

136.

251.    GIAD served as the armored vehicle assembly unit for the Sudanese Ministry of Defense. ECF No. 435-53, Austin Reply at ¶ 138.

252.    GIAD was sanctioned by the U.S. government. ECF No. 435-53, Austin Reply at ¶ 138.

253.    Between 2004 and 2008, BNPP Paris extended U.S. dollar, revolving lines of credit to finance transactions between French company Renault Trucks (also known as "Renault VI") and GIAD and between other various unidentified entities and GIAD. ECF No. 435-53, Austin Reply at ¶ 139; see, e.g., Ex. 81, BNPP-KASHEF-00024439 at 24439-40.

254.    The credit limits exceeded $16 million USD for Renault's transactions with GIAD and $9 million USD for transactions between GIAD and "various" entities that BNPP has not identified. Ex. 64, BNPP Defendants' Responses and Objections to Plaintiffs' Requests for Admission No. 222, at 180-81; Ex. 84, BNPP-KASHEF-00027592; Ex. 35, BNPP-KASHEF-00003882 (indicate some $9 million USD in additional credit to unidentified beneficiaries with GIAD as the counterparty).

255.    The credit extended by BNPP to Renault was intended to facilitate Renault's transactions with GIAD and ensure that Renault would be paid for its products. Ex. 124, Deposition of Philippe Maillard ("Maillard Dep.") at 149:10-20 ("Q. And that commitment of more than $10 million was to facilitate the transaction between GIAD and Renault Trucks? A. This commitment was probably a guarantee issued in favor of Renault Trucks to insure that Renault Trucks would be paid. Q. For? A. Most likely for selling the product or supplying GIAD with products.") (objections omitted).

256.    GIAD acquired from Renault armored vehicle kits—including Renault Midlum 4x4s—imported and assembled by GIAD, fitted with heavy weapons, and used by military and

militia forces in ground assaults on the targeted civilian populations. ECF No. 435-52, Austin Report at ¶ 130, 142; *see also* Ex. 175, UNSC Panel of Experts Report (2008); Ex. 174, UNSC Panel of Experts Report (2009); ECF No. 435-52, Austin Report at ¶ 130, 142; *see also* ECF No. 435-93, Verhoeven Report at 53 ("GIAD manufactured Sudan's first domestic tank – the Bashir – and plenty of other lethal kit.").

257.    Janjaweed forces used GIAD-assembled and branded models of Renault Midlum 4x4s equipped with artillery. ECF No. 435-59, Elbagir Decl. at ¶¶ 31-33.

258.    The weapons and vehicles in the Janjaweed's possession had been supplied by the Regime. ECF No. 435-59, Elbagir Decl. at ¶ 57 ("Of course, the government gave them to us.").

259.    GIAD trucks were employed by the Sudanese Armed Forces (the "SAF"). ECF No. 435-52, Austin Report at ¶ 142; Ex. 174, UNSC Panel of Experts Report (2009), ¶¶ 168-70.

260.    BNPP knew or should have known that GIAD was a military entity.  ECF No. 435-53, Austin Reply at ¶ 147 (explaining that GIAD's 2005 Annual Report disclosed that it was partly owned by the "Military Industrial Corporation" and in March 2005, Jane's Defence Weekly—a popular defense industry journal—reported that GIAD was assembling imported trucks for Sudan's Ministry of Defense for military purposes).

261.    In May 2007, the U.S. Treasury Department added GIAD to the SDN list, announcing that it had "supplied armored vehicles to the Sudanese government for military operations in Darfur." Ex. 95, BNPP-KASHEF-00031982 at 31993.

262.    BNPP had the U.S. Treasury Department's announcement on file. Ex. 95, BNPP-KASHEF-00031982.

263.    BNPP has produced no evidence to show that it cut off the GIAD credit line before it expired in December 2008.

264.    BNPP has not identified (i) the total number of credit facilities involving GIAD, (ii) the total credit limit of all such facilities, (iii) the ostensible purpose and true nature of the underlying transactions, (iii) the total number and value of all transactions processed by BNPP involving GIAD, or (iv) what if any screening procedures were undertaken, and by whom, to ensure that the transactions did not involve military-related activities.

### 3). BNPP's screening for military links.

265.    BNPP claims it had a policy of screening out transactions involving military or dual-use goods. Ex. 66 to Decl. of Charity E. Lee, ECF No. 435-66, Expert Report of Antoine Gaudemet at ¶¶ 22, 116, 162 ("Gaudemet Report"), dated January 6, 2023; Ex. 6, Koch Reply at ¶¶ 65-66.

266.    BNPP was required, under the UN Security Council, the European Union, French and Swiss arms embargo, to screen out and reject military-related transactions. Ex. 6, Koch Reply at ¶ 65, n. 91; ECF No. 435-83, Koch Report at ¶ 255 ("UN Security Council Resolution 1556 imposed an arms embargo on the Darfur region of Sudan, prohibiting 'the sale or supply' of 'arms and related materiel of all types, including weapons and ammunition, military vehicles and equipment, paramilitary equipment, and spare parts for the aforementioned' to the Janjaweed and other nongovernmental actors."); ECF No. 435-68, Hudson Report at ¶ 209 & n. 208 (noting that a copy of the UN Security Council's Resolution 1591 of 2005 that imposed an arms embargo on Sudan was circulated internally at BNPP).

267.    In 2004, instructions from BNPP's Head Office in Paris indicate that Sudanese military and arms-related transactions under 50 million Euros were not subject to any compliance procedures. Ex. 52, BNPP-KASHEF-00009794 ("[W]e need to call a TAC only for military equipment export finance transactions related to weapons or military equipment exported to

sensitive or very sensitive countries for amounts which represent, for the Bank, a final take for more than EUR 50 million. Otherwise, no problem.").

268.    It was only in 2006 that BNPP promulgated a policy to "steer clear" of "anything that can in any way be used or converted for military use." Ex. 65, BNPP-KASHEF-00013989 at 13991; Ex. 6, Koch Reply at ¶¶ 65-66.

269.    There is no record evidence that BNPP actually complied with that policy. Ex. 6, Koch Reply at ¶¶ 65-66; ECF No. 435-83, Koch Report at ¶¶ 256-57; Ex. 126, Cozine Dep. at 161:5-162:7, 258:9-259:18 (BNPP's 30(b)(6) witness was unable to describe any details of that screening process, or any employees who had the requisite screening skills, or identify any relevant documentation); ECF No. 435-53, Austin Reply at ¶ 174 ("BNPP's screening procedures—to the extent they existed—were porous, permissive, and poorly understood."); Ex. 22, BNPP-KASHEF-00000177 at 188 ("In my opinion, the theoretical controls on the underlying [transactions] are almost too rigorous in Geneva, but on the other hand, Compliance Geneva has serious doubts about their application by GC8 [ECEP's Sudan desk].").

270.    BNPP's screening procedures to detect military-linked transactions were "all too often merely a formality, or not really done at all." Ex. 22, BNPP-KASHEF-00000177 at 188; Ex. 89, BNPP-KASHEF-00029233 at 29233 ("there are no qualms about financing military-related equipment").

271.    There is no record evidence that any BNPP employees actually followed any policies or procedures ensuring that BNPP avoid financing arms. Ex. 6, Koch Reply at ¶¶ 65-66.

272.    There is no record evidence that BNPP put controls in place to prevent, detect, and report any financing of military (or dual use) equipment that could have been violative of the arms embargo. Ex. 6, Koch Reply at ¶ 67.

**4). BNPP's willful blindness.**

273.     There were serious deficiencies in BNPP's compliance practices. ECF No. 435-83, Koch Report at ¶¶ 258-62 ("[T]he bank had no due diligence procedures in place before it developed its KYC [Know Your Customer] review for banks in 2002" and its "post-2002 due diligence procedures consisted largely of 'putting the fox in charge of the hen house.'"); Ex. 21, BNPP-KASHEF-00000171.

274.     BNPP unreasonably relied on the Central Bank of Sudan and other Sudanese, Middle Eastern, and Chinese banks to perform Know Your Customer due diligence and screen out military links. ECF No. 435-83, Koch Report at ¶¶ 259-62.

275.     It did so even though BNPP knew that even if Sudanese anti-money laundering and anti-terrorist financing  banking regulations exist on paper, their "[c]ompliance mechanism must be weak if not non-existent." Ex. 39, BNPP-KASHEF-00005144 at 5144.

276.     BNPP also knew that "cover movements and payment orders carried out between a Sudanese bank and its correspondents cannot give rise to any knowledge of the underlying transactions." Ex. 41, BNPP-KASHEF-00005327.

277.     Compliance in Paris knew that documentation for the Sudanese banks was "scarce and not reliable" and the "final content of the compliance files for each of these [Sudanese] banks [was] not satisfactory." Ex. 40, BNPP-KASHEF-00005280 at 5281.

278.     BNPP had no procedures in place to determine what the Regime was doing with the money BNPP laundered through New York. Ex. 126, Cozine Dep. at 135:145:13, 174:20-176:23.

