# EXHIBIT H

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ENTESAR OSMAN KASHEF, *et al.*,

4                    Plaintiffs,

5           v.                          16 CV 3228 (AKH)

6   BNP PARIBAS SA, *et al.*,

7                    Defendants.        Conference
    ------------------------------x
8                                       New York, N.Y.
                                        June 24, 2024
9                                       4:00 p.m.

10  Before:

11                  HON. ALVIN K. HELLERSTEIN,

12                                      District Judge

13                         APPEARANCES

14  HAUSFELD LLP
         Attorneys for Plaintiffs
15  BY:  MICHAEL D. HAUSFELD
         SCOTT GILMORE
16       AMANDA LEE-DASGUPTA
         -and-
17  HECHT PARTNERS LLP
    BY:  KATHRYN LEE BOYD
18
    SULLIVAN & CROMWELL LLP
19       Attorneys for Defendants
    BY:  KAREN PATTON SEYMOUR
20       SUHANA S. HAN
         -and-
21  CLEARY GOTTLIEB STEEN & HAMILTON LLP
    BY:  CARMINE D. BOCCUZZI
22       ABENA MAINOO

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
1                 THE COURT:  Good afternoon.  We have Michael Hausfeld?

2                 MR. HAUSFELD:  Yes, your Honor.

3                 THE COURT:  Scott Gilmore.

4                 MR. GILMORE:  Yes, your Honor.

5                 THE COURT:  Kathryn Lee Boyd.

6                 MS. BOYD:  Yes, your Honor.

7                 THE COURT:  And.

8                 MR. BRUENING:  Theodore Bruening.

9                 MS. LEE-DASGUPTA:  Amanda Lee-DasGupta.

10                THE COURT:  For plaintiffs.

11          And for defendants, Karen Seymour.

12                MS. SEYMOUR:  Good afternoon, your Honor.

13                THE COURT:  Suhana Han.

14                MS. HAN:  Good afternoon, your Honor.

15                THE COURT:  Carmine Boccuzzi.

16                MR. BOCCUZZI:  Good afternoon, your Honor.

17                THE COURT:  Abena Mainoo.

18                MS. MAINOO:  Good afternoon, your Honor.

19                THE COURT:  Good afternoon to everybody.

20                First, I want to talk about some of the issues of

21    notice.

22                Why, Mr. Hausfeld, regarding the identity of class

23    members, not use the procedure of the *Touhy* case?  *Touhy* says,

24    and 6 C.F.R. Section 5.45 provides, that the party seeking

25    release or testimony must set forth in writing and with as much
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    specificity as possible the nature and relevance of the

2    official information sought.  You would ask in a *Touhy* letter,

3    giving a copy to the U.S. Attorney, exactly what you want,

4    namely, the list.

5         Now, I don't know if, under 8 C.F.R. Section 208.6,

6    you can get it because the authorization for the Department of

7    Homeland Security is any legal action arising from the

8    adjudication of the asylum application or from a credible fear

9    or determination.

10        There might be an issue.

11        MR. HAUSFELD:  We felt, your Honor, under the

12   regulations, there was a provision for obtaining information in

13   pursuit of civil litigation.

14        THE COURT:  What is that provision?

15        MS. BOYD:  5 U.S.C. 502(a).

16        THE COURT:  Use it.  Get it.

17        MR. HAUSFELD:  We still need a court order, your

18   Honor.

19        THE COURT:  Not according to 6 C.F.R. Section 545.  I

20   am not going to issue a subpoena.  If you want to give me an

21   order on motion, with a copy to the U.S. Attorney, we can have

22   a procedure.

23        MR. HAUSFELD:  That was our sense, your Honor,

24   exactly.

25        THE COURT:  Under 6 C.F.R. Section 545, you should try

 1  voluntarily to get this information.  Do that step.  If they

 2  say no or get a court order, then you come back to me.

 3          MS. BOYD:  We did that, your Honor.

 4          THE COURT:  I am not going to sign a subpoena willy

 5  nilly.

 6          MR. HAUSFELD:  Yes, your Honor.

 7          THE COURT:  Should have been done.  We are just

 8  wasting time.

 9          MS. BOYD:  Your Honor, we did speak to the general

10  counsel of DHS, and we were told that voluntarily they cannot

11  help but in a court order, pursuant to this section, and we

12  would be able to get their help to turn over the information we

13  need.

14          THE COURT:  I'm not giving you a court order unless I

15  get the view of the U.S. Attorney.

16          MS. BOYD:  Very well.

17          THE COURT:  There seems to be some confusion about the

18  nature of a trial.  The nature of the trial will conform to the

19  certification.  I set out the three issues in my order filed

20  May 9.  There is no provision for damages in it.  Damages are

21  individual.

22          There is some suggestion, Mr. Hausfeld, in your

23  papers, that somehow at the end of this class trial I'll issue

24  a judgment.  It won't be an order.

25          MR. HAUSFELD:  The order, your Honor, pursuant to the

1    issues you identified and certified, would be consistent with a

2    common injury.

3         THE COURT:  There is no common injury.  There may be

4    common injuries to some people but not all people.  I don't see

5    that I can issue a judgment for damages because, even taking

6    your point of view, it would be a judgment that answers some of

7    the people but not all the people.  Some people lost their

8    homes.  Some people were raped.  Some people were maimed.  Some

9    people lost amounts of property and possessions.  There are

10   variations in the loss.

11        MR. HAUSFELD:  We agree with those variations, your

12   Honor.  Those are not the variations that would apply to the

13   violation with regard to moral harm.  That's a loss of dignity

14   for the fact of being unable to return to your homeland, losing

15   your culture and your life as you knew it.

16        THE COURT:  I don't think I can make that

17   determination or a jury can make that determination outside of

18   the context of an entire loss that an individual suffers.  I

19   think this is an individual-driven loss case with important

20   common issues that I can decide, and then the individual trials

21   will be left for different people.

22        MS. BOYD:  Your Honor, with respect to your order,

23   common issues for trial, subsection D states:  Whether such

24   acts of BNPP proximately caused the forcible displacement of

25   the members of the class from their homes and property.  The

1    common issue is based on common proof of refugee asylum status,

2    which is common to everyone in this class because they have all

3    been adjudicated as not being able to return home by the U.S.

