**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ENTESAR OSMAN KASHEF, *et al.*,<br><br>　　　　　　*Plaintiffs*,<br><br>　-against-<br><br>BNP PARIBAS S.A. and BNP PARIBAS US WHOLESALE HOLDINGS, CORP.,<br><br>　　　　　　*Defendants*. | No. 1:16-cv-03228-AKH-JW<br><br>Hon. Alvin K. Hellerstein |

**CLASS COUNSEL'S MOTION FOR AN**
**ORDER REGULATING INDIVIDUAL DAMAGES CLAIMS**
**AND USE OF SETTLEMENT QUESTIONNAIRES**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

BACKGROUND .................................................................................................................... 5

A.    The Court Certified a Class for Common Issues. ................................................... 5

B.    The Court Created a Parallel Opt-In Process for Individual Damages Claims...................... 5

C.    The Court Adopted a Settlement Questionnaire and Matrix.................................................. 7

D.    The Settlement Questionnaire Process Has Faced Numerous Challenges. ........................... 8

ARGUMENT ........................................................................................................................11

A.    Due process precludes barring the individual claims of class members unable to complete
questionnaires without assistance of counsel..............................................................................11

B.    The Court should adopt a claims procedure for class members who opt-in to pursue
individual damages with assistance of counsel........................................................................... 14

C.    The Court should preclude BNPP's use of settlement questionnaires and matrices for non-
settlement purposes...................................................................................................................... 17

CONCLUSION.................................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adir Int'l, LLC v. Starr Indem. & Liab. Co.*,
   994 F.3d 1032 (9th Cir. 2021)...................................................................... 12

*BNP Paribas SA v. Kashef*,
   2025 WL 889140 (U.S. Mar. 24, 2025) ........................................................ 5

*Degen v. United States*,
   517 U.S. 820 (1996) ..................................................................................... 21

*Eisen v. Carlisle & Jacquelin*,
   391 F.2d 555 (2d Cir. 1968)......................................................................... 14

*Guajardo-Palma v. Martinson*,
   622 F.3d 801 (7th Cir. 2010)........................................................................ 12

*Hansberry v. Lee*,
   311 U.S. 32 (1940)........................................................................................ 14

*In re A.H. Robins Co., Inc.*,
   197 B.R. 568 (E.D. Va. 1994)................................................................. 19, 20

*In re Sept. 11 Litig.*,
   723 F. Supp. 2d 526 (S.D.N.Y. 2010) .......................................................... 20

*In re Terrorist Attacks on Sept. 11, 2001*,
   2020 WL 7043282 (S.D.N.Y. Dec. 1, 2020).......................................... 15, 16

*In re: Dow Corning Litigation*,
   2004 WL 2282909 (E.D. Mich. Sept. 29, 2004)........................................... 15

*Kern v. Siemens Corp.*,
   393 F.3d 120 (2d Cir. 2004)........................................................................... 5

*Lyondell Chem. Co. v. Occidental Chem. Corp.*,
   608 F.3d 284 (5th Cir. 2010)........................................................................ 19

*Muench Photography, Inc. v. Houghton Mifflin Harcourt Pub. Co.*,
   2015 WL 4757601 (S.D.N.Y. Aug. 12, 2015) ............................................. 21

*My Mavens, LLC v. Grubhub, Inc.*,
   2023 WL 5237519 (S.D.N.Y. Aug. 14, 2023) ............................................. 19

*Potashnick v. Port City Const. Co.*,
  609 F.2d 1101 (5th Cir. 1980)................................................................. 12

*Powell v. Alabama*,
  287 U.S. 45 (1932) ............................................................... 2, 4, 12

*Rein v. Socialist People's Libyan Arab Jamahiriya*,
  568 F.3d 345 (2d Cir. 2009)........................................................ 18, 19

*Trout v. Milton S. Hershey Med. Ctr.*,
  572 F. Supp. 2d 591 (M.D. Pa. 2008) .......................................... 19

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016) ........................................................................ 5

*Van Gemert v. Boeing Co.*,
  590 F.2d 433 ......................................................................... 4, 12

**Rules**

Fed. R. Civ. P. 23................................................................................. 15

Fed. R. Civ. P. 33................................................................................. 20

Fed. R. Civ. P. 408........................................................................ 18, 19, 20

## INTRODUCTION

Class Counsel respectfully move the Court to (1) clarify that class members who opt in by July 1, 2025, but are unable to complete a settlement questionnaire, may still pursue individual damages with assistance of counsel; (2) direct Class Counsel to submit a proposed case management plan for the docketing of class members' individual damages claims after July 1, 2025, and (3) preclude Defendants' use of the settlement questionnaire and matrix for any purpose other than settlement.

On October 24, 2024, Court ordered the Parties to implement a questionnaire and individual injuries matrix as "guidance" for "potential settlement discussions." Hr'g Tr. 21-23 (Oct. 29, 2024) (Attached as Ex. 1). Despite the best efforts of the Special Master, the settlement questionnaire process has been beset by challenges. To date, Class Counsel have received almost 3000 calls from class members unable to complete questionnaires or otherwise confused by the process.[1] Checking a box to opt in or out is manageable: as of March 25, 2025, 5,377 class members have opted in. So far, the opt-in claims rate is roughly 23% of the estimated class—far greater than the median claims rate of 9% in consumer class actions, as determined by the Federal Trade Commission.[2]

But for many, the questionnaire is not: more than half of all opt-ins have been unable to complete a questionnaire.[3] Many cannot navigate the website, which has had numerous technical bugs, some which persist today. Due to widespread educational deficiencies, low literacy in

---

[1] See Decl. of K. Lee Boyd ("Boyd Decl.").

