**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ENTESAR OSMAN KASHEF, *et al.*, | |
| *Plaintiffs,* | |
| against | No. 1:16-cv-03228-AKH-JW |
| BNP PARIBAS S.A. and BNP PARIBAS US WHOLESALE HOLDINGS, CORP. (f/k/a BNP PARIBAS NORTH AMERICA, INC.), | Hon. Alvin K. Hellerstein |
| *Defendants.* | |

**[REDACTED] PLAINTIFFS' OPPOSITION TO DEFENDANTS'**
**MOTION TO PRECLUDE EXPERT TESTIMONY**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT .......................................................................................................................... 4

    I.      The Court Should Allow the Testimony of Cameron Hudson. ..................................... 4

        A.    There Is Nothing Inappropriate About a Hybrid Fact/Expert Witness. ........................ 5

        B.    Mr. Hudson Does Not Rely on Classified Information. ................................................ 8

        C.    The Bank's objections to specific opinions offered by Mr. Hudson ........................... 13

    II.     Barry Koch Is a Banking and Compliance Expert Whose Expert Testimony Provides
            Relevant Context for the Jury on Complex Issues. ....................................................... 15

        A.    BNPP Does Not Dispute that Mr. Koch is Qualified to Opine as an Expert on
              Compliance and Risk Management in the Financial Services Industry. ..................... 17

        B.    BNPP Cannot Discredit Mr. Koch's Methodology. ..................................................... 19

        C.    BNPP's Misrepresentations of, and Substantive Disagreements with, Mr. Koch's
              Conclusions Do Not Render His Testimony Inadmissible. .......................................... 20

        D.    Mr. Koch Will Not Draw Legal Conclusions and Will Not Opine on the Bank's
              Subjective State of Mind. ............................................................................................. 21

    III.    The Opinions of Plaintiffs' Medical and Psychological Experts Have Been Properly
            Disclosed and Are Relevant and Methodologically Sound. ......................................... 23

        A.    Drs. Green and Grypma Expert Opinions Were Fully Disclosed Under
              Rule 26(a)(2). ............................................................................................................... 24

        B.    The Testimony of Plaintiffs' Medical and Psychological Experts Is Relevant, Reliable
              and Admissible. ............................................................................................................. 25

        C.    Plaintiffs' Experts' Opinions as to Forced Displacement and Population-Based Data
              are Relevant and Admissible. ....................................................................................... 26

        D.    Drs. Rosenfeld and Green's Psychological Evaluations Are Reliable and
              Admissible. ................................................................................................................... 28

    IV.    Dr. Baldo's Opinions Are Relevant and Non-Duplicative. ........................................ 30

        A.    Dr. Baldo Properly Provides Opinions Linking the Genocidal Campaign of Human
              Rights Abuses in Sudan to the Regime. ....................................................................... 31

         B.    Defendants Concede Dr. Baldo Provides Contextual Background to the Jury. ........... 34

        C.    Dr. Baldo's Opinions on BNPP's Role in Funding the GOS Are Proper. .................. 35

        D.    BNPP's Other Assorted Arguments for Excluding Dr. Baldo's Opinions Fail........... 37

V.  Dr. Jok's Opinions Are Relevant, Helpful, And Non-Duplicative. ............................. 40

    A.  Dr. Jok Will Opine Generally on the Cultural Taboos and Norms, Sexual Violence, Gender Roles, and Distinctive Methods of Communication and Reactions to the Abuses Experienced, and Will Not Offer Testimony About Plaintiffs' Specific Injuries. ...................................................................................................................... 41

    B.  BNPP's Catchall Arguments for Precluding Dr. Jok's Opinions are Unavailing. ....... 45

VI.  Dr. Harry Verhoeven's Testimony Is Reliable, Relevant and Admissible. ................. 46

    A.  All of Dr. Verhoeven's Opinions are Founded on Reliable Methodology................... 47

    B.  Dr. Verhoeven's Opinions as to BNPP's Role in the Bashir Regime's Ability to Commit Human Rights Abuses are Methodologically Sound...................................... 48

    C.  Dr. Verhoeven's Opinions as to the Impact of Oil Extraction on the GOS's Human Rights Abuses are Methodologically Sound. ............................................................. 51

    D.  Dr. Verhoeven's Testimony as to Oil and GOS Human Rights Abuses Is Non-Duplicative and Relevant.............................................................................................. 52

    E.  Dr. Verhoeven's Opinions Regarding Causation and BNPP's Knowledge Do Not Improperly Displace the Jury. .................................................................................... 53

VII.  The Court Should Allow Tim Fogarty to Testify as To the Topics in Plaintiffs' Notice................................................................................................................................ 54

    A.  Mr. Fogarty Will Testify Only About the Effect of BNPP's Sanction Violations on the Regime's Military Expenditures, *Not* Its Human Rights Abuses................................. 55

    B.  The BNNP Transaction Review is Dense and Complicated, and Mr. Fogarty's Testimony Will Help the Jury to Understand It. ......................................................... 56

    C.  BNPP's Other Criticisms of Mr. Fogarty Should Be Raised in Cross- Examination, Not a Motion to Exclude. ............................................................................................. 57

CONCLUSION.................................................................................................................... 59

## TABLES OF AUTHORITIES

**Cases**

*Adeghe v. Janssen Pharms., Inc.*,
  No. 16-cv-2235 (LGS), 2017 WL 3741310 (S.D.N.Y. Aug. 30, 2017) ................................... 18

*Al-Khawaldeh v. Tackett*,
  No. 1-20-cv-1079-RP, 2021 WL 5908401 (W.D. Tex. Dec. 14, 2021) ................................... 43

*Amorgianos v. Nat. Railroad Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002)...................................................................................... 20, 21

*Better Holdco, Inc. v. Beeline Loans, Inc.*,
  666 F. Supp. 3d 328 (S.D.N.Y. 2023)................................................................................ 22

*Blais v. Islamic Republic of Iran*,
  459 F. Supp. 2d 40 (D.D.C. 2006), *enforcement granted*, No. 02-CV-285 (RCL), 2011 WL
  13376985 (D.D.C. Dec. 2, 2011) ...................................................................................... 11

*Boucher v. United States Suzuki Motor Corp.*,
  73 F.3d 18 (2d Cir. 1996).................................................................................................. 57

*Brown v. Islamic Republic of Iran*,
  687 F. Supp. 3d 21 (D.D.C. 2023) .................................................................................... 10

*Camenisch v. Umpqua Bank*,
  763 F. Supp. 3d 871 (N.D. Cal. 2025) ......................................................................... 17, 20

*Carrizosa v. Chiquita Brands International, Inc.*,
  47 F.4th 1278 (11th Cir. 2022) ................................................................................ 31, 32, 35

*Chavez v. Carranza*,
  559 F.3d 486 (6th Cir. 2009) ................................................................................... 5, 9, 33

*Chen-Oster v. Goldman, Sachs & Co.*, No. 10 Civ. 6950 (AT) (RWL), 2022 WL 814074
  (S.D.N.Y. Mar. 17, 2022) .................................................................................................. 48

*Colvin v. Syrian Arab Republic*,
  363 F. Supp. 3d 141 (D.D.C. 2019) ................................................................................... 10

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)........................................................................................................... 20

*Deutsch v. Novartis Pharms. Corp.*,
  768 F. Supp. 2d 420 (E.D.N.Y. 2011) ............................................................................... 54

*Dongguk Univ. v. Yale Univ.*,
  Civ. No. 3:08CV441 (TLM), 2012 WL 1977978 (D. Conn. June 1, 2012) ............................. 43

*Equal Emp. Opportunity Comm'n v. S&B Indus., Inc.*,
   No. 3:15-CV-0641-D, 2017 WL 345641 (N.D. Tex. Jan. 24, 2017) ........................................ 15

*Fed. Trade Comm'n v. Vyera Pharms., LLC*,
   No. 20CV00706 (DLC), 2021 WL 5336949 (S.D.N.Y. Nov. 16, 2021) ................................. 50

*Figueroa v. Boston Scientific Corp.*,
   254 F. Supp. 2d 361 (S.D.N.Y. 2003) ................................................................................. 20

*Frost v. Islamic Repub. of Iran*,
   383 F. Supp. 3d 33 (D.D.C. 2019) ...................................................................................... 10

*Gill v. Arab Bank, PLC*,
   893 F. Supp. 2d 523 (E.D.N.Y. 2012) ................................................................. 11, 16, 33, 57

*Iacobelli Constr., Inc. v. Cnty. of Monroe*,
   32 F.3d 19 (2d Cir.1994) ...................................................................................................... 57

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
   643 F. Supp. 2d 482 (S.D.N.Y. 2009) ................................................................................. 53

*In re Mirena IUD Prods. Liab. Litig,*
   169 F. Supp. 3d 396 (S.D.N.Y. 2016) ....................................................................... 12, 22, 50

*In re Ocean Bank,*
   481 F. Supp. 2d 892 (N.D. Ill. 2007) .................................................................................. 17

*Karcher v. Islamic Repub. of Iran*,
   396 F. Supp. 3d 12 (D.D.C. 2019) ...................................................................................... 10

*Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp., N.V.*,
   14 F. Supp. 2d 391 (S.D.N.Y. 1998) ................................................................................... 23

*Linde v. Arab Bank, PLC*,
   922 F. Supp. 2d 316 (E.D.N.Y. 2013) ................................................................................ 48

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*,
   97 F. Supp. 3d 485 (S.D.N.Y. 2015) ................................................................................... 57

*Malletier v. Dooney & Bourke, Inc.*,
   525 F. Supp. 2d 558 (S.D.N.Y. 2007) ................................................................................. 51

*Miller v. Holzmann*,
   563 F. Supp. 2d 54 (D.D.C. 2008) ...................................................................................... 15

*Novartis Pharma AG v. Incyte Corp.*,
   1:20-CV-400-GHW, 2024 WL 3608338 (S.D.N.Y. July 29, 2024) ...................................... 57

*Outley v. City of New York*,
   837 F.2d 587 (2d Cir. 1988) ............................................................................................... 45

*Owens v. Repub. of Sudan*,
  864 F.3d 751, (D.C. Cir. 2017), *vacated on other grounds and remanded sub nom. Opati v.*
  *Repub. of Sudan*, 590 U.S. 418, 140 S. Ct. 1601, 206 L.Ed.2d 904 (2020) ............................... 1

*Silivanch v. Celebrity Cruises, Inc.*,
  171 F. Supp. 2d 241 (S.D.N.Y. 2001) ...................................................................................... 57

*TC Sys. Inc. v. Town of Colonie, New York*,
  213 F. Supp. 2d 171 (N.D.N.Y. 2002) ...................................................................................... 15

*United States v. Angiulo*,
  897 F.2d 1169 (1st Cir. 1990) .................................................................................................. 11

*United States v. Dukagjini*,
  326 F.3d 45 (2d Cir. 2003) ................................................................................................... 5, 6

*United States v. Hammoud*,
  381 F.3d 316 (4th Cir. 2004), *cert. granted, judgment vacated on other grounds*, 543 U.S.
  1097, 125 S. Ct. 1051, 160 L. Ed. 2d 997 (2005), *and opinion reinstated in part*, 405 F.3d
  1034 (4th Cir. 2005) .................................................................................................................. 12

*United States v. Mejia*,
  545 F.3d 179 (2d Cir. 2008) ...................................................................................................... 6

*United States v. Pollok*,
  No. 23-6114-CR, --- F.4th ---, 2025 WL 1553327 (2d Cir. June 2, 2025) ............. 32, 36, 37, 42

*United States v. Ray*,
  No. 20-CR-110 (LJL), 2022 WL 101911 (S.D.N.Y. Jan. 11, 2022) ........................... 26, 35, 42

*United States v. Ray*,
  No. 20-CR-110 (LJL), 2022 WL 101911 (S.D.N.Y. Jan. 11, 2022), *aff'd sub nom.*
  *United States v. Pollok,* No. 23-6114-CR, --- F.4th ---, 2025 WL 1553327
  (2d Cir. June 3, 2025) ........................................................................................................... 35, 42

*United States v. Smith,*
  919 F.3d 825 (4th Cir. 2019) ............................................................................................... 44, 46

*United States v. Torres*,
  No. 20CR608 (DLC), 2021 WL 1947503 (S.D.N.Y. May 13, 2021), *aff'd,* No. 21-2665-CR,
  2023 WL 378942 (2d Cir. Jan. 25, 2023) ................................................................................. 26

*United States v. Young*,
  745 F.2d 733 (2d Cir. 1984) ...................................................................................................... 6

*United States v. Zakaria*,
  No. WDQ-10-0043, 2010 WL 3895383 (D. Md. Oct. 1, 2010), *aff'd* 469 F. App'x 192 (4th
  Cir. 2012) .................................................................................................................................. 42

*Vang v. Toyed*,
    944 F.2d 476 (9th Cir. 1991) ............................................................................................ 41, 42

*Viscusi v. Proctor & Gamble*,
    No. 05-CV-01528 (DLI)(LB), 2007 WL 2071546 (E.D.N.Y. July 16, 2007).......................... 20

**Other Authorities**

*Chavez v. Carranza*, No. 03-2932 (W.D. Tenn.), Trial Tr. 315-16, available at https://cja.org/wp-
    content/uploads/downloads/Carranza%20Trial%20Transcript,%20Volume%202,%20pages%2
    0246-447.pdf ....................................................................................................................... 10

Todd D. Jick, Mixing Qualitative & Quantitative Methods: Triangulation in Action, 602–611
    (1979)..................................................................................................................................... 48

**Rules**

Fed. R. Evid. 702(a)....................................................................................................................... 41

Fed. R. Evid. 702, Advisory Committee's Note .......................................................................... 16

Fed. R. Evid. 801(d)(2)(E)............................................................................................................... 8

## PRELIMINARY STATEMENT

Plaintiffs have the burden of proof in this case on each of the three elements of Art. 50(1) of the Swiss Code and must therefore provide evidence that (1) the Government of Sudan ("GOS" or the "Bashir Regime") committed human rights abuses against Plaintiffs; (2) BNPP (or "the Bank") consciously assisted the GOS and knew or should have known that it was contributing to these abuses; and (3) this was the natural and adequate cause of Plaintiffs' injuries. The Bank has made crystal clear that it intends to hold Plaintiffs to their burden of proof on each of these elements. Now the Bank seeks to hamstring Plaintiffs' ability to prove their case by moving to exclude testimony from exceptionally well-qualified experts that is routinely admitted, particularly in human rights cases. There is nothing wrong with Defendants putting Plaintiffs to their burden, but they cannot ask for facts on the one hand and then try to exclude all ability to prove them on the other.

For example, the Bank not only refuses to concede any connection between the GOS and the Janjaweed—a connection manifestly self-evident to any credible observer, including the U.S. Congress, the UN, and the ICC—it also seeks to exclude competent expert testimony proving this basic point. What's more, the Bank also seeks to exclude expert testimony about the attribution of the attacks which injured Plaintiffs and which form a core of this case, testimony which is standard in human rights cases. In fact, in a case involving Sudan, the D.C. Circuit specifically recognized the need for similar expert testimony on attribution of violence and material support because "firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign." *Owens v. Repub. of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *vacated on other grounds and remanded sub nom. Opati v. Repub. of Sudan*, 590 U.S. 418, 140 S. Ct. 1601, 206 L.Ed.2d 904 (2020). In other words, the Government of Sudan will not show up in

Court to provide the necessary information, and so expert testimony is required for the jury to make a reasoned conclusion on attribution.

