UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ENTESAR OSMAN KASHEF *et al.*,<br><br>               Plaintiffs,<br><br>        -against-<br><br>BNP PARIBAS S.A. and BNP PARIBAS US WHOLESALE HOLDINGS, CORP.,<br><br>              Defendants. | No. 16 Civ. 3228 (AKH)<br><br>Hon. Alvin K. Hellerstein |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SANCTIONS AS A RESULT OF PLAINTIFFS' COUNSEL'S MISCONDUCT AND FOR A HEARING**

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
T: (212) 351-4000

CLEARY GOTTLIEB
STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
T: (212) 225-2000

*Counsel for Defendants BNP Paribas S.A. and BNP Paribas US Wholesale Holdings, Corp.*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ........................................................................................................................5

    I.     The Court-Ordered Questionnaire Process...........................................................5

    II.    Plaintiffs' Counsel Agreed They Would Never Tell A Class Member How To Answer the Questionnaires or Engage in Suggestive Communications ................6

    III.   Plaintiffs' Counsel Blatantly Violated The Court's Orders ....................................7

    IV.   Questionnaire Responses Submitted During or Shortly After Plaintiffs' Roadshows ........................................................................................................9

LEGAL STANDARD ...............................................................................................................12

ARGUMENT ...........................................................................................................................13

    I.     Plaintiffs' Counsel's Misconduct Falls Well Within the Court's Inherent Authority to Issue Sanctions and Violates Section 1927. ...................................13

    II.    The Court Should Require Plaintiffs' Counsel to Produce All Documentation Concerning their Outreach to Prospective Class Members, Including a Log of All Such Communications, and Order a Hearing. ..............................................21

    III.   The Court Should Admit Evidence of Counsel's Misconduct at the September Trial and Instruct the Jury. ...............................................................................23

CONCLUSION.........................................................................................................................26

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Agee v. Paramount Commc'ns. Inc.*,
   144 F.3d 395 (2d Cir. 1997)..................................................................................19

*Aoude v. Mobil Oil Corp.*,
   892 F.2d 1115 (1st Cir. 1989) ...............................................................................13

*Baker v. Urban Outfitters, Inc.*,
   431 F. Supp. 2d 351 (S.D.N.Y. 2006), aff'd, 249 F. App'x 845 (2d Cir. 2007) ...................19

*Chambers v. NASCO, Inc.*,
   501 U.S. 32 (1991) ...........................................................................12, 20, 22, 23

*Charlestown Capital Advisors, LLC v. Acero Junction, Inc.*,
   337 F.R.D. 47 (S.D.N.Y. 2020)........................................................................24, 25

*Chevron Corp. v. Donziger*,
   974 F. Supp. 2d 362 (S.D.N.Y. 2014)......................................................................4

*Daval Steel Prods., a Div. of Francosteel Corp. v. M/V Fakredine*,
   951 F.2d 1357 (2d Cir. 1991)..............................................................................20

*Erhardt v. Prudential Group*,
   629 F.2d 843 (2d Cir.1980)................................................................................12

*In re Filosa*,
   976 F. Supp. 2d 460 (S.D.N.Y. 2013).....................................................................17

*Matter of Friedman*,
   196 A.D.2d 280 (NY App. Div. 1st Dep't 1994).........................................................17

*In re Girardi*,
   611 F.3d 1027 (9th Cir. 2010).............................................................................15

*Gonzales v. Texaco Inc.*,
   2007 WL 3036093 (N.D. Cal. Oct. 16, 2007), *vacated on other grounds*, 344
   F. App'x 304 (9th Cir. 2009) ..............................................................................24

*Gulf Oil Co. v. Bernard*,
   452 U.S. 89 (1981) ..........................................................................................12

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
   790 F. Supp. 2d 125 (S.D.N.Y. 2011)....................................................................12

*Hong v. Mommy's Jamaican Mkt. Corp.*,
   2024 WL 3824394 (S.D.N.Y. Aug. 14, 2024)........................................................17, 19

*Link v. Wabash R.R. Co.*,
   370 U.S. 626 (1962) ........................................................................................12

**TABLE OF AUTHORITIES**
(*continued*)

Page(s)

McMunn v. Memorial Sloan-Kettering Cancer Ctr.,
   191 F. Supp. 2d 440 (S.D.N.Y. 2002) .................................................................. 13, 14, 20

Morris v. Adams-Millis Corp.,
   758 F.2d 1352 (10th Cir. 1985) ................................................................................ 20, 21

Mullen v. Butler,
   91 F.4th 1243 (7th Cir. 2024) ........................................................................................ 20

Oliveri v. Thompson,
   803 F.2d 1265 (2d Cir. 1986) ......................................................................................... 19

Ransmeier v. Mariani,
   718 F. 3d 64 (2d Cir. 2013) ............................................................................................ 12

Revson v. Cinque & Cinque, P.C.,
   221 F.3d 71 (2d Cir. 2000) ............................................................................................. 19

Riley v. City of New York,
   2015 WL 541346 (E.D.N.Y. Feb. 10, 2015) ............................................................. 24, 25

Romano v. SLS Residential Inc.,
   253 F.R.D. 292 (S.D.N.Y. 2008) .................................................................................... 15

In re Sch. Asbestos Litig.,
   842 F.2d 671 (3d Cir. 1988) ........................................................................................... 16

Matter of Schildhaus,
   23 A.D.2d 152 (NY App. Div. 1st Dep't 1965) .............................................................. 17

Shangold v. Walt Disney Co.,
   2006 WL 71672 (S.D.N.Y. Jan. 12, 2006) ............................................................... 12, 14

Skywark v. Isaacson,
   1999 WL 1489038 (S.D.N.Y. Oct. 14, 1999) ................................................................. 13

United States v. Avenatti,
   81 F.4th 171 (2d Cir. 2023), cert. denied, 144 S. Ct. 2598 (2024) ...................................4

Virginia Properties, LLC v. T-Mobile Northeast LLC,
   2016 WL 11947503 (S.D.N.Y. April 12, 2016) ......................................................... 13, 14

West v. Goodyear Tire & Rubber Co.,
   167 F.3d 776 (2d Cir. 1999) ........................................................................................... 20

**TABLE OF AUTHORITIES**
(*continued*)

<u>Page(s)</u>

**Statutes**

28 U.S.C. § 1927.................................................................................................*passim*

**Rules**

Fed. R. Civ. P. 23(c)(2)(B)(v).................................................................................16

Fed. R. Civ. P. 23(d) ..............................................................................................12

Fed. R. Civ. P. 33(b)(3) ............................................................................................6

Fed. R. Civ. P. 37(b) ...............................................................................................19

