# EXHIBIT 3

Page 1

1

2

3

4

5

6

7

8

9

10

11    7444884 - 2025.04.29 - Special Master Conference

12    Zoom Recording

13

14

15

16

17

18

19

20

21

22

23

24

25

1           PROFESSOR CAPRA:  Okay.  So today, I
2   guess, first, I'd like to start with a process
3   issue that there's not going to be any
4   interruptions today, and I don't want anybody
5   interrupting anybody else today.  Everybody gets
6   to talk.  Then, when I say they're done talking,
7   then we'll go to somebody else.  There will be no
8   interruptions today.  I'm very -- It took me a
9   week to get over what happened at the last
10  session, and I'm not going to tolerate that
11  today.  All right?
12          So I'd like to start, as we usually do,
13  with somebody from Epiq to give us some updates
14  on how things are.  And we're over 4,000 in terms
15  of people who have filed questionnaires, which is
16  good.  But beyond that, Ms. Kovacs, what do you
17  have?
18          LOREE KOVACH:  Yeah, sure.  Thank you.
19          So we had the release on the 22nd of
20  the website for last week with some updates, the
21  "repeated" option, the "over how much time"
22  option added to acts of violence, home invasion,
23  sexual assault, and torture, the "before 1997"
24  option added to what month and year did you leave
25  Sudan or South Sudan, and background information.

Page 3

1  We added checkboxes for "I did not earn any

2  income" in the background information section,

3  increased the size of the checkboxes on mobile

4  view for accessibility, tweaked the alignment of

5  radio buttons, and the corresponding text on

6  mobile view for better accessibility, and then we

7  updated the English "do nothing" text on the opt-

8  in and opt-out form.  And so those were all

9  topics that were discussed.

10          We made some updates to Facilitator on

11  the 24th.  So those were Sudanese Arabic names

12  and addresses not displaying correctly, that we'd

13  had a bug there.  New questions that were added

14  to the website on Tuesday were added to the

15  questionnaire screens in Facilitator two days

16  later.  So you can see them, and they're included

17  in the query wizards as those can be pulled into

18  reporting.  And then, that daily automated

19  questionnaire report that can be pulled from

20  Facilitator was also updated to include those new

21  questionnaire data fields.

22          And then, our next scheduled release is

23  for Thursday the 1st.  That release is going to

24  include the hiding the pregnancy questions when

25  "male" is selected.  I know that was an important

Page 4

1   one from Ms. Boyd.  We'll also be disabling and

2   graying out the fields for month, year, and state

3   when the user checks "I don't remember."  And

4   then, we're going to be updating the

5   functionality to send confirmation emails

6   automatically when the questionnaire is

7   submitted.  We will be removing the calendar

8   picker from the date fields, and auto-formatting

9   so people can just type in the dates.  And then,

10  when somebody successfully saves a harm

11  transaction, we're going to change the focus of

12  the page so it moves them down to that table so

13  they can see that it has been saved, those

14  entries have been saved.

15          So those are all the items included in

16  the release on the 1st.  Everything seems on

17  track on our side for that one, and so we'll get

18  it to Counsel for review, you know, soon.

19          We have not heard reports of any

20  technical issues since the last call.  Obviously,

21  if there are some, I'm sure Counsel will let us

22  know about them.  And then, we are reviewing the

23  first proof of the questionnaire how-to video.

24  So that's the video walking someone through the

25  questionnaire.  We just got that first draft from

Page 5

1    our vendor today.  And so we're going to do a
2    quick pass, hopefully everything's good, and
3    we'll send it over to you.  But if we need to
4    make some tweaks to language in certain places,
5    we might be doing that before you see it.
6            The first batch of non-responder
7    messages went out on the 17th.  The second batch
8    is planned for May 19th.  And then, we continue
9    to send weekly batches for the 14-day aged
10   incomplete questionnaires, and for people who
11   have both opted in and opted out but have not
12   submitted questionnaires.
13           PROFESSOR CAPRA:  Do you have any data
14   on the effectiveness of all of those reminders?
15           LOREE KOVACH:  I do not right off the
16   top of my head, but we can pull it.  Stephen can
17   look at pulling some, and maybe he's quick enough
18   to get it done before the call ends.  If not,
19   we'll circulate some stats on that afterward.
20           PROFESSOR CAPRA:  Thanks.  I saw some
21   email trail about the conformation, that the
22   applicants are getting confirmation when they
23   finish now.  Is that correct?
24           LOREE KOVACH:  Yeah, so we -- That's in
25   the release coming on the -- on May 1st.  So

                                          Page 6

1    there will be an automated confirmation email

2    when the questionnaire is submitted.  We did

3    retroactively go back and send confirmation

4    emails to -- or we're going to retroactively go

5    back and send confirmation emails to everybody

6    who's already submitted, just so they have that

7    as well, that confirmation to refer back to.

8              PROFESSOR CAPRA:  Okay.  Does Class

9    Counsel have any reports of any problems that we

10   could address and get rectified?

11             KATHRYN LEE BOYD:  Just a couple.  With

12   respect to the "repeated" button, we see that

13   that's in there, and we've gotten some issues

14   surrounding the fact that you're not allowed to

15   put more than one year for "repeated."  So if

16   they click "1998 repeated," then for some reason,

17   the program doesn't allow another year of

18   "repeated," you know, occurrences.  It's just

19   only one year, that's it.  And I think our

20   understanding was that, for example, if you had

21   "repeated torture" one year and you had "repeated

22   torture" another year, you would be able to have

23   it for those two years, separate years.  I don't

24   know if you can address that, but that's one

25   issue that came up.

```
                                              Page 7
 1              PROFESSOR CAPRA:  Okay.  Let's stop
 2     there for a second.
 3              KATHRYN LEE BOYD:  Okay.
 4              PROFESSOR CAPRA:  And is there
 5     something that can be done about that, Ms.
 6     Kovach?
 7              LOREE KOVACH:  Yeah, so I think our
 8     understanding, and it sounds like we did have a
 9     misunderstanding there, was that if you selected
10     "repeatedly," you would just be entering the one
11     time.  So we can make an update so that if you
12     select "repeatedly," you can still enter multiple
13     instances, as many as you want I guess would
14     probably be the right number.
15              PROFESSOR CAPRA:  I think that sounds
16     right.  Unless anybody's got any objection to
17     that, let's move along with that.
18              Ms. Boyd, anything further?
19              KATHRYN LEE BOYD:  One more issue that
20     I guess --
21              ALLISON LEE:  Professor Capra, can I
22     just ask a clarifying question?  I guess --
23              PROFESSOR CAPRA:  Sure.
24              ALLISON LEE:  So if I'm understanding
25     correctly, I just -- I'm struggling to see how
```

Page 8

```
 1   adding this is -- Allowing someone to put in
 2   multiple "repeated -- "
 3            PROFESSOR CAPRA:  I guess the idea
 4   would be that there can be -- I guess what I took
 5   from that is that in separate years, there could
 6   be separate times in which they could be subject
 7   to repeated acts.  That's the thing.  And it
 8   seems to me that you would probably want that
 9   information, Ms. Lee.  Am I wrong?
10            ALLISON LEE:  Yes, we certainly would.
11   The question was how that is different than where
12   we originally started, which was to ask the
13   Respondent to identify the number of different
14   incidents, and then describe each one
15   differently.  And I fear that when we're getting
16   to a world where you can say, you know, I had
17   repeated incidents in 1998, repeated incidents in
18   1999, we're actually starting to go down the road
19   where we were originally concerned that we're
20   going to lose a lot of the details that were
21   originally intended when we set up the one, two,
22   three, four incident schema.
23            PROFESSOR CAPRA:  Okay.  So Ms. Boyd,
24   do you want to respond to that?
25            KATHRYN LEE BOYD:  Well, the fact of
```

```
 1   the matter is from actual victims' data, there
 2   are instances, multiple year instances of
 3   repeated, for example, attacks.  And that's even
 4   historically backed up.  There would be attacks
 5   on a village in 1999, and then not again until
 6   2001, of you know, just a repeated activity.  And
 7   the same goes with being arrested and detained,
 8   and then tortured during those arrests and
 9   detentions.  Some people were arrested, many
10   people were arrested more than once, right,
11   because these were targeted.  So if they were
12   arrested for a month-long, and then another time
13   for two-weeks long, and they had repeated
14   instances of torture daily, I mean, these are
15   just -- they should be able to say that, because
16   they, again, they can't parse out in how -- they
17   can't parse out how many times when it's just
18   over a long period of time with repeated
19   atrocities.  So we just have to (indiscernible)
20             PROFESSOR CAPRA:  I tend to think, Ms.
21   Lee, that -- I get your point that there's a line
22   to be drawn somewhere.  But it's also so that
23   "repeated" could be in separate instances.  So I
24   would suggest that the change be made to at least
25   allow that "repeated" to be done in separate
```

```
                                                      Page 10
 1   years, Ms. Kovach.
 2             ALLISON LEE:  And Loree, can you just
 3   explain how to look on the questionnaire, just if
 4   someone clicks "repeated" and then fills in 1998,
 5   would they then have to -- and then they would, I
 6   would guess, have to answer all of the following
 7   questions, all the, like, close-ended questions,
 8   and the narrative response for that 1998 repeated
 9   incident?  And then you would have to go through
10   the full, I guess, section for repeated 1999,
11   repeated --
12             LOREE KOVACH:  Yeah, they would just
13   click "add another," just like if they -- Let's
14   say they said three times, it would look the same
15   exact way.  It's just they'll have a sort of
16   open-ended number of options once they've
17   selected "repeatedly."
18             PROFESSOR CAPRA:  Right.
19             LOREE KOVACH:  So you know, with the
20   other ones, where we're limiting them two to
21   three, whatever, right, you've got to at least
22   enter two, no more than three based on that
23   selection.  So "repeatedly," it's sort of going
24   to be an open-ended.  You can enter one, or you
25   can enter many.  But otherwise, it operates
```

Page 11

 1   exactly the same.

 2              PROFESSOR CAPRA:  So that's the way it

 3   would work.  Is that -- Do you have a follow up,

 4   Ms. Lee?  Or are you good?

 5              ALLISON LEE:  No, that makes sense.

 6   Thank you, Professor.

 7              PROFESSOR CAPRA:  Okay.  Ms. Boyd,

 8   anything further?  I thought you had a couple.

 9              KATHRYN LEE BOYD:  One more.  And I

10   don't know if this is for certain phones or

11   computers, but in the write-in boxes, there

12   appears to be a character or a word limit.

13   Because people are not able to continue typing

14   when they want to continue.  It's cut off.  And

15   we have reported that to Epiq.  So I don't know

16   if there are word limits or character limits, but

17   I think that we would all agree if people want to

18   keep writing their narrative portion, they should

19   be able to do that.  So I don't know if, Loree,

20   you can address that.

21              LOREE KOVACH:  Yeah, so there is a

22   character limit.  We can't really set fields to

23   be completely open-ended, because then people can

24   like just fall asleep on their computer, and

25   enter a bunch of characters and cause problems.

```
                                            Page 12

1    But we can certainly increase the limit.  So --

2               PROFESSOR CAPRA:  What is it at now?

3               LOREE KOVACH:  I believe it's at 500

4    characters.  Well, I can double-check.  But we

5    can increase it to, I mean, whatever the group

6    thinks is appropriate.

7               PROFESSOR CAPRA:  Well, it is true that

8    you want more information, if they can provide

9    it.  But 500 sounds like -- that sounds like a

10   lot to me.  Is that --

11              KATHRYN LEE BOYD:  That's just

12   characters, though, Professor.

13              PROFESSOR CAPRA:  Yeah, okay.  All

14   right.

15              KATHRYN LEE BOYD:  Not words.

16              PROFESSOR CAPRA:  So do we have a --

17   It's hard to just come up with a limit, like,

18   right here (indiscernible)

19              KATHRYN LEE BOYD:  Can we double it,

20   Loree, without a big problem?

21              LOREE KOVACH:  Yeah, we can double it.

22              KATHRYN LEE BOYD:  Okay.  That would be

23   my suggestion.

24              PROFESSOR CAPRA:  Defense Counsel, do

25   you have any issues with that?
```

```
                                          Page 13
```

```
 1            ALLISON LEE:  No.  No.
 2            PROFESSOR CAPRA:  Hearing none
 3   (indiscernible) okay, let's go forward on that
 4   then, Ms. Kovach.  Let's expand it to 1,000.
 5            LOREE KOVACH:  Okay.
 6            PROFESSOR CAPRA:  Okay.  Anything
 7   further, Ms. Boyd, on this matter?
 8            KATHRYN LEE BOYD:  No.
 9            PROFESSOR CAPRA:  All right.  So then
10   let's move to the issue that's been discussed in
11   the email flurry recently, about I guess you
12   would say -- I guess I'm the one who started
13   calling them problematic responses, and
14   obviously, there's some difference of opinion of
15   what is problematic and what's not.  I do think
16   that there is some ground that's common about
17   some of the dates that put the person, for
18   example, out of the class entirely.  Is -- Let's
19   see, who's been involved in these email writings?
20   Are they here today?  I don't see --
21            Well, at any rate, so I guess what I'd
22   like -- I think I would like to start with the
23   Defense Counsel, and their -- Well, no.  Well,
24   Mr. Donaldson has put out a chart that has what I
25   thought to be pretty straightforward evidence of
```

Page 14

```
 1   inconsistencies, or if not inconsistencies, at
 2   least problematic in terms of, you know, your
 3   answer puts you out of the class or out of the
 4   particular time period.  But everybody's got
 5   comments about them.  So I think I'd like to
 6   start with the Defendants, and basically, their
 7   position on what is -- what should be done.  And
 8   then, we also have to talk about what's
 9   underlying this, about Class Counsel's claims
10   that they can do this by talking to these
11   particular applicants.
12             So I'd like to start with Defense
13   Counsel first.  Who wants to talk?
14             ALLISON LEE:  I'm happy to start,
15   Professor Capra.
16             PROFESSOR CAPRA:  Okay.  Go for it.
17             ALLISON LEE:  So I think there are a
18   couple of areas where Epiq identified areas for
19   follow-up, that the Plaintiffs and Defendants
20   agree.
21             PROFESSOR CAPRA:  Yeah.
22             ALLISON LEE:  I think a good example is
23   where someone put their birth date as today.
24   That's very clearly an error, and we should
25   follow up with them to make sure that they
```

Page 15

```
 1   understood that they should have put in their
 2   birthday rather than the date that they completed
 3   the questionnaire.
 4              I think there were a couple --
 5              PROFESSOR CAPRA:  Let me stop you for a
 6   minute, Ms. Lee.  I agree with that.  And then
 7   there was an exchange about the language that
 8   Epiq should send, and then there was, you know, a
 9   few little tweaks there.  And did you follow
10   that, Mr. Donaldson?  And then, at least I think
11   that we could send notices to those people in the
12   language that was approved by.  But at least
13   that's my thoughts.
14              Okay, I'll get to you, Ms. Boyd, in a
15   second.
16              So Ms. Lee, can you continue?
17              ALLISON LEE:  Sure.  And I'm just -- I
18   think, if it's helpful to point to specific
19   emails that people can pull up?  Because I know
20   that, like you said, Professor, there has been a
21   flurry of emails.
22              PROFESSOR CAPRA:  Yeah.
23              ALLISON LEE:  But I think in Ms. Lee-
24   Dasgupta's email from April 23rd, Class Counsel
25   had identified a couple of examples where Epiq
```

Page 16

1    should follow up.  So you know, birthdates after
2    the class period, those who indicate that they
3    left Sudan before the class period started, and
4    then those who completed on behalf of the
5    deceased class member, where the birth date is
6    after that date, or that date is before the class
7    period.  So you know, things where I think it's
8    rather easy for Epiq to programmatically, if
9    that's the right technical term, to identify
10   potential issues, and we don't have any issues
11   with that either.

