# EXHIBIT 6

Page 1

1

2

3

4

5

6

7

8

9

10

11  7444884 - 2025.04.03 - Special Master Conference

12  Zoom Recording

13

14

15

16

17

18

19

20

21

22

23

24

25

1              PROFESSOR CAPRA:  Hello.

2              JOHN WYNNE:  Hell, Professor Capra.

3    How are you?

4              PROFESSOR CAPRA:  Thanks.  Thanks for

5    doing this, as always.

6              JOHN WYNNE:  No, no problem at all.

7              CY SMITH:  Hello.

8              PROFESSOR CAPRA:  Hello.  You are new.

9              CY SMITH:  I am new.  Cy Smith,

10   Professor.

11             PROFESSOR CAPRA:  Good to see you.

12             CY SMITH:  Nice to see you.

13             PROFESSOR CAPRA:  Hello.

14             AMANDA LEE:  Hello.

15             PROFESSOR CAPRA:  Hello.

16             BARRY BERKE:  Good afternoon, Professor

17   Capra.  We're going to need a bigger screen soon.

18             PROFESSOR CAPRA:  Looks like it.

19   Right?  Just keep on adding more -- you all just

20   keep on adding lawyers.  That's all, you know?

21   I'll have to get a Zoom upgrade.

22             Out of all these people, I don't see

23   any Epiq people on yet, so I do want to hold for

24   --

25             DANYA PERRY:  Hi, Professor Capra.  I'm

Page 3

1    Danya Perry.
2                PROFESSOR CAPRA:  Hi.
3                DANYA PERRY:  Nice to meet you.  I'm
4    one of the many new lawyers.
5                PROFESSOR CAPRA:  Okay.
6                DANYA PERRY:  Great to meet you, and
7    good to see everybody.
8                PROFESSOR CAPRA:  Well, we've
9    established a culture on these calls.  I hope you
10   can, like, you know, get up to speed.
11               DANYA PERRY:  Well, I'm going to try.
12               JOHN WYNNE:  Professor Capra, just to
13   flag, Stephen from Epiq is now on the call.
14               PROFESSOR CAPRA:  Oh, thank you.  I
15   don't see him.
16               JOHN WYNNE:  He's buried, probably.
17               PROFESSOR CAPRA:  Oh, he's down there.
18   There he is.  (indiscernible)
19               STEPHEN DONALDSON:  I'm here.  Sorry --
20   yeah, sorry for being a little bit late there.
21               PROFESSOR CAPRA:  Is Ms. Kovacs going
22   to be here, or is it -- or are you doing the
23   (indiscernible)
24               STEPHEN DONALDSON:  I am the Epiq
25   representative today.

                                        Page 4

1           PROFESSOR CAPRA:  All right, dude.  So
2    why don't we get started with that?  And we
3    usually start these things with an Epiq report
4    about how things are going. and kind of what we
5    still need to do.  So I'm going to send it off to
6    you, Mr. Donaldson.
7           STEPHEN DONALDSON:  Thank you.  Yeah,
8    I've got a few things to cover, so I'll try to be
9    succinct, and not waste everyone's time.
10          So this morning, we deployed the new
11   batch of website updates for the Harm Details
12   pages to show that they're working on first harm,
13   second harm for each category.  There are also
14   some visual updates included there.  Hopefully
15   those will just ease the understanding a little
16   bit for the Claimants who are on those pages.
17          This evening we'll also be applying
18   some smaller enhancements within Facilitator,
19   notably the query wizard for searching.  It's
20   going to default to a new version of that search
21   that includes everything in the questionnaire.
22   The more limited search that's been there will
23   still be there.  It will be an option for, I
24   think it's called Preliminary Data Search,
25   something like that.  But the default will be the

Page 5

1    main search.  So again, if there's any confusion

2    on how that search works or anything, you're

3    welcome to reach out to me anytime.  I'm happy to

4    assist with that.

5             I wanted to call out what Professor

6    Capra was just alluding to.  Lori is out of the

7    office this week.  I am available all of this

8    week, including the weekend, for anything.

9    Starting on Monday, I'm going to be traveling

10   overseas for a work conference, to the United

11   Kingdom, but Lori will be back on Monday, so you

12   will be able to reach out to her the moment that

13   I'm gone.

14             PROFESSOR CAPRA:  Okay.

15             STEPHEN DONALDSON:  I will still be

16   working next week, just on different hours, so my

17   ability to respond to things is just going to be

18   a little offset from what it typically is.

19             PROFESSOR CAPRA:  Okay.

20             STEPHEN DONALDSON:  I did want to

21   acknowledge that we had a limited issue over the

22   weekend with the website, that a handful of

23   Claimants had communicated to Class Counsel.

24   That issue was a result of some lingering data

25   from the questions that we've added or changed

1   since the launch.  So people who submitted at the
2   very beginning, on the first day were able to now
3   go in and reopen their questionnaires, but the
4   data that existed for them back then wasn't one-
5   to-one with the current format of the
6   questionnaire.  So that caused a little bit of
7   hiccup there, but we had individuals at Epiq on
8   call over the weekend.  They helped us get all of
9   that cleaned up and fixed really quickly.  We
10  haven't heard about any new issues arising since
11  we deployed that fix over the weekend, unless
12  Class Counsel has anything new to report since
13  Sunday on that.
14          PROFESSOR CAPRA:  Okay.
15          STEPHEN DONALDSON:  On last week's
16  call, Professor Capra asked for some insight into
17  the response rates of the outreach that we've
18  done for the individuals with aged
19  questionnaires, and also those that submitted
20  both opt-ins and opt-outs.  So I wanted to take
21  just 30 seconds and report on those.
22          For the people who have both opted in
23  and opted out, we've sent messages to 264 unique
24  people, and 71 of them have now subsequently
25  submitted questionnaires.  That's roughly 27%.

Page 7

1           PROFESSOR CAPRA:  That's pretty good I
2    feel.
3           STEPHEN DONALDSON:  Yeah.
4           PROFESSOR CAPRA:  I mean, that sounds
5    good to me.  Yeah.  I'm sorry, go ahead.
6           STEPHEN DONALDSON:  Yeah.  After that
7    first week-and-a-half, it was somewhere around 8%
8    or 9%.  So it definitely is growing the longer --
9    You know, after about a between three and four-
10   week period is when it jumps up the most.  And
11   I'm calling that out only for talking about the
12   next group.  So this is the aged questionnaires
13   when they hit 14 days-plus of inactivity.  We've
14   sent messages to almost 1,800 people.  1,781 is
15   the specific number of unique people.  131 of
16   them have subsequently submitted their
17   questionnaires.  That's roughly 7.5%.  That
18   notable call out there is that that percentage is
19   roughly what it was for that first group, the
20   opt-in and opt-out group, after this much time
21   had passed since we started sending them.
22           So if it trends the same way that the
23   opt-in and opt-out group, after this much time
24   had passed since we started sending them.  So if
25   it trends the same way that the opt-in, opt-out

Page 8

```
 1   messages did, I would not be surprised to see a
 2   much larger spike of another 15% to 20% over the
 3   next week or two.
 4              I couldn't really speak to why it is
 5   that it takes, you know, two-and-a-half to three-
 6   and-a-half weeks to get people to respond to that
 7   message, but it does seem like they're effective.
 8   You know, 71 questionnaires from the first group,
 9   131 questionnaires from the second group, you
10   know, that's attributable to roughly 200, so
11   that's not bad.
12              PROFESSOR CAPRA:  And this stuff goes
13   into your report to the Court.  Right?
14              STEPHEN DONALDSON:  It can, absolutely.
15              PROFESSOR CAPRA:  It should.  I would
16   suggest that, yeah.
17              STEPHEN DONALDSON:  Okay.  Yeah.
18              PROFESSOR CAPRA:  Okay.  Yeah, sorry.
19              STEPHEN DONALDSON:  Yeah, go ahead.
20              PROFESSOR CAPRA:  No, no, you go ahead.
21   I want to -- There's a lot of stuff to go
22   through, so go ahead.
23              STEPHEN DONALDSON:  No, that's fine.
24   Really, that's the last thing on our side.  I
25   know that you had mentioned wanting to discuss
```

1  the non-responder campaigns that we had outlined

2  in our notice plan, doing three times before the

3  deadline.  That's the last item on Epiq's list to

4  address today.

5           PROFESSOR CAPRA:  So we had about that

6  issue, then there is -- there was a text.  This

7  is what we were talking about, remember?  We were

8  talking about the proposed texts that would go

9  out?

10          STEPHEN DONALDSON:  Right.  So the way

11 we outlined that in our notice plan, we would

12 send three rounds via both email and text

13 message.  Yeah.

14          PROFESSOR CAPRA:  And there was -- And

15 Defendant's made some possible changes to that

16 text.  Now we're on to -- That text is what we're

17 talking -- is what they're -- yeah.

18          STEPHEN DONALDSON:  Yes.  Yeah.

19          PROFESSOR CAPRA:  And what's the text

20 limit, the character limit?  I forgot.

21          STEPHEN DONALDSON:  That's exactly what

22 I was going to mention just now.  So the

23 character limit for English is 160 characters.

24 So looking --

25          PROFESSOR CAPRA:  So that was over --

```
                                              Page 10

 1            STEPHEN DONALDSON:  Yeah, looking at

 2   what the Defendant circulated, it looked like

 3   that was 185 characters, so 25 characters too

 4   long.

 5            PROFESSOR CAPRA:  Right.  So --

 6            STEPHEN DONALDSON:  So just wanted to

 7   call that out, that that's what we based our

 8   draft on (indiscernible)

 9            PROFESSOR CAPRA:  Let's deal with that

10   (indiscernible) Why don't we deal with that, why

11   don't we -- Now that we're on that, let's just

12   deal with that now.  In other words, reminders --

13   To clarify, or to just put it all -- because

14   there's so much going on, these are reminders to

15   people who have opted in, but done nothing.  Is

16   that correct?  Or not opted in at all?

17            STEPHEN DONALDSON:  So these reminders

18   would be to people who have done nothing.

19            PROFESSOR CAPRA:  Yeah.

20            STEPHEN DONALDSON:  So if we have

21   either an opt-in or an opt-out that matches that

22   phone number or email, they would be excluded

23   from this.

24            PROFESSOR CAPRA:  Okay.  So just the

25   people who have done nothing.
```

```
                                            Page 11

 1              STEPHEN DONALDSON:  Correct.

 2              PROFESSOR CAPRA:  So obviously, it

 3      makes sense to contact them with reminders, and

 4      reminders were anticipated.  We had talked about

 5      sending reminders.  And so I guess I'd say, Mr.

 6      Donaldson, there's two questions.  One is the

 7      scheduling of that, and then the language of the

 8      text.  That's, I guess, what we're talking about.

 9              And in terms of the scheduling, Epiq

10      had proposed what seemed to me to be a reasonable

11      plan.  And does anybody have any comments or

12      suggestions for change?  Okay.  I'm going to take

13      that as an adopted statement, and now we're going

14      to -- we'll go with that schedule.  Okay, Mr.

15      Donaldson?

16              STEPHEN DONALDSON:  Yeah, absolutely.

17              PROFESSOR CAPRA:  Okay.  So then the

18      text, though, the changes are not implementable

19      because it's too many characters.  So do

20      Defendants have any -- I mean, since we got it, I

21      don't know, like maybe an hour before -- Maybe

22      Ms. Han, do you have something to say on that?

23              SUHANA HAN:  In light of the limitation

24      on the number of characters, may I suggest let us

25      go back and confer, and we will shorten it, and
```

Page 12

1  send out shortly a new proposal consistent with

2  that character limitation?

3          PROFESSOR CAPRA:  Perfect.  Good.  So I

4  think, then, that takes care of it.  Anything

5  further, Mr. Donaldson, in your -- in the startup

6  here?

7          STEPHEN DONALDSON:  Yeah, I would only

8  add that the 160-character limit is for English.

9  We'll need a translated version of this as well

10  to send.  But I would say that our experience,

11  after sending the original notice, is that there

12  is a little bit of flexibility around the number

13  of characters for the Sudanese Arabic characters.

14  They're treated in a different way by the phone

15  carriers.  So I think whatever we end up with for

16  the 160-character English limit will be fine in

17  translation with regards to the character limit

18  in Sudanese Arabic.  So I don't think we have to

19  contemplate that translation as part of the

20  English character limit decision.

21          PROFESSOR CAPRA:  And then, the other

22  understanding we had is that these go out, if we

23  don't have a translator, they go out in English

24  anyway, and then we worry about the translator

25  later.

```
 1              STEPHEN DONALDSON:  So for these, I
 2    think our plan would be to send them -- The
 3    emails would be sent in the exact same way that
 4    the original notices were sent, which I believe
 5    they had both in one email.  And for the texts,
 6    we would follow the same structure that we did
 7    for the original noticing, which is one text in
 8    English, and then followed immediately by the
 9    same content text in Sudanese Arabic.  So they
10    would be delivered as two separate texts at the
11    same time.
12              PROFESSOR CAPRA:  Good.  So usually, we
13    rely on Ms. Boyd, is she not on today, for an
14    update on problems and issues that Claimants
15    might have had, that they know about.  So can I
16    turn to Ms. Nelson?  Can you (indiscernible)
17              KRISTEN NELSON:  Yes, Professor Capra.
18    Thank you.  Ms. Boyd will be here in a little
19    bit, but she did sort of deputize me to provide
20    the update in her place, and --
21              PROFESSOR CAPRA:  That deputization is
22    recognized hereby -- whatever.  Go ahead.
23              KRISTEN NELSON:  Just from Class
24    Counsel's perspective, Epiq's proposed text
25    message, if it's in, you know, within the
```

1   character limit, we don't have any objection to.

2   So we're fine with the language as is, but we

3   look forward to seeing any proposed edits from

4   Defense Counsel.

5           PROFESSOR CAPRA:  Okay.

6   (indiscernible) I'm sorry, go ahead.

7           STEPHEN DONALDSON:  Oh, and then with

8   respect to just a couple of updates, or requests

9   for updates with respect -- kind of in light of

10  what we're seeing or hearing from Class Members.

