# EXHIBIT H

morningtrans.com



# TRANSLATION CERTIFICATION

Date: July 10, 2025

To whom it may concern:

This is to certify that the attached translation is an accurate representation of the documents received by this office. The translation was completed from:

- French (Switzerland)

To:

- English

The documents are designated as:

- 133-iii-81.pdf
- 4A_0401_2023
- 4A_0431_2015

Kate Trotman, Project Manager in this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

_____
Signature of Kate Trotman

## V. PRODUCT LIABILITY

8. **Extract from the judgment of the First Civil Law Division** in the case **X.** v. **Y. AG** (**appeal in civil matters**)
4C.298/2006 of December 19, 2006

*Product liability; defect (Art. 4 PL Act); evidence.*
Concept of defect. Burden of proof (recital 3).
The injured party is not required to prove the cause of the defect, but need only demonstrate that the product fails to meet the legitimate safety expectations of the average consumer. When an accident occurs in connection with the use of a product, the chain of events that led to the damage is, as a rule, assessed under the principle of preponderant probability (recital 4).

82     BGE – Swiss Federal Supreme Court

**A.** In March 2000, X. purchased a V. brand drip coffee maker, model U., from a store in Geneva.

In 1999, Y. AG had imported approximately 15,000 units of the same model into Switzerland from B. Ltd, located in Hong Kong. The user manual enclosed with the product contained the following "Safety Instructions and Important Notices":

> "Avoid dropping the device or exposing it to strong impacts. Never place the carafe on a cold or wet surface while it is still hot, as the glass may break. If the handle begins to detach from the carafe—or if the glass is damaged—immediately replace the carafe with an equivalent model."

Prior to export, model U successfully passed quality control testing.

On June 8, 2001, X. invited E. and Mr. and Mrs. D. over for dinner. At the end of the meal, she went into the kitchen to prepare coffee using the aforementioned coffee maker; the guests remained in the dining room. According to her account, she placed the glass carafe containing the coffee on the laminated countertop and put the lid on it; the pot then exploded, and she sustained serious injuries to her left hand. X. was immediately taken to the Geneva University Hospital, where she underwent surgery. Upon returning home the following day, she found that her guests had cleaned the kitchen and thrown the broken glass into the trash.

The surgical report indicated a glass-related laceration to the palm of the left hand, with a subtotal severing of the deep flexor muscle and a severed radial collateral nerve in the ring finger, resulting in sensory impairment in that finger. Subsequently, the patient, who is left-handed, consulted multiple physicians in an attempt to relieve the pain and functional limitations she experienced when using her left hand.

**B.** On November 17, 2003, X. filed suit against Y. AG, the manufacturer of the coffee maker, seeking CHF 720,948.70 in damages, plus interest, broken down as follows: CHF 66,634.15 as compensation for actual damages, CHF 7,876.80 for moral damages, and CHF 646,437.75 for capitalized future damages. The claim was based on the Federal Act of June 18, 1993 on Product Liability (PL Act; RS 221.112.944).

By judgment of October 13, 2005, the lower court (Court of First Instance of the Canton of Geneva) dismissed the plaintiff's claims.

On June 23, 2006, ruling on appeal by X., the Civil Chamber of Justice upheld the judgement lower court's decision.

**C.** X. filed an appeal in civil matters against the cantonal judgement.

The Federal Supreme Court granted the appeal, reversed the judgement under appeal, and remanded the case to the cantonal court for a new decision.

*Excerpt from the recitals:*

**3.** Like European Directive 85/374/EEC of July 25, 1985, which served as its primary inspiration, the PL Act establishes strict liability, based solely on the defect of the product (FRANZ WERRO, La responsabilité civile, nos. 705/706, pp. 184/185; GILLES PETITPIERRE, Genèse d'une nouvelle réglementation, in Responsabilités objectives, Journée de la responsabilité civile 2002, pp. 23/24). The defect therefore plays a central role in product liability (HANSJÖRG SEILER, in Münch/Geiser [eds.], Schaden – Haftung – Versicherung, no. 19.23, p. 948; CATHERINE WENIGER, La responsabilité du fait des produits pour les dommages causés à un tiers au sein de la Communauté Européenne, PhD thesis, Lausanne 1994, p. 122; FELLMANN/VON BÜREN-VON MOOS, Grundriss der Produktehaftpflicht, no. 172, p. 72).

