UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ENTESAR OSMAN KASHEF *et al.*,

                Plaintiffs,

      -against-

BNP PARIBAS S.A. and BNP PARIBAS US
WHOLESALE HOLDINGS, CORP.,

                Defendants.

No. 16 Civ. 3228 (AKH)

Hon. Alvin K. Hellerstein

**DEFENDANTS' PRE-TRIAL MEMORANDUM**

CLEARY GOTTLIEB
STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
T: (212) 225-2000

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
T: (212) 351-4000

*Counsel for Defendants BNP*
*Paribas S.A. and BNP*
*Paribas US Wholesale*
*Holdings, Corp.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT.................................................................................................1

BACKGROUND ..............................................................................................................4

ARGUMENT ...................................................................................................................5

    I.     Plaintiffs Cannot Prove that the Government of Sudan Could Be Liable as
          a Primary Tortfeasor Under Swiss Law .................................................................5

        A.    Plaintiffs Must Prove that the Government of Sudan Could Be
              Liable as a Main Perpetrator Under Swiss Law .......................................5

        B.    For Two Independent Reasons, Plaintiffs Cannot Prove that a
              Primary Tortfeasor Would Be Liable Under Swiss Tort Law Here...........8

             1.    Swiss Tort Law Does Not Apply Extraterritorially to Acts
                   Committed Outside of Switzerland...............................................8

             2.    Swiss Tort Law Does Not Permit Suit Against a Foreign
                   Sovereign for Actions Taken in Its Official Capacity .................14

    II.    The Evidence at Trial Will Show That BNPP Did Not Culpably Act
          Together with the Government of Sudan to Contribute to an Illicit Act .............15

    III.   The Evidence at Trial Will Show that BNPP's Actions Were Not the
          "Natural Cause" or the "Adequate Cause" of Plaintiffs' Alleged Injuries .........18

    IV.   Plaintiffs Must Prove All Elements of Article 50 under the Full Conviction
          Standard, Except for Natural Causation, which Must Be Proven by
          Preponderant Likelihood.....................................................................................20

CONCLUSION................................................................................................................22

i

# TABLE OF AUTHORITIES

**Page**

**Cases**

Freeman v. HSBC Holdings PLC,
  465 F. Supp. 3d 220 (E.D.N.Y. 2020) ............................................................... 16

Kashef v. BNP Paribas, S.A.,
  2021 WL 603290 (S.D.N.Y. Feb. 16, 2021) ........................................................ 5

Kashef v. BNP Paribas S.A.,
  925 F.3d 53 (2d Cir. 2019) .......................................................................... 5, 15

Kiobel v. Royal Dutch Petroleum Co.,
  569 U.S. 108 (2013) ...................................................................................... 12

McCarthy v. Olin Corp.,
  119 F.3d 148 (2d Cir. 1997) ........................................................................... 18

Twitter, Inc. v. Taamneh,
  598 U.S. 471 (2023) ...................................................................................... 17

**Statutes**

Article 50(1) of the Switzerland Code ................................................................. 3

**Other Authorities**

Delayed Stroke Case,
  4A_401/2023 ........................................................................................... 21, 22

DFSC 104 [1978] II 184 ................................................................................... 16

DFSC 38 [1912] II 471 ..................................................................................... 16

DFSC 4A_444/2010 ......................................................................................... 19

DSFC 142 [2016] III 433 .................................................................................. 20

DSFC 4A_311/2021 ......................................................................................... 19

DFSC 145 [2019] III 72 .................................................................................... 19

Employment Insurance Case,
  4A_424/2020 ................................................................................................ 22

Insurance Contract Case,
  130 III 321 ............................................................................................... 4, 21

Naït-Liman v. Switzerland,
  No. 51357/07 (June 21, 2016) ...................................................................... 9, 11

## TABLE OF AUTHORITIES
(continued)

**Page**

*Naït-Liman v. Switzerland,*
    No. 51357/07 (March 15, 2018)................................................................... 1, 2, 9, 10, 11, 12

Prospectus Case,
    132 III 715 ...........................................................................................................21

Swiss Federal Act on Private International Law (PILA), Art. 3....................................9

Traité de droit Privé Suisse-Le tirtre préliminaire due Code civil (2008)...................21

## PRELIMINARY STATEMENT

Plaintiffs seek to hold BNPP secondarily liable under Swiss law for allegedly assisting the Government of Sudan in committing illicit acts that caused Plaintiffs harm. It is undisputed that, for BNPP to be secondarily liable, Plaintiffs must prove that the Government of Sudan is liable as a primary tortfeasor under Swiss law. That is the law of Switzerland. But that theory of secondary liability is foreclosed under Swiss law. For two independent reasons, Plaintiffs cannot prove that the alleged primary tortfeasor, the Government of Sudan, would or could be liable under Swiss tort law.

*First*, Swiss courts, as well as the European Court of Human Rights, have ruled that Swiss law does not apply extraterritorially to tortious conduct—even tortious conduct that violates *jus cogens* norms—committed outside Switzerland. In the seminal case of *Naït-Liman v. Switzerland*, which the Swiss government described as "the only one of its kind," the Swiss courts and the European Court of Human Rights **rejected** the expansive theory of liability that Plaintiffs seek to impose at trial on BNPP. Ex. A ¶ 147, No. 51357/07 (March 15, 2018) ("Judgment of Grand Chamber"). Abdennacer Naït-Liman, a Tunisian refugee residing in Switzerland, alleged that he suffered vicious torture in Tunisia at the hands of the Tunisian government. *See id*. ¶ 65. However, because "no illegal act or detrimental outcome occurred in Switzerland" and because the defendant government of Tunisia was "not domiciled or habitually resident in Switzerland," first the Swiss courts and then the European Court of Human Rights held that the plaintiff's claims were not actionable under Swiss law. *Id*. ¶ 25. This was true even though Tunisia's actions were "undisputed[ly]" of a "*jus cogens* nature." *Id*. ¶ 129.

