UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ENTESAR OSMAN KASHEF *et al.*, <br><br> Plaintiffs, <br><br> -against- <br><br> BNP PARIBAS S.A. and BNP PARIBAS US WHOLESALE HOLDINGS, CORP., <br><br> Defendants. | No. 16 Civ. 3228 (AKH) <br><br> Hon. Alvin K. Hellerstein |

## DEFENDANTS' MOTION FOR MISTRIAL

CLEARY GOTTLIEB
STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
T: (212) 225-2000

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
T: (212) 351-4000

*Counsel for Defendants BNP Paribas S.A. and BNP Paribas US Wholesale Holdings, Corp.*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ..................................................................................................................... 3

ARGUMENT ........................................................................................................................... 6

CONCLUSION ...................................................................................................................... 10

## PRELIMINARY STATEMENT

Plaintiffs' counsel deliberately misled the Court and defense counsel to elicit plainly impermissible hearsay testimony from their witness, Nima Elbagir, to establish a connection between the Government of Sudan and BNPP. That testimony was the definition of trial by ambush: Plaintiffs' counsel had never disclosed that hearsay testimony, and Ms. Elbagir had never before testified to that connection—let alone suggested that government officials "brag[ged]" to her that their relationship with BNPP allowed them to "[break] America's nose." Sept. 16, 2025 Trial Tr. 435:22–436:9. This was also premeditated misconduct: Plaintiffs' counsel willfully delayed until the very last question of her examination—and after the Court had sustained hearsay objections three times in a row—to draw out Ms. Elbagir's improper hearsay testimony.

The prejudice of that testimony is unmistakable. It improperly ties BNPP to the Government of Sudan in a way that no previously disclosed document or witness could do. The Court ultimately struck the testimony. But the damage has been done, irreparably and just as Plaintiffs' counsel planned. They purposely hid from the Court and defense counsel the anticipated hearsay testimony, disclosing only two other hearsay statements they sought to introduce, and then engaged in trickery to elicit the inadmissible, highly prejudicial testimony after the Court sustained three consecutive objections. As a result of Plaintiffs' counsel's blatant misconduct, the jury heard Ms. Elbagir's testimony regarding alleged conversations with Sudanese government officials that draw the connection from the government to BNPP. They cannot now unhear it. The only solution is to declare a mistrial. That is the necessary and adequate response to Plaintiffs' counsel's flagrant misconduct.

First, there is an overwhelming probability that the jury will be unable to follow the Court's instructions to ignore the testimony. In a highly choreographed stunt, using a high-profile witness, Plaintiffs' counsel laid in wait and elicited shocking testimony about the alleged connection between senior elements of the Sudanese government and BNPP. That improper hearsay followed

on the heels of highly disturbing testimony about mass killings and rapes by alleged agents of the Sudanese government, which was admitted over Defendants' objections. While this Court ultimately struck "[the] entire colloquy about government officials and Bank Paribas" that Plaintiffs' counsel had orchestrated to be the dramatic end of the testimony, no jury would be able to unhear the testimony or unfeel the impact it had on them. And the jurors would struggle to understand where the impermissible colloquy began and where it ended—particularly without drawing more attention to the improper testimony and inadvertently exacerbating the prejudice already suffered by Defendants. Declaring a mistrial is the only adequate solution to address that prejudice.

Second, the improper testimony—in context and as a result of Plaintiffs' counsel's misconduct—was devastating to a fair trial and BNPP's defense. After extensive discovery stretching years, Plaintiffs have been unable to identify any testimony or other evidence even close to Ms. Elbagir's newfound hearsay claim regarding government officials' alleged views about BNPP. During Ms. Elbagir's testimony, Plaintiffs' counsel constructed that evidence through improper hearsay. Plaintiffs' counsel deliberately concealed that improper hearsay from the Court and Defendants for years, and then tactically sprung it in front of the jury. Now, the jury will not even learn that Ms. Elbagir's newfound testimony, in addition to being improper, also had never been claimed in seven hours of deposition testimony or 30 pages of her sworn declaration.

It would be the height of unfairness to reward Plaintiffs' counsel's misconduct by sweeping these events under the rug. The prejudice to Defendants is severe. The impact on the jury is irreparable. Merely striking the testimony and censuring Plaintiffs' counsel will not and cannot remove the taint that now infects these proceedings. Plaintiffs' counsel's actions require a remedy that is commensurate to the harm. Declaring a mistrial is the only solution sufficient to provide Defendants a fair trial.

