UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ENTESAR OSMAN KASHEF *et al.*,

                        Plaintiffs,

            -against-

BNP PARIBAS S.A. and BNP PARIBAS US
WHOLESALE HOLDINGS, CORP.,

                    Defendants.

No. 16 Civ. 3228 (AKH)

Hon. Alvin K. Hellerstein

---

# DEFENDANT BNP PARIBAS S.A.'S MEMORANDUM OF LAW IN SUPPORT OF RULE 50(A) MOTION FOR JUDGMENT AS A MATTER OF LAW

CLEARY GOTTLIEB
STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
T: (212) 225-2000

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
T: (212) 351-4000

*Counsel for Defendant BNP
Paribas S.A.*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND .................................................................................................... 5

    I.      PLAINTIFFS' TESTIMONY CONCERNING THEIR INJURIES ..................... 5

    II.     PLAINTIFFS' THEORY OF CAUSATION RELATING TO BNPP ................. 7

LEGAL STANDARD ............................................................................................. 9

ARGUMENT ......................................................................................................... 9

    I.      PLAINTIFFS FAILED TO DEMONSTRATE BY SUFFICIENT
         EVIDENCE THAT BNPP IS LIABLE FOR THEIR INJURIES UNDER
         SWISS TORT LAW. ................................................................................ 9

         A.     Plaintiffs Failed To Provide Sufficient Evidence That The GOS Is
              Liable For Committing An Illicit Act As A Primary Tortfeasor
              Under Article 41. ........................................................................ 11

              1.    Swiss Law Requires That The Primary Tortfeasor Must Be
                     Capable of Being Held Liable To Hold An Accomplice Liable. .......... 12

              2.    Swiss Tort Law Does Not Apply Extraterritorially To Acts
                     Committed Outside Of Switzerland. ....................................... 16

              3.    Swiss Tort Law Does Not Permit Suit Against A Foreign
                     Sovereign For Actions Taken In Its Official Capacity. ........................ 22

         B.     Plaintiffs Failed To Provide Sufficient Evidence That BNPP
               Culpably Acted Together With The GOS To Contribute To
               Plaintiffs' Injuries. .................................................................. 24

         C.     Plaintiffs Failed To Demonstrate By Sufficient Evidence That
               BNPP's Actions Were The "Natural And Adequate Cause" Of
               Their Alleged Injuries. .............................................................. 27

              1.    Natural Causation. ................................................................. 27

               2.    Adequate Causation ................................................................ 35

         D.     Plaintiffs Failed To Provide Sufficient Evidence To Satisfy The
               Applicable Burden Of Proof For Each Element Of Their Case. .............. 39

    II.     PLAINTIFFS FAILED TO PROVIDE SUFFICIENT EVIDENCE OF
         THEIR ALLEGED DAMAGES ........................................................... 41

    A.     Economic Damages ........................................................................ 42

    B.     Personal Injuries ............................................................................ 44

i

# TABLE OF CONTENTS
(continued)

                                                                                    **Page**

    C.      Noneconomic Damages ......................................................................... 45

   III.    BNPP IS ENTITLED TO JUDGMENT AS A MATTER OF LAW AS TO PLAINTIFFS' CLAIMS ARISING FROM INJURIES THAT OCCURRED BEFORE APRIL 29, 2001. ........................................................ 46

CONCLUSION .................................................................................................................... 50

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002)........................................................................44

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).................................................................................9

*Ashley v. Deutsche Bank Aktiengesellschaft*,
    144 F.4th 420 (2025)..............................................................................33

*Cunningham v. Masterwear Corp.*,
    569 F.3d 673 (7th Cir. 2009) ..................................................................43

*Dugan v. Schering Corp.*,
    86 N.Y.2d 857 (N.Y. 1995) .....................................................................47

*Fed. Republic of Germany v. Philipp*,
    592 U.S. 169 (2021)...............................................................................22

*Glob. Fin. Corp. v. Triarc Corp.*,
    93 N.Y.2d 525 (N.Y. 1999) .....................................................................47

*Guaranty Trust Co. v. York*,
    326 U.S. 99 (1945).................................................................................47

*Ins. Co. of N. Am. v. ABB Power Generation, Inc.*,
    91 N.Y.2d 180 (1997).............................................................................48

*Kashef v. BNP Paribas S.A.*,
    925 F.3d 53 (2d Cir. 2019).........................................................16, 23, 48

*Kashef v. BNP Paribas SA*,
    2021 WL 603290 (S.D.N.Y. Feb. 16, 2021)......................................11, 12

*Kashef v. BNP Paribas SA*,
    2024 WL 1676355 (S.D.N.Y. Apr. 18, 2024)....................................23, 48

*Kiobel v. Royal Dutch Petroleum Co.*,
    569 U.S. 108 (2013)...............................................................................19

*KW Plastics v. U.S. Can Co.*,
    131 F. Supp. 2d 1265 (M.D. Ala. 2001) ..................................................44

*Osorio v. Dole Food Co.*,
    665 F. Supp. 2d 1307 (S.D. Fla. 2009) ...................................................34

*Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*,
    324 F. Supp. 3d 387 (S.D.N.Y. 2018).....................................................47

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Schonfeld v. Hilliard,*
    218 F.3d 164 (2d Cir. 2000) ..................................................................................9

*Sir Speedy, Inc. v. L & P Graphics, Inc.,*
    957 F.2d 1033 (2d Cir. 1992) ......................................................................4, 9, 43

*Stuart v. Am. Cyanamid Co.,*
    158 F.3d 622 (2d Cir. 1998) ................................................................................47

*Sullivan v. Saint-Gobain Performance Plastics Corp.,*
    2019 WL 12323305 (D. Vt. July 26, 2019) ....................................................42, 43

*Tilton v. NynEx.World Trade/Lamarian Systems, Inc.,*
    1999 WL 476441 (S.D.N.Y July 8, 1999) ..........................................................47

*TVT Recs. v. Island Def Jam Music Grp.,*
    412 F.3d 82 (2d Cir. 2005) ..................................................................................13

*Twitter v. Taamneh,*
    598 U.S. 471 (2023) ............................................................................................33

*Washington v. Kellwood Co.,*
    2015 WL 6437456 (S.D.N.Y. Oct. 14, 2015) ....................................................45

*Wills v. Amerada Hess Corp.,*
    379 F.3d 32 (2d Cir. 2004) ..................................................................................44

**Rules**

Fed. R. Civ. P. 44.1 ....................................................................................................13

Fed. R. Civ. P. 50 ....................................................................................................1, 9

N.Y. C.P.L.R. § 202 ..............................................................................................5, 47

N.Y. C.P.L.R. § 213 ..................................................................................................48

## PRELIMINARY STATEMENT

Plaintiffs undoubtedly suffered injuries in Sudan over the course of a decade—at different times, at different places, and at the hands of different wrongdoers.  But trial has exposed critical gaps in Plaintiffs' theory that Defendant BNP Paribas S.A. ("BNPP") is liable for these injuries. Plaintiffs' case against BNPP is factually unsupported, contrary to controlling Swiss law, and barred by numerous Swiss and U.S. legal doctrines.  Because a reasonable jury would have no legally sufficient basis to find for Plaintiffs, BNPP is entitled to judgment as a matter of law. Fed. R. Civ. P. 50(a).

*First*, the Court should grant BNPP judgment as a matter of law because Plaintiffs did not introduce sufficient evidence to support the necessary elements under Swiss law—illicit act, conscious assistance, and causation.

No Illicit Act:  To impose accomplice liability on BNPP for the government of Sudan's ("GOS") actions, Plaintiffs must first prove "an underlying violation by a 'main perpetrator' who could be liable under Swiss tort law."  ECF No. 937 ("Swiss Ambassador's Letter") at 3.  In other words, Swiss law mandates that "there is no joint and several liability without (external) liability."  ECF No. 171-41 ("Brehm") ¶ 33.  Without an actionable claim under Swiss law against a main perpetrator, there can be no secondary liability against an alleged accomplice. But there is no actionable claim against the GOS as a main perpetrator under Swiss law here, for two independent reasons: (1) Swiss law does not apply to acts committed outside of Switzerland, and (2) Swiss private law does not apply to acts committed by a foreign sovereign.

Swiss courts, the European Court of Human Rights, and the government of Switzerland itself all agree that Swiss law does not apply extraterritorially to tortious conduct committed outside Switzerland.  *See* Swiss Ambassador's Letter at 3 ("Article 41 [Swiss Code of

Obligations ("SCO")] … does not impose civil liability … for extraterritorial acts[.]").  *Naït-Liman v. Switzerland* is the seminal Swiss case on this issue and rejected the expansive theory of liability by which Plaintiffs seek to hold BNPP liable for the GOS's actions.  ECF No. 898-1 (No. 51357/07 Eur. Ct. H.R. (Mar. 15, 2018), "Judgment of Grand Chamber") ¶ 147.  There, the European Court of Human Rights did not take issue with the Swiss courts' holding that the government of Tunisia could not be held liable because "no illegal act or detrimental outcome occurred in Switzerland" and because the defendant was "not domiciled or habitually resident in Switzerland."  *Id.* ¶ 25 (quotation omitted); *see also id.* ¶¶ 197, 216.  Trial here showed that Plaintiffs' theory of liability as to the GOS is on all fours with *Naït-Liman*—the GOS committed no "illegal act or detrimental outcome … in Switzerland," is not domiciled in Switzerland, and like Tunisia, it cannot be held liable under Swiss law.

In addition, tortious acts committed by a foreign government in its sovereign capacity, including acts of violence, are not subject to tort liability under Swiss law.  *See* Swiss Ambassador's Letter at 3 ("Article 41 SCO … does not impose civil liability … on foreign sovereigns[.]").  A former deputy judge of the Swiss Federal Supreme Court, Isabelle Romy, explained that the acts of a foreign government in its sovereign capacity are not subject to private Swiss tort law, but are exclusively the subject of Swiss public law, including international treaties.  ECF No. 444-102 ("July 21, 2023 Romy Rep.") ¶¶ 28–31.  However, no such treaty applies here.  Because there is no actionable claim against the GOS as a main perpetrator under Swiss law for the acts demonstrated at trial, Plaintiffs' attempt to impose secondary liability on BNPP for those acts fails at the outset.

<u>No Conscious Assistance</u>:  Plaintiffs offered no evidence that BNPP "consciously assisted [the government of Sudan]"—as this Court has previously held is required to satisfy the second

element of Article 50 SCO.  ECF No. 499 ("MSJ Order") at 3.  The evidence is undisputed that BNPP *complied* with the "embargo which was issued by the European community and adopted by Switzerland" which prohibited "financ[ing] any acquisition of arms or military equipment by Sudan."  Oct. 9 Trial Tr. at 1390:3–12 (Testimony of John Clamon); Oct. 6 Trial Tr. at 1170:22–24 (Testimony of Philippe Maillard) ("Q. And to your knowledge, did BNP ever facilitate any transactions involving weapons or military equipment in Sudan?  A. No, it did not.").  Plaintiffs offered no evidence that BNPP was involved in any of the purported illicit acts by the GOS, and Plaintiffs provided no basis to hold BNPP responsible for the independent actions of a foreign sovereign.

        No Causation:  Plaintiffs also failed to prove that BNPP's alleged assistance to the GOS was "the natural and adequate cause of the plaintiff's harm or loss."  MSJ Order at 3.  This standard requires "a specific causal link between the defendant's conduct and the plaintiff's individual injury."  Swiss Ambassador's Letter at 3.  Plaintiffs' evidence did not tie BNPP's actions to the three Plaintiffs' injuries, and the Swiss Federal Supreme Court has held that "not every act of participation that is merely somewhat of promoting influence, but is not sufficiently closely related to the act itself, is sufficient."  ECF No. 435-98 ("Jan. 6, 2023 Müller Rep.") ¶ 143 (quoting ECF No. 435-120 (DFSC 145 [2019] III 72, "Swisscom Case") at reas. 2.3.1 (internal quotation marks and emphasis omitted)).  The undisputed evidence is that BNPP did not facilitate any transactions involving weapons or military equipment—and certainly none tied to the three Plaintiffs.  And many of Plaintiffs' claimed injuries occurred *before* their experts claim Sudan first exported oil using BNPP's financial services in 1999, and occurred without any form of sophisticated weaponry.  *See* Sept. 18 Trial Tr. at 657:20–22 (Testimony of Turjuman Turjuman) (Plaintiff Turjuman was arrested in 1998); Sept. 26 Trial Tr. at 963:5–6, 965:8–11

3

(Testimony of Entesar Osman Kashef) (Plaintiff Kashef's village was bombed in 1989); Sept. 17 Trial Tr. at 478:9–10 (Testimony of Dr. Harry Verhoeven) ("In August '99, Sudan becomes an exporter of oil[.]").  And Plaintiffs' expert conceded that violence continued unabated throughout Sudan even after BNPP ceased doing any business there.  Sept. 15 Trial Tr. at 211:20–212:14, 213:14–219:4, 234:9–235:25 (Testimony of Cameron Hudson).

