# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ENTESAR OSMAN KASHEF, et al., *Plaintiffs*, - against - BNP PARIBAS, S.A., *Defendant*. | No. 1:16-cv-03228-AKH-JW  Hon. Alvin K. Hellerstein |

## DECLARATION OF SCOTT A. GILMORE

I, Scott A. Gilmore, declare as follows, pursuant to 28 U.S.C. § 1746:

1. I am a partner at Hausfeld LLP and am a counsel of record in the above-captioned matter.

2. I have personal knowledge of Plaintiffs' presentation of evidence and testimony at trial in September and October 2025.

3. None of the potential testimony or out-of-court statements described in Defendant's motion, ECF No. 1022, or in Appendix A to that motion, was presented at trial or in any other filing or proceeding in this litigation.

**May 21, 2025 Expert Witness Mock Exercise**

4. On or about Wednesday, May 21, 2025, I remotely joined, via Zoom, an in-person meeting held at the offices of Perry Law and attended by an expert witness in *Kashef v. BNP Paribas* and several attorneys representing the Class, including Lee Boyd of Hecht Partners LLP and Joan Illuzzi-Orbon, of the Perry Firm.

5. The purpose of the meeting was for Ms. Illuzzi-Orbon to conduct a mock examination of the expert. At the time, Ms. Boyd described Ms. Illuzzi-Orbon as her mentor and wished for her to play a leading role at trial.

6. Nevertheless, from the outset, Ms. Boyd began interrupting Ms. Illuzzi-Orbon's questions and injecting her own answers. Ms. Illuzzi-Orbon grew increasingly exasperated, as she was unable to examine the expert without Ms. Boyd inserting herself.

7. I recall that at a certain point, Ms. Illuzzi-Orbon asked a question regarding sexual violence in Sudan. Once again, Ms. Boyd interrupted, raising her voice and shouting at the expert words to the effect of: "Everyone who went into a ghost house was raped. You have to say that. Everyone in a ghost house was raped." She kept repeating this again and again, with the instruction, "You have to say that."

8. Ms. Illuzzi-Orbon was visibly disturbed and attempted to wrest back control of the meeting. At that time, I had to log off of the Zoom call for another meeting.

9. Ms. Illuzzi-Orbon later called me to debrief. She was shocked by Ms. Boyd's attempts to hijack the meeting and to instruct the expert on how to answer Ms. Illuzzi-Orbon's questions. She felt that Ms. Boyd had crossed the line into coaching responses. I agreed with that assessment, particularly with the harshness of Ms. Boyd's insistence after the expert did not acquiesce to Ms. Boyd's assertions.

10. Ms. Illuzzi-Orbon told me that she was going to speak to Ms. Boyd about her improper handling of the witness.

11. During the September-October 2025 trial, I advised Lead Trial Counsel, Bobby DiCello, and other members of the trial team that we could not call this expert witness because of Ms. Boyd's

attempt to influence his testimony. The DiCello Levitt team agreed, and the expert was not called, over Ms. Boyd's vociferous objection.

**June 2025: Contemplated Unethical Actions**

12. In June 2025, Ms. Illuzzi-Orbon alerted me to another issue with Ms. Boyd. She informed me that during a trip to San Diego by Ms. Boyd, Ms. Illuzzi-Orbon, and several other Plaintiffs' counsel, for the purpose of meeting potential witnesses and other class members, Ms. Boyd had stated to co-counsel—although not, to my knowledge, to any other party—that she intended to engage in conduct that was obviously unethical. Ms. Illuzzi-Orbon represented to me that she dissuaded Ms. Boyd from pursuing this further.

13. The contemplated unilateral action did not ultimately occur, nor was it communicated to any witness testifying at trial. Moreover, no evidence or testimony related to Ms. Boyd's contemplated action was presented at trial.

**Expert Complaints About Ms. Boyd's Pressure**

14. Another incident occurred during expert discovery. To the best of my recollection, this incident occurred sometime around February 2023. During a phone call, a different expert expressed concerns that Ms. Boyd was insisting that the expert adopt inaccurate opinions concerning Sudanese history. The expert made clear that they would not alter their opinions and sacrifice their professional integrity to appease Ms. Boyd, even if it meant stopping work on the case.

15. I assured the expert that they must present their true and accurate opinion, that they should disregard any further attempt by Ms. Boyd, and that Hausfeld would never permit words to be put in their mouth.

3

16. I engaged in repeated back and forth discussions with Ms. Boyd and insisted that she abandon what were obvious historical inaccuracies, as noted by the expert. As a result, the expert's independent opinion—and not Ms. Boyd's—was included in the expert's report and all subsequent testimony.

17. In the end, the expert witness declined to alter their opinion, and the suggested opinions with which they disagreed were not presented at trial.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on November 11, 2025 in Washington, D.C.

_____
Scott A. Gilmore