UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ENTESAR OSMAN KASHEF *et al.*,

                    Plaintiffs,

          -against-

BNP PARIBAS S.A.,

                 Defendant.

No. 16 Civ. 3228 (AKH)

Hon. Alvin K. Hellerstein

**DEFENDANT BNP PARIBAS S.A.'S MEMORANDUM OF LAW IN SUPPORT OF
RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR,
ALTERNATIVELY, MOTION FOR A NEW TRIAL OR TO AMEND THE JUDGMENT**

CLEARY GOTTLIEB
STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
T: (212) 225-2000

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
T: (212) 351-4000

*Counsel for Defendant BNP
Paribas S.A.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

LEGAL STANDARD ................................................................................................... 7

ARGUMENT ................................................................................................................ 8

I.    BNPP Is Entitled To Judgment As A Matter of Law Or, In The Alternative, A New Trial. .......................................................................... 8

    A.    BNPP Is Not Liable Under Article 41 Of The Swiss Code Of Obligations. .............................................................................. 9

    B.    BNPP Is Not Liable Under Article 50 Of The Swiss Code Of Obligations. .............................................................................. 10

        1.    Swiss Law Requires That The Main Perpetrator Must Be Capable of Being Held Liable To Hold An Alleged Accomplice Liable. ....................... 11

        2.    Swiss Tort Law Does Not Apply Extraterritorially To Acts Committed Outside Of Switzerland. ............................ 13

        3.    Swiss Tort Law Does Not Permit Suit Against A Foreign Sovereign For Actions Taken In Its Official Capacity ...................... 19

    B.    Plaintiffs Failed To Prove That BNPP Consciously Assisted The Government Of Sudan And Knew Or Should Have Know That It Was Contributing To The Government Of Sudan's Human Rights Violations. ............................................................................. 21

    C.    Plaintiffs Failed To Demonstrate By Sufficient Evidence That BNPP's Actions Were The "Natural And Adequate Cause" Of Their Alleged Injuries. .................................................... 25

        1.    Natural Causation ............................................................... 26

        2.    Adequate Causation .......................................................... 33

    D.    Plaintiffs Failed To Provide Sufficient Evidence To Satisfy The Applicable Burden Of Proof For Each Element Of Their Case .................... 36

II.    The Court Should Grant A Remittitur Reducing The Award of Damages To Comply With Swiss Law. .......................................... 39

    A.    Swiss Law Requires That Damages Awards Must Be Consistent With Awards In Similar Swiss Cases. ................................ 41

    B.    The Jury's Damages Awards Are Excessive And Far Exceed What Could Be Awarded By A Swiss Court. ............................... 43

    C.    Plaintiffs' Damages Awards Should Be Reduced Or Eliminated Because They Failed To Present Required Expert Testimony On Damages. .................... 47

i

**TABLE OF CONTENTS**
(continued)

**Page**

III.    BNPP Is Entitled To Judgment As A Matter of Law For Plaintiffs' Claims Arising From Injuries That Occurred Before April 29, 2001 And A New Trial Excluding Claims For Such Injuries. .......................................................... 48

CONCLUSION ............................................................................................................................... 52

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..............................................................................7

*Ashley v. Deutsche Bank Aktiengesellschaft*,
  144 F.4th 420 (2025).............................................................................24

*Baird v. Bell Helicopter Textron*,
  491 F. Supp. 1129 (N.D. Tex. 1980) .............................................5, 40

*Bracey v. Bd. of Educ. of City of Bridgeport*,
  368 F.3d 108 (2d Cir. 2004).................................................................8

*Campodonico v. Wal-Mart Stores E., LP*,
  2023 WL 6390171 (S.D.N.Y. Sept. 29, 2023)....................................8

*Cole v. Foxmar, Inc.*,
  2024 WL 74902 (2d Cir. Jan. 8, 2024) ..............................................44

*Cunningham v. Masterwear Corp.*,
  569 F.3d 673 (7th Cir. 2009) ..............................................................48

*Day and Zimmermann, Inc. v. Challoner*,
  423 U.S. 3 (1975) (per curiam)...........................................................40

*Denman v. Sanders*,
  2006 WL 452018 (S.D.N.Y. Feb. 24, 2006)......................................44

*Dugan v. Schering Corp.*,
  86 N.Y.2d 857 (N.Y. 1995) .................................................................49

*El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc.*,
  2008 WL 11370041 (S.D. Tex. Feb. 12, 2008) .................................40

*Ellerton v. Ellerton*,
  745 F. Supp. 2d 458 (D. Vt. 2010)......................................................40

*Matter of Energetic Tank, Inc.*,
  2024 WL 3952239 (S.D.N.Y. Aug. 27, 2024)....................................41

*Fed. Republic of Germany v. Philipp*,
  592 U.S. 169 (2021).............................................................................19

*Garcia v. Chiquita Brands Int'l, Inc.*,
  48 F.4th 1202 (11th Cir. 2022) ...........................................................40

*Gasperini v. Ctr. for Humanities, Inc.*,
  518 U.S. 415 (1996).................................................................5, 6, 39, 40

iii

**TABLE OF AUTHORITIES**
(continued)

Page

*Glob. Fin. Corp. v. Triarc Corp.,*
   93 N.Y.2d 525 (N.Y. 1999) ................................................................49

*Greenbaum v. Handelsbanken,*
   67 F. Supp. 2d 228 (S.D.N.Y. 1999).................................................51

*Guaranty Trust Co. v. York,*
   326 U.S. 99 (1945)..............................................................................49

*Ins. Co. of N. Am. v. ABB Power Generation, Inc.,*
   91 N.Y.2d 180 (N.Y. 1997) ...............................................................50

*Kashef v. BNP Paribas S.A.,*
   925 F.3d 53 (2d Cir. 2019) (*Kashef I*) .........................................21, 49

*Kashef v. BNP Paribas S.A.,*
   442 F. Supp. 3d 809 (S.D.N.Y. 2020) (*Kashef II*) ...........................21

*Kashef v. BNP Paribas S.A.,*
   2021 WL 603290 (S.D.N.Y. Feb. 16, 2021) (*Kashef III*) .............. *passim*

*Kashef v. BNP Paribas S.A.,*
   2024 WL 1676355 (S.D.N.Y. Apr. 18, 2024) (*Kashef IV*)...........20, 50

*Kiobel v. Royal Dutch Petroleum Co.,*
   569 U.S. 108 (2013)........................................................................3, 16

*Lore v. City of Syracuse,*
   670 F.3d 127 (2d Cir. 2012)...............................................................44

*Manley v. AmBase Corp.,*
   337 F.3d 237 (2d Cir. 2003).................................................................8

*Mejias-Quiros v. Maxxam Prop. Corp.,*
   108 F.3d 425 (1st Cir. 1997)...........................................................5, 40

*Nimely v. City of N.Y.,*
   414 F.3d 381 (2d Cir. 2005).................................................................8

*Osorio v. Dole Food Co.,*
   665 F. Supp. 2d 1307 (S.D. Fla. 2009) .............................................31

*Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n,*
   324 F. Supp. 3d 387 (S.D.N.Y. 2018)...............................................49

*Sarus v. Rotundo,*
   831 F.2d 397 (2d Cir. 1987).................................................................7

*Shu–Tao Lin v. McDonnell Douglas Corp.,*
   742 F.2d 45 (2d Cir.1984)..................................................................44

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Sir Speedy, Inc. v. L & P Graphics, Inc.*,
  957 F.2d 1033 (2d Cir. 1992)......................................................................43

*Stuart v. Am. Cyanamid Co.*,
  158 F.3d 622 (2d Cir. 1998)........................................................................48

*Sullivan v. Saint-Gobain Performance Plastics Corp.*,
  2019 WL 12323305 (D. Vt. July 26, 2019) ...........................................47, 48

*Tilton v. NynEx.World Trade/Lamarian Sys., Inc.*,
  1999 WL 476441 (S.D.N.Y July 8, 1999) ..................................................48

*Twitter v. Taamneh*,
  598 U.S. 471 (2023).............................................................................23, 24

*United States v. BNP Paribas S.A.*,
  2015 WL 1962882 (S.D.N.Y. Apr. 30, 2015)..............................................22

*Washington v. Kellwood Co.*,
  2015 WL 6437456 (S.D.N.Y. Oct. 14, 2015) ..............................................47

**Rules**

Fed. R. Civ. P. 50...................................................................................... *passim*

Fed. R. Civ. P. 59......................................................................................7, 8, 39

N.Y. C.P.L.R. § 202...................................................................................6, 49

N.Y. C.P.L.R. § 213(1) ...................................................................................49

N.Y. C.P.L.R. § 215(8)(a).................................................................................49

N.Y. C.P.L.R. § 5501(c) ...................................................................................39

## PRELIMINARY STATEMENT

The law in Switzerland is settled:  There can be no accomplice liability without a main perpetrator who could be liable in tort, and a foreign sovereign can never be liable in tort for acts committed outside of Switzerland.  Five weeks of trial did nothing to alter the unalterable.  And it compels judgment as a matter of law under Federal Rule of Civil Procedure 50(b).

And that settled law compounds the original legal error in this case:  Article 50 of the Swiss Code of Obligations is not an independent basis for tort liability.  It is a joint and several liability provision that allows an injured plaintiff to recover full compensation from one tortfeasor when there are several tortfeasors who are liable for a plaintiff's injury.  But for this provision to apply, each defendant must first be liable as a tortfeasor under Article 41.  The jury here did not consider, much less find, that BNPP met the elements for tort liability under Article 41.

Even if Article 50 were an independent basis for tort liability (it is not), and even if BNPP could be liable as an accomplice for illicit acts committed by the Government of Sudan (it cannot be), Plaintiffs nevertheless failed to establish the three elements of Article 50 that this Court first articulated in its February 26, 2021 decision:  "(1) a main perpetrator committed an illicit act, (2) the accomplice consciously assisted the perpetrator and knew or should have known that he was contributing to an illicit act, and (3) their culpable cooperation was the natural and adequate cause of the plaintiff's harm or loss."  *Kashef v. BNP Paribas S.A.*, 2021 WL 603290, at *2 (S.D.N.Y. Feb. 16, 2021) (*Kashef III*) (citation omitted).  In any event, the Court should grant a new trial because the verdict and damages award in favor of Plaintiffs is against the weight of the evidence and Swiss law.

1

*Article 41*

Article 41 of the Swiss Code of Obligations governs tort liability for private entities. Article 50 does not. That distinction is ironclad in Swiss law. *See, e.g.*, ECF No. 435-120 (Swiss Federal Supreme Court 145 [2019] III 72, "Swisscom Case") at reas. 2.2.1; ECF No. 530-163 (Swiss Federal Supreme Court 130 III 362, "Work Contract Case") at reas. 5.2. Indeed, former Swiss Federal Supreme Court Judge Isabelle Romy emphasized that any contrary interpretation would be "novel" and "not supported by case law." ECF No. 444-102 ("July 21, 2023 Romy Rep.") ¶ 4. Here, the jury was not even charged on Article 41's elements and thus could not have found BNPP liable as a tortfeasor. For this reason alone, Plaintiffs' Swiss law tort claims fail as a matter of law.

*Article 50: Element 1*

Article 50 of the Swiss Code of Obligations is a joint and several liability provision that allows an injured plaintiff to recover full compensation from one tortfeasor when there are several tortfeasors who are liable for a plaintiff's injury. To impose accomplice liability on BNPP under Article 50, the first element requires proof of an illicit act by a main perpetrator who could itself be held liable under Article 41. Here, the Government of Sudan cannot be held liable as a main perpetrator for two independent reasons.

*First*, Swiss courts, as well as the European Court of Human Rights, have ruled that Swiss law does not apply extraterritorially to tortious conduct—even tortious conduct that violates *jus cogens* norms—committed outside Switzerland. In the seminal case of *Naït-Liman v. Switzerland*, which was described as "the only one of its kind," the Swiss courts and the European Court of Human Rights rejected the expansive theory of liability that this Court imposed at trial. ECF No. 898-1 (No. 51357/07 Eur. Ct. H.R. (Mar. 15, 2018), "Judgment of

2

Grand Chamber") ¶ 147. Abdennacer Naït-Liman, a Tunisian refugee residing in Switzerland, alleged that he suffered vicious torture in Tunisia at the hands of the Tunisian government. *See id.* ¶ 65. However, because "no illegal act or detrimental outcome occurred in Switzerland" and because the defendant Government of Tunisia was "not domiciled or habitually resident in Switzerland," first the Swiss courts and then the European Court of Human Rights held that the plaintiff's claims were not actionable under Swiss law. *Id.* ¶ 25. This was true even though Tunisia's actions were "undisputed[ly]" of a "*jus cogens* nature." *Id.* ¶ 129.

Switzerland is not an outlier in this respect. The Grand Chamber in *Naït-Liman* conducted a survey of the 39 European States of the Council of Europe and found only one (the Netherlands) that extended its jurisdiction extraterritorially for cases of torture. *Id.* ¶ 183. And the United States is no different. The Grand Chamber in *Naït-Liman* also cited and analyzed *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013), in which the U.S. Supreme Court rejected the extraterritorial application of the Alien Tort Statute to a suit brought by Nigerian immigrants against Nigerian, British, and Dutch companies for allegedly aiding and abetting the Government of Nigeria's commission of rape, murder, and forcible displacement. *Id.* ¶ 78.

