**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ENTESAR OSMAN KASHEF, et al.,

       *Plaintiffs*,

         -against -

BNP PARIBAS S.A.,

       *Defendant*.

No. 1:16-cv-03228-AKH-JW

Hon. Alvin K. Hellerstein

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT BNP PARIBAS S.A.'S RULE 50(b) MOTION FOR JUDGMENT AS A MATTER OF LAW**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................... 1

LEGAL STANDARD ............................................................................... 2

ARGUMENT ............................................................................................ 3

    I.   Plaintiffs Met Their Burden Under the Proper Swiss Law Standards for Accomplice
       Liability............................................................................................ 4

      A.  The elements of Article 50(1) accomplice liability, as found by Judge Nathan, are
          law  of the case............................................................................ 4

      B.  Burden of Proof: The Court correctly applied the preponderant likelihood standard
          to all elements. ........................................................................... 5

      C.  Illicit Act and Damages: BNPP did not dispute that the Government of Sudan's
          genocidal campaign unlawfully injured the Plaintiffs. ................................. 7

      D.  Conscious Assistance: BNPP's executives admitted they were aware of the genocide
          and BNPP confessed it deliberately undermined the embargo aimed at halting that
          genocide. ................................................................................... 8

          1.  Plaintiffs presented overwhelming evidence that BNPP consciously assisted the
              GOS................................................................................... 8

          2.  BNPP's defenses to conscious assistance are contrary to the evidence and Swiss
              law................................................................................... 12

      E.  Plaintiffs proved that BNPP's assistance was a natural and adequate cause of
          Plaintiffs' injuries....................................................................... 17

          1.  Plaintiffs presented overwhelming evidence of natural causation....................... 18

          2.  Plaintiffs presented overwhelming evidence of adequate causation.................... 24

          3.  BNPP's defenses to causation are contrary to the evidence and to Swiss
              case law............................................................................. 27

    II.  BNPP Misstates the Swiss Law of Accomplice Liability................................. 31

      A.  The Court should apply the same Swiss law that applies in Swiss courts, not a
          tort reform project devised by BNPP. ....................................................... 31

      B.  Plaintiffs need only prove BNPP is liable as an accomplice under Article 50(1)—
          as BNPP conceded four years ago. ......................................................... 32

      C.  This Court need not adjudicate whether the GOS is subject to jurisdiction in
          a    Swiss court or liable under Article 41—as BNPP now concedes........................ 34

          1.  BNPP lacks any precedent for this newfound requirement. ............................. 34

2.  BNPP's argument on Swiss extraterritorial subject matter jurisdiction is irrelevant and frivolous. ...................................................................... 40

3.  BNPP's argument that the GOS has jurisdictional immunity in Switzerland is irrelevant and frivolous. ...................................................................... 42

4.  BNPP waived any argument that Swiss tort law does not apply, and regardless, genocide is unlawful under any choice of law. ..................................... 43

III.  BNPP's Remittitur Motion Should Be Denied ............................................. 44

A.  The damages were proportionate to the intensity of the suffering under the substantive Swiss standard. ......................................................................... 45

B.  There is no statutory cap on damages and the jury was not required to read Swiss case law and assess damages based on precedent, rather than evidence. ................... 47

C.  BNPP's attempt to impose judicially determined damages on a federal jury trial violates the Seventh Amendment. ............................................................. 50

D.  Plaintiffs' damages evidence did not require an expert. ............................... 52

IV.  All of Plaintiffs' Claims Are Timely ............................................................ 54

A.  The Second Circuit's decision on statute of limitations is binding under the mandate rule. ............................................................................................... 55

B.  Plaintiffs' claims are timely under New York's borrowing statute. ........................ 58

C.  BNPP's reliance on *dicta* is not a basis to revisit the timeliness of Plaintiffs' claims. ....................................................................................................... 60

CONCLUSION ............................................................................................................. 61

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ........................................................................................ 54

*Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*,
585 U.S. 33 (2018) ............................................................................................... 38, 39

*Baird v. Bell Helicopter Textron*,
491 F. Supp. 1129 (N.D. Tex. 1980) ............................................................................ 49

*Baiul v. NBC Sports*,
No. 15-CV-9920 (KBF), 2016 WL 1587250 (S.D.N.Y. Apr. 19, 2016) .......................... 43

*Bodner v. Banque Paribas*,
114 F. Supp. 2d 117 (E.D.N.Y. 2000) ........................................................................... 59

*Byrd v. Blue Ridge Rural Elect. Coop., Inc.*,
356 U.S. 525 (1958) .................................................................................................... 51

*Call Center Technologies, Inc. v. Interline Travel & Tour, Inc.*,
622 Fed. App'x 73 (2d Cir. 2015) ................................................................................. 57

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*,
526 U.S. 687 (1999) .................................................................................................... 50

*Connelly v. Cnty. of Rockland*,
61 F.4th 322 (2d Cir. 2023) ........................................................................................... 2

*DLC Mgmt. Corp. v. Town of Hyde Park*,
163 F.3d 124 (2d Cir. 1998) .......................................................................................... 3

*Dupree v. Younger*,
598 U.S. 729 (2023) ...................................................................................................... 3

*Elgin Sweeper Co. v. Melson Inc.*,
884 F. Supp. 641 (N.D.N.Y. 1995) ............................................................................... 42

*Ellerton v. Ellerton*,
745 F. Supp. 2d 458 (D. Vt. 2010) ............................................................................... 49

*Galdieri-Ambrosini, v. Nat'l Realty & Dev. Corp.*,
136 F.3d 276 (2d Cir. 1998) ........................................................................................ 53

iii

*Gasperini v. Ctr. for Humanities, Inc.*,
   518 U.S. 415 (1996) ........................................................................................ 45

*Gonzalez-Marin v. Equitable Life Assur. Soc. of U.S.*,
   845 F.2d 1140 (1st Cir. 1988) .................................................................. 51, 52

*In re Coudert Bros. LLP*,
   809 F.3d 94 (2d Cir. 2015) ............................................................................ 56

*In re Kingate Mng't Ltd Litig.*,
   746 Fed. App'x 40 (2d Cir. 2018) ................................................................. 56

*In re PCH Assocs.*,
   949 F.2d 585 (2d Cir. 1991) ............................................................................ 5

*In re Sanford Fork & Tool Co.*,
   160 U.S. 247 (1895) ........................................................................................ 56

*In re SVB Fin. Grp.*,
   No. 23-10367 (MG), 2025 WL 2751584 (Bankr. S.D.N.Y. Sept. 29, 2025) ................... 31, 50

*ING Global v. United Parcel Serv. Oasis Supply Corp.*,
   757 F.3d 92 (2d Cir. 2014) ............................................................................... 3

*Jean v. Dorelien*,
   431 F.3d 776 (11th Cir. 2005) ........................................................................ 59

*Kashef v. BNP Paribas SA*,
   2024 WL 1676355 (S.D.N.Y. Apr. 18, 2024) ....................................... Passim

*Kashef v. BNP Paribas S.A.*,
   925 F.3d 53 (2d Cir. 2019) ................................................................... Passim

*Kashef v. BNP Paribas SA*,
   316 F. Supp. 3d 770 (S.D.N.Y. 2018) ........................................................... 58

*Kashef v. BNP Paribas SA*,
   No. 16-CV-3228 (AJN), 2021 WL 603290 (S.D.N.Y. Feb. 16, 2021) ................ Passim

*Knipe v. Skinner*,
   999 F.2d 708 (2d Cir. 1993) ........................................................................... 58

*LaForest v. Autoridad de Las Fuentes Fluviales de Puerto Rico*,
   536 F.2d 443 (1st Cir. 1976) .................................................................. 51, 52

*Matter of Energetic Tank, Inc.*,
  2024 WL 3952239 (S.D.N.Y. Aug. 27, 2024)..................................................49

*Manley v. AmBase Corp.*,
  337 F.3d 237 (2d Cir. 2003) ...........................................................................3

*Marshall v. Perez Arzuaga*,
  828 F.2d 845 (1st Cir.1987) ...........................................................................51

*Mejias-Quiros v. Maxxam Property Corporation*,
  108 F.3d 425 (1st Cir. 1997) ..........................................................................49

*Muia v. Brookview Rehab Funding, LLC*,
  No. 10-CV-1315, 2012 WL 1014753 (N.D.N.Y. Mar. 23, 2012)...................57

*Norex Petroleum Ltd. v. Blavatnik*,
  16 N.E.3d 561 (N.Y. 2014) .............................................................................58

*Orthodox Jewish Coal. of Chestnut Ridge v. Vill. of Chestnut Ridge, New York*,
  No. 19-CV-443 (KMK), 2021 WL 3605041 (S.D.N.Y. Aug. 13, 2021) .................57

*Park v. Kim*,
  91 F.4th 610 (2d Cir. 2024) ............................................................................40

*Reed Constr. Data Inc. v. McGraw-Hill Companies Inc.*,
  49 F. Supp. 3d 385 (S.D.N.Y. 2014) ..............................................................43

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000) ....................................................................................2, 3

*Santos v. Dist. Council of N.Y. & Vicinity of United Brotherhood of Carpenters*,
  1978 WL 1632 (S.D.N.Y. May 1, 1978) .........................................................57

*S.E.C. v. Amerindo Inv. Advisors*,
  639 F. App'x 752 (2d Cir. 2016) .....................................................................56

*Santos v. Dist. Council of N.Y. & Vicinity of United Brotherhood of Carpenters*,
  No. 75-CV-4355, 1978 WL 1631 (S.D.N.Y. Feb. 23, 1978) ..........................57

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
  282 U.S. 555 (1931) ........................................................................................52

*Strauss v. Douglas Aircraft Co.*,
  404 F.2d 1152 (2d Cir. 1968) .........................................................................56

*Sullivan v. Saint-Gobain Performance Plastics Corp.*,
  No. 5:16-cv-125, 2019 WL 12323305 (D. Vt. July 26, 2019) ................................................. 53

*Tehran-Berkeley Civil & Env't Eng'rs v. Tippetts-Abbett-McCarthy-Stratton*,
  888 F.2d 239 (2d Cir. 1989) ................................................................................................ 55

*Trott v. Deutsche Bank, AG*,
  No. 20 CIV. 10299 (DEH), 2024 WL 1313040 (S.D.N.Y. Mar. 26, 2024) ........................... 51

*Twitter, Inc. v. Taamneh*,
  598 U.S. 471 (2023) ............................................................................................................. 13

*United States v. Fernandez*,
  516 Fed. App'x 34 (2d Cir. 2013) ....................................................................................... 40

*United States v. Quintieri*,
  306 F.3d 1217 (2d Cir. 2002) ......................................................................................... 55, 57

*United States v. Sealed Defendant One*,
  49 F.4th 690 (2d Cir. 2022) ................................................................................................ 60

*Virgin Atl. Airways v. Nat'l Mediation Bd.*,
  956 F.2d 1245 (2d Cir. 1992) ................................................................................................ 5

*Warfaa v. Ali*,
  1 F. 4th 289 (4th Cir. 2021) ................................................................................................ 59

*Watson v. Tarpley*,
  59 U.S. 517 (1855) .............................................................................................................. 42

*Wells Fargo Fin., Inc. v. Fernandez*,
  No. 98 CIV. 6635 (SAS), 2001 WL 345226 (S.D.N.Y. Apr. 9, 2001) ................................... 48

*Wills v. Amerada Hess Corp.*,
  379 F.3d 32 (2d Cir. 2004) .................................................................................................. 54

**Statutes**

U.S. Const., amend. VII ..................................................................................................... 50, 51

28 U.S.C. § 1332(d)(2) ........................................................................................................... 42

*Sudan Peace Act*,
  Pub. L. 107-245, 116 Stat. 1505 ......................................................................................... 11

**Rules**

Fed R. Civ P. 44.1 ............................................................................................... 32, 44

Fed R. Civ P. 50 .................................................................................................Passim

Fed R. Civ P. 59 .................................................................................................Passim

N.Y. C.P.L.R. § 202 ........................................................................................ 54, 58, 60

N.Y. C.P.L.R. § 215(8) ................................................................................... 54, 57, 60

N.Y. C.P.L.R. § 215(8)(a) .......................................................................... 55, 56, 58, 59

**Other Authorities**

Convention on the Prevention and Punishment of the Crime of Genocide,
    78 U.N.T.S. 277, 277 (Dec. 9, 1948) ..................................................................... 43

**Swiss Authorities**

Article 41 CO .....................................................................................................Passim

Article 50(1) CO ................................................................................................Passim

Article 51 CO ....................................................................................................... 36, 37

Article 1 Swiss Civil Code ........................................................................................ 39

*Boat Collision Case*,
    4A_444/2010 (2011) .......................................................................................... 20, 28

*Carpenter's Strike Case*,
    57 II 417 (1931) .................................................................................................. 13, 24

*Coffeemaker Case*,
    133 III 81 (2006) .................................................................................................... 5, 6

*Gunshot Case*,
    132 II 117 (2006) ................................................................................................ 49, 50

*Hockey Rink Case*,
    79 II 66 (1953) ..................................................................................................... 35, 36

*Locksmith Case,*
  4A_185/2007 (2007) ........................................................................ 13, 25, 28, 35

*Nait-Liman,*
  4C.379/2006 (2007) ................................................................................. 40, 41

*Rediffusion Case,*
  107 II 82 (1981) ........................................................................................ 15, 33, 35

*Shoulder Injury Case,*
  8C_331/2020 (2021) ...................................................................................... 11

*Swisscom Case,*
  145 III 72 (2019) ................................................................................. Passim

*Vehicular Homicide Case,*
  131 IV 145 (2005) ...................................................................................... 20, 28

*Whiplash Case,*
  147 V 161 (2021) ........................................................................................ 17, 20, 27

*Work Contract Case,*
  130 III 362 (2004) ..................................................................................... 36, 37, 38

126 II 145 (2000) ............................................................................................. 43

129 IV 22 (2002) .................................................................................... 45, 47, 49, 50

## PRELIMINARY STATEMENT

In 2014, BNPP confessed that it conspired with Sudan's dictatorship to undermine U.S. sanctions "aimed at halting the genocide." *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 55 (2d Cir. 2019) ("*Kashef II*"); *see also, e.g.*, PX 939, Final Version of Bank's Stipulated Statement of Facts ("SSOF"). At trial, things got worse for the Bank. Its executives confessed they "knew when [they] were doing the financing that the government of Sudan was guilty of human rights violations." Maillard, Trial Tr. (Oct. 6, 2025) at 1181:7-10. Its documents confirmed that BNPP laundered well-over $10 billion in illicit funds. Fogarty, Trial Tr. (Sept. 22, 2025) at 799:23-25; 800:18-22. And they revealed that its co-conspirator, the Government of Sudan ("GOS"), spent those crime proceeds on a "war" against the Black African population that was "absorbing the country's foreign currency reserves" as fast as BNPP could launder them. PX 47.

Meanwhile, the Bank's defense failed to refute that BNPP rescued the GOS from collapse in 1997; failed to dispute that the GOS committed genocide; and failed to challenge that Plaintiffs were victims of that genocide. In fact, BNPP conceded that Plaintiffs suffered "horrible, horrible things," Trial Tr. (Oct. 16, 2026) at 1558:11-19, and that "the scale of that pain and suffering" was "staggering," *id.* at 33:12-19. Instead, the defense vacillated between arguing the survivors should thank BNPP for funding their genocidal dictatorship (touting the wonders of gum arabic) and claiming that the victims would have been raped or killed anyway, so BNPP can't be blamed for funding the slaughter. In the end, the jury sided with the Plaintiffs.

Unable or unwilling to defend on the merits, BNPP's only hope is to set aside the jury verdict through fantasmic counterfactuals, long-debunked legal arguments, and a last minute bid to rewrite Swiss tort law into a safe haven for genocide financiers. It is a fitting strategy for a felon convicted of falsifying business records. But it will not work.

1

BNPP's motion largely ignores the proper Swiss-law elements that governed trial, claiming the evidence was insufficient under a set of resurrected strawman "requirements" its own expert admitted are not actual "elements articulated by the Swiss courts." *Kashef v. BNP Paribas SA*, No. 16-CV-3228 (AJN), 2021 WL 603290, at *4 (S.D.N.Y. Feb. 16, 2021) ("*Kashef IV*").

The Court correctly instructed the jury consistent with the law of the case. And Plaintiffs' month-long mountain of evidence—including contemporaneous BNPP records, expert testimony, and harrowing first-hand accounts—overwhelmingly satisfies each element under the "preponderant likelihood" standard.

BNPP's damages and timeliness objections are either waived, legally incorrect, or factually unsupported. The jury's verdict was firmly grounded in the record and the damages were proportionate to the grievous injuries inflicted by the genocidal campaign BNPP knowingly enabled. The motions should be denied in their entirety.[1]

## **LEGAL STANDARD**

A Rule 50(b) motion "may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." *Connelly v. Cnty. of Rockland*, 61 F.4th 322, 325 (2d Cir. 2023).[2] In deciding a motion for judgment as a matter of law, a court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133,

---

[1] Plaintiffs set forth the factual record for each element in the argument below and therefore dispense with a separate statement of facts, but include as an Appendix, charts of key, non-exhaustive evidence supporting each element of Art. 50(1) CO.

[2] Unless otherwise indicated, internal citations, alterations, and quotation marks are omitted from this brief.

150 (2000). "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151. A renewed motion for judgment as a matter of law may not be granted except to prevent "manifest injustice," which "exists where a jury's verdict is wholly without legal support." *ING Global v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir. 2014).

Under Rule 59, the Court may grant a new trial only if it has concluded "that the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice, *i.e.*, it must view the jury's verdict as against the weight of the evidence." *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003) (cleaned up). "A court considering a Rule 59 motion for a new trial must bear in mind, however, that the court should only grant such a motion when the jury's verdict is 'egregious.'" *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998) (cleaned up).

