UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ENTESAR OSMAN KASHEF *et al.*,

                              Plaintiffs,

            -against-

BNP PARIBAS S.A.,

                              Defendant.

---

No. 16 Civ. 3228 (AKH)

Hon. Alvin K. Hellerstein

---

**DEFENDANT BNP PARIBAS S.A.'S REPLY MEMORANDUM OF LAW IN FURTHER
SUPPORT OF ITS RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
OR, ALTERNATIVELY, FOR A NEW TRIAL OR TO AMEND THE JUDGMENT**

---

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
T: (212) 351-4000

CLEARY GOTTLIEB
STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
T: (212) 225-2000

*Counsel for Defendant BNP
Paribas S.A.*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................................................. 1

ARGUMENT ...................................................................................................................... 4

I.    BNPP Is Entitled To Judgment As A Matter Of Law Or, In The Alternative, A
      New Trial. ................................................................................................................ 4

      A.    BNPP Is Not Liable Under Article 41 Of The Swiss Code Of Obligations. ......... 5

      B.    BNPP Is Not Liable Under Article 50 Of The Swiss Code Of Obligations. ......... 8

            1.    Swiss Law Requires That The Main Perpetrator Be Capable Of
                  Being Held Liable To Support Accomplice Liability................................. 9

            2.    The Government Of Sudan Cannot Be Held Liable As The Main
                  Perpetrator Because Swiss Tort Law Does Not Apply
                  Extraterritorially To Acts Committed Outside of Switzerland. ............... 12

            3.    The Government of Sudan Cannot Be Held Liable As The Main
                  Perpetrator Because Swiss Tort Law Does Not Permit Suit Against
                  A Foreign Sovereign For Actions Taken In Its Sovereign Capacity. ...... 13

      C.    Plaintiffs Failed To Prove That BNPP Consciously Assisted The
            Government Of Sudan And Knew Or Should Have Known That It Was
            Contributing To The Government Of Sudan's Human Rights Violations. ......... 14

      D.    Plaintiffs Failed To Demonstrate By Sufficient Evidence That BNPP's
            Actions Were The "Natural And Adequate Cause" Of Their Alleged
            Injuries. ...................................................................................................... 18

            1.    Natural Causation...................................................................................... 18

            2.    Adequate Causation .................................................................................. 22

      E.    Plaintiffs Failed To Provide Sufficient Evidence To Satisfy The
            Applicable Burden Of Proof For Each Element Of Their Case........................... 24

II.   The Court Should Grant A Remittitur Reducing The Award Of Damages To
      Comply With Swiss Law. ....................................................................................... 26

      A.    Swiss Law Requires That Plaintiffs' Excessive Moral Damages Award Be
            Consistent With Awards In Similar Swiss Cases. ............................................... 26

      B.    Plaintiffs' Damages Awards Should Be Reduced Or Eliminated Because
            They Failed To Present Required Expert Testimony On Damages.................... 32

III.  BNPP Is Entitled To Judgment As A Matter of Law For Plaintiffs' Claims Arising
      From Injuries That Occurred Before April 29, 2001 And A New Trial Excluding
      Claims For Such Injuries. ....................................................................................... 34

i

**TABLE OF CONTENTS**
(continued)

                                                                            **Page**

    A.    BNPP Preserved Its Borrowing Statute Argument In Its Motion To
           Dismiss And Answer. ............................................................................... 34

    B.    Plaintiffs' Claims Are Untimely Under Sudanese Law. ....................................... 36

    C.    Trial Disproved Core Assumptions from the Court's Summary Judgment
           Ruling.................................................................................................... 38

CONCLUSION................................................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Ahmad v. New York Univ.*,
  2025 WL 3022862 (S.D.N.Y. Oct. 29, 2025).............................................................................26

*Ashley v. Deutsche Bank Aktiengesellschaft*,
  144 F.4th 420 (2d Cir. 2025) ...................................................................................................17

*Brown v. City of New York*,
  862 F.3d 182 (2d Cir. 2017).....................................................................................................36

*CTS Corp. v. Waldburger*,
  573 U.S. 1 (2014).....................................................................................................................38

*Earl v. Bouchard Transp. Co.*,
  917 F.2d 1320 (2d Cir. 1990)...................................................................................................29

*Ellerton v. Ellerton*,
  745 F. Supp. 2d 458 (D. Vt. 2010) ..........................................................................................31

*Gasperini v. Ctr. for Humanities., Inc.*,
  518 U.S. 415 (1996)........................................................................................................ *passim*

*GML, Inc. v. Cinque & Cinque, P.C.*,
  9 N.Y.3d 949 (2007) .................................................................................................................39

*Greenbaum v. Handelsbanken*,
  67 F. Supp. 2d 228 (S.D.N.Y. 1999) ........................................................................................39

*Grunenthal v. Long Island R. Co.*,
  393 U.S. 156 (1968)..................................................................................................................30

*Kashef v. BNP Paribas S.A.*,
  2021 WL 603290 (S.D.N.Y. Feb. 16, 2021)..................................................................... *passim*

*Kashef v. BNP Paribas S.A.*,
  2024 WL 1676355 (S.D.N.Y. Apr. 18, 2024) ....................................................................36, 38

*Kashef v. BNP Paribas SA*,
  316 F. Supp. 3d 770 (S.D.N.Y. 2018) ......................................................................................34

*Kulzer v. Pittsburgh-Corning Corp.*,
  942 F.2d 122 (2d Cir. 1991)..................................................................................................4, 35

*LaForest v. Autoridad de Las Fuentes Fluviales de Puerto Rico*,
  536 F.2d 443 (1st Cir. 1976).....................................................................................................30

*Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*,
  967 F.2d 742 (2d Cir.1992).......................................................................................................35

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Loc. Union No. 39, Sheet Metal Workers' Int'l Ass'n, AFL-CIO v. Pelella*,
    350 F.3d 73 (2d Cir. 2003)..............................................................................................32

*Marcano Rivera v. Turabo Med. Ctr. P'ship*,
    415 F.3d 162 (1st Cir. 2005)...........................................................................................30

*Marshall v. Perez Arzuaga*,
    828 F.2d 845 (1st Cir. 1987)...........................................................................................30

*Payne v. Jones*,
    711 F.3d 85 (2d Cir. 2013)..............................................................................................32

*Rangolan v. Cnty. of Nassau*,
    370 F.3d 239 (2d Cir. 2004).................................................................................26, 29, 30

*S.E.C. v. Amerindo Inv. Advisors*,
    639 F. App'x 752 (2d Cir. 2016) ................................................................................34, 35

*Santos v. District Council of New York City*,
    619 F.2d 963 (1980)........................................................................................................35

*Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*,
    762 F.3d 165 (2d Cir. 2014)............................................................................................35

*Stampf v. Long Island R. Co.*,
    761 F.3d 192 (2d Cir. 2014)......................................................................................26, 31

*Sullivan v. Saint-Gobain Performance Plastics Corp.*,
    2019 WL 12323305 (D. Vt. July 26, 2019)....................................................................33

*Twitter v. Taamneh*,
    598 U.S. 471 (2023).......................................................................................................17

*United States v. Picardi*,
    739 F.3d 1118 (8th Cir. 2014) .......................................................................................32

### Statutes

N.Y. C.P.L.R. § 202........................................................................................... *passim*

N.Y. C.P.L.R. § 215........................................................................................................35

### Rules

Fed. R. Civ. P. 8.............................................................................................................35

Fed. R. Civ. P. 44.1 .......................................................................................................11

## PRELIMINARY STATEMENT

The theory of liability Plaintiffs presented at trial is inconsistent with Swiss law. Plaintiffs' lengthy opposition papers do not offer a single Swiss-law case imposing tort liability on remotely similar facts:  They cite no case imposing accomplice liability on a Swiss entity for the acts of a foreign sovereign in its own land; no case finding conscious assistance where Swiss parties complied with the Swiss regulations governing their industry; and no case imposing liability where a plaintiff's injuries would have occurred even without the defendant's challenged acts.  Nor do they cite any Swiss case awarding moral damages that come anywhere close to the jury's seven-figure awards here.  In all these ways, Plaintiffs seek to use an American court to achieve a legal result unprecedented in the annals of Swiss law and directly contrary to Swiss authority.  The trial verdict cannot stand and must be vacated.

*Article 41.*  The Court improperly skipped the threshold question of BNPP's *liability* under Swiss law and proceeded directly to the remedial question whether, *if* BNPP were liable, it could be held jointly and severally liable with the Government of Sudan.  Under the Swiss Code of Obligations, Article 41 provides the *substantive grounds* for liability ("[c]onditions of liability"), whereas Article 50 *allocates* liability among "[m]ultiple liable parties."  ECF No. 171-4 (Articles 41 & 50, Swiss Code of Obligations) at 12, 14; *see also* ECF No. 435-120 (Swiss Federal Supreme Court 145 [2019] III 72, "Swisscom Case") at reas. 2.2.1.  Plaintiffs' theory that BNPP could be held liable directly under Article 50 "misrepresents the Federal Supreme Court's ruling[s]" they cite.  ECF No. 1042-9 ("Nov. 14, 2025 Romy Decl.") ¶ 20.  Because the jury was not charged on Article 41's elements, and thus could not have found BNPP liable as a tortfeasor, BNPP is entitled to judgment as a matter of law.

**Article 50: Element 1.** Article 50 of the Swiss Code of Obligations is a joint-and-several-liability provision that allows an injured plaintiff to recover full compensation from one tortfeasor when several tortfeasors are liable for a plaintiff's injury. So even on Plaintiffs' incorrect theory that Article 50 provides an independent basis for secondary liability, there still must be a "main perpetrator" who committed an illicit act that is actionable under Swiss law. Nov. 14, 2025 Romy Decl. ¶¶ 19–22. Plaintiffs do not dispute that Swiss law precludes an actionable claim against the Government of Sudan, and they do not cite a single Swiss authority imposing secondary tort liability on an accomplice where there is no actionable claim against a main perpetrator. Plaintiffs' novel invention of Swiss tort law—secondary liability without *any* actionable primary liability—is unsupported and limitless; it should be rejected.