**VII. BNPP knew of the Regime's human rights violations in Sudan.**

**1).  BNPP knew it was contributing to the Regime's human rights violations in Sudan.**

**a). BNPP knew of the Regime's atrocities in Sudan.**

279.    BNPP, including members of BNPP's General Management like ████████ ████ (former Group Head of Compliance); ████████████ (former Global Head of ECEP), ████████ (former Chief Executive Officer); ████████ (former Head of Corporate and Investment Bank); and ████████████ (former Group Chief Operating Officer) had ample access to information about the Regime's human rights abuses in Sudan. ECF No. 435-83, Koch Report at ¶¶ 207-08; Ex. 74, BNPP-KASHEF-00014655.

280.    BNPP was on notice of the Regime's human rights violations being committed in Sudan as early as 1997, from the U.S. sanctions themselves. Ex. 68, BNPP-KASHEF-00014129 at 14132; Ex. 126, Cozine Dep. at 214:15-23 (confirming that "this article was in the possession at that time of the predecessor to BNP Geneva Suisse"); ECF No. 435-68, Hudson Report at ¶ 208; *see, e.g.*, Ex. 54, BNPP-KASHEF-00011365 at 11373 (OFAC bulletin in BNPP Paris files confirms that the U.S. sanctions were put in place due to the "policies and actions of the Government of Sudan, including . . . the prevalence of human rights violations, including slavery and the denial of religious freedom[.]"); Ex. 50, BNPP-KASHEF-00007994 (OFAC bulletin in BNPP NY files).

281.    BNPP knew the Sudanese banks with which it dealt played a pivotal part in the support of the Sudanese Government. ECF No. 435-1, SSOF at ¶ 20; Ex. 9, BNPP-KASHEF-00000007 at 13.

282.    BNPP's leadership knew about "the growing opprobrium that a large part of the international community is casting on the behavior of the country's authorities." Ex. 74, BNPP-KASHEF-00014655 at 14656.

283.    A September 2006 memorandum to BNPP Paris executives including the CEO, COO, and Head of Group Compliance warned about the "worrying developments of the last few weeks and the humanitarian risks that are reported daily in the international press." Ex. 74, BNPP-KASHEF-00014655 at 14656.

**b). BNPP could not ignore the Regime's atrocities in Darfur.**

284.    The Second Circuit took judicial notice that the "atrocities . . . in Sudan are widely known and have been condemned by both the United States and the international community as genocide." *Kashef v. BNP Paribas S.A.*, 925 F.3d 55 (2d Cir. 2019) (citing H.R. Con. Res. 467, 108th Cong. (2004) (enacted); S. Con. Res. 133, 108th Cong. (2004) (enacted)).

285.    In the Sudan Peace Act of 2002, Congress determined that the Regime's campaign of atrocities in southern Sudan "constitute[d] genocide as defined by the Convention on the Prevention and Punishment of the Crime of Genocide." Ex. 252, Sudan Peace Act of 2002, Pub. L. No. 107-245, 116 Stat. 1503 (Oct. 21, 2002) at § 2(10).

286.    In July 2004, the Save Darfur campaign was launched by Holocaust survivor and Nobel Laureate Elie Wiesel, the U.S. Holocaust Memorial Museum, and American Jewish World Service. *See* Ex. 153, Carisch Dep. at 341:22-342:9.

287.    On September 9, 2004, Secretary of State Colin Powell formally designated the atrocities in Darfur a genocide under Article VIII of the Genocide Convention: "genocide has been committed in Darfur and . . . the Government of Sudan and the Jingaweit bear responsibility." ECF No. 435-69, Hudson Reply at ¶ 136 (citing the U.S. Department of State, The Crisis in Darfur Testimony Before the Senate Foreign Relations Committee by Secretary Colin L. Powell, Sept. 9, 2004, https://2001-2009.state.gov/secretary/former/powell/remarks/36042.html).

288.    On April 27, 2007, the International Criminal Court issued an arrest warrant for Sudan's Minister of State for the Interior, Ahmed Harun, charging him with crimes against

humanity and war crimes for "recruiting, arming, and funding" the "Militia/Janjaweed in Darfur" and engaging in a "common plan" to commit "murders of civilians, rapes and outrages upon the personal dignity of women and girls, … and pillaging of towns." Ex. 217, *Prosecutor v. Ahmad Harun and Ali Kushayb*, Pre-Trial Chamber I, ICC-02/05-01/07, Apr. 27, 2007, at 5-6, https://www.icc-cpi.int/sites/default/files/CourtRecords/CR2007_02902.PDF.

289.    Later, in 2010, the Appellate and Pre-Trial Chambers of the International Criminal Court issued an arrest warrant for President Omar al-Bashir on charges of genocide, crimes against humanity, and war crimes. Ex. 251, *Prosecutor v. Omar Al-Bashir*, Appeals Chamber Judgment, ICC-02/05-01/09-73, Feb. 3, 2010, ¶¶38-39, https://www.icc-cpi.int/court-record/icc-02/05-01/09-73.

290.    The Darfur conflict received wide media coverage. ECF No. 435-93, Verhoeven Report at 50-51; ECF No. 435-68, Hudson Report at ¶ 198 (by 2010, more than 3,300 articles about the Darfur genocide had been published in eight western countries).

291.    In Paris, *Le Monde* covered the Regime's "scorched earth policy." ECF No. 435-68, Hudson Report at ¶ 200.

292.     BNPP's executives read the news. *See, e.g.,* Ex. 122, De Saint André Dep. at 79:20-80:5, 85:11-20, 89:21-90:6, 104:7-17, 107:12-21; Ex. 123, Bazire Dep. at 192:2-11, 204:7-20; Ex. 124, Maillard Dep. at 74:9-75:17; Ex. 125, D'Estais Dep. at 62:7-2.

293.    Some BNPP employees, including Global Head of ECEP Dominique Remy, received news alerts containing updates from OFAC lists updated to include new "persons impeding the peace process and breaking international law in the conflict in the Darfur region of Sudan." *See* Ex. 34, BNPP-KASHEF-00003874 at 3875 (May 2006 email alert that new restrictive measures are directed "against certain persons impeding the peace process and breaking

international law in the conflict in the Darfur region of Sudan"); Ex. 51, BNPP-KASHEF-00008320 (news clippings in BNPP's possession referencing Darfur genocide).

294.    BNPP knew that the political environment in Sudan was "[d]ominated by the Darfur crisis." ECF No. 435-1, SSOF at ¶ 20; Ex. 12, BNPP-KASHEF-00000023 at 23.

295.    BNPP knew that the political environment in Darfur was "stained by the humanitarian tragedy." Ex. 43, BNPP-KASHEF-00005435 at 5435.

296.    BNPP knew Sudan was "stained by the Darfur problem." Ex. 97, BNPP-KASHEF-00038899 at 38904.

297.    BNPP knew of "the ever looming Darfur conflict plaguing the country's image[.]" Ex. 75, BNPP-KASHEF-00014693 at 14697.

**c). BNPP knew it was contributing to the atrocities in Sudan.**

298.    BNPP's central role in providing Sudanese financial institutions access to the U.S. financial system, despite the Government of Sudan's role in supporting terrorism and committing human rights abuses, was recognized by BNPP employees. ECF No. 435-1, SSOF at ¶ 20; *see Kashef*, 925 F.3d at 56 (As determined by the Second Circuit, BNPP's guilty plea "conceded that it had knowledge of the atrocities being committed in Sudan and of the consequences of providing Sudan access to U.S. financial markets."); Ex. 68, Hudson Report at ¶¶ 178-226 (detailing international reporting on Sudan and BNPP's internal documents and testimony to conclude that "BNPP knew not just that the Bashir Regime was violating human rights on a massive scale, but also that BNPP's services were serving as a pillar of support for the regime").

299.    BNPP knew that its support, for a significant part, allowed the Regime to keep things running in Khartoum. Ex. 82, BNPP-KASHEF-00024869.

300.    BNPP knew the role oil played in fueling the genocide in Darfur. Ex. 123, Bazire Dep. at 87:24-88:12 (emphasis added) (Louis Bazire, Former Head of Territory for BNPP in

Switzerland, testified: "From what I remember, the intensity of communication about Darfur was higher in the years 2006, 2007. There were demonstrations in the street, et cetera. I don't remember the reasons why, at this time, this conflict was more intense. Probably part of this was coming from the fact that some important reserves of oil were discovered in the desert. This is more or less what I remember").

301.    BNPP knew the illegal oil sales it financed were driving the Darfur genocide. Ex. 26, BNPP-KASHEF-00000210 at 211 (A 2006 compliance memorandum warned: "The growth in oil revenue is unlikely to contribute to ending the conflicts [in Darfur] and it is likely that Sudan will remain torn apart for a long time by insurrectionist movements and the resulting repressive measures.").