4    Government.  That's common proof.

5           Now, the jury would ultimately not decide liability on

6    that fact.  They would decide liability based on all the

7    evidence that B&P intends to put forward on forcible

8    displacement, which is also common evidence that life is better

9    here, that they fled a crumbling country, some of the arguments

10   you have heard Ms. Seymour make in this court.

11          With respect to proximate cause, your Honor, the jury

12   has to hear proximate cause of what, and what your Honor put in

13   the order was forced displacement, which is a Swiss code injury

14   of human dignity and general damages.

15          The circumstances of how they fled are not for this

16   trial, but the fact that they are refugees, that fact is a

17   judicially noticeable fact and it is common to everybody.  But

18   causation without a causation of what is simply not going to

19   make sense to the jury and be -- it's not what your Honor put

20   in the order, is what I'm saying.  The circumstances would not

21   be part of the trial.  But the fact that they cannot return

22   home is a judicially noticeable, nonreviewable fact, and that

23   evidence is common to everyone and that is what makes it a

24   common injury.

25          THE COURT:  I don't agree with you.  What has been

 1    decided is that they are refugees.

 2            MS. BOYD:  It has been.

 3            THE COURT:  For purpose of damages I don't believe

 4    there is an issue about -- I don't know the answer to that.

 5    I'm telling you this.  What I'm saying is this.  I can't split

 6    damages.

 7            MS. BOYD:  You're right.  But you can do general

 8    damages for forcible displacement, nothing else, and then move

 9    on to mass tort individualized injuries.

10            THE COURT:  I can't monetize that.

11            MS. BOYD:  But you can, your Honor.  Because we have

12    case law on loss of human dignity, which is uniform across all

13    humans.  It is not individualized when we cannot return home to

14    our home.  That is a loss of human dignity under Swiss law,

15    which is the rule of decision in this court, Swiss law.

16            THE COURT:  So what.  Let's say there is a loss of

17    human dignity.

18            MS. BOYD:  We can monetize that.  It has been done in

19    case before in the Swiss courts.  That's the law that we apply.

20    They can absolutely monetize it.  It has been done here in this

21    court with respect --

22            THE COURT:  That would be a floor for what, for more

23    damages?

24            MS. BOYD:  It would be a general -- what we call

25    general damages under Swiss law.  The individualized

1    circumstances are all part of the mass tort, and they would not

2    be part of that trial, so we wouldn't be taking testimony from

3    our victims on how they -- were they raped, did they lose their

4    property; just that they cannot return home because of a

5    campaign of persecution, your Honor, which is part of our class

6    trial, campaign of persecution.  And the *Hussain* case talks

7    about this at the Ninth Circuit with respect to Sudan.  A

8    campaign of persecution is part of the class.

9            THE COURT:  Tell me when you finish.

10           MS. BOYD:  Yes, sir.

11           THE COURT:  I can adjudicate that, but I can't put

12   into money what this loss of human dignity is until I get an

13   entire case for an individual.

14           Now, you say about the Swiss cases.  Do you have any

15   Swiss case that affirmed the judgment for money based on the

16   loss of dignity?

17           MS. BOYD:  Yes.

18           MR. HAUSFELD:  There are cases, your Honor, in the

19   European court of human rights.

20           MS. BOYD:  Which is the court of highest -- it's the

21   court of highest appeal in Switzerland.  Yes, we do, your

22   Honor.  We do have those cases.  The loss of human dignity has

23   been monetized.  It doesn't go into the individualized

24   circumstances of fleeing.

25           THE COURT:  How much is it worth?

1            MS. BOYD:  50,000 euros upward to 150,000 euros.

2    That's about the range.  We have them.  We have shared them

3    with the defendants.

4            THE COURT:  If it's a range.

5            MS. BOYD:  Your Honor, there have been many cases of

6    loss of human dignity for being unable to return home.  The

7    focus here is unable to return home, which is how refugees are

8    defined, by the way, in the U.S. Code.

9            The circumstances of fleeing is definitely not what we

10   are going to be putting on at the class trial.  It's the fact

11   that they cannot return home due to a campaign of persecution,

12   which will be proven, and of course there will be evidence

13   against that campaign of persecution by Sudan.

14           MR. HAUSFELD:  Your Honor, if I may, I understand one

15   is concerned about a damage award.  But from the issues that

16   you certified, all on the basis of common facts, applied to a

17   common population with common characteristics based upon common

18   conduct by both the regime, as well as the bank, that resulted

19   in a forcible displacement and inability to return home.

20   Arising out of those common elements is the injury that Swiss

21   law and the European court of human rights recognizes as a

22   separate tort to which they have assigned an ability to award a

23   damage award for that loss which every single refugee asylee

24   has experienced.