[2] *See* Alison Frankel, *FTC's comprehensive study finds media consumer class action claims rate in 9%*, Reuters, Sept. 19, 2019, https://www.reuters.com/article/world/ftcs-comprehensive-study-finds-median-consumer-class-action-claims-rate-is-9-idUSKCN1VV2QT/.

[3] *Id.*

English and Arabic, and cultural illiteracy, numerous class members cannot comprehend the questions in English or Arabic and cannot discern what information is sought and for what purpose. Most cannot understand legal terms of art. And some fear the current Administration will obtain their responses and revoke their green cards, denaturalize them, or deport them.[4] Because Class Counsel are restrained from aiding class-member clients to understand and complete the questionnaire, solutions are limited.

The Special Master is working to address some of these challenges, but many issues are endemic to the nature of this vulnerable class and are not fixable—even with more time. The Court, however, can mitigate any prejudicial effect by taking three steps. *First*, the Court should clarify that so long as class members opt in by July 1, 2025, they may pursue individual damages with the assistance of Class Counsel. Given the myriad challenges of the process, the Court should not penalize a class member who cannot complete a questionnaire without assistance by dismissing their individual damages claim with prejudice. Dismissal would arbitrarily deny class members' their due process right to proceed through retained counsel. *See Powell v. Alabama*, 287 U.S. 45, 68 (1932). Here, this would have a disparate impact on women and targeted groups of Black Africans, who often were denied education under Sudan's Arab military-Islamist regime. Opt-ins should be allowed the time to have their individual damages claims filed with the Court, just as approximately 500 have already been filed in the consolidated complaints.[5]

Dismissal would also run afoul of Rule 23 notice requirements: the Notice did not warn that an incomplete questionnaire would forever bar recovery to individuals who have expressed the desire to pursue their individual claims. To the contrary, the Notice states that class members

---

[4] Boyd Decl. at ¶¶ 28-30.

[5] Case Nos.: 1:23-cv-04986-AKH (S.D.N.Y.).; 1:23-cv-05552-AKH (S.D.N.Y.); 1:23-cv-07468-AKH (S.D.N.Y.); 1:24-cv-03639-AKH (S.D.N.Y.); 1:24-cv-03640-AKH (S.D.N.Y.); and 1:24-cv-03641-AKH (S.D.N.Y.).

need only opt in. If an incomplete questionnaire spells dismissal with prejudice, class members would be in a worse position than if they had opted out and filed their own lawsuit with assistance from counsel or this Court's *Pro Se* Unit. Surely, the Court never intended these due process problems to be caused by a questionnaire process meant solely for settlement purposes.

The solution is to limit the questionnaire to the original purpose ordered by the Court: a "bedrock of information" from which "we'll be able to create a matrix of some sort that will enable counsel to settle the case." Hr'g Tr. 24:4-13 (Oct 29, 2024). Irrespective of the challenges noted here, the questionnaires may yield data helpful to the parties to advance settlement discussions and robust enough to permit extrapolation. They also enable comparison with publicly available data concerning the nature and extent of the atrocities committed by the government of Sudan with BNPP's assistance. The questionnaire data will give the parties a sense of the likely scale, type, and severity of the injuries to the Opt-In population.

But an incomplete questionnaire, prepared without counsel, must not be treated as a deficient pleading triggering dismissal with prejudice. This is particularly important due to the fact that as a condition of granting BNPP employee's access to class members' personal settlement information, the Court ordered Defendants to have their in-house counsel swear under oath to guard its confidentiality, which Defendants failed to produce. With little choice and without assistance of counsel, thousands of genocide victims have disclosed sensitive information directly to the felon convicted of conspiring with the regime that sought to exterminate them. And now BNPP appears determined to abuse these settlement disclosures not to settle, but to litigate, by deploying confidential information against highly vulnerable class members.

*Second*, separate from the settlement process, the Court should authorize all class members who opt-in by July 1, 2025 to file a claim for individual damages with assistance of Class Counsel,

which is their right. *See Van Gemert v. Boeing Co.*, 590 F.2d 433, 440 n. 15 (2d Cir. 1978) (en banc) ("A certification under Rule 23(c) makes the Class the attorney's client for all practical purposes."); *Powell v. Alabama*, 287 U.S. 45, 68 (1932) ("If in any case, civil or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him," that "refusal would be a denial of a hearing, and, therefore, of due process"). For now, Class Counsel will outline what such a procedure would entail and will, in due course, submit a proposed case management plan.

*Third*, the Court should foreclose Defendants' attempt to use settlement disclosures in the questionnaire or matrix as fodder for discovery or litigation in advance of the September trial. That misuse violates the Court's repeated orders denying Defendants' request for class discovery. And it violates Rule 408 and the fundamental protections embodied in that rule.

*Lastly*, to respond to the Court's request regarding illiterate class members, Class Counsel support the Special Master's proposal of publishing an interactive video on the website in which a narrator guides illiterate class members on how to submit forms and complete a questionnaire. In addition, Class Counsel have observed that community leaders have been attentive to the needs of illiterate class members to, at a minimum, exercise their rights to opt out or opt in for individual damages. Short of one-on-one interventions, these efforts provide the best practicable opportunities for illiterate class members, so long as the Court removes any punitive effect from an incomplete questionnaire.

These steps will ensure all class members are able to pursue their rights to individual damages claims with assistance of Class Counsel regardless of gender, race, or educational level. And they will safeguard confidence in the Court's confidential settlement mechanism.