The Bank's *Daubert* motion ("Motion") also is inconsistent with the position it takes with respect to its own experts. In its Motion, the Bank objects to expert testimony about its state of mind, solemnly intoning that "Plaintiffs' experts are not mind readers." Mot. at 2. But the Bank simultaneously seeks to call several experts to offer *their own* opinions about the Bank's state of mind. *See* ECF No. 723-4 (Gaudemet Rep.) at 28 ("[I]t appears that the prevailing understanding within BNPP Suisse was that, as a Swiss bank not conducting its own operations in the United States, BNPP Suisse was subject only to Swiss law and to the supervision of the Swiss authorities."). However, there is a critical difference between the expert opinions offered by Plaintiffs and the Bank: The Bank is calling these experts to offer opinions about its *own* state of mind that flatly contradict the sworn admissions in its actual guilty plea. The Bank's complaint, Mot. at 25, that Plaintiffs' expert Barry Koch's opinions with respect to the Bank's state of mind "are often" based on "findings from the guilty plea and statement of facts" therefore gives up the game. After all, there's no more reliable basis for discerning corporate intent than under oath statements by the entity itself. Plaintiffs' experts will guide the jury through the information available to the Bank—including the global outcry against Sudan's mass atrocities—that is necessary for the jury to determine whether the Bank knew or should have known it was supporting human rights abuses.

Much of the Bank's Motion is devoted to complaints about Plaintiffs' experts that go to weight, or provide the basis for cross-examination, rather than admissibility. For example, the Bank argues that Cameron Hudson's conclusion that the U.S. crackdown on BNPP hurt Sudan's ability to export oil is unreliable because Sudanese oil production didn't "significantly decrease"

until several years after OFAC began investigating BNPP. Mot. at 21. The Bank is free to use that time lag to cross-examine Mr. Hudson, but it's no reason to exclude his expert opinion. That the Bank has reason to disagree with an opinion is not a reason to exclude an expert.

Finally, the Bank fundamentally misapprehends the Court's ruling that this trial will be focused on the three selected plaintiffs and will not decide class-wide issues. In the Bank's telling, this prevents Plaintiffs from introducing *any* evidence about the GOS's campaign of terror, or the Bank's complicity in it, that isn't directly connected to one of the attacks that injured one of these three particular plaintiffs. But that is not what this Court said. The Court was clear that the central theory of this case remains the "common sense proposition" that if "you give the government intent on human rights violations . . . more money, they'll do more of it." ECF No. 723-2 (May 20, 2025 Hr'g. Tr.) at 76:8-17. Plaintiffs therefore need to show the first part of the equation—that the GOS was engaged in and intent on perpetrating human rights violations—to prove the second part— that giving the GOS more money would cause more abuses. Information showing that the GOS was "intent on human rights violations" is thus critical to the case. As for Plaintiffs' religious affiliation, it matters not a whit that the three plaintiffs selected by the Court are Muslim; Plaintiffs are entitled to offer evidence of the extremist Islamist and Arab supremacist ideology that animated the Bashir Regime. *See* Mot. at 42 (arguing that the regime's "Islamic" [sic] ideology is irrelevant because of the religion of the three plaintiffs in this trial).

The horrors of the Bashir Regime's genocidal campaign are important for another reason: they show that the Bank "knew or should have known" that it was helping the GOS commit its crimes. The more pervasive, appalling and notorious the GOS's human rights violations were, the less persuasive the Bank's protestations of ignorance (which in any case conflict with the admissions in its guilty plea and reams of contemporaneous internal communications).

3

Plaintiffs have heeded the Court's admonitions and tailored their experts to this case. The Bank should not be allowed to exclude relevant and admissible testimony merely because such testimony is harmful to it. The law demands just the opposite.

## ARGUMENT

### I.    The Court Should Allow the Testimony of Cameron Hudson.

Cameron Hudson is one of the world's leading experts on U.S. sanctions against the Bashir Regime, and the GOS's efforts to evade these restrictions. It's hard to imagine an expert more helpful to the jury's understanding of the U.S. government's effort to stop human rights abuses through sanctions and the impact of BNPP intentionally undermining that effort. A former CIA economics analyst covering Africa, Mr. Hudson served as the Head of African Affairs for the National Security Council under President George W. Bush. He was an intellectual architect of U.S. policy on Sudan, and on sanctions in particular, for much of the time BNPP conspired with the Bashir Regime. And as the former head of the U.S. Holocaust Memorial Museum's Center for the Prevention of Genocide, he is a leading expert on policies aimed at halting atrocities. *See* ECF No. 720-8 (Hudson Rep.) ¶¶ 1, 5-7.

Most of his testimony will consist of his expert opinions that, contrary to the position of the Bank's experts, the Bashir Regime's human rights violations *were* a reason for pre-2006 U.S. sanctions against Sudan, and that BNPP's violation of U.S. sanctions significantly undermined these sanctions and allowed the Bashir Regime to profitably develop Sudan's oil industry and fund its genocidal campaign against its own citizens. Additionally, Mr. Hudson will testify as a fact witness about his firsthand encounter with Sudan's Finance Minister in 2007, after OFAC began investigating BNPP's violations. Mr. Hudson's testimony, as both expert and fact witness, is essential to Plaintiffs' ability to show causation.

### A.  There Is Nothing Inappropriate About a Hybrid Fact/Expert Witness.

There is no statute, rule of evidence or rule of civil procedure, that prohibits the testimony of hybrid fact/expert witnesses. There is also no caselaw disfavoring allowing the testimony of hybrid witnesses, a practice which enhances efficiency and is relatively commonplace. *See, e.g.*, *Chavez v. Carranza*, 559 F.3d 486 (6th Cir. 2009) (affirming admissibility of hybrid fact/expert testimony by former U.S. Ambassador to El Salvador). The Bank's cited cases do not actually support their contrary contention and contain selective and misleading quotations. When examined in full, those cases, if anything, support Plaintiffs.

According to the Bank, "as a general matter 'allowing an expert like [Mr. Hudson] to double as a percipient witness [] raise[s] a host of concerns under Rules of Evidence 702 and 403.'" Mot. at 12. Citing the Second Circuit's opinion in *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003), the Bank argues that "'the aura of special reliability and trustworthiness surrounding expert testimony' may result in Mr. Hudson 'attain[ing] unmerited credibility when testifying about factual matters'"; a failed effort to impeach "Mr. Hudson's expert opinions at trial 'may effectively enhance his credibility as a fact witness,' such that BNPP 'may have to make the strategic choice of declining to cross-examine' Mr. Hudson at all"; and "Mr. Hudson's double role as a fact and expert witness is likely to result in his 'expert testimony [straying] from applying reliable methodology' and instead 'convey to the jury [Mr. Hudson's] sweeping conclusions.'" Mot. at 12.

With the Bank's artful interweaving of quotes from *Dukagjini* and its own commentary, the Court could be forgiven for concluding that the Second Circuit indeed generally disfavors hybrid fact/expert witnesses. Not so. *Dukagjini* involved the risks of allowing such testimony only from a very specific type of witness: a case agent in a criminal trial. The portions of *Dukagjini* carefully excised by defense counsel make this clear:

> [W]hen a fact witness or a case agent also functions as an expert for the government, the government confers upon him "the aura of special reliability and trustworthiness surrounding expert testimony . . . ." This aura creates a risk of prejudice "because the jury may infer that the agent's opinion about the criminal nature of the defendant's activity is based on knowledge of the defendant beyond the evidence at trial," a risk that increases when the witness has supervised the case. Simply by qualifying as an "expert," the witness attains unmerited credibility when testifying about factual matters.

326 F.3d at 53 (quoting *United States v. Young*, 745 F.2d 733, 766 (2d Cir. 1984) (Newman, J., concurring)). For case agents in charge of federal criminal cases, who have "supervised the case" and sit next to the prosecutor at counsel table, this caution makes sense. The Second Circuit therefore warned, *in that context*, that "when the prosecution uses a case agent as an expert, there is an increased danger that the expert testimony will stray from applying reliable methodology and convey to the jury the witness's 'sweeping conclusions' about appellants' activities, deviating from the strictures of Rules 403 and 702." *Id.* at 54. That's not the case here, where there is no criminal trial and no case agent.

The Bank plays the same trick with its other Second Circuit authority. In *United States v. Mejia*, 545 F.3d 179, 192 (2d Cir. 2008), the Second Circuit, citing *Dukagjini,* commented that "[t]he defense's inability to meaningfully challenge the case agent's expert opinions inadvertently reinforces the agent's credibility on questions of fact." *Id.* (emphasis added). By replacing the words "case agent" with the generic "witness," Mot. at 13, the Bank changes the meaning of the quote. Again, *Mejia* involved a criminal case—in which the accused had not pleaded guilty—and a testifying hybrid case agent seated at counsel table, who represented the face of the government's investigation. None of those facts remotely apply here.

The Bank also complains that Plaintiffs violated their disclosure obligations because they purportedly "never disclosed that they intended to introduce Mr. Hudson as a percipient witness at trial" until the Notice provided to Defendants on May 12, 2025. Mot. at 11. According to the

Bank, they suffered prejudice from this ostensibly late disclosure, since they did not have "the opportunity to depose Mr. Hudson as a potential lay witness, or to propound written discovery on him." *Id.*

Nonsense. The Bank was informed of *all* aspects of Mr. Hudson's testimony long before the Notice. In fact, not only did the Bank have the "opportunity" to depose Mr. Hudson about his personal observations, the Bank *deposed* Mr. Hudson on these very subjects. *See* Ex. 1 (Hudson Dep. Tr.) at 219-22 (discussing 2007 meeting with Sudan's Minister of Finance who complained about the effect of U.S. sanctions).[1] The Bank received two lengthy reports setting forth Mr. Hudson's expected testimony—including a full description of his percipient testimony and took a day-long deposition, far more disclosure than it would have been entitled to had Mr. Hudson been proffered merely as a fact witness. This is hardly the stuff of "sandbagging," as the Bank baselessly complains. Mot. at 12.

Finally, as the Bank concedes, Mr. Hudson's only percipient witness testimony is a statement, "clearly delineated" in his report, about a meeting that he had with the Sudanese Finance Minister in 2007. Mot. at 12. At the meeting, about which Mr. Hudson testified at length at deposition, a visibly agitated Minister complained about his country's inability to access the U.S. financial markets: "All transfers are affected and now cost us more. I can't even get U.S. dollars now." ECF No. 720-8 (Hudson Rep.) ¶ 172. Contrary to the Bank's argument, this is not inadmissible as hearsay, Mot. at 12, or under Federal Rule of Evidence 403. First, these statements are not offered for their truth—whether the GOS had trouble accessing the U.S. financial markets—but as evidence of the GOS's reaction to the crackdown on BNPP. Second, even if offered for the truth, they are non-hearsay and admissible as statements by a co-conspirator in

---

[1] All exhibits herein are to the accompanying Declaration of Josh T. Mathew ("Mathew Decl."), dated June 17, 2025.

furtherance of BNPP's admitted conspiracy. *See* Fed. R. Evid. 801(d)(2)(E). And finally, the Rule 403 balancing analysis is lopsided in Plaintiffs' favor.

### B. Mr. Hudson Does Not Rely on Classified Information.

The Bank asks the Court to exclude the entirety of Mr. Hudson's testimony because, according to the Bank, "all of Mr. Hudson's proposed testimony depends on undisclosed 'confidential' and 'classified' sources that he reviewed while working at the CIA and White House, preventing Defendants from effectively cross-examining him." Mot. at 11. This is 100% wrong. "*All*" of Mr. Hudson's proposed testimony doesn't depend on classified sources; *none* of it does. And the Bank has had a full opportunity to depose Mr. Hudson on both his opinions and their bases.

The Bank concedes that Mr. Hudson's Report contains the statement that, in preparing this report, he did not rely on classified intelligence. Mot. at 15; ECF No. 720-8 (Hudson Rep.) ¶ 30. However, the Bank asks the Court to disbelieve this statement. In so doing, it offers no evidence that Mr. Hudson is lying, nor does it mention that Mr. Hudson's reports include an exhaustive list of the sources, all unclassified, on which he relied. *Id.* at ¶ 29 (referencing appendices and footnotes containing sources).

Moreover, the "examples" that the Bank lists to demonstrate its purported prejudice from not being able to ask Mr. Hudson about classified information at deposition in fact show the opposite. The examples make clear that these questions were not related to the bases of opinions that Mr. Hudson intended to offer; instead, this was bad-faith questioning designed only to elicit the witness's refusal to answer questions about classified information, which had no role in his report.

The Bank complains that Mr. Hudson refused to provide classified information when asked about "the U.S. government's purported consideration of intervening in Sudan to combat atrocities

8

by the GOS." Mot. at 14. But Mr. Hudson will not go anywhere near that subject, which appears nowhere in either of his reports. And a review of the transcript of Mr. Hudson's deposition reveals that the *only* question he couldn't fully answer because it called for classified information was defense counsel's question about what *specific type* of military intervention was contemplated by President Bush in 2005. Ex. 1 (Hudson Dep. Tr.) at 57:16-58:3. To be clear: the United States ultimately did *not* intervene militarily, and the fact that it was contemplating doing so is not part of Mr. Hudson's reports or contemplated testimony. The Bank was in no way prejudiced by its inability to delve into the operational details of a military strike that never happened and forms no part of Mr. Hudson's opinions. The Bank should not be permitted to exclude an expert witness by intentionally asking him questions outside the scope of his opinions that it knows he cannot answer without committing a federal crime, and then argue that it is prejudiced by his inability to answer these setup questions. Under this theory, every witness who had, at one point, access to classified information would be excluded from testifying, because they cannot disclose that information in a deposition without violating the law. Any person who served in the intelligence community or the diplomatic corps could never testify on any issues remotely related to their experience, because they potentially possessed some scrap of classified information (never mind that it played no role in their testimony) tangentially related to the subject at issue.

*Chavez v. Carranza* is on point. 559 F.3d 486, 497 (6th Cir. 2009). There, the Sixth Circuit affirmed the admissibility of expert testimony from a former U.S. Ambassador to El Salvador, "based on intelligence gathered by himself, his staff, and other government agents." The

ambassador was offered as a non-retained hybrid fact-expert witness and was permitted to testify without even having disclosed an expert report under Rule 26.[2]

Like Mr. Hudson here, the former ambassador in *Chavez* opined on the human rights practices of a foreign government, on the U.S. government's foreign policy responses, and the U.S. government investigations that informed those responses. *See, e.g.*, Tr. at 331-34. He specifically opined that a campaign of human rights abuses was attributable to the Government of El Salvador: "Q: Was that your experience in El Salvador in 1980, that the security forces were committing these acts? A: Yes." *Id.* at 334. His access to "view classified information" was offered as a basis for his expertise. *Id.* at 315.

*Chavez* is not the only example. In *Colvin v. Syrian Arab Republic*, the District Court for the District of Columbia admitted the expert testimony of a former U.S. ambassador to Syria whose opinions on the Syrian government's repressive policies were based in part on classified embassy cables and his own personal communications with Syrian officials. *Colvin v. Syrian Arab Republic*, 363 F. Supp. 3d 141, 146, n.3 (D.D.C. 2019). Similarly, in *Karcher v. Islamic Repub. of Iran*, 396 F. Supp. 3d 12, 19 (D.D.C. 2019), the court recognized a former U.S. intelligence officer as an expert in military intelligence and terrorism, allowing his testimony to establish Iran's involvement in terrorist activities. *See also Brown v. Islamic Republic of Iran*, 687 F. Supp. 3d 21, 32 (D.D.C. 2023) (admitting same intelligence officer as expert); *Frost v. Islamic Repub. of Iran*, 383 F. Supp. 3d 33, 38 (D.D.C. 2019) (same). Like Mr. Hudson, that expert was a former intelligence official. He was permitted to testify regarding "intelligence matters, including attribution of terror attacks and also evidence collection and analysis in the intelligence field." *Karcher*, 396 F. Supp. 3d at

---

[2] *Chavez v. Carranza*, No. 03-2932 (W.D. Tenn.), Trial Tr. 315-16, available at https://cja.org/wp-content/uploads/downloads/Carranza%20Trial%20Transcript,%20Volume%202,%20pages%20246-447.pdf.

19. This is nearly identical to the subjects of Mr. Hudson's testimony: *See, e.g.*, ECF No. 720-8 (Hudson Rep.) ¶¶ 164-68 (commenting on the effectiveness of U.S. sanctions on Sudan, citing a conversation with the Sudanese Finance Minister and a public OFAC report).