N.Y. R. Prof. Cond. 3.3(a)........................................................................................4

N.Y. R. Prof. Cond. 3.3(b)........................................................................................4

N.Y. R. Prof. Cond. 3.4(a)(4) ...................................................................................4

N.Y. R. Prof. Cond. 8.4(c)....................................................................................4, 17

N.Y. R. Prof. Cond. 8.4(d)....................................................................................4, 17

N.Y. R. Prof. Cond. 8.4(h)....................................................................................4, 17

**"[N]o Class Counsel, or anyone associated with Class Counsel has responded to any class member, or anyone who filled out a questionnaire, as to what answer to put in that questionnaire. That has not happened, or we would be violating our duties. . . . *We do not and would never tell a class member or anyone filling out a questionnaire what to answer*."**

-Plaintiffs' Counsel Michael Hausfeld to Special Master, April 29, 2025

**"[O]ne of the questions is whether you have suffered mental health injuries. And I, as your lawyer, advise you to check that box unless a doctor has pronounced that you are free of all trauma. I've never heard of that yet from a refugee or an asylee, but maybe that's your case. If not, please, mental injuries are also injuries and sometimes can be worse than the physical. *So check the box.*"**

-Plaintiffs' Counsel Lee Boyd to Prospective Class Members, May 16, 2025

## PRELIMINARY STATEMENT

For the past several months, Plaintiffs' counsel crisscrossed the country, holding no fewer than 22 community roadshows with prospective class members. Their goal was simple: "pressure the bank . . . to settle this case," at all costs. Ex. 1[1] (May 16, 2025 ▮▮▮▮ Facebook Video Tr.) at 7:8–7:10; Ex. 1A at 15:50–15:55. We have discovered online videos of those roadshows—posted publicly by attendees themselves—that reflect an alarming pattern of misconduct by Plaintiffs' counsel. They reveal Plaintiffs' counsel *instructing* prospective class members about what injuries and damages to claim under oath, regardless of whether those claims were known to be true or not. They reveal Plaintiffs' counsel pressuring attendees to opt-in and discouraging them from opting-out, by misrepresenting the relief available to them in other forums. And they reveal Plaintiffs' counsel insinuating that false responses would not be detected.

---

[1] Citations to "Ex." refer to exhibits to the accompanying declaration of Matt Benjamin in support of this motion.

Plaintiffs' counsel have flouted this Court's orders, misled the Special Master about their communications with prospective class members, and violated well-established ethical rules and principles. Their tactics are blatantly improper and call into question the integrity of these proceedings and the upcoming three-Plaintiff trial—all three of whom were apparently recruited at similar roadshows. We respectfully submit that the Court should order discovery and a hearing to assess the full scope and impact of these abuses.

The publicly available video evidence reaches only a fraction of Plaintiffs' counsel's communications with prospective class members. But even the limited publicly available evidence is replete with numerous instances of open-and-shut attorney misconduct.

For example, at a May 16, 2025 meeting Plaintiffs' counsel claimed to represent a packed room of Sudanese community members and used that position of trust to instruct *each and every attendee* to claim mental health injuries on their questionnaires. "So one of the questions is whether you have suffered mental health injuries. And ***I, as your lawyer, advise you to check that box*** unless a doctor has pronounced that you are free of all trauma. . . . If not, please, mental injuries are also injuries and sometimes can be worse than the physical. ***So check the box***." Ex. 2 (May 16, 2025 ▮▮▮▮▮▮▮ Facebook Videos Tr.) at 7:14-7:22; Ex. 2A, clip 00006, at 1:24-1:59.

Yet just two weeks earlier, Plaintiffs' counsel had assured Special Master Capra the exact opposite—that they would *never* suggest to attendees, in any way, how or what to answer in questionnaire responses. "As a representative of the class, and as duty-bound by the Court's orders, no Class Counsel, or anyone associated with Class Counsel has responded to any class member, or anyone who filled out a questionnaire, ***as to what answer to put in that questionnaire. That has not happened, or we would be violating our duties***…. ***We do not, and would never tell a class member, or anyone filling out a questionnaire, what to answer***." Ex. 3 (Apr. 29, 2025 Special Master Call Tr.) at 42:19–24, 47:2-4 (emphasis added). Plaintiffs' counsel made these representations in the specific context of discussions with Special Master Capra where concerns had been raised about their communications with prospective class members,

2

and were promises to the Special Master that they would not commit the *exact* misconduct that has now been established.

Plaintiffs' counsel's representations to Special Master Capra are demonstrably false and violate this Court's crystal-clear directives.  For example, in October 2024, the Court emphasized the need to be "careful about suggesting anything to the people" filling out questionnaires, which must be answered "not by counsel but by the individuals" under oath.  ECF No. 582, Oct. 29, 2024 Hr'g. Tr. at 23:3-15.  The Court also instructed that, contrary to what counsel told community members, Plaintiffs' counsel does *not* represent class members:  "You don't represent the class yet, so they're not your clients."  *Id.* at 14:1–8.  And again, in April 2025, Special Master Capra reaffirmed to the parties after consulting with the Court: "We all agree that class counsel cannot suggest substantive answers."  Ex. 4 at 1 (Apr. 29, 2025 E-mail from Special Master Capra to Parties).

Plaintiffs' counsel also pressured those in attendance on May 16 to opt in to the class, and not opt out, under false pretenses.  Counsel stated: "This is your case, for Americans. It's the only one in the world that offers compensation for victims of the Sudanese wars under the Bashir regime.  The only one.  ***No other case like it***," telling attendees, "***Come to us.  Because if you don't report it, you won't get the money***.  And even worse, the bank will keep the money.  Because the bank made billions of dollars on this war.  So report every, every crime."  Ex. 2 at 3:22–4:1; 6:3–7; Ex 2A, clip 00004 at 00:42-1:00.  Those statements were knowingly false in several respects.  As Plaintiffs' counsel knows, the whole premise of an opt-out process is that a class action is *not* the only legal option, and that plaintiffs may pursue damages in individual lawsuits.  Plaintiffs' counsel also knew that hundreds of Sudanese community members had filed their own individual suits.  And Plaintiff's counsel also knew that BNPP did not make "billions of dollars" from its business in Sudan.  Counsel used similar pressure tactics on April 6, 2025, when they were recorded urging a table of attendees, "Did you opt in? Everybody opt in?"  Ex. 5 (Apr. 6, 2025 ███████ Facebook Livestream Tr.) at 18:5–6; Ex. 5A at 35:09-35:12.  Finally, Plaintiffs' counsel assured prospective class members that questionnaire responses that conflict

with immigration records would not be detected, because "no one else is going to check."  Ex. 1 at 5:3–4; Ex. 1A at 8:58-9:00.