12            I think, you know, a limiting factor is
13   what Epiq can do.  Obviously, you know, there's a
14   lot of questionnaires, and there's narrative
15   responses.  And so, you know, I think these are
16   all good examples of, you know, basic information
17   about an individual that Epiq can easily identify
18   that I think we're all on the same page about.
19            PROFESSOR CAPRA:  Well, I think --
20            ALLISON LEE:  I actually think we're
21   also on the same page about, although maybe Epiq
22   will correct me, about the form language that
23   will go out, although we may need to tweak the
24   language to be specific to whatever issue we're
25   trying to alert the Respondent to.  But I believe

```
                                              Page 17
 1   that we're generally in agreement about the form
 2   and substance of the email, setting aside that
 3   we'll have to figure out how to describe what we
 4   need people to go back and fix.
 5              PROFESSOR CAPRA:  Okay.  So I think
 6   let's carve that out, those ones that are that
 7   obvious.
 8              But Ms. Boyd, do you have a point?
 9              KATHRYN LEE BOYD:  Yes.  On the
10   birthday, we reported earlier, and I want to
11   revisit this, that that calendar is causing
12   troubles that are -- We're now halfway through,
13   and I think if we got rid of the calendar, and we
14   ask that because we're hearing about this, that's
15   why we're getting a today date for birthday.
16   Just let them write it in, you know, 01/01/1979.
17   And please, if we could just delete the calendar,
18   I think we're not going to have this problem
19   going forward as much as we have.
20              PROFESSOR CAPRA:  That's good.  That's
21   a good point.  But then the question is, what
22   about the people who had suffered the calendar
23   before?
24              KATHRYN LEE BOYD:  Well, we send this
25   out.  I'm not in disagreement with that, that we
```

Page 18

```
 1    send out this.
 2              PROFESSOR CAPRA:  Okay.
 3              KATHRYN LEE BOYD:  But I just want to
 4    try to cut this -- We're about halfway through
 5    this notice period.  We could avoid this big
 6    problem continuing if we got rid of that
 7    calendar.
 8              LOREE KOVACH:  The calendar --
 9              KATHRYN LEE BOYD:  It is really
10    confusing on a phone, I guess, but we just hear a
11    lot of (indiscernible)
12              PROFESSOR CAPRA:  Okay.
13              LOREE KOVACH:  The calendar is going to
14    be removed on the release on the 1st.
15              KATHRYN LEE BOYD:  Oh.
16              LOREE KOVACH:  Yeah.  It was in the
17    list.  It probably got buried in the list I just
18    gave you.
19              PROFESSOR CAPRA:  So that's like --
20    like, three days --
21              LOREE KOVACH:  But yeah, the calendar
22    is going to be removed, and they'll just be able
23    to type the date in instead of the calendar
24    (indiscernible)
25              PROFESSOR CAPRA:  Okay.  So let's deal
```

Page 19

```
 1   with these calendar-ish, I guess we can call them
 2   calendar-ish problems.
 3              Mr. Donaldson, can you carve that out,
 4   and get working on that?
 5              STEPHEN DONALDSON:  Yes.
 6              PROFESSOR CAPRA:  Okay.  I see your
 7   head going, but I can't tell -- You've got to say
 8   yes, too.  So --
 9              ALLISON LEE:  And Professor Capra,
10   obviously there's a lot of data to go through,
11   and to the extent that we identify other kind of
12   calendar-like issues, we'll raise them.  But we
13   hadn't to date kind of identified wide scale,
14   easy to identify issues that would kind of fall
15   within this program.
16              PROFESSOR CAPRA:  Right.  So I guess
17   the question I've been just, you know, tossing
18   through -- about is what happens if we don't send
19   -- I guess maybe this is the first question we
20   should ask you.  What happens if we don't send
21   anything out, and these problems go unaddressed?
22   And then, what is one to make of such an
23   application?  And I -- Of the significance of
24   such an application?
25              So the first thing is, you know, then
```

```
 1   does it even become part of your consideration of

 2   what this whole thing was about, about

 3   information necessary for a settlement?  Do you

 4   just -- Would one just throw out that

 5   information?  Would you just throw it out?  So if

 6   you would just throw it out, then obviously, we

 7   have to act and fix it.  Right?  Because

 8   otherwise, it's just been a waste.  So I guess

 9   that's what we're trying to avoid.

10              Okay.  So where are we then after that,

11   after cleaning up these kind of, you know, date-

12   like issues?  Ms. Lee?

13              ALLISON LEE:  I guess where we are now,

14   if we agree on these more calendar-like issues,

15   is the subject of the flurry of emails between

16   the parties.  And really, what caught our

17   attention and raised concern was the line in Ms.

18   Lee-Dasgupta's email that suggested that, you

19   know, Class Counsel wasn't only having

20   conversations about technical issues, like the

21   ones that we've been discussing on these calls,

22   but rather having more substantive conversations

23   with the Respondents about how they should be

24   answering the questionnaire, and what they

25   (indiscernible)
```

Page 21

```
 1              PROFESSOR CAPRA:  Hang on.  Can I stop
 2   you before -- can I stop you before you get to
 3   that?  Because there's one, I guess, preliminary
 4   issue before that.
 5              There was an email from which
 6   Defendants took the position that many of the
 7   asserted inconsistencies that Mr. Donaldson had
 8   kind of charted weren't inconsistencies at all.
 9   Do you want to address that?
10              ALLISON LEE:  Sure.  We're happy to.  I
11   think certain -- I think you're referring to
12   certain answers where -- that suggested that
13   people were injured such that, at a time such
14   that they would not be within the class period,
15   or by individuals who are not the government of
16   Sudan, and therefore don't qualify as part of
17   this class.
18              PROFESSOR CAPRA:  Right.  Or
19   individuals who say there was a harm, and then
20   when they ask what the harm is, they say none.
21   Stuff like that.
22              ALLISON LEE:  Right.  That's --
23              PROFESSOR CAPRA:  Why (indiscernible)
24   inconsistent or problematic?
25              ALLISON LEE:  And so I think there's a
```

```
                                            Page 22
 1   -- I would actually put the ones who say "none"
 2   in a different bucket, if I could address those
 3   second?
 4            PROFESSOR CAPRA:  Okay.
 5            ALLISON LEE:  The first ones, who
 6   generally kind of exclude themselves from the
 7   class period by their -- whatever answer they put
 8   in the questionnaire, I think our position was
 9   that those are probably correct answers, and we
10   had actually included those potential answers to
11   make sure that people really understood whether
12   or not they were in the class.  And so when
13   they're -- And you know, obviously we've
14   mentioned multiple times, people are answering
15   these under penalty of perjury, but there's
16   always room for misunderstanding about whether or
17   not you qualify for the class.  And so having all
18   of these questions, and having all of these
19   options, which when answered in one way would
20   mean that you are part of the class and when
21   answered in another way, based on the options
22   we've all agreed to give the Class Member -- or
23   the Respondents, that they're not part of the
24   class, it's actually a questionnaire functioning
25   well.
```

```
                                            Page 23
 1              PROFESSOR CAPRA:  Yeah, I disagree with
 2     that.
 3              ALLISON LEE:  But I think that
 4     actually, that was our position.  That was our
 5     concern.  But we actually, I think in the email
 6     correspondence, we agreed we should -- we can go
 7     ahead and follow up with those individuals as
 8     well, and (indiscernible)
 9              PROFESSOR CAPRA:  Okay.  Actually, I
10     didn't catch that part.
11              ALLISON LEE:  Yeah.
12              PROFESSOR CAPRA:  But now that
13     (indiscernible) we can drop that.  Okay.
14              ALLISON LEE:  Yes.  Okay.
15              PROFESSOR CAPRA:  Because I think that
16     what Mr. Donaldson brought up, they do show some
17     -- I don't know about -- well, they do show
18     inconsistencies, and they do show that perhaps
19     the complicated nature of the questionnaire got
20     the better of these people, and I think that they
21     should be contacted as such.
22              KATHRYN LEE BOYD:  Yeah.
23              PROFESSOR CAPRA:  So I'm going to stay
24     with Mr. Donaldson's chart.  That's what I think
25     we should pursue.
```

```
 1              So now I'll let you to go, Ms. Lee, to
 2    your point about, this last point about the
 3    question --
 4              ALLISON LEE:  The "none."
 5              PROFESSOR CAPRA:  Yeah.  And then we'll
 6    get to Ms. Boyd.  Yeah.
 7              ALLISON LEE:  Oh, so the second bucket
 8    of individuals who answered "none" in the
 9    narrative (indiscernible)
10              PROFESSOR CAPRA:  Yeah.  Oh, sorry.
11    Yeah?
12              ALLISON LEE:  I think we would include
13    that.  And Epiq had included that, I believe, in
14    their chart of, you know, issues to follow up
15    with.  But it's kind of, as you noticed, it is
16    inconsistent with their answers to the closed-end
17    answer.
18              PROFESSOR CAPRA:  Agreed.
19              ALLISON LEE:  So we think it does make
20    sense to answer it.  It was a mandatory question
21    that the judge said everyone needed to answer, so
22    we think it makes sense to follow up.
23              PROFESSOR CAPRA:  Yep, agreed.  Okay.
24    So again, I think are we now at where I
25    interrupted you on, about the context?
```

Page 25

```
 1              ALLISON LEE:  I think Ms. Boyd wanted
 2    to say something before we move on to --
 3              PROFESSOR CAPRA:  Oh, you want
 4    something on this one, Boyd?  Go ahead, Ms. Boyd.
 5              KATHRYN LEE BOYD:  I want to address
 6    the two buckets, because we see them a little bit
 7    differently.
 8              The first bucket, the class is --
 9    definitionally consists of those people who lived
10    in Sudan or South Sudan a certain period of time.
11    Because an injury occurs outside of the class
12    period doesn't mean they're out of the class.  I
13    mean, let's just get that clear.  I mean, we know
14    --
15              PROFESSOR CAPRA:  I agree with that.  I
16    agree with that.
17              KATHRYN LEE BOYD:  Okay.  All right.
18              PROFESSOR CAPRA:  And I think that --
19    But nonetheless --
20              KATHRYN LEE BOYD:  So they're not
21    inconsistent.  In other words, it just would not
22    be a compensable injury.  It doesn't mean they're
23    indicating, as Ms. Lee said, that they are not in
24    the class.  Okay?  So they checked the box --
25              PROFESSOR CAPRA:  Right.  But wouldn't
```

Page 26

```
 1   you agree that that is something that should be
 2   followed up on?  Right?  It just seems like
 3   something that --
 4            KATHRYN LEE BOYD:  No, I don't.
 5   Because we know that sanctions were imposed
 6   because there were atrocities occurring before
 7   the class period.  That's why they went into
 8   effect.  And we know that the injuries even
 9   continued after, given all of the apparatus and
10   command and control that was put in place by
11   BNP's funding.  So you know, no, I don't think
12   so.  Because, Professor, these are atrocity
13   victims.  And going back into this kind of tell
14   us again when your injuries happened, it's just -
15   - I don't think it's worth it, number one,
16   because I don't think they're inconsistent.
17   Let's put it that way.  And I think that the harm
18   is more than the good.  So that's my first
19   bucket.
20            The second bucket is there's no
21   inconsistency, and here is why.  When you check
22   the box that you were raped, the first box, that
23   box doesn't require writing.  Now, most men are
24   filling out these.  We have double the amount of
25   men than women.  Women don't want to talk about
```

Page 27

1    their rapes either, but I will tell you men

2    really don't want to talk about their rapes.  So

3    the second time they go to check the box, it's

4    required that you write, and they're like, ah,

5    I'm out, and so they uncheck it.

6              Now, we explained this early on, and we

7    went through so many fights and upsetedness about

8    this.  Writing down atrocities, particularly of a

9    sexual nature, is -- without counsel, without

10   help of a professional trauma -- is a lot.  And

11   so -- and it's more than we should be asking of

12   these people.

13             So again, going back to them on these

14   substantive types of issues, the first point is

15   it's not technically inconsistent.  Checking

16   boxes and writing are not consistent, you know?