11  As we discussed, and I think we've all approved

12  previously the repeated option for rape and

13  torture harms will go live I think sometime later

14  this month.  But we're also hearing from

15  individuals that for the harm of home invasion

16  and also village attack, that it is often a

17  repeat occurrence.  And we think that that harm

18  set of questions could benefit from an addition

19  of the "repeated," you know, instead of one, two,

20  three, ten-plus times something happened.  So we

21  thought that if it's not too big of a lift for

22  Epiq, since we have already approved it for two

23  other harms, that it would be useful to have for

24  the harms of village attack and home invasion.

25          PROFESSOR CAPRA:  Lift.  Epiq, is it a

Page 15

1    big lift?

2              STEPHEN DONALDSON:  Sorry, I muted

3    myself accidentally.

4              No.  I think the scope of work there

5    would be no different than what we're doing for

6    the other pages.  So adding it to two additional

7    Harm pages would not represent a big lift.  And

8    being that we've already solved, you know, how to

9    ensure that we do that without any data conflicts

10   or anything --

11             PROFESSOR CAPRA:  Yeah.  Right.

12             STEPHEN DONALDSON:  -- I think this

13   would be pretty straightforward to do.

14             PROFESSOR CAPRA:  Well, I would be --

15   It sounds like a plan.  Unless the Defendants

16   have a suggestion, or do you want to think about

17   it for a while?  Or what do you think?  I'm

18   turning to Ms. Han on this.

19             SUHANA HAN:  May I ask again, Kristen,

20   for which categories are you suggesting the

21   "repeated" language?  For all of the categories

22   now?

23             KRISTEN NELSON:  Specifically for home

24   invasion and village attack.  So it would be for

25   home invasion, village attack, torture, and rape.

Page 16

1          SUHANA HAN:  So that would be
2    everything except for property?
3          KRISTEN NELSON:  It would -- Well,
4    arrest is not included in there.  But I guess to
5    be sort of consistent, we could include it in
6    arrest as well.  And then it would be everything
7    except for property.  Property, and harm to
8    others, family members.  But that is a little bit
9    more specific.  People seem to be providing
10   detail as to individual family members who they
11   witnessed harm occurring to.
12         SUHANA HAN:  And that's based upon the
13   fact that the Claimants that Class Counsel have
14   spoken to have also reported the same issue, that
15   there have been several occurrences?
16         KRISTEN NELSON:  Right.  Well, the
17   question is, well, so if it happened all of the
18   time, if you know, it happened many times in
19   2003, how do I put that in.  Right?  And so right
20   now it's, well, you have to put it in -- you
21   know, if it's eight times, or if it's more than
22   10 times, you have to put that in, you know, the
23   exact same thing, village attack in this
24   particular area in 2003, in 2003, in 2003.  But
25   then, it is perhaps more efficient, if it is

Page 17

1    that, you know, a multitude of times in a
2    particular year, just you know, to tick off
3    "repeated," and put that information in once
4    instead of a dozen times.
5              PROFESSOR CAPRA:  Well, conceptually,
6    they're the kinds of injuries that could happen
7    repeatedly, I think.  Right?  So there would be
8    no reason not to allow that, I think.
9              But I'm sorry, Ms. Han.  Your thoughts?
10             SUHANA HAN:  Yeah, let us -- In my
11   view, it seems reasonable.  But let me confer
12   with the rest of the team, and when we come back
13   with our proposed revisions to the reminder, we
14   will also confirm whether or not we agree with
15   the "repeated" addition to the other categories.
16             PROFESSOR CAPRA:  Good.  And let's do
17   this by email, then we can just get it done.  And
18   -- yeah, that's great.
19             Okay --
20             STEPHEN DONALDSON:  Okay.  I would like
21   to call out, so I'm understanding village attack
22   to be active violence on your village/town/city.
23   That's how we have that labeled?
24             KRISTEN NELSON:  Yes.
25             STEPHEN DONALDSON:  Okay.  And then,

Page 18

```
 1   and home invasion is the other section.  So then
 2   right now, the sections that would not have it
 3   would be arrest detention, unless you want us to
 4   consider adding it there, additional physical
 5   injury, harm to close family members, and loss of
 6   property.
 7               KRISTEN NELSON:  Right.  I think, as we
 8   were, as Suhana and I were just discussing, I
 9   think it would make sense to add for arrest, but
10   not necessarily for other physical injury, and
11   harm to others, family members, or property.
12               STEPHEN DONALDSON:  Understood.  I'll
13   note that third page, then, that would have it
14   added is arrest detention.
15               KRISTEN NELSON:  Yes.  Thank you.
16               STEPHEN DONALDSON:  Thank you.
17               PROFESSOR CAPRA:  Okay.
18               KRISTEN NELSON:  Another thing that we
19   have been hearing that's been causing some
20   confusion is that when people enter multiple
21   instances of a type of harm, for example arrest,
22   and they check off two times, and they fill in
23   their two instances of arrest, there appears,
24   after you hit Save the second time, there appears
25   to be a blank form that, you know, suggests that
```

Page 19

1    the individual needs to fill in more information.

2    And they're getting confused as to whether they

3    need to fill something in again, because the

4    information -- you know, the questions are all

5    there but blank, or they can continue on.  And we

6    were thinking it might be helpful, if there is a

7    way to sort of roll up or collapse the questions

8    after the number of instances of the type of harm

9    have been completed, that would sort of reduce

10   people's confusion over whether they're obliged

11   to enter more information into these blank

12   sections of the questionnaire.

13           PROFESSOR CAPRA:  Well, it would be

14   good to have something visual here for that one.

15   But why would that come up?  Why would this come

16   up?

17           KRISTEN NELSON:  Well, so in the

18   example, what I was just describing, so an

19   individual ticks off they've been arrested two

20   times, and they fill out one instance, and they

21   hit Save, they fill in a second instance, hit

22   Save, and then, you know, their records of those

23   two arrests appear in the little table of

24   arrests.  But then, there is a blank form, you

25   know, that somebody could fill in a third time

                                                      Page 20

1    the instance of arrest, and people are confused

2    as to whether they need to fill that in, even

3    though they only marked off that there were two

4    instances of arrest, for example.

5              PROFESSOR CAPRA:  But why would that

6    show up?

7              STEPHEN DONALDSON:  I think -- I'm

8    sharing my screen here.  I think I understand

9    what Ms. Nelson is explaining.  And for -- you

10   asked for a visual.  So --

11             PROFESSOR CAPRA:  Yeah, thanks.

12             KRISTEN NELSON:  I appreciate that,

13   Stephen.  Thank you.

14             STEPHEN DONALDSON:  Yeah.  So tell me

15   if I'm understanding this right.  So for example,

16   in this sample form that I've got here on act of

17   violence, you know, let's say they have said that

18   they experienced this two times.

19             PROFESSOR CAPRA:  Yeah.

20             STEPHEN DONALDSON:  They've entered two

21   saved records here.

22             PROFESSOR CAPRA:  Yeah?

23             STEPHEN DONALDSON:  But now it's asking

24   them for a third act of violence, and showing

25   them all these fields as if they need to complete

Page 21

1    it.

2            PROFESSOR CAPRA:  Yeah.  Why?

3            STEPHEN DONALDSON:  And your suggestion

4    is to hide this section once they have entered

5    this many things?

6            PROFESSOR CAPRA:  Yeah.  For sure.

7            KRISTEN NELSON:  Right.

8            STEPHEN DONALDSON:  Okay.  From a

9    technical standpoint, I'm thinking through this.

10   So if they had chosen something with a range,

11   like three to five, I think we would not be able

12   to hide it.  If they had submitted three or four,

13   it would still be shown.  We would have to hide

14   it once they hit five only.  So if they select

15   three to five because they have three, the fields

16   would still have to be there.  But I think it

17   could help with understanding for -- You know, I

18   think hiding it in the cases where we know that

19   they've entered the max that they can makes more

20   sense than not doing anything.  So yeah, I don't

21   -- I think that would be possible.

22            PROFESSOR CAPRA:  All right.  Why don't

23   you put that on a checklist, Mr. Donaldson, and

24   see if that can work.  It's not a substantive

25   issue, it's just a kind of a tech issue.  And I

Page 22

1   get you --

2           STEPHEN DONALDSON:  Right.

3           PROFESSOR CAPRA:  I see the points both

4   ways.  I got that.  Okay.

5           STEPHEN DONALDSON:  Yeah.  So if they

6   answer two, have saved two, we would then hide

7   this entire details section, ant they wouldn't

8   have to see another Save button, they would just

9   see -- underneath this would be the Next button.

10          PROFESSOR CAPRA:  Yeah.

11          STEPHEN DONALDSON:  Essentially.  And

12  then, if they needed to get to this section, they

13  would have to modify this to say More.

14          PROFESSOR CAPRA:  Yeah.

15  (indiscernible)

16          STEPHEN DONALDSON:  And then, what

17  would we do, what would we do about a "repeated"

18  answer?

19          KRISTEN NELSON:  "Repeated," I think,

20  should just be one time, then people would fill

21  it in one time.

22          PROFESSOR CAPRA:  Yeah.

23          STEPHEN DONALDSON:  Okay.

24          PROFESSOR CAPRA:  I mean, that's the

25  whole point of "repeated," that you don't fill in

```
                                              Page 23
 1   individual ones, because it's continuous.
 2             STEPHEN DONALDSON:  That makes sense.
 3   Okay.  Yeah, we can absolutely add that as a
 4   future enhancement, if there's no disagreement to
 5   that.
 6             PROFESSOR CAPRA:  Okay.  Let's --
 7   Anything further?  To Ms. Nelson?
 8             KRISTEN NELSON:  Oh, one last thing.
 9   And I've been sort of brainstorming this myself,
10   and I don't exactly know what the solution is,
11   but here I'll report the problem.  In the
12   outreach for follow-ups for people who have, for
13   example, aged questionnaires, it is also -- it's
14   the case that some of these -- not some, several
15   of these people have opted in multiple times.
16   And so when we provide outreach to people for
17   aged questionnaires, they receive a message and a
18   unique ID and pin that doesn't necessarily match
19   the ID and pin of another questionnaire, based
20   upon another opt-in that they submitted.  And so
21   we're getting calls saying this pin number and ID
22   doesn't match, and oh, I also submitted my
23   questionnaire.  Why am I getting a message saying
24   that I didn't submit my questionnaire?
25             And so I don't know if there's a way to
```

Page 24

1   provide more targeted outreach to individuals who
2   we know have not completed a questionnaire under
3   any ID or PIN?  But we have received several
4   calls with concerns over whether people's data
5   was lost because they had completed a
6   questionnaire, but they got a PIN and ID for
7   another opt-in that hadn't had a questionnaire
8   completed.
9           PROFESSOR CAPRA:  Do we have a stance
10  on how many people have done that, like have
11  opted in twice?  Or more, opted in multiply?
12          STEPHEN DONALDSON:  I think there are a
13  decent number of duplicate submissions from a lot
14  of individuals on the opt-ins especially.
15          JOHN WYNNE:  But it would only be a
16  subset.  It would be someone who's opted in and
17  completed one questionnaire, but not a second
18  questionnaire, I think is the group range.
19          PROFESSOR CAPRA:  A subset of that.
20  Yeah, that's true.  I was just curious as to how
21  many there were as a set.  But at any rate, your
22  focus is these people who have finished one
23  questionnaire, and they've done duplicate opt-
24  ins.
25          KRISTEN NELSON:  Right.  So they're

```
                                          Page 25
 1    receiving the secondary outreach even though they
 2    have completed a questionnaire.
 3              PROFESSOR CAPRA:  Essentially, though,
 4    I mean -- Well, I don't know.  I'm trying to
 5    figure out how to put this nicely.  Why do we
 6    care?  They've filled in their application,
 7    right?  Ot they've filled in the questionnaire.
 8    That's what we need.
 9              KRISTEN NELSON:  It's, I guess --
10              PROFESSOR CAPRA:  If they fill in
11    another questionnaire, well, we'll track it down,
12    I assume.  So why do we even need to worry about
13    that?
14              KRISTEN NELSON:  Well, it's just I'm --
15    because we're reporting what we're hearing, and
16    these are calls -- these are individuals who are
17    concerned that their data, you know, has been
18    erased or has gone missing.
19              PROFESSOR CAPRA:  Ah.  Okay.
20              KRISTEN NELSON:  And then, you know,
21    we're able to, with the information available in
22    Facilitator, look at the unique ID and PIN and
23    see, oh, you know, based on this email address
24    and this name, this person has completed a
25    questionnaire, but oh, they do have also another
```

Page 26

1    opt-in.

2            PROFESSOR CAPRA:  So what's the

3    solution for this?

4            KRISTEN NELSON:  I mean, I was -- I

5    don't know if, Stephen, if there's any way to

6    maybe target, you know, to target communications

7    for -- only to individuals who don't have a --

8    that have completed a questionnaire after the

9    date of other opt-ins that they have, so that

10   most recent in time filled out questionnaire

11   would eliminate the follow-ups for the other opt-

12   ins, the previous opt-ins that they have?

13           STEPHEN DONALDSON:  Yeah.  Thinking

14   through this from the data side and the messaging

15   side, I think there are two groups of people that

16   would be affected by this.  One are people that

17   have submitted a questionnaire, and also have

18   some other in-progress questionnaire, and people

19   who have multiple in-progress questionnaires,

20   because they've opted in multiple times and

21   they're not sure.