**3.1**   Pursuant to Article 4(1) of the Product Liability Act (PL Act), a product is defective if it fails to offer the safety that can legitimately be expected, taking into account all circumstances, and in particular its presentation (lit. a), the use that can reasonably be expected of it (lit. b), and the time it was placed on the market (lit. c). This definition is taken almost verbatim, from Article 6(1) of Directive 85/374/EEC. As the introductory recitals to that Directive state, product liability seeks to protect "the consumer against damage to his health and property caused by a defective product" (recital 1). Accordingly, a defect is determined "not by the product's unsuitability for use, but by the lack of the safety that the general public is entitled to expect," with the specification that "this safety is assessed while excluding any misuse of the product that is unreasonable under the circumstances" (recital 6). It is also a matter of ensuring "a fair apportionment of risks between the injured party and the producer" (recital 7). In view of the obvious analogy between the European Directive and Swiss law, these considerations are also applicable for determining the purpose behind the PL Act.

84        BGE – Swiss Federal Supreme Court

The absence of the safety that can legitimately be expected constitutes an indeterminate legal concept. It is the responsibility of the court to determine, in each individual case, the level of safety a product must offer, based on all relevant circumstances (FELLMANN, Basler Kommentar, 3rd ed., n. 2 ad Art. 4 PL Act; REY, Ausservertragliches Haftpflichtrecht, 3rd ed., n. 1190, pp. 266–267; ANDREAS E. BORSARI, Schadensabwälzung nach dem schweizerischen Produktehaftpflichtgesetz, dissertation, Zurich 1998, p. 110; HANS-JOACHIM HESS, Kommentar zum Produktehaftpflichtgesetz, 2nd ed., n. 4 ad Art. 4 PL Act, p. 240; LUKAS WYSS, Der Fehlerbegriff im schweizerischen Produktehaftpflichtgesetz, in recht 14/1996, p. 119; FELLMANN / VON BÜREN-VON MOOS, op. cit., n. 185, p. 76). The pronoun "one" in Article 4(1) refers to the safety expectations of the average consumer—not those of the injured party, nor those of a particular group of highly trained or, conversely, inexperienced users. Expected safety in any given case must therefore be assessed objectively (ERDEM BÜYÜKSAGIS, La notion de défaut dans la responsabilité du fait des produits, dissertation, Fribourg 2005, pp. 248–250; WERRO, op. cit., n. 749, p. 194; REY, op. cit., n. 1190, p. 266; HESS, op. cit., n. 7 et seq. ad Art. 4 PL Act, p. 241 et seq.; FELLMANN / VON BÜREN-VON MOOS, op. cit., nn. 182/183, p. 75).

In addition, the court must consider "all the circumstances." Article 4(1) expressly identifies three specific factors that are of particular importance (REY, op. cit., n. 1190, p. 267; BORSARI, op. cit., p. 119; FELLMANN / VON BÜREN-VON MOOS, op. cit., n. 207, p. 82).

The product´s presentation (lit. a) includes, in particular, the instructions provided by the producer. In this respect, the consumer's attention must be clearly drawn to foreseeable dangers associated with the use of the product and how any harm may be prevented (REY, op. cit., n. 1192, p. 267; BORSARI, op. cit., p. 127; HESS, op. cit., nn. 66–68, pp. 265–266; FELLMANN / VON BÜREN-VON MOOS, op. cit., nn. 240–245, pp. 91–92). However, this duty to provide warnings is not a substitute for the producer´s obligation to design and manufacture safe products (FELLMANN, op. cit., n. 15 ad Art. 4 PL Act; BORSARI, op. cit., p. 132; WYSS, op. cit., p. 114; FELLMANN / VON BÜREN-VON MOOS, op. cit., n. 247, p. 93; see also WERRO, op. cit., n. 762, p. 197).

Case 1:16-cv-03228-AKH-JW    Document 813-8    Filed 08/01/25    Page 7 of 11

Product Liability – 133 III 81                    85

Thus, for everyday consumer products, those for which the public expects a certain basic level of safety, the producer cannot release in advance from liability simply by affixing a warning about a specific risk (cf. Art. 8 PL Act; FELLMANN, op. cit., n. 15 ad Art. 4 PL Act; BORSARI, op. cit., p. 132). Consider, for example, the risk of explosion posed by a glass bottle containing carbonated mineral water (FELLMANN / VON BÜREN-VON MOOS, op. cit., n. 248, pp. 93–94).

Another criterion to be applied by the court is the use that can reasonably be expected of the product (Art. 4(1)(b) PL Act). This concept encompasses not only use consistent with the product's intended purpose, but also foreseeable alternative use (*Fehlgebrauch*), which the producer must reasonably anticipate (for example, using a chair as a stepladder). In contrast, product liability is not applicable in cases of abusive misuse (("*Missbrauch*"; for example, drying a dog in a microwave oven) (REY, op. cit., nn. 1194, 1195, pp. 267–268; BORSARI, op. cit., p. 139 et seq.; FELLMANN / VON BÜREN-VON MOOS, op. cit., nn. 257–264, pp. 96–98).