Switzerland is not an outlier in this respect. The Grand Chamber in *Naït-Liman* conducted a survey of the 39 European States of the Council of Europe and found only one (the Netherlands) that extended its jurisdiction extraterritorially for cases of torture. *Id.* ¶ 183. And

the United States is no different. The Grand Chamber in *Naït-Liman* also cited and analyzed *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013), in which the U.S. Supreme Court **rejected** the extraterritorial application of the Alien Tort Statute to a suit brought by Nigerian immigrants against Nigerian, British, and Dutch companies for allegedly aiding and abetting the Government of Nigeria's commission of rape, murder, and forcible displacement. *Id.* ¶ 78.

To remove all doubt about the domestic boundaries of Swiss tort law, Switzerland **rejected** a proposed 2020 amendment to its constitution and the Swiss Code of Obligations that would have imposed tort liability on Swiss companies for human rights abuses committed abroad. Not only did this rejection crystallize Switzerland's stance against the extraterritorial application of its tort law, but it also made plain that no such extraterritorial jurisdiction existed in the first place.

*Second*, acts committed by a foreign government, including the Government of Sudan, in its sovereign capacity, including for alleged murder, torture, or rape, are not subject to tort liability under Swiss law. As the former deputy judge of the Swiss Federal Supreme Court, Isabelle Romy, explains in her declaration, the acts of a foreign government are not subject to private Swiss tort law, such as Articles 41 or 50 of the Swiss Code of Obligations. Rather, they are subject to Swiss public law provisions, including international treaties. But no such treaty applies here. Accordingly, for two independent reasons, Swiss law would not and could not allow a finding that the Government of Sudan is or could be liable as a primary tortfeasor for its alleged illicit acts.

If this case nonetheless proceeds to trial on Plaintiffs' erroneous theory of liability, the evidence at trial will show that Plaintiffs have failed to carry their burden of establishing the three elements for a claim under Article 50(1) against BNPP. As discussed above, Plaintiffs

2

cannot satisfy the first element of Article 50(1), which requires evidence of an illicit act committed by a main perpetrator who could be liable under Swiss law.  Because the Government of Sudan could not be sued as a main perpetrator under Article 41, Plaintiffs cannot satisfy the first element of Article 50(1).

The evidence at trial will also show that Plaintiffs have failed to satisfy the second element of Article 50(1), which requires Plaintiffs to demonstrate that BNPP "consciously assisted the [main] perpetrator and knew or should have known that [BNPP] was contributing to an illicit act."  Mot. Summ. J. Op., ECF No. 499 at 3.  As that text makes clear, this element contains three sub-elements: (1) BNPP consciously assisted the Government of Sudan; (2) BNPP contributed to an illicit act committed by the Government of Sudan; and (3) BNPP knew or should have known that it was contributing to the Government of Sudan's illicit acts.  BNPP had no relationship (legal or otherwise) with the individual Plaintiffs, was not involved in any of the purported illicit acts by the Government of Sudan, and is not responsible for the independent actions of that foreign sovereign.

Furthermore, the evidence at trial will show that Plaintiffs have failed to satisfy their burden on the third element of Article 50(1), which requires proving that "culpable cooperation" between BNPP and the Government of Sudan was "the natural and adequate cause of the plaintiff's harm or loss."  *Id.*  Human rights abuses in Sudan did not start with BNPP, did not end when BNPP left Sudan, and were not caused by BNPP.  The evidence will show that BNPP never participated in Sudanese military transactions in any way—it never financed Sudan's purchase of arms, and there is no evidence linking any specific transaction to Plaintiffs' injuries.  And even at a macro level, there is no evidence that BNPP's financial services were a necessary element of Plaintiffs' purported harms.  Accordingly, BNPP could not be held liable under Swiss tort law.

3

Finally, Plaintiffs must prove each of the elements of their tort claim under the "full conviction" standard except for natural (but for) causation, which is subject to "preponderant likelihood." The "full conviction" standard requires proof such that the jury "no longer has any serious doubts about the existence of an asserted fact or any remaining doubts appear negligible," tantamount to a quantum of proof requiring at least 90% certainty. Decl. Ex. C at ¶3.2, ECF No. 813-3 (Insurance Contract Case, 130 III 321)). Even the lower "preponderant likelihood" standard requires "strong reasons in favor of the accuracy of an allegation, with no other possibilities carrying significant weight or reasonably being taken into account," tantamount to a quantum of proof requiring at least 75% certainty. ECF No. 813-1 ¶¶ 36-39.

## BACKGROUND

For a full understanding of the facts in this case, BNPP respectfully refers this Court to its Statement of Undisputed Material Facts, submitted in support of its Motion for Summary Judgment. ECF No. 437.

This Court has held that, to state a claim against BNPP, Plaintiffs must prove that BNPP is secondarily liable under Article 50(1) of the Switzerland Code of Obligations ("SCO") for specific actions taken by the Government of Sudan that harmed the three individual Plaintiffs. Doing so requires Plaintiffs to prove that (1) "a main perpetrator committed an illicit act," (2) BNPP "consciously assisted the [main] perpetrator and knew or should have known that [BNPP] was contributing to an illicit act," and (3) BNPP was "the natural and adequate cause of the plaintiff's harm or loss." *Kashef v. BNP Paribas, S.A.*, 2021 WL 603290, at *2 (S.D.N.Y. Feb. 16, 2021) ("*Kashef II*").[1]

---

[1] By using the standard adopted by this Court in prior opinions, BNPP does not accept that this is the correct standard under Swiss law or that Article 50 imposes substantive liability. BNPP