2

**BACKGROUND**

Plaintiffs' counsel deliberately concealed from the Court and Defendants Ms. Elbagir's testimony about hearsay statements made by Sudanese government officials. It was not included in any prior testimony or briefing in this case. In almost seven hours of deposition testimony and 30 pages of her sworn declaration, Ms. Elbagir never identified any statements allegedly made by Sudanese officials about BNPP. To the contrary, when asked about the basis for her statement in her deposition that BNPP was "part and parcel of the financing of the Sudanese government," Ms. Elbagir explained only that BNPP "provided a letter of credit" to the Government. Elbagir Dep. Tr. at 60:9-61:5. When pressed, Ms. Elbagir failed to identify "any other basis" for her statement. *Id*. at 61:3-5. If Ms. Elbagir had heard Sudanese government officials "brag[ing] about" BNPP's purported financial assistance, as she now improperly testified, Sept. 16, 2026 Trial Tr. at 436:2, she had an obligation to reveal that knowledge in response to direct questioning about it. She never did.

Just as Ms. Elbagir never testified about the alleged hearsay statements of Sudanese government officials, Plaintiffs' counsel never suggested in their filings that Ms. Elbagir could or would provide this testimony—despite numerous opportunities to do so. Before trial, BNPP moved this Court to exclude Ms. Elbagir's testimony, predicting correctly that Ms. Elbagir would serve as an improper conduit for inadmissible hearsay. *See* ECF No. 853. In response, Plaintiffs disclaimed any intent to have Ms. Elbagir testify as to hearsay. Instead, they asserted that she would provide her "first-hand account of relevant events" on a variety of topics, including illicit acts by the Government of Sudan, the Government of Sudan's control over Janjaweed militia groups, and the Government of Sudan arming the Janjaweed. ECF No. 909 at 1, 4. None of those topics included BNPP's alleged connection to the Sudanese government.

At the September 3rd pretrial conference, Plaintiffs' counsel again suggested that Ms. Elbagir "does not intend to testify to any hearsay, but to her percipient eyewitness [sic]." Sept. 3,

3

2025 Hr'g Tr. at 44:22–23. Recognizing the significant potential for abuse, the Court permitted Ms. Elbagir to testify, but only as to "what she saw," holding that she "may not be used as a conduit to introduce inadmissible hearsay." ECF 944 at 4.

To enforce these guardrails on Ms. Elbagir's testimony, BNPP filed a letter brief the day before her testimony to preclude her from introducing inadmissible hearsay. *See* ECF No. 959. Plaintiffs responded by arguing only that Ms. Elbagir "will testify that she interviewed two Janjaweed leaders who made statements admitting that they were funded and controlled by the Government of Sudan," which, according to Plaintiffs, were admissible under Rule 804(b)(3) as statements against interest. ECF No. 960 at 1. Plaintiffs identified no other statements that would be the subject of Ms. Elbagir's testimony, let alone any other statements against interest that should be considered by this Court as potentially inadmissible hearsay.

This was a deliberate and calculated deception. Plaintiffs' counsel planned to surprise this Court and BNPP with the testimony—and spring it in front of the jury—before it could be excluded. Indeed, Plaintiffs' counsel pursued this course of questioning despite knowing that this Court would not permit it. From the moment Plaintiffs' counsel began questioning Ms. Elbagir about her conversations with government officials, this Court repeatedly sustained BNPP's objections. But Plaintiffs' counsel was not deterred. She continued to pursue the objectionable line of questioning until she arrived at the deliberately orchestrated grand finale, through a seemingly innocuous question designed to hide that she was again seeking to tar BNPP through the same inadmissible hearsay that the Court had already rejected:

> Q. In your reporting on Sudan, let's cabin it to your time in Sudan, 2002-2008, did you have the opportunity to speak with government of Sudan officials?
>
> A. Yes, I did.
>
> Q. Could you tell us a little bit about whom you spoke with?
>
> A. Oh, everyone.

4

> **MR. MARTINEZ: Objection, your Honor.**
>
> **THE COURT: Sustained.**
>
> Q. In your reporting on victims, did you speak to anyone else on those stories that you were or the reporting you were covering for the survivors besides the survivors themselves?
>
> **MR. MARTINEZ: Objection, your Honor.  Objection, your Honor.**
>
> **THE COURT: Sustained.**
>
> Q. You mentioned you would crosscheck your work. Was there, could you explain what you mean by that?
>
> **THE COURT: Sustained.**
>
> Q. During your reporting on Sudan between 2002-2008 for the assignment we discussed, did you ever have the opportunity to encounter BNP Paribas?
>
> A. Yes.
>
> Q. In what context?
>
> A. Government officials would brag about it.
>
> MR. MARTINEZ: Objection, your Honor.
>
> MS. BOYD: No further questions.
>
> MR. MARTINEZ: Move to strike.
>
> THE COURT: Which government officials?
>
> THE WITNESS: Those overseeing the oil industry, the intelligence officials, the minister of interior.  They were, how they would put it is we broke America's nose.