*Second*, the Court should enter judgment as a matter of law as to each of Plaintiffs' claimed categories of damages—including property damages, lost income, personal injuries, and noneconomic damages—because Plaintiffs did not offer sufficient non-speculative evidence to support them.  Judgment as a matter of law is required where, as here, a plaintiff fails to "present evidence that provides the finder of fact with a reasonable basis upon which to calculate the amount of damages."  *Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992).  For example, each of the Plaintiffs claimed various categories of property damage— including lost livestock and lost Sudanese real property.  But the value of such property is far outside the knowledge of a lay jury sitting in New York, and Plaintiffs presented no expert testimony or other competent, non-speculative evidence to provide the jury a valid basis for awarding damages.  *See* Sept. 25 Trial Tr. at 909:2–11 (Testimony of Abulgasim Abdalla) (speculating that the value of Plaintiff Abdalla's livestock today "could be up to a million [U.S. dollars]" because "it's been over 20 years, and every year the cows would have more new baby cows").  Plaintiffs' claims for other types of economic and noneconomic damages similarly fail based on their lack of competent, non-speculative evidence.

*Third*, judgment as a matter of law is required as to all claims arising from injuries that occurred before April 29, 2001.  Trial showed that each of the Plaintiffs apparently seeks to recover for injuries that would have been time-barred under Sudan's 15-year limitations period—

where their claims arose.  New York's borrowing statute, N.Y. C.P.L.R. § 202, therefore bars

recovery for those injuries.  The Court should hold that Plaintiffs cannot seek, and the jury

cannot award, damages based on such claims.

For the foregoing reasons, BNPP respectfully requests that the Court enter judgment as a

matter of law in favor of BNPP.

## BACKGROUND

Plaintiffs' testimony concerning their injuries provides the foundation for analyzing their

Swiss tort claims.

## I.    PLAINTIFFS' TESTIMONY CONCERNING THEIR INJURIES

**Mr. Turjuman Turjuman:**  Mr. Turjuman, a former judge during the regime of Omar

Hassan Ahmad al-Bashir, testified that he was arrested and detained on four occasions in

retaliation for suing the GOS or otherwise being perceived as a political opponent of the regime.

In 1998, National Security officers arrested Mr. Turjuman, held him for three days, subjected him

to physical abuse, and told him not to sue the government again.  Sept. 18 Trial Tr. at 657:20–22,

658:10–659:4, 661:22–663:13, 664:6–16, 666:9–669:20, 670:15–673:3 (Turjuman).  In 2000,

military intelligence officers arrested Mr. Turjuman again, but he was released after only a

"couple hours" after the governor intervened.  *Id.* at 673:18–677:1, 677:12–22.  In 2002 or 2003,

armed intelligence officers again arrested Mr. Turjuman and detained him for three days at the

military barracks, where he was subjected to physical abuse.  *Id.* at 677:23–679:12, 680:1–683:7.

In 2004, National Security officers arrested and detained Mr. Turjuman for 11 days at the

National Security headquarters, where he was again subjected to physical abuse.  *Id.* at 683:23–

689:24, 691:17–692:3.  Later that year, Mr. Turjuman fled to Egypt, *id.* at 694:19–695:3, 697:11–

16, and on March 17, 2005, he moved to the United States, *id.* at 638:25–639:1.

**Mr. Abulgasim Abdalla:**  Mr. Abdalla testified that in 1999, the Sudanese government and Janjaweed militias attacked his village of Doweit, destroying his home, stealing livestock, and causing his family to flee to neighboring Chad for some time.  Sept. 25 Trial Tr. at 910:23–911:5, 916:4–11, 916:24–917:17 (Abdalla).  In the summer of 2003, the Sudanese government and Janjaweed again attacked Doweit.  *Id.* at 920:2–20, 921:8–25.  Later in 2003, while fleeing toward Nyala after the attack, Mr. Abdalla was accosted by "a big group of Janjaweed accompanied by Omar Al Bashir's [a]rmy."  *Id.* at 927:1–3.  Mr. Abdalla attributed this attack to an ethnic conflict between Arab peoples and the Sudanese African tribes from "way back then." *Id.* at 933:16–20.  Mr. Abdalla testified that in 2006, the Janjaweed and Sudanese government came to "dismantle the camp" in which he and his family resettled in Nyala.  *Id.* at 936:19–21, 937:12–14, 938:25–939:1.  In 2014, Mr. Abdalla and his family came to the United States.  *Id.* at 901:17–18, 942:7–15, 901:19–22; PX 854.

**Ms. Entesar Osman Kashef:**  Ms. Kashef described episodes of violence beginning in 1989.  In or around 1989, when Ms. Kashef was around five years old, her mother was killed "after an air raid" in South Kordofan.  Sept. 26 Trial Tr. at 963:1–6, 964:25–965:1, 8–11 (Kashef).  Her father, a member of the army, then moved the family to her grandmother's home in Kutum, Darfur.  *Id.* at 965:3–6.  In 2003, Kutum was attacked by "Army people" and what Ms. Kashef described as "the enemy," later stating that "[t]he Janjaweed are the Army."  *Id.* at 967:9–968:12; 970:3–6.  In 2008, five men in army uniform attacked Ms. Kashef's family home in Kutum.  *Id.* at 978:19–979:4; 980:2–25; 981:10, 17.  Ms. Kashef fled to Khartoum, *id.* at 982:21, and while in Khartoum, the Sudanese police detained and physically abused Ms. Kashef twice, *id.* at 988:6–992:12; 994:3–995:9.  Ms. Kashef testified she was ethnically targeted for the first arrest because she was a Black African from Darfur and that such persecution originated "a

very long time ago." *Id.* at 987:20–988:1. The second arrest occurred during a "random[]" police sweep by Sudanese officers. *Id.* at 994:8–9. Ms. Kashef fled Sudan shortly after. *Id.* at 995:19–996:5. In 2015, she came to the United States. *Id.* at 999:18–19.

## II.   PLAINTIFFS' THEORY OF CAUSATION RELATING TO BNPP

The undisputed trial evidence showed that BNPP never facilitated the purchase of any weapons or military equipment in Sudan. Oct. 6 Trial Tr. at 1170:22–24 (Maillard) ("Q. And to your knowledge, did BNP ever facilitate any transactions involving weapons or military equipment in Sudan? A. No, it did not."); Oct. 9 Trial Tr. at 1390:10–12 (Clamon) ("according to this embargo, we were not allowed to finance any acquisition of arms or military equipment by Sudan, Sudan government or Sudan corporates").

Lacking evidence connecting BNPP to the purchase or sale of weapons or military equipment, Plaintiffs rely on a series of inferences that allegedly indirectly connect BNPP's conduct to Plaintiffs' injuries. First, Plaintiffs assert that BNPP's provision of financial services in Sudan—specifically, its provision of letters of credit and ordinary commodity trade finance services to European and Asian companies that bought and sold Sudanese oil—permitted entities in Sudan's oil industry to obtain additional oil revenue. *See* Sept. 17 Trial Tr. at 479:11–480:08 (Verhoeven); Sept. 22 Trial Tr. at 817:08–19 (Testimony of Timothy Fogarty). Second, Plaintiffs assert these entities were owned or controlled by the GOS and therefore the oil sales yielded additional revenue to the GOS. *See, e.g.*, Sept. 17 Trial Tr. at 482:15–20 (Verhoeven) (stating the Sudanese regime managed oil resources), 495:06–09 (describing the "military Islamist regime in Sudan" "clearing the oil fields"); Sept. 22 Trial Tr. at 802:14–23 (Fogarty) (noting that over 90% of oil export transactions were on behalf of the Central Bank of Sudan or Sudapet), 822:09–823:01 (describing PX 971 as showing oil export funds being received into the accounts of the

GOS).  Third, Plaintiffs assert that the GOS spent those increased revenues on military

expenditures.  *See* Sept. 22 Trial Tr. at 822:13–22 (Fogarty) & PX 971.  Fourth, Plaintiffs assert

that increases in military expenditures allowed the GOS and its agents to conduct additional

military activities, *see, e.g.*, Sept. 17 Trial Tr. at 576:17–578:19 (Verhoeven); Sept. 22 Trial Tr. at

822:13–22 (Fogarty), and that these additional military activities harmed the Plaintiffs in

different locations across Northern, Southern, and Western Sudan from 1998 to 2008, *see* Sept.

18 Trial Tr. at 637:02–710:10 (Turjuman); Sept. 25 Trial Tr. at 900:08–947:04 (Abdalla); Sept.

26 Trial Tr. at 962:08–1002:06 (Kashef).

In response, BNPP presented undisputed evidence showing that from 1997 to 2009, non-

oil related revenues far exceeded Sudan's military budget, and also far exceeded Sudan's oil

revenue that Plaintiffs attribute to BNPP.  Oct. 6 Trial Tr. at 1197:5–8 (Testimony of Dimitri

Zenghelis) ("Q. … For the period in question, 1997 through the 2000s, how did Sudan's non-oil

revenues compare to its military spending?  A. Well, they were both rising over the period, but

non-oil revenues were significantly higher than military spending.").  BNPP also presented

undisputed evidence showing that the GOS continued to generate oil revenues and fund its

military even after BNPP ceased doing business in Sudan.  *Id.* at 1224:5–12 ("Q. …  What does

this chart tell you about whether BNPP's financial services were necessary for Sudan's oil

revenues in 2010?  A. Well, if they were necessary, then oil revenues would have had to cease or

fall very rapidly to zero, and yet what we see here is the trend in oil revenues is actually

relatively flat.  And we know that in terms of barrels of oil, Sudan was producing, distributing,

and exporting oil at record levels throughout that period.").  BNPP also presented evidence

showing that atrocities of the kind Plaintiffs suffered were widespread long before BNPP

provided oil-export-related financial services in Sudan, while Sudan was wracked by a brutal,

decades-long civil war. *See* DX-SH (1989 State Department report), DX-SI (1991 State Department report), DX-SJ (1997 State Department report).

**LEGAL STANDARD**

Judgment as a matter of law is appropriate when "a party has been fully heard . . . during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). In other words, where there "can be but one reasonable conclusion as to the verdict," the court should direct a verdict for the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In addition, because "[d]amages may not be merely speculative, possible or imaginary," *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000) (quotation omitted), a court should direct a verdict on damages against a plaintiff who has failed to "present evidence that provides the finder of fact with a reasonable basis upon which to calculate the amount of damages," *Sir Speedy, Inc.*, 957 F.2d at 1038.

**ARGUMENT**

I.   **PLAINTIFFS FAILED TO DEMONSTRATE BY SUFFICIENT EVIDENCE THAT BNPP IS LIABLE FOR THEIR INJURIES UNDER SWISS TORT LAW.**

Plaintiffs failed to provide sufficient evidence to prove each element necessary for BNPP to be held liable as an accomplice under Swiss law.[1] There are two relevant provisions of the Swiss Code of Obligations: Article 41 SCO, which provides the "conditions of liability," and Article 50 SCO, which governs joint and several liability in the event of "multiple liable parties" who have "together caused damage."

---

[1] That is true under either the "full conviction" or the "preponderant likelihood" standard, although as discussed below, BNPP maintains that for all but one element, Plaintiffs were required to prove their claims by the "full conviction" standard under Swiss law. *See infra* § I.D.

9

Article 41 SCO states:  "Any person who unlawfully causes damage to another, whether wilfully [sic] or negligently, is obliged to provide compensation."  ECF No. 171-4 ("Article 41 SCO") at 3.  There are four elements to establish tort liability under Article 41(1) SCO: (1) unlawfulness, (2) fault, (3) causation and (4) harm or damage to the plaintiff.  *See* Jan. 6, 2023 Müller Rep. ¶ 14; ECF No. 435-99 ("July 21, 2023 Müller Rep.") ¶ 30.