To remove all doubt about the domestic boundaries of Swiss tort law, Switzerland rejected a proposed 2020 amendment to its constitution and the Swiss Code of Obligations that would have imposed tort liability on Swiss companies for human rights abuses committed abroad. Not only did this rejection crystallize Switzerland's stance against the extraterritorial application of its tort law, but it also made plain that no such extraterritorial jurisdiction existed in the first place.

*Second*, acts committed by a foreign government in its sovereign capacity, including for alleged murder, rape, or torture, are not subject to tort liability under Swiss law. As former Swiss

Federal Supreme Court Judge Romy explains, the acts of a foreign government are not subject to private Swiss tort law, such as Articles 41 or 50 of the Swiss Code of Obligations. Rather, they are subject to Swiss public law provisions, including international treaties. No such treaty applies here. Accordingly, for two independent reasons, Swiss law prohibits a finding that the Government of Sudan could be liable as a main perpetrator for its alleged illicit acts under the first element of Article 50; as a result, there can be no viable claim for accomplice liability against BNPP under Article 50.

### Article 50: Element 2

Plaintiffs failed to provide sufficient evidence of the second element of Article 50, which requires proof that BNPP "consciously assisted [the Government of Sudan] and knew or should have known that it was contributing to an illicit act" by the Government of Sudan. *Kashef III*, 2021 WL 603290, at *2 (citation omitted). The evidence is undisputed that BNPP *complied* with the "embargo which was issued by the European community and adopted by Switzerland," which prohibited "financ[ing] any acquisition of arms or military equipment by Sudan." Oct. 9 Trial Tr. at 1390:3–12 (Testimony of John Clamon); Oct. 6 Trial Tr. at 1170:22–24 (Testimony of Philippe Maillard). BNPP had no relationship (legal or otherwise) with the individual Plaintiffs, was not involved in any of the purported illicit acts by the Government of Sudan, and is not responsible for the independent actions of that foreign sovereign.

### Article 50: Element 3

Plaintiffs failed to provide sufficient evidence of the third element of Article 50, which requires proof that BNPP's conduct was the "natural and adequate" cause of Plaintiffs' injuries. *Kashef III*, 2021 WL 603290, at *2 (citation omitted). Until the October 1, 2025 oral argument on BNPP's Rule 50(a) motion, the Court had held—for years—that natural and adequate

causation under Swiss law was akin to but-for and proximate causation under U.S. law.  But during that October 1st oral argument, the Court reversed course and found that natural causation requires only proximate-cause-like reasonableness and foreseeability, rather than but-for analysis.  That reversal was erroneous.  Under either standard, however, Plaintiffs failed to prove natural and adequate causation.  The undisputed evidence is that BNPP did not facilitate any transactions involving weapons or military equipment—and certainly none tied to the three Plaintiffs.  And, as Plaintiffs' own experts testified, many of Plaintiffs' claimed injuries occurred before BNPP provided any financial services related to Sudan's export of oil starting in 1999.  And Plaintiffs' expert conceded that violence continued unabated throughout Sudan even after BNPP stopped doing any business there.  Even at the macro-economic level, there was no evidence that BNPP's financial services were a natural or adequate cause of Plaintiffs' injuries.

***Remittitur***

The Court should grant a remittitur for Plaintiffs' damages awards, which far exceed any amount that could be recovered in a Swiss court.  On a motion for remittitur, this Court must "determine whether the jury's verdict is within the confines set by state law," *Gasperini v. Ctr. for Humanities, Inc*., 518 U.S. 415, 435 (1996), and courts apply this same analysis where foreign law governs, *see, e.g.*, *Baird v. Bell Helicopter Textron*, 491 F. Supp. 1129, 1152 (N.D. Tex. 1980); *see also Mejias-Quiros v. Maxxam Prop. Corp*., 108 F.3d 425, 427 n.1 (1st Cir. 1997) ("If local law placed a substantive cap on medical damages, it would control[.]").  Swiss law prohibits the award of speculative pecuniary damages and requires the court to review whether moral damages awards "set[] an unfair compensation amount that is manifestly too low or too

high" by comparing the award to the moral damages awarded by courts in similar cases. Ex. 1 (Swiss Federal Supreme Court 129 IV 22).[1]

Because Plaintiffs presented evidence of only limited recoverable pecuniary damages (if any), the vast majority of Plaintiffs' awards necessarily must consist of moral damages for pain and suffering. *See* ECF No. 1004 (awarding Ms. Kashef $7.3 million, Mr. Abdalla $6.7 million, and Mr. Turjuman $6.75 million). These awards far exceed—by more than an order of magnitude—any amounts that have *ever* been awarded by Swiss courts for similar injuries. Ex. 9 ("Nov. 14, 2025 Romy Decl.") ¶ 36. Former Swiss Federal Supreme Court Judge Romy confirmed that no Swiss court has *ever* awarded moral damages exceeding CHF 250,000 (equivalent of US $277,500)[2]—which is a small fraction of the amounts the jury awarded each of the Plaintiffs here. *See* ECF No. 1004. "*Erie* precludes a recovery in federal court significantly larger than the recovery that would have been tolerated in state court." *Gasperini*, 518 U.S. at 431. Swiss law mandates a substantial reduction in Plaintiffs' awards.

### *Time-Barred Claims*

BNPP is entitled to judgment as a matter of law for all claims arising from injuries that occurred before April 29, 2001. Each of the Plaintiffs sought to recover at trial for injuries that were time-barred under Sudan's 15-year limitations period—the law of the place where their claims arose. New York's borrowing statute, N.Y. C.P.L.R. § 202, therefore bars recovery for those injuries. Granting a new trial is the only way to remedy the fact that Plaintiffs presented

---

[1] All exhibits cited in this brief are attached to the concurrently filed declaration of Michael Martinez.

[2] The conversion from CHF to USD herein is based on an average exchange rate of 1 CHF = 1.11 USD. BNPP reserves all rights to update the relevant ranges and precedent based on the damages specified by the Plaintiffs.

time-barred claims to the jury because (1) the general verdict form makes it impossible to know the extent to which the jury based its liability and damages findings on claims that fall outside the limitations period and (2) evidence of those time-barred claims tainted the rest of the trial and cannot be undone without a new trial as to all claims.

***

For the foregoing reasons, BNPP respectfully requests that the Court enter judgment as a matter of law in favor of BNPP or, in the alternative, grant a new trial or remittitur of the unauthorized award of damages.

## LEGAL STANDARD

Federal Rule of Civil Procedure 50(b) provides that "[i]f the court does not grant a motion for judgment as a matter of law" after an opposing party has been heard fully at trial, a party "may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b). Motions for judgment as a matter of law pursuant to Rule 50(b) are evaluated using the same standard as motions made pursuant to Rule 50(a). *See Sarus v. Rotundo*, 831 F.2d 397, 400 (2d Cir. 1987). Judgment as a matter of law is appropriate when "a party has been fully heard … during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). In other words, where there "can be but one reasonable conclusion as to the verdict," the Court should direct a verdict for the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

A court may grant a motion for a new trial pursuant to Federal Rule of Civil Procedure 59(a) "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). For instance, a court may grant a new trial if it

"determines that, in its independent judgment, the jury has reached a seriously erroneous result or its verdict is a miscarriage of justice." *Nimely v. City of N.Y.*, 414 F.3d 381, 392 (2d Cir. 2005) (citation modified). Such grounds would include "a verdict that is against the weight of the evidence." *Campodonico v. Wal-Mart Stores E., LP*, 2023 WL 6390171, at *17 (S.D.N.Y. Sept. 29, 2023). Notably, "Rule 59(a) … has a less stringent standard than Rule 50 in two significant respects: (1) a new trial under Rule 59(a) may be granted even if there is substantial evidence supporting the jury's verdict, and (2) a trial judge is free to weigh the evidence … and need not view it in the light most favorable to the verdict winner." *Manley v. AmBase Corp.*, 337 F.3d 237, 244–45 (2d Cir. 2003) (citation modified). Finally, if the Court concludes that the damages are excessive, it may offer a remittitur in lieu of a new trial under Rule 59. *See Bracey v. Bd. of Educ. of City of Bridgeport*, 368 F.3d 108, 117 (2d Cir. 2004).

## ARGUMENT

### I. BNPP Is Entitled To Judgment As A Matter of Law Or, In The Alternative, A New Trial.

BNPP renews and expressly incorporates the argument from its Rule 50(a) motion that Plaintiffs failed to prove each element necessary for BNPP to be held liable as an accomplice under Swiss law.[3] *See* ECF No. 998 ("BNPP's Rule 50(a) Mot.") at 9–41. BNPP is entitled to judgment as a matter of law for all of Plaintiffs' claims or, in the alternative, a new trial.

---

[3] Plaintiffs' failure to provide sufficient evidence to prove their claims is true under either the "full conviction" or the "preponderant likelihood" standard, although as discussed below, BNPP maintains that for all but one element, Plaintiffs were required to prove their claims by the "full conviction" standard under Swiss law. *See infra* § I.D.

**A.      BNPP Is Not Liable Under Article 41 Of The Swiss Code Of Obligations.**

BNPP renews and expressly incorporates the argument from its Rule 50(a) motion that Plaintiffs failed to provide sufficient evidence that the first element of Article 50 had been satisfied.  BNPP's Rule 50(a) Mot. at 11–24.

BNPP disagrees with this Court's prior ruling that Article 50 of the Swiss Code of Obligations provides an independent basis for liability.  *See Kashef III*, 2021 WL 603290, at *2. Under the Swiss Code of Obligations, Article 41 provides the "[c]onditions of liability," while Article 50 governs joint and several liability in the event of "[m]ultiple liable parties" who have "together caused damage."  *See* ECF No. 171-4 (Articles 41 & 50, Swiss Code of Obligations) at 3, 5.  As the Swiss Federal Supreme Court has repeatedly made clear, Article 50, like joint and several liability in the United States, is not an independent basis for liability but rather allows an injured party to recover full compensation from one tortfeasor when there are multiple tortfeasors who are liable for a plaintiff's injuries.  *See, e.g.*, Swisscom Case at reas. 2.2.1 (explaining that Article 50 "only stipulates that several participants are jointly and severally liable for damage caused collectively," and "presupposes [responsibility under civil law]"); Work Contract Case at reas. 5.2 ("Joint and several liability implies a preceding liability: a person who is not liable for damage cannot be held joint and severally liable."); *see also* ECF No. 435-99 ("July 21, 2023 Müller Rep.") ¶¶ 10–11; ECF No. 435-98 ("Jan. 6, 2023 Müller Rep.") ¶ 35.

As former Swiss Federal Supreme Court Judge Romy made clear, "an accomplice may only be jointly and severally liable under Art. 50(1) CO if he meets all the requirements of Art. 41 CO, including the commission of the unlawful act."  July 21, 2023 Romy Rep. ¶ 4.  Put differently, the elements for Article 41 liability must be satisfied for joint and several liability to apply under Article 50.  Any "interpretation of Art. 50(1) CO as an independent basis for

9

liability," former Judge Romy stressed, is "novel" and "not supported by case law." *Id.* The jury therefore had to find that BNPP met all the elements of Article 41, including the commission of an unlawful act against these Plaintiffs. But the jury did not do so. Nor could they have, as they were not even charged on the elements of Article 41. For this reason alone, Plaintiffs' Swiss law tort claims fail as a matter of law.

**B.    BNPP Is Not Liable Under Article 50 Of The Swiss Code Of Obligations.**

Even if Article 50 were an independent basis for tort liability (it is not), Plaintiffs' Swiss-law tort claims fail as a matter of law. The Court decided that tort liability for an accomplice can be established under Article 50 by showing "(1) a main perpetrator committed an illicit act, (2) the accomplice consciously assisted the perpetrator and knew or should have known that he was contributing to an illicit act, and (3) their culpable cooperation was the natural and adequate cause of the plaintiff's harm or loss." *Kashef III*, 2021 WL 603290, at *2. Even under the Court's standard, Plaintiffs had to prove that the Government of Sudan could be liable as a main perpetrator under Swiss law for BNPP to be held liable as an accomplice to the Government of Sudan's illicit acts.

To be clear, that does *not* mean that the Government of Sudan must be named as a party in this case, or that the Government of Sudan's liability as a main perpetrator is adjudicated in this case. But it does require that a claim against the Government of Sudan as a main perpetrator under Article 41 be actionable in Switzerland. Otherwise, there is no main perpetrator (and indeed no party) who could be liable for an action to which BNPP is an alleged accomplice under Article 50. *See* Article 50 (titled "Multiple *liable* parties" (emphasis added)); *see also* ECF No. 937 ("Swiss Ambassador's Letter") at 3 ("For Article 50(1) SCO joint and several liability to

10

apply to an accomplice, there must be an underlying violation by a 'main perpetrator' who could be liable under Swiss tort law.").