## **ARGUMENT**

A New York federal jury found BNPP liable for aiding and abetting human rights abuses under Swiss law—and yet the Bank's principle objection is that the Swiss courts lack jurisdiction to hear a hypothetical case against the GOS. That disconnect—between fact and hypothetical, case law and concoction—undermines BNPP's entire motion. BNPP devotes reams of paper arguing Plaintiffs presented insufficient evidence to prove so-called elements never articulated by any Swiss court and twice rejected by this Court. But a Rule 50 motion is not the proper vehicle to re-assert legal arguments resolved in summary judgment and thus preserved for appeal. *See Dupree v. Younger*, 598 U.S. 729, 735–36 (2023). Nor is a Rule 59 motion. Rule 59 concerns whether "the jury's verdict [was] against the weight of the evidence," *Manley*, 337 F.3d at 245, not whether the Court should revisit previously rejected legal standards or reconsider its Swiss-law rulings.

3

Plaintiffs will rebut this motion in four parts. First, Plaintiffs will demonstrate under the law of the case—and controlling Swiss precedent—that the evidence more than met Plaintiffs' burden (Section I). Plaintiffs will then demonstrate that BNPP's effort to rewrite Swiss tort law on the eve of trial, through a political proxy, directly contradicts both Swiss case law and BNPP's own prior stipulations (Section II). Plaintiffs next demonstrate that the damages were proportionate to the heinous injuries (Section III) and that BNPP's statute-of-limitations is both forfeited and foreclosed by the Second Circuit's decision that Plaintiffs' claims are all timely (Section IV).

## I.    Plaintiffs Met Their Burden Under the Proper Swiss Law Standards for Accomplice Liability

### A.    The elements of Article 50(1) accomplice liability, as found by Judge Nathan, are law of the case.

In 2021, this Court held that Article 50(1) creates accomplice liability for contributing to the unlawful acts of a third party. *Kashef IV*, 2021 WL 603290, at *2. The Court set forth the three elements of Article 50 accomplice liability, when it "adopt[ed] Plaintiffs' expert's descriptions of the applicable Swiss law" and denied BNPP's motion to dismiss. *Id.* In its motion for partial reconsideration, BNPP then stipulated that the Court had correctly articulated the elements necessary to prove Plaintiffs' claims:

> To state a claim for secondary liability under Article 50(1) of the Swiss Code of Obligations, a plaintiff needs to allege that "(1) a main perpetrator committed an illicit act, (2) the accomplice consciously assisted the perpetrator and knew or should have known that he was contributing to an illicit act, and (3) their culpable cooperation was the natural and adequate cause of the plaintiff's harm or loss."

ECF No. 198, Defs.' Mot. for Partial Recon., at 2 (quoting *Kashef IV*, 2021 WL 603290, at *2).

The Court properly instructed the jury on these elements:

- First, that the government of Sudan, through its agencies and companies, or through paramilitary organizations, such as the Janjaweed, committed gross human rights violations;

- Second, that Paribas knew or should have known that the banking and financial services it was providing to the government of Sudan was contributing to the government of Sudan's human rights violations; and

- Third, that Paribas' banking and financial services to the government of Sudan were a natural and adequate cause of each plaintiff's injuries and losses.

Trial Tr. (Oct. 16, 2025) at 1624:12-21.

These elements—and the Court's prior interpretation of them—are law of the case. *See In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991) (holding a decision on an issue of law is "binding precedent" in subsequent stages of the same litigation). For Rule 50 and Rule 59 purposes, the sufficiency of the evidence must be tested under these elements—BNPP fails to demonstrate any basis to depart from the law of the case. *See Virgin Atl. Airways v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (holding a court may only set aside a prior legal ruling when there has been "an intervening change of controlling law," new evidence becomes available, or there is a "need to correct a clear error or prevent manifest injustice.").

**B. Burden of Proof: The Court correctly applied the preponderant likelihood standard to all elements.**

BNPP renews its challenge to the Court's prior Burden of Proof Order, ECF No. 951. *See* Mot. at 36-39; *see also* Trial Tr. (Oct. 10, 2025) at 1462:12-16 ("THE COURT: I resolved that [issue of burden of proof] in an order" and dismissing objections). But the time to move for reconsideration has long passed. And BNPP provides no new reasons for the Court to reconsider its holding.

The Court correctly held that the preponderant likelihood standard applied to all elements, heeding the Swiss Supreme Court's instructions in the *Coffeemaker Case*, Swiss Sup. Ct. 133 III 81 at 4.2.2, p. 89 (2006), ECF No. 813-8. There the Swiss high court held that the preponderant likelihood standard applies to any element of any civil claim "when, due to the nature of the case,

strict proof is not possible or cannot reasonably be required, in particular if the facts alleged by the party bearing the burden of proof can only be established indirectly or by circumstantial evidence." This precondition—the need for circumstantial evidence—is called a "*Beweisnot*."

As Professor Werro explained, this case presents a *beweisnot* triggering the preponderant likelihood standard for all elements. *See* ECF No. 800, July 18, 2025 Declaration of Prof. Franz Werro ("Jul. 18, 2025 Werro Decl.") ¶¶ 23-39. Circumstantial evidence was necessary to prove the first element (an illicit act by the GOS): "In a country ruled by a military dictatorship and embroiled in a civil war, it would be unreasonable to expect that the Plaintiffs could obtain direct evidence from Sudan." *Id.* at ¶ 23. The second element—conscious assistance—also required circumstantial proof: "proving that the bank should have known it was contributing to human rights abuses necessarily requires inferences drawn from circumstantial evidence." *Id.* at ¶ 26. BNPP, moreover, falsified records and redacted documents (purportedly due to Swiss bank secrecy), further underscoring the need for circumstantial proof, because direct evidence was destroyed or concealed. *Id.* As for causation, BNPP concedes that natural causation is subject to the preponderant likelihood standard. ECF No. 812, Def's Mem. of Law Re: Swiss Law Burden of Proof and Proof of Asylum Status, at 12. And adequate causation—which turns largely on reasonableness and foreseeability—required drawing the same circumstantial inferences from the context of BNPP's actions and from the Bank's tampered records. *See* Jul. 18, 2025 Werro Decl. ¶¶ 38-39. Finally, the same predominance standard applies to damages, which, under Article 41(2), do not require strict proof. *Id.* ¶ 42.

The Court's jury charge on the predominant likelihood standard, Trial Tr. (Oct. 16, 2025) 1624:23-1625, is squarely in line with the ways the test has been articulated by the Swiss Supreme Court, *see* Jul. 18, 2025 Werro Decl. ¶¶ 12-18. In contrast, BNPP insists the jury charge should

have been larded with a string of adjectives that would have made this standard even more stringent than proof beyond a reasonable doubt. Mot. at 38. Worse still, BNPP blithely claims that "[t]he preponderant likelihood standard therefore requires a confidence level at or around 75%." *Id.* But the Bank fails to mention that in 2021, the Swiss Supreme Court expressly held that its "case law renounces using percentages of probability, unlike legal scholars who propose a percentage of probability significantly higher than 51% for preponderant likelihood." ECF No. 819-1, *Shoulder Injury Case*, Swiss Sup. Ct., 8C_331/2020 (2021). Once again, BNPP's willingness to disregard Swiss legal precedent is on full display.

In any event, BNPP does not explain how this supposed different burden of proof actually affected the jury's verdict, merely stating that "[a]s explained above" the evidence was insufficient under their preferred standard. Mot. at 39. That conclusory statement falls short of their burden to show a "complete absence of evidence" (to support a Rule 50 motion) or how the verdict was "egregious" (to support a Rule 59 motion). The preponderant likelihood standard was properly charged and Plaintiffs met that burden.

### C. Illicit Act and Damages: BNPP did not dispute that the Government of Sudan's genocidal campaign unlawfully injured the Plaintiffs.

At trial, BNPP never contested that the GOS committed a genocidal campaign of human rights abuses against Plaintiffs and their communities. The Bank never disputed that the Plaintiffs were grievously injured by the GOS or its agents. Nor did the Bank dispute that the genocide was unlawful. Because BNPP's motion does not challenge the first (illicit acts) and fourth (resulting damages) elements, these elements are conceded. In any event, the record is full of support for each of those elements. *See* Appendix, Element 1 Chart (key, non-exhaustive evidentiary support for illicit acts); *id.*, Element 4 Chart (key, non-exhaustive evidentiary support for damages); *see also infra* at III.D (covering Plaintiffs' evidence for damages).

7

**D. Conscious Assistance: BNPP's executives admitted they were aware of the genocide and BNPP confessed it deliberately undermined the embargo aimed at halting that genocide.**

BNPP dedicates only one paragraph to the proper Swiss law standard: "that BNPP 'knew, or reasonably should have known, that the government of Sudan was engaged in human rights violations and that [BNPP's] activities would contribute to the government's ability to commit human rights violations.'" Mot. at 25 (quoting Trial Tr. (Oct. 16, 2025) at 1625:19–22). The evidence is more than sufficient to meet this correct standard.

**1. Plaintiffs presented overwhelming evidence that BNPP consciously assisted the GOS.**

*First*, BNPP and its executives admitted under oath that they were fully aware of the GOS's human rights atrocities. BNPP's own witness, ECEP executive Philippe Maillard confessed:

> The Court: And you knew when you were doing the financing that the government of Sudan was guilty of human rights violations?

> The Witness: Yes, your honor.

Maillard, Trial Tr. (Oct. 6, 2025) at 1181:7-10.

This testimony confirmed BNPP's guilty plea admission that BNPP employees "recognized" the "human rights abuses" committed by the GOS and referred to them as a "humanitarian catastrophe." PX 939, SSOF at 6. Indeed, the jury heard robust, corroborated evidence that BNPP had actual knowledge of the atrocities being committed by its co-conspirator (which BNPP often couched in sanitized euphemisms), which were the subject of widespread media reporting, international pressure campaigns, UN resolutions, sanctions regimes from multiple governing authorities, and criminal prosecutions at the International Criminal Court.[3]

---

[3] *See, e.g.*, PX 939, SSOF at 10 (admitting that "senior compliance and legal personnel expressed concerns . . . but were rebuffed"); *id.* at 11 (admitting that concerns in 2005 – at the height of the genocide – were "dismissed" and a BNPP executive "requested that no minutes of the meeting be taken"); PX 336 ("marked by a humanitarian tragedy"); PX 162 ("delicate humanitarian environment" with "media flare-ups"); PX 139 (acknowledging the link between "oil

BNPP had that knowledge at least as early as November 10, 1997. Shortly after the United States first imposed trade sanctions, bankers at GC8—the Sudan relationship managers—circulated a November 6, 1997 Reuters article. That article reported: "The sanctions were intended to put political pressure on Sudan's Islamist government for what Secretary of State Madeleine Albright said was also 'its effort to destabilize neighboring countries and its abysmal record on human rights.'" PX 22.

The jury saw the Bank's callous indifference to genocide, in the Bank's own words. As one memo notes:

> We have been working since the beginning in a delicate humanitarian environment which has its media flare-ups from time to time . . . . This update outlines the worrying developments of the last few weeks and the **humanitarian risks** that are reported daily in the international press. It recalls the growing opprobrium that a large part of the international community is casting on the behavior of the country's authorities.

PX 162 (emphasis added).

*Second*, BNPP's own internal documents confirmed that the Bank was not just aware of the atrocities; it also knew it was contributing to them. The Bank knew it was undermining an embargo aimed at preventing human rights violations being committed by the GOS. *See, e.g.*, PX 939, SSOF at 2 (admitting that EO 13067 concerned the GOS's "human rights violations"); Trial Tr. (Sept. 30, 2025) at 1060:18-20 (RFA 13) (admitting that the Bank was aware of EO 13142).[4]

---

revenue" and "conflicts," including "repressive measures" by the GOS resulting in "suffering endured by the civilian population"); PX 174 (Sudan was "relatively unstable" and "on the U.S. list of terrorist countries"); PX 990, Louis Bazire Deposition Designations at 87:16-19 (admitting knowledge of "civil war" ongoing for "20 years" and "demonstrations" and newspaper articles concerning Darfur); PX 988, Patrice de Saint Andre Deposition Designations at 85:15-20 (admitting that information on Darfur "you can find easily in newspaper"); PX 987, Jacques D'Estais, Deposition Designations at 62:7-10 (admitting he read "press" reports on human rights violations occurring in Sudan); PX 991, Dan Cozine Deposition Designations at 253:7-14 (admitting to "tremendous press coverage of the war in Sudan" and that it "was a highly visible global issue" including "a lot of scrutiny on the country and, therefore, a lot of scrutiny on institutions that were active in the country"); Hudson, Trial Tr. (Sept. 15, 2025) at 198:1-6 (noting "a massive volume of information" about Sudan in the press).

[4] *See also, e.g.*, PX 23 (Nov. 13, 1997 wire transfer within days of sanctions being imposed, stated: "IN CONSIDERATION TO THE RECENT AMERICAN EMBARGO VIS-A-VIS SUDAN YOU ARE KINDLY REQUESTED TO MENTION YR. REFS AND THE NEGOTIATING BANKS' REFS. WITHOUT ANY

BNPP's guilty plea admitted the Bank knew that the Sudanese state banks it conspired with in 1997 were pillars of support for the Bashir Regime. *See* PX 939, SSOF at 6 (admitting "that certain Sudanese banks with which BNPP dealt 'play a pivotal part in the support of the Sudanese government . . .'"). A reasonable jury could infer that a sophisticated bank with due diligence obligations should have known its customer (the GOS) and could not have avoided learning of its customer's mass atrocities.[5]

BNPP admitted that it understood its scheme would be seen by the public as supporting the Regime and contributing to the suffering of the civilian population. A 2007 internal email fretted about what would happen if BNPP's conspiracy came to light: "'In a context where the International Community puts pressure to bring an end to the dramatic situation in Darfur, no one would understand why BNP Paribas persists [in Sudan] which could be interpreted as supporting the leaders in place.'" PX 939, SSOF at 6. In July 2006, a compliance officer expressed similar concerns that BNPP's business with Sudan, if exposed, would be "seen to help the rulers in power and contribute to furthering the suffering endured by the civilian population." PX 139.

BNPP even admitted it knew that the oil proceeds it funneled to the GOS would help perpetuate the Bashir Regime's "repressive measures for a long time." PX 939, SSOF at 6.[6]

---

REFERENCE TO OUR PART AS ISSU[I]NG BANK REGARDING REIMBURSEMENT OF OUR L/CS ISSUED IN US DOLLARS."); PX 991, Dan Cozine Deposition Designations at 38:13-15 (admitting that BNPP had "a mechanism to inform people as to evolutions of sanctioned -- or sanction activity"); Hudson, Trial Tr. (Sept. 11, 2025) at 99:20-100:10 (explaining the process by which OFAC disseminated sanctions information to "bank compliance officers around the world").

[5] A jury could reasonably infer that a sophisticated international bank with billions of dollars on the line performed due diligence concerning their customers, especially a bank that was the Central Bank of Sudan's "sole correspondent bank," PX 939, SSOF at 5, and that controlled so much of Sudan's international trade. Indeed, BNPP regularly visited Sudan and met with senior GOS officials to provide updates on risk and business opportunities in Sudan. *See, e.g.*, PX 47 (Khartoum visit June 2003); PX 336 (June 2004 meeting in London with Central Bank of Sudan representatives); PX 77 (Oct. 2004 Washington DC meeting with GOS); PX 195 (June 2007 visit to Khartoum); PX 113 (noting bank officials meeting "the Sudanese Finance Minister and the President of the Central bank," who were "very pleased" with BNPP).

[6] Full quote: "'[t]he growth of revenue from oil is unlikely to help end the conflict [in Darfur], and it is probable that Sudan will remain torn up by insurrections and resulting repressive measures for a long time.'" PX 939, SSOF at 6.

*Third*, despite that knowledge, BNPP provided financial support to the Bashir Regime for more than a decade. Beginning in November 1997, BNPP propped up the Bashir Regime by conspiring to undermine the U.S. embargo and giving Sudan access to billions in U.S. dollar funding that it "otherwise would not have had." *Id.* at 12. BNPP began its sanctions evasion conspiracy in November 1997, within days of the imposition of the U.S. embargo. PX 939, SSOF at 5; DX AX (PX 107). BNPP used deceptive methods to help the Regime, falsifying commercial instruments and creating a money laundering structure of front-company bank accounts called "satellite banks." *Id.* at 5; Koch, Trial Tr. (Sept. 18, 2025) at 604:12-20, 605:12-606:2 (explaining wire stripping); *id.* at 608:18-609:9 (explaining resubmissions); Strombelline, Trial Tr. (Sept. 16, 2025) at 377:8-15 (explaining that BNPP had no filters to catch resubmissions). The Bank pled guilty to "knowingly, intentionally and willfully move[ing] billions of dollars through the U.S. financial system on behalf of Sanctioned Entities in violation of U.S. sanctions laws." PX 939, SSOF at 3.

Given this overwhelming evidence, BNPP does not even come close to meeting its burden under Rule 50 or Rule 59. Fully aware of the atrocities it was funding, BNPP chose to facilitate over $80 billion in USD transactions with Sudan—including at least $10 billion that admittedly violated U.S. sanctions. Fogarty, Trial Tr. (Sept. 22, 2025) at 799:23-25; 800:18-22. BNPP chose to partner with the GOS at the moment that it was most vulnerable to the international pressure campaigns – from the World Bank, the IMF, the U.S., and even Sudan's Arab world former sponsors. Verhoeven, Trial Tr. (Sept. 17, 2025) at 474:2-6. And it rescued the dictatorial regime, *id.* at 578:2-6, and turned it into a well-oiled killing machine whose nationwide campaign of persecution increased to genocidal proportions, as recognized by the U.S. government in 2002, Sudan Peace Act of 2002, Pub. L. 107-245, 116 Stat. 1505 (admitted as PX 404), and 2004, U.S.