**Article 50: Element 2.** Plaintiffs failed to provide sufficient evidence that BNPP "consciously assisted [the Government of Sudan] and knew or should have known that [it] was contributing to an illicit act" by the Government of Sudan. *Kashef v. BNP Paribas S.A.*, 2021 WL 603290, at *2 (S.D.N.Y. Feb. 16, 2021) (*Kashef III*) (citation omitted). Because Plaintiffs never identified a duty of care to support a negligence claim, they were required to prove that BNPP intended to contribute to an illicit act. In their opposition, Plaintiffs rely on BNPP's plea agreement with the United States, as they did at trial. But that agreement is not evidence of contribution to an illicit act under Swiss law because it is based upon the sanctions regime of only one country: the United States. Trial showed that, though it violated U.S. economic sanctions on Sudan, BNPP complied with Swiss, French, European Union, and United Nations sanctions regimes that intentionally took a narrower approach. Undisputed evidence established that BNPP never "finance[d] any acquisition of arms or military equipment by Sudan" and complied with Swiss and European sanctions designed to prevent violence without

unintentionally punishing the Sudanese population. Oct. 9 Trial Tr. at 1390:3–12 (Testimony of Jean Clamon); Oct. 6 Trial Tr. at 1170:22–24 (Testimony of Philippe Maillard). BNPP's U.S. sanctions violation does not show that BNPP knew it was contributing to an illicit act.

*Article 50: Element 3.*  Plaintiffs failed to prove the third element of Article 50, that BNPP's alleged conscious assistance was the "natural and adequate" cause of Plaintiffs' injuries. *See Kashef III*, 2021 WL 603290, at *2.  To demonstrate that BNPP was the natural cause of their injuries, Plaintiffs needed to show that BNPP was the but-for cause of their injuries. *See* ECF No. 533-61 (Swiss Federal Supreme Court 4A_444/2010 of Mar. 22, 2011, "Boat Collision Case") at reas. 2.1, 4.4.  But Plaintiffs failed to connect BNPP's actions to any specific injuries they suffered and never showed that BNPP's actions were necessary for their injuries to occur. *See* Sept. 11 Trial Tr. at 27:13–15 (Pls.' Opening Statement) ("The evidence that we intend to offer does not suggest—well, excuse me—will not involve an inference that these three people were harmed because there was money.").  Plaintiffs' theory of adequate causation fails because the financing offered by BNPP was "very far to the back" of the "chain of actions" that caused harm to Plaintiffs.  Swisscom Case at reas. 2.1

*Remittitur.*  Plaintiffs cannot escape that *Erie* precludes a recovery in this Court "significantly larger than the recovery that would have been tolerated" in a Swiss court. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 431 (1996).  Plaintiffs admit that "[t]he principal damages demanded and awarded were compensation for pain and emotional suffering, called 'moral compensation' in Swiss terms," Opp. at 45, but make no effort to dispute that those moral damages awards are many times higher than any amounts *ever* awarded by Swiss courts for even the most grievous injuries.  *See* ECF No. 1042-8 (Hardy Landolt, Genugtuungsrecht, Band 2, 2013).  Under *Gasperini*, a court errs by failing to "check[] the jury's verdict against"

the relevant decisions of the jurisdiction whose substantive law governs (and performing this analysis does not violate the Seventh Amendment). *Gasperini*, 518 U.S. at 439. *Gasperini* requires a remittitur to comply with substantive Swiss law requiring that a verdict conform with similar awards.

**Time-Barred Claims.** New York's borrowing statute bars claims that were untimely in the place where the injuries occurred. N.Y. C.P.L.R. § 202. Under the plain text of Sudan's limitations law, Plaintiffs' claims for injuries that occurred before April 29, 2001 are untimely. In opposition, Plaintiffs rely primarily on waiver arguments that are baseless because BNPP asserted the borrowing statute in both its motion to dismiss and its answer to the complaint, either of which is sufficient to preserve the defense. *See Kulzer v. Pittsburgh-Corning Corp.*, 942 F.2d 122, 125 (2d Cir. 1991) ("[A]ssertion of the [statute of limitations] defense in the defendant's answer, rather than in its prior motions for dismissal and summary judgment, was sufficient and timely."). Nor does the Second Circuit's ruling foreclose this argument; that decision was based solely on timeliness under New York law and did not address timeliness under Sudanese law.

*    *    *

BNPP requests that the Court enter judgment as a matter of law in favor of BNPP or, in the alternative, grant a new trial or remittitur of the unauthorized award of damages.

## ARGUMENT

**I.    BNPP Is Entitled To Judgment As A Matter Of Law Or, In The Alternative, A New Trial.**

This Court should grant BNPP's motion for judgment as a matter of law or, in the alternative, for a new trial. Plaintiffs' overheated rhetorical attacks do not counter BNPP's points that basic principles of Swiss law preclude liability here.

**A.    BNPP Is Not Liable Under Article 41 Of The Swiss Code Of Obligations.**

Plaintiffs do not argue BNPP could have been held liable under Article 41.  But as former Swiss Supreme Court Deputy Judge Romy has explained, establishing liability under Article 41 is necessary because Article 50(1) is not an "independent basis for liability."  ECF No. 435-102 ("July 21, 2023 Romy Decl.") ¶ 4; *see also* ECF No. 897 ("Aug. 28, 2025 Romy Decl.") ¶ 10 ("Joint and several liability under Art. 50(1) CO presupposes the existence of multiple tortfeasors, i.e. at least two, who must be liable themselves.").  Because Plaintiffs lack any basis to hold BNPP liable under the only Swiss statute that provides for tort liability, BNPP is entitled to judgment.

The fundamental difference between Articles 41 and 50 is demonstrated by the plain text of these provisions and their location in the Swiss Code of Obligations.  The Swiss Code of Obligations expressly states that Article 41 provides the substantive grounds on which a person can be held liable—that is, the "[c]onditions of liability"—while Article 50 governs joint and several liability when multiple *liable* parties have "together caused damage."  Articles 41 & 50, Swiss Code of Obligations at 12, 14; *see also* Aug. 28, 2025 Romy Decl. ¶ 10; ECF No. 937 ("Swiss Ambassador's Letter") at 2.  Article 50 is located in the Swiss Code of Obligations under the heading "Multiple liable parties," while Article 41 falls under the heading "Conditions of liability."  *See also* Aug. 28, 2025 Romy Decl. ¶ 8.  As Plaintiffs admit, Article 50 "only expressly refers to joint and several liability."  Opp. at 32.  Article 50 does not furnish an independent ground for liability, but rather a means of allocating damages among multiple parties already found liable.

Swiss case law further supports this view.  The Swiss Federal Supreme Court has described Article 50 and its companion, Article 51, as loss-allocation provisions that apply only

after a defendant is held liable under a different provision. *See* Swisscom Case at reas. 2.2.1 (explaining that joint and several liability "presupposes" the liability of multiple tortfeasors); ECF No. 530-18 (Swiss Federal Supreme Court 130 [2004] III 362 "Work Contract Case") at reas. 5.2 ("Joint and several liability implies a preceding liability: a person who is not liable for damage cannot be held joint and severally liable (NIGG, op. cit., page 130; refer to BREHM, Bernese Commentary, No. 33 ad **art. 50 CO**)." (bold in original)).

Plaintiffs misinterpret these legal authorities and their implications for the meaning of Article 50. For example, Plaintiffs cite the Swisscom Case, which was a copyright case, for the proposition that a person can be liable in tort as an accomplice even if he "does not himself fulfill any statutory infringement requirement." Opp. at 33. But neither Swisscom nor the other case on which Plaintiffs rely, ECF No. 533-10 (Swiss Federal Supreme Court 107 [2020] II 82 "Rediffusion Case"), supports the notion that a plaintiff can sue for damages in tort under Article 50 without demonstrating the existence of underlying liability. In the portions of the Swisscom and Rediffusion Cases Plaintiffs cite, the Swiss Federal Supreme Court was focused on that availability of *injunctive relief* under the Swiss Copyright Act to prevent further harm, and it looked to Article 50 by analogy to determine whether multiple parties could be enjoined. Swisscom Case at reas. 2.2.1; Rediffusion Case at reas. 9. In the process, the Swiss Supreme Court confirmed in both cases that Article 50 "presupposes" the "legal recognition of the parties' responsibility under civil law." Swisscom Case at reas. 2.2.1; *see also* Rediffusion Case at reas. 3. But the court made clear that in evaluating a separate claim "for damages," it would continue to look to "art. 41 in conjunction with art. 50." Swisscom Case at reas. 2.2.1.

Plaintiffs resort to baselessly accusing former Deputy Judge Romy, a distinguished Swiss law jurist, of "misrepresenting legal authorities" on this subject. Opp. at 36–37. This accusation

is shamefully false.  Plaintiffs contend Judge Romy miscited the Work Contract Case by saying

that it addresses Article 50, when (in Plaintiffs' telling) it is a case solely about Article 51.  But

the *very sentence* Plaintiffs quote, read in full, refers directly to a Swiss legal commentary about

the proper interpretation of Article 50:

> Indeed, the very reason for this action is based upon the existence of joint and
> several liability.  Joint and several liability implies a preceding liability: a person
> who is not liable for damage cannot be held joint and severally liable (NIGG, op.
> cit., page 130; refer to BREHM, Bernese Commentary, No. 33 ad **art. 50 CO**).

Work Contract Case at reas. 5.2 (bold in original).  The reference to Article 50 of the Code of

Obligations ("art. 50 CO") is there, in black and white, as support for the Swiss court's (and

Judge Romy's interpretation) of joint and several liability.  If any expert lacks credibility, it is

Professor Werro, who incorrectly asserted that "Article 50 CO does not even appear in that

decision."  ECF No. 985-1 ("Werro Sept. 30, 2025 Decl.") ¶ 139.[1]

The fact that the Swiss Federal Supreme Court looks to the Brehm Commentary on the

proper interpretation of Article 50 in a case involving Article 51 makes sense because the two

Articles are related.  Articles 50 and 51 appear under the same title of the Swiss Code of

Obligations: "Multiple liable parties."  Article 51 is another statute that apportions liability: for

persons liable on different legal grounds for the same harm (*i.e.*, in tort or contract).  Nov. 14,

2025 Romy Decl. ¶¶ 14–16.  Thus, as Professor Romy explains, both Articles 50 and 51 serve

the purpose of apportioning liability, rather than determining it, and the relationship of both

provisions of Swiss law with liability-creating rules is material here.  *Id.*

---

[1] Plaintiffs puzzlingly attack Judge Romy for BNPP's not attaching a translated copy of the decision in a prior filing, Opp. at 37, but BNPP took this approach because the decision had already been docketed, ECF No. 530-18, and this Court's rules prohibited BNPP from refiling the decision.  *See* Indiv. R. of Judge Hellerstein R. 2(C)(i)(III) ("Parties shall refer to exhibits already filed and not duplicate them.").