302.    BNPP was only concerned about what would happen to its reputation if the world found out. *See* ECF No. 435-1, SSOF at ¶ 20; Ex. 25, BNPP-KASHEF-00000207 at 207 ("In a context where the international community puts pressure to end the dramatic situation in Darfur, no one would understand why BNP Paribas persists in, what could be viewed as, supporting the rulers in power."); Ex. 22, BNPP-KASHEF-00000177 at 188 ("ECEP Management does not seem to me to fully realize[] the risks involved in not complying with a US embargo . . . Geneva views the Sudan case more as a problem concerning reputation[.]").

303.    There is no evidence in the record that BNPP expressed any concern for its victims. Ex. 44, BNPP-KASHEF-00005469 at 5469 (instead, when BNPP learned that victims of the al-Qaeda attack on the USS Cole had sued the Government of Sudan, its employees joked: "I better shut up . . . the victims might sue me :-)[.]").

## VIII. BNPP's conspiracy was global.

## 1). BNPP Paris oversaw the conspiracy.

304.     BNPP's Head Office in Paris had centralized control over the business lines, including ECEP at BNPP Suisse. ECF No. 435-83, Koch Report at ¶ 137 (citing Ex. 123, Bazire Dep. at 38-45; Ex. 225, Depo. of Yuri Beissel at 27:24-28:22; Ex. 124, Maillard Dep. at 25:9-26:8).

305.     ECEP's proposed credit commitments and client engagements were ultimately subject to the approval of Head Office in Paris, principally the Credit Committee of BNP Paribas General Management (the "CCDG"). ECF No. 435-83, Koch Report at ¶ 137; Ex. 97, BNPP-KASHEF-00038899; Ex. 55, BNPP-KASHEF-00011916; Ex. 24, BNPP-KASHEF-00000201.

306.     BNPP admitted that processing transactions on behalf of the Sanctioned Parties was a systematic practice, as directed from high levels of the Bank's group management and spanning many years and involving multiple BNPP branches and business lines. Ex. 1, DFS Consent Order at ¶ 3; Ex. 3, Settlement Agreement between the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC Settlement") and BNP Paribas S.A., COMPL-2013-193659 at ¶ 3.

## a).  BNPP Paris approved loans.

307.     The partnership between BNPP and Sudan was ratified and approved by the Credit Committee of BNPP General Management in Paris. ECF No. 435-1, SSOF at ¶ 37.

308.     Every year, the CCDG approved BNPP Suisse's Sudan business and authorized credit lines for Sudan. *See, e.g.,* Ex. 55, BNPP-KASHEF-00011916 at 11918 (2001 CCDG minutes approving credit lines for Sudan); Ex. 42, BNPP-KASHEF-00005355 at 5360 (2002 CCDG minutes approving credit lines for Sudan); Ex. 58, BNPP-KASHEF-00012466 at 12468 (2003 CCDG meeting approving credit of EUR 75M for the Central Bank of Sudan); Ex. 60, BNPP-KASHEF-00013131 at 13131 (2004 CCDG minutes approving credit lines for Sudanese "state

entities," "majority state-owned commercial banks," and other Sudanese entities); Ex. 57, BNPP-KASHEF-00012133 at 12136 (2005 CCDG minutes approving credit lines for Sudan); Ex. 24, BNPP-KASHEF-00000201 (2006 CCDG minutes authorizing credit for "Banks of Sudan"); Ex. 59, BNPP-KASHEF-00012862 at 12864 (2007 CCDG minutes approving 19.22 million euros in financing related to airport equipment).

309.    On November 9, 2004, the CCDG approved a credit limit of $42 million for Sudan's "State Entities" and BNPP's Global Ethics department had a "[f]avorable opinion . . . regarding these relationships." Ex. 37, BNPP-KASHEF-00004780 at 4780.

310.    In June 2005, the Credit Committee approved ECEP's request for a two-year, "multi-purpose" 150 million USD line of credit for the Central Bank "to address an urgent need within the country, in particular for the oil industry . . . covering the import of vehicles[.]" Ex. 97, BNPP-KASHEF-00038899 at 38901; Ex. 72, BNPP-KASHEF-00014532 at 14540-41 (approving the loan).

311.    In July 2006, the Credit Committee in Paris raised Sudan's credit limit from 500 to 600 million euros. Ex. 24, BNPP-KASHEF-00000201 at 206.

312.    This was done with the approval of Group Compliance. ECF No. 435-1, SSOF at ¶ 37; Ex. 24, BNPP-KASHEF-00000201 at 202 ("Compliance Recommendations: The relationship with this group of counterparties is historical and the commercial stakes are high. For these reasons, Compliance does not wish to stand in the way of maintaining this business activity for ECEP and BNPP Suisse.").

313.    Loans "managed in Paris" were extended to Sudan's Ministry of Defense. Ex. 33, BNPP-KASHEF-00003542 at 3551.

314.    Loans "managed in Paris" were extended to Sudan's Ministry of Finance. Ex. 33, BNPP-KASHEF-00003542 at 3551.

**b). BNPP Paris approved practices.**

315.    To accomplish its conspiracy with the Government of Sudan, BNPP used its branches and subsidiaries around the globe. Settlement Agreement between the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") and BNP Paribas SA ("BNPP"), COMPL-2013-193659, ECF No. 237-2, at 13-14; Ex. 45, BNPP-KASHEF-00005625 at 5629; Ex. 49, BNPP-KASHEF-00007574 (payment order from BNPP London to pay $117,897.00 to BNPP Geneva for the account of Sudanese French Bank was successfully paid).

316.    For example, BNPP Singapore requested that BNPP Geneva open an account for a Chinese oil company involved in the petroleum consortium operating in Sudan, for the clearing of U.S. dollars, in order to circumvent the U.S. embargo. Ex. 47, BNPP-KASHEF-00005700 at 5706.

317.    On July 29, 2004, the request was approved not only by a "Compliance Officer" and a "Client Acceptance Committee" but also by the "Head of group" himself. Ex. 47, BNPP-KASHEF-00005700 at 5703.

318.    Until at least 2004, BNPP's internally published policy for processing US. Dollar payments involving Sudan stated: 'Do not list in any case the name of Sudanese entities on messages transmitted to American banks or to foreign banks installed in the U.S.'" ECF No. 435-1, SSOF at ¶ 22; Ex. 20, BNPP-KASHEF-00000160 at 164.

319.    Wire stripping instructions came from Paris: "CIB [Corporate Investment Banking] General Management encouraged us to proceed with this system . . ." Ex. 13, BNPP-KASHEF-00000034; see also ECF No. 435-83, Koch Report at ¶¶ 148-57, 161-63, 215 (discussing examples of BNPP Paris' approval of and participation in wire-stripping); Ex. 15, BNPP-KASHEF-00000075.

320.    BNPP admitted that wire-stripping "enabled BNPP to manage or finance billions of dollars' worth of U.S. dollar denominated letters of credit for Sudanese entities." ECF No. 435-1, SSOF at ¶ 18; see also ECF No. 435-83, Koch Report at ¶¶ 148-57, 161-63 (discussing examples of BNPP Paris' approval of and participation in wire-stripping); Ex. 6, Koch Reply at ¶ 95, n. 147.

321.    Payments transferred through BNPP accounts funneled oil sale revenues through BNPP Paris, Geneva, and New York. ECF No. 435-88, Patey Report at 12; ECF No. 435-64, Fogarty Reply at ¶ 102. Ex. 62, BNPP-KASHEF-00013603 at 13605-06 ("As far as Crude Oil is concerned, payments are received under L/Cs opened by order of [various redacted corporations]" and the "major portion of this volume is opened by BNP Paribas Group (Geneva, Hong Kong, Singapore and Paris).")

**c). BNPP Paris had ultimate authority on the Sudanese business.**

322.    BNPP's conspiracy was accomplished under the management and compliance oversight of BNPP's Head Office in Paris. See, e.g., Ex. 85, Ex. 45, BNPP-KASHEF-00005625 at 5629.

323.    In 2003, BNPP in Paris was handling the KYC of the Central Bank of Sudan. Ex. 73, BNPP-KASHEF-00014641.

324.    BNPP Geneva annually sought and received approval from BNPP General Management. *See*, e.g., Ex. 126, Cozine Dep. at 223: 9-14, 226: 1-9 ("[T]his was not the decision taken in Geneva. It was the decision taken in Paris.").

325.    BNPP General Management in Paris had the ultimate authority on whether to cut off support for the Regime. *See* ECF No. 435-83, Koch Report at ¶ 157; Ex. 46, BNPP-KASHEF-00005642 at 5642-43 (In February 22, 2007, the Head of ECEP's Business Center in Geneva, ███████████████ (CH NPR-E10) stated in an email to BNPP Paris compliance officer ███████ concerning Sudan "no one is immune to operational risk or to a "political attack"

organized by the US, therefore, I would like to point out that we defer to General Management to decide on how to proceed with these relations."); Ex. 96, BNPP-KASHEF-00038668 ("The Task Force is not opposed to shifting the collateral surplus, but ultimately defers to the CCI's decision[.]").