25           THE COURT:  How much do they assign?

```
1                  MS. BOYD:  50,000 euro.

2                  THE COURT:  Ms. Boyd, either you'll talk or

3   Mr. Hausfeld will talk.

4                  MS. BOYD:  Yes, sir.

5                  MR. HAUSFELD:  In any situation, your Honor, even

6   involving pecuniary damages, there is always the possibility of

7   the element of intentional infliction or negligent infliction

8   or mental distress or PTSD.  Those are awards that are separate

9   from the physical damage.

10                  In this case there is a set of circumstances that give

11  rise to an injury recognized under Swiss and European law for

12  forcible displacement.

13                  How it was set up in your certification order leads

14  naturally and proximately to an award of damage for that injury

15  applicable to the entire population of refugees and asylees.

16                  THE COURT:  Subparagraph D states:  Whether such acts

17  of Bank Paribas proximately caused the forcible displacement of

18  members of the class from their homes and property, and other

19  injuries to be tried in individual cases.

20                  You're arguing that if the judgment is that there was

21  forcible displacement from homes and property, that can be

22  subsumed in a monetary judgment?

23                  MR. HAUSFELD:  Yes, your Honor.

24                  MS. BOYD:  And other individual injuries will be the

25  subject of the bellwether trials for mass tort.
```

```
 1              THE COURT:  You're saying that there are cases in the
 2    European union that monetize the forcible displacement.
 3              MR. HAUSFELD:  Yes, your Honor.
 4              THE COURT:  And they range from what?
 5              MR. HAUSFELD:  50,000 euro to 150,000 euro.
 6              THE COURT:  Depending on what?
 7              MR. HAUSFELD:  Depending upon the circumstances of the
 8    forcible displacement.
 9              MS. BOYD:  Campaign of persecution.
10              THE COURT:  I can't deal with both of you speaking.
11              Why don't you take a few minutes and decide between
12    you who will be the spokesperson.
13              MS. BOYD:  Mr. Hausfeld.
14              THE COURT:  Otherwise, I don't want to hear you.
15              Who is going to be the spokesperson?
16              MS. BOYD:  Mr. Hausfeld.
17              THE COURT:  Depending on what circumstances?
18              MR. HAUSFELD:  The circumstances causing the inability
19    to return, and here, your Honor, you have a situation not
20    unlike --
21              THE COURT:  What do you mean, depending on inability
22    to return?  Some people can return, some people can't return?
23              MR. HAUSFELD:  For fear of persecution at a time when
24    the government in Sudan was conducting an intense campaign of
25    persecution on its targeted persons.
```

```
 1              THE COURT:  I grant you that, and presumably all
 2    members can't go home, but their homes are worth different sums
 3    of money.  So there is, you're saying, an element of emotional
 4    damage that is the forcible displacement.
 5              MR. HAUSFELD:  Yes.
 6              THE COURT:  The loss of dignity.
 7              MR. HAUSFELD:  Yes.
 8              THE COURT:  What say you, Ms. Seymour?
 9              MR. BOCCUZZI:  I was going to address this, your
10    Honor.
11              THE COURT:  Yes, go ahead.
12              MR. BOCCUZZI:  There are very few things that the
13    Swiss law experts in this case agree on, but one thing they do
14    agree on is that Swiss law damages, whether it's property
15    damage or what is called moral damage, which I think is what
16    plaintiffs' counsel are discussing, is done on an
17    individualized basis.  And here forcible displacement is a
18    specific kind of illicit act.  It's actually the government
19    driving someone from their property.
20              The cases that they are referencing in the European
21    Court of Human Rights, they actually do differentiate based on
22    the circumstances of the forced displacement in that case.  So
23    there, the Burlya case I think they are referencing, there were
24    19 plaintiffs.  Some were actually in their house when the mobs
25    came and drove them from their house in Ukraine.  Others were
```

1    not there and found out about it later.  There was, therefore,

2    a difference in the amount awarded based on that.  Moral

3    damages are not just a free-floating thing that you can just

4    pick a number and generalize it.

5         And, importantly, there is no claim for forced

6    displacement.  That's just based on, I can't return to my

7    country.  Forced displacement is all the factors your Honor was

8    referencing in terms of if you're driven from your home, and

9    then there is all the other individual claims that they might

10   bring in terms of physical abuse, wrongful interrogation, etc.

11   But there is no free-floating general, common damage or forced

12   displacement either in Swiss law or in the cases they talk to.

13   There is not a free-floating, quote, dignity injury.  Moral

14   damages always links back to the tortious act that the person

15   suffers.  It's kind of like pain-and-suffering component.

16        THE COURT:  Mr. Boccuzzi, how far do I go under D?

17   Let's say I find for the plaintiffs.  Your theory is that I

18   issue an order saying that Bank Paribas proximately caused the

19   forcible displacement of the class from their homes and

20   property.  I stop there.

21        MR. BOCCUZZI:  The way this order is framed, if that's

22   the answer that the jury gives to the common injury point, the

23   claim common injury and forcible displacement, then that's

24   correct.

25        THE COURT:  Mr. Hausfeld, what comes after that, if

 1    anything, in the order?

 2           MR. HAUSFELD:  For me, your Honor, as I understand,

 3    again, the questions and the concept of forcible displacement

 4    would be what damage did the class suffer as a result of being

 5    unable to return to their home and their lives and their

 6    families.  And everything -- their history because there was a

 7    continued campaign of persecution.

 8           THE COURT:  So you're saying that there is an amount

 9    that could be ascribed to each and all members of the class for

10    loss of homes.

11           MR. HAUSFELD:  Yes.  A common amount for being unable

12    to return, not because someone else is living in your house,

13    but, as the Second Circuit said in one case involving Jewish

14    persons who did not want to return to Germany during the Third

15    Reich.  They fled because of fear of persecution, and they

16    couldn't return because of fear of persecution, and they lost

17    that family value that the European Court of Human Rights said

18    every person has a dignity to have.

19           MS. BOYD:  If I may.

20           THE COURT:  Ms. Boyd, no, you can't.

21           Mr. Boccuzzi, what presumptive value, if any, does the

22    adjudication of the immigration court have?

23           MR. BOCCUZZI:  Your Honor, other than helping us know

24    who meets your class definition, that's it, because to be a

25    refugee under U.S. law, that means you either suffered

1    persecution or had a reasonable fear of persecution.  A

2    reasonable fear of persecution does not equal suffering the

3    illicit act of forcible displacement under Swiss law.

4         This concept, again, they say comes to Swiss law

5    through the European Court of Human Rights and that case law.

6    The one expert, former judge of that court, Judge Keller, whose

7    declaration your Honor has, says that the determination of

8    forced displacement is not linked to U.S. refugee status or

9    other refugee status.  It's derived from the facts of the case,

10   like the *Burlya* case, where an individual was driven from their

11   home.

12        That is completely divorced from the black-box result

13   of the refugee status process that the U.S. Government goes

14   through that says someone is a refugee or an asylee.  Don't

15   forget, this class includes asylees.  Those are people who are

16   here and say I want asylum because I have a reasonable fear

17   that if I go back there, I will be persecuted.

18        Your Honor, I think it's plain that the result of that

19   black-box administrative proceeding -- we are not challenging

20   that they are not rightfully deemed refugees or asylees.  But

21   the result of that proceeding would just confuse a jury or

22   other fact finder in terms of how that relates to forcible

23   displacement.

24        THE COURT:  One of the facts that must be determined

25   to grant asylum status and also grant refugee status is that

1    you can't return to your home without being persecuted.  If I

2    remember the law, there are categories mostly having to do with

3    punishment for your religious or political expressions or

4    joining various groups and the fear of persecution if you come

5    home.  Those would be the findings of the immigration court.

6    That's, in effect, tantamount to the issue, can I go home again

7    or forcible displacement.  It's the same issue.

8           Now, it's not a court that has determined that.  It's

9    an administrative agency.  I don't know if it's the immigration

10   judge or the Board of Immigration Appeals or what, or a fiat of

11   the Department of State.

12          What is the source of the determination that a person

13   can't go home again and deserves refugee or asylum status?