## BACKGROUND

**A.    The Court Certified a Class for Common Issues.**

This Court certified a Rule 23(b)(3) class defined as "[a]ll refugees or asylees admitted by the United States who formerly lived in Sudan or South Sudan between November 4, 1997 and December 31, 2011." Order Regulating Proceedings at ¶ 1, ECF No. 581. The Court certified the core issues of liability for classwide resolution and held that individual damages will be determined on an individual basis, built on the determination of common liability issues—a structure in line with *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).[6] Both the Supreme Court and the Second Circuit have now denied BNPP's petitions for interlocutory review under Rule 23(f).[7] The Court has reserved judgment on whether common damages for forced displacement may be awarded on a classwide basis. That injury is shared by all class members, and Class Counsel intend to soon file a motion setting out a damages theory susceptible to classwide proof.

Thus, all who do not opt out by July 1, 2025 are class members and parties bound by the judgment on all certified issues—regardless of whether they opt in or not. *See Kern v. Siemens Corp.*, 393 F.3d 120, 128 (2d Cir. 2004) ("[W]e cannot envisage any circumstances when Rule 23 would authorize an 'opt in' class in the liability stage of a litigation."). In short, the July 1 deadline for opting in does not affect or redefine the class.

**B.    The Court Created a Parallel Opt-In Process for Individual Damages Claims.**

In line with *Tysons Foods*, the Court created a mechanism by which class members may opt-in to pursue claims for individual damages in this action, following a trial on the common

---

[6] In *Tyson Foods*, the Supreme Court held that where "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages . . . peculiar to some individual class members." 577 U.S. at 453.

[7] *See BNP Paribas SA v. Kashef*, 24-628, 2025 WL 889140, at *1 (U.S. Mar. 24, 2025).

issues. The opt-ins are not a class or subclass under Rule 23. Like all other class members, they have identical interests on all certified questions; a verdict on those questions will be *res judicata*. The opt-in mechanism is simply an efficient means to resolve certain class members' additional claims for individual damages.

The Court incorporated the opt-in form into the Notice. Separately, the Court also incorporated a questionnaire designed to facilitate potential settlement (discussed in the next section). The Notice informs class members that they must opt in by July 1, 2025 to be eligible to seek individual damages:

> Those who wish to be eligible to seek individual damages will have to so indicate by opting in. Promptly after they do so, they will receive a questionnaire, by which they can advise the lawyers and the Court of the necessary details about their claims. One or more trials, or a settlement, may follow.[8]

Later on, the Notice states: "You MUST complete an opt-in form and a questionnaire online by midnight ET on July 1, 2025." But the Notice does not state that dismissal with prejudice would be the consequence of an incomplete questionnaire.[9] This appears to be a source of confusion that the Court should resolve.

As reflected in the Notice, the Opt-In Form is necessary to pursue a claim for individual damages as part of this action. Thus, all who opt in by the deadline will be (1) bound by any judgment on common issues (including any potential common damages award) and (2) eligible to seek individual damages. Because the questionnaire was for purposes of facilitating settlement, it should not have any prejudicial effect on the right of an opt-in claimant to pursue their claim.

---

[8] Attachment 1 to Decl. of Cameron Azari, ECF No. 603 at ECF page no. 3 ("Notice").

[9] The verb "must" *could* imply that, but it is strictly true as a technical matter that the opt-in form and questionnaire must be filed by July 1 because the website will close after that.

## C.    The Court Adopted a Settlement Questionnaire and Matrix.

The filing and litigation of opt-in claims should not be conflated with the settlement mechanism adopted by the Court: the questionnaire and matrix. In summer and fall of 2024, after losing both summary judgment and class certification, Defense Counsel repeatedly told Class Counsel that BNPP needed information to better understand class members' injuries as a condition to negotiating settlement. They repeated that representation in open court: "It would help the parties, as you suggest, to understand exposure so that they could make appropriate decisions about how to manage this matter." Ex. 1, Hr'g Tr. 21:6-7 (Oct. 29, 2024). Class Counsel assented, and the Court ordered the Parties to implement a questionnaire and injuries matrix as "guidance" for "potential settlement discussions." *Id*. at 21-23.

The Court has reiterated that the questionnaires are advisory and for purposes of settlement: "Once we have the questionnaire resolved and the answers submitted, we can make learned decisions about what a settlement should be and how to distribute the settlement and perhaps how to make a trial . . . unnecessary."  Hr'g Tr. 19:9-14 (Nov. 18, 2024) (Attached as Ex. 2).

The Court declined to adopt Class Counsel's proposal that the questionnaires take the form of short-form pleadings prepared with assistance of counsel, whether in person or through a call center, and registered on an administrative docket.[10] Instead, the Court ordered that the questionnaire be a settlement tool: "I look upon these questionnaires as a very useful tool to both plaintiffs and defendants in trying to work out a settlement." Hr'g Tr. 7:14-16 (Jan. 13, 2025) (Attached as Ex. 3). "The more information you have," the Court noted, "the better a settlement that you can devise, and the fairer a distribution that you can devise." *Id.* at 7:18-19.

---

[10] *See* Ex. 1, Hr'g Tr. 23:12-14 (Oct. 29, 2024) (directing that questionnaires must be completed by the class members themselves); Ex. 2, Hr'g Tr. 29:2-10 (Nov. 18, 2024) (prohibiting Class Counsel from assisting class members with the questionnaire through a proposed call center).