Even some of the cases cited by the Bank include the admission of similar expert testimony. For example, the Bank cites Judge Weinstein's decision in *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523, 541-42 (E.D.N.Y. 2012), to exclude the testimony of Pinhas Shmilovitch, a former member of the Israel Security Agency (ISA), most of whose testimony was "based on facts developed through confidential ISA investigations and investigatory methods." *Id.* The Bank neglects to mention that, in the same case, Judge Weinstein allowed expert testimony by several other former ISA and Israeli Defense Forces military intelligence employees and contractors, rejecting the challenge that their background in classified investigations would prevent adequate cross-examination. 893 F. Supp. 2d at 532-540. This included the testimony of the former "head of the ISA Southern District Headquarters responsible for counter-terrorism investigations in Gaza," who for security reasons could only be identified as "Igal."[3]

Indeed, courts regularly allow testimony by expert witnesses who were exposed to classified information on the same subject matter as their expert opinions. *See Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 49 (D.D.C. 2006), *enforcement granted*, No. 02-CV-285 (RCL), 2011 WL 13376985 (D.D.C. Dec. 2, 2011) (allowing expert who was a former CIA officer to testify that a particular terrorist attack would not have happened without Iranian support, an opinion which was based "on publicly available sources that were not inconsistent with classified information known to him," including congressional testimony); *United States v. Angiulo*, 897 F.2d 1169, 1188 (1st Cir. 1990) (allowing former FBI agents to provide expert testimony about La

---

[3] In the interests of full disclosure, undersigned counsel (Mr. Goelman) was one of the plaintiff's lawyers in the cases against Arab Bank, including the *Gill* case.

Cosa Nostra because "[r]egardless of the information that contributed to their background expertise, the experts' testimony regarding the particular charges against these defendants was based solely on an analysis of the tape recordings" that were played at trial); *United States v. Hammoud*, 381 F.3d 316, 340 (4th Cir. 2004) (allowing expert to testify because "while his general knowledge regarding Hizballah derived in part from his classified work with the FBI, he did not rely on any classified information in forming his opinion regarding [the defendant's] relationship to Hizballah"), *cert. granted, judgment vacated on other grounds*, 543 U.S. 1097, 125 S. Ct. 1051, 160 L. Ed. 2d 997 (2005), *and opinion reinstated in part*, 405 F.3d 1034 (4th Cir. 2005).

The Bank spills much ink trying to analogize Mr. Hudson's testimony to the testimony of a former FDA official in *In re Mirena*, but critical portions of that official's opinion explicitly relied on government information she refused to disclose. *IUD Prods. Liab. Litig.* There, the defendant, Bayer, planned to call Dr. Hixon to offer opinion testimony regarding Mirena, an IUD developed and sold by Bayer. Specifically, Dr. Hixon was to opine, among other things, that Bayer "met or exceeded its regulatory responsibilities with respect to Mirena." 169 F. Supp. 3d at 469. Dr. Hixon "personally participated" in the regulatory review of Mirena as the Medical Officer, serving as the primary reviewer and team leader in the FDA handling the review, *id.* at 472, and she admitted that she based her opinions "*at least in part*, on her experience as a 'regulatory reviewer of Mirena.'" *Id.* at 471 (emphasis added). She nevertheless refused to disclose important details involving that very review. *Id.* Judge Seibel therefore excluded part but not all of Dr. Hixon's opinions—the part that was based on non-disclosed information.

According to the Bank, "[t]his case is no different" than *In re Mirena*. But this case is *entirely different*. Mr. Hudson was an intelligence official specializing in efforts to combat the Bashir Regime's human rights abuses in Sudan. Unlike Dr. Hixon, he was not in charge of any

investigation or review of the Bank's conduct, and the bases of his opinion are all publicly available and long ago disclosed. Unlike Dr. Hixon, who admitted that her testimony was based "at least in part" on confidential information, Mr. Hudson was explicit that his testimony did not rely on classified information and was consistent with publicly available information. *See* ECF No. 720-8 (Hudson Rep.) ¶ 30 ("In preparing this report, I did not rely on classified intelligence and I have not disclosed classified information, sources, or methods."); *id.* ¶ 127 (describing previously classified, now publicly available information about Regime's human rights abuses).

### C. The Bank's objections to specific opinions offered by Mr. Hudson

The Bank objects to any opinion testimony offered by Mr. Hudson regarding the Bank's state of mind on the grounds that "it is impermissible for an expert to testify to a party's state of mind or provide legal conclusions." Mot. at 18. This is a bit rich coming from the party who is offering no fewer than three(!) experts to opine that it had an innocent state of mind or was "confused" about U.S. sanctions, despite its own squarely opposite admissions under oath. *Contrast* ECF No. 691-2 (Stipulated Statement of Facts) ¶ 31 ("[S]enior BNPP compliance and legal personnel repeatedly recognized BNPP's role in circumventing U.S. sanctions against Sudan, and yet allowed these transactions to continue in part because of their importance to BNPP's business relationships and 'goodwill' in Sudan.") *with* ECF No. 723-4 (Gaudemet Rep.) ¶ 36 (asserting that, until 2014, there were "credible arguments in support of [BNPP's USD book-to-book transactions] under U.S. economic sanctions").

According to the Bank, "[t]he purpose of U.S. sanctions is only arguably relevant to the extent BNPP was actually aware of that purpose." Mot. at 19 n.3. Not so—the fact that the sanctions were explicitly and publicly designed at least in part to prevent human rights abuses is fundamentally relevant to whether the Bank knew or *should have known* that it was consciously assisting the GOS's crimes, the second element that Plaintiffs must show. In any event, more than

one of the Defendants' experts argues, implausibly and incorrectly, that until 2006, all of the sanctions imposed by the United States on Sudan were designed to achieve other goals. *See* ECF No. 528-71 (Hufbauer Rep.) ¶ 50 (claiming that the sanction objectives of preventing "genocide" and "human rights atrocities" in the Darfur Act of 2006 "represented a shift in political focus"). Mr. Hudson's testimony on that point is relevant to showing that U.S. sanctions from as early as 1993 were aimed at, and publicly justified by, the need to minimize atrocities being committed by the GOS. *See* ECF No. 720-8 (Hudson Rep.) at 3.

The Bank also objects to opinions set forth in Mr. Hudson's Reply Report regarding the European sanctions regimes, arguing that he "has no relevant expertise or training on these topics, notwithstanding his work in Sudan." Mot. at 22. To be clear, this is evidence that will only be used under certain conditions. The Court should exclude all evidence and opinion about French, EU, Swiss and UN sanctions for the reasons set forth in Plaintiffs' *Daubert* motion, in which case Mr. Hudson's opinions about foreign sanctions regimes will not be offered. If, however, the Court allows the Bank to offer this evidence, Mr. Hudson is well-qualified to rebut these incorrect statements. From his experience as one of the architects of the U.S. sanctions regime, Mr. Hudson was well-placed to observe the ineffectiveness of the sanctions imposed by these other authorities, including their lack of effective enforcement mechanisms. ECF No. 720-9 (Hudson Reply Rep.) at 21-24.

The Bank's challenges to other specific opinions offered by Mr. Hudson go to weight, not admissibility, and can easily be explored on cross-examination. Mr. Hudson's opinion about the Bank's role in the longevity and lethalness of the Bashir Regime is well-grounded in his expertise, as is his opinion that the Bank's sanctions violations allowed the Bashir Regime to use Sudan's oil to earn U.S. dollars and in turn use those proceeds to fund its war machine and solidify its hold on

power in Sudan. Defense counsel's complaint that these opinions are "unreliable" because Sudanese oil production didn't decrease significantly until several years after the crackdown on BNPP, or because the Bashir Regime didn't immediately collapse in its aftermath, are classic examples of points that can be made on cross-examination and argued to the jury. They do not justify exclusion of truly expert opinion on causation, which is likely to be the most contested issue at trial.

## II.    Barry Koch Is a Banking and Compliance Expert Whose Expert Testimony Provides Relevant Context for the Jury on Complex Issues.

Plaintiffs seek to introduce testimony from Barry M. Koch, an expert with more than two decades of experience in compliance and risk management in the financial services industry, having served in senior compliance roles at a number of major international financial institutions, including as Global Head of Anti-Money Laundering Compliance at American Express and Chief Compliance Officer of Western Union. ECF No. 720-17 (Koch Rep.) at 1, 3-7. BNPP does not dispute that Mr. Koch is well-qualified to offer his opinions.

Nor can BNPP credibly deny the relevance of Mr. Koch's opinions. Most jurors will have little if any understanding of international correspondent banking and trade finance. They will need a guide for the perplexed and Mr. Koch will provide it. "If an expert distills a complicated subject into language a jury can understand, and that subject is relevant, she can be admitted as a 'teaching witness.'" *Equal Emp. Opportunity Comm'n v. S&B Indus., Inc.*, No. 3:15-CV-0641-D, 2017 WL 345641, at *4 (N.D. Tex. Jan. 24, 2017) 94) ("If an expert distills a complicated subject into language a jury can understand, and that subject is relevant, she can be admitted as a 'teaching witness.'" (quoting *Miller v. Holzmann*, 563 F. Supp. 2d 54, 91–92 (D.D.C. 2008)); *see also TC Sys. Inc. v. Town of Colonie, New York*, 213 F. Supp. 2d 171, 175 (N.D.N.Y. 2002) ("[a]n economist, through his or her educational training, is qualified to educate the fact finder about such

15

broad economic principles and market forces."). The plain text of FRE 702, the Advisory Committee Note,[4] and cases applying it show why his testimony is readily admissible. *See In re Platinum-Beechwood Litig,*, 469 F. Supp. 3d 105, 118 (S.D.N.Y. 2020) (allowing expert explanations that "synthesize and summarize evidence in a manner that streamlines the presentation of evidence to the jury, saving the jury time and avoiding unnecessary confusion" in a case involving complicated facts that the jury may not be "capable of understanding on their own").

Here, Mr. Koch will explain bank terminology, products, and "the role of banks' compliance function" to the jury.[5] In *Gill v. Arab Bank, PLC,* for example, the court allowed testimony on "banking terms and standards" from a former compliance executive for Bank of America because "[a]n explanation of banking terminology and concepts will aid the jury in understanding complex evidence on topics of critical importance to this litigation, including the Bank's conduct and state of mind." 893 F. Supp. 2d at 535.

Applying his extensive compliance experience and knowledge of industry practice to a thorough review of the record, Mr. Koch will also explain the sanctions-evasion methods and "complex money laundering structures used by the Bank;" as well as "the role of the bank's compliance personnel in the Bank's decision to continue doing business with Sudanese SDN's."[6]

---

[4] "[I]t might also be important in some cases for an expert to educate the factfinder about general principles . . . ." Fed. R. Evid. 702, Advisory Committee's Note.

[5] *See* ECF No. 723-21 (Pls.' Rev. Not.) at 4; ECF No. 720-17 (Koch Rep.) ¶¶ 62-76, 102-133. Despite seeking the exclusion of Mr. Koch's testimony in its entirety, BNPP has no legitimate basis to exclude Mr. Koch's explanations of trade finance and correspondent banking. Instead, BNPP simply claims these opinions are "entirely duplicative" of sections of Mr. Fogarty's expert report. *See* Mot. at 26 n.6. As Mr. Fogarty will not be explaining these concepts to the jury, BNPP's arguments regarding this aspect of Koch's proposed testimony are moot. *See* ECF No. 723-21 (Pls.' Rev. Not.) at 4.

[6] *See* ECF No. 723-21 (Pls.' Rev. Not.) at 4; ECF No. 720-17 (Koch Rep.) ¶¶ 152-158, 159-201, 202-242, 246-285; ECF No. 720-18 (Koch Rep. Reply) ¶¶ 33-52, 61-70, 71-80, 90-98. Mr. Koch will not be providing any testimony on the "importance of BNPP's financial services to the GOS's ability to commit

Koch's proposed testimony is similar to expert testimony that Judge Rakoff permitted to "contextualize the evidence" in a trial related to a Ponzi scheme. *See In re Platinum-Beachwood Litig.*, 469 F. Supp. 3d 105 at 116-117 (permitting expert testimony regarding "(1) what a fiduciary or investment manager in a given context would ordinarily do according to relevant industry standards, (2) what the defendants here did instead, and (3) why the latter had the effect of defrauding or harming [plaintiffs]").

Likewise, in *In re Ocean Bank*, the court allowed testimony on "the quality of [a bank's] compliance program, which may help the jury" determine whether the bank acted knowingly. 481 F. Supp. 2d 892, 904 (N.D. Ill. 2007); *see also Camenisch v. Umpqua Bank,* 763 F. Supp. 3d 871, 885 (N.D. Cal. 2025) (expert "has years of expertise in the banking industry and may testify about standard banking practices and common red flags and typical responses to those red flags"). Mr. Koch's testimony about the red flags that put BNPP on notice and the off-ramps it could have taken to avoid funding genocide will illuminate esoteric banking issues that a lay jury likely would not understand without expert testimony.

### A. BNPP Does Not Dispute that Mr. Koch is Qualified to Opine as an Expert on Compliance and Risk Management in the Financial Services Industry.

BNPP concedes that Mr. Koch is qualified as an expert in the fields of banking, compliance, and risk management. For this reason alone, Mr. Koch should be permitted to testify before the jury. *Compare.* ECF No. 475, Order (Oct. 10, 2023) (denying BNPP's motion to exclude testimony of Plaintiffs' immigration expert Mr. Khatri as "Defendants do not dispute Khatri's qualifications, and Defendants' substantive disagreements with Khatri's conclusions are irrelevant for *Daubert* purpose.") (internal citation omitted); *see also Adeghe v. Janssen Pharms., Inc.*, No. 16-cv-2235

---

human rights violations." *Compare* Mot. at 27 n.7 *with* Pls.' Rev. Not. at 4. BNPP's motion to exclude Mr. Koch on this basis is thus also moot.

(LGS), 2017 WL 3741310, at *3 (S.D.N.Y. Aug. 30, 2017) ("[t]he strength of [an expert's] qualifications provides circumstantial evidence of reliability" under Fed. R. Evid. 702) (cleaned up).

BNPP makes only one substantive attack on Mr. Koch's qualifications, claiming "his opinions regarding international sanctions" are "unrelated" to his qualifications and therefore should be excluded. Mot. at 28.[7] But as the former head of cross-jurisdictional compliance programs as global financial institutions like American Express and Western Union, Mr. Koch is eminently qualified to opine on these subjects.[8]

Regardless, Mr. Koch will not be providing any opinions on U.N., E.U., Swiss, French, or other international sanctions regimes, and neither should Defendants' experts, for the reasons detailed in Plaintiffs' Motion to Exclude. ECF No. 722 at 5-14 (explaining how such testimony would be irrelevant and confusing for the jury); *see also* ECF No. 723-2 (May 20, 2025 Hr'g Tr.) at 25, 65-67 (noting that the only country whose sanctions regime is relevant to this case is the United States).

If, however, Defendants are permitted to offer testimony or argument about BNPP's purported compliance with the sanctions regimes of other jurisdictions, Mr. Koch should be permitted to rebut that testimony. For example, Defendants' proposed expert Mr. Antoine

---

[7] While Defendants claim that Mr. Koch's qualifications are limited to U.S. sanctions, Mot. at 28, Mr. Koch repeatedly testified that his expertise and qualifications extend beyond that. *See e.g.,* Ex. 2 (Koch Dep. Tr.) at 92:17-20 ("I'm an expert in [anti-money laundering] and sanctions compliance for global financial institutions, which include financial institutions in Europe").

[8] Mr. Koch has personally led some of the world's largest financial industry compliance programs and compliance teams; reviewed and developed compliance tools to satisfy "Know Your Customer" requirements in many jurisdictions; and provided advice on issues relating to economic sanctions and anti-money laundering (AML) transaction monitoring and investigations. Mr. Koch established his consulting practice in 2016, with a specialty in financial crimes investigations and AML compliance, is the co-founder of the United States and European Bankers Alliances Against Human Trafficking, is an active participant in The Wolfsberg Group, and has been teaching Global Corporate Compliance at the Benjamin N. Cardozo School of Law since 2017.