The prejudice caused by Plaintiffs' counsel's misconduct is substantial, demonstrable, and ongoing.  Empirical evidence shows that Plaintiffs' counsel's misconduct has tainted class members' substantive responses to questionnaires—information that was provided under oath and that will shape the class members' claims against BNPP.  For example, questionnaires submitted on the same date, and in the same state, as Plaintiffs' counsel's roadshows show conspicuously elevated rates of alleged harm, particularly for "mental health"—precisely as Plaintiffs' counsel had instructed.  The roadshow questionnaires also show an elevated rate of verbatim, or near-verbatim, copy-and-paste responses.  This is red-flag *prima facie* evidence of abuse of the questionnaire process, witness coaching, and fraud on the Court.  Such misconduct plainly satisfies the standard for sanctions under the Court's inherent authority and 28 U.S.C. § 1927.

The idea that an attorney would cross moral, ethical, and legal lines trying to pressure a defendant to settle is, unfortunately, not new.  *See United States v. Avenatti,* 81 F.4th 171, 175 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 2598 (2024) (affirming conviction based on attorney's "threat to cause Nike reputational and financial injury if it did not pay him millions of dollars"); *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 402 (S.D.N.Y. 2014) (finding RICO violation based on plaintiffs' lawyer's "pressure campaign directed at Chevron").  The New York Rules of Professional Conduct, applicable to the conduct of attorneys appearing before this Court, expressly condemn creating false testimony and coaching clients to provide false evidence to courts.  N.Y. R. Prof. Cond. 3.3(a) & (b), 3.4(a)(4), and 8.4(c), (d), & (h).[2]  Plaintiffs' counsel's actions here—particularly where they sought to mislead potential class members they claim to represent—demand prompt investigation and redress by this Court.

---

[2] These Rules prohibit attorneys from participating in the creation of false evidence; offering or attempting to offer false testimony; engaging in the criminal and fraudulent creation of false testimony; and engaging in deceit, fraud and misrepresentation.

At a minimum, the Court should order the following relief, as an initial step towards understanding the scope of and addressing Plaintiffs' counsel's misconduct.

First, the Court should order counsel to produce a log and documentation of all their communications with prospective class members. Special Master Capra proposed that Plaintiffs' counsel provide such documentation, but they resisted it, based on the representation that they would never suggest to class members how to answer the questionnaires. Ex. 3 at 42:19–43:1. That representation was false, and the documentation requirement is plainly warranted.

The Court should also hold a hearing to determine the full scope of Plaintiff's counsel's misconduct and the extent to which it has compromised the integrity of these proceedings and the testimony to be presented at the upcoming trial. Defense counsel has consulted with several well-known ethics experts, who are prepared to submit declarations and testify at a hearing about Plaintiffs' counsel's apparent ethical violations of the New York Rules of Professional Conduct and the need for redress.

Second, the Court should rule that evidence of Plaintiffs' counsel's attempts to influence prospective class members' claims is admissible and may be weighed by the jury when assessing the credibility of the Plaintiffs' claims, as they were all apparently recruited to join this case through similar public meetings.

## **BACKGROUND**

### I.    **The Court-Ordered Questionnaire Process**

Last fall, this Court designed an objective process for the submission of questionnaires by prospective class members. One of the goals of the questionnaire process was to give the parties accurate, reliable information about class members' alleged injuries and damages. The Court was unequivocal: questionnaires must be completed by class members "individually and under oath," must reflect those individuals' complete and truthful responses, and must be free from coaching or influence by lawyers. *See* ECF No. 596, Nov. 18, 2024 Hr'g. Tr. 19:4–5, 25:5–12; ECF No. 582, Oct. 29, 2024 Hr'g. Tr. at 23:4–6 (observing "we have to be careful about suggesting anything to the people").

While the Court acknowledged there would be situations in which Plaintiffs' counsel would need to speak with their "potential clients," the Court made clear its own role to protect the class because prospective class members were not "technically [counsel's] client till they appear." *Id.* 14:1–8. The Court instructed that "neither the plaintiffs nor defendants control the process." *Id.* 35:1–3. The Court instructed that "Questionnaire[s] must be filled out under oath. It's the equivalent of a Rule 33 interrogatory answer not by the parties, ***not by counsel but by the individuals***." *Id.* 23:7–15 (emphasis added); *see also* ECF No. 581, Order Regulating Proceedings at 2 ("The questionnaires shall be completed under oath, see Fed. R. Civ. P. 33(b)(3).").

## II.    Plaintiffs' Counsel Agreed They Would Never Tell A Class Member How To Answer the Questionnaires or Engage in Suggestive Communications

Throughout the questionnaire process, there were several indications that Plaintiffs' counsel were improperly communicating with prospective class members. When defense counsel raised those concerns to the Special Master, Plaintiffs' counsel represented to both the Special Master and to BNPP that their role was limited to providing factual information about the case and the questionnaire process.

On March 19, 2025, defense counsel observed that one of Plaintiffs' counsel joined a zoom meeting using the screenname "Sudan Victims Case Liaison Zoom"—suggesting Plaintiffs' lawyers had been in contact with prospective class members and representing themselves as "Case Liaisons." *See* Ex. 6 (Apr. 3, 2025 Special Master Call Tr.) at 47:3–48:7. On April 3, defense counsel raised this issue with Special Master Capra and asked for a log of calls with prospective class members. *Id.* The Special Master agreed that the Court would be interested in Plaintiffs' counsel's communications with prospective class members and that it would be useful to have a log of these calls. *Id.* at 50:17–51:6.

Weeks later, the parties discussed how to address the issue of prospective class members who submitted inconsistent questionnaire responses, and whether Epiq should have a role in reaching out to them. On April 23, Plaintiffs' counsel rejected the idea that Epiq should engage

6

with prospective class members to clarify the substance of certain inconsistent questionnaire responses. *See* Ex. 4 at 7–9 (Apr. 23, 2025 E-mail from Amanda Lee-DasGupta to Special Master Capra).

Throughout this process, Plaintiffs' counsel repeatedly agreed to the Court's conditions of neutrality—both as representatives of the class and as attorneys with ethical duties of candor to this tribunal. For example, on April 29, Plaintiffs' counsel Michael Hausfeld represented to Special Master Capra: "As a representative of the class, and as duty-bound by the Court's orders, no Class Counsel, or anyone associated with Class Counsel has responded to any class member, or anyone who filled out a questionnaire, as to what answer to put in that questionnaire." Ex. 3 at 42:19–24. Counsel stated unequivocally, "That has not happened, or we would be violating our duties." *Id.* at 42:25–43:1. Resisting the Special Master's request that Plaintiffs' counsel document their communications with prospective class members, Mr. Hausfeld continued: "There is no solicitation here … ***We do not, and would never tell a class member, or anyone filling out a questionnaire, what to answer***." *Id.* at 44:20–21; 47:2–4 (emphasis added). Plaintiffs' counsel Lee Boyd attended and otherwise participated in this conference, but did not correct Mr. Hausfeld's representation.