17   They're not the same, apples and oranges.  And I

18   just, as a protector of the class, ask that we

19   don't do this.  This is a lot.  And the

20   upsetedness, the pain and suffering that people

21   suffered, why they have to do this, the tears,

22   the panic attacks and all of that, we're hearing

23   that because of Class Counsel lines.  So no, I

24   think that's just -- we just can't do that.  The

25   juice is not worth the squeeze, and it's not

Page 28

1   truly inconsistent, and so -- And it's, I think
2   at this point, getting to be cruel.
3             We did this questionnaire.  We knew it
4   wasn't perfect.  The questionnaire says, "Do the
5   best you can."  "We know it's hard, do the best
6   you can."  They're doing the best they can.
7             PROFESSOR CAPRA:  Right.
8             KATHRYN LEE BOYD:  We never thought
9   they would be able to do better, especially
10  without any help.  So I think let's not do that.
11            PROFESSOR CAPRA:  So -- I guess there
12  is ultimately, since I pushed the Defendants to
13  agree on the chart, and the Plaintiffs don't even
14  want to have -- I mean, that was my instinct
15  coming in, it was just leave it at this kind of
16  date-ish stuff, and --
17            But nonetheless, if that's so, am I
18  right, Ms. Lee, that you would agree that you're
19  actually good with just leaving it at these date-
20  ish, as it was, you know, kind of issues, and not
21  to get into any of this?  I kind of forced you to
22  concede, and the Plaintiffs don't even want this.
23  So if nobody wants it, why would I care?  Go
24  ahead, Ms. Lee.
25            ALLISON LEE:  I will say that you

Page 29

```
 1   forced us into it, Professor Capra.  But if Class
 2   Counsel doesn't see the need, we had -- that was
 3   our original position as well.  And so I think we
 4   can leave it to the date-ish people.
 5           PROFESSOR CAPRA:  Okay.
 6           ALLISON LEE:  I just wanted to make
 7   sure I understood where the "none" piece was
 8   coming in, and maybe Loree and Stephen can
 9   actually explain.  I thought the "none" was
10   coming in, like, in the narrative response -- or
11   where they click
12           "rape" in the gatekeeping questions,
13   where it kind of tells the questionnaire what
14   pages to populate, and which pages don't need to
15   be populated.  And then so they click "rape" at
16   "Please tell us the different kinds of categories
17   of harm,"  and then when you get to the rape
18   page, they click "no rape."
19           PROFESSOR CAPRA:  None -- Is that right
20   (indiscernible)
21           ALLISON LEE:  Is that right?
22           KATHRYN LEE BOYD:  Yes.  That's
23   correct.  Because you have to write on that page,
24   mandatory.  That's right.
25           ALLISON LEE:  Right.  Well, so I guess
```

```
                                            Page 30
 1   the question is, the judge said it was mandatory.
 2   So how is it not inconsistent to say, yes, I
 3   suffered rape on the gatekeeping questions, but
 4   then choose to say --
 5              PROFESSOR CAPRA:  Answer "none."
 6              ALLISON LEE:  Yeah.
 7              PROFESSOR CAPRA:  And I guess, if I was
 8   to make -- What Ms. Boyd is saying is it's not
 9   really inconsistent because of the nature of the
10   report.  And I guess, you know, you'll just have
11   to take all of that into account in assessing the
12   quality of that information, I guess.
13              KATHRYN LEE BOYD:  That's right.
14              PROFESSOR CAPRA:  I'm not pushing you
15   to do something you don't want to do.  So, all
16   right.
17              KATHRYN LEE BOYD:  That's all right.
18   We have to take the Plaintiffs as we find them.
19              PROFESSOR CAPRA:  Right.
20              KATHRYN LEE BOYD:  They are rape
21   victims and atrocity victims.
22              PROFESSOR CAPRA:  All right.  So Ms.
23   Lee then, let's get to --
24              So then, Mr. Donaldson, I think that
25   whatever notice goes out goes out to the issues
```

```
                                              Page 31
 1   with respect to the date, which I do think are
 2   important, especially given the difficulties of
 3   the calendar, so that we can make sure that
 4   people do seem to get messed up on the calendar.
 5   I think that's really important.
 6              ALLISON LEE:  Professor Capra, may I
 7   suggest, just because we've been saying "calendar
 8   issues -- "
 9              PROFESSOR CAPRA:  I know.  I know.
10              ALLISON LEE:  But if Epiq could, after
11   this, kind of identify which exactly are the ones
12   they think are the calendar ones, just to make
13   sure we're all on the same page, before anything
14   goes out?
15              PROFESSOR CAPRA:  Absolutely.
16              ALLISON LEE:  That might be beneficial
17   for everybody.
18              PROFESSOR CAPRA:  I totally agree with
19   that.
20              LOREE KOVACH:  Yeah, we'll circulate
21   the final list, just to make sure everybody's in
22   agreement.
23              PROFESSOR CAPRA:  Great.  Okay.
24              ALLISON LEE:  Thank you.
25              PROFESSOR CAPRA:  Okay.  Ms. Lee, then
```

Page 32

```
 1   let's go up to the final issue here.
 2             ALLISON LEE:  Yeah.  Thank you,
 3   Professor Capra.
 4             So as I was mentioning before, and as
 5   we've been kind of discussing by emails, we
 6   became concerned that there were conversations
 7   that Class Counsel were having beyond kind of the
 8   technical issues that we've been discussing on
 9   these calls to more substantive discussions about
10   how or what -- and how someone should be
11   answering a question, the questionnaire, what
12   they should be saying in response to these
13   questions.  And as we put in our email
14   correspondence, we think that kind of substantive
15   communication with the Respondents is improper,
16   and contrary to the process that the Court set
17   up.  I think the Court repeatedly was quite clear
18   that this was going to be an impartial process
19   that was not kind of guided by Class Counsel.  He
20   even distinguished the questionnaire responses
21   from, you know, interrogatory responses that are,
22   you know, prepared with the assistance of
23   counsel.  He said the questionnaire responses are
24   not that, they should be prepared by the
25   Respondents.
```

```
                                              Page 33

 1          And so the question is, we obviously
 2   don't actually know what kinds of communications
 3   that Class Counsel is having with these -- with
 4   the Respondents.  We just read the, you know, the
 5   email, and it raised the concern.  And so, you
 6   know, that is why we are concerned.  But we would
 7   appreciate additional information from Class
 8   Counsel about are they actually having these
 9   kinds of communications that kind of raise some
10   concerns with us?  Or are we just
11   misunderstanding the email, and things are
12   actually all clear?
13          PROFESSOR CAPRA:  Would we agree,
14   before I get to you, Ms. Boyd, would we agree
15   that a line could be drawn between answering
16   questions about how to fill in the questionnaire
17   versus answering questions about what answers to
18   put in the questionnaire?  I mean, isn't that --
19   Is that an appropriate line?  Would you agree
20   with that, Ms. Lee?
21          ALLISON LEE:  I think, yeah, if I'm
22   understanding what the first bucket is, which is
23   how do I navigate from page to page, do I have to
24   click this one, do I have to answer -- how do I
25   use this very complicated questionnaire that
```

Page 34

```
 1  we've set up --
 2          PROFESSOR CAPRA:  Yeah. Like, you --
 3          ALLISON LEE:  -- I think that's totally
 4  fine, and --
 5          PROFESSOR CAPRA:  You've got these
 6  windows, and it says, you know, injury -- attack
 7  to a home, and attack on the village, and then I
 8  might wonder, well, you know, is what happened to
 9  me, is it an attack on the village or is it an
10  attack on the home?  I mean, I think that's a
11  question about how to designate information.  But
12  the question about, then, how to actually fill in
13  an answer would be something that the Court would
14  definitely be concerned about.  So I guess that's
15  the question.
16          Mr. Berke first, since you're on --
17  We're talking about the Defendant's side here,
18  and I want to get this clear, so go ahead.
19          BARRY BERKE:  And I'm sorry, Professor,
20  I didn't mean to interrupt.
21          I just wanted to clarify in response to
22  your question, if it is an actual recipient who's
23  filling out the questionnaire, and proactively
24  asks questions, that's one issue.  It's very
25  different, of course, in reaching out directly to
```

Page 35

```
 1    anyone who has started to, or is attempting to
 2    fill out a questionnaire.  Obviously, you know, I
 3    could say a number of different things.  But for
 4    example, the Business and Commercial Litigation
 5    in Federal Courts chapter that was cited by Ms.
 6    Boyd is very clear that during the opt-in, opt-
 7    out period, Class Counsel cannot do anything that
 8    could be considered to be solicitation.  They
 9    refer to anti-solicitation.  And so it has to be
10    very careful, and nothing can be done to
11    proactively reach out to anyone to suggest they
12    should complete a questionnaire, or have any such
13    communications.
14            So I do think that it's different if
15    somebody proactively (indiscernible)
16            PROFESSOR CAPRA:  But these people, by
17    definition, are ones who have already filled in
18    the questionnaire.  Right?  (indiscernible)
19    right?
20            BARRY BERKE:  Well, it depends what the
21    communications are.  Certainly someone who is
22    filling it out and has questions, that is
23    different than proactively reaching out to
24    somebody.
25            PROFESSOR CAPRA:  Well, the window that
```

Page 36

```
 1   we're talking about is people who have questions
 2   -- who have filled it completely out, and the
 3   answers are somehow, at least in somebody's
 4   judgment, problematic or inconsistent.  There's
 5   obviously no issues of solicitation there because
 6   they've already completed the questionnaire.
 7            BARRY BERKE:  But I think once you have
 8   Class Counsel speaking directly to a member who
 9   still has a decision to opt in or opt out, that
10   raises questions.  We think Epiq should be doing
11   it.  They are the neutrals.  The judge was very
12   clear, he wanted this to be independent and
13   individual.  Neither the Plaintiffs or the
14   Defense should be in control of the process.
15            So I do think there is a difference in
16   terms of who is having the communications.  And I
17   think it's worked out quite well, I think in
18   fairness to everybody, that to make sure that
19   neither Plaintiffs or Defense can have an impact
20   on the answers, it's proper for Epiq to do what
21   it's been doing to clarify.
22            PROFESSOR CAPRA:  Okay.  Ms. Boyd,
23   thank you for your patience.  Please go ahead.
24            CY SMITH:  So I'll actually pick this
25   up, Professor Capra --
```

Page 37

```
 1            KATHRYN LEE BOYD:  I'm not patient.
 2   I'm not that patient.  I'm not going to speak.
 3            PROFESSOR CAPRA:  Oh, you're not?
 4   Okay.
 5            KATHRYN LEE BOYD:  I'm really not very
 6   patient, no.  But thank you.  Thank you.
 7            PROFESSOR CAPRA:  How do you like that?
 8   Okay.  All right.
 9            CY SMITH:  -- on behalf of Class
10   Counsel.
11            So let me just sort of start in terms
12   of the background, which you're obviously more
13   familiar with than I am, but I've spent a fair
14   amount of time getting up to speed on how we got
15   to this point.  My understanding is that from the
16   outset, there were a lot of concerns expressed
17   about using this questionnaire process with
18   individuals who, as Ms. Boyd pointed out, are the
19   victims of genocide, atrocities, and so on.  And
20   a lot of the problems that we see today were
21   forecast, right, that this questionnaire process,
22   you know, could be fraught with difficulties,
23   especially with a mostly illiterate class, or
24   largely illiterate class, and that a lot of the
25   things that we see now, the problematic
```

Page 38

1   questionnaire responses, the mismatches and so

2   on, you know, are chronicles of a problem

3   foretold.

4            So that's sort of how I got here --

5            PROFESSOR CAPRA:  Well, I've got to

6   stop you.  I don't know what that actually all

7   means.  Because are you saying that this was a

8   misguided effort?

9            CY SMITH:  No, not misguided.  But the

10  problems that we see now, some of those were

11  anticipated.  So now we have this problem, we

12  have the mismatched questionnaires, and as you

13  pointed out just a moment ago, these are not

14  people who are outside of class.  They're not

15  talking about, you know, whether they should join

16  a class.  We all know there's no such thing as an

17  opt-in class under Rule 23.  They are members of

18  the class who have started or begun a

19  questionnaire, and they're entitled to

20  information about that process.  And the

21  Defendants were the ones who advocated very

22  strongly for, you know, a lot of the tools that

23  brought us here, and now want to micromanage our

24  efforts to make sure that the situation is

25  handled appropriately, and that we're able to

```
                                                     Page 39
 1    deal effectively with members of a certified
 2    class.  It's not people who are thinking about
 3    joining the class, they're already in the
 4    certified class.
 5              So that's as background.  Another piece
 6    of background that you're probably familiar with,
 7    but just maybe bears repeating, is that in the
 8    nine years of this litigation, Class Counsel have
 9    developed contact information, signed retention
10    agreements, you know, filed individual cases in
11    the hundreds.  And in terms of the numbers of
12    class members that have attorney-client
13    relationship, or not attorney-client
14    relationships, have actual retention agreements,
15    those are in the thousands.  And a lot of that
16    information was used, as I understand it, for
17    direct notice under the notice plan after the
18    class was certified.
19              So it's important to remember there's
20    hundreds of people who have filed cases, and
21    thousands of people who had pre-existing
22    attorney-client relationships here.  And so
23    that's reflected in part in the class notice.  It
24    has the numbers of both the Hecht Partners firm
25    and the Hausfeld firm.  Right?
```

```
                                              Page 40
 1              PROFESSOR CAPRA:  Yeah.
 2              CY SMITH:  And so it was anticipated,
 3      and Judge Hellerstein, I've seen the transcript,
 4      says, I recognize that class members are going to
 5      ask questions.  They have a right to ask
 6      questions, to be in contact with Class Counsel.
 7      And there have been -- I don't know the exact
 8      number, but it's well over a thousand calls like
 9      that, some of them going in both directions.
10      (indiscernible)
11              PROFESSOR CAPRA:  wait, wait. What do
12      you mean by some of them going in both
13      directions?
14              CY SMITH:  Well, there are calls in,
15      there might be a call out in response to that.
16              PROFESSOR CAPRA:  In response to the
17      call, yeah.  But --
18              CY SMITH:  And then (indiscernible)
19              PROFESSOR CAPRA:  -- this would be, if
20      I may -- The proposition that was addressed in
21      the email was that Class Counsel would reach out
22      to these people, instead of Epiq doing so, to get
23      them to elaborate on these possible problematic
24      responses.  That's a little bit different from
25      having them call in and say they've got a
```

Page 41

1    problem.  Would you not agree?