22           I think the solution that we would

23   propose, based on what you're hearing and

24   suggesting, is that we would send a single

25   message, with a single unique ID and PIN,

Page 27

```
 1   targeting whatever thing they have worked on the
 2   most -- or I'm sorry, most recently.  So if the
 3   most recent thing that they've done is submit a
 4   questionnaire, then we would not message them
 5   about an incomplete one that was older than that.
 6   And if we see multiple open questionnaires, we
 7   would message them about the questionnaire that
 8   has been worked on most recently.
 9             PROFESSOR CAPRA:  I mean, will that --
10             SUHANA HAN:  But if -- I'm sorry,
11   Professor.
12             PROFESSOR CAPRA:  No, I'm sorry.  I
13   just wondered then, can that be done?  You can do
14   that?
15             STEPHEN DONALDSON:  Yeah, we're able to
16   see that information from that.  Yeah.
17             PROFESSOR CAPRA:  Ms. Han?
18             SUHANA HAN:  I was just going to ask,
19   if we have a record that they opted in, and they
20   already completed a questionnaire, can we then
21   just make sure we remove them from any follow-up
22   list?  It sounds to me that this issue is arising
23   because they're getting the prompt to complete
24   their questionnaire, and they're thinking, I've
25   already done so.  So if we already -- It sounds
```

Page 28

```
 1    like we're able to identify if somebody has opted
 2    in several times.  So if we already know that
 3    they've completed the questionnaire, let's just
 4    remove them from any follow-up list.
 5              PROFESSOR CAPRA:  Agreed.
 6              I mean, the one you're talking about,
 7    Mr. Donaldson, yeah, your solution was right for
 8    those.  But if they've completed, they shouldn't
 9    be contacted at all.
10              STEPHEN DONALDSON:  Yeah.
11              PROFESSOR CAPRA:  Yeah.
12              STEPHEN DONALDSON:  Okay.  That makes
13    sense.
14              PROFESSOR CAPRA:  Excellent.
15              Anything further, Ms. Nelson?
16              KRISTEN NELSON:  No, not as to the
17    website.  I think I put in correspondence about
18    the video.
19              PROFESSOR CAPRA:  Yeah, but we're going
20    to talk about the video -- Let's talk about the
21    video now.
22              So, the video.  So you'll note that the
23    order that was sent out yesterday has on the
24    agenda illiterate -- people who are suffering
25    illiteracy, and they are having trouble.  And
```

Page 29

```
 1    that came out of just a bunch of discussions that
 2    I've had with a judge about this, and you know,
 3    things I had been thinking about, and so I just
 4    want to tell you that -- kind of what to expect.
 5              I mean, it is -- his thought is that
 6    doing things -- I mean, this has already been
 7    discussed, though, by the parties even before I
 8    was here, things like phone banks, and getting
 9    students involved, and these kinds of -- really
10    kind of the broader programs are not appropriate,
11    or not within his view.  But the video, he liked
12    that idea.  And so I think it will be good to
13    proceed on that.
14              And then, with respect to that, Ms.
15    Nelson provided some -- The transcript was sent
16    out to everybody, and Ms. Nelson provided some
17    suggestions that I think were sound, and I
18    haven't heard -- I don't think I've heard from
19    the Defendants about the content of the video.
20              SUHANA HAN:  If we can -- We will take
21    a look at what Kristen circulated, and Defendants
22    will comment on that shortly.
23              PROFESSOR CAPRA:  And then my question
24    would be, is there -- And this is Mr. Donaldson.
25    Is there a way to do a demo for April 9th?
```

Page 30

```
 1              STEPHEN DONALDSON:  A demo on the
 2    video?
 3              PROFESSOR CAPRA:  On how the video
 4    would look, yeah.
 5              STEPHEN DONALDSON:  So we did circulate
 6    a proof of concept for that video, that
 7    essentially was that demo that we had put
 8    together.  I think the next step is that we would
 9    move into full production of the video, once
10    Counsel has agreed on the content.
11              PROFESSOR CAPRA:  Yeah, how long would
12    that take?
13              STEPHEN DONALDSON:  That is a good
14    question.  I think it's going to take a couple of
15    weeks, probably, to get it produced, and in
16    Counsel's hands for approval.
17              PROFESSOR CAPRA:  Well, maybe the
18    concept, maybe that concept thing that you
19    showed, could you have that ready to kind of
20    display, if the judge wants to look at it on the
21    9th?
22              STEPHEN DONALDSON:  Yes.
23              PROFESSOR CAPRA:  Okay.  And I would
24    say as to that video, the one thing you don't
25    want is, like, a robotic AI voice.  And so I
```

```
                                              Page 31
 1    don't know if we've concluded what voice would it
 2    be, but that's maybe -- Some people were talking
 3    about Ms. Boyd.  I'd like Epiq to give it a shot,
 4    and to see what kind of voice you can come up
 5    with that doesn't sound like a robotic AI voice.
 6              SUHANA HAN:  I think, Professor, during
 7    our last call, Lee had commented, or someone from
 8    the Class Counsel side commented that one of the
 9    voices that had previously been used was an
10    acceptable voice.
11              PROFESSOR CAPRA:  Oh, yes.
12              SUHANA HAN:  And I can't remember who
13    that person was.
14              PROFESSOR CAPRA:  That was Ms. Kovacs
15    who said they had a voice, and they just so used
16    that voice.  And if you can't, George Clooney's
17    in town.  Maybe we should try that, you know?
18    That would be good.
19              Anyway, so the demo would be useful to
20    see, and we really would like to proceed on that,
21    because obviously he's interested in this matter.
22              One issue that Ms. Nelson had is,
23    shouldn't we have a video for the opt-in, opt-
24    out?  I totally agree with that.  I think that's
25    a really good idea.  And that would be pretty --
```

1   that's a pretty simple video to do.  So can we

2   proceed with that, Mr. Donaldson?

3           STEPHEN DONALDSON:  Yeah, we'll write

4   up a similar draft script for that page, and

5   circulate it to the parties.

6           PROFESSOR CAPRA:  Okay.  I think that's

7   all I have to say about the video.  Any other --

8           So I'm sorry, maybe I just went over

9   this.  Ms. Han, you're going to check out, and

10  come back with any changes that you might have to

11  the transcript?  Okay, good.

12          Anything further on all these?  One

13  thing I wanted to bring up is that we had talked

14  about from time to time what to do about

15  problematic questionnaires, questionnaires with

16  inconsistent information.  And Epiq has prepared

17  a notice to people about, you know, something

18  that's possibly wrong with their questionnaires,

19  inconsistent language -- inconsistent answers and

20  such.  And I had suggested that, when I received

21  this, that we should hold off on this, because

22  one of the big issues that I think is really

23  troubling me is -- that needs to be resolved is

24  what is the consequence of the questionnaires,

25  and what's the consequence of not completely

Page 33

1    filling it in, or filling it in with

2    inconsistency?  And I think that needs to be

3    ruled upon before we start bothering people about

4    their inconsistencies.

5            And so about that, let's turn to that,

6    the issue of, you know, what happens on July 1st?

7    And what's the consequences of the

8    questionnaires?  And what about people who have

9    not filled out questionnaires, but they've opted

10   in?  As we all know, the Plaintiffs have filed

11   papers about that issue, and my understanding is

12   that a schedule has not been set for that, and

13   for that to be teed up for the Court.  The Court

14   has time in May, and you can work with the clerk

15   on that.

16           And I guess the confusing issue, the

17   confusing problem was that there are kind of two

18   issues that are somewhat related.  One issue,

19   which we would call the July 1st issue, is you

20   know, what happens -- what's the meaning of a

21   questionnaire?  What's the importance of a

22   questionnaire?  And then, the other issue is the

23   broader one about what to do about people who

24   just -- you know, who neither opt in nor opt out,

25   do they have any recovery, like baseline

Page 34

1    recovery?  And I guess in my mind, you could call
2    that the Rule 23 issue.  And Judge Hellerstein, I
3    spoke with him on this in detail, thought that
4    those issues should be split, and that whatever's
5    going to be argued in May would be this argument
6    about what's the consequence of the July
7    questionnaire.
8              So Class Counsel actually did divide
9    this in two, and basically filed papers on the
10   July 1st issue.  So I think that that issue, from
11   the Class Counsel's position, unless they tell me
12   otherwise, is ready to go, and we've got to
13   figure out a date for a response from the
14   Defendants, and then we move along with this.
15             Any comment from anybody about how this
16   is -- my thoughts here?
17             BARRY BERKE:  Yeah --
18             CY SMITH:  Your Honor, Cy Smith for the
19   Plaintiffs.
20             You're correct, we think that that
21   issue is, from our perspective, is submitted.
22   And so, yes, we should set a response date, and
23   hear it in May.
24             PROFESSOR CAPRA:  Yeah.  Mr. Berke?
25             BARRY BERKE:  Yeah, and we agree that

Page 35

```
1   we can hear that issue in May, instead of
2   scheduling.  I guess the -- Here's the confusion
3   on the second issue, what to do with Class
4   Members who don't file anything.  We understand
5   that that's separate, and we had understood
6   Plaintiffs had previously said they were going to
7   file, they told us they were going to file that
8   motion as a separate motion, but file it soon.
9   And so we anticipated there would be two motions
10  that would be filed, and we would then respond to
11  both.
12           PROFESSOR CAPRA:  Yeah.
13           BARRY BERKE:  And at the May
14  conference, we would argue both, recognizing
15  separate issues, but we would deal with them
16  both.
17           So I guess one question is, is it still
18  anticipated that the second issue, which the
19  judge had asked about, will be filed, and then we
20  would have a schedule for responding to both?
21           PROFESSOR CAPRA:  Right.  Good
22  question.  And how would I answer that?  The
23  judge -- You refer to it as that the judge had
24  asked about.  It's really -- I have to take most
25  of it, it wouldn't be credit, actually, but I
```

```
                                        Page 36

 1    have to take -- I'm the one who brought this up,

 2    and I kind of apologize for putting those two

 3    issues together.  And then having talked about it

 4    with the judge, he wants to move on issue number

 5    one, shall we say, the July 1st issue, and not to

 6    hear both at the same time.  And so I'm going to

 7    leave it up to the parties to schedule that

 8    second question, but let's get this first

 9    question done first.

10              And the reason that that's so is

11    because, you know, it's got to be done -- you

12    know, that one has to be done in time to kind of

13    evaluate on July 1st kind of what the problems

14    actually are, like how serious -- you know?

15    They're life or death questions really, if this

16    questionnaire is somehow dispositive of

17    everything, and then they're not if they're not.

18    So it's really important to have that one out.

19              Then, the other question is one that,

20    you know, is just in a way more profound, and is

21    more of a legal question, and more of a Rule 23

22    question, and I leave it to the parties to figure

23    out when they want to move on that, you know?

24    The judge is going to want to hear that at some

25    time, but not now.
```

```
                                                 Page 37

 1              BARRY BERKE:  Yeah.  Okay.  No, we

 2     appreciate that, Professor Capra.  So what we'll

 3     do is we'll propose a schedule to respond to

 4     Plaintiffs.  And then, I think what we had talked

 5     about is when we're in court next week, we'll

 6     talk to the judge's clerk, Bridget, find out his

 7     schedule so we can get it calendared at a

 8     convenient time for him in May, that works for

 9     everybody.

10              PROFESSOR CAPRA:  Exactly.  Great.

11              BARRY BERKE:   Great.

12              PROFESSOR CAPRA:  And then, so that

13     other issue that -- you know, about people who

14     are not involved at all.  Obviously, it's there,

15     and I leave it to the parties to figure it out.

16     But May is -- no reason to get that done in May,

17     the way I see it.

18              BARRY BERKE:  Very good.  Thank you.

19              PROFESSOR CAPRA:  Okay, good.  That

20     leaves us with -- well, at least in my mind, that

21     leaves us with -- I want to talk a little bit

22     about the agenda for April 9th, and some

23     questions about what it might -- well, questions

24     about the agenda on April 9th.

25              So the April 9th agenda, the way the
```

Page 38

1  judge has talked about it, we would add this idea

2  of the illiterate Complainants.  And I think

3  that, you know, I don't know that there's a whole

4  lot to argue about there.  Unless the Plaintiffs

5  want to, you know, re-raise issues, I basically

6  think that's just illustrating to the judge what

7  we've done.  In other words, that the video is

8  kind of the response.  And I don't know that it's

9  going to be any kind of ruling from the judge,

10 but I just think he wants to hear about kind of

11 what's being done.  And I think a lot has been

12 tried, and I think the video is certainly not a

13 complete answer, but you know, it's an effort.

14 So that's all I'd have to say about that.

15             Then, the issues about the trial.

16 There will be issues about 403 issue, about the

17 guilty plea, the trial date, and the identity of

18 the Plaintiffs who are going forth.  And I think

19 that there was a question about other issues that

20 might be added to the agenda, and I wanted to

21 talk about them, and if there's any other issues

22 that are going to be added to the agenda.

23             Have you filed -- you filed was it

24 yesterday, or was it today?

25             CY SMITH:  Yes, we did.  Yeah.

Page 39

1            PROFESSOR CAPRA:  Yeah.  Is there
2   anything else that's been added to that list?
3            CY SMITH:  Yes, Your Honor -- Professor
4   Capra.  For the Plaintiffs, we added a pre-trial
5   schedule.  If the trial if the trial date stays
6   in --
7            PROFESSOR CAPRA:  Yeah.
8            CY SMITH:  -- there's, you know, five
9   months of real estate between now and then.  And
10  we've sent the Defendants, a week or so ago, sent
11  them a proposed schedule that has, you know,
12  milestones for motions in limine, Daubert
13  exchanges of witness lists, exhibit lists, all
14  that kind of stuff.
15           PROFESSOR CAPRA:  Okay.
16           CY SMITH:  And they've said they prefer
17  to see whether the date stays or not.
18           PROFESSOR CAPRA:  Well, sure --
19           CY SMITH:  The other --  Well
20  (indiscernible)
21           PROFESSOR CAPRA:  Yeah, I mean, that
22  does make a difference, I guess is what I would
23  say.  But go ahead.
24           CY SMITH:  It does.  But then, you
25  know, there's just not a lot of time between now

Page 40

1   and then.

2            And then, the other thing is we filed
3   in one motion two issues, one of which you've
4   just been talking about, right, which is what's
5   the effect on July 1st?  And the other is the
6   question of use, or misuse, frankly, of the
7   questionnaire data in submissions that have been
8   made to the Court.

9            PROFESSOR CAPRA:  So where is that
10  submission?  Is that in the --

11           CY SMITH:  It's part of the same
12  (indiscernible) it's part of ECF 660.  So that --

13           PROFESSOR CAPRA:  The two papers that
14  were about -- that were issued about -- yes.
15  Okay, I get that.  But so why would you divide
16  those into asking one at this, at the April 9th
17  meeting, and then the other one in May, and --

18           CY SMITH:  So fair question.  I mean,
19  the 408 issue is one that's recurring, from the
20  Plaintiff's perspective, that Defendants have
21  taken questionnaire data, and presented it to the
22  Court in various different ways, and it seems to
23  be an ongoing issue.  And so that's why we're
24  seeking, really, just confirmation that those
25  questionnaires have a very limited purpose that

Page 41

1    is for settlement (indiscernible)

2            PROFESSOR CAPRA:  And that actually is

3    the main -- to me, to my mind, that's the main

4    argument.  Like, what is the meaning of the

5    questionnaires?  What are they for?  What do they

6    do?  Right?  Well --

7            DANI JAMES:  Yeah, Professor -- I'm

8    sorry.