The third circumstance referred in Article 4(1) PL Act is the time the product was placed on the market (lit. c). If a defective product causes damage, the law presumes that the defect already existed at the time it was placed on the market (cf. Art. 5(1)(b) PL Act; REY, op. cit., n. 1211, p. 272).

Among the criteria not expressly listed in Article 4(1) PL Act, technical standards and safety regulations may also play a role in assessing whether a defect exists; the average consumer is entitled to expect that the producer adheres to such standards, thereby ensuring a basic level of safety (FELLMANN, op. cit., n. 27 ad Art. 4 PL Act; REY, op. cit., n. 1199, p. 268).

**3.2**  Legal literature generally distinguishes types of defects based on their origin (see also judgment 4C.307/2005 of January 25, 2006, recital 3). A manufacturing defect (*Fabrikationsfehler*) occurs when an error arises during the manufacturing process of a product that is otherwise properly designed (WERRO, op. cit., n. 755, p. 196; SEILER, op. cit., n. 19.6, p. 940; HESS, op. cit., n. 37, p. 253). An example would be a microcrack in the glass of a bottle of carbonated mineral water, even where such a defect is statistically inevitable among a certain number of units ("*Ausreißer*"; German BGH, Judgment of May 9, 1995, in NJW 1995 p. 2162; BÜYÜKSAGIS, op. cit., pp. 285–286).

86             BGE – Swiss Federal Supreme Court

Another example of a manufacturing defect is the failure of a suspension ring embedded in the reinforcement of a precast concrete slab, even though a large number of identical slabs had already been manufactured, and the suspension rings had never previously been problematic (cf. BGE 110 II 456).

A design defect (*Konstruktionsfehler*) results from the way the product was conceived (WERRO, op. cit., n. 757, p. 196); as designed, the product has a characteristic that makes it dangerous either when used for its intended purpose or for another use that the producer should reasonably have anticipated (SEILER, op. cit., n. 19.26, p. 949; HESS, op. cit., n. 22, p. 248). An example of a design defect is found in decision C.564/1984 of May 14, 1985: a dental chair collapsed under a patient's weight because the rivets used to fasten the chair's moving parts were made of a metal that lacked sufficient mechanical resistance to wear.

A defect in presentation (*Instruktionsfehler*) affects a product that is not accompanied by sufficient information about the risks it presents to the consumer (WERRO, op. cit., n. 759, p. 197; PLÜSS / JETZER, Die Produktehaftpflicht, n. 120, pp. 46–47).

The Product Liability Act (PL Act) does not distinguish based on the type or origin of the defect.. This means the various categories of defect mentioned above do not carry normative value (REY, op. cit., n. 1202, p. 269; FELLMANN, op. cit., n. 4 ad Art. 4 PL Act; FELLMANN / VON BÜREN-VON MOOS, op. cit., n. 202, p. 81; see a differing opinion: HESS, op. cit., n. 21, p. 247). Nonetheless, these categories are not useless, as they assist the court in understanding the factual circumstances presented (PLÜSS / JETZER, op. cit., n. 115, p. 45).

**3.3**   Unlike Directive 85/374/EEC (see Art. 4), the PL Act contains no provision that explicitly places the burden of proving the defect on the injured party. However, under Swiss product liability law, this burden of proof arises from the general principle set out in Article 8 of the Swiss Civil Code (CC) (PIERRE WESSNER, Quelques propos erratiques sur des questions liées à la responsabilité du fait des produits défectueux, in Responsabilités objectives, Journée de la responsabilité civile 2002, p. 68; FELLMANN / VON BÜREN-VON MOOS, op. cit., n. 176, p. 73).

In itself, the occurrence of damage does not prove the existence of a defect in the product (WYSS, op. cit., p. 111). Nevertheless, if it can be established that the product played a role in the occurrence of the damage, the injured party provides a significant indication of the existence of a defect, in accordance with the adage res ipsa loquitur (WESSNER, op. cit., p. 68 in fine; see also FELLMANN / VON BÜREN-VON MOOS, op. cit., n. 178, pp. 73–74). For example, a bottle of carbonated mineral water that explodes, or a car whose brakes fail, may clearly be considered defective products (HESS, op. cit., n. 24, p. 249). Applying national law implementing Directive 85/374/EEC, a French court likewise recognized that an exploding fireplace screen is affected by a defect, regardless of the room's ventilation or draft (case reported in Recueil Le Dalloz 2001, no. 38, p. 3092).