## ARGUMENT

I.    **PLAINTIFFS CANNOT PROVE THAT THE GOVERNMENT OF SUDAN COULD BE LIABLE AS A PRIMARY TORTFEASOR UNDER SWISS LAW**

A.    **Plaintiffs Must Prove that the Government of Sudan Could Be Liable as a Main Perpetrator Under Swiss Law**

It is undisputed that Plaintiffs must prove that a primary tortfeasor could be liable under Swiss law in order for a secondary actor to be secondarily liable as an accomplice.  Indeed, as discussed below, this Court, the Second Circuit, and both parties' experts have all agreed.  *Kashef v. BNP Paribas SA*, 2021 WL 603290, at *4 (S.D.N.Y. Feb. 16, 2021) (adopting view of Professor Werro that "Article 50.1 allows liability if an accomplice" consciously assists "'the illicit act of the perpetrator who himself is also at fault'"); *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 60 (2d Cir. 2019) ("*Kashef I*") ("To be sure, to prevail on their secondary liability claims against BNPP, the plaintiffs will need to establish primary torts committed by the Sudanese regime."); Decl. Supp. Mot. Summ. J. Ex. 104 ¶ 64, ECF No. 528-104 ("March 2, 2023 Werro Decl.") ("To establish the first element of Article 50.1 CO, the Plaintiffs must prove that their rights were violated by an unlawful act of the Sudanese government (Article 41 CO)."); Decl. Supp. Mot. Summ. J. Ex. 98 ¶ 90, ECF No. 435-98 ("Jan. 6, 2023 Müller Rep.") ("GOS's liability as the perpetrator is a precondition for the Defendants' liability as accomplices . . . ."); Decl. Supp. Mot. Summ. J. Ex. 102 ¶ 19, ECF No. 444-102 ("July 21, 2023 Romy Rep.") ("Assuming . . . that . . . Plaintiffs may base their claims against BNPP on Art. 50 (1) CO . . ., Plaintiffs would have to prove and establish that the main perpetrator . . . would be liable towards the putative class members based on Art. 41 CO.").

---

reserves all rights to challenge the validity of the standard on appeal, as well as any and all other rulings by this Court that are accepted as law of the case for purposes of this filing.

This unanimous view is grounded in the text of Article 50 itself. Article 50(1) is a joint and several liability provision. It states that "[w]here two or more persons have together caused damage, whether as instigator, perpetrator or accomplice, they are jointly and severally liable to the person suffering damage." ECF 174-1 at 4A.[2] The text of Article 50 makes clear that any liability for "instigator[s]" and "accomplice[s]" requires a predicate tort by a main "perpetrator." The existence of a main "perpetrator" is an essential element of that equation because, without the perpetrator, there would be no tortious act that an instigator could instigate or an accomplice could assist. *Id.*

What constitutes an actionable tort by a "perpetrator" is spelled out by other provisions of the Swiss Code. As Plaintiffs' expert, Professor Werro, explains, "[t]he primary tort liability of a perpetrator is governed by Article 41 CO." March 2, 2023 Werro Decl. ¶¶ 16-17. Thus, in order for secondary liability to attach under Article 50, there must be a primary tortfeasor who could be held liable under Article 41. *See id.*; *see also* July 21, 2023 Romy Rep. ¶ 19. That is a necessary and threshold requirement of Swiss tort law in this case.

The liability of the tortfeasor under Article 41 must be concrete and real under Swiss law. As Plaintiffs' expert Professor Werro has stated throughout this case,[3] for the first element of Article 50 liability to be satisfied, the "illicit acts" in question must be *actionable in Swiss law*"

---

[2] "The prevailing doctrine . . . is that an accomplice may only be jointly and severally liable under Art. 50 (1) CO if he meets all the requirements of Art. 41 CO, including the commission of an unlawful act." July 21, 2023 Romy Rep. ¶ 4. As former deputy judge of the Swiss Federal Supreme Court Isabelle Romy has explained, "Plaintiffs' interpretation of Art. 50 (1) CO as an independent basis for liability . . . is novel, disputed and not supported by case law." *Id.* However, the Court has held otherwise, and BNPP does not reiterate its prior arguments here.

[3] At summary judgment, Professor Werro conspicuously reversed course on that subject. Aug. 27, 2025 Romy Decl. ¶ 38.

against the primary tortfeasor.  Decl. Opp'n Mot. Dismiss ¶ 5, ECF No. 174 (emphasis added) ("August 31, 2020 Werro Decl."); March 2, 2023 Werro Decl. ¶ 64 ("To establish the first element of Article 50.1 CO, the Plaintiffs must prove that their rights were violated by an unlawful act of the Sudanese government (Article 41 CO)."); Decl. Franz Werro, ECF No. 81 ¶ 30 ("May 22, 2017 Werro Decl.") ("Art. 50 section 1 CO requires that several persons together cause someone else to suffer an illegal harm.").  And BNPP's experts agree.  *See* Jan. 6, 2023 Müller Rep. ¶ 90; July 21, 2023 Romy Rep. ¶ 19.  Without a tort that would be actionable under Article 41 against the primary tortfeasor, secondary liability simply would not exist.  That makes sense, as there would be no primary tortfeasor for purposes of Article 41 that could give rise to secondary liability under Article 50.  ECF No. 897 ¶ 47 ("Aug. 27, 2025 Romy Decl.").

Swiss case law predictably supports the conclusion that a main perpetrator's violation of Article 41 must be actionable for secondary liability to attach.  Whether the tort at issue involves the violation of trademarks, an airplane crash, a shooting in a garden, or the violation of copyright, Swiss courts consistently find the existence of a primary tort that is actionable under Article 41 before proceeding to the discussion of secondary liability under Article 50.  *See, e.g.*, ECF Nos. 174-1, 174-2 Exs. 10 ¶ 1, 11 ¶ 1, 19 ¶ 4, 29 ¶ 2.