Sept. 16, 2025 Trial Tr. at 435:5–436:9 (emphases added).

Plaintiffs' counsel's attempt to explain away her misconduct only confirmed it.  Plaintiffs' counsel tried to justify her improper questioning by suggesting that Plaintiffs had briefed and received permission that "statements against interest were going to be allowed under 804(d)."  But the Court saw right through that pretextual fig leaf.  Plaintiffs had conspicuously *not included* this particular hearsay statement in their 804(d) letter brief filed that morning.  *Id.* at 454:20–21.  The

5

Court correctly noted that Plaintiffs' counsel was "talking about something else"—in other words, the narrow testimony offered "earlier" by Ms. Elbagir that *had been* expressly raised and briefed by the Plaintiffs, *id.* at 455:7–8—and not the improper hearsay testimony about Sudanese government officials that Plaintiffs had deliberately hidden from the Court.

The Court ultimately ruled that the testimony was improper and therefore ordered that the "entire colloquy about government officials and Bank Paribas is stricken." *Id.* at 436:15–17. The Court also censured Plaintiffs' counsel, Ms. Boyd, for eliciting it. The Court explained that Ms. Boyd's tactic to "ask these questions as if it were the prelude to something that was relevant but just to ask the questions itself ***was wrong. You should not have done that***, Ms. Boyd, and don't do it again. . . ." *Id.* at 454:9–12 (emphasis added). That misconduct is, unfortunately, entirely unsurprising given Ms. Boyd's past alleged misconduct in this case. As her own co-counsel explained in sworn statements, Ms. Boyd tried to "force words into the mouth of an expert witness" in a May 2025 "mock prep exercise" and "brazenly" threatened to take unspecified unethical action in June 2025 during a trip to prepare "victim-side witnesses" for trial. ECF No. 784 at 2, 8, 13–15. Unfortunately, as BNPP predicted in its motion for a hearing on Ms. Boyd's past misconduct, ECF No. 815, her improper questioning in front of the jury has now irrevocably tainted this trial.

## ARGUMENT

Ignoring this Court's decisions both before and during trial, Plaintiffs deliberately elicited improper hearsay testimony from Ms. Elbagir. They did so without requesting permission from this Court, despite briefing the applicability of hearsay exceptions for *other* hearsay testimony that Ms. Elbagir would offer. Plaintiffs' counsel's plan was obvious: to surprise this Court and BNPP with Ms. Elbagir's improper testimony at the very end of questioning, hoping that the jury would hear the testimony before an objection could be sustained.

In light of the obvious prejudice to BNPP, this Court must declare a mistrial. The Second Circuit has held that a mistrial is warranted, even after the Court has issued a curative instruction,

where "there is [1] an 'overwhelming probability that the jury will be unable to follow the court's instructions' and [2] the evidence is 'devastating' to the defense." *United States v. Colombo*, 909 F.2d 711, 715 (2d Cir. 1990) (quoting *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987)). This standard is satisfied here. By concealing and then willfully eliciting inadmissible hearsay in violation of this Court's prior orders, Plaintiffs' counsel irrevocably tainted the jury's consideration of the facts of this case.

Ms. Elbagir's testimony was so shocking that the jury is overwhelmingly *un*likely to heed this Court's curative instruction. First, she testified to the connection between BNPP and Sudanese officials in particularly caustic terms: these officials allegedly "brag[ged]" about leveraging their relationship with BNPP to "[break] America's nose." Sept. 16, 2025 Trial Tr. at 436: 2–9. Moreover, Ms. Elbagir implied that this perspective was endemic at the highest levels of Sudan's government, indicating that the unknown "officials" in question included "[t]hose "overseeing the oil industry, the intelligence officials, the minister of the interior." *Id.* at 436:6–9. This kind of "shocking" testimony is the very kind that a jury will be unable to disregard, even in the face of a timely instruction. *United States v. Williams*, 585 F.3d 703, 710 (2d Cir. 2009).

The "shocking" nature of this inadmissible testimony is heightened by the way Ms. Boyd improperly sprung it upon the jury. As counsel for BNPP stated on the record, Plaintiffs' counsel made a calculated decision to introduce this highly provocative testimony through a "very articulate journalist," whose testimony was likely to resonate with and impress the jury. Sept. 16, 2025 Trial Tr. at 454:1–4. That improper hearsay followed on the heels of highly disturbing testimony about mass killings and rapes by alleged agents of the Sudanese government, which was admitted over Defendants' objections. Plaintiffs' counsel then elicited Ms. Elbagir's inadmissible, highly prejudicial testimony only at the very end of her testimony, staging a dramatic and

7

memorable finale for the jurors. Ms. Boyd choreographed this moment so tightly that she theatrically stated "[n]o further questions" before the Court had even a moment to rule on opposing counsel's objection. *Id.* at 436:3–6.