Article 50(1) provides for joint and several liability for two or more persons who "cause[] damage" together within the meaning of Article 41.  ECF No. 171-4 ("Article 50 SCO") at 5.  As the Swiss Federal Supreme Court has repeatedly made clear, Article 50(1), like joint and several liability in the United States, is not an independent basis for liability but rather it allows an injured party to recover full compensation from one tortfeasor when there are multiple tortfeasors who are liable for a plaintiff's injuries.  *See, e.g.*, Swisscom Case at reas. 2.2.1 (explaining that Article 50 strictly speaking "only stipulates that several participants are jointly and severally liable for damage caused collectively," and "presupposes [responsibility under civil law]"); ECF No. 530-163 (DFSC 130 III 362, "Work Contract Case") at reas. 5.2 ("Joint and several liability implies a preceding liability: a person who is not liable for damage cannot be held joint and severally liable."); *see also*  July 21, 2023 Müller Rep. ¶¶ 10–11; Jan. 6, 2023 Müller Rep. ¶ 35.  In other words, the elements for Article 41 liability must be satisfied for the apportionment mechanism of joint and several liability under Article 50 to apply.  Plaintiffs therefore cannot hold BNPP jointly and severally liable under Article 50 without first demonstrating that BNPP was liable under Article 41.  Because Plaintiffs failed to establish BNPP's liability under Article 41 at trial, for the reasons explained in BNPP's summary judgment briefing and supporting materials, their Swiss law tort claims fail as a matter of law.

BNPP recognizes that this Court has previously ruled that BNPP could be held secondarily liable under Article 50(1) without being held liable as a tortfeasor under Article 41. Back in 2021, this Court (Nathan, J.) determined that such liability can be independently established on a showing that "(1) a main perpetrator committed an illicit act, (2) the accomplice consciously assisted the perpetrator and knew or should have known that he was contributing to an illicit act, and (3) their culpable cooperation was the natural and adequate cause of the plaintiff's harm or loss." *Kashef v. BNP Paribas S.A.*, 2021 WL 603290, at \*2 (S.D.N.Y. Feb. 16, 2021) (citation omitted). Even under that standard—which BNPP submits is incorrect—Plaintiffs did not introduce sufficient evidence at trial to establish BNPP's liability under Article 50(1).

### A. Plaintiffs Failed To Provide Sufficient Evidence That The GOS Is Liable For Committing An Illicit Act As A Primary Tortfeasor Under Article 41.

Under this Court's interpretation of Swiss law, Plaintiffs had to show that the GOS was liable as a primary tortfeasor for an accomplice to be held liable for the primary tortfeasor's acts. To be clear, this does not mean that the GOS must be named as a party in this case. But it does require that an actionable claim exist against the GOS as a primary tortfeasor under Article 41. Otherwise, there is no primary tortfeasor (and indeed no party) who could be liable for an action that BNPP is accused of aiding and abetting under Article 50. *See* Article 50 SCO (entitled "Multiple *liable* parties" (emphasis added)); *see also* Swiss Ambassador's Letter at 3 ("For Article 50(1) SCO joint and several liability to apply to an accomplice, there must be an underlying violation by a 'main perpetrator' who could be liable under Swiss tort law.").

This Swiss-law requirement presents an insurmountable obstacle to Plaintiffs' case against BNPP. According to Plaintiffs, the GOS is the primary tortfeasor that caused their

11

injuries.  But the GOS could not be held liable as a primary tortfeasor under Article 41, for two independent reasons.  *First*, the Swiss courts do not extend their jurisdiction to extraterritorial acts by a primary tortfeasor committed outside of Switzerland, even if those acts violate *jus cogens* norms.  *Second*, the GOS is a foreign sovereign to which private Swiss law (namely, Article 41 of the Swiss Code of Obligations) is inapplicable.  *See* Swiss Ambassador's Letter at 3 ("Article 41 SCO is a private law obligation that does not impose civil liability (1) on foreign sovereigns or (2) for extraterritorial acts committed outside of Switzerland.").  And even if liability against Sudan were possible (it is not), Plaintiffs failed to introduce sufficient evidence at trial to support such a claim under Swiss law.  BNPP is therefore entitled to judgment as a matter of law.

### 1.    *Swiss Law Requires That The Primary Tortfeasor Must Be Capable of Being Held Liable To Hold An Accomplice Liable.*

As the Swiss government explains, "[f]or Article 50(1) SCO joint and several liability to apply to an accomplice, there must be an underlying violation by a 'main perpetrator' who could be liable under Swiss tort law."  Swiss Ambassador's Letter at 3.  For much of this case, this proposition seemed unremarkable—this Court and the parties all appeared to agree that there must be an "actionable" claim against a main perpetrator under Article 41 in order for joint and several liability to attach under Article 50.  *Kashef*, 2021 WL 603290, at *4 (adopting view of Professor Franz Werro that "Article 50.1 allows liability if an accomplice" consciously assists "'the illicit act of the perpetrator who himself is also at fault'"); ECF No. 435-104 ("Mar. 2, 2023 Werro Decl.") ¶ 64; Jan. 6, 2023 Müller Rep. ¶ 90; ECF No. 444-102 ("July 21, 2023 Romy Rep.") ¶ 19.

12

Contrary to the Court's comments at the October 1 hearing, this issue does not present "a question of fact of a material element."  Oct. 1 Trial Tr. at 1075:4–5.  Under controlling Swiss law, Plaintiffs have not and cannot establish the first element as a matter of law.  *See TVT Recs. v. Island Def Jam Music Grp.*, 412 F.3d 82, 88 (2d Cir. 2005) (the issue of the "legal viability" of a claim is a "question[] of law"); *see also* Fed. R. Civ. P. 44.1 ("The court's determination [of an issue of foreign law] must be treated as a ruling on a question of law.").

Swiss case law is clear that for accomplice liability to attach, Plaintiffs had to establish that the GOS could be liable under Swiss law.  The Swiss Federal Supreme Court has explained that "[j]oint and several liability implies a preceding liability: a person who is not liable for damage cannot be held joint and severally liable."  Work Contract Case at reas. 5.2.  Although the Supreme Court addressed Article 51, another joint and several liability section, it relied for support on a discussion of Article 50 in the authoritative "BREHM, Bernese Commentary, No. 33 ad ***art. 50 CO***," a respected commentary addressing Article 50.  *Id.* (emphasis added).  Dr. Roland Brehm's treatment of Article 50 confirms that "***there is no joint and several liability without (external) liability***."  ECF No. 171-41 ("Brehm") ¶ 33 (emphasis added).

The Brehm commentary also speaks directly to the issue of whether the primary tortfeasor must be capable of being liable under Article 41 in order for Article 50 liability to attach.  As a hypothetical, the commentary points to a situation where an "instigator encourages the main perpetrator to cause damage, while the main perpetrator's judgement is impaired."  *Id.* ¶ 25.  In such a case, the "perpetrator, who is incapable of judgement, is not at fault."  *Id.*  As a result, the "***situation is then outside the scope of application of Art. 50: The sole instigator is then liable as per Art. 41***."  *Id.* (emphasis added).

13

The Brehm commentary on Article 50 is important in two respects. First, it shows that the absence of a primary tortfeasor requires liability against an accomplice or instigator to be proven under Article 41, not Article 50, which is altogether inapplicable. Second, it makes clear that the notion of "fault" is not simply a reference to fault in the lay sense; it is a reference to legal fault, as it contemplates a party that is "[]capable of judgement." *Id.* ¶ 25. This makes sense, as there is then no "joint" liability between the parties—there is only the possibility of liability outside the context of joint-and-several liability under Article 41.

Throughout this case, Plaintiffs' expert Professor Werro, appeared to agree with the proposition that the primary tortfeasor must commit an act for which it could be held liable in order for Article 50 to apply to BNPP. *See* ECF No. 174 ("Aug. 31, 2020 Werro Decl.") ¶ 5 (Plaintiffs must show that the GOS committed illicit acts "actionable in Swiss law"). Now, however, Professor Werro says that his view has always been that a party can be liable under Article 50, "even though the principal that created the danger … could not be liable under Article 41 CO." ECF No. 985-1 ("Oct. 1, 2025 Werro Decl.") ¶ 136.

Professor Werro asserts that his new position is supported by the decision of the Swiss Supreme Court in the Hockey Rink Case. But that case in no way supports Professor Werro's theory. In the Hockey Rink Case, a hockey player, Loriol, injured a spectator who lost an eye. ECF No. 435-112 ("Hockey Rink Case") at para. A. The hockey player, other players, and the hockey club all "caused damage by joint negligence." *Id.* at reas. 8. "[T]hey also [were] jointly and severally liable" for the harm under Article 50. *Id.* Thus, in the Hockey Rink Case, there was a primary tortfeasor (the player) who harmed someone, and his actions were made possible by the actions of contributing tortfeasors, who were also liable in negligence. The immune municipality was not the primary tortfeasor, and its liability was therefore irrelevant. If

14

anything, therefore, the Hockey Rink Case supports the notion that there must be a primary tortfeasor liable under Article 41 in order for Article 50 liability to attach.

The treatises that Professor Werro cites are also not to the contrary.  For example, Professor Werro quotes the Oftinger/Stark treatise for the proposition that "[i]nstigation and complicity [is] also possible when the principal perpetrator does not become liable, … In that case, only the instigator or the accomplice is liable."  Oct. 1, 2025 Werro Decl. ¶ 140 (alterations in original).  But that passage does not explain which article of the Swiss Code of Obligations provides the basis for liability.  On that point, Oftinger/Stark agree with Judge Romy that Article 50 liability presupposes liability under Article 41.

> The joint nature of liability for damage by multiple persons presumes their participation in the causation of the damage.  ***The conditions of liability of CO 41 must exist for each of them, because CO 50 does not establish any type of liability, instead it only regulates the circumstances where multiple persons are liable***.  Therefore, the group of jointly and severally liable persons under CO 50 only includes persons who have culpably committed a contributing factor to the damage.

ECF No. 170-1 ("Oftinger/Stark") ¶ 318.  Professor Walter Fellman also agrees.  ECF No. 170-2 ("Schweizerisches Haftpflichtrecht") ¶ 2761 ("It is however true that the basis of the liability, which is addressed in art. 50 CO, is contained in art. 41 CO.  The conditions of liability of art. 41 CO (damage, causality, unlawfulness and fault) must therefore be fulfilled ***for each participant***." (emphasis added)); *id.* ¶ 2772 ("All must be capable of judgment and all must be charged with intent or negligence.").  Thus, Professor Werro's proposition that BNPP could be held liable under Article 50 as a secondary accomplice when no party could be found liable under Article 41 is contrary to the authorities he relies on.

15

Without a tort that could be actionable under Article 41 against the primary tortfeasor, secondary liability simply cannot exist. That makes sense, as there would be no primary tortfeasor for purposes of Article 41 that could give rise to accomplice liability.

### 2. *Swiss Tort Law Does Not Apply Extraterritorially To Acts Committed Outside Of Switzerland.*

Plaintiffs seek to hold BNPP liable as an accomplice for actions taken by the GOS beyond the borders of Switzerland. But Swiss law does not permit suit in tort for the GOS's extraterritorial acts, even if those acts violate *jus cogens* norms. In this manner, Switzerland is like many European countries and the United States itself—those countries, absent express indication to the contrary, limit civil jurisdiction to the borders of their sovereign territory. This principle is separate and distinct from the "act of state" doctrine under U.S. law and instead goes to the extraterritorial reach of the Swiss Code of Obligations. The Second Circuit's prior holding on the act of state doctrine as a matter of U.S. law does not alter the basic requirements of tort liability as a matter of Swiss law. *See generally Kashef v. BNP Paribas S.A.*, 925 F.3d 53 (2d Cir. 2019).

A 2018 judgment by the European Court of Human Rights confirms that Swiss courts would reject any claim against the GOS in Switzerland under Article 41 for acts committed in Sudan. Indeed, at every stage—the Swiss trial court, the Federal Supreme Court of Switzerland, and the European Court of Human Rights—reaffirmed that a claim against the GOS as a main perpetrator simply could not be brought under Swiss law, and therefore no claim for secondary accomplice liability exists here.

The court decided a case brought by Abdennacer Naït-Liman, a political asylee in Switzerland, who alleged that he had been detained and subjected to horrific torture in Tunisia on

16

the orders of the Minister of the Interior (referred to in the case as A.K.).  *See* Judgment of Grand

Chamber ¶ 15.  Naït-Liman brought civil claims in Swiss court against A.K. and the government

of Tunisia for the resulting damages.  ECF No. 898-2 ("Judgment of Second Section") ¶ 22.