This Swiss-law requirement presents an insurmountable obstacle to Plaintiffs' case against BNPP. According to Plaintiffs, the Government of Sudan is the main perpetrator that caused their injuries. But as a matter of law, the Government of Sudan could not be held liable as a main perpetrator under Article 41 for two independent reasons. *First*, the Swiss courts do not extend their jurisdiction to extraterritorial acts by a main perpetrator committed outside of Switzerland, even if those acts violate *jus cogens* norms. *Second*, the Government of Sudan is a foreign sovereign to which private Swiss law (namely, Article 41) is inapplicable. *See* Swiss Ambassador's Letter at 3 ("Article 41 SCO is a private law obligation that does not impose civil liability (1) on foreign sovereigns or (2) for extraterritorial acts committed outside of Switzerland."); ECF No. 897 ("Aug. 28, 2025 Romy Decl.") ¶¶ 17–18; ECF No. 471-161 ("Sept. 8, 2023 Romy Decl.") ¶ 18 (quoting Franz Werro & Vincent Perritaz ("In the absence of a public law provision, the public authority is therefore not liable under CO 41 [*et seq.*]" (English translation))).

### 1.    *Swiss Law Requires That The Main Perpetrator Must Be Capable of Being Held Liable To Hold An Alleged Accomplice Liable.*

As the Swiss government set out in its letter to this Court, "[f]or Article 50(1) SCO joint and several liability to apply to an accomplice, there must be an underlying violation by a 'main perpetrator' who could be liable under Swiss tort law." Swiss Ambassador's Letter at 3. For much of this case, this proposition seemed unremarkable—this Court and the parties all appeared to agree that there must be an actionable claim against a main perpetrator under Article 41 for joint and several liability to attach under Article 50. *Kashef III*, 2021 WL 603290, at *4 (adopting view of Plaintiffs' expert, Professor Franz Werro, that "Article 50.1 allows liability if

an accomplice" consciously assists "'the illicit act of the perpetrator who himself is also at fault'"); ECF No. 435-104 ("Mar. 2, 2023 Werro Decl.") ¶ 64; Jan. 6, 2023 Müller Rep. ¶ 90 ("GOS's liability as the perpetrator is a precondition for the Defendants' liability as accomplices …."); July 21, 2023 Romy Rep. ¶ 19 ("Assuming … that … Plaintiffs may base their claims against BNPP on Art. 50(1) CO …, Plaintiffs would have to prove and establish that the main perpetrator … would be liable towards the putative class members based on Art. 41 CO.").

Whether the tort at issue involves the violation of trademarks, an airplane crash, a shooting in a garden, or the violation of copyright, Swiss courts consistently confirm the existence of an actionable claim against a main perpetrator under Article 41 before proceeding to the discussion of secondary liability under Article 50. *See, e.g.*, ECF No. 174-1, Ex. 10 (Swiss Federal Supreme Court 107 II 82, "Rediffusion Case") at reas. 1; ECF No. 174-1, Ex. 11 (Swiss Federal Supreme Court 112 [1986] II 118, "Aircraft Case") at reas. 1; ECF No. 708-15 (Swiss Federal Supreme Court 4A_185/2007, "Locksmith Case") at reas. 4; ECF No. 435-111 (Swiss Federal Supreme Court 71 [1945] II 107, "Shooting Contest Case") at reas. 2. It is hornbook Swiss law that a suit against a purported accomplice may not proceed when there is no actionable claim against a main perpetrator. S*ee* ECF No. 171-41 (Roland Brehm, *Bernese Commentary*, art. 50 CO (4th ed. 2013), "Brehm Commentary") ¶ 33 (commenting that under Article 50 "there is no joint and several liability without (external) liability").[4] To hold otherwise would radically

---

[4] The Brehm Commentary speaks directly to the issue of whether the main perpetrator must be capable of being liable under Article 41 for Article 50 liability to attach. As a hypothetical, the commentary points to a situation where an "instigator encourages the main perpetrator to cause damage, while the main perpetrator's judgement is impaired." *Id.* ¶ 25. In such a case, the "perpetrator, who is incapable of judgement, is not at fault." *Id.* As a result, the "situation is

expand the scope of Swiss law.[5]  Indeed, former Swiss Federal Supreme Court Judge Romy emphasized that "[w]here the [Government of Sudan] is not liable under Swiss law and no claim against it could be adjudicated in Swiss courts, to apply Art. 50(1) CO as the basis for the independent liability of an alleged accomplice of the [Government of Sudan] for actions in exercise of its sovereign authority would be an *unprecedented* extension of the liability of private entities."  ECF No. 897 ("Aug. 27, 2025 Romy Decl.") ¶ 49 (emphasis added).

### 2.    *Swiss Tort Law Does Not Apply Extraterritorially To Acts Committed Outside Of Switzerland.*

The jury held BNPP liable as an accomplice for actions taken by the Government of Sudan beyond the borders of Switzerland.  But Swiss law does not permit suit in tort for the Government of Sudan's extraterritorial acts, even if those acts violate *jus cogens* norms.  In this manner, Switzerland is like many European countries and the United States itself—those countries, absent express indication to the contrary, limit civil jurisdiction to the borders of their sovereign territory.

A 2018 judgment by the European Court of Human Rights confirms that Swiss courts would reject any claim against the Government of Sudan in Switzerland under Article 41 for acts committed in Sudan.  Indeed, at every stage—the Swiss trial court, the Federal Supreme Court of Switzerland, and the European Court of Human Rights—courts reaffirmed that a claim against

---

then outside the scope of application of Art. 50: The sole instigator is then liable as per Art. 41."  *Id.* (emphasis added).

[5] Plaintiffs rely on the Hockey Rink Case to argue that a party can be liable under Article 50, "even though the principal that created the danger … could not be liable under Article 41 CO."  ECF No. 985-1 ("Oct. 1, 2025 Werro Decl.") ¶ 136.  Not so.  The Hockey Rink Case included an Article 41 main perpetrator—*i.e.*, the hockey player who injured the victim spectator.  ECF No. 435-112 ("The Hockey Rink Case") at reas. 8.

the Government of Sudan as a main perpetrator simply could not be brought under Swiss law, and therefore no claim for secondary accomplice liability exists here.

The court decided a case brought by Mr. Naït-Liman, a political asylee in Switzerland, who alleged that he had been detained and subjected to horrific torture in the African nation of Tunisia on the orders of the Minister of the Interior (referred to in the case as A.K.).  *See* Judgment of Grand Chamber ¶ 15.  Naït-Liman brought civil claims in Swiss court against A.K. and the Government of Tunisia for the resulting damage.  ECF No. 898-2 ("Judgment of Second Section") ¶ 22.

The Swiss trial court dismissed the case.  According to the court, it did "not have territorial jurisdiction under international law to examine the complaint, given that the defendants are not domiciled or habitually resident in Switzerland, and given also that no illegal act or detrimental outcome occurred in Switzerland."  Judgment of Grand Chamber ¶ 25. Although Swiss law authorizes jurisdiction in the absence of any other available forum, that provision similarly requires a sufficient connection to Switzerland.  *See* ECF No. 893-3 (Swiss Federal Act on Private International Law (PILA), Art. 3); July 21, 2023 Romy Rep. ¶ 31; Aug. 28, 2025 Romy Decl. ¶¶ 24–26.  That connection was altogether absent in a lawsuit brought to challenge the Tunisian government's actions in Tunisia.  ECF No. 898-2 ("Judgment of Second Section") ¶ 18 ("All of the acts for whose after-effects the claimant, a Tunisian national, seeks compensation for non-pecuniary damage, were allegedly inflicted on him … in Tunisia … by the Tunisian State and its agents.").

The Swiss Federal Supreme Court dismissed Naït-Liman's appeal.[6]  As the Swiss Federal Supreme Court explained, there is no provision in Swiss law authorizing extraterritorial jurisdiction over actions by a foreign actor in a foreign state:

> In the present case … the claimant complains of acts of torture that were allegedly committed in Tunisia, by Tunisians resident in Tunisia, against a Tunisian residing in Italy.  All of the specific features of the case come back to Tunisia ….  The facts of the case thus have no connection with Switzerland, so that the question of whether or not the link with this country is sufficient does not arise.  In those circumstances, it is not possible to recognise the jurisdiction of the Swiss courts ….

Judgment of Grand Chamber ¶ 30.

Naït-Liman filed an application against Switzerland with the European Court of Human Rights, arguing that the right to a tribunal guaranteed by the European Convention on Human Rights required the Swiss courts to adjudicate his civil claims.  The Government of Switzerland conceded that party states had a responsibility to prevent torture, but it argued that "universal civil jurisdiction … went beyond the limits of what a State governed by the rule of law could do."  *Id.* ¶ 143.  Indeed, Naït-Liman's case was described as "***very unusual, and the only one of its kind which had had to be decided by the Swiss courts***."  *Id.* ¶ 147 (emphasis added).

The European Court of Human Rights sided with Switzerland in affirming the territorial limits of Swiss law.  The court rejected the argument that Switzerland was required to expand the scope of its statutes to apply outside of its territory:  "While there is little doubt as to the binding effect of this right on the States with regard to acts of torture perpetrated on the territory of the forum State or by persons within its jurisdiction, the same does not apply to acts committed by

---

[6] The intermediate appellate court, the Court of Justice, rejected Naït-Liman's appeal on the ground that Tunisia had immunity from jurisdiction because "the acts of torture had been perpetrated in the exercise of sovereign authority (*iure imperii*) and not under private law (*iure gestionis*)."  Judgment of Grand Chamber ¶ 28.  The court therefore did not reach the question of extraterritoriality.

third States or persons under their jurisdiction." *Id.* ¶ 97. Therefore, even though the prohibition on torture was "undisputed[ly]" of a "*jus cogens* nature," the court held that "norms of international law" did not require Switzerland to find jurisdiction over Naït-Liman's claim against Tunisia. *Id.* ¶¶ 129, 198.

In arriving at this judgment, the court conducted a survey of other member States of the Council of Europe. The court found that, "of the 39 European States included in the analysis, only the Netherlands recognise universal civil jurisdiction in respect of acts of torture." *Id.* ¶ 69; *see also* Judgment of Second Section ¶ 114 (stating that Switzerland's decision "is in no way exceptional and falls within a very broad consensus among the member States of the Council of Europe").

The European Court of Human Rights correctly noted that even the extraterritorial jurisdiction provided by the United States was limited, citing the U.S. Supreme Court's decision in *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013). Judgment of Grand Chamber ¶ 78. In *Kiobel*, a group of Nigerian nationals residing in the United States sued Dutch, British, and Nigerian companies under the Alien Tort Statute, alleging that the companies aided and abetted the Nigerian government's commission of various heinous acts, including rape, murder, and the destruction of property and the resulting displacement of people. 569 U.S. at 113. The U.S. Supreme Court concluded that the presumption against extraterritoriality foreclosed suit against the companies. As the Supreme Court explained, there was "no indication that the ATS was passed to make the United States a uniquely hospitable forum for the enforcement of international norms." *Id.* at 123.

After conducting its international survey, the European Court of Human Rights decided that there is no "international custom which would have obliged the Swiss courts to find that they

had jurisdiction to examine" Naït-Liman's claim.  Judgment of Grand Chamber ¶ 187.  The result of the judgment was to leave Naït-Liman, the alleged victim of torture in an African nation in violation of *jus cogens* norms, without a remedy in civil court in Switzerland, in deference to well-established legal principles against extraterritorial application of statutes and the comity owed to domestic courts.

The Swiss and international court's thoroughly reasoned and uniformly consistent decisions in *Naït-Liman* were not "solely concerned with whether Swiss court have subject matter jurisdiction," as Plaintiffs claim.  Oct. 1, 2025 Werro Decl. ¶ 155.  To the contrary, the European Court of Human Rights' decision was clear that as a substantive matter, the "right of victims of acts of torture to obtain appropriate and effective compensation … does not apply to acts committed by [other] States or persons under their jurisdiction."  Judgment of Grand Chamber ¶ 97.

The Swiss government's position in *Naït-Liman* against the extraterritorial application of its tort laws is consistent with other actions taken by the country to limit expansive tort liability. In 2020, Switzerland held a referendum concerning a proposed amendment of the Swiss Federal Constitution and the Swiss Code of Obligations that would have explicitly held Swiss companies liable in tort in certain circumstances where their foreign subsidiaries commit human rights abuses abroad.  Jan. 6, 2023 Müller Rep. ¶ 147.  The initiative sought to impose a "due diligence" obligation on companies established in Switzerland that would have required them to "examine the actual and potential impact on internationally recognized human rights and on the environment, take appropriate measures to prevent any violation of internationally recognized human rights and environmental standards, put an end to existing violations and report on the measures taken."  *Id.* ¶ 149 (citations omitted).