11

Department of State, The Crisis in Darfur Testimony Before the Senate Foreign Relations Committee by Secretary Colin L. Powell, Sept. 9, 2004, https://2001-2009.state.gov/secretary/former/powell/remarks/36042.htm (admitted as PX 397). If that is not conscious, culpable assistance, then nothing is.

### 2. BNPP's defenses to conscious assistance are contrary to the evidence and Swiss law.

BNPP tries to resurrect the very same "sub-elements" that the Court previously determined were fabricated by BNPP's experts. *See Kashef IV*, 2021 WL 603290, at *4. Defying the Court's prior rulings, Swiss precedent, and testing the limits of Rule 11, BNPP rattles off a list of *ipse dixit* adjectives as if they were elements of Article 50(1) accomplice liability. Mot. at 23. BNPP's "participation" it claims, "must exceed mere facilitation or generalized assistance—it must consist of direct, significant, and concrete participation in the illicit acts at issue." *Id.* BNPP does not quote this purported standard from a Swiss case. Nor can it: the Swiss courts have said no such thing. To the contrary, facilitation is *exactly* what's required. The Swiss Supreme Court expressly held that "the conduct of a contributor can only justify" a secondary liability claim under Article 50(1) "if it is generally capable of facilitating the . . . infringement of the direct infringer." ECF No. 708-13, *Swisscom Case*, Swiss Sup. Ct., 145 III 72 at 2.3.1, p. 77 (2019).

Worse still, BNPP resurrects the false claim that conscious assistance requires "a willful and substantial assistance to the unlawful act that injured the plaintiff at issue, not generalized assistance to the perpetrator." Mot. at 23. This is the very same standard that BNPP's expert (the only expert timely disclosed and deposed) "admit[ted] . . . are not elements articulated by the Swiss courts, but are instead his own interpretation of the law as he believes *should* be applied based on his analysis of the cases." *Kashef IV*, 2021 WL 603290, at *4. BNPP cannot launder this fabricated standard through a letter from an ambassador that merely repeats them rote, without legal citation.

It gets worse. BNPP claims that "intent" to "substantially contribut[e]" is "required under Swiss law." Mot. at 25. But it flagrantly omits contrary authority from the Swiss Supreme Court, which has held for nearly a century that it "does not matter" whether an accomplice "intended such a brutal abuse of the Plaintiff . . . since even negligent complicity can establish joint and several liability pursuant to Art. 50 CO." ECF No. 708-8, *Carpenter's Strike Case*, Swiss Sup. Ct., 57 II 417, at reas. 2 [PDF p. 4] (1931); *see also* ECF No. 708-15, *Locksmith Case*, Swiss Sup. Ct., 4A_185/2007, at reas. 6.2.2, p. 11 (2007) (holding that to be liable accomplices must have "wanted the harm to occur (intent), or at least were aware it could happen (recklessness), or they could have avoided it if they had paid the necessary attention to the circumstances (negligence).").

BNPP's fabricated requirement that "generalized assistance" is insufficient is belied by the same Swiss case cited by the Bank. In the *Locksmith* case, the Swiss Supreme Court held that a managing consultant for a locksmith was liable as an accomplice for all acts of trademark infringement committed by its client. The accomplice did not choose or design the infringing mark or design an infringing mark. But it was liable precisely because it provided systemic, generalized assistance, despite its knowledge of the infringements:

> The important nature of the administrative and financial assistance provided by the [accomplices] to [the locksmith], who in an illegal and conspicuous manner, used the plaintiff's trademark and tradename . . . demonstrated that the [accomplices] knew they were cooperating to cause the damage ultimately suffered  . . . .

ECF No. 708-15, Swiss Sup. Ct., 4A_185-2007 at reas. 6.2.1, p. 11 (2007).

U.S. aiding and abetting law follows the same principle that "pervasive and systemic" support of a criminal enterprise constitutes aiding and abetting. *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 506 (2023) (holding "if plaintiff's theory would hold a defendant liable for all the torts of an enterprise, then a showing of pervasive and systemic aid is required to ensure that defendants actually aided and abetted each tort of that enterprise."). BNPP cites *Twitter*, but omits its contrary

holding. Mot. at 23. BNPP's support of the Bashir Regime, through a criminal sanctions-evasion conspiracy and billions of laundered funds is the paradigmatic example of "pervasive and systemic aid" making the jury's verdict entirely reasonable.

There is more. Quoting the *ipse dixit* assertion of an expert rather than case law, BNPP claims Plaintiffs must prove BNPP was in a "'joint enterprise' with respect to the illicit act.'" Mot. at 21. But the Swiss Supreme Court has said no such thing. Regardless, BNPP pled guilty to precisely such a joint enterprise. The U.S. embargo was put in place to prevent human rights abuses by defunding the GOS, and BNPP conspired to undermine that embargo. A scheme to thwart a crime-prevention measure is a scheme to facilitate the crime. Plain and simple.

Faced with that blunt reality, BNPP mischaracterizes the role of its conspiracy to evade U.S. sanctions, claiming Plaintiffs are "borrow[ing] legal norms" from U.S. law. Mot. at 23. But as Professor Werro explains, "[f]rom a Swiss law perspective, the violation of U.S. sanctions is relevant as a factual, not a legal matter." ECF No. 980, September 29, 2025 Declaration of Prof. Franz Werro ("Sept. 29, 2025 Werro Decl.") ¶ 6. "The means and methods of BNPP's conspiracy to help Sudan evade the U.S. embargo are how BNPP consciously assisted Sudan's campaign of persecution." *Id.* "The evidence of this conspiracy is relevant because it shows (a) that BNPP was aware that the sanctions were, in part, aimed at preventing Sudan from funding genocide, (b) that BNPP was therefore aware of the risk it was funding genocide, and (c) that BNPP's undermining of the embargo contributed to the genocide by giving Sudan access to U.S. dollar funding that it otherwise did not have. The guilty plea is relevant because it proves these facts are true." *Id.*; *see also* ECF No. 528-104, March 2, 2023 Declaration of Prof. Franz Werro ("Mar. 2, 2023 Werro Decl.") n.59.[7]

---

[7] Similarly, it is utterly irrelevant whether or not Plaintiffs were eligible for restitution under U.S. law as part of BNPP's criminal conviction. First of all, Plaintiffs did not apply for restitution and there was no adjudication of

With a straight face, BNPP claims (at 24) Plaintiffs were required to prove that BNPP had a contractual relationship with Plaintiffs in order to be liable for knowingly funding and facilitating Sudan's genocide. But Swiss law is replete with liable accomplices who owed no contractual or other duty of care to their victims: like BNPP these accomplices were liable because they knew or should have known they were contributing to the unlawful infringement of their victim's rights. *See* Mar. 2, 2023 Werro Decl. ¶¶ 35-44 (surveying Article 50 cases that found accomplice liability even where they did not breach any legal duty or do anything intrinsically unlawful). In the *Rediffusion Case*, for example, the Swiss Supreme Court held it was irrelevant whether a state-owned satellite company itself breached a legal duty under the copyright statute: "[t]hey are jointly and severally liable under Article 50(1) [CO] for the tort if they participate in the violation of rights by [the principal], even if only as an accomplice"). ECF No. 533-10, 107 II 82, at § 9, p. 92-93 (1981).

Finally, BNPP's main defense—that it purportedly complied with Switzerland's arms embargo on Sudan—is legally irrelevant and factually wrong. Mot. at 4. BNPP claims it "complied with the embargo which was issued by the European community and adopted by Switzerland, which prohibited financ[ing] any acquisition of arms or military equipment by Sudan." *Id.* (internal quotation marks omitted). But as the Court correctly instructed the jury, Swiss law forecloses this as a valid defense. In the *Rediffusion Case*, the Swiss Supreme Court expressly held: "The fact that the defendants may have considered their actions to be licit does not exempt them." ECF No. 533-

---

whether or not they qualified for this remedy. Second, even if they had, the standard of "direct harm" for restitution is not the same as Swiss law standards for accomplice liability and adequate causation. Whatever U.S. prosecutors had to say at a sentencing hearing, Mot. at 22, is irrelevant: in fact, BNPP well knows that the statements did not refer to plaintiffs in this case, but to judgment-creditors with pre-existing judgments against BNPP's sovereign conspirators. Hr'g. Tr. 2:24-3:2, 3:20-21 (May 1, 2015), *United States v. BNP Paribas, S.A.*, No. 1:14-cr-00460 (LGS) (S.D.N.Y.), ECF No. 55. The language the bank quotes refers specifically to the lien of a single Cuban-American seeking to enforce a judgement against Cuba—for the murder of her father in 1959—against BNPP's forfeited profits and not to Sudanese human rights victims, Plaintiffs in this case. *See* Notice of Lien, *United States v. BNP Paribas, S.A.*, No. 1:14-cr-00460 (LGS) (S.D.N.Y.), ECF No. 29-2 at 19.

10, Swiss Sup. Ct., 107 II 82, at § 9, p. 93 (1981). As Professor Werro explains, "Knowing one is acting unlawfully is irrelevant to the distinct issue of knowing whether one is helping someone else commit an illicit act . . . ." Sept. 29, 2025 Werro Decl. ¶ 4. "Thus, Swiss law precludes BNPP from contending that it did not know it was contributing to human rights abuses merely because it believed it was complying with Swiss sanctions and did not need to respect U.S. sanctions." *Id.*

In any case, the jury heard evidence that BNPP directly supported key military entities in Sudan, even lending money to Sudan's Ministry of Defense. PX 60. For years—at the height of the genocide between 2004 and 2007—BNPP extended multiple lines of credit financing vehicle imports for GIAD, Sudan's state-owned manufacturer of armored vehicles.[8] BNPP had a unique relationship with Sudan's Civil Aviation Authority. The Bank served as an escrow agent, collecting and transferring the overflight fees that funded all of Sudan's hybrid military-civilian air bases. *See* PX 174; Elbagir, Trial Tr. (Sept. 16, 2026) at 409:16-18, 410:8-11, 416:17-18 (testimony of Nima Elbagir regarding dual function of Sudanese airports). The Regime used these BNPP-assisted air bases to carry out aerial attacks on Plaintiff Kashef's and Abdalla's villages and to transport Plaintiff Turjuman to a detention center.[9] No doubt, the jury heard BNPP's executives self-servingly claim they complied with the arms embargo. But the Bank's documents told a different story, and the jury believed Plaintiffs' version, not the Bank's.[10] BNPP comes nowhere close to meeting its Rule 50 or Rule 59 burden.

---

[8] *See, e.g.*, PX 84, PX 207 (noting BNPP exposure to GIAD credit lines for Renault truck imports).

[9] *See* Abdalla, Trial Tr. (Sept. 25, 2025) at 923:25-924:3 (testimony of Mr. Abdalla describing his observations of Sudanese government bombing sorties on his and neighboring villages); Kashef, Trial Tr. (Sept. 26, 2025) at 967:9-10 (testimony Ms. Kashef describing a 2003 bombing raid on her village); Turjuman, Trial Tr. (Sept. 18, 2025) at 692:4-13 (testimony of Mr. Turjuman describing being taken in a military cargo plane to an airport in Khartoum, and from there to a facility of the national security apparatus).

[10] Moreover, BNPP's post-hoc claims that it screened transactions ignores the contemporaneous record that (1) its clients included SDNs and entities that the U.S. government and others determined to be key parts of the violent regime and (2) BNPP admittedly was unable to screen between civilian and military goods with either of Sudan or China. *See, e.g.*, PX 84, PX 207 (BNPP facilitating deals with GIAD); PX 980 (admission that goods could be used "indirectly" for "military purposes" and that "in Sudan, the distinction between civil and military is very blurred");

### E. Plaintiffs proved that BNPP's assistance was a natural and adequate cause of Plaintiffs' injuries.

Once again, BNPP scarcely references, Mot. at 32-33, 36, the correct Swiss law standard that was charged. Natural causation means "the human rights violations of the plaintiffs would not have occurred in the same way or in the same magnitude without the banking and financing services provided by BNP Paribas." Trial Tr. (Oct. 16, 2025) at 1626:24–1627:2. Adequate causation means that "it was reasonably foreseeable that banking and financing services provided by a major international bank to the government of Sudan would result in a greater likelihood or greater intensity of human rights violations and thereby plaintiffs' damages." *Id*. at 1627:11–17.

Contrary to BNPP's claim, the Court's instruction was consistent with its prior holdings: "A natural causal link exists where the harm would not have occurred at the same time or in the same way or magnitude without the conduct alleged." *Kashef IV*, 2021 WL 603290, at *6 (cleaned up); ECF No. 708-14, *Whiplash Case*, Swiss Sup. Ct., 147 V 161 at § 3.2, p. 163 (2021) (applying same standard); *see also* ECF No. 985-1, September 30, 2025 Declaration of Prof. Franz Werro ("Sept. 30, 2025 Decl.") ¶¶ 55-57. "An adequate causal link exists when the wrongdoer's conduct was capable, in the ordinary course of events and common experience, of leading to the kind of result that occurred." *Kashef IV*, 2021 WL 603290, at *7 (cleaned up). Although "not every random contributing act that is merely 'somehow' a supportive influence . . . is adequate," this causation standard is met if "the conduct of a contributor" is "generally capable of facilitating the [illicit act] of the direct infringer." ECF No. 708-13, *Swisscom Case*, Swiss Sup. Ct., 145 III 72 at 2.3.1, p. 77. As Professor Werro explains, a facilitator is one who makes things easier, which the Larousse

---

PX 991, Cozine Deposition Designations at 160:3-15 (BNPP facilitated USD transactions "in and out" with China and had no way to know what was being purchased); PX 60 (listing some of BNPP's SDN clients, including the Ministry of Defense and Omdurman National Bank, well-known as the Sudanese armed forces bank).

Dictionary illustrates with the example of "Money." Sept. 30, 2025 Werro Decl. ¶ 59. Here, BNPP's support – which encompassed far more than just "Money" – facilitated the GOS's human rights abuses, which predictably increased in frequency and tempo as BNPP continued to provide billions in USD to the Bashir Regime.

### 1. Plaintiffs presented overwhelming evidence of natural causation.

At the outset, the jury heard uncontroverted evidence that in November 1997, BNPP's conspiracy rescued the Bashir Regime from the brink of collapse. Renowned expert on Sudan[11] Dr. Harry Verhoeven was unequivocal that before procuring BNPP's help, the Regime (which seized power in a military-Islamist coup) "was running [the] government on a shoestring," the GOS's ability to procure weapons "was limited," and the military budgets were "very limited." Verhoeven, Trial Tr. (Sept. 16, 2025) at 451:24-452:5; Verhoeven, Trial Tr. (Sept. 17, 2025) at 461:12-25. The Regime's record on human rights abuses and terrorism led to its abandonment by its former supporters in the Arab world, as foreign aid dried up in the 1990s. PX 891. The World Bank and International Monetary Fund pulled out of Sudan in the 1990s. Verhoeven, Trial Tr. (Sept. 17, 2025) at 474:2-6. The U.S. financial embargo hit the GOS in November 1997, creating "an existential problem" for the Central Bank of Sudan tasked with overseeing and transforming a heavily dollarized economy. *Id.* at 491:24-495:19. The GOS was in crisis, "desperate" for help,

---

[11] BNPP proffered no experts on Sudan's political economy to rebut Dr. Verhoeven. A jury could reasonably credit Dr. Verhoeven's recounting of Sudan's economic state, spending priorities, available resources, and actual military budget over that of BNPP's generalist Mr. Zenghelis, especially given that Dr. Verhoeven's focused expertise is informed by his extensive discussions with GOS officials, travels in Sudan, and other direct and indirect study of the Sudanese political economy. By contrast, Mr. Zenghelis, who works at a firm that regularly provides expert trial testimony and who substituted into this case for another expert less than two months before trial (i.e., a true "hired gun"), relied solely on officially reported numbers and lacks the knowledge to assess or contextualize those numbers. *See, e.g.*, Zenghelis, Trial Tr. (Oct. 6, 2025) at 1232:23-1233:9 (admitting no specialized knowledge of Sudan or even Africa), 1233:22-24 (not offering opinions on the politics or military of Sudan), 1234:16-1235:9 (admitting to not reviewing BNPP documents or speaking with anyone at BNPP).

facing armed insurrection, resulting in "a very bleak moment from the standpoint of the government." *Id.* at 470:18-471:1-6.

According to Dr. Verhoeven, "the idea that the regime was going to fall at that moment in time [prior to 1997] was really not something that was hypothetical or that people were exaggerating about. There was this real fear in Khartoum, in the regime, that this could be the end of the road." *Id.* at 470:13-17.

BNPP failed to dispute that the Regime was poised to fall when the U.S. sanctions were imposed in 1997. Nor did it dispute that BNPP saved the Regime from this fate. According to BNPP's guilty plea, BNPP came to the rescue "shortly after the imposition of U.S. sanctions." PX 939, SSOF at 5. In late 1997, BNPP became "the sole correspondent bank in Europe for Sudanese Government Bank 1 [the Central Bank of Sudan]" and took on "a central role in Sudan's foreign commerce market." *Id.*

According to an internal BNPP memorandum, in 2001, with the addition of "flying fees," BNPP "completed the already existing domiciliation" in BNPP's "books" of "the country's principal foreign exchange earnings, namely oil, oil products, telephone fees, gold revenues and agricultural products." PX 174. That means that even before Sudan's oil boom in late 2000, BNPP, through letters of credit, laundered wire payments, and sanctions-evasion, was already managing Sudan's foreign currency reserves from trade. Critically, BNPP protected the GOS's U.S. dollar reserves from being frozen by U.S. authorities. Verhoeven, Trial Tr. (Sept. 17, 2025) at 487:5-14.