The similarities between Articles 50 and 51 are vitally important to the question whether Article 50 provides a separate basis for tort liability because Plaintiffs *agree* that Article 51 "requires that all jointly liable tortfeasors be independently liable under a separate provision, Article 41 CO." ECF No. 986 at 2. Although Plaintiffs cite Article 51 for this proposition, they point to no language or precedent that would support the distinction they attempt to draw between these two key Swiss rules for apportioning liability. Judge Romy's explanation is equally true for both Articles.

Finally, Plaintiffs claim BNPP conceded "years ago" that Article 50 provides an independent basis for liability. Opp. at 32. This is not true. The Bank has consistently interpreted Article 50 as a loss-allocation provision, not a freestanding ground for holding a party liable under Switzerland's tort laws. Plaintiffs cite BNPP's Motion for Partial Reconsideration of the Court's February 16, 2021 Opinion and Order granting in part and denying in part the Bank's motion to dismiss the Second Amended Complaint. *Id.* at 31–32. In that motion, BNPP merely argued that even "[b]ased on th[e] standard" the Court incorrectly adopted—according to which Article 50 would provide a basis for secondary liability—Plaintiffs failed to plausibly allege a claim against BNPP North America. ECF No. 198 at 2. BNPP was thus arguing that Plaintiffs had failed to properly allege BNPP North America's liability even under their own, unprecedented view of Article 50. *See id.* (quoting *Kashef III*, 2021 WL 603290, at *2). The remark obviously did not waive BNPP's broader arguments about the correct interpretation of the key governing provision of Swiss law.

**B.    BNPP Is Not Liable Under Article 50 Of The Swiss Code Of Obligations.**

Even under the erroneous articulation of Article 50 presented to the jury, in which Article 50 is an accomplice-liability statute rather than a joint-and-several-liability provision, BNPP still

is not liable because no actionable claim exists against the Government of Sudan. Swiss accomplice-liability law requires a primary tortfeasor; here, there is no person who could be held primarily liable for the actions that BNPP allegedly aided and abetted, both because Swiss law does not apply extraterritorially and because it does not permit suit against a foreign sovereign for actions taken in its official capacity.

>    ### *I.    Swiss Law Requires That The Main Perpetrator Be Capable Of Being Held Liable To Support Accomplice Liability.*

In their Opposition, Plaintiffs continue to misrepresent that BNPP is improperly seeking to litigate the liability of the Government of Sudan in this proceeding. Opp. at 34. But that is not the case. For the reasons discussed below, the Government of Sudan indisputably cannot be held liable as the primary tortfeasor under Swiss law for the human-rights violations it committed in Sudan—that is why Plaintiffs have not sued the Government of Sudan. BNPP's argument is that *secondary liability for BNPP* is inappropriate under Article 50 in the absence of a main perpetrator who could be liable in tort. Nov. 14, 2025 Romy Decl. ¶¶ 19–22. Where, as here, the main perpetrator is not liable, there can be no secondary liability for an accomplice. This result follows directly from Plaintiffs' and the Court's interpretation of Article 50.

All parties agree that Article 50 requires at least two "*liable* parties." Article 50 Swiss Code of Obligations (emphasis added); *see also* Swiss Ambassador's Letter at 2 ("For Article 50(1) SCO joint and several liability to apply, there must be an underlying violation by a 'main perpetrator' who could be liable under Swiss tort law."). As BNPP explains in its motion, both Swiss caselaw and scholarly commentary are in accord. *See, e.g.*, Work Contract Case at reas. 5.2 (joint and several liability requires a preceding liability); Swisscom Case at reas. 2.2.2 (explaining a lower court's reasoning that "in the absence of an infringement of copyright by the customers, the respondent's liability as a participant is also out of the question"); ECF No. 171-

41 (Roland Brehm, *Bernese Commentary*, art. 50 CO (4th ed. 2013) "Brehm Commentary") ¶ 33 (explaining that, under Article 50, "there is no joint and several liability without (external) liability"). Indeed, the Brehm commentary makes clear that when a "main perpetrator" is "not at fault," Article 41, not Article 50, applies. Brehm Commentary ¶ 25.

Plaintiffs themselves have represented throughout this litigation that, even under their incorrect reading of Article 50, joint and several liability does not attach absent the liability of a main perpetrator. *See, e.g.*, ECF No. 174 ("Aug. 31, 2020 Werro Decl.") ¶ 5 (Plaintiffs must show that the Government of Sudan committed illicit acts "actionable in Swiss law."). Rather than a new fourth "element" for Article 50 liability, this is simply the requirement advanced by Plaintiffs all along that a main perpetrator must commit an illicit act for Article 50 to apply.

Plaintiffs do not adequately respond to this key point. First, they argue that the Hockey Rink Case "disproves BNPP's theory," supposedly because the court there held several defendants liable under Article 50(1), even while dismissing an Article 41 claim against a municipality. Opp. at 35–36 (citing ECF No. 528-112 (Swiss Federal Supreme Court 79 [1953] II 66 "Hockey Rink Case")). But Plaintiffs wrongly presume that the municipality was the only available "main perpetrator" for Article 50 purposes. In reality, "[t]he Moutier players, the Delémont Hockey Club and Loriol caused damage by joint negligence" and on that basis were liable both as main perpetrators under Article 41 and "*also* . . . jointly and severally liable" under Article 50. Hockey Rink Case at reas. 8 (emphasis added); *see also* Nov. 14, 2025 Romy Decl. ¶ 20. Plaintiffs cannot overcome this basic point by disagreeing with the decision and asserting that "the player merely played an ordinary game of hockey," while the "municipality created the dangerous condition." Opp. at 36 n.20. The court explicitly states that Loriol (the player)

"caused damage by joint negligence," a basis of Article 41 primary liability. Hockey Rink Case at reas. 8. The Hockey Rink case thus directly supports BNPP's position.

Second, Plaintiffs claim that the Brehm commentary reaches "the opposite conclusion" from BNPP when it states that "[t]he claimant only needs to prove that the defendant contributed to the damage" and not "the liability of the other involved parties" when choosing whether to claim a part or the whole compensation from all the joint and several debtors. Opp. at 38 (citing Brehm Commentary ¶ 36). But this simply means that if the Government of Sudan were capable of being held liable as a primary tortfeasor, it would not *also* need to be "named as a party in this case"; Plaintiffs would be free in that counterfactual to seek compensation only from BNPP (so long as they still established the Government of Sudan's primary liability), as BNPP has acknowledged. Mot. at 10–11. As the Brehm commentary puts it, "[t]he injured party is … not required to justify their choice of the liable person being sued." Brehm Commentary ¶ 36. None of this changes the fact that the requirements of Article 50 liability—including the primary liability of a main perpetrator under Article 41—must still be met. Plaintiffs here sued BNPP because they *could not* have held the Government of Sudan liable under Swiss law.

Finally, Plaintiffs claim that BNPP improperly relies on the Swiss Ambassador's Letter for propositions of Swiss law, including the proposition that Article 50(1) SCO joint and several liability requires "an underlying violation by a 'main perpetrator' who could be held liable under Swiss tort law." Opp. at 38 (quoting Swiss Ambassador's Letter at 3). As discussed above, this position is amply supported by decisional law, including the decisions of the Swiss Federal Supreme Court. But this Court need not limit itself to those sources of law. Instead, "[i]n determining foreign law," this Court can (and should) "consider any relevant material or source," including the Swiss Ambassador's Letter. Fed. R. Civ. P. 44.1.

       **2.**      ***The Government Of Sudan Cannot Be Held Liable As The Main Perpetrator Because Swiss Tort Law Does Not Apply Extraterritorially To Acts Committed Outside of Switzerland.***

Plaintiffs assert that whether Swiss courts would have subject-matter jurisdiction over the Government of Sudan for alleged illicit acts committed outside of Switzerland is "irrelevant" because "[w]e are not in a Swiss court and the Government of Sudan is neither a defendant, nor … a necessary party." Opp. at 40. But because this Court has determined that Swiss law applies to this case, the contents of Swiss law are hardly irrelevant. As discussed above, Swiss law imposes no accomplice liability unless a main perpetrator is capable of being held liable. It therefore is no "non sequitur," *id.*, that Swiss law does not apply extraterritorially to acts committed outside of Switzerland. Without the extraterritorial application of Swiss law to the Government of Sudan as the main perpetrator, Plaintiffs cannot demonstrate the Bank's purported accomplice liability under Article 50.

In *Naït-Liman v. Switzerland*, the seminal case on the non-extraterritorial application of Swiss law, the European Court of Human Rights held that the Convention for the Protection of Human Rights did not require Swiss courts to adjudicate the plaintiff's civil claims of torture by the Government of Tunisia after the Swiss courts had refused to find jurisdiction to adjudicate the claims. ECF No. 898-1 ("Judgment of Grand Chamber") ¶¶ 25–30. As the Swiss Federal Supreme Court explained, there is no provision in Swiss law authorizing extraterritorial jurisdiction over actions by a foreign actor in a foreign state:

> In the present case … the claimant complains of acts of torture that were allegedly committed in Tunisia, by Tunisians resident in Tunisia, against a Tunisian residing in Italy. All of the specific features of the case come back to Tunisia …. The facts of the case thus have no connection with Switzerland, so that the question of whether or not the link with this country is sufficient does not arise. In those circumstances, *it is not possible to recognize the jurisdiction of the Swiss courts* ….

Judgment of Grand Chamber ¶ 30 (emphasis added).  Plaintiffs quibble that *Naït-Liman* is "not an Article 50 case."  Opp. at 41.  But that misses the forest for the trees.  *Naït-Liman* demonstrates conclusively that the Swiss courts would not recognize jurisdiction over claims by an individual concerning extraterritorial actions taken by a foreign state on foreign soil, even if those claims are undisputedly of a *jus cogens* nature.  Accordingly, as Plaintiffs do not dispute, Swiss courts would not entertain a claim against the Government of Sudan for actions taken against individuals in Sudan.  *See also* Mot. at 3 (discussing failed 2020 constitutional amendment to impose extraterritorial liability for human rights abuses).  There is therefore no actionable claim against a main perpetrator who caused Plaintiffs' injuries to which BNPP could have served as an accomplice.