326.    BNPP's processing of Sudanese transactions had the full support of Senior Management in Paris. Ex. 14, BNPP-KASHEF-00000066 at 73 ("I see that some questions are resurfacing concerning how we process these transactions. I recall that back when you introduced me to the Sudanese Finance Minister and the President of the Central Bank, . . . it was specified that all business activity, with which, by the way, the Minister and the President were very please, had received the full support of our General Management in Paris.")

327.    General Management in Paris, including ███████████████—Chief Operating Officer of BNP Paribas in Paris, dismissed compliance concerns about executing transactions with and for Sudanese customers. ECF No. 435-1, SSOF at ¶ 33; Ex. 30, BNPP-KASHEF-00000885 at 892; Ex. 27, BNPP-KASHEF-00000326 at 335-337; Ex. 91, BNPP-KASHEF-00030213 at 30215; Ex. 55, BNPP-KASHEF-00011916.

328.    The Geneva compliance offer who sounded the alarm, ████████████, was fired because BNPP's Head of Territory in Switzerland did not find him to be constructive. ECF No. 435-83, Koch Report at ¶ 248.

329.    General Management in Paris had, at all times, the authority to stop BNPP's conspiracy with Sudan, as it belatedly began to do in June 2007. Ex. 6, Koch Reply at ¶ 95, n. 147 (citing Ex. 150, BNPP Defendants' Responses and Objections to Plaintiffs' Requests for Admissions Nos. 234, 235, 237, 243, dated July 15, 2022).

**2). BNPP Wholesale also contributed to Sudan's embargo-breaking scheme.**

330.    Stephen Strombelline, Head of Compliance for North America, was employed by BNPP Wholesale. BNPP's Mem. at 59-60; Ex. 168, Aug. 23, 2022 & Sept. 22, 2022 emails from Katherine Lynch to Brent Landau.

331.    BNPP's compliance program was defective by design. ECF No. 435-83, Koch Report at ¶ 246.

332.    BNPP rendered its compliance program ineffective by putting unqualified, uninformed employees in compliance management roles, where they were not competent to address the bank's compliance risks. ECF No. 435-83, Koch Report at ¶ 247; Ex. 122, De Saint André Dep. at 59:12-24 (in 2005, BNPP appointed as global head of BNPP's "Fight Against the Financing of Terrorism and Management of Financial Embargos" a bank executive who had never worked in compliance in his life).

333.    Mr. Strombelline himself was uninformed and ignorant about his responsibility regarding how to supervise BNPP's compliance program and ensure that the screening controls were functioning effectively. ECF No. 435-83, Koch Report at ¶ 182.

334.    Mr. Strombelline admitted that he knew little about sanctions regulations, or world events, or even how compliance was designed to work at BNPP. ECF No. 435-83, Koch Report at ¶ 182; Ex. 129, Deposition of Stephen Strombelline ("Strombelline Dep.") at 52:20-53:1, 54:2-5, 53:12-14, 57:9-13, 60:20-23.

335.    Mr. Strombelline at some point heard of the Darfur genocide and knew that "people were killed in Sudan" and that U.S. sanctions were imposed. Ex. 129, Strombelline Dep. at 56:16-57:8.

336.    An OFAC document regarding those sanctions and maintained in the New York office, where Mr. Strombelline worked, described "the prevalence of human rights violations,

including slavery and the denial of religious freedom" in Sudan as well as "violence against civilians and sexual violence against women and girls." Ex. 129, Strombelline Dep. at 59:2-13, 61:14-23, 62:14-21; Ex. 28, BNPP-KASHEF-00000753 (Dep. Ex. 152).

337.    Mr. Strombelline does not recall whether, as Head of Compliance for BNPP, he believed that BNPP had a responsibility to end the genocide in Sudan. Ex. 129, Strombelline Dep. at 71:16-20.

338.    Mr. Strombelline disclaimed any personal responsibility to do so. Ex. 129, Strombelline Dep. at 74:7-12.

339.    Mr. Strombelline had a responsibility to have a compliance department that supported the bank to follow U.S. sanctions. Ex. 129, Strombelline Dep. at 72:8-16.

340.    Mr. Strombelline admitted that, in June 2022, he would now "be concerned with a financial institution doing business with Sudan" because "things were being done" by the Government of Sudan that were "not good." Ex. 129, Strombelline Dep. at 81:25-82:12.

341.    While serving as BNPP's Head of Compliance, Mr. Strombelline was not concerned about BNPP doing business with Sudan. Ex. 129, Strombelline Dep. at 87:13-17; Ex. 77, BNPP-KASHEF-00020847 (Dep. Ex. 154); Ex. 129, Strombelline Dep. at 129:1-133:24 (discussing his participation in an October 2004 decision about processing payments for "Sudan's leading oil company" despite the "reputational risk"); Ex. 78, BNPP-KASHEF-00020893 (Dep. Ex. 158).

342.    In January 2006, after being informed that the State of Illinois would not do business with BNPP because of BNPP's relationship with the Central Bank of Sudan, █████ ███████ shrugged it off, writing: "I am not concerned with non-US BNPP affiliates doing

business with the Central Bank of Sudan." Ex. 129, Strombelline Dep. at 87:13-17; Ex. 77, BNPP-KASHEF-00020847 (Dep. Ex. 154).

343.     Even as late as 2009, Mr. Strombelline approved opening an account for a customer affiliated with Sudanese companies that "may have financially contributed to genocidal activity and may provide little benefit to the disadvantaged populations of Sudan," including through documented "forcible displacement" of thousands of people, despite consideration of a "UN report on Darfur that had investigated reports of violations of international humanitarian law and human rights law in Darfur." Ex. 129, Strombelline Dep. at 258:8-261:5, 294:5-298:13.

344.     Mr. Strombelline was well aware of the weaknesses in BNPP's compliance function that permitted non-US BNPP affiliates to evade U.S. sanctions and provide the Government of Sudan with access to U.S. dollars. Ex. 129, Strombelline Dep. at 97:18-113:15; Ex. 94, BNPP-KASHEF-00031735 (Dep. Ex. 156); ECF No. 435-83, Koch Report at ¶¶ 177-79.

345.     In January 2004, Mr. Strombelline received an email detailing the improper use of MT202 payment messages to strip out sanctioned parties to a U.S. dollar transaction cleared through BNPP in New York. Ex. 129, Strombelline Dep. at 97:18-113:15; Ex. 94, BNPP-KASHEF-00031735 (Dep. Ex. 156); ECF No. 435-83, Koch Report at ¶¶ 177-79.

346.     The only remedial action taken in response was an email directing BNPP personnel not to "resubmit" payments that been rejected. ECF No. 435-83, Koch Report at ¶¶ 180-81 (quoting Ex. 99, BNPP-KASHEF-00039213 and Ex. 129, Strombelline Dep. at 120:10-122:6).

347.     The email was only about resubmissions– i.e., payment messages that at one point included a reference to a sanctioned entity– and says nothing about payment messages that never included such a reference in the first place, which "is a striking omission." ECF No. 435-83, Koch

Report at ¶¶ 180-81 (quoting Ex. 99, BNPP-KASHEF-00039213 and Ex. 129, Strombelline Dep. at 120:10-122:6).

348.    In December 2005, another bank – ABN AMRO – was fined $80 million for its own wire-stripping sanctions violations. ECF No. 435-83, Koch Report at ¶ 219.

349.    BNPP had been doing the very same thing as ABN AMRO. ECF No. 435-83, Koch Report at ¶ 219 (citing Ex. 129, Strombelline Dep. at 143-45, 157-58).

350.    Upon learning of the ABN AMRO fine, Mr. Strombelline wrote in an email: "The dirty little secret isn't so secret anymore, oui?" Ex. 18, BNPP-KASHEF-00000146 (Dep. Ex. 160); Ex. 129, Strombelline Dep. at 152:17-25. Ex. 1, DFS Consent Order at ¶ 8.

351.    Mr. Strombelline's "dirty little secret" email was about how "the highest level of the compliance division for the New York Branch recognized and accepted that amending, omitting and stripping was widespread among foreign banks transmitting funds through the U.S." Ex. 1, DFS Consent Order at ¶ 8.

352.    Just two days after Mr. Strombelline wrote about the "dirty little secret," a more junior compliance employee emailed him to express that she was "unsettled by what some of the people in our department are saying" and concerned about "willful blindness" to customers being involved in "something illegal." Ex. 104, BNPP-KASHEF-00047372 at 47373 (Dep. Ex. 161); Ex. 129, Strombelline Dep. at 158:24-164:7.

353.    Mr. Strombelline responded to his subordinate's email by assuring her that he could "get comfortable with the compliance officer in a secrecy territory like Geneva telling me that a thorough investigation of the facts we presented to them was conducted, and though they can't give us the details, they are confident that the activity is appropriate." Ex. 104, BNPP-KASHEF-00047372 (Dep. Ex. 161); Ex. 129, Strombelline Dep. at 164:11-165:5.