14          MS. MAINOO:  Your Honor, I will speak to this.

15          The determination of whether an individual qualifies

16   to be a refugee or an asylee depends on whether the individual

17   experienced persecution or had a well-founded fear of

18   persecution on account of a protected characteristic and is

19   unable or unwilling to return and is unable or unwilling to

20   avail herself of the protection of her country on that basis.

21          THE COURT:  Stop.  That's the very point that

22   Mr. Hausfeld wants to prove.

23          MS. MAINOO:  But it's not, your Honor, for two

24   reasons.

25          First, refugee or asylee status does not mean that a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

 1    particular government, for example, the government of Sudan,

 2    persecuted an individual or caused her to have reasonable fear

 3    of persecution.  The Second Circuit --

 4              THE COURT:  Stop.  Why not?

 5              MS. MAINOO:  Because the Second Circuit has explained

 6    that persecution can be at the hands of the government or at

 7    the hands of an organization or person from which the

 8    government cannot or will not protect the applicant, and that's

 9    in the *Castro-Perez* case.  That's 833F --

10              THE COURT:  If there are roving bands and the

11    government does nothing about it, under our immigration law

12    that is grounds to grant refugee or asylum status.  Under

13    practical grounds here it means I can't go home again.

14              MS. MAINOO:  Correct.  Also, if an applicant's

15    partner, domestic partner, abuses her and the government cannot

16    protect her, that's also grounds for refugee or asylee status.

17              THE COURT:  The proofs that will be coming in on the

18    other issues will make that point academic.

19              MS. MAINOO:  The other reason, your Honor, is that --

20              THE COURT:  Let me ask you this question.  Let's

21    suppose that the plaintiffs prove A, B, and C.  Doesn't D

22    follow from the immigration decision?

23              MS. MAINOO:  Your question is, if the plaintiffs prove

24    A, B, and C, does D follow from the immigration decision?  It

25    does not.

```
 1                THE COURT:  Why not?

 2                MS. MAINOO:  Again, as I was explaining --

 3                THE COURT:  The only one there that would be an

 4   exception would be domestic abuse, but that's precluded by the

 5   finding under A.

 6                MS. MAINOO:  No, your Honor.  I was giving the example

 7   of domestic abuse just to show that an applicant can get

 8   refugee or asylee status based on the actions of a private

 9   actor and not necessarily based on the actions of a government,

10   here, the government of Sudan.

11                THE COURT:  The first question is whether the

12   government of Sudan persecuted class members or caused them to

13   have reasonable fears of persecution because of their race,

14   religion, or ethnicity between November 1997 and December 2011.

15   That's the government of Sudan, not an individual.

16                The question I have really is what value I accord the

17   decision of the immigration judge.  I don't know if it went up

18   beyond that.  Tell me, by what fiat is a person adjudged a

19   refugee or an asylee?

20                MR. BOCCUZZI:  I think it's just a determination by

21   USCIS.

22                THE COURT:  By whom?

23                MS. MAINOO:  USCIS, the U.S. Citizenship and

24   Immigration Services.

25                THE COURT:  Only one person, please.
```

1          MS. MAINOO:  It's an administrative agency, the U.S.

2    Citizenship and Immigration Services.  And for all of the

3    named --

4          THE COURT:  Is that a procedure?

5          MS. MAINOO:  No.  It's a determination by an official.

6    It's not an adjudicative process.  It's not an adversarial

7    process.  For all of the named plaintiffs in this case, they

8    are all refugees.

9          THE COURT:  Doesn't that mean that it's admissible

10   under 803(8)?

11         MS. MAINOO:  It does not because 803(8) addresses --

12   803(8), for example, addresses factual investigations from --

13   factual findings from a legally authorized investigation.

14         THE COURT:  Well --

15         MS. MAINOO:  The determination of whether an applicant

16   is a refugee or asylee is not based on any investigation.  It's

17   a legal conclusion about whether the applicant met the

18   statutory criteria.

19         THE COURT:  But there hasn't been an adversary

20   proceeding.

21         MS. MAINOO:  There has not been an adversarial

22   process.  There is no judge.  There is no hearing.  There are

23   no witnesses.

24         THE COURT:  I don't believe I can give it more than an

25   admissibility status.

1          MS. MAINOO:  Right.  I would also add that the BNP

2     defendants were not involved at all in that administrative

3     determination, so we certainly had no opportunity to litigate

4     any issue.

5          THE COURT:  Mr. Hausfeld, do I give it more than

6     803(8) standing?

7          MS. BOYD:  Yes.

8          THE COURT:  Ms. Boy, will you please keep quiet or be

9     the spokesperson, one or the other.  You choose.

10          Yes, Mr. Hausfeld.

11          MR. HAUSFELD:  It is admissible, your Honor, and it is

12     also highly probative.  It's also consistent with the one.

13          THE COURT:  Is it presumptive?

14          MR. HAUSFELD:  It's presumptive, your Honor, in my

15     judgment, along with all of the other evidence that there was a

16     campaign of persecution.

17          THE COURT:  If it's presumptive, you don't need any

18     other evidence.  It is up to the other side to bring in

19     evidence.

20          MR. HAUSFELD:  Here is the connection that counsel for

21     BNP made but then distorted.  The fact of refugee status or

22     asylee status is a fact, and it is based on objective criteria

23     which courts have recognized is nonreviewable.  That is the

24     fact of your status.  That status has to be considered in

25     connection with the violation of Swiss law.  So along with the

1   other factors, does that fear of persecution render you unable

2   to return because there is an ongoing campaign of persecution?

3         THE COURT:  I hear everything you say.  It's not

4   argument now.  It's a technical point.  What status is it?

5         Let's say that Ms. Mainoo wants to come up and argue

6   that, no, no, they could have come back.  Is she precluded?

7         MR. HAUSFELD:  On one hand, your Honor, I would like

8   to say, no, they are not precluded.  On the other hand -- I got

9   that backwards.  On one hand, I'd like to say, yes, they are

10  precluded.  On the other hand, if they really want to test

11  their credibility, sure.  Say these people who are targeted for

12  persecution, where there was a campaign of persecution, where

13  the world condemned the persecution, and BNP refused to

14  recognize that it was ongoing, sure they could have returned.

15        THE COURT:  I think where I come out on this is that

16  it's admissible under 803(8).  And if there is no further

17  proof, that would be sufficient *prima facie* for a final order.

18  If there is additional proof, then I have to deal with the

19  proofs to find out what's persuasive.

20        Actually, this would be a jury question, wouldn't it?

21        MR. HAUSFELD:  Yes, your Honor.

22        MS. MAINOO:  Your Honor, if I may just be heard

23  further on this issue.