To implement this ruling, the Court ordered Epiq to "post the Summary and Long Form Notices . . . as well as the opt-in or opt-out form and questionnaire, to the case-specific website." Second Revised Order Approving Proposed Notice Plan at 2, ECF No. 611 ("Notice Order"). The Notice gives class members three options: (1) opt out of the class action, (2) opt in and be bound by any classwide judgment and be eligible to seek individual damages, or (3) do nothing and be bound by any classwide judgment but ineligible to seek individual damages. *See* Notice at ECF page 32. The Court set "midnight ET on July 1, 2025" as the deadline to opt out altogether or opt in to seek individual damages. Notice Order at ¶ 6.[11]

**D.    The Settlement Questionnaire Process Has Faced Numerous Challenges.**

Class members' completion of the settlement questionnaire has been hindered by a number of difficulties related to low literacy, fear, and shame over participation in this process requesting private information, and confusion and frustration with questionnaire functionality.

The most fundamental challenge with settlement questionnaire completion is widespread illiteracy or semi-literacy in both English and Arabic among class members. Fluency in written Arabic is limited where class members have, on average, a seventh-grade education in Arabic or their native tribal language, and many have lived in the United States for 10-20 years. Boyd Decl. at ¶¶ 10–11. Accordingly, 90% of class members who complete the questionnaire do so in English, relying largely on conversational English to answer substantive questions about the most traumatic atrocities that have happened to them and their loved ones. *Id.* ¶ 14. Language difficulties extend to the tone and register of the settlement questionnaire as well. Even those class members with conversational English struggle with the questionnaire's terminology, either because it is too legal or simply too formal (*e.g.*, "deceased," "immigrate," "vaginal or anal penetration."). *Id.* ¶ 15.

---

[11] "A class member may request to pursue compensation for individual damages and losses by submitting an opt-in form and an accompanying questionnaire, signed under oath, by midnight ET on July 1, 2025." *Id.*

Without access to their counsel to explain these terms, the need for completeness, and clarify what information is being sought, and why, the language difficulties are a significant barrier.

In addition, to complete the questionnaire, many class members must overcome significant fear and shame surrounding their participation. When developing the questionnaire in 2024, the Parties did not, and could not, anticipate a fear now felt strongly among class members—that answering questions relating to their immigration status will cause their status to be reviewed and overturned by the Trump Administration. *Id*. ¶¶ 28-30. Reports of recent deportations of Sudanese Refugees have only kindled these fears and chilled questionnaire responses. *Id*.

Culturally, class members feel shame when they are labeled as "victims" of the regime's atrocities by other members of the community. This further chills questionnaire responses and prevents disclosure of injuries when class members must rely on those close to them to overcome language barriers. *Id*. ¶ 16. The nature of the injuries perpetrated by the GOS undoubtedly contribute to class members' reticence. Current questionnaire data indicates severe underreporting of injuries class members deem shameful, especially those caused by sexual violence. As of March 25, 2025, only 451 individuals indicated they were raped or sexually assaulted and nearly half (208) provided inconsistent responses as to whether they were sexually assaulted, indicating in some places that they had and in others that they had not. *Id*. ¶ 24. These inconsistencies evince a lack of understanding and a need for follow up and verification.

The questionnaire's challenges have a visibly gender impact on the class. Men complete the questionnaire at twice the rate of women and nearly 73% of started-but-still-outstanding questionnaires are being completed by men. *Id*. ¶ 17. Illiteracy has an undue impact on women class members as well, as GOS discriminatory policies prohibited or limited education for women,

ensuring that some of the class members most injured by the Bashir regime are unable to effectively report their injuries through the questionnaire without assistance. *Id.* ¶ 11.

Class members who can overcome language limitations and any accompanying fear and shame must then contend with challenging questionnaire functionality. While completing a questionnaire would undoubtedly be easier on a computer, class members access the questionnaire using the technology to which they have access—83% of class members complete questionnaires on mobile devices. *Id.* ¶ 18. Typing lengthy textual narrative on a mobile device is limiting. Frustration with the effort is compounded by the repetition of questions. For every type of harm, class members are asked twice to describe "what happened," responding first to check-box questions and then another question asking for narrative. For those unaccustomed to completing any sort of electronic form, the redundancy is confusing and frustrating—particularly on a shame-inducing, taboo subject like rape. *Id.* ¶ 23.

Significant technical issues with the questionnaire website (*e.g.*, screens freezing) though Epiq has worked diligently over time to address them, have hindered questionnaire competition as well. *Id.* ¶¶ 31–32.

The widespread confusion is clear. Across hundreds of questionnaires, there is a pattern of class members providing logically impossible or contradictory responses. For example, facing repeated questions regarding rape or sexual abuse, respondents frequently respond simultaneously yes and no—perhaps out of a mistaken understanding of a question or why it is being repeated. In other instances, class members inconsistently report being injured both by GOS forces and by non-GOS rebel groups that did not operate in the part of the country at the time.[12] Because these parties

---

[12] For example, as of March 21, 2025, 120 Questionnaires reflect injuries that have been attributed to both SPLA and the Janjaweed, when those entities operated in distinct and geographically distant provinces of Sudan. Boyd Decl. at ¶ 26.

were unable to confer with Counsel, it is impossible to determine from the questionnaire the source of anomaly (*e.g.*, whether two separate incidents in different parts of the country are being conflated). This highlights the lack of factual verification one would expect from an ordinary litigation filing.

These myriad obstacles, many endemic to the nature of the class, are preventing a significant percentage of the class population from even starting, much less completing, a questionnaire. As of March 25, 2025, only 43% of those who opted in have completed questionnaires. Over half of those who started questionnaires have not completed them.[13] This does not mean the questionnaires cannot be used for their original purpose: they provide a bedrock of data for extrapolation. And they confirm what was alleged in the complaint: the class contains numerous members who, in addition to forcible displacement, suffered torture, murder of relatives, sexual violence, and village attacks.