Gaudemet concludes that Defendants "apparently always complied with" French, Swiss, and European sanctions because BNPP "always endeavored . . . to avoid executing transactions that could contribute to the financing of arms or terrorism in Sudan." *See* ECF No. 723-4 (Gaudemet Rep.) ¶¶ 19, 21-22. If BNPP opens the door to BNPP's purported compliance with European sanctions, Mr. Koch is well equipped to rebut this unnecessary sideshow.

### B. BNPP Cannot Discredit Mr. Koch's Methodology.

BNPP makes a half-hearted attempt at discrediting Mr. Koch's methodology. *See* Mot. at 26 ("most of Mr. Koch's proposed testimony is unreliable because it includes no methodology whatsoever and consists of simple *ipse dixit* statements"). To do so, BNPP plucks two sentences out of Mr. Koch's 96-page report and claims these two statements have no "citation or explanation." *Id.* at 27.

The reality is that Mr. Koch spends five pages of his reply report, and large portions of his deposition, detailing the methodology from which his opinions are derived. ECF No. 720-18 (Koch Reply Rep.) ¶¶ 8, 13-25 (explaining that his methodology is "consistent with industry practice in Europe and the United States"); *see also* ECF No. 720-17 (Koch Rep.) ¶¶ 6, 35; Ex. 2 (Koch Dep. Tr.) at 48:3-8, 150:25-153:17.

Mr. Koch makes clear that his opinions arise out of the knowledge and experience he has gained through his decades-long career in the fields of banking and compliance, as well as his review of applicable industry guidance and practices. Mr. Koch applied this knowledge, expertise, and training to his review of BNPP's documents produced in discovery; BNPP employees' testimony; and BNPP's stipulated statement of facts during the 2014 guilty pleas; as well as his review of an extensive contextual and historical record.

BNPP does not mention, discuss, or contest this methodology. Nor could they. Courts in this circuit have consistently recognized that an expert witness may properly testify "on the basis

of experience alone" or "in conjunction with other knowledge, training, skill or education." *See Figueroa v. Boston Scientific Corp.*, 254 F. Supp. 2d 361, 365 (S.D.N.Y. 2003); *Viscusi v. Proctor & Gamble*, No. 05-CV-01528 (DLI)(LB), 2007 WL 2071546, at *7 (E.D.N.Y. July 16, 2007). Similarly, the court in *Umpqua Bank*, found an opinion "sufficiently well founded" where an expert "appropriately based her analysis on branch employees' testimony and internal correspondence and her familiarity with banking from her decades regulating and advising banks." 763 F. Supp. 3d 871 at 884 (internal citation omitted).

Mr. Koch's acceptance as a compliance expert by, among others, the United States Department of Justice (Koch Rep. ¶ 26, ECF No. 720-17); the Wolfsberg Group (*id.* ¶ 27); The New York Clearinghouse (*id.* ¶ 28); and private clients and non-profits (*id.* ¶¶ 30-33) demonstrates that his methodology and expertise have been accepted by his peers. Mr. Koch is qualified, his methodology is reliable, and his opinions should be admitted. *Amorgianos v. Nat. Railroad Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) ("[T]he district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions.") (citing *Daubert*, 595 (1993)).

### C. BNPP's Misrepresentations of, and Substantive Disagreements with, Mr. Koch's Conclusions Do Not Render His Testimony Inadmissible.

Unable to discredit Mr. Koch's qualifications and ignoring his reliable methodology, the Bank attacks the substance of Mr. Koch's opinions and claims that Mr. Koch is simply providing a factual narrative, opining on BNPP's state of mind, or making legal conclusions. *See* Mot. at 23-27. None of this is true. The Bank's challenges to Mr. Koch's conclusions rest on fundamental misrepresentations of his testimony and should be denied.

According to the Bank, Mr. Koch's opinions are an improper factual narrative, because he "simply quotes sections of the BNPP plea agreement" or relies "on BNPP internal documents" and "the jury can examine the underlying documents and draw their own conclusions without Mr. Koch's assistance." Mot. at 25 & n.5.

But a lay jury will not understand that the satellite bank structure devised by BNPP was a money laundering device. Nor will it understand what wire-stripping is. Now will it understand the significance of a senior bank official instructing that no minutes be taken of a briefing by compliance officers on U.S. sanctions. For the jury to understand BNPP's internal communications and its convoluted financial machinations, the jury will need Mr. Koch's explanations and analysis. And for that Mr. Koch will need to discuss key facts. An expert "may lay a factual foundation." *In re Platinum-Beechwood Litig.,* 469 F. Supp. 3d at 118 (internal citation omitted). Mr. Koch will not present factual narratives, divorced from his expert opinions; he will present opinions resting on sufficient data. *See Amorgianos*, 303 F.3d at 265 (noting that fact that expert opinion is "grounded on sufficient facts or data" is an "indicia of reliability") .

### D. Mr. Koch Will Not Draw Legal Conclusions and Will Not Opine on the Bank's Subjective State of Mind.

BNPP claims that Mr. Koch's testimony is inadmissible because it "opin[es] on whether BNPP acted with the requisite scienter under Swiss law," and "draws a legal conclusion." Mot. at 24. But Mr. Koch is not opining that BNPP broke U.S. law—that is admitted. He is explaining to a lay jury the sophisticated, non-obvious methods BNPP used to break the law and analyzing the information environment that would have put any major financial institution on notice of the risks of funding genocide. [9] Simply because these facts are critical to the jury's resolution of the second

---

[9] Similarly, Mr. Koch explicitly states that he is "not offering any legal opinion as to whether the conduct of BNPP's senior management in Paris . . . meets or does not meet any particular legal tests under Swiss law; that is for the Court and jury to decide." ECF No. 720-18 (Koch Reply Rep.) at fn. 2.

element of Article 50(1) does not mean an expert cannot address them. To the contrary, Rule 704 provides: "An opinion is not objectionable just because it embraces an ultimate issue." Mr. Koch can explain *how* BNPP acted in furtherance of its conspiracy with the Bashir Regime; leaving it up to the jury to decide whether this satisfies the requirements of conscious assistance. *See Better Holdco, Inc. v. Beeline Loans, Inc.,* 666 F. Supp. 3d 328, 376 (S.D.N.Y. 2023) (denying a motion to exclude an expert's testimony where "he leaves open for the jury the ultimate question").

Similarly, Mr. Koch can illuminate the context of the Swiss banking sector's historic reckoning with its role in the Holocaust, precisely because this should have put a reasonable compliance program on high alert that one of the Bank's most lucrative clients was being accused of genocide and crimes against humanity. In doing so, Mr. Koch is again opining on objective facts from which a juror could conclude that BNPP was willfully blind or worse.

The same is true for Mr. Koch's review of BNPP's decision-making processes. He refers to facts in internal documents that, in his expert opinion, would have put compliance personnel on notice that there was a risk of the Bank enabling sanctions violations and criminal conduct. *See In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d at 479–80 (excluding expert's opinions on the "intent, motives or states of mind of corporations," but permitting testimony on "what information was in [defendant's] possession"). Mr. Koch's testimony on red flags is precisely the type of objective evidence from which a jury can infer the defendants' subjective state of mind.

BNPP takes issue with Mr. Koch's rebuttal of the Bank's "reliance" and "motivations" arguments. *See* Mot. at 23, 26. But the Bank cannot ask this Court to allow its expert Teresa Pesce to opine on BNPP's "reliance on a legal memorandum in deciding to continue its Sudan business,"—testimony that is fundamentally about the Bank's "state of mind"—yet prevent Mr. Koch from rebutting that same testimony. As explained in Plaintiffs' Motion to Preclude, and as

further supported by the very case law cited by the Bank in its Motion,[10] Ms. Pesce's testimony should not be admitted. However, if Ms. Pesce or others are allowed to testify about the purported "confusion" within BNPP about the applicability of U.S. sanctions, Mr. Koch should be permitted to rebut that testimony, including by contextualizing BNPP's sanctions-violating products and the applicable international compliance standards.

Because Mr. Koch is well-qualified and offers relevant and reliable opinions; and because BNPP's motion is based on misrepresentations about his planned testimony, the Bank's motion to exclude Mr. Koch's expert testimony in its entirety should be denied.

### III.    The Opinions of Plaintiffs' Medical and Psychological Experts Have Been Properly Disclosed and Are Relevant and Methodologically Sound.

The Bank does not challenge the qualifications of Drs. Rosenfeld and Keller, who performed psychological and medical evaluations (respectively), on Plaintiffs Abulgasim Abdalla and Turjuman Adam, and who prepared a general report that speaks to the manifestation of trauma across similar populations. Similarly, the Bank does not object to the qualifications of Drs. Green and Grympa, who performed psychological and medical evaluations (respectively) on Plaintiff Entesar Kashef, using the same methodology employed by Drs. Rosenfeld and Keller.[11] However, the Bank argues that Drs. Green and Grympa were not properly disclosed, and challenges the

---

[10] *See* Mot. at 26 (citing to *Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp., N.V.*, 14 F. Supp. 2d 391, 404 (S.D.N.Y. 1998) ("To the extent that [the expert] would seek to opine before the jury that [the party] acted reasonably and in good faith . . . the overwhelming weight of Second Circuit authority precludes expert testimony about these issues.")).

[11] As well they should not. Dr. Rosenfeld is a professor at Fordham University and board certified in forensic psychology, and Dr. Green is a clinical and forensic psychologist. Both are extensively published and practiced in the areas of "assessing the impact of torture and trauma on mental health functioning," mental health of refugees and "detection of feigned mental disorders." Both have extensive experience conducting psychological assessments. Dr. Keller is the founder of the Bellevue Hospital/New York University School of Medicine Program for Survivors of Torture, and is a leading expert on assessing torture and war-related trauma, as well its physical and mental health sequelae. Dr. Grympa, board certified in internal medicine, has performed hundreds of evaluations on refugees and asylees for various immigration matters.

methodology of their reports and the relevance of their testimony. Each of these arguments is wrong.

### A. Drs. Green and Grypma Expert Opinions Were Fully Disclosed Under Rule 26(a)(2).

BNPP had every opportunity to depose Drs. Green and Grypma; its failure to do so is not a valid basis for a *Daubert* challenge. Yet BNPP now distorts the record to claim that it never knew they were experts in this case. That is false. Plaintiffs' disclosure of both experts met all Rule 26(a)(2) criteria. On September 30, 2022, Plaintiffs served BNPP with a general report headlined by Drs. Rosenfeld and Keller, describing how some Representative Plaintiffs were evaluated by other psychological and medical experts, including Drs. Green and Grypma, consistent with the methodology used by Drs. Rosenfeld and Keller.[12] The report detailed the qualifications of Drs. Green and Grypma and provided their *curricula vitae*, along with a list of their prior case testimony.[13] It disclosed their compensation for work on the case.[14] And it disclosed that Drs. Green and Grypma had examined Ms. Kashef.

Because Ms. Kashef, an observant Muslim, had concerns about being evaluated by men on religious modesty grounds, she was evaluated by Drs. Green and Grypma, both of whom are female. Both doctors signed the evaluation report.[15] Plaintiffs provided BNPP with the notes and photos taken and data from testing instruments used during Ms. Kashef's evaluation. The trial testimony of Drs. Green and Grypma will be limited to their evaluation of Ms. Kashef.

BNPP cannot now claim to be surprised that Plaintiffs would call these experts at trial. At no point did Plaintiffs refer to Drs. Green and Grypma as "consulting experts." The Bank's

---

[12] ECF No. 720-13 (Rosenfeld/Keller Rep.) at 6-7.
[13] *Id.* at 6-7.
[14] *Id.* at 7.
[15] *Id.* at 8.

suggestion that it somehow relied on Dr. Keller's brief characterization of the work of Drs. Green and Grypma—in a deposition taken the day before the discovery deadline[16]—to decide that it should not depose these additional experts is preposterous. Because Drs. Green and Grypma were fully disclosed in this matter, the Court should deny the Bank's motion to exclude their testimony.

### B. The Testimony of Plaintiffs' Medical and Psychological Experts Is Relevant, Reliable and Admissible.

Most of the Bank's argument to limit the testimony of Drs. Rosenfeld and Keller (and presumably also Drs. Grypma and Green) is based on a mischaracterization of their opinions and should be denied.

Plaintiffs' medical and psychological experts offer no opinion on attribution. They do not testify, for instance that it was the Regime's Janjaweed forces that pulled Plaintiff Abulgasim Abdalla off a truck and beat him until he passed out, leaving him with a bleeding head and unable to walk (though it was). Instead, they describe how identified physical evidence █████████ ███████████████████████████████████████████████████████ █████████████████████████████████████████████████████ █████████████████████ are consistent with an individual having experienced the reported abuses.[18] They further analyze the psychological and medical impact of the abuses detailed by Plaintiffs, the likelihood of improvement over time, and the type of interventions Plaintiffs may need for that improvement to manifest. It is, of course, a matter for the jury to assess Plaintiffs' accounts of the abuses they suffered, the causal attribution of those abuses to the Bashir Regime, and BNPP's liability for those injuries. But the experts may surely offer testimony that the evidence from their examination is consistent with the mechanism of injury the Plaintiff describes.

---

[16] ECF No. 409 (order extending expert discovery deadline to April 28, 2023).
[17] ECF No. 720-13 (Rosenfeld/Keller Rep.).
[18] *Id.* at 6-7.

Additionally, Plaintiffs' medical and psychological experts will not offer the narration of Plaintiffs' histories or gratuitous repetition of facts that the Bank fears. The Plaintiffs themselves are surely in the best position to testify to their own lives and experiences (and they will do so). However, the testimony of Drs. Rosenfeld, Keller, Green and Grypma will apply expert "synthesis and interpretation" to the events relayed by Plaintiffs. *United States v. Torres*, No. 20CR608 (DLC), 2021 WL 1947503, at *7 (S.D.N.Y. May 13, 2021), *aff'd,* No. 21-2665-CR, 2023 WL 378942 (2d Cir. Jan. 25, 2023). "That is sufficient to satisfy Rule 703." *Id.* (allowing expert testimony based on qualitative interviews where the testimony applies expert analysis to statements rendered, "rather than the mere conveyance of those statements to the jury"); *see also United States v. Ray*, No. 20-CR-110 (LJL), 2022 WL 101911, at *11-13 (S.D.N.Y. Jan. 11, 2022) ("Presenting expert testimony that is consistent with lay witness testimony is the permissible building block for any case.") This testimony will be helpful to the jury, who would not otherwise be able identify that specific scar patterns, medical conditions or psychological symptoms are consistent with an individual having experienced the event described. Any inconsistency between the doctors' understanding of an event and Plaintiffs' testimony is a topic BNPP is free to explore as necessary on cross-examination.

Accordingly, the Bank's motion to exclude narration of Plaintiffs' experiences or testimony that it was the GOS that abused Plaintiffs should be denied as moot.

### C. Plaintiffs' Experts' Opinions as to Forced Displacement and Population-Based Data are Relevant and Admissible.

Without addressing it by name, the Bank seeks to exclude as "irrelevant" testimony about forced displacement. Mot. at 32. But the Bank seems to forget that all three Plaintiffs will seek damages for being forcibly displaced from their homes and homeland due to a reasonable fear of

the Bashir Regime's campaign of persecution. Expert testimony on the harms from that human rights violation is thus plainly relevant.

In his report and deposition testimony, Dr. Rosenfeld explained that the experience of forced displacement as a traumatic event separate and distinct from the other individual abuses Plaintiffs suffered.[19] Dr. Rosenfeld will educate the jury on how "displacement alone is certainly traumatic," and moreover, that "being *forced* to move is traumatic."[20] An informed discussion of the "trauma inherent in displacement" is based on an analysis of the available literature as well as his knowledge, training and experience with refugee, asylee or otherwise displaced populations, not only the evaluations of the three Plaintiffs.[21] Because the concept of forced displacement and its intrinsic trauma are not necessarily understood by a layperson, Dr. Rosenfeld's testimony on the issue will assist the jury in assessing the damage commonly experienced by the three Plaintiffs. Accordingly, BNPP's motion to exclude this testimony as irrelevant should be denied.