In reliance on counsel's representations and promises, Special Master Capra spoke with this Court and subsequently informed the parties: "We all agree that class counsel cannot suggest substantive answers." Ex. 4 at 1. He further explained that the Court had instructed Plaintiffs' counsel "not to reach out proactively to those who have submitted 'problematic' questionnaires and who have not signed retention letters.'" *Id.*

## III. Plaintiffs' Counsel Blatantly Violated The Court's Orders

Publicly available evidence now confirms that Plaintiffs' counsel have violated this Court's orders and broken their promises to the Special Master.[3] Plaintiffs' counsel and agents

---

[3] Defendants will lodge with the Court a copy of the videos referenced in this motion, which were all publicly viewable on Facebook at the time we discovered them. The videos marked as Exs. 1A and 5A, from May 16, 2025 and April 6, 2025, are no longer publicly accessible.

traveled across the United States—visiting at least 22 cities in at least 15 different states—in an effort to drum up opt-ins, discourage opt-outs, and even explicitly instruct individuals how to answer questionnaires and what injuries to claim, regardless of the truth.

**Plaintiffs' Counsel Pressured Individuals To Opt In and Discouraged Them From Opting Out.**  On April 6, 2025, Plaintiffs' counsel, Ms. Boyd, was recorded urging attendees, "Did you opt in? Everybody opt in?"  Ex. 5 at 18:5–6; Ex. 5A at 35:09-35:12.  More recently, she went even further, falsely telling attendees that opting-in is the only way to receive compensation for their injuries and to stop BNPP from profiting.  At a May 16 community meeting, Ms. Boyd represented, "This is your case, for Americans. It's the only one in the world that offers compensation for victims of the Sudanese wars under the Bashir regime.  The only one. *No other case like it*," telling attendees, "***Come to us. Because if you don't report it, you won't get the money***.  And even worse, the bank will keep the money.  Because the bank made billions of dollars on this war.  So report every, every crime."  Ex. 2 at 3:22–4:1; 6:3–7; Ex 2A, clip 00004 at 00:42-1:00 (emphasis added).  Counsel further suggested that compensation was nearly guaranteed: "The Court will say you won. Prepare to collect your money. That will be a good day, and I'll come back, and we'll celebrate together." Ex. 1 at 13:10–16; Ex. 1A at 30:47-30:57.

**Plaintiffs' Counsel Instructed Individuals How To Answer Questionnaires and What Injuries to Claim.**  Plaintiffs' counsel explicitly instructed individuals how to answer questionnaires.  At the May 16, 2025 meeting, Ms. Boyd *told every attendee to check the box for mental health injuries* unless they had been expressly diagnosed otherwise.  She stated, "So one of the questions is whether you have suffered mental health injuries. And I, as your lawyer, *advise you to check that box* unless a doctor has pronounced that you are free of all trauma. I've never heard of that yet from a refugee or an asylee, but maybe that's your case. If not, please, mental injuries are also injuries, and sometimes can be worse than the physical. *So check the box*."  Ex. 2 at 7:14-7:22[4]; Ex. 2A, clip 00006 at 1:24-1:59.

---

[4] Plaintiffs' counsel also offered to fill out questionnaires on attendees' behalf, raising the concern that inappropriate, suggestive statements could likewise have infected the provision of

**Plaintiffs' Counsel Encouraged Potentially False Responses By Telling Attendees That No One Could Check The Accuracy Of Their Responses.** At the May 16, 2025 meeting, Ms. Boyd told prospective class members that if their questionnaire responses differed from their immigration records, no one would ever know:

> The only person who has the right to get your files from Immigration is you. I don't even have that right, not unless you give me authorization. And that's a process, believe me. So you can do that. If you want to make sure that your facts that you gave Immigration are the same as what you're giving now, you can do that. ***But no one else is going to check.*** They're just not allowed to.

Ex. 1 at 4:20–5:4; Ex. 1A at 8:39-9:03.

## IV.     Questionnaire Responses Submitted During or Shortly After Plaintiffs' Roadshows

As reflected in the chart below, each of Plaintiffs' counsel's roadshow meetings has been followed by a conspicuous spike in opt-ins from that location. Comparing the number of opt-ins in the "0" column (the week the roadshow occurred) to the weeks before or after the roadshow reveals an indisputable spike directly following Plaintiffs' counsel's solicitations.[5]

---

such assistance. For example, at the April 6, 2025 meeting, Ms. Boyd told individuals to call counsel's 24/7 helpline to have someone else fill out their questionnaire, stating: "Again, the helpline number is very important because even if you don't have access to a computer, we can put you with people that do. For example, during our meetings that we do around the country, or the people on the line do have their own computers, and so they can help." Ex. 5 at 8:21–9:5; Ex. 5A at 17:47-18:07. And at the May 16 meeting, Ms. Boyd again stated: "So we are here to help you get through the process of filling it [the questionnaire] out. It's difficult. This is a big crowd . . . So we're going to have to go one by one and get everybody signed up." Ex. 1 at 8:17–24; Ex. 1A at 19:59-20:23. While assistance may be necessary for individuals who are illiterate or lack computer access, Ms. Boyd's statements during the roadshows heighten concerns about whether such assistance was inappropriately suggestive.

[5] The State in which each roadshow occurred has been given an anonymous three-digit identifier to maintain confidentiality.



The evidence also reflects a conspicuous overlap or clustering of substantive responses in questionnaires submitted on the same day, and with a home address in the same state, as Plaintiffs' counsel's roadshows ("roadshow questionnaires"). For example, roadshow questionnaires reflect substantially elevated rates of claimed harm, particularly for "mental health."



The roadshow questionnaires also contain a comparatively high incidence of verbatim, or nearly verbatim, copy-and-paste responses. *For example, the following passage—replete with identical grammatical errors—appeared in at least 40 separate questionnaires*:



While correlation is not necessarily causation, and there may be plausible explanations for such glaring, anomalous spikes in the roadshow questionnaire data, it cannot be dismissed as a mere coincidence, particularly in light of the video evidence of Plaintiffs' counsel instructing prospective class members how to fill out the questionnaires.