2              CY SMITH:  It is different, but it has

3    to be judged against the background of an

4    attorney-client relationship that exists between

5    Class Counsel and their clients.

6              One of the cases that was cited by the

7    Defense Counsel in this email exchange was a case

8    called Dodona v. Goldman Sachs from the Southern

9    District in 2014.

10             PROFESSOR CAPRA:  Yeah.

11             CY SMITH:  And that case says, in a

12   line that was not, I think, quoted by the

13   Defendants, it says, "The majority of courts,

14   including at least one court in this district,

15   have found that class certification itself

16   creates an attorney-client relationship, at least

17   for the limited purpose of aiding prospective

18   class members in deciding whether or not to join

19   in the class action."  There is an attorney-

20   client relationship that absolutely does exist

21   between Class Counsel appointed by the Court to

22   represent the class, and the members of that

23   class.  And so that -- We, or Class Counsel, has

24   an absolute undivided loyalty to the class, and

25   has to be able to respond to requests for

```
                                        Page 42
 1    information, and to try and ameliorate this
 2    problem.
 3             I mean, the amount of attention that's
 4    been devoted to these mismatched or problematic
 5    questionnaire answers tells us there is a problem
 6    here, and it has to be addressed.
 7             I see Mr. Hausfeld has raised his hand.
 8             PROFESSOR CAPRA:  Mr. Hausfeld --
 9    You're muted, Mr. Hausfeld.
10             MICHAEL HAUSFELD:  I'm still learning
11    technology, Professor.
12             PROFESSOR CAPRA:  No, you're good now.
13             MICHAEL HAUSFELD:  Okay.  Thank you.
14             I'd like to directly address the
15    concern that Ms. Lee raised.  That's a concern
16    that you pointed out, the difference between
17    explaining the process and providing an answer.
18             PROFESSOR CAPRA:  Yeah.  Go ahead.
19             MICHAEL HAUSFELD:  As a representative
20    of the class, and as duty-bound by the Court's
21    orders, no Class Counsel, or anyone associated
22    with Class Counsel has responded to any class
23    member, or anyone who filled out a questionnaire,
24    as to what answer to put in that questionnaire.
25    That has not happened, or we would be violating
```

```
                                          Page 43
```

 1  our duties.

 2          PROFESSOR CAPRA:  Right.

 3          MICHAEL HAUSFELD:  This is nothing more

 4  than a fishing expedition, you know, totally

 5  unwarranted.

 6          What we have a duty to do is if we get

 7  a call, or there are inconsistent answers, or

 8  problematic answers, to explain to the individual

 9  why that answer is problematic or inconsistent,

10  and what the process is for them to answer it,

11  not us.  That's never happened.

12          PROFESSOR CAPRA:  So first of all, Ms.

13  Lee-Dasgupta, is your arm okay?

14          MS. LEE-DASGUPTA:  No.  I have to have

15  surgery on my shoulder.  But I think you for

16  that, the concern.

17          PROFESSOR CAPRA:  Ah.  Okay, okay.

18          So secondly, so how can that be -- Is

19  that possible, to -- Those contacts that you --

20  So you plan to make contact to these people who

21  have, I guess speaking broadly, problematic

22  questionnaires, and seek out some resolution to

23  that?  That's actually the plan?

24          MICHAEL HAUSFELD:  Yes.

25          PROFESSOR CAPRA:  Well, I mean, then is

Page 44

```
 1   there a way to document to whom you are reaching

 2   out?

 3              MICHAEL HAUSFELD:  I guess --

 4              PROFESSOR CAPRA:  Here's why I think

 5   that might be something that might be useful.

 6   Because then, if that is documented in some way,

 7   like just the person to whom you reached out, not

 8   to discuss what was actually said, but that those

 9   people were contacted --

10              KATHRYN LEE BOYD:  I think there is

11   some --

12              PROFESSOR CAPRA:  -- then everybody,

13   Defendants included, can properly evaluate the

14   outcome.

15              What do you think on that?

16              MICHAEL HAUSFELD:  That's a problem,

17   Professor.  Because as Mr. Berke commented, the

18   issue dealing with some of these communications

19   that others engage in, that we are not, deals

20   with solicitation.  There is no solicitation

21   here.

22              PROFESSOR CAPRA:  I don't -- Yeah,

23   that's completely off the table.  My question is,

24   is there a way to -- Okay.

25              MICHAEL HAUSFELD:  Yeah.  And that's
```

Page 45

1    what I'm getting to.  When it comes to anyone
2    else in the class that may have a question about,
3    you know, the process, or we perceive there is a
4    question, you know, about the process, we should
5    have an unimpaired right to speak to them, as
6    their counsel, to assist --
7                PROFESSOR CAPRA:  Agreed.  But what I -
8    -
9                MICHAEL HAUSFELD:  -- to assist in
10   getting the bedrock information that the Court
11   has suggested is necessary for the settlement,
12   you know, process.
13               PROFESSOR CAPRA:  But Mr. Hausfeld,
14   just the issue, you know, of reaching out, if
15   that could be documented, not what the actual
16   content of the discussion was, but that these
17   people were contacted by counsel, well, we would
18   get that, you know, everybody would get that
19   information if Epiq were doing it.  Okay?  If
20   Epiq sent out these notices to everybody, then
21   everybody would have the information about -- and
22   then you could see what the first answer was, and
23   then how it got corrected, and then you could
24   properly assess that for settlement purposes.  So
25   why wouldn't the same information that Epiq could

Page 46

1    provide be something that you should not provide?

2              MICHAEL HAUSFELD:  Because Epiq does

3    not have a client-attorney relationship with

4    these individuals.

5              PROFESSOR CAPRA:  Right.  But this

6    would not be disclosing the actual communications

7    between the client and the lawyer.  It would just

8    be disclosing that there was a contact.

9              MICHAEL HAUSFELD:  But if, as --

10              PROFESSOR CAPRA:  I mean, the Second

11    Circuit (indiscernible) what the privilege

12    protects is actually, the actual communications

13    about the legal problem, not the fact that

14    anybody sought a lawyer.

15              MICHAEL HAUSFELD:  I think --

16              PROFESSOR CAPRA:  The case is in re

17    Chargel.  I know it quite well.

18              MICHAEL HAUSFELD:  I don't see the

19    difference if someone had one answer one time,

20    and then whether they spoke to counsel and better

21    understood the process, and thought better of the

22    answer that they gave and they put their answer

23    down, that the Defendant can then say, hey, look,

24    you had one answer, you got another answer, I

25    throw out your answer.  They don't need to know

Page 47

1    that we spoke to them.

2                We do not, and would never tell a class

3    member, or anyone filling out a questionnaire,

4    what to answer.

5                PROFESSOR CAPRA:  Agreed.  I agree with

6    that.

7                MICHAEL HAUSFELD:  And therefore, there

8    is nothing to be gained by us informing the

9    Defendants (indiscernible)

10               PROFESSOR CAPRA:  So since you would

11   never do that, then it doesn't make any

12   difference that you -- that there was this

13   contact, is your point?

14               MICHAEL HAUSFELD:  We can make a record

15   of it internally, and we could keep it, but not

16   share it with the Defendant.

17               PROFESSOR CAPRA:  Hm.  I see.  Mister -

18   - should I go to Mr. Berke for a response?  I'm

19   sorry, I'll pop to Ms. Boyd next.

20               BARRY BERKE:  Well, thank you

21   (indiscernible)

22               PROFESSOR CAPRA:  Sorry, Mr. Berke,

23   let's have Mr. Boyd speak, and then

24   (indiscernible)

25               KATHRYN LEE BOYD:  One question, point

```
                                         Page 48
 1   of information.  So already, my understanding,
 2   maybe I'm wrong, is that Epiq is sending out a
 3   certain amount of notices about the date issues.
 4   Is that correct?
 5              PROFESSOR CAPRA:  Just those.  Just
 6   those, but not anything else that they might
 7   think is problematic.
 8              KATHRYN LEE BOYD:  All right, just
 9   those.  Okay.  And so there's this other set of
10   maybe problematic, maybe not problematic.  We
11   don't know.
12              PROFESSOR CAPRA:  Right.
13              KATHRYN LEE BOYD:  We don't know until,
14   you know, there's a follow up, I guess, if
15   someone can talk to them, if it's even
16   inconsistent.  Right?
17              PROFESSOR CAPRA:  Right.
18              KATHRYN LEE BOYD:  So it's that bucket
19   we're really concerned about, and they want to
20   know who we decide to call.  But why don't --
21   Isn't there already a universe identified, that
22   Stephen and Loree have already given us?  Isn't
23   there already identified buckets, that we just
24   don't know if they're inconsistent or not, and is
25   that -- Why do we have to now document -- That's
```

```
                                          Page 49
 1    the bucket that we would be working with.  Right?
 2              PROFESSOR CAPRA:  Yeah, I get it.  I
 3    get that point.
 4              ALLISON LEE:  Professor --
 5              KATHRYN LEE BOYD:  We do we have to
 6    document it?  That's what we're working with.
 7    Some people we'll get through, some people we
 8    won't get through, I guess, you know?
 9              PROFESSOR CAPRA:  In a way, it could --
10    I mean, thinking of the other side of this, it
11    may be that you're -- that that could give a
12    thought to what your choices are.
13              KATHRYN LEE BOYD:  That's the universe.
14    We work from that universe that Stephen gave us.
15              PROFESSOR CAPRA:  Mr. Berke?
16              BARRY BERKE:  Yeah, no, thank you,
17    Professor Capra.
18              So listen, I just -- Again, we also
19    have been reviewing the transcripts.  I don't
20    think this is consistent with what, you know,
21    Judge Hellerstein had in mind.  He was very clear
22    at both the October 29th hearing and the November
23    18th hearing that he wanted these to be the
24    individuals' answers, he wanted it to be
25    supervised by the Court.  He was resisting
```

Page 50

```
 1   various roles by the lawyers, and was very clear.
 2   He has very clear language in what he said.
 3           So I think if we're going to have now a
 4   process that allows Class Counsel to read the
 5   questionnaires, and then proactively reach out to
 6   the Respondents to discuss their answers, because
 7   there is some substantive discussion about the
 8   answers, that's just the nature of what they're
 9   proposing, I do think that's inconsistent with
10   what the judge has raised.  And so I'm troubled
11   by that, and I don't think it's necessary.  And
12   also, to do it without any transparency, I think,
13   you know, furthers our concerns about what might
14   happen in this process.
15           I mean, it touches on other things as
16   well, but I think just for purpose of this
17   process, the judge was very clear.  I think
18   there's a reason why it hasn't happened yet, and
19   I think there's an easier way to proactively
20   reach out to them where it's not Plaintiffs, but
21   just Epiq doing it.  And then we can get clarity
22   on the answer, we can have transparency, and we
23   know that it's entirely objective.  Whether
24   conscious or unconscious, they're just going to
25   try to get the best answer, without bringing any
```

Page 51

```
1   knowledge of the class or the case, or being an
2   advocate.
3           PROFESSOR CAPRA:  Yeah, but your point
4   about correctively reaching out for these
5   questions that are not, as we've called them,
6   calendar-ish, you guys don't want to do that
7   anyway.  So I'm not sure -- I mean, it seems to
8   me that what your objection is not that, well,
9   let's let Epiq do it, but let's let nobody do it.
10  Really, that's what you're saying.
11          BARRY BERKE:  No, but what I'm saying
12  is that there's a process where there's a
13  question that's not being answered or the like,
14  there's a process of doing it that's not Class
15  Plaintiffs doing it, if there's a clarifying
16  question.
17          My concern is we have the
18  questionnaires, they are what they are.  I think
19  the judge clearly envisioned the lawyers were not
20  going to do it.  He said these are done by
21  individuals, under oath.  That's a very important
22  process supervised by the Court.  And I think
23  allowing Plaintiffs to proactively reach out to
24  people who have filled out a questionnaire is
25  inconsistent with that, and I don't think that's
```

```
                                            Page 52
 1   a proper way of proceeding, with respect to
 2   everyone, without (indiscernible)
 3           PROFESSOR CAPRA:  Well, to clarify, the
 4   dispute is over proactive -- You used the word
 5   proactive quite a bit, so it's the proactive
 6   aspect that you've got a problem with.  You don't
 7   have a problem with somebody calling Class
 8   Counsel and saying, I have a problem, I don't
 9   understand how question number 27 relates to
10   question number 28.  You have no problem with
11   that.
12           BARRY BERKE:  If somebody reaches out
13   to the Class with a question and says, I'm
14   proactively reaching out, I have a question, and
15   they just give instructions about how to answer
16   it, without talking about the substance, that's
17   fine.  That's different, though, than them, for
18   example, going out in the community, and
19   encouraging people to fill out questionnaires,
20   telling people to opt in.  That would be
21   improper.  And it's different than them waiting,
22   than them proactively reaching out to someone
23   who's filled out a questionnaire, to discuss
24   different answers or changing answers.  We don't
25   think that's proper.
```

Page 53

 1            PROFESSOR CAPRA:  All right.  So here's
 2    what I would suggest.  I'm going to consult the
 3    Court on this, and I have my own opinion about
 4    what's correct.  But what we do have is agreement
 5    on at least the basic concept that there will be
 6    notices given to people who have, broadly
 7    speaking, calendar problems, that to be massaged
 8    a bit with subsequent emails over the next couple
 9    days.  And I'd like Mr. Donaldson to kind of take
10    a crack at that, you know, what you think the
11    date issues are, and circulate it to the parties.
12    And we can have some agreement about that, and we
13    can send those notices out forthwith, once the
14    language is agreed upon.
15            As to the other, I guess you would call
16    them more substantive inconsistencies, parties
17    seem to be agreed that there's no reason to
18    follow up on those, so we're not going to follow
19    up on them.  But then the final question is,
20    should Class Counsel be allowed to proactively
21    contact those who have filled in such
22    questionnaires, and perhaps -- I'd say
23    proactively contact them.  Let's put it that way.
24    And I would -- I'm going to, I guess you would
25    say that Class Counsel should not do that now for