9            PROFESSOR CAPRA:  I'm sorry.  No,

10   whoever (indiscernible)

11           DANI JAMES:  You may or may not want to

12   hear from me on this at this juncture.

13           The Plaintiffs have accurately captured

14   our -- and we included our responses in our email

15   communication to Chambers, that we do think a

16   discussion of a pretrial schedule before we've

17   confirmed the trial date isn't particularly a

18   good use of everybody's time, recognizing that if

19   we're going forward in September, we can very

20   quickly meet and confer, and have something to

21   propose to the judge.  If we're going forward on

22   a different date, we just didn't think it was

23   worth the sort of mental gymnastics to come to

24   something agreed upon.

25           On the second issue, it is something

Page 42

1    they raised in their papers, which we are

2    planning to respond to in their papers.  And

3    quite frankly, if you look at the rule, like, I

4    don't -- We asked them on our call, what is it

5    you think we've done that violates the rule?

6    Because we haven't used the questionnaires in a

7    way to challenge, you know, claims or numbers,

8    it's just information.  And we had indicated in

9    our communication with the Court last night that,

10   you know, we expect to address this issue in due

11   course when we reply to the brief in which they

12   made this argument.

13           PROFESSOR CAPRA:  Yeah, I will just

14   tell you that the judge feels that that issue,

15   which you might call the 408 issue, I have

16   trouble getting that into my head, because 408 is

17   about admitting evidence in a trial.

18           DANI JAMES:  Exactly.

19           PROFESSOR CAPRA:  But I do get the

20   point, though.  I can see how it's a 408 issue,

21   is bound up with the other.  And so I think

22   you're going to find that he's going to find that

23   it's premature for the April 9th.  He's obviously

24   interested in deciding that issue, but he thinks,

25   as do I, that it's that May issue.  It should be

                                                    Page 43

1   put to May, because that's where the papers are,

2   and the Defendants haven't responded to it yet,

3   so --

4            And here's the final thing I'd say.  So

5   this claim trial starts at 2:30.  It's probably

6   not going to be 2:30, it's probably going to be

7   3:00.  And the 403 argument's are going to last

8   like an hour-and-a-half, and I have to leave at

9   4:30 because I teach -- which doesn't make much

10  difference. actually.  But I don't think you want

11  the judge on a midnight schedule here.  So I

12  really -- this April 9th thing should be trial

13  date, individual Plaintiffs, and the 403 guilty

14  plea.  That's a lot, I think.  And then we've got

15  to talk to him about the video, too.

16            But anyway, obviously, it's on the

17  agenda.  I'm just giving you a preview that his

18  view is that that particular one is premature

19  right now.  I should say that he wants to hear it

20  with the other issues about the questionnaire for

21  July 1st.

22            CY SMITH:  Understood.

23            PROFESSOR CAPRA:  Excuse me -- yeah,

24  with the issue about July 1st.

25            Sorry, Mr. Smith.  Is that --

Page 44

```
 1              CY SMITH:  No, no, understood.  Thank
 2    you.
 3              PROFESSOR CAPRA:  Okay.
 4              And then, as to the trial, setting up
 5    dates, I don't know that he has an opinion about
 6    that right now.  So obviously, you can talk to
 7    him on the 9th.
 8              CY SMITH:  Yeah.
 9              PROFESSOR CAPRA:  Okay.  I think that's
10    all I have.
11              STEPHEN DONALDSON:  Professor Capra --
12              PROFESSOR CAPRA:  Yes?
13              STEPHEN DONALDSON:  If you don't mind,
14    I'd like to ask a follow-up question.  I don't
15    believe that anyone from Epiq is slated to
16    appear, or even attend that April 9th conference.
17              PROFESSOR CAPRA:  Oh.
18              STEPHEN DONALDSON:  And I think if the
19    only purpose for that would have been to show the
20    video, I think from our perspective, it's fine
21    for Counsel to show that on our behalf, if that's
22    acceptable.
23              PROFESSOR CAPRA:  Yeah.  Does somebody
24    want to volunteer on that one?  I mean, maybe
25    it's not even necessary.  I think it actually is,
```

Page 45

```
 1   though.  I think it would be useful to have him
 2   to see, have him see what's been done.  Somebody
 3   from Class Counsel side can probably do that,
 4   can't they?  Because they're the ones who are,
 5   you know, bringing up that issue.  Can we ask, or
 6   --
 7             CY SMITH:  I'm sure we can arrange for
 8   that.
 9             PROFESSOR CAPRA:  Okay.  Yeah, I don't
10   want you to go nuts.  But if it can be done, it
11   would be useful to have it there.
12             CY SMITH:  By nuts, do you mean popcorn
13   and soda?  Or what --
14             PROFESSOR CAPRA:  I mean you do not
15   need to bring, you know, a whole camera, a video
16   crew in there to do it.  Just like, if somebody
17   knows how to do it, and can play it on their
18   laptop.  Otherwise, let's forget it.
19             Okay.  Anything further?  So our next
20   meeting, if we're --
21             BARRY BERKE:  Professor Capra, I'm
22   sorry -- oh, I'm sorry.
23             PROFESSOR CAPRA:  Yes?  Oh, keep going.
24   Yeah, sorry, I didn't mean to (indiscernible)
25             BARRY BERKE:  (indiscernible) but we
```

Page 46

```
1    can do -- if you want to do scheduling first?  I
2    didn't mean to interrupt.
3            PROFESSOR CAPRA:  Okay.  Well, all I
4    was saying is that having a meeting on -- it
5    would be the 10th, seems -- I don't know.
6    Because we're going to meet all, kind of half of
7    the day on the 9th.  So I was thinking that the
8    next meeting, I would like to schedule it for
9    Tuesday the 15th, at 2:00.  So that is, that's
10   what I'm going to do.  Yeah, I can do that.
11   That's what I'm going to do.  And I don't see the
12   point of meeting the day after the April 9th
13   meeting, so -- So the 15th, 2:00.
14           Mr. Wynne, good for you?
15           JOHN WYNNE:  No problem from my
16   perspective, Professor Capra.
17           PROFESSOR CAPRA:  Okay.  So let's keep
18   going, and we'll keep -- Whoever's got anything
19   to talk about -- Mr. Berke?
20           BARRY BERKE:  Thank you, Professor
21   Capra.
22           So I just wanted to raise an issue --
23   really, two issues to raise.  One relates to the
24   questionnaire process.  And if you recall, we've
25   had discussions about why it would not be
```

Page 47

1   appropriate to have, like, a phone bank for the
2   questionnaire respondents, or folks responding.
3          And sort of related to that issue, one
4   of the things that has come to my attention
5   recently, but that we've noticed is that one of
6   the lawyers from the Hecht firm, Theo Bruening,
7   who's not on this call I should note, but Ms.
8   Nelson is from the same firm, that when he has
9   joined the Zoom, including recently in March, his
10  Zoom name says Sudan Victims Case Liaisons Zoom.
11  He has, when this has happened, including
12  recently, he changed it to his name, but it was -
13  - and I'll repeat it, it said Sudan Victims Case
14  Liaisons Zoom, and we're not sure what that
15  relates to.  And there have obviously been some
16  discussions about what communications can be had
17  and cannot be had with respondents regarding the
18  questionnaire.
19          So we would ask, Professor Capra, that
20  if you could inquire and ask, and I appreciate in
21  fairness Mr. Hecht is not -- I'm sorry Mr.
22  Bruening is not on the phone, and I'm not sure
23  whether Ms. Nelson knows the answer.  But to
24  explain what these meetings are, what it means to
25  be a Victims Case Liaison?  Because it's really

Page 48

1   not the case.  They're Plaintiff's lawyers.  And

2   was this done recently?  Because last time, I

3   think we've seen it March 19th, and who are they

4   meeting with?  Is it about the questionnaire,

5   what's being said?  So we would ask that that

6   information be provided.  We think that would be

7   appropriate.

8              And then we have sort of a related

9   request, but I'll pause on that.

10             PROFESSOR CAPRA:  Well, I just want to

11  ask a question before I get to that.  So I mean,

12  I'm aware, I guess we're all aware that Class

13  Counsel received complaints, which has actually

14  fueled this process.  Right?

15             BARRY BERKE:  A hundred percent.

16             PROFESSOR CAPRA:  And so there is an

17  implicit agreement that Class Counsel can field

18  these complaints, and bring them to us for the

19  purpose of improving the questionnaire process.

20             BARRY BERKE:  We completely agree.  And

21  in fact, Boyd, in her submission said that there

22  have been thousands of calls with questions.  And

23  in terms of, you know, questions and

24  questionnaires, 100%.  That's different, though,

25  obviously, than having -- you know?  And again,

```
                                      Page 49
 1   we don't know the answer.  It may be nothing.
 2           PROFESSOR CAPRA:  Yeah.
 3           BARRY BERKE:  There may be nothing.  It
 4   may be unrelated.  There may not be any sort of
 5   liaison meetings.  We don't know.  But the issue
 6   was raised, and had recently come to my
 7   attention, although it had been noticed by other
 8   counsel at an earlier time, and it was brought to
 9   our attention to discuss.  So I think at first,
10   we would just like more information.  Because we
11   think in terms of evaluating the questionnaire
12   and the questionnaire process, we'd like to
13   better understand it.  Not suggesting that
14   there's anything improper with it, we just don't
15   know what it is, obviously.  But the fact that it
16   was called that raised some questions.  And it
17   may be they are easy to answer, we just don't
18   know.
19           So that would be the first
20   questionnaire-related question.  And there's a
21   second related to that, and that is whether or
22   not Plaintiffs are keeping any logs of these
23   calls they're having.  Because again related to
24   this, Ms. Boyd, in her recent submission
25   declaration, said that there have been thousands
```

```
                                                  Page 50
 1   of discussions and meetings with potential
 2   Respondents regarding the questionnaires.  So the
 3   question is, is there a record of this?  Who's
 4   calling?  What are they asking and the like, that
 5   we could then just be produced so that everybody
 6   has the same information.
 7            PROFESSOR CAPRA:  Well, it's
 8   unfortunate that Ms. Boyd is not on the call
 9   today so she could respond to that.  But Ms.
10   Nelson, do you have a preliminary response?
11            KRISTEN NELSON:  If I may, Barry and
12   Professor Capra, I'd like to defer to Lee on
13   that.  And she's not on the call at the moment,
14   so we'd be happy to get back with you on that on
15   our next call, or when it when it's next
16   appropriate.
17            PROFESSOR CAPRA:  Yeah, why don't we
18   make, why don't -- I'll give some thought of what
19   you're what you're bringing up Mr. Berke, and why
20   don't we have that as an agenda item for the next
21   call,, that they can explain the association
22   there, and what's being done, and what's being
23   logged, and what's being recorded.  Those are
24   questions that certainly the judge would be
25   interested in.  I mean, he's obviously interested
```

```
                                        Page 51
 1   in that issue.  I mean, he had it where, you

 2   know, the question was, can you have, like,

 3   outside agents come and contact the Claimants?

 4   And so, yeah, he would be interested in that, so

 5   it would be useful to have a record that I could

 6   present to him, and a description, if I need to.

 7           So okay, Ms. Nelson?  Is that something

 8   we can ask Ms. Boyd to do?

 9           KRISTEN NELSON:  Yes, Professor Capra.

10   I'll relay that message to her.

11           PROFESSOR CAPRA:  Okay.

12           BARRY BERKE:  Great.

13           PROFESSOR CAPRA:  Thanks.  Anything --

14           BARRY BERKE:  Thank you, Professor

15   Capra.  We appreciate that.  That's very fair,

16   since Ms. Boyd and Mr. Bruening are not on the

17   call.  So I completely agree.

18           PROFESSOR CAPRA:  Right.  Great.

19           BARRY BERKE:  The second issue, we just

20   wanted to -- You had asked, are there any other

21   issues that could be on the agenda for next week?

22   We just wanted to mention, just for your

23   awareness, not asking you to do anything,

24   obviously, as Professor, you know, predating our

25   involvement and your involvement, there was a
```

```
                                          Page 52
 1   whole Rule 23 Class Counsel selection process
 2   that had certain requirements and the like.  We
 3   have written a letter to Plaintiffs regarding the
 4   new lawyers, and what we believe to be the
 5   requirements of Rule 23 for information.
 6              And again, just flagging this, because
 7   we asked them to respond by the end of tomorrow.
 8   So they have received the letter, there's no
 9   issue that's prompted, but depending on the
10   response, it's possible those could be present
11   issues that we raise before the judge, even if we
12   ask to submit papers after it.  Because we
13   recognize we have limited time, so we're going to
14   be respectful.  But just in response to your
15   question, we didn't want to not mention it, that
16   it's possible at least that issue could be
17   raised, even if it's to submit papers after the
18   conference.
19              PROFESSOR CAPRA:  Oh, you would just --
20   what, you would flag it and say, don't decide it
21   now, here's your papers?
22              BARRY BERKE:  Well, no, no.  I don't
23   even think it's to be decided.  So you know, new
24   counsel have arrived.  We believe that there is
25   that, as when -- Even in this case, when Class
```

Page 53

1   Counsel sought to have new lawyers come in, they

2   made an application pursuant to Rule 23 to

3   substitute who would be Class Counsel for the

4   Class.  Here that has not been done.  There's

5   simply been notices of appearances filed on

6   behalf of two new law firms.

7           Our view is that we believe Rule 23,

8   and the case law says more is required, and as

9   part of that -- And again, we don't necessarily

10  have a dispute yet.  But as part of that process,

11  we have asked Plaintiffs to provide more

12  information regarding new counsel.  And in

13  fairness to them, we told them to respond by the

14  end of business tomorrow so we can know whether

15  there's anything to raise.

16          If there is a dispute, all I'm saying

17  is I can envision making the judge aware of it

18  since I think we have an obligation to raise it

19  in a timely way, but to say we would be happy to

20  submit papers on the issue after the conference,

21  if he prefers.  But we think that we would at

22  least want to flag it for him.  If there is a

23  dispute, it may be something we can resolve.