**4.**

**4.1**   In the present case, contrary to the conclusion reached by the cantonal court, the plaintiff was not required to prove, by means of an expert report, that the glass carafe of the coffee maker was affected by either a manufacturing defect or a design defect. It is true that an analysis of the glass shards might have revealed microfractures constituting a manufacturing defect; likewise, an expert examination of an identical coffee maker, focusing on the quality of the glass used, could, where applicable, have shown a design defect. And had the plaintiff thereby established the existence of a manufacturing or design defect, the product would undoubtedly have been considered defective within the meaning of Article 4 PL Act. However, this does not imply that the absence of the safety legitimately expected by the consumer can be proven solely through such means. As previously noted, the categories of "manufacturing defect" and "design defect" do not have normative value. The injured party is not required to prove the cause of the defect, but only that the product failed to meet the level of safety that the average consumer could reasonably expect under the circumstances. It follows that, in this case, the cantonal court applied a concept of defect that is not consistent with Article 4 PL Act.

**4.2**   It is now necessary to determine whether, based on the facts established in the judgment under appeal, the plaintiff has shown that the coffee maker in question presented a defect within the meaning of Article 4 PL Act — that is, whether it failed to meet the legitimate safety expectations of the average consumer, particularly in terms of its presentation and reasonably foreseeable use.

88          BGE – Swiss Federal Supreme Court

**4.2.1**   At the time of the accident, the plaintiff had been using the coffee maker for just over a year. Thus, it was a relatively recent appliance. The model in question had passed quality control testing, but this does not, in itself, rule out the existence of a defect within the meaning Article 4 PL Act. When the glass container exploded, the plaintiff was preparing coffee. She was using the appliance for its intended purpose. Unlike the previously mentioned cases involving an exploding bottle of mineral water or a fireplace screen, here the explosion occurred while the plaintiff was handling the product. The question arises, therefore, whether the injured party made proper use of the coffee maker—particularly whether she followed the manufacturer's safety instructions, provided they do not amount to unacceptable limitations on the producer's liability.

The judgment under appeal does not contain findings regarding the actual course of events during the accident. In fact, the cantonal court found that the causes of the explosion could not be determined with certainty. The plaintiff, who was alone in the kitchen at the time, stated that she placed the carafe filled with hot coffee on a marble-look laminate countertop, and then placed the lid on the carafe—at which point the container exploded.

**4.2.2**   It was incumbent upon the plaintiff to prove the existence of a defect, which, in this case, required demonstrating the circumstances surrounding the accident.

As a rule, a fact is considered proven when the court is persuaded of the truth of an allegation. However, statutory law, legal literature, and case law provide for exceptions to this principle of evidence evaluation. A lesser evidentiary burden is warranted in cases of "evidentiary hardship" (*Beweisnot*), which arise when, by nature of the matter, strict proof is either impossible or cannot reasonably be demanded—particularly where the facts alleged by the party bearing the burden of proof can only be demonstrated indirectly, through circumstantial indicators (BGE 132 III 715, recital 3.1, p. 720; BGE 130 III 321, recital 3.2, p. 324, and references cited). This situation may be found, for example, in the context of insurance claims for theft (BGE 130 III 321, recital 3.2, p. 325, and cited decisions), or the existence of a natural or hypothetical causal link (BGE 132 III 715, recital 3.2, p. 720, and cited rulings). In such cases, the required standard of proof is that of preponderant probability (*die überwiegende Wahrscheinlichkeit*), which imposes a higher evidentiary threshold than mere plausibility (*die Glaubhaftmachung*).

Preponderant probability requires that, viewed objectively, there are compelling reasons supporting the accuracy of the allegation, without other possible explanations being of substantial importance or reasonably likely (BGE 132 III 715, recital 3.1, p. 720; BGE 130 III 321, recital 3.3, p. 325).

Pursuant to Article 8 of the Swiss Civil Code (CC), the party who does not bear the burden of proof has the right to submit counter-evidence. Such evidence aims to demonstrate circumstances capable of raising serious doubts in the judge's mind concerning the accuracy of the principal allegations. To succeed, it is sufficient for the counter-evidence to undermine the initial evidence to the extent that the primary allegations no longer appear to be the most likely (BGE 130 III 321, recital 3.4, p. 326).

**4.2.3** When an accident occurs in connection with the use of a product, the consumer will often have nothing more than their own account from which to reconstruct the sequence of events. Under such circumstances, it is not reasonable to require the injured party to establish a strict causal chain leading to the occurrence of the damage. Therefore, as a rule, the court will assess the facts alleged by the injured party based on the criterion of preponderant probability.

In this case, this means that the cantonal court misapplied federal law by requiring the plaintiff to prove the facts with certainty. As a result, the appeal must be granted, the judgment under appeal set aside, and the case remanded to the Court of Justice for a new assessment of the evidence under the criterion of preponderant probability. For that purpose, the court will have at its disposal the plaintiff's statements concerning the incident, as well as—at least in part—indirect testimony from Mr. and Mrs. D. and from Mr. E. For its part, the defendant may exercise its right to submit counter-evidence, seeking to demonstrate that the plaintiff's version of events does not appear to be the most probable.