In the absence of a primary tortfeasor that could be liable under Swiss law, Plaintiffs' claims based on Article 50 fail.  Swiss law does not permit suit against a purported accomplice or instigator when there is no actionable tort by a primary tortfeasor under Swiss law.  To hold otherwise would radically expand the scope of Swiss law.  Aug. 27, 2025 Romy Decl. ¶ 49 ("Where the GOS is not liable under Swiss law and no claim against it could be adjudicated in Swiss courts, to apply Art. 50(1) CO as the basis for the independent liability of an alleged accomplice of the

GOS for actions in exercise of its sovereign authority would be an unprecedented extension of the liability of private entities and is not supported by Swiss law or precedent.").

**B.      For Two Independent Reasons, Plaintiffs Cannot Prove That a Primary Tortfeasor Would Be Liable Under Swiss Tort Law Here**

The reality that an illicit act must be actionable under Article 41 for Article 50 liability to apply presents an insurmountable obstacle to Plaintiffs' case against BNPP.  According to Plaintiffs, the Government of Sudan is the primary tortfeasor that caused their injuries.  But a lawsuit against the Government of Sudan under Article 41 would not be actionable for two independent reasons.  First, the Swiss courts would not extend their jurisdiction to extraterritorial acts by a primary tortfeasor committed outside of Switzerland, even if those acts violate *jus cogens* norms.  Second, even if Swiss law applied extraterritorially to acts committed outside of Switzerland, the Government of Sudan is a foreign sovereign to which private Swiss law (namely Article 41 of the Swiss Code of Obligations) is inapplicable.

**1.      Swiss Tort Law Does Not Apply Extraterritorially to Acts Committed Outside of Switzerland**

Plaintiffs seek to hold BNPP secondarily liable for actions taken by the Government of Sudan beyond the borders of Switzerland.  The Government of Sudan allegedly committed illicit acts against Sudanese citizens on Sudanese soil.  Swiss law does not permit suit in tort for the Government of Sudan's extraterritorial acts, even if those acts violate *jus cogens* norms.  In this manner, Switzerland is like many European countries and like the United States itself—those countries, absent express indication to the contrary, limit civil jurisdiction to the borders of their sovereign territory.

This issue of extraterritorial jurisdiction has not been previously addressed by the parties. However, a 2018 judgment by the European Court of Human Rights confirms that Swiss courts

would reject the notion that the Government of Sudan could be sued in Switzerland under Article 41 of the Swiss Code of Obligations for acts committed in its own country. The court decided a case brought by Abdennacer Naït-Liman, a political asylee in Switzerland, who alleged that he had been detained and subjected to horrific torture in Tunisia on the orders of the Minister of the Interior (referred to in the case as A.K.). *See* Judgment of Grand Chamber ¶ 15. Naït-Liman brought civil claims in Swiss court against A.K. and the government of Tunisia for the resulting damages. Ex. B ¶ 22, No. 51357/07 (June 21, 2016) ("Judgment of Second Section").

At every stage, the Swiss courts and the European Court of Human Rights rejected Naït-Liman's claims, based on the territorial limits of Swiss law.

The Swiss trial court dismissed the case. According to the court, it did "not have territorial jurisdiction under international law to examine the complaint, given that the defendants are not domiciled or habitually resident in Switzerland, and given also that no illegal act or detrimental outcome occurred in Switzerland." Judgment of Grand Chamber ¶ 25. Although Switzerland has a jurisdictional provision authorizing jurisdiction in the absence of any other available forum, that provision similarly requires a connection to Switzerland. *See* Ex. C, Swiss Federal Act on Private International Law (PILA), Art. 3; July 21, 2023 Romy Rep. ¶ 31; Aug. 27, 2025 Romy Decl. ¶ 24-26. That connection was altogether absent in a lawsuit brought to challenge the Tunisian government's actions in Tunisia. Judgment of Second Section ¶ 18 ("All of the acts to whose after-effects the claimant, a Tunisian national, seeks compensation for non-pecuniary damage, were allegedly inflicted on him . . . in Tunisia . . . by the Tunisian State and its agents.").

The Federal Supreme Court of Switzerland dismissed Naït-Liman's appeal.[4]  As the Federal Supreme Court explained, there is no provision in Swiss law authorizing extraterritorial jurisdiction over actions by a foreign actor in a foreign state:

> In the present case . . . the claimant complains of acts of torture that were allegedly committed in Tunisia, by Tunisians resident in Tunisia, against a Tunisian residing in Italy.  All of the specific features of the case come back to Tunisia . . . .  The facts of the case thus have no connection with Switzerland, so that the question of whether or not the link with this country is sufficient does not arise.  In those circumstances, *it is not possible to recognise the jurisdiction of the Swiss courts . . . .*"

Judgment of Grand Chamber ¶ 30 (emphasis added).

Naït-Liman filed an application against Switzerland with the European Court of Human Rights, arguing that the right to a tribunal guaranteed by the European Convention on Human Rights required the Swiss courts to adjudicate his civil claims.  The Government of Switzerland conceded that party states had a responsibility to prevent torture, but it argued that "universal civil jurisdiction . . . went beyond the limits of what a State governed by the rule of law could do."  *Id.* ¶ 143.  Indeed, the Swiss Government represented that Naït-Liman's case was "*very unusual, and the only one of its kind which had had to be decided by the Swiss courts.*"  *Id.* ¶ 147 (emphasis added); *see also id.* (noting that the dismissal was "in line with previous practice" of the Swiss courts).