The Court's instruction to the jury as to what testimony the jury should disregard was less clear than it might have been. Before ruling on counsel's objection and motion to strike, the Court interposed to ask the witness a clarifying question, to which the witness responded in an equally objectionable manner. *Id.* at 436:6–9. Only after this response did the Court order the jury to "[p]ay no attention" to "[t]he last sentence." *Id.* at 436:11–12. Jury members may not have understood whether the Court was referring to Ms. Elbagir's response to the Court's inquiry or to her testimony before counsel's initial objection. Soon thereafter, upon realizing that Ms. Boyd was not establishing foundation or background for admissible testimony, the Court subsequently ordered the jury to disregard "[t]his entire colloquy about government officials and Bank Paribas." *Id.* at 436:15–17. But again, the jury may well have been confused about whether this "colloquy" referred to the Court's colloquy with the witness or whether it extended further back (and if so, where exactly in the testimony it began).

Moreover, Plaintiffs' counsel's unethical conduct caused this testimony to be placed before the jury without all the evidence that raises questions regarding its veracity. That evidence includes the witness's prior testimony and statements, none of which mentioned the alleged conversations with government officials. The jury also did not hear that the newly claimed conversations had never before been disclosed by Plaintiffs' counsel when describing the witness' purportedly relevant testimony to this case.

Ms. Elbagir's testimony—in context and as a result of Plaintiffs' counsel's misconduct—was "devastating" to a fair trial and BNPP's defense. *Williams*, 585 F.3d at 709 (citation omitted). In *United States v. Williams*, the Second Circuit found the lower court's instruction to disregard inadmissible evidence inadequate, because that evidence substantiated critical inferences that the prosecution could not establish through other evidence. *Id.* at 710. On the question of whether the defendant had been in possession of a handgun—an issue central to the case—the Government could only show, without the inadmissible evidence, that "Jackson was a convicted felon . . . who ran from the police." *Id.* With the inadmissible evidence, however, the Government could persuasively "invite[] the jury to infer that Jackson . . . associated with dangerous drug dealers equipped with an array of weapons who operated a narcotics business out of a residential apartment building," leaving the defendant with "little chance to prevail" on that central question. *Id.*

The same is true here. Even after combing through tens of thousands of pages of documents in discovery and eliciting the deposition testimony of an extraordinary number of witnesses, Plaintiffs have proven incapable of substantiating the inference central to their case: the alleged link between BNPP's facilitation of financial transactions in Sudan and the three trial Plaintiffs' specific injuries. Evidence of this long-sought missing link, though, is precisely what Plaintiffs' counsel manufactured through Ms. Elbagir's inadmissible testimony. By staging improper testimony that Sudanese government officials—officials "overseeing the oil industry," "intelligence officials," and even the "minister of the interior"— "brag[ged]" that their relationship with BNPP allowed them to "[break] America's nose," Sept. 16, 2025 Trial Tr. at 435:22–436:9, Plaintiffs' counsel illicitly bolstered a key alleged connection between BNPP and the Government of Sudan that is not otherwise supported by admissible evidence. Striking the end of the witness'

9

testimony or even her entire testimony will not and cannot cure the overwhelming prejudice caused by Plaintiffs' counsel's stunt.

## CONCLUSION

For the foregoing reasons, this Court must grant BNPP's motion for a mistrial.

Respectfully submitted,

Dated: New York, New York
September 17, 2025

| | |
|---|---|
| */s/ Barry H. Berke* | */s/ Carmine D. Boccuzzi, Jr.* |
| Barry H. Berke | Carmine D. Boccuzzi, Jr. |
| Dani R. James | Abena Mainoo |
| Michael Martinez | |
| Matt Benjamin | CLEARY GOTTLIEB STEEN & |
| David P. Salant | HAMILTON LLP |
| | One Liberty Plaza |
| GIBSON, DUNN & CRUTCHER LLP | New York, New York 10006 |
| 200 Park Avenue | T: (212) 225-2000 |
| New York, New York 10166 | cboccuzzi@cgsh.com |
| T: (212) 351-4000 | amainoo@cgsh.com |
| bberke@gibsondunn.com | |
| djames@gibsondunn.com | |
| mmartinez2@gibsondunn.com | *Counsel for Defendants BNP Paribas S.A.* |
| mbenjamin@gibsondunn.com | *and BNP Paribas US Wholesale Holdings,* |
| dsalant@gibsondunn.com | *Corp.* |