The Swiss trial court dismissed the case.  According to the court, it did "not have

territorial jurisdiction under international law to examine the complaint, given that the

defendants are not domiciled or habitually resident in Switzerland, and given also that no illegal

act or detrimental outcome occurred in Switzerland."  Judgment of Grand Chamber ¶ 25.

Although Swiss law authorizes jurisdiction in the absence of any other available forum, that

provision requires a connection to Switzerland.  *See* ECF No. 893-3 ("Swiss Federal Act on

Private International Law (PILA), Art. 3"); July 21, 2023 Romy Rep. ¶ 31; ECF No. 897 ("Aug.

28, 2025 Romy Decl.") ¶¶ 24–26.  That connection was altogether absent in a lawsuit brought to

challenge the Tunisian government's actions in Tunisia.  Judgment of Second Section ¶ 18 ("All

of the acts for whose after-effects the claimant, a Tunisian national, seeks compensation for non-

pecuniary damage, were allegedly inflicted on him … in Tunisia … by the Tunisian State and its

agents.").

The Swiss Federal Supreme Court dismissed Naït-Liman's appeal.[2]  As the Federal

Supreme Court explained, there is no provision in Swiss law authorizing extraterritorial

jurisdiction over actions by a foreign actor in a foreign state:

> In the present case … the claimant complains of acts of torture that were allegedly
> committed in Tunisia, by Tunisians resident in Tunisia, against a Tunisian residing

---

[2] The intermediate appellate court, the Court of Justice, rejected Naït-Liman's appeal on the
ground that Tunisia had immunity from jurisdiction because "the acts of torture had been
perpetrated in the exercise of sovereign authority (*iure imperii*) and not under private law (*iure
gestionis*)."  Judgment of Grand Chamber ¶ 28.  The court therefore did not reach the question of
extraterritoriality.

in Italy.  All of the specific features of the case come back to Tunisia ….  The facts of the case thus have no connection with Switzerland, so that the question of whether or not the link with this country is sufficient does not arise.  In those circumstances, it is not possible to recognise the jurisdiction of the Swiss courts ….

Judgment of Grand Chamber ¶ 30.

Naït-Liman filed an application against Switzerland with the European Court of Human Rights, arguing that the right to a tribunal guaranteed by the European Convention on Human Rights required the Swiss courts to adjudicate his civil claims.  The government of Switzerland conceded that party states had a responsibility to prevent torture, but it argued that "universal civil jurisdiction … went beyond the limits of what a State governed by the rule of law could do."  *Id.* ¶ 143.  Indeed, the Swiss government represented that Naït-Liman's case was "***very unusual, and the only one of its kind which had had to be decided by the Swiss courts***."  *Id.* ¶ 147 (emphasis added); *see also id.* (noting that the dismissal was "in line with previous practice" of the Swiss courts).

The European Court of Human Rights sided with Switzerland in affirming the territorial limits of Swiss law.  The court rejected the argument that Switzerland was required to expand the scope of its statutes to apply outside of its territory:  "While there is little doubt as to the binding effect of this right on the States with regard to acts of torture perpetrated on the territory of the forum State or by persons within its jurisdiction, the same does not apply to acts committed by third States or persons under their jurisdiction."  *Id.* ¶ 97.  Therefore, even though the prohibition on torture was "undisputed[ly]" of a "*jus cogens* nature," the court held that "norms of international law" did not require Switzerland to find jurisdiction over Naït-Liman's claim against Tunisia.  *Id.* ¶¶ 129, 198.

In arriving at this judgment, the court conducted a survey of other member States of the Council of Europe. The court found that, "of the 39 European States included in the analysis, only the Netherlands recognise universal civil jurisdiction in respect of acts of torture." *Id.* ¶ 69; *see also* Judgment of Second Section ¶ 114 (stating that Switzerland's decision "is in no way exceptional and falls within a very broad consensus among the member States of the Council of Europe").

The European Court of Human Rights correctly noted that even the extraterritorial jurisdiction provided by the United States was limited, citing the Supreme Court's decision in *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013); Judgment of Grand Chamber ¶ 78. In *Kiobel*, a group of Nigerian nationals residing in the United States brought suit against Dutch, British, and Nigerian companies under the Alien Tort Statute, alleging that the companies aided and abetted the Nigerian government's commission of various heinous acts, including rape, murder, and the destruction of property and resulting displacement of people. 569 U.S. at 113. The U.S. Supreme Court concluded that the presumption against extraterritoriality foreclosed suit against the companies. As the Supreme Court explained, there was "no indication that the ATS was passed to make the United States a uniquely hospitable forum for the enforcement of international norms." *Id.* at 123.

After conducting its international survey, the European Court of Human Rights decided that there is no "international custom which would have obliged the Swiss courts to find that they had jurisdiction to examine" Naït-Liman's claim. Judgment of Grand Chamber ¶ 187. The result of the judgment was to leave Naït-Liman, the alleged victim of torture in violation of *jus cogens* norms, without a remedy in civil court in Switzerland, in deference to well-established

19

legal principles against extraterritorial application of statutes and the comity owed to domestic courts.[3]

The Swiss and international courts' thoroughly reasoned and uniformly consistent decisions in *Naït-Liman* were not "solely concerned with whether Swiss court have subject matter jurisdiction," as Plaintiffs claim. Oct. 1, 2025 Werro Decl. ¶ 155. To the contrary, the European Court of Human Rights' decision was clear that as a substantive matter, the "right of victims of acts of torture to obtain appropriate and effective compensation … does not apply to acts committed by [other] States or persons under their jurisdiction." Judgment of Grand Chamber ¶ 97.

The Swiss government's position in *Naït-Liman* against the extraterritorial application of its tort laws is consistent with other actions taken by the country to limit expansive tort liability. In 2020, Switzerland held a referendum concerning a proposed amendment of the Swiss Federal Constitution and the Swiss Code of Obligations that would have explicitly held Swiss companies liable in tort in certain circumstances where their foreign subsidiaries commit human rights abuses abroad. Jan. 6, 2023 Müller Rep. ¶ 147. The initiative sought to impose a "due diligence" obligation on companies established in Switzerland that would have required them to "examine the actual and potential impact on internationally recognized human rights and on the environment, take appropriate measures to prevent any violation of internationally recognized human rights and environmental standards, put an end to existing violations and report on the measures taken." *Id.* ¶ 149 (citations omitted).

---

[3] This conclusion is based on the application of Swiss tort law to the extraterritorial acts of the alleged primary tortfeasor in this case, the GOS, all of which occurred in Sudan. BNPP's connections to Switzerland are irrelevant.

The Swiss government opposed the initiative because "the liability regime was much stricter than that found in other legal systems and would therefore put Swiss companies at a disadvantage, would discourage investment by Swiss companies abroad and would overload the judicial system." *Id.* ¶ 150.  According to the Federal Council and Parliament, the initiative would require "Swiss courts … to rule on complex cases where a foreign company has caused damage abroad.  They would also have to apply Swiss law.  Not only would this place an excessive burden on our legal system, but Switzerland would also be violating internationally recognized legal principles if it explicitly subjected such cases to its own jurisdiction."  ECF No. 898-4, *Popular initiative "Responsible businesses – protecting people and the environment"* at 17 (Nov. 29, 2020).

The initiative failed.  Jan. 6, 2023 Müller Rep. ¶¶ 152–153.  Swiss law today contains no similar liability regime that would penalize Swiss companies for their actions abroad.  *Id.* ¶ 154.  Switzerland's rejection of the amendment demonstrates a refusal to impose sweeping extraterritorial liability on Swiss companies.  To do so in this case, in the absence of a primary tortfeasor who could be held liable under Swiss law, would therefore constitute a radical expansion of the territorial limits expressly defined by Switzerland.

Professor Werro would have this Court ignore *Naït-Liman* because, under his reading, Plaintiffs may "choose whom to sue" under Article 50, and BNPP's connections with Switzerland provide a basis for suit.  Oct. 1, 2025 Werro Decl. ¶ 145.  But that argument incorrectly assumes that Article 50 provides an independent basis for suit against BNPP in the absence of any main perpetrator that could be liable under Article 41.  As discussed above, the sources on which Professor Werro relies do not support this unprecedented, anomalous, and

radical proposition.  Because the GOS could not be liable under Article 41 of the Swiss Code, there can be no basis for joint and several liability.

### 3.    *Swiss Tort Law Does Not Permit Suit Against A Foreign Sovereign For Actions Taken In Its Official Capacity.*

Even if Swiss tort law could apply to extraterritorial actions, the GOS still could not be subject to liability in Switzerland as a main perpetrator under Article 41.  First, as Isabelle Romy, former deputy judge of the Swiss Federal Supreme Court, explained, there is a distinction in Swiss law between the acts of a state in its sovereign capacity (*jure imperii*) and acts of a state operating as a private individual (*jure gestionis*).  July 21, 2023 Romy Rep. ¶ 31.  Acts of a foreign state in its sovereign capacity are immune from suit.  Aug. 28, 2025 Romy Decl. ¶ 17. Swiss law recognizes sovereign immunity for a sovereign's "military activities [and] acts analogous to expropriation or nationalization."  *Id.* ¶ 18 (citing ATF 113 Ia 172 at reas. 3); *see also* Judgment of Grand Chamber ¶ 28 ("[T]he acts of torture had been perpetrated in the exercise of sovereign authority (*iure imperii*) and not under private law (*iure gestionis*)."); *cf. Fed. Republic of Germany v. Philipp*, 592 U.S. 169, 179–80 (2021) (recognizing that the international law of expropriation "does not cover expropriations of property belonging to a country's own nationals" (citation omitted)).  The same would apply to the alleged illicit acts committed by the GOS, which are acts of public power performed in its sovereign capacity.[4] Aug. 28, 2025 Romy Decl. ¶ 19.

Second, regardless of whether immunity attaches, acts in the GOS's sovereign capacity also are not governed by Swiss private tort law, such as Articles 41 or 50.  They are instead

---

[4] Even if the acts were performed by Sudan in a *jure gestionis* capacity, the government could still invoke the principle of immunity from jurisdiction due to the lack of ties with Switzerland. Aug. 28, 2025 Romy Decl. ¶ 17.

governed by public law, including treaties with foreign nations. No such treaty applies here. "[B]ecause Art. 41 CO is not applicable against [Sudan] for the alleged conduct at issue, Art. 50(1) CO cannot be used as an independent basis for liability against BNPP." July 21, 2023 Romy Rep. ¶ 36. This conclusion is supported by Swiss precedent, including the Hockey Rink Case, which held that a municipality was not subject to private Swiss tort law. Hockey Rink Case at reas. 5. Plaintiffs' expert, Professor Werro, agreed with this conclusion in his 2021 Commentaire romand Code des obligations I: Art. 61 CO (2021). *See* ECF No. 471-161 ("Sept. 8, 2023 Romy Decl.") ¶ 18 (quoting Franz Werro & Vincent Perritaz ("In the absence of a public law provision, the public authority is not liable under CO 41 [et seq.]" (English translation))).

Professor Werro's most recent declaration makes no attempt to dispute the GOS would be immune from suit based on its actions in this case and instead argues only that immunity would not attach to BNPP. Oct. 1, 2025 Werro Decl. ¶ 152. Of course, BNPP does not argue for derivative immunity, but that the GOS's immunity defeats the existence of an actionable illicit act—an essential element of Plaintiffs' secondary liability claim against BNPP.

Contrary to this Court's prior ruling, nothing in the Second Circuit's decision about the act of state doctrine and *jus cogens* norms forecloses this straightforward application of Swiss law. *See Kashef v. BNP Paribas S.A.*, 2024 WL 1676355, at *2 (S.D.N.Y. Apr. 18, 2024). Nor could it: The Second Circuit's decision was issued long *before* Judge Nathan decided that Swiss law, not New York law, governs this action. *See Kashef*, 925 F.3d at 57 ("In the Second Amended Complaint (the 'SAC'), Plaintiffs asserted twenty claims arising under New York tort law."); ECF No. 151 ("Choice of Law Order") at 10 ("The Court concludes that Swiss law governs this case."). **In other words, at the time the Second Circuit issued its decision, this case was not governed by Swiss law, and therefore nothing in the Second Circuit's decision**

could have determined the applicability of a Swiss-law rule of law to the alleged liability of the GOS under Article 41.