The Swiss government opposed the initiative because "the liability regime was much stricter than that found in other legal systems and would therefore put Swiss companies at a disadvantage, would discourage investment by Swiss companies abroad and would overload the judicial system." *Id.* ¶ 150.  According to the Swiss Federal Council and Parliament, the initiative would require "Swiss courts … to rule on complex cases where a foreign company has caused damage abroad.  They would also have to apply Swiss law.  Not only would this place an excessive burden on our legal system, but Switzerland would also be violating internationally recognized legal principles if it explicitly subjected such cases to its own jurisdiction."  ECF No. 898-4 (*Popular initiative "Responsible businesses – protecting people and the environment"* (Nov. 29, 2020)) at 17.

The initiative failed.  Jan. 6, 2023 Müller Rep. ¶¶ 152–153.  Swiss law today contains no similar liability regime that would penalize Swiss companies for their actions abroad.  *Id.* ¶ 154. Switzerland's rejection of the amendment demonstrates a refusal to impose sweeping extraterritorial liability on Swiss companies.  To do so in this case, in the absence of a main perpetrator who could be held liable under Swiss law, would therefore constitute a radical expansion of the territorial limits expressly defined by Switzerland.

Professor Werro would have this Court ignore *Naït-Liman* because, under his reading, Plaintiffs may "choose whom to sue" under Article 50, and BNPP's connections with Switzerland provide a basis for suit.  Oct. 1, 2025 Werro Decl. ¶ 145.  But that argument incorrectly assumes that Article 50 provides a basis for suit against BNPP in the absence of a main perpetrator who could be liable under Article 41.  That proposition is contrary to Swiss case

law,[7] the official position of the Swiss government,[8] and the declaration of a former Swiss Federal Supreme Court Judge.[9]  Simply put, the overwhelming weight of Swiss legal authority establishes that because the Government of Sudan could not be liable under Article 41, BNPP cannot be liable as an accomplice under Article 50.

### 3. *Swiss Tort Law Does Not Permit Suit Against A Foreign Sovereign For Actions Taken In Its Official Capacity.*

Even if Swiss tort law could apply to extraterritorial actions, the Government of Sudan still could not be subject to liability in Switzerland as a main perpetrator under Article 41.  First, as former Swiss Federal Supreme Court Judge Romy explained, there is a distinction in Swiss law between the acts of a state in its sovereign capacity (*jure imperii*) and acts of a state operating as a private individual (*jure gestionis*).  July 21, 2023 Romy Rep. ¶ 31.  Acts of a foreign state in its sovereign capacity are immune from suit.  ECF No. 897 ("Aug. 27, 2025 Romy Decl.") ¶ 17.  Unlike the act of state doctrine under United States law, which the Second Circuit held does not apply to actions that violate *jus cogens* norms, the Swiss law of immunity extends to "military activities [and] acts analogous to expropriation or nationalization."  *Id.* ¶ 18 (citing Ex. 2, ATF 113 Ia 172 at reas. 3); *see also* Judgment of Grand Chamber ¶ 28 ("[T]he acts of torture had been perpetrated in the exercise of sovereign authority (*iure imperii*) and not under private law (*iure gestionis*)."); *cf. Fed. Republic of Germany v. Philipp*, 592 U.S. 169, 179–80 (2021) (recognizing that the international law of expropriation "does not cover expropriations of

---

[7] *See supra* section I.B.1.

[8] *See* Swiss Ambassador's Letter at 3 ("For Article 50(1) SCO joint and several liability to apply to an accomplice, there must be an underlying violation by a 'main perpetrator' who could be liable under Swiss tort law.").

[9] July 21, 2023 Romy Rep. ¶ 19 ("Assuming … that … Plaintiffs may base their claims against BNPP on Art. 50(1) CO …, Plaintiffs would have to prove and establish that the main perpetrator … would be liable towards the putative class members based on Art. 41 CO.").

property belonging to a country's own nationals" (citation omitted)).  The same would apply to the Plaintiffs' descriptions of the illicit acts committed by the Government of Sudan, which are acts of public power performed in its sovereign capacity.[10]  Aug. 28, 2025 Romy Decl. ¶ 19.

Second, regardless of whether immunity attaches, acts in the Government of Sudan's sovereign capacity also are not governed by Swiss private tort law, such as Articles 41 or 50. They are instead governed by public law, including treaties with foreign nations.  No such treaty applies here.  "[B]ecause Art. 41 CO is not applicable against [Sudan] for the alleged conduct at issue, Art. 50(1) CO cannot be used as an independent basis for liability against BNPP."  July 21, 2023 Romy Rep. ¶ 36.  This conclusion is supported by Swiss precedent, including the Hockey Rink Case, which held that a municipality was not subject to private Swiss tort law.  ECF No. 435-112 (Swiss Federal Supreme Court SCD 79 II 66, "Hockey Rink Case") at reas. 5.

Professor Werro's most recent declaration makes no attempt to dispute that the Government of Sudan would be immune from suit based on its actions in this case and instead argues only that immunity would not attach to BNPP.  Oct. 1, 2025 Werro Decl. ¶ 152.  Of course, BNPP does not argue for derivative immunity, but that the Government of Sudan's immunity defeats the existence of an actionable claim against a main perpetrator—an essential element of Plaintiffs' accomplice liability claim against BNPP.

Nothing in the Second Circuit's decision about the act of state doctrine and *jus cogens* norms forecloses this straightforward application of Swiss law.  *See Kashef v. BNP Paribas S.A.*, 2024 WL 1676355, at *2 (S.D.N.Y. Apr. 18, 2024) (*Kashef IV*).  Nor could it.  The Second

---

[10] Even if the acts were performed by Sudan in a *jure gestionis* capacity, the government could still invoke the principle of immunity from jurisdiction due to the lack of ties with Switzerland. Aug. 27, 2025 Romy Decl. ¶ 17.

Circuit's decision was issued long *before* Judge Nathan decided that Swiss law, not New York law, governs this action.  *See Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 57 (2d Cir. 2019) (*Kashef I*) ("In the Second Amended Complaint (the 'SAC'), Plaintiffs asserted twenty claims arising under New York tort law."); *Kashef v. BNP Paribas S.A.*, 442 F. Supp. 3d 809, 818 (S.D.N.Y. 2020) (*Kashef II*) ("The Court concludes that Swiss law governs this case.").  In other words, at the time the Second Circuit issued its decision, this case was not governed by Swiss law, and therefore nothing in the Second Circuit's decision could have determined the applicability of a Swiss-law immunity to the Government of Sudan, or the consequent lack of liability of BNPP.

> **B.    Plaintiffs Failed To Prove That BNPP Consciously Assisted The Government Of Sudan And Knew Or Should Have Know That It Was Contributing To The Government Of Sudan's Human Rights Violations.**

BNPP renews and expressly incorporates the argument from its Rule 50(a) motion that Plaintiffs failed to prove the second element of Article 50, under which Plaintiffs were required to prove that BNPP consciously assisted the Government of Sudan and knew or should have known that it was contributing to the Government of Sudan's human rights violations.  BNPP's Rule 50(a) Mot. at 24–27; *see also Kashef III*, 2021 WL 603290, at *2.  In short, it is a requirement that the main perpetrator and BNPP "culpably acted together."  Jan. 6, 2023 Müller Rep. ¶ 124.  Plaintiffs failed to provide sufficient evidence to establish this culpable cooperation.

The second element of Article 50 liability has several sub-elements:

*First*, Plaintiffs were required to prove that BNPP consciously assisted the Government of Sudan *in the illicit acts* that allegedly injured each Plaintiff.  Under Swiss law, one party "conscious[ly]" assists another when the two are involved in a "joint enterprise" with respect to the illicit act that constitutes "genuine solidarity" between the parties.  Jan. 6, 2023 Müller Rep. ¶ 125 n.98 (citing ECF No. 169-7 (Swiss Federal Supreme Court 55 [1929] II 310) at reas. 2).

The "mere plurality" of "several persons caus[ing] damage through different, independent acts" does not suffice. *Id.*

Plaintiffs' evidence at trial does not demonstrate any such "joint enterprise" between BNPP and the Government of Sudan to commit illicit acts against the Plaintiffs. Plaintiffs did not, and could not, put forward evidence that BNPP participated in violent acts by the Government of Sudan that injured Plaintiffs, that BNPP sought to further these violent acts in any fashion, or that it financed the purchase of weapons or military equipment. *See* Sept. 17 Trial Tr. at 561:12–16 (Testimony of Harry Verhoeven). The only evidence that Plaintiffs pointed to on this subject is BNPP's guilty plea to violations of U.S. sanctions on Sudan, but the guilty plea in no way shows that BNPP engaged in conduct that consciously assisted the Government of Sudan in harming the Plaintiffs. *See* PX 939. Indeed, the federal prosecutors in that case emphasized that those individuals "who suffered grievous harm at the direction of the regime[ ] in Sudan" "are not victims of this crime and cannot show that they were directly harmed by BNPP's conduct,"[11] and the sentencing court confirmed that those individuals could not seek restitution from BNPP "[b]ecause any injury [they] suffered or will suffer is not fairly traceable to BNPP's actions."[12] Furthermore, the evidence established that BNPP complied with Swiss and European sanctions that prohibited military transactions and would reasonably be expected to prevent harm to civilians. Oct. 6 Trial Tr. at 1170:22–24 (Maillard); Oct. 9 Trial Tr. at 1390:10–12 (Clamon).

---

[11] Transcript of Sentencing Hearing at 9:9-21, *United States v. BNP Paribas, S.A.*, No. 1:14-cr-00460 (LGS) (S.D.N.Y. May 1, 2015), ECF No. 55.

[12] *United States v. BNP Paribas S.A.*, 2015 WL 1962882, at *3 (S.D.N.Y. Apr. 30, 2015).

Nor can the violation of U.S. sanctions support this element because Swiss courts do not "borrow" legal norms from non-Swiss jurisdictions for purposes of Articles 41 or 50. This is consistent with, and reflective of, Swiss courts' restrictive approach to tort liability. *See, e.g.*, ECF No. 169-16 (Swiss Federal Supreme Court 4A_637/2015, "Third Person Car Crash Case") at reas. 4.2 ("It was precisely in the case of such indirect damage that a reasonable limitation of liability had to be made on the basis of the theory of adequacy."); *see also* July 21, 2023 Müller Report ¶ 37 (stating that "[t]he Swiss Federal Supreme Court is … extremely reluctant to recognise protective norms [capable of] establishing unlawfulness by conduct"); ECF No. 444-103 ("Jan. 6, 2023 Thevenoz Rep.") ¶ 15 ("[T]he potential civil liability of BNPP France for the alleged wrongdoings of BNPP Suisse is not governed by the principles of U.S. criminal law which were the basis for BNPP France accepting criminal liability for the breach of U.S. sanctions by BNPP Suisse.").

*Second*, any conscious assistance must—in reality—"contribute" to the illicit act. This participation must exceed mere facilitation or generalized assistance—it must consist of direct, significant, and concrete participation in the illicit acts at issue. *See* Locksmith Case at reas. 6.2.1 (identifying significant acts of participation in illicit act); *see also* Swiss Ambassador's Letter at 2 ("The application of Article 50(1) SCO also requires that the accomplice made a 'conscious cooperation' in the plaintiff's injury, meaning a willful and substantial assistance to the unlawful act that injured the plaintiff at issue, not generalized assistance to the perpetrator."). This Swiss law requirement is consistent with United States law. As the Supreme Court explained in *Twitter v. Taamneh*, "aiding and abetting is inherently a rule of secondary liability for specific wrongful acts." 598 U.S. 471, 494 (2023). "[I]t is not enough … that a defendant have given substantial assistance to a transcendent 'enterprise' separate from and floating above

all the actionable wrongs that constitute it.  Rather, a defendant must have aided and abetted …

another person in the commission of the actionable wrong."  *Id.* at 495 (emphasis added); *see

also Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 432, 444 (2025) (explaining that

an attenuated connection based in part on "sheer number and volume of U.S. dollar transactions"

"offers no discernable nexus between the [financial services] and the attacks").  Plaintiffs

presented no evidence at trial that BNPP participated directly, significantly, or concretely in any

alleged illicit acts giving rise to Plaintiffs' injuries.  To the contrary, Plaintiffs presented only a

generalized theory that BNPP's processing of financial transactions increased oil revenues to the

country that, in turn, independently chose to fund violent activities that caused additional injuries

to individuals in the country, which may have included Plaintiffs.  But Plaintiffs' expert

Dr. Verhoeven admitted that the Government of Sudan is the one that chose how to use its

increased revenue—including to fund its military—*not* BNPP.  Sept. 17 Trial Tr. at 561:12–16

(Verhoeven) ("Q. And it was the government of Sudan's decision to increase spending on the

military, right?  A. It was.  Q. That also wasn't BNPP's decision, right?  A. It wasn't.").