The jury even saw macroeconomic data from the World Bank (PX 891) showing the moment in late 1997 when BNPP saved the GOS from financial collapse, as reproduced here.



Source: World Bank



    BNPP completely failed to refute this key point, either through cross-examination or rebuttal testimony. The jury could thus reasonably conclude that the atrocities committed by the Regime against the Plaintiffs would *not have occurred at all*, but-for BNPP's sanctions-evasion scheme, because the Regime would not have survived past 1997. Although Plaintiffs have no need to prove that BNPP was the "sole or direct cause" of Plaintiffs' injuries, the record evidence shows it was indeed a *condition sine qua non*—going far beyond the level of proof required. *See* Sept. 30, 2025 Werro Decl. ¶ 64 (citing *Whiplash Case*, Swiss Sup. Ct., 147 V 161 at § 3.2, p. 163 (2021); *Boat Collision Case*, Swiss Sup. Ct., 4A_444/2010 at 2.1 (2011); *Vehicular Homicide Case*, Swiss Sup. Ct., 131 IV 145 at § 5.2, p. 148 (2005)). The record is clear that the GOS could not have met its "strategic objectives" of "state terror" without BNPP's support that "allowed the military Islamist regime in Sudan to escape many of the effects of U.S. sanctions." Verhoeven, Trial Tr. (Sept. 17, 2025) at 578:2-6.

After rescuing the Regime in 1997, BNPP spent the next decade funneling billions of dollars (and other foreign currencies) to the GOS, fueling a dramatic increase in military spending and an escalation in the Regime's campaign of human rights abuses. The jury heard extensive evidence that, starting at the GOS's "very bleak moment," BNPP's illicit and criminal support provided the GOS with billions in USD foreign currency reserves. According to Timothy Fogarty, an international banking expert formerly from the New York Federal Reserve, BNPP Geneva moved $81 billion in or out of Sudanese bank accounts from 2002-2009 alone, at least $10 billion of which was admittedly in violation of U.S. sanctions. Fogarty, Trial Tr. (Sept. 22, 2025) at 793:5-8, 795:18-797:2, 799:23-25; 800:18-22.[12]

Damningly, an internal Bank memorandum admitted that the Bashir Regime actually spent these foreign currency reserves—laundered by BNPP—on the Regime's war against the restive Black African population. *See* PX 47. Reporting on a visit to Khartoum, a BNPP employee described that  this "war" was "absorbing the country's foreign currency reserves." *Id.* This is further uncontroverted evidence that funds facilitated by BNPP were spent on mass atrocities, proving natural causation.

Indeed, the jury heard evidence that pursuing "state terror" is exactly what the GOS did with BNPP's financial support. Defense and security spending skyrocketed with the growth in revenue facilitated by BNPP. PX 970 (showing correlation between revenue growth and defense spending but not other categories of spending); Fogarty, Trial Tr. (Sept. 22, 2025) at 822:23-823:9 (noting that the GOS's oil revenues laundered by BNPP exceeded the GOS's exploding military budget); PX 971 (same).

---

[12] *See* PX 939, SSOF at 4 ($4 billion in illicit transactions with SDNs); *id.* at 5 (BNPP enabled the GOS and SDNs to "engage in billions of dollars' worth of U.S. dollar-based financial transactions, significantly undermining the U.S. embargo"); PX 341; PX 991, Cozine Deposition Designations at 184:1-8, 189:15-19 (admitting to $81 billion in "vostro" transactions "involving Sudanese entities").

Revenue going to the GOS, via BNPP's money-laundering structure, was fueling its war machine: as "the Sudan budget increases, so too does its ability to wage war" such that there is a "direct correlation." Hudson, Trial Tr. (Sept. 11, 2025) at 118:11-119:1. The jury heard evidence that the money was used by the GOS to vastly expand its national security state – including imported weapons, salaries, militias, and the development of a domestic military industrial complex – that transformed the GOS from an embattled regime into a well-oiled fighting machine terrorizing millions across the country. *E.g.*, Elbagir, Trial Tr. (Sept. 16, 2025) at 428:15-432:1 (investigative reporter Nima Elbagir describing the arms from "Al Yarmook or [] GIAD," both of which are part of "Sudan's military industrial complex" and Chinese imported arms she observed); Verhoeven, Trial Tr. (Sept 17, 2025) at 578:16-19 (Dr. Verhoeven noting that GIAD is part of the "Military Industrial Corporation of Sudan"). Unlike its pre-BNPP state of precarity, after 1997, the GOS was able to arm, supply, and support the Janjaweed and other militias across Sudan at unprecedented levels. *E.g.*, Elbagir, Trial Tr. (Sept. 16, 2025) at 424:2-10 (Ms. Elbagir testifying that she saw "an array of Sudanese government trucks, artillery, weaponry" with the Janjaweed); Abdalla, Trial Tr. (Sept. 25, 2025) at 921:8-25 (Mr. Abdalla testifying about Antonov barrel bombs); Kashef, Trial Tr. (Sept. 26, 2025) at 967:4-10, 968:8-16 (Ms. Kashef testifying about airplane and helicopter attacks).

Indeed, the record is so replete with evidence of how the GOS used its BNPP-fueled financial resources on scaling up human rights abuses that BNPP did not bother to challenge the first element, illicit acts by the GOS.[13]

---

[13] *See, e.g.*, PX 404, PX 405, PX 406 (U.S. government documents describing the GOS's campaign of violence); Verhoeven, Trial Tr. (Sept. 17, 2025) at 496:24-497:14 (Dr. Verhoeven describing oilfield clearings involving "Antonov planes, some helicopter gunships, and infantry and artillery targeting both the rebels and the civilian populations there and waging a campaign of scorched earth"); *id.* at 403:11-404:8, 910:23-911:5, 916:4-11, 967:9-18 (testimony concerning destroyed villages); *id.* at 692:15-16, 658:18-659:12, 662:3-11, 664:10-12, 669:2-8, 670:15-22, 678:3-25, 680:1-681:24, 687:10-688:2, 931:15-19, 988:2-7, 989:3-15, 992:24-993:17, 995:7-17 (testimony

BNPP's support directly correlated with increased human rights abuses in a "direct correlation between the amount of money that the government was earning and the level of atrocities that they were committing in the country." Hudson, Trial Tr. (Sept. 11, 2025) at 108:14-20. Although the Bashir Regime committed human rights abuses prior to 1997—that was one reason why the sanctions were imposed in the first place—the evidence shows a clear escalation in the scale and scope of violence across Sudan, as documented by human rights organizations, the United States government, and the United Nations. *See, e.g.*, PX 404 (Sudan Peace Act); PX 405 (Report on the Sudan Peace Act); PX 406 (Comprehensive Peace Act in Sudan); Verhoeven, Trial Tr. (Sept. 17, 2025) at 496:24-497:14 (describing how the GOS ramped up human rights abuses in "a campaign of scorched earth" to develop its oil exports, which was thoroughly documented "by the United Nations as well as by a range of civil society organizations and foreign embassies . . .").

BNPP does not claim otherwise, nor could it as the GOS conducted an officially declared genocide in Darfur after it began to reap the financial windfall of BNPP's criminal support. *See* PX 397 (Secretary of State Collin Powell genocide letter);[14] PX 406 ("genocide has been committed").

The combined effect of this evidentiary record is more than sufficient for the jury to find that BNPP chose to become the regime's "Black Knight," rescuing it from a "very bleak moment," and to fuel the growth of the regime into a well-oiled killing machine. The linkage is undeniable. So, too, is the conclusion that whatever level of violence the regime was able to inflict pre-BNPP was dwarfed by the violence that it actually carried out with BNPP's support.

---

concerning the torture performed by security services paid for through the GOS's expanded security state budget); *id.* at 404:8-20, 415:14-16, 967:6-22, 971:7-10, 992:13-20, 993:2-17 (testimony concerning rape committed by same).

[14] Within weeks of this public proclamation, BNPP met with CBOS officials to discuss using book to book transfers to continue evading U.S. sanctions. PX 77.

A reasonable juror need not take up BNPP's invitation to speculate as to what might have happened in the face of such overwhelming evidence of what *actually* happened: the linkage between BNPP's support and the increased human rights abuses. Indeed, BNPP's counterfactual claim that there have always been human rights abuses in Sudan and its hypothetical that Plaintiffs might have been abused even if the Regime had fallen is idle speculation. Under the Swiss test for natural causation, if the Regime had fallen and some other actor attacked the Plaintiffs, then their injuries would not have occurred "in the same way . . . without the conduct alleged." *Kashef IV*, 2021 WL 603290, at *6. In any case, BNPP's counterfactual defense takes causation to absurd limits. Under BNPP's theory, a look-out who helped someone mug a victim on the streets of Brooklyn could never be deemed the natural cause, because people get mugged all the time; if the assailant had not done it, someone else could have. That is not how the law works in Switzerland or anywhere else.

Causation is about what *actually* happened. And BNPP's own documents leave no room for doubt. As a senior compliance officer warned management in 2007, BNPP was "writing a monthly cheque . . . which, for a significant part, allows this government to keep things run[n]ing in Khartoum." PX 215. That is why it was eminently reasonable for the jury to find BNPP liable.

### 2. Plaintiffs presented overwhelming evidence of adequate causation.

Plaintiffs similarly proved adequate causation, which requires that BNPP's contribution was "generally capable of facilitating the unlawful" act. ECF No. 708-13, *Swisscom Case*, Swiss Sup. Ct., 145 III 72 at § 2.1, p. 73 (2019). The hallmark of adequate causation is foreseeability. This does not mean that each of Plaintiffs' specific injuries was foreseeable, but that it was reasonably foreseeable that the GOS would use BNPP's support to commit human rights abuses. *See, e.g.*, ECF No. 708-8, *Carpenters' Strike Case*, Swiss. Sup. Ct., 57 II 417 at s. 2 (1931) (finding

union leader liable for incendiary speech that incited striking workers to later rough up strike-breakers as a group, even though he could not foresee the specific injuries to the specific plaintiffs); ECF No. 708-15, *Locksmith Case*, Swiss Sup. Ct., 4A_185/2007 at § 6.2.3 (2007) (adopting foreseeability standard).

First, it was foreseeable that thwarting a genocide-prevention embargo would facilitate and fund genocide, because the United States government publicly announced the connection between the GOS's access to USD (and oil revenues) and human rights abuses. *See, e.g.*, PX 441 (EO 13067, explicitly linking GOS's access to USD to "human rights violations").[15] The jury saw evidence—fortuitously saved in BNPP's files from 1997—of Secretary of State Madeline Albright stating that "[t]he purpose of the sanctions is to deprive the regime in Khartoum of the financial and material benefits of US trade and investment, including investment in Sudan's petroleum sector." PX 923; PX 22. So, BNPP could foresee as early as November 1997 that enabling the Regime to benefit from U.S. trade and oil proceeds, would contribute to human rights abuses. This was repeatedly confirmed, notably in the 2002 Sudan Peace Act, which contained the congressional finding that the GOS "has repeatedly stated that it intends to use the expected proceeds from the future oil sales to increase the tempo and lethality of the war against the areas outside of its control." PX 404. Indeed, the jury heard from former White House official Cameron Hudson that "[i]t was the view of the United States government that there was a causal link between oil revenue going to the [GOS] and human rights abuses being committed by that same government." Hudson, Trial Tr. (Sept. 15, 2025) at 278:9-21.

---

[15] *See also* Hudson, Trial Tr. (Sept. 15, 2025) at 244:9-12 (Mr. Hudson noted that the goal of U.S. policy "was to end human rights abuses"); PX 442 (EO 13400, additional sanctions due in part to "persistence of violence in Sudan's Darfur region, particularly against civilians and including sexual violence against women and girls"); PX 443 (EO 13412, additional sanctions due to "certain policies and actions of the government of Sudan that violate human rights"); PX 405 (U.S. report stating that the GOS pools revenues and linking "an increase in government revenue" to "at least proportionally increased military expenditures").

Second, BNPP actually did foresee the link between the GOS's revenues and the types of human rights abuses that befell the Plaintiffs. *See supra* at I.D.1; *see also* PX 139 (admitting that "[t]he growth in oil revenue is unlikely to contribute to ending the conflicts" and will "contribute to furthering the suffering endured by the civilian population"; PX 215 (admitting that BNPP was providing money to "keep things running in Khartoum").

In sum, the GOS's existing record on human rights abuses made it reasonably foreseeable – even inevitable – that BNPP's extensive support for the GOS would result in the GOS expanding on its "strategic objectives" of "state terror." The GOS was sanctioned in large part for its extensive human rights violations as it tried to wrest full control of the country following the coup. *See supra* at 1.D.1. And while BNPP employees attempted to downplay the humanitarian catastrophe in Sudan,[16] BNPP had access to a real-time feedback loop conclusively demonstrating that its support led to increased human rights violations through the extensive public reporting on Sudan such that it "was an information you can find easily in newspaper." PX 988, Patrice de Saint Andre Deposition Designations at 85:18-20; *see also* Maillard, Trial Tr. (Oct. 6, 2025) at 1184:4-9 (Mr. Maillard admitting that he knew about the Darfur genocide while BNPP was providing illicit services to the GOS). BNPP had ample access to information – from experts such as the U.S. government, human rights investigators and NGOs, and international institutions such as the United Nations – that made clear the tie between the GOS's revenues and human rights abuses. That tie was borne out by reality: the GOS vastly increased its campaign of violence, just as it

---

[16] *See* PX 64; PX 123; PX 162; PX 336; DX-AX; PX 990, Louis Bazire Deposition Designations at 88:13-20; PX 991, Dan Cozine Deposition Designations at 253:04-21; PX 989, Philippe Blavier Deposition Designations, at 1267:24-128:19, 149:25-150:19; Strombelline, Trial Tr. (Sept. 16, 2025) at 357:15-21; PX 988, Patrice de Saint Andre Deposition Designations at 199:05-200:18, 200:25-201:05; PX 987, Jacques D'Estais Deposition Designations at 190:23-191:05, 191:15-191:20.

stated that it intended to do. There is no need to speculate or indulge in counterfactuals; adequate causation was conclusively established by reality, or at least a reasonable jury could so find.

### 3. BNPP's defenses to causation are contrary to the evidence and to Swiss case law.

BNPP claims that Plaintiffs were required to trace their injuries to specific transactions, Mot. at 27, but that misstates Swiss law. Under Swiss law, an accomplice needs to make a "legally relevant contribution." ECF No. 708-13, *Swisscom Case*, Swiss Sup. Ct., 145 III 72 at § 2.3.1, p. 77. For that contribution to be an adequate cause, it must have been "generally capable of facilitating" the illicit act. *Id.*

BNPP's argument that *Swisscom* exonerates it, Mot. at 36, has already been thoroughly rejected by this Court. *Swisscom* was the first case in a hundred years where the Swiss Supreme Court found that an alleged accomplice did not make an adequate causal contribution. And in that case, the tort of copyright infringement had already been committed before the accomplice (an internet service provider) entered the picture, the direct infringers were neither clients of the internet service provider nor a beneficiary of its services, and its users who *were* clients had a lawful right to download pirated content under Swiss law. In other words, the internet service provider facilitated a *lawful* act by its clients.

This Court rightly concluded that "unlike the internet service provider in *Swisscom* and its hundreds of thousands of users, BNPP and the government of Sudan had a direct contractual and *illegal* relationship." *Kashef IV*, 2021 WL 603290, at *9. "It is therefore . . . reasonable to determine that BNPP is responsible for the harm caused by its transactions – transactions that were illegal specifically because they would result in that harm . . . ." *Id.*

Nor does BNPP's support need to be the "sole or direct cause" of Plaintiffs' injuries, *contra* Mot. at 30. *See* Sept. 30, 2025 Werro Decl. ¶ 64 (citing *Whiplash Case*, Swiss Sup. Ct., 147 V 161

at § 3.2, p. 163 (2021); *Boat Collision Case*, Swiss Sup. Ct., 4A_444/2010 at 2.1 (2011); *Vehicular Homicide Case*, Swiss Sup. Ct., 131 IV 145 at § 5.2, p. 148 (2005)). And this case is plainly unlike the *Somatoform Disorder Case*, Mot. at 33-34, in which there were several additional factors complicating the causal chain for a medical claim. Here, the causal chain is much simpler: the BNPP chose to give a blank check to a regime infamous (and isolated) for committing human rights abuses, and the regime used the illicit funds to commit additional human rights abuses. Indeed, it is BNPP that attempts to obfuscate this simple causal chain by speculating with what BNPP might have done – in other currencies, with other banks, using other resources, at other times – while ignoring what actually happened. *E.g.*, Mot. at 34. For the issue is not, for example, whether the GOS "independently decided to use those increased revenues" on human rights abuses, *id.*, but rather that it was foreseeable that BNPP's criminal support would lead the GOS to commit additional human rights abuses (it was and it did). After all, the locksmith in the *Locksmith Case* could have independently chosen to use the accomplices' "administrative and financial support" to infringe a trademark (or not). What matters is that it foreseeably *used* that support to commit illicit acts, just as the GOS used BNPP's administrative and financial support.[17]

BNPP's arguments concerning Sudan's human rights record before and after BNPP's involvement, *e.g.*, Mot. at 35, presupposes that the GOS's human rights record and violence in the country mean that BNPP cannot be responsible for any violence that was facilitated by BNPP's support. This warped view gets it exactly backwards: while the rest of the civilized world tried to put out the fire of human rights abuses, BNPP threw gasoline on a smoldering fire and watched the fire increase and spread.