Plaintiffs cannot distinguish *Naït-Liman* by arguing that "Switzerland has a nexus to this case."  *Id.*  The same was true of *Naït-Liman*, which involved a Swiss resident suing in Switzerland.  What was relevant to the Swiss courts for jurisdictional purposes was the place where the injuries occurred.  Judgment of the Grand Chamber ¶ 30.  In *Naït-Liman*, that place was Tunisia; in the present case, that place was Sudan.  In both cases, a claim against the foreign government would not be actionable in Switzerland.

### 3. The Government of Sudan Cannot Be Held Liable As The Main Perpetrator Because Swiss Tort Law Does Not Permit Suit Against A Foreign Sovereign For Actions Taken In Its Sovereign Capacity.

Acts of a foreign state in its sovereign capacity are immune from suit under Swiss law, and the alleged illicit acts committed by the Government of Sudan qualify as acts performed in its sovereign capacity.  Aug. 28, 2025 Romy Decl. ¶¶ 17, 19.  Therefore, the Government of Sudan is immune from suit for its alleged illicit acts in the courts of Switzerland.

Plaintiffs do not dispute these points. Instead, they return to their strawman, arguing that the Government of Sudan is not a defendant and BNPP is not "entitled to derivative foreign sovereign immunity." Opp. at 42. But that again misunderstands BNPP's argument. Accomplice liability under Article 50 requires that there be a main perpetrator that could be held liable under Article 41. Without an actionable claim against a main perpetrator, there can be no liable accomplice under Swiss law. *See* Swisscom Case at reas. 2.2.2; Brehm Commentary ¶ 33; Aug. 31, 2020 Werro Decl. ¶ 5.

To be clear, BNPP is not arguing here that another body of law, such as "public law," governs this case. Opp. at 43–44. Indeed, a body of public law establishing the liability of a foreign state in Switzerland does not exist. Aug. 28, 2025 Romy Decl. ¶¶ 40–41. BNPP is instead arguing that a claim against the Government of Sudan would not be actionable under Swiss law and that there is accordingly no main perpetrator whose liability could support Plaintiffs' purported claim under Article 50. Indeed, *Naït-Liman* proves that a Swiss-law claim for a human rights violation, like a claim for torture, would not be actionable if those acts took place in a foreign country.

### C.    Plaintiffs Failed To Prove That BNPP Consciously Assisted The Government Of Sudan And Knew Or Should Have Known That It Was Contributing To The Government Of Sudan's Human Rights Violations.

To demonstrate that BNPP consciously assisted the Government of Sudan, Plaintiffs needed to show that BNPP and the Government of Sudan "culpably acted together." ECF No. 435-98 ("Jan. 6, 2023 Müller Rep.") ¶ 124. Plaintiffs failed to offer sufficient evidence of such culpable cooperation at trial.

*First*, Plaintiffs do not seriously contend that BNPP consciously assisted the Government of Sudan *in the illicit acts* that harmed Plaintiffs. *See* Jan. 6, 2023 Müller Rep. ¶ 125 n.98 (citing

ECF No. 169-7 (Swiss Federal Supreme Court 55 [1929] II 310) at reas. 2); *see also* ECF No.

169-8 (Swiss Federal Supreme Court 82 [1956] II 544) at reas. 1 (explaining that the tortious

conduct must have been "committed collectively").

    As at trial, Plaintiffs point to BNPP's guilty plea in an attempt to establish BNPP's

assistance with those acts.  But Plaintiffs do not dispute that because Swiss courts do not borrow

legal norms from other countries, BNPP's civil liability under Swiss law would "not [be]

governed by the principles of U.S. criminal law which were the basis for BNPP France accepting

criminal liability for the breach of U.S. sanctions by BNPP Suisse."  ECF No 444-103 ("Jan. 6,

2023 Thevenoz Rep.") ¶ 15.

    Plaintiffs also argue that the guilty plea is "relevant as a factual matter" because it

"proves" that BNPP was "aware of the risk it was funding genocide."  Opp. at 14 (quoting ECF

No. 980 ("Sept. 29, 2025 Werro Decl.") ¶ 6).  But the U.S. guilty plea cannot support that

inference; U.S. sanctions are only one piece of a much larger puzzle.  Numerous countries

adopted sanctions against Sudan, and many of them, including the European countries in which

BNPP operates, adopted much narrower prohibitions that targeted the sale of arms while

allowing certain transactions to avoid inadvertent impacts on the civilian population.  *See* Oct. 9

Trial Tr. at 1390:10–16 (Clamon); Sept. 15 Trial Tr. at 252:20–22 (Hudson).  The evidence at

trial showed that BNPP complied with these sanctions.  *See* Oct. 6 Trial Tr. at 1170:22–24

(Maillard); Oct. 9 Trial Tr. at 1403:2–6 (Clamon).

    Plaintiffs miss the mark in arguing that Swiss precedent forecloses an ignorance-of-the-

law defense.  Opp. at 15 (quoting ECF No. 533-10, 107 [1981] II 82 at reas. 9).  As BNPP has

repeatedly explained, BNPP is not seeking to excuse its non-compliance with U.S. sanctions by

arguing that it was ignorant of those restrictions.  It is arguing that its non-compliance with U.S.

sanctions does not, by itself, demonstrate that it consciously intended to assist in genocidal acts, when BNPP was otherwise in full compliance with European sanctions regimes that had the same purpose of curbing the same violence in Sudan. On that issue, which is centrally relevant to BNPP's state of mind, Plaintiffs have no response.

Plaintiffs next mischaracterize the record to claim that BNPP did not comply with non-U.S. sanctions because it allegedly "directly supported key military entities" through transactions with GIAD, the Civil Aviation Authority, and the Ministry of Defense. Opp. at 16. But the record establishes that BNPP's interactions with those entities were entirely lawful. With respect to the Civil Aviation Authority, BNPP provided financing only for equipment such as airport "shuttles, X-ray gates, [and] baggage turnstiles." PX 174; *see also* Oct. 9 Trial Tr. at 1388:20–23 (Clamon). BNPP's interactions with GIAD occurred before even the *United States* had designated the company as a Specially Designated National. *See* PX 317; PX 318; Oct. 6 Trial Tr. at 1149:4–7, 1149:22–1150:2 (Maillard). And with respect to the Ministry of Defense, the evidence at trial unequivocally established that the single 30,000-euro transaction merely advanced payment to a European supplier and was entirely unrelated to the purchase of weapons. *See* PX 60; Oct. 6 Trial Tr. at 1163:4–8, 17–19 (Maillard).

*Second*, relying on the Locksmith Case and the Swisscom Case, Plaintiffs contend that a defendant need not have provided willful or substantial assistance to the wrongful act and may be held liable merely for providing "generalized assistance." *See* Opp. at 12–13. But neither case stands for anything of the sort. As Professor Müller explained, the Locksmith Case is "clearly distinguished," Jan. 6, 2023 Müller Rep. ¶¶ 70–71, from this case because there, the accounting company's contribution to the trademark infringement was not through mere "financial assistance" entirely unrelated to the infringement. *See* ECF 708-15 (Swiss Federal

Supreme Court 4A_185-2007, "Locksmith Case") at reas. 6.2.1.  Rather, the accounting company "clearly acted in concert with respect to the harmful act" because, among other things, it leased vans, sent invoices, and used letterhead that displayed the infringing mark.  *Id.*; *see also* Jan. 6, 2023 Müller Rep. at ¶¶ 70–72.  Nor does the Swisscom Case stand for the proposition that acts that are "generally capable of facilitating" a tort suffice to establish liability.  Opp. at 12.  There the Swiss Federal Supreme Court *rejected* liability for an internet provider because it was "very far to the back" in the chain of actions that led to the alleged copyright infringement and thus not "adequately causal for the unlawful main act."  Swisscom Case at reas. 2.1.  And Plaintiffs incorrectly claim that their interpretation of Swiss law would be consistent with U.S. aiding-and-abetting liability as set forth by the Supreme Court in *Twitter v. Taamneh*, 598 U.S. 471 (2023), but they make no attempt to distinguish the Second Circuit's clear holding, relying on *Taamneh*, that without any "culpable conduct" it is impermissible to hold a defendant liable under an aiding-and-abetting theory for a "campaign" that was "vast in scope," *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 448 (2d Cir. 2025).

*Third*, Plaintiffs mischaracterize BNPP's argument with respect to the requirement of substantial contribution.  BNPP did not claim that "Plaintiffs were required to prove that BNPP had a contractual relationship with Plaintiffs" to be liable.  Opp. at 15.  Rather, to prevail on a negligence theory, Plaintiffs had to identify *some* legal basis for imposing on BNPP a duty of care toward Plaintiffs.  *See* Jan. 6, 2023 Müller Rep. at ¶ 69.  One possible source of such a duty could be a contractual relationship, *see, e.g.*, ECF No. 435-111 (Swiss Federal Supreme Court DSFC 71 [1945] II 107, "Shooting Contest Case") at reas. 3.  Plaintiffs were free to consider other possible sources of Swiss law yet they failed to do so at any point, including in their opposition—confirming the absence of such a duty.  Without a duty of care, Plaintiffs were

required to show that BNPP *intended* to commit human rights abuses undertaken by the Government of Sudan. *See* Jan. 6, 2023 Müller Rep. ¶¶ 133–35. They failed to do so.

The Carpenter's Strike Case does not counsel otherwise. Plaintiffs incorrectly cite this case for the proposition that mere "negligent complicity" is sufficient to establish liability. *See* Opp. at 13 (quoting ECF No. 708-8, 57 [1931] II 417 at reas. 2). But that case does not stand for the sweeping proposition that a defendant need not intend to contribute to the wrongful act; it merely notes that a defendant need not intend the *specific* result. Indeed, the court noted that all but one of the defendants had affirmatively "agreed … to ambush the strikebreaking workers … and to beat them" and engaged in "mutual encouragement, … mutual ambushing, and [a] mutual attack" that together caused the harm. *Id.* The court explained that "each person who participates in any such fight or encourages it must expect that … things occur that can have serious consequences for the attacked person." *Id.* Because all defendants were present and engaged in the same conduct, they "ha[d] … the same first-hand and personal knowledge of the tortious situation." Jan. 6, 2023 Müller Rep. at ¶ 86. Such mutuality of action and first-hand knowledge is entirely lacking in this case.