354.    Mr. Strombelline prepared a memo for BNPP's top executives in Paris about the ABN AMRO fine and "why it won't happen to us," but he omitted any mention of BNPP's use of MT202 messages to conceal information about sanctioned entities. ECF No. 435-83, Koch Report at ¶ 221 (citing Ex. 129, Strombelline Dep. at 181-82, 186, 190-93; Ex. 100, BNPP-KASHEF-00039354 (Dep. Ex. 163B); Ex. 103, BNPP-KASHEF-00047293 (Dep. Ex. 163A); Ex. 102, BNPP-KASHEF-00047292 (Dep. Ex. 164A).

355.    Mr. Strombelline recommended discontinuing the use of cover payments, but █████ █████ of BNPP Paris compliance (NPR-E52) was dismissive because of the impact it would have on the bank's Sudanese business. ECF No. 435-83, Koch Report at ¶ 223 (citing Ex. 23, BNPP-KASHEF-00000191 at 191 (Dep. Ex. 166) ("If ████████████ only offers the choice of waiving MT20[2] for customer transactions or promising BNPP NY that we do not do USD wire transfers involving Cuba, Iran, Sudan or Syria, the only solution I see is going through a bank other than BNPP NY for all transactions to these destinations. The other less attractive alternatives are to stop working in USD in these zones or to twist reality, with the difficult choice between lying to BNPP NY or to JP Morgan.").

356.    Mr. Strombelline did nothing to follow up. Ex. 129, Strombelline Dep. at 213:2-5 (testifying that "I don't recall" whether he "received any response to this e-mail"); *id.* at 228:23-25 ("Q. Did you ever discuss this issue of the MT202s with ████████ directly? A. Not that I recall."); *id.* at 229:3-16 (testifying that he "may have discussed" the issue with others in Paris but "can't remember specific conversation[s]" and did not "remember" their reaction to his suggestion about MT202s).

357.    Compliance staff at the New York Branch operated knowing that they did not have adequate legal and compliance authority to ensure that activities conducted from BNP Paribas

offices outside of the United States complied with New York and U.S. laws and regulations; this practice was intentional. Ex. 1, DFS Consent Order at ¶ 7.

358.    Following the U.S. government's investigation into BNPP's criminal conduct, Mr. Strombelline's employment was terminated when he was asked to resign at the direction of the New York Department of Financial Services. Ex. 129, Strombelline Dep. at 261:19, 262:10-15; Ex. 186, DFS Press Release - *Cuomo Administration Announces BNP Paribas to Pay 8.9 Billion* (June 30, 2014) (noting that Mr. Strombelline was among the "senior executives" who "were terminated by or separated from the Bank as a result of the investigation" at the direction of DFS).

359.    Under the DFS Consent Order, BNPP was specifically prohibited from "in the future, directly or indirectly, retain[ing]" Mr. Strombelline "as either an officer, employee, agent, consultant, contractor of BNPP, or any affiliate of BNPP, or in any other capacity." Ex. 1, DFS Consent Order at ¶ 58.

360.    Mr. Strombelline also received "zero" bonus as part of his disciplinary action, but, nevertheless, received "deferred compensation" that was between ███████████████. Ex. 214, BNPP 2d Supp. Interrog. Resp., App'x 1; Ex. 129, Strombelline Dep. at 264:15-265:24.

361.    Mr. Strombelline had ultimate responsibility for managing the compliance department in North America. Ex. 129, Strombelline Dep. at 23:4-8.

362.    A compliance officer in a healthy and effective compliance program would normally provide advice and guidance on exactly the kind of policy and procedural issues that BNPP handled so badly. Ex. 6, Koch Reply at ¶ 14.

363.    BNPP's ineffective compliance program was intentionally ignored by BNPP's senior management, the result of which facilitated BNPP's criminal scheme in support of the Government of Sudan. Ex. 6, Koch Reply at ¶ 3.

## IX. BNPP refused to end the conspiracy.

### 1).  BNPP perpetuated the conspiracy despite the U.S. genocide determination's of genocide in Sudan.

364.    In the fall of 2004, BNPP was preoccupied with how to conceal from the U.S. government the billions in Sudanese oil sales it laundered. Ex. 64, BNPP-KASHEF-00013941 at 13944.

365.    On October 1, 2004—just three weeks after the U.S. determination of genocide in Darfur—BNPP met with a Central Bank of Sudan official in Washington to discuss "exploiting new opportunities" and the "US sanctions." Ex. 64, BNPP-KASHEF-00013941 at 13944; *see also* ECF No. 435-68, Hudson Report at ¶¶ 122-123 & n. 110.

366.    BNPP's chief Sudan relationship manager, ███████, who attended the meeting, knew that business development was taking place in a difficult political environment. Ex. 64, BNPP-KASHEF-00013941 at 13941.

367.    BNPP and the Central Bank of Sudan agreed to make more use of 'in house' correspondent accounts to make book-to-book transfers and avoid USD transfers outside the internal circuit with BNPP. Ex. 64, BNPP-KASHEF-00013941 at 13942.

368.    For payments for oil letters of credit, "buyers which are BNPP clients" would be handled through in-house book-to-book "(without fund movements)", while "buyers which are not BNPP clients" would make "payment in GBP (no USD)." Ex. 64, BNPP-KASHEF-00013941 at 13941.

369.   Four days later, ███████ describes Sudan's "political environment" as "dominated by the crisis in Darfur" in an email chain about BNPP's internal designation of Sudan as a "sensitive country." Ex. 12, BNPP-KASHEF-00000023 at 23.

370.   Attached to the chain is a document listing Sudanese banks targeted by U.S. sanctions, with a handwritten note in English: "LIST OF BAD GUY SINCE 12/2002." Ex. 12, BNPP-KASHEF-00000023 at 25.

371.   On that list are the Central Bank of Sudan, Bank of Khartoum, and El Nilein Industrial Bank. Ex. 12, BNPP-KASHEF-00000023 at 25.

372.   The Central Bank of Sudan, Bank of Khartoum, and El Nilein Industrial Bank were all BNPP clients or counterparties. ECF No. 435-83, Koch Report at ¶ 152 (citing to BNPP Corporate and Investment Banking's list of "approved legal entities" identifying "clients or counterparties located in OFAC sanctioned countries with which a CIB business relationship exists or is known to have existed").

373.   In September 2004, two senior BNPP Paris executives and BNPP Geneva executives decided that Sudanese dollar-clearing transactions should be routed through a non-BNPP bank—JPMorgan Chase—rather than BNPP New York.  ECF No. 435-1, SSOF at ¶ 30; Ex. 6, Koch Reply at ¶ 92 n. 144; ECF No. 435-83, Koch Report at ¶ 213; Ex. 17, BNPP-KASHEF-00000092.

374.   The decision to switch dollar clearing involving Sanctioned Entities to JPMorgan Chase was at least in part an attempt to decrease BNPP New York's exposure to enforcement actions by U.S. authorities. ECF No. 435-1, SSOF at ¶ 30; ECF No. 435-83, Koch Report at ¶ 214.

375.    BNPP General Management asked BNPP employees in Paris and Geneva to send payment messages involving Sudan to JPMorgan Chase, instead of BNPP New York. ECF No. 435-83, Koch Report at ¶ 215 (listing various directives from BNPP General Management).

376.    In October 2004, Cleary Gottlieb—BNPP's counsel in this case—provided BNPP a legal memorandum suggesting that BNPP may have been able to protect itself from being penalized by US. authorities if it conducted these prohibited transactions through another U.S. bank. ECF No. 435-1, SSOF at ¶ 30; Ex. 93, BNPP-KASHEF-00031347 at 31360; ECF No. 435-83, Koch Report at ¶ 217; Ex. 6, Koch Reply at ¶ 50.

377.    BNPP's General Management knew that, regardless of what bank handled the USD services requirements of BNPP, BNPP must conform to US requirements, including the embargo. Ex. 79, BNPP-KASHEF-00021370.

**2).  New sanctions on Sudan in 2007.**

378.    On October 17, 2006, President Bush issued additional sanctions aimed at the Bashir Regime's ability to finance genocide with oil revenues. ECF No. 435-68, Hudson Report at ¶¶ 140-142 (citing to Exec. Order No. 13412, 71 Fed. Reg. 61369 (Oct. 17, 2006), https://www.govinfo.gov/content/pkg/FR-2006-10-17/pdf/06-8769.pdf (prohibiting "all transactions by United States persons relating to the petroleum or petrochemicals industries in Sudan.")).

379.    In May 2007, the U.S. launched a sanctions strategy "targeting the oil and military-industrial complex and Sudan's international accomplices." ECF No. 435-68, Hudson Report at ¶ 165.

380.    OFAC announced it would pursue "aggressive investigation of the methods and accomplices that the Government of Sudan may be using to circumvent our sanctions and access the U.S. financial system illegally." ECF No. 435-68, Hudson Report at ¶ 156 & n. 140 (citing to

U.S. Department of the Treasury, *Prepared Remarks of Adam J. Szubin Director of the Treasury Department's Office of Foreign Assets Control*, May 29, 2007, https://home.treasury.gov/news/press-releases/hp427).