24        Any evidence underlying a determination that a class

25  member is a refugee or an asylee is useable to the extent that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  is admissible.  But the conclusions that are reflected in the

2  determination that a class member is a refugee or asylee is not

3  in itself admissible evidence.

4        THE COURT:  What is not admissible?

5        MS. MAINOO:  The determination by the U.S. agency that

6  a class member satisfied the statutory criteria to qualify as

7  an asylee or refugee.

8        THE COURT:  I disagree.  That's what they precisely

9  held.  That's their precise holding, that you're entitled to be

10  a refugee or an asylee.

11        MS. MAINOO:  That is a legal conclusion, your Honor,

12  and in the 9/11 litigation you had said, your Honor, that legal

13  conclusions are not -- are likely not admissible under 803(8).

14  In the 9/11 litigation, you admitted certain findings from the

15  9/11 report in the 9/11 litigation, and there, in saying that

16  those findings were admissible under the 803(8) exception --

17        THE COURT:  What case are you citing, *Bavis*?

18        MS. MAINOO:  *In Re September 11 litigation*, 621

19  F.Supp. 2d. 131 (S.D.N.Y. 2009).

20        THE COURT:  They are all entitled the same way.  Which

21  particular case is that?  Is that the *Bavis* case?

22        MS. MAINOO:  Excuse me, your Honor?

23        THE COURT:  Is that the *Bavis* case, B-a-v-i-s?

24        MS. MAINOO:  I will need to get back to you on that,

25  your Honor.

1          But the point from the September 11 litigation, you

2     explained that the findings from the report that you admitted

3     were written following an investigation by a public commission.

4          THE COURT:  I would have held, and I don't know if I

5     have ever held, but I would have held that it was admissible

6     under 803(8).

7          MS. MAINOO:  Under 803(8).  You said that there was a

8     public commission that did an investigation, heard 160

9     witnesses.

10         THE COURT:  I know what I said.  It would have been

11     admissible under 803(8).

12         You're not paying attention to me.  I'm saying that

13     it's admissible.  Without further proof it will be sufficient

14     for a judgment.  If there is further proof, I have to consider

15     the ruling versus the other proof, or whatever else comes in.

16         MS. MAINOO:  I am saying it's not admissible because

17     it is hearsay.  That does not qualify for any hearsay

18     exception, including 803(8).

19         THE COURT:  I would hold it as 803(8).  It has all the

20     earmarks of 803(8).

21         MS. MAINOO:  There are not guarantees of

22     trustworthiness.  There was no hearing.  There were no

23     witnesses.  There was no equivalent of cross-examination.  In

24     addition, it does not even meet the requirements of 803(8)

25     because it does not reflect factual findings from a legally

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    authorized investigation.

2           THE COURT:  Federal Rule of Evidence 803(8):  A record

3    or a statement of a public office -- the immigration decision

4    is a record -- if it sets out the office's activities.

5           The immigration tribunal is set out and is authorized,

6    so that is satisfied.

7           A matter observed while under a legal duty to report.

8    That's certainly the case of the immigration official in a

9    civil case or against the government in a criminal case.

10          Factual findings from a legally authorized

11   investigation.  This is a legally authorized investigation into

12   the province of the person coming before the tribunal to see if

13   that person qualifies for refugee status or asylee status.

14          (Continued on next page)

1        And, B, the opponent does not show that the source of

2  information or other circumstances indicate a lack of

3  trustworthiness.  It would be up to you to show that.

4        MS. MAINOO:  Your Honor, I think that the --

5        THE COURT:  In the absence of proof that there is a

6  lack of trustworthiness of these findings, I rule that 803(8)

7  applies.  That's my ruling.

8        MS. MAINOO:  Your Honor, just to clarify, I think

9  there's a misunderstanding about how these determinations were

10  made, right.  As I explained, all of the named plaintiffs here

11  are refugees.  That means that they were determined to be

12  refugees based on a bureaucratic process.  According to

13  plaintiffs' own immigration experts, to apply for refugee

14  status, an applicant fills out an intake form and then

15  undergoes an interview by an United States intake personnel;

16  and then, there's a determination whether the applicant

17  qualifies as a refugee mainly based on this intake form and

18  interview.  So this process that you were describing involving

19  a tribunal and maybe there's a hearing, there is none of that.

20        THE COURT:  I didn't say anything about tribunal.

21  We're talking about a decision by a judicial agency or an

22  administrative court.  We're talking about a public record in

23  the manner described here.

24        MS. MAINOO:  But an individual's status --

25        THE COURT:  I ruled.

1          MS. MAINOO:  An individual's status as a refugee or

2     asylee is not a public record, your Honor.  It's a

3     determination about whether they meet statutory criteria.

4          THE COURT:  I hold that it applies, that under rule

5     803(8) that it's admissible, and without further proof, it's

6     sufficient to base a final order.

7          If I'm correct, that there will be no judgment on the

8     issues that have to be litigated, there has to be an additional

9     proceeding, a rather complicated one, to apply individual

10    judgments to each particular case.  It's very complicated.  The

11    first step with a notice that's being developed now sets up an

12    opt-out class; namely, the individuals who are in the class, if

13    they don't opt out, are included.  A very important

14    consideration for the defendant because the defendant needs to

15    have finality in the case of any settlement.

16         Without an understanding of who is in and who is out

17    of the class, there can't be such finality.  The problem I

18    have, Mr. Hausfeld, and I look upon you to resolve this

19    problem, is how to have a reasonably ascertainable class, by

20    which I mean, ascertainable individuals.  So if two or three

21    years from now, someone pops up and says, I want to sue Bank

22    Paribas.  Bank Paribas says there was a discharge in the lease,

23    and if you don't know who is in the class and who is not in the

24    class, how can you do it?