## ARGUMENT

### A.   Due process precludes barring the individual claims of class members unable to complete questionnaires without assistance of counsel.

A class member's inability to complete a questionnaire by July 1 should not result in dismissal with prejudice, so long as they have opted in. This would unfairly penalize semi-literate class members, who were restrained from seeking the assistance of their lawyers, and violate due process in at least three ways.

*First*, dismissal due to an incomplete questionnaire would deprive class members of their due process right to litigate through retained counsel—essentially forcing them to proceed *pro se*. Without good cause, a court may not refuse to hear a civil litigant through their chosen counsel. The Supreme Court made this clear nearly a century ago in *Powell v. Alabama*: "If in any case,

---

[13]  Boyd Decl. at ¶ 19.

civil or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, . . . such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense." 287 U.S. 45, 69 (1932). Lower courts have repeatedly embraced that holding. *See, e.g.*, *Adir Int'l, LLC v. Starr Indem. & Liab. Co.*, 994 F.3d 1032, 1039 (9th Cir. 2021); *Guajardo-Palma v. Martinson*, 622 F.3d 801, 803 (7th Cir. 2010); *Potashnick v. Port City Const. Co.*, 609 F.2d 1101, 1117 (5th Cir. 1980).[14] On matters of consequence, a court may not "substantially interfere[] with a party's ability to communicate with his or her lawyer or actively prevent[] a party who is willing and able to obtain counsel from doing so." *Adir Int'l, LLC,* 994 F.3d at 1039–40.

Here, class members who opt in have been restrained from having their lawyers—Class Counsel—help them with the questionnaire process. Class Counsel represent them. *See Van Gemert v. Boeing Co.,* 590 F.2d 433, 440 n. 15 (2d Cir. 1978) (en banc) ("A certification under Rule 23(c) makes the Class the attorney's client for all practical purposes."). Yet Class Counsel were barred from advising them to ensure their responses were complete, accurate, and fully informed.

Blocking Class Counsel from assisting with questionnaires is not fatally prejudicial—if the questionnaire is merely an advisory tool for guiding settlement. But it is unconstitutional if the right to recover individual damages hinges on the submission of a fully completed questionnaire. Most class members were not educated in the United States and received only a 7th grade level education level in Sudan.[15] Many, particularly women, were never educated. Most have no

---

[14] Plaintiffs do not assert a right to a government-paid, court-appointed lawyer in civil proceedings. The right to proceed through retained counsel is distinct, as the Ninth Circuit explained: "'there is no right of *subsidized* access' in civil cases like there is in the Sixth Amendment context, but if a civil litigant '*hires* a lawyer,' then certain protections kick in." *Adir Int'l, LLC*, 994 F.3d at 1039 (quoting *Guajardo-Palma*, 622 F.3d at 803) (emphasis in original).
[15] Boyd Decl. at ¶ 10.

familiarity with the U.S. legal system or class actions. Yet without assistance of counsel, there was no one to inform them of the need for completeness, the consequences of a deficient questionnaire, or the meaning of legal or esoteric terms of art like "perjury," "anal or vaginal penetration" or "deceased." These obstacles have a disparate impact on women and the illiterate and under-educated Black population, especially given the gender discrimination in education for class members raised under Sudan's radical Islamist regime. Fairness and equity thus require giving class members the opportunity to perfect their claim with assistance of counsel, rather than suffer dismissal based solely on an incomplete settlement questionnaire.

*Second*, the Notice did not unambiguously inform class members that an incomplete questionnaire would forever bar recovery. To the contrary, the Notice explicitly states they need only opt in: "Those who wish to be eligible to seek individual damages will have to so indicate by opting in." Notice at ECF page 32. The Notice does not specify that failure to complete a questionnaire will result in dismissal. It states that "[p]romptly after" class members opt in, "they will receive a questionnaire, by which they can advise the lawyers and the Court of the necessary details about their claims." *Id.* The Notice does not say this is the *sole* means to advise the lawyers of their claims.[16] Adding an additional requirement—a completed questionnaire—would not comport with due process or Rule 23's notice requirement: "the procedure adopted must conform to the requirements of due process and fairly insure the protection of absent parties who are to be bound." *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 568 (2d Cir. 1968); *Hansberry v. Lee*, 311 U.S. 32 (1940).

---

[16] It is only after this explanation that the Notice states "You MUST complete an opt-in form and a questionnaire online by midnight ET on July 1, 2025." Notice at ECF page 32. This statement correctly apprises class members that they may not submit a form or questionnaire after July 1, 2025—because the website will be closed. But it does not unambiguously state that failure to do so will result in dismissal.

*Third*, penalizing an uncounseled, incomplete questionnaire would give class members fewer rights than *pro se* litigants. This Court routinely offers accommodations for *pro se* litigants, including a telephone help line and the right to file a handwritten pleading.[17] Yet class members who opt in receive no such accommodations: rather than handwrite, they must spend hours on a small cell phone screen navigating a complex website whose technical glitches took months to resolve, eating into an already-truncated six-month period. If the Court treats the questionnaire as a complaint whose deficiency means dismissal with prejudice, class members will be penalized for not opting out. Indeed, they may have been better off filing their own lawsuit with help from counsel or this Court's *Pro Se* Intake Unit.