BNPP seeks to limit the doctors' testimony to "their medical and psychological assessments" of Plaintiffs.[22] However, Plaintiffs were not evaluated in a vacuum. They did not appear in the examination room from thin air a moment before the assessments were performed. Where Plaintiffs may have presentations of medical or psychological conditions that are culturally specific, or consistent with similarly situated populations, testimony on these population-based findings is relevant and admissible. ████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[19] ECF No. 720-13 (Rosenfeld/Keller Rep.) at 9-10; Ex. 3 (Rosenfeld Dep. Tr.) at 88:22-92:20.
[20] *See* Ex. 3 (Rosenfeld Dep. Tr.) at 88:22-92:20.
[21] ECF No. 720-13 (Rosenfeld/Keller Rep.) at 9-10, 12-14.
[22] Mot. at 32.
[23] *See* Ex. 3 (Rosenfeld Dep. Tr.) at 220:4-23.

████████████████████████████████████████████████████████

████████████████████████████████ Similarly, Dr. Keller opines that the

manifestation of somatic symptoms (i.e., physical symptoms without a clear underlying medical

etiology) is "very, very common among trauma survivors."[25] Because these manifestations of

trauma are unlikely to be familiar to most jurors, expert testimony will be essential. This testimony

is relevant, helpful to the jury and admissible at trial. To the extent BNPP is looking to exclude

such testimony, its motion should be denied.

### D. Drs. Rosenfeld and Green's Psychological Evaluations Are Reliable and Admissible.

In a three-sentence argument shoved at the bottom of the section on these experts, the Bank

attempts to exclude all opinions offered as to Plaintiffs' psychological harms. *See* Mot. at 34-35.

Without citation, the Bank offers three objections to the methodology of Drs. Rosenfeld and,

presumably, Green.

First, relying on no cited source, the Bank mischaracterizes the standard of psychological

assessment to criticize the doctors' use of "unstructured interviews."[26] To assess each Plaintiff's

"current mental state and the extent to which any psychological symptoms or difficulties may

relate to alleged mistreatment and abuse inflicted by the Sudanese government," the doctors' used

a

> methodology that relies on an evaluation of the person's history and functioning
> prior to any interactions with the Sudanese government or its representatives,
> including understanding what those interactions involved and how the person has
> responded in a range of capacities (e.g., physically, psychologically, socially,
> vocationally).[27]

---

[24] *Id.*
[25] *See* Ex. 4 (Keller Dep. Tr.) at 231:12-234:2.
[26] *Id.*
[27] ECF No. 720-14 (Rosenfeld/Keller Reply Rep.) at 3.

The doctors' anamnestic interviews (i.e. clinical interviews used to assess Plaintiffs' history) captured this information, while "virtually none of this information is obtainable from . . . structured diagnostic interviews."[28] In fact, some literature has flagged the use of structured interviews in forensic settings (which Defendants implicitly advocate as the better approach) as problematic, since such structured interviews may "sugges[t] possible symptoms that an evaluee may readily endorse due to demand characteristics of the setting."[29] Furthermore, structured interviews have not been linguistically or culturally validated for this population.[30]

Second——again relying on nothing more than unsupported assertion——BNPP claims that Plaintiffs' experts "failed to obtain objective external records" necessary for psychological diagnosis.[31] In other words, the Bank says that the medical examinations are invalid because the doctors failed to obtain information like work-evaluations and test scores in order to assess Plaintiffs' functional impairment. This is incorrect—the doctors not only analyzed all available medical records, they also considered "when relevant, other collateral sources."[32] If the Bank believes that they failed to properly consider relevant outside sources in their evaluation, that is fodder for cross-examination, not exclusion.

Further, the doctors focused their functional impairment analysis on areas more befitting Plaintiffs. For economically disadvantaged refugees like Plaintiffs, functional impairment largely does not manifest in work performance or educational achievement because they have to work to survive. *See* Ex. 3 (Rosenfeld Dep. Tr.) at 243:8-245:15. Instead, it is seen in their interpersonal relationships and social functioning. Here, those are best assessed in anamnestic interviews. Any

---

[28] *Id.*
[29] *Id.*
[30] *Id.* at 4 n.9.
[31] Mot. at 35.
[32] ECF No. 720-14 (Rosenfeld/Keller Reply Rep.) at 5.

collection of third-party information on the topic, like interviews with social peers, would mean interviewing other refugees who likely experienced events related to those Plaintiffs report, which may affect their assessment of Plaintiffs' social conduct. *Id.* at 246:4-247:15. Plaintiffs' experts therefore used the best, most reliable information available to assess functional impairment.

Finally, the Bank falsely asserts that Plaintiffs' experts did not consider alternative causes of Plaintiffs' psychological harms.[33] Wrong. For example, in assessing Plaintiff Kashef, Dr. Green considered the potential traumatic impact of the death of Ms. Kashef's mother ███████████ ████████████████████ in her analysis, both events that occurred before the relevant time period.[34] As to traumatic events occurring *after* Plaintiffs left Sudan, these are "not completely separable phenomena" from what happened to them in Sudan.[35] Plaintiffs' experts cite the "extensive research literature indicating that exposure to past trauma increases the risk of PTSD and related symptoms arising from subsequent traumatic events."[36] Just as with work-evaluations, any issues like this can provide fodder for potential cross-examination, but has no relevance to exclusion.

## IV.    Dr. Baldo's Opinions Are Relevant and Non-Duplicative.

Dr. Suliman Baldo is a preeminent Sudanese human rights investigator, who researched and co-authored key reports documenting the systematic human rights violations by the GOS under the Bashir Regime. Dr. Baldo is qualified by his specialized knowledge, training, and professional experience[37] to assist the jury in understanding key issues, including:

> [A]ttribution—linking the genocidal campaign, and the specific attacks that injured the three representative plaintiffs testifying at trial, to the organs and agents of the Regime[;] . . . the organization and strategy of the Bashir regime; the statutory

---

[33] Mot. at 35.
[34] ECF No. 720-13 (Rosenfeld/Keller Rep.).
[35] ECF No. 720-14 (Rosenfeld/Keller Reply Rep.) at 7.
[36] *Id.*
[37] *See* ECF No. 720-2 (Baldo Rep.) ¶¶ 2, 23-40; ECF No. 720-3 (Baldo Reply Rep.) ¶¶ 8-15.

mobilization of military, security, paramilitary, and militia forces—e.g., the Janjaweed—as organs of the state; key events in the genocidal campaign; and the role of government entities specifically funded by BNPP—including GIAD, the state's armored-vehicle manufacturer, and the Civil Aviation Authority, which operated air bases used for military operations against civilians."[38]

BNPP does not dispute Dr. Baldo's expert qualifications and does not dispute many of his opinions. *See* Mot. at 43. Rather, BNPP seeks to arbitrarily limit Dr. Baldo's opinions for a grab bag of unfounded reasons, ranging from his attribution testimony (a subject about which human rights researchers and investigators routinely testify[39]) ostensibly consisting of an impermissible legal conclusion to excluding his opinion on the well-documented "open secret" of the Janjaweed-GOS nexus (a matter on which he has extensive experience and is well acknowledged by every legitimate institution to consider the matter). None of the reasons put forth by the Bank are valid, and Dr. Baldo's testimony should not be so limited.

### A. Dr. Baldo Properly Provides Opinions Linking the Genocidal Campaign of Human Rights Abuses in Sudan to the Regime.

Without any legal authority, BNPP improperly asserts that Dr. Baldo's opinions on the modus operandi and identifying features of the Bashir Regime's forces encroach on what the jury "must ultimately decide." Mot. at 44. But Dr. Baldo is not offering a legal conclusion on the illicitness of an act; he is opining on factual circumstances that would permit a juror to conclude that the perpetrator of an abuse was acting under color of law of the Bashir Regime and/or pursuant to its campaign of persecution. Indeed, Dr. Baldo is describing *how* the Bashir Regime committed a campaign of persecution involving precisely the same types of attacks that injured the three plaintiffs. Dr. Baldo's testimony will enable the jury to see how Plaintiffs' ordeals match the patterns observed by Dr. Baldo and are contextualized by the facts on the ground. This will help

---

[38] ECF No. 723-21 (Pls.' Rev. Not.) at 2-3.
[39] *See Carrizosa v. Chiquita Brands International, Inc.*, 47 F.4th 1278, 1318 (11th Cir. 2022).

the jury decide whether Plaintiffs have met their burden on proving the first element (an illicit act by the Bashir Regime), but it won't decide the issue for them.

The jury will likely know nothing about Sudan's mass atrocities or the Regime's command and control structures. Dr. Baldo will illuminate these essential facts. And he will provide gold-standard testimony, based on his extensive human rights investigations, on the distinctive patterns of abuses, modus operandi, and distinguishing features of Bashir Regime forces that permit the identification of perpetrators. In cases involving human rights abuses and state-sponsored terrorism, expert testimony on this type of modus operandi evidence is routinely admitted and, indeed, deemed essential for the jury to decide the ultimate question of whether an abuse was attributable to a perpetrator. *See, e.g.*, *Karcher v. Islamic Repub. of Iran*, 396 F. Supp. 3d 12, 19 (D.D.C. 2019) (allowing an expert on military intelligence and terrorism to testify "regarding intelligence matters, including attribution of terror attacks and also evidence collection and analysis in the intelligence field.").

This type of modus operandi and command structure evidence is so essential to human rights and terrorism cases that excluding qualified and reliable expert opinion is considered reversible error. For example, in *Carrizosa v. Chiquita Brands International, Inc.*, the Eleventh Circuit reversed the trial court's exclusion of expert testimony from an international relations professor who opined that, based on the documented *modus operandi* of paramilitary violence, a Colombian paramilitary funded by Chiquita caused the murder of plaintiffs' relatives. 47 F.4th at 1318. *See also United States v. Pollok*, No. 23-6114-CR, --- F.4th ---, 2025 WL 1553327, at *8 (2d Cir. June 2, 2025) (collecting cases permitting expert testimony on "operating practices common to certain criminal conduct, with which a jury may not be familiar," such as structures of organized crime families, operating methods of narcotics dealers, operations of forced labor

scheme); *Gill*, 893 F. Supp. 2d at 532 (admitting expert testimony attributing terrorist attack to Hamas).

   *Second*, BNPP seeks to exclude Dr. Baldo's opinion that the Janjaweed[40] and other militias were "organs and agents" of the Regime, Mot. at 45, under the guise of it being improper instruction on legal terms. Never mind that an opinion that the Janjaweed militia were funded and controlled by the GOS is not a legal conclusion, Dr. Baldo will explain the "open secret" of the Government-Janjaweed nexus in Sudan reported by government officials themselves. *See, e.g.*, ECF No. 720-2 (Baldo Rep.) ¶ 74. Command responsibility—who is in charge—is precisely a subject about which human rights investigators and academics routinely testify. *See, e.g.*, *Chavez v. Carranza*, 559 F.3d at 497 (expert testimony of a Latin American studies professor admitted to prove the "levels of violence in El Salvador during the period of military control," including opinions on the "Salvadoran military structure and [the defendant's] *command responsibility*," and specifically holding it appropriate for the expert to rely "upon interviews, commission reports . . . documentary research, and field research to form her opinions," and her credentials as an expert in the politics of Latin America.) (emphasis added).

   What's more, Dr. Baldo's opinions on the Janjaweed-GOS nexus are acknowledged by any legitimate entity that has considered the issue, and are fully supported by primary sources and other human rights investigation material, including: the head of Sudan's Security Services statement to a reporter that the Regime "had indeed armed tribes and militias to fight the rebels in Darfur," ECF No. 720-2 (Baldo Rep.) ¶ 73; that "[International Criminal Court] investigation determined that what victims and outsiders called 'janjaweed' were in practice Arab tribal

---

[40] "Janjaweed" is the slang term translated as "devils on horseback," for the militias mobilized by the Bashir Regime from largely nomadic Arab tribes in Sudan's western Darfur region. *See* Baldo Rep. ¶ 7. Dr. Baldo explains that they were recruited, armed, and deployed under the Regime's statutory framework in the Popular Defense Act of 1989. *Id.* ¶¶ 69-76.

members who had been mobilized through the well-stablished government framework for mobilizing auxiliaries to support the [Sudan Armed Forces]," ECF No. 720-3 (Baldo Reply Rep.) ¶ 53; that an emergency plan was issued by Sudan's National Security council in May 2003 that provided the GOS "intended to use members of Arab tribes to target members of the non-Arab tribes that were accused of supporting the rebellion, as well as residential areas where rebels were believed to be hiding," *id.* ¶ 57; and that a December 2003 plan stipulated that the "GoS would create 'semi-regular forces from Arab tribes,' including Militia/*Janjaweed*, arm, train and integrate them into the armed forces, and assassinate 'rebel leaders and the sympathisers from among community leaders (*umdahs*) and local administration officials.'" *Id.* ¶ 60. Dr. Baldo further quotes directly from a UN Panel of Experts Report co-authored by BNPP's own proposed expert, Enrico Carisch, which specifically describes the Arab trial militia/Janjaweed as "Government of the Sudan auxiliary forces." *Id.* ¶ 48.

These opinions fit squarely within Dr. Baldo's undisputed experience as a human rights investigator and documentarian in Sudan, and they comport with the basic facts that every legitimate organization to consider the matter has found: the Janjaweed were an "agent and organ" of the GOS.

**B.  Defendants Concede Dr. Baldo Provides Contextual Background to the Jury.**

Dr. Baldo will offer opinions generally as to "key events in the genocidal campaign,"[41] committed by the GOS between 1997 and 2011, and other information summarized in Plaintiffs' Revised Notice of Trial Experts, which will "provide[] the jury with contextual background that help[s] in evaluating the evidence presented in this case." *See Pollok*, 2025 WL1553327, at *9. BNPP concedes that Dr. Baldo can provide such "nonduplicative expert testimony regarding

---

[41] ECF No. 723-21 (Pls.' Rev. Not.) at 3.

relevant Sudanese conflicts" and may "present the facts which underlie [attribution] opinions to the jury," Mot. at 43. Plaintiffs agree. There is "nothing wrong with [expert] testimony that corroborates the testimony of a party's fact witnesses and thereby makes that testimony more credible or believable to the jury." *Ray*, 2022 WL 101911, at *13, *aff'd sub. nom. Pollok*, 2025 WL1553327 (2d Cir. Jun. 3, 2025). Providing independent facts or context that corroborate plaintiff testimony is entirely proper.

### C.  Dr. Baldo's Opinions on BNPP's Role in Funding the GOS Are Proper.

BNPP incorrectly argues that Dr. Baldo's opinions relating to "BNPP and the GOS's 'culpable cooperation'" simply "parrot[] . . . plaintiffs['] theory of causation." Mot. at 46-47. Whether BNPP's systemic funding of the Bashir Regime contributed to its capacity to persecute millions is a *factual* issue well within the scope of Dr. Baldo's expert opinion. He offers no opinion on the legal question the jury must decide: whether that contribution is legally sufficient to render BNPP liable under Article 50(1). Opining on the facts essential to a legal conclusion is entirely proper under Fed. R. Evid. 704(a). *See Carrizosa*, 47 F.4th 1278 at 1318-20 (reversing trial court's exclusion of expert testimony from international relations professor who opined on an ultimate factual issue, namely that a Colombian paramilitary funded by Chiquita caused the murder of plaintiffs' relatives).

Based on his extensive research on how Sudan's oil and banking sectors were controlled by and sustained the Bashir Regime's military-security apparatus control, Dr. Baldo will offer an opinion that BNPP's role in funding the Bashir Regime played a critical role in the Regime's *ability* to commit human rights abuses at the scale it did.[42] This opinion does not instruct the jury— implicitly or explicitly—that Plaintiffs have met their legal burden.