## <u>LEGAL STANDARD</u>

All federal courts have "the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process and assure a level playing field for all litigants." *Shangold v. Walt Disney Co.*, 2006 WL 71672 at *4 (S.D.N.Y. Jan. 12, 2006). Federal courts also have inherent power to "achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO*, Inc., 501 U.S. 32, 43 (1991) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31 (1962)). This inherent power is "squeezed from the need to make the court function." *Chambers*, 501 U.S. at 42. It includes the authority to "sanction a party or attorney who has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Ransmeier v. Mariani*, 718 F. 3d 64, 68 (2d Cir. 2013) (quoting *Chambers*, 501 U.S. at 45–46). Congress has complemented this inherent authority with Section 1927 of the Judicial Code, which specifically authorizes the court to sanction any attorney who "multiplies the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927.

Courts have a special role to ensure the integrity of class actions. "Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981); *see also* Fed. R. Civ. P. 23(d). One core judicial function under Rule 23 is to protect class members from "misleading communications from the parties or their counsel." *Erhardt v. Prudential Group*, 629 F.2d 843, 846 (2d Cir. 1980); *see Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 125, 134 (S.D.N.Y. 2011) ("The Court's primary purpose in supervising communications is thus to ensure that potential class members receive accurate and impartial information regarding the status, purposes and effects of the class action.").

## ARGUMENT

Plaintiffs' counsel's misconduct amounts to fraud on the Court. It has interfered with the opt-out procedures in Rule 23 and resulted in potentially false sworn testimony being submitted in the questionnaire process that will also be the basis for the class members' claims against BNPP. The evidence submitted with this motion—which reflects only a small percentage of Plaintiffs' counsel's communications with prospective class members—documents apparent improper witness coaching, abuse of the opt-out and questionnaire process, and misrepresentations to the Court. And the questionnaire data plainly shows—in conspicuously elevated claims rates of injuries and verbatim copy-pasted language—the prejudice caused by Plaintiffs' counsel's misconduct.

These abuses plainly satisfy the standard for sanctions under the Court's inherent authority and 28 U.S.C. § 1927. Entering the requested relief will, at a minimum, ensure that the Court has a more complete record of Plaintiffs' counsel's communications with prospective class members and will give the Court the opportunity to conduct a hearing. That hearing would enable the Court to determine the full scope of Plaintiffs' counsel's misconduct and to determine whether that misconduct has compromised the integrity of the testimony to be presented at the upcoming trial. Defense counsel has consulted with well-known ethics experts—several of whom this Court has appointed or cited as authorities—and they are prepared to testify at a hearing about Plaintiffs' counsel's apparent ethical violations.

## I. Plaintiffs' Counsel's Misconduct Falls Well Within the Court's Inherent Authority to Issue Sanctions and Violates Section 1927.

*This Court Has Inherent Authority to Sanction Counsel's Misconduct.* The Court's inherent sanction authority extends to "bad faith, vexatious" conduct, including fraud on the court. *McMunn v. Memorial Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 445 (S.D.N.Y. 2002). Counsel commits fraud on the court where counsel "has acted knowingly in an attempt to hinder the fact finder's fair adjudication of the case and his adversary's defense of the action." *Id.* (quoting *Skywark v. Isaacson*, 1999 WL 1489038, at *14 (S.D.N.Y. Oct. 14, 1999)); *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989). Fraud on the court is particularly serious

13

where counsel "lies to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process." *Virginia Properties, LLC v. T-Mobile Northeast LLC*, 2016 WL 11947503, at *2 (S.D.N.Y. April 12, 2016) (Hellerstein, J.) (quoting *McMunn*, 191 F. Supp. 2d at 445 (S.D.N.Y. 2002)).

To determine whether counsel's conduct is sanctionable as fraud on the court, courts in the Second Circuit consider the following five factors: "(1) whether the misconduct was the product of intentional bad faith; (2) whether and to what extent the misconduct prejudiced the other party; (3) whether there is a pattern of misbehavior, rather than an isolated instance; (4) whether and when the misconduct was corrected; and (5) whether further misconduct is likely to continue in the future." *Shangold*, 2006 WL 71672, at *4 (quoting *McMunn*, 191 F. Supp. 2d at 446); *Virginia Properties*, 2016 WL 11947503, at *2 (Hellerstein, J.). That counsel engaged in sanctionable conduct must be established by clear and convincing evidence. *Virginia Properties*, 2016 WL 11947503, at *2 (Hellerstein, J.).

Plaintiffs' counsel's misconduct satisfies all five factors.

**First**, counsel acted intentionally in bad faith. This Court laid down the ground rules of the questionnaire process clearly: questionnaires must be completed by class members "individually and under oath," must reflect those individuals' complete and truthful responses, and must be free from coaching or influence by lawyers. ECF No. 582, Oct. 29, 2024 Hr'g. Tr. 23:11–15; ECF No. 596, Nov. 18, 2024 Hr'g. Tr. 19:4–5, 25:5–12; ECF No. 581, Order Regulating Proceedings at 2. Just as clearly, Plaintiffs' counsel confirmed their understanding and assent: "We do not and would never tell a class member or anyone filling out a questionnaire what to answer. . . . [T]hat has not happened. We [would] be violating our duties." Ex. 3 at 42:25–43:1. After receiving those representations, Special Master Capra declined to require Plaintiffs' counsel to log all communications with prospective class members. At the same time, Special Master Capra spoke to the Court and reaffirmed, "We all agree that class counsel cannot suggest substantive answers." Ex. 4 at 1. Plaintiffs' counsel did not object or attempt to correct the record at this or any other time.

But "suggest[ing] substantive answers" is exactly what Plaintiffs' counsel did. Video recordings were publicly available for only two of the 22 roadshows, but counsel's instructions to prospective class members speak for themselves: "So one of the questions is whether you have suffered mental health injuries. And *I, as your lawyer, advise you to check that box* unless a doctor has pronounced that you are free of all trauma. . . . If not, please, mental injuries are also injuries, and sometimes can be worse than the physical. *So check the box*." Ex. 2 at 7:14-7:22; Ex. 2A, clip 00006 at 1:24-1:59 (emphasis added). Whether some (or many) class members actually suffered mental health injuries is irrelevant. Plaintiffs' counsel gave a clear instruction about how to complete the substance of the questionnaire—something Plaintiffs' counsel promised they would never do and conceded to Special Master Capra that, if it happened, would be a violation of their duties. By instructing *each and every attendee* to "check that box," Plaintiffs' counsel conveyed to prospective class members a made-up presumption of emotional distress with reckless disregard for the truth and without any factual support for the supposed presumption. *In re Girardi*, 611 F.3d 1027, 1034 (9th Cir. 2010) (issuing sanctions where counsel "had 'recklessly' made false statements to the Ninth Circuit" in seeking to enforce a Nicaraguan judgment).