Page 54

```
 1    a while.  I want to work with the Court on this,
 2    to figure this out.  But don't do it until we
 3    meet, at least until we meet next week, and I'll
 4    have some greater guidance from the Court about
 5    that one.
 6              MICHAEL HAUSFELD:  And Professor, when
 7    you raise this issue with the Court, I want to
 8    follow through on Mr. Berke's outcome, that he
 9    wants the best answers to the questionnaires.
10    You're not going to get the best answers if
11    people are confused, or they didn't understand
12    it, or they couldn't figure out, you know, how to
13    navigate the questionnaire itself.
14              What Mr. Berke is suggesting is
15    actually obstructing the ability to get the
16    bedrock information for settlement purposes that
17    the Court initially conceived would be available
18    from those that fully understood the
19    questionnaires, and answered them in their own
20    words.
21              PROFESSOR CAPRA:  Right.  Yeah.  And
22    obviously, I need not state that counsel cannot
23    help them actually, substantively with the
24    answers.  I mean, we all agree with that.  Yes,
25    Mr. Hausfeld.  But I mean, the question in my
```

```
                                         Page 55
 1   mind is, you know, if it is a proactive contact,
 2   you know, can the Court order that it be
 3   documented, at least that this contact was made?
 4   And I'm going to address that with the judge.
 5            Ms. Boyd?
 6            KATHRYN LEE BOYD:  Also, just a point
 7   to circle back to what Mr. Smith said, 2,500
 8   people have retention agreements with us.  They
 9   are true clients.  They've been clients for many,
10   many years.  And it's a little weird, just being
11   told you're not able to contact a client, speak
12   to a client about certain things.  So just remind
13   the judge that these are -- And we believe the
14   Second Circuit law is very clear, they are --
15   anyone opting in is a client, there is attorney-
16   client privilege, and that they have a right to
17   know status of the case, they have a right for us
18   to gather information from them, I think those
19   are the exact words in the research that we
20   posted.  So you know, these are clients, like any
21   other client.
22            BARRY BERKE:  But (indiscernible)
23            PROFESSOR CAPRA:  Like I said, so I
24   will contact the judge on this, and I'll get back
25   to you further.
```

```
                                           Page 56
 1            Mr. Berke, did you have a response?
 2            BARRY BERKE:  I was just going to
 3   clarify.  I assume some of these folks may have
 4   engagement letters, may not, but others may not
 5   have engagement letters.  Right?
 6            PROFESSOR CAPRA:  Right.
 7            BARRY BERKE:  There's a subset, we
 8   don't know.
 9            PROFESSOR CAPRA:  That's great.  And so
10   your concern is about those who do not.
11            BARRY BERKE:  Well, my concern is if
12   they're reaching out to those about their
13   questionnaire, then I'd like to know who it is so
14   we can know the questionnaire for anyone, if that
15   happens.  But I am particularly concerned about
16   those who don't have an engagement letter or
17   retention letter, yes.
18            PROFESSOR CAPRA:  Right.
19            BARRY BERKE:  Thank you, Professor.
20            PROFESSOR CAPRA:  Anything further from
21   anybody on this subject?  Okay.  So let's go
22   forward with that.  It's kind of a two-pronged
23   approach.  One, we'll get these first notes out,
24   and secondly, I'll get back to you at the next
25   meeting, which I think is Tuesday, a week from --
```

```
                                              Page 57
 1   is it a week from Tuesday?  Ms. Brilliant, you
 2   got that?
 3              At any rate, it's been docketed -- it's
 4   been posted.  So we'll meet then, and we'll
 5   resolve this issue, and any other issues that
 6   might come up.
 7              Thank you very much.  This one made me
 8   happy.  I appreciate it greatly.  All right.
 9              BARRY BERKE:  A successful one, then.
10   Thank you, Professor.
11              PROFESSOR CAPRA:  Yes (indiscernible)
12              BARRY BERKE:  Thank you.  Until next
13   week.
14              PROFESSOR CAPRA:  Thanks.  Bye.
15
16
17
18
19
20
21
22
23
24
25
```

Page 58

1                C E R T I F I C A T I O N

2

3    I, Lindsay Peacock, certify that the foregoing

4    transcript is a true and accurate record of the

5    proceedings.

6

7

8

9    _____

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date: June 22, 2025

**[01/01/1979 - allowing]**                                        Page 1

| **0** |
| --- |

| **01/01/1979** |
| 17:16 |

| **1** |

**1,000**  13:4
**11501**  58:23
**14**  5:9
**17th**  5:7
**18th**  49:23
**1997**  2:23
**1998**  6:16 8:17
  10:4,8
**1999**  8:18 9:5
  10:10
**19th**  5:8
**1st**  3:23 4:16
  5:25 18:14

| **2** |

**2,500**  55:7
**2001**  9:6
**2014**  41:9
**2025**  58:25
**2025.04.29**  1:11
**22**  58:25
**22nd**  2:19
**23**  38:17
**23rd**  15:24
**24th**  3:11
**27**  52:9
**28**  52:10
**28661**  58:7

| **29th**  49:22 |
| --- |

| **3** |

| **300**  58:22 |
| **330**  58:21 |

| **4** |

| **4,000**  2:14 |

| **5** |

| **500**  12:3,9 |

| **7** |

| **7444884**  1:11 |

| **a** |

**ability**  54:15
**able**  6:22 9:15
  11:13,19 18:22
  28:9 38:25
  41:25 55:11
**absolute**  41:24
**absolutely**
  31:15 41:20
**accessibility**
  3:4,6
**account**  30:11
**accurate**  58:4
**act**  20:7
**action**  41:19
**activity**  9:6
**acts**  2:22 8:7
**actual**  9:1
  34:22 39:14
  45:15 46:6,12
**actually**  8:18
  16:20 22:1,10

22:24 23:4,5,9
28:19 29:9
33:2,8,12
34:12 36:24
38:6 43:23
44:8 46:12
54:15,23
**add**  10:13
**added**  2:22,24
  3:1,13,14
**adding**  8:1
**additional**  33:7
**address**  6:10,24
  11:20 21:9
  22:2 25:5
  42:14 55:4
**addressed**
  40:20 42:6
**addresses**  3:12
**advocate**  51:2
**advocated**
  38:21
**afterward**  5:19
**aged**  5:9
**ago**  38:13
**agree**  11:17
  14:20 15:6
  20:14 25:15,16
  26:1 28:13,18
  31:18 33:13,14
  33:19 41:1
  47:5 54:24
**agreed**  22:22
  23:6 24:18,23

45:7 47:5
53:14,17
**agreement**  17:1
  31:22 53:4,12
**agreements**
  39:10,14 55:8
**ah**  27:4 43:17
**ahead**  23:7
  25:4 28:24
  34:18 36:23
  42:18
**aiding**  41:17
**alert**  16:25
**alignment**  3:4
**allison**  7:21,24
  8:10 10:2 11:5
  13:1 14:14,17
  14:22 15:17,23
  16:20 19:9
  20:13 21:10,22
  21:25 22:5
  23:3,11,14
  24:4,7,12,19
  25:1 28:25
  29:6,21,25
  30:6 31:6,10
  31:16,24 32:2
  33:21 34:3
  49:4
**allow**  6:17 9:25
**allowed**  6:14
  53:20
**allowing**  8:1
  51:23

**[allows - believe]**

| | | | |
|---|---|---|---|
| **allows** 50:4 | **anyway** 51:7 | **asserted** 21:7 | **b** |
| **ameliorate** 42:1 | **apparatus** 26:9 | **assess** 45:24 | **back** 6:3,5,7 |
| **amount** 26:24 | **appears** 11:12 | **assessing** 30:11 | 17:4 26:13 |
| 37:14 42:3 | **apples** 27:17 | **assist** 45:6,9 | 27:13 55:7,24 |
| 48:3 | **applicants** 5:22 | **assistance** | 56:24 |
| **answer** 10:6 | 14:11 | 32:22 | **backed** 9:4 |
| 14:3 22:7 | **application** | **associated** | **background** |
| 24:17,20,21 | 19:23,24 | 42:21 | 2:25 3:2 37:12 |
| 30:5 33:24 | **appointed** | **assume** 56:3 | 39:5,6 41:3 |
| 34:13 42:17,24 | 41:21 | **atrocities** 9:19 | **barry** 34:19 |
| 43:9,10 45:22 | **appreciate** 33:7 | 26:6 27:8 | 35:20 36:7 |
| 46:19,22,22,24 | 57:8 | 37:19 | 47:20 49:16 |
| 46:24,25 47:4 | **approach** | **atrocity** 26:12 | 51:11 52:12 |
| 50:22,25 52:15 | 56:23 | 30:21 | 55:22 56:2,7 |
| **answered** | **appropriate** | **attack** 34:6,7,9 | 56:11,19 57:9 |
| 22:19,21 24:8 | 12:6 33:19 | 34:10 | 57:12 |
| 51:13 54:19 | **appropriately** | **attacks** 9:3,4 | **based** 10:22 |
| **answering** | 38:25 | 27:22 | 22:21 |
| 20:24 22:14 | **approved** | **attempting** | **basic** 16:16 |
| 32:11 33:15,17 | 15:12 | 35:1 | 53:5 |
| **answers** 21:12 | **april** 15:24 | **attention** 20:17 | **basically** 14:6 |
| 22:9,10 24:16 | **arabic** 3:11 | 42:3 | **batch** 5:6,7 |
| 33:17 36:3,20 | **areas** 14:18,18 | **attorney** 39:12 | **batches** 5:9 |
| 42:5 43:7,8 | **arm** 43:13 | 39:13,22 41:4 | **bears** 39:7 |
| 49:24 50:6,8 | **arrested** 9:7,9 | 41:16,19 46:3 | **bedrock** 45:10 |
| 52:24,24 54:9 | 9:10,12 | 55:15 | 54:16 |
| 54:10,24 | **arrests** 9:8 | **auto** 4:8 | **begun** 38:18 |
| **anti** 35:9 | **aside** 17:2 | **automated** | **behalf** 16:4 |
| **anticipated** | **asking** 27:11 | 3:18 6:1 | 37:9 |
| 38:11 40:2 | **asks** 34:24 | **automatically** | **believe** 12:3 |
| **anybody** 2:4,5 | **asleep** 11:24 | 4:6 | 16:25 24:13 |
| 46:14 56:21 | **aspect** 52:6 | **available** 54:17 | 55:13 |
| **anybody's** 7:16 | **assault** 2:23 | **avoid** 18:5 20:9 | |

**beneficial** 31:16
**berke** 34:16,19 35:20 36:7 44:17 47:18,20 47:22 49:15,16 51:11 52:12 54:14 55:22 56:1,2,7,11,19 57:9,12
**berke's** 54:8
**best** 28:5,5,6 50:25 54:9,10
**better** 3:6 23:20 28:9 46:20,21
**beyond** 2:16 32:7
**big** 12:20 18:5
**birth** 14:23 16:5
**birthdates** 16:1
**birthday** 15:2 17:10,15
**bit** 25:6 40:24 52:5 53:8
**bnp's** 26:11
**bound** 42:20
**box** 25:24 26:22,22,23 27:3
**boxes** 11:11 27:16

**boyd** 4:1 6:11 7:3,18,19 8:23 8:25 11:7,9 12:11,15,19,22 13:7,8 15:14 17:8,9,24 18:3 18:9,15 23:22 24:6 25:1,4,4,5 25:17,20 26:4 28:8 29:22 30:8,13,17,20 33:14 35:6 36:22 37:1,5 37:18 44:10 47:19,23,25 48:8,13,18 49:5,13 55:5,6
**brilliant** 57:1
**bringing** 50:25
**broadly** 43:21 53:6
**brought** 23:16 38:23
**bucket** 22:2 24:7 25:8 26:19,20 33:22 48:18 49:1
**buckets** 25:6 48:23
**bug** 3:13
**bunch** 11:25
**buried** 18:17
**business** 35:4

**button** 6:12
**buttons** 3:5
**bye** 57:14

**c**

**c** 58:1,1
**calendar** 4:7 17:11,13,17,22 18:7,8,13,21,23 19:1,2,12 20:14 31:3,4,7 31:12 51:6 53:7
**call** 4:20 5:18 19:1 40:15,17 40:25 43:7 48:20 53:15
**called** 41:8 51:5
**calling** 13:13 52:7
**calls** 20:21 32:9 40:8,14
**capra** 2:1 5:13 5:20 6:8 7:1,4 7:15,21,23 8:3 8:23 9:20 10:18 11:2,7 12:2,7,13,16,24 13:2,6,9 14:15 14:16,21 15:5 15:22 16:19 17:5,20 18:2 18:12,19,25 19:6,9,16 21:1

21:18,23 22:4 23:1,9,12,15,23 24:5,10,18,23 25:3,15,18,25 28:7,11 29:1,5 29:19 30:5,7 30:14,19,22 31:6,9,15,18,23 31:25 32:3 33:13 34:2,5 35:16,25 36:22 36:25 37:3,7 38:5 40:1,11 40:16,19 41:10 42:8,12,18 43:2,12,17,25 44:4,12,22 45:7,13 46:5 46:10,16 47:5 47:10,17,22 48:5,12,17 49:2,9,15,17 51:3 52:3 53:1 54:21 55:23 56:6,9,18,20 57:11,14
**care** 28:23
**careful** 35:10
**carve** 17:6 19:3
**case** 41:7,11 46:16 51:1 55:17
**cases** 39:10,20 41:6

catch 23:10
categories
  29:16
caught 20:16
cause 11:25
causing 17:11
certain 5:4
  11:10 21:11,12
  25:10 48:3
  55:12
certainly 8:10
  12:1 35:21
certification
  41:15
certified 39:1,4
  39:18
certify 58:3
change 4:11
  9:24
changing 52:24
chapter 35:5
character
  11:12,16,22
characters
  11:25 12:4,12
chargel 46:17
chart 13:24
  23:24 24:14
  28:13
charted 21:8
check 12:4
  26:21 27:3
checkboxes 3:1
  3:3

checked 25:24
checking 27:15
checks 4:3
choices 49:12
choose 30:4
chronicles 38:2
circle 55:7
circuit 46:11
  55:14
circulate 5:19
  31:20 53:11
cited 35:5 41:6
claims 14:9
clarify 34:21
  36:21 52:3
  56:3
clarifying 7:22
  51:15
clarity 50:21
class 6:8 13:18
  14:3,9 15:24
  16:2,3,5,6
  20:19 21:14,17
  22:7,12,17,20
  22:22,24 25:8
  25:11,12,24
  26:7 27:18,23
  29:1 32:7,19
  33:3,7 35:7
  36:8 37:9,23
  37:24 38:14,16
  38:17,18 39:2
  39:3,4,8,12,18
  39:23 40:4,6