24          PROFESSOR CAPRA:  Yeah, I don't know,

25  actually -- truthfully, I don't know how he is

Page 54

1    about -- how ironclad he is about agendas.  You

2    probably know better than I, Mr. Berke, about how

3    he is about agendas.  Like -- It's not on the

4    agenda.  Right?

5              BARRY BERKE:  Yeah.  And it's not yet

6    just because the issue has come to our attention,

7    and we're waiting for a response.  So>..

8              PROFESSOR CAPRA:  Right.

9              DANI JAMES:  We're hoping there's not

10   going to be a dispute.

11             BARRY BERKE:  Well, we're happy to

12   raise it beforehand (indiscernible)

13             CY SMITH:  Just to be clear about it,

14   Professor Capra, we did receive a letter from Mr.

15   Berke.  There hasn't been any change in Class

16   Counsel.  The co-lead Class Counsel are Ms. Boyd

17   and Mr. Hausfeld.  That hasn't changed at all.

18             PROFESSOR CAPRA:  Yeah.  Right.

19             CY SMITH:  There's no action that's

20   required under Rule 23.

21             BARRY BERKE:  And on that, I believe

22   that then I think it is likely there will be a

23   dispute.  But we agree with you, though, that

24   it's a limited time period on Wednesday next

25   week, and we want to be careful that we focus on

```
                                              Page 55

 1    the issues of most immediate concern.

 2              PROFESSOR CAPRA:  Right.  Okay, great.

 3    I mean, I have preliminary thoughts about how

 4    that would work.  I mean, you know, you can't --

 5    Well, nope.  Nope, not going to say it.  That's

 6    beyond my -- It's not my jurisdiction, actually,

 7    so I will leave it at that.

 8              Anything further?  Other things we can

 9    discuss?

10              BARRY BERKE:  Not from Defense.

11              PROFESSOR CAPRA:  So yeah, I was

12    thinking that, you know -- yes.  And so one of

13    the agenda items that we'll have on the 15th is

14    pursuant to the request that Ms. Boyd is going to

15    respond to, but also anything that we need to

16    clean up from the 9th we'll talk about, and then

17    obviously, you know, matters as they recur.  So

18    the next meeting, as I say, Tuesday the 15th, at

19    2:00.  And anything that -- We're going to have,

20    just to recap, we're going to have email

21    exchanges about the outstanding matters.  Ms. Han

22    is going to take care of that.

23              And yeah, I think that's all I have.

24    Anything further?

25              BARRY BERKE:  Nope.  I will note I am
```

```
                                            Page 56
 1    seeing "Good Night, Good Luck" tomorrow.
 2              PROFESSOR CAPRA:  There you are.
 3              BARRY BERKE:  So if I see Clooney, and
 4    he happens to seem like he has free time
 5    (indiscernible) the video.
 6              PROFESSOR CAPRA:  Yeah, just ask him.
 7    Just ask him, yeah.  Either him, or Jonathan
 8    Groff.  He's playing Bobby Darin.  He would
 9    actually be better.  But anyway --
10              BARRY BERKE:  Oh, nice.
11              PROFESSOR CAPRA:  Thank you.  Thanks,
12    Mr. Wynne.
13              CY SMITH:  Very good.  Thank you.
14              DANI JAMES:  Bye-bye.
15
16
17
18
19
20
21
22
23
24
25
```

Page 57

1                 C E R T I F I C A T I O N

2

3   I, Lindsay Peacock, certify that the foregoing

4   transcript is a true and accurate record of the

5   proceedings.

6

7

8

9   _____

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date: June 21, 2025

**[1,781 - ahead]**

| 1 |
|---|
| **1,781** 7:14 |
| **1,800** 7:14 |
| **10** 16:22 |
| **100** 48:24 |
| **10th** 46:5 |
| **11501** 57:23 |
| **131** 7:15 8:9 |
| **14** 7:13 |
| **15** 8:2 |
| **15th** 46:9,13 |
| 55:13,18 |
| **160** 9:23 12:8 |
| 12:16 |
| **185** 10:3 |
| **19th** 48:3 |
| **1st** 33:6,19 |
| 34:10 36:5,13 |
| 40:5 43:21,24 |

| 2 |
|---|
| **20** 8:2 |
| **200** 8:10 |
| **2003** 16:19,24 |
| 16:24,24 |
| **2025** 57:25 |
| **2025.04.03** 1:11 |
| **21** 57:25 |
| **23** 34:2 36:21 |
| 52:1,5 53:2,7 |
| 54:20 |
| **25** 10:3 |
| **264** 6:23 |

| 27 6:25 |
|---|
| **28661** 57:7 |
| **2:00** 46:9,13 |
| 55:19 |
| **2:30** 43:5,6 |

| 3 |
|---|
| **30** 6:21 |
| **300** 57:22 |
| **330** 57:21 |
| **3:00** 43:7 |

| 4 |
|---|
| **403** 38:16 43:7 |
| 43:13 |
| **408** 40:19 |
| 42:15,16,20 |
| **4:30** 43:9 |

| 6 |
|---|
| **660** 40:12 |

| 7 |
|---|
| **7.5** 7:17 |
| **71** 6:24 8:8 |
| **7444884** 1:11 |

| 8 |
|---|
| **8** 7:7 |

| 9 |
|---|
| **9** 7:8 |
| **9th** 29:25 30:21 |
| 37:22,24,25 |
| 40:16 42:23 |
| 43:12 44:7,16 |
| 46:7,12 55:16 |

| a |
|---|
| **ability** 5:17 |
| **able** 5:12 6:2 |
| 21:11 25:21 |
| 27:15 28:1 |
| **absolutely** 8:14 |
| 11:16 23:3 |
| **acceptable** |
| 31:10 44:22 |
| **accidentally** |
| 15:3 |
| **accurate** 57:4 |
| **accurately** |
| 41:13 |
| **acknowledge** |
| 5:21 |
| **act** 20:16,24 |
| **action** 54:19 |
| **active** 17:22 |
| **actually** 34:8 |
| 35:25 36:14 |
| 41:2 43:10 |
| 44:25 48:13 |
| 53:25 55:6 |
| 56:9 |
| **add** 12:8 18:9 |
| 23:3 38:1 |
| **added** 5:25 |
| 18:14 38:20,22 |
| 39:2,4 |
| **adding** 2:19,20 |
| 15:6 18:4 |

| **addition** 14:18 |
|---|
| 17:15 |
| **additional** 15:6 |
| 18:4 |
| **address** 9:4 |
| 25:23 42:10 |
| **admitting** |
| 42:17 |
| **adopted** 11:13 |
| **affected** 26:16 |
| **afternoon** 2:16 |
| **aged** 6:18 7:12 |
| 23:13,17 |
| **agenda** 28:24 |
| 37:22,24,25 |
| 38:20,22 43:17 |
| 50:20 51:21 |
| 54:4 55:13 |
| **agendas** 54:1,3 |
| **agents** 51:3 |
| **ago** 39:10 |
| **agree** 17:14 |
| 31:24 34:25 |
| 48:20 51:17 |
| 54:23 |
| **agreed** 28:5 |
| 30:10 41:24 |
| **agreement** |
| 48:17 |
| **ah** 25:19 |
| **ahead** 7:5 8:19 |
| 8:20,22 13:22 |
| 14:6 39:23 |

**ai** 30:25 31:5
**allow** 17:8
**alluding** 5:6
**amanda** 2:14
**answer** 22:6,18
  35:22 38:13
  47:23 49:1,17
**answers** 32:19
**ant** 22:7
**anticipated**
  11:4 35:9,18
**anybody** 11:11
  34:15
**anytime** 5:3
**anyway** 12:24
  31:19 43:16
  56:9
**apologize** 36:2
**appear** 19:23
  44:16
**appearances**
  53:5
**appears** 18:23
  18:24
**application**
  25:6 53:2
**applying** 4:17
**appreciate**
  20:12 37:2
  47:20 51:15
**appropriate**
  29:10 47:1
  48:7 50:16

**approval** 30:16
**approved**
  14:11,22
**april** 29:25
  37:22,24,25
  40:16 42:23
  43:12 44:16
  46:12
**arabic** 12:13,18
  13:9
**area** 16:24
**argue** 35:14
  38:4
**argued** 34:5
**argument** 34:5
  41:4 42:12
**argument's**
  43:7
**arising** 6:10
  27:22
**arrange** 45:7
**arrest** 16:4,6
  18:3,9,14,21,23
  20:1,4
**arrested** 19:19
**arrests** 19:23
  19:24
**arrived** 52:24
**asked** 6:16
  20:10 35:19,24
  42:4 51:20
  52:7 53:11
**asking** 20:23
  40:16 50:4

  51:23
**assist** 5:4
**association**
  50:21
**assume** 25:12
**attack** 14:16,24
  15:24,25 16:23
  17:21
**attend** 44:16
**attention** 47:4
  49:7,9 54:6
**attributable**
  8:10
**available** 5:7
  25:21
**aware** 48:12,12
  53:17
**awareness**
  51:23

**b**

**back** 5:11 6:4
  11:25 17:12
  32:10 50:14
**bad** 8:11
**bank** 47:1
**banks** 29:8
**barry** 2:16
  34:17,25 35:13
  37:1,11,18
  45:21,25 46:20
  48:15,20 49:3
  50:11 51:12,14
  51:19 52:22

  54:5,11,21
  55:10,25 56:3
  56:10
**based** 10:7
  16:12 23:19
  25:23 26:23
**baseline** 33:25
**basically** 34:9
  38:5
**batch** 4:11
**beginning** 6:2
**behalf** 44:21
  53:6
**believe** 13:4
  44:15 52:4,24
  53:7 54:21
**benefit** 14:18
**berke** 2:16
  34:17,24,25
  35:13 37:1,11
  37:18 45:21,25
  46:19,20 48:15
  48:20 49:3
  50:19 51:12,14
  51:19 52:22
  54:2,5,11,15,21
  55:10,25 56:3
  56:10
**better** 49:13
  54:2 56:9
**beyond** 55:6
**big** 14:21 15:1
  15:7 32:22

| | | | |
|---|---|---|---|
| **bigger** 2:17 | **bye** 56:14,14 | 15:11,14 17:5 | **careful** 54:25 |
| **bit** 3:20 4:16 | **c** | 17:16 18:17 | **carriers** 12:15 |
| 6:6 12:12 | | 19:13 20:5,11 | **case** 23:14 |
| 13:19 16:8 | **c** 57:1,1 | 20:19,22 21:2 | 47:10,13,25 |
| 37:21 | **calendared** | 21:6,22 22:3 | 48:1 52:25 |
| **blank** 18:25 | 37:7 | 22:10,14,22,24 | 53:8 |
| 19:5,11,24 | **call** 3:13 5:5 | 23:6 24:9,19 | **cases** 21:18 |
| **bobby** 56:8 | 6:8,16 7:18 | 25:3,10,19 | **categories** |
| **bothering** 33:3 | 10:7 17:21 | 26:2 27:9,12 | 15:20,21 17:15 |
| **bound** 42:21 | 31:7 33:19 | 27:17 28:5,11 | **category** 4:13 |
| **boyd** 13:13,18 | 34:1 42:4,15 | 28:14,19 29:23 | **caused** 6:6 |
| 31:3 48:21 | 47:7 50:8,13 | 30:3,11,17,23 | **causing** 18:19 |
| 49:24 50:8 | 50:15,21 51:17 | 31:11,14 32:6 | **certain** 52:2 |
| 51:8,16 54:16 | **called** 4:24 | 34:24 35:12,21 | **certainly** 38:12 |
| 55:14 | 49:16 | 37:2,10,12,19 | 50:24 |
| **brainstorming** | **calling** 7:11 | 39:1,4,7,15,18 | **certify** 57:3 |
| 23:9 | 50:4 | 39:21 40:9,13 | **challenge** 42:7 |
| **bridget** 37:6 | **calls** 3:9 23:21 | 41:2,9 42:13 | **chambers** |
| **brief** 42:11 | 24:4 25:16 | 42:19 43:23 | 41:15 |
| **bring** 32:13 | 48:22 49:23 | 44:3,9,11,12,17 | **change** 11:12 |
| 45:15 48:18 | **camera** 45:15 | 44:23 45:9,14 | 54:15 |
| **bringing** 45:5 | **campaigns** 9:1 | 45:21,23 46:3 | **changed** 5:25 |
| 50:19 | **capra** 2:1,2,4,8 | 46:16,17,21 | 47:12 54:17 |
| **broader** 29:10 | 2:11,13,15,17 | 47:19 48:10,16 | **changes** 9:15 |
| 33:23 | 2:18,25 3:2,5,8 | 49:2 50:7,12 | 11:18 32:10 |
| **brought** 36:1 | 3:12,14,17,21 | 50:17 51:9,11 | **character** 9:20 |
| 49:8 | 4:1 5:6,14,19 | 51:13,15,18 | 9:23 12:2,8,16 |
| **bruening** 47:6 | 6:14,16 7:1,4 | 52:19 53:24 | 12:17,20 14:1 |
| 47:22 51:16 | 8:12,15,18,20 | 54:8,14,18 | **characters** 9:23 |
| **bunch** 29:1 | 9:5,14,19,25 | 55:2,11 56:2,6 | 10:3,3 11:19 |
| **buried** 3:16 | 10:5,9,19,24 | 56:11 | 11:24 12:13,13 |
| **business** 53:14 | 11:2,17 12:3 | **captured** 41:13 | **check** 18:22 |
| **button** 22:8,9 | 12:21 13:12,17 | **care** 12:4 25:6 | 32:9 |
| | 13:21 14:5,25 | 55:22 | |