The European Court of Human Rights sided with Switzerland in affirming the territorial limits of Swiss law.  The court rejected the argument that Switzerland was required to expand the

---

[4] The intermediate appellate court, the Court of Justice, rejected Naït-Liman's appeal on the ground that Tunisia had immunity from jurisdiction because "the acts of torture had been perpetrated in the exercise of sovereign authority (*iure imperii*) and not under private law (*iure gestionis*)."  Judgment of Grand Chamber, ¶ 28.  The court therefore did not reach the question of extraterritoriality.

scope of its jurisdictional statutes to apply outside of its territory: "While there is little doubt as to the binding effect of this right on the States with regard to acts of torture perpetrated on the territory of the forum State or by persons within its jurisdiction, the same does not apply to acts committed by third States or persons under their jurisdiction." *Id*. ¶ 97. As the court explained, extraterritorial (or universal) jurisdiction over acts committed outside of Switzerland would "result in an excessive workload for the domestic courts" and would hamper "the effectiveness of the justice system." *Id*. ¶ 126. Therefore, even though the prohibition on torture was "undisputed[ly]" of a "*jus cogens* nature," the court held that "norms of international law" did not require Switzerland to find jurisdiction over Naït-Liman's claim against Tunisia. *Id*. ¶¶ 129, 198.

In arriving at this judgment, the court conducted a survey of other member States of the Council of Europe. The court found that, "of the 39 European States included in the analysis, only the Netherlands recognise universal civil jurisdiction in respect of acts of torture." *Id*. ¶ 69; *see also* Judgment of Second Section ¶ 114 (stating that Switzerland's decision "is in no way exceptional and falls within a very broad consensus among the member States of the Council of Europe"). Non-member States have consistently limited the extraterritorial reach of their jurisdiction, too.

The European Court of Human Rights correctly noted that even the extraterritorial jurisdiction provided by the United States was limited, citing the Supreme Court's decision in *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013). Judgment of Grand Chamber ¶ 78. In *Kiobel*, a group of Nigerian nationals residing in the United States brought suit against Dutch, British, and Nigerian companies under the Alien Tort Statute, alleging that the companies aided and abetted the Nigerian government's commission of various heinous acts, including rape,

murder, and the destruction of property and resulting displacement of people. 569 U.S. at 113. The U.S. Supreme Court concluded that the presumption against extraterritoriality foreclosed suit against the companies. As the Supreme Court explained, there was "no indication that the ATS was passed to make the United States a uniquely hospitable forum for the enforcement of international norms." *Id*. at 123.

After conducting its international survey, the European Court of Human Rights decided that there is no "international custom which would have obliged the Swiss courts to find that they had jurisdiction to examine" Naït-Liman's claim. Judgment of Grand Chamber ¶ 187. The result of the judgment was to leave Naït-Liman, the alleged victim of torture in violation of *jus cogens* norms, without a remedy in civil court in Switzerland, in deference to well-established legal principles against extraterritorial application of statutes and the comity owed to domestic courts.[5]

**(a)     The Swiss Government Has Rejected Legislative Proposals to Give Switzerland's Tort Laws Extraterritorial Application**

The Swiss government's position in *Naït-Liman* against the extraterritorial application of its tort laws is consistent with other actions taken by the country to limit expansive tort liability. In 2020, Switzerland held a referendum concerning a proposed amendment of the Swiss Federal Constitution and the SCO that would have explicitly held Swiss companies liable in tort in certain circumstances where their foreign subsidiaries commit human rights abuses abroad. Jan. 6, 2023 Müller Rep. ¶ 147. The initiative sought to impose a "due diligence" obligation on companies established in Switzerland that would have required them to "examine the actual and

---

[5] This conclusion is based on the application of Swiss tort law to the extraterritorial acts of the alleged primary tortfeasor in this case, the Government of Sudan, all of which occurred in Sudan. BNPP's connections to Switzerland are irrelevant.

potential impact on internationally recognized human rights and on the environment, take appropriate measures to prevent any violation of internationally recognized human rights and environmental standards, put an end to existing violations and report on the measures taken." *Id*. ¶ 149 (citations omitted).

The Swiss government opposed the initiative because "the liability regime was much stricter than that found in other legal systems and would therefore put Swiss companies at a disadvantage, would discourage investment by Swiss companies abroad and would overload the judicial system." *Id*. ¶ 150. According to the Federal Council and Parliament, the initiative would require "Swiss courts . . . to rule on complex cases where a foreign company has caused damage abroad. They would also have to apply Swiss law. Not only would this place an excessive burden on our legal system, but Switzerland would also be violating internationally recognized legal principles if it explicitly subjected such cases to its own jurisdiction." Ex. D *Popular initiative "Responsible businesses – protecting people and the environment"* at 17 (Nov. 29, 2020).

The initiative failed. Jan. 6, 2023 Müller Rep. ¶¶ 152-53. Swiss law today contains no similar liability regime that would penalize Swiss companies for their actions abroad. *Id*. ¶ 154.

Switzerland's rejection of the amendment demonstrates the Swiss government's refusal to impose sweeping extraterritorial liability on Swiss companies. To do so in this case, in the absence of a primary tortfeasor who could be held liable under Swiss law, would therefore constitute a radical expansion of the territorial limits expressly defined by Switzerland.

2.    **Swiss Tort Law Does Not Permit Suit Against a Foreign Sovereign for Actions Taken in Its Official Capacity**

Even if Swiss tort law applied to extraterritorial actions, the Government of Sudan is not subject to liability in Switzerland. ECF No. 443 at 32–33. First, as former deputy judge of the Swiss Federal Supreme Court Isabelle Romy has explained, there is a distinction in Swiss law between the acts of a state in their sovereign capacity (*jure imperii*) and acts of a state operating as a private individual (*jure gestionis*). July 21, 2023 Romy Rep. ¶ 31. Acts of a foreign state in its sovereign capacity are immune from suit. Aug. 27, 2025 Romy Decl. ¶ 17. Unlike the act of state doctrine under United States law, which the Second Circuit held does not apply to actions that violate *jus cogens* norms, the Swiss law of immunity extends to "military activities [and] acts analogous to expropriation or nationalization." *Id*. ¶ 18. The same would apply to the alleged illicit acts committed by the Government of Sudan, which are acts of public power performed *jure imperii*.[6] *Id* ¶ 19.