B.    **Plaintiffs Failed To Provide Sufficient Evidence That BNPP Culpably Acted Together With The GOS To Contribute To Plaintiffs' Injuries.**

Under the second element of Article 50(1) SCO, Plaintiffs were required to show that BNPP "consciously assisted the [GOS] and knew or should have known that [BNPP] was contributing to an illicit act."  *See* ECF No. 193 ("MTD Order") at 6.  In short, it is a requirement that the perpetrator and the defendant "culpably acted together."  Jan. 6, 2023 Müller Rep. ¶ 124.  Plaintiffs failed to provide sufficient evidence to establish this culpable cooperation.

The second element of Article 50 liability—as repeatedly articulated by the Court, at both the motion-to-dismiss stage and the summary judgment stage—has several sub-elements:

*First*, Plaintiffs must prove that BNPP consciously assisted the GOS ***in the illicit acts*** that allegedly injured each Plaintiff.  One party "consciously assists" another when the two are involved in a "joint enterprise" with respect to the illicit act that constitutes "genuine solidarity" between the parties.  Jan. 6, 2023 Müller Rep. ¶ 125 n.98 (citing ECF No. 169-7 (DFSC 55 [1929] II 310) at reas. 2).  The "mere plurality" of "several persons caus[ing] damage through different, independent acts" does not suffice.  *Id.*

Plaintiffs' evidence at trial does not demonstrate any such "joint enterprise" between BNPP and the GOS to commit illicit acts against the Plaintiffs.  Plaintiffs did not, and could not, put forward evidence that BNPP participated in violent acts by the GOS that injured Plaintiffs, that BNPP sought to further these violent acts in any fashion, or that it financed the purchase of weapons or military equipment.  *See* Sept. 17 Trial Tr. at 561:12–16 (Verhoeven).  The only evidence that Plaintiffs pointed to on this subject is the bank's guilty plea to violations of U.S.

24

sanctions on Sudan, but the guilty plea in no way shows that BNPP engaged in conduct that consciously assisted the GOS in harming the Plaintiffs. *See* PX 939. To the contrary, BNPP complied with Swiss and European sanctions that prohibited military transactions and would reasonably be expected to prevent harm to civilians. Oct. 6 Trial Tr. at 1170:22–24 (Maillard); Oct. 9 Trial Tr. at 1390:10–12 (Clamon).

Nor can the violation of U.S. sanctions support this element because Swiss courts do not "borrow" legal norms from non-Swiss jurisdictions for purposes of Articles 41 or 50 SCO. This is consistent with, and reflective of, Swiss courts' restrictive approach to tort liability. *See, e.g.*, ECF No. 169-16 (DFSC 4A_637/2015, "Third Person Car Crash Case") at reas. 4.2 ("It was precisely in the case of such indirect damage that a reasonable limitation of liability had to be made on the basis of the theory of adequacy."); *see also* July 21, 2023 Müller Report ¶ 37 (stating that "[t]he Swiss Federal Supreme Court is . . . extremely reluctant to recognize protective norms [capable of] establishing unlawfulness by conduct"); ECF No. 444-103 ("Jan. 6, 2023 Thevenoz 2023 Rep.") ¶ 15 ("[T]he potential civil liability of BNPP France for the alleged wrongdoings of BNPP Suisse is not governed by the principles of U.S. criminal law which were the basis for BNPP France accepting criminal liability for the breach of U.S. sanctions by BNPP Suisse.").

*Second*, any conscious assistance must—in reality—"contribute" to the illicit act. This participation must exceed mere facilitation or generalized assistance—it must consist of direct, significant, and concrete participation in the illicit acts at issue. *See* ECF No. 708-15 (DFSC 4A_185/2007, "Locksmith Case") at reas. 6.2.1 (identifying significant acts of participation in illicit act); *see also* Jan. 6, 2023 Müller Report ¶ 72 (quoting the Locksmith Case at reas. 6.2.1); Swiss Ambassador's Letter at *2* ("The application of Article 50(1) SCO also requires that the

accomplice made a 'conscious cooperation' in the plaintiff's injury, meaning a willful and substantial assistance to the unlawful act that injured the plaintiff at issue, not generalized assistance to the perpetrator."). Plaintiffs presented no evidence at trial that BNPP participated directly, significantly, or concretely in any alleged illicit acts giving rise to Plaintiffs' injuries. To the contrary, Plaintiffs presented only a generalized theory that BNPP's processing of financial transactions increased oil revenues to the country that, in turn, independently chose to fund violent activities that caused additional injuries to individuals in the country, which may have included Plaintiffs. *Supra* Background § 2. But Plaintiffs' expert Dr. Verhoeven admitted that the GOS is the one that chose how to use its increased revenue—including to fund its military— *not* BNPP. Sept. 17 Trial Tr. at 561:12–16 (Verhoeven) ("Q. And it was the government of Sudan's decision to increase spending on the military, right? A. It was. Q. That also wasn't BNPP's decision, right? A. It wasn't.").

*Third*, Plaintiffs must prove that BNPP knew or should have known, "had it exercised due care," that it was contributing to the illicit acts that injured Plaintiffs. MTD Order at 9. Under Swiss law, a duty of care—specifying what a defendant "should have known"—may arise through a contractual relationship or through operation of law. *See, e.g.*, ECF No. 435-111 (DFSC 71 [1945] II 107, "Shooting Contest Case") at reas. 3 (noting that an innkeeper has a "'sui generis' contract" with guests requiring that each guest be protected from "harm to his health or physical safety"); *see also* Jan. 6, 2023 Müller Rep. ¶ 128. However, BNPP did not have a contractual relationship with Plaintiffs, and Plaintiffs have not identified any duty of care that would arise by operation of Swiss law. *See* Jan. 6, 2023 Müller Rep. ¶ 69. BNPP owed no duty of care toward the Plaintiffs, and, in the absence of such a duty, could not have acted negligently towards them. Accordingly, Swiss law requires evidence of BNPP's willful participation in the injurious conduct

26

(*i.e.*, intent to commit human rights abuses).  *See id.* ¶¶ 108, 133–135 (explaining that deliberate participation in the primary tort is required under the circumstances); ECF No. ECF No. 176 ("BNPP Supp. MTD Reply") at 6–10; ECF No. 170 ("Aug. 17, 2020 Roberto Supp. Reply Decl.") ¶¶ 15–18, 23 (citing Walter Fellmann, Andrea Kottmann, Roland Brehm).  Plaintiffs failed to adduce any evidence at trial that BNPP had actual knowledge—much less intent (as required under Swiss law)—that it was substantially contributing to the specific illicit acts that the GOS allegedly committed against the Plaintiffs.  *See* Sept. 17 Trial Tr. (Verhoeven) at 561:12–16.

Plaintiffs therefore failed to establish conscious assistance as a matter of law.

### C.    Plaintiffs Failed To Demonstrate By Sufficient Evidence That BNPP's Actions Were The "Natural And Adequate Cause" Of Their Alleged Injuries.

Plaintiffs failed to show they satisfied the third element of Article 50(1), that is, that BNPP's alleged culpable cooperation was the "natural and adequate" cause of Plaintiffs' specific injuries.  MTD Order at 4–5.  As this Court has repeatedly held—again, at both the motion-to-dismiss stage and the summary judgment stage—"natural" causation is "similar to the concept[] of 'but for'" causation in U.S. tort law, and "adequate" causation is "similar to the concept[] of … 'proximate'" causation.  *Id.* at 12.

#### 1.    *Natural Causation*

"Natural causation is the logical (or scientific) relationship between the event giving rise to liability and the damage or loss:  an event is thus the natural cause of a result if it is one of the *sine qua non* conditions of the result.  There is accordingly a natural causal link between an event and a result if, without the event, the result would not have occurred."  Jan. 6, 2023 Müller Rep. ¶ 137(i).  As the Swiss Federal Supreme Court has stated, natural causation is not satisfied if "the damage would have occurred in full or to a lesser extent even without the [conduct]."  ECF No. 533-61 (DFSC 4A_444/2010 of Mar. 22, 2011, "Boat Collision Case") at reas. 4.4.  That is, the

27

defendant's conduct must have been "a necessary condition (*conditio sine qua non*) for the damage that has occurred," *id.* at reas. 2.1, such that the contribution of the conduct must be "indispensable for achieving … the final result," *id.* at reas. 4.4; *see also* MTD Order at 12–13 (analyzing whether Plaintiffs' allegations were sufficient to show "but for" causation in considering the natural causation element).

Until the October 1 hearing on BNPP's oral Rule 50(a) motion, the Court and Plaintiffs (correctly) agreed that natural causation requires an analysis similar to but-for causation analysis in U.S. law.  In its order on BNPP's motion to dismiss back in 2021, for example, the Court stated that "natural" causation is "similar to the concept[] of 'but for'" causation in U.S. tort law, and considered whether Plaintiffs' allegations were sufficient to show "but for" causation.  MTD Order at 12.  Plaintiffs' expert Professor Werro has also expressly endorsed this comparison.  *See* Mar. 2, 2023 Werro Rep. ¶ 110 ("Although the[] concepts of [natural and adequate causation] roughly correspond to 'but-for' and 'proximate' causation in American law, Swiss law provides specific legal tests that must be applied.").  Professor Werro has stated that "[n]atural causation is based on the link between an act that actually occurred and the harm," which "is a test of a condition '*sine qua non*.'"  *Id.* ¶ 121.  In his report, he quoted the Swiss Federal Supreme Court explaining that "[a]n act is the natural cause of a result if it is one of the sine qua non conditions of the result" and that "[t]o determine whether an act is the natural cause of an outcome, one must ask whether the outcome would recur if, all other things being equal, the conduct to be judged were removed.  If it is very likely that it would not, this conduct is causal, because it is the sine qua non of the result."  *Id.* (quoting BGE 138 IV I at 9) (emphasis omitted).

The Court's and Plaintiffs' suggestion at the October 1 hearing that natural causation does not require a but-for inquiry, and instead involves only a reasonableness or foreseeability

28

analysis was incorrect and contrary to these prior statements.  *See* Oct. 1 Trial Tr. at 1097:7–15.

*Adequate* causation is similar to proximate causation and involves a question of reasonableness.

*See infra* § I.C.2.  At no point in the Coffeemaker Case—a product liability case that briefly

discussed the burden of proof for natural causation—did the Swiss Federal Supreme Court hold

otherwise.  *See* ECF No. 813-8 (DFSC 133 III 81, "Coffeemaker Case") at reas. 4.2.2.

Moreover, Plaintiffs' reliance on the Locksmith Case is misguided.  *See* Oct. 1, 2025 Werro Decl.

¶ 68 (discussing the Locksmith Case at reas. 6.2.1).  Plaintiffs erroneously conflated natural and

adequate causation in arguing that the Locksmith Case "illustrates there doesn't need to be any

showing that the infringement[] wouldn't have happened … but for the contribution of the

accomplice," and that rather the question is merely "was [the infringement] foreseeable?"  Oct. 1

Trial Tr. at 1097:7–13.  The Swiss Federal Supreme Court was analyzing *adequate* causation

when it explained that there was a sufficient causal link in the Locksmith Case because the

damage was "reasonably foreseeable."  Locksmith Case at reas. 6.2.3; *see id.* ("In the ordinary

course of events and common experience, it was reasonably foreseeable that the defendants …

would infringe the plaintiff's intangible rights, cause the plaintiff a significant loss of earnings,

additional advertising costs, and damage his reputation (see, with respect to an ***adequate*** causal

relationship, ATF 129 II 312 recital 3.3 page 318)." (emphasis added)).  The Locksmith Case

does not support dispensing with the separate requirement to establish a natural causal link.

Correctly understood, the jury cannot find that BNPP's conduct naturally caused Plaintiffs'

injuries if it finds that Plaintiffs' injuries would have occurred without BNPP's conduct—whether

in full or to a lesser extent.  That is because natural causation requires that the defendant's conduct

be a necessary condition for each claimed injury.  The Court's statement that "[n]atural causation

does not mean that the defendant's assistance was required for the plaintiffs' injuries to have

occurred at all in the first place," Oct. 1. Trial Tr. at 1086:1–3, directly contravenes the Swiss Federal Supreme Court's directive that natural causation means that the defendant's conduct must be a *sine qua non* condition of the claimed injuries. *See* Boat Collision Case at reas. 2.1. **If the jury finds "that plaintiffs' injuries would have occurred at a different time, in a different manner, or to a lesser magnitude without defendant's conduct," Oct. 1. Trial Tr. at 1086:8–10, then it must find that natural causation <u>does not</u> exist.**

No reasonable jury could find that Plaintiffs proved natural causation here. Plaintiffs were required—but failed—to "prove (as a matter of fact) that without the Defendant[] … processing financial transactions for the GOS during the relevant period," each of the three Plaintiffs "would not have suffered the damage or loss that he or she has suffered." Jan. 6, 2023 Müller Rep. ¶ 138. To do this, Plaintiffs could not rely on the fungibility of money to prove that BNPP generally facilitated the GOS's activities. Instead, Plaintiffs had to prove that their specific injuries were the result of specific transactions processed by BNPP, and that, absent BNPP's actions, those injuries would not have occurred. *Id.* ¶¶ 138, 146. As the Swiss government explained, "there must be a specific causal link between the defendant's conduct and the plaintiff's individual injury"; "[b]asing liability on a general engagement with a perpetrator, without tying the bank's services to the specific plaintiff's injuries, would have no basis in Swiss law." Swiss Ambassador's Letter at 3.