    *Third*, Plaintiffs were required to prove that BNPP knew or should have known that it

was contributing to the Government of Sudan's human rights violations.  *See Kashef III*, 2021

WL 603290, at *2.  Under Swiss law, a duty of care—specifying what a defendant "should have

known"—may arise through a contractual relationship or through operation of law.  *See, e.g.*,

Shooting Contest Case at reas. 4 (noting that an innkeeper has a "'sui generis' contract" with

guests requiring that each guest be protected from "harm to his health or physical safety"); *see

also* Jan. 6, 2023 Müller Rep. ¶ 128.  However, BNPP did not have a contractual relationship

with Plaintiffs, and Plaintiffs have not identified any duty of care that would arise by operation of

Swiss law.  *See* Jan. 6, 2023 Müller Rep. ¶ 69.  BNPP thus owed no duty of care toward the

24

Plaintiffs and, in the absence of such a duty, could not have acted negligently towards them. Accordingly, Swiss law requires evidence of BNPP's knowing participation in the injurious conduct. *See* ECF No. 170 ("Aug. 17, 2020 Roberto Supp. Reply Decl.") ¶¶ 15–18, 23 (citing Walter Fellmann, Andrea Kottmann, Roland Brehm); *see also* Jan. 6, 2023 Müller Rep. ¶¶ 108, 133–135. Plaintiffs failed to adduce any evidence at trial that BNPP had actual knowledge— much less intent (as required under Swiss law)—that it was substantially contributing to the specific illicit acts that the Government of Sudan allegedly committed against the Plaintiffs. *See* Sept. 17 Trial Tr. at 561:12–16 (Verhoeven).

In the alternative, Plaintiffs failed to present sufficient evidence to establish the second element under the charge given to the jury, which BNPP contends was erroneous as a matter of law. For the reasons discussed above, the evidence presented by Plaintiffs did not establish that BNPP "knew, or reasonably should have known, that the government of Sudan was engaged in human rights violations and that [BNPP's] activities would contribute to the government's ability to commit human rights violations." Oct. 16 Trial Tr. at 1625:19–22.

### C.    Plaintiffs Failed To Demonstrate By Sufficient Evidence That BNPP's Actions Were The "Natural And Adequate Cause" Of Their Alleged Injuries.

BNPP renews and expressly incorporates the argument from its Rule 50(a) motion that Plaintiffs failed to prove the third element of Article 50, that is, that BNPP's alleged conscious assistance was the "natural and adequate" cause of Plaintiffs' specific injuries. *See* BNPP's Rule 50(a) Mot. at 27–38; *Kashef III*, 2021 WL 603290, at *2. As this Court has consistently held since 2021, but abruptly reversed during trial, "natural" causation is "similar to the concept[] of 'but for'" causation in U.S. tort law, and "adequate" causation is "similar to the concept[] of … 'proximate'" causation. *See Kashef III*, 2021 WL 603290, at *6.

### 1. Natural Causation

"Natural causation is the logical (or scientific) relationship between the event giving rise to liability and the damage or loss:  an event is thus the natural cause of a result if it is one of the *sine qua non* conditions of the result.  There is accordingly a natural causal link between an event and a result if, without the event, the result would not have occurred."  Jan. 6, 2023 Müller Rep. ¶ 137(i).  As the Swiss Federal Supreme Court has stated, natural causation is not satisfied if "the damage would have occurred in full or to a lesser extent even without the [conduct]."  ECF No. 533-61 (Swiss Federal Supreme Court 4A_444/2010 of Mar. 22, 2011, "Boat Collision Case") at reas. 4.4.  That is, the defendant's conduct must have been "a necessary condition (*conditio sine qua non*) for the damage that has occurred," *id.* at reas. 2.1, such that the contribution of the conduct must be "indispensable for achieving … the final result," *id.* at reas. 4.4; *see also Kashef III*, 2021 WL 603290, at *6 (analyzing whether Plaintiffs' allegations were sufficient to show "but for" causation in considering the natural causation element).

Until the October 1 hearing on BNPP's oral Rule 50(a) motion, the Court and Plaintiffs (correctly) agreed that natural causation requires an analysis similar to but-for causation analysis in U.S. law.  In its order on BNPP's motion to dismiss back in 2021, for example, the Court stated that "natural" causation is "similar to the concept[] of 'but for'" causation in U.S. tort law, and considered whether Plaintiffs' allegations were sufficient to show "but for" causation. *Kashef III*, 2021 WL 603290, at *6.  Plaintiffs' expert Professor Werro has also expressly endorsed this comparison.  *See* Mar. 2, 2023 Werro Rep. ¶ 110 ("Although the[] concepts of [natural and adequate causation] roughly correspond to 'but-for' and 'proximate' causation in American law, Swiss law provides specific legal tests that must be applied.").  Professor Werro has stated that "[n]atural causation is based on the link between an act that actually occurred and

the harm," which "is a test of a condition '*sine qua non.*'" *Id.* ¶ 121. In his report, he quoted the Swiss Federal Supreme Court explaining that "[a]n act is the natural cause of a result if it is one of the sine qua non conditions of the result" and that "[t]o determine whether an act is the natural cause of an outcome, one must ask whether the outcome would recur if, all other things being equal, the conduct to be judged were removed. If it is very likely that it would not, this conduct is causal, because it is the sine qua non of the result." *Id.* (quoting BGE 138 IV I at 9) (emphasis omitted).

The Court's conclusion at the October 1 hearing that natural causation requires only reasonableness or foreseeability, rather than but-for analysis, is contrary to Swiss law and the prior holdings of this Court. *See* Oct. 1 Trial Tr. at 1076:15–18. *Adequate* causation is similar to proximate causation and involves a question of reasonableness and foreseeability. *See infra* section I.C.2. The Court cited the Coffeemaker Case to support its change of position, Oct. 1 Trial Tr. at 1076:5–19, but at no point in the Coffeemaker Case did the Swiss Federal Supreme Court hold otherwise. *See* ECF No. 813-8 (Swiss Federal Supreme Court 133 III 81, "Coffeemaker Case") at reas. 4.2.2.

Correctly understood, the jury could not find that BNPP's conduct naturally caused Plaintiffs' injuries if Plaintiffs' injuries would have occurred without BNPP's conduct—whether in full or to a lesser extent. That is because natural causation requires that the defendant's conduct be a necessary condition for each claimed injury. The Court's statement that "[n]atural causation does not mean that the defendant's assistance was required for the plaintiffs' injuries to have occurred at all in the first place," Oct. 1. Trial Tr. at 1086:1–3, directly contravenes the Swiss Federal Supreme Court's directive that natural causation means that the defendant's conduct must be a sine qua non condition of the claimed injuries. *See* Boat Collision Case at reas. 2.1.

No reasonable jury—properly instructed on Swiss law—could find that Plaintiffs proved natural causation here. Plaintiffs were required—but failed—to "prove (as a matter of fact) that without the Defendant[] … processing financial transactions for the [Government of Sudan] during the relevant period," each of the three Plaintiffs "would not have suffered the damage or loss that he or she has suffered." Jan. 6, 2023 Müller Rep. ¶ 138. To do this, Plaintiffs could not rely on the fungibility of money to prove that BNPP generally facilitated the GOS's activities. Instead, Plaintiffs had to prove that their individual injuries were the result of specific transactions processed by BNPP, and that, absent BNPP's actions, those injuries would not have occurred. *Id.* ¶¶ 138, 146. As the Swiss government explained, "there must be a specific causal link between the defendant's conduct and the plaintiff's individual injury"; "[b]asing liability on a general engagement with the perpetrator, without tying the bank's services to the specific plaintiff's injuries, would have no basis in Swiss law." Swiss Ambassador's Letter at 3.

Plaintiffs did not even attempt to establish the required specific causal link at trial. *See* Sept. 11 Trial Tr. at 27:13–15 (Pls.' Opening Statement) ("The evidence that we intend to offer does not suggest—well, excuse me—will not involve an inference that these three people were harmed because there was money."). There is no evidence that ties revenue from transactions that BNPP processed to any weapons, military equipment, or attacks carried out on Plaintiffs, or that demonstrates that such attacks would not have been carried out in the absence of such revenue. Oct. 6 Trial Tr. at 1170:22–24 (Maillard) ("Q. And to your knowledge, did BNP ever facilitate any transactions involving weapons or military equipment in Sudan? A. No, it did not."); *see also id.* at 1196:20–1197:3 (Dimitri Zenghelis) ("Sudan's oil reserves were not necessary for the funding of its military. … First of all, there were substantial non-oil reserves available to the government of Sudan to fund its military. And secondly, even if there were no

oil revenues available at all, it is very clear that the government of Sudan would have been perfectly able to fund its military spending at the levels attained over that period.").

To the contrary, non-oil related revenues far exceeded Sudan's military budget from 1997 to 2009, and also far exceeded Sudan's oil revenue that Plaintiffs seek to attribute to BNPP. *Id.* at 1197:4–8 (Zenghelis) ("Q. … For the period in question, 1997 through the 2000s, how did Sudan's non-oil revenues compare to its military spending?  A. Well, they were both rising over the period, but non-oil revenues were significantly higher than military spending."); DX PH (comparing Sudan non-oil revenues with military spending).  And even "after BNP was no longer involved in transactions involving oil with Sudan, Sudan was [presumably] still able to sell its oil," and generate revenue to fund the government.  Sept. 15 Trial Tr. at 248:17–20 (Cameron Hudson); *see also* Oct. 6 Trial Tr. at 1224:5–12 (Zenghelis) ("Q. … What does this chart tell you about whether BNPP's financial services were necessary for Sudan's oil revenues in 2010?  A. Well, if they were necessary, then oil revenues would have had to cease or fall very rapidly to zero, and yet what we see here is the trend in oil revenues is actually relatively flat. And we know that in terms of barrels of oil, Sudan was producing, distributing, and exporting oil at record levels throughout that period.").

And even when BNPP was involved in Sudanese transactions, the Sudanese government continued to sell oil in currencies other than the U.S. dollar—which demonstrates that U.S. dollar transactions were not necessary to the Government's oil sales.  Sept. 17 Trial Tr. at 556:10–12 (Verhoeven) ("Q. And you know for a fact, sir, that China did oil transactions with Sudan in different currencies, don't you?  A. It did carry out transactions in different currencies, yes."); *id.* at 573:9–10; Oct. 6 Trial Tr. at 1222:4–10 (Zenghelis) ("Q. … What other currencies are available and were, in fact, used by Sudan to trade oil with China?  A. So one can trade oil in

British pounds.  One can trade oil in Japanese yen, and one can trade oil in euros.  And indeed as you said, Sudan did, I believe, trade in all of those currencies especially after BNP Paribas left the scene in and around 2007.").

Instead, Plaintiffs sought to establish causation based on a generalized theory that BNPP's processing of financial transactions increased oil revenues to the country that in turn independently chose to fund violent activities that caused additional injuries to individuals in the country, which may have included Plaintiffs.  That radically expansive theory, based on speculation about the fungibility of money, would create liability for any company that operates and pays taxes in a foreign country where the government harms an individual.

Swiss law does not endorse such a limitless theory of causation.  Although the conduct in question need not be "the sole" cause of the injuries for natural causation to be satisfied, it must be the case that the injuries "could not have occurred" without the conduct in question.  Boat Collision Case at reas. 2.1.  A generalized theory that processing financial transactions increased the magnitude of the harm inflicted by the Government of Sudan is exactly the kind of theory that the Swiss Federal Supreme Court explained would not satisfy natural causation:  "if the damage would have occurred in full *or to a lesser extent* even without the [conduct]" then it would "not be its consequence and therefore not attributable" to the defendant.  *Id.* at reas. 4.4 (emphasis added).

For example, in the Unfair Competition Case, the Swiss Federal Supreme Court concluded that causation was lacking where the plaintiff claimed that it lost sales due to the alleged unfair business practices of the defendant, a competitor company, that had a similar name and contact information, and had hired its former employees.  *See* ECF No. 435-121 (DSFC 4A_311/2021 of February 3, 2022) at reas. 2.  The Swiss Federal Supreme Court agreed with the

lower court that the plaintiff failed to establish the natural causal link between the risk of confusion due to the competitor's practices and the drop in sales, as there were other causes for the drop in sales, and "hasty inferences" related to the risk of confusion did not prove that, without the defendant's conduct, the plaintiffs' "sales would not have fallen (or not in the same way; a sine qua non condition)." *Id.* at reas. 2, 3.2.1, 3.2.2 (citation omitted). Plaintiffs' theory is similarly generalized and based on unsupported inferences; their evidence does not establish that but for BNPP's conduct, they would not have been injured. To permit the imposition of liability without any showing of actual causation—as Plaintiffs urge—would violate BNPP's due process rights. *See Osorio v. Dole Food Co.*, 665 F. Supp. 2d 1307, 1345 (S.D. Fla. 2009) (refusing to enforce foreign judgment as violative of due process because "[b]asic fairness requires proof of a connection between a plaintiff's injury and a defendant's conduct").

Plaintiffs' theory is not only legally flawed, but it also fails to account for the fact that violence of the kind that injured these Plaintiffs long pre-dated BNPP's facilitation of trade with Sudan, and continued long after BNPP exited the Sudan-related business. *See infra* § I.C.2. In addition, none of the Plaintiffs was injured by the type of sophisticated weaponry Plaintiffs contend the Government of Sudan was able to procure with oil revenues. The evidence is clear that the Government of Sudan had access to airplanes, helicopters and the types of basic weaponry that were used to injure Plaintiffs long before BNPP facilitated transactions of any kind.