---

[17] To address on minor related point, Ms. Kashef did not seek damages for the death of her mother, *contra* Mot. at 32; the information was provided as background as to Ms. Kashef's life in Sudan. Plaintiffs did not ask for damages for this event in summation and there is nothing to suggest that the jury considered this event in Ms. Kashef's damages.

BNPP's arguments concerning what happened after its withdrawal, Mot. at 29, 35, ignores that with BNPP's support the GOS developed and created its oil export infrastructure and developed a domestic arms industry. In other words, a reasonable jury could conclude that BNPP created a well-oiled machine that was poised to have a long, deadly tail following the end of BNPP's criminal support. This argument also ignores the unrebutted testimony from Mr. Hudson that the GOS finally relented to U.S. pressure and permitted the humanitarian deployment of U.N. peacekeepers in Darfur *immediately* after OFAC cracked down on BNPP in 2007. *See* Hudson, Trial Tr. (Sept. 11, 2025) at 165:20-167:15, 168:16-169:7. In other words, a jury could easily infer that the GOS itself considered BNPP's facilitation of USD transactions to be paramount to its ability to achieve its aims, which included "a campaign of scorched earth" against its ethnic enemies.

BNPP's generalist argued that the GOS had other revenue sources, Mot. at 28-29, but the only expert on Sudan's political economy was unequivocal that BNPP's support was extensive and saved a regime on the brink of collapse precisely because it was out of options. *See, e.g.*, Verhoeven, Trial Tr. (Sept. 16, 2025) at 451:34-495:19. The GOS's "ability to raise some of those resources from its own people was limited" and many "refused to pay taxes." *Id.* at 450:6-451-6. It was the jury's province to choose between the two versions of Sudanese economic history, and the jury decided sided with the Plaintiffs.

In any event, BNPP already supported the GOS in its other means to access the crucial USD foreign reserves it needed to fulfill its deadly objectives. *See* PX 174 ("We are the main banker of the country, with Sudanese revenues from oil, petroleum products, telephone fees, gold and agricultural products on our books."). Similarly, Mr. Zenghelis relied (as he must) on officially reported numbers for his conclusions and vastly understated how much of the GOS's budget went

to its aim of "terror." *See* Mot. at 29. But Dr. Verhoeven testified that while "official numbers" show that the GOS spent between 8-12% of their budget on the national security state, "[t]he actual numbers, according to researchers like myself, are much closer to 40 to 45 percent of the national budget." *See* Verhoeven, Trial Tr. (Sept. 17, 2025) at 574:1-17. These examples show that a reasonable jury would easily conclude that Mr. Zenghelis lacked the expertise to provide reliable information about Sudan or draw reliable conclusions about the GOS's political and financial situation as compared to the eminently qualified Dr. Verhoeven; the verdicts suggests exactly that.

BNPP's argument that Plaintiffs were not injured with "sophisticated weaponry," Mot. at 31, is a red herring that ignores that the illicit USD that BNPP chose to provide – to a regime headed by the first sitting head of state to be indicted by the International Criminal Court, and for crimes against humanity and genocide – was used to purchase the loyalty (through *tamkeen*, by way of salaries and other benefits for NISS and other regime loyalists) that propped up the regime and the allies (the militias the GOS used in the oil fields, Darfur, and more) that were used to commit human rights abuses. *See, e.g.*, Verhoeven, Trial Tr. (Sept. 16, 2025) at 449:11-450:13; Elbagir, Trial Tr. (Sept 16, 2025) at 418:21-24 (describing a money drop from the GOS to Janjaweed commander Musa Hilal). It also ignores that BNPP pooled the GOS's foreign reserves to allow the GOS to use them as it saw fit—the "most important service" that the Bank provided for the GOS and one that allowed for the GOS to spend USD "as they liked." Verhoeven, Trial Tr. (Sept. 17, 2025) at 487:5-18. In other words, BNPP provided wide-ranging support – amounting to billions of dollars – for the GOS to do what the U.S. government and all competent observers predicted it would do: expand its campaign of ethnic cleansing and human rights abuses.

30

## II.    BNPP Misstates the Swiss Law of Accomplice Liability

### A.  The Court should apply the same Swiss law that applies in Swiss courts, not a tort reform project devised by BNPP.

Nearly five years ago, BNPP conceded that Article 50(1) of the Swiss Code of Obligations ("CO") provides for secondary accomplice liability and only requires three elements:

> To state a claim for secondary liability under Article 50(1) of the Swiss Code of Obligations, a plaintiff needs to allege that "(1) a main perpetrator committed an illicit act, (2) the accomplice consciously assisted the perpetrator and knew or should have known that he was contributing to an illicit act, and (3) their culpable cooperation was the natural and adequate cause of the plaintiff's harm or loss."

ECF No. 198, Mar. 2, 2021, Defs.' Mot. for Partial Recon., at 2 (quoting *Kashef IV*, 2021 WL 603290, at *2).

Nevertheless, BNPP has embarked on a tort-reform crusade to have a U.S. court erase accomplice liability from the Swiss Code. Rather than apply Swiss case law, the Bank has asked the Court to create an incoherent constellation of more than 14 purported "requirements" on Article 50.[18]  The Court, however, previously held these "are not elements articulated by the Swiss courts." *Kashef IV*, 2021 WL 603290, at *4. In fact, the Court rejected them after Swiss law discovery revealed that BNPP's expert had made these up as "his own interpretation of the law as he believes it *should* be applied." *Id.*

Undeterred, BNPP is yet again asking this Court to rewrite Swiss law. Now it seeks to impose new, incoherent requirements that neither the Swiss legislature nor any Swiss court has ever imposed. But "this Court will *not* create foreign law." *In re SVB Fin. Grp.*, No. 23-10367

---

[18] As of August 2020, BNPP had requested the Court to impose the following requirements on Article 50: (1) "willful," ECF No. 172, BNPP Supplemental Mem. in support of Motion to Dismiss at 8; (2) "substantial," *id.*; (3) "immediate," *id.*; (4) "in the injurious course of conduct," *id.*; (5) "in the relevant course of conduct," *id.* at 9; (6) "committing . . . violations together," *id.* at 10; (7) "encouraged or directed," *id.*; (8) "closely manage or control," *id.* at 11, (9) commit "analogous" "primary" violations, *id.*; (10) "close proximity," *id.*; (11) "directly interacted," *id.*; (12) "for the purpose and with the intent to aid," *id.*; (13) not "through a separate course of conduct," *id.* at 13; and, if we count compounds, (14) "intentional, deliberate cooperation in a particular injurious course of conduct," *id.* at 15.

(MG), 2025 WL 2751584, at *31 (Bankr. S.D.N.Y. Sept. 29, 2025). Rule 44.1 and international comity require applying the Swiss Code as interpreted by the Swiss Supreme Court. Any request to repeal accomplice liability from the Swiss code must be addressed to the Swiss legislature.

### B. Plaintiffs need only prove BNPP is liable as an accomplice under Article 50(1)— as BNPP conceded four years ago.

BNPP makes the astonishing claim that there is no accomplice liability in Swiss law, that Plaintiffs must prove the Bank has liability as a primary tortfeasor under Article 41, and that Article 50(1) is merely a loss-allocation mechanism: "like joint and several liability in the United States, Article 50 is not an independent basis for liability but rather it allows an injured party to recover full compensation from one tortfeasor when there are multiple tortfeasors who are liable for a plaintiff's injuries." Mot. at 9-10.

But four years ago, the Bank stipulated that Article 50(1) provides "secondary liability." ECF No. 198 at 2. And six years ago, the Swiss Supreme Court considered—and rejected—this very argument in a case that BNPP misquotes and mischaracterizes.

In 2019, the Swiss Supreme Court held that Article 50(1) is an independent basis of liability for an accomplice—*i.e.*, one who culpably contributes to the unlawful act of a third party. ECF No. 708-13, *Swisscom Case*, Swiss Sup. Ct. 145 III 72 at reas. 2.2.1, p. 74 (2019). Recognizing that the statute only expressly refers to joint and several liability, the Court clarified that Article 50(1) imposes liability on accomplices who contribute to the unlawful act of a third party, but could not themselves be held primarily liable for the infringement under Article 41 (the primary liability statute): "Strictly speaking, [Article 50(1) CO] only stipulates that several participants are jointly and severally liable for damage caused collectively, **but [it] is nevertheless interpreted as a statutory recognition of the civil liability of the participants**." *Id.* (emphasis added).

BNPP misrepresented this contrary authority by selectively editing the quotation: in its motion (at 10) it only quotes the first clause and omits the second, dispositive one. BNPP also omitted a key portion of the opinion that directly contradicts its position. The Swiss Supreme Court ruled that Article 50(1) "recogni[zes] the civil liability" of a "person who contributes to the infringement as an accomplice, but does not himself fulfil any statutory infringement requirement." ECF No. 708-13, *Swisscom Case*, Swiss Sup. Ct. 145 III 72 at reas. 2.2.1, p. 74.

*Swisscom* directly contradicts BNPP's claim that "Plaintiffs . . . cannot hold BNPP jointly and severally liable under Article 50 without first demonstrating that BNPP was liable under Article 41." Mot. at 10. And it fatally undermines BNPP's assertion that "the elements for Article 41 liability must be satisfied for the apportionment mechanism of joint and several liability under Article 50 to apply." *Id. Swisscom* is not alone. The Swiss Supreme Court has long held accomplices secondarily liable under Article 50(1) even though they were not primarily liable for any illicit acts under Article 41. *See, e.g.*, ECF No. 533-10, *Rediffusion Case*, Swiss Sup. Ct., 107 II 82 (1981) at p.92-93 ("It is not necessary to rule whether the PTT companies violate copyrights in operating the directional beam network. They are jointly and severally liable under Article 50.1 [CO] for the tort if they participate in the violation of rights by Rediffusion, **even if only as an accomplice**.") (emphasis added); *see generally* Mar. 2, 2023 Werro Decl. at 8-24 (reviewing a century of case law).

This Court was thus entirely correct when it held that "plaintiffs have to prove, not that BNPP itself committed unlawful acts, but that BNPP consciously assisted Sudan and knew or should have known that it was contributing to Sudan' illicit acts." *Kashef v. BNP Paribas SA*, No. 16 Civ. 3228 (AKH), 2024 WL 1676355, at *2 (S.D.N.Y. Apr. 18, 2024) ("*Kashef VI*"). Because

BNPP is liable as an accomplice under Article 50, it is irrelevant whether or not it is liable as a principal tortfeasor under Article 41.

### C. This Court need not adjudicate whether the GOS is subject to jurisdiction in a Swiss court or liable under Article 41—as BNPP now concedes.

It is also irrelevant whether the Government of Sudan could be subjected to jurisdiction and liability in a Swiss court. BNPP concedes there is no requirement that "the Government of Sudan must be named as a party in this case, or that the Government of Sudan's liability as a main perpetrator is adjudicated in this case." Mot. at 10. If Sudan need not be joined and its liability need not be adjudicated, then why, given the dictates of Rule 11, has BNPP wasted the Court's and Plaintiffs' time and resources pressing a frivolous defense? Indeed, BNPP invented this so-called requirement on the eve of trial and is unable to cite a single Article 50 case that ever articulated this purported precondition for accomplice liability.

### 1. BNPP lacks any precedent for this newfound requirement.

Five years after the close of Swiss law discovery, BNPP argued for the first time in its pretrial memorandum, ECF No. 896, that there are four elements for Article 50(1), not three as it previously stipulated. The Bank suddenly claimed the GOS must itself be liable under Article 41 and subject to Swiss jurisdiction in order for the Bank to be liable for aiding and abetting. Mot. at 10-21. Despite previously stipulating that Article 50(1) only requires proof that "a main perpetrator committed an illicit act," ECF No. 198 at 2, BNPP now contends that proof of commission is not enough: Plaintiffs must establish proof of subject matter jurisdiction and liability in a hypothetical suit against the GOS in Swiss court. Remarkably, this so-called requirement was absent from every expert report submitted by the Bank on Article 50 between 2016 and 2024. More importantly, it is wholly absent from the scholarly publications of BNPP's experts.

34

This counterfactual fantasyland is a distraction. BNPP does not cite a single Article 50 case articulating this purported requirement.[19] Nor could it. Plaintiffs have reviewed all Article 50 cases surveyed by the experts over the past nine years, in addition to searching Swiss law databases. Not in a century of case law has any court held that Article 50(1) requires establishing jurisdiction and a justiciable claim against co-tortfeasors. Plaintiffs are unable to find, and BNPP has not cited, a single case where a claim against an accomplice was dismissed because a joint tortfeasor had a defense to jurisdiction or liability.

Once again, this purported "requirement" is not one of the "elements articulated by the Swiss courts." *Kashef IV*, 2021 WL 603290, at *4. To the contrary, in 2019, the Swiss Supreme Court confirmed that "a claim" under Article 50(1) against "a contributor requires an unlawful principal act" by a "third party." ECF No. 708-13, *Swisscom Case*, 145 III 72 at reas. 2.2.2. Proof that a principal committed an unlawful act is sufficient. The Court has *never* held that an Article 50 claim against an accomplice requires proving that principal could be haled into a Swiss court and found liable under Article 41.

In fact, the Swiss Supreme Court's *Hockey Rink Case* disproves BNPP's theory. There, the court dismissed an Article 41 claim against a municipality that operated a dangerous rink, because cantonal governments cannot be sued under federal law. But the court held that the hockey teams who contributed to the danger by playing on an unsafe rink remained liable to an injured guest

---

[19] BNPP rattles off a string-cite of cases, but apparently failed to make any reasonable inquiry as to whether any actually articulate this so-called requirement. The string cite includes a case that does not involve Article 50 or secondary liability: ECF No. 174-1, Ex. 11 (Swiss Federal Supreme Court 112 [1986] II 118, "*Aircraft Case*") at reas. 1. In the other cases, the liability of the main perpetrator had either already been adjudicated, *see, e.g.*, ECF No. 708-15, *Locksmith Case*, Swiss Sup. Ct., 4A_185-2007, or the Plaintiffs joined the main perpetrator and the accomplice in the same suit, so the Court necessarily adjudicated the primary liability of the perpetrator, *see, e.g.*, ECF No. 533-10, *Rediffusion Case*, Swiss Sup. Ct. 107 II 82; ECF No. 708-32, *Shooting Contest Case*, Swiss Sup. Ct. 71 II 107 (1945).

under Article 50(1) CO. ECF No. 528-112, *Hockey Rink Case*, Swiss Sup. Ct., 79 II 66 (1953).[20] The fact that the perpetrator who created the danger was immune from liability did not exempt the other participants from Article 50(1). As Professor Werro explains, "[a]n accomplice is liable for culpably cooperating under Article 50(1) CO, even if the perpetrator is dead, defunct, immune, incapacitated, or otherwise beyond the reach of a Swiss court." Sept. 30, 2025 Werro Decl. ¶ 7.

Unable to locate a single Article 50 case supporting its novel theory, BNPP relies on three misleading sources: (1) an untimely expert declaration that falsely described an Article 51 case dealing with contribution claims as an Article 50 case dealing with accomplice liability; (2) a scholarly work that reached literally the opposite conclusion from what BNPP claims; and (3) an eleventh-hour letter from a Swiss diplomat that was either ghost-written by BNPP or simply copied BNPP's litigating positions—including those this Court found had been invented by BNPP's expert and never articulated by any Swiss court.

*First*, BNPP's proposed expert Isabelle Romy has been caught misrepresenting legal authorities. *See* ECF No. 986, Pls' Motion to Strike Untimely Expert Declaration. Shortly before trial, the Bank submitted a declaration, ECF No. 897, from Romy—an expert never disclosed or deposed during Swiss law discovery—in support of the Bank's pretrial memorandum, ECF No. 896. That declaration sought to impose BNPP's new theory that Plaintiffs must prove Swiss jurisdiction over the GOS and liability under Article 41. ECF No. 897, ¶ 10. To support this new theory, Prof. Romy cited a Swiss Supreme Court decision, the *Work Contract Case*, 130 III 362 (2004), and represented that it established a legal standard for Article 50 CO. In fact, she claimed this case provides the foundational premise for her entire argument:

---

[20] BNPP tries to distinguish the *Hockey Rink Case* by arguing that a hockey player was the main perpetrator. Mot. at 13, n.5. But the player merely played an ordinary game of hockey—the municipality created the dangerous condition and the player was liable as a contributor because he should have been aware of the danger (satisfying the conscious assistance element of Article 50).

> Joint and several liability under Art. 50 (1) CO presupposes the existence of multiple tortfeasors, i.e. at least two, who must be liable themselves (see ATF 130 lll 362 consid. 5.2: "la solidarité implique une responsabilité préalable: celui qui ne répond pas d'un dommage, ne saurait en repondre solidairement"; informal translation: "Solidarity implies a prior responsibility: one who is not liable for a damage cannot be held jointly liable for it").

ECF No. 897, ¶ 10.

What Romy failed to disclose is that this case does not apply Article 50(1) at all, nor does it even involve aiding and abetting liability. The *Work Contract Case* involves a *contribution* claim under an entirely different statute: Article 51.[21] That statute applies when multiple tortfeasors are primarily liable for causing the same injury, on independent legal grounds, rather than through culpable cooperation (in contrast to Article 50(1)). Unlike Article 50, Article 51 does not address secondary liability: it recognizes a cause of action for *contribution*. Under Article 51, all liable parties have joint and several obligations to the plaintiff and, if one is forced to pay the entire damages, he or she may bring a contribution claim against the other liable parties. Obviously, the necessary predicate for a contribution claim is that the other tortfeasor be liable. As Professor Werro—who caught the sleight of hand—observed: "Not only does Professor Romy fail to disclose to the Court that the case 130 III 362 is not an Article 50 CO case, she fails to include a copy in translation, further preventing the Court from seeing that Romy is conflating two norms whose prerequisities are totally different." Sept. 30, 2025 Werro Decl. ¶ 139.