**D.    Plaintiffs Failed To Demonstrate By Sufficient Evidence That BNPP's Actions Were The "Natural And Adequate Cause" Of Their Alleged Injuries.**

Plaintiffs did not prove that BNPP's alleged conscious assistance was the "natural and adequate" cause of Plaintiffs' specific injuries. *See Kashef III*, 2021 WL 603290, at *2. Their post-hoc attempts to recharacterize the law and the facts to support their claims fail.

*1. Natural Causation*

Plaintiffs contend that they proved natural causation, but their arguments confirm that their evidence establishes only correlation—they did not provide sufficient evidence that BNPP's conduct was a necessary condition to Plaintiffs' specific injuries, as Swiss law requires. *See* Boat

Collision Case at reas. 2.1, 4.4. Where damage would "have occurred in full or to a lesser extent" absent the defendant's conduct, it is not a natural cause. *Id.* at reas. 4.4. Plaintiffs do not dispute that natural causation supplies a "but for" standard, as has been the law of the case since Judge Nathan decided the motion to dismiss following remand. *See Kashef III*, 2021 WL 603290, at *6 (analyzing whether Plaintiffs' allegations were sufficient to show "but for" causation in considering the natural causation element).

Unable to prove that without BNPP's conduct Plaintiffs' injuries would not have occurred or would have occurred to the same extent, Plaintiffs resort to an utterly implausible, extremely high-level narrative lacking legitimate causation analysis. Plaintiffs assert that, according to their expert, the Bashir regime would not have survived past 1997 without BNPP's financing of the Government of Sudan, and therefore Plaintiffs' injuries would not have occurred without BNPP's conduct. Opp. at 20. Under this expansive argument, *all* of the Government of Sudan's post-1997 conduct would have been "caused" by BNPP, regardless of any intervening events because, according to Plaintiffs, BNPP is responsible for the continuation of the Bashir regime. Plaintiffs do not, and cannot, point to any Swiss case that has endorsed such a sweeping theory of causation. To the contrary, Swiss courts have rejected exactly this generalized theory of "system liability." Swisscom Case at reas. 2.3.2.

Swiss courts have also rejected natural causation where, for example, the chain of causation is broken by intervening events (or "overriding causality"). For instance, in the Whiplash Case that Plaintiffs cite, the Swiss Federal Supreme Court rejected attribution of the plaintiff's current disability to the accident in question because the disability was caused by an intervening disease and would have existed regardless of the earlier accident—"even if the accident alone would have caused a disability." *See* ECF No. 708-14 (Swiss Federal Supreme

Court 147 [2021] V 161) at reas. 3.4, 5.1.  Plaintiffs' causal theory does not account for any of

the intervening or external events occurring in Sudan.  For example, it does not account for the

fact that China had an "iron clad" commitment to grow Sudan's oil production and "sank

billions" into developing the industry to fuel its own growing economy.  Sept. 17 Trial Tr. at

554:6–20 (Verhoeven); *see* Oct. 6 Trial Tr. at 1219:10–21 (Zenghelis).  It also ignores that

Plaintiffs' expert admitted that it was the Government of Sudan, not BNPP, that chose to use its

increased revenue to fund its military.  *See* Sept. 17 Trial Tr. at 561:12–16 (Verhoeven).  Nor

does Plaintiffs' theory factor in that Sudan had been in a pronounced "state of perpetual civil

war" and that various governing regimes had been engaged in "persecut[ion]" since the country

gained independence in 1956.  Sept. 15 Trial Tr. at 211:23–212:2; 214:1–5 (Hudson).  Indeed,

even according to Plaintiffs' own evidence, the relevant government expenditure increases that

were purportedly enabled by BNPP's financial services resulting in increased oil revenues did

not materialize until mid-1999.  *See* Mot. at 32.

Of a kind with this expansive, unsupported theory of liability, Plaintiffs rely on

generalized evidence of BNPP transactions that lack any connection to the actions that injured

Plaintiffs.  Plaintiffs point to evidence of BNPP's Sudanese financial transactions from 2002 to

2009 and of the Government of Sudan's military expenditures, Opp. at 16, 21–22, but none of

that evidence connects the transactions to Plaintiffs' specific injuries, and it does not account for

the many independent decisions by the Government of Sudan and its agents that led to those

injuries.  For instance, Plaintiffs emphasize that BNPP extended lines of credit financing for

GIAD, Sudan's state-owned manufacturer of armored vehicles, as well as testimony stating that

GIAD was part of Sudan's military industrial complex, but they provided no evidence that

GIAD's vehicles (much less vehicles specifically financed through the lines of credit in question)

were used to injure Plaintiffs, or that they would not have been used to do so had BNPP not extended those lines of credit. Opp. at 16, 22; *see* ECF No. 435-121 (DSFC 4A_311/2021 of February 3, 2022, "Unfair Competition Case") (rejecting causation based on "hasty inferences").

Plaintiffs dismiss BNPP's arguments relating to the Government of Sudan's conduct before and after BNPP's involvement in Sudan and to sources of financing unrelated to BNPP and oil revenues, *see* Opp. at 24, but analyzing *causation* (as opposed to mere correlation) requires examining whether Plaintiffs' injuries would have occurred had BNPP not provided financial services in Sudan—that is, it requires assessing counterfactuals. *See* ECF 813-3 (Swiss Federal Supreme Court 130 [2004] III 321, "Insurance Contract Case") at reas. 3.4 (explaining that a defendant is "free to present an alternative version of events, which—compared to the claimant's version—is equally plausible or even more likely"). Plaintiffs do not deny that the evidence showed the Government of Sudan committed human rights abuses before and after BNPP's involvement and that the Government of Sudan had alternative sources of financing. *See* Mot. at 28–30. Instead, they say the jury could have concluded that "BNPP created a well-oiled machine that was poised to have a long, deadly tail" following BNPP's financing. Opp. at 29. Such a conclusion, which expands Plaintiffs' broad theory of liability even further, was based entirely on speculation and not supported by evidence.

Plaintiffs rely on their expert, Dr. Harry Verhoeven, Opp. at 18 n.11, 29–30, but as BNPP explained, Plaintiffs' evidence was insufficient to establish natural causation even if all of their experts' testimony were credited. Mot. at 27–32. Moreover, Mr. Zenghelis's testimony showed the holes in Plaintiffs' and Dr. Verhoeven's theory of causation by demonstrating that Sudan's oil reserves, and BNPP's services to sell those reserves, were not necessary to fund Sudan's military.

*See* Oct. 6 Tr. at 1196:20–1197:3.  No reasonable jury could have found Plaintiffs' evidence sufficient to prove natural causation.

### 2.    *Adequate Causation*

Plaintiffs seek to hide their lack of evidence proving causation by insisting that adequate causation requires showing only that BNPP's conduct was "generally capable of facilitating" the Government of Sudan's conduct that harmed Plaintiffs.  Opp. at 24 (citing Swisscom).  But in Swisscom, the Swiss Federal Supreme Court required more, holding that the defendant internet service provider was not liable for the actions of its users because it had not made a "legally relevant contribution" to their conduct.  Swisscom Case at reas. 2.1.  The court held that adequate causation was not established because the defendant's actions were "very far" removed in the chain of actions from the original wrongful act.  *Id.*  As the Court explained, "the service provided by the [defendant], according to the normal course of events and general life experience, is not suitable to promote the relevant infringement and is therefore not adequately causal for the unlawful main act."  *Id.*  Read in full, the Swisscom Case illustrates that adequate causation is not satisfied where the chain of causation between the alleged accomplice's conduct and the injury is attenuated and "not very close to the original wrongful act."  *Id.*; *see also* Jan. 6, 2023 Müller Rep. ¶ 137(ii) (explaining that adequate causation requires considering "all the circumstances of the case," as well as "the protective function of the norm and the types of circumstances that appropriately should give rise to liability").  That is the case here too.

Plaintiffs' suggestion that BNPP gave a "blank check" to Sudan that was used "to commit additional human rights abuses" grossly mischaracterizes the case and glosses over the numerous steps inherent in their theory of causation.  *See* Opp. at 28.  Plaintiffs' theory required the jury to find that: (1) BNPP processed financial transactions involving Sudanese entities; (2) those

transactions increased the Government of Sudan's overall revenues; (3) the Government of Sudan independently decided to use those increased revenues to increase military spending; (4) that increased military spending led to particular military actions; (5) those military actions—and not the independent, unauthorized decisions of individuals—were the reason for the actions that harmed the trial Plaintiffs; and (6) none of those actions would have occurred without BNPP's involvement. Connecting these steps to Plaintiffs' injuries requires "conjecture" that "depend[s] on the intervention of multiple parties," *Kashef III*, 2021 WL 603290, at *7, such that adequate causation cannot be satisfied. Plaintiffs brush aside similarities to the Somatoform Disorder Case, Opp. at 28, but as in that case, the chain of causation here is too long to establish liability.

Contrary to Plaintiffs' representation, BNPP never argued that its conduct had to be the "sole or direct cause" of Plaintiffs' injuries to satisfy causation, *id.* at 27, but rather that adequate causation is lacking where the defendant's actions were independent of actions and decisions by non-parties that directly caused plaintiffs' injuries, *see* Jan. 6, 2023 Müller Rep. ¶ 137. In the Somatoform Disorder Case, the plaintiff's disorder was directly caused by "additional burdens" after the accident in question, such that the disorder could "no longer be reasonably attributed to" the party liable for the accident. *See* ECF No. 435-118 (DSFC 142 [2016] III 433) at reas. 4.7, 4.8. Here, Plaintiffs needed to prove that none of the steps in the chain of causation above would have occurred without BNPP's involvement. They came nowhere close to meeting that burden. Given Plaintiffs' "generalizing attribution," it would be "excessive to extend" liability to BNPP. *Id.* at reas. 4.8. The Court should grant BNPP judgment as a matter of law on causation, or at least order a new trial, because the jury's verdict is against the weight of the evidence.

E.    **Plaintiffs Failed To Provide Sufficient Evidence To Satisfy The Applicable Burden Of Proof For Each Element Of Their Case.**

Plaintiffs do not contest that, with the exception of natural causation, the default standard of proof under Swiss law is "full conviction," meaning "strict proof." Insurance Contract Case at reas. 3.2; *see also* Swiss Ambassador's Letter at 3–4; Mot. at 36–37. Nor do Plaintiffs argue that their evidence in this case satisfied this standard, which requires a confidence level of at least 90%. *See* ECF No. 813-1 ("Aug. 21, 2025 Müller Rep.") ¶ 28. Because that is the appropriate standard here for every element of Plaintiffs' claim other than natural causation, Plaintiffs' failure of proof provides an independent reason to grant this motion.