### 3). BNPP gets investigated.

381.    In a May 11, 2007, meeting attended by OFAC director Adam Szubin, OFAC expressed concern about BNPP's Sudanese clients: "bad guys … have US$ accounts in Geneva." Ex. 106, BNPP-KASHEF-00037990 at 37994.

382.    Two weeks later, BNPP's Global Head of Compliance authored a memo on Sudan expressing alarm at how to manage "the reputational risk vis-à-vis Sudan, given the conflict in Darfur and the international condemnation of the Sudanese authorities." Ex. 25, BNPP-KASHEF-00000207 at 207.

383.    On June 12, 2007, General Management in Paris issued a "Group Policy on Sudan," announcing its "decision to stop all BNPP relationships with Sudanese entities and individuals based there." Ex. 31, BNPP-KASHEF-00001184 at 1184.

384.    General Management in Paris' Group Policy specified that "channeling funds to Sudan through BNPP Geneva, which used to entertain some relations with this country, is no longer possible." Ex. 31, BNPP-KASHEF-00001184 at 1185.

385.    Clamping off the flow of U.S. dollars from BNPP to Khartoum had an immediate impact on the Bashir Regime. ECF No. 435-68, Hudson Report at ¶¶ 171-172.

386.    In Fall 2007, Sudan's Finance Minister requested a meeting with Plaintiffs' expert Cameron Hudson and National Security Council staff to protest the sanctions. ECF No. 435-68, Hudson Report at ¶ 172.

387.    Sudan's Finance Minister Al-Hassan argued: 'All transfers are affected and now cost us more. I can't even get U.S. dollars now.' ECF No. 435-68, Hudson Report at ¶ 172.

**4).  But BNPP does not stop.**

388.    Despite the announcement to stop BNPP's relationship with Sudan, ECEP continued "channeling funds to Sudan" through Geneva with Head Office approval. *See* ECF No. 435-83, Koch Report at ¶¶ 235-41.

389.    BNPP's ECEP banker ▓▓▓▓▓▓▓▓ flew to Khartoum to negotiate a deal with Sudanese authorities. Ex. 85, BNPP-KASHEF-00028707 at 28710; Ex. 56, BNPP-KASHEF-00012026; ECF No. 435-83, Koch Report at ¶ 236.

390.    BNPP agreed to continue processing US dollar transactions "in house" until the end of 2007 and then would start converting payments to euros. Ex. 85, BNPP-KASHEF-00028707 at 28710; ECF No. 435-83, Koch Report at ¶ 236.

391.    BNPP also agreed that the Central Bank of Sudan could continue to pay commitments linked to the $150 million credit line approved by BNPP Paris, all the way through 2009. Ex. 85, BNPP-KASHEF-00028707 at 28710; ECF No. 435-83, Koch Report at ¶ 236.

392.    A Central Bank of Sudan official wished to send a message to the Head Office in Paris: "I feel bitter at seeing 'a major correspondent who has been present from the outset and at the most sensitive times leaving,' particularly 'an oil bank on which international players rely . . .'" Ex. 85, BNPP-KASHEF-00028707 at 28708.

393.    The Regime could still get British pounds from BNPP, with Head Office approval. *See* Ex. 82, BNPP-KASHEF-00024869 at 24869-70; ECF No. 435-83, Koch Report at ¶ 239.

394.    Transactions coordinated between BNPP Paris and BNPP Geneva continued to channel oil proceeds into Sudan's treasury after June 2007:

> I just wanted to have everybody aware that, currently, each month, BNPP Geneva is feeding the Sudanese government with £30 million, which is about $60 million. Compared to a yearly budget of $ 7 billion for the Republic of Sudan (which probably has increased with the price of oil), this means that BNPP Geneva

represents, month after month, 10% of the revenue of a government which, for a large part of the public opinion, is not made with nice people.

For every dollar that this government is spending, 10 cents are coming direct from the pocket of BNPP in Switzerland and the [redacted] in Geneva is writing a monthly cheque (fortunately not in US dollar) which, for a significant part, allows this government to keep things running in Khartoum. The management of BNPP has explained that, since June 2007, the bank was not doing anything any more with this country, and I will not be the one who will explain to the US administration how it comes that the bank has been able to overcome this contradiction.

Ex. 82, BNPP-KASHEF-00024869 at 24869-70; ECF No. 435-83, Koch Report at ¶ 239.

395.   BNPP continued to feed the Sudanese government with the escrow account, which was contrary to what it was telling the US Administration. Ex. 53, BNPP-KASHEF-00011268 at 11272 ("Keeping the escrow account at BNPP Geneva is seen as continuing to feed the Sudanese government with the necessary cash to continue its different operations in different places. This is not exactly what the bank is saying regularly to the US Administration.").

396.   BNPP's outside counsel, the same legal counsel representing the bank in this litigation, knew of the existence of the escrow account in October 2007. Ex. 53, BNPP-KASHEF-00011268 at 11271 ("This question of escrow account has been discussed with Cleary Gottlieb yesterday and [they] have been made aware of its existence, its reasons, the advantage it entails for the government of Sudan and the approach taken by ECEP for keeping it in Geneva when Geneva has had no reason, for months now, to keep it.").

397.   In late January 2008, a compliance officer of BNPP Paris renewed his request that ███████████, Global Head of ECEP, stop the payments to the Regime: "the clock is ticking and the fact that each time one sterling pound is received by ECEP Paris to reimburse the [CH UAE Corporate 16] loan, BNPP Geneva is feeding the Sudanese treasury with many times this amount is well taken into account by everybody." Ex. 63, BNPP-KASHEF-00013746 at 13748-49; ECF No. 435-83, Koch Report at ¶ 241.

398.    In October 2008, BNPP credited an amount for a Sudanese off-shore client, a last payment as part of a contract, which implicated BNPP NY. Ex. 29, BNPP-KASHEF-00000787.

399.    In the six months following BNPP's purported withdrawal from Sudan, the bank channeled funds with an "exchange value of more than USD 0.5 billion" to "the Sudanese government." Ex. 90, BNPP-KASHEF-00030053 at 56.

400.    A March 2009 country-risk analysis circulated by ████████ reported that the "International Criminal Court (ICC) issued an arrest warrant on March 4, 2009 against President Omar al-Bashir for "war crimes and crimes against humanity in Darfur.'" Ex. 67, BNPP-KASHEF-00014068 at 14073.

401.    In October 2009, certain Sudanese accounts were still open, despite a GC8 "post-mortem" in October 2009. Ex. 66, BNPP-KASHEF-00014009 at 14014.

402.    In December 2009, Group Financial Security confirmed that BNPP could maintain a euro account, in its books, for the Central Bank of Sudan. Ex. 88, BNPP-KASHEF-00029054.

403.    BNPP London facilitated $6.7 billion in Sudan transactions from 2008 through 2010—transactions that BNPP admitted violated U.S. sanctions. ECF No. 435-64, Fogarty Reply at ¶¶ 99-102; ECF No. 435-63, Fogarty Report at ¶ 250, and Ex. 6.

404.    As late as March 2012, BNPP in Paris approved a credit renewal request for Sudanese Government Department 2 of EUR 0.574. Ex. 61, BNPP-KASHEF-00013268.

## X. Effects of BNPP's Conspiracy.

### 1).  Lasting effects.

405.    BNPP's conspiracy with the Regime produced long-lasting effects that continued through at least 2011. ECF No. 435-93, Verhoeven Report at 56-57.

406.    The weapons systems the Regime purchased with BNPP-generated petrodollars remained. ECF No. 435-93, Verhoeven Report at 56-57.

407.    The arsenal acquired by SAF during the peak oil years of the early 2000s was vital for the Regime in wagging war in South Kordofan and Blue Nile State in June 2011. ECF No. 435-93, Verhoeven Report at 56.

408.    Some of the fighter jets, artillery and ammunitions that the Regime purchased in the early to mid-2000s with petrodollars were used in bombardments of civilian areas in 2011. ECF No. 435-93, Verhoeven Report at 56.

## 2). Forced Displacement.

409.    The Regime's nationwide campaign of persecution forcibly displaced millions of Sudanese citizens. Ex. 5, Jok Report at ¶ 125.

410.    These Sudanese citizens were displaced "through the destruction of their means of livelihood and theft of their land and cattle, through the raids on their villages, and the terror of the police state." Ex. 5, Jok Report at ¶ 117.

411.    Others were driven into exile by a Regime policy of denying "undesirable" populations access to humanitarian aid and food. ECF No. 435-54, Baldo Report at ¶ 212.

412.    Hundreds of thousands gathered in internally displaced persons ("IDP") camps within Sudan or sought refuge across international borders, sheltering in squalid refugee camps in Chad and Egypt. Ex. 5, Jok Report at ¶¶ 117-28.