25         MR. HAUSFELD:  Your Honor, I apologize for not raising

```
 1    this before, but may I argue from the seat?

 2              THE COURT:  Sorry?

 3              MR. HAUSFELD:  May I argue seated as opposed to

 4    standing?

 5              THE COURT:  Yes.

 6              MR. HAUSFELD:  Thank you, your Honor.

 7              That is an additional question that permeates almost

 8    every class.  This class is exceptional.  By definition, you've

 9    ascertained and identified them.  They are refugee -- they are

10    individuals who have achieved refugee and asylee status.

11              THE COURT:  How do know who is a refugee or an asylee?

12              MR. HAUSFELD:  There are records that the government

13    has.

14              THE COURT:  How are you going to get those records?

15              MR. HAUSFELD:  Yes, your Honor.  We'll ask for them.

16              THE COURT:  Yes, and if you don't get those records,

17    we'll have to figure out what else to do.  But if you get them,

18    we'll have them.

19              MR. HAUSFELD:  That's one.

20              THE COURT:  Now, let's say you address a letter to the

21    last known addresses, a certain number of them will come back.

22    How are you going to find who they are?  You'll know every

23    name.  You'll know every single name.  You may not be able to

24    find them.

25              MR. HAUSFELD:  Correct.
```

 1          THE COURT:  So the means you have laid out to find

 2    them seem to be reasonable and appropriate.

 3          MR. HAUSFELD:  And we've gone to an expert in the

 4    field.

 5          THE COURT:  Provided, and this is a basic provision,

 6    that we know all the names.

 7          MR. HAUSFELD:  Yes.

 8          THE COURT:  Do you have any problem with that,

 9    defendants?  Who is going to speak, Mr. Boccuzzi?

10          MR. BOCCUZZI:  I apologize, your Honor.  I didn't hear

11    the last few words you said about knowing and not knowing the

12    names.

13          THE COURT:  I said that we would know the names of

14    every individual who would classify as a refugee or asylee

15    because the government has those names.  And assuming that

16    Mr. Hausfeld, using the *Touhy* procedures, will obtain their

17    names, the question then becomes if they are not at their last

18    known addresses, how to reach them.  So here, a reasonable

19    method of finding them is such as described by the plaintiffs,

20    and if they use those methods, it seems to me, I should find

21    that the notice requirement of Rule 23 is satisfied.  But if

22    they don't get the names of the people, then we have to

23    consider this issue further.

24          MR. BOCCUZZI:  Consider the issue?

25          THE COURT:  Further.

1          MR. BOCCUZZI:  I think that's right.  I mean, in their

2    proposed procedures, they essentially discuss a three-pronged

3    approach.  One, going to the government, and we put in our

4    response that we think the government needs to be asked through

5    this *Touhy* procedure or otherwise --

6          THE COURT:  If you sit down and use the microphone,

7    I'll hear you better.

8          MR. BERKE:  OK.  Is this better?

9          THE COURT:  Yes.

10          MR. BERKE:  So we put in our response that, yes, they

11    should go through the government, either through this *Touhy*

12    process or otherwise, to figure out what the government is able

13    and willing to do.  Because it's not simply refugee or asylee

14    status; it's refugee or asylee status with individuals who

15    lived in Sudan during the class period, so 1997 to 2011.

16    Obviously, you know, there's been years before and years after

17    that when people lived in that country --

18          THE COURT:  Not a problem because we have an opt-out

19    situation, and if we give notice to more than the people in the

20    class, no harm done.  When we assess damages, we'd have to have

21    another procedure, a claims procedure of some sort.  That we'll

22    get to in a few minutes.

23          MR. BOCCUZZI:  OK.

24          THE COURT:  But at the initial stage, we shouldn't

25    care if the notice goes to more people than it has to go to.

 1          MR. BOCCUZZI:  Assuming between what the government

 2   does, what these relocation organizations do, and then the

 3   other notice that they proposed through the media, that

 4   three-pronged approach seems like it's sufficient under the

 5   case law.  As your Honor said, if the government comes back and

 6   says, We don't have the information in this form or We can't do

 7   this, then we need to reassess.

 8          THE COURT:  Yes.  I'm not keen on the idea that the

 9   government will issue the notice.  It seems to me that it's my

10   responsibility as a judge and this Court's responsibility to

11   have the notice administered accountable to the Court.  All

12   right.  So do your wonders, Mr. Hausfeld.

13          MR. HAUSFELD:  We believe, your Honor, as you just

14   said, that it is your responsibility to do exactly as you

15   identified.

16          THE COURT:  And let it come back.  And let's talk

17   about what happens after.  You haven't given me a form of

18   notice yet, and you have to do that.

19          MR. HAUSFELD:  Yes.

20          THE COURT:  You have to exhaust the *Touhy* procedures.

21   You haven't done that.

22          MR. HAUSFELD:  Yes.

23          THE COURT:  But let's now talk about what happens

24   afterwards.  We have a trial.  It's a jury trial, and we have

25   common issues.  If I'm correct in my view, there's no judgment

1    here.  The next step, assuming that the plaintiff wins on these

2    issues, is to create a procedure by which we can eventuate with

3    either jury trials or a firm objective basis for settlements.

4    And here, I think, we can make use of the procedures that we

5    used in the 9/11 litigation.

6         I will propose that if you get the final orders that

7    you expect, the next step would be to ask the people in the

8    class to come forward and make their claims.  And then, we work

9    out with a special master a series of questions in the form of

10   interrogatories that would require individual answers.  Based

11   on those individual answers, we can create bellwether

12   procedures for depositions and trials.  That worked in the 9/11

13   case.  It should work here.  It will create an objective basis

14   for making distribution of any awards.  It will require

15   plaintiffs to come forward and swear to the varitudes of their

16   complaints, their claims, and it will allow a creation of a

17   joint database so that everyone is on the same territory in

18   deciding values if we settle or going to trials if we don't.

19        This is a framework that I think we can work under.

20   It's early for commenting, but what do you think, Mr. Hausfeld?

21        MR. HAUSFELD:  I would like to think a little more

22   about it, your Honor.  But I would ask this question:  In the

23   first trial, and I see what your Honor is attempting to put

24   together with the individual trials, would it not be consistent

25   to have the jury award at least an amount for the moral damage

1    common to all that they would then add at the individual trial

2    when those individual trials came up?

3        THE COURT:  This is the point that Ms. Boyd has argued

4    with such passion, and it's a serious point.  I don't think any

5    courts confronted this issue because our law is based on

6    individual rights, and I'm concerned about splitting causes of

7    action.  I'm concerned of either an inability or unfairness in

8    asking a jury to place an amount without that jury being able

9    to assess an entire situation.

10       Damages are now forms of full trials, enable the jury

11   to look at the whole person and assess damages, particularly

12   noneconomic damages, and we are working with noneconomic

13   damages.  To these noneconomic damages, there will be different

14   values on the homestead, different values on the personal

15   possessions, different values according to the injuries,

16   personal injuries, suffered by the people.  It's a complex

17   situation, and I am not a fan of letting a jury come to a

18   monetary sum in the abstract.