All these due process concerns have a simple cure. The Court should clarify that the questionnaire is not a pleading. It is, as the Court previously held, a settlement tool. Each class member who opts in by midnight ET on July 1, 2025, is eligible to submit a claim for individual damage, with assistance of counsel, regardless of the completeness of their questionnaire. In addition, all class members—whether they opt in for individual damages or not—may receive a share of any award of common damages (as Class Counsel will soon address in separate briefing)

**B.    The Court should adopt a claims procedure for class members who opt-in to pursue individual damages with assistance of counsel.**

On July 1, 2025, thousands of class members will have opted in to pursue individual damages as part of this civil action. Before that date, the Court should adopt a procedure to docket these claims and stay them until after the September trial or settlement. Approximately 500 class members' individual damages claims have already been docketed in the companion complaints

---

[17] Representing Yourself in Federal Court (Pro Se), U.S District Court, https://www.nysd.uscourts.gov/prose (last visited Mar. 25, 2025).

filed prior to class certification; the remainder should be on file.[18] Subject to the Court's ruling on this motion, Class Counsel will submit a proposed case management plan for docketing individual damages claims. A substantive outline follows.

The Court should adopt a procedure for class members who opt in to add their individual damages claims to the allegations in the Third Amended Complaint, ECF No. 237-1. Class Counsel will propose a short-form pleading. Courts routinely adopt short-form pleadings in putative or certified class actions. *See, e.g.*, *In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MDL-1570-GBD-SN, 2020 WL 7043282, at *1 (S.D.N.Y. Dec. 1, 2020); *In re: Dow Corning Litigation*, No. CIV.A 00-cv-00001, 2004 WL 2282909, at *1 (E.D. Mich. Sept. 29, 2004) (adopting a short-form procedure for opt-out claimants). The Court may do so here under its Fed. R. Civ. P. 23(d)(1) authority.

A short-form pleading is needed because the settlement questionnaire is not a pleading. Indeed, Class Counsel originally proposed a litigation fact sheet procedure, where the questionnaire would be prepared with assistance of counsel and used as a pleading, just as in *Dow Corning Litigation*. 2004 WL 2282909, at *1 (ordering, in an opt out context, that "timely submission of the Questionnaire . . . constitutes the initiation of an action"). Instead, the Court ordered the questionnaires be prepared as a *pro se* settlement tool. *See supra* n. 10.

Class Counsel propose the following procedure and is prepared to submit a draft plan and draft forms for approval. *First*, the Clerk should register a list of all class members who opt in by July 1, 2025, using the numerical identifier assigned by Epiq. If this action settles, this registry can function as an "administrative docket" to organize individual releases and Rule 41 dismissals. *See,*

---

[18] Case Nos.: 1:23-cv-04986-AKH (S.D.N.Y.).; 1:23-cv-05552-AKH (S.D.N.Y.); 1:23-cv-07468-AKH (S.D.N.Y.); 1:24-cv-03639-AKH (S.D.N.Y.).; 1:24-cv-03640-AKH (S.D.N.Y.); and 1:24-cv-03641-AKH (S.D.N.Y.).

*e.g.*, Pretrial Order No. 22, ECF No. 898, *In Re: 3M Combat Arms Earplug Products Liab. Litig.*, No. 3:19-md-2885 (N.D. Fla. Jan. 7, 2020).

*Second*, for all class members who opt in by the deadline, Class Counsel should have an opportunity to verify the factual basis for any individual claim and file a short-form pleading. Because these class members are parties to this action, their short-form pleading should take the form of a Notice of Amendment, modeled on *In re Terrorist Attacks on Sept. 11, 2001*, 2020 WL 7043282, at *1. Their individual injury allegations should be deemed incorporated into the underlying Complaint, ECF No. 4, and operative Third Amended Complaint, ECF No. 237-1. They will thus be bound by the rulings of this Court and the Second Circuit.

*Third*, these claims should be recorded on the *Kashef* docket. With the guidance of the Clerk's Office, Class Counsel suggest that Notices of Amendment be compiled in PDF volumes and filed as "Annexes to the Third Amended Complaint."

*Fourth*, the Court should stay any responsive pleading, motions, or discovery for these individual damages claims, just as the consolidated cases have been stayed, pending the outcome of the September trial or a settlement. If needed, bellwether cases can then be selected.

This procedure is fair and efficient. It enables the Court to avoid a deluge of unnecessary filings. It ensures the Defendants are informed of the parties seeking individual damages and the nature of those injuries. It also avoids the risk of claim splitting that would occur if the common elements of a class member's claim are litigated in this action, while the individual elements are litigated in separate lawsuits. The Court should direct Class Counsel to submit this proposed plan and Notice of Amendment.

**C.    The Court should preclude BNPP's use of settlement questionnaires and matrices for non-settlement purposes.**

After representing to Class Counsel and the Court that the questionnaire was needed for settlement,[19] BNPP has now, in a classic bait and switch, misused class members' settlement disclosures as fodder for class discovery and litigation. In its February 18, 2025 letter brief, BNPP improperly used settlement disclosures to move the Court to modify its case management plan. *See* Defs.' Letter to Hon. Judge Alvin K. Hellerstein and Special Master Daniel Capra (Feb. 18, 2025). Citing questionnaire data, the bank sought to disqualify rape-victim class representatives and to conscript new class representatives for the upcoming trial. *Id*. BNPP did it again on March 3, 2025, when it misused settlement disclosures to seek to strike named Plaintiffs. *See* Defs.' Letter at 2, ECF No. 641 (Mar. 3, 2025). (arguing that "the questionnaire responses received to date" "illustrat[e]" that "the named Plaintiffs' injuries are more severe than those of the putative class as a whole"). And on calls with Special Master Capra, the bank has now stated it intends to use the questionnaires and matrix in pre-trial motions and at the class trial.