---

[42] Drs. Baldo and Verhoeven, as a human rights investigator and political economist respectively, will not overlap on the expert testimony that they provide, as they focus on completely different subject matters.

*Second*, BNPP improperly characterizes Dr. Baldo's conclusions as to BNPP's involvement in Sudan as based on a "recitation of BNPP internal documents and deposition testimony" and without a basis in personal knowledge. Mot. 47. Dr. Baldo's specialized expertise as a human rights investigator and monitor—whose methodology includes using primary sources and contemporaneous human rights reports to contextualize BNPP documents/testimony about the Bank's relationship with the Bashir Regime—will assist the jury in evaluating the impact of BNPP's cooperation with the Regime. *See Pollok,* 2025 WL 1553327, at *9 (expert testimony permitted that "provided the jury with contextual background that helped in evaluating the evidence presented in this case."). For example, Dr. Baldo will provide indispensable context to the undisputed fact that BNPP financed airport infrastructure for Sudan's Civil Aviation Authority (CAA), ECF No. 720-2 (Baldo Rep.) ¶ 87.  Without Dr. Baldo's testimony, the jury would have no way of knowing that the Civil Aviation Authority was the agency that operated the airbases used by Sudan's air force to bomb civilians and transport troops. Specifically, Dr. Baldo will opine that "these were the same airports that housed the Sudanese air force's air bases from whose runways the regime's Antonov cargo plane bombers and helicopter gunships took off," *id.*, and that Sudanese Air Force (SAF) "personnel sometimes convey[ed] aircraft bombs to SAF Antonov aircraft at El Fasher airport using ordinary luggage trolleys." *Id.* ¶ 58. Those facts are not included in BNPP internal documents but are crucial to the jury understanding that BNPP was not simply doing legitimate business with civilian actors, but was directly supporting a murderous military dictatorship.

**D. BNPP's Other Assorted Arguments for Excluding Dr. Baldo's Opinions Fail.**[43]

In an effort to stymie the unquestionably relevant testimony of Dr. Baldo, Defendants throw a variety of unsupported arguments at the wall, hoping something will stick. Nothing does.

First, Defendants argue that Dr. Baldo's testimony is duplicative of Dr. Verhoeven's. Mot. at 48. That is not true. Each expert has distinct qualifications and stated topics for testimony, and these topics are not the same. For example, Dr. Baldo, relying on his expertise as a monitor and investigator of human rights abuses, will provide testimony on the modus operandi of the Bashir Regime's military and security forces as perpetrators of a genocidal campaign involving the same pattern of abuses that Plaintiffs experienced. *See, e.g.*, ECF No. 723-21 (Pls.' Rev. Not.) at 2-3.[44] As a political economist, Dr. Verhoeven will provide testimony on the historical rise of the Bashir Regime, its ideology and motivations, its precarious financial condition prior to the imposition of the sanctions, and how BNPP's role as Sudan's *de facto* central bank enabled the Regime to survive the U.S. embargo and realize its strategy of domination.[45]

Next, the Defendants select three topics about which Dr. Baldo offers an opinion ("religious persecution, child soldiers and attacks in oil-producing regions") and mischaracterize them as "irrelevant." Mot. at 49. All are relevant and within Dr. Baldo's expertise.

---

[43] Without citation to either legal authority or to specific sections of Dr. Baldo's opinions, BNPP blithely claims that to the extent Dr. Baldo's opinions are a "conduit for hearsay, his proposed testimony is also prejudicial to BNPP[.]" Mot. at 48. Although Plaintiffs are unable to respond specifically to such an abstract statement, they agree that experts cannot be used simply as hearsay delivery devices. But the Second Circuit has "repeatedly held that expert testimony admissible under Rule[] 702 . . . can, under certain conditions, be based on hearsay and evidence not admitted at trial." *Pollok*, 2025 WL 1553327, at *9 n.9.

[44] Dr. Baldo will not offer opinion on the specific language of sanctions against Sudan, Mot. at 49, because it is duplicative of other evidence..

[45] Similarly, should Dr. Jok provide limited-scope opinions, it will not concern the "Regime's rise to power," Mot. at 48, and instead will contextualize the experiences of the three Plaintiffs particularly with respect to cultural taboos and norms, sexual violence, gender roles, and distinctive methods of communication and reactions to the abuses experienced, as well as forced displacement. *Id.* at 5; *see also infra* Section V.

Consider Dr. Baldo's opinion on religious persecution. The Bank's claim that "none" of the three Plaintiffs "(each of whom is Muslim), suffered from religious persecution" is flat out wrong. Mot. at 49. As a purely conceptual matter, members of the same broad religion can suffer religious persecution at their hands of co-religionists. Indeed, history is replete with abuses and aggressions perpetrated by sects of one particular religious group against another sect—the very definition of sectarian violence. The French Wars of Religion were still wars, and people suffered repression, even though the warring Catholics and Protestants were all Christian. Similarly, the three Plaintiffs suffered a repressive Islamist militarist regime openly hostile to the practice of moderate Islam (their own); this regime's motive was to impose Sharia law across the country. ECF No. 720-2 (Baldo Rep.) ¶¶ 141, 144. The very section of Dr. Baldo's report to which BNPP cites discusses that "from a regime security perspective, the regime considered Sudanese Christians and *those Muslims who supported secularism* and defended the religious freedom of non-Muslims as naturally inclined to sympathize with the rebels of the Sudanese People Liberation Movement ("SPLM")" placing "[p]eople of such profile . . . under a blanket suspicion of being potential spies for enemies of the regime." *Id.* ¶ 146 (emphasis added). Fundamentalist persecution of co-religionists whom they consider apostates is still religious persecution.

Contrary to Defendants efforts to exclude, Mot. at 49, Dr. Baldo's opinions regarding "attacks in oil-producing regions" are directly relevant to the claims of the three Plaintiffs, because the Bashir Regime "pioneered" its coordinated ground and air assault tactic in the oilfields, which became "a template for operations in Darfur," ECF No. 720-2 (Baldo Rep.) ¶¶ 179-80, where both plaintiffs Abulgasim Abdalla and Entesar Kashef lived and were harmed. These crimes in and around the oil fields also underscores the role that Sudan's development of its oil infrastructure, funded by BNPP, played in its human rights abuses. In addition, religious persecution, oilfield

attacks, and use of child soldiers are all relevant and necessary to show the coercive environment that was part and parcel of the Regime's nationwide campaign of persecution that made it unreasonable to expect Plaintiffs (and so many others) to merely relocate within Sudan and unrealistic to believe that BNPP, with its footprint in Sudan, was unaware of the Regime's crimes.

Third, Dr. Baldo properly substantiates his opinion that "[o]il added new weapon systems to the regime arsenal: helicopter gunships," ECF No. 720-2 (Baldo Rep.) ¶ 178, by both citing to Human Rights Watch reports about helicopter deaths, *id.*, and to a diplomatic cable from the U.S. Embassy in Khartoum which reported that Sudan's "budget allocate[d] substantial revenue to military and security expenditures, leaving relatively small amounts available for development, health and education." *id.* ¶ 86 n.60. The same diplomatic cable supports the opinion that "revenues from oil barely benefited ordinary citizens," *Id.* ¶ 103, and that the regime planned to concentrate development and investment projects in Northern Sudan to "keep the identity of the nation [Islam and Arabism]." *Id.*

Lastly, BNPP's argument that Dr. Baldo seeks to offer state of mind testimony regarding Regime and nonstate actors should be denied. Dr. Baldo will testify to the *scale of harm* committed by the Regime as far greater than the guerilla-style fighting of nonstate actors in Sudan, *see, e.g.*, ECF No. 720-3 (Baldo Reply Rep.) ¶¶ 94-104, 106-26. Testifying to the scale of the harm is not the same as testifying as to the Regime's subjective state of mind.

Nor is explaining the publicly announced policies and positions of the Bashir Regime: these are objective facts from which the jury can infer an intent to expand the military and commit human rights abuses. Indeed, Dr. Baldo's experience as a human rights investigator makes him uniquely qualified to offer opinions on discrimination, ethnic cleansing, and genocide, and how ethnicity animated this violence by the Regime (and by comparison did not for non-state actors). *Contra*

Mot. at 50 (seeking to limit testimony on discriminatory/genocidal motives). Dr. Baldo's bases for this opinion include, for example, express ICC findings that the GOS forces, including "their allied Janjaweed Militia," committed the crimes of *genocide*, ECF No. 720-3 (Baldo Reply Rep.) ¶ 141, and that there were reasonable grounds to believe that GOS forces subjected Fur, Masalit and Zaghawa tribes to acts of murder and extermination, *id.* ¶ 139.. Here, Dr. Baldo is not speculating as to what was going on inside of someone's head. He is pointing to a historical record.

The Bank has made clear that it intends to argue that, because anti-government rebels or common criminals also committed acts of violence, it is impossible to attribute the harm done to Plaintiffs to the Regime and its affiliates. Dr. Baldo's testimony that there is no comparison between the isolated and sporadic attacks on civilian committed by Regime opponents and the sustained, systematic and publicly declared campaign of atrocities by the Regime itself, is necessary to rebut the Bank's argument.

## V.    Dr. Jok's Opinions Are Relevant, Helpful, And Non-Duplicative.

Dr. Jok is a professor of anthropology, history and public affairs at Syracuse University whose expertise focuses on Sudan and South Sudan; he formerly served as Undersecretary in the Ministry of Culture of the Republic of South Sudan. He has decades of experience conducting social science research in Sudan and South Sudan, focusing on gender roles and sexual violence. Dr. Jok is qualified by his specialized knowledge, training, and professional experience[46] to assist the jury in to understanding certain behavior of Plaintiffs that might otherwise be confusing. He will opine generally about Sudanese cultural taboos and norms surrounding sexual violence, strict gender roles, and distinctive methods of communication and reactions to sexual assault. Further, he can also provide general testimony about the uniquely Sudanese experience of the common

---

[46] *See* ECF No. 720-11 (Jok Rep.) ¶¶ 1-2.

harm of forced displacement, and how the Bashir Regime's genocidal campaign destroyed the longstanding, vibrant and prosperous agrarian societies of Sudan in which the three plaintiffs lived.[47]

Experts on culture of testifying victims, like Dr. Jok, are routinely permitted to offer limited scope opinions in similar cases to contextualize the experiences of plaintiffs who hail originally from a culture or locations with which the jury may be unfamiliar.[48] The testimony is helpful and relevant (including as to unique harms such as forced displacement) and it neither impermissibly opines on the credibility of Plaintiffs, nor is it duplicative. Fed. R. Evid. 702(a). BNPP's post hoc effort to counter Dr. Jok's opinions with a blanket elimination should be rejected.

### A. Dr. Jok Will Opine Generally on the Cultural Taboos and Norms, Sexual Violence, Gender Roles, and Distinctive Methods of Communication and Reactions to the Abuses Experienced, and Will Not Offer Testimony About Plaintiffs' Specific Injuries.

Dr. Jok's opinions on cultural taboos and norms, sexual violence, gender roles, and distinctive methods of communication and Sudanese victims' unique reactions to the abuses experienced are relevant and proper. On the one hand, BNPP argues that these opinions concern the impact on Sudanese populations generally which are "disconnected from the specific claims of the Individual Plaintiffs." Mot. at 40. But in the very next paragraph BNPP says that on the other hand, the opinions impermissibly bolster the individual plaintiffs' claimed damages. *Id.* They cannot have it both ways.  In fact, as described further below, Dr. Jok can testify in a limited manner to both issues.

Experts on culture like Dr. Jok are routinely permitted to testify "to assist the trier of fact to understand certain behavior of the parties that might otherwise be confusing." *Vang*, 944 F.2d

---

[47] ECF No. 723-21 (Pls.' Rev. Not.) at 5.
[48] *See, e.g.*, *Vang v. Toyed*, 944 F.2d 476, 480–82 (9th Cir. 1991).

at 481. In *Dang Vang*, the Ninth Circuit found that the trial court did not abuse its discretion in deciding an expert on "Hmong culture and the role of women in that culture, was relevant," including the trial court's statement that the expert was "the only expert that either side has located who can explain to the trier of fact who these people are, where they came from, and *why they have responded the way they have in these various functions and various relationships*." *Id.* The Ninth Circuit held that that testimony was not "*unduly prejudicial* because of its limited scope and its direct relevance to issues in the case." *Id.* at 481-82; *see also United States v. Zakaria*, No. WDQ-10-0043, 2010 WL 3895383, at *2 (D. Md. Oct. 1, 2010), *aff'd* 469 F. App'x 192 (4th Cir. 2012) (admitting expert testimony where "'cultural norms' of Ghana may be outside the purview and common experience of the jury.").

Thus, Dr. Jok's opinions as a culture expert will not impermissibility bolster, or "interpret" the three plaintiffs' testimony. Mot. at 37-38, 40. Rather, the parties are permitted to "provide[] the jury with contextual background that help[s] in evaluating the evidence presented in this case." *Pollok*, 2025 WL 1553327, at *9. "Expert testimony that is "consistent with lay witness testimony is the permissible building block for any case." *Ray*, 2022 WL 101911, at *13, *aff'd sub. nom. Pollok*, 2025 WL 1553327. If Dr. Jok's testimony supports the testimony of the victims, "that will be because the witnesses testify consistently with what [Dr. Jok] will testify is the victim experience generally and because the jury—after cross examination—will believe both [Dr. Jok] and the victims." *Ray*, 2022 WL 101911, at *13, *aff'd sub. nom. Pollok*, 2025 WL 1553327.

Thus, Dr. Jok can provide general opinion, not tied to the three plaintiffs' specific injuries or testimony, concerning the "patterns and practices" of the Bashir Regime, Mot. at 36-38, specifically within the context of sexual violence and cultural norms. This includes, for example, that "rape was a means for the government and its forces to disrupt and destroy the cultural fabric

42

of targeted communities" through stigma, silence, loss of honor and dignity, and birth of babies that were the product of the rapes, ECF No. 720-11 (Jok Rep.) ¶¶ 93-100; identification of persecuted groups and agents/actors of the GOS, *id.* ¶¶ 9-24; distinctive communication (or silence) concerning harms experiences and atrocities survived including that "the problem" or the "incident" are common ways that Sudanese reference to genocide and atrocities; *id.* ¶¶ 156-58; use of certain epithets against non-Arab, Black Africans as intentional "othering" and a form of Arab supremacy, *id.* ¶¶ 103-106; strict gender and familial roles in Sudanese communities, ¶¶ 145-47; and how Sudanese live in Sudan as compared to how they live as refugees in the United States, *id.* ¶ 143.

Courts also permit cultural testimony on the issues of damages—just as Dr. Jok will testify here on the issue of forced displacement as an affront to human dignity and the experience of sexual violence to identify of the victims. *Id.* ¶¶ 118-23. In *Al-Khawaldeh v. Tackett*, the court permitted an expert on Islamic law and culture in a wrongful death case to offer opinion that "under Jordanian law and culture, parents are entitled to financial support from their children, and are entitled to their children's inheritances." No. 1:20-cv-1079-RP, 2021 WL 5908401, at *6 (W.D. Tex. Dec. 14, 2021); *see also Dongguk Univ. v. Yale Univ.*, Civ. No. 3:08CV441 (TLM), 2012 WL 1977978, at *8 (D. Conn. June 1, 2012) (permitting expert testimony on cultural issues, including "aid[ing] the jury in understanding evidence [plaintiff] proposes to present regarding its non-economic damages.")