In addition, the Court expressly rejected Plaintiffs' Counsel's proposal to run a call center to field class members' calls, explaining, "Everything has to be objective and indisputable." ECF No. 596, Nov. 18, 2024 Hr'g Tr. 27:23-29:10. The Court was clear: "*A call center does not work*. Who is going to operate the call center? . . . [T]he person calling will ask questions. Should we say to the operators, no, you can't answer those questions? It's unwieldy, it's subjective, it's prone to error. No." *Id*. 29:6–10 (emphasis added). Instead, the Court directed that questionnaires be completed "individually and under oath." *Id*. at 19:4–5, 25:5–12. And the Court admonished that counsel was to avoid "suggesting anything to the people" in the questionnaire process, and confirmed "it's got to be supervised to get this information." ECF No. 582, Oct. 29, 2024 Hr'g. Tr. at 23:4–6. Yet Plaintiffs' counsel ignored the Court's instruction and told class members that "[w]e are here to help you get through the process of filling [the

questionnaire] out" and that class members could have a questionnaire filled out on their behalf—an offer directly at odds with the Court's rejection of the proposed call center.  Ex. 1 at 8:17–24; Ex. 1A at 19:58-20:06.

In class actions, courts must supervise communications with prospective class members to curtail "abusive communications . . . that affect class members' decisions regarding whether to participate in the litigation, communications that undermine class members' confidence in class counsel or the court, and communications that contain false or misleading statements about the litigation."  *Romano v. SLS Residential Inc.*, 253 F.R.D. 292, 296 (S.D.N.Y. 2008).  The whole premise of a court-supervised notice and opt-out process under Rule 23 is that Plaintiffs must be given an informed choice to proceed as part of the class or to be "exclude[d] from the class" to pursue an individual claim—or not.  Fed. R. Civ. P. 23(c)(2)(B)(v).  Communications seeking to "influence the threshold decision whether to remain in the class" or "influence the choice of remedies are . . . within a district court's discretion to regulate."  *In re Sch. Asbestos Litig.*, 842 F.2d 671, 683 (3d Cir. 1988).

Yet Plaintiffs' counsel subverted that opt-out process in at least two ways.  First, counsel misled prospective class members: "Come to us.  Because if you don't report it, you won't get money"—falsely insinuating that individuals could receive compensation for their injuries only by opting into this class action.  Ex. 2 at 6:3–4; Ex 2A, clip 00004 at 00:42-00:49.  Second, Plaintiffs' counsel told class members that if they did not opt in, "the bank will keep the money.  Because the bank made billions of dollars on this war.  So report every, every crime."  Ex. 2 at 6:3–7.  This biased and inflammatory portrayal of the case is nothing like the language the Court approved to describe the claims in the class notice.  ECF No. 582, Oct. 29, 2024 Hr'g. Tr. at 30:1–3 ("THE COURT: Start specifying all the kinds of damages, you're loading the notice. So we're not going to do that. We're going to have it in a more general way."); ECF No. 608.  Nor is there any evidence that BNPP "made billions of dollars on this war."  In fact, Plaintiffs' own expert contends that "post-2002 profits for the bank with transactions related to Sudan were

16

estimated to be circa **USD 90 million**."  ECF No. 528-93, Verhoeven Rep. at 39 (emphasis added).

Plaintiffs' counsel also purported to advise Sudanese community members—not all of whom had opted in to the class—in the role "as your lawyer."  Ex. 2 at 7:14-7:22; Ex. 2A, clip 00006 at 1:29-1:33.  That representation was contrary to the Court's express admonition that "[y]ou don't represent the class yet, so they're not your clients."  ECF No. 582, Oct. 29, 2024 Hr'g. Tr. at 14:1–8.

This is textbook bad faith.  Ethical rules expressly bar such conduct "involving dishonesty, fraud, deceit or misrepresentation"; "conduct that is prejudicial to the administration of justice"; and conduct that "adversely reflects on the lawyer's fitness as a lawyer."  N.Y. R. Prof. Cond. 8.4(c), (d) & (h).  And an attorney "is to be held strictly accountable for his statements or conduct which reasonably could have the effect of deceiving or misleading the court."  *Matter of Friedman*, 196 A.D.2d 280, 296 (NY App. Div. 1st Dep't 1994) (disbarring attorney for requesting and allowing false testimony) (quoting *Matter of Schildhaus*, 23 A.D.2d 152, 155 (NY App. Div. 1st Dep't 1965); *see also In re Filosa*, 976 F. Supp. 2d 460, 469–71 (S.D.N.Y. 2013) (one-year suspension appropriate for attorney who engaged in "intentionally deceptive misconduct that interfered with the administration of justice," where counsel "misled [defendant] . . . failed to correct [plaintiff's] evasive deposition testimony, and failed to timely produce documents" before trying "to **quickly settle the case before the defendants caught on to the truth**") (emphasis added); *Hong v. Mommy's Jamaican Mkt. Corp.*, 2024 WL 3824394, at *14 (S.D.N.Y. Aug. 14, 2024) (counsel's "claims were without a colorable basis because, quite simply, they were untrue and known to be untrue").

**Second**, this conduct prejudices BNPP in several ways.  Pressuring prospective class members to opt in and not to opt out—in part by falsely stating that participating in this class action is the only path to potential recovery—has inflated the size of the class.  In terms of the substantive questionnaire responses, instructing class members to state that they have suffered mental trauma has, predictably, increased the number of class members seeking recovery for

17

mental trauma.  The overlapping and intended effect of these bad-faith communications is to ratchet up the threatened magnitude of a potential unfavorable judgment and attempt to coerce BNPP to settle.  In Plaintiffs' counsel's own words: "the more people we get signed up, the more pressure the bank has to settle this case."  Ex. 1 at 7:8–10; Ex. 1A at 15:49-15:55.

The limited evidence available to Defendants reflects this substantial prejudice.  As noted above, opt-ins spike at or immediately after roadshow events and roadshow questionnaires show significantly elevated rates of claimed injuries under particular harm categories ███████████
████████████████████████████████████████████████████████████████
█████████████████████████  Roadshow questionnaires also show higher rates of verbatim or near-verbatim copy-and-paste language—language that was no doubt encouraged by Plaintiffs' counsel's reassurance that "no one else is going to check" their responses against immigration records.  Ex. 1 at 5:3–4; Ex. 1A at 8:58-9:00.