40:21 41:5,15
  41:18,19,21,22
  41:23,23,24
  42:20,21,22,22
  45:2 47:2 50:4
  51:1,14 52:7
  52:13 53:20,25
cleaning 20:11
clear 25:13
  32:17 33:12
  34:18 35:6
  36:12 49:21
  50:1,2,17
  55:14
clearly 14:24
  51:19
click 6:16 10:13
  29:11,15,18
  33:24
clicks 10:4
client 39:12,13
  39:22 41:4,16
  41:20 46:3,7
  55:11,12,15,16
  55:21
clients 41:5
  55:9,9,20
close 10:7
closed 24:16
come 12:17
  57:6
comes 45:1
coming 5:25
  28:15 29:8,10

command
  26:10
commented
  44:17
comments 14:5
commercial
  35:4
common 13:16
communication
  32:15
communicati...
  33:2,9 35:13
  35:21 36:16
  44:18 46:6,12
community
  52:18
compensable
  25:22
complete 35:12
completed 15:2
  16:4 36:6
completely
  11:23 36:2
  44:23
complicated
  23:19 33:25
computer
  11:24
computers
  11:11
concede 28:22
conceived
  54:17

**[concept - defendants]** Page 5

| | | | d |
|---|---|---|---|
| concept 53:5 | 53:21,23 55:1 | 15:24 20:19 | |
| concern 20:17 | 55:3,11,24 | 27:9,23 29:2 | daily 3:18 9:14 |
| 23:5 33:5 | contacted | 32:7,19,23 | dasgupta 43:13 |
| 42:15,15 43:16 | 23:21 44:9 | 33:3,8 35:7 | 43:14 |
| 51:17 56:10,11 | 45:17 | 36:8 37:10 | dasgupta's |
| concerned 8:19 | contacts 43:19 | 39:8 40:6,21 | 15:24 20:18 |
| 32:6 33:6 | content 45:16 | 41:5,7,21,23 | data 3:21 5:13 |
| 34:14 48:19 | context 24:25 | 42:21,22 45:6 | 9:1 19:10 |
| 56:15 | continue 5:8 | 45:17 46:20 | date 4:8 14:23 |
| concerns 33:10 | 11:13,14 15:16 | 50:4 52:8 | 15:2 16:5,6,6 |
| 37:16 50:13 | continued 26:9 | 53:20,25 54:22 | 17:15 18:23 |
| conference | continuing | counsel's 14:9 | 19:13 20:11 |
| 1:11 | 18:6 | country 58:21 | 28:16,19 29:4 |
| confirmation | contrary 32:16 | couple 6:11 | 31:1 48:3 |
| 4:5 5:22 6:1,3 | control 26:10 | 11:8 14:18 | 53:11 58:25 |
| 6:5,7 | 36:14 | 15:4,25 53:8 | dates 4:9 13:17 |
| conformation | conversations | course 34:25 | day 5:9 |
| 5:21 | 20:20,22 32:6 | court 32:16,17 | days 3:15 18:20 |
| confused 54:11 | correct 5:23 | 34:13 41:14,21 | 53:9 |
| confusing | 16:22 22:9 | 45:10 49:25 | deal 18:25 39:1 |
| 18:10 | 29:23 48:4 | 51:22 53:3 | dealing 44:18 |
| conscious | 53:4 | 54:1,4,7,17 | deals 44:19 |
| 50:24 | corrected 45:23 | 55:2 | deceased 16:5 |
| consideration | correctively | court's 42:20 | decide 48:20 |
| 20:1 | 51:4 | courts 35:5 | deciding 41:18 |
| considered | correctly 3:12 | 41:13 | decision 36:9 |
| 35:8 | 7:25 | crack 53:10 | defendant |
| consistent | corresponden... | creates 41:16 | 46:23 47:16 |
| 27:16 49:20 | 23:6 32:14 | cruel 28:2 | defendant's |
| consists 25:9 | corresponding | cut 11:14 18:4 | 34:17 |
| consult 53:2 | 3:5 | cy 36:24 37:9 | defendants |
| contact 39:9 | counsel 4:18,21 | 38:9 40:2,14 | 14:6,19 21:6 |
| 40:6 43:20 | 6:9 12:24 | 40:18 41:2,11 | 28:12 38:21 |
| 46:8 47:13 | 13:23 14:13 | | |

41:13 44:13
47:9
**defense** 12:24
13:23 14:12
36:14,19 41:7
**definitely** 34:14
**definition**
35:17
**definitionally**
25:9
**delete** 17:17
**depends** 35:20
**describe** 8:14
17:3
**designate** 34:11
**details** 8:20
**detained** 9:7
**detentions** 9:9
**developed** 39:9
**devoted** 42:4
**difference**
13:14 36:15
42:16 46:19
47:12
**different** 8:11
8:13 22:2
29:16 34:25
35:3,14,23
40:24 41:2
52:17,21,24
**differently** 8:15
25:7
**difficulties** 31:2
37:22

**direct** 39:17
**directions** 40:9
40:13
**directly** 34:25
36:8 42:14
**disabling** 4:1
**disagree** 23:1
**disagreement**
17:25
**disclosing** 46:6
46:8
**discuss** 44:8
50:6 52:23
**discussed** 3:9
13:10
**discussing**
20:21 32:5,8
**discussion**
45:16 50:7
**discussions**
32:9
**displaying** 3:12
**dispute** 52:4
**distinguished**
32:20
**district** 41:9,14
**docketed** 57:3
**document** 44:1
48:25 49:6
**documented**
44:6 45:15
55:3
**dodona** 41:8

**doing** 5:5 28:6
36:10,21 40:22
45:19 50:21
51:14,15
**donaldson**
13:24 15:10
19:3,5 21:7
23:16 30:24
53:9
**donaldson's**
23:24
**double** 12:4,19
12:21 26:24
**draft** 4:25
**drawn** 9:22
33:15
**drop** 23:13
**duties** 43:1
**duty** 42:20 43:6

**e**

**e** 58:1
**earlier** 17:10
**early** 27:6
**earn** 3:1
**easier** 50:19
**easily** 16:17
**easy** 16:8 19:14
**effect** 26:8
**effectively** 39:1
**effectiveness**
5:14
**effort** 38:8

**efforts** 38:24
**either** 16:11
27:1
**elaborate** 40:23
**email** 5:21 6:1
13:11,19 15:24
17:2 20:18
21:5 23:5
32:13 33:5,11
40:21 41:7
**emails** 4:5 6:4,5
15:19,21 20:15
32:5 53:8
**encouraging**
52:19
**ended** 10:7,16
10:24 11:23
**ends** 5:18
**engage** 44:19
**engagement**
56:4,5,16
**english** 3:7
**enter** 7:12
10:22,24,25
11:25
**entering** 7:10
**entirely** 13:18
50:23
**entitled** 38:19
**entries** 4:14
**envisioned**
51:19
**epiq** 2:13 11:15
14:18 15:8,25

16:8,13,17,21
24:13 31:10
36:10,20 40:22
45:19,20,25
46:2 48:2
50:21 51:9
**error**  14:24
**especially**  28:9
31:2 37:23
**evaluate**  44:13
**everybody**  2:5
6:5 31:17
36:18 44:12
45:18,20,21
**everybody's**
14:4 31:21
**everything's**
5:2
**evidence**  13:25
**exact**  10:15
40:7 55:19
**exactly**  11:1
31:11
**example**  6:20
9:3 13:18
14:22 35:4
52:18
**examples**  15:25
16:16
**exchange**  15:7
41:7
**exclude**  22:6
**exist**  41:20

**existing**  39:21
**exists**  41:4
**expand**  13:4
**expedition**  43:4
**explain**  10:3
29:9 43:8
**explained**  27:6
**explaining**
42:17
**expressed**
37:16
**extent**  19:11

**f**

**f**  58:1
**facilitator**  3:10
3:15,20
**fact**  6:14 8:25
46:13
**factor**  16:12
**fair**  37:13
**fairness**  36:18
**fall**  11:24 19:14
**familiar**  37:13
39:6
**fear**  8:15
**federal**  35:5
**fields**  3:21 4:2
4:8 11:22
**fights**  27:7
**figure**  17:3
54:2,12
**filed**  2:15 39:10
39:20

**fill**  33:16 34:12
35:2 52:19
**filled**  35:17
36:2 42:23
51:24 52:23
53:21
**filling**  26:24
34:23 35:22
47:3
**fills**  10:4
**final**  31:21 32:1
53:19
**find**  30:18
**fine**  34:4 52:17
**finish**  5:23
**firm**  39:24,25
**first**  2:2 4:23
4:25 5:6 14:13
19:19,25 22:5
25:8 26:18,22
27:14 33:22
34:16 43:12
45:22 56:23
**fishing**  43:4
**fix**  17:4 20:7
**flurry**  13:11
15:21 20:15
**focus**  4:11
**folks**  56:3
**follow**  11:3
14:19,25 15:9
16:1 23:7
24:14,22 48:14
53:18,18 54:8

**followed**  26:2
**following**  10:6
**forced**  28:21
29:1
**forecast**  37:21
**foregoing**  58:3
**foretold**  38:3
**form**  3:8 16:22
17:1
**formatting**  4:8
**forthwith**
53:13
**forward**  13:3
17:19 56:22
**found**  41:15
**four**  8:22
**fraught**  37:22
**full**  10:10
**fully**  54:18
**functionality**
4:5
**functioning**
22:24
**funding**  26:11
**further**  7:18
11:8 13:7
55:25 56:20
**furthers**  50:13

**g**

**gained**  47:8
**gatekeeping**
29:12 30:3

| | | **h** | **hecht**  39:24 |
|---|---|---|---|
| **gather**  55:18 | 55:4 56:2 | | **hellerstein**  40:3 |
| **generally**  17:1 | **goldman**  41:8 | **halfway**  17:12 | 49:21 |
| 22:6 | **good**  2:16 5:2 | 18:4 | **help**  27:10 |
| **genocide**  37:19 | 11:4 14:22 | **hand**  42:7 | 28:10 54:23 |
| **getting**  5:22 | 16:16 17:20,21 | **handled**  38:25 | **helpful**  15:18 |
| 8:15 17:15 | 26:18 28:19 | **hang**  21:1 | **hey**  46:23 |
| 28:2 37:14 | 42:12 | **happen**  50:14 | **hiding**  3:24 |
| 45:1,10 | **gotten**  6:13 | **happened**  2:9 | **historically**  9:4 |
| **give**  2:13 22:22 | **government** | 26:14 34:8 | **hm**  47:17 |
| 49:11 52:15 | 21:15 | 42:25 43:11 | **home**  2:22 34:7 |
| **given**  26:9 31:2 | **graying**  4:2 | 50:18 | 34:10 |
| 48:22 53:6 | **great**  31:23 | **happens**  19:18 | **hopefully**  5:2 |
| **go**  2:7 6:3,4 | 56:9 | 19:20 56:15 | **hundreds** |
| 8:18 10:9 13:3 | **greater**  54:4 | **happy**  14:14 | 39:11,20 |
| 14:16 16:23 | **greatly**  57:8 | 21:10 57:8 | **i** |
| 17:4 19:10,21 | **ground**  13:16 | **hard**  12:17 | |
| 23:6 24:1 25:4 | **group**  12:5 | 28:5 | **idea**  8:3 |
| 27:3 28:23 | **guess**  2:2 7:13 | **harm**  4:10 | **identified** |
| 32:1 34:18 | 7:20,22 8:3,4 | 21:19,20 26:17 | 14:18 15:25 |
| 36:23 42:18 | 10:6,10 13:11 | 29:17 | 19:13 48:21,23 |
| 47:18 56:21 | 13:12,21 18:10 | **hausfeld**  39:25 | **identify**  8:13 |
| **goes**  9:7 30:25 | 19:1,16,19 | 42:7,8,9,10,13 | 16:9,17 19:11 |
| 30:25 31:14 | 20:8,13 21:3 | 42:19 43:3,24 | 19:14 31:11 |
| **going**  2:3,10 | 28:11 29:25 | 44:3,16,25 | **illiterate**  37:23 |
| 3:23 4:4,11 5:1 | 30:7,10,12 | 45:9,13 46:2,9 | 37:24 |
| 6:4 8:20 10:23 | 34:14 43:21 | 46:15,18 47:7 | **impact**  36:19 |
| 17:18,19 18:13 | 44:3 48:14 | 47:14 54:6,25 | **impartial**  32:18 |
| 18:22 19:7 | 49:8 53:15,24 | **head**  5:16 19:7 | **important**  3:25 |
| 23:23 26:13 | **guidance**  54:4 | **hear**  18:10 | 31:2,5 39:19 |
| 27:13 32:18 | **guided**  32:19 | **heard**  4:19 | 51:21 |
| 37:2 40:4,9,12 | **guys**  51:6 | **hearing**  13:2 | **imposed**  26:5 |
| 50:3,24 51:20 | | 17:14 27:22 | **improper**  32:15 |
| 52:18 53:2,18 | | 49:22,23 | 52:21 |
| 53:24 54:10 | | | |

**incident** 8:22
  10:9
**incidents** 8:14
  8:17,17
**include** 3:20,24
  24:12
**included** 3:16
  4:15 22:10
  24:13 44:13
**including** 41:14
**income** 3:2
**incomplete**
  5:10
**inconsistencies**
  14:1,1 21:7,8
  23:18 53:16
**inconsistency**
  26:21
**inconsistent**
  21:24 24:16
  25:21 26:16
  27:15 28:1
  30:2,9 36:4
  43:7,9 48:16
  48:24 50:9
  51:25
**increase** 12:1,5
**increased** 3:3
**independent**
  36:12
**indicate** 16:2
**indicating**
  25:23

**indiscernible**
  9:19 12:18
  13:3 18:11,24
  20:25 21:23
  23:8,13 24:9
  29:20 35:15,18
  40:10,18 46:11
  47:9,21,24
  52:2 55:22
  57:11
**individual**
  16:17 36:13
  39:10 43:8
**individuals**
  21:15,19 23:7
  24:8 37:18
  46:4 49:24
  51:21
**information**
  2:25 3:2 8:9
  12:8 16:16
  20:3,5 30:12
  33:7 34:11
  38:20 39:9,16
  42:1 45:10,19
  45:21,25 48:1
  54:16 55:18
**informing** 47:8
**initially** 54:17
**injured** 21:13
**injuries** 26:8,14
**injury** 25:11,22
  34:6