**[checklist - cy]**                                                          Page 4

| | | | |
|---|---|---|---|
| **checklist** 21:23 | **comment** 29:22 | **concluded** 31:1 | **continue** 19:5 |
| **chosen** 21:10 | 34:15 | **confer** 11:25 | **continuous** |
| **circulate** 30:5 | **commented** | 17:11 41:20 | 23:1 |
| 32:5 | 31:7,8 | **conference** | **convenient** |
| **circulated** 10:2 | **comments** | 1:11 5:10 | 37:8 |
| 29:21 | 11:11 | 35:14 44:16 | **correct** 10:16 |
| **city** 17:22 | **communicated** | 52:18 53:20 | 11:1 34:20 |
| **claim** 43:5 | 5:23 | **confirm** 17:14 | **corresponden...** |
| **claimants** 4:16 | **communication** | **confirmation** | 28:17 |
| 5:23 13:14 | 41:15 42:9 | 40:24 | **counsel** 5:23 |
| 16:13 51:3 | **communicati...** | **confirmed** | 6:12 14:4 |
| **claims** 42:7 | 26:6 47:16 | 41:17 | 16:13 30:10 |
| **clarify** 10:13 | **complainants** | **conflicts** 15:9 | 31:8 34:8 |
| **class** 5:23 6:12 | 38:2 | **confused** 19:2 | 44:21 45:3 |
| 13:23 14:10 | **complaints** | 20:1 | 48:13,17 49:8 |
| 16:13 31:8 | 48:13,18 | **confusing** | 52:1,24 53:1,3 |
| 34:8,11 35:3 | **complete** 20:25 | 33:16,17 | 53:12 54:16,16 |
| 45:3 48:12,17 | 27:23 38:13 | **confusion** 5:1 | **counsel's** 13:24 |
| 52:1,25 53:3,4 | **completed** 19:9 | 18:20 19:10 | 30:16 34:11 |
| 54:15,16 | 24:2,5,8,17 | 35:2 | **country** 57:21 |
| **clean** 55:16 | 25:2,24 26:8 | **consequence** | **couple** 14:8 |
| **cleaned** 6:9 | 27:20 28:3,8 | 32:24,25 34:6 | 30:14 |
| **clear** 54:13 | **completely** | **consequences** | **course** 42:11 |
| **clerk** 33:14 | 32:25 48:20 | 33:7 | **court** 8:13 |
| 37:6 | 51:17 | **consider** 18:4 | 33:13,13 37:5 |
| **clooney** 56:3 | **concept** 30:6,18 | **consistent** 12:1 | 40:8,22 42:9 |
| **clooney's** 31:16 | 30:18 | 16:5 | **cover** 4:8 |
| **close** 18:5 | **conceptually** | **contact** 11:3 | **credit** 35:25 |
| **collapse** 19:7 | 17:5 | 51:3 | **crew** 45:16 |
| **come** 17:12 | **concern** 55:1 | **contacted** 28:9 | **culture** 3:9 |
| 19:15,15 31:4 | **concerned** | **contemplate** | **curious** 24:20 |
| 32:10 41:23 | 25:17 | 12:19 | **current** 6:5 |
| 47:4 49:6 51:3 | **concerns** 24:4 | **content** 13:9 | **cy** 2:7,9,9,12 |
| 53:1 54:6 | | 29:19 30:10 | 34:18,18 38:25 |

[cy - effect]                                                                            Page 5

| | | | |
|---|---|---|---|
| 39:3,8,16,19,24 40:11,18 43:22 44:1,8 45:7,12 54:13,19 56:13 | **decision** 12:20 **declaration** 49:25 **default** 4:20,25 **defendant** 10:2 **defendant's** 9:15 **defendants** 11:20 15:15 29:19,21 34:14 39:10 40:20 43:2 **defense** 14:4 55:10 **defer** 50:12 **definitely** 7:8 **delivered** 13:10 **demo** 29:25 30:1,7 31:19 **depending** 52:9 **deployed** 4:10 6:11 **deputization** 13:21 **deputize** 13:19 **describing** 19:18 **description** 51:6 **detail** 16:10 34:3 **details** 4:11 22:7 | **detention** 18:3 18:14 **difference** 39:22 43:10 **different** 5:16 12:14 15:5 40:22 41:22 48:24 **disagreement** 23:4 **discuss** 8:25 49:9 55:9 **discussed** 14:11 29:7 **discussing** 18:8 **discussion** 41:16 **discussions** 29:1 46:25 47:16 50:1 **display** 30:20 **dispositive** 36:16 **dispute** 53:10 53:16,23 54:10 54:23 **divide** 34:8 40:15 **doing** 2:5 3:22 9:2 15:5 21:20 29:6 **donaldson** 3:19 3:24 4:6,7 5:15 5:20 6:15 7:3,6 | 8:14,17,19,23 9:10,18,21 10:1,6,17,20 11:1,6,15,16 12:5,7 13:1 14:7 15:2,12 17:20,25 18:12 18:16 20:7,14 20:20,23 21:3 21:8,23 22:2,5 22:11,16,23 23:2 24:12 26:13 27:15 28:7,10,12 29:24 30:1,5 30:13,22 32:2 32:3 44:11,13 44:18 **dozen** 17:4 **draft** 10:8 32:4 **dude** 4:1 **due** 42:10 **duplicate** 24:13 24:23 |
| **d** | | | |
| **dani** 41:7,11 42:18 54:9 56:14 **danya** 2:25 3:1 3:3,6,11 **darin** 56:8 **data** 4:24 5:24 6:4 15:9 24:4 25:17 26:14 40:7,21 **date** 26:9 34:13 34:22 38:17 39:5,17 41:17 41:22 43:13 57:25 **dates** 44:5 **daubert** 39:12 **day** 6:2 46:7,12 **days** 7:13 **deadline** 9:3 **deal** 10:9,10,12 35:15 **death** 36:15 **decent** 24:13 **decide** 52:20 **decided** 52:23 **deciding** 42:24 | | | **e** |
| | | | **e** 57:1 **earlier** 49:8 **ease** 4:15 **easy** 49:17 **ecf** 40:12 **edits** 14:3 **effect** 40:5 |

effective  8:7
efficient  16:25
effort  38:13
eight  16:21
either  10:21
   56:7
eliminate  26:11
email  9:12
   10:22 13:5
   17:17 25:23
   41:14 55:20
emails  13:3
english  9:23
   12:8,16,20,23
   13:8
enhancement
   23:4
enhancements
   4:18
ensure  15:9
enter  18:20
   19:11
entered  20:20
   21:4,19
entire  22:7
envision  53:17
epiq  2:23 3:13
   3:24 4:3 6:7
   11:9 14:22,25
   31:3 32:16
   44:15
epiq's  9:3
   13:24

erased  25:18
especially
   24:14
essentially
   22:11 25:3
   30:7
established  3:9
estate  39:9
evaluate  36:13
evaluating
   49:11
evening  4:17
everybody  3:7
   29:16 37:9
   50:5
everybody's
   41:18
everyone's  4:9
evidence  42:17
exact  13:3
   16:23
exactly  9:21
   23:10 37:10
   42:18
example  18:21
   19:18 20:4,15
   23:13
excellent  28:14
except  16:2,7
exchanges
   39:13 55:21
excluded  10:22
excuse  43:23

exhibit  39:13
existed  6:4
expect  29:4
   42:10
experience
   12:10
experienced
   20:18
explain  47:24
   50:21
explaining  20:9

**f**

f  57:1
facilitator  4:18
   25:22
fact  16:13
   48:21 49:15
fair  40:18
   51:15
fairness  47:21
   53:13
family  16:8,10
   18:5,11
feel  7:2
feels  42:14
field  48:17
fields  20:25
   21:15
figure  25:5
   34:13 36:22
   37:15
file  35:4,7,7,8

filed  33:10 34:9
   35:10,19 38:23
   38:23 40:2
   53:5
fill  18:22 19:1,3
   19:20,21,25
   20:2 22:20,25
   25:10
filled  25:6,7
   26:10 33:9
filling  33:1,1
final  43:4
find  37:6 42:22
   42:22
fine  8:23 12:16
   14:2 44:20
finished  24:22
firm  47:6,8
firms  53:6
first  4:12 6:2
   7:7,19 8:8 36:8
   36:9 46:1 49:9
   49:19
five  21:11,14
   21:15 39:8
fix  6:11
fixed  6:9
flag  3:13 52:20
   53:22
flagging  52:6
flexibility
   12:12
focus  24:22
   54:25

**folks** 47:2
**follow** 13:6
   23:12 26:11
   27:21 28:4
   44:14
**followed** 13:8
**foregoing** 57:3
**forget** 45:18
**forgot** 9:20
**form** 18:25
   19:24 20:16
**format** 6:5
**forth** 38:18
**forward** 14:3
   41:19,21
**four** 7:9 21:12
**frankly** 40:6
   42:3
**free** 56:4
**fueled** 48:14
**full** 30:9
**further** 12:5
   23:7 28:15
   32:12 45:19
   55:8,24
**future** 23:4

**g**

**george** 31:16
**getting** 19:2
   23:21,23 27:23
   29:8 42:16
**give** 31:3 50:18

**giving** 43:17
**go** 6:3 7:5 8:19
   8:20,21,22 9:8
   11:14,25 12:22
   12:23 13:22
   14:6,13 34:12
   39:23 45:10
**goes** 8:12
**going** 2:17 3:11
   3:21 4:4,5,20
   5:9,17 9:22
   10:14 11:12,13
   27:18 28:19
   30:14 32:9
   34:5 35:6,7
   36:6,24 38:9
   38:18,22 41:19
   41:21 42:22,22
   43:6,6,7 45:23
   46:6,10,11,18
   52:13 54:10
   55:5,14,19,20
   55:22
**good** 2:11,16
   3:7 7:1,5 12:3
   13:12 17:16
   19:14 29:12
   30:13 31:18,25
   32:11 35:21
   37:18,19 41:18
   46:14 56:1,1
   56:13
**great** 3:6 17:18
   37:10,11 51:12

   51:18 55:2
**groff** 56:8
**group** 7:12,19
   7:20,23 8:8,9
   24:18
**groups** 26:15
**growing** 7:8
**guess** 11:5,8
   16:4 25:9
   33:16 34:1
   35:2,17 39:22
   48:12
**guilty** 38:17
   43:13
**gymnastics**
   41:23

**h**

**half** 7:7 8:5,6
   43:8 46:6
**han** 11:22,23
   15:18,19 16:1
   16:12 17:9,10
   27:10,17,18
   29:20 31:6,12
   32:9 55:21
**handful** 5:22
**hands** 30:16
**happen** 17:6
**happened**
   14:20 16:17,18
   47:11
**happens** 33:6
   33:20 56:4

**happy** 5:3
   50:14 53:19
   54:11
**harm** 4:11,12
   4:13 14:15,17
   15:7 16:7,11
   18:5,11,21
   19:8
**harms** 14:13,23
   14:24
**hausfeld** 54:17
**head** 42:16
**hear** 34:23 35:1
   36:6,24 38:10
   41:12 43:19
**heard** 6:10
   29:18,18
**hearing** 14:10
   14:14 18:19
   25:15 26:23
**hecht** 47:6,21
**hell** 2:2
**hellerstein** 34:2
**hello** 2:1,7,8,13
   2:14,15
**help** 21:17
**helped** 6:8
**helpful** 19:6
**hi** 2:25 3:2
**hiccup** 6:7
**hide** 21:4,12,13
   22:6
**hiding** 21:18

hit 7:13 18:24
19:21,21 21:14
hold 2:23 32:21
home 14:15,24
15:23,25 18:1
honor 34:18
39:3
hope 3:9
hopefully 4:14
hoping 54:9
hour 11:21
43:8
hours 5:16
hundred 48:15

**i**

idea 29:12
31:25 38:1
identify 28:1
identity 38:17
illiteracy 28:25
illiterate 28:24
38:2
illustrating
38:6
immediate 55:1
immediately
13:8
implementable
11:18
implicit 48:17
importance
33:21

important
36:18
improper 49:14
improving
48:19
inactivity 7:13
include 16:5
included 4:14
16:4 41:14
includes 4:21
including 5:8
47:9,11
incomplete
27:5
inconsistencies
33:4
inconsistency
33:2
inconsistent
32:16,19,19
indicated 42:8
indiscernible
3:18,23 10:8
10:10 13:16
14:6 22:15
39:20 40:12
41:1,10 45:24
45:25 54:12
56:5
individual
16:10 19:1,19
23:1 43:13
individuals 6:7
6:18 14:15

24:1,14 25:16
26:7
information
17:3 19:1,4,11
25:21 27:16
32:16 42:8
48:6 49:10
50:6 52:5
53:12
injuries 17:6
injury 18:5,10
inquire 47:20
ins 6:20 24:14
24:24 26:9,12
26:12
insight 6:16
instance 19:20
19:21 20:1
instances 18:21
18:23 19:8
20:4
interested
31:21 42:24
50:25,25 51:4
interrupt 46:2
invasion 14:15
14:24 15:24,25
18:1
involved 29:9
37:14
involvement
51:25,25
ironclad 54:1

issue 5:21,24
9:6 16:14
21:25,25 27:22
31:22 33:6,11
33:16,18,19,22
34:2,10,10,21
35:1,3,18 36:4
36:5 37:13
38:16 40:19,23
41:25 42:10,14
42:15,20,24,25
43:24 45:5
46:22 47:3
49:5 51:1,19
52:9,16 53:20
54:6
issued 40:14
issues 6:10
13:14 32:22
33:18 34:4
35:15 36:3
38:5,15,16,19
38:21 40:3
43:20 46:23
51:21 52:11
55:1
item 9:3 50:20
items 55:13