Second, regardless of whether immunity attaches, acts *jure imperii* are also not governed by Swiss private tort law, such as Articles 41 or 50. They are instead governed by public law, including treaties with foreign nations. No such treaty applies here. "[B]ecause Art. 41 CO is not applicable against [Sudan] for the alleged conduct at issue, Art. 50(1) CO cannot be used as an independent basis for liability against BNPP." July 21, 2023 Romy Rep. ¶ 36. This conclusion is supported by Swiss precedent, including the *Moutier* case, which held that a municipality was not subject to private Swiss tort law. *Id*. ¶ 39. Plaintiffs' expert, Professor Werro, agreed with this conclusion in his 2021 Commentaire romand Code des obligations I: Art.

---

[6] Even if the acts were performed by Sudan in a *jure gestionis* capacity, the Government could still invoke the principle of immunity from jurisdiction due to the lack of ties with Switzerland. Aug. 27, 2025 Romy Decl. ¶ 17.

61 CO (2021). *See* Supp. Decl. Supp. Mot. Summ. J. Ex. 161 ¶ 18 , ECF No. 471-161 ("Sept. 8, 2023 Romy Decl.") (quoting Franz Werro & Vincent Perritaz ("In the absence of a public law provision, the public authority is therefore not liable under CO 41 [et seq.]" (English translation))).

Nothing in the Second Circuit's decision about the act of state doctrine and *jus cogens* norms forecloses this straightforward application of Swiss law. Nor could it. The Second Circuit's decision was issued long before Judge Nathan decided that Swiss law, not New York law, governs this action. *See Kashef I*, 925 F.3d at 57 (2d Cir. 2019) ("In the Second Amended Complaint (the 'SAC'), Plaintiffs asserted twenty claims arising under New York tort law."); Mar. 3, 2023 Op. at 10, ECF No. 151 ("The Court concludes that Swiss law governs this case."). In other words, at the time the Second Circuit issued its decision, this case was not governed by Swiss law. Respectfully, this Court erred in holding that the Second Circuit's decision on the act-of-state doctrine resolved this Swiss law issue.[7]

## II. THE EVIDENCE AT TRIAL WILL SHOW THAT BNPP DID NOT CULPABLY ACT TOGETHER WITH THE GOVERNMENT OF SUDAN TO CONTRIBUTE TO AN ILLICIT ACT

The second element of Article 50(1) requires Plaintiffs to prove that BNPP "consciously assisted the perpetrator and knew or should have known that [it] was contributing to an illicit act." ECF No. 193, at 6. It is, in short, a requirement that the perpetrator and the defendant

---

[7] Even if a claim against the Government of Sudan were permissible under Swiss law, which it is not, Plaintiffs must still demonstrate that the Government has satisfied all the elements for liability as a primary tortfeasor under Article 41. *See Kashef I*, 925 F.3d at 60 ("To be sure, to prevail on their secondary liability claims against BNPP, the plaintiffs will need to establish primary torts committed by the Sudanese regime.").

"culpably acted together."  Jan. 6, 2023 Müller Rep. ¶ 124.  This element of Article 50 liability

(as articulated by the Court) has several sub-elements.

First, Plaintiffs must prove that BNPP consciously assisted the Government of Sudan in

the illicit acts that allegedly injured each Plaintiff.  One party "consciously assist[s]" another

when the two are involved in a "joint enterprise" with respect to the illicit act, such that there is

"genuine solidarity," rather than the "mere plurality" that obtains where "several persons cause

damage through different, independent acts, without awareness of their cooperation."  See id. ¶

125 n.98.  Conscious assistance requires the defendant's "cooperation in the wrongful act."

Decl. Supp. Mot. Summ. J. Ex. 99 ¶ 50, ECF No. 435-99 ("July 21, 2023 Müller Rep."); see also

August 31, 2020 Werro Decl. ¶ 78 (emphasizing that conscious assistance to the illicit act of the

main perpetrator is what "triggers liability for an accomplice under Article 50"); see also, e.g.,

ECF No. 422-115, DFSC 104 [1978] II 184 (three children playing with a bow and arrow jointly

liable when one child shot someone in the eye); ECF No. 422-108, DFSC 38 [1912] II 471 (two

boys throwing stones jointly liable when bystander was hit by one of the stones).  As under

United States law, mere awareness does not suffice.  See Freeman v. HSBC Holdings PLC, 465 F.

Supp. 3d 220, 230 (E.D.N.Y. 2020) (allegations that a defendant was "aware that its conduct

violates the law—even one intended to prevent terrorism," was insufficient to plead general

awareness of role in supporting terrorist activity).  There is no evidence that shows that BNPP

was involved in a "joint enterprise" marked by "genuine solidarity" to inflict harm on these three

Plaintiffs by means of rape, torture, assault, or other forms of violence.