Plaintiffs did not even attempt to establish the required specific causal link at trial. *See* Sept. 11 Trial Tr. at 27:13–15 (Pls.' Opening Statement) ("The evidence that we intend to offer does not suggest—well, excuse me—will not involve an inference that these three people were harmed because there was money."). There is no evidence that ties revenue from transactions that BNPP processed to any weapons or military equipment (much less any weapons used

against Plaintiffs), to attacks carried out on Plaintiffs, or that demonstrates that such attacks would not have been carried out in the absence of such revenue. Oct. 6 Trial Tr. at 1170:22–24 (Maillard) ("Q. And to your knowledge, did BNP ever facilitate any transactions involving weapons or military equipment in Sudan? A. No, it did not."); *see also id.* at 1196:20–1197:3 (Zenghelis) ("Sudan's oil reserves were not necessary for the funding of its military. … First of all, there were substantial non-oil reserves available to the government of Sudan to fund its military. And secondly, even if there were no oil revenues available at all, it is very clear that the government of Sudan would have been perfectly able to fund its military spending at the levels attained over that period.").

To the contrary, non-oil related revenues far exceeded Sudan's military budget from 1997 to 2009, and also far exceeded Sudan's oil revenue that Plaintiffs seek to attribute to BNPP. *Id.* at 1197:4–8 (Zenghelis) ("Q. … For the period in question, 1997 through the 2000s, how did Sudan's non-oil revenues compare to its military spending? A. Well, they were both rising over the period, but non-oil revenues were significantly higher than military spending."); *see also* Sept. 17 Trial Tr. at 475:11–13 (Verhoeven) ("[G]um arabic exports … were something like $40 or $45 million U.S. per year."). And even "after BNP was no longer involved in transactions involving oil with Sudan, Sudan was [presumably] still able to sell its oil," and generate revenue to fund the government. Sept. 15 Trial Tr. at 248:17–20 (Hudson); *see also* Oct. 6 Trial Tr. at 1224:5–12 (Zenghelis) ("Q. … What does this chart tell you about whether BNPP's financial services were necessary for Sudan's oil revenues in 2010? A. Well, if they were necessary, then oil revenues would have had to cease or fall very rapidly to zero, and yet what we see here is the trend in oil revenues is actually relatively flat. And we know that in terms of barrels of oil, Sudan was producing, distributing, and exporting oil at record levels throughout that period.").

31

And even when BNPP was involved in Sudanese transactions, the Sudanese government continued to sell oil in currencies other than the U.S. dollar—which is the unique service Plaintiffs claim BNPP provided.  Sept. 17 Trial Tr. at 556:10–12 (Verhoeven) ("Q. And you know for a fact, sir, that China did oil transactions with Sudan in different currencies, don't you?  A. It did carry out transactions in different currencies, yes."); *id.* at 573:9–10; Oct. 6 Trial Tr. at 1222:4–10 (Zenghelis) ("Q. … What other currencies are available and were, in fact, used by Sudan to trade oil with China?  A. So one can trade oil in British pounds.  One can trade oil in Japanese yen, and one can trade oil in euros.  And indeed as you said, Sudan did, I believe, trade in all of those currencies especially after BNP Paribas left the scene in and around 2007.").

Instead, Plaintiffs sought to establish causation based on a generalized theory that BNPP's processing of financial transactions increased oil revenues to the country that in turn independently chose to fund violent activities that caused additional injuries to individuals in the country, which may have included Plaintiffs.  *Supra* Background § 2.  **To be clear, that theory, based on speculation about the fungibility of money, would create liability for any company that operates and pays taxes in a foreign country where the government harms an individual.**

Swiss law does not endorse such a limitless theory of causation.  Although the conduct in question need not be "the sole" cause of the injuries, for natural causation to be satisfied, it must be the case that the injuries "could not have occurred" without the conduct in question.  Boat Collision Case at reas. 2.1.  A generalized theory that processing financial transactions increased the magnitude of the harm inflicted by the GOS is exactly the kind of theory that the Swiss Federal Supreme Court explained would not satisfy natural causation:  "if the damage would

32

have occurred in full *or to a lesser extent* even without the [conduct]" then it would "not be its

consequence and therefore not attributable" to the defendant. *Id.* at reas. 4.4 (emphasis added).

For example, in the Unfair Competition Case, the Swiss Federal Supreme Court

concluded that causation was lacking where the plaintiff claimed that it lost sales due to the

alleged unfair business practices of the defendant, a competitor company, that had a similar name

and contact information, and had hired its former employees. *See* ECF No. 435-121 (DSFC

4A_311/2021 of February 3, 2022) at reas. 2. The Swiss Federal Supreme Court agreed with the

lower court that the plaintiff failed to establish the natural causal link between the risk of

confusion due to the competitor's practices and the drop in sales, as there were other causes for

the drop in sales, and "hasty inferences" related to the risk of confusion did not prove that

without the defendant's conduct, the plaintiffs' "sales would not have fallen (or not in the same

way; a sine qua non condition)." *Id.* at reas. 2, 3.2.1, 3.2.2 (citation omitted). Plaintiffs' theory

is similarly generalized and based on unsupported inferences; their evidence does not establish

that but for BNPP's conduct, they would not have been injured.

The United States, like Switzerland, does not recognize tort liability in such a limitless

manner either. As the Supreme Court explained in *Twitter v. Taamneh*, "aiding and abetting is

inherently a rule of secondary liability for specific wrongful acts." 598 U.S. 471, 494 (2023).

"[I]t is not enough … that a defendant have given substantial assistance to a transcendent

'enterprise' separate from and floating above all the actionable wrongs that constitute it. Rather,

a defendant must have aided and abetted … another person in the commission of the actionable

wrong." *Id.* at 495 (emphasis added); *see also Ashley v. Deutsche Bank Aktiengesellschaft*, 144

F.4th 420, 432, 444 (2025) (explaining that an attenuated connection based in part on "sheer

number and volume of U.S. dollar transactions" "offers no discernable nexus between the

33

[financial services] and the attacks"). To permit the imposition of liability without any showing

of actual causation—as Plaintiffs urge—would violate BNPP's due process rights. *See Osorio v.*

*Dole Food Co.*, 665 F. Supp. 2d 1307, 1345 (S.D. Fla. 2009) (refusing to enforce foreign

judgment as violative of due process because "[b]asic fairness requires proof of a connection

between a plaintiff's injury and a defendant's conduct").

Plaintiffs' theory is not only legally flawed, but it also fails to account for the fact that

violence of the kind that injured these Plaintiffs long pre-dated BNPP's facilitation of trade with

Sudan, and continued long after BNPP exited the Sudan-related business. *See supra* Background

§ 1; *see also infra* § I.C.2. In addition, none of the Plaintiffs was injured by the type of

sophisticated weaponry Plaintiffs contend the GOS was able to procure with oil revenues. The

evidence is clear that the GOS had access to airplanes, helicopters and the types of basic

weaponry that were used to injure Plaintiffs long before BNPP facilitated transactions of any

kind.

Moreover, even if such generalized assistance were sufficient to establish natural

causation—and it is not—the timeline of events makes it impossible to tie several of the

Plaintiffs' injuries to BNPP. For instance, Plaintiffs seek to recover for injuries related to attacks

against Mr. Turjuman that occurred in 1998, *see supra* Background § 1, and attacks that resulted

in the death of Ms. Kashef's mother in 1989, *see supra* Background § 1. But the U.S. sanctions

at the heart of Plaintiffs' case were not enacted until 1997, and according to Plaintiffs, the

relevant government expenditure increases that were purportedly enabled by BNPP's provision

of financial services resulting in increased oil revenues did not materialize until 1999. *See* PX

939 at 5 (BNPP agreed to become sole correspondent bank in Europe in 1997); Sept. 17 Trial Tr.

at 478:9–10 (Verhoeven) ("In August '99, Sudan becomes an exporter of oil[.]").  Thus, even under Plaintiffs' broad theory, no liability for these injuries would be possible.

Plaintiffs tried to salvage their theory of causation as to these early injuries by arguing that BNPP's services allowed the GOS to *import* oil before it started exporting oil.  *See* Oct. 1 Trial Tr. at 1098:23–1099:1.  But there is no factual evidence in the record that foreign oil was somehow critical for Mr. Turjuman's 1998 arrest, or that BNPP was solely responsible for facilitating oil imports.  Nor is there any evidence in the record that, prior to 1997 when U.S. sanctions were imposed, BNPP was somehow on notice that facilitating trade with Sudan would allegedly contribute to human rights abuses..

Plaintiffs failed to prove at trial that their injuries would not have occurred—in full or to a lesser extent—without BNPP's actions, and they therefore failed to establish natural causation.

### 2.    *Adequate Causation*

"[L]ike proximate cause, the requirement of adequate cause works as a limit on legal liability in an otherwise infinite chain of but-for causal effects."  MTD Order at 14.  Adequate causation "serves as a corrective factor to the concept of causes in science, which may need to be restricted in order to be acceptable for legal responsibility."  Swisscom Case at reas. 2.3.1.  The Court "must consider not only all the circumstances of the case, but also the protective function of the norm and the types of circumstances that appropriately should give rise to liability."  Jan. 6, 2023 Müller Rep. ¶ 137(ii).  The Swiss Federal Supreme Court has accordingly held that "not every act of participation that is merely 'somewhat' of promoting influence, but is not sufficiently closely related to the act itself, is sufficient."  *Id.* ¶ 143 (quoting the Swisscom Case at reas. 2.3.1).

To satisfy adequate causation, Plaintiffs were required to prove that BNPP's actions could be "***reasonably considered to have directly resulted*** in at least some of the harm done to Plaintiffs." MTD Order at 16 (emphasis added). Adequate causation is not satisfied where the chain of causation is "too attenuated," "rest[s] on mere conjecture" or "depend[s] on the intervention of multiple parties." *Id.* (citations and quotations omitted). This includes an assessment of "whether it would be 'reasonable' to hold BNPP responsible for causing at least some of the human rights abuses in Sudan," and "whether those atrocities were foreseeable to BNPP at the time." MSJ Order at 9 (quoting MTD Order at 15). In addition to foreseeability, the assessment must consider all of the circumstances of the case, including consideration of "the norm and the types of circumstances that appropriately should give rise to liability." Jan. 6, 2023 Müller Report ¶ 137(ii).

Swiss courts have found adequate causation lacking where the defendant's actions were independent of actions and decisions by non-parties that directly caused plaintiffs' injuries. Jan. 6, 2023 Müller Rep. ¶ 137. In the Somatoform Disorder Case, for example, the Swiss Federal Supreme Court concluded that the plaintiff's pain disorder, which developed over several months due to overwork after he began taking care of his wife following her accident, could not be attributed to the party liable for the accident. *See* ECF No. 435-118 (DSFC 142 [2016] III 433) at reas. 4.7. The Court explained that "the (natural) causal chain between the accident and the Plaintiff's somatoform pain disorder is much longer" than if the alleged injury been related, for example, to immediate shock from witnessing the accident. *Id.* at reas. 4.6. The cause of the disorder was rooted in "additional burdens after the accident, which led to overwork," such that the disorder could "no longer be reasonably attributed to the liable party," as it would be

"excessive to extend" liability that far. *Id.* at reas. 4.7, 4.8. "[S]uch a generalizing attribution would not lead to a reasonable limitation of liability." *Id.* at reas. 4.8.