Moreover, even if such generalized assistance were sufficient to establish natural causation—and it is not—the timeline of events makes it impossible to tie several of the Plaintiffs' injuries to BNPP. For instance, Plaintiffs sought to recover for injuries related to attacks against Mr. Turjuman that occurred in 1998, *see* Sept. 18 Trial Tr. at 657:20–659:17, and

attacks that resulted in the death of Ms. Kashef's mother in 1989, *see* Sept. 26 Trial Tr. at 965:7–12.  But the U.S. sanctions at the heart of Plaintiffs' case were not enacted until November 1997, and according to Plaintiffs, the relevant government expenditure increases that were purportedly enabled by BNPP's provision of financial services resulting in increased oil revenues did not materialize until mid-1999.  *See* PX 939 at 5 (BNPP agreed to become sole correspondent bank in Europe in 1997); Sept. 17 Trial Tr. at 478:9–10 (Verhoeven) ("In August '99, Sudan becomes an exporter of oil[.]").  Thus, even under Plaintiffs' broad theory, no liability for these injuries would be possible.

Plaintiffs tried to salvage their theory of causation as to these early injuries by arguing that BNPP's services allowed the Government of Sudan to *import* oil before it started exporting oil.  *See* Oct. 1 Trial Tr. at 1098:23–1099:1 (Rule 50 Argument).  But there is no factual evidence in the record that foreign oil was somehow relevant to Mr. Turjuman's 1998 arrest or the death of Ms. Kashef's mother in 1989, or that BNPP was necessary for the Government to purchase oil.  Nor is there any evidence in the record that, before 1997 when U.S. sanctions were imposed, BNPP was somehow on notice that facilitating trade with Sudan would allegedly contribute to human rights abuses.

Plaintiffs failed to prove at trial that their injuries would not have occurred without BNPP's actions, and they therefore failed to establish natural causation.  In the alternative, Plaintiffs failed to present sufficient evidence to establish natural causation under the charge given to the jury, which BNPP contends was erroneous as a matter of law.  For the reasons discussed above, the evidence presented by Plaintiffs did not establish that "the human rights violations of the plaintiffs would not have occurred in the same way or in the same magnitude

without the banking and financing services provided by BNP Paribas." Oct. 16 Trial Tr. at 1626:24–1627:2.

### 2.    *Adequate Causation*

"[L]ike proximate cause, the requirement of adequate cause works as a limit on legal liability in an otherwise infinite chain of but-for causal effects." *Kashef III*, 2021 WL 603290, at *7. Adequate causation "serves as a corrective factor to the concept of causes in science, which may need to be restricted in order to be acceptable for legal responsibility." Swisscom Case at reas. 2.3.1. The Court "must consider not only all the circumstances of the case, but also the protective function of the norm and the types of circumstances that appropriately should give rise to liability." Jan. 6, 2023 Müller Rep. ¶ 137(ii). As the Court instructed the jury, if the "the link between [BNPP's] financial and banking services to the government of Sudan and the injuries suffered by the plaintiffs [was] too attenuated or remote, then causation [was] not adequate." Oct. 16 Trial Tr. at 1627:19–22; *see also Kashef III*, 2021 WL 603290, at *7 (explaining that adequate causation would not be satisfied where the chain of causation "rest[s] on mere conjecture" or "depend[s] on the intervention of multiple parties") (citations and quotations omitted).

Swiss courts have found adequate causation lacking where the defendant's actions were independent of actions and decisions by non-parties that directly caused plaintiffs' injuries. Jan. 6, 2023 Müller Rep. ¶ 137. In the Somatoform Disorder Case, for example, the Swiss Federal Supreme Court concluded that the plaintiff's pain disorder, which developed over several months due to overwork after he began taking care of his wife following her accident, could not be attributed to the party liable for the accident. *See* ECF No. 435-118 (DSFC 142 [2016] III 433) at reas. 4.7, 4.8. The Court explained that "the (natural) causal chain between the accident and

the Plaintiff's somatoform pain disorder is much longer" than if the alleged injury had been related, for example, to the immediate shock from witnessing the accident. *Id.* at reas. 4.6. The cause of the disorder was rooted in "additional burdens after the accident, which led to overwork," such that the disorder could "no longer be reasonably attributed to the liable party," as it would be "excessive to extend" liability that far. *Id.* at reas. 4.7, 4.8. "[S]uch a generalizing attribution would not lead to a reasonable limitation of liability." *Id.* at reas. 4.8.

As with the plaintiff's theory in the Somatoform Disorder Case, Plaintiffs' chain of causation here is too attenuated to satisfy adequate causation. There is no evidence of a substantial or direct link between the acts and injuries, as required under Swiss law. ECF No. 949. Instead, Plaintiffs' theory requires the jury to find that (1) BNPP processed financial transactions involving Sudanese entities, (2) those transactions increased the Sudanese government's overall revenues, (3) the government independently decided to use those increased revenues to increase military spending, (4) that increased military spending led to actions that harmed the trial Plaintiffs, and (5) the government would not have taken those actions without BNPP's involvement.

The contingent nature of this theory of liability is self-evident. The chain of causation depends on speculation regarding numerous independent decisions by independent actors, from third-party buyers of Sudanese oil to militia members to government officials. For instance, Plaintiffs' own expert testified that the Government of Sudan independently decided when, where, and how to use the funds it had at its disposal. Sept. 17 Trial Tr. at 561:2–16 (Verhoeven). But even if this long, attenuated chain could establish liability as a legal matter, the evidence at trial does not support it.

As Plaintiffs' witnesses testified, acts of violence in Sudan were widespread long before BNPP's dealings with Sudan and persisted long after BNPP withdrew from Sudan, to the present. *See* Sept. 26 Trial Tr. at 963:5–6, 965:8–11 (Kashef) (describing 1989 bombing of her village); *id.* at 987:16–988:1 (Ms. Kashef was ethnically targeted for arrest because she was a Black African from Darfur and that such persecution originated "a very long time ago"); Sept. 25 Trial Tr. at 933:16–20 (Abdalla) (attributing attack to an ethnic conflict between Arab peoples and the Sudanese African tribes from "way back then"); Sept. 15 Trial Tr. at 211:20–212:14, 213:14–219:4, 234:9–235:25 (Hudson) (discussing history of violence in Sudan before 1997 and after 2011). It is wholly speculative to say that the Government of Sudan would not have taken the actions that it took to harm Plaintiffs without BNPP's involvement.

The Swiss Federal Supreme Court rejected causation on similar facts in the Swisscom Case when it held that an internet service provider would not be liable under Article 50 even if its customers' internet use were considered to unlawfully infringe on the plaintiffs' copyrights. Swisscom Case at reas. 2.1, 2.3.2. The court held that there was "no adequate causal link" and no "concrete contribution to the direct copyright infringement" under these circumstances. *Id.* at 2.3.2. The court reasoned that recognizing causation under those circumstances would create improper "system liability" and would force the legislature to "provide a regulation … to combat copyright infringements on the Internet," but held that the "introduction of corresponding regulatory measures … has so far been waived." *Id.* So too here. Plaintiffs' theory of causation would impose de facto common law sanctions on Swiss financial institutions that the legislature of Switzerland expressly *rejected* in favor of targeted sanctions. *See* ECF No. 746 (BNPP's Mot. to Admit Evid. of BNPP's State of Mind re: Sanctions) at 8–10, 16–18. Notably, the Swisscom Case is more pertinent here than the Locksmith Case or others because it "is the most recent

officially published … decision rendered by the Swiss Federal Supreme Court with respect to Article 50(1) SCO" and "the involved third person acted within the framework of its business." Jan. 6, 2023 Müller Rep. ¶ 84.

In the alternative, Plaintiffs failed to present sufficient evidence to establish adequate causation under the charge given to the jury, which BNPP contends was erroneous as a matter of law. For the reasons discussed above, the evidence presented by Plaintiffs did not establish that "it was reasonably foreseeable that banking and financing services provided by a major international bank to the government of Sudan would result in a greater likelihood or greater intensity of human rights violations and thereby plaintiffs' damages." Trial Tr. at 1627:11–17. Instead, "the link between [BNPP's] financial and banking services ... to the government of Sudan and the injuries suffered by the plaintiffs is too attenuated or remote." Trial Tr: 1627:17–22.

### D.    Plaintiffs Failed To Provide Sufficient Evidence To Satisfy The Applicable Burden Of Proof For Each Element Of Their Case.

BNPP renews and expressly incorporates the argument from its Rule 50(a) motion that under any potentially applicable burden of proof, Plaintiffs failed to provide sufficient evidence. BNPP's Rule 50(a) Mot. at 39–41. Under either "full conviction" or "preponderant likelihood," ECF No. 951 ("Burden of Proof Order") at 3, BNPP is entitled to judgment as a matter of law. However, Swiss law dictates that each of the elements of the Swiss tort at issue, other than natural causation, be proven under the full conviction standard.

The default burden of proof in Swiss civil litigation—"full conviction" (meaning "strict proof")—applies to Plaintiffs' claims and damages, with the exception of natural causation. ECF No. 813-3 (Swiss Federal Supreme Court 130 [2004] III 321, "Insurance Contract Case") at para. 3.2; ECF No. 813-5 (Swiss Federal Supreme Court 4A_401/2023, "Delayed Stroke Case") at

para. 6.1.1; *see also* ECF No. 812 ("BNPP's Burden of Proof Br.") at 7–8.  As the Government of

Switzerland has explained, "Swiss jurisprudence is clear that the party alleging tort liability

under the Swiss Code of Obligations must prove every required element and that the standard for

civil tort liability is 'full conviction,' which is otherwise known as 'strict proof.'  Only with

respect to the element of natural causation may the 'preponderant likelihood' standard be

applied."  Swiss Ambassador's Letter at 3–4.  Most Swiss legal scholars regard proof under full

conviction as requiring a confidence level of at least 90%.  ECF No. 813-1 ("Aug. 1, 2025

Müller Rep.") ¶ 28.

      Contrary to the Court's prior ruling, Burden of Proof Order at 4, Plaintiffs did not

establish that an exception to the default standard is warranted as to the illicit act, conscious

assistance, or adequate causation elements of their claims, as Swiss law recognizes an exception

only "when, by the nature of the matter, strict proof is either impossible or cannot reasonably be

demanded."  Aug. 1, 2025 Müller Rep. ¶ 32 (quoting Ex. 3, Swiss Federal Supreme Court 149

[2023] III 218 at reas. 2.2.3; Ex. 4, Swiss Federal Supreme Court 148 [2022] III 134 at reas.

3.4.1; Ex. 5, Swiss Federal Supreme Court 148 [2021] III 105 at reas. 3.3.1.).  Swiss courts have

explained that "[m]ere difficulties in proving facts in a particular case do not justify an easing of

the burden of proof."  Insurance Contract Case at para. 3.2 (citing Swiss Federal Supreme Court

5C.175/1997 of 17 October 1997 at paras. 2 and 3); *see also* BNPP's Burden of Proof Br. at 10–

12.  And as for damages, the Swiss Code of Obligations allows courts to lower the burden, *see*

Art. 42(2) SCO, but only "where the nature of the damage makes strict proof objectively

impossible or cannot reasonably be demanded—placing the plaintiff in a state of evidentiary

necessity," Aug. 1, 2025 Müller Rep. ¶ 48 (quoting Ex. 6, Swiss Federal Supreme Court 147

[2021] III 463 at reas. 4.2.3; Ex. 7, Swiss Federal Supreme Court 4A_59/2024 of 20 December 2024 at reas. 5).

Plaintiffs, at best, established "[m]ere difficulties in proving facts" material to their case. Insurance Contract Case at para. 3.2. That is a reason to grant this motion for lack of sufficient evidence, not a justification to reduce the applicable burden of proof. "[E]videntiary necessity" justifying an "easing of the burden of proof" is "not established simply because a fact that could easily be directly proven cannot be shown due to the party's lack of evidence." *Id.*

The Court also erred in concluding that to satisfy the "preponderant likelihood" standard, there must be "compelling reasons supporting the accuracy of the allegation, without other possible explanations being of substantial importance or reasonably likely." Burden of Proof Order at 5; *see also* Oct. 16 Trial Tr. 1624:23–1625:1 (instructing the jury that "preponderant likelihood means that it is more likely than not that the event occurred, and that other explanations do not reasonably explain the event."). As the Swiss Federal Supreme Court has recognized, properly understood, the preponderant likelihood standard is a demanding one, not to be confused with the preponderance of the evidence standard under United States law. The proof necessary to satisfy the preponderant likelihood standard must be "compelling," "decisive," free from "serious doubts," and rendering other conclusions "[in]conceivable." *See* Insurance Contract Case at paras. 3.3–3.5; ECF No. 813-9 (Swiss Federal Supreme Court 4A_424/2020 (2021), "Employment Insurance Case") at reas. 4.1; *see also* Coffeemaker Case at reas. 4.2.2. The preponderant likelihood standard therefore requires a confidence level at or around 75%. *See* Delayed Stroke Case at para. 6.4 ("[A]ccording to commentary, a 51% degree of probability is not sufficient, and a clearly higher level must be used; a probability of 75% has been cited."); *see also* Aug. 1, 2025 Müller Rep. ¶¶ 37–39; BNPP's Burden of Proof Br. at 8–9.