---

[21] Article 51 CO provides:

> [1] Where two or more persons are liable for the same damage on different legal grounds, whether under tort law, contract law or by statute, the provision governing recourse among persons who have jointly caused damage is applicable *mutatis mutandis*.

> [2] As a rule, compensation is provided first by those who are liable in tort and last by those who are deemed liable by statutory provision without being at fault or in breach of contractual obligation.

Swiss Code of Obligations, https://www.fedlex.admin.ch/eli/cc/27/317_321_377/en.

Following Plaintiffs' motion to strike the offending declaration, ECF No. 986, BNPP has ceased citing Romy for this argument, apparently retracting the misleading opinion. But it still relies on the *Work Contract Case* as its sole legal precedent, pretending that this contribution claim case, decided under a different statute, is valid authority. *See* Mot. at 8, 15. It is not.

*Second*, BNPP's next cited authority is equally misleading. The Bank cites a commentary by Swiss scholar Roland Brehm to support its claim that for BNPP to be liable as an accomplice, Plaintiffs must establish the liability of the GOS. Mot. at 12 But BNPP fails to disclose that Brehm reaches *the opposite conclusion*, literally stating that to establish a claim against an accomplice or instigator under Article 50(1), "[t]he claimant only needs to prove that the defendant contributed to the damage. ***He does not need to prove the liability of the other involved parties.***" ECF No. 171-41, Roland Brehm, Bernese Commentary, No. 33 ad art. 50 CO.

*Finally,* BNPP's third purported authority provides no legal support. BNPP quotes a last-second letter emailed to the Court on the eve of trial and signed by Switzerland's Ambassador to the United States, Dr. Ralph Heckner, for the proposition: "[f]or Article 50(1) SCO joint and several liability to apply to an accomplice, there must be an underlying violation by a 'main perpetrator' who could be liable under Swiss tort law." Mot. at 11. But the Ambassador's letter cites no case law or even secondary source for this statement, nor does it even indicate that it represents the informed view of the Swiss Ministry of Justice. And Ambassador Heckner is not a lawyer: he is a historian and career diplomat.[22]

The Court may give "respectful consideration" to the letter as a reflection of Swiss *policy preferences*. *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 585 U.S. 33, 36 (2018). But as a matter of U.S. law, the *ipse dixit* views of a Swiss ambassador (penned by a non-lawyer and

---

[22] *See* https://swissimpactusa.com/welcome-to-our-new-ambassador-dr-ralf-heckner/.

devoid of nearly any legal citations) are not a probative source of foreign law. *See id*. at 43 (noting that courts should consider whether such a statement provides sufficient "support"). And although BNPP cites the letter as gospel, the Swiss Civil Code makes clear that the policy views of the executive branch are not a source of law that may be applied by a judge. Under Article 1 of that Code, there are only three sources of law that a judge may apply: statutes, customary law, and "established doctrine and case law."[23]

Regardless, there are serious questions as to the origins of the letter and its authorship. Not only does the letter contain no independent legal analysis and scarcely any citations, but it appears to simply parrot BNPP's arguments. There is one dead giveaway that BNPP likely furnished these talking points: the Ambassador's Letter asserts that "conscious cooperation" requires "a willful and substantial assistance to the unlawful act that injured the plaintiff." ECF No. 937 at 3. The phrase "willful and substantial assistance" must have originated with BNPP, because this Court has found that these purported requirements were invented by BNPP's expert and "are not elements articulated by the Swiss courts." *Kashef IV*, 2021 WL 603290, at *4. But in the final analysis, it matters little whether BNPP ghost-wrote the letter or the author simply copied BNPP's litigating positions—the letter is not a source of law, presents no independent legal analysis, and cites hardly any authority.

---

[23] Article 1 of the Swiss Civil Code provides:

> 1 The law applies according to its wording or interpretation to all legal questions for which it contains a provision.

> 2 In the absence of a provision, the court shall decide in accordance with customary law and, in the absence of customary law, in accordance with the rule that it would make as legislator.

> 3 In doing so, the court shall follow established doctrine and case law.

Thus, BNPP does not present a single colorable legal authority to support its foundational premise that Plaintiffs must establish that the GOS could be held liable in a Swiss court. Defense counsel was required to make a "reasonable inquiry required by Rule 11 and long-standing precedent, into the validity of the arguments [they] present[]." *Park v. Kim*, 91 F.4th 610, 615 (2d Cir. 2024) (per curiam). Selectively editing Swiss legal opinions in a misleading manner is not in keeping with the spirit of that obligation. *See United States v. Fernandez*, 516 Fed. App'x 34, 36 & n.2 (2d Cir. 2013) (admonishing attorney for his "editorial license" and noting his affirmative obligation to correct false statements of law). Nor is passing off an Article 51 case as an Article 50 case or misrepresenting the conclusions of the Brehm commentary. Whether or not such bad faith practices are sanctionable, they clearly are insufficient grounds for setting aside the verdict or ordering a new trial.

### 2. BNPP's argument on Swiss extraterritorial subject matter jurisdiction is irrelevant and frivolous.

BNPP argues at length, Mot. at 13-19, that a Swiss court would lack subject matter jurisdiction over a hypothetical suit against the GOS, citing the *Nait-Liman Case*. But this is an irrelevant *non sequitur*. We are not in a Swiss court and the GOS is neither a defendant, nor, as BNPP concedes, a necessary party. Mot. at 10. And, as shown above, Plaintiffs have no need to establish that the GOS is liable and amenable to suit in a Swiss court. As BNPP's own cited source states: "The claimant . . . does not need to prove the liability of the other involved parties." ECF No. 171-41, Brehm ¶ 36. Whether or not the GOS could be successfully sued in a Swiss court is BNPP's problem, should it seek to bring a contribution claim against its erstwhile client and co-conspirator.

Plaintiffs will not dwell long on *Nait-Liman*. In that case, the Swiss Supreme Court held that Switzerland's Private International Law Act did not grant Swiss courts subject matter

jurisdiction over tort claims brought against a Tunisian official, who was not present in Switzerland, for acts of torture committed against a Tunisian national in Tunisia, because the claim lacked any connection to Switzerland. Declaration of Kathryn Lee Boyd ("Boyd Decl."), Ex. 1, *Nait-Liman*, Swiss Sup. Ct., 4C.379/2006 at reas. 3.4, PDF p. 6 (2007).[24] The plaintiff appealed to the European Court of Human Rights, which held that Switzerland was not obligated under human rights law to exercise subject matter jurisdiction over the claim, given its lack of any nexus to Switzerland. *See* ECF No. 898-2 (Eur. Ct. Hum. Rts. Grand Chamber Judgment).

*Nait-Liman* has no bearing on this case for two reasons. *First*, it is factually distinguishable. *Nait-Liman* is not an Article 50 case, and it does not involve aiding and abetting liability. Nor does it involve an accomplice who used its Swiss subsidiary to effectuate an international conspiracy to thwart U.S. government efforts to stop genocide and launder billions of dollars in genocide-financing transactions through accounts in Geneva. This Court has already found that Switzerland has a nexus to this case—that is precisely why Judge Nathan decided to apply Swiss law. ECF No. 151 at 1 ("*Kashef III*"). And BNPP waived any argument that Switzerland lacks a sufficient connection to this case, when it urged the Court to apply Swiss law as the law of the jurisdiction with the greatest contacts and interests. ECF No. 69 at 14.

*Second*, *Nait-Liman* is solely concerned with the subject matter of Swiss courts under Article 3 of the Swiss Private International Law Act ("Swiss PILA"). The question was not, as BNPP misstates, whether Swiss tort law applies to conduct overseas, it was: "whether the Swiss courts have jurisdiction to hear the case." Boyd Decl., Ex. 1, *Nait-Liman* at reas. 3, PDF p. 5. Here, BNPP obscured the actual question presented by failing to translate and attach the actual Swiss decision.

---

[24] The opinion is unpaginated; the page number refers to the page of the PDF document.

The extraterritorial scope of jurisdiction under the Swiss PILA is utterly irrelevant. This Court's subject matter jurisdiction is governed by the U.S. Constitution and by Acts of Congress, not the Swiss Private International Law Act. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2), which BNPP does not dispute, *see* ECF No. 934, Pre-Trial Mem. Swiss law cannot divest a federal court of subject matter jurisdiction. *See Watson v. Tarpley*, 59 U.S. 517, 520 (1855) (holding state law "cannot affect, either by enlargement or diminution, the jurisdiction of the courts of the United States as vested and prescribed by the constitution and laws of the United States"); *Elgin Sweeper Co. v. Melson Inc.*, 884 F. Supp. 641, 647 (N.D.N.Y. 1995) ("Application of controlling foreign law would not divest this court of subject matter jurisdiction."). So, if BNPP were to sue the GOS for contribution in Swiss court, it might need to establish jurisdiction under the Swiss PILA and *Nait-Liman*, but that is the Bank's problem.

### 3. BNPP's argument that the GOS has jurisdictional immunity in Switzerland is irrelevant and frivolous.

For the same reasons, BNPP's argument concerning sovereign immunity, Mot. at 19-21, is specious. BNPP claims that the GOS could not be sued in Switzerland because it enjoys sovereign immunity. But we are not in a Swiss court and the GOS is not a defendant. Sudan's putative immunity from Swiss jurisdiction is all the more irrelevant because BNPP does not claim it is entitled to derivative foreign sovereign immunity. Mot. at 20. Nor could it. As Professor Werro explains, "The Code of Obligations precludes BNPP from borrowing jurisdictional defenses that are unique to the GOS." Sept. 30, 2025 Werro Decl. ¶ 150 (explaining that Article 145 CO bars an allegedly jointly and severally liable defendant from invoking personal defenses only available to other co-tortfeasors).

### 4. BNPP waived any argument that Swiss tort law does not apply, and regardless, genocide is unlawful under any choice of law.

Finally, the Court should reject BNPP's last-minute change of heart on choice of law. Despite successfully arguing for nine years that Swiss tort law applies to this case, BNPP now claims it does not. Mot. at 20. Instead, BNPP contends the unlawfulness of the GOS's genocidal acts should be determined under "public law, including treaties with foreign nations." *Id.*

But BNPP waived any argument that Swiss tort law does not apply here, by positing for years that Swiss tort law governs. Courts in this Circuit are clear that a "party can waive a choice-of-law argument." *Reed Constr. Data Inc. v. McGraw-Hill Companies Inc.*, 49 F. Supp. 3d 385, 423 (S.D.N.Y. 2014). A waiver occurs when a party switches position about what law applies. *Baiul v. NBC Sports*, No. 15-CV-9920 (KBF), 2016 WL 1587250, at *12 (S.D.N.Y. Apr. 19, 2016), *aff'd*, 708 F. App'x 710 (2d Cir. 2017) ("Plaintiffs' argument that California law applies similarly fails because plaintiffs have waived their choice of law argument by affirmatively representing that New York law applies in numerous prior filings in this action.").

Regardless, BNPP's choice of law argument is purely academic: No matter what body of law one applies, genocide, torture, rape, and murder of civilians are always unlawful, violating *jus cogens* norms. Genocide is unlawful under public international law (Switzerland and Sudan are both parties to the Genocide Convention),[25] and the Swiss Supreme Court has held that "the prohibition of genocide is part of mandatory customary international law." ECF No. 174-1, Ex. 15, 126 II 145 at 165, at reas. 4.d. (2000). And, as the Second Circuit previously held in this case, these acts are also unlawful under Sudanese law. *Kashef II*, 925 F.3d at 61.

---

[25] *See* Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9, 1948, 78 U.N.T.S. 277, 277, https://treaties.un.org/pages/ViewDetails.aspx?src=TREATY&mtdsg_no=IV-1&chapter=4.

In the end, there is no dispute that genocide is unlawful—under any choice of law—and at trial, BNPP did not dispute that the GOS engaged in genocide against the Plaintiffs and those similarly situated to them. Nothing more was required for the Plaintiffs to prove the first element of Article 50(1). BNPP's Rule 50 motion must be evaluated under the actual Swiss law standards that govern this case—not BNPP's latest inventions. Under those standards, the verdict stands.

## III.    BNPP's Remittitur Motion Should Be Denied

BNPP's lackluster defense against overwhelming evidence left the jury little choice but to award substantial damages. The Bank's summation conceded that "the plaintiffs were seriously and significantly harmed and injured in Sudan," Trial Tr. (Oct. 16, 2025) at 1559:11-12, and that they "shared compelling, tragic experiences about the harm they truly suffered," *id.* at 1558:11-19. Having conceded that "the scale of that pain and suffering" is "staggering," *id.* (Sept. 11, 2025) at 33:12-19, and that Plaintiffs—as genocide survivors—suffered "horrible, horrible things," *id.* (Oct. 16, 2025) at 1558:11-19, BNPP should be estopped from denying it and from reducing the damages to disproportionately low amounts.

Swiss law does not require lower damages. Under the Swiss substantive standard, the damages awarded are proportionate to the extraordinary suffering of the Plaintiffs. And Swiss law has no damages cap, no fixed tariff rates for personal injuries, and no requirement that a fact-finder base damages on precedent rather than evidence. BNPP's attempt to have this Court create a flat cap on damages—wholly absent from the Swiss Code—is improper under Rule 44.1 and international comity. And its effort to supplant a federal jury with Switzerland's practice of judicially determined damages runs afoul of the Seventh Amendment. Both remittitur and retrial should be denied.

**A. The damages were proportionate to the intensity of the suffering under the substantive Swiss standard.**

Swiss substantive standards for determining damages apply in this diversity action, but only to the extent they comport with the Seventh Amendment. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 435 (1996).[26] There are no juries in Switzerland, and all damages are determined by the judge. Mar. 2, 2023 Werro Decl. ¶ 157. Although this Court must apply Swiss substantive law on damages, it may not supplant the jury with the Swiss procedure of judicially determined damages.

Here, the damages awarded by the jury were "fair," not at all "disproportionate to the intensity of the moral suffering caused to the victim," and well within the "discretion" of the finder of fact. ECF No. 1042-1, Swiss Sup. Ct., 129 IV 22, at reas. 7.2, p. 36-37 (2002). That is all that Swiss law requires.

This is a human rights case, not a commercial one. The principal damages demanded and awarded were compensation for pain and emotional suffering, called "moral compensation" in Swiss terms. According to the Swiss Supreme Court, the amount of "moral compensation" to award "depends first and foremost on the seriousness of the physical and psychological suffering resulting the injury suffered by the victim and the possibility of significantly alleviating the resulting moral suffering by paying a sum of money." *Id.*, at reas. 7.2, p. 36-37. "Its determination is at the discretion" of the fact-finder (here, the jury). *Id.* The "compensation awarded must be fair." *Id.* The finder of fact "will therefore proportion the amount to the seriousness of the injury suffered and will avoid the amount awarded appearing derisory to the victim." *Id.*

---

[26] Seventh Amendment constraints are discussed below in Section III.C. The Court, however, need not reach the Seventh Amendment issue because the damages awarded are proportionate under the Swiss substantive test.

Upon review, "this is a question of fairness." *Id.* at p. 37. The reviewing court "intervenes with restraint" and examines whether the fact finder "has misused its discretionary power by basing its decision on considerations unrelated to the applicable provision, by failing to take relevant factors into account, or by setting an unfair compensation amount that is manifestly too low or too high." *Id.* Although the reviewing court may modify the award, this action requires preponderant proof that "the amount awarded takes [in]sufficient account of the seriousness of the injury or . . . is disproportionate to the intensity of the moral suffering caused to the victim." *Id.*

Under this standard, the damages were neither unfair nor "disproportionate to the intensity of the moral suffering." *Id.* After all, the jury heard uncontroverted testimony from genocide survivors on the worst moral suffering conceivable: a horrific campaign of violence by a state against a common portion of its own people, the Black African population. *See, e.g.*, Verhoeven, Trial Tr. (Sept. 17, 2025) at 571:15-19 ("for the vast majority of Black Africans, whether they came from South Sudan, the Nuba mountains, or Darfur, in this time it was about all the violence and the continued discrimination that they experienced . . . .").

For example. Ms. Kashef testified to the slaughter of her family while she hid in terror, and of "being bombed from above," which "was hell" and felt like it "was [the] end of the world at that time." Kashef, Trial Tr. (Sept. 26, 2025) at 967:4-10. When she was being tortured in Khartoum, she described how Government police officers "put[] out cigarettes on [her] body," how they "tie[d her] by the legs and hoist[ed her] upside down," as well as the horror of being gang-raped multiple times a day. *Id.* at 993:2-17, 992:1-3.

Mr. Turjuman similarly testified that he was detained by Government military intelligence and was "beaten" with whips, "tortur[ed]", treated "like an animal." Turjuman, Trial Tr. (Sept. 18, 2025) at 664:10-12, 669:2-8. At the moment he was forced to leave Sudan he was "crying" and

"felt like [he was] le[aving his] life behind;" and "everything was taken." *Id.* at 695:2-7. Mr. Abdalla witnessed Government Antonovs dropping bombs and "breaking the houses and trees." Abdalla, Trial Tr. (Sept. 25, 2025) at 921:18-25. He was beaten so "mercilessly" "with a butt end of the rifle," and whips by unnumerable Janjaweed, while being cussed at and told "you are a slave,"—that he lost consciousness. *Id.* at 930:18-931:19. When he was forced to leave Sudan, he reflected that "[a]ll I had was ruined." *Id.* at 943:15-21. BNPP failed to cross-examine the Plaintiffs and conceded that they suffered such atrocities.