Plaintiffs agree that the lower "preponderant likelihood" standard is only available when "strict proof is not possible or cannot reasonably be required" because "the facts alleged by the party bearing the burden of proof can *only be established* indirectly or by circumstantial evidence." Opp. at 6 (quoting ECF No. 813-8 (133 [2006] III 81, "Coffeemaker Case") at reas. 4.2.2) (emphasis added). Indeed, Plaintiffs expressly concede that the "need" for circumstantial evidence is a "precondition" to a lowering of the standard of proof. *Id.* But there was no *need* to rely on circumstantial evidence here. Plaintiffs' laundry list of reasons why their evidence fell short of the appropriate standard amount to no more than "[m]ere difficulties in proving facts" that "do not justify an easing of the burden of proof." Insurance Contract Case at para. 3.2.

Plaintiffs misstate the Coffeemaker Case as applying a lower standard of proof in "any civil claim" requiring "circumstantial evidence." Opp. at 5–6. But Plaintiffs ignore that the Coffeemaker Case concerned product liability and addressed only one specific element of that claim—namely the existence of a product defect. It did not examine Article 50 SCO. It is thus wrong to conclude that all elements of an accomplice claim—especially conscious assistance—are subject to the lower standard of proof of preponderant likelihood. Even if Swiss tort law

permits a lower standard of proof for causation and quantum of loss in some circumstances because of *Beweisnot* (evidentiary necessity), "Swiss law does not permit a court to assess the entire tort claim under a lower standard of proof." Aug. 21, 2025 Müller Rep. ¶ 31.

Plaintiffs' arguments supporting the jury instruction under the preponderant likelihood standard similarly fall flat. Plaintiffs question whether the preponderant likelihood standard requires a probability of 75%. But the Swiss Supreme Court has, more recently than the case relied on by Plaintiffs, noted that "a probability of 75% has been cited" by Swiss courts. *See* ECF No. 813-5 (Swiss Federal Supreme Court DSFC 4A_401/2023, "Delayed Stroke Case") at reas. 6.4. *Compare id.* (decided May 15, 2024), *with* ECF No. 819-1 (8C_331/2020 "Shoulder Injury Case") (decided March 4, 2021), cited by Plaintiffs at Opp. 7.

Separately, the Court's charge to the jury fell well below any articulation of the preponderant likelihood standard offered by Swiss courts. The Court instructed the jury that it needed to find that "it is more likely than not that the event occurred and that other explanations do not reasonably explain the event" and that this only "require[s] more than a bare probability." Oct. 16 Trial Tr. at 1624:24–1625:3. But, even when applying the lower standard of proof of preponderant likelihood, Swiss courts require evidence that is "compelling" and that renders other conclusions "[in]conceivable." *See* Coffeemaker Case at reas. 4.2.2; ECF No. 813-9 (Swiss Federal Supreme Court 4A_424/2020 (2021), "Employment Insurance Case") at reas. 4.1; *accord* Shoulder Injury Case at reas. 5.3. These standards cannot be squared with the jury instruction given by the Court.

II.     **The Court Should Grant A Remittitur Reducing The Award Of Damages To Comply With Swiss Law.**

    A.     **Swiss Law Requires That Plaintiffs' Excessive Moral Damages Award Be Consistent With Awards In Similar Swiss Cases.**

"*Erie* precludes a recovery in federal court significantly larger than the recovery that would have been tolerated in state court." *Gasperini v. Ctr. for Humanities.*, 518 U.S. 415, 431 (1996). There is no question that Plaintiffs' seven-figure verdicts here—composed mainly of noneconomic "moral" damages—far exceed what "would have been tolerated" in Swiss courts, and a remittitur is required to reduce the excessive awards. *See Stampf v. Long Island R. Co.*, 761 F.3d 192, 208 (2d Cir. 2014) (reversing denial of remittitur where verdict awarded $200,000 in emotional distress damages); *Rangolan v. Cnty. of Nassau*, 370 F.3d 239, 246 (2d Cir. 2004) (affirming remittitur of pain and suffering damages award of $1,250,000 because the award "deviated materially from what would be reasonable compensation" under New York law); *Ahmad v. New York Univ.*, 2025 WL 3022862, at *31 (S.D.N.Y. Oct. 29, 2025) (granting remittitur reducing verdict to "the maximum amount of emotional-distress damages that would not materially deviate from reasonable compensation" and collecting cases granting remittitur of emotional distress damages).

Under Swiss law, a reviewing court must determine whether an award of moral damages sets "an unfair compensation amount that is manifestly too low or too high." ECF No. 1042-1 (Swiss Federal Supreme Court 129 [2002] IV 22) at reas. 7.2; *see also* Nov. 14, 2025 Romy Decl. ¶¶ 31–40. Swiss appellate courts do so by comparing the award of moral damages by the trial court to the moral damages awarded by courts in similar cases. Swiss Federal Supreme Court 129 IV 22 at reas. 7.4; *see also* Nov. 14, 2025 Romy Decl. ¶¶ 38, 40 (discussing examples of the Federal Supreme Court reducing the compensation awarded by a lower court after comparing the award to the amount awarded in comparable cases). Swiss courts' substantive

review differs materially from the "common-law shock the conscience test" because, like New York law, it requires "[m]ore rigorous comparative evaluations" than common law; it is this Swiss standard that must be applied under *Gasperini*. *Gasperini*, 518 U.S. at 416.

Plaintiffs do not dispute that: (1) the vast majority of Plaintiffs' multi-million-dollar awards consists of moral damages, (2) their moral damages awards are many times higher than the highest moral damages award ever approved by a Swiss court, or (3) Swiss cases addressing similarly grievous injuries awarded a mere fraction of the amounts awarded here. *See* Opp. at 44–52; Nov. 14, 2025 Romy Decl. ¶¶ 36–40. These undisputed facts require substantial reductions in Plaintiffs' awards under binding federal caselaw. *Gasperini*, 518 U.S. at 431.

Plaintiffs argue, in conclusory fashion, that "the damages awarded by the jury were 'fair.'" Opp. at 45 (quoting Swiss Federal Supreme Court 129 [2002] IV 22, at reas. 7.2). But they cite no Swiss caselaw to support that assertion. And although Plaintiffs reject any reference to similar awards in Swiss courts, they identify no metric for how this Court *should* determine whether such an award is "fair" or "manifestly … too high." Swiss Federal Supreme Court 129 [2002] IV 22, at reas. 7.2. Plaintiffs' remaining arguments for avoiding the heightened review required by Swiss law are unavailing.[2]

That Swiss trial judges are not required to "match" the damages awarded in prior cases does not mean that judges are free to ignore precedent concerning similar awards. Opp. at 48. As former Swiss Supreme Court Deputy Judge Romy explained, Swiss law requires courts to

---

[2] Plaintiffs contend that BNPP "should be estopped from denying" a statement that Plaintiffs were "seriously and significantly harmed and injured in Sudan." Opp. at 44 (quoting Oct. 16 Trial Tr. at 1559:11–12). To be clear, BNPP does not diminish the gravity of harms that Plaintiffs have suffered at the hands of the Government of Sudan and its agents. But Plaintiffs' claims are governed by Swiss law, which requires that an award of moral damages be comparable to that awarded in cases with similar injuries. *See* Nov. 14, 2025 Romy Decl. ¶¶ 38–40.

conduct a fact-sensitive inquiry that considers not only "the nature and severity of the injury, the intensity and duration of its effect on the personality of the person concerned, and the degree of fault attributable to the perpetrator," but also "precedents set out by case law." Nov. 14, 2025 Romy Decl. ¶¶ 33, 35. The comparison to precedent serves to ensure consistency across similar cases, not to "disregard the evidence of the extent of suffering" in this case.[3] Opp. at 47. Indeed, "[e]ven in the most severe cases, the amount awarded by the court does not exceed CHF 250,000 and often falls well below this threshold, even in cases of torture and sexual abuse." Nov. 14, 2025 Romy Decl. ¶ 35 (citing Hardy Landolt, Genugtuungsrecht, Band 2, 2013, p. 374 seq.). For instance, Swiss courts awarded the following amounts:

- CHF 250,000 (US $277,500) to a girl who was shot five times by her father and paralyzed for life, ECF No. 1042-8 at 3, No. 556;

- CHF 160,000 (US $177,600) for an infant who "suffered indescribable agony – torture" where "main perpetrator convicted of multiple attempted murders, multiple grievous bodily harm, multiple sexual acts with children, and multiple indecent assaults," *id.* at 4, No. 209;

- CHF 75,000 (US $83,250) for "deprivation of liberty and hours-long gang rape by four perpetrators – knife held to victim's throat," *id.* at 6, No. 237;

- CHF 65,000 (US $72,150) for victim "who was held in her apartment by her husband for several hours, raped, and sexually coerced" and then "shot … four times," *id.* at 7, No. 798;

- CHF 50,000 (US $55,500) for victim of "hand-grenade attack" who suffered "almost complete spastic paralysis of the left leg – impairment of bladder, bowel, and sexual function – bilateral tinnitus with hearing loss – victim can walk short distances with two

---

[3] Plaintiffs similarly overread the Swiss court's directive that a judge should account for inflation before adopting compensation figures from analogous cases. *See* Opp. at 48 ("If the judge draws inspiration from certain precedents, he or she will ensure that they are suitable for current circumstances to take into account the depreciation of the currency …." (quoting 129 [2002] IV 22, at reas. 7.2)). Although judges may not be required to refer to *specific* precedents, they must ensure that the compensation is not disproportionate to that awarded in similar cases.

canes; for longer distances uses a wheelchair – eight-month hospital stay – multiple surgeries – 50% disability," *id.* at 8, No. 274;

- CHF 25,000 (US $27,750) where defendant "forced his 18-year-old girlfriend to perform sexual acts – forced into intercourse by punches to the face and abdomen – burned her breast and leg with an iron and stabbed her thigh with a knife – locked her twice in a bathroom for hours," *id.* at 13, No. 701;

- CHF 20,000 (US $22,200) where defendant "forced three women into prostitution – one woman was beaten and forced to perform sexual acts herself – another woman was beaten repeatedly," *id.* at 15, No. 388.