413.    Life in IDP and foreign refugee camps is disorganized, brutal, and dehumanizing. Ex. 5, Jok Report at ¶ 118.

414.    The UN High Commission on Refugees ("UNHCR") coordinated the resettlement of Sudanese refugees to other countries that were willing to take them. Ex. 75 to Decl. of Charity E. Lee, ECF No. 435-75, Expert Report of Prakash Khatri ("Khatri Report") at 11-12, dated September 30, 2022.

415.    With respect to the situation in Darfur, the UNHCR recommended in 2006 that there should be a 'presumption of eligibility to refugee status' for non-Arab Darfurians. *See* ECF No. 435-75, Khatri Report at 12.

416.    This was a recognition of the Regime's racial persecution. *See* ECF No. 435-75, Khatri Report at 12.

417.    The United States provided refuge and asylum to thousands of Sudanese civilians forcibly displaced by the Bashir Regime. Ex. 76 to Decl. of Charity E. Lee, ECF No. 435-76, Expert Reply Report of Prakash Khatri ("Khatri Reply") at 12 n.24, 17-18, dated March 2, 2023.

418.    An estimated 25,800 victims who fled Sudan during the 1997 to 2011 period were admitted to the United States, in 92.8% of those cases "with an explicit U.S. government finding" that they "suffered or faced persecution at the hands of the Government of Sudan or its agents." ECF No. 435-76, Khatri Reply at 1, 12 n.24, 18.

419.    All of the refugees share the experience of "trauma inherent in displacement, fearing for their safety and being forced to flee their homes and country[.]" Ex. 7, Expert Report of Dr. Allen Keller and Dr. Barry Rosenfeld ("Keller & Rosenfeld Report") at 9-10.

420.    Displacement stripped Sudanese civilians from all regions of ties to ancestral land and communities. Ex. 5, Jok Report at ¶ 116.

421.    The loss of ancestral lands is a unique and deeply felt injury to Sudanese sense of self, identity, pride and worth as a human. Ex. 5, Jok Report at ¶ 116.

422.    Being reduced to refugees is "humiliating for anyone steeped in Sudanese culture, which prizes formality, propriety, decency, work, and provision for the family." Ex. 5, Jok Report at ¶ 118.

423.    Through displacement, the Regime "succeeded in its goal of robbing the displaced Sudanese of sense of self, human dignity, and cultural continuity."  Ex. 5, Jok Report at ¶ 123.

424.    What drove forced displacement from Sudan during the class period (1997-2011) was a common pattern of abuses committed by the Regime against disfavored racial, religious, and social groups, including:

- Abduction and arbitrary detention in "ghost houses";
- Torture by military, security, or militia forces;
- Killing or disappearing family members;
- Rape and other forms of sexual violence against women and men;
- Aerial bombing of civilian targets;
- Targeted attacks on civilians by infantry, artillery, cavalry, or armored vehicles;
- Pillage of property and livestock and poisoning of wells;
- Deprivation of food, water, or medical aid.

*See* Ex. 5, Jok Report at at 12-37; Ex. 4, Baldo Report at 29-42.

425.    Raids by government forces not only caused destroyed buildings, stolen cattle, and killed family members, the dispersal of community and ensuing grief deeply injured the identity and human dignity of the populace who were told in word and deed that they were not only inferior humans compared to the Sudanese ruling racial class, but also that they were unwelcome and unsafe in their ancestral homelands. Ex. 5, Jok Report at ¶¶ 115-16.

## XI. Plaintiffs' Injuries.

426.    Plaintiff Isaac Ali continues to suffer physical and psychological injuries, including but not limited to frequent intrusive memories of the traumatic experiences and symptoms consistent with PTSD and chronic depression, as a result of the multiple traumatic experiences inflicted by the GOS and its agents. Ex. 7, Isaac Appendix at 6. Isaac also suffered physical injuries. *See* Plaintiffs' Response to Proposed Fact Nos. 169, 173, 176, 180-82, 184-85. In 2001, Isaac further suffered forced displacement when he had to flee Sudan for Egypt prior to coming to the United States. Ex. 231, Isaac Rog. No. 1.

427.    Plaintiff Halima Khalifa continues to suffer physical and psychological symptoms, including but not limited to frequent intrusive memories of the traumatic experiences and symptoms consistent with PTSD, chronic depression and generalized anxiety, as a result of the multiple traumatic experiences inflicted by the GOS and its agents. Ex. 7, Halima Appendix at 8. Halima also suffered physical injuries. *See* Plaintiffs' Response to Proposed Fact Nos. 150, 157, 159, 161-63. In 2000, Halima was forcibly displaced and deprived of resources when she fled Sudan, prior to coming to the United States. Ex. 227, Halima Rog. No. 1.

428.    Plaintiff Turjuman Adam Turjuman continues to suffer physical and psychological injuries, including but not limited to frequent intrusive memories of the traumatic experiences and symptoms consistent with PTSD and chronic depression, as a result of the multiple traumatic experiences inflicted by the GOS and its agents. Ex. 7, Turjuman Appendix at 7-8. Turjuman also suffered physical injuries. *See* Plaintiffs' Response to Proposed Fact Nos. 127, 132, 137, 137, 143, 144. Turjuman was forcibly displaced from Sudan when he fled to Egypt, prior to coming to the United States. Ex. 239, Turjuman Rog. No. 1.

429.    Plaintiff Judy Doe continues to suffer physical and psychological symptoms, including but not limited to frequent intrusive memories of the traumatic experiences, symptoms consistent with PTSD, intensive fear, and HIV infection, as a result of the multiple traumatic experiences inflicted by the GOS and its agents. Ex. 7, Judy Doe Appendix at 6. Judy Doe also suffered physical injuries. *See* Plaintiffs' Response to Proposed Fact Nos. 234, 236-37. In 2003, Judy Doe was forcibly displaced and deprived of resources when she fled Sudan for Egypt, prior to coming to the United States. Ex. 242, Judy Doe Rog. No. 1.

430.    Plaintiff Judy Roe continues to suffer physical and psychological symptoms, including but not limited to symptoms of PTSD and depression, including intrusive memories,

instances in which she reexperiences her traumas, deliberate attempts to avoid reminders of her experiences in Sudan, and profound changes in her mood and thinking, as a result of the multiple traumatic experiences inflicted by the GOS and its agents. Ex. 7, Judy Roe Appendix at 9. Judy Roe also suffered physical injuries. *See* Plaintiffs' Response to Proposed Fact Nos. 190, 192, 195. In 2001, Judy Roe further suffered forced displacement when she had to flee Sudan for Egypt, prior to coming to the United States. Ex. 243, Judy Roe Rog. No. 1.

431.    Plaintiff Nicolas Lukudu continues to suffer physical and psychological symptoms, including but not limited to symptoms of PTSD and depression, including intrusive memories and attempts to avoid reminders of his experiences in Sudan, as a result of the multiple traumatic experiences inflicted by the GOS and its agents. Ex. 7, Nicolas Appendix at 6. Nicolas also suffered physical injuries. *See* Plaintiffs' Response to Proposed Fact Nos. 417, 422. In or about April of 2004, Nicolas was forcibly displaced and deprived of resources when he fled Sudan for Egypt, prior to coming to the United States. Ex. 236, Nicolas Rog. No. 1.

432.    Plaintiff Ambrose Ulau continues to suffer physical and psychological symptoms, including but not limited to symptoms of PTSD and depression, including intrusive memories, instances in which he reexperiences his traumas, deliberate attempts to avoid reminders of his experiences in Sudan, and profound changes in his mood and thinking, as a result of the multiple traumatic experiences inflicted by the GOS and its agents. Ex. 7, Ambrose Appendix at 4-6. Ambrose also suffered physical injuries. *See* Plaintiffs' Response to Proposed Fact Nos. 222, 224, 227-28. In 2000, Ambrose further suffered forced displacement when he had to flee Sudan for Egypt, prior to coming to the United States. Ex. 230, Ambrose Rog. No. 1.

433.    Plaintiff Kuol Shbur continues to suffer physical and psychological symptoms, including but not limited to symptoms of PTSD and depression, including instances in which he

reexperiences his traumas and deliberate attempts to avoid reminders of his experiences in Sudan, as a result of the multiple traumatic experiences inflicted by the GOS and its agents. Ex. 7, Kuol Appendix at 7. Kuol also suffered physical injuries. *See* Plaintiffs' Response to Proposed Fact Nos. 408, 410, 413. Kuol further suffered forced displacement and was deprived of resources when he had to flee Sudan for Egypt in September 2002. Ex. 235, Kuol Rog. No. 1.

434.    Plaintiff Nyanriak Tingloth continues to suffer physical and psychological symptoms, including but not limited to substantial symptoms of PTSD, including intrusive memories and functional impairment, as a result of the multiple traumatic experiences inflicted by the GOS and its agents. Ex. 7, Nyanriak Appendix at 5-6. Nyanriak also suffered physical injuries. *See* Plaintiffs' Response to Proposed Fact Nos. 302, 306. Nyanriak further suffered forced displacement and was deprived of resources when she and her children had to flee Sudan for Egypt, prior to coming to the United States. Ex. 237, Nyanriak Rog. No. 1.