19       MR. HAUSFELD:  I don't believe, your Honor, in this

20   instance when you are dealing with persecution, there's an

21   abstraction in terms of an assessment of a non-pecuniary

22   damage.  If you have a government that is engaged in a campaign

23   of persecution which is consciously assisted by a bank enabling

24   it to do so, and people flee that persecution and then are

25   presented with the issue when they asked for entry into the

1    United States and the United States determines, What do I do?

2    Do I let you in or do I force you to go back?  That's forcible

3    displacement because you're putting the refugee or the asylee

4    in a position of having to say:  Do I want to go back

5    voluntarily to a government that I know has targeted me for

6    persecution?

7            THE COURT:  We're passed that.  You've already proved

8    those points.  The question is whether we put a monetary amount

9    on it.

10           MR. HAUSFELD:  And that's what I'm getting to.

11           THE COURT:  And that's the question that I have grave

12   concern about.

13           MR. HAUSFELD:  Everyone has a right not to be put in

14   that position.  Everyone has a general right to a life deprived

15   by reason of persecution, and that right should be equal to

16   all.  There may be aggravating circumstances, your Honor, which

17   add to that injury, but that injury of that right to life, that

18   right to your history, your culture, your homeland, that is a

19   right that I believe a jury can assess and award damage per

20   individual and then have that added to the aggravating rights.

21           THE COURT:  Suppose defendants wanted to settle.

22   Let's say I accept your argument.  The jury fixes a monetary

23   award, what, for the class as a whole?

24           MR. HAUSFELD:  They could do that because then there

25   still would have to be --

```
 1              THE COURT:  How do you know how many people are in the

 2    class?

 3              MR. HAUSFELD:  Here is the issue, your Honor.  We have

 4    estimates right now, based upon review of the records that are

 5    publicly available, as to the number of persons who receive

 6    refugee or asylee status and lived in Sudan from 1997 to 2011.

 7    They still would then need to make a claim at the end of the

 8    process.

 9              THE COURT:  Let's stay defendants wanted to settle it

10    at this point when there's a class judgment.  Would they be

11    able to?  Would I be able to approve an award?

12              MR. HAUSFELD:  Yes, your Honor.

13              THE COURT:  Well, how would that be based?  Let's say,

14    if you want more than the jury decision, than the jury verdict

15    for the class, how could there be a settlement?  And if you

16    don't want to take away the rights of the individuals, how

17    could defendants settle?  They would need releases, and they

18    couldn't get releases.

19              MR. HAUSFELD:  If the class were certified and it was

20    a class judgment, all class members would be bound by that.

21              THE COURT:  Exactly.  Even though they have larger

22    claims.

23              MR. HAUSFELD:  They would only be releasing the claim

24    with regard to the forced displacement, not for the aggregating

25    injuries.
```

 1          THE COURT:  You are not going to get a settlement on

 2     that basis.  I don't see how I would be able to approve it.

 3          MR. HAUSFELD:  Your Honor, if I may, there's a

 4     two-track process here, which could proceed as two tracks or

 5     one track with two levels.  The two-track process would be a

 6     settlement or a verdict on a class basis with regard to the

 7     violation of Swiss law with an award of an aggregate class

 8     damage for the moral injury.

 9          THE COURT:  Which can be executed upon?

10          MR. HAUSFELD:  Can be?

11          THE COURT:  Executed upon.

12          MR. HAUSFELD:  Yes.  Claims would have --

13          THE COURT:  Even though that is not a final judgment?

14          MR. HAUSFELD:  It would be final as to that claim.

15          THE COURT:  Could it be appealed?

16          MR. HAUSFELD:  It could be.

17          THE COURT:  Would it be appealable as of right?

18          MR. HAUSFELD:  I don't see why not.

19          THE COURT:  It's not a final judgment.

20          MR. HAUSFELD:  It would be a final judgment with

21     regard to that claim under Swiss law.

22          THE COURT:  That's not a final judgment.  That's a

23     partial judgment.

24          MR. HAUSFELD:  The other claims would be for different

25     violations dealing with the aggravating injuries of torture,

1    rape, et cetera.

2            THE COURT:  It's in a package?

3            MR. HAUSFELD:  We can put it in a package, your Honor.

4    Again, if there was an award for the moral injury for every

5    individual, that gets added on to a final package when the

6    individual's aggravating injuries are combined with a jury

7    trial adding the separate moral damage.

8            THE COURT:  I'm going to reread the European cases;

9    I'm going to reread our own law on class settlements, and come

10   to a decision.  Meanwhile, you go ahead, but I can tell you

11   that my strong feeling is that there can be no monetary

12   judgment on the basis of the class trials.

13           Tell me about another issue.  What about the

14   individual cases?  How many are there?

15           MR. HAUSFELD:  We estimate there are going to be

16   thousands of individual cases among the aggregate of refugees

17   and asylees.

18           THE COURT:  And will they be bound by the class

19   determination.

20           MR. HAUSFELD:  They will be bound by class

21   determination.

22           THE COURT:  So there will not be individual cases;

23   they'll be individual claims that do apply?

24           MR. HAUSFELD:  Yes.

25           THE COURT:  I'm asking you how many individual cases

1    are now on file with the United States District Court?

2            MR. HAUSFELD:  The visa cases, your Honor, the non-

3    refugee/asylee?

4            THE COURT:  Those are your class members.  Are there

5    individual cases now pending in the court?

6            MR. HAUSFELD:  600, your Honor, I'm told.

7            THE COURT:  What would I do with them?

8            MR. HAUSFELD:  What you would do is follow your

9    blueprint in 9/11.

10           THE COURT:  Are you representing those people?

11           MR. HAUSFELD:  If they are class members, yes.

12           THE COURT:  So they are not class members.  They

13   brought their own cases.

14           MR. HAUSFELD:  We will give them the option at this

15   point, since now they are not class members, to select their

16   individual counsel.

17           THE COURT:  They are separately represented?

18           MR. HAUSFELD:  Not right now, your Honor.

19           THE COURT:  Who represents them?

20           MR. HAUSFELD:  We do until we notify them that they

21   are not in the class, and they need to seek individual

22   representation.

23           THE COURT:  Ms. Boyd, there are 600 cases in the

24   court?

25           MS. BOYD:  There are approximately 600 visa cases that

1   are defined out of the class.