The Court should not permit BNPP to exploit its access to settlement disclosures. *First*, using settlement efforts as a backdoor to class discovery violates the Court's repeated orders that BNPP may not take any further class discovery. In October 2024, BNPP asked to use the questionnaire process to conduct class discovery and mount defenses at the class trial. *See* Joint Letter at 7-8, ECF No. 576 (Oct. 18, 2024) (seeking "targeted discovery" of non-named class members "[b]ased on the responses to those questionnaires," to "formulate 'class-member specific' defenses" to the common questions for the class trial). The Court rejected that request:

---

[19] Defense counsel represented to the Court that the questionnaires and matrix would enable Defendants "to understand exposure so that they could make appropriate decisions about how to manage this matter." Ex. 1, Hr'g Tr. 21:6-7 (Oct. 29, 2024).

- BNPP COUNSEL: […] And for that, your Honor, we have asked for discovery, targeted discovery. But **included in that is the information from the so-called questionnaire process or matrix**….

COURT: **You're not going to do discovery of class members**. You're simply not going to have any more discovery. The case is a 2016 case. It's not going to happen."

Ex. 1, Hr'g Tr. 21:12-15; 21:20-22 (Oct. 29, 2024) (emphasis added); Order Regulating Proceedings at ¶ 5, ECF No. 581 ("Defendants' request to take additional discovery on class issues is denied."). The Court repeated that ruling in January 2025: "[n]o more discovery . . . no expert and no fact [discovery] of any kind." Ex. 3, Hr'g Tr. 23:2-3 (Jan. 13, 2025). BNPP clearly does not intend to comply with this repeated order. Instead, it will see if it can get away with simply exploiting class members' settlement disclosures.

*Second*, BNPP's misuse of settlement disclosures violates FRE 408 and its underlying common law principles. The Court expressly ordered the Parties to implement a questionnaire and injuries matrix as "guidance" for "potential settlement discussions." Ex. 1, Hr'g Tr. 21-23 (Oct. 29, 2024). Thus, the questionnaire responses and all data in the matrix are "statement[s] made during compromise negotiations about the claim." Fed. R. Evid. 408. Lest there be any doubt, BNPP even labeled its matrix proposal, submitted to Special Master Capra, "Subject to FRE 408." So did Class Counsel.

Rule 408 "essentially forbids" any use of settlement disclosures in litigation that would result in a court "basing adverse findings on a party's concessions in settlement negotiations." *Rein v. Socialist People's Libyan Arab Jamahiriya,* 568 F.3d 345, 351 (2d Cir. 2009). BNPP's efforts to use the settlement questionnaire and matrix as fodder for motions and trial violates this "long-

standing fundamental rule, memorialized in Fed. R. Evid. 408." *Id.*[20] That violation thwarts a vital public policy: promoting settlement. *See id.* at 352.

This fundamental rule is not limited to admissibility at trial. In *Rein*, the Second Circuit reversed a district court that allowed information obtained in settlement negotiations to be used in a fee dispute. The court held this was an "impermissible use of a settlement concession," even though that use did not technically "violate[ ] a rule set forth in the Federal Rules of Evidence." 568 F.3d at 352. Thus, "even where Rule 408 does not technically apply, the policy underlying it is binding on courts." *My Mavens, LLC v. Grubhub, Inc.*, 20 Civ.4657 (PGG), 2023 WL 5237519, at *16 (S.D.N.Y. Aug. 14, 2023) (applying fundamental principle behind Rule 408 to strike settlement-derived facts from a complaint).

The protection underlying Rule 408 extends to the settlement questionnaires in this case. Indeed, courts specifically protect questionnaires and claim forms disclosed for settlement purposes. *See, e.g.*, *Trout v. Milton S. Hershey Med. Ctr.*, 572 F. Supp. 2d 591, 600 (M.D. Pa. 2008) (holding that "[i]ntroduction of the settlement agreement and claim documents" in a personal injury action "conflicts with the policy underlying Rule 408"); *Lyondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 299 (5th Cir. 2010).

The *Dalkon Shield* litigation provides a blueprint for protecting the confidentiality and integrity of class members' settlement questionnaires. In *In re A.H. Robins Co., Inc.*, 197 B.R. 568, 570 (E.D. Va. 1994), the district court approved a questionnaire mechanism, similar to this Court's, that aimed to resolve claims by injured intrauterine device users against a Chapter 11 trust. *Id.* By

---

[20] Fed. R. Evid. 408 ("[S]tatements made in compromise negotiations regarding the claim" are "not admissible . . . when offered to prove liability . . . or amount of a claim that was disputed as to validity or amount"); 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 408.03[1] (Joseph M. McLauglin ed., 2d ed. 2009) ("Rule 408 codifies the long-standing axiom in federal courts that compromises proposed . . . are not evidence of an admission of the validity . . . of the claim or the amount of damage.").

court order, a questionnaire was sent to claimants seeking medical information to facilitate settlement—just as this Court ordered the distribution of questionnaires to guide settlement. *Id.* Like this Court, the *A.H. Robins* court mandated that the questionnaires would be "strictly confidential." *Id.* at 571. And just like here, the process had "unrepresented claimants in mind." *Id.* at 570.