Here, narrowly-tailored testimony from Dr. Jok on the forced displacement damages common to the three plaintiffs, including concerning displacement from homeland and culture, marriage and divorce, physical injuries from torture and rape, and a culture of silence and shame, is relevant and helpful for the jury to understand Plaintiffs' testimony in light of Sudanese cultural

norms and taboos BNPP claims such statements are "sweeping" and "conclusory," but their illustrative excerpts excise crucial explanatory text that belie their unfounded assertions. For example, the Bank claims that "Sudanese refugees face unique and grave injury to their dignity as displaced refugees" is overbroad and conclusory. ECF No. 720-11 (Jok Rep.) ¶ 118. But the Bank neglects to include the very next first part of the sentence: "As outlined in greater detail below." (and all that follows). *Id.* In the same vein, BNPP cherry-picks Dr. Jok's statement that "physical injuries are particularly and uniquely problematic for Sudanese refugees," conveniently omitting explanatory opinion that follows about Sudanese refugees' lack of access to healthcare in the U.S, and which injuries are considered shameful to speak about. *Id.* ¶ 83. Dr. Jok can thus opine generally to underreporting of harm/damages as a cultural phenomenon for Sudanese, and his opinions are well-supported and relevant.

Finally, BNPP's claim that Dr. Jok's opinions lack methodology, Mot. at 40, is without merit. The Fourth Circuit in *United States v. Smith* recognized that the expert testimony of a FBI agent with significant experience in gang investigations on "drug and gang terminology in Maryland" could be likened to a "foreign language interpreter or an anthropologist who studies a group by educating himself and conducting fieldwork," in that "his expertise does not derive from any singular piece of information." 919 F.3d 825, 835-36 (4th Cir. 2019). The Court found that the trial court did not abuse its discretion in admitting expert testimony where it would be "impossible to ask this expert to lay such a precise foundation for an opinion when his expertise was gained over extended, repeated exposure." *Id.* at 836.

Dr. Jok is an anthropologist, an expert in the study of people. As an anthropologist, he is "trained in qualitative research techniques that involve the use of ethnographic methods of participant observation, interviews, focus groups and life histories of individuals in the context of

their culture, environment and livelihoods and life-experiences." ECF No. 720-11 (Jok Rep.) at 1. The fact that Dr. Jok did not interview any plaintiffs in advance of his opinions makes even more credible his *general* opinions concerning cultural taboos and norms of the Sudanese and the Sudanese refugee population in America. He has conducted social science research in Sudan for more than 20 years, carried out fieldwork there, and researched in refugee camps; in other words, he has been in frequent, direct contact with the very population on which he seeks to offer expert opinion. *See id.* at 1-2.

**B. BNPP's Catchall Arguments for Precluding Dr. Jok's Opinions are Unavailing.**

Plaintiffs other assertions regarding Dr. Jok's testimony are similarly unavailing. It is not "impermissible," Mot. at 41, for Plaintiffs to reserve the right to call Dr. Jok as an expert witness. Plaintiffs have timely provided to the Court and Defendants the narrow subjects upon which he *would* testify if called, *see* ECF No. 723-21 (Pls.' Rev. Not.) at 5, and have provided good reason as to why the final decision on the expert roster is being held in abeyance for a short period: Dr. Jok has been in South Sudan since late May, and Plaintiffs would like the opportunity to confer when he returns, at which time Plaintiffs may reconsider his participation in the September trial. *Id.* An expert witness whose report has been offered, deposition taken, and potential topics for expert opinion disclosed, but who is currently unavailable because he is in the very region on which he plans to testify, should not suffer the "extreme sanction" of being precluded. *Outley v. City of New York*, 837 F.2d 587, 591 (2d Cir. 1988).

In addition, as with Dr. Baldo, *see supra* Section IV.D, Plaintiffs' experts will not be offering duplicative opinions. BNPP implicitly recognizes this reality because its argument is artificially constructed based on references to Dr. Jok, Dr. Baldo and Dr. Verhoeven's *reports*, Mot. at 42, and not the actual subjects each expert will cover set out in Plaintiffs' Revised List of Trial Experts. To the extent that Dr. Jok provides testimony, he *will* contextualize the experiences

of the three Plaintiffs particularly with respect to cultural taboos and norms, sexual violence, gender roles, and distinctive methods of communication and reactions to the abuses experienced, as well as forced displacement, but he *will not* cover the rise of the Bashir Regime, ideology or factions of militias in Sudan. Mot. at 42.

Next, as explained in connection with Dr. Baldo, *see supra* Section IV.D, simply pointing out that the three plaintiffs are Muslim is not a reasonable basis for exclusion of opinion about the Regime's Islamist militaristic ideology. As an expert on Sudanese culture, it will be helpful to the jury to hear about how the Regime's Islamist ideology also had a "pronounced racist emphasis," ECF No. 720-11 (Jok Rep.) ¶ 5, to better understand the meaning of racial slurs and epithets used against the target population, ¶¶ 103-06, to grasp the religious fervor that was part of the language of the Janjaweed, *id.* ¶ 22, and to understand the Regime's ideology that both non-Arab Black African Muslim women and Christian women were to be despised and objectified, *id.* ¶¶ 94, 96.

Lastly, just as with Dr. Jok's opinions on cultural taboos and norms, the opinions which BNPP cherry-picks concerning the ubiquity of violence in Sudan and Regime awareness of the spread of HIV in its army, Mot. at 42, do not lack "discernable methodology." As an anthropologist, his expertise is "gained over extended, repeated exposure," *Smith*, 919 F.3d at 836, and these opinions are properly offered.

BNPP's motion to exclude Dr. Jok's opinions should be denied.

## VI.  Dr. Harry Verhoeven's Testimony Is Reliable, Relevant and Admissible.

BNPP makes no objection to the qualifications of Dr. Harry Verhoeven, Plaintiffs' expert in Sudanese political economy. Dr. Verhoeven is a scholar of African politics, author of books, articles and reports on the political economy of African nations (including Sudan), and has served as a professor in the School of International and Public Affairs of Columbia University, as a Senior Research Scholar at the Center on Global Energy Policy and as a Senior Adviser to the European

Institute of Peace on security and political matters pertaining to the Horn of Africa, with a focus on Sudan. His research endeavors are uniquely suited to this litigation, including over a dozen trips to Sudan, where he has interviewed ministers, ambassadors, army generals, business leaders, civil servants, civil society activists, insurgents, bankers and veterans of Sudan's conflicts.[49]

This experience allows Dr. Verhoeven to assist the jury in understanding key issues outside the ken of a layperson—"how the Bashir Regime controlled Sudan's natural resources, banking sector, and private industry; how BNPP funded the Regime through the Central Bank of Sudan and other entities; and how the Regime used this funding to remain in power and carry out the genocide."[50] For the following reasons, BNPP's motion to limit the testimony of Dr. Verhoeven should be denied.

### A. All of Dr. Verhoeven's Opinions are Founded on Reliable Methodology.

BNPP slings a variety of ill-founded criticisms at Dr. Verhoeven's methodology, ignoring the substance of his report, the support he provides for his conclusions, and the explanation he provides for the methodological approach he used in reaching his opinions. Despite BNPP's claim that Dr. Verhoeven uses "no discernible methodology,"[51] Dr. Verhoeven clearly stated that he applied the methodology of qualitative political economic analysis:

> My methodology is one of triangulation. So, it's to rely on various sources. Some of these are primary interviews, and some of this is the shear amount of time I spent in country in context understanding, sometimes not always through formal interviews there, but there were informal conversations, and then, of course, extensive reliance on secondary sources, academic sources, policy reports, things written by colleagues, as well as, of course, bank documents.[52]

---

[49] ECF No. 720-20 (Verhoeven Rep.) at 1.
[50] ECF No. 723-21 (Pls.' Rev. Not.) at 3.
[51] Mot. at 53.
[52] *See* Ex. 5 (Verhoeven Dep. Tr.) at 197:11-22.

This triangulation allows him to build "solid," and indeed reliable, conclusions by using different sources and pieces of information as building blocks.[53] "[R]ather than making a claim based on any one single document or any one single report, it is the interplay, the interconnection between those with what you see and the context . . . that allows" Dr. Verhoeven to reach the conclusions formulated in his reports.[54] He used the same research methodology in this case as he does in his published academic work, allowing his research to "stand the test of peer review."[55] Courts have routinely admitted experts who testify using the triangulation methodology Dr. Verhoeven employs. *See Chen-Oster v. Goldman, Sachs & Co.,* No. 10 Civ. 6950 (AT) (RWL), 2022 WL 814074, at *14 (S.D.N.Y. Mar. 17, 2022)) ("Additionally, [the expert] report is grounded in the social science methodology of triangulation and this methodology has long been accepted in her field.") (citing Todd D. Jick, Mixing Qualitative & Quantitative Methods: Triangulation in Action, 602–611 (1979);); *See also Linde v. Arab Bank, PLC,* 922 F. Supp. 2d 316, 322–23 (E.D.N.Y. 2013)) ("careful review of [the expert] report supports the reliability of his analysis. [The expert] describes his methodology as "'the collection of information from many sources, which included primary and secondary sources, and cross-referencing them, as well as the examination of new information that supports or contradicts previous assumptions that have been made in the course of the research.'").

### B.  Dr. Verhoeven's Opinions as to BNPP's Role in the Bashir Regime's Ability to Commit Human Rights Abuses are Methodologically Sound.

BNPP mischaracterizes Dr. Verhoeven's opinion about the role of the Bank in the Regime's commission of human rights abuses by claiming it is informed only by a set of "cherry-

---

[53] *Id.* at 164:16-25.
[54] *Id.* at 189:23-190:6.
[55] *Id.* at 164:16-25.

picked documents" and improperly gives a factual narrative.[56] This is wrong on several fronts. First, Dr. Verhoeven was not provided a selection of documents, Plaintiffs gave him access to a searchable database containing BNPP's entire production. The only limitation on his understanding of the *transactions* BNPP performed for Sudan were those imposed by BNPP's refusal to produce additional documents from France or Switzerland and its withholding and redaction of information from Plaintiffs and the U.S. government.

Second, BNPP's allegations of cherry-picking are confusing, given that the Bank fails to identify any document on which Dr. Verhoeven should have relied but did not. There are no meaningfully exculpatory documents in BNPP's production, which is likely why the Bank pleaded guilty in the first place. And BNPP certainly has no evidence of improper "curat[ion]" or "gloss" from Plaintiffs' counsel, because it did not happen. If BNPP believes to the contrary, this is an appropriate area for cross-examination.

Third, Dr. Verhoeven's opinions are hardly an improper factual narrative. He provides specialized expert testimony on the Sudanese political economy, contextualizing the evidence of BNPP's transactions with and support of the Bashir Regime, assisting the jury in evaluating the impact of BNPP in a political environment and national economy with which jurors will have no familiarity.[57] As with Barry Koch, Dr. Verhoeven is a teaching witness. *See supra* Section II.

BNPP claims Dr. Verhoeven's opinions are "conclusory," but the quantity and quality of his sources and the triangulation methodology he uses to ensure his conclusions are reliable and

---

[56] Mot. at 52-53.

[57] Dr. Verhoeven further describes his use of the Bank's documents as part of a larger analysis: "I quote there from a number of documents provided by the bank to me, but my discussion of their significance and of how to understand them is not limited to what is stated in the documents. That, again, is part of this exercise of triangulation that is essential to my research methodology of trying to put different pieces of information in conversation with each other to arrive at a deeper understanding…" *See* Ex. 5 (Verhoeven Dep. Tr.) at 322:13-24.

far from *ipse dixit*. BNPP strips all context from two sentences of Dr. Verhoeven's report to claim that they are "without evidentiary support."[58] The first, that a predecessor to BNPP's "trade financing, by underwriting key fuel imports, fed directly into the regime's military operations," is supported by the entire paragraph building to it, including the preceding sentence, explaining that Sudan was entirely reliant on fuel imports, its military operations were reliant on fuel imports as well.[59] With the second, that BNPP's role in providing the GOS with access to US dollars "bolstered regime efforts to rebrand itself as a force focused on economic transformation," BNPP similarly disregards *pages* of cited support.[60] BNPP's invented claim that Dr. Verhoeven confirmed that these statements are not supported by a methodology is patently false.[61]

Bizarrely, BNPP contends that the only reliable methodology is to disregard historical facts, and instead speculate on counterfactuals that are irrelevant because they did not occur, an approach that is improper under both U.S. and Swiss law.[62] Dr. Verhoeven's refusal to speculate on various hypothetical scenarios posited by the Bank's experts, "when there is such concrete evidence" of what *did* happen, only increases the reliability of his opinion.[63] "After all, much of the evidence is not disputed,[,] and engaging in counterfactual speculation merely serves to obscure established facts and [admitted] legal responsibilities."[64]

---

[58] Mot. at 53-54.

[59] ECF No. 720-20 (Verhoeven Rep.) at 29-30.

[60] *See e.g. id.* at 16-18 ("Bashir and Taha vowed to focus on economic growth, to provide the Sudanese people with bread and butter reasons for accepting and legitimating their leaders, despite their track-record of extreme violence against the civilian population"); and 25-42 (describing how oil money was used in repression of Sudanese civilians, BNPP's role in providing the GOS access to petrodollars, and how it served Bashir and Taha's strategy to maintain power.)

[61] Mot. at 54.

[62] *Id.* at 54; *see also* ECF No. 722 (Pls.' *Daubert* Br.) at 26-27, *citing* ECF No. 528-104, Decl. of Prof. Franz Werro (March 2, 2023) at ¶¶ 121-128; *See Fed. Trade Comm'n v. Vyera Pharms., LLC*, No. 20CV00706 (DLC), 2021 WL 5336949, at *5 (S.D.N.Y. Nov. 16, 2021); *In re Mirena*, 169 F. Supp. 3d at 466.

[63] ECF No. 720-21 (Verhoeven Reply Rep.) at 10, 15, 28.

[64] ECF No. 720-21 (Verhoeven Reply Rep.) at 28.

BNPP further criticizes Dr. Verhoeven for relying in part on facts to which BNPP admitted.[65] The ship has sailed on whether BNPP's guilty plea admissions are relevant and admissible under Rule 401-403. Were Dr. Verhoeven to ignore these admissions, he would have disregarded key facts and formed a less reliable opinion, engaging in the same fallacies as several of the Bank's experts.[66] And to the extent BNPP balks at Dr. Verhoeven relying on articles or reports that might not otherwise be admissible as hearsay, these are accepted sources for triangulation in social science. *See Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007) (holding an expert's opinions are not inadmissible because he relies on hearsay and citing Fed. R. Evid. 703, Advisory Committee Note to 2000 Amendment).

### C. Dr. Verhoeven's Opinions as to the Impact of Oil Extraction on the GOS's Human Rights Abuses are Methodologically Sound.

In its argument to exclude Dr. Verhoeven's opinions concerning the relationship between oil extraction and the GOS's human rights abuses, BNPP reduces Dr. Verhoeven's analysis on this issue to a graph, a single assertion and "hearsay statements from former Sudanese officials."[67] Not so. Using his methodology of source triangulation, Dr. Verhoeven dedicates pages of his report to the issue, citing academic articles, reports from Amnesty International, Human Rights Watch and Small Arms Survey (among other organizations), reports from the UN General Assembly and BNPP documents.[68] As an expert in political economy, he analyzed the available information regarding oil revenue and funding and execution of human rights abuses, and developed reliable opinions on the topic which will assist the jury in understanding the significance of oil revenue in abuse perpetration.

---

[65] Mot. at 54 n.17.
[66] ECF No. 722 (Pls.' *Daubert* Br.) at 31-32, 34.
[67] *Id.* at 55.
[68] ECF No. 723-20 (Verhoeven Rep.) at 19-27.

Accordingly, the Court should deny Bank's motion to exclude Dr. Verhoeven's opinions on methodological grounds.