**Third**, these communications reflect a deliberate pattern of misconduct, not isolated lapses in judgment.  Again, this evidence documents only a fraction of what Plaintiffs' counsel has said at more than 20 roadshows likely attended by thousands of people.  While we have access to only a handful of videos posted publicly by roadshow attendees, even this limited evidence shows a pattern of instructing *all attendees* to opt in and instructing *all attendees* to claim certain injuries with reckless disregard for the truth.  The pattern of misconduct is also facially apparent because it has had a measurable effect on class members' participation and the substantive responses submitted nationwide, and classwide.

**Fourth**, there is no evidence that Plaintiffs' counsel have attempted to correct their misconduct.  On the contrary, Plaintiffs' counsel have resisted efforts to gather facts about their communications with prospective class members.

**Fifth**, all the evidence indicates the misconduct will continue in the future—absent intervention by the Court.  In the video evidence, Plaintiffs' counsel did not backtrack or make curative statements noting the independence or objectivity of the process.  And Plaintiffs'

counsel has never tried to correct the record of their prior misrepresentations to the Special Master.

All five *McMunn* factors are easily satisfied. Plaintiffs' counsel's misconduct warrants sanctions under the Court's inherent authority.

***Section 1927 Also Authorizes Sanctions.*** Section 1927 authorizes sanctions for conduct that "multiplies the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927. "[T]he bad faith conduct that is necessary for a proper award of § 1927 sanctions is the same bad faith conduct that justifies an award of sanctions under the court's inherent powers." *Baker v. Urban Outfitters, Inc.*, 431 F. Supp. 2d 351, 363 (S.D.N.Y. 2006), aff'd, 249 F. App'x 845 (2d Cir. 2007); *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986). Such conduct must, in other words, have been "entirely meritless" and undertaken "for improper purposes." *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71, 79 (2d Cir. 2000) (quoting *Agee v. Paramount Commc'ns. Inc.*, 144 F.3d 395, 398 (2d Cir. 1997)). "[C]ourts have not hesitated to impose Section 1927 sanctions based on false factual representations in documents other than pleadings." *Hong*, 2024 WL 3824394, at *15 (collecting cases).

Plaintiffs' counsel's misconduct has already multiplied the proceedings in this case "unreasonably and vexatiously," and will continue to do so. This Court, the Special Master, and Defendants have spent significant time and resources participating in a supposedly impartial process designed to give the parties accurate, reliable information about class members' alleged injuries and damages. Plaintiffs' counsel has corrupted that process. The Court, the Special Master, and Defendants are now spending substantial additional time and resources attempting to assess and remedy the damage caused by counsel's misconduct. That invariably "multiplies the proceedings" within the meaning of § 1927.

Because the legal standard for bad faith is the same whether sanctions are sought under § 1927 or under the Court's inherent authority, the showing above under the *McMunn* factors also establishes the availability of sanctions under § 1927.[6]

**The Court Has Broad Discretion To Craft A Sanction Appropriate To The Violation.**
When crafting sanctions pursuant to their inherent authority, federal courts enjoy broad discretion. *Mullen v. Butler*, 91 F.4th 1243, 1250 (7th Cir. 2024) ("District courts have broad discretion to fashion sanctions against litigants.") (attorney sanctioned for improperly interfering with class notice process and members and knowingly making false statement to the court about communications with class members); *Chambers*, 501 U.S. at 45 ("[O]utright dismissal of a lawsuit . . . is within the court's discretion. . . . Consequently, the less severe sanction of an assessment of attorney's fees is undoubtedly within a court's inherent power as well."). The sanction imposed must be tailored and appropriate to the misconduct at issue. *Chambers*, 501 U.S. at 33, 44–45. Courts in the Second Circuit have assessed appropriateness through two overlapping tests. The first consists of consulting again the five factors used to determine whether to impose sanctions in the first place. *McMunn*, 191 F. Supp. 2d at 461. The second is to gauge whether the sanction in question will "(1) deter parties from engaging in the sort of misbehavior [at issue]; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore [the opposing party] to the position it would have been absent the wrongdoing." *Id.* (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)).

A court finding that a party's conduct is sanctionable under § 1927 may order that party "to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because

---

[6] To the extent the Court considers the questionnaires to be a discovery mechanism, and considers its related orders to be "discovery orders," Federal Rule of Civil Procedure 37(b) also authorizes sanctions and supports the relief requested in this motion. *See Daval Steel Prods., a Div. of Francosteel Corp. v. M/V Fakredine*, 951 F.2d 1357, 1363 (2d Cir. 1991) ("Provided that there is a clearly articulated order of the court requiring specified discovery, the district court has the authority to impose Rule 37(b) sanctions for noncompliance with that order.").

of such conduct."  28 U.S.C. § 1927; *Morris v. Adams-Millis Corp.*, 758 F.2d 1352, 1357 n.7 (10th Cir. 1985).

II.    **The Court Should Require Plaintiffs' Counsel to Produce All Documentation Concerning their Outreach to Prospective Class Members, Including a Log of All Such Communications, and Order a Hearing.**

When Special Master Capra suggested that Plaintiffs' counsel log their communications with prospective class members, counsel resisted that obligation by representing, "There is no solicitation here" and "We do not, and would never tell a class member, or anyone filling out a questionnaire, what to answer."  Ex. 3 at 44:20–21; 47:2–4.  Both statements were false.

As a starting point, the Court should order Plaintiffs' counsel to do what Special Master Capra was inclined to require, and what counsel avoided only through false statements: to provide documentation reflecting the full extent of communications between Plaintiffs' counsel and prospective class members.  Despite video evidence documenting a fraction of these communications, BNPP at this point has insufficient information to quantify the extent to which Plaintiffs' counsel has influenced the opt-in numbers and the substance of the questionnaire answers.  To generate sufficient data, the Court should order Plaintiffs' counsel to provide a log reflecting the following information about each contact between Plaintiffs' counsel (including counsel's agents) and any prospective class member:

- the name of the prospective class member
- the name of Plaintiffs' counsel or their agent who participated in the contact
- the date and time of the communication
- the method of communication (e.g., in-person, telephone)
- the location of the meeting for in-person meetings
- the subject of the conversation

In addition to a communications log, the Court should order Plaintiffs' counsel to produce:

- All videos, audio recordings, written transcriptions, documents or notes in Plaintiffs' counsel's possession, custody, or control, relating to any of their meetings with prospective class members.[7]

- A sworn declaration from Plaintiffs' counsel providing information regarding their internal processes for fielding calls and questions from prospective class members, including the names and employers of the individuals who communicated with prospective class members, whether these individuals were attorneys, and how these individuals were compensated (*e.g.*, based on the number of people they signed up as opt-ins or helped to complete questionnaires).

- Any documents in Plaintiffs' counsel's possession, custody, or control reflecting their outreach to prospective class members, including any scripts or talking points prepared in connection with assisting prospective class members in completing the questionnaire.