**instances** 7:13
  9:2,2,14,23
**instinct** 28:14
**instructions**
  52:15
**intended** 8:21
**internally**
  47:15
**interrogatory**
  32:21
**interrupt** 34:20
**interrupted**
  24:25
**interrupting**
  2:5
**interruptions**
  2:4,8
**invasion** 2:22
**involved** 13:19
**ish** 19:1,2 28:16
  28:20 29:4
  51:6
**issue** 2:3 6:25
  7:19 13:10
  16:24 21:4
  32:1 34:24
  44:18 45:14
  54:7 57:5
**issues** 4:20 6:13
  12:25 16:10,10
  19:12,14 20:12
  20:14,20 24:14
  27:14 28:20
  30:25 31:8

32:8 36:5 48:3
  53:11 57:5
**items** 4:15

**j**

**join** 38:15
  41:18
**joining** 39:3
**judge** 24:21
  30:1 36:11
  40:3 49:21
  50:10,17 51:19
  55:4,13,24
**judged** 41:3
**judgment** 36:4
**juice** 27:25
**june** 58:25

**k**

**kathryn** 6:11
  7:3,19 8:25
  11:9 12:11,15
  12:19,22 13:8
  17:9,24 18:3,9
  18:15 23:22
  25:5,17,20
  26:4 28:8
  29:22 30:13,17
  30:20 37:1,5
  44:10 47:25
  48:8,13,18
  49:5,13 55:6
**keep** 11:18
  47:15

**kind**  19:11,13
  19:14 20:11
  21:8 22:6
  24:15 26:13
  28:15,20,21
  29:13 31:11
  32:5,7,14,19
  33:9 53:9
  56:22
**kinds**  29:16
  33:2,9
**knew**  28:3
**know**  3:25 4:18
  4:22 6:18,24
  8:16 9:6 10:19
  11:10,15,19
  14:2 15:8,19
  16:1,7,12,13,15
  16:16 17:16
  19:17,25 20:11
  20:19 22:13
  23:17 24:14
  25:13 26:5,8
  26:11 27:16
  28:5,20 30:10
  31:9,9 32:21
  32:22 33:2,4,6
  34:6,8 35:2
  37:22 38:2,6
  38:15,16,22
  39:10 40:7
  43:4 45:3,4,12
  45:14,18 46:17
  46:25 48:11,13

  48:14,20,24
  49:8,20 50:13
  50:23 53:10
  54:12 55:1,2
  55:17,20 56:8
  56:13,14
**knowledge**
  51:1
**kovach**  2:18
  5:15,24 7:6,7
  10:1,12,19
  11:21 12:3,21
  13:4,5 18:8,13
  18:16,21 31:20
**kovacs**  2:16

**l**

**language**  5:4
  15:7,12 16:22
  16:24 50:2
  53:14
**largely**  37:24
**law**  55:14
**lawyer**  46:7,14
**lawyers**  50:1
  51:19
**learning**  42:10
**leave**  2:24
  28:15 29:4
**leaving**  28:19
**lee**  6:11 7:3,19
  7:21,24 8:9,10
  8:25 9:21 10:2
  11:4,5,9 12:11

  12:15,19,22
  13:1,8 14:14
  14:17,22 15:6
  15:16,17,23,23
  16:20 17:9,24
  18:3,9,15 19:9
  20:12,13,18
  21:10,22,25
  22:5 23:3,11
  23:14,22 24:1
  24:4,7,12,19
  25:1,5,17,20,23
  26:4 28:8,18
  28:24,25 29:6
  29:21,22,25
  30:6,13,17,20
  30:23 31:6,10
  31:16,24,25
  32:2 33:20,21
  34:3 37:1,5
  42:15 43:13,14
  44:10 47:25
  48:8,13,18
  49:4,5,13 55:6
**left**  16:3
**legal**  46:13
  58:20
**letter**  56:16,17
**letters**  56:4,5
**limit**  11:12,22
  12:1,17
**limited**  41:17
**limiting**  10:20
  16:12

**limits**  11:16,16
**lindsay**  58:3
**line**  9:21 20:17
  33:15,19 41:12
**lines**  27:23
**list**  18:17,17
  31:21
**listen**  49:18
**litigation**  35:4
  39:8
**little**  15:9 25:6
  40:24 55:10
**lived**  25:9
**long**  9:12,13,18
**look**  5:17 10:3
  10:14 46:23
**loree**  2:18 5:15
  5:24 7:7 10:2
  10:12,19 11:19
  11:21 12:3,20
  12:21 13:5
  18:8,13,16,21
  29:8 31:20
  48:22
**lose**  8:20
**lot**  8:20 12:10
  16:14 18:11
  19:10 27:10,19
  37:16,20,24
  38:22 39:15
**loyalty**  41:24

**m**

**made** 3:10 9:24
55:3 57:7
**majority** 41:13
**make** 5:4 7:11
14:25 19:22
22:11 24:19
29:6 30:8 31:3
31:12,21 36:18
38:24 43:20
47:11,14
**makes** 11:5
24:22
**male** 3:25
**mandatory**
24:20 29:24
30:1
**massaged** 53:7
**master** 1:11
**matter** 9:1 13:7
**mean** 9:14 12:5
22:20 25:12,13
25:13,22 28:14
33:18 34:10,20
40:12 42:3
43:25 46:10
49:10 50:15
51:7 54:24,25
**means** 38:7
**meet** 54:3,3
57:4
**meeting** 56:25

**member** 16:5
22:22 36:8
42:23 47:3
**members** 38:17
39:1,12 40:4
41:18,22
**men** 26:23,25
27:1
**mentioned**
22:14
**mentioning**
32:4
**messages** 5:7
**messed** 31:4
**michael** 42:10
42:13,19 43:3
43:24 44:3,16
44:25 45:9
46:2,9,15,18
47:7,14 54:6
**micromanage**
38:23
**mind** 49:21
55:1
**mineola** 58:23
**minute** 15:6
**misguided** 38:8
38:9
**mismatched**
38:12 42:4
**mismatches**
38:1
**mister** 47:17

**misunderstan...**
7:9 22:16
33:11
**mobile** 3:3,6
**moment** 38:13
**month** 2:24 4:2
9:12
**move** 7:17
13:10 25:2
**moves** 4:12
**multiple** 7:12
8:2 9:2 22:14
**muted** 42:9

**n**

**n** 58:1
**names** 3:11
**narrative** 10:8
11:18 16:14
24:9 29:10
**nature** 23:19
27:9 30:9 50:8
**navigate** 33:23
54:13
**necessary** 20:3
45:11 50:11
**need** 5:3 16:23
17:4 29:2,14
46:25 54:22
**needed** 24:21
**neither** 36:13
36:19
**neutrals** 36:11

**never** 28:8
43:11 47:2,11
**new** 3:13,20
**nine** 39:8
**non** 5:6
**notes** 56:23
**notice** 18:5
30:25 39:17,17
39:23
**noticed** 24:15
**notices** 15:11
45:20 48:3
53:6,13
**november**
49:22
**number** 7:14
8:13 10:16
26:15 35:3
40:8 52:9,10
**numbers** 39:11
39:24
**ny** 58:23

**o**

**o** 58:1
**oath** 51:21
**objection** 7:16
51:8
**objective** 50:23
**obstructing**
54:15
**obvious** 17:7
**obviously** 4:20
13:14 16:13

| | | | |
|---|---|---|---|
| 19:10 20:6 22:13 33:1 35:2 36:5 37:12 54:22 | **open** 10:16,24 11:23 | **pain** 27:20 | **perceive** 45:3 |
| **occurrences** 6:18 | **operates** 10:25 | **panic** 27:22 | **perfect** 28:4 |
| | **opinion** 13:14 53:3 | **parse** 9:16,17 | **period** 9:18 14:4 16:2,3,7 18:5 21:14 22:7 25:10,12 26:7 35:7 |
| **occurring** 26:6 | **opt** 3:7,8 35:6,6 36:9,9 38:17 52:20 | **part** 20:1 21:16 22:20,23 23:10 39:23 | |
| **occurs** 25:11 | | | |
| **october** 49:22 | | **particular** 14:4 14:11 | **perjury** 22:15 |
| **oh** 18:15 24:7 24:10 25:3 37:3 | **opted** 5:11,11 | **particularly** 27:8 56:15 | **person** 13:17 44:7 |
| | **opting** 55:15 | | **phone** 18:10 |
| | **option** 2:21,22 2:24 | **parties** 20:16 53:11,16 | **phones** 11:10 |
| **okay** 2:1 6:8 7:1,3 8:23 11:7 12:13,22 13:3 13:5,6 14:16 15:14 17:5 18:2,12,25 19:6 20:10 22:4 23:9,13 23:14 24:23 25:17,24 29:5 31:23,25 36:22 37:4,8 42:13 43:13,17,17 44:24 45:19 48:9 56:21 | **options** 10:16 22:19,21 | **partners** 39:24 | **pick** 36:24 |
| | **oranges** 27:17 | **pass** 5:2 | **picker** 4:8 |
| | **order** 55:2 | **patience** 36:23 | **piece** 29:7 39:5 |
| | **orders** 42:21 | **patient** 37:1,2,6 | **place** 26:10 |
| | **original** 29:3 | **peacock** 58:3 | **places** 5:4 |
| | **originally** 8:12 8:19,21 | **penalty** 22:15 | **plaintiffs** 14:19 28:13,22 30:18 36:13,19 50:20 51:15,23 |
| | **outcome** 44:14 54:8 | **people** 2:15 4:9 5:10 9:9,10 11:13,17,23 15:11,19 17:4 17:22 21:13 22:11,14 23:20 25:9 27:12,20 29:4 31:4 35:16 36:1 38:14 39:2,20 39:21 40:22 43:20 44:9 45:17 49:7,7 51:24 52:19,20 53:6 54:11 55:8 | |
| | **outset** 37:16 | | **plan** 39:17 43:20,23 |
| | **outside** 25:11 38:14 | | **planned** 5:8 |
| | **own** 53:3 54:19 | | **please** 17:17 29:16 36:23 |
| **old** 58:21 | | | |
| **once** 9:10 10:16 36:7 53:13 | **p** | | **point** 9:21 15:18 17:8,21 24:2,2 27:14 28:2 37:15 47:13,25 49:3 51:3 55:6 |
| **ones** 10:20 17:6 20:21 22:1,5 31:11,12 35:17 38:21 | **page** 4:12 16:18,21 29:18 29:23 31:13 33:23,23 | | |
| | **pages** 29:14,14 | | **pointed** 37:18 38:13 42:16 |

**pop** 47:19
**populate** 29:14
**populated** 29:15
**portion** 11:18
**position** 14:7 21:6 22:8 23:4 29:3
**possible** 40:23 43:19
**posted** 55:20 57:4
**potential** 16:10 22:10
**pre** 39:21
**pregnancy** 3:24
**preliminary** 21:3
**prepared** 32:22 32:24
**pretty** 13:25
**privilege** 46:11 55:16
**proactive** 52:4 52:5,5 55:1
**proactively** 34:23 35:11,15 35:23 50:5,19 51:23 52:14,22 53:20,23
**probably** 7:14 8:8 18:17 22:9 39:6

**problem** 12:20 17:18 18:6 38:2,11 41:1 42:2,5 44:16 46:13 52:6,7,8 52:10
**problematic** 13:13,15 14:2 21:24 36:4 37:25 40:23 42:4 43:8,9,21 48:7,10,10
**problems** 6:9 11:25 19:2,21 37:20 38:10 53:7
**proceeding** 52:1
**proceedings** 58:5
**process** 2:2 32:16,18 36:14 37:17,21 38:20 42:17 43:10 45:3,4,12 46:21 50:4,14 50:17 51:12,14 51:22
**professional** 27:10
**professor** 2:1 5:13,20 6:8 7:1 7:4,15,21,23 8:3,23 9:20

10:18 11:2,6,7 12:2,7,12,13,16 12:24 13:2,6,9 14:15,16,21 15:5,20,22 16:19 17:5,20 18:2,12,19,25 19:6,9,16 21:1 21:18,23 22:4 23:1,9,12,15,23 24:5,10,18,23 25:3,15,18,25 26:12 28:7,11 29:1,5,19 30:5 30:7,14,19,22 31:6,9,15,18,23 31:25 32:3 33:13 34:2,5 34:19 35:16,25 36:22,25 37:3 37:7 38:5 40:1 40:11,16,19 41:10 42:8,11 42:12,18 43:2 43:12,17,25 44:4,12,17,22 45:7,13 46:5 46:10,16 47:5 47:10,17,22 48:5,12,17 49:2,4,9,15,17 51:3 52:3 53:1 54:6,21 55:23 56:6,9,18,19,20

57:10,11,14
**program** 6:17 19:15
**programmati...** 16:8
**pronged** 56:22
**proof** 4:23
**proper** 36:20 52:1,25
**properly** 44:13 45:24
**proposing** 50:9
**proposition** 40:20
**prospective** 41:17
**protector** 27:18
**protects** 46:12
**provide** 12:8 46:1,1
**providing** 42:17
**pull** 5:16 15:19
**pulled** 3:17,19
**pulling** 5:17
**purpose** 41:17 50:16
**purposes** 45:24 54:16
**pursue** 23:25
**pushed** 28:12
**pushing** 30:14
**put** 6:15 8:1 13:17,24 14:23

**[put - represent]**                                                        Page 14

15:1 22:1,7
26:10,17 32:13
33:18 42:24
46:22 53:23
**puts**   14:3

**q**

**qualify**   21:16
22:17
**quality**   30:12
**query**   3:17
**question**   7:22
8:11 17:21
19:17,19 24:3
24:20 30:1
32:11 33:1
34:11,12,15,22
44:23 45:2,4
47:25 51:13,16
52:9,10,13,14
53:19 54:25
**questionnaire**
3:15,19,21 4:6
4:23,25 6:2
10:3 15:3
20:24 22:8,24
23:19 28:3,4
29:13 32:11,20
32:23 33:16,18
33:25 34:23
35:2,12,18
36:6 37:17,21
38:1,19 42:5
42:23,24 47:3