**j**

james 41:7,11
42:18 54:9
56:14

| | | | |
|---|---|---|---|
| **john** 2:2,6 3:12 | 46:6 | **kristen** 13:17 | **letter** 52:3,8 |
| 3:16 24:15 | **kinds** 17:6 29:9 | 13:23 15:19,23 | 54:14 |
| 46:15 | **kingdom** 5:11 | 16:3,16 17:24 | **liaison** 47:25 |
| **joined** 47:9 | **know** 2:20 3:10 | 18:7,15,18 | 49:5 |
| **jonathan** 56:7 | 7:9 8:5,8,10,25 | 19:17 20:12 | **liaisons** 47:10 |
| **judge** 29:2 | 11:21 13:15,25 | 21:7 22:19 | 47:14 |
| 30:20 34:2 | 14:19 15:8 | 23:8 24:25 | **life** 36:15 |
| 35:19,23,23 | 16:18,21,22 | 25:9,14,20 | **lift** 14:21,25 |
| 36:4,24 38:1,6 | 17:1,2 18:25 | 26:4 28:16 | 15:1,7 |
| 38:9 41:21 | 19:4,22,25 | 29:21 50:11 | **light** 11:23 14:9 |
| 42:14 43:11 | 20:17 21:17,18 | 51:9 | **liked** 29:11 |
| 50:24 52:11 | 23:10,25 24:2 | | **likely** 54:22 |
| 53:17 | 25:4,17,20,23 | **l** | **limine** 39:12 |
| **judge's** 37:6 | 26:5,6 28:2 | **labeled** 17:23 | **limit** 9:20,20,23 |
| **july** 33:6,19 | 29:2 31:1,17 | **language** 11:7 | 12:8,16,17,20 |
| 34:6,10 36:5 | 32:17 33:6,10 | 14:2 15:21 | 14:1 |
| 36:13 40:5 | 33:20,24 36:11 | 32:19 | **limitation** |
| 43:21,24 | 36:12,14,20,23 | **laptop** 45:18 | 11:23 12:2 |
| **jumps** 7:10 | 37:13 38:3,3,5 | **larger** 8:2 | **limited** 4:22 |
| **juncture** 41:12 | 38:8,13 39:8 | **late** 3:20 | 5:21 40:25 |
| **june** 57:25 | 39:11,25 42:7 | **launch** 6:1 | 52:13 54:24 |
| **jurisdiction** | 42:10 44:5 | **law** 53:6,8 | **lindsay** 57:3 |
| 55:6 | 45:5,15 46:5 | **lawyers** 2:20 | **lingering** 5:24 |
| | 48:23,25 49:1 | 3:4 47:6 48:1 | **list** 9:3 27:22 |
| **k** | 49:5,15,18 | 52:4 53:1 | 28:4 39:2 |
| **keep** 2:19,20 | 51:2,24 52:23 | **lead** 54:16 | **lists** 39:13,13 |
| 45:23 46:17,18 | 53:14,24,25 | **leave** 36:7,22 | **little** 3:20 4:15 |
| **keeping** 49:22 | 54:2 55:4,12 | 37:15 43:8 | 5:18 6:6 12:12 |
| **kind** 4:4 14:9 | 55:17 | 55:7 | 13:18 16:8 |
| 21:25 29:4,10 | **knows** 45:17 | **leaves** 37:20,21 | 19:23 37:21 |
| 30:19 31:4 | 47:23 | **lee** 2:14 31:7 | **live** 14:13 |
| 33:17 36:2,12 | **kovacs** 3:21 | 50:12 | **logged** 50:23 |
| 36:13 38:8,9 | 31:14 | **legal** 36:21 | **logs** 49:22 |
| 38:10 39:14 | | 57:20 | |

| | | | |
|---|---|---|---|
| **long**  10:4 30:11 | **matches**  10:21 | 23:17,23 26:25 | **muted**  15:2 |
| **longer**  7:8 | **matter**  31:21 | 27:4,7 51:10 | **n** |
| **look**  14:3 25:22 | **matters**  55:17 | **messages**  6:23 | **n**  57:1 |
| 29:21 30:4,20 | 55:21 | 7:14 8:1 | **name**  25:24 |
| 42:3 | **max**  21:19 | **messaging** | 47:10,12 |
| **looked**  10:2 | **mean**  7:4 11:20 | 26:14 | **necessarily** |
| **looking**  9:24 | 22:24 25:4 | **midnight**  43:11 | 18:10 23:18 |
| 10:1 | 26:4 27:9 28:6 | **milestones** | 53:9 |
| **looks**  2:18 | 29:5,6 39:21 | 39:12 | **necessary** |
| **lori**  5:6,11 | 40:18 44:24 | **mind**  34:1 | 44:25 |
| **loss**  18:5 | 45:12,14,24 | 37:20 41:3 | **need**  2:17 4:5 |
| **lost**  24:5 | 46:2 48:11 | 44:13 | 12:9 19:3 20:2 |
| **lot**  8:21 24:13 | 50:25 51:1 | **mineola**  57:23 | 20:25 25:8,12 |
| 38:4,11 39:25 | 55:3,4 | **missing**  25:18 | 45:15 51:6 |
| 43:14 | **meaning**  33:20 | **misuse**  40:6 | 55:15 |
| **luck**  56:1 | 41:4 | **modify**  22:13 | **needed**  22:12 |
| **m** | **means**  47:24 | **moment**  5:12 | **needs**  19:1 |
| **made**  9:15 40:8 | **meet**  3:3,6 | 50:13 | 32:23 33:2 |
| 42:12 53:2 | 41:20 46:6 | **monday**  5:9,11 | **neither**  33:24 |
| **main**  5:1 41:3,3 | **meeting**  40:17 | **month**  14:14 | **nelson**  13:16,17 |
| **make**  18:9 | 45:20 46:4,8 | **months**  39:9 | 13:23 15:23 |
| 27:21 39:22 | 46:12,13 48:4 | **morning**  4:10 | 16:3,16 17:24 |
| 43:9 50:18 | 55:18 | **motion**  35:8,8 | 18:7,15,18 |
| **makes**  11:3 | **meetings**  47:24 | 40:3 | 19:17 20:9,12 |
| 21:19 23:2 | 49:5 50:1 | **motions**  35:9 | 21:7 22:19 |
| 28:12 | **members**  14:10 | 39:12 | 23:7,8 24:25 |
| **making**  53:17 | 16:8,10 18:5 | **move**  30:9 | 25:9,14,20 |
| **march**  47:9 | 18:11 35:4 | 34:14 36:4,23 | 26:4 28:15,16 |
| 48:3 | **mental**  41:23 | **multiple**  18:20 | 29:15,16 31:22 |
| **marked**  20:3 | **mention**  9:22 | 23:15 26:19,20 | 47:8,23 50:10 |
| **master**  1:11 | 51:22 52:15 | 27:6 | 50:11 51:7,9 |
| **match**  23:18,22 | **mentioned**  8:25 | **multiply**  24:11 | **new**  2:8,9 3:4 |
| | **message**  8:7 | **multitude**  17:1 | 4:10,20 6:10 |
| | 9:13 13:25 | | |

6:12 12:1 52:4
52:23 53:1,6
53:12
**nice**  2:12 3:3
56:10
**nicely**  25:5
**night**  42:9 56:1
**non**  9:1
**nope**  55:5,5,25
**notable**  7:18
**notably**  4:19
**note**  18:13
28:22 47:7
55:25
**notice**  9:2,11
12:11 32:17
**noticed**  47:5
49:7
**notices**  13:4
53:5
**noticing**  13:7
**number**  7:15
10:22 11:24
12:12 19:8
23:21 24:13
36:4
**numbers**  42:7
**nuts**  45:10,12
**ny**  57:23

**o**

**o**  57:1
**objection**  14:1

**obligation**
53:18
**obliged**  19:10
**obviously**  11:2
31:21 37:14
42:23 43:16
44:6 47:15
48:25 49:15
50:25 51:24
55:17
**occurrence**
14:17
**occurrences**
16:15
**occurring**
16:11
**office**  5:7
**offset**  5:18
**oh**  3:14,17 14:7
23:8,22 25:23
25:25 31:11
44:17 45:22,23
52:19 56:10
**okay**  3:5 5:14
5:19 6:14 8:17
8:18 10:24
11:12,14,17
14:5 17:19,20
17:25 18:17
21:8 22:4,23
23:3,6 25:19
28:12 30:23
32:6,11 37:1
37:19 39:15

40:15 44:3,9
45:9,19 46:3
46:17 51:7,11
55:2
**old**  57:21
**older**  27:5
**once**  17:3 21:4
21:14 30:9
**ones**  23:1 45:4
**ongoing**  40:23
**open**  27:6
**opinion**  44:5
**opt**  6:20,20
7:20,20,23,23
7:25,25 10:21
10:21 23:20
24:7,14,23
26:1,9,11,12
31:23,23 33:24
33:24
**opted**  6:22,23
10:15,16 23:15
24:11,11,16
26:20 27:19
28:1 33:9
**option**  4:23
14:12
**order**  28:23
**original**  12:11
13:4,7
**ot**  25:7
**outlined**  9:1,11
**outreach**  6:17
23:12,16 24:1

25:1
**outs**  6:20
**outside**  51:3
**outstanding**
55:21
**overseas**  5:10

**p**

**page**  18:13
32:4
**pages**  4:12,16
15:6,7
**papers**  33:11
34:9 40:13
42:1,2 43:1
52:12,17,21
53:20
**part**  12:19
40:11,12 53:9
53:10
**particular**
16:24 17:2
43:18
**particularly**
41:17
**parties**  29:7
32:5 36:7,22
37:15
**passed**  7:21,24
**pause**  48:9
**peacock**  57:3
**people**  2:22,23
6:1,22,24 7:14
7:15 8:6 10:15

10:18,25 16:9
18:20 20:1
22:20 23:12,15
23:16 24:10,22
26:15,16,18
28:24 31:2
32:17 33:3,8
33:23 37:13
**people's** 19:10
24:4
**percent** 48:15
**percentage**
7:18
**perfect** 12:3
**period** 7:10
54:24
**perry** 2:25 3:1
3:3,6,11
**person** 25:24
31:13
**perspective**
13:24 34:21
40:20 44:20
46:16
**phone** 10:22
12:14 29:8
47:1,22
**physical** 18:4
18:10
**pin** 23:18,19,21
24:3,6 25:22
26:25
**place** 13:20

**plaintiff's**
40:20 48:1
**plaintiffs** 33:10
34:19 35:6
37:4 38:4,18
39:4 41:13
43:13 49:22
52:3 53:11
**plan** 9:2,11
11:11 13:2
15:15
**planning** 42:2
**play** 45:17
**playing** 56:8
**plea** 38:17
43:14
**plus** 7:13 14:20
**point** 22:25
42:20 46:12
**points** 22:3
**popcorn** 45:12
**position** 34:11
**possible** 9:15
21:21 52:10,16
**possibly** 32:18
**potential** 50:1
**pre** 39:4
**predating**
51:24
**prefer** 39:16
**prefers** 53:21
**preliminary**
4:24 50:10
55:3

**premature**
42:23 43:18
**prepared** 32:16
**present** 51:6
52:10
**presented**
40:21
**pretrial** 41:16
**pretty** 7:1
15:13 31:25
32:1
**preview** 43:17
**previous** 26:12
**previously**
14:12 31:9
35:6
**probably** 3:16
30:15 43:5,6
45:3 54:2
**problem** 2:6
23:11 33:17
46:15
**problematic**
32:15
**problems** 13:14
36:13
**proceed** 29:13
31:20 32:2
**proceedings**
57:5
**process** 46:24
48:14,19 49:12
52:1 53:10

**produced**
30:15 50:5
**production**
30:9
**professor** 2:1,2
2:4,8,10,11,13
2:15,16,18,25
3:2,5,8,12,14
3:17,21 4:1 5:5
5:14,19 6:14
6:16 7:1,4 8:12
8:15,18,20 9:5
9:14,19,25
10:5,9,19,24
11:2,17 12:3
12:21 13:12,17
13:21 14:5,25
15:11,14 17:5
17:16 18:17
19:13 20:5,11
20:19,22 21:2
21:6,22 22:3
22:10,14,22,24
23:6 24:9,19
25:3,10,19
26:2 27:9,11
27:12,17 28:5
28:11,14,19
29:23 30:3,11
30:17,23 31:6
31:11,14 32:6
34:24 35:12,21
37:2,10,12,19
39:1,3,7,15,18

**[professor - recognize]** Page 13

39:21 40:9,13
41:2,7,9 42:13
42:19 43:23
44:3,9,11,12,17
44:23 45:9,14
45:21,23 46:3
46:16,17,20
47:19 48:10,16
49:2 50:7,12
50:17 51:9,11
51:13,14,18,24
52:19 53:24
54:8,14,18
55:2,11 56:2,6
56:11
**profound** 36:20
**programs**
29:10
**progress** 26:18
26:19
**prompt** 27:23
**prompted** 52:9
**proof** 30:6
**property** 16:2,7
16:7 18:6,11
**proposal** 12:1
**propose** 26:23
37:3 41:21
**proposed** 9:8
11:10 13:24
14:3 17:13
39:11
**provide** 13:19
23:16 24:1

53:11
**provided** 29:15
29:16 48:6
**providing** 16:9
**purpose** 40:25
44:19 48:19
**pursuant** 53:2
55:14
**put** 10:13 16:19
16:20,22 17:3
21:23 25:5
28:17 30:7
43:1
**putting** 36:2

**q**

**query** 4:19
**question** 16:17
29:23 30:14
35:17,22 36:8
36:9,19,21,22
38:19 40:6,18
44:14 48:11
49:20 50:3
51:2 52:15
**questionnaire**
4:21 6:6 19:12
23:19,23,24
24:2,6,7,17,18
24:23 25:2,7
25:11,25 26:8
26:10,17,18
27:4,7,20,24
28:3 33:21,22

34:7 36:16
40:7,21 43:20
46:24 47:2,18
48:4,19 49:11
49:12,20
**questionnaires**
6:3,19,25 7:12
7:17 8:8,9
23:13,17 26:19
27:6 32:15,15
32:18,24 33:8
33:9 40:25
41:5 42:6
48:24 50:2
**questions** 5:25
11:6 14:18
19:4,7 36:15
37:23,23 48:22
48:23 49:16
50:24
**quickly** 6:9
41:20
**quite** 42:3