Second, the purported "conscious assistance" must "contribut[e] to an illicit act."  Mere

facilitation or generalized assistance is not enough.  To count as contribution, the defendant must

have participated—directly, significantly, and concretely—in the primary tortfeasor's illicit

conduct.  *See* Jan. 6, 2023 Müller Rep. ¶ 72 (quoting DFSC 4A_185/2007 reas. 6.2.1).  For example, in the Locksmith Case—a dispute over accomplice liability for trademark infringement—the Swiss Supreme Court emphasized that "the accomplice was in charge of the accounts of the perpetrator," "the accomplice was in possession of all of the perpetrator's accounting documents," and "[r]eminders and debt collection acts in relation to the perpetrator were signed by the accomplice 'on behalf of the perpetrator.'"  *Id.* at ¶ 71.  This approach is likewise a mainstay of the American approach to aiding and abetting.  *See e.g.*, *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 501–07 (2023) (determining that there was no aiding and abetting liability for ISIS terrorist attacks in light of the absence of any "concrete nexus" between defendants and the attacks, even though defendants provided services directly to ISIS).  The evidence at trial will show that BNPP did not participate directly, significantly, or concretely in the alleged illicit acts giving rise to Plaintiffs' injuries.

*Third*, Plaintiffs must prove that BNPP knew or should have known, "had it exercised due care," that it was contributing to the illicit acts that injured Plaintiffs.  ECF No. 193 at 9.  Under Swiss law, a duty of care—specifying what a defendant "should have known"—may arise through a contractual relationship or through operation of law.  *See* Jan. 6, 2023 Müller Rep. ¶ 128 (discussing the Shooting Contest Case, where the duty of care arose based upon the defendant's status as an innkeeper).  However, BNPP did not have a contractual relationship with Plaintiffs, and Plaintiffs have not identified any duty of care that would arise by operation of Swiss law.  *See id.* ¶ 69 ("[T]he Defendants never owed any legal duty to the Plaintiffs to ensure their safety, i.e., the Defendants were never under any duty to '*take all measures required by the circumstances to ensure the safety*' of the citizens of Sudan. Therefore, by providing Sudanese banks and the GOS with financial transaction services, the Defendants could not breach any duty

towards the Plaintiffs.").  BNPP therefore owed no duty of care toward trial Plaintiffs and, in the absence of such a duty, could not have acted negligently toward them.  *See McCarthy v. Olin Corp.*, 119 F.3d 148, 156 (2d Cir. 1997) (holding that duty and breach are essential to proof of negligence).  To establish culpable cooperation, then, Plaintiffs must prove that BNPP had actual knowledge that it was substantially contributing to the specific illicit acts that the Government of Sudan allegedly committed against trial Plaintiffs.  The evidence at trial will show that BNPP lacked such knowledge.  BNPP operated in good faith, relied on international regulatory guidance, and maintained strict compliance protocols throughout its operations.

## III.    THE EVIDENCE AT TRIAL WILL SHOW THAT BNPP'S ACTIONS WERE NOT THE "NATURAL CAUSE" OR THE "ADEQUATE CAUSE" OF PLAINTIFFS' ALLEGED INJURIES

Under the third element of Article 50(1), Plaintiffs must prove that BNPP's alleged culpable cooperation was both the "natural cause" and the "adequate cause" of Plaintiffs' alleged injuries.  ECF No. 193 at 4-5.  "Natural" causation is similar to the concept of "but for" causation in U.S. tort law.  "Adequate" causation is similar to the concept of "proximate" causation.  *Id*. at 12.

"Natural causation is the logical (or scientific) relationship between the event giving rise to liability and the damage or loss:  an event is thus the natural cause of a result if it is one of the *sine qua non* conditions of the result.  There is accordingly a natural causal link between an event and a result if, without the event, the result would not have occurred."  Jan. 6, 2023 Müller Rep. ¶ 137(i).  If "the damage would have occurred in full or to a lesser extent even without the [conduct]," then natural causality is not satisfied.  Decl. Ex. 21, at 91, ECF No. 174-2 (DFSC 4A_444/2010 of Mar. 22, 2011 at reas. 4.4).  Plaintiffs must "prove (as a matter of fact) that without the Defendants … processing financial transactions for the GOS during the relevant

18

period," each of the three Plaintiffs "would not have suffered the damage or loss that he or she has suffered."  Jan. 6, 2023 Müller Rep. ¶ 138.  To do this, Plaintiffs cannot rely on the fungibility of money to prove that BNPP generally facilitated the Government of Sudan's activities, but must prove that their specific injuries were the result of specific transactions processed by BNPP.  *Id.* ¶ 146.

"[L]ike proximate cause, the requirement of adequate cause works as a limit on legal liability in an otherwise infinite chain of but-for causal effects."  ECF No. 193 at 14.  Adequate causation "serves as a corrective factor to the concept of causes in science, which may need to be restricted in order to be acceptable for legal responsibility."  Decl. Ex. 120, at reas. 2.3.1, ECF No. 435-120 (DFSC 145 [2019] III 72, "Swisscom Case").  The Court "must consider not only all the circumstances of the case, but also the protective function of the norm and the types of circumstances that appropriately should give rise to liability."  Jan. 6, 2023 Müller Rep. ¶ 137(ii).  The Swiss Federal Supreme Court has accordingly held that "not every act of participation that is merely 'somewhat' of promoting influence, but is not sufficiently closely related to the act itself, is sufficient."  *Id.* ¶ 143 (quoting the Swisscom Case).

To satisfy adequate causation, Plaintiffs must prove that BNPP's actions can be "reasonably considered to have directly resulted in at least some of the harm done to Plaintiffs."  ECF No. 193 at 16 (emphasis added).  It is not satisfied if the chain of causation is "too attenuated," "rest[s] on mere conjecture" or "depend[s] on the intervention of multiple parties."  ECF No. 193 at 16 (citations and quotations omitted).  In particular, Swiss courts have found adequate causation lacking where the defendant's actions were independent of actions and decisions by non-parties that directly caused plaintiffs' injuries.  Jan. 6, 2023 Müller Rep. ¶ 137; *see also* Decl. Ex. 121, at reas. 3.2.1, ECF No. 435-121 (DSFC 4A_311/2021 of February 3,

2022) (finding that the causal link between unfair business practices of a competitor company and a drop in sales was lacking because the drop in sales could be attributed to other causes); Decl. Ex. 118, at reas. 4.7, ECF No. 435-118, DSFC 142 [2016] III 433 (plaintiff's pain disorder, which developed over several months due to overwork after he began taking care of his wife following her accident, could not be attributed to the party liable for the accident).