As with the plaintiff's theory in the Somatoform Disorder Case, Plaintiffs' chain of causation here is too attenuated to satisfy adequate causation. There is no evidence of a substantial or direct link between the acts and injuries, as required under Swiss law. ECF No. 949. Nor is there any evidence that BNPP's provision of banking services in Sudan directly caused Plaintiffs' injuries. Instead, Plaintiffs' theory requires the jury to find that (1) BNPP processed financial transactions involving Sudanese entities, (2) those transactions increased the Sudanese government's overall revenues, (3) the government independently decided to use those increased revenues to increase military spending, (4) that increased military spending led to actions that harmed the trial Plaintiffs, and (5) the government would not have taken those actions without BNPP's involvement.

The contingent nature of this theory of liability is self-evident. The chain of causation depends on speculation regarding numerous independent decisions by independent actors, from third-party buyers of Sudanese oil to militia members to government officials. For instance, Plaintiffs' evidence showed that the GOS independently decided when, where, and how to use the funds it had at its disposal. Sept. 17 Trial Tr. at 561:2–16 (Verhoeven). But even if this long, attenuated chain could establish liability as a legal matter, the evidence at trial does not support it.

As Plaintiffs' witnesses testified, acts of violence in Sudan were widespread long before BNPP's dealings with Sudan and persisted long after BNPP withdrew from Sudan, to the present. *See* Sept. 26 Trial Tr. at 965:8–11 and 963:5–6 (Kashef) (describing 1989 bombing of her village); *id.* at 987:16–988:1 (Ms. Kashef was ethnically targeted for arrest because she was a

37

Black African from Darfur and that such persecution originated "a very long time ago"); Sept. 25 Trial Tr. at 933:16–20 (Abdalla) (attributing attack to an ethnic conflict between Arab peoples and the Sudanese African tribes from "way back then"); Sept. 15 Trial Tr. at 211:20–212:14, 213:14–219:4, 234:9–235:25 (Hudson) (discussing history of violence in Sudan before 1997 and after 2011).  It is wholly speculative to say that the GOS would not have taken the actions that it took to harm Plaintiffs without BNPP's involvement.

The Swiss Federal Supreme Court rejected causation on similar facts in the Swisscom Case when it held that an internet service provider is not liable under Article 50 when people choose to use the internet to infringe on the plaintiffs' copyrights.  Swisscom Case at reas. 2.3.2. The court held that there was "no adequate causal link" and no "concrete contribution to the direct copyright infringement" under these circumstances.  *Id.*  The court reasoned that recognizing causation under those circumstances would create improper "system liability" and would force the legislature to "provide a regulation … to combat copyright infringements on the Internet," but held that the "introduction of corresponding regulatory measures … has so far been waived."  *Id.*  So too here.  Plaintiffs' theory of causation would impose de facto common law sanctions on Swiss financial institutions that the legislature of Switzerland expressly *rejected* in favor of targeted sanctions.  *See* ECF No. 746 (BNPP's Mot. to Admit Evid. of BNPP's State of Mind re: Sanctions) at 8–10, 16–18.  Notably, the Swisscom Case is more pertinent here than the Locksmith Case or others because it "is the most recent officially published decision rendered by the Swiss Federal Supreme Court with respect to Article 50(1) SCO" and "the involved third person acted within the framework of its business."  Jan. 6, 2023 Müller Rep. ¶ 84.

As a matter of law, Plaintiffs failed to establish adequate causation.

**D.    Plaintiffs Failed To Provide Sufficient Evidence To Satisfy The Applicable Burden Of Proof For Each Element Of Their Case.**

Under any potentially applicable standard, Plaintiffs failed to prove their case. Under either "full conviction" or "preponderant likelihood," ECF No. 951 ("Burden of Proof Order") at 3, BNPP is entitled to judgment as a matter of law.

As the Government of Switzerland has explained, "Swiss jurisprudence is clear that the party alleging tort liability under the Swiss Code of Obligations must prove every required element and that the standard for civil tort liability is 'full conviction,' which is otherwise known as 'strict proof.' Only with respect to the element of natural causation may the 'preponderant likelihood' standard be applied." Swiss Ambassador's Letter at 3–4.

The default standard of proof in Swiss civil litigation—"full conviction" (meaning "strict proof")—applies to Plaintiffs' claims and damages, with the exception of natural causation. ECF No. 812 ("BNPP's Burden of Proof Br.") at 7–8. Most Swiss legal scholars regard proof under full conviction as requiring a confidence level of at least 90%. *Id.* at 8. Contrary to the Court's prior ruling, Burden of Proof Order at 4, Plaintiffs did not establish that an exception to the default standard is warranted as to the illicit act, conscious assistance, or adequate causation elements of their claims, as Swiss law recognizes an exception only "when, by the nature of the matter, strict proof is either impossible or cannot reasonably be demanded." ECF No. 813-1 ("Aug. 1, 2025 Müller Rep.") ¶ 32 (quoting DFSC 149 [2023] III 218 at reas. 2.2.3; DFSC 148 [2022] III 134 at reas. 3.4.1; DFSC 148 [2021] III 105 at reas. 3.3.1.). Swiss courts have explained that "[m]ere difficulties in proving facts in a particular case do not justify an easing of the burden of proof." ECF No. 813-3 (DFSC 130 [2004] III 321, "Insurance Contract Case") at para. 3.2 (citing DFSC 5C.175/1997 of 17 October 1997 at paras. 2 and 3); *see also* BNPP's

Burden of Proof Br. at 10–12. And as for damages, the Swiss Code of Obligations allows courts to lower the burden, *see* Art. 42(2) SCO, but only "where the nature of the damage makes strict proof objectively impossible or cannot reasonably be demanded—placing the plaintiff in a state of evidentiary necessity," Aug. 1, 2025 Müller Rep. ¶ 48 (quoting DFSC 147 [2021] III 463 at reas. 4.2.3; DFSC 4A_59/2024 of 20 December 2024 at reas. 5).

Plaintiffs, at best, established "[m]ere difficulties in proving facts" material to their case. Insurance Contract Case at para. 3.2. That is a reason to grant this motion for lack of sufficient evidence, not a justification to reduce the applicable burden of proof. "[E]videntiary necessity" justifying an "easing of the burden of proof" is "not established simply because a fact that could easily be directly proven cannot be shown due to the party's lack of evidence." *Id.*

The Court also erred in concluding that to satisfy the "preponderant likelihood" standard, there must be "compelling reasons supporting the accuracy of the allegation, without other possible explanations being of substantial importance or reasonably likely." Burden of Proof Order at 5. As the Swiss Federal Supreme Court has recognized, properly understood, the preponderant likelihood standard is a demanding one, not to be confused with the preponderant evidence standard under United States law. The proof necessary to satisfy the preponderant likelihood standard must be "compelling," "decisive," free from "serious doubts," and rendering other conclusions "[in]conceivable." *See* Insurance Contract Case at paras. 3.3, 3.5; ECF No. 813-9 (DFSC 4A_424/2020 (2021), "Employment Insurance Case") at para. 4.1; *see also* Coffeemaker Case at para. 4.2.2. The preponderant likelihood standard therefore requires a confidence level at or around 75%. *See* ECF No. 813-5 (DFSC 4A_401/2023, "Delayed Stroke Case") at para. 6.4 ("[A]ccording to commentary, a 51% degree of probability is not sufficient,

and a clearly higher level must be used; a probability of 75% has been cited."); *see also* Aug. 1, 2025 Müller Rep. ¶¶ 37–39; BNPP's Burden of Proof Br. at 8–9.

However, even under the preponderant likelihood standard adopted by this Court, Plaintiffs failed to demonstrate "compelling reasons supporting the accuracy of the[ir] allegation[s]" regarding each element of their claims, "without other possible explanations being of substantial importance or reasonably likely." Burden of Proof Order at 5. As explained above, Plaintiffs did not show with sufficient evidence that without BNPP's provision of financial services, the GOS or its agents would not otherwise have committed the attacks that injured Plaintiffs.

## II. PLAINTIFFS FAILED TO PROVIDE SUFFICIENT EVIDENCE OF THEIR ALLEGED DAMAGES.

Plaintiffs failed to provide sufficient evidence giving the jury a non-speculative basis to award their requested economic and noneconomic damages. Under Art. 42(1) SCO, Plaintiff bears the burden of proving damages. This burden includes not only "the existence of the damage or loss, but also its amount in francs and cents." Jan. 6, 2023 Müller Rep. ¶ 158. Thus, Swiss law forces the plaintiff to "prove the damages or loss," including as to the amount, under the applicable full conviction standard, and if he fails to "bear the negative consequences … i.e., not be awarded damages." *Id.* (citing DFSC 122 [1996] 219 at reas. 3a, and DFSC 107 [1981] II 269 at reas. 2b).

Each of the three trial Plaintiffs claimed different categories of economic damages in their pretrial disclosures. But each of them failed to offer any evidence sufficient for a jury to award damages in a non-speculative amount for those injuries. Each of the categories of damages at issue is beyond the common knowledge of a lay jury and cannot be valued in a non-

speculative way without competent expert testimony.  *Sullivan v. Saint-Gobain Performance Plastics Corp.*, 2019 WL 12323305, at *2 (D. Vt. July 26, 2019) (noting that, pursuant to Rule 701 of the Federal Rules of Evidence, federal courts prohibit property owners from offering lay testimony about property values when they "lack[] first-hand information about valuation"). Plaintiffs also provided no evidence sufficient for the jury to award non-speculative damages for personal injuries or noneconomic damages.

### A.    Economic Damages

Plaintiffs' claims for economic damages fail for lack of sufficiently certain, non-speculative evidence of damages.

Turjuman:  Before trial, Mr. Turjuman claimed damages based on the loss of a home in Khartoum, a home in Wau, and three vehicles (a Land Rover, a Toyota, and a Yamaha motorcycle).  ECF No. 444-16 ("Pls.' Supp. Initial Disclosures") at 7.  At trial, Mr. Turjuman provided no evidence about the value of the three vehicles.  Mr. Turjuman testified that the value of his house in Wau is between $300,000 and $500,000, Sept. 18 Trial Tr. at 703:15 (Turjuman), and the value of his house in Khartoum is between $2 million and $4 million, *id.* at 704:1.  Mr. Turjuman, however, had not resided in either house since at least 2004, when he left Sudan.  *Id.* at 653:9–10; *see also id.* at 703:6–12 (testifying that both houses were confiscated by the GOS and sold).  Because Mr. Turjuman had not owned either property for approximately two decades, his estimate of the values of those houses was necessarily based on inadmissible hearsay, as his testimony confirmed:

> THE COURT: So how do you know [the Wau property is] worth $300,000?
> THE WITNESS: I asked them, some engineers, the architect. I know. I asked them…. A lot of people, they told me this is the estimate, you know, for the price….
> THE COURT: And, again, the basis of your value [of the Khartoum property] is conversations with people?

> THE WITNESS: For the home in Khartoum?
> THE COURT: Yes.
> THE WITNESS: Now price is between $2 millions to $4 millions because I know
> somebody who bought a house like my house in Khartoum. He paid $4 million.

*Id.* at 705:24–707:5.  Although federal courts may permit "property owners with personal knowledge about their property to offer lay opinions as to value," they are not allowed "'to merely repeat another person's valuation which was what [the witness] wanted to do.'"  *Sullivan*, 2019 WL 12323305, at *2–3 (alteration in original) (quoting *Cunningham v. Masterwear Corp.*, 569 F.3d 673, 676 (7th Cir. 2009)).  Mr. Turjuman failed to provide any competent evidence as to his alleged property damages.  The Court noted at the October 1 hearing that BNPP could have cross-examined Mr. Turjuman on this issue.  Oct. 1 Trial Tr. at 1084:15–18.  But it is Plaintiffs who bear the burden of proving their case, and failed to do so.  Cross examination would be needed only to attack Mr. Turjuman's credibility with the jury.  But Plaintiffs' failure to provide non-speculative evidence of the amount of damages in the first place means they have failed to create a triable issue for the jury to consider.  *See Sir Speedy, Inc.*, 957 F.2d at 1038.

Mr. Turjuman also claimed at trial that he suffered lost wages, but provided only his wages in the U.S., without identifying his wages in Sudan.  *See, e.g.*, Sept. 18 Trial Tr. at 700:1–11 (Turjuman).  Without a comparator to identify what wages, if any, he actually lost in Sudan, the jury has no basis to award any damages for that loss.

Abdalla:  Mr. Abdalla claimed economic damages based on the loss of a home, a farm, and livestock (200 cows, 300 goats).  ECF No. 444-16 at 14–15.  At trial, Mr. Abdalla estimated that the value of his home today would be "above 200,000 [U.S. dollars]."  Sept. 25 Trial Tr. at 909:12–15 (Abdalla).  That present-value estimation, however, could not have been based on first-hand knowledge, given that he, like Mr. Turjuman, had not resided in Sudan for

43

approximately two decades.  *See id.* at 942:7–9 (explaining that Mr. Abdalla left Sudan in 2006).