However, even under the preponderant likelihood standard adopted by this Court, Plaintiffs failed to demonstrate that it is "more likely than not that the event occurred" and that "other explanations do not reasonably explain the event regarding each element of their claims. Oct. 16 Trial Tr. 1624:23–25. As explained above, Plaintiffs did not prove with sufficient evidence that without BNPP's provision of financial services, the Government of Sudan or its agents would not otherwise have committed the attacks that injured Plaintiffs.

## II.    The Court Should Grant A Remittitur Reducing The Award of Damages To Comply With Swiss Law.

BNPP renews and expressly incorporates the argument from its Rule 50(a) motion that Plaintiffs failed to provide the jury with a sufficient, non-speculative evidentiary basis on which to award their requested pecuniary and non-pecuniary damages. BNPP's Rule 50(a) Mot. at 41–46. The jury's multimillion-dollar award—consisting mostly of non-pecuniary "moral" damages for pain and suffering—is contrary to substantive Swiss law and should be substantially reduced under Federal Rule of Civil Procedure 59.

The U.S. Supreme Court has held that a court sitting in diversity, as here, must apply substantive damages limits on remittitur. The Court explained that the district court "determine[s] whether the jury's verdict is within the confines set by state law" and then, "by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 435 (1996) (citation omitted). Thus, "*Erie* precludes a recovery in federal court significantly larger than the recovery that would have been tolerated in state court." *Id*. at 431. In *Gasperini*, the Court held that a federal court sitting in diversity must apply New York's CPLR § 5501(c), which requires that "the appellate division shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation," instead of the federal "'shock the

conscience' test." *Id*. at 424.  The Supreme Court held that the district court erred because it did not apply this standard by "check[ing] the jury's verdict against the relevant New York decisions" as required by New York law.  *Id*. at 439.

The same logic applies to questions of foreign law.  *See Day and Zimmermann, Inc. v. Challoner*, 423 U.S. 3 (1975) (per curiam) (holding that federal courts must apply foreign law if properly determined to be applicable); *Garcia v. Chiquita Brands Int'l, Inc.*, 48 F.4th 1202, 1209 (11th Cir. 2022) (noting "that *Erie Railroad Company v. Tompkins* and its progeny instruct us that the substantive law of Colombia must be applied in the same manner as we would apply the substantive law of Texas or Florida").  Accordingly, district courts sitting in diversity have applied foreign law to damages calculations.  *See*, *e.g.*, *El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc.*, 2008 WL 11370041, at *12 (S.D. Tex. Feb. 12, 2008) (citing *Gasperini* and concluding that Mexican law governs the calculation of attorneys' fees "because their relation to the final judgment determines the amount of the award"); *Ellerton v. Ellerton*, 745 F. Supp. 2d 458, 465 (D. Vt. 2010) (applying Canadian law to the pain and suffering remedies sought by the plaintiff, including the cap on damages established by the Supreme Court of Canada); *Baird v. Bell Helicopter Textron*, 491 F. Supp. 1129, 1152 (N.D. Tex. 1980) (applying the "Canadian principles of damage calculation for non-pecuniary loss," including an upper limit on damages); *Mejias-Quiros v. Maxxam Prop. Corp.*, 108 F.3d 425, 428 n.1 (1st Cir. 1997) (explaining that a federal court would apply Puerto Rico's standard of review to a jury verdict if it departed from the federal standard, citing *Gasperini*).

A.    **Swiss Law Requires That Damages Awards Must Be Consistent With Awards In Similar Swiss Cases.**

Under Swiss law—where there are no juries—courts subject damages awards to far greater scrutiny than the federal "shock the conscience" standard, and as set forth above, this Court must apply the Swiss standard in considering BNPP's request for remittitur.

**Non-Pecuniary Moral Damages:**  Swiss law requires the court to review whether an award of moral damages "sets an unfair compensation amount that is manifestly too low or too high," and "whether the amount awarded takes sufficient account of the seriousness of the injury or whether it is disproportionate to the intensity of the moral suffering caused to the victim." Swiss Federal Supreme Court 129 IV 22; *see also* Nov. 14, 2025 Romy Decl. ¶¶ 31–40.  Swiss appellate courts conduct such an inquiry by comparing the award of moral damages by the trial court to the moral damages awarded by courts in similar cases.  Swiss Federal Supreme Court 129 IV 22.[13]  In addition, an essential part of Swiss law's substantive limitation on moral damages is that "[t]he determination of compensation for moral injury is a question of application of federal law, which the [reviewing] Court therefore examines freely."  *Id*.

Swiss courts consistently award significantly smaller sums for serious injuries than United States juries.  Nov. 14, 2025 Romy Decl. ¶¶ 36–40; *see generally* Ex. 8 (Hardy Landolt, Genugtuungsrecht, Band 2, 2013).  For example, the Swiss court awarded CHF 40,000 [US

---

[13] Courts in this district have previously applied a similar principle required by Singaporean law to the award of damages in a diversity case.  *See Matter of Energetic Tank, Inc*., 2024 WL 3952239, at *4 (S.D.N.Y. Aug. 27, 2024) (holding that "Petitioner may propose that the [guidelines compiling past damages awards by Singapore courts] will guide, if not govern, the instructions to the jury on the calculation of damages" because "Singapore courts refer to the Guidelines as precedent for past damages awards"), on reconsideration in part, No. 18-CV-1359 (LAP), 2024 WL 4451710 (S.D.N.Y. Oct. 9, 2024).

$44,400] to a young man who was abducted, kidnapped, and threatened with death.[14]  In general, the amount of damages for moral harm following the death of a spouse is in the range of CHF 30,000 [US $33,300] to CHF 50,000 [US $55,500]; the amount awarded to parents for the loss of a child and vice versa is in the range of CHF 20,000 [US $22,200] to CHF 30,000 [US $33,300]; and the amount awarded following the death of a brother or sister living in the same household is in the range of CHF 5,000 [US $5,550] to CHF 10,000 [US $11,100].[15]

Numerous sources confirm that there is no example in Swiss law of any award for moral damages ever exceeding CHF 250,000 [US $277,500]—let alone the multimillion-dollar awards given by the jury here.  Nov. 14, 2025 Romy Decl. ¶ 36; *see also* Ex. 8 (Hardy Landolt, Genugtuungsrecht, Band 2, 2013) at 374 (listing the highest compensation awarded by a Swiss court as CHF 250,000); Ernst Karner, *Quantification of Moral Damages in Personal Injury Cases*, Institute for European Tort Law, https://tinyurl.com/bders287 ("Highest award: approx. CHF 200,000").

**Pecuniary Damages:**  Swiss substantive law also prohibits the award of speculative pecuniary damages, including speculative future damages.  According to Article 42(1), the plaintiff must prove both the existence and the amount of economic loss.  Nov. 14, 2025 Romy Decl. ¶ 42. The court's analysis of pecuniary damages is guided by several principles.  First, Swiss law does not allow compensation that exceeds the actual loss suffered.  *Id*. ¶ 45.  Second, Swiss law bars damages for loss of opportunity to make a profit, which ultimately amounts to allowing compensation for loss based on an uncertain probability.  *Id*.; ECF 813-12 ("Hospital Headache

---

[14] Adapted from July 21, 2023 Müller Report ¶ 64 (citing Decision of Federal Supreme Court 129 [2003] IV 22 reas. 7.4 at 39).

[15] Adapted from July 21, 2023 Müller Report ¶ 63 (citing Heinz Rey/Isabelle Wildhaber, Ausservertragliches Haftpflichtrecht (5th ed. 2018), ¶ 589 et seq.).

Case"), ATF 133 III 462.  Third, the injured party must prove the existence and amount of the loss, and the calculation of the damages must be based on a detailed explanation of all the elements that constitute the claimed damages.  *Id*. ¶ 47.  Under substantive Swiss law, plaintiffs cannot rely on their own testimony alone to prove damages.  Rather, they must "present detailed allegations and evidence, such as proof of the actual market value of their houses or real properties in the area, proof of comparably valued property (for instance, proof of sale price for similar homes), expert opinions on the value of their real property and cattle, and proof of ownership."  *Id*.

In cases where the exact value of the damages cannot be quantified, the court can decide the amount by accounting for the normal course of events and the evidence of value offered by the injured party (Art. 42 (2) CO).  *Id*. ¶ 48.  But this does not give plaintiffs the right to claim any amount of damages without providing specific supporting information, and if the plaintiff fails to meet that burden, the court must deny compensation altogether.  *Id*. ¶ 49; s*ee also Sir Speedy, Inc. v. L & P Graphics, Inc*., 957 F.2d 1033, 1038 (2d Cir. 1992) (plaintiffs must "present evidence that provides the finder of fact with a reasonable basis upon which to calculate the amount of damages").

### B.    The Jury's Damages Awards Are Excessive And Far Exceed What Could Be Awarded By A Swiss Court.

The jury's damages awards here far exceed what could be awarded for these claims by Swiss courts.  *See* ECF No. 1004 (awarding Ms. Kashef $7.3 million, Mr. Abdalla $6.7 million, and Mr. Turjuman $6.75 million).  If allowed to stand, these awards would dwarf—by more than an order of magnitude—any damages awards that have ever been recognized by Swiss courts for similar claims.  *Erie* requires that the Court grant a remittitur and reduce the awards as set forth below.  And Second Circuit precedent allows a remittitur to reduce a jury award that "is intrinsically excessive in the sense of being greater than the amount a reasonable jury could have

awarded, although the surplus cannot be ascribed to a particular, quantifiable error." *Lore v. City of Syracuse*, 670 F.3d 127, 177 (2d Cir. 2012) (quoting *Shu-Tao Lin v. McDonnell Douglas Corp.,* 742 F.2d 45, 49 (2d Cir.1984)).

The Court instructed the jury on two types of damages: pecuniary damages and moral damages (which the Court called "pain and suffering" in its instruction). Oct. 16 Trial Tr. at 1628:12, 1629:3. The verdict form did not distinguish between the two types of damages, but based on the jury charge, any damages that are not pecuniary damages—for which Plaintiffs bore the burden of "proving the existence and amount" (Oct. 16 Trial Tr. at 1628:22–24)—must necessarily be "pain and suffering" damages, which are considered moral damages under Swiss law. *See* Nov. 14, 2025 Romy Decl. ¶ 30; ECF No. 895 (Pls. Prop. Jury Instructions) at 36 ("non-pecuniary damages … means moral harm such as pain, suffering, and emotional distress"); ECF No. 435-104 (Werro July 21, 2023 Decl.) ¶ 64, discussing "economic harm as well as … so-called 'moral harm'—the pain and suffering that result").

Even the most conservative interpretation of the verdicts shows that the jury awarded each of the trial Plaintiffs several million dollars in moral damages for pain and suffering, as well as unreasonable amounts for pecuniary damages that far exceed what the evidence could support. At a minimum, the Court should order a reduction in the awards as required by Swiss and U.S. law. *See Denman v. Sanders*, 2006 WL 452018, at *10 (S.D.N.Y. Feb. 24, 2006) (granting in part defendant's motion for remittitur upon finding the damages award excessive in comparison to other similar cases as required by New York law); *Cole v. Foxmar, Inc.*, 2024 WL 74902, at *1–3 (2d Cir. Jan. 8, 2024), *cert. denied*, 144 S. Ct. 2528, 219 L. Ed. 2d 1204 (2024), *reh'g denied*, 144 S. Ct. 2720 (2024) (affirming district court order setting aside jury award as excessive under

Vermont law without offering plaintiff opportunity to accept lower damages award through remittitur).

**Ms. Kashef:**  The jury awarded Ms. Kashef $7.3 million.  ECF No. 1004.  Ms. Kashef did not testify to any pecuniary losses, meaning the entire $7.3 million of the verdict is presumably attributable to moral damages.  Nov. 14, 2025 Romy Decl. ¶ 51.  At a minimum, the Court should reduce Ms. Kashef's total award to no more than $277,500 (equivalent of 250,000 CHF for moral damages)—the highest damages award ever granted or recognized by Swiss courts for comparable non-pecuniary injuries.  Ex. 8 (Hardy Landolt, Genugtuungsrecht, Band 2, 2013) at 374.

**Mr. Abdalla:**  The jury awarded Mr. Abdalla $6.7 million.  ECF No. 1004.  Mr. Abdalla speculated that the value of his home was "above $200,000" and the value of his livestock was "up to a million" dollars based on unstated assumptions about the current price of cattle and their reproduction rate.  Sept. 25 Trial Tr. at 909:12–15, 909:2–11.