These are not garden-variety torts: they are conscience-shocking "atrocities"—in BNPP's own words. Trial Tr. (Oct. 16, 2025) at 1558:11-19. These atrocities "have been condemned by both the United States and the international community as genocide." *Kashef II*, 925 F.3d at 55. The scale and gravity of these atrocities was shown to the jury through evidence that was uncontroverted and went largely unobjected. *See, e.g.*, Hudson, Trial Tr. (Sept. 11, 2025) at 113:6-9 (congressional finding that the "acts of the government of Sudan . . . constitute genocide as defined by the convention on the prevention and punishment of the crime of genocide."). As a matter of Swiss law, the awards *must* be commensurate with the extraordinarily heinous nature of Plaintiffs' suffering, and they were.

### B. There is no statutory cap on damages and the jury was not required to read Swiss case law and assess damages based on precedent, rather than evidence.

BNPP does not claim the jury "fail[ed] to take relevant factors into account." ECF No. 1042-1, Swiss Sup. Ct., 129 IV 22, at reas. 7.2, p. 36-37 (2002). Nor does the Bank claim the jury "bas[ed] its decision on considerations unrelated" to Article 50(1) and the genocidal attacks on Plaintiffs and their communities that the Bank funded. *Id.* Instead, the Bank asks the Court to *disregard* the evidence of the extent of suffering and reduce the damages award to a flat rate of $277,500 for all three Plaintiffs (or order a new damages trial). Mot. at 45-47. According to BNPP,

the jury should have mechanically awarded the same amount awarded by Swiss judges in other cases, rather than calculate damages in proportion to the suffering at evidence.

But there are four problems with this position. *First*, BNPP waived any argument that the damages needed to be based on precedent by failing to make this objection to the jury charges, failing to raise it in its Rule 50(a) motion, and failing to offer Swiss damages precedents into evidence or in proposed jury charges. *See* ECF No. 1003-1, Def.'s Chart of Objections to Jury Charges at 1, 12-13; Trial Tr. (Oct. 10, 2025) at 1462:6-16. A "Rule 59(e) motion is not a vehicle for . . . asserting arguments that could and should have been made before judgment issued." *Wells Fargo Fin., Inc. v. Fernandez*, No. 98 CIV. 6635 (SAS), 2001 WL 345226, at *1 (S.D.N.Y. Apr. 9, 2001). As Mr. Martinez, BNPP's attorney, himself correctly recognized during the charging conference: "if we don't raise [an objection] in a charging conference with respect to a jury instruction" then "it would be waived." Trial Tr. (Oct. 10, 2025) at 1463:16-23 (referencing "Second Circuit case law" he "recently read"). BNPP then failed to request that the jury be presented with Swiss judicial precedents on damages, even after the jury specifically asked the lawyers in a note: "In the event we are considering damages, is there an established formula for calculating an amount for compensatory damages and pain and suffering?" Trial Tr. (Oct. 17, 2025) at 1657:19-1661:3. By remaining silent, BNPP conceded there is no formula—yet now it dares ask the Court to impose one retroactively.

*Second*, Swiss judges are not *required* to base damages awards on a comparison of judicial precedents, nor was the jury here. The Swiss Supreme Court case cited by BNPP confirms that the finder of fact on damages is *permitted* to draw comparisons from precedents, but is not *required* to match the amount of damages awarded in prior cases: "***if*** the judge draws inspiration from certain precedents, he or she will ensure that they are suitable for current circumstances to take into

account the depreciation of the currency . . . ." ECF No. 1042-1, 129 IV 22, at reas. 7.2, p. 36-37 (2002).

The "if" says it all: a judge may "draw inspiration" from precedent but is not shackled to it. Indeed, the Swiss Supreme Court forbids applying a tariff system for pain and suffering damages, where dollar amounts are assigned to types of injuries based on precedent. *See* ECF No. 708-21, *Gunshot Case*, Swiss Sup. Ct., 132 II 117 at reas. 2.2.3, 120 (2006) ("the amount of [moral compensation] may not be determined according to fixed tariffs . . ."); *see also* Mar. 2, 2023 Werro Decl. ¶ 159.[27]

*Third*, under Swiss law "[t]here are no maximum statutory caps on damages that would limit the amount of compensation for pain and suffering that could be awarded by an American jury in this case." Mar. 2, 2023 Werro Decl. ¶ 162. Unlike the cases cited by BNPP (at 40), there is no Swiss "cap on damages." The Bank thus finds no support in *Ellerton v. Ellerton*, 745 F. Supp. 2d 458, 465 (D. Vt. 2010) (applying Canadian damages cap), or *Baird v. Bell Helicopter Textron*, 491 F. Supp. 1129, 1152 (N.D. Tex. 1980) (same). Nor does *Mejias-Quiros v. Maxxam Property Corporation* help BNPP: there, the First Circuit determined that because Puerto Rico "placed" no "substantive cap on medical damages," the sole question in a review of a remittitur denial was whether "the damages awarded lack a rational basis in evidence." 108 F.3d 425, 428, n.1 (1st Cir. 1997) (holding evidence only permitted a lower award).

The upshot is this: BNPP is asking this Court to legislate—from an American bench—a cap on Swiss compensatory damages that is wholly absent from the Swiss Code. But "this Court

---

[27] For this reason, BNPP misplaces its reliance on *Matter of Energetic Tank, Inc.*, cited by BNPP at 41, n.13. In that diversity case applying Singaporean law, Judge Preska agreed that the jury charges could draw on Singapore's published tariffs for damages (called the "Guidelines"), which fixed the permissible ranges of damages for personal injuries. No. 18-CV-1359 (LAP), 2024 WL 3952239, at *2 (S.D.N.Y. Aug. 27, 2024), *on reconsideration in part*, No. 18-CV-1359 (LAP), 2024 WL 4451710 (S.D.N.Y. Oct. 9, 2024). Switzerland does not have the same mandatory tariff system, or a codified set of guidelines. Its discretionary practice of permitting Swiss judges to consult precedent is not binding on the jury in this case.

will *not* create foreign law"—doing so would violate international comity. *In re SVB Fin. Grp.*, No. 23-10367 (MG), 2025 WL 2751584, at *31 (Bankr. S.D.N.Y. Sept. 29, 2025). The Court should decline that invitation.

*Finally*, unmooring the award from the evidence and applying a flat ceiling rate of $277,500 to all three Plaintiffs for all non-economic damages runs afoul of the Swiss Supreme Court's directive that a court must not take a mechanical, formulaic approach to pain-and-suffering damages: "due to its nature, compensation for mental suffering, which is intended to repair damage that cannot easily be reduced to a simple sum of money, cannot be determined according to mathematical criteria . . . ." ECF No. 1042-1, 129 IV 22, at reas. 7.2, p. 36-37 (2002). Instead of heeding that instruction, BNPP wishes to disregard the inhumanity of the crimes it funded and treat damages as a mathematical question of fixed tariffs. But the Swiss Supreme Court has "rejected the idea that the assessment of moral damages should be aligned to schematic standards." ECF No. 708-21, *Gunshot Case*, Swiss Sup. Ct., 132 II 117 at reas. 2.2.3, 120 (2006). And BNPP should be barred from downplaying the gravity of Plaintiffs' injuries, after it conceded to the jury that Plaintiffs were "so directly impacted and harmed by the atrocities that happened." Trial. Tr. (Oct. 16, 2025) at 1558:11-19. Both remittitur and retrial should be denied.

### C. BNPP's attempt to impose judicially determined damages on a federal jury trial violates the Seventh Amendment.

The Seventh Amendment gives Plaintiffs the right to have their damages be determined by a federal jury, not by Swiss judges in unrelated cases.[28] And they have a right to have the jury's

---

[28] "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. Const., amend. VII. Because Plaintiffs' Article 50 claims under Swiss law "soun[d] basically in tort, and seek legal relief," the "Seventh Amendment jury guarantee extends to [these] statutory claims." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 709 (1999).

factual determinations be reexamined only "according to the rules of the common law"—not according to the amounts of judicially determined damages under the *civil* law. U.S. Const., amend. VII. *See, e.g.*, *Gonzalez-Marin v. Equitable Life Assur. Soc. of U.S.*, 845 F.2d 1140, 1149 (1st Cir. 1988) (holding that reducing federal jury's award to amounts awarded by Puerto Rican judges in civil-law proceedings would violate the Seventh Amendment); *Marshall v. Perez Arzuaga*, 828 F.2d 845, 849 (1st Cir.1987), *cert. denied,* 484 U.S. 1065 (1988) ("For if Puerto Rico's practice of judicially determined damages is deemed to be intimately 'bound up' with the substantive rules of . . . Puerto Rico's civil law[,] . . . the right to jury trial in diversity cases in federal court in Puerto Rico would be no more.").

BNPP's motion would deny Plaintiffs those rights. The Bank asks the Court to adopt a discretionary Swiss procedural *mode* of assessing damages, and have the judge, not the jury, calculate damages based on case law rather than evidence. In the alternative, BNPP is seeking a retrial of damages under purported Swiss rules of evidence, which, in BNPP's erroneous view, would require submitting to the jury Swiss case law from unrelated cases as evidence of damages. Neither rule comports with the Seventh Amendment because both blur the distinction between judge and jury that is deeply rooted in common law.

"[T]here is a strong federal policy against allowing state rules to disrupt the judge-jury relationship in the federal courts." *Byrd v. Blue Ridge Rural Elect. Coop., Inc.*, 356 U.S. 525, 533–40 (1958). The Seventh Amendment preserves the jury's role in determining damages in federal court, including in diversity cases involving tort claims under foreign or civil law that are analogous to common law causes of action. *See, e.g.*, *LaForest v. Autoridad de Las Fuentes Fluviales de Puerto Rico*, 536 F.2d 443, 446–47 (1st Cir. 1976); *Trott v. Deutsche Bank, AG*, No. 20 CIV. 10299 (DEH), 2024 WL 1313040, at *3 (S.D.N.Y. Mar. 26, 2024).

The First Circuit has repeatedly confronted the issue raised by BNPP whenever it is asked to review a federal jury's damages award in a diversity action applying Puerto Rican civil law. And it has long held that federal courts cannot supplant the jury's function with the practices of a civil law jurisdiction that lacks jury trials and relies solely on judicial determinations of damages. *See LaForest*, 536 F.2d at 446–47. As the First Circuit holds, the mere "disparity in damages awards" between common-law jury awards "in the federal courts" and judicially determined awards in civil-law courts "is insufficient to warrant a deviation from the principles of federal common law" and the dictates of the Seventh Amendment. *Gonzalez-Marin v. Equitable Life Assur. Soc. of U.S.*, 845 F.2d 1140, 1149 (1st Cir. 1988). The same is true here.

The Constitution does not permit assigning to a lay federal jury the task of parsing Swiss case law and basing damages on precedent, not evidence. Nor does it permit binding a federal common-law jury to the amount of prior damages awarded by foreign civil-law judges in unrelated matters. The jury's verdict should stand.

### D.   Plaintiffs' damages evidence did not require an expert.

As the Court noted, damages here are not "a Rule 50 point." Trial Tr. (Oct. 1, 2025) at 1084:19-23. This is especially true here, where Plaintiffs were forced to flee for their very lives:

> Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.

*Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931).

Here, Plaintiffs presented sufficient evidence to support "a just and reasonable inference" for damages. For example, Mr. Turjuman testified extensively about the size of his homes in

Sudan, that he built his house in Wau, and that he is intimately familiar with the general values of homes in Sudan at this time due to his recent travels to the country and consulting with "some engineers, the architect" others concerning the value of homes in Khartoum and Wau. Turjuman, Trial Tr. (Sept. 18, 2025) at 703:9-707:5. This is not "merely repeat[ing] another person's valuation" but instead shows that Mr. Turjuman stuck close to his "own knowledge and perception" about the value of his property, which "may be intuitive and difficult to support through objective measures, but it has evidentiary value and falls well within the mainstream of federal practice." *Sullivan v. Saint-Gobain Performance Plastics Corp.*, No. 5:16-cv-125, 2019 WL 12323305, at *3 (D. Vt. July 26, 2019) (cited Mot. at 47).

Similarly, each of the Plaintiffs testified extensively about the extent of the injuries they suffered to their bodies, their minds, and their human dignity.[29] Defendants elected not to cross-examine or offer contrary proof, and they cannot now claim insufficiency. The Second Circuit makes clear that Rule 50 is reserved for cases with a complete absence of evidence, not merely a disagreement over its weight. *See Galdieri-Ambrosini*, v. *Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 287 (2d Cir. 1998).

BNPP vicariously argues that that Plaintiffs were required to rely on their "medical causation experts." ECF No. 998 at 44.[30] Medical experts are useful and required in certain

---

[29] Mr. Turjuman testified about being arrested, tortured, forced to abandon his homeland and property, and that "I feel just like I'm someone who is dead walking, no life." Turjuman, Trial Tr. (Sept. 18, 2025) at 658:18-659:12, 662:3-11, 664:10-12, 669:2-8, 670:15-22, 678:3-25, 680:1-681:24, 687:10-688:2, 702:7-23, 703:9-707:5. Mr. Abdalla testified about the destruction of his village, injuries to his human dignity (including his trauma from seeing his family suffer), and that his extensive livestock would have been worth "up to a million." Abdalla, Trial Tr. (Sept. 25, 2025) at 924:14-25, 931:15-19, 934:1-10, 944:24-945:7, 921:15-20, 909:1-11, 945:14-25. Ms. Kashef testified about witnessing her family members being shot, the land her family owned, and the severe physical and mental anguish she suffered and continues to suffer. Kashef, Trial Tr. (Sept. 26, 2025) at 987:25-988:1, 966:3-10, 980:1-25, 980:8-15, 996:6-22, 1000:4-1001:1.

[30] BNPP purports to incorporate by reference its arguments concerning damages from its Rule 50(a) motion, ECF No. 998. Mot. at 47. Although a party's Rule 50(b) motion must refer to and may not enlarge its Rule 50(a) motion, a party cannot preserve an argument from a Rule 50(a) motion that it abandons in its Rule 50(b) motion. BNPP has effectively abandoned their arguments concerning the alleged need for medical experts and the lack of evidence of moral damages.

contexts to explain the nexus between an action (*e.g.*, exposure to a toxic chemical) and resulting injury (*e.g.*, cancer). But this is not like a toxic tort case based on the medical injuries suffered from exposure to a dangerous chemical. *Contra Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 268 (2d Cir. 2002) (cited ECF No. 998 at 44). A medical expert is not required to understand "the nexus between the injury and the alleged cause" for Mr. Abdalla's vision injury to his beating at the hands of the GOS, Mr. Turjuman's difficulty standing due to the beatings he suffered, or Ms. Kashef's mental scars from the horrific abuses (including rape and torture) that she endured. *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004).

BNPP's suggestion that there is no record evidence to support "moral damages," ECF No. 998 at 45, is hardly worth mentioning. First, the record is replete with evidence of the almost indescribable human rights abuses the GOS committed against Plaintiffs. *See, e.g.*, PX 162 (Oct. 1, 2006 email describing a genocide as "a delicate humanitarian environment which has its media flare-ups from time to time"). Second, the fact that some areas of Sudan were subjected to conflict prior to BNPP throwing gasoline on the fire does not discredit that Plaintiffs lived a "peaceful life" in Sudan. ECF No. 998 at 46. BNPP's attempt to discredit and deny the unrebutted testimony of Plaintiffs is unconscionable.

## IV.    All of Plaintiffs' Claims Are Timely

It is the Bank's timeliness challenge that is tardy, not Plaintiffs' claims. This Court confirmed that the Second Circuit's holding pursuant to C.P.L.R. § 215(8) is law of the case. *Kashef VI*, 2024 WL 1676355, at *5. Specifically, "[New York's] one-year statute also is shorter than the 15-year statute of Sudanese law, thus complying with [C.P.L.R.] § 202 [the borrowing statute]." *Id.* The outcome now is no different: the mandate rule applies. BNPP has also long since waived its right to challenge timeliness; and in any event, Plaintiffs' claims are timely under Sudanese law.

BNPP bases its latest quibble with prior rulings on a faulty premise. It recasts *dicta* from the Court's summary judgment order stating that it would be arbitrary to apply Sudanese law when the courts were not open to Plaintiffs, as the "basis for the Court's decision at summary judgment." It then posits that no such exception exists to the New York borrowing statute. Mot. at 50.

BNPP then argues that the trial record supports the preposterous premise that Sudanese courts were open to Plaintiffs, targeted victims of the Bashir Regime. According to BNPP, Plaintiffs should have divined BNPP's sanctions-evasion conspiracy with Sudan years before BNPP publicly pled guilty, and even before the U.S. government was investigating BNPP, and brought their case earlier in either Sudan or the United States. Under BNPP's theory, at the same time Mr. Turjuman was being tortured by the GOS for his legal advocacy *within the Sudanese court system*, he should have nonetheless *availed himself of the country's courts* to file this action. BNPP's argument is logically deficient, morally bankrupt, and should be rejected.

### A. The Second Circuit's decision on statute of limitations is binding under the mandate rule.

BNPP continues to refuse a binding Second Circuit decision, as well as this Court's more recent affirmation that all claims are timely under N.Y. C.P.L.R. § 215(8)(a). *See Kashef II*, 925 F.3d at 63; *Kashef VI*, 2024 WL 1676355, at *5. Now nearing the 10-year mark in the case, and where BNPP long contended that *New York* law applies,[31] it argues for the application of a *Sudanese* statute of limitations, and asserts "all claims for injuries that occurred . . . before April 29, 2001, are time-barred." Mot. at 50.