BNPP in no way seeks to minimize the injuries Plaintiffs suffered at the hands of the Government of Sudan and its agents, but Swiss courts have addressed situations involving similarly severe injuries—including those involving permanent physical and mental disability—and in each instance, the Swiss courts awarded damages totaling only a small fraction of the amounts awarded here. *See generally id.* Allowing Plaintiffs' multimillion-dollar awards to stand—amounts far exceeding what is required to compensate for harm under Swiss law—would be tantamount to allowing an award of punitive damages, which Swiss law forbids. *See* Jan. 6, 2023 Müller Rep. ¶ 164.

Similarly, Plaintiffs misconstrue BNPP's argument as insisting on a damages "cap" of $277,500. Opp. at 44. BNPP identified the upper bound of damages awarded by Swiss courts, which must inform this Court's review of the "fairness" of the disproportionate damages awarded here. The alternative is not, as Plaintiffs contend, a "mechanical, formulaic approach" to moral damages. *Id.* at 50. Rather, BNPP argued that "the court should reduce the award 'only to the maximum amount that would be upheld by the district court as not excessive.'" *Rangolan*, 370 F.3d at 244 (quoting *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1330 (2d Cir. 1990)). Such a result is required by *Gasperini*, and fully consistent with the Seventh Amendment. *Id.*

Plaintiffs' argument concerning the Seventh Amendment simply ignores *Gasperini* and cites pre-*Gasperini* cases that are irrelevant. Opp. at 51. Plaintiffs claim that "[t]he Seventh

Amendment gives Plaintiffs the right to have their damages be determined by a federal jury, not by Swiss judges in unrelated cases." *Id.* But *Gasperini* expressly held that the district court in that case erred because it did not "check[] the jury's verdict against the relevant New York decisions." *Gasperini*, 518 U.S. at 439. The Supreme Court held that "[n]othing in the Seventh Amendment ... precludes appellate review of the trial judge's denial of a motion to set aside [a jury verdict] as excessive" based on state-law precedents. *Id.* at 436 (quoting and adopting *Grunenthal v. Long Island R. Co.*, 393 U.S. 156, 164 (1968) (Stewart, J., dissenting)). Second Circuit case law is consistent. *See Rangolan* 370 F.3d at 244 (rejecting Seventh Amendment challenge to order granting remittitur).

Plaintiffs also argue that the Seventh Amendment includes a "right to have the jury's factual determinations be reexamined only according to the rules of common law—not according to the amounts of judicially determined damages under the *civil* law." Opp. at 50. In the pre-*Gasperini* First Circuit cases Plaintiffs cite, the defendants urged the district courts to reduce the federal juries' awards to the amount a Puerto Rican court would have awarded, because the amounts awarded were "much higher than any thus far sustained by the Supreme Judicial Court of Puerto Rico." *LaForest v. Autoridad de Las Fuentes Fluviales de Puerto Rico*, 536 F.2d 443, 446 (1st Cir. 1976); *see also Marshall v. Perez Arzuaga*, 828 F.2d 845, 849 (1st Cir. 1987). Those courts rejected the requests, as the defendants identified no substantive Puerto Rican law that would have required a reviewing court to ensure that awards were consistent with similar cases. And post-*Gasperini* cases have recognized that "Puerto Rico law 'suggests no … departure'" from the "federal standards for judging excessiveness," *i.e.*, whether a verdict "shock[s] the conscience." *Marcano Rivera v. Turabo Med. Ctr. P'ship*, 415 F.3d 162, 172–73 (1st Cir. 2005).

By contrast, Swiss law—like the New York law at issue in *Gasperini*—affirmatively requires a reviewing court to determine what would be "fair" compensation with reference to prior caselaw. Swiss Federal Supreme Court 129 IV 22 at reas. 7.2; *cf. Gasperini*, 518 U.S. at 439 ("To determine whether an award 'deviates materially from what would be reasonable compensation,' New York state courts look to awards approved in similar cases."). Plaintiffs do not, and cannot, dispute that Swiss courts' standard for reviewing damages awards differs materially from the federal "shocks the conscience" standard. It therefore must be applied under *Gasperini*.

A federal court's review of a jury's award for consistency with similar cases as mandated by Swiss law does not, as Plaintiffs contend, "supplant the jury with the Swiss procedure of judicially determined damages." Opp. at 45. Rather, "the federal district court is capable of performing the checking function" required under the applicable law without usurping the jury's role. *Gasperini*, 518 U.S. at 437. And contrary to Plaintiffs' arguments, this Court must apply Swiss law requiring consistency with past awards regardless of whether that standard is based in statute or common law. *See, e.g.*, *Ellerton v. Ellerton*, 745 F. Supp. 2d 458, 465 (D. Vt. 2010) (applying "the Supreme Court of Canada['s] … [common law] limit on non-pecuniary damages for pain and suffering in tort cases").

Finally, Plaintiffs' argument that BNPP waived its challenge to the amount of moral damages by not requesting an instruction is wrong. Opp. at 48. The review of a verdict for consistency with similar verdicts is a question of law reserved for the Court, not a question of fact for the jury. *See Stampf*, 761 F.3d at 204 (holding that when considering the excessiveness of damages, "there must be an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable men may differ, ***but a question of law***" (emphasis

added) (quoting *Payne v. Jones*, 711 F.3d 85, 97–98 (2d Cir. 2013))); *Gasperini*, 518 U.S. at 435

("***The role of the district court*** is to determine whether the jury's verdict is within the confines

set by state law." (emphasis added)); *United States v. Picardi*, 739 F.3d 1118, 1126–27 (8th Cir.

2014) ("A defendant is not entitled to a jury instruction regarding an issue reserved for the

court."). Swiss law is consistent: "The manner in which judges exercise their discretion to award

moral damages is a question of law that is reviewed freely by both the Court of Appeal and the

Federal Supreme Court." Nov. 14, 2025 Romy Decl. ¶ 37. Plaintiffs cite no caselaw requiring a

jury to review foreign damages awards in analogous cases to ensure its verdict conforms to those

comparators. Therefore, failure to inform the jury about how to calculate a damages award does

not waive a party's argument that an award is excessive as a matter of law. Indeed, because the

question of whether damages are excessive is "ripe for legal challenge after a verdict is entered,"

*Loc. Union No. 39, Sheet Metal Workers' Int'l Ass'n, AFL-CIO v. Pelella*, 350 F.3d 73, 89 (2d

Cir. 2003), a party does not waive such arguments by failing to raise them at a pre-verdict

charging conference.

  **B.**  **Plaintiffs' Damages Awards Should Be Reduced Or Eliminated Because They Failed To Present Required Expert Testimony On Damages.**

  Under Swiss law, a plaintiff must prove both the existence and the amount of economic

loss. Nov. 14, 2025 Romy Decl. ¶ 42 (citing Article 42(1)). Plaintiffs do not disagree with

BNPP's expert that they are required to "present detailed allegations and evidence, such as proof

of the actual market value of their houses or real properties in the area, proof of comparably

valued property (for instance, proof of sale price for similar homes), expert opinions on the value

of their real property and cattle, and proof of ownership." *Id.* ¶ 47. Nevertheless, Plaintiffs

ignore these requirements in arguing that they satisfied their burden of proving pecuniary

damages.

For example, they offer Mr. Turjuman's testimony reciting hearsay as evidence of the value of his former homes, notwithstanding the fact that he has not owned either property in decades and thus could not testify knowledgeably about their current conditions. *Cf. Sullivan v. Saint-Gobain Performance Plastics Corp.*, 2019 WL 12323305, at *2 (D. Vt. July 26, 2019) ("As residents, [homeowners] have first-hand knowledge of what they paid for the property *as well as the cost of any improvements.*" (emphasis added)). This lack of first-hand knowledge bars Plaintiffs' testimony as to valuation. *See id.*

Plaintiffs similarly offer no explanation as to how they could prove a causal nexus between Mr. Abdalla's injuries in Sudan and his later loss of vision without competent testimony from a medical expert. *See* Sept. 25 Trial Tr. at 935:12–14 (Abdalla) (testifying that he saw a doctor for his vision in 2015). Plaintiffs cite no U.S. case allowing a jury—unaided by expert testimony—to find a nexus between an injury and vision loss, as occurred at trial.[4]

At bottom, Plaintiffs cite no U.S. case allowing an award of pecuniary damages based on Plaintiffs' speculation and hearsay statements about the value of their home. And they cite no Swiss law allowing the award of pecuniary damages for lost property based solely on the testimony of the plaintiff and unsupported by any documentation or expert support. *See* Nov. 14, 2025 Romy Decl. ¶ 47. The Court should reduce the verdicts based on Plaintiffs' failure to adequately prove pecuniary damages.

---

[4] Contrary to Plaintiffs' contention, BNPP did not "abandon[]" the argument concerning the need for medical experts or the lack of evidence of moral damages raised in its Rule 50(b) motion. Opp. at 53 n.30. BNPP clearly stated that it "renews and expressly incorporates the argument from its Rule 50(a) motion that Plaintiffs failed to provide the jury with a sufficient, non-speculative evidentiary basis on which to award their requested pecuniary and non-pecuniary damages." Mot. at 39.

III.    **BNPP Is Entitled To Judgment As A Matter of Law For Plaintiffs' Claims Arising From Injuries That Occurred Before April 29, 2001 And A New Trial Excluding Claims For Such Injuries.**

Plaintiffs' claims for injuries that occurred before April 29, 2001 are untimely under

Sudanese law—"where the cause of action accrued"—and therefore fail under New York's

borrowing statute.  N.Y. C.P.L.R. § 202.  Plaintiffs' arguments to the contrary miss the mark.

A.    **BNPP Preserved Its Borrowing Statute Argument In Its Motion To Dismiss And Answer.**

Plaintiffs argue that BNPP waived its statute of limitations defense under the borrowing

statute "by not raising it in its motion to dismiss the complaint or amended complaint."  Opp. at

56 (quoting *S.E.C. v. Amerindo Inv. Advisors*, 639 F. App'x 752, 754 (2d Cir. 2016) (summary

order)).  That argument is wrong as a matter of law and fact.