*435.*    Plaintiff Jane Roe was in good health prior to 2003. Ex. 7, Jane Roe Appendix at 4. As a direct result of the violence and multiple rapes she experienced at the hands of the Sudanese security forces, Jane Roe experienced a miscarriage and is now HIV positive. *Id.* at 5; Ex. 148, Jane Roe Dep. at 91:10-20; Ex. 5, Jok Report ¶ 155; *see also* Plaintiffs' Response to Proposed Fact Nos. 240, 243, 245, 247, 249.  She has experienced, and continues to experience, symptoms of PTSD and depression, including suicidal ideation, as a direct result of the violence, multiple rapes, and miscarriage she suffered. Jane Roe Appendix at 6-9.  In 2003, Jane Roe further suffered forced displacement when she had to flee Sudan for Egypt, prior to coming to the United States. Ex. 241, Jane Roe Rog. No. 1.

436.    Plaintiff John Doe continues to suffer physical and psychological symptoms, including but not limited to symptoms of physical pain, PTSD, and depression, including frequent

intrusive memories of traumatic experiences and avoidance of reminders of his experiences in Sudan, as a result of the multiple traumatic experiences inflicted by the GOS and its agents. John Doe Appendix at 7. John Doe also suffered physical injuries. *See* Plaintiffs' Response to Proposes Fact Nos. 439, 441, 444, 447. John Doe further suffered forced displacement and was deprived of resources when he had to flee Sudan for Egypt in 2004, prior to coming to the United States. Ex. 244, John Doe Rog. No. 1.

437.    Plaintiff Shafika Hassan continues to suffer physical and psychological symptoms, including but not limited to symptoms of PTSD, including frequent intrusive memories of her traumatic experiences, intense fear surrounding anything to do with the sexual assaults by government officials, and related somatic physical symptoms as a result of the multiple traumatic experiences inflicted by the GOS and its agents. Shafika Appendix at 8-9. Shafika also suffered physical injuries. *See* Plaintiffs' Response to Proposed Fact Nos. 428, 430, 431, 345. In 2004, Shafika was forcibly displaced and deprived of resources when she fled to Egypt, prior to coming to the United States. Ex. 238, Shafika Rog. No. 1.

438.    Plaintiff Hawa Omar suffered posttraumatic sequalae following the abuses she faced in at the hands of the GOS and its agents. Hawa Appendix at 5. She avoids discussions of her experiences in Sudan and uses interventions to change her thoughts when she experiences intrusive memories. *Id.* Hawa also suffered physical injuries. *See* Plaintiffs' Response to Proposed Fact Nos. 314, 320. In 2005, Hawa was forcibly displaced and deprived of resources when she fled Sudan for Chad, prior to coming to the United States. Ex. 234, Hawa Rog No. 1.

439.    Plaintiff Abulgasim Abdalla continues to suffer symptoms of an ongoing depressive disorder, including symptoms of anhedonia, issues concentrating, avoidance of discussions related to past traumatic experiences and other chronic depressive symptoms. Abulgasim Appendix at 6–

7. Additionally, he has "ongoing physical pain and significant functional limitations," like chronic leg pain and difficulty walking, resulting from his multiple traumatic experiences inflicted by the GOS and its agents. *Id.* The scarring from his beatings seems to have resulted in inadequate return of blood to his legs, especially his right leg, causing varicose veins and chronic pain symptoms. *Id.* at 7. Abulgasim also suffered physical injuries. *See* Plaintiffs' Response to Proposed Fact Nos. 207, 210, 214, 216. Abulgasim suffered forced displacement when he had to first flee his village of Dowiet attacked by the Janjaweed and the GOS forces. Ex. 229, Abulgasim Rog. No. 1. Abulgasim further suffered forced displacement when he had to flee the internally displaced persons camp near Nyala when it was destroyed by GOS forces and had to go to the Nuba mountains. *Id.* Abulgasim further suffered forced displacement when he had to flee Sudan for Kenya prior to coming to the United States. *Id.*

440.    Plaintiff Hamdan Abakar has suffered symptoms of post-traumatic stress disorder for almost 20 years as a result of the multiple traumatic experiences inflicted by the GOS and its agents. Hamdan Appendix at 6. Hamdan also suffered physical injuries. *See* Plaintiffs' Response to Proposed Fact Nos. 384, 386, 387-89, 391, 396, 398-99, 401, 405. In 2004, Hamdan further suffered forced displacement when he had to flee his home in Sudan and after spending time in the Nuba mountains, he went to a refugee camp in Kenya in 2006, prior to coming to the United States. Ex. 226, Hamdan Rog. No. 1.

441.    Plaintiff Abbo Abakar continues to suffer physical and psychological symptoms, including but not limited to symptoms of PTSD and chronic depression, notably suffering intrusive memories of the multiple traumatic experiences inflicted by the GOS and its agents. Abbo Appendix at 6. Abbo also suffered physical injuries. *See* Plaintiffs' Response to Proposed Fact

Nos. 329, 332, 334, 338. In 2005, Abbo was forcibly displaced from Sudan as he fled to a refugee

camp in Ghana, prior to coming to the United States. Ex. 228, Abbo Rog. No. 1.

442.    Plaintiff Entesar Kashef continues to suffer physical and psychological symptoms,

including but not limited to symptoms of PTSD and depression, notably suffering intrusive

memories of her traumatic experiences, "significant distress when triggered by these memories

and deliberate attempts to avoid reminders of her trauma," as inflicted by the GOS and its agents.

Entesar Appendix at 7. Entesar also suffered physical injuries. *See* Plaintiffs' Response to Proposed

Fact Nos. 360, 362, 368, 373, 375, 376, 378-79. In early 2009, Entesar was forcibly displaced and

deprived of resources when she fled Sudan, prior to coming to the United States. Ex. 233, Entesar

Rog. No. 1.

443.    Plaintiff Abubakar Abakar continues to suffer physical and psychological

symptoms, including but not limited to some symptoms of PTSD, deliberately avoiding memories,

thoughts, feelings and external reminders of the traumatic experiences inflicted by the GOS and

its agents. Abubakar Appendix at 4–5. Abubakar also suffered physical injuries. *See* Plaintiffs'

Response to Proposed Fact Nos. 113, 114. In 2003, Abubakar was forcibly displaced from Sudan

when he fled to a refugee camp in Chad, prior to coming to the United States. Ex. 232, Abubakar

Rog. No. 1.

444.    Plaintiff Jane Doe continues to suffer "numerous, severe symptoms of PTSD" and

she suffered a "major depression episode" following abuses inflicted by the GOS or its agents.

Jane Doe Appendix at 8–9. She reported symptoms like "frequent intrusive recollections of the

many traumatic experiences she has suffered, as well as engaging in avoidance behaviors, sleep

disturbance, and [feeling a] pronounced sense of shame (among others). She also reported

persistent depressed mood, frequent crying, appetite disturbance and feeling cut-off from others."

*Id.* Jane Doe also suffered physical injuries. *See* Plaintiffs' Response to Proposed Fact Nos. 343, 345, 351, 353-54, 357. In 2005, Jane Doe further suffered forced displacement when she had to flee Sudan for Egypt, prior to ultimately resettling in the United States. Ex. 240, Jane Doe Rog. No. 1.

Dated: August 18, 2023                                    Respectfully submitted,


*/s/ Kathryn Lee Boyd*                                    */s/ Brent W. Landau*
Kathryn Lee Boyd                                          Brent W. Landau
Theodor Bruening                                          HAUSFELD LLP
Michael Eggenberger                                       325 Chestnut Street, Suite 900
Terrence W. Scudieri, Jr.                                 Philadelphia, PA 19106
HECHT PARTNERS LLP                                        (215) 985-3273
125 Park Avenue, 25th Floor                               blandau@hausfeld.com
New York, NY 10017
(646) 502-9515
(646) 396-6452                                            Michael D. Hausfeld
(646) 777-2489                                            Scott A. Gilmore
lboyd@hechtpartners.com                                   Amanda E. Lee-DasGupta
tbruening@hechtpartners.com                               Claire A. Rosset
meggenberger@hechtpartners.com                            Mary S. Van Houten Harper
tscudieri@hechtpartners.com                               HAUSFELD LLP
                                                          888 16th Street NW, Suite 300
                                                          Washington, DC 20006
Kristen Nelson                                            (202) 540-7200
HECHT PARTNERS LLP                                        mhausfeld@hausfeldllp.com
6420 Wilshire Boulevard, 17th Floor                       sgilmore@hausfeld.com
Los Angeles, CA 90048                                     alee@hausfeld.com
(646) 490-2408                                            crosset@hausfeld.com
knelson@hechtpartners.com                                 mvanhouten@hausfeld.com


                                                          *Counsel for Plaintiffs*