2         THE COURT:  Why were they defined out of the class?

3         MS. BOYD:  Well, because originally our class was

4   defined as all Sudanese-Americans, whether they came in through

5   refugee/asylee status, or they came in through other ways like

6   visas, spousal visas, diversity visas.  Those visa recipients,

7   we have fee agreements with them.  We have engagement

8   agreements with them, so we do represent them right now.  And

9   we filed their individual cases once your Honor ruled the

10  class.  We filed their individual cases.  We had a duty to do

11  that under the statute of limitations.

12        We are in the process of contracting all of these

13  hundreds, which is a long process, to tell them what happened,

14  explain to them they have the opportunity to seek other

15  counsel, that their cases are filed with the court, and they

16  would be proceeding individually.  We think procedurally it

17  makes the most sense to stay those cases until resolution of

18  the class trial, which has substantial overlapping issues,

19  which may be, because they are all in privity, collateral

20  estoppel.  So we would be asking for stays of those individual

21  matters until the class-wide cases are resolved.

22        THE COURT:  How could you be on both sides of a stay

23  motion?

24        MS. BOYD:  How could I be on both sides of a stay

25  motion?  Well...

 1              MR. HAUSFELD:  It's my opinion, your Honor, that those

 2    other plaintiffs need to --

 3              THE COURT:  I can't hear you, Mr. Hausfeld.

 4              MR. HAUSFELD:  Those other plaintiffs need to retain

 5    other counsel.

 6              THE COURT:  Yes.

 7              MR. HAUSFELD:  That's what we need to advise them of

 8    and have them do that.  But at that point when they do, the

 9    separate track of individual mass-tort-type cases can be

10    combined with the mass-tort-type classes of the class members.

11              THE COURT:  You say, though, that these are not people

12    who are refugees or asylees?

13              MR. HAUSFELD:  Correct.

14              MS. BOYD:  They suffer the same persecution.  They

15    just came to the United States in a different way.

16              THE COURT:  What's your thoughts, defendants?

17              MR. BOCCUZZI:  I think your Honor, just to be clear,

18    there are about 600 plaintiffs.  There's six captioned cases.

19    The first three were filed last year, and all those seem to

20    plead that they're refugees, except for about six of them where

21    they just say they arrived in the U.S.

22              And then we have the three new actions filed this

23    year, which we understood would be on behalf of visa status

24    folks who are here, but now we understand that it's kind of a

25    mix.  And so, plaintiffs need to figure out who is a refugee,

```
 1    who is an asylee, and I guess all of those people would be

 2    absorbed into the class.  And the visa folks in these three

 3    cases and maybe one of the old cases from last year would

 4    proceed with separate counsel.  We certainly think it makes

 5    sense for them to figure out who is what and what they are

 6    going to plead, because right now it seems like we have a bunch

 7    of placeholders.  But it's not clear to me that once we

 8    understand the situation, that we'd want to have a stay,

 9    because, for example, there have been discussions among the

10    parties, and as your Honor did in 9/11, there's the

11    questionnaire process.  There could be information that is

12    gathered from the parties that is relevant either to a

13    bellwether stage or class-wide defenses.

14            THE COURT:  We're ahead of ourselves.  We don't know

15    what the story is.  We don't know if they can succeed in those

16    cases or not.

17            MR. BOCCUZZI:  I'm all saying is --

18            THE COURT:  I don't think you can combine plaintiffs

19    in a single caption.  In 9/11, I required everybody to get a

20    separate caption and get a separate index number.  That process

21    itself will eliminate a lot of people.

22            Look, at this point, I'm not going to entertain a

23    motion to stay.  I've got to figure out a way to deal with

24    these cases, and we have to do that.

25            They were filed when?  When Judge Nathan was presiding
```

1    or when I was presiding?

2              MS. BOYD:  When you were presiding, we filed the first

3    three, and the -- all of them were filed.  Your Honor, we do

4    need to voluntarily dismiss quite a few of the individual

5    claims because they are class members, so we need time to just

6    do that because they are part of the class.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  I'll wait and not do anything until you go

 2   through that process.

 3              MS. BOYD:  Thank you.

 4              THE COURT:  When do we meet again?  How much time do

 5   you need to address the State Department and get a response, to

 6   look at the cases you are going to dismiss?

 7              MR. HAUSFELD:  Given the summer months, your Honor, I

 8   would say 30 days.

 9              THE COURT:  I don't think you will get an answer from

10   the State Department in 30 days.  They don't do passports well.

11              Give me a realistic time.

12              MR. HAUSFELD:  September.

13              THE COURT:  How about September 24 at 2:30?  If you

14   need me before then, let me know.

15              MR. HAUSFELD:  Yes, your Honor.

16              THE COURT:  You are going to see what you can get out

17   of the State Department.  If the answer is you get a subpoena,

18   you will make a motion.

19              MR. HAUSFELD:  Yes, your Honor.

20              THE COURT:  Before then.  Don't wait.

21              What else do you have to do?

22              MR. HAUSFELD:  At this point, given what we are now

23   looking at, that would need to be done.

24              Do we have your Honor's approval for the notice

25   program?
```

```
 1              THE COURT:  I think you should develop a form of

 2    notice.

 3              MR. HAUSFELD:  Thank you.

 4              THE COURT:  It may possibly be wasted time if the

 5    State Department is not cooperative, but I think you should do

 6    the notice.

 7              MR. HAUSFELD:  We can get a notice --

 8              THE COURT:  It has got to be in English, doesn't it?

 9              MR. HAUSFELD:  I would think it would be in both, your

10    Honor.

11              MR. BOCCUZZI:  On the form of notice, there have been

12    a round of drafting between the defendants and the plaintiffs

13    where we gave them comments.  They took some.  Some were

14    subject to the discussion today about whether there would be a

15    class-wide damage, etc., and that was part of the disagreement

16    in the form of notice.  Should the parties go back to the

17    drawing board and see if we could narrow any other differences

18    on the form before it comes to your Honor?

19              THE COURT:  Well, it depends on you.  I don't want you

20    to waste time when you need rulings.

21              One minute.

22              I think you should do it on a form where it describes

23    the issues to be decided by a class, and thereafter there will

24    be procedures to undertake claims and procedures for assessing

25    damages or determining damages.  You work out that language.  I
```

1    think that's what we are talking about today.

2              MR. HAUSFELD:  That's what I understood, your Honor.

3              THE COURT:  Thank you very much.

4              (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25