On these facts, the court held that the questionnaires were confidential settlement communications and barred settlement objectors from using them as evidence to support their claims. *Id.* at 571–72. The court specifically invoked the broader principles animating Rule 408: precluding the use of settlement questionnaires for adverse litigation purposes "protects not only the individual parties to settlement discussions, but also protects all other claimants *by protecting the claims resolution process itself*." *Id.* at 572. (emphasis added).

So too here.[21] If unchecked, BNPP's misuse of settlement disclosures would compromise the resolution process' integrity. "If the claims resolution process were to become crippled by secretive postures, defensive tactics, and a general failure of claimant confidence, then the process would cease to be efficient or effective, and all claimants would suffer." *In re A.H. Robins Co.*, 197 B.R. at 572.[22] As shown above, BNPP has already eroded confidence in this Court's claims

---

[21] Being submitted under oath does not remove the questionnaires from the protection of Rule 408 and the fundamental principle recognized in *Reis*. To the contrary, this Court instructed that the questionnaire would be equivalent to an interrogatory under Fed. R. Civ. P. 33. *See* Order Regulating Proceedings at ¶6, ECF No. 581. Under Rule 33(c), an interrogatory response may only "be used to the extent allowed by the Federal Rules of Evidence." Thus, Rule 408 fully applies.

[22] In the *September 11 Litigation*, the Court emphasized the same principles in the related context of confidential documents "exchanged during damages discovery, settlement negotiations, and mediation submitted in connection with the motion for approval of the property damage settlement," noting that "*public disclosure [would not] enhance the function of settlement negotiations*." *In re Sept. 11 Litig.*, 723 F. Supp. 2d 526, 533 (S.D.N.Y. 2010) (emphases added).

resolution process: reneging on representations, defying discovery orders, and repurposing confidential information in public motions.

Indeed, as a condition of allowing BNPP employees to access class members' personal settlement information, the Court ordered Defendants to have their in-house counsel swear under oath to guard its confidentiality. But Defendants have so far failed to produce confirmation of any sworn oaths. Thousands of genocide victims have disclosed sensitive information directly to the felon convicted of conspiring with the regime that sought to exterminate them. The victims turned over that information with little choice—all without assistance of counsel or a sworn guarantee of confidentiality. Now, that same convicted felon appears determined to abuse these settlement disclosures not to settle but to litigate, deploying confidential information against highly vulnerable class members.

This Court should foreclose any use of the questionnaires or matrix for any purpose other than settlement. In addition to the authorities cited above, the Court has inherent power to do so.[23]

## CONCLUSION

For these reasons, Class Counsel respectfully request that the Court enter an order to:

(1) clarify that any class member who opts-in by midnight ET on July 1, 2025 may pursue, with assistance of counsel, individual damages as part of this action, as reflected in the Notice;

(2) prohibit the use of any information gleaned from the settlement questionnaires or matrices for any non-settlement purpose unless and until otherwise instructed; and

(3) direct Class Counsel to submit a proposed case management plan for the docketing of individual damages claims.

---

[23] *See Degen v. United States*, 517 U.S. 820, 826, 827 (1996) (emphasizing that a district court has inherent authority to "protect [its] proceedings and judgments"); *Muench Photography, Inc. v. Houghton Mifflin Harcourt Pub. Co.*, No. 09 CIV. 2669 LAP, 2015 WL 4757601, at *3 (S.D.N.Y. Aug. 12, 2015) (noting the district court's "'inherent authority' includes the court's ability 'to strike any filed paper which it determines to be abusive or otherwise improper under the circumstances.'").

Dated: <u>March 26, 2025</u>                                 Respectfully submitted,


<u>/s/Kathryn Lee Boyd</u>                               <u>/s/ Michael D. Hausfeld</u>
Kathryn Lee Boyd                                  Michael D. Hausfeld
Theodor Bruening                                  Scott A. Gilmore
Michael Eggenberger                               Amanda E. Lee-DasGupta
HECHT PARTNERS LLP                                Claire A. Rosset
125 Park Avenue, 25th Floor                       Mary S. Van Houten Harper
New York, NY 10017                                HAUSFELD LLP
(646) 502-9515                                    888 16th Street NW, Suite 300
(646) 396-6452                                    Washington, DC 20006
(646) 777-2489                                    (202) 540-7200
lboyd@hechtpartners.com                           mhausfeld@hausfeld.com
tbruening@hechtpartners.com                       sgilmore@hausfeld.com
meggenberger@hechtpartners.com                    alee@hausfeld.com
                                                  crosset@hausfeld.com
Kristen Nelson                                    mvanhouten@hausfeld.com
HECHT PARTNERS LLP
2121 Avenue of the Stars                          James D. Gotz
Los Angeles, CA 90067                             HAUSFELD LLP
(646) 490-2408                                    One Marina Park Dr., Suite 1410
knelson@hechtpartners.com                         Boston, MA 02210
                                                  (617) 207-0660
Aitan D. Goelman                                  jgotz@hausfeld.com
ZUCKERMAN SPAEDER LLP (DC)
1800 M Street, Suite 1000                         E. Danya Perry
Washington, DC 20036                              PERRY LAW
(202) 778-1996                                    445 Park Avenue, 7th Floor
agoelman@zuckerman.com                            New York, NY 10022
                                                  (212) 840-7939
Cyril V. Smith                                    dperry@danyaperrylaw.com
ZUCKERMAN SPAEDER LLP (Baltimore)
100 East Pratt Street, Suite 2440                 Joshua Perry
Baltimore, MD 21202                               PERRY LAW
(410) 332-0444                                    445 Park Avenue, 7th Floor
csmith@zuckerman.com                              New York, NY 10022
                                                  (212) 251-2619
                                                  jperry@danyaperrylaw.com


22