### D. Dr. Verhoeven's Testimony as to Oil and GOS Human Rights Abuses Is Non-Duplicative and Relevant.

Unlike the Bank, Plaintiffs have proactively narrowed the testimony their experts will provide to the jury. The Bashir Regime's oil revenue is a central pillar of this case. Accordingly, several experts will discuss different aspects of oil funding, but this testimony will not be duplicative.[69] Drawing on his triangulation methodology, Dr. Verhoeven will present a *qualitative* analysis of the Regime's need for oil revenue, who was involved in extracting and exporting oil—including those using BNPP to launder their activities, how the Regime spent its largesse of laundered oil proceeds on abusing citizens, and why the ability to access these petrodollars was critical to the Regime's survival. In contrast, Mr. Fogarty will *quantify* the magnitude of that revenue in dollars.[70] And Dr. Baldo will provide limited testimony on how the Regime's expanded military and updated arsenal, enabled by laundered oil proceeds, sustained and enhanced its campaign of persecution.[71]

The Bank seeks a sweeping limitation on Dr. Verhoeven's testimony, attempting to exclude as irrelevant "testimony regarding how oil extraction contributed to Sudanese civil wars and human rights abuses around oil fields."[72] According to the Bank, this evidence is irrelevant because the three Plaintiffs chosen by the Court did not live inside specific oil blocs. But this disregards the commonsense proposition that tens of billions of dollars of laundered oil proceeds bolstered the Regime's ability to terrorize the population across the vast territory of Sudan. Expert testimony

---

[69] ECF No. 723-21 (Pls. Rev. Not.).
[70] ECF No. 720-5 (Fogarty Rep.) at 100-01.
[71] ECF No. 723-21 (Pls.' Rev. Not.) at 3.
[72] Mot. at 56.

on how the oil boom fueled Sudan's mass atrocities is plainly relevant—indeed it is a lynchpin of the case against BNPP. And while the Plaintiffs might not have lived in oil fields, they were residents of the regions that contained the Sudan's coveted oil reserves. The Regime unleashed waves of violence against the civilian population in southern and western Sudan to ensure that the Black African ethnicities in those regions did not secede, taking the oil wealth with them. Because BNPP profited from the Regime's control over oil, it profited from the Regime's brutal subjugation of the oil-producing regions.

### E.  Dr. Verhoeven's Opinions Regarding Causation and BNPP's Knowledge Do Not Improperly Displace the Jury.

BNPP misstates the applicable law in an attempt to limit Dr. Verhoeven's opinions. An expert's testimony is "not objectionable just because it embraces an ultimate issue" in the case. Fed. R. Evid. 704(a). Here, Dr. Verhoeven's testimony will properly engage with ultimate issues without amounting to legal conclusions.

Dr. Verhoeven will offer opinions that BNPP played a pivotal role in the Bashir Regime's *ability* to commit human rights abuses at the scale it did. This factual testimony does not tell the jury that Plaintiffs have met their legal burden and is well-within the permissible ambit of Rule 704.

Similarly, Dr. Verhoeven offers opinions as to the available information concerning the Regime's human rights abuses at various points during the relevant period.[73] Although this analysis certainly is *relevant* to the ultimate issue of whether BNPP knew or should have known it was contributing to an illicit act, such testimony in unquestionably permissible. *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 643 F. Supp. 2d 482, 497 (S.D.N.Y. 2009)

---

[73] *See e.g.* ECF No. 720-20 (Verhoeven Rep.) at 20-21 (summarizing reporting on abuses due to oil clearances); *id.* at 36 (reporting on oil and human rights in Sudan; *id.* at 52-57 (describing BNPP activities while reporting on war crimes and crimes against humanity "filled" newspapers).

("Burns may testify concerning the availability of information concerning the risk of public exposure to MTBE and the specific range of information available within the petroleum industry concerning the safety of MTBE."); *Deutsch v. Novartis Pharms. Corp.*, 768 F. Supp. 2d 420, 448 (E.D.N.Y. 2011) (not "preclud[ing] Dr. Marx from offering his expert opinion on what information was available based on the relevant medical literature and Novartis internal documents.").

For all of the foregoing reasons, the Court should deny BNPP's motion to limit the testimony of Dr. Verhoeven.

### VII.    The Court Should Allow Tim Fogarty to Testify as To the Topics in Plaintiffs' Notice.

Mr. Fogarty served for many years as a Senior Vice President at the Federal Reserve Bank of New York (FRBNY), where he oversaw Central Bank and International Account Services. Among other things, Mr. Fogarty was directly responsible for establishing and managing the dollar accounts for the Iraqi authorities at the FRBNY following the Iraq War that permitted Iraq to resume the export of oil to finance the new government's operation. Notably, BNPP does not challenge Mr. Fogarty's qualifications

Mr. Fogarty's testimony will principally be limited to two topics. First, he will explain how international correspondent banking and trade finance works, and how and why Sudan required access to the U.S. dollar clearing system to monetize its oil exports. Second, he will present a quantitative analysis of BNPP's contribution to the illicit acts of the Regime. In preparing his expert report, Mr. Fogarty reviewed the "lookbacks" and "transactions reviews" prepared by BNPP during the criminal investigation. *See* ECF No. 720-26 ("Cumulative Transaction Review Results for BNP Paribas Geneva," BNPP-KASHEF-00046989-00047109) (hereinafter, the "BNPP Transaction Review"). Based on his analysis of this and other BNPP documents, Mr. Fogarty calculated that during the class period, BNPP completed transactions totaling more than

$80 billion for the Bashir Regime and its affiliated entities, enabling a massive increase in Sudan's military expenditures during the same period. *See* ECF No. 723-21 (Pls.' Rev. Not.) at 3-4; ECF No. 720-5 (Fogarty Rep.) at 87.

BNPP seeks to exclude Mr. Fogarty's analysis, claiming that he makes legal conclusions, that he simply summarizes BNPP documents, and that his "quantitative analysis contains serious methodological flaws."[74] Mot. at 59-62. BNPP's arguments have no merit, as they mischaracterize Mr. Fogarty's opinions, ignore the applicable law on experts, and rely on BNPP's disagreements with Mr. Fogarty's analysis that the Bank is free to explore on cross-examination.

### A. Mr. Fogarty Will Testify Only About the Effect of BNPP's Sanction Violations on the Regime's Military Expenditures, *Not* Its Human Rights Abuses.

BNPP complains that "Mr. Fogarty's conclusion that BNPP's provision of financial services to Sudanese entities enabled the Bashir Regime to increase its human rights abuses is just a restatement of Plaintiffs' theory of causation." Mot. at 59. But BNPP mischaracterizes the testimony Mr. Fogarty will offer at trial. He states that BNPP's sanction violations gave the Bashir Regime access to revenue, which in turn enabled it to increase its *military expenditures*:

- Access to international commercial banking accounts and services was necessary for the Bashir regime to financially exploit Sudan's crude oil reserves[.] . . .

- BNP Paribas gave Sudan the indispensable access to accounts, credit, trade finance, U.S. Dollars and banking telecommunication services that permitted the Bashir regime to effectively evade the crippling sanctions and realize significant revenues from the sale of its oil. . . . [and]

- Oil revenue generated by the Government of Sudan using BNPP's services enabled the Government of Sudan to increase its Military Expenditure[.]

---

[74] BNPP also seeks to exclude portions of Mr. Fogarty's report that address the organization of the Sudanese government, Sudanese history, and human rights abuses in Sudan. *See* Mem at 62-63 (Section VII.C). Plaintiffs do not seek to offer Mr. Fogarty for such testimony. *See* Pls.' Rev. Not. at 3-4, mooting these issues.

ECF No. 720-5 (Fogarty Rep.) at 5-6. Based on his analysis of BNPP's lookbacks and transaction reviews, Mr. Fogarty estimates the benefit that BNPP's sanction violations gave the Bashir Regime. Mr. Fogarty will not testify as to whether specific BNPP transactions involved the purchase of military equipment or weaponry, nor would he need to. *See* ECF No. 723-2 (May 20, 2025 Hr'g Tr.) at 64:16-18 ("The Court: Because you wouldn't see anything. It's a dollar-enablement of banks financing institutions and the government. You're not going to see it in a gun or a whip."). Mr. Fogarty offers factual analysis, not legal conclusions.

### B. The BNNP Transaction Review is Dense and Complicated, and Mr. Fogarty's Testimony Will Help the Jury to Understand It.

BNPP argues that Mr. Fogarty's testimony is not admissible because he supposedly "summarize[s] BNPP's documents that were produced in this litigation, deposition testimony and publicly available sources," and that "[t]he Transaction Review is record evidence which the jury can interpret without Mr. Fogarty's assistance." Mot. at 60-61.

Even a casual glance at the Transaction Review shows that this is not true. It is 120 pages of dense charts and forensic accountant-speak.[75] Mr. Fogarty reviewed the 120-page BNPP Transaction Review as well as numerous other BNPP documents to calculate that BNPP completed transactions totaling more than $80 billion for the Regime and its affiliated entities. BNPP's argument that jurors should just be expected to sift through over 120 pages to estimate their own value of prohibited transactions is disingenuous and conflicts with applicable law and the role that experts regularly play.

---

[75] In fact, BNPP is offering its own expert to explain its (misleading and inaccurate) interpretation of the Transaction Review to the jury. *See* ECF No. 723-1 (Defs.' Second Rev. Not.) at 10 ("Mr. Goolsby will testify regarding BNPP's transactions with Sudanese entities, including by explaining and analyzing the transaction review provided by BNPP to U.S. authorities in connection with its investigation into transactions subject to U.S. sanctions . . . ."); *see also, e.g.*, ECF No. 723-8 (Goolsby Rep.) at 10 (stating that the Transaction Review "found impermissible transactions of $10.9 billion related to Sudanese counterparties").

It is well accepted that expert witnesses can testify about voluminous documents produced in litigation and "streamline the presentation of that data to the jury, saving the jury time and avoiding unnecessary confusion." *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 504–05 (S.D.N.Y. 2015) (quoting *Gill*, 893 F. Supp. 2d at 536); *see also Iacobelli Constr., Inc. v. Cnty. of Monroe,* 32 F.3d 19, 25 (2d Cir.1994) ("Given the inherently voluminous and highly technical nature of the data in such cases, the parties in a construction-contract dispute usually must retain experts to summarize and interpret that data."). Courts regularly reject the type of argument made by BNPP. In *Novartis Pharma AG v. Incyte Corp.*, for example, the plaintiff's expert reviewed financial models produced in the litigation and offered his opinion. The court rejected the defendant's argument that the expert's opinions were "a mere parroting of factual content," and found that he had "synthesized the economic models' inputs and outputs into streamlined findings, illustrated via demonstratives that summarize[d] and interpret[ed] the data in a format more easily understandable to the factfinder." *See Novartis,* No. 1:20-CV-400-GHW, 2024 WL 3608338, at *19 (S.D.N.Y. July 29, 2024).

## C. BNPP's Other Criticisms of Mr. Fogarty Should Be Raised in Cross-Examination, Not a Motion to Exclude.

Finally, BNPP's various quibbles with Mr. Fogarty's analysis are not a proper basis to exclude his testimony. "Generally, arguments that the assumptions relied on by an expert are unfounded go to the weight rather than the admissibility of the evidence." *Silivanch v. Celebrity Cruises, Inc.*, 171 F. Supp. 2d 241, 270 (S.D.N.Y. 2001) (citing *Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)). BNPP accuses Mr. Fogarty of "double counting" the inflows and outflows of certain transactions. However, Mr. Fogarty already responded to this criticism in his reply report, and at his deposition, where he explained that he credited the outflow and inflow on certain transactions where both parties were Sudanese entities. Mr. Fogarty

explained that such transactions provide both the sender and recipient with distinct benefits. That is, but for BNPP's prohibited transaction, the buyer would not be able to purchase a good or service with U.S. dollars, and the seller would not be able to sell that good or service. *See* Ex. 6 (Fogarty Dep. Tr.) 209:5-9 ("Q: And again, your view is that that's not double-counting? A: My view is that both parties engage in the transaction and receive some benefit."). BNPP might take issue with Mr. Fogarty's final estimate, but it fails to offer any evidence that his methodology is not generally accepted in banking analysis. BNPP can raise this dispute on cross examination, as it did at deposition.

Similarly, BNPP complains that Mr. Fogarty's $80 billion calculation supposedly conflicts with the amount of $6.4 billion that BNPP agreed to in the Stipulated Statement of Facts (SSOF). BNPP's position is confusing, as it continues to maintain that these portions of the SSOF should be redacted and hidden from the jury. *See* No. 715-2 at 44 (Revised Offer of Proof – SSOF) (discussing value of BNPP's illicit transactions). But BNPP's own transaction review states that there were over $80 billion in transactions involving Sudan. ECF No. 720-26 (BNPP Transaction Review) at 115. And the SSOF's mention of $6.4 billion referred to one limited period in 2006 and 2007 out of a scheme that lasted more than a decade. SSOF ¶ 41. Indeed, the SSOF made repeated use of the phrase "at least" to show that the cited figures were not the upper bound of all transactions that BNPP processed for Sudan. Even if it were, BNPP does not explain why *Plaintiffs'* expert would be prevented from presenting a different estimated value of prohibited transactions than *Defendants* pled to. Again, BNPP's disagreement with Mr. Fogarty's final calculation is a topic for cross examination, not a basis for exclusion.[76]

---

[76] BNPP also states that the BNPP Transaction Review identified $81.1 billion in transactions across six sanctioned countries but only $44.8 billion for Sudan, and that Mr. Fogarty wrongly considered all $81.1 billion as relating to Sudan. Mot. at 61 (citing BNPP Transaction Review at 1, BNPP-KASHEF-00046989).

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Defendants' Motion to Exclude Expert Testimony as set forth above.

---

This is incorrect. The Review expressly states that the total amount of transactions relating to Sudan is approximately $81 billion. *See* ECF No. 720-26 (BNPP Transaction Review) at 115 (listing $81,121.4 million twice). BNPP's citation is to the Review's table of contents, not to any value or analysis. One table in the Transaction Review refers to $44.8 billion in "in-scope transactions" with Sudan, but it states that the total value of "in-scope transactions" across all six sanctioned countries is $60.5 billion, not $81.1. *Id.* at 5. Lastly, BNPP's discussion of supposedly "permissible" transactions is self-serving, was apparently rejected by the government, and is irrelevant to Mr. Fogarty's calculation of the total value of BNPP's services to the Regime.

Dated: June 17, 2025

*/s/Kathryn Lee Boyd*
Kathryn Lee Boyd
Theodor Bruening
Michael Eggenberger
HECHT PARTNERS LLP
125 Park Avenue, 25th Floor
New York, NY 10017
(646) 502-9515
(646) 396-6452
(646) 777-2489
lboyd@hechtpartners.com
tbruening@hechtpartners.com
meggenberger@hechtpartners.com

Kristen Nelson
HECHT PARTNERS LLP
6420 Wilshire Boulevard, 17th Floor
Los Angeles, CA 90048
(646) 490-2408
knelson@hechtpartners.com

Aitan D. Goelman
ZUCKERMAN SPAEDER LLP (DC)
1800 M Street, Suite 1000
Washington, DC 20036
(202) 778-1996
agoelman@zuckerman.com

Cyril V. Smith
ZUCKERMAN SPAEDER LLP (Baltimore)
100 East Pratt Street, Suite 2440
Baltimore, MD 21202
(410) 332-0444
csmith@zuckerman.com

*/s/Michael D. Hausfeld*
Michael D. Hausfeld
Scott A. Gilmore
Amanda E. Lee-DasGupta
Claire A. Rosset
Mary S. Van Houten Harper
HAUSFELD LLP
1200 17th St NW Suite 600
Washington, DC 20006
(202) 540-7200
mhausfeld@hausfeld.com
sgilmore@hausfeld.com
alee@hausfeld.com
crosset@hausfeld.com
mvanhouten@hausfeld.com

James D. Gotz
HAUSFELD LLP
One Marina Park Drive, Suite 1410
Boston, MA 02210
(617) 207-0660
jgotz@hausfeld.com

E. Danya Perry
PERRY LAW
445 Park Avenue, 7th Floor
New York, NY 10022
(212) 840-7939
dperry@danyaperrylaw.com

Joshua Perry
PERRY LAW
445 Park Avenue, 7th Floor
New York, NY 10022
(212) 251-2619
jperry@danyaperrylaw.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 17, 2025, a true and correct copy of the foregoing Opposition to the Defendants' Motion to Exclude Expert Testimony was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of filing to all counsel of record.

Dated: June 17, 2025                    By:  _/s/ Josh T. Mathew_
                                             Josh T. Mathew