- A Rule 30(b)(6) witness to sit for a deposition, who is authorized to speak on behalf of all class counsel on issues relating to (i) outreach to prospective class members, (ii) Plaintiffs' counsel's advice to prospective class members regarding the questionnaire, and (iii) all other contacts or attempted contacts with prospective class members relating to the questionnaire or opt-in process.

In addition, the Court should order an evidentiary hearing. A hearing would allow the Court an opportunity to assess the nature, scope, and impact of counsel's misconduct, including its impact on the upcoming trial, and would allow an opportunity for direct examination by the Court. Given the evidence of Plaintiffs' counsel's misconduct and the prejudicial impact it

---

[7] The Court already ruled that Plaintiffs' counsel does not represent the prospective class members: "You don't represent the class yet, so they're not your clients." ECF No. 582, Oct. 29, 2024 Hr'g. Tr. at 14:1–8. Plaintiffs' counsel have no legitimate claim of privilege or work product over these communications. Moreover, counsel's meetings were open to the public, and several videos were made available publicly online, further defeating any privilege Plaintiffs' counsel might claim.

appears to have had, the remedies requested above are well within the Court's discretion to award. *Chambers*, 501 U.S. at 33, 44–45.

### III.    The Court Should Admit Evidence of Counsel's Misconduct at the September Trial and Instruct the Jury.

Plaintiffs' counsel's use of community meetings to shape class members' allegations casts doubt on the claims of the three Plaintiffs selected for trial—each of whom apparently participated in similar community meetings. As a matter of basic fairness, the Court should rule that evidence of Plaintiffs' counsel's attempts to influence prospective class members' claims is admissible and may be weighed by the jury when assessing the credibility of the Plaintiffs' claims.

Plaintiffs' counsel's use of community meetings and roadshows to solicit class members is nothing new—they apparently recruited each of the three Plaintiffs set for trial in September the same way. ███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████ BNPP has relatively little information about what occurred at those recruitment meetings, as Plaintiffs did not produce videos of those meetings and instructed witnesses not to answer questions about the meetings or any documents filled out at the meetings. ███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

23

████████ But the recent revelations about Plaintiffs' counsel's recruitment efforts speak volumes about the influence these meetings have had on class members' allegations.

Plaintiffs' counsel's instructions to "check the box" for certain types of injuries—and the demonstrable impact this had on questionnaire responses—is particularly troubling, given the Court's instruction that questionnaires were to be "filled out under oath," "not by counsel but by the individuals." ECF No. 582, Oct. 29, 2024 Hr'g. Tr. 23:7–15. The fact that Plaintiffs' counsel told prospective class members how to respond casts doubt on all other discovery responses and sworn testimony their clients have provided in this case, or will provide at trial.

The decision in *Gonzales v. Texaco Inc.* is instructive. 2007 WL 3036093 (N.D. Cal. Oct. 16, 2007), *vacated on other grounds*, 344 F. App'x 304 (9th Cir. 2009). There, three Ecuadoran plaintiffs falsely claimed to have cancer. The court issued sanctions against their attorneys for failure to properly investigate these claims and held their attorneys personally responsible for their clients' false claims. *Id.* at *1. The court explained that "where the clients live in a foreign country, where the fact issues are not simple, where so much can be lost in translation, where counsel plans to use them as named plaintiffs in a suit in the United States, counsel have much to ask and **much to explain to their clients**." *Gonzales*, 2007 WL 3036093, at *12. Here, it was counsel's improper instructions and suggestions to prospective class members that *encouraged* their false claims, and sanctions are therefore warranted, even if plaintiffs did not themselves know they were doing anything wrong. *Id.* at *11–12.

The jury cannot be kept in the dark about counsel's efforts to recruit Plaintiffs and any effort to coach their testimony. At minimum, the jury must be allowed to consider this evidence of Plaintiffs' counsel's recruitment and coaching of class members. The jury should also be instructed that this evidence may be considered when weighing the credibility of the Plaintiffs' claims.

Admission of this evidence and an accompanying jury instruction is appropriate under the circumstances. For example, in *Riley v. City of New York*, the court found that "monetary sanctions, in addition to **notifying the jury of Plaintiff's witness tampering and permitting the**

24

***jury to draw an adverse inference against Plaintiff*** based on the witness tampering allegations, are appropriate sanctions." 2015 WL 541346, at *12 (E.D.N.Y. Feb. 10, 2015) (emphasis added). This remedy is also consistent with the case law providing an adverse inference as a sanction where a party destroys evidence. *See Charlestown Capital Advisors, LLC v. Acero Junction, Inc.*, 337 F.R.D. 47, 52 (S.D.N.Y. 2020) (allowing the aggrieved party "to present evidence to the finder of fact at trial regarding the loss of" data and authorizing the aggrieved party to "seek an appropriate jury instruction . . . allowing the jury to consider that loss of that evidence, and the circumstances of its loss, in evaluating witness credibility and otherwise making its determinations").

## CONCLUSION

Plaintiffs' counsel intentionally corrupted the questionnaire and class opt-out process. Plaintiffs' counsel instructed prospective class members to state, under oath, that they had suffered injuries without obtaining or even seeking any evidence it was true. And Plaintiffs' counsel misrepresented and shielded their conduct from the Special Master and this Court. Their misconduct has tainted the questionnaire process, has unfairly influenced class members' decisions to opt in, and has distorted the substance of their responses. Such misconduct is plainly sanctionable under the Court's inherent authority and Section 1927.

Accordingly, the Court should issue the relief requested herein, as an initial step towards assessing the full scope and impact of these abuses. BNPP reserves the right to seek additional relief.

Dated: New York, New York
        June 25, 2025

/s/ Barry H. Berke                         /s/ Carmine D. Boccuzzi, Jr.
Barry H. Berke                             Carmine D. Boccuzzi, Jr.
Dani R. James                              Abena Mainoo
Michael Martinez                           CLEARY GOTTLIEB STEEN &
Matt Benjamin                              HAMILTON LLP
David P. Salant                            One Liberty Plaza
GIBSON, DUNN & CRUTCHER LLP                New York, New York 10006
200 Park Avenue                            T: (212) 225-2000
New York, New York 10166                   cboccuzzi@cgsh.com
T: (212) 351-4000                          amainoo@cgsh.com
bberke@gibsondunn.com
djames@gibsondunn.com                      *Counsel for Defendants BNP Paribas and*
mmartinez2@gibsondunn.com                  *BNP Paribas US Wholesale Holdings, Corp.*
mbenjamin@gibsondunn.com
dsalant@gibsondunn.com