51:24 52:23
54:13 56:13,14
**questionnaires**
2:15 5:10,12
16:14 38:12
43:22 50:5
51:18 52:19
53:22 54:9,19
**questions**   3:13
3:24 10:7,7
22:18 29:12
30:3 32:13
33:16,17 34:24
35:22 36:1,10
40:5,6 51:5
**quick**   5:2,17
**quite**   32:17
36:17 46:17
52:5
**quoted**   41:12

**r**

**r**   58:1
**radio**   3:5
**raise**   19:12
33:9 54:7
**raised**   20:17
33:5 42:7,15
50:10
**raises**   36:10
**rape**   29:12,15
29:17,18 30:3
30:20

**raped**   26:22
**rapes**   27:1,2
**rate**   13:21 57:3
**rather**   15:2
16:8 20:22
**reach**   35:11
40:21 50:5,20
51:23
**reached**   44:7
**reaches**   52:12
**reaching**   34:25
35:23 44:1
45:14 51:4
52:14,22 56:12
**read**   33:4 50:4
**really**   11:22
18:9 20:16
22:11 27:2
30:9 31:5 37:5
48:19 51:10
**reason**   6:16
50:18 53:17
**recently**   13:11
**recipient**   34:22
**recognize**   40:4
**record**   47:14
58:4
**recording**   1:12
**rectified**   6:10
**refer**   6:7 35:9
**referring**   21:11
**reflected**   39:23
**relates**   52:9

**relationship**
39:13 41:4,16
41:20 46:3
**relationships**
39:14,22
**release**   2:19
3:22,23 4:16
5:25 18:14
**remember**   4:3
39:19
**remind**   55:12
**reminders**   5:14
**removed**   18:14
18:22
**removing**   4:7
**repeated**   2:21
6:12,15,16,18
6:21,21 8:2,7
8:17,17 9:3,6
9:13,18,23,25
10:4,8,10,11
**repeatedly**   7:10
7:12 10:17,23
32:17
**repeating**   39:7
**report**   3:19
30:10
**reported**   11:15
17:10
**reporting**   3:18
**reports**   4:19
6:9
**represent**
41:22

representative
42:19
requests 41:25
require 26:23
required 27:4
research 55:19
resisting 49:25
resolution
43:22
resolve 57:5
respect 6:12
31:1 52:1
respond 8:24
41:25
responded
42:22
respondent
8:13 16:25
respondents
20:23 22:23
32:15,25 33:4
50:6
responder 5:6
response 10:8
29:10 32:12
34:21 40:15,16
47:18 56:1
responses
13:13 16:15
32:20,21,23
38:1 40:24
retention 39:9
39:14 55:8
56:17

retroactively
6:3,4
review 4:18
reviewing 4:22
49:19
revisit 17:11
rid 17:13 18:6
right 2:11 5:15
7:14,16 9:10
10:18,21 12:14
12:18 13:9
16:9 19:16
20:7 21:18,22
25:17,25 26:2
28:7,18 29:19
29:21,24,25
30:13,16,17,19
30:22 35:18,19
37:8,21 39:25
40:5 43:2 45:5
46:5 48:8,12
48:16,17 49:1
53:1 54:21
55:16,17 56:5
56:6,18 57:8
road 8:18
58:21
roles 50:1
room 22:16
rule 38:17

**s**

sachs 41:8

sanctions 26:5
saved 4:13,14
saves 4:10
saw 5:20
saying 30:8
31:7 32:12
38:7 51:10,11
52:8
says 28:4 34:6
40:4 41:11,13
52:13
scale 19:13
scheduled 3:22
schema 8:22
screens 3:15
second 5:7 7:2
15:15 22:3
24:7 26:20
27:3 46:10
55:14
secondly 43:18
56:24
section 3:2
10:10
see 3:16 4:13
5:5 6:12 7:25
13:19,20 19:6
25:6 29:2
37:20,25 38:10
42:7 45:22
46:18 47:17
seek 43:22
seem 31:4
53:17

seems 4:16 8:8
26:2 51:7
seen 40:3
select 7:12
selected 3:25
7:9 10:17
selection 10:23
send 4:5 5:3,9
6:3,5 15:8,11
17:24 18:1
19:18,20 53:13
sending 48:2
sense 11:5
24:20,22
sent 45:20
separate 6:23
8:5,6 9:23,25
session 2:10
set 8:21 11:22
32:16 34:1
48:9
setting 17:2
settlement 20:3
45:11,24 54:16
sexual 2:23
27:9
share 47:16
shoulder 43:15
show 23:16,17
23:18
side 4:17 34:17
49:10
signature 58:7

| | | | |
|---|---|---|---|
| **signed** 39:9 | **special** 1:11 | **subsequent** | **sure** 2:18 4:21 |
| **significance** | **specific** 15:18 | 53:8 | 7:23 14:25 |
| 19:23 | 16:24 | **subset** 56:7 | 15:17 21:10 |
| **situation** 38:24 | **speed** 37:14 | **substance** 17:2 | 22:11 29:7 |
| **size** 3:3 | **spent** 37:13 | 52:16 | 31:3,13,21 |
| **smith** 36:24 | **spoke** 46:20 | **substantive** | 36:18 38:24 |
| 37:9 38:9 40:2 | 47:1 | 20:22 27:14 | 51:7 |
| 40:14,18 41:2 | **squeeze** 27:25 | 32:9,14 50:7 | **surgery** 43:15 |
| 41:11 55:7 | **start** 2:2,12 | 53:16 | **surrounding** |
| **solicitation** | 13:22 14:6,12 | **substantively** | 6:14 |
| 35:8,9 36:5 | 14:14 37:11 | 54:23 | |
| 44:20,20 | **started** 8:12 | **successful** 57:9 | **t** |
| **solutions** 58:20 | 13:12 16:3 | **successfully** | **t** 58:1,1 |
| **somebody** 2:7 | 35:1 38:18 | 4:10 | **table** 4:12 |
| 2:13 4:10 | **starting** 8:18 | **sudan** 2:25,25 | 44:23 |
| 35:15,24 52:7 | **state** 4:2 54:22 | 16:3 21:16 | **take** 30:11,18 |
| 52:12 | **stats** 5:19 | 25:10,10 | 53:9 |
| **somebody's** | **status** 55:17 | **sudanese** 3:11 | **talk** 2:6 14:8,13 |
| 36:3 | **stay** 23:23 | **suffered** 17:22 | 26:25 27:2 |
| **soon** 4:18 | **stephen** 5:16 | 27:21 30:3 | 48:15 |
| **sorry** 24:10 | 19:5 29:8 | **suffering** 27:20 | **talking** 2:6 |
| 34:19 47:19,22 | 48:22 49:14 | **suggest** 9:24 | 14:10 34:17 |
| **sort** 10:15,23 | **stop** 7:1 15:5 | 31:7 35:11 | 36:1 38:15 |
| 37:11 38:4 | 21:1,2 38:6 | 53:2 | 52:16 |
| **sought** 46:14 | **straightforward** | **suggested** | **targeted** 9:11 |
| **sounds** 7:8,15 | 13:25 | 20:18 21:12 | **tears** 27:21 |
| 12:9,9 | **strongly** 38:22 | 45:11 | **technical** 4:20 |
| **south** 2:25 | **struggling** 7:25 | **suggesting** | 16:9 20:20 |
| 25:10 | **stuff** 21:21 | 54:14 | 32:8 |
| **southern** 41:8 | 28:16 | **suggestion** | **technically** |
| **speak** 37:2 45:5 | **subject** 8:6 | 12:23 | 27:15 |
| 47:23 55:11 | 20:15 56:21 | **suite** 58:22 | **technology** |
| **speaking** 36:8 | **submitted** 4:7 | **supervised** | 42:11 |
| 43:21 53:7 | 5:12 6:2,6 | 49:25 51:22 | |

| | | | |
|---|---|---|---|
| **tell** 19:7 26:13 | 23:3,5,15,20,24 | **throw** 20:4,5,6 | **transcripts** |
| 27:1 29:16 | 24:12,19,22,24 | 46:25 | 49:19 |
| 47:2 | 25:1,18 26:11 | **thursday** 3:23 | **transparency** |
| **telling** 52:20 | 26:15,16,17 | **time** 2:21 7:11 | 50:12,22 |
| **tells** 29:13 42:5 | 27:24 28:1,10 | 9:12,18 14:4 | **trauma** 27:10 |
| **tend** 9:20 | 29:3 30:24 | 21:13 25:10 | **troubled** 50:10 |
| **term** 16:9 | 31:1,5,12 | 27:3 37:14 | **troubles** 17:12 |
| **terms** 2:14 14:2 | 32:14,17 33:21 | 46:19 | **true** 12:7 55:9 |
| 36:16 37:11 | 34:3,10 35:14 | **times** 8:6 9:17 | 58:4 |
| 39:11 | 36:7,10,15,17 | 10:14 22:14 | **truly** 28:1 |
| **text** 3:5,7 | 36:17 41:12 | **today** 2:1,4,5,8 | **try** 18:4 42:1 |
| **thank** 2:18 11:6 | 43:15 44:4,10 | 2:11 5:1 13:20 | 50:25 |
| 31:24 32:2 | 44:15 46:15 | 14:23 17:15 | **trying** 16:25 |
| 36:23 37:6,6 | 48:7 49:20 | 37:20 | 20:9 |
| 42:13 47:20 | 50:3,9,11,12,16 | **told** 55:11 | **tuesday** 3:14 |
| 49:16 56:19 | 50:17,19 51:18 | **tolerate** 2:10 | 56:25 57:1 |
| 57:7,10,12 | 51:22,25 52:25 | **took** 2:8 8:4 | **tweak** 16:23 |
| **thanks** 5:20 | 53:10 55:18 | 21:6 | **tweaked** 3:4 |
| 57:14 | 56:25 | **tools** 38:22 | **tweaks** 5:4 15:9 |
| **thing** 8:7 19:25 | **thinking** 39:2 | **top** 5:16 | **two** 3:15 6:23 |
| 20:2 38:16 | 49:10 | **topics** 3:9 | 8:21 9:13 |
| **things** 2:14 | **thinks** 12:6 | **torture** 2:23 | 10:20,22 25:6 |
| 16:7 33:11 | **thought** 11:8 | 6:21,22 9:14 | 56:22 |
| 35:3 37:25 | 13:25 28:8 | **tortured** 9:8 | **type** 4:9 18:23 |
| 50:15 55:12 | 29:9 46:21 | **tossing** 19:17 | **types** 27:14 |
| **think** 6:19 7:7 | 49:12 | **totally** 31:18 | **typing** 11:13 |
| 7:15 9:20 | **thoughts** 15:13 | 34:3 43:4 | |
| 11:17 13:15,22 | **thousand** 40:8 | **touches** 50:15 | **u** |
| 14:5,17,22 | **thousands** | **track** 4:17 | **ultimately** |
| 15:4,10,18,23 | 39:15,21 | **trail** 5:21 | 28:12 |
| 16:7,12,15,18 | **three** 8:22 | **transaction** | **unaddressed** |
| 16:19,20 17:5 | 10:14,21,22 | 4:11 | 19:21 |
| 17:13,18 21:11 | 18:20 | **transcript** 40:3 | **uncheck** 27:5 |
| 21:11,25 22:8 | | 58:4 | |

**unconscious**
50:24
**under**  22:15
38:17 39:17
51:21
**underlying**
14:9
**understand**
39:16 52:9
54:11
**understanding**
6:20 7:8,24
33:22 37:15
48:1
**understood**
15:1 22:11
29:7 46:21
54:18
**undivided**
41:24
**unimpaired**
45:5
**universe**  48:21
49:13,14
**unwarranted**
43:5
**update**  7:11
**updated**  3:7,20
**updates**  2:13
2:20 3:10
**updating**  4:4
**upsetedness**
27:7,20

**use**  33:25
**used**  39:16 52:4
**useful**  44:5
**user**  4:3
**using**  37:17
**usually**  2:12

**v**

**v**  41:8
**various**  50:1
**vendor**  5:1
**veritext**  58:20
**versus**  33:17
**victims**  9:1
26:13 30:21,21
37:19
**video**  4:23,24
**view**  3:4,6
**village**  9:5 34:7
34:9
**violating**  42:25
**violence**  2:22

**w**

**wait**  40:11,11
**waiting**  52:21
**walking**  4:24
**want**  2:4 7:13
8:8,24 11:14
11:17 12:8
17:10 18:3
21:9 25:3,5
26:25 27:2
28:14,22 30:15
34:18 38:23

48:19 51:6
54:1,7
**wanted**  25:1
29:6 34:21
36:12 49:23,24
**wants**  14:13
28:23 54:9
**waste**  20:8
**way**  10:15 11:2
22:19,21 26:17
44:1,6,24 49:9
50:19 52:1
53:23
**we've**  6:13
20:21 22:13,22
31:7 32:5,8
34:1 51:5
**website**  2:20
3:14
**week**  2:9,20
54:3 56:25
57:1,13
**weekly**  5:9
**weeks**  9:13
**weird**  55:10
**went**  5:7 26:7
27:7
**wide**  19:13
**window**  35:25
**windows**  34:6
**wizards**  3:17
**women**  26:25
26:25

**wonder**  34:8
**word**  11:12,16
52:4
**words**  12:15
25:21 54:20
55:19
**work**  11:3
49:14 54:1
**worked**  36:17
**working**  19:4
49:1,6
**world**  8:16
**worth**  26:15
27:25
**write**  11:11
17:16 27:4
29:23
**writing**  11:18
26:23 27:8,16
**writings**  13:19
**wrong**  8:9 48:2

**y**

**yeah**  2:18 5:24
7:7 10:12
11:21 12:13,21
14:21 15:22
18:16,21 23:1
23:11,22 24:5
24:6,10,11
30:6 31:20
32:2 33:21
34:2 40:1,17
41:10 42:18

44:22,25 49:2
49:16 51:3
54:21
**year**   2:24 4:2
6:15,17,19,21
6:22 9:2
**years**   6:23,23
8:5 10:1 39:8
55:10
**yep**   24:23

**z**

**zoom**   1:12