**r**

**r** 57:1
**raise** 38:5
46:22,23 52:11
53:15,18 54:12
**raised** 42:1
49:6,16 52:17
**range** 21:10
24:18

**rape** 14:12
15:25
**rate** 24:21
**rates** 6:17
**reach** 5:3,12
**ready** 30:19
34:12
**real** 39:9
**really** 6:9 8:4
8:24 29:9
31:20,25 32:22
35:24 36:15,18
40:24 43:12
46:23 47:25
**reason** 17:8
36:10 37:16
**reasonable**
11:10 17:11
**recall** 46:24
**recap** 55:20
**receive** 23:17
54:14
**received** 24:3
32:20 48:13
52:8
**receiving** 25:1
**recent** 26:10
27:3 49:24
**recently** 27:2,8
47:5,9,12 48:2
49:6
**recognize**
52:13

recognized
  13:22
recognizing
  35:14 41:18
record  27:19
  50:3 51:5 57:4
recorded  50:23
recording  1:12
records  19:22
  20:21
recovery  33:25
  34:1
recur  55:17
recurring
  40:19
reduce  19:9
refer  35:23
regarding
  47:17 50:2
  52:3 53:12
regards  12:17
related  33:18
  47:3 48:8
  49:20,21,23
relates  46:23
  47:15
relay  51:10
rely  13:13
remember  9:7
  31:12
reminder  17:13
reminders
  10:12,14,17
  11:3,4,5

remove  27:21
  28:4
reopen  6:3
repeat  14:17
  47:13
repeated  14:12
  14:19 15:21
  17:3,15 22:17
  22:19,25
repeatedly  17:7
reply  42:11
report  4:3 6:12
  6:21 8:13
  23:11
reported  16:14
reporting
  25:15
represent  15:7
representative
  3:25
request  48:9
  55:14
requests  14:8
required  53:8
  54:20
requirements
  52:2,5
resolve  53:23
resolved  32:23
respect  14:8,9
  29:14
respectful
  52:14

respond  5:17
  8:6 35:10 37:3
  42:2 50:9 52:7
  53:13 55:15
responded  43:2
respondents
  47:2,17 50:2
responder  9:1
responding
  35:20 47:2
response  6:17
  34:13,22 38:8
  50:10 52:10,14
  54:7
responses
  41:14
rest  17:12
result  5:24
revisions  17:13
right  2:19 4:1
  8:13 9:10 10:5
  15:11 16:16,19
  16:19 17:7
  18:2,7 20:15
  21:7,22 22:2
  24:25 25:7
  28:7 35:21
  40:4 41:6
  43:19 44:6
  48:14 51:18
  54:4,8,18 55:2
road  57:21
robotic  30:25
  31:5

roll  19:7
roughly  6:25
  7:17,19 8:10
rounds  9:12
rule  34:2 36:21
  42:3,5 52:1,5
  53:2,7 54:20
ruled  33:3
ruling  38:9

          s

sample  20:16
save  18:24
  19:21,22 22:8
saved  20:21
  22:6
saying  23:21,23
  46:4 53:16
says  47:10 53:8
schedule  11:14
  33:12 35:20
  36:7 37:3,7
  39:5,11 41:16
  43:11 46:8
scheduling
  11:7,9 35:2
  46:1
scope  15:4
screen  2:17
  20:8
script  32:4
search  4:20,22
  4:24 5:1,2

**[searching - step]**                                                          Page 15

searching  4:19
second  4:13 8:9
   18:24 19:21
   24:17 35:3,18
   36:8 41:25
   49:21 51:19
secondary  25:1
seconds  6:21
section  18:1
   21:4 22:7,12
sections  18:2
   19:12
see  2:11,12,22
   3:7,15 8:1
   21:24 22:3,8,9
   25:23 27:6,16
   31:4,20 37:17
   39:17 42:20
   45:2,2 46:11
   56:3
seeing  14:3,10
   56:1
seeking  40:24
seem  8:7 16:9
   56:4
seemed  11:10
seems  17:11
   40:22 46:5
seen  48:3
select  21:14
selection  52:1
send  4:5 9:12
   12:1,10 13:2
   26:24

sending  7:21
   7:24 11:5
   12:11
sense  11:3 18:9
   21:20 23:2
   28:13
sent  6:23 7:14
   13:3,4 28:23
   29:15 39:10,10
separate  13:10
   35:5,8,15
september
   41:19
serious  36:14
set  14:18 24:21
   33:12 34:22
setting  44:4
settlement  41:1
several  16:15
   23:14 24:3
   28:2
sharing  20:8
shorten  11:25
shortly  12:1
   29:22
shot  31:3
show  4:12 20:6
   44:19,21
showed  30:19
showing  20:24
shown  21:13
side  8:24 26:14
   26:15 31:8
   45:3

signature  57:7
similar  32:4
simple  32:1
simply  53:5
single  26:24,25
slated  44:15
smaller  4:18
smith  2:7,9,9
   2:12 34:18,18
   38:25 39:3,8
   39:16,19,24
   40:11,18 43:22
   43:25 44:1,8
   45:7,12 54:13
   54:19 56:13
soda  45:13
solution  23:10
   26:3,22 28:7
solutions  57:20
solved  15:8
somebody
   19:25 28:1
   44:23 45:2,16
somewhat
   33:18
soon  2:17 35:8
sorry  3:19,20
   7:5 8:18 14:6
   15:2 17:9 27:2
   27:10,12 32:8
   41:8,9 43:25
   45:22,22,24
   47:21

sort  13:19 16:5
   19:7,9 23:9
   41:23 47:3
   48:8 49:4
sought  53:1
sound  29:17
   31:5
sounds  7:4
   15:15 27:22,25
speak  8:4
special  1:11
specific  7:15
   16:9
specifically
   15:23
speed  3:10
spike  8:2
split  34:4
spoke  34:3
spoken  16:14
stance  24:9
standpoint
   21:9
start  4:3 33:3
started  4:2 7:21
   7:24
starting  5:9
starts  43:5
startup  12:5
statement
   11:13
stays  39:5,17
step  30:8

**[stephen - think]** Page 16

| | | | |
|---|---|---|---|
| **stephen** 3:13,19 3:24 4:7 5:15 5:20 6:15 7:3,6 8:14,17,19,23 9:10,18,21 10:1,6,17,20 11:1,16 12:7 13:1 14:7 15:2 15:12 17:20,25 18:12,16 20:7 20:13,14,20,23 21:3,8 22:2,5 22:11,16,23 23:2 24:12 26:5,13 27:15 28:10,12 30:1 30:5,13,22 32:3 44:11,13 44:18 **straightforward** 15:13 **structure** 13:6 **students** 29:9 **stuff** 8:12,21 39:14 **submission** 40:10 48:21 49:24 **submissions** 24:13 40:7 **submit** 23:24 27:3 52:12,17 53:20 | **submitted** 6:1 6:19,25 7:16 21:12 23:20,22 26:17 34:21 **subsequently** 6:24 7:16 **subset** 24:16,19 **substantive** 21:24 **substitute** 53:3 **succinct** 4:9 **sudan** 47:10,13 **sudanese** 12:13 12:18 13:9 **suffering** 28:24 **suggest** 8:16 11:24 **suggested** 32:20 **suggesting** 15:20 26:24 49:13 **suggestion** 15:16 21:3 **suggestions** 11:12 29:17 **suggests** 18:25 **suhana** 11:23 15:19 16:1,12 17:10 18:8 27:10,18 29:20 31:6,12 **suite** 57:22 | **sunday** 6:13 **sure** 21:6 26:21 27:21 39:18 45:7 47:14,22 **surprised** 8:1<br><br>**t**<br><br>**t** 57:1,1 **table** 19:23 **take** 6:20 11:12 29:20 30:12,14 35:24 36:1 55:22 **taken** 40:21 **takes** 8:5 12:4 **talk** 28:20,20 37:6,21 38:21 43:15 44:6 46:19 55:16 **talked** 11:4 32:13 36:3 37:4 38:1 **talking** 7:11 9:7 9:8,17 11:8 28:6 31:2 40:4 **target** 26:6,6 **targeted** 24:1 **targeting** 27:1 **teach** 43:9 **team** 17:12 **tech** 21:25 **technical** 21:9 **teed** 33:13 | **tell** 20:14 29:4 34:11 42:14 **ten** 14:20 **terms** 11:9 48:23 49:11 **text** 9:6,12,16 9:16,19 11:8 11:18 13:7,9 13:24 **texts** 9:8 13:5 13:10 **thank** 3:14 4:7 13:18 18:15,16 20:13 37:18 44:1 46:20 51:14 56:11,13 **thanks** 2:4,4 20:11 51:13 56:11 **theo** 47:6 **thing** 8:24 16:23 18:18 23:8 27:1,3 30:18,24 32:13 40:2 43:4,12 **things** 4:3,4,8 5:17 21:5 29:3 29:6,8 47:4 55:8 **think** 4:24 12:4 12:15,18 13:2 14:11,13,17 15:4,12,16,17 17:7,8 18:7,9 |

[think - update]                                                        Page 17

20:7,8 21:11
21:16,18,21
22:19 24:12,18
26:15,22 28:17
29:12,17,18
30:8,14 31:6
31:24 32:6,22
33:2 34:10,20
37:4 38:2,6,10
38:11,12,18
41:15,22 42:5
42:21 43:10,14
44:9,18,20,25
45:1 48:3,6
49:9,11 52:23
53:18,21 54:22
55:23
**thinking**  19:6
21:9 26:13
27:24 29:3
46:7 55:12
**thinks**  42:24
**third**  18:13
19:25 20:24
**thought**  14:21
29:5 34:3
50:18
**thoughts**  17:9
34:16 55:3
**thousands**
48:22 49:25
**three**  7:9 8:5
9:2,12 14:20
21:11,12,15,15

**tick**  17:2
**ticks**  19:19
**time**  4:9 7:20
7:23 13:11
16:18 18:24
19:25 22:20,21
26:10 32:14,14
33:14 36:6,12
36:25 37:8
39:25 41:18
48:2 49:8
52:13 54:24
56:4
**timely**  53:19
**times**  9:2 14:20
16:18,21,22
17:1,4 18:22
19:20 20:18
23:15 26:20
28:2
**today**  3:25 9:4
13:13 38:24
50:9
**together**  30:8
36:3
**told**  35:7 53:13
**tomorrow**  52:7
53:14 56:1
**torture**  14:13
15:25
**totally**  31:24
**town**  17:22
31:17

**track**  25:11
**transcript**
29:15 32:11
57:4
**translated**  12:9
**translation**
12:17,19
**translator**
12:23,24
**traveling**  5:9
**treated**  12:14
**trends**  7:22,25
**trial**  38:15,17
39:4,5,5 41:17
42:17 43:5,12
44:4
**tried**  38:12
**trouble**  28:25
42:16
**troubling**  32:23
**true**  24:20 57:4
**truthfully**
53:25
**try**  3:11 4:8
31:17
**trying**  25:4
**tuesday**  46:9
55:18
**turn**  13:16 33:5
**turning**  15:18
**twice**  24:11
**two**  8:3,5 11:6
13:10 14:19,22
15:6 18:22,23

19:19,23 20:3
20:18,20 22:6
22:6 26:15
33:17 34:9
35:9 36:2 40:3
40:13 46:23
53:6
**type**  18:21 19:8
**typically**  5:18

**u**

**under**  24:2
54:20
**underneath**
22:9
**understand**
20:8 35:4
49:13
**understanding**
4:15 12:22
17:21 20:15
21:17 33:11
**understood**
18:12 35:5
43:22 44:1
**unfortunate**
50:8
**unique**  6:23
7:15 23:18
25:22 26:25
**united**  5:10
**unrelated**  49:4
**update**  13:14
13:20

| | | | |
|---|---|---|---|
| **updates** 4:11 | **violates** 42:5 | **way** 7:22,25 | **whoever's** |
| 4:14 14:8,9 | **violence** 17:22 | 9:10 12:14 | 46:18 |
| **upgrade** 2:21 | 20:17,24 | 13:3 19:7 | **witness** 39:13 |
| **ups** 23:12 | **visual** 4:14 | 23:25 26:5 | **witnessed** |
| 26:11 | 19:14 20:10 | 29:25 36:20 | 16:11 |
| **use** 40:6 41:18 | **voice** 30:25 | 37:17,25 42:7 | **wizard** 4:19 |
| **used** 31:9,15 | 31:1,4,5,10,15 | 53:19 | **wondered** |
| 42:6 | 31:16 | **ways** 22:4 | 27:13 |
| **useful** 14:23 | **voices** 31:9 | 40:22 | **words** 10:12 |
| 31:19 45:1,11 | **volunteer** | **we've** 3:8 5:25 | 38:7 |
| 51:5 | 44:24 | 6:17,23 7:13 | **work** 5:10 15:4 |
| **usually** 4:3 | | 14:11 15:8 | 21:24 33:14 |
| 13:12 | **w** | 31:1 34:12 | 55:4 |
| | | 38:7 39:10 | **worked** 27:1,8 |
| **v** | **waiting** 54:7 | 41:16 42:5 | **working** 4:12 |
| | **want** 2:23 5:20 | 43:14 46:24 | 5:16 |
| **various** 40:22 | 8:21 15:16 | 47:5 48:3 | **works** 5:2 37:8 |
| **veritext** 57:20 | 18:3 29:4 | **website** 4:11 | **worry** 12:24 |
| **version** 4:20 | 30:25 36:23,24 | 5:22 28:17 | 25:12 |
| 12:9 | 37:21 38:5 | **wednesday** | **worth** 41:23 |
| **victims** 47:10 | 41:11 43:10 | 54:24 | **write** 32:3 |
| 47:13,25 | 44:24 45:10 | **week** 5:7,8,16 | **written** 52:3 |
| **video** 28:18,20 | 46:1 48:10 | 7:7,10 8:3 37:5 | **wrong** 32:18 |
| 28:21,22 29:11 | 52:15 53:22 | 39:10 51:21 | **wynne** 2:2,6 |
| 29:19 30:2,3,6 | 54:25 | 54:25 | 3:12,16 24:15 |
| 30:9,24 31:23 | **wanted** 5:5 | **week's** 6:15 | 46:14,15 56:12 |
| 32:1,7 38:7,12 | 6:20 10:6 | **weekend** 5:8,22 | |
| 43:15 44:20 | 32:13 38:20 | 6:8,11 | **y** |
| 45:15 56:5 | 46:22 51:20,22 | **weeks** 8:6 | |
| **view** 17:11 | **wanting** 8:25 | 30:15 | **yeah** 3:20 4:7 |
| 29:11 43:18 | **wants** 30:20 | **welcome** 5:3 | 7:3,5,6 8:16,17 |
| 53:7 | 36:4 38:10 | **went** 32:8 | 8:18,19 9:13 |
| **village** 14:16 | 43:19 | **whatever's** | 9:17,18 10:1 |
| 14:24 15:24,25 | **waste** 4:9 | 34:4 | 10:19 11:16 |
| 16:23 17:21,22 | | | 12:7 15:11 |

17:10,18 20:11
20:14,19,22
21:2,6,20 22:5
22:10,14,22
23:3 24:20
26:13 27:15,16
28:7,10,11,19
30:4,11 32:3
34:17,24,25
35:12 37:1
38:25 39:1,7
39:21 41:7
42:13 43:23
44:8,23 45:9
45:24 46:10
49:2 50:17
51:4 53:24
54:5,18 55:11
55:23 56:6,7
**year**   17:2
**yesterday**
28:23 38:24

**z**

**zoom**   1:12 2:21
47:9,10,10,14