The evidence at trial will show that BNPP is not the natural or adequate cause of Plaintiffs' injuries.  BNPP's provision of banking services in Sudan did not cause conflict and civilian abuses in Sudan, which were widespread long before BNPP's presence in Sudan and have persisted long since BNPP withdrew from Sudan.  BNPP never financed the Government of Sudan's purchase of arms, and there is no evidence linking any specific BNPP transaction to Plaintiffs' injuries.  Nor is there any evidence that BNPP's financial services were a necessary cause of Plaintiffs' injuries.  To the contrary, the Government of Sudan independently decided when, where, and how to use the funds it had.  The evidence will therefore show that Plaintiffs' theory of indirect causation is far too attenuated to meet the requirements for natural and adequate causation under Swiss law.

## IV.    PLAINTIFFS MUST PROVE ALL ELEMENTS OF ARTICLE 50 UNDER THE FULL CONVICTION STANDARD, EXCEPT FOR NATURAL CAUSATION, WHICH MUST BE PROVEN BY PREPONDERANT LIKELIHOOD.

Under Article 8 of the Swiss Civil Code, "the burden of proving the existence of an alleged fact shall rest on the person who derives rights from that fact."  Plaintiffs suing in tort must, accordingly, prove each of the elements of their claim, ECF No. 813-6, and "all facts necessary to establish each element," ECF No. 813-1 ¶ 22.  Plaintiffs must prove all elements of Article 50(1) under the "full conviction" standard except for natural causation, which may be proven by "preponderant likelihood."  *Id.* at ¶ 36–39.

The default standard of proof for every element of a Swiss civil claim—including all claims under Article 50(1)—is "full conviction," *id*. ¶ 26, meaning "strict proof." *See, e.g*., Decl. Ex. C ¶ 3.2, ECF No. 813-3 (Insurance Contract Case, 130 III 321); Decl. Ex. E ¶ 6.1.1, ECF No. 813-5 (Delayed Stroke Case, 4A_401/2023). To satisfy this standard, Plaintiffs must prove each material fact "from an objective point of view," Decl. Ex. B. ¶ 3.1, ECF No. 813-2 (Prospectus Case, 132 III 715), such that the factfinder "no longer has any serious doubts about the existence of the asserted fact or if any remaining doubts appear negligible," Decl. Ex. C ¶ 3.2, ECF No. 813-3 (Insurance Contract Case, 130 III 321). The consensus among legal scholars is that proof satisfying the "full conviction" standard must convince the factfinder of the Plaintiffs' claim with probability of at least 90%. Decl. Ex. K, at 253 n.66, ECF No. 813-11 (Steinauer, Traité de droit Privé Suisse–Le tirtre préliminaire due Code civil (2008)). Plaintiffs must, accordingly, prove by "full conviction" that "a main perpetrator [the Government of Sudan] committed an illicit act," that "the accomplice [BNPP] consciously assisted the perpetrator and knew or should have known that he was contributing to an illicit act," and that BNPP's culpable cooperation was the adequate cause of Plaintiffs' injuries. ECF No. 499 at 3.

The standard governing Plaintiffs' showing on natural (but-for) causation is an exception to this general rule. Plaintiffs may prove natural causation instead under the "preponderant likelihood" standard. Decl. Ex. E ¶ 6.1.1, ECF No. 813-5 (Delayed Stroke Case, 4A_401/2023). "Preponderant likelihood" requires "strong reasons in favor of the accuracy of an allegation, with no other possibilities carrying significant weight or reasonably being taken into account." Decl. Ex. A. ¶¶ 36–39, ECF No. 813-1. Swiss courts have characterized such proof as "compelling" or "decisive." Decl. Ex. E. ¶¶ 3.1, 6.4, ECF No. 813-5 (Delayed Stroke Case, 4A_401/2023); Decl. Ex. I ¶¶ 3.3, 4.2, ECF No. 813-9 (Employment Insurance Case, 4A_424/2020). Legal

scholarship, recognized by the Swiss Supreme Court, describes the standard as requiring proof of at least 75% certainty.  Decl. Ex. A ¶ 37, ECF No. 813-1 ("[T]he Federal Supreme Court has acknowledged that 'a 51% probability is not sufficient, and a clearly higher level must be used; a probability of 75% has been cited.' Legal scholarship supports a threshold of at least 75%.").

The evidence at trial will demonstrate that Plaintiffs have failed to satisfy these stringent Swiss-law standards for liability.

## CONCLUSION

Plaintiffs cannot prove a claim for secondary liability against BNPP that would be actionable under Swiss law.  Moreover, the evidence at trial will demonstrate that Plaintiffs have failed to carry their burden to demonstrate that BNPP is secondarily liable under all three elements of Article 50(1).

Respectfully submitted,

Dated: New York, New York
August 28, 2025

/s/ Barry H. Berke
Barry H. Berke
Dani R. James
Michael Martinez
Matt Benjamin
David P. Salant

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
T: (212) 351-4000
bberke@gibsondunn.com
djames@gibsondunn.com
mmartinez2@gibsondunn.com
mbenjamin@gibsondunn.com
dsalant@gibsondunn.com

/s/ Carmine D. Boccuzzi, Jr.
Carmine D. Boccuzzi, Jr.
Abena Mainoo

CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
T: (212) 225-2000
cboccuzzi@cgsh.com
amainoo@cgsh.com

Counsel for Defendants BNP Paribas S.A.
and BNP Paribas US Wholesale Holdings,
Corp.