Mr. Abdalla also speculated that the value of that livestock today "could be up to a million [U.S.

dollars]" because "it's been over 20 years, and every year the cows would have more new baby

cows." *Id.* at 909:2–11.  Yet that conjectural figure lacks any sound basis in fact, or competent

methodology.  *See KW Plastics v. U.S. Can Co.*, 131 F. Supp. 2d 1265, 1274 (M.D. Ala. 2001)

("A Rule 701 witness cannot simply assert conclusions; his testimony must rest upon an

antecedent predicate and foundation.").

    <u>Kashef</u>:  Ms. Kashef's pretrial disclosures claimed economic damages based on the loss

of her family's home, loss of a farm, and loss of livestock (30 goats, 15 sheep, 3 horses).  ECF

No. 444-16 at 10.  However, at trial, she provided no evidence whatsoever of the value of any of

these claimed economic losses.

## B.    Personal Injuries

    Each of the Plaintiffs testified to physical or psychological personal injuries, but they

abandoned their medical causation experts at trial and thus provided the jury with no non-

speculative basis to award personal injury damages.  For example, Mr. Abdalla testified that he

has lost part of his eyesight and suffers memory loss from being hit in the head while detained in

Sudan. Sept. 25 Trial Tr. at 935:12–14 (Abdalla); *id.* at 933:22–23.  However, the law is clear

that medical causation for these types of injuries requires expert testimony, as Mr. Abdalla is not

a medical professional and is therefore not qualified to determine the medical cause of his own

injuries.  *See Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004) ("Where … the nexus

between the injury and the alleged cause would not be obvious to the lay juror, expert evidence is

often required to establish the causal connection between the accident and some item of physical

or mental injury." (quotation modified)); *see also Amorgianos v. Nat'l R.R. Passenger Corp.*, 303

F.3d 256, 268 (2d Cir. 2002) ("There is … no older requirement in this area of law than the need to show such a link [i.e., medical causation] between the defendant's actions and the plaintiff's loss." (citation omitted)).

### C.    Noneconomic Damages

Plaintiffs also failed to provide sufficient evidence as to their alleged noneconomic damages. *See* ECF No. 895 ("Pls.' Request to Charge") at 38. As Plaintiffs acknowledge, "[i]f the injured party demands moral damages in excess of the amount to be awarded according to general life experience, published values and the known circumstances of the offense, it is incumbent on him to present and prove the relevant elements … that suggest such an increase." ECF No. 709 ("Pls.' Mot. for an Order Regulating Evidentiary Burdens and Making Findings on Swiss Law") at 30 (quoting ECF No. 708-25 (DFSC 127 [2001] IV 215, "Home Invasion Case") at 219)).

The cultural and geographic differences between the Plaintiffs and the jury make it impossible for a lay jury, unfamiliar with Sudan, to understand the categories of noneconomic damages Plaintiffs claimed or award any amount of noneconomic damages grounded in anything but speculation. *See Washington v. Kellwood Co.*, 2015 WL 6437456, at *27 (S.D.N.Y. Oct. 14, 2015) ("[E]xpert testimony is required when an area of knowledge or some relevant causal connection at issue in a case is sufficiently beyond the knowledge of the lay juror." (quotation modified)). Indeed, Plaintiffs' expert *concedes* that civil war and conflict ravaged Sudan decades before the first barrel of Sudanese oil was exported, and long after BNPP ceased all dealings with the country. *See* Sept. 15 Trial Tr. at 211:20–212:14, 213:14–219:4, 234:9–235:25 (Hudson) (discussing history of violence in Sudan before 1997 and after BNPP stopped doing business with Sudan). Thus, any attempt by Plaintiffs to claim damages for depriving them of the

peaceful life in Sudan they described to the jury is not merely speculative, but counterfactual, and cannot support a valid claim for damages. *See* Sept. 18 Trial Tr. at 642:5–6 (Turjuman); Sept. 26 Trial Tr. at 966:5–967:12 (Kashef).

Finally, "forced displacement" as such is not a damage or loss that can be compensated. *See* Oct. 1 Trial Tr. at 1083:23–1084:14. "Only the involuntary diminution of an individual Plaintiff's assets or well-being resulting from any 'forced displacement' could potentially qualify as a damage or loss that can be compensated under Swiss law." Jan. 6, 2023 Müller Rep. ¶ 100. Plaintiffs and their expert have identified no Swiss court decision recognizing forced displacement damages. At the October 1 hearing on BNPP's oral motion, Plaintiffs argued that the "expulsion case" supports forced displacement damages. Oct. 1 Trial Tr. at 1114:8–22. That is wrong. That case concerned the circumstances under which a foreign national convicted of grievous bodily harm may be entitled to a waiver of an order of expulsion based on serious personal hardship. It did not even discuss whether an individual wrongly expelled from his country is entitled to compensation under Article 49 SCO or any other provision of Swiss law, let alone endorse such recovery. *See* ECF No. 708-3 (DFSC [2019] 146 IV 105, "Expulsion Case").

For each of the claimed sub-categories of moral damage, Plaintiffs have failed to provide sufficient non-speculative evidence of the value. The Court should therefore grant BNPP judgment as a matter of law and rule that the jury cannot award Plaintiffs such damages.

## III.   BNPP IS ENTITLED TO JUDGMENT AS A MATTER OF LAW AS TO PLAINTIFFS' CLAIMS ARISING FROM INJURIES THAT OCCURRED BEFORE APRIL 29, 2001.

Plaintiffs' claims for injuries occurring before April 29, 2001 are time-barred under the applicable statute of limitations. The Court should grant judgment as a matter of law and hold that Plaintiffs cannot seek, and the jury cannot award, damages based on such claims.

46

Under the New York borrowing statute, which applies to federal courts sitting in diversity in New York,[5] where claims accrued to non-New York residents outside of New York, such claims must be timely both under New York law and under the law of the place where the claims accrued. *See* N.Y. C.P.L.R. § 202 ("An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply."). Here, no Plaintiffs were New York residents at the time their causes of action accrued.[6] *See* ECF No. 241 ("Third Amended Compl.") ¶¶ 30–50e. Further, a tort claim accrues "at the time and in the place of the injury." *Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 324 F. Supp. 3d 387, 399 (S.D.N.Y. 2018) (citing *Glob. Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 526 (N.Y. 1999)). Here, the Plaintiffs were injured in Sudan. Accordingly, the timeliness of any

---

[5] According to the *Erie* and *Klaxon* Doctrines, a federal court sitting in diversity must apply the choice of law rules of the state in which it sits for substantive questions, including statutes of limitations. *See Tilton v. NynEx.World Trade/Lamarian Sys., Inc.*, 1999 WL 476441, at *2 (S.D.N.Y July 8, 1999) ("Generally, for *Erie* purposes, statute of limitations questions are treated as substantive, and consequently, are controlled by state law."); *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 626–27 (2d Cir. 1998) ("Where jurisdiction rests upon diversity of citizenship, a federal court sitting in New York must apply the New York choice-of-law rules and statutes of limitations."); *see also Guaranty Trust Co. v. York*, 326 U.S. 99, 109–11 (1945). The New York choice of law rules for limitations periods include the New York borrowing statute.

[6] Whether an individual was a New York resident or non-New York resident at the time the cause of action accrued—rather than at a later point in time—is the relevant consideration for purposes of applying N.Y. C.P.L.R. § 202. *See, e.g., Dugan v. Schering Corp.*, 86 N.Y.2d 857, 859 (N.Y. 1995) ("Because decedent was not a resident of New York at the time the cause of action accrued, CPLR 202, the so-called 'borrowing' statute, requires dismissal of this suit unless it is timely under the Statute of Limitations of both New York and North Carolina[.]" (citation omitted)).

claims for injuries asserted by Plaintiffs is governed by the shorter of the time periods provided for by New York and Sudanese law.

The maximum limitations period for any of Plaintiffs' claims is six years under New York law. *See* N.Y. C.P.L.R. § 213(1). The Second Circuit previously found that Plaintiffs' claims were timely under New York law, specifically N.Y. C.P.L.R. § 215(8)(a), which provided them with one year from May 1, 2015 (the date that BNP Paribas's judgment of conviction was entered) to commence a civil action. *Kashef*, 925 F.3d at 62–63. But that holding answered only half of the question under the borrowing statute, which also requires timeliness under *Sudanese* law.

Under Sudanese law, Section 159 of the Civil Transactions Act 1984 provides that (1) no action for damages/compensation may be heard after the lapse of five years from the date the injured person has known of (i) the injury and (ii) the person who caused the tortious act; and (2) in all cases, no action can be heard after the lapse of fifteen years from the date of the injury. *See* ECF No. 435-100 ("Sept. 30, 2022 Hassabo Rep.") ¶ 12; ECF 435-101 ("Mar. 2, 2023 Hassabo Decl.") ¶ 2. The 15-year time limit is absolute and cannot be subject to tolling or suspending under Sudanese law. Mar. 2, 2023 Hassabo Decl. ¶ 31. As a result, regardless of any tolling or other suspension provisions that may be provided by New York law, all claims for injuries that occurred at least fifteen years before the filing of the Complaint on April 29, 2016, i.e., before April 29, 2001, are time-barred.

This Court previously held that the Second Circuit's limitations holding is the law of the case, and that "it would be arbitrary to apply Sudanese law when the courts of Sudan were not open to the Plaintiffs." *Kashef*, 2024 WL 1676355, at *5. However, as a matter of law, no such exception to the borrowing statute exists. *See Ins. Co. of N. Am. v. ABB Power Generation, Inc.*,

91 N.Y.2d 180, 187–88 (1997) (holding that Borrowing Statute does not require courts to determine whether jurisdiction is obtainable over defendant in foreign state where claim accrued). And the trial evidence undercuts core assumptions that formed the basis for the Court's decision at summary judgment.

Trial showed that Mr. Turjuman has been living in the U.S. since 2005, for the vast majority of the duration of the 15-year limitations period. He even received an LLM degree in the U.S. Sept. 18 Trial Tr. at 700:12–13. There is nothing "arbitrary" about holding that he should have filed his claims in a U.S. court well before the expiration of the Sudanese limitations period, even if the courts of Sudan "were not open to the Plaintiffs." Further, Turjuman presented no evidence at trial that Sudanese courts would have been inaccessible to him in the first place. If anything, the evidence shows that Turjuman was a Sudanese civil rights lawyer, and he would have both litigated the statute of limitations as an attorney and adjudicated it as a judge. He is therefore time-barred from pursuing claims based on the arrests that occurred in 1998 and 2000—more than 15 years before he filed suit.

Similarly, Mr. Abdalla testified that the Janjaweed attacked his village in 1999—17 years before he filed suit. Sept. 25 Trial Tr. at 910:23–911:5. And he came to the U.S. in 2014—two years before he filed suit. Abdalla provided no trial evidence excusing the untimeliness of his claims, and his claim based on the 1999 attack is time-barred. *Id.* at 901:17–18.

Finally, Ms. Kashef testified that her mother was killed in or around 1989 in an "air raid" in South Kordofan. Sept 26. Trial Tr. at 965:8–11, 963:5–6. To the extent she attempts to recover damages based on this event, her claim is time-barred by the Sudanese statute of limitations.

49

BNPP is therefore entitled to judgment as a matter of law on Plaintiffs' claims arising from injuries suffered prior to April 29, 2001. These claims are untimely under Sudanese law and therefore cannot be brought in New York under the borrowing statute.

## CONCLUSION

The Court should grant judgment as a matter of law in favor of BNPP. In the alternative, BNPP requests partial judgment as a matter of law as to each individual Plaintiff and claim identified above.

Respectfully submitted,

Dated: New York, New York

October 10, 2025

*/s/ Barry H. Berke*
Barry H. Berke
Dani R. James
Michael Martinez
Matt Benjamin
David P. Salant

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
T: (212) 351-4000
bberke@gibsondunn.com
djames@gibsondunn.com
mmartinez2@gibsondunn.com
mbenjamin@gibsondunn.com
dsalant@gibsondunn.com

*/s/ Carmine D. Boccuzzi, Jr.*
Carmine D. Boccuzzi, Jr.
Abena Mainoo

CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
T: (212) 225-2000
cboccuzzi@cgsh.com
amainoo@cgsh.com

*Counsel for Defendant BNP Paribas S.A.*