Mr. Abdalla's claim that his cattle would be worth $1 million, based on unstated assumptions about their rate of reproduction and the price of cattle, amounts to a claim for speculative future profits, and cannot support any valid award of damages under Swiss law.  *See* Nov. 14, 2025 Romy Decl. ¶ 53.  But even if the jury fully credited his unsupported testimony, the remainder of the award constitutes at least $5.5 million in moral damages for pain and suffering.  *Id.*

At a minimum, the Court should reduce Mr. Abdalla's total award to no more than $477,500 ($200,000 pecuniary damages for his home, and $277,500 [equivalent of 250,000 CHF] for moral damages)—the highest damages award ever granted or recognized by Swiss courts for comparable injuries.

**Mr. Turjuman:** The jury awarded Mr. Turjuman $6.75 million. Mr. Turjuman testified that when he fled Sudan, he was forced to leave "everything behind," including "a lot of money" that he made from his "very successful business" and his two homes. Sept. 18 Trial Tr. at 653:23, 696:23–34.

Mr. Turjuman provided no documentary evidence to support the asserted value of his sugar business and the amount of money he left behind in Sudan, making any award for such losses necessarily speculative and unrecoverable under Swiss law. *See id*. at 709:5-6 (claiming that his sugar business made "around $200,000 to $300,000); *id*. at 707:19-708:8 (claiming that he left $300,000 in his account at Khartoum Bank); *see also* Nov. 14, 2025 Romy Decl. ¶ 52.

Mr. Turjuman also testified that the value of his house in Wau is between $300,000 and $500,000, *id.* at 703:15, and that the value of his house in Khartoum is between $2 million and $4 million, *id.* at 704:1. Mr. Turjuman's estimate that the value of his home in Khartoum could be as high as $4 million is grossly excessive in light of the trial evidence of economic conditions in Sudan. *See, e.g.*, Sept. 17 Trial Tr. at 559:20–22 (Sudan's GDP per capita in 2008 was only $532). Pecuniary damages are meant to compensate the victim, not to punish the defendant or enrich the plaintiff. *See* Oct. 16 Trial Tr. 1628:10-1629:2; *see also* Nov. 14, 2025 Romy Decl. ¶ 45. And as discussed below, Mr. Turjuman's lay valuation opinion for was an insufficient evidentiary basis for the jury to award any amount. *See* Sept. 18 Trial Tr. at 705:24–707:5 (Q: "So how do you know it's worth $300,000? A: "I asked them, some engineers … Q: Have you looked at any property values? A: Yeah. They told me the price would be like that. … A lot of people, they told me this is the estimate, you know, for the price."). At a minimum, the Court should reduce the jury's award of pecuniary damages for the loss of Mr. Turjuman's Khartoum

home to something more reasonable, in the range of $500,000, which is more in line with the claimed value of his other home and Mr. Abdalla's home.

Even if the jury fully credited Mr. Turjuman's speculative hearsay testimony, it must have awarded him the remainder, at least $1.6 million, in moral damages—far exceeding the highest amount ever awarded by a Swiss court.  *See* Nov. 14, 2025 Romy Decl. ¶ 52.

At a minimum, Mr. Turjuman's total award should be reduced to no more than $1,077,500 ($800,000 pecuniary damages for his two homes, and $277,500 [equivalent of 250,000 CHF] for moral damages)—the highest damages award ever granted or recognized by Swiss courts for comparable injuries.

### C. Plaintiffs' Damages Awards Should Be Reduced Or Eliminated Because They Failed To Present Required Expert Testimony On Damages.

Aside from the unreasonableness under Swiss law, as an evidentiary matter, Plaintiffs' failure to provide competent expert testimony supporting their damages—including medical causation testimony and real estate valuation testimony—further supports eliminating or reducing such damages for the reasons explained more fully in BNPP's prior motion for judgment as a matter of law, which BNPP fully incorporates by reference into this Motion.  *See* BNPP's Rule 50(a) Mot. at 44–46; *Washington v. Kellwood Co.*, 2015 WL 6437456, at *27 (S.D.N.Y. Oct. 14, 2015) ("[E]xpert testimony is required when an area of knowledge or some relevant causal connection at issue in a case is sufficiently beyond the knowledge of the lay juror." (quotation modified)); *Sullivan v. Saint-Gobain Performance Plastics Corp*., 2019 WL 12323305, at *2 (D. Vt. July 26, 2019) (noting that, pursuant to Rule 701 of the Federal Rules of Evidence, federal courts prohibit property owners from offering lay testimony about property values when they "lack[] first-hand information about valuation").

For instance, the sole evidence of the value of Mr. Turjuman and Mr. Abdalla's homes was their testimony. Even though federal courts may permit "property owners with personal knowledge about their property to offer lay opinions as to value," they are not allowed "'to merely repeat another person's valuation.'" *Sullivan*, 2019 WL 12323305, at *2–3 (quoting *Cunningham v. Masterwear Corp.*, 569 F.3d 673, 676 (7th Cir. 2009)). Mr. Turjuman had not resided in either of his houses since at least 2004, when he left Sudan. Sept. 18 Trial Tr. at 653:9–10; *see also id.* at 703:6–12 (testifying that both houses were confiscated by the Government of Sudan and sold). And Mr. Abdalla left Sudan in 2006. Because Mr. Turjuman and Mr. Abdalla had not owned or resided at their houses for nearly two decades or more, their estimates of the values of their houses were based only on hearsay and were insufficient to establish their claimed damages. *See Sullivan*, 2019 WL 12323305, at *2–3.

## III.    BNPP Is Entitled To Judgment As A Matter of Law For Plaintiffs' Claims Arising From Injuries That Occurred Before April 29, 2001 And A New Trial Excluding Claims For Such Injuries.

BNPP renews the argument from its Rule 50(a) motion that Plaintiffs' claims for injuries occurring before April 29, 2001 are time-barred under the applicable statute of limitations. BNPP's Rule 50(a) Mot. at 46–50. The Court should grant judgment as a matter of law and order a new trial that excludes these time-barred claims.

Under the New York borrowing statute, which applies to federal courts sitting in diversity in New York,[16] where claims accrued to non-New York residents outside of New York, such

---

[16] According to the *Erie* and *Klaxon* Doctrines, a federal court sitting in diversity must apply the choice of law rules of the state in which it sits for substantive questions, including statutes of limitations. *See Tilton v. NynEx.World Trade/Lamarian Sys., Inc.*, 1999 WL 476441, at *2 (S.D.N.Y July 8, 1999) ("Generally, for *Erie* purposes, statute of limitations questions are treated as substantive, and consequently, are controlled by state law."); *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 626–27 (2d Cir. 1998) ("Where jurisdiction rests upon diversity of citizenship, a federal court sitting in New York must apply the New York choice-of-law rules and statutes of

claims must be timely both under New York law and under the law of the place where the claims accrued. *See* N.Y. C.P.L.R. § 202 ("An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply."). Here, no Plaintiffs were New York residents at the time their causes of action accrued.[17] *See* ECF No. 241 ("Third Amended Compl.") ¶¶ 30–50e. Further, a tort claim accrues "at the time and in the place of the injury." *Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 324 F. Supp. 3d 387, 399 (S.D.N.Y. 2018) (citing *Glob. Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 526 (N.Y. 1999)). Here, the Plaintiffs were injured in Sudan. Accordingly, the timeliness of any claims for injuries asserted by Plaintiffs is governed by the shorter of the time periods provided for by New York and Sudanese law.

The maximum limitations period for any of Plaintiffs' claims is six years under New York law. *See* N.Y. C.P.L.R. § 213(1). The Second Circuit previously found that Plaintiffs' claims were timely under New York law, specifically N.Y. C.P.L.R. § 215(8)(a), which provided them with one year from May 1, 2015 (the date that BNP Paribas's judgment of conviction was entered) to commence a civil action. *Kashef I*, 925 F.3d at 62–63. But that holding answered

---

limitations."); *see also Guaranty Trust Co. v. York*, 326 U.S. 99, 109–11 (1945). The New York choice of law rules for limitations periods include the New York borrowing statute.

[17] Whether an individual was a New York resident or non-New York resident at the time the cause of action accrued—rather than at a later point in time—is the relevant consideration for purposes of applying N.Y. C.P.L.R. § 202. *See, e.g.*, *Dugan v. Schering Corp.*, 86 N.Y.2d 857, 859 (N.Y. 1995) ("Because decedent was not a resident of New York at the time the cause of action accrued, CPLR 202, the so-called 'borrowing' statute, requires dismissal of this suit unless it is timely under the Statute of Limitations of both New York and North Carolina[.]" (citation omitted)).

only half of the question under the borrowing statute, which also requires timeliness under *Sudanese* law.

Under Sudanese law, Section 159 of the Civil Transactions Act 1984 provides that (1) no action for damages/compensation may be heard after the lapse of five years from the date the injured person has known of (i) the injury and (ii) the person who caused the tortious act; and (2) in all cases, no action can be heard after the lapse of fifteen years from the date of the injury. *See* ECF No. 435-100 ("Sept. 30, 2022 Hassabo Rep.") ¶ 12; ECF 435-101 ("Mar. 2, 2023 Hassabo Decl.") ¶ 2. The 15-year time limit is absolute and cannot be subject to tolling or suspending under Sudanese law. Mar. 2, 2023 Hassabo Decl. ¶ 31. As a result, regardless of any tolling or other suspension provisions that may be provided by New York law, all claims for injuries that occurred at least fifteen years before the filing of the Complaint on April 29, 2016, *i.e.*, before April 29, 2001, are time-barred.

This Court previously held that the Second Circuit's limitations holding is the law of the case, and that "it would be arbitrary to apply Sudanese law when the courts of Sudan were not open to the Plaintiffs." *Kashef IV*, 2024 WL 1676355, at *5. However, as a matter of law, no such exception to the borrowing statute exists. *See Ins. Co. of N. Am. v. ABB Power Generation, Inc.*, 91 N.Y.2d 180, 187–88 (N.Y. 1997) (holding that Borrowing Statute does not require courts to determine whether jurisdiction is obtainable over a defendant in foreign state where a claim accrued). And the trial evidence undercuts core assumptions that formed the basis for the Court's decision at summary judgment.

Trial showed that Mr. Turjuman has been living in the U.S. since 2005, for the vast majority of the duration of the 15-year limitations period. He even received an LLM degree in the United States. Sept. 18 Trial Tr. at 645:14. There is nothing "arbitrary" about holding that he

should have filed his claims in a U.S. court well before the expiration of the Sudanese limitations period, even if the courts of Sudan "were not open to the Plaintiffs." Further, Mr. Turjuman presented no evidence at trial that Sudanese courts would have been inaccessible to him in the first place. If anything, the evidence shows that Mr. Turjuman was a Sudanese civil rights lawyer, and he would have both litigated statute of limitations as an attorney and adjudicated it as a judge. He is therefore time-barred from pursuing claims based on the arrests that occurred in 1998 and 2000—more than 15 years before he filed suit.

Similarly, Mr. Abdalla testified that the Janjaweed attacked his village in 1999—17 years before he filed suit. Sept. 25 Trial Tr. at 910:23–911:5. And he came to the U.S. in 2014—two years before he filed suit. *Id.* at 901:17–18. Mr. Abdalla provided no trial evidence excusing the untimeliness of his claims, and his claim based on the 1999 attack is time-barred.

Finally, Ms. Kashef testified that her mother was killed in or around 1989 in an "air raid" in South Kordofan. Sept. 26. Trial Tr. at 965:8–11. This claim is time-barred by the Sudanese statute of limitations.

BNPP is therefore entitled to judgment as a matter of law on Plaintiffs' claims arising from injuries suffered prior to April 29, 2001. These claims are untimely under Sudanese law and therefore cannot be brought in New York under the borrowing statute. Granting a new trial is the only way to remedy the fact that Plaintiffs presented time-barred claims to the jury because (1) the general verdict form makes it impossible to know to what extent the jury based its liability and damages findings on injuries that fall outside the limitations period and (2) evidence of those time-barred claims tainted the rest of the trial and cannot be undone without a new trial as to all claims. *Greenbaum v. Handelsbanken*, 67 F. Supp. 2d 228, 259–60 (S.D.N.Y. 1999) ("When two theories of liability are submitted to a jury, one of which is invalid, and the jury

returns a general verdict without specifying the discrete basis for its finding, the jury's entire verdict must be reversed.").

## CONCLUSION

The Court should grant judgment as a matter of law in favor of BNPP. In the alternative, BNPP requests a new trial or an order amending the judgment to reduce the excessive damages awards.

Respectfully submitted,

Dated: November 14, 2025
      New York, New York

*/s/ Barry H. Berke*
Barry H. Berke
Dani R. James
Michael Martinez
Matt Benjamin
David P. Salant

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
T: (212) 351-4000
bberke@gibsondunn.com
djames@gibsondunn.com
mmartinez2@gibsondunn.com
mbenjamin@gibsondunn.com
dsalant@gibsondunn.com

*/s/ Carmine D. Boccuzzi, Jr.*
Carmine D. Boccuzzi, Jr.
Abena Mainoo

CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
T: (212) 225-2000
cboccuzzi@cgsh.com
amainoo@cgsh.com

*Counsel for Defendant BNP Paribas S.A.*