The law of the case or mandate rule "requires a trial court to follow an appellate court's previous ruling on an issue in the same case." *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d

---

[31] *Tehran-Berkeley Civil & Env't Eng'rs v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989) (holding that the parties' briefs discussing only New York law gave implied consent to use New York law).

Cir. 2002) (citations omitted). This means that the Court here "is bound by the [appellate] decree as the law of the case and must carry it into execution according to the mandate." *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255 (1895).

In 2019, the Second Circuit expressly held that the "Plaintiffs' claims are timely under [N.Y. C.P.L.R.] § 215(8)(a)," which provides a one-year civil limitations period for crime victims. *Kashef II,* 925 F.3d at 63. This Court unequivocally reiterated the mandate in its 2021 Opinion and Order on Defendants' Motion to Dismiss: the "Second Circuit . . .h[eld] that Plaintiffs' claims were not . . . untimely." *Kashef IV*, 2021 WL 603290, at *2. In 2024, this Court again affirmed the decision, finding at summary judgment that "[t]he Second Circuit's holding establishes the law of the case, and I follow it." *Kashef VI*, 2024 WL 1676355, at *4. Dismissing even a portion of Plaintiffs' claims as time-barred under Sudanese law now would be to give the Second Circuit's mandate "no legal effect." *In re Coudert Bros. LLP*, 809 F.3d 94, 99 (2d Cir. 2015).

BNPP "waived [its] statute of limitations defense" under Sudanese law "by not raising it in [its] motion to dismiss the [complaint or] amended complaint." *S.E.C. v. Amerindo Inv. Advisors*, 639 F. App'x 752, 754 (2d Cir. 2016) (summary order). BNPP was "obliged to plead the [Sudanese] Statute of Limitations at the earliest possible moment." *Strauss v. Douglas Aircraft Co.*, 404 F.2d 1152, 1155 (2d Cir. 1968). An inexcusable delay constitutes waiver because it prejudices the Plaintiffs' ability to file in other fora where the claim might be timely. *In re Kingate Mng't Ltd Litig.*, 746 Fed. App'x 40, 43 (2d Cir. 2018) (holding party "waived [its timeliness challenge to application of particular U.S. law to certain claims in class action] by failing to raise it before the District Court in response to . . . [the] first motion to dismiss."). Here, BNPP failed to raise Sudan's statute of limitations for four years, omitting it from its motions to dismiss the amended and second amended complaints. *See* ECF No. 38 at 6-10; ECF No. 69 at 6-10. BNPP's

delay in invoking Sudan's statute of limitations, was an inexcusable delay. *See* ECF No. 213, Answer, Apr. 15, 2021. Unsurprisingly, courts in this Circuit deem that delay a waiver.[32]

It was also waived by failure to raise it before the Second Circuit. *See United States v. Quintieri*, 306 F.3d at 1225 ("The 'mandate rule' ordinarily forecloses relitigation of all issues previously waived by the defendant . . . ."). An issue will be considered waived so long as the party had "an opportunity and an incentive to raise it . . . on appeal," *id.* at 1229—both of which BNPP had.

Indeed in *Call Center Technologies, Inc. v. Interline Travel & Tour, Inc.*, the Second Circuit rejected a challenge to the application of Connecticut law, after ten years of litigation and appeal, because "[Defendant] had every incentive to put its best case forward prior to the initial appeal . . . . The fact that it now believes Texas law is more favorable than Connecticut law in light of [the Second Circuit's] decision in the initial appeal does not mean that it did not have the incentive and opportunity to pursue the case under Texas law prior to that appeal." 622 Fed. App'x 73, 75 (2d Cir. 2015). There is no do-over for BNPP to challenge limitations periods: "[e]specially given the long history of this case and the fact that *for years the parties and the court operated under the premise that* [N.Y. C.P.L.R. § 215(8)] applied, [BNPP's] failure to raise the choice of law issue in the district court prior to the first appeal served as a waiver of the argument." *Call Ctr Tech*, 622 Fed. App'x at 75. (emphasis added).[33]

---

[32] "[F]ailure to raise the defense in a motion to dismiss, even though technically not a pleading, has been held to be a waiver." *Santos v. Dist. Council of N.Y. & Vicinity of United Brotherhood of Carpenters*, No. 75-CV-4355, 1978 WL 1631, at *1 (S.D.N.Y. Feb. 23, 1978), *on reargument*, 1978 WL 1632 (S.D.N.Y. May 1, 1978); *see also Muia v. Brookview Rehab Funding, LLC*, No. 10-CV-1315, 2012 WL 1014753, at *3 n.4 (N.D.N.Y. Mar. 23, 2012) (holding that a statute of limitations defense was "deemed waived" where the "[d]efendants did not raise it in their initial [m]otion to dismiss"); *Orthodox Jewish Coal. of Chestnut Ridge v. Vill. of Chestnut Ridge, New York*, No. 19-CV-443 (KMK), 2021 WL 3605041, at *6 (S.D.N.Y. Aug. 13, 2021) (same).

[33] BNPP failed at every juncture to raise the specter of Sudanese statute of limitations in motion practice prior to summary judgment. It failed to raise it: (1) with the Court in its initial 2017 motion to dismiss, *see* ECF No. 69, Mem. of L. of Defs. in support of their Mtn. to Dismiss the Second Amended Complaint, Mar. 21, 2017 at 6-10; (2) during the 2018 Second Circuit appeal, *see* BNPP Appellee Brief at 43-52; (3) on remand in 2019 when the Court provided

**B.  Plaintiffs' claims are timely under New York's borrowing statute.**

BNPP well knows that under New York's borrowing statute, N.Y. C.P.L.R. § 202, the result is the same as found by the Second Circuit: N.Y. C.P.L.R. § 215(8)(a) governs the limitations period and all claims are timely. The borrowing statute first requires a *comparison* between the New York limitations—here, N.Y. C.P.L.R. § 215(8)(a)—and Sudan's "limitations period . . . fully encumbered with all [of Sudan's] tolling rules"; the foreign period is only *borrowed* if it is the shorter of the two. *Norex Petroleum Ltd. v. Blavatnik*, 16 N.E.3d 561, 568 (N.Y. 2014). This Court performed the analysis and explicitly found that "[New York's] one year statute also is shorter than the 15-year statute of Sudanese law, thus complying with [C.P.L.R.] § 202." *Kashef VI*, 2024 WL 1676355, at *5.[34]

Section 159 of Sudan's Civil Transactions Act 1984 ("CTA")'s fifteen-year limitations period,[35] *is subject to tolling or suspension*. *See* ECF No. 461-69, Decl. of Osman Mekki Osman Abdulrahman ("Mekki Decl.") ¶¶ 3, 17-62.[36] As Plaintiffs' expert points out, the Sudanese limitations period did not even *begin* to run until at least 2019 when the Bashir government was ousted, based on multiple sources of Sudanese law, including the Maliki school of Shari'a and

---

BNPP with an opportunity to file a supplemental brief to address any instance where "Defendants contend that the Second Circuit's decision in *Kashef* [*II*], bears on the remaining grounds to which Defendants already moved [on motion to dismiss]", *see* ECF No. 112, Order, Jun. 14, 2019 at 1, ECF No. 117, Suppl. Br. of Defs. in further support of their Mtn. to Dismiss the Second Amended Complaint, Jun. 28, 2019, ECF No. 128, Suppl. Reply Br. of Defs. in further support of their Mtn. to Dismiss the Second Amended Complaint, Aug. 9, 2019; and (4) when it subsequently sought reconsideration of the Court's February 16, 2021 decision on its motion to dismiss following remand, *see* ECF No. 198. BNPP also filed another motion to dismiss for *forum non conveniens* in 2022—denied by this Court—and again failed to argue that a new Sudanese limitations period applied. *See* ECF No. 262, Mem. of L. in support of Defs.' Mtn. to Dismiss for Forum Non Conveniens, Dec. 18, 2021.

[34] This is consistent with the Court's 2018 decision that "[t]he parties agree that New York's statutes of limitations will apply to the causes of action in this case because under New York's borrowing statute, N.Y. C.P.L.R. 202, the Court must apply the shorter statute of limitations period of either New York or the state where the cause of action accrued." *Kashef v. BNP Paribas SA*, 316 F. Supp. 3d 770, 779 (S.D.N.Y. 2018) ("*Kashef I*").

[35] *See also* ECF No. 435-100, Decl. of Tayeb Hassabo dated Sept. 30, 2022 ("Hassabo SOL Decl.") ¶ 22.

[36] BNPP once again fails to address Mr. Mekki's 2023 report or the suspension of Sudanese limitation periods and should not be permitted to do so for the first time on reply. *See, e.g.*, *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993) ("Arguments may not be made for the first time in a reply brief.").

Egyptian jurists' interpretation of a general rule of suspension from Article 382 of the Egyptian Civil Code.[37] Threat of persecution and retaliation and the Regime's control over the military and its agents, fraudulent concealment of BNPP's involvement with the Regime, and a non-functioning judiciary that prevented victims from bringing suit in Sudan, tolled the statute. *See* Mekki Decl. at ¶¶ 3(a), 17-59.[38] Tolling under Sudanese law is consistent with U.S. tolling when civil war or repressive authoritarian regimes constitute extraordinary circumstances. *See, e.g.*, *Warfaa v. Ali*, 1 F. 4th 289, 295 (4th Cir. 2021) ("regimes committing egregious human rights violations don't ordinarily foster legal systems in which those abuses can be redressed").[39]

Thus, since N.Y. C.P.L.R. § 215(8)(a) limits tolling to one year from BNPP's judgment of conviction—May 1, 2015, *see Kashef II,* 925 F.3d at 63, and Sudan's statute of limitations did not even *begin* to run until at least 2019—three years after this lawsuit was filed, *see* Mekki Decl. at ¶ 59—the borrowing statute requires applying N.Y. C.P.L.R. § 215(8)(a), under which the Second Circuit has already ruled Plaintiffs' claims are timely. *See also Kashef VI*, 2024 WL 1676355, at *5.

---

[37] Shari'a, principally the Maliki school of jurisprudence, is Sudan's "main source" of legislation and no legislation can contradict Shari'a. *See* ECF No. 435-100, Hassabo SOL Decl. ¶ 16; ECF No. 461-69, Mekki Decl. ¶ 18. Sudanese courts similarly look to Egyptian jurists' interpretation of the Egyptian civil code to aid in interpretation of the CTA. *See* Hassabo SOL Decl. ¶ 21; Mekki Decl. ¶¶ 26-37. Where, as here, there is no legislative text addressing suspension or interruption of the limitation periods, "the courts shall apply Islamic Shari'a . . . ." Mekki Decl. ¶ 22 (quoting Civil Procedures Act of 1983, Section 6(2)); *see also id.* ¶ 21 (discussing for example, that the CTA refers to general principles of limitation including "interruption, cessation . . ." in Section 652 that do not exist in Act). BNPP's Sudanese law expert bases his entire interpretation on Section 159 of the CTA being the "legislative text" and the fact that solely in his opinion, no Sudanese court has cited Egyptian cases in the tort context. *See generally* ECF No. 444-101. But the absence of court precedent (especially in Sudan) is not authority.

[38] The same result is alternatively reached because under Sudanese law, where the wrongful acts of the Bashir Regime created both criminal and civil liability, the civil limitation does not expire until the criminal limitation expires—again at least until 2019 with the ouster of the Bashir regime. Mekki Decl. ¶¶ 3(b), 31, 60.

[39] "[E]very court that has considered the question of whether a civil war and a repressive authoritarian regime constitute 'extraordinary circumstances' has answered in the affirmative." *Jean v. Dorelien*, 431 F.3d 776, 780 (11th Cir. 2005) (pattern and practice of torture, murder, intimidation, and reprisals during Haitian military regime qualified as "extraordinary circumstances" to toll statute of limitations); *see also Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 135-36 (E.D.N.Y. 2000) (claims tolled against French financial institutions who allegedly participated in scheme to expropriate assets from Jewish customers during Nazi occupation and withhold assets from descendants).

**C. BNPP's reliance on *dicta* is not a basis to revisit the timeliness of Plaintiffs' claims.**

BNPP attempts to rely on *dicta* from the summary judgment decision, claiming that "core assumptions that formed the basis of the Court's decision at summary judgment" are undermined by the trial evidence. *See United States v. Sealed Defendant One*, 49 F.4th 690, 699 n.4 (2d Cir. 2022). In fact, the basis for the holding was "§ 215(8) is the law of the case," and "is the law [Court] hold[s] to be applicable" and New York's "one-year statute is also shorter than the 15-year statute of Sudanese law, thus complying with § 202." *Kashef VI*, 2024 WL 1676355, at *5.

Furthermore, BNPP's so-called trial evidence fails to undermine that "it would be arbitrary to apply Sudanese law when the courts of Sudan were not open to the Plaintiffs and lacked the capacity to control a genocidal government." *Id.* BNPP asserts Mr. Turjuman who has lived in the U.S. since 2005 "should have filed his claims in a U.S. court well before the expiration of the Sudanese limitations period," and that the trial record lacks evidence that "Sudanese courts" were "inaccessible to him" during the time that his tormentors still ruled the country. Mot. at 51. Putting aside BNPP does not address that half of Sudan (including where Mr. Turjuman lived) was split into two separate countries in 2011, each supposition is wrong. First, BNPP fails to explain how Mr. Turjuman and Plaintiffs could have brought their claims before BNPP's covert criminal support of the Government of Sudan was revealed in 2014. Second, BNPP skirts the reality that Plaintiffs *did* file their claims within the Sudanese limitations period, as recognized by Court, *see Kashef VI*, 2024 WL 1676355, at *5, which did not even *start to run* until 2019 at the earliest. And third, BNPP ignores the fact that it was Mr. Turjuman's work *in the Sudanese courts* as both a judge and lawyer that led to him being targeted by the Government of Sudan. *See, e.g.*, Turjuman, Trial Tr. (Sept. 18, 2025) at 658:10-659:2 ("As soon as I filed that motion and a copy sent to national security [as a precursor to a case against the government of Warrap state], they [the

national security] came that afternoon and arrested me. And they took me to their headquarters . .
. where I was tortured too badly"). BNPP similarly omits that Mr. Abdalla testified to suffering for
more than a decade in internally displaced persons camps and a refugee camp in Kenya after the
GOS and Janjaweed had burned had twice burned down his home and village, until coming to the
United States in late December 2013. *See* Abdalla, Trial Tr. (Sept. 25, 2025) at 901:23-902:10; PX
854. And the class action lawsuit was filed within a year of BNPP having been sentenced for its
crimes.[40]

 Accordingly, BNPP's newly attempted timeliness argument is meritless.

## <u>CONCLUSION</u>

 For the foregoing reasons, Plaintiffs respectfully submit that the Motion be denied in its
entirety.

 Dated: December 8, 2025       Respectfully submitted,

*/s/ Kathryn Lee Boyd*        */s/ Michael D. Hausfeld*
 Kathryn Lee Boyd         Michael D. Hausfeld
 David L. Hecht          Scott A. Gilmore
 Maxim Price           Amanda E. Lee-DasGupta
 Michael Eggenberger        Claire A. Rosset
 HECHT PARTNERS LLP       Mary S. Van Houten Harper
 125 Park Avenue, 25th Floor      Percy Metcalfe
 New York, NY 10017        HAUSFELD LLP
 (646) 502-9515          1200 17th Street, Suite 600
 lboyd@hechtpartners.com       Washington, DC 20036
 dhecht@hechtpartners.com       (202) 540-7200
 mprice@hechtpartners.com       mhausfeld@hausfeld.com
 meggenberger@hechtpartners.com     sgilmore@hausfeld.com
               alee@hausfeld.com
 Kristen Nelson         crosset@hausfeld.com
 HECHT PARTNERS LLP       mvanhouten@hausfeld.com

---

[40] Ms. Kashef did not seek compensation for the loss of her mother—this was family background provided at trial to
which BNPP never objected and Plaintiffs did not ask for damages for this event in summation. The parties' openings
and closings clearly delineate 1997 as being the beginning of the relevant time period. *See, e.g.*, Trial Tr. at 23:17-19;
25:12-14; 1538:9-14; 1543:9-12.

2121 Avenue of the Stars
Los Angeles, CA 90067
(646) 490-2408
knelson@hechtpartners.com

Greg G. Gutzler
Carrie A. Syme
DICELLO LEVITT LLP
485 Lexington Ave., Ste 1001
New York, NY 10017
(646) 933-1000
ggutzler@dicellolevitt.com
csyme@dicellolevitt.com

Kenneth P. Abbarno
Mark A. DiCello
Robert F. DiCello
DICELLO LEVITT LLP
8160 Norton Parkway, Third Floor
Mentor, Ohio
(440) 953-8888
kabbarno@dicellolevitt.com
mdicello@dicellolevitt.com
rfdicello@dicellolevitt.com

Adam J. Levitt
DICELLO LEVITT LLP
Ten North Dearborn Street, Sixth Floor
Chicago, IL 60602
(312) 214-7900
alevitt@dicellolevitt.com

*Co-Counsel for Plaintiffs*

pmetcalfe@hausfeld.com

James D. Gotz
HAUSFELD LLP
One Marina Park Dr., Suite 1410
Boston, MA 02210
(617) 207-0660
jgotz@hausfeld.com

Cyril V. Smith
ZUCKERMAN SPAEDER LLP (Baltimore)
100 East Pratt Street, Suite 2440
Baltimore, MD 21202
(410) 332-0444
csmith@zuckerman.com

Aitan D. Goelman
ZUCKERMAN SPAEDER LLP (DC)
1800 M Street, Suite 1000
Washington, DC 20036
(202) 778-1996
agoelman@zuckerman.com