As a factual matter, BNPP raised the borrowing statute in its motion to dismiss, which

itself was sufficient to preserve the defense.  *See* ECF No. 69 at 6 n.4 ("New York law applies

because New York's borrowing statute provides that where, as here, an action accrues outside

New York, the court must apply the shorter statute of limitations period of either New York or the

state where the cause of action accrued.  *See* N.Y. C.P.L.R. § 202.");  ECF No. 248.  In dismissing

Plaintiffs' claims as untimely, the Court did not address the Sudanese limitations period because

"[t]he parties agree[d] that New York's statutes of limitations will apply to the causes of action in

this case because" it was assumed to be "the shorter statute of limitations period[s]" when

compared to Sudan's limitations period.  *Kashef v. BNP Paribas SA*, 316 F. Supp. 3d 770, 779

(S.D.N.Y. 2018), *vacated and remanded*, 925 F.3d 53 (2d Cir. 2019) (*Kashef I*).

Of course, the Second Circuit disagreed with the Court's interpretation of New York's

limitations period and reversed, but it did not even cite the borrowing statute, nor did it address

Sudan's statute of limitations.  *Kashef I*, 925 F.3d at 62–63.  Thus, Plaintiffs' argument that the

"Second Circuit expressly held that 'Plaintiffs' claims are timely under N.Y. C.P.L.R. § 215(8)(a)'"

misses the point. Opp. at 56 (quoting *Kashef I*, 925 F.3d at 63 (alterations omitted)). Rather, "the

district court d[oes] not violate the mandate rule by addressing on remand an issue that was not

decided by [the Second Circuit] in the original appeal." *Sompo Japan Ins. Co. of Am. v. Norfolk

S. Ry. Co.*, 762 F.3d 165, 175 (2d Cir. 2014). Far from challenging the Second Circuit's ruling,

BNPP *accepts* that ruling for present purposes, and is entitled to argue that under what is now the

law of the case, New York's statute of limitations period is no longer the shorter limitations period,

and Plaintiffs' claims are time-barred under Sudanese law.

   In addition, BNPP alleged the borrowing statute as an affirmative defense in its answer,

and nothing more is required to preserve the defense. ECF No. 213 at 88 (pleading as an

affirmative defense, "the New York borrowing statute, N.Y. C.P.L.R. § 202"). "[A]ssertion of the

[statute of limitations] defense *in the defendant's answer, rather than in its prior motions for

dismissal and summary judgment, was sufficient and timely*." *Kulzer v. Pittsburgh-Corning

Corp.*, 942 F.2d 122, 125 (2d Cir. 1991) (emphasis added) ("[T]he statute of limitations defense

need not be raised in a pre-answer motion. Rather, under Fed.R.Civ.P. 8(c), the statute of

limitations constitutes an affirmative defense, to be asserted in a responsive pleading." (quoting

*Santos v. Dist. Council of New York City*, 619 F.2d 963 (1980))). Plaintiffs' reliance on the

summary order in *S.E.C. v. Amerindo Investment Advisors*, 639 F. App'x 752, 753 (2d Cir. 2016)

is misguided. There, in the sentence immediately following the one Plaintiffs quote, the Second

Circuit clarified the rule that "[a] claim that a statute of limitations bars a suit is an affirmative

defense, and, as such, it is waived if not raised in *the answer to the complaint*." *Id.* (emphasis

added) (quoting *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 751–52 (2d

Cir.1992)).  Plaintiffs cite no case holding that a limitations defense is waived where, as here, it

was asserted in an answer.

Plaintiffs also argue that BNPP waived its defense under the borrowing statute "by [its]

failure to raise it before the Second Circuit."  Opp. at 57.  But BNPP *won* on the statute of

limitations in this Court based on the mutual understanding that New York provided the shorter

limitations period.  Having prevailed in the district court on its interpretation of the New York

statute of limitations, BNPP had no reason to argue Sudanese law on appeal.  The Second Circuit

"has not held that an appellee is required, upon pain of subsequent waiver, to raise every possible

alternate ground upon which the lower court could have decided an issue."  *Brown v. City of New

York*, 862 F.3d 182, 188 (2d Cir. 2017).  In fact, *Brown* held that *Quintieri*—which is the only

case Plaintiffs cite—was irrelevant because its waiver holding applied only to "the limited scope

of [a] resentencing remand" and because the defendant "was the appellant, not the appellee."  *Id.*

Plaintiffs' waiver arguments all fail.

> **B.    Plaintiffs' Claims Are Untimely Under Sudanese Law.**

Plaintiffs attempt to argue timeliness under the borrowing statute by simply comparing

the nominal number of years allowed under each limitations period—without considering when

each period started running—and claiming "New York's one year statute … is shorter than the

15-year statute of Sudanese law."  Opp. at 58 (quoting *Kashef v. BNP Paribas S.A.*, 2024 WL

1676355, at *5 (S.D.N.Y. Apr. 18, 2024) (*Kashef IV*) (citations modified)).  But this simplistic

comparison misses the point because the borrowing statute does not apply the nominally

"shorter" limitation period—what matters is that the borrowing statute bars claims filed "after

the expiration of the time limited by the laws of either the state or the place without the state

where the cause of action accrued."  C.P.L.R. § 202.  Where, as here, New York's limitations

period did not begin running at the time of injury, the nominal length of the limitations period is
not dispositive.

Plaintiffs argue that Sudan's limitations period "is subject to tolling or suspension," and
make the baseless claim that "the Sudanese limitations period did not even *begin* to run until at
least 2019 when the Bashir government was ousted."  Opp. at 58.  But the text of Section 159 of
Sudan's Civil Transactions Act 1984 leaves no doubt that the outer bound for a civil claim is 15
years "from the date of injury":

> No claim for compensation arising from an injury shall be heard after the lapse of five years
> from the date on which the victim becomes aware of the injury and the person liable for
> the injury. In all cases, ***no claim may be heard after the lapse of fifteen years from the
> date of the injury***.

ECF No. 435-100 at 5 (emphasis added) (quoting Civil Transactions Act 1984 § 159).

Plaintiffs' expert concedes that BNPP's expert "is correct in stating that 'all claims for
injuries [in this case] occurring before April 29, 2001 would be time barred under Sudanese law
as there has been a 15-year lapse between those injuries and the filing of the Complaint on April
29, 2016.'"  ECF No. 461-69 at 1.  Unable to dispute the plain text of Sudan's statute of
limitations, Plaintiffs' expert cites instead to provisions from Shari'a law, Egyptian law, and
repealed Sudanese statutes recognizing various exceptions that could have tolled the statute of
limitations.  *See generally id.*  But as BNPP's expert explained, "[n]one of these bodies of law
hold weight under Sudanese law where, as here, there is a directly applicable statutory
provision."  ECF No. 435-101 at 2.  Rather, "Sudanese courts are *prohibited* from invoking
Shari'a law to rewrite the text of an unambiguous Sudanese statute like CTA Section 159."  *Id.*
(emphasis added).  And although "Egyptian law may provide guidance in interpreting Sudanese
law where the Egyptian and Sudanese civil codes have adopted identical or equivalent
provisions," "Sudanese courts would not apply Egyptian statutory provisions that contradict, or

are wholly absent from, the corresponding Sudanese statutes—indeed, the fact that the Sudanese Legislature adopted some, but not all, of the text of the Egyptian statute of limitations for civil claims indicates that the Sudanese Legislature did *not* intend to adopt the omitted provisions." *Id.* And Plaintiffs' reliance on repealed Sudanese statutes is no more legitimate than it would be under U.S. law: "a statute that is repealed, by definition, ceases to apply." *Id.*

C.    **Trial Disproved Core Assumptions from the Court's Summary Judgment Ruling.**

The Court held that "it would be arbitrary to apply Sudanese law when the courts of Sudan were not open to the Plaintiffs." *Kashef IV*, 2024 WL 1676355, at *5. But trial showed that each of the Plaintiffs could have sued in other courts well before the 15-year cutoff, and Mr. Turjuman was a practicing attorney. Mot. at 51. There would be nothing arbitrary about holding Plaintiffs to the limitations period of Sudan, as required by the borrowing statute.

Plaintiffs respond with the irrelevant claim that "BNPP fails to explain how Mr. Turjuman and Plaintiffs could have brought their claims before BNPP's covert criminal support of the Government of Sudan was revealed in 2014." Opp. at 60. But Sudan's 15-year limitations period runs from the date of "injury," not *knowledge* of the injury, which is subject to only a five-year limitations period under Sudanese law. ECF No. 435-100 at 5 (quoting Civil Transactions Act 1984 § 159). Nor would it contravene public policy as "arbitrary" to enforce the limitations period as written without any discovery rule—that is a key *feature* of statutes of repose, which are widely enforced. *See CTS Corp. v. Waldburger*, 573 U.S. 1, 8 (2014) ("The statute of repose limit is not related to the accrual of any cause of action; the injury need not have occurred, much less have been discovered." (citation modified)); *id.* at 9 ("Statutes of repose effect a legislative judgment that a defendant should be free from liability after the legislatively determined period of time.") (citation modified).

Moreover, Plaintiffs' argument about the difficulty of filing suit *in Sudan* during the limitations period is a red herring to the timeliness of the claims they decided to file *in New York*. *See GML, Inc. v. Cinque & Cinque, P.C.*, 9 N.Y.3d 949, 951 (2007) (declining to apply Tennessee tolling provision based on inability to sue defendant in Tennessee, since defendants "were amenable to suit in New York" and it was therefore "irrelevant whether defendants are also subject to suit in Tennessee").

\*       \*       \*

A new trial is required to cure the taint of allowing the jury to consider Plaintiffs' untimely claims in rendering its general verdict. *Greenbaum v. Handelsbanken*, 67 F. Supp. 2d 228, 259–60 (S.D.N.Y. 1999) ("When two theories of liability are submitted to a jury, one of which is invalid, and the jury returns a general verdict without specifying the discrete basis for its finding, the jury's entire verdict must be reversed.").

**CONCLUSION**

The Court should grant judgment as a matter of law in favor of BNPP.  In the alternative,

the Court should grant BNPP's request for a new trial or an order amending the judgment to

reduce the excessive damages awards.

Respectfully submitted,

Dated: December 22, 2025
      New York, New York


*/s/ Barry H. Berke*
Barry H. Berke
Dani R. James
Michael Martinez
Matt Benjamin
David P. Salant

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
T: (212) 351-4000
bberke@gibsondunn.com
djames@gibsondunn.com
mmartinez2@gibsondunn.com
mbenjamin@gibsondunn.com
dsalant@gibsondunn.com

*/s/ Carmine D. Boccuzzi, Jr.*
Carmine D. Boccuzzi, Jr.
Abena Mainoo

CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
T: (212) 225-2000
cboccuzzi@cgsh.com
amainoo@cgsh.com


*Counsel for Defendant BNP Paribas S.A.*